## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| **CEDRIC ALLEN RICKS,** | Case No. 4:20-CV-1299-O |
| Petitioner, | |
| | U.S. District Judge Reed C. O'Connor |
| *v.* | |
| **BOBBY LUMPKIN, Director,** | |
| Texas Department of | |
| Criminal Justice, | |
| Correctional Institutions Division, | |
| Respondent. | |

## PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2254

JASON D. HAWKINS
Federal Public Defender

Jeremy Schepers (TX 24084578)
Supervisor, Capital Habeas Unit

Naomi Fenwick (TX 24107764)
Assistant Federal Public Defender

Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746
214-767-2886 (fax)
jeremy_schepers@fd.org

## THIS IS A CAPITAL CASE

## PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2254

Petitioner Cedric Allen Ricks, through counsel, pursuant to all rights available under the Constitution, laws, or treaties of the United States, respectfully petitions this Court for a writ of habeas corpus declaring unconstitutional and invalid his conviction for capital murder as well as the resulting death sentence.

# TABLE OF CONTENTS

PETITION FOR WRIT OF HABEAS CORPUS  PURSUANT TO 28 U.S.C. § 2254................. i

TABLE OF CONTENTS................................................................................................. ii

TABLE OF AUTHORITIES ....................................................................................... vii

JURISDICTION AND VENUE ..................................................................................... 1

PARTIES ........................................................................................................................ 1

PROCEDURAL HISTORY............................................................................................ 1

STATEMENT OF FACTS ............................................................................................. 3

28 U.S.C. § 2254(D) SHOULD NOT APPLY TO CLAIMS ADJUDICATED ON THE MERITS IN STATE COURT............................................................................ 6

CLAIMS FOR RELIEF ................................................................................................. 8

Claim One    The State exercised peremptory strikes on the basis of race in violation of the Fourteenth Amendment. ................................................. 8

           A.    Mr. Ricks can establish that the State purposefully discriminated on the basis of race in exercising peremptory strikes. ............................................................................... 10

                1.    The State annotated its jury selection materials to reflect the race and ethnicity of veniremembers.................................. 10

                2.    The State struck A. Stafford on the basis of race. ..................... 13

                3.    The State struck W. Stafford on the basis of race. .................... 19

                4.    The State's unconstitutional use of peremptory strikes to exclude veniremembers on the basis of race requires a new trial................................................................................. 22

           B.    This claim is unexhausted................................................................ 22

Claim Two    Direct appeal counsel was ineffective for failing to challenge the State's unconstitutional use of its peremptory strikes, in violation of the Sixth Amendment right to counsel. .................................................... 23

    A.   Direct appeal counsel's failure to challenge the trial court's erroneous *Batson* ruling constitutes deficient performance. .............. 24

    B.   Direct appeal counsel's failure to raise error under *Batson* prejudiced Mr. Ricks. ....................................................................... 26

    C.   The relitigation bar under 28 U.S.C. § 2254(d) does not preclude this Court's review because the state court's decision was factually and legally unreasonable. .............................................. 27

Claim Three   Trial counsel were ineffective during jury selection in violation of the Sixth Amendment right to counsel. .............................................. 27

    A.   Trial counsel's failure to raise a *Batson* objection on the basis of gender constitutes deficient performance. ..................................... 27

    B.   Trial counsel's failure to raise a *Batson* objection on the basis of gender prejudiced Mr. Ricks. ........................................................ 28

    C.   This claim is unexhausted. ................................................................ 29

Claim Four   Mr. Ricks's shackling during his trial violated his Fifth, Sixth, and Fourteenth Amendment rights. ................................................................ 30

    A.   The jury saw Mr. Ricks in shackles during his trial. ........................ 31

    B.   Mr. Ricks's shackling violated his rights under the Fifth, Sixth, and Fourteenth Amendments. ............................................................ 32

    C.   This Court can review this claim on the merits. ............................... 36

Claim Five   Trial counsel's failure to object to Mr. Ricks's shackling and require that the trial court identify the justification for shackling Mr. Ricks violated his Sixth Amendment rights. ............................................ 37

    A.   The jury saw Mr. Ricks in shackles during his trial. ........................ 38

    B.   Trial counsel's failure to object to Mr. Ricks's shackling and request that the court justify Mr. Ricks's shackling violated Mr. Ricks's Sixth Amendment right to counsel. ..................................... 38

        1.   Trial counsel's failure to object to Mr. Ricks's shackling and failure to ask the trial court for findings about the shackling constitutes deficient performance. ............................ 38

        2.   There is a reasonable probability that the result of the penalty phase would have been different had the jury not seen Mr. Ricks in shackles. ....................................................... 39

       C.    The relitigation bar in 28 U.S.C. § 2254(d) does not preclude this Court's review because the state court's decision was factually and legally unreasonable. .................................................... 41

Claim Six      Mr. Ricks's Sixth Amendment right to counsel was violated by trial counsel's ineffectiveness at the penalty phase. ......................................... 41

       A.    A Sixth Amendment violation occurs when trial counsel's representation falls below prevailing professional norms and the defendant is prejudiced. ............................................................. 43

       B.    Trial counsel's representation was deficient. .................................... 43

            1.    Trial counsel failed to develop an individualized defense. ........ 44

            2.    Trial counsel conceded future dangerousness. .......................... 52

            3.    Trial counsel imposed unreasonable limitations on the mitigation investigation. ............................................................ 54

            4.    Trial counsel unreasonably failed to follow up on red flags of significant trauma, mental illness, neurodevelopmental disorders, and other mental health issues. .................................. 58

            5.    Trial counsel retained a neuropsychologist who has testified that "minority status" is a risk factor for future dangerousness. ........................................................................... 61

            6.    Trial counsel relied on a "catch-all" expert. ............................... 62

            7.    Trial counsel failed to investigate extraneous offenses. ............. 63

       C.    Mr. Ricks was prejudiced by trial counsel's deficient performance. ...................................................................................... 65

            1.    Trial counsel's concession of future dangerousness prejudiced Mr. Ricks. ................................................................ 66

            2.    Had trial counsel performed in accordance with prevailing professional norms, the jury would have seen an entirely different picture of Mr. Ricks and his life history. ..................... 66

            3.    Trial counsel's failure to investigate extraneous offenses prejudiced Mr. Ricks. ................................................................ 69

       D.    This claim is unexhausted. ............................................................. 71

Claim Seven    The State relied on false testimony to secure a death sentence against Mr. Ricks in violation of the Fourteenth Amendment. ................. 72

A.  The State introduced the false and misleading testimony of Deputy Marcus Moore in support of its case on future dangerousness. .................................................................. 72

   1.  The State elicited testimony from Deputy Marcus Moore suggesting that Mr. Ricks engaged in dangerous activity by having a pencil on his person while being transported to a pretrial proceeding. ........................................... 72

   2.  The State knew that Deputy's Moore's testimony was false. ................................................................... 73

   3.  Deputy Moore's testimony was material. .................................... 74

B.  The State introduced the false and misleading testimony that Mr. Ricks had forced his high school girlfriend into a car against her will. .................................................................. 75

   1.  The State elicited testimony that Mr. Ricks had forced his high school girlfriend, Tina Brown, into a car against her will. ........................................................................ 75

   2.  The State knew this testimony was false. ................................. 75

   3.  Mr. Cooper's false testimony was material. ............................... 76

C.  The State elicited false and misleading testimony to obscure the circumstances surrounding the brutal beating of Mr. Ricks at the Garvin County jail. .................................................. 76

   1.  The State elicited testimony that Mr. Ricks was beaten because he bragged about the offense. ....................................... 76

   2.  The State knew the picture painted by this testimony was false. ....................................................................... 77

   3.  This false testimony is material. ............................................... 79

D.  This false testimony is cumulatively material. ................................. 80

E.  This claim is unexhausted. ................................................................ 80

Claim Eight   The State violated *Brady v. Maryland* by failing to disclose information regarding the pencil incident to defense counsel. .................. 80

A.  The State's suppression of the evidence relating to the pencil violated *Brady*. .................................................................. 81

   1.  The information about the pencil found on Mr. Ricks was exculpatory. ............................................................... 81

2. The State suppressed the exculpatory information it had about the pencil. ........................................................................ 82

3. The suppressed exculpatory evidence was material. .................. 82

B. This claim is unexhausted. ................................................................. 83

Claim Nine   Mr. Ricks's death sentenced was imposed by an unconstitutionally arbitrary and discriminatory system in violation of the Eighth and Fourteenth Amendment. ........................................................................... 83

Claim Ten   Texas Code of Criminal Procedure Article 37.071 is unconstitutional because jurors do not understand the penalty phase instructions. ............................................................................................... 84

PRAYER FOR RELIEF ....................................................................................... 86

VERIFICATION BY ATTORNEY ....................................................................... 88

CERTIFICATE OF SERVICE .............................................................................. 89

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Amos v. Scott*,
   61 F.3d 333 (5th Cir. 1995) ...................................................37

*Andrus v. Texas*,
   140 S. Ct. 1875 (2020)......................................................54, 58, 65

*Atkins v. Virginia*,
   536 U.S. 304 (2002)......................................................84

*Barr v. City of Columbia*,
   378 U.S. 146 (1964)......................................................36

*Batson v. Kentucky*,
   476 U.S. 79 (1986)...................................................... *passim*

*Beazley v. Johnson*,
   242 F.3d 248 (5th Cir. 2001) ...................................................85

*Bowers v. Quarterman*,
   497 F.3d 459 (5th Cir. 2007) ...................................................63

*Brady v. Maryland*,
   373 U.S. 83, 87 (1963)......................................................80, 81

*Brecht v. Abrahamson*,
   507 U.S. 619 (1993)......................................................35

*Buck v. Davis*,
   137 S. Ct. 756 (2017)......................................................45, 46, 62

*Chapman v. California*,
   386 U.S. 18 (1967)......................................................34

*Coleman v. Thompson*,
   501 U.S. 722 (1991)......................................................36

*Deck v. Missouri*,
   544 U.S. 622 (2005)...................................................... *passim*

*Flowers v. Mississippi*,
   139 S. Ct. 2228 (2019)......................................................10, 29

*Ford v. Georgia,*
    498 U.S. 411 (1991)................................................................36, 37

*Foster v. Chatman,*
    578 U.S. 488 (2016)................................................................9, 10, 12

*Giglio v. United States,*
    405 U.S. 150 (1972)................................................................81

*Hathorn v. Lovorn,*
    457 U.S. 255 (1982)................................................................36, 37

*Hatten v. Quarterman,*
    570 F.3d 595 (5th Cir. 2009) ................................................35

*Holbrook v. Flynn,*
    475 U.S. 560 (1986)................................................................32, 34, 35

*Illinois v. Allen,*
    397 U.S. 337 (1970)................................................................32, 33

*J.E.B. v. Alabama,*
    511 U.S. 127 (1994)................................................................27

*James v. Kentucky,*
    466 U.S. 341 (1984)................................................................36

*Johnson v. California,*
    545 U.S. 162 (2005)................................................................24, 28, 29

*Johnson v. Williams,*
    568 U.S. 289 (2013)................................................................6

*Jurek v. Texas,*
    428 U.S. 262 (1976)................................................................84

*Kelly v. Lynaugh,*
    862 F.2d 1126 (5th Cir. 1988) ................................................84

*Kyles v. Whitley,*
    514 U.S. 419 (1995)................................................................80

*Lockett v. Ohio,*
    438 U.S. 586 (1978)................................................................44, 85

*Lockhart v. Johnson,*
    104 F.3d 54 (5th Cir. 1997) ................................................34

*Miller-El v. Dretke,*
 545 U.S. 231 (2005)................................................................................ *passim*

*Moore v. Vannoy,*
 968 F.3d 482 (5th Cir. 2020) ...................................................................24

*Murray v. Carrier,*
 477 U.S. 478 (1986).................................................................................23

*Napue v. Illinois,*
 360 U.S. 264 (1950)..................................................................72, 74, 76, 79

*Nelson v. Davis,*
 No. 16-cv-00904 (N.D. Tex. Dec. 22, 2016) ....................................44, 46

*Neville v. Dretke,*
 423 F.3d 474 (5th Cir. 2005) ...................................................................71

*Padilla v. Kentucky,*
 559 U.S. 356 (2010).................................................................................38

*Panetti v. Quarterman,*
 551 U.S. 930 (2007)...............................................................................6, 8

*Paredes v. Quarterman,*
 574 F.3d 281 (5th Cir. 2009) ...................................................................85

*Penry v. Lynaugh,*
 492 U.S. 302 (1989).................................................................................84

*Porter v. McCollum,*
 558 U.S. 30 (2009)...................................................................................55

*Powers v. Ohio,*
 499 U.S. 400 (1991).................................................................................29

*Pyles v. Johnson,*
 136 F.3d 986 (5th Cir. 1998) ...................................................................72

*Reed v. Quarterman,*
 555 F.3d 364 (5th Cir. 2009) ...................................................................10

*Rhines v. Weber,*
 544 U.S. 269 (2005)................................................................................ *passim*

*Smith v. Robbins,*
 528 U.S. 259 (2000).................................................................................23

ix

*Snyder v. Louisiana*,
    552 U.S. 472 (2008) .................................................................................10, 25

*Stokes v. Anderson*,
    123 F.3d 858 (5th Cir. 1997) .................................................................36

*Strickland v. Washington*,
    466 U.S. 668 (1984) ........................................................................ *passim*

*Strickler v. Greene*,
    527 U.S. 263 (1985) .............................................................................81, 83

*Sullivan v. Louisiana*,
    508 U.S. 275 (1993) .................................................................................28

*Teague v. Lane*,
    489 U.S. 288 (1989) .................................................................................85

*Trevino v. Thaler*,
    569 U.S. 413 (2013) .............................................................................30, 71

*Tumey v. Ohio*,
    273 U.S. 510 (1927) .................................................................................28

*United States v. Bagley*,
    473 U.S. 667 (1985) .......................................................................74, 81, 82

*United States v. Garza-De La Cruz*,
    __ F.4th __, 2021 WL 5232387 (5th Cir. 2021) .................................85

*United States v. Williamson*,
    183 F.3d 458 (5th Cir. 1999) .............................................................24, 39

*Vasquez v. Hillery*,
    474 U.S. 254 (1986) .................................................................................28

*Weaver v. Massachusetts*,
    137 S. Ct. 1899 (2017) .........................................................................28, 29

*Wiggins v. Smith*,
    539 U.S. 510 (2003) .......................................................................58, 63, 65

*Wilkins v. Stephens*,
    560 F. App'x 299 (5th Cir. 2014) .......................................................33, 34

*Williams v. Taylor*,
    529 U.S. 362 (2000) .................................................................................42

*Woodson v. North Carolina*,
    428 U.S. 280 (1976).................................................................................85

**State Cases**

*Ex parte Chavez*,
    560 S.W.3d 191 (Tex. Crim. App. 2018)...................................................36

*Estrada v. State*,
    313 S.W.3d 274 (Tex. Crim. App. 2010)..............................................40, 82

*Hassan v. State*,
    369 S.W.3d 872 (Tex. Crim. App. 2012)...................................................26

*Ex parte Kerr*,
    64 S.W.3d 414 (Tex. Crim. App. 2002)......................................................6

*Morris v. State*,
    554 S.W.3d 98 (Tex. Ct. App.—El Paso 2018, pet ref'd) ...........................39

*Nelson v. State*,
    No. AP-76,924, 2015 WL 1747144 (Tex. Crim. App. Apr. 15, 2015)........46, 52

*Ex parte Nelson*,
    137 S.W.3d 666 (Tex. Crim. App. 2004)..........................................36, 46, 62

*Ricks v. State*,
    No. AP-77,040, 2017 WL 4401589 (Tex. Crim. App. Oct. 4, 2017) ...............2

*Ex parte Ricks*,
    No. WR-85,278-01, 2020 WL 6777958 (Tex. Crim. App. Nov. 18, 2020) .........2, 8, 36

*Texas v. Cedric Allen Ricks*,
    No. 1361004R (Tex. 371st Dist. Ct.—Tarrant County) ................................1

*Wells v. State*,
    611 S.W.3d 396 (Tex. Crim. App. 2020).................................................51, 52

**Federal Statutes**

18 U.S.C. § 3599........................................................................................2

28 U.S.C. § 1331........................................................................................1

28 U.S.C. § 2241........................................................................................1

28 U.S.C. § 2254............................................................................1, 6, 27, 41, 86

**State Statutes**

Tex. Code Crim. Proc. art. 11.071 .....................................................................2, 6, 7, 8

Tex. Code Crim. Proc. art. 37.071 .......................................................................... *passim*

**Rules**

Tex. R. Evid. 705.............................................................................................................49

**Constitutional Provisions**

U.S. Const. Amend. V....................................................................................31, 32, 35, 38

U.S. Const. Amend. VI ............................................................................................ *passim*

U.S. Const. Amend. VIII...............................................................................52, 83, 84, 85

U.S. Const. Amend. XIV ......................................................................................... *passim*

**Other Authorities**

*Guidelines for the Appointment and Performance of Defense Counsel in Death
    Penalty Cases*, 31 Hofstra L. Rev. 913 (2003) .......................................................54

*Supplementary Guidelines for the Mitigation Function of Defense Teams in Death
    Penalty Cases*, 36 Hofstra L. Rev. 677, 689 (2008) ..........................................54, 55

## JURISDICTION AND VENUE

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 2241(a), and 2254(a). Venue is proper in the United States District Court for the Northern District of Texas under 28 U.S.C. § 2241(d) because it is the court for the district within which Mr. Ricks was convicted and sentenced.

## PARTIES

Petitioner Cedric Allen Ricks is an inmate of the Texas Department of Criminal Justice ("TDCJ"). Mr. Ricks's TDCJ number is 999593 and he is housed at the Polunksy Unit, Livingston, Texas.

Respondent Bobby Lumpkin is the Director of TDCJ's Correctional Institutions Division and an agent of the State that has custody of Mr. Ricks. He has custody pursuant to the judgment and sentence of death entered against Mr. Ricks on May 16, 2014, in *Texas v. Cedric Allen Ricks*, No. 1361004R (Tex. 371st Dist. Ct.—Tarrant County).

## PROCEDURAL HISTORY

Cedric Ricks was convicted of capital murder and sentenced to death by the 371st District Court of Tarrant County, Texas, on May 16, 2014. 2 CR 526. At trial, Mr. Ricks was represented by court-appointed attorneys William Ray and Stephen Gordon. On direct appeal, counsel for Mr. Ricks filed a brief raising twenty points of error under the United States Constitution, the Texas Constitution, the Texas Code of Criminal Procedure, and Oklahoma statutes. *See* Appellant's Brief, *Ricks v. State*, No. AP-77,040 (Tex. Crim. App. Aug. 3, 2015). The Texas Court of Criminal Appeals ("CCA") affirmed Mr. Ricks's conviction and sentence of death on October 4, 2017.[1]

---

[1] The CCA repeatedly faulted counsel for failing to include arguments or authorities in support of the claims raised. *See Ricks*, 2017 WL 4401589, at *8–9.

*Ricks v. State*, No. AP-77,040, 2017 WL 4401589 (Tex. Crim. App. Oct. 4, 2017).

Mr. Ricks filed an Application for Writ of Habeas Corpus in the convicting court on June 13, 2016, raising eleven claims. 1 SHCR 16.[2] The State filed a reply to Mr. Ricks's habeas application on December 12, 2016, in which it denied the allegations raised in the petition and attached several affidavits and supporting documents. 3 SHCR 1221. On June 25, 2018, the convicting court determined pursuant to Texas Code of Criminal Procedure Article 11.071, § 8(a) that there were no controverted, previously unresolved factual issues material to Mr. Ricks's confinement and ordered the parties to file proposed findings of fact and conclusions of law. 4 SHCR 1894. The convicting court adopted the State's Proposed Findings of Fact and Conclusions of Law in full and *verbatim* on July 9, 2019. 4 SHCR 1899; 2d Supp. SHCR 4. The CCA, "[b]ased upon the trial court's findings and conclusions and [its] own review," denied habeas relief on November 18, 2020. *Ex parte Ricks*, No. WR-85,278-01, 2020 WL 6777958, at *2 (Tex. Crim. App. Nov. 18, 2020).

This Court appointed the Federal Public Defender's Office for the Northern District of Texas ("FPD") pursuant to 18 U.S.C. § 3599 to represent Mr. Ricks in federal habeas proceedings on January 4, 2021. ECF No. 4. Pursuant to its appointment, the FPD sought to obtain all files and records in connection with trial counsel's representation of Mr. Ricks. *See* ECF No. 7 at 2–3. Trial counsel indicated to the FPD that they would not turn over some of the records and files absent a court order. *See* ECF No. 12. On April 20, 2021, Mr. Ricks filed a Motion for Order Directing Trial Counsel to Turn Over Files and Records to Federal Habeas Counsel. ECF No. 7. This Court ordered the Director to respond, ECF No. 8, and the Director filed a Brief in Opposition on May

---

[2] "SHCR" refers to the Clerk's Record in state habeas proceedings. "RR" refers to the Reporter's Record and "CR" to the Clerk's Record from Mr. Ricks's trial.

6, 2021. ECF No. 9. This Court denied Mr. Ricks's Motion on May 7, 2021. ECF No. 10. On May 24, 2021, Mr. Ricks filed a Motion for Reconsideration of Order Denying Motion To Produce Documents. ECF No. 11. The following day, this Court denied Mr. Ricks's Motion for Reconsideration, finding that this Court did not have subject matter jurisdiction. ECF No. 13. On August 10, 2021, Mr. Ricks filed a Motion for Order Directing Trial Counsel To Turn Over Files and Records to Federal Habeas Counsel in the 371st District Court, Tarrant County. *See* ECF No. 15-1. That Motion remains pending in the trial court.

On October 20, 2021, Mr. Ricks filed in this Court an Unopposed Motion to Amend Order Appointing Counsel and Setting Deadlines. ECF No. 15. On October 29, 2021, this Court granted Mr. Ricks's Motion and ordered Mr. Ricks to file an amended petition on or before March 17, 2022. ECF No. 16 at 2.

## STATEMENT OF FACTS

On the evening of May 1, 2013, Bedford police officers arrived at the Shoal Creek Apartments in Bedford, Texas, after receiving two 911 calls. 31 RR 87. The first was made by Mr. Ricks's cousin, who called after she and her father received a phone call from Mr. Ricks telling them that he had done something bad. *Id.* at 64. While they were on their way to the apartment, dispatchers received a second 911 call from M. Figueroa, who told dispatchers that he, his brother A. Figueroa, and his mother Roxann Sanchez had been injured by Ms. Sanchez's boyfriend, Cedric Ricks, at the apartment where they all resided. When the officers arrived at the apartment, they discovered that Ms. Sanchez and A. had died but that M. had survived. *Id.* at 97.

DNA and other forensic evidence could not establish what happened on that evening between Mr. Ricks and Ms. Sanchez. In the days and hours leading up to that evening, Mr. Ricks had reached out to his family and friends for help. He had lost his job and his car was repossessed,

and he had turned to his family as his relationship and mental health deteriorated. Those he turned to for help, however, shrugged him off. On the evening of May 1, a neighbor recalled overhearing an argument break out between Mr. Ricks and Ms. Sanchez shortly after 7 p.m. 31 RR 44. Mr. Ricks and Ms. Sanchez argued and came to blows with each other. 32 RR 26. An hour or so later, M. called from the apartment to report that Mr. Ricks had hurt him, A., and Ms. Sanchez. 32 RR 47.

Bedford law enforcement pinged Mr. Ricks's cellphone through cell tower data and relayed his location to the Oklahoma Highway Patrol. Oklahoma law enforcement arrested him in Garvin County, just north of the Texas border. 6 RR 76; 31 RR 135. At the time of the arrest, law enforcement had neither probable cause nor a warrant for Mr. Ricks's arrest. 6 RR 150, 173. Troopers took Mr. Ricks to the Garvin County jail and then to a local hospital to be treated for lacerations to his hands. 31 RR 159–60. The Garvin County under-sheriff then deliberately placed Mr. Ricks in a cell with other inmates, including inmates belonging to the United Aryan Brotherhood. 38 RR 18. There, Mr. Ricks was violently assaulted at least in part on account of his race. Ex. 27. In the meantime, Bedford law enforcement conducted a warrantless search of Mr. Ricks's and Ms. Sanchez's apartment, spending hours inside the apartment gathering evidence that would eventually be used against Mr. Ricks at trial. 6 RR 73–74.

The day after being violently beaten at the Garvin County jail, Mr. Ricks waived extradition proceedings and was returned to Texas. Mr. Ricks was charged with the capital murder of Ms. Sanchez and A. and incarcerated at the Tarrant County Jail. During his incarceration in the year leading up to trial, Mr. Ricks attempted to commit suicide at least once. *See* Ex. 19. At trial, Cedric testified that he was "sorry about everything." 40 RR 37.

Mr. Ricks's trial was tainted by fundamental unfairness from the outset. The State violated

4

Mr. Ricks's and prospective jurors' rights by discriminating in jury selection on the basis of race and gender. The State exercised its peremptory strikes to strike the only Black women who could have served on the jury and to disproportionately strike women. The State further relied on testimony it knew to be false and withheld exculpatory evidence to obtain a death sentence, in violation of Mr. Ricks's due process rights.

Furthermore, without justification, Mr. Ricks was placed in shackles and a shock belt throughout trial and despite a pretrial order prohibiting shackles. The jury then saw Mr. Ricks in shackles during the penalty phase, also in violation of Mr. Ricks's due process rights. The State compounded this constitutional violation by telling the jury that "you saw him walk back to counsel's table this morning with shackles on" in support of its future dangerousness case. 40 RR 128. Moreover, trial counsel did not object to the shackles despite the clear violation of Mr. Ricks's due process rights.

Leading up to and during trial, Mr. Ricks was also failed by those appointed to defend him. Trial counsel's entire case for a sentence less than death was that Mr. Ricks was "a train looking for a wreck." 40 RR 114. Rather than develop an individualized defense, trial counsel applied a cookie-cutter case that resulted in a death sentence for their previous client just months prior. Despite significant red flags of mental illness and trauma, trial counsel presented the testimony of only one "catch-all" expert, who explicitly told the jury that Mr. Ricks always was and always would be violent. 38 RR 148, 150. Trial counsel thus conceded the future dangerousness special issue. This deficiency was further compounded by their failure to present any mitigation. 40 RR 105. These deficiencies, as well as others, violated Mr. Ricks's Sixth Amendment right to effective assistance of counsel.

## 28 U.S.C. § 2254(D) SHOULD NOT APPLY TO CLAIMS ADJUDICATED ON THE MERITS IN STATE COURT

This Court should not apply 28 U.S.C. § 2254(d) to Mr. Ricks's claims decided on the merits by the state court because the state court proceedings did not comport with due process. The CCA has stated that Texas Code of Criminal Procedure Article 11.071, which governs capital state habeas proceedings, ensures "that a death row inmate *does* have one full and fair opportunity to present his constitutional or jurisdictional claims in accordance with the procedures of the statute." *Ex parte Kerr*, 64 S.W.3d 414, 419 (Tex. Crim. App. 2002) (emphasis in original). 28 U.S.C. § 2254, in turn, assumes that the CCA honors that responsibility and follows procedures that comport with due process, so that petitioners receive full and fair review of their claims before litigating in federal court. *See Panetti v. Quarterman*, 551 U.S. 930, 952 (2007) (holding that the "state court failed to provide petitioner with a constitutionally adequate opportunity to be heard"). When states fail to do so, state prisoners must seek their "one bite at the apple" in federal court, and the limitations that § 2254(d) places on the granting of federal habeas relief do not apply. *See Johnson v. Williams*, 568 U.S. 289, 301–02 (2013) (explaining that the application of § 2254(d) to claims presented to the state court is rebuttable presumption).

Mr. Ricks diligently sought a full and fair opportunity to litigate his claims for writ of habeas corpus in state court. He was nevertheless deprived of the process to which he was due. Mr. Ricks timely filed an Application for Writ of Habeas Corpus pursuant to Texas Code of Criminal Procedure Article 11.071 on June 13, 2016. 1 SHCR 16–500; 2 SHCR 503–1000; 3 SHCR 1003–1220. In that Application, Mr. Ricks raised several constitutional challenges to his conviction and death sentence. *Id.* On June 17, 2016, the State filed and was granted a Motion for Affidavits of Applicant's Trial and Appellate Counsel, requesting that Mr. Ricks's trial and appellate counsel be ordered to respond to Mr. Ricks's allegations of ineffective assistance of

counsel. 4 SHCR 1814–17. Trial counsel and direct appeal counsel were ordered to respond to issues identified by the State only. *Id.*

On December 12, 2016, the State filed its Reply to Application for Writ of Habeas Corpus. 3 SHCR 1221–1463. In its Reply, the State denied Mr. Ricks's allegations and controverted issues of fact raised by Mr. Ricks. The State relied, in part, on the affidavits trial and direct appeal counsel gave on issues identified by the State. *Id.* On December 13, 2016, the State filed a Motion for Court to Order Preparation of Proposed Findings of Fact and Conclusions of Law on the ground that there were "no controverted, previously unresolved factual issues material to the legality of Applicant's confinement[.]"[3] 4 SHCR 1885–87. On June 25, 2018, the trial court granted the State's motion and ordered that the parties submit proposed findings in accordance with Texas Code of Criminal Procedure Article 11.071, § 8. 4 SHCR 1894. The State filed its Proposed Findings of Fact and Conclusions of Law on July 24, 2018, 4 SHCR 1899–969, and Mr. Ricks filed his Proposed Findings of Fact and Conclusions of Law the same day. 4 SHCR 1970–99; 5 SHCR 2003–10. On July 9, 2019, the trial court adopted the State's Proposed Findings of Fact and Conclusions of Law in full and *verbatim* and recommended that habeas relief be denied. 2d Supp. SHCR 4.

In light of the trial court's Order adopting the State's Proposed Findings of Fact and Conclusions of Law, Mr. Ricks filed in the trial court Objections To, and Motion for Withdrawal of, the Convicting Court's Findings of Fact and Conclusions of Law and Recommendation of Denial of Relief. 2nd Supp. SHCR 5–14. Mr. Ricks argued that the trial court should withdraw its Order on the ground that the trial court's Findings of Fact and Conclusions of Law were based on

---

[3] The State filed a Second Motion for Court to Order Preparation of Proposed Findings of Fact and Conclusions of Law re-urging its arguments to the trial court on June 15, 2018. 4 SHCR 1889–93.

inadequate fact-finding procedures and were not supported by the record. *Id.* Mr. Ricks further argued that, by adopting the State's Proposed Findings of Fact and Conclusions of Law in full, the trial court abdicated its role as a neutral arbiter. *Id.* Mr. Ricks's Objections were unaddressed. On November 18, 2020, the CCA denied habeas relief. *Ex parte Ricks*, No. WR-85,278-01, 2020 WL 6777958 (Tex. Crim. App. Nov. 18, 2020).

There are several hallmarks of unfairness present in Mr. Ricks's state habeas proceedings. First, the State's Reply controverted previously unresolved factual issues material to Mr. Ricks's conviction and death sentence, and further failed to designate those facts and the manner of their resolution in accordance with Texas Code of Criminal Procedure Article 11.071, §§ 8, 9. Second, the trial court resolved those material issues by adopting the State's proposed findings in full. 2nd Supp. SHCR 5–14. Those proposed findings were based on affidavits by trial and direct appeal counsel in response to only the State's questions, and on further affidavits and evidence that Mr. Ricks never had an opportunity to test or challenge. *See* 4 SHCR 1899–969. Finally, by adopting the State's proposed findings, and thus adjudicating facts against Mr. Ricks, in full and *verbatim*, the trial court failed to act as neutral arbiter. *See* 2nd Supp. SHCR 6–7.

The procedures in Mr. Ricks's state habeas proceedings were clearly inadequate to ascertain the truth and reach reasonably correct results. *See Panetti*, 551 U.S. at 954. On that basis, § 2254(d) should not apply as a bar to the relitigation, *de novo*, of the claims that Mr. Ricks raised in state habeas that were decided on the merits.

## CLAIMS FOR RELIEF

**Claim One**      **The State exercised peremptory strikes on the basis of race in violation of the Fourteenth Amendment.**

During jury selection, the State struck the only two Black women who could have been

seated on the jury.[4] Trial counsel raised an objection citing *Batson v. Kentucky*, 476 U.S. 79 (1986), and, in support of its *prima facie* case, pointed to the State's pattern of strikes against Black and Hispanic veniremembers and the State's disparate questioning of a Black veniremember struck by the State. 30 RR 26–32. The trial court denied the *Batson* objection and denied trial counsel's request that the trial court review the State's notes from jury selection and make those notes and materials a part of the record. *Id.* at 36.

Critical new information, including the State's notes and materials from jury selection that it had previously refused to disclose, has recently come to light that significantly strengthens Mr. Ricks's *Batson* claim. This new information makes clear that the State exercised peremptory strikes on the basis of race in violation of the Fourteenth Amendment. *See Batson*, 476 U.S. at 86. Indeed, the State's notes and materials from jury selection reflect that the State was marking its materials to reflect the race of veniremembers. This "persistent focus on race in the prosecution's file," including the handwritten annotations "B" or "AA" by the names of Black veniremembers and the annotation "H" by the names of Hispanic veniremembers, supports finding that the State impermissibly struck veniremembers on the basis of race and in violation of the Equal Protection Clause of the Fourteenth Amendment. *See Foster v. Chatman*, 578 U.S. 488, 512 (2016).

Furthermore, while the trial court did not require the State to provide race-neutral reasons for striking certain veniremembers, the State articulated purportedly race-neutral reasons for striking the veniremembers at issue during state habeas proceedings on a related claim. Those

---

[4] The State also struck Flores, who was the only person within the strike zone who identified his race on the juror questionnaire as Hispanic. The trial court later found that veniremember Dawson was Hispanic. 30 RR 34. The State further asked that the record reflect that veniremember Hernandez was Hispanic. *Id.* at 30. Both identified their race as white on their juror questionnaires.

reasons, however, are pretextual.[5] Because the State impermissibly struck veniremembers on the

basis of race, Mr. Ricks is entitled to a new trial. *See Miller-El v. Dretke*, 545 U.S. 231, 266 (2005).

### A.   Mr. Ricks can establish that the State purposefully discriminated on the basis of race in exercising peremptory strikes.

Discrimination on the basis of race or ethnicity in jury selection violates the Equal

Protection Clause of the Fourteenth Amendment. *Batson*, 476 U.S. at 86. "The Constitution forbids

striking even a single prospective juror for a discriminatory purpose." *Flowers v. Mississippi*, 139

S. Ct. 2228, 2244 (2019) (citing *Foster*, 136 S. Ct. at 1747); *see Snyder v. Louisiana*, 552 U.S.

472, 478 (2008) (same). In adjudicating a *Batson* challenge, courts follow a three-step analysis:

> First, a defendant must present a prima facie case that the prosecution exercised its peremptory challenges on the basis of race. Second, if the defendant meets this initial burden, the burden shifts to the prosecutor to present a race-neutral explanation for striking the jurors in question. Finally, the court must determine whether the defendant has carried his burden of proving purposeful discrimination.

*Reed v. Quarterman*, 555 F.3d 364, 368 (5th Cir. 2009) (citing *Batson*, 476 U.S. at 96–98). Here,

the State provided purportedly race-neutral reasons in Mr. Ricks's state habeas proceedings.

### 1.   The State annotated its jury selection materials to reflect the race and ethnicity of veniremembers.

Immediately following the parties' simultaneous exercise of their peremptory strikes, trial

counsel raised a *Batson* objection. 30 RR 25–26. In support of their *prima facie* case of

discrimination on the basis of race, trial counsel pointed to the State's peremptory strikes against

the only two Black women within the strike zone (A. Stafford and W. Stafford), the State's

peremptory strike against a Hispanic man (Flores), and the fact that the questioning of A. Stafford

was the longest *voir dire* by the State of any veniremember. *Id.* at 26–32. On the heels of trial

counsel's objection, the State asked that the record reflect that the defense had struck a Hispanic

---

[5] At this stage, based on the currently available information, Mr. Ricks is only challenging the strikes of A. Stafford and W. Stafford, not Flores.

woman (Hernandez), a Black man (Bean), and a veniremember who "has an Anglo name, [but] appears to be Hispanic" (Dawson).[6] *Id.* at 30–31. The State did not dispute trial counsel's evidence of the State's disparate questioning of A. Stafford. *Id.* at 32.

The court denied trial counsel's *Batson* challenge "just based on the numbers [and] without the necessity of the State having to offer race-neutral reasons." 30 RR 35. Trial counsel then asked that the trial court review the State's notes from jury selection and place them in the record under seal. *Id.* at 36. The State objected to turning over their notes and assured the trial court that, "if required later on by an appellate court, [it] c[ould] provide many adequate race-neutral reasons for striking each of these three individuals." *Id.* The trial court denied trial counsel's request and the State was not required to turn over their notes and materials from jury selection. *Id.*

Those notes and materials were recently provided by the State to counsel for Mr. Ricks and show that the State annotated its jury selection materials to reflect the race and ethnicity of veniremembers. The State annotated the race and ethnicity of minority veniremembers on a list of qualified veniremembers, a strike-zone chart, and certain juror questionnaires. On a typed 17-page list of veniremembers titled "Random Panel List" and marked in pen as "2d list," the following annotations have been made in black and blue pen:

- "W/M" by the names of white male veniremembers;

- "W/F" by the names of white female veniremembers;

---

[6] Hernandez and Dawson identified their race as "white" on their juror questionnaires. The court added *sua sponte* that the record would further reflect that trial counsel had struck a veniremember "of half-Asian origin." 30 RR 31–32. In response to trial counsel's objection to the State's description of veniremember Dawson, the trial court called him in and asked that he "tell [the court] what the family origin background of [his] parents is." *Id.* at 33. Dawson explained that his mother was Caucasian and his father Hispanic, and that both he and his brother bore their mother's surname. *Id.* The court asked "[w]hat was [his] father's surname[,]" and when he replied that it was Gonzalez, the court ordered that "the record will reflect that Mr. Dawson has a heritage that includes half-Hispanic." *Id.* at 34.

- "B/F" by the names A. Stafford, Nixon, Williams, W. Stafford, Jeanne-Raglin, McLean, and Slay;

- "B/M" by the names Bean, Barnes, Jackson, Reynolds, Buris, Runnels, and Vance;

- "H/M" by the names Flores, Saucedo, and Hernandez; and

- "Other/M South Asian" by the name Parikh.

Ex. 1. On a typed chart made up of boxes with each box corresponding to the name of a qualified veniremember and in order of qualification, the following annotations have been made:

- The number 28, corresponding to W. Stafford, has been circled in purple pen and the annotation "AA" made in green pen;

- The number 13, corresponding to A. Stafford, has been circled in purple and the annotation "AA" made in green pen;

- A tick in purple ink next to the name Dawson and the annotation "H" made in green pen;

- The annotation "H" and then crossed out in green pen by the name Argurieo;

- The number 10, corresponding to Flores, circled in purple and the annotation "H" made in green pen;

- The annotation "AA" made in green pen by the name Barnes.

Ex. 2.

In addition, the State's copy of A. Stafford's questionnaire includes the annotation in blue pen "B/F." Ex. 3. And on the State's copy of Lopez's questionnaire, her age, gender, and race have been circled in blue ink. Ex. 4. This "persistent focus on race in the prosecution's file" further supports finding that the State impermissibly struck veniremembers on the basis of race and ethnicity in violation of the Equal Protection Clause of the Fourteenth Amendment. *Foster*, 578

12

U.S. at 512.

### 2.    The State struck A. Stafford on the basis of race.

Trial counsel raised a *Batson* objection on the basis of the State's peremptory strike against A. Stafford. 30 RR 25–26. Trial counsel also relied on the fact that the State's questioning of A. Stafford was the longest of any *voir dire* by the State. *Id.* at 32. The State's materials from jury selection further reflect that the State annotated the letters "B/F" and "AA" by A. Stafford's name on the State's list of veniremembers, a strike-zone chart, and A. Stafford's juror questionnaire. *See* Ex. 1, 2, 3.

In state habeas proceedings, the State articulated purportedly race-neutral reasons for exercising a peremptory strike against A. Stafford. *See* 3 SHCR 1461−63.[7] But a side-by-side comparison on these issues of A. Stafford with juror Attebery, a white woman who was accepted by the State and seated on the jury, belies the State's supposedly race-neutral reasons for striking A. Stafford. This side-by-side comparison establishes that the State impermissibly struck A. Stafford on the basis of race. *See Miller-El*, 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step.").

The State represented that it had exercised a peremptory strike against A. Stafford because "she indicated in her juror information sheet that she was not in favor of the death penalty." 3 SHCR 1462. The State further represented that it had struck her because her brother had served a 25-year sentence and the State "[d]id not want to accept veniremembers with relatives or friends

---

[7] The State provided these supposedly race-neutral reasons in its Reply to Mr. Ricks's claim that his direct appeal counsel was ineffective for failing to raise *Batson* error on appeal. That claim was resolved in state court without the State's racially coded jury selection notes that it recently provided to counsel for Mr. Ricks.

who are in trouble with the law or with family members who have been convicted of a crime." *Id.* Additionally, the State said that A. Stafford "expressed distrust in the criminal justice system in her questionnaire[;]" that "she did not feel that everyone is treated fairly in the criminal justice system[;]" and that she believed that "there is much room for improvement in the criminal justice system." *Id.*

First, A. Stafford's answers to questions about the death penalty were similar to answers offered by juror Attebery—indeed, A. Stafford's answers were more favorable to the death penalty. In her questionnaire, A. Stafford ticked that she was "not in favor" of the death penalty.[8] A. Stafford explained that she "fe[lt] that you must have a clear understanding of what constitutes the offense of capital murder and the offense must be proven." In response to the same question, juror Attebery also ticked that she was "not in favor" of the death penalty and explained that "it depends on the circumstances so thos [sic] to be considered." A. Stafford further answered in her questionnaire that she believed that "yes," the death penalty does serve a legitimate purpose because "[i]n some instances it removes the threat of repeated acts of violence." She also answered that she thought the death penalty should be available for "[m]alicious violent acts against children." By contrast, juror Attebery answered that "no," the death penalty does not serve any legitimate purpose in our society, making clear that she had a less favorable view of the death penalty than A. Stafford.

Second, A. Stafford's views on the criminal justice system in general were markedly similar to those of juror Attebery's. In response to questions regarding her view of the criminal justice system, A. Stafford answered that she "d[idn't] always feel that everyone is treated fairly

---

[8] This Court directed that, should Mr. Ricks raise a Batson claim, the Respondent should file juror questionnaires into the record before this Court. ECF No. 16 at 4.

in the criminal justice system" and that there was "much room for improvement." When asked if she thought the criminal justice system was "too lenient," "too severe," or "just about right," A. Stafford answered that the punishment of criminal offenders was "just about right." In response to the same questions, juror Attebery likewise answered that the system "can be too lenient on some people and hard on others" and that it was "successful in some areas." She indicated, however, that the punishment of criminal offenders was "too severe." Moreover, in her *voir dire*, juror Attebery unequivocally stated that she believed her uncle had been falsely convicted. 12 RR 198.

Third, both A. Stafford and juror Attebery had close family members who had been convicted of a crime. During *voir dire*, A. Stafford explained that her brother received a 25-year prison sentence. 15 RR 83. In her questionnaire, juror Attebery indicated that both her uncle and her son were convicted of criminal offenses: her uncle served a 20-year sentence and her son was convicted of family violence. As well as juror Attebery, juror Flint, a white man, indicated that he had a son who was or had been in prison or jail. These comparisons further belie the State's argument that it struck A. Stafford because it "[d]id not want to accept veniremembers with relatives or friends who are in trouble with the law or with family members who have been convicted of a crime." 3 SHCR 1462.

Moreover, A. Stafford and juror Attebery were disparately questioned about their impressions of the criminal justice system based on their loved ones' experiences. During *voir dire*, the State questioned A. Stafford extensively about the circumstances of her brother's conviction:

Q.   Do you feel like he was treated fairly in that case?

A.   He took a plea bargain. He was advised to take a plea bargain, and so. . .

Q.      Well, what's your -- what's your -- what's your perception of whether or not he was treated fairly?

A.      My perception is that he took the plea, which is what his attorney advised. I don't know, if he would have gone to trial, if he would have received that sentence, because due to the -- you know, the circumstances, he actually was the only person that did any time.

Q.      Okay.

A.      And I honestly -- you know, it's my brother. I don't know all the details of the -- you know, of the situation of the case,

Q.      Uh-huh.

A.      -- but. . .

Q.      And that's why I'm just asking you about your perception of how things went.

A.      Yeah.

Q.      I mean, obviously, here's what I'm getting at.

A.      Uh-huh.

Q.      Robert and I are prosecutors.

A.      Yes.

Q.      And, you know, I'm sensitive -- when people like you come into the courthouse and you have a relative that's been convicted, --

A.      Uh-huh.

Q.      -- I'm sensitive to the fact that you may feel like a prosecutor was overbearing or overzealous or just somehow your loved one was railroaded into taking a plea bargain that you don't think they deserved.

A.      I was going to say, honestly, he took the plea bargain based on his attorney's, you know, information or what his attorney advised him to do. And my parents are older or whatever else. And, you know, he was advised from his attorney that if you take this plea -- if you pretty much take the plea, go do a quarter of your sentence, pretty much, when you come up for parole, you're not in trouble, whatever else, then more than likely you will

16

come home, and with someone with no history of anything. So he just did what the attorney advised. So --

Q.      Well, so, I guess, let me ask it a different way.

A.      Okay.

Q.      Do you feel like that was a fair outcome to the case for him?

A.      For him? No.

Q.      Okay. And why not?

A.      Because I think that, you know -- whatever the circumstances were, I just feel as though that everyone that was involved or had anything to do with it should have also been punished.

Q.      Whose fault do you think it is that everyone involved was not punished? Why do you think that happened?

A.      I really honestly don't know. That's, you know, a question that, you know, I've had.

15 RR 83–85. By contrast, the State asked juror Attebery just two questions about her opinion on her uncle's conviction:

Q.      Do you feel like he was falsely convicted?

A.      From what I know of him, yes, I felt that way, but I didn't live in the house, and, you know, sometimes people are not what they seem.

Q.      So you kind of feel like you just don't have enough facts one way or the other to know for sure?

A.      Yeah. [. . .]

17

12 RR 198. Similarly, and in stark comparison to its questioning of A. Stafford, the State did not question juror Flint on his son's prison or jail time. Tellingly, the State did not dispute that its questioning of A. Stafford was the longest of any veniremember.[9] 30 RR 32.

Finally, the State's remaining reasons are likewise pretextual. The State treated A. Stafford, who did not have children, differently than white veniremembers who did not have children. Although the State claimed that it "d[id] not want to accept veniremembers who have no children because it is [its] belief that they are not as invested in our community," 3 SHCR 1462, the very first juror the State accepted on the jury, juror Twietmeyer, indicated in his questionnaire that he did not have any children. Likewise, the State did not exercise a peremptory strike against juror Lemay, a white woman with no children. And the State claimed that it struck A. Stafford because she "had prior jury service that resulted in a not guilty verdict." *Id.* A. Stafford did not indicate in her questionnaire what the outcome was but was questioned repeatedly by the State on the verdict in the case. 15 RR 71–72, 101–02. At least two jurors, both of whom were white, also indicated that they had previously served as jurors. Yet, by contrast with the questioning of A. Stafford, juror Flint was never asked about the verdict and juror Dorman was not asked about her prior jury service at all. 17 RR 12; 13 RR 70–143.

In sum, a side-by-side comparison of A. Stafford, a Black woman against whom the State exercised a peremptory strike, and juror Attebery, a white woman who was seated on the jury, betrays the pretextual nature of the State's reasons for striking A. Stafford. Mr. Ricks has therefore established purposeful discrimination on the part of the State when it struck A. Stafford.

---

[9] After the State finished its *voir dire* of A. Stafford, the trial court itself remarked that "[s]ince you've been sitting there for about an hour and 20 minutes, why don't we take a break for just a minute before the Defense asks you some questions?" 15 RR 139.

### 3. The State struck W. Stafford on the basis of race.

Mr. Ricks can also establish that W. Stafford was struck by the State on the basis of race. Trial counsel included W. Stafford in their *Batson* objection. 30 RR 25–26. The record also establishes that the State disparately questioned W. Stafford, including by identifying Mr. Ricks in court and asking her if she could answer the special issues such that Mr. Ricks specifically would be executed. 20 RR 270. The State's materials from jury selection further reflect that the State annotated the letters "B/F" and "AA" by W. Stafford's name on the State's list of veniremembers and a strike-zone chart. *See* Ex. 1, 2.

The State's proffered race-neutral explanations for striking W. Stafford are also pretextual. First, the State claimed in state habeas that it had struck W. Stafford because "[s]he stated that her idea of grace or the idea that somebody is just a human being could be enough to spare their life." 3 SHCR 1462. The State's *voir dire* of W. Stafford, however, makes clear that she was in favor of the death penalty and was unequivocal that she could impose it. Second, the State's claim that it had struck W. Stafford because "[h]er mother was at one time incarcerated in prison[]" and because "[s]he also spent six days in the Tarrant County jail after being booked on a theft-by-check case," *id.*, is belied by the State's acceptance of jurors who also had family members who were incarcerated.

In her juror questionnaire, W. Stafford indicated that she was "in favor" of the death penalty and explained that "[a] crime must have consequences." She also agreed that "yes," capital punishment serves a legitimate purpose, which she explained as "[t]o put away/punish/serve notice that all actions have consequences." When asked for the "best argument in favor of the death penalty," W. Stafford replied that "God has allowed the laws of the land by man [and] [w]e must respect that." W. Stafford further indicated that "no" the death penalty has never been applied in an unfair or discriminatory manner. She described the criminal justice system as "very successful"

19

in dealing with crime and "a great system," and the punishment of offenders as "just about right." Finally, W. Stafford indicated in her questionnaire that she could return a verdict resulting in the death penalty and, during *voir dire*, unequivocally stated that her training in the ministry would not prevent her from answering the special issues in a way that would result in the death penalty. 20 RR 268–69.

In response to the State's questions on *voir dire*, W. Stafford explained that she was an ordained minister at her church. 20 RR 218. She answered that she would have "no hesitation" in finding the defendant guilty, knowing that that the punishment would be life without parole or death. *Id.* at 243. When asked by the State to give examples of mitigating factors, W. Stafford replied she was "not really sure at this moment." *Id.* at 257. She agreed with the State's examples that the defendant's age or background could be mitigating. *Id.* W. Stafford answered that she could take into consideration all of the evidence to determine if there was a mitigating factor. *Id.* at 259–260. The State even remarked that W. Stafford had agreed several times that the answer to the special issues depended on the evidence:

> Q.    Okay. Okay. Now -- and you've said that a lot, depending on the evidence. Okay?
>
> A.    Yes. I think that's what it boils down to for me.
>
> Q.    That's key, isn't it?
>
> A.    That's key for me.
>
> Q.    Okay. It depends on the evidence in the case, right?
>
> A.    Correct.
>
> Q.    And a juror should let the evidence guide them, right?
>
> A.    Correct.

20

*Id.* at 264. W. Stafford stated that she could answer no to the mitigation special issue knowing that it would result in the death penalty and that her training in the ministry would not stand in the way of that. *Id.* at 266, 268–69.

The State also disparately questioned W. Stafford by identifying Mr. Ricks in the courtroom and asked repeatedly:

Q.      And see the guy at the end of the table down there?

A.      Uh-huh.

Q.      That's who we're asking to be executed, right?

A.      I understood.

Q.      You understand that?

A.      Yes, sir.

Q.      Can you do that?

A.      Yes, sir, I can, to the best of my ability.

Q.      Okay. If we prove our case, you can do that?

A.      Yes, sir, I can.

*Id.* at 270. It was only on *voir dire* by the defense that W. Stafford agreed with the defense's statement that "the idea of grace or that somebody is just a human being, that could be enough . . ." *Id.* at 280. Despite the State's questioning—including asking her if she could execute Mr. Ricks specifically—W. Stafford unequivocally stated that she could and would follow the law and evidence. In addition, the State's supposed concern with W. Stafford's involvement in church ministry is belied by the fact that the State did not object to seating juror Hedrick, a youth minister and online campus pastor, 24 RR 118–19, or juror Dorman, a white woman whose questionnaire

21

indicated that in addition to attending the Disciples of Christ Church, she also listed teacher, deacon, and elder as positions she has held at that church.

Finally, as to the State's argument that it struck W. Stafford because her mother had been incarcerated, as discussed *supra*, the State did not strike juror Attebery, a white woman whose uncle served 20 years in prison. By contrast with juror Attebery, W. Stafford unequivocally stated that she believed that her mother was treated fairly by the criminal justice system. 20 RR 272. The State itself even remarked that it did not think the experience of her mother would impact W. Stafford's ability to serve as a juror. *Id.*

Mr. Ricks has therefore established purposeful discrimination on the part of the State when it struck W. Stafford.

### 4. The State's unconstitutional use of peremptory strikes to exclude veniremembers on the basis of race requires a new trial.

Based on the State's peremptory strikes against Black veniremembers who could have sat on the jury, in combination with the State's annotations of Black and Hispanic veniremembers' race in its jury selection notes and the pretextual nature of the State's purportedly race-neutral reasons for striking Black veniremembers, Mr. Ricks has carried his burden of proving purposeful discrimination. Because the State exercised peremptory strikes on the basis of race in violation of the Fourteenth Amendment, a new trial is required. *See Miller-El*, 545 U.S. at 266.

### B. This claim is unexhausted.

This claim was not presented to the state courts on direct appeal or in state habeas proceedings. Mr. Ricks anticipates filing a motion to seek to stay and abey his federal habeas proceedings so that he may return to the state court and exhaust this and other unexhausted claims. *See Rhines v. Weber*, 544 U.S. 269, 278–79 (2005) (holding that district courts have discretion to stay habeas proceedings in federal court to allow the petitioner to present unexhausted claims in

state court). Because Mr. Ricks can excuse his failure to present this claim in a prior application, thereby allowing him to litigate this claim in a subsequent state habeas application, it would be premature to determine that this claim is procedurally defaulted. Even if this claim is eventually defaulted, Mr. Ricks can establish cause and prejudice to overcome that default because he is not at fault for the failure to previously present this claim. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986) ("[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."). External factors, including the State's suppression of its racially coded jury selection materials and the trial court's denial of access to the same, impeded Mr. Ricks's ability to previously bring this claim.

**Claim Two**   **Direct appeal counsel was ineffective for failing to challenge the State's unconstitutional use of its peremptory strikes, in violation of the Sixth Amendment right to counsel.**

Mr. Ricks incorporates by reference all facts alleged in support of Claim One. On direct appeal, counsel did not challenge the trial court's ruling that Mr. Ricks failed to make a *prima facie* case under *Batson*. In state habeas proceedings, Mr. Ricks alleged that direct appeal counsel was ineffective for failing to challenge the trial court's ruling. 1 SHCR 164. In her affidavit, direct appeal counsel argued that she was "compelled . . . to agree with the trial court's decision" because "when dealing with a small number of venire members from a particular racial minority . . . a prima facie case can rarely be made on the statistics alone." 3 SHCR 1453. Direct appeal counsel's argument is a misstatement of the record and finds no support in Supreme Court precedent.

To establish ineffective assistance of counsel in violation of the Sixth Amendment, Mr. Ricks must show that direct appeal counsel's performance was deficient and that Mr. Ricks was prejudiced as a result. *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (holding that the *Strickland* two-prong standard also governs claims of ineffective assistance of direct appeal counsel). "Solid,

meritorious arguments based on directly controlling precedent should be discovered and brought to the court's attention." *United States v. Williamson*, 183 F.3d 458, 464 (5th Cir. 1999). Because Mr. Ricks can show that direct appeal counsel failed to raise a meritorious point of error upon which he would have prevailed on direct appeal, he is entitled to a new trial.

A.   **Direct appeal counsel's failure to challenge the trial court's erroneous *Batson* ruling constitutes deficient performance.**

To establish deficient performance by direct appeal counsel, Mr. Ricks must overcome "the presumption that appellate counsel made a sound strategic decision not to raise the Batson issue." *Moore v. Vannoy*, 968 F.3d 482, 489 (5th Cir. 2020). Direct appeal counsel's affidavit, however belies any contention that her failure to raise the Batson error reflected sound strategic decision-making. Instead, it is apparent from the state court record that direct appeal counsel's failure to raise this meritorious issue was based on a misunderstanding of the facts of Mr. Ricks's case and the relevant law.

The defense's initial burden to establish a *prima facie* showing of discriminatory intent is low. The Supreme Court has made clear that "the first step [is not] so onerous that a defendant would have to persuade the judge on the basis of all the facts" that the State purposefully discriminated in exercising peremptory strikes. *Johnson v. California*, 545 U.S. 162, 170 (2005). Indeed, in *Batson* itself, the Supreme Court "remanded the case for further proceedings because the trial court failed to demand an explanation from the prosecutor—i.e.*,* to proceed to *Batson*'s second step—despite the fact that the petitioner's evidence supported *an inference* of discrimination." *Id.* (citing *Batson*, 476 U.S. at 100 (emphasis in original)). The initial *prima facie* burden is satisfied where a defendant raises an inference that "discrimination *may* have occurred." *Id.* at 173 (emphasis added).

In her affidavit, direct appeal counsel "recognized that the defense's burden to make [a

*prima facie*] showing was low." 3 SHCR 1453. Yet, that affidavit makes clear that her failure to challenge the trial court's *Batson* ruling was not the result of a sound strategic decision. First, direct appeal counsel's claim that "the argument for discriminatory intent was based exclusively on the numbers alone" is a misstatement of the record. 3 SHCR 1453.[10] In fact, the record shows that trial counsel marshalled several factors that have been expressly recognized by the Supreme Court as relevant to a *Batson* inquiry: trial counsel showed that Mr. Ricks is a Black man, that the State struck the only two Black women within the strike zone and thus struck two of the four Black veniremembers within the strike zone, that the State struck a Hispanic man, and that the State disparately questioned a Black woman against whom it exercised a peremptory strike. 30 RR 26–32; *see Miller-El*, 545 U.S. at 540, 549 (explaining the relevance of statistics and disparate questioning, among other issues). Thus, contrary to direct appeal counsel's assertions, trial counsel's argument was based on both qualitative and quantitative arguments about the State's exercise of peremptory strikes, not merely on the numbers alone.

Second, direct appeal counsel ignored Supreme Court precedent establishing that the trial court erred when it denied Mr. Ricks's *Batson* challenge based only on the number of Black and Hispanic veniremembers struck by the State. *See* 30 RR 35 (ruling that Mr. Ricks's *Batson* objection was denied *"*just based on the numbers*"*). The Supreme Court itself has stated that "the Court made it clear that in considering a *Batson* objection . . . *all of the circumstances that bear upon the issue of racial animosity must be consulted*." *Snyder*, 552 U.S. at 478 (emphasis added). At a minimum, the trial court was required under Supreme Court precedent also to consider the

---

[10] Direct appeal counsel belatedly conceded in her affidavit that trial counsel also relied on the State's disparately long questioning of veniremember A. Stafford to establish a *prima facie* case under *Batson*. 3 SHCR 1458. However, she provides no explanation as to why this was not included in her analysis.

disparate questioning of A. Stafford, an issue raised by trial counsel. *See* 30 RR 32. Yet, direct appeal counsel failed to raise the trial court's unconstitutional restriction of relevant factors when determining whether Mr. Ricks met his initial *prima facie* burden.

Finally, direct appeal counsel's reliance on Hassan is both unreasonable and unpersuasive. *See* 3 SHCR 1453 (citing *Hassan v. State*, 369 S.W.3d 872, 877 (Tex. Crim. App. 2012)). Direct appeal counsel cited *Hassan* as support for the trial court's ruling that Mr. Ricks failed to meet his *prima facie* burden. Critically, *Hassan* itself unequivocally states that "saying that statistics alone do not establish a *prima facie* case does not end the inquiry." *Id.* at 878. Yet, direct appeal counsel attempted to rely on Hassan for the entirely opposite proposition. *See* 3 SHCR 1453.

In sum, direct appeal counsel's reasoning for not raising a Batson error is based on a mistake of fact regarding the record and mistakes of law regarding relevant precedent. The failure to raise a meritorious Batson claim based on mistakes of fact and law was unreasonable and direct appeal counsel's performance was deficient.

### B. Direct appeal counsel's failure to raise error under *Batson* prejudiced Mr. Ricks.

To establish prejudice, Mr. Ricks must show that there is a reasonable probability that, but for direct appeal counsel's deficient performance, the outcome of that proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). In her affidavit, direct appeal counsel concedes that "[h]ad [she] raised the *Batson* issue, [she] would have requested that the trial court be ordered to conduct a *Batson* hearing." 3 SHCR 1454. There is a reasonable probability that Mr. Ricks would have prevailed on direct appeal on the *Batson* error. The record reflects that the State struck the only two Black women who could have served on the jury and that the State disparately questioned each of them. Moreover, as established at Claim One *supra*, the State's purported race-neutral reasons for striking the veniremembers at issue are pretextual and make

clear that the State engaged in purposeful discrimination. Mr. Ricks was therefore prejudiced by direct appeal counsel's failure to challenge the State's demonstrated discrimination on the basis of race in jury selection. This error entitles Mr. Ricks to a new trial.

### C. The relitigation bar under 28 U.S.C. § 2254(d) does not preclude this Court's review because the state court's decision was factually and legally unreasonable.

Mr. Ricks raised this claim as Claim Ten in state habeas proceedings. *See* 1 SHCR 164–77. Although this claim was adjudicated on the merits in state court, Mr. Ricks can overcome the relitigation bar because the state court decision was both legally unreasonable under 28 U.S.C. § 2254(d)(1) in light of clearly established Supreme Court precedent and factually unreasonable under § 2254(d)(2) in light of the record before the state court.

**Claim Three**       **Trial counsel were ineffective during jury selection in violation of the Sixth Amendment right to counsel.**

The State struck women from serving on the jury based on their gender, in violation of the Equal Protection Clause of the Fourteenth Amendment. *See J.E.B. v. Alabama*, 511 U.S. 127, 129 (1994) ("[G]ender, like race, is an unconstitutional proxy for juror competence and impartiality."); *see also id.* at 145 ("Because gender and race are overlapping categories, gender can be used as a pretext for racial discrimination."). Despite the State's exercise of two-thirds of its peremptory strikes against women, including against the only two Black women within the strike zone, trial counsel did not raise a *Batson* objection on the basis of gender. Trial counsel's failure to do so constituted ineffective assistance of counsel in violation of the Sixth Amendment and Mr. Ricks is entitled to a new trial.

### A. Trial counsel's failure to raise a *Batson* objection on the basis of gender constitutes deficient performance.

The State exercised nine of its thirteen peremptory strikes against women within the strike zone, including A. Stafford and W. Stafford. 30 RR 15 (Nelson); 30 RR 15 (Chance); 30 RR 16

27

(Fought); 30 RR 17 (A. Stafford, Rush, and Benedetti); 30 RR 19 (Argurieo); 30 RR 20–21 (W. Stafford); 30 RR 21 (Stevens). Although women represented 43.5% of the pool of qualified venirepersons, the State exercised over 69% of its strikes against women. By contrast, the State used just three of its exercised peremptory strikes to strike white men, despite that group representing the largest class within the pool of qualified venirepersons and within the strike zone. 30 RR 14 (Badgwell); 30 RR 20 (Huff); 30 RR 21 (Blagg). Moreover, as established at Claim Sections A(2) and (3) *supra*, the State disparately questioned A. Stafford.

The available evidence supports an inference that "discrimination *may* have occurred." *Johnson*, 545 U.S. at 173 (emphasis added). Trial counsel, however, failed to recognize this pattern of discrimination and did not raise a *Batson* challenge on the basis of gender. Had trial counsel objected under *Batson*, Mr. Ricks would have met his initial *prima facie* burden. This failure to object prevented Mr. Ricks from raising this issue on appeal. Trial counsel's performance was therefore deficient and objectively unreasonable under prevailing professional norms. *See Strickland*, 466 U.S. at 688.

**B.      Trial counsel's failure to raise a *Batson* objection on the basis of gender prejudiced Mr. Ricks.**

In *Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017), the Supreme Court addressed what prejudice standard should apply to an ineffective assistance of counsel claim when the conduct of trial counsel either created or failed to preserve a structural error. *Weaver* listed three examples of structural errors that fall into a category of fundamental unfairness, requiring presumed prejudice in the ineffective-assistance-of-counsel context: (1) a failure to give a reasonable-doubt instruction under *Sullivan v. Louisiana*, 508 U.S. 275 (1993); (2) a biased judge under *Tumey v. Ohio*, 273 U.S. 510 (1927); and (3) the exclusion of grand jurors on the basis of race under *Vasquez v. Hillery*, 474 U.S. 254 (1986). *Weaver* also listed *Batson* as an example of an error where it may

be appropriate to presume prejudice that could potentially fall into this category due to "fundamental unfairness." *Weaver*, 137 S. Ct. at 1911.

In this context, this Court should hold that prejudice for this Sixth Amendment violation is met if Mr. Ricks can prove that a *Batson* violation occurred at trial. Over the years, the Supreme Court has consistently stated that purposeful discrimination in the jury selection process calls into question the fairness of a trial. *Flowers*, 139 S. Ct. at 2242 ("*Batson* sought to protect the rights of defendants and jurors, and to enhance public confidence in the fairness of the criminal justice system."); *Powers v. Ohio*, 499 U.S. 400, 411 (1991) ("[R]acial discrimination in the selection of jurors . . . places the fairness of a criminal proceeding in doubt."); *Batson*, 476 U.S. at 87 ("Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice."). Moreover, there is no principled distinction between the unfairness caused by racial discrimination in grand jury selection—expressly listed as a zone in *Weaver* where prejudice should be presumed in the ineffectiveness context—and racial discrimination in petit jury selection.

The State's pattern of strikes against women and disparate questioning supports an inference of discrimination. *Johnson*, 545 U.S. at 173. In accordance with the *Batson* three-step inquiry, the State should therefore be required to provide gender-neutral reasons for striking the veniremembers at issue, after which Mr. Ricks will need to establish purposeful discrimination. *Batson*, 476 U.S. at 97–98. Because Mr. Ricks can ultimately show that the State violated the Equal Protection Clause by purposefully discriminating against women in jury selection, he is entitled to a new trial because of this Sixth Amendment violation.

### C.    This claim is unexhausted.

This claim was not presented to the state courts. Mr. Ricks anticipates filing a motion to seek to stay and abey his federal habeas proceedings so that he may return to the state court and

exhaust this and other unexhausted claims. *See Rhines v. Weber*, 544 U.S. 269, 278–79 (2005) (holding that district courts have discretion to stay habeas proceedings in federal court to allow the petitioner to present unexhausted claims in state court). Because Mr. Ricks can excuse his failure to present this claim in a prior application, thereby allowing him to litigate this claim in a subsequent state habeas application, it would be premature to determine that this claim is procedurally defaulted. Even if this claim is eventually defaulted, Mr. Ricks can establish cause and prejudice to overcome that default because state habeas counsel was ineffective for failing to present this substantial claim for relief. *See Trevino v. Thaler*, 569 U.S. 413 (2013).

**Claim Four**        **Mr. Ricks's shackling during his trial violated his Fifth, Sixth, and Fourteenth Amendment rights.**

Mr. Ricks was shackled and wore a shock belt during his trial. Trial counsel filed a pretrial motion to prevent Mr. Ricks from being shackled, which was granted. 5 RR 74. Nonetheless, Mr. Ricks was placed in shackles and a shock belt at some point before his trial and wore them throughout his trial. Defense counsel never objected to his shackling and never asked the trial court to make the required findings under the Due Process Clause to explain why it believed Mr. Ricks should be shackled.

The jury saw Mr. Ricks in shackles during the penalty phase. Although the jury was absent from the courtroom when Mr. Ricks first walked to the witness stand to testify, the jury was present when the judge directed Mr. Ricks to return to trial counsel's table after his testimony. 40 RR 85. The jury therefore witnessed Mr. Ricks walking back to the table in shackles.

During their closing argument, the State seized on this to support their case on future dangerousness, arguing "[y]ou saw him walk back to counsel table this morning with shackles on. Everywhere he goes in Tarrant County jail, he's shackled and handcuffed. He's not going to be like that in the penitentiary. It's a different setting. It's completely different." 40 RR 128. Mr.

Ricks's rights under the Fifth, Sixth, and Fourteenth Amendments were violated when the jury saw him in shackles without justification. *Deck v. Missouri*, 544 U.S. 622, 634–35 (2005). This violation entitles Mr. Ricks to a new penalty phase.

### A.   The jury saw Mr. Ricks in shackles during his trial.

On August 21, 2013, trial counsel filed a motion requesting that Mr. Ricks appear at all phases of the trial in civilian clothes and without physical restraints. 1 CR 171–72. The motion specifically noted that the stigma of a defendant appearing before a jury in inmate clothing and physically restrained would violate a defendant's right to a fair and impartial trial guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments. *Id.* The trial court addressed this motion in a pretrial hearing and stated that it was "granted as to trial." 5 RR 74.

The next reference to shackles came during a sealed *ex parte* hearing that occurred on March 17, 2014. 9 RR 1. In a colloquy with the court regarding Mr. Ricks's request to be transferred to a different pretrial detention facility, Mr. Ricks and the trial court discussed the fact that he was in shackles and a shock belt. *Id.* at 19.

Nevertheless, despite granting the pretrial motion prohibiting Mr. Ricks from being shackled during trial, when the trial commenced in May 2014, Mr. Ricks was in fact shackled. Nothing in the record indicates why Mr. Ricks was placed in shackles and a shock belt; the court never made any findings in a written order, at the pretrial hearing, or at trial. In addition, trial counsel did not object or renew its motion to preclude Mr. Ricks from appearing in shackles. Neither the court nor trial counsel addressed the shackling again at trial.

During the penalty phase, Mr. Ricks elected to testify and, after his testimony, the court told Mr. Ricks "you may step down, sir." 40 RR 85. Mr. Ricks accordingly walked back to counsel's table and in the presence of the jury. Defense counsel did not ask the court for the jury to be excused before Mr. Ricks walked back to defense table, nor did the court order the jury

excused.

The State relied on Mr. Ricks's shackling to argue that Mr. Ricks is a future danger. The State told the jury in its penalty phase closing: "You saw him walk back to counsel table this morning with shackles on. Everywhere he goes in the Tarrant County jail, he's shackled and handcuffed. He's not going to be like that in the penitentiary. It's a different setting. It's completely different." 40 RR 128. Trial counsel did not object to the State's closing, nor did it raise the issue again with the court. Ultimately, Mr. Ricks was shackled both during the guilt/innocence phase and penalty phase, the jury saw Mr. Ricks shackled, and the State relied on that fact to prove its penalty phase case for death.

> **B.    Mr. Ricks's shackling violated his rights under the Fifth, Sixth, and Fourteenth Amendments.**

"Visible shackling undermines the presumption of innocence and the related fairness of the factfinding process." *Deck*, 544 U.S. at 630. The shackling of a defendant is an "unmistakable indication[] of the need to separate a defendant from the community at large." *Holbrook v. Flynn*, 475 U.S. 560, 569 (1986). The Supreme Court has held that "no person should be tried while shackled and gagged except as a last resort" because "the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant" and "the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." *Illinois v. Allen*, 397 U.S. 337, 344 (1970). Shackling at the punishment phase of a capital murder trial also violates due process because "[a]lthough the jury is no longer deciding between guilt and innocence, it is deciding between life and death" and "[t]hat decision, given the severity and the finality of the sanction, is no less important than the decision about guilt." *Deck*, 544 U.S. at 632 (citations and quotations omitted). Shackling has a particularly harmful impact in Texas, because the jury must consider whether the defendant will present a future danger to

society. *See* Tex. Code Crim. Proc. art. 37.071, § 2(b)(1).

The Supreme Court has nevertheless recognized that "[t]here will be cases, of course, where these perils of shackling are unavoidable" but cautioned that "given their prejudicial effect, due process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case." *Deck*, 544 U.S. at 632 (citing *Allen*, 397 U.S. at 344). Circumstances that could overcome the presumption against shackling include "essential state interests such as physical security, escape prevention, or courtroom decorum." *Id.* at 628. The Supreme Court has indicated that courts should accordingly make findings explaining the reasons supporting the shackling decision. *Id.* at 634.

Here, the trial court did not articulate *any* reason, let alone an essential state interest, to have Mr. Ricks shackled throughout his trial. In fact, the trial court granted a pretrial motion to prevent Mr. Ricks from being shackled during trial. 5 RR 74. Yet, he was shackled during trial despite that ruling, and there is nothing in the record to indicate why that occurred.

Nor did the State introduce any evidence that there were circumstances in Mr. Ricks's case that warranted his shackling. The only indication in the record that Mr. Ricks spoke out of turn during the trial was during the penalty phase, when his father was testifying and Mr. Ricks said "[i]t's okay, Daddy." 38 RR 124. Moreover, the record lacks any indication that Mr. Ricks's conduct rose to the level in which courts have found that shackling was warranted. *Cf. Wilkins v. Stephens*, 560 F. App'x 299, 314 (5th Cir. 2014) ("The record in the instant case makes clear that Wilkins had attempted escape multiple times: he broke both ankles after falling thirty feet from the outer wall of a prison basketball court; at one point, he was discovered to have swallowed a handcuff key; one of the key events which led to his encounter with murder victims Freeman and

Silva was an escape from a Texas halfway house.");[11] *Lockhart v. Johnson*, 104 F.3d 54, 57 (5th Cir. 1997) ("Lockhart had previously attempted a daring escape from the courthouse by bolting and diving through a closed third story window. Also, the trial court heard testimony that Lockhart had threatened to cause trouble for the deputies who escorted him to and from the court. Additionally, Lockhart reacted to a ruling during a pretrial hearing by standing up and yelling obscenities and resisting the efforts of officers to control him and remove him from the courtroom."). Indeed, the only incidents the State presented during the penalty phase that occurred after Mr. Ricks was taken into custody were his having a pencil at one point in time, which he was prohibited from having because he was on suicide watch, 36 RR 58, and his having hoarded medicine for which he had a prescription, *id.* at 58, 80; 40 RR 104.

Importantly, the jury saw that Mr. Ricks was shackled as a result of him following the trial court's directions. Although the jury was not present when Mr. Ricks took the stand during the penalty phase, the record plainly shows that Mr. Ricks stepped down in the presence of the jury because the court directed him to do so. 40 RR 85 (telling Mr. Ricks "you may step down, sir"). Trial counsel failed to object at this point (or any other point), as discussed in Claim Five, *infra*.

Finally, shackling is inherently prejudicial. *Holbrook*, 475 U.S. at 568. "Thus, where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation." *Deck*, 544 U.S. at 635. Instead, the burden shifts to the State, which "must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.'" *Id.* (quoting *Chapman v. California,* 386 U.S. 18, 24 (1967)). The record establishes

---

[11] Although *Wilkins* also notes the defendant's "history and propensity for violence," here there is no indication that Mr. Ricks had directed any violence toward law enforcement officials or court personnel.

that the State is unable to carry this burden.

First, the State explicitly relied on the fact that Mr. Ricks was shackled to argue to the jury that death was the appropriate sentence. 40 RR 128. Second, when the jury saw Mr. Ricks shackled, they had already heard from Deputy Marcus Moore that restraints are not permissible absent "special circumstances." 36 RR 72. Thus, it is reasonable to infer that the jury assumed special circumstances existed in Mr. Ricks's case given the fact that he was shackled. Third, the jury had already been told, both in *voir dire* and through testimony, that the first question they had to answer was whether he would present a future danger to society. The sight of Mr. Ricks in shackles is, as the Supreme Court has recognized, an "unmistakable indication[] of the need to separate a defendant from the community at large." *Holbrook*, 475 U.S. at 569. Indeed, the State used Mr. Ricks's shackling to argue that Mr. Ricks would be a future danger—in other words, exploiting the prejudice that *Deck* sought to avoid. 40 RR 128. Fourth, the jury struggled with the future dangerousness issue, as evidenced by the first note they submitted during their deliberations, which stated "Special Issue number 1 – need additional explanation of 'would commit criminal acts of violence . . .'" 2 CR 519. In light of these facts, the State cannot prove that this error is harmless beyond a reasonable doubt.

Should this court determine that the harm inquiry is governed by *Brecht v. Abrahamson*, Mr. Ricks can meet his burden that his shackling "had substantial and injurious effect or influence in determining the jury's verdict" for the same reasons that the State cannot establish that the shackling error was not harmless beyond a reasonable doubt. 507 U.S. 619, 637–38 (1993); *see Hatten v. Quarterman*, 570 F.3d 595, 604 (5th Cir. 2009) (applying *Brecht* on collateral review to a shackling claim).

In sum, Mr. Ricks's rights under the Fifth, Sixth, and Fourteenth Amendments were

violated when the jury saw him in shackles during the penalty phase despite no findings in the record indicating an essential state interest. Therefore, Mr. Ricks is entitled to a new penalty phase.

### C.       This Court can review this claim on the merits.

Mr. Ricks raised this claim as Claim Two in state habeas proceedings. 1 SHCR 114–19. The CCA held that Mr. Ricks's shackling claim was procedurally defaulted. *Ricks*, 2020 WL 6777958, at *1. A claim is procedurally defaulted on federal habeas review when the state court denies the claim on an independent and adequate state law ground. *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991). Here, the state disposition does not trigger a procedural default in federal court because the state procedural ground was not adequate: i.e., the state law ground was not "'firmly established and regularly followed state practice'" at the time it was applied. *Ford v. Georgia*, 498 U.S. 411, 423–24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348–51 (1984)). The Supreme Court has made clear that "[s]tate courts may not avoid deciding federal issues by invoking procedural rules that they do not apply evenhandedly to all similar claims." *Hathorn v. Lovorn*, 457 U.S. 255, 263 (1982); *see Barr v. City of Columbia*, 378 U.S. 146, 149 (1964) ("We have often pointed out that state procedural requirements which are not strictly or regularly followed cannot deprive us of the right to review."); *accord Stokes v. Anderson*, 123 F.3d 858, 859 (5th Cir. 1997).

Here, the CCA declined to review the merits of Mr. Ricks's shackling claim "because [he] failed to raise [it] on direct appeal." *Ricks*, 2020 WL 6777958, at *1 (citing *Ex parte Nelson*, 137 S.W.3d 666, 667 (Tex. Crim. App. 2004)). In a separate case decided two years earlier, however, the CCA extensively analyzed a freestanding shackling claim that was raised in state habeas but that was not raised on direct appeal. *See Ex parte Chavez*, 560 S.W.3d 191, 200–03 (Tex. Crim. App. 2018). In that case, although the CCA noted that "[i]t is undisputed that no claim associated with shackling was raised on appeal, and the parties and the habeas court appear to agree that

36

defense counsel did not obtain an adverse ruling at trial," the CCA nevertheless addressed the merits of the defendant's freestanding shackling claim because "Applicant's complaint about the trial counsel's conduct also serves as part of his ineffective-assistance-of-counsel claims, and ineffective assistance claims are ordinarily cognizable on habeas." *Id.* at 200–01.

As discussed both above and *infra*, that is the precise posture that Mr. Ricks was in during his state habeas proceedings: he asserted a freestanding shackling claim that was not raised on direct appeal and an ineffective assistance of counsel claim based on trial counsel's failure to object to Mr. Ricks's shackling at trial. 1 SHCR 114–21. The CCA's refusal to decide the merits of Mr. Ricks's identical freestanding shackling claim stands in direct contravention to its actions in *Chavez. Cf. Amos v. Scott*, 61 F.3d 333, 340 (5th Cir. 1995) (declining to hold rule inadequate where defendant failed to identify "cases in which the rule has been applied—either evenhandedly or unevenhandedly—to claims *identical or similar* to his own [] claim") (italics in original). This Court may therefore consider the merits of Mr. Ricks's freestanding shackling claim. *See Ford*, 498 U.S. at 423–24; *Hathorn*, 457 U.S. at 263.

**Claim Five**     **Trial counsel's failure to object to Mr. Ricks's shackling and require that the trial court identify the justification for shackling Mr. Ricks violated his Sixth Amendment rights.**

As discussed in Claim Four, *supra*, Mr. Ricks appeared at trial in shackles and a shock belt despite the court's earlier ruling prohibiting such restraints. Although trial counsel filed, and was granted, a pretrial motion asking the court to prohibit the shackling of Mr. Ricks, trial counsel failed to object when Mr. Ricks later appeared at trial in shackles and a shock belt. Likewise, trial counsel never asked the trial court to make findings on the record of its reasons for shackling Mr. Ricks. These failures by trial counsel constitutes deficient performance that prejudiced Mr. Ricks. *See Strickland*, 466 U.S. at 687–88, 693–94; *Deck*, 544 U.S. at 624. This violation entitles Mr. Ricks to a new penalty phase.

**A.     The jury saw Mr. Ricks in shackles during his trial.**

Mr. Ricks incorporates by reference the fact discussion regarding shackling found in Claim

Four, *supra*.

**B.     Trial counsel's failure to object to Mr. Ricks's shackling and request that the court justify Mr. Ricks's shackling violated Mr. Ricks's Sixth Amendment right to counsel.**

To establish ineffective assistance of counsel, Mr. Ricks must show that trial counsel's

performance was deficient and that counsel's deficiency prejudiced the defense. *See Strickland*,

466 U.S. at 687. "The first prong—constitutional deficiency—is necessarily linked to the practice

and expectations of the legal community: 'The proper measure of attorney performance remains

simply reasonableness under prevailing professional norms.'" *Padilla v. Kentucky*, 559 U.S. 356,

366 (2010) (quoting *Strickland*, 466 U.S. at 688). To establish prejudice, Mr. Ricks must show

that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is

"a probability sufficient to undermine confidence in [the] outcome." *Id.* at 693–94.

**1.     Trial counsel's failure to object to Mr. Ricks's shackling and failure to ask the trial court for findings about the shackling constitutes deficient performance.**

It is indisputable that trial counsel knew that allowing the jury to see Mr. Ricks in shackles

would violate his due process rights. Indeed, it was trial counsel who filed a motion seeking to

preclude the use of shackles at Mr. Ricks's trial precisely because it would be "violative of the

Defendant's right to a fair and impartial trial as guaranteed to him by the Fifth, Sixth, and

Fourteenth Amendments to the United States Constitution." 1 CR 171. Despite the trial court

granting that motion pretrial, the record is clear that Mr. Ricks appeared at trial in shackles and a

shock belt and that the shackles were visible during the penalty phase. 9 RR 19; 40 RR 128. Trial

counsel admitted that he never objected to the use of shackles on Mr. Ricks. 3 SHCR 1377–78,

38

Affidavit of William H. "Bill" Ray.[12] Indeed, despite the court's direction to Mr. Ricks to step down from the witness stand, Mr. Ray claimed that he did not object because Mr. Ricks's actions, "which were of his own volition caught everyone by surprise . . . It was a complete surprise to me." *Id.* at 1377.

Trial counsel's failure to object to the visible shackling of Mr. Ricks and failure to request that the court make the findings *Deck* contemplates constitutes deficient performance. *Deck*, which requires courts to identify an essential state interest that requires the defendant to be shackled, came out nine years before Mr. Ricks's trial. Trial counsel were well aware of the inherently prejudicial nature of visible shackles, as evidenced by their pretrial motion. *See Williamson*, 183 F.3d at 462–63 ("Solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the court's attention."). Moreover, given that *Deck* directly governed this situation and that the adequate justification for shackling required under *Deck* was never made, trial counsel's failure to object was objectively unreasonable under prevailing professional norms.

### 2. There is a reasonable probability that the result of the penalty phase would have been different had the jury not seen Mr. Ricks in shackles.

There is a reasonable probability that the outcome of the penalty phase would have been different if trial counsel had objected to the use of shackles and a shock belt on Mr. Ricks and had requested a mistrial. *See Strickland*, 466 U.S. at 694. In particular, Mr. Ricks's appearance in shackles likely influenced the jury's consideration of the future dangerousness question: as *Deck* itself recognizes, "[t]he appearance of the offender during the penalty phase in shackles [] almost

---

[12] Nor did Mr. Ray object to the court's using 50,000 volts of electricity to shock his client in a different case three times at the guilt/innocence phase before he was removed from the courtroom. *Morris v. State*, 554 S.W.3d 98, 103–05 (Tex. Ct. App.—El Paso 2018, pet ref'd). In his closing argument, Mr. Ray drew attention to his client's behavior and absence from the courtroom, telling the jury "You may not like Terry Morris. I don't like him. Kind of rude. Smells bad, you know." *Id.* The Eighth Court of Appeals reversed Mr. Morris's conviction based on the trial court's repeated shocking of Mr. Morris.

inevitably implies to a jury, as a matter of common sense, that court authorities consider the offender a danger to the community." *Deck*, 544 U.S. at 633.

That is the precise question the jury must answer in a Texas capital murder penalty phase: "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. art. 37.071, § 2(b)(1). The State emphasized the shackling of Mr. Ricks in its closing argument on future dangerousness to argue for a sentence of death, as opposed to a sentence of life without the possibility of parole. Highlighting the future dangerousness special issue, it told the jury:

> The answer to Special Issue Number 1, undoubtedly, should be yes. This man is a continuing threat wherever he is to whoever he is around. And you know in the general population of the Tarrant – of the Texas criminal justice system that he'll be out in general population running around free, going to chow, getting his email, watching his TV, on a lot less restrictive setting than he's in in the Tarrant County Jail right now.
>
> **You saw him walk back to counsel table this morning with shackles on. Everywhere he goes in the Tarrant County Jail, he's shackled and handcuffed. He's not going to be like that in the penitentiary. It's a different setting. It's completely different.**

40 RR 128 (emphasis added). In other words, the State used Mr. Ricks's shackling to persuade the jury that he would be a future danger to the society he would be in if he were sentenced to life. *See, e.g.*, *Estrada v. State*, 313 S.W.3d 274, 282 (Tex. Crim. App. 2010) (holding that Special Issue No. 1 "asks a jury to decide whether a defendant would be dangerous whether in or out of prison" (quotations omitted)). It is also clear that the jury struggled with the future dangerousness issue, as evidenced by the first note that the jury sent out during penalty phase deliberations, which said "Special Issue number 1 – need additional explanation of 'would commit criminal acts of violence . . .'" 2 CR 519.

Moreover, the jury also heard testimony from Deputy Marcus Moore that he could not

simply decide to handcuff Mr. Ricks in the middle of trial "without some special circumstances." 36 RR 72.[13] The jury then saw Mr. Ricks shackled during his trial, suggesting that special circumstances did indeed exist to support his being shackled—despite the total absence of any identified special circumstances throughout the record.

Given the State's emphasis on Mr. Ricks's shackling and the jury's focus on future dangerousness, as well as the indication to the jury that special circumstances had to exist to justify Mr. Ricks's shackling, there is a reasonable probability that the outcome of the penalty phase would have been different had trial counsel objected to Mr. Ricks's shackling. Thus, Mr. Ricks is entitled to a new penalty phase.

### C. The relitigation bar in 28 U.S.C. § 2254(d) does not preclude this Court's review because the state court's decision was factually and legally unreasonable.

Mr. Ricks raised this issue as Claim Three in state habeas proceedings. 1 SHCR 120–21. Although this claim was adjudicated on the merits in state court, Mr. Ricks can overcome the relitigation bar because the state court decision was both legally unreasonable under § 2254(d)(1) in light of clearly established Supreme Court precedent and factually unreasonable under § 2254(d)(2) in light of the record before the state court with respect to both deficiency and prejudice.

**Claim Six**  **Mr. Ricks's Sixth Amendment right to counsel was violated by trial counsel's ineffectiveness at the penalty phase.**

Trial counsel's case at the penalty phase was that Mr. Ricks was "a train looking for a wreck." 40 RR 114. This defense was the same cookie-cutter defense trial counsel used in two other capital murder cases out of Tarrant County involving Black defendants. Although the State

---

[13] Trial counsel also failed to address Dr. Lewine's mentioning of Mr. Ricks wearing "anklets" when Dr. Lewine administered the quantitative electroencephalography test ("qEEG") in the courtroom. *See* 39 RR 134.

had the burden to prove that Mr. Ricks would be a future danger, trial counsel conceded that issue by presenting testimony from their only expert during the penalty phase that Mr. Ricks was biologically predisposed to violence and aggression. The State relied on that expert testimony in closing to argue to the jury that Mr. Ricks would be a future danger and that he was a psychopath.

Trial counsel also imposed unreasonable limitations on their mitigation investigation and failed to follow up on red flags of significant trauma, mental illness, neurodevelopmental disorders, and other mental health issues. Indeed, the sole "catch-all" expert that trial counsel presented during the penalty phase was *not* a mental health expert, but a research neuroscientist. Although trial counsel did retain a neuropsychologist, that neuropsychologist had just testified in trial counsel's prior capital murder case that the race of the defendant (Steven Nelson, a Black man) increased his risk of committing future violent acts. Finally, trial counsel failed to investigate extraneous offenses that the State relied on to prove Mr. Ricks's future dangerousness. In sum, trial counsel's performance during the penalty phase fell below prevailing professional norms and constitutes deficient performance. *See Strickland*, 466 U.S. at 687.

This constitutionally deficient performance prejudiced Mr. Ricks. *See Strickland*, 466 U.S. at 694. Had trial counsel performed according to prevailing professional norms, the jury would have seen a completely different picture of Mr. Ricks's life history. Trial counsel's deficient performance deprived the jury of the ability to know of and contextualize Mr. Ricks's extensive trauma, mental health, and neurodevelopmental disorders in a way that mitigated, rather than aggravated, his case. In addition, had trial counsel investigated these extraneous offenses the jury would not have been presented with inaccurate evidence regarding these offenses. Because Mr. Ricks can show that trial counsel were ineffective at the penalty phase and that he was prejudiced by their ineffectiveness, Mr. Ricks is entitled to a new penalty trial. *Williams v. Taylor*, 529 U.S.

362, 399 (2000).[14]

### A. A Sixth Amendment violation occurs when trial counsel's representation falls below prevailing professional norms and the defendant is prejudiced.

To establish ineffective assistance of counsel in violation of the Sixth Amendment, Mr. Ricks must show that trial counsel's performance was deficient and that he was prejudiced by trial counsel's deficient performance. *Strickland*, 466 U.S. at 687. Counsel's performance is to be assessed "under prevailing professional norms." *Id.* at 688. To establish prejudice, Mr. Ricks must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

### B. Trial counsel's representation was deficient.

The deficiency of trial counsel's performance during the penalty phase was multifold. Glaringly, trial counsel failed to develop an individualized defense for Mr. Rick's case. Instead, trial counsel relied on the same defense they have used in at least three capital murder trials in Tarrant County involving Black defendants: Steven Nelson, Cedric Ricks, and Amos Wells. Furthermore, trial counsel conceded the issue of future dangerousness by presenting an expert who testified that Mr. Ricks was predisposed to violence and aggression. These deficiencies were compounded by trial counsel's failure to develop evidence—including expert testimony—of trauma, mental health, and neurodevelopmental disorders. Finally, trial counsel failed to investigate extraneous offenses. As a result, the jury was left to rely on inaccurate information when answering the future dangerousness special issue and "zero" mitigation evidence. 40 RR 105.

---

[14] Mr. Ricks will use the amendment period granted by this Court, to provide additional supporting documentation for the factual assertion made in this, and other, claims. *See* ECF No. 16.

### 1.   Trial counsel failed to develop an individualized defense.

Mr. Ricks's right to the effective assistance of counsel was violated by trial counsel's use of a cookie-cutter defense that deprived the jury of the ability to make an individual sentencing determination. *See Strickland*, 466 U.S. at 687; *Lockett v. Ohio*, 438 U.S. 586 (1978). Before completing even a rudimentary investigation of Mr. Ricks's social history, trial counsel hired MINDSET, an organization that conducts and coordinates genetic testing and brain imaging. Trial counsel hired MINDSET for the explicit purpose of proving that Mr. Ricks was biologically predisposed to violence and aggression—which is the exact defense that trial counsel utilized in two other capital murder cases in Tarrant County that resulted in death sentences. Trial counsel's reliance on the cookie-cutter defense that Mr. Ricks was incurably violent, and doing so before conducting a reasonable mitigation investigation, constitutes deficient performance.

### a.   Trial counsel first used the incurably-violent defense at Steven Nelson's trial.

Mr. Ricks's trial counsel first tried this defense when they were appointed to represent Steven Nelson in his October 2012 capital trial. As in Mr. Ricks's case, trial counsel asked Dr. Antoinette McGarrahan to evaluate Mr. Nelson. *Nelson v. Davis*, No. 16-cv-00904 (N.D. Tex. Dec. 22, 2016), Amended Petition for a Writ of Habeas Corpus, at 5 (ECF No. 25). A few months before Mr. Nelson's trial, Dr. McGarrahan wrote to trial counsel that Mr. Nelson's brain "is NOT normal"; that "[i]f asked on cross" she would "agree that [Mr. Nelson] has several traits associated with psychopathy"; and that the State's experts "might fully agree" with everything she says. *Id.* at Ex. 51. Dr. McGarrahan also noted that "some abnormalities of the brain are chemical and some are at the cellular level, neither of which can be read with a neuropsychological battery nor with the naked eye. We are not there scientifically yet but we are pretty far along from where we have been." *Id.*

Despite knowing that Dr. McGarrahan might agree that Mr. Nelson is a psychopath, trial counsel proceeded to have Dr. McGarrahan testify at Mr. Nelson's trial. When asked on direct examination if she agreed that Mr. Nelson "doesn't have anything biologically . . . in the his – the way his brain is wired," Dr. McGarrahan said "I would actually disagree with that." *Texas v. Nelson*, 43 RR 247. She explained: "[W]hat we know about behavior is it's – it comes from the brain. The brain is what controls our behavior and our emotions. And I would argue that there is something significantly wrong with Mr. Nelson's brain being wired in a different way, being predisposed to this severe aggression and violence from a very early age." *Id.* When trial counsel asked Dr. McGarrahan why some people commit crimes, Dr. McGarrahan identified what she called "risk factors," one of which included Mr. Nelson's race:

> What we do know about Mr. Nelson is in addition to the ADHD, he has a number of risk factors. The mother who is working two jobs and absent father, verbal abuse, witnessing domestic violence, *the minority status*,[15] below SCS status, all of those things put an individual at greater risk. We can't pinpoint what it is that made Mr. Nelson go on and do what he did do. We just know that when you look at the risk factors that he had, I mean, it was a storm waiting to happen.

*Id.* at 253 (emphasis added). In a different case, the Supreme Court would later hold that "[n]o competent defense attorney would introduce such evidence about his own client"—i.e., evidence that the client's race increases his risk for future dangerousness. *Buck v. Davis*, 137 S. Ct. 756, 775 (2017).

On cross-examination, Dr. McGarrahan largely agreed with the State that Mr. Nelson was a psychopath. When asked that question directly, she said that "[h]e has many, many psychopathic characteristics, yes." *Id.* at 274–75. She added that although she did not score the Hare Psychopathy Checklist, she "imagine[d] that he meets most of that criteria, yes." *Id.* at 275. She

---

[15] Mr. Nelson is Black. *See* https://www.tdcj.gov/death_row/dr_info/nelsonsteven.html.

further agreed with the State that, although Mr. Nelson lacked the criteria of many short-term marital relationships (which is one of the so-called criteria for psychopathy), he might have met that criteria had he not been incarcerated as much as he had been. *Id.*

During closing arguments, trial counsel emphasized Dr. McGarrahan's point about Mr. Nelson's propensity for violence, which the State also seized on. In asking the jury to spare Mr. Nelson's life, trial counsel argued: "Not because he deserves it, not because there's some justice that you are able to give, but because from the time that man was young, from the time that man started on this path at 3, he was going to end up in a situation like this." *Nelson*, 44 RR 16. Likewise, trial counsel made references to Mr. Nelson's poor decisions, "the ones that Dr. McGarrahan told you about that put him on the track for permanent derailment, those were the ones that were beyond his control." *Id.* at 23. Trial counsel ended by telling the jury that Mr. Nelson "was a train wreck waiting to happen." *Id.* at 24. The State emphasized Mr. Nelson's propensity for violence and highlighted that "[e]ven the Defendant's own expert told you all yesterday that he will continue to be a danger." *Id.* at 16.

In sum, trial counsel's "defense" of Steven Nelson was that he was born bad and had a propensity for violence—evidence that weighed so much in the State's favor in their future dangerousness case that they did not even bother to put their expert on. Mr. Nelson was ultimately sentenced to death. *Nelson v. State*, No. AP-76,924, 2015 WL 1747144, at *1 (Tex. Crim. App. Apr. 15, 2015).

### b. Trial counsel doubled down on their incurably-violent defense in Mr. Ricks's case.

Trial counsel was not deterred by the death sentence imposed in Mr. Nelson's case. Rather, trial counsel once again presented the "defense" that their client was predisposed to violence and aggression. Moreover, trial counsel pressured Mr. Ricks into participating in this unreasonable

defense.

Trial counsel had heard Dr. McGarrahan testify at Mr. Nelson's trial that Mr. Nelson's race was a risk factor for his propensity for violence. Although Mr. Ricks is also Black, trial counsel again retained Dr. McGarrahan to evaluate Mr. Ricks in anticipation of his capital murder trial. Trial counsel moved to appoint Dr. McGarrahan on November 5, 2013. Ex. 5. Two days later, trial counsel sent an introductory letter to Dr. McGarrahan. Ex. 6. This letter stated in relevant part: "As we discussed, I will need a neuropsychological evaluation in this case. Additionally, I would like to see if there is some 'hard science' scanning that we might do." *Id.*

Seeking "hard science," trial counsel then reached out to Dr. Kent Kiehl at MINDSET on December 27, 2013. MINDSET is an organization that conducts and coordinates genetic testing and brain imaging. Trial counsel told Dr. Kiehl that they "are looking at some type of hard science or imaging evidence that we might be able to show the jury concerning our client's brain," noting in particular that "[o]ur client has a history of behavior that is anger related . . . and we are interested in something other than the testimony concerning testing and the corresponding results which are typically used in these type [sic] cases." Ex. 7. Dr. Jeffrey Lewine, a neuroscience researcher at MINDSET who was the only expert to testify at Mr. Ricks's trial, testified that trial counsel had asked MINDSET "to determine if there was anything in the neurobiology [of Mr. Ricks] that was consistent with the idea that there might be a biological predisposition towards aggression and violence." 39 RR 100–01.[16] As the foregoing makes clear, trial counsel in Mr. Ricks's case planned from the outset to present the same defense that they did in Mr. Nelson's case: that Mr. Ricks's brain was abnormal such that he was predisposed to violence and aggression.

---

[16] Before testifying at Mr. Ricks's capital punishment trial, Dr. Lewine had never testified as an expert in a criminal case. 39 RR 98.

After Mr. Ricks agreed to submit to a standard neuropsychological battery administered by Dr. McGarrahan in January 2014, trial counsel told the court at a sealed *ex parte* hearing on March 17, 2014, that Mr. Ricks was refusing to submit to Dr. McGarrahan's administration of the Hare Psychopathy Checklist.[17] 9 RR 6. At the hearing, trial counsel asked the court to order Mr. Ricks to submit to this testing and to have his brain imaged. *Id.* at 7. Trial counsel also threatened to try and force Mr. Ricks into submitting to testing and imaging if he continued to refuse. *Id.* At that hearing, Mr. Ricks ultimately agreed to cooperate with additional testing. *Id.* at 15. Trial counsel nonetheless made Mr. Ricks sign a Memorandum of Understanding ("MOU") "concerning the decision and communications between" Mr. Ricks and trial. Ex. 8. The MOU stated in relevant part:

> The Defendant understands that Attorneys will be required and will petition the court to order and force, if necessary, to submit to psychological testing, and further order and force, if necessary, to submit to brain imaging. If that occurs, the court's action may become a matter of public record, and the State will be privy to the Defendant's actions. In this regard, the State may have the sheriff video or otherwise report on the Defendant's lack of cooperation, and in that case, those facts will tend to bear negatively on the special issues submitted to the jury in this case. There is also a possibility that due to the Defendant's actions, testing may not be complete, which would result in no opinions or conclusions that could potentially save Defendant from a death sentence.

*Id.* In other words, trial counsel pressured Mr. Ricks into participating in testing that ultimately supported the State's case on future dangerousness. And in doing so, trial counsel explicitly recognized that forcing Mr. Ricks to submit to this testing could further support the State's future dangerousness case.

Having secured Mr. Ricks's agreement through the MOU, trial counsel arranged for

---

[17] The State later referenced Dr. McGarrahan's administration of the Hare Psychopathy Checklist in cross-examining Dr. Lewine and Dr. Lewine conceded that Mr. Ricks could fall into psychopathy range. *See* 39 RR 159–65.

MINDSET to send a portable MRI scanner to the Tarrant County Jail to perform an MRI on Mr. Ricks. At that time, trial counsel were also appointed to represent Amos Wells on a separate set of capital murder charges. *See* Section A(1)(c), *infra*. Although trial counsel had only just been appointed to represent Mr. Wells, they had already decided to use their incurably violent defense in Mr. Wells's case as well. Indeed, correspondence between trial counsel and MINDSET indicate that they were planning to use the portable MRI scanner to scan not only Mr. Ricks's brain, but also that of Amos Wells. *See supra*; Ex. 9; 10; 11; 12. Trial counsel accordingly sought funding from the trial court to conduct an MRI on both Mr. Ricks and Mr. Wells. Ex. 13. Mr. Ricks's and Mr. Wells's MRIs took place on April 24, 2014. 39 RR 170. Thus, while trial counsel was obtaining evidence related to Mr. Ricks's brain to use at his trial, it was doing the same thing at the same time with respect to Mr. Wells's trial.

Trial counsel relied on the penalty-phase testimony of MINDSET research scientist Dr. Lewine to assert that Mr. Ricks had a biological predisposition to violence. Dr. Lewine's testimony discussed the results of Dr. McGarrahan's testing, as well as the results of genetic testing and brain imaging that MINDSET performed on Mr. Ricks.[18] Trial counsel also attempted to present evidence to the jury that Mr. Ricks was biologically predisposed to violence based on both his brain imaging and genetic testing that had been performed pretrial. Although the trial court ruled the genetic testimony inadmissible in a hearing conducted pursuant to Texas Rule of Evidence 705(b), had trial counsel been successful in introducing this evidence, Dr. Lewine would have told the jury that Mr. Ricks had a decreased level of the COMT enzyme, which he claimed to be "associated with increased aggression or violence." 39 RR 44. In front of the jury, Dr. Lewine

---

[18] Dr. Lewine's testimony indicates that he was under the impression that Dr. McGarrahan was testifying after him. 39 RR 125. She ultimately did not testify in Mr. Ricks's case.

testified that an image of Mr. Ricks's brain showed that he had an increased putamen (a part of the brain), which "the scientific literature says [] is associated with aggressive and violent behavior." 39 RR 123. He further testified that this increased putamen is "most likely associated with either something he was born with or his developmental course during the first ten years." *Id.* at 124.

Dr. Lewine also testified that Mr. Ricks had increased beta activity in his brain, and that "[w]e often see it in individuals who have anxiety disorder and then also individuals with impulse control and aggression problems." 39 RR 132.[19] He emphasized: "So, again, we have a beta signature which is consistent with the idea of a biological predisposition towards violence and aggression." *Id.* Dr. Lewine did testify that Dr. McGarrahan scored a 25 for Mr. Ricks on the Hare Psychopathy Checklist, which placed him below the threshold for psychopathy, *id.* at 125, and that Mr. Ricks's brain imaging was not in the psychopathy range. *Id.* at 133. On cross-examination, however, he admitted that he agreed with some of the State's scoring changes that would place Mr. Ricks in the range of psychopathy. 39 RR 159–65. And, as discussed in Section C(1), *infra*, the State overwhelmingly relied on this testimony in support of its future dangerousness case at closing.

### c. Trial counsel used the same defense for a third time in their representation of Amos Wells.

Based on the facts of Mr. Nelson's and Mr. Ricks's cases, it is already evident that trial counsel had developed a routine of presenting cookie-cutter defenses of their Black clients charged with capital murder. When it came to Amos Wells's[20] case, however, trial counsel made their formulaic approach explicit.

---

[19] This evidence was based on the qEEG that Dr. Lewine administered to Mr. Ricks in the courtroom on the day he was found guilty of capital murder. 39 RR 132–34; 46 RR Def. Exs. 32, 33 (photographs of the qEEG being administered to Mr. Ricks in the courtroom).

[20] Mr. Wells is Black. *See* https://www.tdcj.texas.gov/death_row/dr_info/wellsamos.html.

About two months after they were appointed to represent Mr. Ricks, trial counsel were appointed to represent Amos Wells for his capital murder charge. Ex. 14; 15. Trial counsel's eventual defense of Mr. Wells paralleled the defense that they had presented at the penalty phase for Mr. Nelson and Mr. Ricks. *See* Ex. 16. (Dr. McGarrahan explained that she was "going to proceed with my standard neuropsych eval and we can do additional testing thereafter as needed – like we did with Ricks. I will likely see Mr. Wells in the next month or so.").

Trial counsel also hired Dr. William Bernet, with whom they had consulted on Mr. Ricks's case. At trial, Dr. Bernet testified that Mr. Wells had a certain version of the monoamine oxidase ("MAOA") gene, which leads to "an increased risk of being a violent adult if that person has an adverse or traumatic childhood." *Wells v. State*, 611 S.W.3d 396, 414 (Tex. Crim. App. 2020). Dr. Bernet concluded that "[Mr. Wells's] genetics and history of childhood mistreatment increased the probability that Appellant would act in a violent or maladaptive manner." *Id.* (citing *Wells*, 43 RR 117).

Likewise, trial counsel again hired Dr. Lewine, who testified that Mr. Wells's "brain is significantly abnormal in the parts of the brain involved in visual information processing, emotional regulation of behavior, and impulse control." *Id.* at 415. Dr. Lewine also told the jury that Mr. Wells "would have difficulty stopping behaviors based on what has happened emotionally." *Id.* As in Mr. Ricks's case, Dr. Lewine found "increased beta activity, which is associated with anxiety and impulse control issues." *Id.* Dr. Lewine concluded that "if faced with the same circumstances leading up to the offense, [Mr. Wells] could have the same response given the right stressors and the right circuitry of his brain." *Id.* Dr. McGarrahan also testified in Mr. Wells's case. She testified that Mr. Wells had a history of aggression and extreme anger, and that he has problems controlling his anger. *Wells*, 40 RR 92–93. Although these experts had been called

51

by the defense, their combined testimony had the effect of portraying Mr. Wells as an incurably violent man.

Trial counsel closed their defense of Mr. Wells by regurgitating the same speech that they used to describe Mr. Nelson and Mr. Ricks in their respective trials. Counsel argued that "Amos wrecked his own life. He's wrecked his daughter's life. He's wrecked his – his family. It's just all one big, bad train wreck." *Wells*, 44 RR 64. They emphasized that Mr. Wells was incurable, telling the jury that "Amos didn't ask for his genetics, he didn't ask for the brain he got, and he darn sure didn't ask for the parents he got handed." *Id.* at 65; *see id.* at 65 ("[h]e has no control").

Not surprisingly, the State relied on trial counsel's own evidence in support of the State's future dangerousness case. In closing, the State emphasized to the jury that "[t]heir own expert tells you he is going to be dangerous." *Wells*, 46 RR 72; *see id.* at 32, 70 (same). Mr. Wells was also sentenced to death. *Wells*, 611 S.W.3d at 402.

As the foregoing makes clear, trial counsel used the same strategy in their defense of Steven Nelson, Cedric Ricks, and Amos Wells. Tellingly, trial counsel used the exact same language to describe each of their clients to the jury. 40 RR 114 (describing Mr. Ricks as "a train looking for a wreck"); *State v. Nelson*, No. AP-76,924, 44 RR 24 (describing Mr. Nelson as "a train wreck waiting to happen."); *State v. Wells*, No. AP-77,070, 46 RR 64 (describing Mr. Wells as "one big, bad train wreck"). And in each case, their clients were sentenced to death. This one-size-fits-all strategy runs contrary to the individualized defense that the Eighth Amendment requires and that the Sixth Amendment requires counsel to present. Trial counsel's performance was therefore constitutionally deficient.

### 2. Trial counsel conceded future dangerousness.

In addition to presenting a cookie-cutter case in Mr. Ricks's case, trial counsel also presented a case that conceded Mr. Ricks's future dangerousness. Under the Texas Code of

Criminal Procedure, it is the State's burden to prove the future dangerousness special issue. Tex. Code Crim. Proc. art. 37.071, § 2(c). Trial counsel's concession of future dangerousness constitutes deficient performance.

The only expert that trial counsel presented during the penalty phase was Dr. Lewine from MINDSET. The thrust of Dr. Lewine's testimony was that Mr. Ricks was biologically predisposed to violence and aggression. Dr. Lewine made clear that—from the outset—trial counsel retained MINDSET "to determine if there was anything in the neurobiology that was consistent with the idea that there might be a biological predisposition towards aggression and violence." 39 RR 100–01. He explained:

> [T]here are certain characteristic findings in brain imaging, electrophysiology, that have been found to be statistically significant in populations with increased history of aggression and violence. So we were looking to see whether there were any of these biological markers in Cedric's brain that are associated with the history of aggression and violence.

*Id.* at 101.

Dr. Lewine then discussed the results of the brain testing that MINDSET had performed on Mr. Ricks.[21] Dr. Lewine first discussed the MRI test that MINDSET had performed on Mr. Ricks in order to review the anatomical structure of Mr. Ricks's brain. In reviewing the MRI results, Dr. Lewine testified that Mr. Ricks displayed "an increase in putamen volume suggestive or consistent with the idea that there's a predisposition towards aggression and violence." *Id.* at

---

[21] Although the judge prohibited defense counsel from discussing the results of the genetic testing performed on Mr. Ricks, trial counsel had nevertheless intended to ask Dr. Lewine to tell the jury about these test results. During a hearing held outside the jury's presence, Dr. Lewine testified that "[l]ooking at the genes related to catecholamine metabolism, the data suggests that Cedric has a genetic profile that is associated with reduced activity in a particular enzyme which alters neurotransmitter function. And there's a body of literature which suggests that individuals who have that profile again are at increased risk for aggression and violent behavior." 39 RR 13.

121–22. Dr. Lewine then discussed the quantitative electroencephalogram ("qEEG") that MINDSET performed on Mr. Ricks in order to measure Mr. Ricks's brain waves. With respect to the qEEG, Dr. Lewine testified that Mr. Ricks "has an excessive amount of beta activity. So much more beta, which we could see just by visual inspection . . . We often see it in individuals with impulse control and aggression problems." *Id.* at 132.

As the foregoing makes clear, the thrust of trial counsel's only expert at the penalty phase was that something was "wrong" with Mr. Ricks and that he had a biological predisposition to violence and aggression. In addition, trial counsel repeatedly elicited testimony from lay witnesses that spoke to Mr. Ricks's purported violence, aggression, and impulse control. *See, e.g.*, 38 RR 47–48. None of this evidence was mitigating. Rather, the elicited testimony was highly aggravating and only served to bolster the State's future dangerousness case. Trial counsel's concession of future dangerousness constitutes deficient performance. *See Andrus v. Texas*, 140 S. Ct. 1875, 1883 (2020) ("Counsel's introduction of seemingly *aggravating* evidence confirms the gaping distance between his performance at trial and objectively reasonable professional judgment." (emphasis in original)).

### 3. Trial counsel imposed unreasonable limitations on the mitigation investigation.

"Counsel's duty to investigate and present mitigation evidence is now well established." *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, American Bar Association, 31 Hofstra L. Rev. 913 (2003) ("*ABA Guidelines*"), Guideline 10.7 at cmt. The mitigation investigation must be "ongoing [and] exhaustive," explore "every aspect" of the client's character and history, and include "a broad set of sources[.]" *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev. 677, 689 (2008) ("*ABA Mitigation Guidelines*"), Guideline 10.11. In-person, one-on-one, and repeat

interviews with the client, his family and friends, and broader community should be at the heart of the mitigation investigation. *Id.* Failure to investigate and present mitigation evidence can constitute deficient performance. *See Porter v. McCollum*, 558 U.S. 30, 40 (2009) (Counsel may not "ignore[] pertinent avenues for investigation of which he should have been aware.").

Here, trial counsel failed to conduct a reasonable mitigation investigation under prevailing professional norms. Indeed, trial counsel and mitigation specialist Mary Burdette did not travel to Chicago, where Mr. Ricks spent most of his life, until eight months after their appointment to Mr. Ricks's case, and then went on just two brief trips. Even then, the defense team did not interview any witnesses beyond those who were able to meet them at Mr. Ricks's parents' home or at trial counsel's hotel. Likewise, what little investigation was conducted in Tarrant County consisted largely of group meetings at trial counsel's office or interviews over the phone. Trial counsel thus imposed unreasonable limitations on the investigation of mitigation that fell short of prevailing professional norms.

> ### a. Trial counsel unreasonably limited their Chicago-based investigation by requiring that potential mitigation witnesses meet them at Mr. Ricks's parents' home or at trial counsel's hotel.

Trial counsel were appointed to represent Mr. Ricks on May 7, 2013, and mitigation specialist Mary Burdette was appointed on June 28, 2013. 1 CR 123. The defense team, however, did not travel to Chicago until eight months later—just one month before *voir dire* began—from February 18 to 20, 2014. This delay was not a due to a lack of funding, as the defense team's travel was at "taxpayer's expense [] and authorized without limitation." 3 SHCR 1376.

During this first visit, trial counsel asked that Mr. Ricks's parents identify and arrange for potential mitigation witnesses to meet with the defense team at Mr. Ricks's parents' home. 3 SHCR 1376. The defense team conducted one group interview with thirteen potential mitigation witnesses

at Mr. Ricks's parents' home. *Id.* Beyond this group interview, the defense team conducted a single one-on-one interview with a potential mitigation witness. This interview was conducted at counsel's hotel in Chicago. Outside of the group interview at Mr. Ricks's parents' home and the one interview at the defense team's hotel, the defense team conducted no further interviews during their initial visit to Chicago.

The defense team then traveled for a second and final time to Chicago from April 4 to 6, 2014. *Voir dire* for Mr. Ricks's trial had begun weeks earlier, on March 20, 2014. This means that trial counsel waited until the middle of *voir dire* to make a second investigative visit to Chicago. The defense team flew out on the evening of Friday, April 4, and returned on Sunday, April 6. Trial counsel then resumed *voir dire* of some sixty remaining veniremembers from Monday, April 7, onwards. *See* RR Vols. 18–30.

During this trip, trial counsel stayed at a hotel near Midway Airport. 3 SHCR 1376. Trial counsel gave their contact information to Mr. Ricks's family to pass on to any potential mitigation witnesses and rented a conference room at their hotel to "interview[] everyone who would come." *Id.* Eight potential mitigation witnesses were able to meet with trial counsel at their hotel. Trial counsel did not seek to meet with any witnesses other than those who were able to meet the defense team at their airport hotel.

While in Chicago, the defense team did not interview any of Mr. Ricks's former teachers or former employers, and did not interview many of Mr. Ricks's family and friends. Instead, the defense team relied entirely on Mr. Ricks's mother to identify and produce witnesses to support a case for life. Notably, Ms. Burdette's notes from the defense team's group interview organized by Helen Ricks reflect that "most" of those who attended were church friends. Ex. 17. Moreover, because trial counsel relied on Helen Ricks to identify and invite potential mitigation witnesses,

the defense team were initially unaware of living Chicago-based members of Mr. Ricks's family, including his grandmother and aunts.

### b. Trial counsel unreasonably limited the mitigation investigation by conducting interviews in groups or over the phone.

Prevailing professional norms make clear that the defense team "must conduct in-person, face-to-face, one-on-one interviews[.]" *ABA Mitigation Guidelines*, Guideline 10.11. The bulk of the interviews with potential mitigation witnesses were conducted in groups or over the phone. During their first trip to Chicago, the defense team interviewed thirteen potential mitigation witnesses as a group at Mr. Ricks's parents' home. Ms. Burdette's notes reflect that "[d]ue to the size of the group, few people volunteered anything other than positive remarks about Cedric[]" and that "[s]everal of [the] attendees did not speak out." Ex. 17. Likewise, potential mitigation witnesses based in the Fort Worth area were also interviewed in groups at trial counsel's office. After Mr. Ricks's parents traveled to Texas from Chicago in May 2013, the defense team interviewed Mr. Ricks's parents and his maternal uncle as a group at trial counsel's office. The defense team conducted a second group interview at trial counsel's office, this time with Mr. Ricks's maternal uncle and aunt Joe and Deborah Sanders, cousins Tamara Butts and Dawn Sanders, and friends Kamika and Keith Griffin.

Outside of these in-person group meetings, most interviews with potential mitigation witnesses were conducted over the phone. Ms. Burdette interviewed all potential mitigation witnesses over the phone from the time she was first appointed in June 2013 up until the defense team's February 2014 trip to Chicago. Ms. Burdette conducted these interviews by phone regardless of whether the witnesses were based in Chicago or local to the Fort Worth area. Likewise, all follow-up interviews after the defense team's in-person visits in Chicago were

conducted over the phone.[22]

### 4. Trial counsel unreasonably failed to follow up on red flags of significant trauma, mental illness, neurodevelopmental disorders, and other mental health issues.

Failure to make reasonable investigative decisions in light of available information constitutes deficient performance. *See Wiggins v. Smith*, 539 U.S. 510, 527 (2003) ("[A] court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."). Mitigation evidence must be investigated and presented "to show that the person who committed the crime is a flawed but real individual rather than a generic evildoer." *ABA Guidelines*, Guideline 10.7 at cmt. In Mr. Ricks's case, even a truncated and inadequate mitigation investigation revealed a staggering number of red flags indicative of trauma, mental illness, neurodevelopmental disorders, and other mental health issues. Trial counsel unreasonably disregarded this evidence. *See Andrus*, 140 S. Ct. at 1883 (holding trial counsel deficient in part because trial "counsel disregarded, rather than explored, the multiple red flags" in the client's life history).

Despite information that Mr. Ricks suffered from extensive trauma, trial counsel argued to the jury that Mr. Ricks "had a family and support system that maybe most of us in the courtroom didn't have." 40 RR 114. Trial counsel's willful ignorance of red flags for trauma was compounded by their failure to present the testimony of a trauma expert. When trial counsel did elicit testimony about some of these red flags—including testimony about Mr. Ricks's behavior in childhood— that testimony was entirely unmoored from any context of the extensive trauma that Mr. Ricks endured or the impact that trauma had on his development and mental health. The State was thus

---

[22] Furthermore, billing records do not indicate that Ms. Burdette ever traveled alone to Chicago to investigate Mr. Ricks's case. Ms. Burdette did travel to Florida to interview Mr. Ricks's former high school football coach, Gary Korhonen. 3 SHCR 1377.

able to rely on the very testimony presented by the defense to argue that Mr. Ricks's behavior betrayed "a life-long pattern of violence and aggression" 39 RR 158–59.

Trial counsel likewise ignored red flags of mental illness. At a minimum, trial counsel were aware that Mr. Ricks suffered from severe depression. Upon his incarceration at the Tarrant County Jail on May 3, 2013, Mr. Ricks reported current suicidal ideation in addition to current and prior depression. Tarrant County Jail mental health services ("MHMR") likewise reported that Mr. Ricks expressed thoughts of suicide and presented as depressed. Mr. Ricks was prescribed the anti-depressants Trazodone and Citalopram and MHMR conducted daily mental status evaluations from May 3, 2013, to April 2014. Ex. 19. Records from those mental status examinations reflect that Mr. Ricks continued to present as depressed, expressed thoughts of suicide, and at times presented as illogical and disheveled. *Id.* Mr. Ricks was identified by Tarrant County Jail as at risk for suicide and was restricted to wearing a "turtle suit." A turtle suit is a "padded one piece" designed to prevent self-harm. 36 RR 58. Mr. Ricks wore this turtle suit to meetings with trial counsel, defense experts, and during transportation to and from court.

Indeed, trial counsel recognized Mr. Ricks's vulnerable mental state at their initial meeting with Mr. Ricks on May 7, 2013. After this meeting, trial counsel retained neuropsychologist Dr. Jim Womack to evaluate Mr. Ricks's risk for suicide. After evaluating Mr. Ricks on May 9, 2013, Dr. Womack reported to trial counsel that Mr. Ricks was depressed, suicidal, and expressed that he wanted to die so that Roxann Sanchez's family could heal. Ex. 18. Tarrant County Jail records reflect that Mr. Ricks attempted to commit suicide on June 5, 2013. Ex. 19. Regardless, trial counsel did not meet with Mr. Ricks again until October 22, 2013, five months after their first

59

meeting with Mr. Ricks.[23] The only mention of Mr. Ricks's attempted suicide in the weeks after the offense, evidencing his profound remorse, was in the State's vitriolic cross-examination of Mr. Ricks when it commented that Mr. Ricks "couldn't even do that right[.]" 40 RR 49.

Trial counsel likewise ignored evidence that Mr. Ricks was suffering from serious mental illness around the time of the offense, sought help, and was turned away by all those he turned to. Notably, text messages in trial counsel's possession showed that Mr. Ricks had sought help from his mother, asking to come home to Chicago, and that she refused. And, upon Mr. Ricks's arrest, law enforcement discovered several prescriptions for medications used in the treatment of mental illness, some of which can provoke serious side effects particularly when used in combination. Moreover, trial counsel ignored information from their own mitigation specialist that, at the time of the offense, Mr. Ricks was experiencing several stressors that aggravated his mental illness. Instead, in closing, trial counsel argued to the jury that the offense was inevitable and that "if it wasn't for [Mr. Ricks's family], he'd have been a car wreck much earlier." 40 RR 114.

Childhood records provided by Helen Ricks to the defense team further established that Mr. Ricks was impacted by mental illness from a young age. These records included information that Mr. Ricks was prescribed forty counseling sessions at the age of 11 but that his parents did not follow-up, and that Mr. Ricks was hospitalized for several weeks following a psychiatric crisis at the age of 17. Despite these significant red flags, trial counsel reported to the defense team,

---

[23] Trial counsel Bill Ray has been found ineffective for failing to appraise a court of his client's mental health history. Mr. Ray was appointed by then-Tarrant County District Judge Gill (who was one of the prosecutors in Mr. Ricks's case) to represent Sandra Wilson in revocation proceedings. While waiting for the hearing, Ms. Wilson attempted to commit suicide at the Tarrant County Jail. After a short hearing, Judge Gill sentenced Ms. Wilson to 15 years, to which Mr. Ray did not object. Mr. Ray did not present evidence of Ms. Wilson's documented history of mental illness, including her recent attempted suicide. On a petition for writ of federal habeas corpus, a federal court found Mr. Ray ineffective for failing to appraise the convicting court of Ms. Wilson's significant mental health history. *See* Ex. 23.

including its experts, that Mr. Ricks had "not much" of a mental health history. Ex. 20.

The failure to follow-up on red flags of mental illness was compounded by trial counsel's failure to present the testimony of a mental health expert. Despite significant evidence of Mr. Ricks's mental illness, including at the time of the offense, trial counsel did not present the testimony of a mental health expert. Whereas trial counsel directed Dr. Womack to assess Mr. Ricks for competency and Dr. McGarrahan to conduct a neuropsychological evaluation of Mr. Ricks, neither expert testified at the penalty phase. Instead, trial counsel focused their sentencing presentation on the testimony of Dr. Lewine. 39 RR 91–152. Dr. Lewine, however, is not a mental health expert. He is a "research scientist" in the field of neuroscience and his expertise is in the fields of "neuroscience, imaging, and physiology." *Id.* at 91, 98. Indeed, Dr. Lewine himself thought that trial counsel would be calling a neuropsychologist at Mr. Ricks's punishment trial. *Id.* at 125. No such testimony, however, was ever presented.

Trial counsel also failed to investigate red flags that Mr. Ricks was impacted by co-occurring neurodevelopmental disorders. This failure was further compounded by trial counsel's failure to retain an expert on neurodevelopmental disorders. For example, several persons told the defense team that they believed something had been wrong with Mr. Ricks even as a young child. Helen Ricks also told the defense team that she drank alcohol during her pregnancy. Trial counsel, however, did not retain an expert in neurodevelopmental disorders who could have conducted appropriate testing to determine the presence, and testify to the impact, of neurodevelopmental disorders, including but not limited to, Fetal Alcohol Spectrum Disorder, Autism Spectrum Disorder, and Attention Deficit Hyperactivity Disorder.

> **5.  Trial counsel retained a neuropsychologist who has testified that "minority status" is a risk factor for future dangerousness.**

Mere months after Mr. Nelson's trial, *see* Section A(1)(a) *supra*, at which trial counsel

retained Dr. McGarrahan, trial counsel once again retained neuropsychologist Dr. McGarrahan in Mr. Ricks's case. At Mr. Nelson's trial, Dr. McGarrahan testified that Mr. Nelson's "minority status" as a Black man was a risk factor for future dangerousness. *Nelson*, 43 RR 253. On direct examination by trial counsel, Dr. McGarrahan told the jury at Mr. Nelson's trial that Mr. Nelson was "a storm waiting to happen." *Id.* Hence, trial counsel was fully on notice of Dr. McGarrahan's belief that Mr. Ricks was dangerous based on his race at the time trial counsel retained her as a neuropsychologist in Mr. Ricks's case. Their decision to retain her in Mr. Ricks's case was unreasonable and constitutes deficient performance. *See Buck*, 137 S. Ct. at 775.

### 6. Trial counsel relied on a "catch-all" expert.

"Counsel should choose experts who are tailored specifically to the needs of the case, rather than relying on an "all-purpose" expert who may have insufficient knowledge or experience to testify persuasively." *ABA Guidelines*, Guideline 10.7 at cmt. Despite evidence of mental illness, co-occurring neurodevelopmental disorders, and trauma, trial counsel presented only the testimony of Dr. Lewine. *See* 39 RR 91–153. Dr. Lewine does not have expertise in trauma, mental health, or neurodevelopmental disorders. Dr. Lewine is a "research scientist" in the field of neuroscience and a "professor of translational neuroscience." 39 RR 7–8, 91. Dr. Lewine has "a bachelor's, master's, and doctoral degree in neuroscience, and post-doctoral training in neuroscience and biophysics." *Id.* at 91. Before testifying at Mr. Ricks's capital punishment trial, Dr. Lewine had never testified as an expert in a criminal case. 39 RR 98.

Dr. Lewine testified that based on MINDSET's neuroimaging, *see* Section A(1)(b) *supra*, Mr. Ricks had a "biological predisposition towards violence and aggression, but it's not so bad that we're in the psychopathy range." 39 RR 133. In addition to neuroimaging, Dr. Lewine testified to the Hare Psychopathy Checklist, a pseudopsychological test for psychopathy. Psychopathy is not a diagnosis recognized by the DSM-5. Dr. Lewine did not administer the Hare Psychopathy

Checklist and testified instead to answers and scores obtained by Dr. McGarrahan—who did not testify at Mr. Ricks's trial. *Id.* at 125. Dr. Lewine testified on direct examination that Dr. McGarrahan scored Mr. Ricks at a 25 on the Hare Psychopathy Checklist (which falls below the psychopathy range), but agreed on cross examination that Dr. McGarrahan's scoring could be revised such that Mr. Ricks would fall within the psychopathy range. *Id.* at 159–65.

Trial counsel asked Dr. Lewine "if Mr. Ricks has this biological predisposition towards aggression and violence, is he a future risk to society?" 39 RR 147. Dr. Lewine told the jury that he "can't predict the future." *Id.* He testified that "the best I can do in that situation is rely on published literature," including actuarial data. *Id.* Dr. Lewine added, however, that he was "not an actuary" and "not an actuarial expert[.]" *Id.* at 147; 148. Dr. Lewine told the jury that he "just went into the literature and looked for -- for some data on this issue [of future dangerousness]." *Id.* Dr. Lewine testified that he "would probably say the answer is yes" to whether Mr. Ricks would constitute a future danger if he were to return to normal society. 39 RR 148. Dr. Lewine further told the jury that "[t]he biology suggested that [Mr. Ricks] is predisposed to violence" and that "[t]he biology makes me worried." *Id.* at 148; 151. The State itself remarked that Dr. Lewine's testimony seemed to be "way outside the expert's area of expertise." 39 RR 152.

### 7. Trial counsel failed to investigate extraneous offenses.

An attorney has a duty to independently investigate the charges against his client. *Wiggins*, 539 U.S. at 524. Trial counsel must perform a "reasonable amount" of pretrial investigation. *Bowers v. Quarterman*, 497 F.3d 459, 467 (5th Cir. 2007) (quotations omitted). "*Strickland* explains that if an investigation is incomplete, a court should weigh that incompleteness only to the extent that 'reasonable professional judgments support the limitations on the investigation' because 'counsel has a duty to make . . . a reasonable decision that makes particular investigations unnecessary.'" *Id.* (quoting *Strickland*, 466 U.S. at 690–91. In Mr. Ricks's case, however, trial

counsel did not conduct a reasonable investigation of the extraneous offenses introduced by the State in support of its case on future dangerousness. The extraneous offenses counsel failed to investigate include, but are not limited to, an incident involving Tina Brown, an ex-girlfriend of Mr. Ricks's; an incident involving Teshana Singleton, Mr. Ricks's ex-wife; an incident at the Garvin County jail; and a pretrial incident in which deputies found a pencil in Mr. Ricks's possession.

The State relied on several extraneous offenses in support of their future dangerousness case. First, the State called James Cooper, who was a security guard at one of the high schools Mr. Ricks attended. 36 RR 7. Mr. Cooper testified that when Mr. Ricks was in high school, Mr. Cooper received a radio call indicating that Mr. Ricks was forcibly removing his girlfriend, Tina Brown, out of school. *Id.* at 13. Mr. Cooper further testified that he "was able to meet the car and stop the car and get her out of the car." *Id.* at 14. Mr. Cooper agreed with the State that Mr. Ricks was "forcibly removing" his girlfriend. *Id.* at 13. After he claimed to have freed Ms. Brown, Mr. Cooper testified that he handcuffed Mr. Ricks and turned him over to the Oak Lawn Police Department. *Id.* at 15. Second, the State called Mr. Ricks's ex-wife, Teshana Singleton,[24] who testified that Mr. Ricks had physically abused her on multiple occasions. *See* 37 RR 17–20. Third, the State introduced the testimony of Niya Cardoso, a jailer at the Garvin County jail, and Michael Rose, an inmate there, to suggest that Mr. Ricks asked to be placed in general population after his arrest in Garvin County and once in population, Mr. Ricks bragged about the offense, which caused other inmates to physically assault Mr. Ricks. 39 RR 238–39, 255–57.[25] Fourth, the State presented the testimony of Deputy Marcus Moore, who told the jury that Mr. Ricks was discovered with a pencil

---

[24] Although the Report's Record refers to her as Tashana Singleton, *see* 37 RR 9, records obtained by undersigned counsel indicate that the correct spelling of her name is Teshana Singleton.
[25] *See* Claim Seven, *infra*.

when he was being moved for a pretrial proceeding, despite the fact that Mr. Ricks was "not allowed to have any implements, such as a pencil, pen, things like that" and that this pencil "can be used as a weapon." 36 RR 58–59.

Despite the duty imposed on counsel by the Sixth Amendment to conduct a reasonable investigation into a defendant's case, trial counsel failed to investigate any of these extraneous offenses. This complete abdication of trial counsel's duty cannot be considered reasonable; despite being on notice that the State planned to introduce this evidence, trial counsel still failed to investigate these incidents. Trial counsel's failure to investigate extraneous offenses constitutes deficient performance. Trial counsel never spoke to Teshana Singleton and never spoke to Tina Brown or her father, Luther Brown. In addition, trial counsel never interviewed the persons involved in Mr. Ricks's physical assault in Garvin County, nor is there any indication that they investigated the pencil incident before Deputy Moore's testimony at trial. In sum, trial counsel's failure to investigate extraneous offenses constitutes deficient performance.

### C.    Mr. Ricks was prejudiced by trial counsel's deficient performance.

Trial counsel's deficient performance prejudiced Mr. Ricks. To establish prejudice, Mr. Ricks need only show a reasonable probability that one juror would have answered the special issues differently. *Andrus*, 140 S. Ct at 1886; *Wiggins*, 539 U.S. at 534. Here, trial counsel's deficiencies prejudiced Mr. Ricks for myriad reasons, relating to both whether he would be a future danger and whether sufficient mitigating evidence existed that justified a sentence less than death. This includes, but is not limited to, concessions of Mr. Rick's future dangerousness, the failure to present mitigation evidence from both lay and expert witnesses that would have presented a completely different picture of Mr. Ricks, and inaccurate evidence regarding extraneous offenses. In sum, trial counsel's deficient performance in Mr. Ricks's penalty phase undermines confidence in the outcome of the proceeding.

### 1.    Trial counsel's concession of future dangerousness prejudiced Mr. Ricks.

By conceding future dangerousness, trial counsel relieved the State of its burden of proof as to the future dangerousness special issue. The jury notes make clear that the future dangerousness and MINDSET evidence weighed heavily in the jury's deliberations. *See* 2 CR 519, 524. By presenting testimony from the defense expert that Mr. Ricks had a predisposition to violence and aggression, thus conceding future dangerousness, trial counsel handed the State its case on future dangerousness. Indeed, after Dr. Lewine testified, the State did not present the testimony of its own expert despite having given notice of that expert testimony.

In its final closing, the State directed the jury's attention to Dr. Lewine's testimony that Mr. Ricks was "dangerous and that he's aggressive and that he's impulsive" and suggested that Dr. Lewine should have been paid by the State, and not the defense: "You knew that from opening statement. You should send a bill in to the County for $500 an hour. You knew all these things." 40 RR 125–26. Dr. Lewine's testimony further enabled the State to argue that Mr. Ricks was "going to be dangerous and impulsive and violent for the rest of his life. That's just not going to change." 40 RR 126. The record makes clear that the jury focused on this evidence, as the first note that the jury sent during the penalty phase asked about the wording of the future dangerousness special issue and the final question the jury sent to the court was to "see the Mindset documents." 2 CR 519, 524.

### 2.    Had trial counsel performed in accordance with prevailing professional norms, the jury would have seen an entirely different picture of Mr. Ricks and his life history.

In the words of the State, trial counsel presented "no mitigation evidence in this case . . . [a]bsolutely zero." 40 RR 105. The testimony presented by trial counsel suggested to the jury that Mr. Ricks had "a family and support system that maybe most of us in this courtroom didn't have." *Id.* at 114. Trial counsel told the jury that "the question then becomes: How does someone who

has all of the things that maybe some of us didn't even have, how does he become a murderer, a double murderer, a child murderer?" *Id.* Trial counsel answered that "if it weren't for [Mr. Ricks's] family, if it weren't for the support system he had, he would have been a car wreck a lot earlier." *Id.* Unsurprisingly, the State seized on the testimony presented by trial counsel to argue to the jury that Mr. Ricks "lived in Utopia" and that he had "a wonderful life." *Id.* at 105–06. As summarized by the State, "[e]very one of their witnesses came in here and told you he had a wonderful upbringing." *Id.* at 105. That picture, however, was wrong.

Had trial counsel conducted an investigation unhampered by unreasonable limitations, the defense team would have uncovered a wealth of mitigating evidence. Indeed, investigation of the red flags uncovered by Ms. Burdette would have revealed, amongst other evidence, that Mr. Ricks was severely physically abused by both his father and mother, that Mr. Ricks was exposed to sexual abuse in his babysitter's home, and that Mr. Ricks's parents did little to confront the significant symptoms of Mr. Ricks's trauma, mental illness, and neurodevelopmental disorders. For example, Mr. Ricks received childcare until the age of 5 in a home where at least two children, including Mr. Ricks's cousin, were sexually abused.

Family members of Mr. Ricks recalled that it is around this time that family members began to notice that Mr. Ricks had trouble sitting still, that he rocked back and forth, banged his head against furniture to fall asleep, and struggled to follow directions. Mr. Ricks was whipped by his mother and his babysitter for his behavior and these whippings became so frequent and so violent that Mr. Ricks started running away from home. For example, Mr. Ricks's father would have testified that Mr. Ricks jumped out of a first-floor window out of fear of being whipped and was discovered hours later, hiding in a neighbor's garage in just his underwear.

Family members would further have testified that Mr. Ricks understood that his behavior

was wrong and teachers would have testified that Mr. Ricks was able to learn to manage his outbursts. For example, Mr. Ricks was one of the very few students who graduated from an intensive 8th grade special education placement to his local high school. Records and witnesses, however, would have established that Mr. Ricks's parents failed to follow up on attempts to provide Mr. Ricks with support and care. For example, Mr. Ricks's parents did not follow-up on counseling sessions prescribed to Mr. Ricks as a child.

Family members and friends would have also testified that this absence of a support system continued into adulthood. Mr. Ricks graduated high school and successfully gained employment and financial independence. Even after being laid off, Mr. Ricks moved to Tarrant County from Illinois to pursue higher education and retrain in the medical field. In the months leading up to the offense, however, Mr. Ricks lost his job and his car, and his mental health deteriorated rapidly. Witnesses would have testified that when Mr. Ricks reached out for help and expressed thoughts of suicide, he was turned away.

Experts in trauma, mental health, and neurodevelopmental disorders would have provided context to the jury within which to understand both the testimony introduced at trial and the above-described information. Whereas the jury heard from witnesses that there had always been something wrong with Mr. Ricks, *see, e.g.*, 38 RR 64, a trauma expert would have explained the significance of the extensive trauma endured by Mr. Ricks and its impact on his development. Likewise, whereas the jury heard that Mr. Ricks was unsuccessful at school, *see, e.g.*, *Id.* at 75, a neurodevelopmental expert would have explained that much of the complained-of behavior, including hand clapping and repetitive feet tapping, is indicative of a neurodevelopmental behavior, such as Autism Spectrum Disorder or Attention Deficit Hyperactivity Disorder.

The jury likewise never heard of the significance of Mr. Ricks's history of mental illness.

68

Trial counsel's willful ignorance of Mr. Ricks's history of mental illness and failure to present the testimony of a mental health expert opened the door to the State's characterization of Mr. Ricks as "a psychopath" and "a monster." 40 RR 101. Had trial counsel presented the testimony of a mental health expert, the jury would have heard that Mr. Ricks's history of violence could not simply be attributed to his biology. Rather, a mental health expert would have explained to the jury the significance and impact of Mr. Ricks's history of mental illness. A mental health expert or trauma expert would further have provided context to the facts of the offense and Mr. Ricks's testimony.

In sum, trial counsel's failure to investigate red flags of trauma, mental illness, and neurodevelopmental disorders led to the presentation of an entirely misleading picture of Mr. Ricks's history. This was compounded by trial counsel's failure to retain experts with expertise in trauma, mental illness, and neurodevelopmental disorders, preventing the jury from understanding the extensive lay witness testimony, including that of Mr. Ricks, about Mr. Ricks's history. By presenting a catch-all expert with no expertise in these domains, trial counsel opened the door to the State's argument that Mr. Ricks was a "psychopath." 40 RR 101.

### 3. Trial counsel's failure to investigate extraneous offenses prejudiced Mr. Ricks.

The State heavily relied on each of these incidents in support of its case for future dangerousness in its closing argument. The State argued that Mr. Ricks physically assaulted his ex-wife, Teshana Singleton. 40 RR 102–03. Referencing the pencil found on Mr. Ricks, the State said "I don't know whose neck that pencil was intended for or what he intended to do with that pencil" after it elicited testimony that the pencil was a "weapon." 40 RR 104; 36 RR 59. The State claimed that Mr. Ricks "hoards pills while he's in jail . . . so he can trade with other contraband,"

40 RR 104, and argued that these two jail incidents are "all a pattern with him," *id.* at 124.[26] After

summarizing this evidence, the State argued that with respect to the future dangerousness question:

> You have plenty of evidence in front of you to answer this question yes. There is
> no other answer to this question when it comes to Cedric Ricks. He is a future
> danger. And he was a future danger when he left Chicago. Well, let's go back even
> further. He was a future danger in high school after he kidnapped his girlfriend, and
> he was a future danger when he met Tashana [sic] and married her.

40 RR 104.

But had trial counsel investigated these incidents, they could have significantly undermined

the State's future dangerousness case. First, had trial counsel investigated the incident that Mr.

Cooper described—and specifically, had trial counsel interviewed Tina Brown herself and her

father, Luther Brown, who pressed charges—trial counsel could have demonstrated that she was

never in the car the day Mr. Cooper purported to assist her. Second, had trial counsel investigated

Mr. Ricks's relationship with Ms. Singleton, they could have demonstrated that she admitted to

having issues with anger and to physically assaulting Mr. Ricks on at least one occasion. Third,

had trial counsel investigated the assault at the Garvin County jail, they could have discovered the

racial slurs that the other inmates in Garvin County used to describe the assault on Mr. Ricks and

could have undercut testimony that Mr. Ricks was beaten because he bragged about the offense.[27]

And finally, had trial counsel investigated the instance in which Mr. Ricks was found to have a

pencil during transport, they could have discovered that Mr. Ricks was in fact allowed to have a

pencil and that such pencil was "soft," thereby undermining the State's claim that this pencil could

---

[26] The State knew that in making this argument, it was relying on facts outside the record and facts
that it knew to be false. The District Attorney's file contains notes about the pills indicating
"situation does not look good – kept pills because wants to kill himself at times – now taking pills
but saved in the past." Ex. 24. Nothing in the District Attorney's file and nothing in the record
support the claim that Mr. Ricks was hoarding these pills to trade them for other contraband.
[27] *See* Claim Seven, *infra.*

have served as a weapon. Ex. 25. In sum, had trial counsel performed their basic duty to their client, they could have significantly weakened the State's future dangerousness case. Taken together, these deficiencies and the prejudice that flows from them significantly undermines confidence in the outcome of the punishment phase of trial.

### D.      This claim is unexhausted.

This claim was not presented to the state courts. In state habeas proceedings, Mr. Ricks presented as Claim One that "Trial Counsel Was Ineffective for Failing To Sufficiently Develop and Present Significant Mitigation Evidence in Violation of Cedric Ricks' Sixth Amendment Right to Counsel." 1 SHCR 59. The claim presented in this Petition, however, presents new legal theories and factual assertions as compared to the claim raised in state court, and is therefore unexhausted. *See Neville v. Dretke*, 423 F.3d 474,478 (5th Cir. 2005) ("The exhaustion requirement is not satisfied, therefore, where the petitioner presents new legal theories or factual claims in his federal habeas petition.").

Mr. Ricks anticipates filing a motion seeking to stay and abate his federal proceedings so that he may return to state court and exhaust this and other unexhausted claims. *See Rhines v. Weber*, 544 U.S. 269, 278–79 (2005) (holding that district courts have discretion to stay habeas proceedings in federal court to allow the petitioner to present unexhausted claims in state court). Because he can plausibly excuse his failure to present this claim in his prior state habeas application, thereby allowing him to litigate the claim in a subsequent state application, it would be premature to determine that this claim is procedurally defaulted. Even if this claim is eventually defaulted, Mr. Ricks can establish cause and prejudice to overcome that default because state habeas counsel was ineffective for failing to present this substantial claim for relief. *See Trevino v. Thaler*, 569 U.S. 413 (2013).

71

**Claim Seven**        **The State relied on false testimony to secure a death sentence against Mr. Ricks in violation of the Fourteenth Amendment.**

The State relied on false testimony to obtain and a death sentence against Mr. Ricks in violation of the Due Process Clause of the Fourteenth Amendment. *Napue v. Illinois*, 360 U.S. 264, 269 (1950) ("[I]t is established that a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."). A due-process violation is established where (1) the State presented false testimony; (2) the State knew or should have known that the testimony was false; and (3) the false testimony was material. *Pyles v. Johnson*, 136 F.3d 986, 996 (5th Cir. 1998) (internal citations omitted).

At trial, the State knowingly elicited false testimony that was material to Mr. Ricks's death sentence. This false testimony includes, but is not limited to, evidence purporting to establish future dangerousness, the brutal beating suffered by Mr. Ricks in Garvin County jail, and his supposed lack of remorse. Because Mr. Ricks satisfies all three *Napue* elements, he is entitled to a new penalty phase.

> **A.      The State introduced the false and misleading testimony of Deputy Marcus Moore in support of its case on future dangerousness.**
>
> > **1.      The State elicited testimony from Deputy Marcus Moore suggesting that Mr. Ricks engaged in dangerous activity by having a pencil on his person while being transported to a pretrial proceeding.**

During the penalty phase of Mr. Ricks's trial, the State called Deputy Marcus Moore, a sheriff's deputy with the Tarrant County Sheriff's Department, to testify that Mr. Ricks was caught attempting to smuggle a contraband weapon—a pencil—into the courtroom. 36 RR 58–59. Deputy Moore testified that, on March 25, 2014, deputies transporting Mr. Ricks saw a pencil fall to the floor when Mr. Ricks was changing from jail attire to civilian clothes. 36 RR 55, 58. Deputy Moore described how, while Mr. Ricks was changing clothes, Deputy Choice "said he heard a sound like something hitting the floor, so we immediately opened the holdover and observed a pencil on the

floor." 36 RR 58–59.28 He further testified that "because of [Mr. Ricks's] classification, he's not allowed to have any implements, such as a pencil, pen, things like that" due to Mr. Ricks being "on suicide watch," and that "obviously that can be something he can use to harm himself or someone else." 36 RR 59. At the State's suggestion, Deputy Moore agreed that this pencil "can be a weapon." Id. Deputy Moore testified that he had discussed this incident with Mr. Ricks on April 11, 2014, and that Mr. Ricks told him then that he had concealed it when he left his cell to come to the courtroom. 36 RR 59–60.29

On cross-examination, Deputy Moore acknowledged that during jury selection, Mr. Ricks had a book in which he took notes with a felt-tip pen. 36 RR 66. Deputy Moore also described the pencil as "small . . . [s]omething similar to what you would do a score card with on a golf course or something like that." 36 RR 67. Nevertheless, on re-direct Deputy Moore agreed with the State that Mr. Ricks "could have used it against one of you." 36 RR 72. The State then relied on this testimony in closing argument. 40 RR 104.

### 2. The State knew that Deputy's Moore's testimony was false.

The State knew that the testimony it adduced from Deputy Moore was false. The District Attorney's files includes notes showing that indigent defendants are generally provided with certain supplies, including a pencil. Ex. 24; 25. The notes also indicated that inmates in the Tarrant County Jail never get regular pencils or pens, and that the only pencils they have for inmates are the "soft" type. Id. In addition, a folder labeled "Jail incident hoarding medications" contained

---

28 Notably, this incident occurred *after* the record made clear that Mr. Ricks was appearing in pretrial proceedings wearing shackles and a shock belt: the court noted Mr. Ricks's constraints on March 17, 2014, but this incident occurred on March 25, 2014. 9 RR 19; 36 RR 58. Mr. Ricks's shackling claim is discussed in Claims Four and Five, *supra*.

29 Although the record states that this conversation occurred on March 11, that predates the incident (which occurred on March 25), so the date in the record is likely a typo. During cross-examination, defense counsel clarified that the date was on April 11. 36 RR 67.

similar notes indicating "indigent – gets short pencil & 3 sheets paper." Ex. 24. These files show that the State knew that Mr. Ricks had been provided the pencil in jail, contrary to Deputy Moore's testimony. Moreover, that it was a "soft" pencil stands in contrast to Deputy Moore's testimony that it could be used as a weapon.

### 3.   Deputy Moore's testimony was material.

False testimony is deemed material where it "may have had an impact on the outcome of the trial." *Napue*, 360 U.S. at 272; *see United States v. Bagley*, 473 U.S. 667, 679 n.9 (1985) ("[A] conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict."). Here, it is evident that the State not only knew that Mr. Ricks was not behaving violently in jail, but also that Mr. Ricks was allowed pencils and that the type of pencil he had was "soft." Yet, the State told the jury that a two-inch soft pencil could be used as a weapon and that this made Mr. Ricks a future danger to society.

In closing arguments during the penalty phase, the State argued to the jury "I don't know whose neck that pencil was intended for or what he intended to do with that pencil." 40 RR 104. The State further argued that the pencil incident when combined with the pill incident indicated a "pattern" of Mr. Ricks's dangerousness in incarceration while awaiting trial. *Id.* at 124. But the State knew that Mr. Ricks was permitted to have a soft pencil; that this soft pencil was allowed because it was unlikely to pose a threat; and that Mr. Ricks had not displayed any violent behavior whatsoever in the Tarrant County Jail. Without Deputy Moore's misleading testimony, the State could not have argued that there was a pattern supporting a finding of future dangerousness in a prison environment. Because the State's misrepresentation of the jail-provided soft pencil as a dangerous weapon was material to the State's future dangerousness case, Mr. Ricks is entitled to a new punishment phase.

**B.      The State introduced the false and misleading testimony that Mr. Ricks had forced his high school girlfriend into a car against her will.**

**1.      The State elicited testimony that Mr. Ricks had forced his high school girlfriend, Tina Brown, into a car against her will.**

At the punishment phase of trial, the State elicited testimony from former high school security guard James Cooper that Mr. Ricks had forced his then-high school girlfriend, Tina Brown, into a car against her will. Mr. Cooper testified that he had been a security guard at Richards High School, where Mr. Ricks and Tina Brown both attended as students. 36 RR 7. Mr. Cooper told the jury that, on September 13, 1991, he had taken Mr. Ricks home after he was suspended. *Id.* at 9. Mr. Cooper testified that when he returned to the school, however, he received a radio call that Mr. Ricks had come back to the school and was "pulling his girlfriend out of the building[.]" *Id.* at 13. Mr. Cooper agreed with the State that Mr. Ricks was "forcibly removing" his girlfriend, Tina Brown. *Id.*

Mr. Cooper testified that Mr. Ricks was already driving off, and that Tina Brown was in the passenger seat of the car. 36 RR 14. Mr. Cooper testified that he then "was able to meet the car and stop the car and get her out of the car." *Id.* Mr. Cooper told the jury that he "jumped the hood, reached in [through the sunroof], cut off the ignition" and pulled Mr. Ricks out of the car. *Id.* at 15. Mr. Cooper testified that he then handcuffed Mr. Ricks and the Oak Lawn Police Department brought Mr. Ricks into custody. *Id.* In closing, the State argued to the jury that Mr. Ricks "was a future danger in high school after he kidnapped his girlfriend[.]" 40 RR 104.

**2.      The State knew this testimony was false.**

According to a contemporaneously prepared police report, Mr. Ricks could not be prosecuted on the charge of unlawful restraint. Ex. 21. Indeed, contrary to Mr. Cooper's testimony, Mr. Ricks never forced Tina Brown into the car he was driving on the day of the incident. Ms. Brown was never in the car and Mr. Ricks was alone in the car when he attempted to leave the

school grounds, was stopped, and handcuffed by Mr. Cooper. Tellingly, Tina Brown herself was not called by the State to testify.

### 3.   Mr. Cooper's false testimony was material.

False testimony is deemed material where it "may have had an impact on the outcome of the trial." *Napue*, 360 U.S. at 272. In closing, the State argued to the jury that, in answering the future dangerousness special issue, the jury could "go back even further" than Mr. Ricks's adulthood because Mr. Ricks was "a future danger in high school after he kidnapped his girlfriend[.]" 40 RR 104. Hence, this false testimony was material because it enabled the State to argue to the jury that Mr. Ricks had "kidnapped" his high school girlfriend, thereby establishing that Mr. Ricks was a future danger even as a teenager. As evidenced by the jury's note during its deliberations on punishment, asking for clarification on the future dangerousness special issue, future dangerousness weighed on the jurors' minds. 2 CR 519.

### C.   The State elicited false and misleading testimony to obscure the circumstances surrounding the brutal beating of Mr. Ricks at the Garvin County jail.

### 1.   The State elicited testimony that Mr. Ricks was beaten because he bragged about the offense.

At the punishment phase of trial, the State presented jailer Niya Arellano Cardoso to testify about Mr. Ricks's booking into the Garvin County jail following his arrest on the night of May 1, 2013. Ms. Cardoso, who was working as a jailer on the night of Mr. Ricks's booking, testified that she initially determined that Mr. Ricks should be placed in a single cell because of the facts of the offense. 39 RR 236. Ms. Cardoso told the jury that, after she informed Mr. Ricks that he would be placed in a single cell, he asked to be placed in general population instead. *Id.* at 238. She testified that Mr. Ricks asked "about the inmates, if they were nice, if we had a quiet cell." *Id.* Ms. Cardoso said she agreed to place Mr. Ricks with other inmates but advised him that he should not speak about the facts of the offense. *Id.* at 238. Ms. Cardoso told the jury that her shift then ended and

she was not the person who "actually placed him in the cell" with other inmates. *Id.* Ms. Cardoso testified that, upon returning to work the next day, she learned that Mr. Ricks had been involved in a "fight" the night before. *Id.* at 239. Ms. Cardoso testified that Mr. Ricks then asked her to waive extradition proceedings. *Id.* at 240.

Immediately following Ms. Cardoso, the State introduced the testimony of Michael Rose, a former Garvin County inmate who was in the general population cell where Mr. Ricks was placed and beaten. 39 RR 251. Mr. Rose testified that Mr. Ricks told the inmates, "willingly, like he was proud of it or something[,]" that he had "killed his wife and kids, stabbed them actually." *Id.* at 255–56. The State continued:

> Q.    Was he bragging about it?
>
> A.    To me, yes, sir. That's what it seemed like.
>
> [. . .]
>
> Q.    Okay. And he wasn't crying when he was telling you the story, was he, about this murder?
>
> A.    No, sir, no emotion at all.
>
> Q.    Well, but there was an emotion of bragging about it, right?
>
> A.    Yes, sir.
>
> Q.    And that's when he was talking about killing the woman and the kids, as well, correct?
>
> A.    Yes, sir.

*Id.* at 256–57. Mr. Rose testified that, at that point, he walked out of the cell and sat further down the hallway to listen to the radio. *Id.*

### 2.    The State knew the picture painted by this testimony was false.

In combination, Ms. Cardoso's and Mr. Rose's testimony represented to the jury that Mr. Ricks was placed in general population at his own request and was then beaten because he bragged

about the offense. That picture, however, is squarely contradicted by the State's own reports and interview of Mr. Ricks at the Garvin County jail. Indeed, law enforcement reports establish that Mr. Ricks was placed in general population at the instigation of Garvin County law enforcement; that Mr. Ricks was beaten, at least in part, because of his race; and that Mr. Ricks expressed profound remorse to law enforcement.

The Garvin County jail booking paperwork establishes that Mr. Ricks was booked into a single cell. Ex. 26. But contrary to the impression created by Ms. Cardoso's testimony to the jury— that Mr. Ricks asked to be moved into general population—according to Bedford Police Detective Mack, the Garvin County Undersheriff moved Mr. Ricks to a cell with other inmates so that those inmates could report any statements made by Mr. Ricks. 38 RR 18–19.

Moreover, Mr. Ricks was placed in a general population cell with inmates who belong to the Universal Aryan Brotherhood, a white supremacist gang. [30] A report by Garvin County jailer Royce Glass shows that Mr. Ricks was beaten, at least in part, because of his race:

> On May 2, 2013 at approximately 1630hours, I was working in the Garvin County Detention Center when I heard an inmate screaming. . . I observed one inmate striking another inmate in the head repeatedly. . . Sheriff Rhodes ordered all inmates out of the cells and into the hallways against the wall. During this time, I heard inmate Jones make the statement; **"That nigger got what he deserved** for killing a 12 year old." . . . Both Inmate Jones and Morrison made statements referring to how proud they were that they attacked Inmate Ricks and **continually used racial slurs in reference to Inmate Ricks**.

Ex. 27 (emphasis added). Unlike Ms. Cardoso, Mr. Glass was at the jail at the time of the assault against Mr. Ricks and reviewed the video surveillance:

> Upon review of the tape I observed Inmate Ricks lying in his bunk as Inmate Morrison struck him with a closed fist **without provocation**. I noticed Inmate Steven Paul Exum block the view of the camera in cell 6 **in an attempt to keep deputies from being able to see the fight taking place**. I also witnessed Justin

---

[30] https://www.adl.org/education/references/hate-symbols/universal-aryan-brotherhood.

> Hammer hold the door to cell 6 shut **to keep Inmate Ricks inside the cell so that he could not get away from his attacker**.

*Id.* (emphasis added). According to Officer Glass's report, none of the inmates involved in the beating required medical attention. *Id.* By contrast, Mr. Ricks had to be transported to Pauls Valley hospital, where records reflect that his eye was swollen shut and that one of his front teeth had been knocked out. Ex. 28. Upon returning to the Garvin County jail, Mr. Ricks "was placed in a suicide gown and given a suicide blanket." Ex. 27. Soon after, Mr. Ricks, who had previously sought to exercise his right to an extradition hearing, spoke to jailer Cardoso about waiving his right to extradition proceedings. 39 RR 240.

When Bedford Detectives Mack and Shelley interviewed Mr. Ricks at the Garvin County jail, Mr. Ricks expressed profound remorse for the offense. Mr. Ricks cried during the interview and expressed thoughts of self-harm to law enforcement. This interview belies testimony that Mr. Ricks was "bragging" to inmates at the Garvin County jail about the facts of the offense. 39 RR 256.

### 3. This false testimony is material.

False testimony is deemed material where it "may have had an impact on the outcome of the trial." *Napue*, 360 U.S. at 272. Here, the false testimony was material because it enabled the State to present to the jury a false narrative that Mr. Ricks was beaten for showing a lack of remorse about the offense, and also to conceal that Mr. Ricks was deliberately placed in general population and then beaten because of his race. Mr. Ricks's lack of remorse was a key theme throughout the State's closing argument. *See* 40 RR 101 (describing Mr. Ricks as a "monster"). That this incident was on the jurors' minds during their punishment deliberations is established by the fact that the jury requested to see records from Mr. Ricks's hospital treatment in Oklahoma. 2 CR 521.

**D.      This false testimony is cumulatively material.**

As argued *supra*, each instance of false testimony was material to the State's case at the penalty phase. At minimum, the cumulative effect of this false testimony was material, even if this Court determines that the individual instances are not. *See Kyles v. Whitley*, 514 U.S. 419, 421 (1995) (explaining that in the related context of assessing materiality for a violation under *Brady v. Maryland*, 373 U.S. 83 (1963), the assessment is done cumulatively across each individual violation).

**E.      This claim is unexhausted.**

This claim was not presented to the state courts during Mr. Ricks's post-conviction proceedings. Mr. Ricks anticipates filing a motion seeking to stay and abey his federal proceedings so that he may return to state court and exhaust this and other unexhausted claims. *See Rhines v. Weber*, 544 U.S. 269, 278–79 (2005) (holding that district courts have discretion to stay habeas proceedings in federal court to allow the petitioner to present unexhausted claims in state court). Because he can plausibly excuse his failure to present this claim in a prior application, thereby allowing him to litigate the claim in a subsequent state application, it would be premature to determine that this claim is procedurally defaulted. Even if this claim is eventually defaulted, Mr. Ricks can establish cause and prejudice to overcome that default.

**Claim Eight      The State violated *Brady v. Maryland* by failing to disclose information regarding the pencil incident to defense counsel.**

The State violated Mr. Ricks's due process rights when it suppressed materially favorable evidence that Mr. Ricks was allowed pencils while at Tarrant County Jail and that the type of pencil he had was "soft." *See* Claim Seven, *supra*. The failure to turn over this evidence allowed the State to present a misleading narrative to the jury about the purported danger of the pencil found in Mr. Ricks's possession, which it then emphasized in closing in support of its future

dangerousness case. 40 RR 104. Mr. Ricks is entitled to a new penalty phase based on this violation.

### A.    The State's suppression of the evidence relating to the pencil violated *Brady*.

In *Brady v. Maryland*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1985) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)). Evidence meets the materiality standard when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. This standard parallels the prejudice requirement from *Strickland* for prevailing on an ineffective assistance of counsel claim. *Id.*

### 1.    The information about the pencil found on Mr. Ricks was exculpatory.

Mr. Ricks is able to establish all three elements of his Brady claim. The State knew that the pencil to which it referred as a "weapon," 36 RR 59, was actually a soft pencil that was issued to Mr. Ricks by the jail. Ex. 24; 25. This incident represented the only incident the State could point to that purported to touch on any kind of "violent" behavior of Mr. Ricks while he was incarcerated. Thus, had defense counsel been informed about the true nature of the pencil, they could have undercut a key part of the State's case on future dangerousness. This evidence is therefore exculpatory.

### 2. The State suppressed the exculpatory information it had about the pencil.

The exculpatory evidence about the pencil was suppressed by the State. Trial counsel filed a pretrial motion requesting all available *Brady* material. 1 CR 115–21. The trial court granted this motion on January 31, 2014. 5 RR 62. The notes describing the pencil as "soft" and indicating that the pencils are routinely provided to inmates at the Tarrant County Jail were located in the District Attorney's file, dated April 11, 2014, and to the best of Mr. Ricks's knowledge were never provided to the defense. Ex. 25.

### 3. The suppressed exculpatory evidence was material.

Third, the undisclosed exculpatory evidence about the pencil was material, as there is a reasonable probability that the failure to disclose it affected the outcome of the penalty phase. *See Bagley*, 473 U.S. at 682. During the penalty phase of a capital murder trial in Texas where the death penalty is sought, the State must prove to the jury that the defendant would be a future danger to society, whether in or out of prison. *See* Tex. Code Crim. Proc. art. 37.071, § 2(b)(1); *Estrada*, 313 S.W.3d at 282. The State emphasized Mr. Ricks's possession of this pencil, calling it a "weapon" and telling the jury during closing "I don't know whose neck that pencil was intended for or what he intended to do with that pencil." 36 RR 59; 40 RR 104. The State further argued that the pencil, when coupled with the ibuprofen found in Mr. Ricks's cell, indicated a "pattern" of Mr. Ricks's dangerousness while incarcerated. 40 RR 124. It is also clear that the jury struggled with the future dangerousness question, as evidenced by the first note the jury sent during the penalty phase, which read "Special Issue number 1 – need additional explanation of 'would commit criminal acts of violence . . .'" 2 CR 519. Had the jury learned that this so-called "weapon" was actually a soft pencil provided to Mr. Ricks by the jail, it would have significantly undercut the State's case on future dangerousness. Mr. Ricks is therefore entitled to a new punishment phase.

**B.      This claim is unexhausted.**

This claim was not presented to the state courts in state habeas proceedings. Mr. Ricks anticipates filing a motion seeking to stay and abey his federal proceedings to return to state court and exhaust this and other unexhausted claims. *See Rhines v. Weber*, 544 U.S. 269, 278–79 (2005) (holding that district courts have discretion to stay habeas proceedings in federal court to allow the petitioner to present unexhausted claims in state court). Because plausible arguments exist regarding his failure to have previously presented this claim to the state courts that could allow it to proceed as a successive state habeas application, it would be premature to determine that this claim is procedurally defaulted. Even if this claim is eventually defaulted, Mr. Ricks can establish cause and prejudice to overcome this default based on the State's failure to disclose this evidence. *See Strickler*, 527 U.S. at 289 (holding that cause to overcome procedural default was established in part on the state's failure to turn over *Brady* material).

**Claim Nine      Mr. Ricks's death sentenced was imposed by an unconstitutionally arbitrary and discriminatory system in violation of the Eighth and Fourteenth Amendment.**

Mr. Ricks's death sentence was imposed by a geographically and racially discriminatory system, in violation of the Eighth Amendment and the Equal Protection Clause of the Fourteenth Amendment. In Texas, the death penalty has been disproportionately sought and carried out against Black and Hispanic defendants. The statistics are even starker in Tarrant County, where Mr. Ricks was sentenced to death. Tarrant County has disproportionately sought and obtained the death penalty against Black and Hispanic defendants.[31] Similarly, just four Texas counties, including Tarrant County, account for over half of all death sentences in Texas since 1976.[32] These numbers make clear that the Texas death penalty system is racially and geographically discriminatory, in

---

[31] https://www.tdcj.texas.gov/death_row/dr_offenders_on_dr.html.
[32] https://www.tdcj.texas.gov/death_row/dr_number_sentenced_death_county.html.

violation of the Eighth Amendment and the Equal Protection Clause of the Fourteenth Amendment.

Mr. Ricks raised this claim as Claim Thirteen on direct appeal. *See* Appellant's Brief, *Ricks v. State*, No. AP-77,040 (Tex. Crim. App. Aug. 3, 2015). Mr. Ricks understands that Supreme Court and Fifth Circuit precedent forecloses this claim. *See generally Jurek v. Texas*, 428 U.S. 262, 275–77 (1976); *see also Kelly v. Lynaugh*, 862 F.2d 1126, 1135 (5th Cir. 1988) (rejecting argument that Texas's death penalty system has been applied in an arbitrary and capricious manner since 1973). Mr. Ricks includes this claim in order to preserve the issue for further appellate review. *See generally Penry v. Lynaugh*, 492 U.S. 302 (1989) (holding Texas death penalty statute unconstitutional as applied to petitioner thirteen years after *Jurek* was decided), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002).

**Claim Ten**          **Texas Code of Criminal Procedure Article 37.071 is unconstitutional because jurors do not understand the penalty phase instructions.**

The special issues set forth in Texas Code of Criminal Procedure Article 37.071 are set forth in a manner that leaves juries unable to understand the meaning of the terms contained therein and gives juries the false impression that they are not entitled to consider the full range of mitigating evidence that could result in a life verdict, all in violation of the Eighth Amendment. This was evident at Mr. Ricks's trial. During the penalty phase deliberations, the jurors sent two notes asking for clarification of the special issues. The first note said "need additional explanation of [would commit criminal acts of violence . . .[,]" 2 CR 519, and the second note asked "[w]hat is the definition of 'personal moral culpability," 2 CR 522. These notes make clear that the jury did not understand how to apply either special issue. Moreover, one of the jurors submitted an affidavit in state habeas explaining that "[t]he jury instructions we were given led me to believe that the defense had to prove that there was a specific mitigating factor." 3 SHCR 1058 ¶ 5. He

further stated that "I did not believe I could vote for life based on my observations and instinct as the jury instructions were not clear." *Id.* ¶ 7. The Supreme Court has made clear that the "vesting of standardless sentencing power in the jury violates the Eighth and Fourteenth Amendments," *Woodson v. North Carolina*, 428 U.S. 280, 302 (1976), and further that juries in death penalty cases must be allowed to consider the full range of mitigating evidence before imposing a death sentence, *Lockett v. Ohio*, 438 U.S. 586 (1978). The vagueness of the language in the special issues and their failure to allow the jury to consider a full range of mitigating evidence violated Mr. Ricks's rights under the Eighth and Fourteenth Amendments.

This claim was presented as Claim Five in Mr. Ricks's state habeas application. 1 SHCR 127–38. Mr. Ricks understands that Fifth Circuit precedent forecloses this claim. *See, e.g.*, *Paredes v. Quarterman*, 574 F.3d 281, 294 (5th Cir. 2009) (holding, *inter alia*, that "criminal acts of violence" have a plain meaning and affirming the constitutionality of Article 37.071); *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir. 2001) (holding that the mitigation special issue does not preclude the jury's consideration of mitigating evidence) (citing *Lockett*, 438 U.S. at 604). Mr. Ricks includes this claim in order to preserve the issue for further appellate review as the Supreme Court has not yet ruled on this claim. *See, e.g.*, *Teague v. Lane*, 489 U.S. 288, 296 (1989) (observing that denials of certiorari do not have precedential value); *see also United States v. Garza-De La Cruz*, __ F.4th __, 2021 WL 5232387, at *2 (5th Cir. 2021) (Costa, Ho, and King, JJs, concurring) ("We see nothing wrong with litigants diligently taking whatever steps they deem necessary to preserve their legal rights.").

## PRAYER FOR RELIEF

WHEREFORE, Cedric Ricks, requests that this Court consider his Petition for Writ of Habeas Corpus and grant the following remedies and such other relief as the Court deems appropriate:

1. Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and be relieved of his unconstitutional sentence of death;

2. Allow Petitioner leave to conduct discovery pursuant to Rule 6 of the Rules Governing 28 U.S.C. § 2254 Cases to more fully develop the factual bases demonstrating the constitutional infirmities in his conviction and sentence;

3. Conduct an evidentiary hearing pursuant to Rule 8 of the Rules Governing 28 U.S.C. § 2254 Cases; and

4. Grant such other relief as law and justice require.

Respectfully submitted,

DATED: November 17, 2021

Respectfully submitted,

JASON D. HAWKINS
Federal Public Defender

*/s/ Jeremy Schepers*
Jeremy Schepers (TX 24084578)
Supervisor, Capital Habeas Unit

Naomi Fenwick (TX 24107764)
Assistant Federal Public Defender

Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746
214-767-2886 (fax)
jeremy_schepers@fd.org

*Counsel for Petitioner*

## VERIFICATION BY ATTORNEY

I, the undersigned, am an attorney at the office appointed by this Court pursuant to 18 U.S.C. § 3599 to represent Petitioner Cedric Ricks in these proceedings. Our office has met with Mr. Ricks, consulted with other staff in the Federal Defender's Office regarding the case, and we have directed experts and investigators regarding the circumstances of Mr. Rick's conviction and sentence of death. It is in that capacity that I verify this Petition. I declare under penalty of perjury that the foregoing allegations in this Petition are true and correct to the best of my knowledge and that this Petition for Writ of Habeas Corpus is being filed using this Court's CM/ECF system on November 17, 2021.

Subscribed by me November 17, 2021,
in Dallas, Texas.

*/s/ Jeremy Schepers*
Jeremy Schepers

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Petition for a Writ of Habeas

Corpus has been served by CM/ECF upon counsel for Respondent on November 17, 2021:

Rachel Patton
Criminal Appeals Division
Office of the Attorney General
P.O. Box 12548
Capitol Station
Austin, TX 78711
rachel.patton@oag.texas.gov

*/s/ Jeremy Schepers*
Jeremy Schepers