# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

**CEDRIC ALLEN RICKS,**

    Petitioner,

  *v.*

**BOBBY LUMPKIN, Director,**
Texas Department of
Criminal Justice,
Correctional Institutions Division,
    Respondent.

Case No. 4:20-CV-1299-O

U.S. District Judge Reed C. O'Connor

---

## AMENDED PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2254

---

JASON D. HAWKINS
Federal Public Defender

Jeremy Schepers (TX 24084578)
Supervisor, Capital Habeas Unit

Naomi Fenwick (TX 24107764)
Assistant Federal Public Defender

Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746
214-767-2886 (fax)
jeremy_schepers@fd.org

## THIS IS A CAPITAL CASE

## AMENDED PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2254

Petitioner Cedric Allen Ricks, through counsel, pursuant to all rights available under the Constitution, laws, or treaties of the United States, respectfully petitions this Court for a writ of habeas corpus declaring unconstitutional and invalid his conviction for capital murder as well as the resulting death sentence.

## TABLE OF CONTENTS

**AMENDED PETITION FOR WRIT OF HABEAS CORPUS  PURSUANT TO 28 U.S.C. § 2254**.................................................................................................... i

TABLE OF CONTENTS............................................................................................ ii

TABLE OF AUTHORITIES ................................................................................... viii

JURISDICTION AND VENUE ................................................................................ 1

PARTIES .................................................................................................................. 1

PROCEDURAL HISTORY....................................................................................... 1

INTRODUCTION .................................................................................................... 3

STATEMENT OF FACTS ........................................................................................ 4

28 U.S.C. § 2254(D) SHOULD NOT APPLY TO CLAIMS ADJUDICATED ON THE MERITS IN STATE COURT.......................................................................... 6

CLAIMS FOR RELIEF ............................................................................................ 9

Claim One     The State exercised peremptory strikes on the basis of race in violation of the Fourteenth Amendment. ...................................... 9

              A.   Mr. Ricks can establish that the State purposefully discriminated on the basis of race in exercising peremptory strikes. ................................................................................. 10

                       1.   The State annotated its jury selection materials to reflect the race and ethnicity of veniremembers................................. 11

                       2.   The State struck A. Stafford on the basis of race. ..................... 13

                       3.   The State struck W. Stafford on the basis of race. .................... 19

                       4.   The State's unconstitutional use of peremptory strikes to exclude veniremembers on the basis of race requires a new trial............................................................................... 22

              B.   This claim is unexhausted................................................. 22

Claim Two     Direct appeal counsel was ineffective for failing to challenge the State's unconstitutional use of its peremptory strikes, in violation of the Sixth Amendment right to counsel. ................................... 23

A.  Direct appeal counsel's failure to challenge the trial court's erroneous *Batson* ruling constitutes deficient performance. .............. 24

B.  Direct appeal counsel's failure to raise error under *Batson* prejudiced Mr. Ricks. ................................................................ 26

C.  The relitigation bar under 28 U.S.C. § 2254(d) does not preclude this Court's review because the state court's decision was factually and legally unreasonable. ............................................. 27

Claim Three    Trial counsel were ineffective during jury selection in violation of the Sixth Amendment right to counsel. ........................................ 27

A.  Trial counsel's failure to raise a *Batson* objection on the basis of gender constitutes deficient performance. ..................................... 28

B.  Trial counsel's failure to raise a *Batson* objection on the basis of gender prejudiced Mr. Ricks. ........................................................ 29

C.  This claim is unexhausted. ............................................................... 30

Claim Four    Mr. Ricks's shackling during his trial violated his Fifth, Sixth, and Fourteenth Amendment rights. ...................................................... 31

A.  The jury saw Mr. Ricks in shackles during his trial. ....................... 32

B.  Mr. Ricks's shackling violated his rights under the Fifth, Sixth, and Fourteenth Amendments. ............................................................ 33

C.  This Court can review this claim on the merits. .............................. 37

Claim Five    Trial counsel's failure to object to Mr. Ricks's shackling and require that the trial court identify the justification for shackling Mr. Ricks violated his Sixth Amendment rights. ............................................. 38

A.  The jury saw Mr. Ricks in shackles during his trial. ....................... 39

B.  Trial counsel's failure to object to Mr. Ricks's shackling and request that the court justify Mr. Ricks's shackling violated Mr. Ricks's Sixth Amendment right to counsel. ..................................... 39

1.  Trial counsel's failure to object to Mr. Ricks's shackling and failure to ask the trial court for findings about the shackling constitutes deficient performance. ............................ 39

2.  There is a reasonable probability that the result of the penalty phase would have been different had the jury not seen Mr. Ricks in shackles. ....................................................... 40

C.   The relitigation bar in 28 U.S.C. § 2254(d) does not preclude this Court's review because the state court's decision was factually and legally unreasonable. ..................................................... 42

Claim Six    Mr. Ricks's Sixth Amendment right to counsel was violated by trial counsel's ineffectiveness at the penalty phase. ......................................... 43

A.   A Sixth Amendment violation occurs when trial counsel's representation falls below prevailing professional norms and the defendant is prejudiced. ............................................................... 44

B.   Trial counsel's damaging penalty phase case. .................................. 45

C.   Trial counsel's representation was deficient. .................................... 48

1.   Trial counsel imposed unreasonable limitations on their investigation. .............................................................. 50

2.   Trial counsel retained a neuropsychologist who has testified that "minority status" is a risk factor for future dangerousness. ............................................................ 54

3.   Trial counsel unreasonably failed to follow up on red flags for, and present mitigating evidence of, significant trauma and trauma-related neurodevelopmental symptoms. ................... 55

4.   Trial counsel failed to follow-up on red flags for, and present evidence of, Mr. Ricks's mental health. ....................... 57

5.   Trial counsel failed to develop an individualized defense. ........ 60

6.   Trial counsel unreasonably relied on a "catch-all" expert. ........ 69

7.   Trial counsel conceded future dangerousness. ........................... 71

a.   Trial counsel's penalty phase case centered on demonstrating to the jury that Mr. Ricks was biologically predisposed to violence, aggression, and poor impulse control. ........................................ 71

b.   Trial counsel failed to investigate extraneous offenses. ........................................................... 75

D.   Mr. Ricks was prejudiced by trial counsel's deficient performance. ..................................................................... 76

1.   Trial counsel's penalty phase presentation that focused on Mr. Ricks's biological predisposition to violence, aggression, and poor impulse control prejudiced Mr. Ricks. ......................................................... 77

  2. Lay witnesses would have testified that Mr. Ricks endured abuse and neglect. ........................................................ 78

    a. Mr. Ricks endured relentless physical and verbal abuse by his parents. .......................................... 79

    b. Mr. Ricks endured physical abuse by other caregivers and at least one teacher. ...................................... 81

    c. Mr. Ricks witnessed domestic violence between his parents. ............................................................ 81

    d. As a young child and then teenager, Mr. Ricks ran away from home to survive the violence. ......................... 82

    e. Mr. Ricks endured emotional, medical, and physical neglect. ............................................................. 83

    f. This neglect in turn exposed Mr. Ricks to sexual abuse and substance abuse. ................................. 85

    g. Mr. Ricks succeeded in the face of this adversity when he was in a structured environment. ......................... 86

    h. Mr. Ricks did not have "a family and support system that maybe most of us in this courtroom didn't have." ....... 88

  3. Expert witnesses would have provided important context to Mr. Rick's conduct. ............................................... 90

  4. Trial counsel's failure to investigate extraneous offenses prejudiced Mr. Ricks. ............................................... 93

 E. This claim is unexhausted. .................................................. 96

Claim Seven The State relied on false testimony to secure a death sentence against Mr. Ricks in violation of the Fourteenth Amendment. ................. 97

 A. The State introduced the false and misleading testimony of Deputy Marcus Moore in support of its case on future dangerousness. ...................................................... 98

  1. The State elicited testimony from Deputy Marcus Moore suggesting that Mr. Ricks engaged in dangerous activity by having a pencil on his person while being transported to a pretrial proceeding. ............................................ 98

  2. The State knew that Deputy's Moore's testimony was false. .................................................................. 99

  3. Deputy Moore's testimony was material. ................................ 100

B.   The State introduced the false and misleading testimony that Mr. Ricks had forced his high school girlfriend into a car against her will. ............................................................................ 100

   1.   The State elicited testimony that Mr. Ricks had forced his high school girlfriend, Tina Brown, into a car against her will. ....................................................................................... 100

   2.   The State knew this testimony was false. .................................. 101

   3.   Mr. Cooper's false testimony was material. .............................. 102

C.   The State elicited false and misleading testimony to obscure the circumstances surrounding the brutal beating of Mr. Ricks at the Garvin County jail. ................................................................. 102

   1.   The State elicited testimony that Mr. Ricks was beaten because he bragged about the offense. ..................................... 102

   2.   The State knew the picture painted by this testimony was false. ........................................................................................ 103

   3.   This false testimony is material. ................................................ 105

D.   This false testimony is cumulatively material. ................................ 105

E.   This claim is unexhausted. .............................................................. 106

Claim Eight   The State violated *Brady v. Maryland* by failing to disclose information regarding the pencil incident to defense counsel. ................ 106

A.   The State's suppression of the evidence relating to the pencil violated *Brady*. ................................................................................ 106

   1.   The information about the pencil found on Mr. Ricks was exculpatory. ............................................................................... 107

   2.   The State suppressed the exculpatory information it had about the pencil. ...................................................................... 107

   3.   The suppressed exculpatory evidence was material. ................. 108

B.   This claim is unexhausted. .............................................................. 108

Claim Nine   Mr. Ricks's death sentenced was imposed by an unconstitutionally arbitrary and discriminatory system in violation of the Eighth and Fourteenth Amendment. .......................................................................... 109

Claim Ten   Texas Code of Criminal Procedure Article 37.071 is unconstitutional because jurors do not understand the penalty phase instructions. ............................................................................................. 110

PRAYER FOR RELIEF ........................................................................................................ 111

EXHIBIT LIST ................................................................................................................... 114

VERIFICATION BY ATTORNEY ...................................................................................... 116

CERTIFICATE OF SERVICE ............................................................................................ 117

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Amos v. Scott,*
   61 F.3d 333 (5th Cir. 1995) ...................................................................................37

*Andrus v. Texas,*
   140 S. Ct. 1875 (2020)...............................................................................54, 58, 65

*Atkins v. Virginia,*
   536 U.S. 304 (2002)...............................................................................................84

*Barr v. City of Columbia,*
   378 U.S. 146 (1964)...............................................................................................36

*Batson v. Kentucky,*
   476 U.S. 79 (1986)...................................................................................... *passim*

*Beazley v. Johnson,*
   242 F.3d 248 (5th Cir. 2001) ................................................................................85

*Bowers v. Quarterman,*
   497 F.3d 459 (5th Cir. 2007) ................................................................................63

*Brady v. Maryland,*
   373 U.S. 83, 87 (1963)....................................................................................80, 81

*Brecht v. Abrahamson,*
   507 U.S. 619 (1993)...............................................................................................35

*Buck v. Davis,*
   137 S. Ct. 756 (2017)..................................................................................45, 46, 62

*Chapman v. California,*
   386 U.S. 18 (1967)................................................................................................34

*Coleman v. Thompson,*
   501 U.S. 722 (1991)...............................................................................................36

*Deck v. Missouri,*
   544 U.S. 622 (2005).................................................................................... *passim*

*Flowers v. Mississippi,*
   139 S. Ct. 2228 (2019)....................................................................................10, 29

*Ford v. Georgia*,
    498 U.S. 411 (1991)..................................................................36, 37

*Foster v. Chatman*,
    578 U.S. 488 (2016)................................................................9, 10, 12

*Giglio v. United States*,
    405 U.S. 150 (1972)..........................................................................81

*Hathorn v. Lovorn*,
    457 U.S. 255 (1982)..................................................................36, 37

*Hatten v. Quarterman*,
    570 F.3d 595 (5th Cir. 2009) ..........................................................35

*Holbrook v. Flynn*,
    475 U.S. 560 (1986)..........................................................32, 34, 35

*Illinois v. Allen*,
    397 U.S. 337 (1970)................................................................32, 33

*J.E.B. v. Alabama*,
    511 U.S. 127 (1994)........................................................................27

*James v. Kentucky*,
    466 U.S. 341 (1984)........................................................................36

*Johnson v. California*,
    545 U.S. 162 (2005)..................................................24, 28, 29

*Johnson v. Williams*,
    568 U.S. 289 (2013)..........................................................................6

*Jurek v. Texas*,
    428 U.S. 262 (1976)........................................................................84

*Kelly v. Lynaugh*,
    862 F.2d 1126 (5th Cir. 1988) ........................................................84

*Kyles v. Whitley*,
    514 U.S. 419 (1995)........................................................................80

*Lockett v. Ohio*,
    438 U.S. 586 (1978)..................................................................44, 85

*Lockhart v. Johnson*,
    104 F.3d 54 (5th Cir. 1997) ............................................................34

*Miller-El v. Dretke,*
    545 U.S. 231 (2005)................................................................................................*passim*

*Moore v. Vannoy,*
    968 F.3d 482 (5th Cir. 2020) ...............................................................................24

*Murray v. Carrier,*
    477 U.S. 478 (1986).............................................................................................23

*Napue v. Illinois,*
    360 U.S. 264 (1950)............................................................................72, 74, 76, 79

*Nelson v. Davis,*
    No. 16-cv-00904 (N.D. Tex. Dec. 22, 2016) ..................................................44, 46

*Neville v. Dretke,*
    423 F.3d 474 (5th Cir. 2005) ...............................................................................71

*Padilla v. Kentucky,*
    559 U.S. 356 (2010).............................................................................................38

*Panetti v. Quarterman,*
    551 U.S. 930 (2007)...........................................................................................6, 8

*Paredes v. Quarterman,*
    574 F.3d 281 (5th Cir. 2009) ...............................................................................85

*Penry v. Lynaugh,*
    492 U.S. 302 (1989).............................................................................................84

*Porter v. McCollum,*
    558 U.S. 30 (2009)...............................................................................................55

*Powers v. Ohio,*
    499 U.S. 400 (1991).............................................................................................29

*Pyles v. Johnson,*
    136 F.3d 986 (5th Cir. 1998) ...............................................................................72

*Reed v. Quarterman,*
    555 F.3d 364 (5th Cir. 2009) ...............................................................................10

*Rhines v. Weber,*
    544 U.S. 269 (2005)..............................................................................................*passim*

*Smith v. Robbins,*
    528 U.S. 259 (2000).............................................................................................23

x

*Snyder v. Louisiana,*
    552 U.S. 472 (2008)..................................................................................10, 25

*Stokes v. Anderson,*
    123 F.3d 858 (5th Cir. 1997) ................................................................36

*Strickland v. Washington,*
    466 U.S. 668 (1984) ......................................................................... *passim*

*Strickler v. Greene,*
    527 U.S. 263 (1985)..................................................................................81, 83

*Sullivan v. Louisiana,*
    508 U.S. 275 (1993)..................................................................................28

*Teague v. Lane,*
    489 U.S. 288 (1989)..................................................................................85

*Trevino v. Thaler,*
    569 U.S. 413 (2013)..................................................................................30, 71

*Tumey v. Ohio,*
    273 U.S. 510 (1927)..................................................................................28

*United States v. Bagley,*
    473 U.S. 667 (1985)..................................................................................74, 81, 82

*United States v. Garza-De La Cruz,*
    __ F.4th __, 2021 WL 5232387 (5th Cir. 2021) ....................................85

*United States v. Williamson,*
    183 F.3d 458 (5th Cir. 1999) ................................................................24, 39

*Vasquez v. Hillery,*
    474 U.S. 254 (1986)..................................................................................28

*Weaver v. Massachusetts,*
    137 S. Ct. 1899 (2017)..............................................................................28, 29

*Wiggins v. Smith,*
    539 U.S. 510 (2003)..................................................................................58, 63, 65

*Wilkins v. Stephens,*
    560 F. App'x 299 (5th Cir. 2014) .........................................................33, 34

*Williams v. Taylor,*
    529 U.S. 362 (2000)..................................................................................42

*Woodson v. North Carolina,*
        428 U.S. 280 (1976).................................................................................85

**State Cases**

*Ex parte Chavez,*
        560 S.W.3d 191 (Tex. Crim. App. 2018)..................................................36

*Estrada v. State,*
        313 S.W.3d 274 (Tex. Crim. App. 2010)..............................................40, 82

*Hassan v. State,*
        369 S.W.3d 872 (Tex. Crim. App. 2012)..................................................26

*Ex parte Kerr,*
        64 S.W.3d 414 (Tex. Crim. App. 2002)......................................................6

*Morris v. State,*
        554 S.W.3d 98 (Tex. Ct. App.—El Paso 2018, pet ref'd) .........................39

*Nelson v. State,*
        No. AP-76,924, 2015 WL 1747144 (Tex. Crim. App. Apr. 15, 2015)............46, 52

*Ex parte Nelson,*
        137 S.W.3d 666 (Tex. Crim. App. 2004)..........................................36, 46, 62

*Ricks v. State,*
        No. AP-77,040, 2017 WL 4401589 (Tex. Crim. App. Oct. 4, 2017) ......................2

*Ex parte Ricks,*
        No. WR-85,278-01, 2020 WL 6777958 (Tex. Crim. App. Nov. 18, 2020) ..................2, 8, 36

*Texas v. Cedric Allen Ricks,*
        No. 1361004R (Tex. 371st Dist. Ct.—Tarrant County) ...........................1

*Wells v. State,*
        611 S.W.3d 396 (Tex. Crim. App. 2020)..............................................51, 52

**Federal Statutes**

18 U.S.C. § 3599.....................................................................................2

28 U.S.C. § 1331.....................................................................................1

28 U.S.C. § 2241.....................................................................................1

28 U.S.C. § 2254.....................................................................1, 6, 27, 41, 86

**State Statutes**

TEX. CODE CRIM. PROC. art. 11.071 ..................................................................2, 6, 7, 8

TEX. CODE CRIM. PROC. art. 37.071 ................................................................ *passim*

**Rules**

TEX. R. EVID. 705..............................................................................................49

**Constitutional Provisions**

U.S. CONST. AMEND. V..........................................................................31, 32, 35, 38

U.S. CONST. AMEND. VI .................................................................................. *passim*

U.S. CONST. AMEND. VIII..........................................................................52, 83, 84, 85

U.S. CONST. AMEND. XIV ................................................................................ *passim*

**Other Authorities**

*Guidelines for the Appointment and Performance of Defense Counsel in Death
    Penalty Cases*, 31 Hofstra L. Rev. 913 (2003) ..........................................54

*Supplementary Guidelines for the Mitigation Function of Defense Teams in Death
    Penalty Cases*, 36 Hofstra L. Rev. 677, 689 (2008) ........................................54, 55

## JURISDICTION AND VENUE

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 2241(a), and 2254(a). Venue is proper in the United States District Court for the Northern District of Texas under 28 U.S.C. § 2241(d) because it is the court for the district within which Mr. Ricks was convicted and sentenced.

## PARTIES

Petitioner Cedric Allen Ricks is an inmate of the Texas Department of Criminal Justice ("TDCJ"). Mr. Ricks's TDCJ number is 999593 and he is housed at the Polunksy Unit, Livingston, Texas.

Respondent Bobby Lumpkin is the Director of TDCJ's Correctional Institutions Division and an agent of the State that has custody of Mr. Ricks. He has custody pursuant to the judgment and sentence of death entered against Mr. Ricks on May 16, 2014, in *Texas v. Cedric Allen Ricks*, No. 1361004R (Tex. 371st Dist. Ct.—Tarrant County).

## PROCEDURAL HISTORY

Cedric Ricks was convicted of capital murder and sentenced to death by the 371st District Court of Tarrant County, Texas, on May 16, 2014. 2 CR 526. At trial, Mr. Ricks was represented by court-appointed attorneys William Ray and Stephen Gordon. On direct appeal, counsel for Mr. Ricks filed a brief raising twenty points of error under the United States Constitution, the Texas Constitution, the Texas Code of Criminal Procedure, and Oklahoma statutes. *See* Appellant's Brief, *Ricks v. State*, No. AP-77,040 (Tex. Crim. App. Aug. 3, 2015). The Texas Court of Criminal Appeals ("CCA") affirmed Mr. Ricks's conviction and sentence of death on October 4, 2017. *Ricks*

1

*v. State*, No. AP-77,040, 2017 WL 4401589 (Tex. Crim. App. Oct. 4, 2017).[1]

Mr. Ricks filed an Application for Writ of Habeas Corpus in the convicting court on June 13, 2016, raising eleven claims. 1 SHCR 16.[2] The State filed a reply to Mr. Ricks's habeas application on December 12, 2016, in which it denied the allegations raised in the petition and attached several affidavits and supporting documents. 3 SHCR 1221. On June 25, 2018, the convicting court determined pursuant to Texas Code of Criminal Procedure Article 11.071, § 8(a), that there were no controverted, previously unresolved factual issues material to Mr. Ricks's confinement and ordered the parties to file proposed findings of fact and conclusions of law. 4 SHCR 1894. The convicting court adopted the State's Proposed Findings of Fact and Conclusions of Law in full and *verbatim* on July 9, 2019. 4 SHCR 1899; 2d Supp. SHCR 4. The CCA, "[b]ased upon the trial court's findings and conclusions and [its] own review," denied habeas relief on November 18, 2020. *Ex parte Ricks*, No. WR-85,278-01, 2020 WL 6777958, at *2 (Tex. Crim. App. Nov. 18, 2020).

This Court appointed the Federal Public Defender's Office for the Northern District of Texas ("FPD") pursuant to 18 U.S.C. § 3599 to represent Mr. Ricks in federal habeas proceedings on January 4, 2021. ECF No. 4. Pursuant to its appointment, the FPD sought to obtain all files and records in connection with trial counsel's representation of Mr. Ricks. *See* ECF No. 7 at 2–3. Trial counsel indicated to the FPD that they would not turn over some of the records and files absent a court order. *See* ECF No. 12. On April 20, 2021, Mr. Ricks filed a Motion for Order Directing

---

[1] The CCA repeatedly faulted counsel for failing to include arguments or authorities in support of the claims raised. *See Ricks*, 2017 WL 4401589, at *8–9.

[2] "SHCR" refers to the Clerk's Record in state habeas proceedings. "RR" refers to the Reporter's Record and "CR" to the Clerk's Record from Mr. Ricks's trial.

Trial Counsel to Turn Over Files and Records to Federal Habeas Counsel. ECF No. 7. This Court ordered the Director to respond, ECF No. 8, and the Director filed a Brief in Opposition on May 6, 2021. ECF No. 9. This Court denied Mr. Ricks's Motion on May 7, 2021. ECF No. 10. On May 24, 2021, Mr. Ricks filed a Motion for Reconsideration of Order Denying Motion To Produce Documents. ECF No. 11. The following day, this Court denied Mr. Ricks's Motion for Reconsideration, finding that this Court did not have subject matter jurisdiction. ECF No. 13. On August 10, 2021, Mr. Ricks filed a Motion for Order Directing Trial Counsel To Turn Over Files and Records to Federal Habeas Counsel in the 371st District Court, Tarrant County. *See* ECF No. 15-1. That Motion remains pending in the trial court.

On October 20, 2021, Mr. Ricks filed in this Court an Unopposed Motion to Amend Order Appointing Counsel and Setting Deadlines. ECF No. 15. On October 29, 2021, this Court granted Mr. Ricks's Motion and ordered Mr. Ricks to file an amended petition. ECF No. 16 at 2. Mr. Ricks's Amended Petition is due on or before May 18, 2022. ECF No. 28.

## INTRODUCTION

Mr. Ricks's trial was tainted by fundamental unfairness from the outset. The State violated Mr. Ricks's and prospective jurors' rights by discriminating in jury selection on the basis of race and gender. The State exercised its peremptory strikes to strike the only Black women who could have served on the jury and to disproportionately strike women. The State further relied on testimony it knew to be false and withheld exculpatory evidence to obtain a death sentence in violation of Mr. Ricks's due process rights.

Furthermore Mr. Ricks was placed in shackles and a shock belt throughout trial without justification and despite a pretrial order prohibiting shackles. The jury then saw Mr. Ricks in shackles during the penalty phase, in violation of Mr. Ricks's due process rights. The State

compounded this constitutional violation by telling the jury that "you saw him walk back to counsel's table this morning with shackles on" in support of its future dangerousness case. 40 RR 128. Moreover, trial counsel did not object to the shackles despite the clear violation of Mr. Ricks's due process rights.

Leading up to and during trial, Mr. Ricks was also failed by those appointed to defend him. Trial counsel's entire case for a sentence less than death was that Mr. Ricks was "a train looking for a wreck." 40 RR 114. Rather than develop an individualized defense, trial counsel applied a cookie-cutter case that resulted in a death sentence for their previous client just months prior. Despite significant red flags of trauma and mental health concerns, trial counsel presented the testimony of only one "catch-all" expert who explicitly told the jury that Mr. Ricks always was and always would be violent. 38 RR 148, 150. Trial counsel thus conceded the future dangerousness special issue.

This deficiency was further compounded by their failure to present any mitigation. 40 RR 105. Had trial counsel performed effectively, the jury would have heard that Mr. Ricks endured physical abuse at the hands of his parents, other caretakers, and even a teacher. The jury would have also heard that Mr. Ricks suffered physical and emotional neglect. Appropriate experts would have explained to the jury that Mr. Ricks's conduct reflected profound trauma. The jury would have further heard that Mr. Ricks exhibited resilience, but when he reached out in distress in the weeks leading up to the offense, his mother and family turned him away. These deficiencies, as well as others, violated Mr. Ricks's Sixth Amendment right to effective assistance of counsel.

## STATEMENT OF FACTS

On the evening of May 1, 2013, Bedford police officers arrived at the Shoal Creek Apartments in Bedford, Texas, after receiving two 911 calls. 31 RR 87. The first was made by Mr.

Ricks's cousin, who called after she and her father received a phone call from Mr. Ricks telling them that he had done something bad. *Id.* at 64. While they were on their way to the apartment, dispatchers received a second 911 call from M. Figueroa, who told dispatchers that he, his brother A. Figueroa, and his mother Roxann Sanchez had been injured by Ms. Sanchez's boyfriend, Cedric Ricks, at the apartment where they all resided. When the officers arrived at the apartment, they discovered that Ms. Sanchez and A. had died but that M. had survived. *Id.* at 97.

DNA and other forensic evidence could not establish what happened on that evening between Mr. Ricks and Ms. Sanchez. In the days and hours leading up to that evening, Mr. Ricks had reached out to his family and friends for help. He had lost his job and his car was repossessed, and he had turned to his family as his relationship and mental health deteriorated. Those he turned to for help, however, shrugged him off. On the evening of May 1, a neighbor recalled overhearing an argument break out between Mr. Ricks and Ms. Sanchez shortly after 7 p.m. 31 RR 44. Mr. Ricks and Ms. Sanchez argued and came to blows with each other. 32 RR 26. An hour or so later, M. called from the apartment to report that Mr. Ricks had hurt him, A., and Ms. Sanchez. 32 RR 47.

Bedford law enforcement pinged Mr. Ricks's cellphone through cell tower data and relayed his location to the Oklahoma Highway Patrol. Oklahoma law enforcement arrested him in Garvin County, just north of the Texas border. 6 RR 76; 31 RR 135. At the time of the arrest, law enforcement had neither probable cause nor a warrant for Mr. Ricks's arrest. 6 RR 150, 173. Troopers took Mr. Ricks to the Garvin County jail and then to a local hospital to be treated for lacerations to his hands. 31 RR 159–60. The Garvin County Undersheriff, Jim Mullett, then deliberately placed Mr. Ricks in a cell with other inmates, including inmates belonging to the Universal Aryan Brotherhood. 38 RR 18; Ex. 54. There, Mr. Ricks was violently assaulted at least

in part on account of his race. Ex. 26.[3] In the meantime, Bedford law enforcement conducted a warrantless search of Mr. Ricks's and Ms. Sanchez's apartment, spending hours inside the apartment gathering evidence that would eventually be used against Mr. Ricks at trial. 6 RR 73–74.

The day after being violently beaten at the Garvin County jail, Mr. Ricks waived extradition proceedings and was returned to Texas. Mr. Ricks was charged with the capital murder of Ms. Sanchez and A. and incarcerated at the Tarrant County Jail. During his incarceration in the year leading up to trial, Mr. Ricks attempted to commit suicide at least once. *See* Ex. 19. At trial, Mr. Ricks testified that he was "sorry about everything." 40 RR 37.

## 28 U.S.C. § 2254(D) SHOULD NOT APPLY TO CLAIMS ADJUDICATED ON THE MERITS IN STATE COURT

This Court should not apply 28 U.S.C. § 2254(d) to Mr. Ricks's claims decided on the merits by the state court because the state court proceedings did not comport with due process. The CCA has stated that Texas Code of Criminal Procedure Article 11.071, which governs capital state habeas proceedings, ensures "that a death row inmate *does* have one full and fair opportunity to present his constitutional or jurisdictional claims in accordance with the procedures of the statute." *Ex parte Kerr*, 64 S.W.3d 414, 419 (Tex. Crim. App. 2002) (emphasis in original). 28 U.S.C. § 2254, in turn, assumes that the CCA honors that responsibility and follows procedures that comport with due process, so that petitioners receive full and fair review of their claims before litigating in federal court. *See Panetti v. Quarterman*, 551 U.S. 930, 952 (2007) (holding that the "state court failed to provide petitioner with a constitutionally adequate opportunity to be heard"). When states fail to do so, state prisoners must seek their "one bite at the apple" in federal court

---

[3] Exhibits 1 through 27 are lodged at ECF No. 18.

and the limitations that § 2254(d) places on the granting of federal habeas relief do not apply. *See Johnson v. Williams*, 568 U.S. 289, 301–02 (2013) (explaining that the application of § 2254(d) to claims presented to the state court is a rebuttable presumption).

Mr. Ricks diligently sought a full and fair opportunity to litigate his claims for writ of habeas corpus in state court. He was nevertheless deprived of the process to which he was due. Mr. Ricks timely filed an Application for Writ of Habeas Corpus pursuant to Texas Code of Criminal Procedure Article 11.071 on June 13, 2016. 1 SHCR 16–500; 2 SHCR 503–1000; 3 SHCR 1003–1220. In that Application, Mr. Ricks raised several constitutional challenges to his conviction and death sentence. *Id.* On June 17, 2016, the State filed and was granted a Motion for Affidavits of Applicant's Trial and Appellate Counsel, requesting that Mr. Ricks's trial and appellate counsel be ordered to respond to Mr. Ricks's allegations of ineffective assistance of counsel. 4 SHCR 1814–17. Trial counsel and direct appeal counsel were ordered to respond to issues identified by the State only. *Id.*

On December 12, 2016, the State filed its Reply to Application for Writ of Habeas Corpus. 3 SHCR 1221–1463. In its Reply, the State denied Mr. Ricks's allegations and controverted issues of fact raised by Mr. Ricks. The State relied, in part, on the affidavits trial and direct appeal counsel rpovided on issues identified by the State. *Id.* On December 13, 2016, the State filed a Motion for Court to Order Preparation of Proposed Findings of Fact and Conclusions of Law on the ground that there were "no controverted, previously unresolved factual issues material to the legality of Applicant's confinement[.]"[4] 4 SHCR 1885–87. On June 25, 2018, the trial court granted the

---

[4] The State filed a Second Motion for Court To Order Preparation of Proposed Findings of Fact and Conclusions of Law re-urging its arguments to the trial court on June 15, 2018. 4 SHCR 1889–93.

State's motion and ordered that the parties submit proposed findings in accordance with Texas Code of Criminal Procedure Article 11.071, § 8. 4 SHCR 1894. The State filed its Proposed Findings of Fact and Conclusions of Law on July 24, 2018, 4 SHCR 1899–969, and Mr. Ricks filed his Proposed Findings of Fact and Conclusions of Law the same day, 4 SHCR 1970–99; 5 SHCR 2003–10. On July 9, 2019, the trial court adopted the State's Proposed Findings of Fact and Conclusions of Law in full and *verbatim* and recommended that habeas relief be denied. 2d Supp. SHCR 4.

In light of the trial court's Order adopting the State's Proposed Findings of Fact and Conclusions of Law, Mr. Ricks filed in the trial court Objections To, and Motion for Withdrawal of, the Convicting Court's Findings of Fact and Conclusions of Law and Recommendation of Denial of Relief. 2nd Supp. SHCR 5–14. Mr. Ricks argued that the trial court should withdraw its Order on the ground that the trial court's Findings of Fact and Conclusions of Law were based on inadequate fact-finding procedures and were not supported by the record. *Id.* Mr. Ricks further argued that, by adopting the State's Proposed Findings of Fact and Conclusions of Law in full, the trial court abdicated its role as a neutral arbiter. *Id.* Mr. Ricks's Objections were left unaddressed. On November 18, 2020, the CCA denied habeas relief. *Ex parte Ricks*, No. WR-85,278-01, 2020 WL 6777958, at *2 (Tex. Crim. App. Nov. 18, 2020).

There are several hallmarks of unfairness present in Mr. Ricks's state habeas proceedings. First, the State's Reply controverted previously unresolved factual issues material to Mr. Ricks's conviction and death sentence, and further failed to designate those facts and the manner of their resolution in accordance with Texas Code of Criminal Procedure Article 11.071, §§ 8, 9. Second, the trial court resolved those factual material issues by adopting the State's proposed findings in full. 2nd Supp. SHCR 5–14. Those proposed findings were based on affidavits by trial and direct

appeal counsel in response to only the State's questions, and on further affidavits and evidence that Mr. Ricks never had an opportunity to test or challenge. *See* 4 SHCR 1899–969. Finally, by adopting the State's proposed findings, and thus adjudicating facts against Mr. Ricks, in full and *verbatim*, the trial court failed to act as neutral arbiter. *See* 2nd Supp. SHCR 6–7.

The procedures in Mr. Ricks's state habeas proceedings were clearly inadequate to ascertain the truth and reach reasonably correct results. *See Panetti*, 551 U.S. at 954. On that basis, § 2254(d) should not apply as a bar to the relitigation, *de novo*, of the claims that Mr. Ricks raised in state habeas that were decided on the merits.

## CLAIMS FOR RELIEF

**Claim One**          **The State exercised peremptory strikes on the basis of race in violation of the Fourteenth Amendment.**

During jury selection, the State struck the only two Black women who could have been seated on the jury.[5] Trial counsel raised an objection citing *Batson v. Kentucky*, 476 U.S. 79 (1986), and, in support of its *prima facie* case, pointed to the State's pattern of strikes against Black and Hispanic veniremembers and the State's disparate questioning of a Black veniremember struck by the State. 30 RR 26–32. The trial court denied the *Batson* objection and denied trial counsel's request that the trial court review the State's notes from jury selection and make those notes and materials a part of the record. *Id.* at 36.

Critical new information, including the State's notes and materials from jury selection that it had previously refused to disclose, has recently come to light that significantly strengthens Mr. Ricks's *Batson* claim. This new information makes clear that the State exercised peremptory

---

[5] The State also struck Flores, who was the only person within the strike zone who identified his race on the juror questionnaire as Hispanic. The trial court later found that veniremember Dawson was Hispanic. 30 RR 34. The State further asked that the record reflect that veniremember Hernandez was Hispanic. *Id.* at 30. Both identified their race as white on their juror questionnaires.

strikes on the basis of race in violation of the Fourteenth Amendment. *See Batson*, 476 U.S. at 86. Indeed, the State's notes and materials from jury selection reflect that the State was marking its materials to reflect the race of veniremembers. This "persistent focus on race in the prosecution's file," including the handwritten annotations "B" or "AA" by the names of Black veniremembers and the annotation "H" by the names of Hispanic veniremembers, supports finding that the State impermissibly struck veniremembers on the basis of race and in violation of the Equal Protection Clause of the Fourteenth Amendment. *See Foster v. Chatman*, 578 U.S. 488, 512 (2016).

Furthermore, while the trial court did not require the State to provide race-neutral reasons for striking certain veniremembers, the State articulated purportedly race-neutral reasons for striking the veniremembers at issue during state habeas proceedings on a related claim. Those reasons, however, are pretextual.[6] Because the State impermissibly struck veniremembers on the basis of race, Mr. Ricks is entitled to a new trial. *See Miller-El v. Dretke*, 545 U.S. 231, 266 (2005).

### A.  Mr. Ricks can establish that the State purposefully discriminated on the basis of race in exercising peremptory strikes.

Discrimination on the basis of race or ethnicity in jury selection violates the Equal Protection Clause of the Fourteenth Amendment. *Batson*, 476 U.S. at 86. "The Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2244 (2019) (citing *Foster*, 136 S. Ct. at 1747); *see Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) (same). In adjudicating a *Batson* challenge, courts follow a three-step analysis:

> First, a defendant must present a prima facie case that the prosecution exercised its peremptory challenges on the basis of race. Second, if the defendant meets this initial burden, the burden shifts to the prosecutor to present a race-neutral explanation for striking the jurors in question. Finally, the court must determine whether the defendant has carried his burden of proving purposeful discrimination.

---

[6] At this stage, based on the currently available information, Mr. Ricks is only challenging the strikes of A. Stafford and W. Stafford, not Flores.

*Reed v. Quarterman*, 555 F.3d 364, 368 (5th Cir. 2009) (citing *Batson*, 476 U.S. at 96–98). Here, the State provided purportedly race-neutral reasons in Mr. Ricks's state habeas proceedings.

    1.   **The State annotated its jury selection materials to reflect the race and ethnicity of veniremembers.**

Immediately following the parties' simultaneous exercise of their peremptory strikes, trial counsel raised a *Batson* objection. 30 RR 25–26. In support of their *prima facie* case of discrimination on the basis of race, trial counsel pointed to the State's peremptory strikes against the only two Black women within the strike zone (A. Stafford and W. Stafford), the State's peremptory strike against a Hispanic man (Flores), and the fact that the questioning of A. Stafford was the longest *voir dire* by the State of any veniremember. *Id.* at 26–32. On the heels of trial counsel's objection, the State asked that the record reflect that the defense had struck a Hispanic woman (Hernandez), a Black man (Bean), and a veniremember who "has an Anglo name, [but] appears to be Hispanic" (Dawson).[7] *Id.* at 30–31. The State did not dispute trial counsel's evidence of the State's disparate questioning of A. Stafford. *Id.* at 32.

The court denied trial counsel's *Batson* challenge "just based on the numbers [and] without the necessity of the State having to offer race-neutral reasons." 30 RR 35. Trial counsel then asked that the trial court review the State's notes from jury selection and place them in the record under

---

[7] Hernandez and Dawson identified their race as "white" on their juror questionnaires. The court added *sua sponte* that the record would further reflect that trial counsel had struck a veniremember "of half-Asian origin." 30 RR 31–32. In response to trial counsel's objection to the State's description of veniremember Dawson, the trial court called him in and asked that he "tell [the court] what the family origin background of [his] parents is." *Id.* at 33. Dawson explained that his mother was Caucasian and his father Hispanic, and that both he and his brother bore their mother's surname. *Id.* The court asked "[w]hat was [his] father's surname[,]" and when he replied that it was Gonzalez, the court ordered that "the record will reflect that Mr. Dawson has a heritage that includes half-Hispanic." *Id.* at 34.

seal. *Id.* at 36. The State objected to turning over their notes and assured the trial court that, "if required later on by an appellate court, [it] c[ould] provide many adequate race-neutral reasons for striking each of these three individuals." *Id.* The trial court denied trial counsel's request and the State was not required to turn over their notes and materials from jury selection. *Id.*

Those notes and materials were recently provided by the State to counsel for Mr. Ricks and show that the State annotated its jury selection materials to reflect the race and ethnicity of veniremembers.[8] The State annotated the race and ethnicity of minority veniremembers on a list of qualified veniremembers, a strike-zone chart, and certain juror questionnaires. On a typed 17-page list of veniremembers titled "Random Panel List" and marked in pen as "2d list," the following annotations have been made in black and blue pen:

- "W/M" by the names of white male veniremembers;

- "W/F" by the names of white female veniremembers;

- "B/F" by the names A. Stafford, Nixon, Williams, W. Stafford, Jeanne-Raglin, McLean, and Slay;

- "B/M" by the names Bean, Barnes, Jackson, Reynolds, Buris, Runnels, and Vance;

- "H/M" by the names Flores, Saucedo, and Hernandez; and

- "Other/M South Asian" by the name Parikh.

Ex. 1. On a typed chart made up of boxes with each box corresponding to the name of a qualified veniremember and in order of qualification, the following annotations have been made:

- The number 28, corresponding to W. Stafford, has been circled in purple pen and the annotation "AA" made in green pen;

- The number 13, corresponding to A. Stafford, has been circled in purple and the annotation "AA" made in green pen;

---

[8] The record reflects that each qualified veniremember was photographed by the court. *See, e.g.*, 25 RR 117.

- A tick in purple ink next to the name Dawson and the annotation "H" made in green pen;
- The annotation "H" and then crossed out in green pen by the name Argurieo;
- The number 10, corresponding to Flores, circled in purple and the annotation "H" made in green pen;
- The annotation "AA" made in green pen by the name Barnes.

Ex. 2.

In addition, the State's copy of A. Stafford's questionnaire includes the annotation in blue pen "B/F." Ex. 3. And on the State's copy of Lopez's questionnaire, her age, gender, and race have been circled in blue ink. Ex. 4. This "persistent focus on race in the prosecution's file" underscores that the State impermissibly struck veniremembers on the basis of race and ethnicity in violation of the Equal Protection Clause of the Fourteenth Amendment. *See Foster*, 578 U.S. at 512.

### 2. The State struck A. Stafford on the basis of race.

Trial counsel raised a *Batson* objection on the basis of the State's peremptory strike against A. Stafford. 30 RR 25–26. Trial counsel relied on the fact that the State's questioning of A. Stafford was the longest of any *voir dire* by the State. *Id.* at 32. The State's materials from jury selection reflect that the State annotated the letters "B/F" and "AA" by A. Stafford's name on the State's list of veniremembers, a strike-zone chart, and A. Stafford's juror questionnaire. *See* Exs. 1, 2, 3.

In state habeas proceedings, the State articulated purportedly race-neutral reasons for exercising a peremptory strike against A. Stafford. *See* 3 SHCR 1461−63.[9] But a side-by-side

---

[9] The State provided these supposedly race-neutral reasons in its Reply to Mr. Ricks's claim that his direct appeal counsel was ineffective for failing to raise *Batson* error on appeal. That claim was resolved in state court without the State's racially-coded jury selection notes that it recently provided to counsel for Mr. Ricks.

comparison on these issues of A. Stafford with juror Attebery, a white woman who was accepted by the State and seated on the jury, belies the State's supposedly race-neutral reasons for striking A. Stafford. This side-by-side comparison establishes that the State impermissibly struck A. Stafford on the basis of race. *See Miller-El*, 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step.").

The State represented that it had exercised a peremptory strike against A. Stafford because "she indicated in her juror information sheet that she was not in favor of the death penalty." 3 SHCR 1462. The State further represented that it had struck her because her brother had served a 25-year sentence and the State "[d]id not want to accept veniremembers with relatives or friends who are in trouble with the law or with family members who have been convicted of a crime." *Id.* Additionally, the State said that A. Stafford "expressed distrust in the criminal justice system in her questionnaire[;]" that "she did not feel that everyone is treated fairly in the criminal justice system[;]" and that she believed that "there is much room for improvement in the criminal justice system." *Id.*

First, A. Stafford's answers to questions about the death penalty were similar to answers offered by juror Attebery—indeed, A. Stafford's answers were more favorable to the death penalty. In her questionnaire, A. Stafford ticked that she was "not in favor" of the death penalty.[10] A. Stafford explained that she "fe[lt] that you must have a clear understanding of what constitutes the offense of capital murder and the offense must be proven." In response to the same question,

---

[10] This Court directed that, should Mr. Ricks raise a Batson claim, the Respondent should file juror questionnaires into the record before this Court. ECF No. 16 at 4.

juror Attebery also ticked that she was "not in favor" of the death penalty and explained that "it depends on the circumstances so thos [sic] to be considered." A. Stafford further answered in her questionnaire that she believed that "yes," the death penalty does serve a legitimate purpose because "[i]n some instances it removes the threat of repeated acts of violence." She also answered that she thought the death penalty should be available for "[m]alicious violent acts against children." By contrast, juror Attebery answered that "no," the death penalty does not serve any legitimate purpose in our society.

Second, A. Stafford's views on the criminal justice system in general were markedly similar to those of juror Attebery's. In response to questions regarding her view of the criminal justice system, A. Stafford answered that she "d[idn't] always feel that everyone is treated fairly in the criminal justice system" and that there was "much room for improvement." When asked if she thought the criminal justice system was "too lenient," "too severe," or "just about right," A. Stafford answered that the punishment of criminal offenders was "just about right." In response to the same questions, juror Attebery likewise answered that the system "can be too lenient on some people and hard on others" and that it was "successful in some areas." She indicated, however, that the punishment of criminal offenders was "too severe." Moreover, in her *voir dire*, juror Attebery stated that she believed her uncle had been falsely convicted. 12 RR 198.

Third, both A. Stafford and juror Attebery had close family members who had been convicted of a crime. During *voir dire*, A. Stafford explained that her brother received a 25-year prison sentence. 15 RR 83. In her questionnaire, juror Attebery indicated that both her uncle and her son were convicted of criminal offenses: her uncle served a 20-year sentence and her son was convicted of family violence. As well as juror Attebery, juror Flint, a white man, indicated on his questionnaire that he had a son who was or had been in prison or jail. These comparisons further

belie the State's argument that it struck A. Stafford because it "[d]id not want to accept veniremembers with relatives or friends who are in trouble with the law or with family members who have been convicted of a crime." 3 SHCR 1462.

Moreover, A. Stafford and juror Attebery were disparately questioned about their impressions of the criminal justice system based on their loved ones' experiences. During *voir dire*, the State questioned A. Stafford extensively about the circumstances of her brother's conviction:

Q.    Do you feel like he was treated fairly in that case?

A.    He took a plea bargain. He was advised to take a plea bargain, and so. . .

Q.    Well, what's your -- what's your -- what's your perception of whether or not he was treated fairly?

A.    My perception is that he took the plea, which is what his attorney advised. I don't know, if he would have gone to trial, if he would have received that sentence, because due to the -- you know, the circumstances, he actually was the only person that did any time.

Q.    Okay.

A.    And I honestly -- you know, it's my brother. I don't know all the details of the -- you know, of the situation of the case,

Q.    Uh-huh.

A.    -- but. . .

Q.    And that's why I'm just asking you about your perception of how things went.

A.    Yeah.

Q.    I mean, obviously, here's what I'm getting at.

A.    Uh-huh.

Q.    Robert and I are prosecutors.

A.    Yes.

Q.    And, you know, I'm sensitive -- when people like you come into the courthouse and you have a relative that's been convicted, --

A.    Uh-huh.

Q.    -- I'm sensitive to the fact that you may feel like a prosecutor was overbearing or overzealous or just somehow your loved one was railroaded into taking a plea bargain that you don't think they deserved.

A.    I was going to say, honestly, he took the plea bargain based on his attorney's, you know, information or what his attorney advised him to do. And my parents are older or whatever else. And, you know, he was advised from his attorney that if you take this plea -- if you pretty much take the plea, go do a quarter of your sentence, pretty much, when you come up for parole, you're not in trouble, whatever else, then more than likely you will come home, and with someone with no history of anything. So he just did what the attorney advised. So --

Q.    Well, so, I guess, let me ask it a different way.

A.    Okay.

Q.    Do you feel like that was a fair outcome to the case for him?

A.    For him? No.

Q.    Okay. And why not?

A.    Because I think that, you know -- whatever the circumstances were, I just feel as though that everyone that was involved or had anything to do with it should have also been punished.

Q.    Whose fault do you think it is that everyone involved was not punished? Why do you think that happened?

A.    I really honestly don't know. That's, you know, a question that, you know, I've had.

15 RR 83–85. By contrast, the State asked juror Attebery just a few questions about her opinion on her uncle's conviction:

Q.    Do you feel like he was falsely convicted?

A.    From what I know of him, yes, I felt that way, but I didn't live in the house, and, you know, sometimes people are not what they seem.

Q.    So you kind of feel like you just don't have enough facts one way or the other to know for sure?

A.    Yeah. [. . .]

12 RR 198. Similarly, and in stark comparison to its questioning of A. Stafford, the State did not question juror Flint on his son's prison or jail time. 17 RR 5–52. Tellingly, the State did not dispute that its questioning of A. Stafford was the longest of any veniremember.[11] 30 RR 32.

Finally, the State's remaining reasons are likewise pretextual. The State treated A. Stafford, who did not have children, differently than white veniremembers who did not have children. Although the State claimed that it "d[id] not want to accept veniremembers who have no children because it is [its] belief that they are not as invested in our community," 3 SHCR 1462, the very first juror the State accepted on the jury, juror Twietmeyer, indicated in his questionnaire that he did not have any children. Likewise, the State did not exercise a peremptory strike against juror Lemay, a white woman with no children, and alternate juror Smith, a white man with no children. And the State claimed that it struck A. Stafford because she "had prior jury service that resulted in a not guilty verdict." *Id.* A. Stafford did not indicate in her questionnaire what the outcome was but was questioned repeatedly by the State on the verdict in the case. 15 RR 71–72, 101–02. At least three jurors who were white also indicated that they had previously served as jurors (Attebery, Dorman, Flint). Yet, by contrast with the questioning of A. Stafford, juror Flint was never asked about the verdict and jurors Dorman and Attebery were not asked by the State about their prior

---

[11] After the State finished its *voir dire* of A. Stafford, the trial court itself remarked that "[s]ince you've been sitting there for about an hour and 20 minutes, why don't we take a break for just a minute before the Defense asks you some questions?" 15 RR 139.

jury service at all. 17 RR 12; 13 RR 70–143.

In sum, a side-by-side comparison of A. Stafford, a Black woman against whom the State exercised a peremptory strike, and juror Attebery, a white woman who was seated on the jury, betrays the pretextual nature of the State's reasons for striking A. Stafford. Mr. Ricks has therefore established purposeful discrimination on the part of the State when it struck A. Stafford.

### 3. The State struck W. Stafford on the basis of race.

Mr. Ricks can also establish that W. Stafford was struck by the State on the basis of race. Trial counsel included W. Stafford in their *Batson* objection. 30 RR 25–26. The record also establishes that the State disparately questioned W. Stafford, including by identifying Mr. Ricks in court and asking her if she could answer the special issues such that Mr. Ricks specifically would be executed. 20 RR 270. The State's materials from jury selection further reflect that the State annotated the letters "B/F" and "AA" by W. Stafford's name on the State's list of veniremembers and a strike-zone chart. *See* Ex. 1, 2.

The State's proffered race-neutral explanations for striking W. Stafford are also pretextual. First, the State claimed in state habeas that it had struck W. Stafford because "[s]he stated that her idea of grace or the idea that somebody is just a human being could be enough to spare their life." 3 SHCR 1462. The State's *voir dire* of W. Stafford, however, makes clear that she was in favor of the death penalty and was unequivocal that she could impose it. Second, the State's claim that it had struck W. Stafford because "[h]er mother was at one time incarcerated in prison[]" and because "[s]he also spent six days in the Tarrant County jail after being booked on a theft-by-check case," *id.*, is belied by the State's acceptance of jurors who also had family members who were incarcerated.

In her juror questionnaire, W. Stafford indicated that she was "in favor" of the death penalty and explained that "[a] crime must have consequences." She also agreed that "yes," capital

punishment serves a legitimate purpose, which she explained as "[t]o put away/punish/serve notice that all actions have consequences." When asked for the "best argument in favor of the death penalty," W. Stafford replied that "God has allowed the laws of the land by man [and] [w]e must respect that." W. Stafford further indicated that "no" the death penalty has never been applied in an unfair or discriminatory manner. She described the criminal justice system as "very successful" in dealing with crime and "a great system," and the punishment of offenders as "just about right." Finally, W. Stafford indicated in her questionnaire that she could return a verdict resulting in the death penalty and, during *voir dire*, unequivocally stated that her training in the ministry would not prevent her from answering the special issues in a way that would result in the death penalty. 20 RR 268–69.

In response to the State's questions on *voir dire*, W. Stafford explained that she was an ordained minister at her church. 20 RR 218. She answered that she would have "no hesitation" in finding the defendant guilty, knowing that that the punishment would be life without parole or death. *Id.* at 243. When asked by the State to give examples of mitigating factors, W. Stafford replied she was "not really sure at this moment." *Id.* at 257. She agreed with the State's examples that the defendant's age or background could be mitigating. *Id.* at 257–59. W. Stafford answered that she could take into consideration all of the evidence to determine if there was a mitigating factor. *Id.* at 259–260. The State even remarked that W. Stafford had agreed several times that the answer to the special issues depended on the evidence:

> Q.    Okay. Okay. Now -- and you've said that a lot, depending on the evidence. Okay?
>
> A.    Yes. I think that's what it boils down to for me.
>
> Q.    That's key, isn't it?
>
> A.    That's key for me.

Q.    Okay. It depends on the evidence in the case, right?

A.    Correct.

Q.    And a juror should let the evidence guide them, right?

A.    Correct.

*Id.* at 264. W. Stafford stated that she could answer no to the mitigation special issue knowing that it would result in the death penalty and that her training in the ministry would not stand in the way of that. *Id.* at 266, 268–69.

The State also disparately questioned W. Stafford by identifying Mr. Ricks in the courtroom and asked repeatedly:

Q.    And see the guy at the end of the table down there?

A.    Uh-huh.

Q.    That's who we're asking to be executed, right?

A.    I understood.

Q.    You understand that?

A.    Yes, sir.

Q.    Can you do that?

A.    Yes, sir, I can, to the best of my ability.

Q.    Okay. If we prove our case, you can do that?

A.    Yes, sir, I can.

*Id.* at 270. It was only on *voir dire* by the defense that W. Stafford agreed with the defense's statement that "the idea of grace or that somebody is just a human being, that could be enough . . ." *Id.* at 280. Despite the State's questioning—including asking her if she could execute Mr. Ricks specifically—W. Stafford unequivocally stated that she could and would follow the law and

21

evidence. In addition, the State's supposed concern with W. Stafford's involvement in church ministry is belied by the fact that the State did not object to seating juror Hedrick, a youth minister and online campus pastor, 24 RR 118–19, or juror Dorman, a white woman whose questionnaire indicated that in addition to attending the Disciples of Christ Church, she also listed teacher, deacon, and elder as positions she has held at that church.

Finally, as to the State's argument that it struck W. Stafford because her mother had been incarcerated, as discussed *supra*, the State did not strike juror Attebery, a white woman whose uncle served 20 years in prison. By contrast with juror Attebery, W. Stafford unequivocally stated that she believed that her mother was treated fairly by the criminal justice system. 20 RR 272. The State itself even remarked that it did not think the experience of her mother would impact W. Stafford's ability to serve as a juror. *Id.*

Mr. Ricks has therefore established purposeful discrimination on the part of the State when it struck W. Stafford.

### 4. The State's unconstitutional use of peremptory strikes to exclude veniremembers on the basis of race requires a new trial.

Based on the State's peremptory strikes against Black veniremembers who could have sat on the jury, in combination with the State's annotations of Black and Hispanic veniremembers' race in its jury selection notes and the pretextual nature of the State's purportedly race-neutral reasons for striking Black veniremembers, Mr. Ricks has carried his burden of proving purposeful discrimination. Because the State exercised peremptory strikes on the basis of race in violation of the Fourteenth Amendment, a new trial is required. *See Miller-El*, 545 U.S. at 266.

### B. This claim is unexhausted.

This claim was not presented to the state courts on direct appeal or in state habeas proceedings. Mr. Ricks anticipates filing a motion to seek to stay and abey his federal habeas

proceedings so that he may return to the state court and exhaust this and other unexhausted claims. *See Rhines v. Weber*, 544 U.S. 269, 278–79 (2005) (holding that district courts have discretion to stay habeas proceedings in federal court to allow the petitioner to present unexhausted claims in state court). Because Mr. Ricks can excuse his failure to present this claim in a prior application, thereby allowing him to litigate this claim in a subsequent state habeas application, it would be premature to determine that this claim is procedurally defaulted. Even if this claim is eventually defaulted, Mr. Ricks can establish cause and prejudice to overcome that default because he is not at fault for the failure to previously present this claim. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986) ("[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."). External factors, including the State's suppression of its racially coded jury selection materials and the trial court's denial of access to the same, impeded Mr. Ricks's ability to previously bring this claim.

**Claim Two**     **Direct appeal counsel was ineffective for failing to challenge the State's unconstitutional use of its peremptory strikes, in violation of the Sixth Amendment right to counsel.**

Mr. Ricks incorporates by reference all facts alleged in support of Claim One. On direct appeal, counsel did not challenge the trial court's ruling that Mr. Ricks failed to make a *prima facie* case under *Batson*. In state habeas proceedings, Mr. Ricks alleged that direct appeal counsel was ineffective for failing to challenge the trial court's ruling. 1 SHCR 164. In her affidavit, direct appeal counsel argued that she was "compelled . . . to agree with the trial court's decision" because "when dealing with a small number of venire members from a particular racial minority . . . a prima facie case can rarely be made on the statistics alone." 3 SHCR 1453. Direct appeal counsel's argument is a misstatement of the record and finds no support in Supreme Court precedent.

To establish ineffective assistance of counsel in violation of the Sixth Amendment, Mr.

Ricks must show that direct appeal counsel's performance was deficient and that Mr. Ricks was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Smith v. Robbins*, 528 U.S. 259, 285 (2000) (holding that the *Strickland* two-prong standard also governs claims of ineffective assistance of direct appeal counsel). "Solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the court's attention." *United States v. Williamson*, 183 F.3d 458, 464 (5th Cir. 1999). Because Mr. Ricks can show that direct appeal counsel failed to raise a meritorious point of error upon which he would have prevailed on direct appeal, he is entitled to a new trial.

### A. Direct appeal counsel's failure to challenge the trial court's erroneous *Batson* ruling constitutes deficient performance.

To establish deficient performance by direct appeal counsel, Mr. Ricks must show that there is no "reasonable argument" for appellate counsel's failure to raise the *Batson* error. *Harper v. Lumpkin*, 19 F.4th 771, 784 (5th Cir. 2021). Direct appeal counsel's affidavit, however, belies any contention that her failure to raise the Batson error reflected sound strategic decision-making. Instead, it is apparent from the state court record that direct appeal counsel's failure to raise this meritorious issue was based on a misunderstanding of the facts of Mr. Ricks's case and unreasonable interpretation of the relevant law.

The defense's initial burden to establish a *prima facie* showing of discriminatory intent is low. The Supreme Court has made clear that "the first step [is not] so onerous that a defendant would have to persuade the judge on the basis of all the facts" that the State purposefully discriminated in exercising peremptory strikes. *Johnson v. California*, 545 U.S. 162, 170 (2005). Indeed, in *Batson* itself, the Supreme Court "remanded the case for further proceedings because the trial court failed to demand an explanation from the prosecutor—i.e.*,* to proceed to *Batson*'s second step—despite the fact that the petitioner's evidence supported *an inference* of

discrimination." *Id.* (citing *Batson*, 476 U.S. at 100 (emphasis in original)). The initial *prima facie* burden is satisfied where a defendant raises an inference that "discrimination *may* have occurred." *Id.* at 173 (emphasis added).

In her affidavit, direct appeal counsel "recognized that the defense's burden to make [a *prima facie*] showing was low." 3 SHCR 1453. Yet, that affidavit makes clear that her failure to challenge the trial court's *Batson* ruling was not the result of a sound strategic decision. First, direct appeal counsel's claim that "the argument for discriminatory intent was based exclusively on the numbers alone" is a misstatement of the record. 3 SHCR 1453.[12] In fact, the record shows that trial counsel marshalled several factors that have been expressly recognized by the Supreme Court as relevant to a *Batson* inquiry: trial counsel showed that Mr. Ricks is a Black man, that the State struck the only two Black women within the strike zone and thus struck two of the four Black veniremembers within the strike zone, that the State struck a Hispanic man, and that the State disparately questioned a Black woman against whom it exercised a peremptory strike. 30 RR 26– 32; *see Miller-El*, 545 U.S. at 540, 549 (explaining the relevance of statistics and disparate questioning, among other issues). Thus, contrary to direct appeal counsel's assertions, trial counsel's argument was based on both qualitative and quantitative arguments about the State's exercise of peremptory strikes, not merely on the numbers alone.

Second, direct appeal counsel ignored Supreme Court precedent establishing that the trial court erred when it denied Mr. Ricks's *Batson* challenge based only on the number of Black and Hispanic veniremembers struck by the State. *See* 30 RR 35 (ruling that Mr. Ricks's *Batson*

---

[12] Direct appeal counsel belatedly conceded in her affidavit that trial counsel also relied on the State's disparately long questioning of veniremember A. Stafford to establish a *prima facie* case under *Batson*. 3 SHCR 1458. She provides no explanation, however, as to why this was not included in her analysis.

objection was denied *"just based on the numbers"*). The Supreme Court itself has stated that "the Court made it clear that in considering a *Batson* objection . . . *all of the circumstances that bear upon the issue of racial animosity must be consulted*." *Snyder*, 552 U.S. at 478 (emphasis added). At a minimum, the trial court was required under Supreme Court precedent also to consider the disparate questioning of A. Stafford, an issue raised by trial counsel. *See* 30 RR 32. Yet, direct appeal counsel failed to raise the trial court's unconstitutional restriction of relevant factors when determining whether Mr. Ricks met his initial *prima facie* burden.

Finally, direct appeal counsel's reliance on *Hassan v. State*, 369 S.W.3d 872, 877 (Tex. Crim. App. 2012), is both unreasonable and unpersuasive. *See* 3 SHCR 1453. Direct appeal counsel cited *Hassan* as support for the trial court's ruling that Mr. Ricks failed to meet his *prima facie* burden. Critically, *Hassan* itself unequivocally states that "saying that statistics alone do not establish a *prima facie* case does not end the inquiry." *Id.* at 878. Yet, direct appeal counsel attempted to rely on Hassan for the entirely opposite proposition. *See* 3 SHCR 1453.

In sum, direct appeal counsel's reasoning for not raising a *Batson* error is based on a mistake of fact regarding the record and mistakes of law regarding relevant precedent. The failure to raise a meritorious *Batson* claim based on mistakes of fact and law was unreasonable and direct appeal counsel's performance was deficient.

**B.    Direct appeal counsel's failure to raise error under *Batson* prejudiced Mr. Ricks.**

To establish prejudice, Mr. Ricks must show that there is a reasonable probability that, but for direct appeal counsel's deficient performance, the outcome of that proceeding would have been different. *Strickland*, 466 U.S. at 694. In her affidavit, direct appeal counsel concedes that "[h]ad [she] raised the *Batson* issue, [she] would have requested that the trial court be ordered to conduct a *Batson* hearing." 3 SHCR 1454. There is a reasonable probability that Mr. Ricks would have

26

prevailed on direct appeal on the *Batson* error. The record reflects that the State struck the only two Black women who could have served on the jury and that the State disparately questioned each of them. Moreover, as established at Claim One, *supra*, the State's purported race-neutral reasons for striking the veniremembers at issue are pretextual and make clear that the State engaged in purposeful discrimination. Mr. Ricks was therefore prejudiced by direct appeal counsel's failure to challenge the State's demonstrated discrimination on the basis of race in jury selection. This error entitles Mr. Ricks to a new trial.

### C. The relitigation bar under 28 U.S.C. § 2254(d) does not preclude this Court's review because the state court's decision was factually and legally unreasonable.

Mr. Ricks raised this claim as Claim Ten in state habeas proceedings. *See* 1 SHCR 164–77. Although this claim was adjudicated on the merits in state court, Mr. Ricks can overcome the relitigation bar because the state court decision was both legally unreasonable under 28 U.S.C. § 2254(d)(1) in light of clearly established Supreme Court precedent and factually unreasonable under § 2254(d)(2) in light of the record before the state court.

**Claim Three    Trial counsel were ineffective during jury selection in violation of the Sixth Amendment right to counsel.**

The State struck women from serving on the jury based on their gender in violation of the Equal Protection Clause of the Fourteenth Amendment. *See J.E.B. v. Alabama*, 511 U.S. 127, 129 (1994) ("[G]ender, like race, is an unconstitutional proxy for juror competence and impartiality."); *see also id.* at 145 ("Because gender and race are overlapping categories, gender can be used as a pretext for racial discrimination."). Despite the State's exercise of two-thirds of its peremptory strikes against women, including against the only two Black women within the strike zone, trial counsel did not raise a *Batson* objection on the basis of gender. Trial counsel's failure to do so constituted ineffective assistance of counsel in violation of the Sixth Amendment and Mr. Ricks

is entitled to a new trial.

A.    **Trial counsel's failure to raise a *Batson* objection on the basis of gender constitutes deficient performance.**

The State exercised nine of its thirteen peremptory strikes against women within the strike zone, including A. Stafford and W. Stafford. 30 RR 15 (Nelson); 30 RR 15 (Chance); 30 RR 16 (Fought); 30 RR 17 (A. Stafford, Rush, and Benedetti); 30 RR 19 (Argurieo); 30 RR 20–21 (W. Stafford); 30 RR 21 (Stevens). Although women represented 43.5% of the pool of qualified venirepersons, the State exercised over 69% of its strikes against women. By contrast, the State used just three of its exercised peremptory strikes to strike men, despite that group representing the larger gender class within the pool of qualified venirepersons and within the strike zone. 30 RR 14 (Badgwell); 30 RR 20 (Huff); 30 RR 21 (Blagg).

In addition, several of the women against whom the State exercised a peremptory strike were similarly situated to male jurors. On their questionnaires, three of the women (Fought, Benedetti, and W. Stafford) indicated that they were in favor of the death penalty and believed it served a legitimate interest. They were thus similarly situated to five male jurors (Twietmeyer, Duckett, Flint, Barnes, and Fry) and both male alternates (Hedrick and Smith). Four of the women (Nelson, Chance, A. Stafford, Rush) against whom the State exercised a peremptory strike indicated that they were not in favor of the death penalty but that the death penalty served a legitimate interest. They were thus similarly situated to one of the male jurors (Guckel). Several of the struck women (Chance, Fought, A. Stafford, Benedetti, and W. Stafford) further indicated that they believed the death penalty to be appropriate for some cases of capital murder, and were thus similarly situated to seven of the male jurors (Twietmeyer, Duckett, Flint, Barnes, Fry, Guckel, and Schubert) and both alternates (Hedrick and Smith).

Several of the women veniremembers struck by the State were also similarly situated to

male jurors with respect to their views on the criminal justice system. For example, several (Chance, Fought, Argurieo, W. Stafford, and Stevens) expressed positive opinions, and were thus similarly situated to male jurors (Duckett, Flint, Barnes, Hedrick). Others (for example, Rush and A. Stafford) answered in a way that was similar to several male jurors (Schubert, Fry, Smith). And, several of struck women (Chance, Fought, A. Stafford, Benedetti, and W. Stafford) answered that punishment by the criminal justice system was "just about right," thus making them similarly situated to several male jurors (Flint, Barnes, Fry) and one of the male alternates (Smith). Finally, as established at Claim One, Sections A(2) and (3) *supra*, the State disparately questioned A. Stafford.

The available evidence supports an inference that "discrimination may have occurred." *Johnson*, 545 U.S. at 173. Trial counsel, however, failed to recognize this pattern of discrimination and did not raise a *Batson* challenge on the basis of gender. Had trial counsel objected under *Batson*, Mr. Ricks would have met his initial *prima facie* burden. This failure to object prevented Mr. Ricks from raising this issue on appeal. Trial counsel's performance was therefore deficient and objectively unreasonable under prevailing professional norms. *See Strickland*, 466 U.S. at 688.

**B.    Trial counsel's failure to raise a *Batson* objection on the basis of gender prejudiced Mr. Ricks.**

In *Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017), the Supreme Court addressed what prejudice standard should apply to an ineffective assistance of counsel claim when the conduct of trial counsel either created or failed to preserve a structural error. *Weaver* listed three examples of structural errors that fall into a category of fundamental unfairness, requiring presumed prejudice in the ineffective-assistance-of-counsel context: (1) a failure to give a reasonable-doubt instruction under *Sullivan v. Louisiana*, 508 U.S. 275 (1993); (2) a biased judge under *Tumey v. Ohio*, 273 U.S. 510 (1927); and (3) the exclusion of grand jurors on the basis of race under *Vasquez v.*

*Hillery*, 474 U.S. 254 (1986). *Weaver* also listed *Batson* as an example of an error where it may be appropriate to presume prejudice that could potentially fall into this category due to "fundamental unfairness." *Weaver*, 137 S. Ct. at 1911.

In this context, this Court should hold that prejudice for this Sixth Amendment violation is met if Mr. Ricks can prove that a *Batson* violation occurred at trial. Over the years, the Supreme Court has consistently stated that purposeful discrimination in the jury selection process calls into question the fairness of a trial. *Flowers*, 139 S. Ct. at 2242 ("*Batson* sought to protect the rights of defendants and jurors, and to enhance public confidence in the fairness of the criminal justice system."); *Powers v. Ohio*, 499 U.S. 400, 411 (1991) ("[R]acial discrimination in the selection of jurors . . . places the fairness of a criminal proceeding in doubt."); *Batson*, 476 U.S. at 87 ("Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice."). Moreover, there is no principled distinction between the unfairness caused by racial discrimination in grand jury selection—expressly listed as a zone in *Weaver* where prejudice should be presumed in the ineffectiveness context—and racial discrimination in petit jury selection.

The State's pattern of strikes against women and disparate questioning supports an inference of discrimination. *Johnson*, 545 U.S. at 173. In accordance with the *Batson* three-step inquiry, the State should therefore be required to provide gender-neutral reasons for striking the veniremembers at issue, after which Mr. Ricks will need to establish purposeful discrimination. *Batson*, 476 U.S. at 97–98. Because Mr. Ricks can ultimately show that the State violated the Equal Protection Clause by purposefully discriminating against women in jury selection, he is entitled to a new trial because of this Sixth Amendment violation.

### C.    This claim is unexhausted.

This claim was not presented to the state courts. Mr. Ricks anticipates filing a motion to

seek to stay and abey his federal habeas proceedings so that he may return to the state court and exhaust this and other unexhausted claims. *See Rhines v. Weber*, 544 U.S. 269, 278–79 (2005) (holding that district courts have discretion to stay habeas proceedings in federal court to allow the petitioner to present unexhausted claims in state court). Because Mr. Ricks can excuse his failure to present this claim in a prior application, thereby allowing him to litigate this claim in a subsequent state habeas application, it would be premature to determine that this claim is procedurally defaulted. Even if this claim is eventually defaulted, Mr. Ricks can establish cause and prejudice to overcome that default because state habeas counsel was ineffective for failing to present this substantial claim for relief. *See Trevino v. Thaler*, 569 U.S. 413 (2013).

**Claim Four**      **Mr. Ricks's shackling during his trial violated his Fifth, Sixth, and Fourteenth Amendment rights.**

Mr. Ricks was shackled and wore a shock belt during his trial. Trial counsel filed a pretrial motion to prevent Mr. Ricks from being shackled, which was granted. 5 RR 74. Nonetheless, Mr. Ricks was placed in shackles and a shock belt at some point before his trial and wore them throughout his trial. Defense counsel never objected to his shackling and never asked the trial court to make the required findings under the Due Process Clause to explain why it believed Mr. Ricks should be shackled.

The jury saw Mr. Ricks in shackles during the penalty phase. Although the jury was absent from the courtroom when Mr. Ricks first walked to the witness stand to testify, the jury was present when the judge directed Mr. Ricks to return to trial counsel's table after his testimony. 40 RR 85. The jury therefore witnessed Mr. Ricks walking back to the table in shackles.

During their closing argument, the State seized on this to support their case on future dangerousness, arguing "[y]ou saw him walk back to counsel table this morning with shackles on. Everywhere he goes in Tarrant County jail, he's shackled and handcuffed. He's not going to be

like that in the penitentiary. It's a different setting. It's completely different." 40 RR 128. Mr. Ricks's rights under the Fifth, Sixth, and Fourteenth Amendments were violated when the jury saw him in shackles without justification. *Deck v. Missouri*, 544 U.S. 622, 634–35 (2005). This violation entitles Mr. Ricks to a new penalty phase.

### A.    The jury saw Mr. Ricks in shackles during his trial.

On August 21, 2013, trial counsel filed a motion requesting that Mr. Ricks appear at all phases of the trial in civilian clothes and without physical restraints. 1 CR 171–72. The motion specifically noted that the stigma of a defendant appearing before a jury in inmate clothing and physically restrained would violate a defendant's right to a fair and impartial trial guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments. *Id.* The trial court addressed this motion in a pretrial hearing and stated that it was "granted as to trial." 5 RR 74.

The next reference to shackles came during a sealed *ex parte* hearing that occurred on March 17, 2014. 9 RR 1. In a colloquy with the court regarding Mr. Ricks's request to be transferred to a different pretrial detention facility, Mr. Ricks and the trial court discussed the fact that he was in shackles and a shock belt. *Id.* at 19.

Nevertheless, despite granting the pretrial motion prohibiting Mr. Ricks from being shackled during trial, when the trial commenced in May 2014, Mr. Ricks was in fact shackled. *See* 38 RR 128 (reminding Mr. Ricks that "[y]ou are restrained"). Nothing in the record indicates why Mr. Ricks was placed in shackles and a shock belt; the court never made any findings in a written order, at the pretrial hearing, or at trial. In addition, trial counsel did not object or renew its motion to preclude Mr. Ricks from appearing in shackles. Neither the court nor trial counsel addressed the shackling again at trial.

During the penalty phase, Mr. Ricks elected to testify and, after his testimony, the court told Mr. Ricks "you may step down, sir." 40 RR 85. Mr. Ricks accordingly walked back to

counsel's table and in the presence of the jury. Defense counsel did not ask the court for the jury to be excused before Mr. Ricks walked back to defense table, nor did the court order the jury excused.

The State relied on Mr. Ricks's shackling to argue that Mr. Ricks is a future danger. The State told the jury in its penalty phase closing: "You saw him walk back to counsel table this morning with shackles on. Everywhere he goes in the Tarrant County jail, he's shackled and handcuffed. He's not going to be like that in the penitentiary. It's a different setting. It's completely different." 40 RR 128. Trial counsel did not object to the State's closing, nor did it raise the issue again with the court. Ultimately, Mr. Ricks was shackled both during the guilt/innocence phase and penalty phase, the jury saw Mr. Ricks shackled, and the State relied on that fact to prove its penalty phase case for death.

   **B.    Mr. Ricks's shackling violated his rights under the Fifth, Sixth, and Fourteenth Amendments.**

"Visible shackling undermines the presumption of innocence and the related fairness of the factfinding process." *Deck*, 544 U.S. at 630. The shackling of a defendant is an "unmistakable indication[] of the need to separate a defendant from the community at large." *Holbrook v. Flynn*, 475 U.S. 560, 569 (1986). The Supreme Court has held that "no person should be tried while shackled and gagged except as a last resort" because "the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant" and "the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." *Illinois v. Allen*, 397 U.S. 337, 344 (1970). Shackling at the punishment phase of a capital murder trial also violates due process because "[a]lthough the jury is no longer deciding between guilt and innocence, it is deciding between life and death" and "[t]hat decision, given the severity and the finality of the sanction, is no less important than the decision about guilt." *Deck*,

544 U.S. at 632 (citations and quotations omitted). Shackling has a particularly harmful impact in Texas, because the jury must consider whether the defendant will present a future danger to society. *See* Tex. Code Crim. Proc. art. 37.071, § 2(b)(1).

The Supreme Court has nevertheless recognized that "[t]here will be cases, of course, where these perils of shackling are unavoidable" but cautioned that "given their prejudicial effect, due process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case." *Deck*, 544 U.S. at 632 (citing *Allen*, 397 U.S. at 344). Circumstances that could overcome the presumption against shackling include "essential state interests such as physical security, escape prevention, or courtroom decorum." *Id.* at 628. The Supreme Court has indicated that courts should accordingly make findings explaining the reasons supporting the shackling decision. *Id.* at 634.

Here, the trial court did not articulate *any* reason, let alone an essential state interest, to have Mr. Ricks shackled throughout his trial. In fact, the trial court granted a pretrial motion to prevent Mr. Ricks from being shackled during trial. 5 RR 74. Yet, he was shackled during trial despite that ruling, and there is nothing in the record to indicate why that occurred.

Nor did the State introduce any evidence that there were circumstances in Mr. Ricks's case that warranted his shackling. The only indication in the record that Mr. Ricks spoke out of turn during the trial was during the penalty phase, when his father was testifying and Mr. Ricks said "[i]t's okay, Daddy." 38 RR 124. Moreover, the record lacks any indication that Mr. Ricks's conduct rose to the level in which courts have found that shackling was warranted. *Cf. Wilkins v. Stephens*, 560 F. App'x 299, 314 (5th Cir. 2014) ("The record in the instant case makes clear that Wilkins had attempted escape multiple times: he broke both ankles after falling thirty feet from the outer wall of a prison basketball court; at one point, he was discovered to have swallowed a

handcuff key; one of the key events which led to his encounter with murder victims Freeman and Silva was an escape from a Texas halfway house.");[13] *Lockhart v. Johnson*, 104 F.3d 54, 57 (5th Cir. 1997) ("Lockhart had previously attempted a daring escape from the courthouse by bolting and diving through a closed third story window. Also, the trial court heard testimony that Lockhart had threatened to cause trouble for the deputies who escorted him to and from the court. Additionally, Lockhart reacted to a ruling during a pretrial hearing by standing up and yelling obscenities and resisting the efforts of officers to control him and remove him from the courtroom."). Indeed, the only incidents the State presented during the penalty phase that occurred after Mr. Ricks was taken into custody were his having a pencil at one point in time, which he was prohibited from having because he was on suicide watch, 36 RR 58, and his having hoarded medicine for which he had a prescription, *id.* at 58, 80; 40 RR 104.

Importantly, the jury saw that Mr. Ricks was shackled as a result of him following the trial court's directions. Although the jury was not present when Mr. Ricks took the stand during the penalty phase, the record plainly shows that Mr. Ricks stepped down in the presence of the jury because the court directed him to do so. 40 RR 85 (telling Mr. Ricks "you may step down, sir"). Trial counsel failed to object at this point (or any other point), as discussed in Claim Five, *infra*.

Finally, shackling is inherently prejudicial. *Holbrook*, 475 U.S. at 568. "Thus, where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation." *Deck*, 544 U.S. at 635. Instead, the burden shifts to the State, which "must prove 'beyond a

---

[13] Although *Wilkins* also notes the defendant's "history and propensity for violence," here there is no indication that Mr. Ricks had directed any violence toward law enforcement officials or court personnel.

reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.'" *Id.* (quoting *Chapman v. California,* 386 U.S. 18, 24 (1967)). The record establishes that the State is unable to carry this burden.

First, the State explicitly relied on the fact that Mr. Ricks was shackled to argue to the jury that death was the appropriate sentence. 40 RR 128. Second, when the jury saw Mr. Ricks shackled, they had already heard from Deputy Marcus Moore that restraints are not permissible absent "special circumstances." 36 RR 72. Thus, it is reasonable to infer that the jury assumed special circumstances existed in Mr. Ricks's case given the fact that he was shackled. Third, the jury had already been told, both in *voir dire* and through testimony, that the first question they had to answer was whether he would present a future danger to society. The sight of Mr. Ricks in shackles is, as the Supreme Court has recognized, an "unmistakable indication[] of the need to separate a defendant from the community at large." *Holbrook,* 475 U.S. at 569. Indeed, the State used Mr. Ricks's shackling to argue that Mr. Ricks would be a future danger—in other words, exploiting the prejudice that *Deck* sought to avoid. 40 RR 128. Fourth, the jury struggled with the future dangerousness issue, as evidenced by the first note they submitted during their deliberations, which stated "Special Issue number 1 – need additional explanation of 'would commit criminal acts of violence . . .'" 2 CR 519. In light of these facts, the State cannot prove that this error is harmless beyond a reasonable doubt.

Should this court determine that the harm inquiry is governed by *Brecht v. Abrahamson*, Mr. Ricks can meet his burden that his shackling "had substantial and injurious effect or influence in determining the jury's verdict" for the same reasons that the State cannot establish that the shackling error was not harmless beyond a reasonable doubt. 507 U.S. 619, 637–38 (1993); *see Hatten v. Quarterman*, 570 F.3d 595, 604 (5th Cir. 2009) (applying *Brecht* on collateral review to

a shackling claim).

In sum, Mr. Ricks's rights under the Fifth, Sixth, and Fourteenth Amendments were violated when the jury saw him in shackles during the penalty phase despite no findings in the record indicating an essential state interest. Therefore, Mr. Ricks is entitled to a new penalty phase.

### C.    This Court can review this claim on the merits.

Mr. Ricks raised this claim as Claim Two in state habeas proceedings. 1 SHCR 114–19. The CCA held that Mr. Ricks's shackling claim was procedurally defaulted. *Ricks*, 2020 WL 6777958, at *1. A claim is procedurally defaulted on federal habeas review when the state court denies the claim on an independent and adequate state law ground. *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991). The state disposition in this case does not trigger a procedural default in federal court because the state procedural ground was not adequate: i.e., the state law ground was not "'firmly established and regularly followed state practice'" at the time it was applied. *Ford v. Georgia*, 498 U.S. 411, 423–24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348–51 (1984)). The Supreme Court has made clear that "[s]tate courts may not avoid deciding federal issues by invoking procedural rules that they do not apply evenhandedly to all similar claims." *Hathorn v. Lovorn*, 457 U.S. 255, 263 (1982); *see Barr v. City of Columbia*, 378 U.S. 146, 149 (1964) ("We have often pointed out that state procedural requirements which are not strictly or regularly followed cannot deprive us of the right to review."); *accord Stokes v. Anderson*, 123 F.3d 858, 859 (5th Cir. 1997).

Here, the CCA declined to review the merits of Mr. Ricks's shackling claim "because [he] failed to raise [it] on direct appeal." *Ricks*, 2020 WL 6777958, at *1 (citing *Ex parte Nelson*, 137 S.W.3d 666, 667 (Tex. Crim. App. 2004)). In a separate case decided two years earlier, however, the CCA extensively analyzed a freestanding shackling claim that was raised in state habeas but that was not raised on direct appeal. *See Ex parte Chavez*, 560 S.W.3d 191, 200–03 (Tex. Crim.

App. 2018). In that case, although the CCA noted that "[i]t is undisputed that no claim associated with shackling was raised on appeal, and the parties and the habeas court appear to agree that defense counsel did not obtain an adverse ruling at trial," the CCA nevertheless addressed the merits of the defendant's freestanding shackling claim because "Applicant's complaint about the trial counsel's conduct also serves as part of his ineffective-assistance-of-counsel claims, and ineffective assistance claims are ordinarily cognizable on habeas." *Id.* at 200–01.

As discussed both above and *infra*, that is the precise posture that Mr. Ricks was in during his state habeas proceedings: he asserted a freestanding shackling claim that was not raised on direct appeal and an ineffective assistance of counsel claim based on trial counsel's failure to object to Mr. Ricks's shackling at trial. 1 SHCR 114–21. The CCA's refusal to decide the merits of Mr. Ricks's identical freestanding shackling claim stands in direct contravention to its actions in *Chavez*. *Cf. Amos v. Scott*, 61 F.3d 333, 340 (5th Cir. 1995) (declining to hold rule inadequate where defendant failed to identify "cases in which the rule has been applied—either evenhandedly or unevenhandedly—to claims *identical or similar* to his own [] claim") (italics in original). This Court may therefore consider the merits of Mr. Ricks's freestanding shackling claim. *See Ford*, 498 U.S. at 423–24; *Hathorn*, 457 U.S. at 263.

**Claim Five**      **Trial counsel's failure to object to Mr. Ricks's shackling and require that the trial court identify the justification for shackling Mr. Ricks violated his Sixth Amendment rights.**

As discussed in Claim Four, *supra*, Mr. Ricks appeared at trial in shackles and a shock belt despite the court's earlier ruling prohibiting such restraints. Although trial counsel filed, and was granted, a pretrial motion asking the court to prohibit the shackling of Mr. Ricks, trial counsel failed to object when Mr. Ricks later appeared at trial in shackles and a shock belt. Likewise, trial counsel never asked the trial court to make findings on the record of its reasons for shackling Mr. Ricks. These failures by trial counsel constitutes deficient performance that prejudiced Mr. Ricks.

38

*See Strickland*, 466 U.S. at 687–88, 693–94; *Deck*, 544 U.S. at 624. This violation entitles Mr. Ricks to a new penalty phase.

> **A.      The jury saw Mr. Ricks in shackles during his trial.**

Mr. Ricks incorporates by reference the fact discussion regarding shackling found in Claim Four, *supra*.

> **B.      Trial counsel's failure to object to Mr. Ricks's shackling and request that the court justify Mr. Ricks's shackling violated Mr. Ricks's Sixth Amendment right to counsel.**

To establish ineffective assistance of counsel, Mr. Ricks must show that trial counsel's performance was deficient and that counsel's deficiency prejudiced the defense. *See Strickland*, 466 U.S. at 687. "The first prong—constitutional deficiency—is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) (quoting *Strickland*, 466 U.S. at 688). To establish prejudice, Mr. Ricks must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in [the] outcome." *Id.* at 693–94.

> **1.   Trial counsel's failure to object to Mr. Ricks's shackling and failure to ask the trial court for findings about the shackling constitutes deficient performance.**

It is indisputable that trial counsel knew that allowing the jury to see Mr. Ricks in shackles would violate his due process rights. Indeed, it was trial counsel who filed a motion seeking to preclude the use of shackles at Mr. Ricks's trial precisely because it would be "violative of the Defendant's right to a fair and impartial trial as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution." 1 CR 171. Despite the trial court granting that motion pretrial, the record is clear that Mr. Ricks appeared at trial in shackles and a

shock belt and that the shackles were visible during the penalty phase. 9 RR 19; 40 RR 128. Trial

counsel admitted that he never objected to the use of shackles on Mr. Ricks. 3 SHCR 1377–78,

Affidavit of William H. "Bill" Ray.[14] Indeed, despite the court's direction to Mr. Ricks to step

down from the witness stand, Mr. Ray claimed that he did not object because Mr. Ricks's actions,

"which were of his own volition caught everyone by surprise . . . It was a complete surprise to

me." *Id.* at 1377.

Trial counsel's failure to object to the visible shackling of Mr. Ricks and failure to request

that the court make the findings *Deck* contemplates constitutes deficient performance. *Deck*, which

requires courts to identify an essential state interest that requires the defendant to be shackled,

came out nine years before Mr. Ricks's trial. Trial counsel were well aware of the inherently

prejudicial nature of visible shackles, as evidenced by their pretrial motion. *See Williamson*, 183

F.3d at 462–63 ("Solid, meritorious arguments based on directly controlling precedent should be

discovered and brought to the court's attention."). Moreover, given that *Deck* directly governed

this situation and that the adequate justification for shackling required under *Deck* was never made,

trial counsel's failure to object was objectively unreasonable under prevailing professional norms.

### 2. There is a reasonable probability that the result of the penalty phase would have been different had the jury not seen Mr. Ricks in shackles.

There is a reasonable probability that the outcome of the penalty phase would have been

different if trial counsel had objected to the use of shackles and a shock belt on Mr. Ricks and had

---

[14] Nor did Mr. Ray object to the court's using 50,000 volts of electricity to shock his client in a different case three times at the guilt/innocence phase before he was removed from the courtroom. *Morris v. State*, 554 S.W.3d 98, 103–05 (Tex. Ct. App.—El Paso 2018, pet ref'd). In his closing argument, Mr. Ray drew attention to his client's behavior and absence from the courtroom, telling the jury "You may not like Terry Morris. I don't like him. Kind of rude. Smells bad, you know." *Id.* The Eighth Court of Appeals reversed Mr. Morris's conviction based on the trial court's repeated shocking of Mr. Morris.

requested a mistrial. *See Strickland*, 466 U.S. at 694. In particular, Mr. Ricks's appearance in shackles likely influenced the jury's consideration of the future dangerousness question: as *Deck* itself recognizes, "[t]he appearance of the offender during the penalty phase in shackles [] almost inevitably implies to a jury, as a matter of common sense, that court authorities consider the offender a danger to the community." *Deck*, 544 U.S. at 633.

That is the precise question the jury must answer in a Texas capital murder penalty phase: "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. art. 37.071, § 2(b)(1). The State emphasized the shackling of Mr. Ricks in its closing argument on future dangerousness to argue for a sentence of death, as opposed to a sentence of life without the possibility of parole. Highlighting the future dangerousness special issue, it told the jury:

> The answer to Special Issue Number 1, undoubtedly, should be yes. This man is a continuing threat wherever he is to whoever he is around. And you know in the general population of the Tarrant – of the Texas criminal justice system that he'll be out in general population running around free, going to chow, getting his email, watching his TV, on a lot less restrictive setting than he's in the Tarrant County Jail right now.
>
> **You saw him walk back to counsel table this morning with shackles on. Everywhere he goes in the Tarrant County Jail, he's shackled and handcuffed. He's not going to be like that in the penitentiary. It's a different setting. It's completely different.**

40 RR 128 (emphasis added). In other words, the State used Mr. Ricks's shackling to persuade the jury that he would be a future danger to the society he would be in if he were sentenced to life. *See, e.g.*, *Estrada v. State*, 313 S.W.3d 274, 282 (Tex. Crim. App. 2010) (holding that Special Issue No. 1 "asks a jury to decide whether a defendant would be dangerous whether in or out of prison" (quotations omitted)). It is also clear that the jury struggled with the future dangerousness issue, as evidenced by the first note that the jury sent out during penalty phase deliberations, which

41

said "Special Issue number 1 – need additional explanation of 'would commit criminal acts of violence . . .'" 2 CR 519.

Moreover, the jury also heard testimony from Deputy Marcus Moore that he could not simply decide to handcuff Mr. Ricks in the middle of trial "without some special circumstances." 36 RR 72.[15] The jury then saw Mr. Ricks shackled during his trial, suggesting that special circumstances did indeed exist to support his being shackled—despite the total absence of any identified special circumstances throughout the record.

Given the State's emphasis on Mr. Ricks's shackling and the jury's focus on future dangerousness, as well as the indication to the jury that special circumstances had to exist to justify Mr. Ricks's shackling, there is a reasonable probability that the outcome of the penalty phase would have been different had trial counsel objected to Mr. Ricks's shackling. Thus, Mr. Ricks is entitled to a new penalty phase.

**C.    The relitigation bar in 28 U.S.C. § 2254(d) does not preclude this Court's review because the state court's decision was factually and legally unreasonable.**

Mr. Ricks raised this issue as Claim Three in state habeas proceedings. 1 SHCR 120–21. Although this claim was adjudicated on the merits in state court, Mr. Ricks can overcome the relitigation bar because the state court decision was both legally unreasonable under § 2254(d)(1) in light of clearly established Supreme Court precedent and factually unreasonable under § 2254(d)(2) in light of the record before the state court with respect to both deficiency and prejudice.

---

[15] Trial counsel also failed to address Dr. Lewine's mentioning of Mr. Ricks wearing "anklets" when Dr. Lewine administered the quantitative electroencephalography test ("qEEG") in the courtroom. *See* 39 RR 134.

**Claim Six**       **Mr. Ricks's Sixth Amendment right to counsel was violated by trial counsel's ineffectiveness at the penalty phase.**

Trial counsel's case at the penalty phase centered on one theme: that Mr. Ricks was biologically predisposed to violence, aggression, and poor impulse control. As Mr. Ricks's own counsel told the jury in closing, Mr. Ricks was "a train looking for a wreck." 40 RR 114. In support of this contention, trial counsel elicited testimony from Mr. Ricks's friends and family members that Mr. Ricks came from a kind and loving home, but that his biological makeup was such that the instant offense was all but inevitable. Trial counsel further relied on the testimony of a neuroscientist to emphasize to the jury that Mr. Ricks's brain was structured in a way that predisposed Mr. Ricks to violence and aggression. As trial counsel argued in their closing arguments, "[t]he very thing that ought to be sufficiently mitigating is the fact that it was never his control or his desire to be born that way." 40 RR 113. The State told the jury that "[t]here's nothing mitigating in this case." 40 RR 130. Left with no mitigation case, the jury answered the special issues in a manner that required a death sentence.

Trial counsel violated Mr. Ricks's Sixth Amendment right to the effective assistance of counsel at the penalty phase. Trial counsel's deficient performance is established in several ways explained in detail below, but their deficiency is essentially rooted in presenting a case that hinged on the jury believing that their client was incurably violent, that he had always been this way, and that he would always be this way. Trial counsel did so after performing a perfunctory investigation into Mr. Ricks's background, and even when that investigation yielded significant mitigation themes, trial counsel unreasonably failed to further investigate them. Far from being a one-off, trial counsel conducted three capital murder trials in a row involving Black defendants in which they focused their case on their clients' supposed inherent dangerousness. All three of those clients are now on death row. In sum, trial counsel's representation was objectively unreasonable and fell

far below prevailing professional norms in capital cases. *See Strickland*, 466 U.S. at 687.

Trial counsel's deficient performance prejudiced Mr. Ricks. *See Strickland*, 466 U.S. at 694. Had trial counsel performed according to prevailing professional norms, the jury would have seen a completely different picture of Mr. Ricks's life history. Far from hearing only that Mr. Ricks was inherently violent despite growing up in a utopia-like family environment, multiple friends and family members would have told the jury about the severe physical abuse and neglect he suffered at the hands of his parents, other family members, and educators; rampant substance abuse by caregivers; and repeated childhood trauma. Mr. Ricks was further prejudiced by trial counsel's failure to present the testimony of a trauma expert and a neuropsychologist, who would have explained to the jury that Mr. Ricks's conduct is the result of trauma-related neurodevelopmental limitations and trauma response. Had the jury been provided with a complete picture of Mr. Ricks's life history properly contextualized, as opposed to the lone theme that Mr. Ricks always had and always would be violent, the result of the penalty phase would have likely been different. *See Wiggins v. Smith*, 539 U.S. 510, 537 (2003) ("Wiggins' sentencing jury heard only one significant mitigating factor—that Wiggins had no prior convictions. Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance.").

Mr. Ricks is therefore entitled to a new penalty trial.

### A.    A Sixth Amendment violation occurs when trial counsel's representation falls below prevailing professional norms and the defendant is prejudiced.

To establish ineffective assistance of counsel in violation of the Sixth Amendment, Mr. Ricks must show that trial counsel's performance was deficient and that he was prejudiced by trial counsel's deficient performance. *Strickland*, 466 U.S. at 687. Counsel's performance is to be assessed "under prevailing professional norms" and "[a] convicted defendant making a claim of

ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 688, 690. "In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial process work in the particular case." *Id.* at 690.

To establish prejudice, Mr. Ricks must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* Thus, prejudice is established if "there is a reasonable probability that at least one juror would have struck a different balance" in reaching their verdict. *Wiggins*, 539 U.S. at 537.

### B.    Trial counsel's damaging penalty phase case.

At Mr. Ricks's penalty phase, trial counsel focused on one theme: that Mr. Ricks came from a loving and supportive family, but that Mr. Ricks was biologically predisposed to violence, as evidenced by numerous lay witness recollections of violent outbursts dating from a very young age and by a neuroscientist. The defense's first witness was Mr. Ricks's former Sunday school teacher, Jane Crossley. 38 RR 26. Ms. Crossley testified that Mr. Ricks came from "a very secure family." *Id.* at 27. On cross, Ms. Crossley similarly described Mr. Ricks's family as "a very supportive family, a very earnest family" and "some of the best people you would want to meet[.]" *Id.* at 38. Mr. Ricks's older cousin, Kim McCullough, testified that Mr. Ricks had "a positive relationship" with his parents and that they "coddl[ed] him. *Id.* at 94. Ms. McCullough "absolutely" agreed with trial counsel that the Ricks family "err[ed] on the side of love." *Id.* at 94–95. Mr. Ricks's childhood friend, Keith Griffin, likewise testified that Mr. Ricks's parents "were a caring family." 39 RR 161.

Mr. Ricks's father, Shederick Ricks, testified that Mr. Ricks was kicked out of kindergarten

after just one day, that he set fires to bushes outside their home when he was 8 or 9 years old, and that his misbehavior worsened as he got older. 38 RR 117, 119, 122–23. Shederick Ricks "didn't want to get confrontational physically" and so he claimed that he disciplined Mr. Ricks by restricting his TV time or his pocket money for movies. *Id.* at 122, 130. He explained that, when Mr. Ricks would misbehave, he and his wife "would sit there, and [] talk to him and question him." *Id.* at 124. Mr. Ricks's father further testified that they "went to counselors" and "went to therapists" but that "no one ever, ever suggested that [they] do anything more extensive." *Id.* at 125. Mr. Ricks's parents had good health insurance and were willing to spend whatever was needed to ensure Mr. Ricks received support. *Id.* at 126. Shederick Ricks testified that Mr. Ricks ran away from home on a "[c]ouple of occasions." *Id.* at 130. On one of those occasions, Mr. Ricks "went in the house, then he run back out the back door, and he threw a brick through [the] kitchen picture window." *Id.*

Mr. Ricks's mother, Helen Ricks, testified that, as a toddler, Mr. Ricks was "kind of aggressive, mischievous . . . hyperactive[e]." 39 RR 192. He would "just kick" his brother, "couldn't be still," and "couldn't follow instructions." *Id.* at 193. If she told Mr. Ricks to sit down, "he wouldn't say [he was not going to sit down], but he wouldn't sit when I'd ask him to." *Id.* Helen and Shederick Ricks "just kept saying, 'something's wrong here. Got to be.'" *Id.* at 194. Helen Ricks explained that they "went to different counselors," and her and her husband "tried everything [they] knew how." *Id.* at 194–95, 196. Although Mr. Ricks "got whippings sometimes, "a lot of times, [they] just took things away from him." *Id.* at 196. Mr. Ricks "didn't like his father arguing with [him]" but "they never got into any altercations or anything." *Id.* at 200. Helen Ricks also testified that she had a "pretty good" relationship with Shederick Ricks. *Id.* at 197. According to Helen Ricks, Mr. Ricks saw his father slap her "one time." *Id.* at 204. She agreed with trial

46

counsel's question that "[i]t was certainly true that [she] would try to support [Mr. Ricks] and assist him as best [she] could." *Id.* at 199.[16]

Mr. Ricks's older brother, Dwayne Ricks,[17] testified that he "didn't live with our parents in the beginning" and instead stayed with an aunt. 38 RR 177–78. Dwayne Ricks further testified that they "didn't want for anything" and that their parents "did the best they could at home." *Id.* at 179. He also explained that they "went to therapy as kids" but that "a lot of things escalated because [they] . . . didn't really pay attention." *Id.* at 189. In Dwayne Ricks's words, "[e]veryone used to call us the Huxtables." *Id.* at 192. Mr. Ricks's ex-girlfriend, Jennifer Clark, likewise described the Ricks family as "the Huxtables." 35 RR 138.

Dr. Lewine, a neuroscientist, testified that he was retained by trial counsel to determine, among other issues, "if there was anything in the neurobiology that was consistent with the idea that there might be a biological predisposition towards aggression and violence" and "whether there were any . . . biological markers in [Mr. Ricks's] brain that are associated with a history of violence and aggression." 39 RR 100–01. Dr. Lewine testified that he was "also asked to determine if there was anything in the biological, physiological, or behavioral profile that would be consistent

---

[16] During Helen Ricks's testimony, where she had claimed that she had provided as much support as possible to Mr. Ricks, that she had disciplined him mostly by taking away his pocket money, and that she had a good relationship with her husband, trial counsel sought to introduce a PowerPoint presentation. 39 RR 205; 46 RR Defense Exs. 38, 38A. That PowerPoint included several pictures of Mr. Ricks alongside his parents and brother, their church, and their home, as well as several school records. 46 RR at Defense Exs. 38, 38A. That exhibit also included several slides of text, such as "Picture Perfect Family – **Not So Perfect.**" *Id.* at Defense Ex. 38A (emphasis in original). Because trial counsel failed to secure the necessary business record affidavits, the trial court sustained the State's hearsay objection as to the PowerPoint except for the photos. 39 RR 210.

[17] Although the Reporter's Record spells his name "Dewayne," the correct spelling of his name is "Dwayne."

with a diagnosis of [Mr. Ricks] being a psychopath." *Id.* at 101. Dr. Lewine testified that brain imaging showed "an increase in putamen volume suggestive or consistent with the idea that there's a predisposition towards aggression and violence" and did not show "brain changes that would typically be indicative of psychopathy." *Id.* at 122. Dr. Lewine also testified to personality testing performed by the defense-retained neuropsychologist, Dr. McGarrahan, who determined that Mr. Ricks had a score of 25 on the Hare Psychopathy Checklist. *Id.* at 125. Dr. Lewine also testified that Mr. Ricks's score was "in the lowest one percent percentile of the population" on a test designed to measure emotional intelligence. *Id.* at 127.

Finally, Mr. Ricks elected to testify at the penalty phase. 40 RR 26. He described the severe stress that he had been experiencing over the two years prior to the offense, including moving away from his family, having his car repossessed, and losing his job. *Id.* at 31. He testified that following his domestic violence arrest in November 2012, he decided to seek counseling from Mitzi Ellington. *Id.* at 36.[18] Mr. Ricks testified that he was "sorry about everything" *Id.* at 37; *see id.* at 46 (answering "[a]bsolutely" in response to a question of whether he was sorry about what happened). Trial counsel continued to elicit testimony from Mr. Ricks concerning his difficulty in controlling his anger. *See id.* at 39–40, 42–44.

### C.    Trial counsel's representation was deficient.

Trial counsel argued to the jury that the offense "was going to happen unfortunately" because Mr. Ricks was "a train looking for a wreck." 40 RR 113–14. According to trial counsel, however, this biological predisposition to violence "ought to be sufficiently mitigating [because]

---

[18] On cross-examination, Mr. Ricks further made clear that it was his choice, and not court-mandated, that he elected to go to anger management classes in 2012. 40 RR 64 ("I went to anger management class because that's what I wanted to do. I signed up for anger management classes before the courts even got involved in it . . . I did that on my own.").

it was never [Mr. Ricks's] control or desire to be that way." *Id.* at 113. After eliciting extensive testimony that Mr. Ricks came from a wonderful family, trial counsel asked the jury "[h]ow does someone who has all the things that maybe some of us didn't, how does he become a murderer, a double murderer, a child murderer?" *Id.* at 114. Trial counsel answered that "if it weren't for [Mr. Ricks's] family, if it weren't for the support system he had, he would have been a car wreck earlier." *Id.*

In short, trial counsel's case at punishment was that the offense was inevitable because Mr. Ricks was biologically predisposed to murderous violence, but that "the very thing that makes him violent might be mitigating." 40 RR 111. The State, of course, seized on trial counsel's evidence and argument:

> There's been no mitigation evidence in this case, ladies and gentlemen . . . Every one of their witnesses came in here and told you he had a wonderful upbringing. He lived in a Utopia, as one of the witnesses called it. His father made good money. They loved him. They took him to Disney world with his brother. He had a wonderful life. But he's just the way that he is. He's a murderer and a psychopath.

*Id.* at 105–06. Having heard from the defense's evidence that Mr. Ricks was raised in a loving family but that his very biology made it inevitable that he would commit a double murder, the jury answered the future dangerousness and mitigation special issues such that Mr. Ricks was sentenced to death.

The deficiency of trial counsel's performance during the penalty phase was multifold. First, trial counsel imposed unreasonable limitations on their investigation. Second, trial counsel retained a neuropsychologist who had just testified in another capital murder case that "minority status" was a risk factor for future dangerousness. Third, even after a truncated investigation revealed numerous red flags for trauma and mental health concerns, trial counsel failed to develop and present any trauma or trauma-related neurodevelopmental evidence. Fourth, trial counsel then failed to develop an individualized defense, and instead relied on the same defense they have used

in at least three capital murder trials in Tarrant County involving Black defendants: Steven Nelson, Cedric Ricks, and Amos Wells. Finally, trial counsel conceded future dangerousness by presenting expert testimony that Mr. Ricks was biologically predisposed to violence. As a result, the jury was left with "zero" mitigation evidence. 40 RR 105. This conduct cannot be squared with reasonable judgment. *See Andrus v. Texas*, 140 S. Ct. 1875, 1885 (2020) (noting that it "is hardly the work of reasonable counsel" to, among other things, fail to "attempt to exclude or rebut the State's evidence").

### 1. Trial counsel imposed unreasonable limitations on their investigation.

"Counsel's duty to investigate and present mitigation evidence is now well established." *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, American Bar Association, 31 Hofstra L. Rev. 913 (2003) ("*ABA Guidelines*"), Guideline 10.7 at cmt. The mitigation investigation must be "ongoing [and] exhaustive," explore "every aspect" of the client's character and history, and include "a broad set of sources[.]" *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev. 677, 689 (2008) ("*ABA Mitigation Guidelines*"), Guideline 10.11. In-person, one-on-one, and multiple interviews with the client, his family and friends, and broader community should be at the heart of the mitigation investigation. *Id.*

Trial counsel failed to conduct a reasonable mitigation investigation under prevailing professional norms. Indeed, trial counsel and mitigation specialist Mary Burdette did not travel to Chicago, where Mr. Ricks spent most of his life, until eight months after their appointment to Mr. Ricks's case and weeks away from trial, and then went on just two brief trips. Even then, the defense team did not interview any witnesses beyond those who were able to meet them at Mr. Ricks's parents' home or at trial counsel's hotel. Likewise, what little investigation was conducted in Tarrant County consisted largely of group meetings at trial counsel's office or interviews over

the phone. Trial counsel thus imposed unreasonable limitations on their investigation that fell short of prevailing professional norms.

### a. Trial counsel unreasonably limited their Chicago-based investigation by requiring that potential mitigation witnesses meet them at Mr. Ricks's parents' home or at trial counsel's hotel.

Trial counsel were appointed to represent Mr. Ricks on May 7, 2013, and mitigation specialist Mary Burdette was appointed on June 28, 2013. 1 CR 123. The defense team, however, did not travel to Chicago until eight months later—just one month before *voir dire* began—from February 18 to 20, 2014. Ex. 43. This delay was not due to a lack of funding, as the defense team's travel was at "taxpayer's expense [] and authorized without limitation." 3 SHCR 1376. Indeed, trial counsel rented a 10-person stretch limousine to travel to and from Mr. Ricks's parents' home, trial counsel's hotel, and the airport. Ex. 39. By the time trial counsel and Ms. Burdette traveled to Chicago for the first time, the State had already conducted in-person interviews there with Mr. Ricks's family. 38 RR 141.

During this first trip, on February 18, 2014, trial counsel conducted a single one-on-one interview with a witness at trial counsel's hotel. Ex. 41. Trial counsel also asked Mr. Ricks's mother to identify and arrange for "anyone who knew [Mr. Ricks]" to meet with the defense team at Mr. Ricks's parents' home. Ex. 32 ¶ 24; 3 SHCR 1376. On February 19, 2014, the defense team conducted one group interview with thirteen potential mitigation witnesses at Mr. Ricks's parents' home. 3 SHCR 1376; Ex. 17. And on February 20, 2014, trial counsel flew back to Texas. Outside of the group interview at Mr. Ricks's parents' home and the one interview at the defense team's hotel, the defense team conducted no further interviews during their initial visit to Chicago.

The defense team then traveled for a second and final time to Chicago from April 4 to 6, 2014. 3 SHCR 1376; Ex. 42. *Voir dire* for Mr. Ricks's trial had begun weeks earlier, on March 20,

2014, and did not conclude until April 28, 2014. *See* RR Vols. 11, 30. This means that trial counsel waited until the middle of *voir dire* to make a second investigative visit to Chicago. The defense team flew out on the evening of Friday, April 4, and returned on Sunday, April 6. Ex. 42. Trial counsel then resumed *voir dire* of some sixty remaining veniremembers from Monday, April 7, onwards. *See* RR Vols. 18–30.

During this trip, trial counsel stayed at a hotel near Midway Airport. 3 SHCR 1376. They gave their contact information to Mr. Ricks's family to pass on to any potential mitigation witnesses and rented a conference room at their hotel to "interview[] everyone who would come." *Id.* Eight people were able to meet with trial counsel at their hotel. Exs. 42, 43. Trial counsel did not meet with any witnesses other than those who were able to meet the defense team at their airport hotel. *Id.*

While in Chicago, the defense team did not interview any of Mr. Ricks's former teachers or former employers and did not interview many of Mr. Ricks's family and friends. Ex. 55. Instead, the defense team relied on Mr. Ricks's mother to identify and produce witnesses to support a case for life. Notably, Ms. Burdette's notes from the defense team's group interview organized by Helen Ricks reflect that "most" of those who attended were church friends. Ex. 17.

### b. Trial counsel unreasonably limited their investigation by conducting interviews in groups or over the phone.

Prevailing professional norms make clear that the defense team "must conduct in-person, face-to-face, one-on-one interviews[.]" *ABA Mitigation Guidelines*, Guideline 10.11. The bulk of the interviews with potential mitigation witnesses were conducted in groups or over the phone. *See* Exs. 40–42, 44–45. During their first trip to Chicago, the defense team interviewed thirteen potential mitigation witnesses as a group at Mr. Ricks's parents' home. Ex. 17. Ms. Burdette's notes reflect that "[d]ue to the size of the group, few people volunteered anything other than

positive remarks about Cedric[]" and that "[s]everal of [the] attendees did not speak out." *Id.* Likewise, when trial counsel met with witnesses at their airport near Chicago Midway airport, witnesses "took turns speaking but no one got too in depth because it was awkward with Mr. and Mrs. Ricks there." Ex. 31 ¶ 9.

Potential mitigation witnesses based in the Fort Worth area were also interviewed in groups at trial counsel's office. After Mr. Ricks's parents traveled to Texas from Chicago in May 2013, the defense team interviewed Mr. Ricks's parents and his maternal uncle as a group at trial counsel's office. Ex. 40. The defense team conducted a second group interview at trial counsel's office, this time with Mr. Ricks's maternal uncle and aunt Joe and Deborah Sanders, cousins Tamara Butts and Dawn Sanders, and friend Keith Griffin. Exs. 34, 43. Mr. Griffin "felt uncomfortable during that meeting because [he] was the only non-family member" and he was "also worried about sharing [his] impressions of [Mr. Ricks] because his parents were in the room." Ex. 34 ¶ 9.

Outside of these in-person group meetings, most interviews with potential mitigation witnesses were conducted over the phone. *See* Exs. 40–42. Indeed, Ms. Burdette interviewed witnesses over the phone only, from the time she was first appointed in June 2013 up until the defense team's February 2014 trip to Chicago. *See* Exs. 40–41. Ms. Burdette conducted these interviews by phone regardless of whether the witnesses were based in Chicago or were local to the Fort Worth area, where Ms. Burdette herself was based. Likewise, all follow-up interviews after the defense team's in-person visits in Chicago were conducted over the phone.[19] *See* Exs. 42,

---

[19] Furthermore, billing records do not indicate that Ms. Burdette ever traveled alone to Chicago to investigate Mr. Ricks's case. *See* Exs. 40–42, 43. Ms. Burdette did travel to Florida to interview Mr. Ricks's former high school football coach, Gary Korhonen. 3 SHCR 1377.

44–45, Others, such as Mr. Ricks's maternal grandmother, were never contacted again after trial counsel's initial Chicago group meeting. Ex. 30 ¶ 14. This truncated investigation constitutes deficient performance.

### 2. Trial counsel retained a neuropsychologist who has testified that "minority status" is a risk factor for future dangerousness.

Despite knowing that Dr. Antoinette McGarrahan had a history of espousing views that race is a risk factor for future dangerousness and relying on psychopathy to diagnose defendants, trial counsel nevertheless retained her to perform a neuropsychological evaluation of Mr. Ricks.[20] Mere months before they began representing Mr. Ricks, trial counsel had used Dr. McGarrahan at Steven Nelson's capital murder trial. At Mr. Nelson's trial, Dr. McGarrahan testified that Mr. Nelson's "minority status" as a Black man was a risk factor for future dangerousness. *Texas v. Nelson*, 43 RR 253; *see* Section C.5.a, *infra*. On direct examination by trial counsel, Dr. McGarrahan told the jury at Mr. Nelson's trial that Mr. Nelson was "a storm waiting to happen." *Id.* Hence, trial counsel were fully on notice of Dr. McGarrahan's belief that Mr. Ricks, a Black man, was dangerous because of his race at the time trial counsel retained her as a neuropsychologist in Mr. Ricks's case. Their decision to retain her in Mr. Ricks's case was unreasonable and constitutes deficient performance. *See Buck v. Davis*, 137 S. Ct. 756, 775 (2017) (holding that trial counsel were deficient by allowing an expert to testify despite knowing that the expert's report "reflected the view that Buck's race disproportionately predisposed him to violent conduct"); *see also Turner v. Murray*, 476 U.S. 28, 35 (1986) (plurality opinion) (noting dangers of appealing to racist stereotype of Black men as "violence prone").[21]

---

[20] *Texas v. Nelson*, 43 RR 274–75.

[21] Mr. Ricks is aware that the Fifth Circuit has previously held that trial counsel were not ineffective for retaining Dr. McGarrahan in Mr. Nelson's case. *See Nelson v. Davis*, 952 F.3d 651,

### 3. Trial counsel unreasonably failed to follow up on red flags for, and present mitigating evidence of, significant trauma and trauma-related neurodevelopmental symptoms.

In Mr. Ricks's case, even a truncated investigation revealed significant red flags indicative of trauma and trauma-related neurodevelopmental concerns. "Yet, counsel disregarded, rather than explored, the multiple red flags." *Andrus*, 140 S. Ct. at 1883. The Supreme Court has made clear that it is unreasonable under *Strickland* not to investigate further when counsel has information available to him that suggests additional mitigating evidence. *Id.* at 1882 (determining that performance was deficient where "counsel 'ignored pertinent avenues for investigation of which he should have been aware,' and indeed was aware" (quoting *Porter v. McCollum*, 558 U.S. 30, 40 (2009))); *see Wiggins*, ("[A] court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."). Trial counsel's failure to explore these red flags was compounded by them eliciting extensive testimony that was contradicted by information uncovered by Ms. Burdette and provided to trial counsel.

Prior to trial, mitigation specialist Mary Burdette produced an extensive list of examples of trauma and stressors. Ex. 55. This document reflects that Shederick and Helen Ricks physically and verbally abused Mr. Ricks and his brother, that Mr. Ricks witnessed his parents' domestic abuse over the course of years, and that he ran away often and for as long as a month. Ex. 55. In

---

663–64 (5th Cir. 2020). There, the court held that "[w]e have consistently found that death penalty counsel is not ineffective if they rely on a medical expert's assessment of the defendant's mental functioning to inform their punishment phase strategy[.]" *Id.* The Fifth Circuit has also held, however, that knowledge of a "red flag" about a particular expert calls into question the reasonableness of counsel's reliance on that expert. *See Murphy v. Davis*, 737 F. App'x 693, 708 (5th Cir. 2018). Personal knowledge that an expert is known to espouse such views in a capital murder trial where the defendant is Black surely constitutes a red flag that renders trial counsel's reliance unreasonable.

particular, Ms. Burdette detailed an incident of physical abuse when Shederick Ricks punched Mr. Ricks, then a child, in the stomach while Dwayne Ricks was making donuts. *Id.* The document also states that Helen Ricks "couldn't stop herself when [she was] beating" Mr. Ricks. *Id.* This "known evidence would [have] le[d] a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527.

Trial counsel, however, did not. Instead, they elicited testimony that Shederick Ricks "never got into any altercations or anything" with Mr. Ricks. 39 RR 200. Trial counsel also elicited testimony from numerous witnesses that Mr. Ricks had "a positive relationship" with his parents, that they "erred on the side of love," and "were some of the best people you want to meet." 38 RR 38, 94, 94–95. Trial counsel further elicited testimony that Mr. Ricks's parents' relationship, which Ms. Burdette described as physically abusive, was "pretty good." 39 RR 197.

In addition to Ms. Burdette's preliminary work reflecting significant evidence of trauma, Dr. McGarrahan performed a neuropsychological evaluation on January 14 and 22, 2014.[22] Dr. McGarrahan did not testify. In state habeas, Dr. Price reviewed Dr. McGarrahan's testing and found that results across several measures were indicative of heightened distress, depression, "and the possibility his symptoms are related to traumatic events from his past." 3 SHCR 1395. Dr. McGarrahan's testing further revealed a pattern of performance consistent with central nervous system damage, the etiologies of which include repeated head injuries and traumatic stress. Ex. 60. Trial counsel, however, argued to the jury only that Mr. Ricks had a biological predisposition to violence "from the time he was born . . . [and] there was nothing he can do about that." 40 RR 116.

---

[22] Dr. McGarrahan did not produce a report.

Nor did trial counsel retain a trauma expert. The only expert testimony presented by trial counsel was that of Dr. Lewine, who testified that Mr. Ricks had a biological predisposition to violence, that Mr. Ricks was in the lowest percentile on an emotional intelligence scale, and that Mr. Ricks might qualify for a diagnosis of psychopathy. *Id.* at 122, 125, 160–66.

Hence, when trial counsel did elicit testimony about some of these red flags—including testimony about Mr. Ricks's behavior in childhood—that testimony was entirely unmoored from any context of the extensive trauma that Mr. Ricks endured or the impact that trauma had on his development and mental health. The State was thus able to rely on the very testimony presented by the defense to argue that Mr. Ricks's behavior betrayed "a life-long pattern of violence and aggression" 39 RR 158–59.

Finally, trial counsel later contended that they did not present any trauma-related evidence because these "were things [they] didn't know about" and "the family would not be totally forthcoming." 3 SHCR 1386. That contention, however, cannot withstand scrutiny in light of the evidence available to trial counsel at the time of trial. *See* Ex. 55; 46 RR Def. Exs. 38 and 38A. And, even if Mr. Ricks was at times uncooperative, this does not excuse trial counsel's failure to follow up on these red flags. *See Porter*, 558 U.S. at 40 ("Porter may have been fatalistic or uncooperative, but that does not obviate the need for defense counsel to conduct *some* sort of mitigation investigation." (emphasis in original)).

### 4. Trial counsel failed to follow-up on red flags for, and present evidence of, Mr. Ricks's mental health.

Trial counsel likewise ignored red flags of mental illness. At a minimum, trial counsel were aware that Mr. Ricks suffered from severe depression. Upon his incarceration at the Tarrant County Jail on May 3, 2013, Mr. Ricks reported current suicidal ideation in addition to current and prior depression. Ex. 19. Tarrant County Jail mental health services ("MHMR") likewise reported that

Mr. Ricks expressed thoughts of suicide and presented as depressed. *Id.* Mr. Ricks was prescribed the anti-depressants Trazodone and Citalopram and MHMR conducted daily mental status evaluations from May 2013 to April 2014. *Id.* Records from those mental status examinations reflect that Mr. Ricks continued to present as depressed, expressed thoughts of suicide, and at times presented as illogical and disheveled. *Id.* Mr. Ricks was identified by Tarrant County Jail as at risk for suicide and was restricted to wearing a "turtle suit." A turtle suit is a "padded one piece" designed to prevent self-harm. 36 RR 58. Mr. Ricks wore this turtle suit to meetings with trial counsel, defense experts, and during transportation to and from court. Tarrant County Jail records reflect that Mr. Ricks attempted to commit suicide on June 5, 2013. Ex. 19.

Despite these significant red flags, trial counsel reported to the defense team, including its experts, that Mr. Ricks had "not much" of a mental health history. Ex. 20. And, even after Mr. Ricks attempted to commit suicide in June 2013, trial counsel did not meet with Mr. Ricks again in the period from their initial meeting on May 7 to October 22, 2013.[23] Trial counsel never brought Mr. Ricks's attempted suicide, nor serious mental health concerns to the jury's attention. The only mention of Mr. Ricks's attempted suicide in the weeks after the offense, evidencing his profound remorse, was in the State's vitriolic cross-examination of Mr. Ricks when it commented

---

[23] Trial counsel Bill Ray has been found ineffective for failing to appraise a court of his client's mental health history. Mr. Ray was appointed by then-Tarrant County District Judge Gill (who was then one of the prosecutors in Mr. Ricks's case) to represent Sandra Wilson in revocation proceedings. While waiting for the hearing, Ms. Wilson attempted to commit suicide at the Tarrant County Jail. After a short hearing, Judge Gill sentenced Ms. Wilson to 15 years, to which Mr. Ray did not object. Mr. Ray did not present evidence of Ms. Wilson's documented history of mental illness, including her recent attempted suicide. On a petition for writ of federal habeas corpus, a federal court found Mr. Ray ineffective for failing to appraise the convicting court of Ms. Wilson's significant mental health history. *See* Ex. 23. In reporting this finding of ineffectiveness to the 8th Administrative Judicial Region, Mr. Ray refused to accept responsibility for his failure to investigate his client's mental health history, and instead accused her of faking it—despite a federal judge's finding to the contrary. *See* Ex. 38.

that Mr. Ricks "couldn't even do that right[.]" 40 RR 49.

Trial counsel likewise ignored evidence that Mr. Ricks was suffering from serious mental distress around the time of the offense, sought help, and was turned away by all those he turned to. As with evidence of trauma, trial counsel ignored information from their own mitigation specialist that, at the time of the offense, Mr. Ricks was experiencing several stressors that aggravated his mental illness. Ex. 55. Instead, in closing, trial counsel argued to the jury that the offense was inevitable and that "if it wasn't for [Mr. Ricks's family], he'd have been a car wreck much earlier." 40 RR 114.

Childhood records provided by Helen Ricks to the defense team further established that Mr. Ricks struggled with his mental health from a young age. These records include information that Mr. Ricks was prescribed forty counseling sessions at the age of 11 but that his parents did not follow-up, and that Mr. Ricks was hospitalized for several weeks following a psychiatric crisis at the age of 17. Exs. 57, 61.

The failure to follow-up on red flags of mental distress was compounded by trial counsel's failure to present the testimony of a mental health expert. Despite significant evidence of Mr. Ricks's mental distress, including at the time of the offense, trial counsel did not present the testimony of a mental health expert. Whereas trial counsel directed Dr. McGarrahan to conduct a neuropsychological evaluation of Mr. Ricks, she did not testify at the penalty phase. Instead, trial counsel focused their sentencing presentation on the testimony of Dr. Lewine. 39 RR 91–152. Dr. Lewine, however, is not a mental health expert. Dr. Lewine himself thought that trial counsel would be calling a neuropsychologist at Mr. Ricks's punishment trial. *Id.* at 125. No such testimony, however, was ever presented.

### 5. Trial counsel failed to develop an individualized defense.

The foregoing makes clear that after performing a cursory investigation into Mr. Ricks's background—albeit one that uncovered red flags—trial counsel nevertheless chose to establish that Mr. Ricks was raised in a Utopia but was incurably violent and could not control his actions. But this was not the first time that trial counsel had defended a case in this manner. Rather, trial counsel put on nearly identical cases in two other capital murder trials that occurred around the time of Mr. Ricks's trial: that of Steven Nelson and Amos Wells. Such a cookie-cutter defense deprived Mr. Ricks of right to the effective assistance of counsel because it deprived the jury of the ability to make an individual sentencing determination. *See Strickland*, 466 U.S. at 687; *Lockett v. Ohio*, 438 U.S. 586 (1978).

### a. Trial counsel first used the incurably-violent defense at Steven Nelson's trial.

Mr. Ricks's trial counsel first tried this defense when they were appointed to represent Steven Nelson in his October 2012 capital trial. As in Mr. Ricks's case, trial counsel asked Dr. McGarrahan to evaluate Mr. Nelson. *Nelson v. Davis*, No. 16-cv-00904 (N.D. Tex. Dec. 22, 2016), Amended Petition for a Writ of Habeas Corpus, at 5 (ECF No. 25). A few months before Mr. Nelson's trial, Dr. McGarrahan wrote to trial counsel that Mr. Nelson's brain "is NOT normal"; that "[i]f asked on cross" she would "agree that [Mr. Nelson] has several traits associated with psychopathy"; and that the State's experts "might fully agree" with everything she says. *Id.* at Ex. 51. Dr. McGarrahan also noted that "some abnormalities of the brain are chemical and some are at the cellular level, neither of which can be read with a neuropsychological battery nor with the naked eye. We are not there scientifically yet but we are pretty far along from where we have been." *Id.*

Despite knowing that Dr. McGarrahan might agree that Mr. Nelson is a psychopath, trial

counsel proceeded to have Dr. McGarrahan testify at Mr. Nelson's trial. When asked on direct examination if she agreed that Mr. Nelson "doesn't have anything biologically . . . in the his – the way his brain is wired," Dr. McGarrahan said "I would actually disagree with that." *Texas v. Nelson*, 43 RR 247. She explained: "[W]hat we know about behavior is it's – it comes from the brain. The brain is what controls our behavior and our emotions. And I would argue that there is something significantly wrong with Mr. Nelson's brain being wired in a different way, being predisposed to this severe aggression and violence from a very early age." *Id.* When trial counsel asked Dr. McGarrahan why some people commit crimes, Dr. McGarrahan identified what she called "risk factors," which included Mr. Nelson's race:

> What we do know about Mr. Nelson is in addition to the ADHD, he has a number of risk factors. The mother who is working two jobs and absent father, verbal abuse, witnessing domestic violence, *the minority status*,[24] below SCS status, all of those things put an individual at greater risk. We can't pinpoint what it is that made Mr. Nelson go on and do what he did do. We just know that when you look at the risk factors that he had, I mean, it was a storm waiting to happen.

*Id.* at 253 (emphasis added). In a different case, the Supreme Court would later hold that "[n]o competent defense attorney would introduce such evidence about his own client"—i.e., evidence that the client's race increases his risk for future dangerousness. *Buck*, 137 S. Ct. at 775.

On cross-examination, Dr. McGarrahan largely agreed with the State that Mr. Nelson was a psychopath. When asked that question directly, she said that "[h]e has many, many psychopathic characteristics, yes." *Nelson*, 43 RR 274–75. She added that although she did not score the Hare Psychopathy Checklist, she "imagine[d] that he meets most of that criteria, yes." *Id.* at 275. She further agreed with the State that, although Mr. Nelson lacked the criteria of many short-term marital relationships (which is one of the so-called criteria for psychopathy), he might have met

---

[24] Mr. Nelson is Black. *See* https://www.tdcj.gov/death_row/dr_info/nelsonsteven.html.

that criteria had he not been incarcerated as much as he had been. *Id.*

During closing arguments, trial counsel emphasized Dr. McGarrahan's point about Mr. Nelson's propensity for violence, which the State also seized on. In asking the jury to spare Mr. Nelson's life, trial counsel argued: "Not because he deserves it, not because there's some justice that you are able to give, but because from the time that man was young, from the time that man started on this path at 3, he was going to end up in a situation like this." *Nelson*, 44 RR 16. Likewise, trial counsel made references to Mr. Nelson's poor decisions, "the ones that Dr. McGarrahan told you about that put him on the track for permanent derailment, those were the ones that were beyond his control." *Id.* at 23. Trial counsel ended by telling the jury that Mr. Nelson "was a train wreck waiting to happen." *Id.* at 24. The State emphasized Mr. Nelson's propensity for violence and highlighted that "[e]ven the Defendant's own expert told you all yesterday that he will continue to be a danger." *Id.* at 16.

In sum, trial counsel's "defense" of Steven Nelson was that he was born bad and had a propensity for violence—evidence that weighed so much in the State's favor in their future dangerousness case that they did not even bother to put their expert on. Mr. Nelson was ultimately sentenced to death. *Nelson v. State*, No. AP-76,924, 2015 WL 1747144, at *1 (Tex. Crim. App. Apr. 15, 2015).[25]

### b. Trial counsel doubled down on their incurably-violent defense in Mr. Ricks's case.

Trial counsel was not deterred by the death sentence imposed in Mr. Nelson's case. Rather, trial counsel once again presented the "defense" that their client was predisposed to violence and aggression. Moreover, trial counsel pressured Mr. Ricks into participating in this unreasonable

---

[25] *See supra* n.21 (discussing *Nelson v. Davis*, 952 F.3d 651 (5th Cir. 2020)).

defense.

Trial counsel had heard Dr. McGarrahan testify at Mr. Nelson's trial that Mr. Nelson's race was a risk factor for his propensity for violence. Although Mr. Ricks is also Black, trial counsel again retained Dr. McGarrahan to evaluate Mr. Ricks in anticipation of his capital murder trial. Trial counsel moved to appoint Dr. McGarrahan on November 5, 2013. Ex. 5. Two days later, trial counsel sent an introductory letter to Dr. McGarrahan. Ex. 6. This letter stated in relevant part: "As we discussed, I will need a neuropsychological evaluation in this case. Additionally, I would like to see if there is some 'hard science' scanning that we might do." *Id.*

Seeking "hard science," trial counsel then reached out to Dr. Kent Kiehl at MINDSET on December 27, 2013. MINDSET is an organization that conducts and coordinates genetic testing and brain imaging. Trial counsel told Dr. Kiehl that they "are looking at some type of hard science or imaging evidence that we might be able to show the jury concerning our client's brain," noting in particular that "[o]ur client has a history of behavior that is anger related . . . and we are interested in something other than the testimony concerning testing and the corresponding results which are typically used in these type [sic] cases." Ex. 7. Dr. Jeffrey Lewine, a neuroscience researcher at MINDSET who was the only expert to testify at Mr. Ricks's trial, testified that trial counsel had asked MINDSET "to determine if there was anything in the neurobiology [of Mr. Ricks] that was consistent with the idea that there might be a biological predisposition towards aggression and violence." 39 RR 100–01.[26] As the foregoing makes clear, trial counsel in Mr. Ricks's case planned from the outset to present the same defense that they did in Mr. Nelson's case: that Mr.

---

[26] Before testifying at Mr. Ricks's capital punishment trial, Dr. Lewine had never testified as an expert in a criminal case. 39 RR 98.

Ricks's brain was abnormal such that he was predisposed to violence and aggression.

After Mr. Ricks agreed to submit to a standard neuropsychological battery administered by Dr. McGarrahan in January 2014, trial counsel told the court at a sealed *ex parte* hearing on March 17, 2014, that Mr. Ricks was refusing to submit to Dr. McGarrahan's administration of the Hare Psychopathy Checklist.[27] 9 RR 6. At the hearing, trial counsel asked the court to order Mr. Ricks to submit to this testing and to have his brain imaged. *Id.* at 7. Trial counsel also threatened to try and force Mr. Ricks into submitting to testing and imaging if he continued to refuse. *Id.* At that hearing, Mr. Ricks ultimately agreed to cooperate with additional testing. *Id.* at 15. Trial counsel nonetheless made Mr. Ricks sign a Memorandum of Understanding ("MOU") "concerning the decision and communications between" Mr. Ricks and trial counsel. Ex. 8. The MOU stated in relevant part:

> The Defendant understands that Attorneys will be required and will petition the court to order and force, if necessary, to submit to psychological testing, and further order and force, if necessary, to submit to brain imaging. If that occurs, the court's action may become a matter of public record, and the State will be privy to the Defendant's actions. In this regard, the State may have the sheriff video or otherwise report on the Defendant's lack of cooperation, and in that case, those facts will tend to bear negatively on the special issues submitted to the jury in this case. There is also a possibility that due to the Defendant's actions, testing may not be complete, which would result in no opinions or conclusions that could potentially save Defendant from a death sentence.

*Id.* In other words, trial counsel pressured Mr. Ricks into participating in testing that ultimately supported the State's case on future dangerousness. And in doing so, trial counsel explicitly recognized that forcing Mr. Ricks to submit to this testing could further support the State's future dangerousness case.

_____

[27] The State later referenced Dr. McGarrahan's administration of the Hare Psychopathy Checklist in cross-examining Dr. Lewine and Dr. Lewine conceded that Mr. Ricks could fall within psychopathy range. *See* 39 RR 159–65.

Having secured Mr. Ricks's agreement through the MOU, trial counsel arranged for MINDSET to send a portable MRI scanner to the Tarrant County Jail to perform an MRI on Mr. Ricks. At that time, trial counsel were also appointed to represent Amos Wells on a separate set of capital murder charges. *See* Section C(5)(c), *infra*. Although trial counsel had only just been appointed to represent Mr. Wells, they had already decided to use their incurably violent defense in Mr. Wells's case as well. Indeed, correspondence between trial counsel and MINDSET indicate that they were planning to use the portable MRI scanner to scan not only Mr. Ricks's brain, but also that of Amos Wells. *See supra*; Exs. 9–12. Trial counsel accordingly sought funding from the trial court to conduct an MRI on both Mr. Ricks and Mr. Wells. Ex. 13. Mr. Ricks's and Mr. Wells's MRIs took place on April 24, 2014. 39 RR 170. Thus, while trial counsel was obtaining evidence related to Mr. Ricks's brain to use at his trial, they were doing the same thing at the same time with respect to Mr. Wells's trial.

Trial counsel relied on the penalty-phase testimony of MINDSET research scientist Dr. Lewine to assert that Mr. Ricks had a biological predisposition to violence. Dr. Lewine's testimony discussed the results of Dr. McGarrahan's testing, as well as the results of genetic testing and brain imaging that MINDSET performed on Mr. Ricks.[28] Trial counsel also attempted to present evidence to the jury that Mr. Ricks was biologically predisposed to violence based on both his brain imaging and genetic testing that had been performed pretrial. Although the trial court ruled the genetic testimony inadmissible in a hearing conducted pursuant to Texas Rule of Evidence 705(b), had trial counsel been successful in introducing this evidence, Dr. Lewine would have told

---

[28] Dr. Lewine's testimony indicates that he was under the impression that Dr. McGarrahan was testifying after him. 39 RR 125. She ultimately did not testify in Mr. Ricks's case.

the jury that Mr. Ricks had a decreased level of the COMT enzyme, which he claimed to be "associated with increased aggression or violence." 39 RR 44. In front of the jury, Dr. Lewine testified that an image of Mr. Ricks's brain showed that he had an increased putamen (a part of the brain), which "the scientific literature says [] is associated with aggressive and violent behavior." 39 RR 123.

Dr. Lewine also testified that Mr. Ricks had increased beta activity in his brain, and that "[w]e often see it in individuals who have anxiety disorder and then also individuals with impulse control and aggression problems." 39 RR 132.[29] He emphasized: "So, again, we have a beta signature which is consistent with the idea of a biological predisposition towards violence and aggression." *Id.* Dr. Lewine did testify that Dr. McGarrahan scored a 25 for Mr. Ricks on the Hare Psychopathy Checklist, which placed him below the threshold for psychopathy, *id.* at 125, and that Mr. Ricks's brain imaging was not in the psychopathy range. *Id.* at 133. On cross-examination, however, he admitted that he agreed with some of the State's scoring changes that would place Mr. Ricks in the range of psychopathy. 39 RR 159–65. And, as discussed in Section C(7), *infra*, the State overwhelmingly relied on this testimony in support of its future dangerousness case at closing.

### c. Trial counsel used the same defense for a third time in their representation of Amos Wells.

Based on the facts of Mr. Nelson's and Mr. Ricks's cases, it is already evident that trial counsel had developed a routine of presenting cookie-cutter defenses of their Black clients charged

---

[29] This evidence was based on the qEEG that Dr. Lewine administered to Mr. Ricks in the courtroom on the day he was found guilty of capital murder. 39 RR 132–34; 46 RR, Def. Exs. 32, 33 (photographs of the qEEG being administered to Mr. Ricks in the courtroom).

with capital murder. When it came to Amos Wells's[30] case, however, trial counsel made their formulaic approach explicit.

About two months after they were appointed to represent Mr. Ricks, trial counsel were appointed to represent Amos Wells for his capital murder charge. Exs. 14, 15. Trial counsel's eventual defense of Mr. Wells paralleled the defense that they had presented at the penalty phase for Mr. Nelson and Mr. Ricks. *See* Ex. 16. (Dr. McGarrahan explained that she was "going to proceed with my standard neuropsych eval and we can do additional testing thereafter as needed – like we did with Ricks. I will likely see Mr. Wells in the next month or so.").

Trial counsel also hired Dr. William Bernet, with whom they had consulted on Mr. Ricks's case. At trial, Dr. Bernet testified that Mr. Wells had a certain version of the monoamine oxidase ("MAOA") gene, which leads to "an increased risk of being a violent adult if that person has an adverse or traumatic childhood." *Wells v. State*, 611 S.W.3d 396, 414 (Tex. Crim. App. 2020). Dr. Bernet concluded that "[Mr. Wells's] genetics and history of childhood mistreatment increased the probability that Appellant would act in a violent or maladaptive manner." *Id.* (citing *Wells*, 43 RR 117).

Likewise, trial counsel again hired Dr. Lewine, who testified that Mr. Wells's "brain is significantly abnormal in the parts of the brain involved in visual information processing, emotional regulation of behavior, and impulse control." *Id.* at 415. Dr. Lewine also told the jury that Mr. Wells "would have difficulty stopping behaviors based on what has happened emotionally." *Id.* As in Mr. Ricks's case, Dr. Lewine found "increased beta activity, which is associated with anxiety and impulse control issues." *Id.* Dr. Lewine concluded that "if faced with

---

[30] Mr. Wells is Black. *See* https://www.tdcj.texas.gov/death_row/dr_info/wellsamos.html.

the same circumstances leading up to the offense, [Mr. Wells] could have the same response given the right stressors and the right circuitry of his brain." *Id.* Dr. McGarrahan also testified in Mr. Wells's case. She testified that Mr. Wells had a history of aggression and extreme anger, and that he has problems controlling his anger. *Wells*, 40 RR 92–93. Although these experts had been called by the defense, their combined testimony had the effect of portraying Mr. Wells as an incurably violent man.

Trial counsel closed their defense of Mr. Wells by regurgitating the same speech that they used to describe Mr. Nelson and Mr. Ricks in their respective trials. Counsel argued that "Amos wrecked his own life. He's wrecked his daughter's life. He's wrecked his – his family. It's just all one big, bad train wreck." *Wells*, 44 RR 64. They emphasized that Mr. Wells was incurable, telling the jury that "Amos didn't ask for his genetics, he didn't ask for the brain he got, and he darn sure didn't ask for the parents he got handed." *Id.* at 65; *see id.* at 65 ("[h]e has no control").

Not surprisingly, the State relied on trial counsel's own evidence in support of the State's future dangerousness case. In closing, the State emphasized to the jury that "[t]heir own expert tells you he is going to be dangerous." *Wells*, 46 RR 72; *see id.* at 32, 70 (same). Mr. Wells was also sentenced to death. *Wells*, 611 S.W.3d at 402.

As the foregoing makes clear, trial counsel used the same strategy in their defense of Steven Nelson, Cedric Ricks, and Amos Wells. Tellingly, trial counsel used the exact same language to describe each of their clients to the jury. 40 RR 114 (describing Mr. Ricks as "a train looking for a wreck"); *State v. Nelson*, No. AP-76,924, 44 RR 24 (describing Mr. Nelson as "a train wreck waiting to happen."); *State v. Wells*, No. AP-77,070, 46 RR 64 (describing Mr. Wells as "one big, bad train wreck"). And in each case, their clients were sentenced to death. This one-size-fits-all strategy runs contrary to the individualized defense that the Eighth Amendment demands and that

the Sixth Amendment requires counsel to present. Trial counsel's performance was therefore constitutionally deficient.

### 6. Trial counsel unreasonably relied on a "catch-all" expert.

"Counsel should choose experts who are tailored specifically to the needs of the case, rather than relying on an "all-purpose" expert who may have insufficient knowledge or experience to testify persuasively." *ABA Guidelines*, Guideline 10.7 at cmt. Despite evidence of trauma and trauma-related neuropsychological deficits, trial counsel presented only the testimony of Dr. Lewine. *See* 39 RR 91–153. Dr. Lewine does not have expertise in trauma, mental health, or neurodevelopmental disorders. Dr. Lewine is a "research scientist" in the field of neuroscience and a "professor of translational neuroscience." *Id.* at 7–8, 91. Dr. Lewine has "a bachelor's, master's, and doctoral degree in neuroscience, and post-doctoral training in neuroscience and biophysics." *Id.* at 91. Before testifying at Mr. Ricks's capital punishment trial, Dr. Lewine had never testified as an expert in a criminal case. *Id.* at 98. Trial counsel's failure to call any other expert cannot be credited as reasonable under these facts.

On April 28, 2014, MINDSET performed an MRI on Mr. Ricks in a truck outside of the Tarrant County Jail. 46 RR, Def. Exs. 20–29, 37. Dr. Lewine did not perform a quantitative electroencephalogram ("qEEG") on Mr. Ricks until May 7, 2014—literally in the middle of trial. 46 RR, Def. Ex. 35. This was also the day on which the jury returned a guilty verdict in Mr. Ricks's case. 33 RR 71. As the following image illustrates, Mr. Ricks was made to sit at counsel's table wearing a cap with wires sticking out of it while trial counsel looked on:



Ex. 52.

Dr. Lewine testified that based on MINDSET's neuroimaging, Mr. Ricks had a "biological predisposition towards violence and aggression, but it's not so bad that we're in the psychopathy range." 39 RR 133. In addition to neuroimaging, Dr. Lewine testified to the Hare Psychopathy Checklist, a pseudopsychological test for psychopathy. Psychopathy is not a diagnosis recognized by the DSM-5. Dr. Lewine did not administer the Hare Psychopathy Checklist and testified instead to answers and scores obtained by Dr. McGarrahan. *Id.* at 125. Dr. Lewine testified on direct examination that Dr. McGarrahan scored Mr. Ricks at a 25 on the Hare Psychopathy Checklist (which falls below the psychopathy range) but agreed on cross examination that Dr. McGarrahan's scoring could be revised such that Mr. Ricks would fall within the psychopathy range. *Id.* at 159–65.

Trial counsel asked Dr. Lewine "if Mr. Ricks has this biological predisposition towards aggression and violence, is he a future risk to society?" 39 RR 147. Dr. Lewine told the jury that he "can't predict the future." *Id.* He testified that "the best I can do in that situation is rely on

70

published literature," including actuarial data. *Id.* Dr. Lewine added, however, that he was "not an actuary" and "not an actuarial expert[.]" *Id.* at 147; 148. Dr. Lewine told the jury that he "just went into the literature and looked for -- for some data on this issue [of future dangerousness]." *Id.* Dr. Lewine testified that he "would probably say the answer is yes" to whether Mr. Ricks would constitute a future danger if he were to return to normal society. 39 RR 147–48. Dr. Lewine further told the jury that "[t]he biology suggested that [Mr. Ricks] is predisposed to violence" and that "[t]he biology makes me worried." *Id.* at 148; 151. The State itself remarked that Dr. Lewine's testimony seemed to be "way outside the expert's area of expertise." 39 RR 152.

### 7. Trial counsel conceded future dangerousness.

#### a. Trial counsel's penalty phase case centered on demonstrating to the jury that Mr. Ricks was biologically predisposed to violence, aggression, and poor impulse control.

Instead of presenting a case that would have enabled the jury to fairly adjudicate Mr. Ricks's "moral culpability" in rendering their verdict, trial counsel instead emphasized only Mr. Ricks's supposed propensity for violence, aggression, and poor impulse control—and by doing so, essentially relieved the State of its burden of proving future dangerousness. *See Andrus*, 140 S. Ct. at 1885–86; Tex. Code Crim. Proc. art. 37.071, § 2(c) (placing the burden on the State to prove future dangerousness). Trial counsel did so by failing to follow up on red flags regarding trauma and mental health, which necessarily meant that they did not present any such evidence at trial. Rather, trial counsel followed their cookie-cutter approach to capital murder cases involving Black defendants and focused solely on arguing that their client was born bad. This is made clear from both Dr. Lewine's testimony and from the damaging testimony that trial counsel elicited from lay witnesses, all of which amounted to the theme that Mr. Ricks was, and always had been, violent, aggressive, and unable to control himself. This concession of future dangerousness constitutes deficient performance. *See Andrus*, 140 S. Ct. at 1885 ("There is no squaring that conduct, certainly

when examined alongside counsel's other shortfalls, with objectively reasonable judgment."); *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009) ("[A] conscious and informed decision on trial tactics and strategy cannot be the basis of constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." (internal quotations and citations omitted)).

The only expert that trial counsel presented during the penalty phase was Dr. Lewine from MINDSET. The thrust of Dr. Lewine's testimony was that Mr. Ricks was biologically predisposed to violence and aggression. Dr. Lewine made clear that—from the outset—trial counsel retained MINDSET "to determine if there was anything in the neurobiology that was consistent with the idea that there might be a biological predisposition towards aggression and violence." 39 RR 100–01. He explained:

> [T]here are certain characteristic findings in brain imaging, electrophysiology, that have been found to be statistically significant in populations with increased history of aggression and violence. So we were looking to see whether there were any of these biological markers in Cedric's brain that are associated with the history of aggression and violence.

*Id.* at 101.

With regards to brain imaging performed on Mr. Ricks by MINDSET, Dr. Lewine first discussed the MRI test that MINDSET had performed on Mr. Ricks in order to review the anatomical structure of Mr. Ricks's brain.[31] In reviewing the MRI results, Dr. Lewine testified that

---

[31] Although the judge prohibited defense counsel from discussing the results of the genetic testing performed on Mr. Ricks, trial counsel had nevertheless intended to ask Dr. Lewine to tell the jury about these test results. During a hearing held outside the jury's presence, Dr. Lewine testified that "[l]ooking at the genes related to catecholamine metabolism, the data suggests that Cedric has a genetic profile that is associated with reduced activity in a particular enzyme which alters neurotransmitter function. And there's a body of literature which suggests that individuals who have that profile again are at increased risk for aggression and violent behavior." 39 RR 13.

Mr. Ricks displayed "an increase in putamen volume suggestive or consistent with the idea that there's a predisposition towards aggression and violence." *Id.* at 121–22. With respect to the qEEG that MINDSET performed on Mr. Ricks in order to measure Mr. Ricks's brain waves, Dr. Lewine testified that Mr. Ricks "has an excessive amount of beta activity. So much more beta, which we could see just by visual inspection . . . We often see it in individuals with impulse control and aggression problems." *Id.* at 132.

As the foregoing makes clear, the thrust of trial counsel's only expert testimony at the penalty phase was that something was "wrong" with Mr. Ricks and that he had a biological predisposition to violence and aggression. If there were any doubt, trial counsel's closing arguments to the jury make this clear. *See, e.g.*, 40 RR 111 (trial counsel arguing in closing that "[w]e think there's something the matter with him"); *id.* at 112 (arguing that "the Defendant doesn't have [his behavior] under his own control because he was born with that condition"); *id.* (asking "[w]hat would you expect with somebody whose brain's not right?"); *id.* at 116 ("He was prone to impulsivity and acts of aggression.").

In addition, trial counsel repeatedly elicited from lay witnesses to further underscore Mr. Ricks's purported violence, aggression, and poor impulse control. In cross-examining Mr. Ricks's ex-girlfriend Tamara Partridge, trial counsel repeatedly asked her to agree if Mr. Ricks was impulsive and aggressive. *See* 36 RR 46 ("Would you describe that as impulsive? . . . Maybe instantaneously impulsive. Would you agree with that?"); *id.* at 47 ("Short fuse"?); *id.* ("And so when he would have these outbursts, sometimes he'd get kind of aggressive, like you said, when he was choking you?"); *id.* at 50 ("Did it seem that these aggressive and impulsive behaviors seemed a little overboard . . . given the situation?"); *id.* at 51 ("Pow. Boom . . . Off to the moon. Just instantaneous. Way overboard."). Likewise, when cross-examining Mr. Ricks's ex-wife,

rather than explain or contextualize Mr. Ricks's behavior, trial counsel focused on the aggravating nature of it. *See* 37 RR 42 ("When Cedric would do something harmful, bad, however you want to characterize it, did it seem like whatever he did was way over the top, as far as the response that he should have had?"); *id.* ("[D]id it seem like he responded a lot more serious or aggravated than whatever the situation would call for?"); *id.* ("Seemed kind of over the top? . . . Seemed kind of impulsive?"); *id.* at 43 ("Be just – just seem like a – almost surprising the amount of aggravation or response or meanness or whatever you want to call it?").[32]

Trial counsel also adduced testimony that Mr. Ricks was prone to violence, aggression, and impulse control from their own witnesses. In questioning Courtland Byrd, a childhood friend of Mr. Ricks, trial counsel asked Mr. Byrd to recount a story "about Cedric maybe having a – a short fuse sometimes if it was a bad call on the field." 38 RR 47. They also elicited testimony that "[s]ometimes Cedric couldn't control his temper on the football field" and pushed back when Mr. Byrd would not agree to that statement. *See id.* at 47–48. Trial counsel also questioned Stephen Ware, another childhood friend, about whether "there [was] ever a time in your experience with Cedric that you came to the conclusion that Cedric might not be acting the way he should or is not the person he should be?" *Id.* at 75–76. Trial counsel tried to elicit similar testimony from Keith Griffin, a childhood friend, that Mr. Ricks's "temper was short." *Id.* at 156.

None of this evidence was mitigating. Rather, the elicited testimony was highly aggravating and only served to bolster the State's future dangerousness case, essentially undermining the adversarial process owed to Mr. Ricks. *See Strickland*, 466 U.S. at 686 ("The

---

[32] It is against this backdrop of highly aggravating testimony that Mr. Ricks elected to testify. 40 RR 27.

benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."). Trial counsel's concession of future dangerousness constitutes deficient performance. *See Andrus*, 140 S. Ct. at 1883 ("Counsel's introduction of seemingly *aggravating* evidence confirms the gaping distance between his performance at trial and objectively reasonable professional judgment." (emphasis in original)).

### b. Trial counsel failed to investigate extraneous offenses.

An attorney has a duty to independently investigate the charges against his client. *Wiggins*, 539 U.S. at 524. Trial counsel must perform a "reasonable amount" of pretrial investigation. *Bowers v. Quarterman*, 497 F.3d 459, 467 (5th Cir. 2007) (quotations omitted). In Mr. Ricks's case, however, trial counsel did not conduct a reasonable investigation of the extraneous offenses introduced by the State in support of its case on future dangerousness. The extraneous offenses counsel failed to investigate include an incident involving Teshana Singleton, Mr. Ricks's ex-wife; an incident at the Garvin County jail; and a pretrial incident in which deputies found a pencil in Mr. Ricks's possession.

The State relied on several extraneous offenses in support of their future dangerousness case. First, the State called Mr. Ricks's ex-wife, Teshana Singleton,[33] who testified that Mr. Ricks had physically abused her on multiple occasions. *See* 37 RR 17–20. Second, the State introduced the testimony of Niya Cardoso, a jailer at the Garvin County jail, and Michael Rose, an inmate there, to suggest that Mr. Ricks asked to be placed in general population after his arrest in Garvin County and once in population, Mr. Ricks bragged about the offense, which caused other inmates

---

[33] Although the Report's Record refers to her as Tashana Singleton, *see* 37 RR 9, records obtained by undersigned counsel indicate that the correct spelling of her name is Teshana Singleton.

to physically assault Mr. Ricks. 39 RR 238–39, 255–57.[34] Third, the State presented the testimony of Deputy Marcus Moore, who told the jury that Mr. Ricks was discovered with a pencil when he was being moved for a pretrial proceeding, despite the fact that Mr. Ricks was "not allowed to have any implements, such as a pencil, pen, things like that" and that this pencil "can be used as a weapon." 36 RR 58–59.

Despite the duty imposed on counsel by the Sixth Amendment to conduct a reasonable investigation into a defendant's case, trial counsel failed to investigate any of these extraneous offenses. Trial counsel never spoke to Teshana Singleton. Ex. 36. In addition, there is no indication that trial counsel ever interviewed the persons involved in Mr. Ricks's physical assault in Garvin County, nor that they investigated the pencil incident before Deputy Moore's testimony at trial. In sum, trial counsel's failure to investigate extraneous offenses constitutes deficient performance.

This complete abdication of trial counsel's duty cannot be considered reasonable; despite being on notice that the State planned to introduce this evidence, trial counsel still failed to investigate these incidents. Trial counsel's failure to investigate extraneous offenses constitutes deficient performance. *See Andrus*, 140 S. Ct. at 1881–82 ("[C]ounsel failed adequately to investigate the State's aggravating evidence, thereby forgoing critical opportunities to rebut the case in aggravation."); *id.* at 1885 ("[B]y failing to conduct even a marginally adequate investigation, counsel not only 'seriously compromis[ed his] opportunity to respond to a case for aggravation,' . . . but also relinquished the first of only two procedural pathways for opposing the State's pursuit of the death penalty." (quoting *Rompilla v. Beard*, 545 U.S. 374, 385 (2005))).

### D.    Mr. Ricks was prejudiced by trial counsel's deficient performance.

Trial counsel's deficient performance prejudiced Mr. Ricks. To establish prejudice, Mr.

---

[34] *See* Claim Seven, *infra*.

Ricks need only show a reasonable probability that one juror would have answered the special issues differently. *Andrus*, 140 S. Ct at 1886; *Wiggins*, 539 U.S. at 534. In assessing prejudice, the court reweighs the newly presented evidence against what was presented at trial. *Wiggins*, 539 U.S. at 534. This requires the court to "evaluate the totality of the evidence—'both that adduced at trial, and the evidence adduced in the habeas proceeding.'" *Id.* at 536 (quoting *Williams*, 529 U.S. at 397–98 (emphasis omitted)); *see Strickland*, 466 U.S. at 695 ("[A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.").

Here, trial counsel's deficiencies prejudiced Mr. Ricks for myriad reasons, relating to both whether he would be a future danger and whether sufficient mitigating evidence existed that justified a sentence less than death. This includes, but is not limited to, the concession of Mr. Rick's future dangerousness, the failure to present mitigation evidence from both lay and expert witnesses that would have painted a completely different picture of Mr. Ricks, and inaccurate evidence regarding extraneous offenses. In sum, trial counsel's deficient performance in Mr. Ricks's penalty phase undermines confidence in the outcome of the proceeding.

> 1. **Trial counsel's penalty phase presentation that focused on Mr. Ricks's biological predisposition to violence, aggression, and poor impulse control prejudiced Mr. Ricks.**

The prejudice that Mr. Ricks experienced due to deficient performance of his trial counsel is manifest. At the outset, by conceding future dangerousness, trial counsel relieved the State of its burden of proof as to the future dangerousness special issue. The jury notes make clear that the future dangerousness and MINDSET evidence weighed heavily in the jury's deliberations. *See* 2 CR 519, 524. By presenting testimony from the defense expert that Mr. Ricks had a predisposition to violence and aggression, trial counsel handed the State its case on future dangerousness. Indeed, after Dr. Lewine testified, the State did not present the testimony of its own expert despite having given notice of that expert testimony. *See* 1 CR 319 (State's Answer to Defendant's Motion to

Disclose the Names and Addresses of Expert Witnesses for the State).

In its final closing, the State directed the jury's attention to Dr. Lewine's testimony that Mr. Ricks was "dangerous and that he's aggressive and that he's impulsive" and suggested that Dr. Lewine's testimony was so helpful to the State's case that Dr. Lewine should have been paid by the State, and not the defense. 40 RR 125–26. Dr. Lewine's testimony further enabled the State to argue that Mr. Ricks was "going to be dangerous and impulsive and violent for the rest of his life. That's just not going to change." *Id.* at 126. The record makes clear that the jury focused on this evidence, as the first note that the jury sent during the penalty phase asked about the wording of the future dangerousness special issue and the final question the jury sent to the court was to "see the Mindset documents." 2 CR 519, 524.

> ### 2. Lay witnesses would have testified that Mr. Ricks endured abuse and neglect.

In the words of the State, trial counsel presented "no mitigation evidence in this case . . . [a]bsolutely zero." 40 RR 105. Instead, trial counsel presented inaccurate testimony from numerous lay witnesses that conveyed to the jury that Mr. Ricks had "a family and support system that maybe most of us in this courtroom didn't have." *Id.* at 114. Trial counsel told the jury that that "if it weren't for [Mr. Ricks's] family, if it weren't for the support system he had, he would have been a car wreck a lot earlier." *Id.* Unsurprisingly, the State seized on the testimony presented by trial counsel to argue to the jury that Mr. Ricks "lived in Utopia" and that he had "a wonderful life." *Id.* at 105–06. As summarized by the State, "[e]very one of their witnesses came in here and told you he had a wonderful upbringing." *Id.* at 105. That picture, however, was false.

Had trial counsel not disregarded evidence and thus presented inaccurate testimony about Mr. Ricks's childhood, the jury would have heard, amongst other mitigating testimony, that Mr. Ricks was physically abused by his parents, that he endured neglect, and that he witnessed

domestic violence. The jury would have also heard that, far from any "support system," Mr. Ricks's parents did little to confront the significant symptoms of Mr. Ricks's resulting trauma.

### a. Mr. Ricks endured relentless physical and verbal abuse by his parents.

The jury would have heard that Mr. Ricks endured brutal beatings at the hands of his parents throughout his childhood. Mr. Ricks's older brother, Dwayne, would have described to the jury how their mother "used to take [them] into the bathroom and the [sic] lock the door so we couldn't get out" as their mother "whipped [them] with belts and extension cords." 2 SHCR 808 ¶ 8. Dwayne Ricks remembered "crying, screaming, and hitting the locked door to try and get out" from the locked bathroom as their mother beat him and his younger brother. *Id.*

Mr. Ricks's mother, Helen Ricks, would have also told the jury that "[w]hen [Mr. Ricks] was about 8-9 years old I started bringing him into the bathroom and whipping him with a belt." 2 SHCR 797 ¶ 15. Mr. Ricks's father, Shederick Ricks, knew of these violent beatings in the bathroom but only "sometimes" intervened. *Id.*; 2 SHCR 823 ¶ 11. This, however, only "frustrated [Helen Ricks] because it felt like another way for Shederick to try and control [her]." *Id.* at 797 ¶ 15. In other words, Helen Ricks was unconcerned by the violence she inflicted upon Mr. Ricks and simply resented her husband for intervening.

Nor were these whippings entirely disciplinary. Rather, as Shederick Ricks would have told the jury, "[s]ometimes [Mr. Ricks] had the tub running and Helen came in and whipped him." 2 SHCR 823 ¶ 11. Indeed, Mr. Ricks's mother herself would have told the jury that "[i]t was not so much that Cedric got into trouble, but more that Cedric was very active and fidgety." Ex. 32 ¶ 9. Mr. Ricks's mother would seemingly "snap" and beat Mr. Ricks. *Id.* These violent beatings, although unpredictable, became so frequent that Mr. Ricks "just learned to take them." *Id.* at 809 ¶ 10. Mr. Ricks's mother herself would have told the jury that she "do[esn't] remember [Mr. Ricks]

79

crying very much when [she] whipped him." *Id.* at 797 ¶ 15. Dwayne Ricks tried to report their mother's physical abuse to a teacher. Ex. 32 ¶ 12. When Mr. Ricks's mother learned of this report, however, she "thought it was funny[.]" *Id.*

Mr. Rick's father would have likewise told the jury that, while he did not use a belt or extension cord as his wife did, he beat Mr. Ricks "with [his] hands[.]" 2 SHCR 823 ¶ 11. Helen Ricks remembered that Mr. Ricks "seemed really afraid of his father." Ex. 32 ¶ 18. Indeed, Mr. Ricks's brother recalled that their father "had a temper and it got worse when he drank alcohol." *Id.* at 809 ¶ 11. Helen Ricks would have told the jury that they "all had to learn to walk on eggshells when Shederick was home, particularly when he had been drinking." Ex. 32 ¶ 21. Because of her husband's violent temper, she simply "tried to avoid him as much as possible." *Id.*

Their father's temper was so severe that Mr. Ricks's brother "didn't have friends over for sleepovers or to hang out because [he] was worried that he might come home angry." 2 SHCR 809 ¶ 11. One of Mr. Ricks's closest childhood friends, Keith Griffin, likewise noticed that "[e]ven though [he] lived close by, [he] never went over to Cedric's house." Ex. 34 ¶ 1. One of Mr. Ricks's paternal cousin would have also told the jury that it was well known that "if you pissed off Uncle Shederick, you would get beaten up." Ex. 33 ¶ 2.

In addition to their father's physical violence, Mr. Ricks and his brother endured their father's verbal abuse. Helen Ricks would have told the jury that her husband referred to Dwayne Ricks as "a fag" and to Mr. Ricks as "a pickle head" and "ugly." Ex. 32 ¶ 16. Mr. Ricks's maternal grandmother, Christine Sudduth, likewise remembered that Shederick Ricks "called the boys names [she] did not think he should be using." Ex. 30 ¶ 12. Reflecting on her husband's physical and verbal abuse of their sons, Mr. Ricks's mother would have told the jury: "I should have taken the boys and left, and I feel guilty that I didn't." Ex. 32 ¶ 22.

### b. Mr. Ricks endured physical abuse by other caregivers and at least one teacher.

The jury would have heard that Mr. Ricks also endured physical abuse at the hands of other caregivers and even teachers. A close cousin, Tammy Hall, would have explained that she, Mr. Ricks, and several other cousins were all babysat by a great-aunt, Geraldine. 2 SHCR 817 ¶¶ 2–3. Ms. Hall would have told the jury that this aunt also "punished [Mr. Ricks] by whipping him with a white extension cord." *Id.* ¶ 5. Ms. Hall would have further told the jury that Mr. Ricks was whipped simply for being "fidgety" or "for getting up," and that he was "punished more than the other kids at [Geraldine's] home." *Id.* ¶¶ 5, 8.

In addition, Mr. Ricks was also physically abused by at least one teacher. Mr. Ricks's mother would have told the jury that when Mr. Ricks was in the third grade, his teacher "hit [him] in the face with her keys." Ex. 32 ¶ 11. And Dwayne Ricks remembered that "the special education teacher punished [Mr. Ricks] by putting him in a closet." 2 SHCR 808 ¶ 7.

### c. Mr. Ricks witnessed domestic violence between his parents.

The jury would have heard that Mr. Ricks's parents' relationship was extremely violent and that Mr. Ricks witnessed this violence. Mr. Ricks's mother would have told the jury that she "ha[d] a temper and never passed up an opportunity to fight." Ex. 32 ¶ 12. Indeed, "when the boys were still young," Helen Ricks "was the one who would pick fights with Shederick." *Id.* She would have described to the jury how she "would jump on his back and tear at his shirt" and, when her husband locked himself in the bathroom, she "took a knife and swiped it under the door to get to him." *Id.*

Mr. Ricks's mother would have also told the jury that, after she gave her life to Christ, "Shederick started hitting me more often." Ex. 32 ¶ 20. Mr. Ricks's father "shoved, slapped, and hit" her. 2 SHCR 797 ¶14. Although the domestic violence worsened, Shederick Ricks had always

81

been physically abusive towards his wife. For example, Helen Ricks remembered one incident in particular because she had been pregnant with Mr. Ricks when her husband hit her. Ex. 32 ¶ 20. And, when she sought refuge with her mother Christine Sudduth, her mother told her "Shederick was a provider and [she] should go back." *Id.*; Ex. 30 ¶ 11.

Multiple witnesses would have told the jury that Mr. Ricks witnessed this domestic violence between his parents. Helen Ricks would have told the jury that Mr. Ricks "saw [his father] hit [her], after which he became very protective towards [her]." Ex. 32¶ 17. Christine Sudduth, Mr. Rick's maternal grandmother, also recalled that Mr. Rick's parents fought "a lot, often in front of the kids." Ex. 30 ¶ 11. A close cousin, Stephanie Halverson, likewise remembered that Mr. Ricks's parents were "often both drunk" and "yelled and screamed at each other in front of [the children] when they were drunk." 2 SHCR 814 ¶10. Ms. Halverson "felt scared watching them fight." *Id.*

Helen Ricks would have told the jury that Mr. Ricks "used to cry and tell me that Shederick shouldn't hit [her]." 2 SHCR 797 ¶ 14. And, "[w]hen he got older he told [her] to leave Shederick." *Id.* Helen Ricks, however, "was too scared" to leave. Ex. 32 ¶ 17.

### d. As a young child and then teenager, Mr. Ricks ran away from home to survive the violence.

The jury would have heard that, from a young age, Mr. Ricks "started to run away to escape" his parents' physical abuse. Even as a child, Mr. Ricks sometimes ran away for days and then weeks at a time. 2 SHCR 823 ¶ 14; Ex. 32 ¶ 18. The violence endured by Mr. Ricks was so severe that, "when he was in elementary school, he jumped out of a first-floor window in his underwear, which was probably a 5-6 foot drop" to escape from his father. 2 SHCR 823 ¶ 13.

Shederick Ricks would have told the jury that even when Mr. Ricks was running away for weeks at a time, he "[didn't] know where he went during that time" and "didn't call the police

about him running away." 2 SHCR 823 ¶ 14. Mr. Ricks's mother would have likewise told the

jury that Mr. Ricks ran away "sometimes for one to two weeks" and that she was "not sure where

he stayed when he ran away." *Id.* at 798 ¶ 16. She recalled that she would "[s]ometimes . . . find

him hiding under [her] car." Ex. 32 ¶ 18. Mr. Ricks's cousin Tammy Hall also remembered that

she "found him hiding in our garage, wearing only a pair of white underwear." 2 SHCR 818 ¶ 13.

### e.  Mr. Ricks endured emotional, medical, and physical neglect.

The jury would have heard that Mr. Ricks was neglected by his parents and other caregivers.

As described above, from a young age, Mr. Ricks was running away from home, sometimes for

weeks at a time, yet his parents neither knew where he was, nor tried to find him. 2 SHCR 823

¶ 14, 798 ¶ 16; Ex. 30 ¶ 18. In addition to this physical neglect, Mr. Ricks suffered emotional

neglect by his parents. Mr. Ricks's brother would have explained to the jury that while "[their]

parents provided all the material things we needed . . . emotionally there was something missing."

*Id.* at 809 ¶ 14. For example, Mr. Ricks's mother would have told the jury that when Mr. Ricks

came to her crying and heartbroken, she "thought it was funny" and "didn't say anything back to

him." Ex. 32 ¶ 23. Similarly, when Dwayne Ricks "told his teacher how [his mother] had whooped

him so hard that he had marks on him," Helen Ricks thought "it was funny that Dwayne thought

[she] was abusive." *Id.* ¶ 12. Dwayne Ricks would have also testified that when he told his mother

that he had been sexually abused by a family friend, and when a doctor raised concerns about

Dwayne having been sexually abused, his mother did nothing. 2 SHCR 807 ¶ 4, 808 ¶ 12.

Mr. Ricks's mother would have also told the jury that Shederick Ricks disapproved of

giving their children attention because "it would turn them into sissies and babies." Ex. 32 ¶ 16.

Indeed, after their children were born, Shederick Ricks became increasingly absent and "seemed

jealous" of any attention their mother gave them. *Id.* He "started going out more and more" and

"he never took the boys." *Id.* Even when the family took vacations together, for example to Disney

World, "he wouldn't speak to [his wife and sons] . . . and sat apart from [them] on the flight home."[35] "Shederick [Ricks] often didn't even show up on holidays involving [the] immediate family, like Dwayne [Rick's] birthday or Mother's Day." *Id.*

Mr. Ricks's parents also neglected him by refusing or failing to follow-through on medical care and school services. For example, when Mr. Ricks was in the 2nd grade at Burr Oak Elementary, the school recommended that Mr. Ricks receive counseling. Ex. 46. There is no indication, however, that his parents ever heeded the school's advice. Likewise, when Mr. Ricks was in the 6th grade at Seven Holy Founders, a local Catholic school, the school recommended several times that Mr. Ricks attend counseling and be tested. *See* Ex. 49. Mr. Ricks was referred to Mercy Hospital, who recommended counseling and parent counseling. Ex. 51. Mercy Hospital records, however, reflect that Mr. Ricks's parents terminated care, including parent counseling, *Id.* Mr. Ricks was also evaluated by the Chicago Clinic for Child Development, who recommended forty sessions of therapy. Ex. 57. Mr. Ricks's parents, however, did not follow up on the Clinic's recommendation. Mr. Ricks's parents also failed to attend Individual Education Program meetings with high school teachers and support staff and refused referrals for counseling and other services. Ex. 48.

Mr. Ricks's parents eventually agreed to a referral to a local hospital, who also recommended parental counseling as well as that Mr. Ricks take Ritalin. Ex. 51. As previously, however, Mr. Ricks's parents did not pursue counseling and refused for Mr. Ricks to take any medication. 39 RR 194. Helen Ricks would have explained to the jury that Shederick Ricks initially refused to attend any counseling at all and that they stopped after just one session. Ex. 32

---

[35] This further contradicts the State's account in closing that this trip to Disney World was evidence that Mr. Ricks "had a wonderful life." 40 RR 105–06.

¶ 14.

### f. This neglect in turn exposed Mr. Ricks to sexual abuse and substance abuse.

Family members would have told the jury that Mr. Ricks's parents were absent as caregivers during his early childhood, which in turn exposed Mr. Ricks to sexual abuse and substance abuse. Mr. Ricks's mother herself would have explained to the jury that "[o]nce the boys were born, [she] left them at Aunt Geraldine's house during the week" and "[w]hen Shederick and [her] went out on weekends, Aunt Jackie or Aunt Sherann babysat the boys." Ex. 32 ¶ 7. Mr. Ricks's parents often did not pick up their children from Aunt Geraldine's home until "late at night, around 2:00am." 2 SHCR 813 ¶ 10. On weekends, Mr. Ricks's parents "would go to bars and clubs together or separately." Ex. 32 ¶ 7. Helen Ricks also "used cocaine, smoked weed on the way to work, and drank alcohol too." *Id.* ¶ 8. In short, from the age of around 4 months old and until he began attending school, Mr. Ricks's parents were not his caregivers.

This arrangement, however, exposed Mr. Ricks to sexual abuse and further exposed him to substance abuse. Indeed, when at Aunt Geraldine's house during the week, her live-in boyfriend Booker "took care of the kids a lot." Ex. 32 ¶ 7. Ms. Halverson, however, would have told the jury that Booker sexually abused her and at least one other child in Aunt Geraldine's care. 2 SHCR 813 ¶¶ 7–8. In Ms. Halverson's words, "[t]he abuse usually happened when Geraldine let [the children] alone with Booker" and "went on for years, and only ended when Booker died." *Id.* ¶ 7. Ms. Halverson "started locking [her]self in the bathroom, hiding, or going to the downstairs neighbor's apartment to escape the abuse." *Id.* ¶ 7. At least one other child was also sexually abused by Booker and reported the sexual abuse to Aunt Geraldine, but she "did not believe her" and Ms. Halverson "never saw her again." *Id.* at ¶ 8. Despite Booker's years-long sexual abuse of Ms. Halverson, Aunt Geraldine nevertheless continued to leave the children alone with Booker. Mr. Ricks's

85

brother would likewise have told the jury that he was sexually abused by one of the other children in Aunt Geraldine's care. *Id.* at 808 ¶ 4. When Dwayne reported the sexual abuse to his doctor, who in turn alerted Helen Ricks, "she did not follow-up about the doctor's concern." *Id.*

In addition to Booker's known sexual abuse of at least two of the children in Aunt Geraldine's care, it was well known that Booker "drank heavily on a daily basis" and "passed out after drinking." 2 SHCR 808 ¶ 3. Helen Ricks, who entrusted Mr. Ricks and his brother to Booker's care, would have told the jury that he "drank a lot, to the point that he never really participated in family events with us." Ex. 32 ¶ 7. Regardless of Booker's known alcoholism and Dwayne Ricks's and at least one other child's report of sexual abuse, Mr. Ricks's parents continued to have Mr. Ricks stay with Aunt Geraldine throughout the week and until late into the night. *See e.g.*, 2 SHCR 813–14 ¶¶ 7–8, 10, 808 ¶ 4. In Helen Ricks's words, Booker "took care of the kids a lot and took them on car rides" and "really loved [Mr. Ricks]." Ex. 32 ¶ 7.

After leaving their children with Aunt Geraldine and Booker during the week, "when [Mr. Ricks's parents] went out on weekends, Aunt Jackie or Aunt Sherann babysat the boys." Aunt Sherann "didn't care what [the children] did and kept to herself in her room or went out with boyfriends." Ex. 33 ¶ 6. Another cousin, Tommy Abner, would have told the jury that Aunt Sherann would "drink alcohol and smoke cigarettes and weed while [they] played by [them]selves in the living room." *Id.* Other times, '[a]s soon as [Mr. Ricks's] mom . . . picked them up from school on Fridays, she would head over to Aunt Jackie's house and drop the boys off." *Id.* And when no other family member looked after Mr. Ricks and his brother, then one of Mr. Ricks's older cousins would babysit Mr. Ricks and his brother. *Id.*

### g. Mr. Ricks succeeded in the face of this adversity when he was in a structured environment.

Despite physical and verbal abuse at the hands of multiple caretakers, neglect and resulting

86

exposure to sexual and substance abuse, and other multiple forms of profound childhood trauma he endured, Mr. Ricks demonstrated resilience.

Contrary to the picture that emerged at trial of Mr. Ricks as an aggressive and incorrigible child, when in a structured and supportive environment, Mr. Ricks did do well. For example, the jury would have heard that after years of Mr. Ricks's parents refusing services and support on behalf of their son, Mr. Ricks's behavior improved significantly when he finally integrated into a specialized school, Spaulding School, in middle school. Mr. Ricks's 8th grade teacher, Sharon Speedwell, would have testified that Spaulding was a school for "students with emotional and behavioral problems." 2 SHCR 830 ¶ 2. Ms. Speedwell, however, did not remember Mr. Ricks as "being aggressive or having to [be] physically restrain[ed]" unlike many of the other Spaulding students. *Id.* at 831 ¶ 11. Mr. Ricks needed "extra attention" because "he had a hard time ignoring other people and was easily pulled into situations." *Id.* at 830 ¶ 6. Ms. Speedwell met with Mr. Ricks one-on-one once a week and the whole class participated in group therapy. *Id.* at 831 ¶ 11. With this support, consisting primarily of psychological support, Mr. Ricks's behavior improved and he progressed both behaviorally and academically to the point that he was one of the few students to transfer back to regular school. *Id.* ¶¶ 11, 12; *see* Ex. 56. Ms. Speedwell would have told the jury that Mr. Ricks had "a sweet smile, but [she] think[s] it was masking some of the issues he struggled with." *Id.* ¶ 11.

Other friends and family members would likewise have testified to Mr. Ricks's positive qualities. For example, his cousin Debbie Abner would have told the jury that he was "always fun and goofy." Ex. 31 ¶ 3. Another cousin, Tamara Butts, described him as "her favorite cousin" and "funny." Ex. 35 ¶ 2. His childhood friend, Keith Griffin, remembered that Mr. Ricks "had a smile that could light up a room." Ex. 34 ¶ 6. Another childhood friend, Courtland Byrd, "admired [Mr.

Ricks] for being able to move out of his parents shortly after high school." Ex. 37 ¶ 5.

Indeed, despite significant academic and behavioral challenges in high school, Mr. Ricks nevertheless graduated after being transferred to a therapeutic day school with access to therapy and mental health support. Ex. 48. Mr. Ricks then worked a series of odd jobs before gaining and maintaining employment with a sprinkle fitters union (Sprinkle Fitters Union, Local 281). Ex. 53. Mr. Ricks began his apprenticeship in 1999 and was employed with the union for nearly ten years, until the 2008 stock market crash, when Mr. Ricks was laid off. *Id.* During those nearly ten years, Mr. Ricks was financially independent and successful. His sudden loss of employment in 2008 "destroyed his spirit." Ex. 33 ¶ 13. Indeed, one of Mr. Ricks's cousins with whom he was close, Tommy Abner, would have told the jury that Mr. Ricks "had always worked hard and was proud to have a well-paying job." *Id.* When Mr. Ricks lost his union job, he "lost part of his identity as a financially stable and hardworking person."

Despite the significant financial and psychological hardship of his unemployment in 2008, Mr. Ricks then enrolled in a Texas college to study for a career as a medical assistant. Ex. 50. As his mental health continued to decline through the early 2010s, Mr. Ricks actively sought help and care. For example, Mr. Ricks sought and received counseling in late 2012. 40 RR 64. In the months and days leading up to the offense, Mr. Ricks further sought help from several family members and friends. Mr. Ricks's mother and others, however, turned him away. *See, e.g.*, 2 SHCR 798 ¶ 21.

### h. Mr. Ricks did not have "a family and support system that maybe most of us in this courtroom didn't have."[36]

As the above makes clear, Mr. Ricks did not have "a wonderful upbringing" and

---

[36] *See* 40 RR 114.

"wonderful life." 40 RR 104–05. Mr. Ricks did not "live[] in a Utopia." *Id.* at 104. As a child, Mr. Ricks endured physical and verbal abuse, physical, emotional, and medical neglect, and was exposed to domestic violence, sexual abuse, and substance abuse. Mr. Ricks likewise did not run away from home on a handful of occasions, but was instead gone for weeks at a time to escape from his parents. Mr. Brown, who noted that Mr. Ricks "seemed so unhappy at home," would have told the jury that Mr. Ricks "carried the emotional scars from witnessing his father's violence." Ex. 29 ¶ 5.

As a child, Mr. Ricks struggled to survive the trauma he endured, impacting his behavior and neurodevelopment. *See* Section 3 *infra*. Mr. Ricks's childhood friends would have told the jury that they remembered him "rock[ing] back and forth, even in high school" and that he "sucked his thumb a lot." Exs. 34 ¶ 2, 37 ¶ 3. Keith Griffin would have told the jury that "even when [Mr. Ricks seemed happy, he would get depressed easily as a kid." Ex. 34 ¶ 4. He would have described Mr. Ricks as "an emotional kid in the sense that he teared up easily and wore his emotions on his sleeve." *Id.* ¶ 4. Mr. Ricks "got easily overwhelmed and didn't seem to know how to communicate his feelings." *Id.* Another friend, Tommy Maracich, would have told the jury that Mr. Ricks "was often over at [Mr. Maracich's] house" and "[i]t seemed like [his] house was a safe haven for Mr. Ricks." Ex. 28 ¶ 4.

Mr. Ricks's lack of any support system became all the more apparent in the months and days leading up to the offense. Mr. Ricks faced increasingly difficult and stressful circumstances, including the loss of his job, the loss of his car, and the breakdown in his relationship. As Mr. Ricks explained at trial, he knew that his mental health was deteriorating rapidly and sought help. 40 RR 36, 64. What the jury did not hear is that on the day of the offense, Mr. Ricks asked his mother for her help in leaving and coming home to Chicago. 2 SHCR 798 ¶ 21. His mother,

however, refused. *Id.* Mr. Ricks likewise reached out to Luther Brown, but Mr. Brown missed the call. Ex. 29 ¶ 8. A few days before the offense, Mr. Ricks also reached out to a paternal cousin, Tommy Abner, who he admired and with whom he was close. Ex. 33 ¶¶ 11, 14. "The thought did cross [Mr. Abner's] mind that [Mr. Rick]s might be suicidal." *Id.* ¶ 7. Mr. Abner's wife, Debbie Abner, with whom Mr. Ricks had also had a close relationship, also "asked Tommy [Abner] if he thought that [Mr. Ricks] might be suicidal." Ex. 31 ¶ 7. Mr. Abner, however, chalked the call up to "just [Mr. Ricks] talking" and Mrs. Abner only later "realized that [Mr. Ricks's] phone call had been a cry for help." Exs. 33 ¶ 14; 31 ¶ 7.

In sum, lay witnesses would have painted an entirely different picture than that presented by trial counsel at trial. Crucially, this lay witness testimony would have provided the jury with mitigating evidence by which to assess the mitigation special issue.

### 3. Expert witnesses would have provided important context to Mr. Rick's conduct.

Dr. Lewine's testimony that Mr. Ricks was biologically predisposed to violence opened the door to the State's characterization of Mr. Ricks as "a psychopath" and "a monster." 40 RR 101. Had trial counsel presented the testimony of a trauma expert and neuropsychologist, the jury would have heard that Mr. Ricks's history of violence could not simply be attributed to his biology.

Experts in trauma and neurodevelopmental disorders would have provided critical context to the jury within which to understand both the testimony introduced at trial and the above-described information. Whereas the jury heard from witnesses that there had always been something wrong with Mr. Ricks, *see, e.g.*, 38 RR 64, a trauma expert would have been able to explain and provide context to Mr. Ricks's conduct as described by lay witnesses. Trial counsel elicited extensive testimony from lay witnesses that Mr. Ricks exhibited a propensity for violence, aggression, and poor impulse control. *See* Claim Six, Section (C)(7)(a), *supra*. A trauma expert,

however, would have explained to the jury that many of the examples provided by lay witnesses are examples of trauma and its impact on Mr. Ricks's childhood development. *See, e.g.*, *Williams*, 529 U.S. at 398 (determining prejudice in part where additional evidence showed "behavior was a compulsive reaction rather than the product of cold-blooded premeditation").

A trauma expert would have opined to the jury that Mr. Ricks was raised in "a family riddled with abuse and serious neglect, and that he was suffering from severe trauma symptoms." Ex. 59. Indeed, even prenatally, Mr. Ricks was exposed to significant risk factors for trauma, including prenatal exposure to alcohol and other drugs. *Id.* A trauma expert would have testified that from a young age, Mr. Ricks experienced "family violence, parental substance abuse, and physical abuse [and] neglect," which are all forms of trauma. *Id.* And from around the same age, Mr. Ricks began exhibiting symptoms of trauma, including dissociation when his mother whipped him, "bang[ing] his head on a wall, rock[ing] back and forth, suck[ing] his thumb, and twirl[ing] his hair to the point of developing a bald spot." *Id.*

Likewise, whereas the jury heard that Mr. Ricks exhibited disruptive behavior at school and at home, a neuropsychologist would have testified that Mr. Ricks exhibited neurodevelopmental deficits, "the[] etiologies of [which] include repeated head injuries and traumatic stress." Ex. 60 at 9. In Mr. Ricks's case, these head injuries were likely a result of his extensive history playing football, and in particular, playing positions that required high-impact hitting. *See id.* at 3. A neuropsychologist would have explained to the jury that Mr. Ricks experienced a "significant change to his IQ score between when he was tested as a child and when he was tested in connection with his trial in this case. *Id.* at 6–7. Mr. Ricks scored a full-scale IQ ("FSIQ") of 120 on the Wechsler Intelligence Scale for Children Revised ("WISC-R") when he was 12. *Id.* at 4. By contrast, Mr. Ricks scored a FSIQ of 88 on Wechsler Adult Intelligence Scale

IV ("WAIS-IV") administered by Dr. McGarrahan in 2014. *Id.*[37] A neuropsychologist would have also explained to the jury that in light of this drop in FSIQ, it is appropriate to administer a test of pre-morbid functioning, which can approximate what a person's FSIQ would be before this drop. *Id.* at 6–7. In Mr. Ricks's case, the predicted FSIQ is 112. *Id.* at 7. A neuropsychologist would have testified that this significant drop "may be indicative of acquired central nervous system damage." *Id.* at 7. A neuropsychologist would have also told the jury that additional neuropsychological testing revealed that Mr. Ricks has significant impairments in executive functioning. *Id.* at 8.[38]

Consistent with a trauma expert, a neuropsychologist would have told the jury that this neuropsychological profile indicates that Mr. Ricks "is deeply troubled and traumatized," as confirmed by neuropsychological testing. Ex. 60 at 9–10. In addition, his impairments in executive functioning and his exhibited cognitive deficits contributed to how Mr. Ricks would react to high-stress situations. *Id.* at 10. A neuropsychologist could therefore have explained that Mr. Ricks "operate[d] out of a 'fight or flight' mentality" which would impact his ability to understand and respond to high stress situations.[39]

---

[37] The State's expert in state habeas determined that "[t]he results of the evaluation are considered valid" and that Mr. Ricks's "performance on all of these validity indicators were below recommended cutoffs and indicative of credible performance and adequate motivation." 3 SCHR 1395.

[38] Finally, a neuropsychologist would have testified that the State's expert failed to rule out whether head trauma could have caused issues Mr. Ricks was experiencing (as opposed to the State's expert's diagnosis of antisocial personality disorder), and that this failure constitutes a fundamental diagnostic error. *Id.* at 9.

[39] Moreover, trauma and mental health experts would not have "opened the door" to rebuttal testimony by the State. *See generally Feldman v. Thaler*, 695 F.3d 372, 381 (5th Cir. 2012). As described above, Dr. Lewine—who had no expertise in mental health—testified extensively on cross-examination about psychopathy and conceded that Mr. Ricks's scoring on the Hare

In sum, trial counsel's failure to investigate red flags of trauma, mental distress, and neurodevelopmental disorders led to the presentation of an entirely misleading picture of Mr. Ricks's history. This was compounded by trial counsel's failure to retain experts with expertise in trauma and neurodevelopmental disorders, which prevented the jury from understanding the extensive lay witness testimony, including that of Mr. Ricks, about Mr. Ricks's history. By presenting a catch-all expert with no expertise in these domains, trial counsel underscored the State's argument that Mr. Ricks was a "psychopath." 40 RR 101. *See Walbey v. Quarterman*, 309 F. App'x 795, 803–04 (5th Cir. 2009) (determining prejudice in part where the testifying expert "did severe damage to Walbey's case").

### 4. Trial counsel's failure to investigate extraneous offenses prejudiced Mr. Ricks.

Mr. Ricks was prejudiced by his trial counsel's failure to investigate offenses on which the State relied to prove future dangerousness. The State heavily relied on each of these incidents in support of its case for future dangerousness in its closing argument. The State argued that Mr. Ricks physically assaulted his ex-wife, Teshana Singleton. 40 RR 102–03. Referencing the pencil found on Mr. Ricks, the State said "I don't know whose neck that pencil was intended for or what he intended to do with that pencil" after it elicited testimony that the pencil was a "weapon." *Id.* at 104; 36 RR 59. The State claimed that Mr. Ricks "hoards pills while he's in jail . . . so he can trade with other contraband," 40 RR 104, and argued that these two jail incidents are "all a pattern with him," *id.* at 124.[40] After summarizing this evidence, the State argued that with respect to the future

---

Psychopathy Checklist could fall within the range for psychopathy in certain circumstances. *See* 39 RR 159–65. Thus, the door was open at trial and the State chose not to present mental health testimony. The expert testimony at issue here would have contextualized and explained Mr. Ricks's complex trauma and mental health history, not aggravated it.

[40] The State knew that in making this argument, it was relying on facts outside the record and facts that it knew to be false. The District Attorney's file contains notes about the pills indicating

dangerousness question:

> You have plenty of evidence in front of you to answer this question yes. There is no other answer to this question when it comes to Cedric Ricks. He is a future danger. And he was a future danger when he left Chicago. Well, let's go back even further. He was a future danger in high school after he kidnapped his girlfriend, and he was a future danger when he met Tashana [sic] and married her.

40 RR 104.

But had trial counsel investigated these incidents, they could have significantly undermined the State's future dangerousness case. First, had trial counsel investigated Mr. Ricks's relationship with Ms. Singleton, the jury would have heard that Ms. Singleton also struggled with anger issues and that on at least one occasion, her anger caused her to physically assault Mr. Ricks at the location of his incisions from a recent surgery. Ex. 36 ¶ 4. The jury would have also heard that even while he was being assaulted, Mr. Ricks did not retaliate. *Id.* Ms. Singleton also would have told the jury, had she been asked, that she stayed with Mr. Ricks for as long as they did because they enjoyed each other's company and that Mr. Ricks was affectionate and enjoyed taking care of her. *Id.* ¶ 5. Second, had trial counsel investigated the assault at the Garvin County jail, they could have discovered the racial slurs that the other inmates in Garvin County used to describe the assault on Mr. Ricks and could have undercut testimony that Mr. Ricks was beaten because he bragged about the offense.[41] And finally, had trial counsel investigated the instance in which Mr. Ricks was found to have a pencil during transport, they could have discovered that Mr. Ricks was in fact allowed to have a pencil and that such pencil was "soft," thereby undermining the State's

---

"situation does not look good – kept pills because wants to kill himself at times – now taking pills but saved in the past." Ex. 24. Nothing in the District Attorney's file and nothing in the record support the claim that Mr. Ricks was hoarding these pills to trade them for other contraband.

[41] *See* Claim Seven, *infra*.

claim that this pencil could have served as a weapon. Ex. 25. In sum, had trial counsel performed their basic duty to their client, they could have significantly weakened the State's future dangerousness case.

The foregoing makes clear that had the jury heard this overwhelming evidence of physical and emotional abuse, physical and emotional neglect, and the lack of family and educational support, there is a reasonable probability that at least one juror may have voted differently. *Wiggins*, 539 U.S. at 537. This evidence shows "the kind of troubled history [the Supreme Court] ha[s] declared relevant to assessing a defendant's moral culpability." *Id.* at 535 (citations omitted). Relatedly, this substantial history of abuse and neglect "contain[s] little of the double edge we have found to justify limited investigations in other cases." *Id.* Rather, this extensive evidence of abuse and neglect "might well have influenced the jury's appraisal of Mr. Ricks's moral culpability" had the jury been able to consider it. *Williams*, 529 U.S. at 398; *see Adams v. Quarterman*, 324 F. App'x 340, 352 (5th Cir. 2009) ("We conclude that [counsel's] insufficient investigation prevented his discovery of substantial, readily available mitigating evidence of Adams's childhood abuse, neglect, and abandonment. A reasonable probability exists that, absent those errors (and even when considering the aggravating aspects of Adams's crime), a jury would have determined that the balance of aggravating and mitigating circumstances did not warrant death.").

This is especially true where, as here, at trial the jury heard only that Mr. Ricks came from a stable and loving family but that he was born "bad." *See* Section B, *supra*. Indeed, this case is remarkably similar to *Sears v. Upton*, 561 U.S. 945 (2010). There, "[d]uring the penalty phase of Sears' capital trial, his counsel presented evidence describing his childhood as stable, loving, and essentially without incident." *Id.* at 947. Similar to the State's closing argument in Mr. Ricks's

95

child, in which they repeatedly pointed out Mr. Ricks's wonderful family and upbringing, *see* 40 RR 105–06, 129, the State in *Sears* "ultimately used the evidence of Sears' purportedly stable and advantaged upbringing against him during the State's closing argument." *Id.* In post-conviction proceedings, however, substantial evidence emerged demonstrating that the picture trial counsel painted was false. *See id.* at 948 ("His parents had a physically abuse relationship . . . his father was verbally abusive . . . Sears struggled in school, demonstrating substantial behavioral problems from a very young age . . . and was referred to a local health center for evaluation at age nine . . . [and] was described as severely learning disabled and as severely behaviorally handicapped." (internal citations and quotations omitted)).

Likewise, and as discussed in Section (D)(3), *supra*, later psychological evaluations demonstrated that he "had substantial deficits in mental cognition and reasoning—i.e., problems with planning, sequencing and impulse control—as a result of several serious head injuries he suffered as a child[.]" *Id.* at 949; *see id.* at 950 (noting that "Sears suffers from substantial cognitive impairment"). In light of this substantial evidence, the Supreme Court observed that "[c]ompetent counsel should have been able to turn some of the adverse evidence into a positive—perhaps in support of a cognitive deficiency mitigation theory," *id.* at 951—which stands in stark contrast to the biological predisposition theory that trial counsel espoused at Mr. Ricks's trial. Although *Sears* focused on the deficient performance element of *Strickland*, the Supreme Court nevertheless noted that they "have found deficiency *and* prejudice in other cases in which counsel presented what could be described as a superficially reasonable mitigation theory during the penalty phase." *Id.* at 954 (citing *Williams*, *Rompilla*, and *Porter*).

### E.    This claim is unexhausted.

This claim was not presented to the state courts. In state habeas proceedings, Mr. Ricks presented as Claim One that "Trial Counsel Was Ineffective for Failing To Sufficiently Develop

and Present Significant Mitigation Evidence in Violation of Cedric Ricks' Sixth Amendment Right to Counsel." 1 SHCR 59. The claim presented in this Petition, however, presents new legal theories and factual assertions as compared to the claim raised in state court, and is therefore unexhausted. *See Neville v. Dretke*, 423 F.3d 474,478 (5th Cir. 2005) ("The exhaustion requirement is not satisfied, therefore, where the petitioner presents new legal theories or factual claims in his federal habeas petition.").

Mr. Ricks anticipates filing a motion seeking to stay and abate his federal proceedings so that he may return to state court and exhaust this and other unexhausted claims. *See Rhines v. Weber*, 544 U.S. 269, 278–79 (2005) (holding that district courts have discretion to stay habeas proceedings in federal court to allow the petitioner to present unexhausted claims in state court). Because he can plausibly excuse his failure to present this claim in his prior state habeas application, thereby allowing him to litigate the claim in a subsequent state application, it would be premature to determine that this claim is procedurally defaulted. Even if this claim is eventually defaulted, Mr. Ricks can establish cause and prejudice to overcome that default because state habeas counsel was ineffective for failing to present this substantial claim for relief. *See Trevino v. Thaler*, 569 U.S. 413 (2013).

**Claim Seven        The State relied on false testimony to secure a death sentence against Mr. Ricks in violation of the Fourteenth Amendment.**

The State relied on false testimony to obtain and a death sentence against Mr. Ricks in violation of the Due Process Clause of the Fourteenth Amendment. *Napue v. Illinois*, 360 U.S. 264, 269 (1950) ("[I]t is established that a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."). A due-process violation is established where (1) the State presented false testimony; (2) the State knew or should have known that the testimony was false; and (3) the false testimony was material.

*Pyles v. Johnson*, 136 F.3d 986, 996 (5th Cir. 1998) (internal citations omitted).

At trial, the State knowingly elicited false testimony that was material to Mr. Ricks's death sentence. This false testimony includes, but is not limited to, evidence purporting to establish future dangerousness, the brutal beating suffered by Mr. Ricks in Garvin County jail, and his supposed lack of remorse. Because Mr. Ricks satisfies all three *Napue* elements, he is entitled to a new penalty phase.

**A.    The State introduced the false and misleading testimony of Deputy Marcus Moore in support of its case on future dangerousness.**

**1.    The State elicited testimony from Deputy Marcus Moore suggesting that Mr. Ricks engaged in dangerous activity by having a pencil on his person while being transported to a pretrial proceeding.**

During the penalty phase of Mr. Ricks's trial, the State called Deputy Marcus Moore, a sheriff's deputy with the Tarrant County Sheriff's Department, to testify that Mr. Ricks was caught attempting to smuggle a contraband weapon—a pencil—into the courtroom. 36 RR 58–59. Deputy Moore testified that, on March 25, 2014, deputies transporting Mr. Ricks saw a pencil fall to the floor when Mr. Ricks was changing from jail attire to civilian clothes. 36 RR 55, 58. Deputy Moore described how, while Mr. Ricks was changing clothes, Deputy Choice "said he heard a sound like something hitting the floor, so we immediately opened the holdover and observed a pencil on the floor." 36 RR 58–59.[42] He further testified that "because of [Mr. Ricks's] classification, he's not allowed to have any implements, such as a pencil, pen, things like that" due to Mr. Ricks being "on suicide watch," and that "obviously that can be something he can use to harm himself or

---

[42] Notably, this incident occurred *after* the record made clear that Mr. Ricks was appearing in pretrial proceedings wearing shackles and a shock belt: the court noted Mr. Ricks's constraints on March 17, 2014, but this incident occurred on March 25, 2014. 9 RR 19; 36 RR 58. Mr. Ricks's shackling claim is discussed in Claims Four and Five, *supra*.

someone else." 36 RR 59. At the State's suggestion, Deputy Moore agreed that this pencil "can be a weapon." Id. Deputy Moore testified that he had discussed this incident with Mr. Ricks on April 11, 2014, and that Mr. Ricks told him then that he had concealed it when he left his cell to come to the courtroom. 36 RR 59–60.[43]

On cross-examination, Deputy Moore acknowledged that during jury selection, Mr. Ricks had a book in which he took notes with a felt-tip pen. 36 RR 66. Deputy Moore also described the pencil as "small . . . [s]omething similar to what you would do a score card with on a golf course or something like that." 36 RR 67. Nevertheless, on re-direct Deputy Moore agreed with the State that Mr. Ricks "could have used it against one of you." 36 RR 72. The State then relied on this testimony in closing argument. 40 RR 104.

### 2.    The State knew that Deputy's Moore's testimony was false.

The State knew that the testimony it adduced from Deputy Moore was false. The District Attorney's files includes notes showing that indigent defendants are generally provided with certain supplies, including a pencil. Exs. 24, 25. The notes also indicated that inmates in the Tarrant County Jail never get regular pencils or pens, and that the only pencils they have for inmates are the "soft" type. Id. In addition, a folder labeled "Jail incident hoarding medications" contained similar notes indicating "indigent – gets short pencil & 3 sheets paper." Ex. 24. These files show that the State knew that Mr. Ricks had been provided the pencil in jail, contrary to Deputy Moore's testimony. Moreover, that it was a "soft" pencil stands in contrast to Deputy Moore's testimony that it could be used as a weapon.

---

[43] Although the record states that this conversation occurred on March 11, that predates the incident (which occurred on March 25), so the date in the record is likely a typo. During cross-examination, defense counsel clarified that the date was on April 11. 36 RR 67.

### 3.    Deputy Moore's testimony was material.

False testimony is deemed material where it "may have had an impact on the outcome of the trial." *Napue*, 360 U.S. at 272; *see United States v. Bagley*, 473 U.S. 667, 679 n.9 (1985) ("[A] conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict."). Here, it is evident that the State not only knew that Mr. Ricks was not behaving violently in jail, but also that Mr. Ricks was allowed pencils and that the type of pencil he had was "soft." Yet, the State told the jury that a two-inch soft pencil could be used as a weapon and that this made Mr. Ricks a future danger to society.

In closing arguments during the penalty phase, the State argued to the jury "I don't know whose neck that pencil was intended for or what he intended to do with that pencil." 40 RR 104. The State further argued that the pencil incident when combined with the pill incident indicated a "pattern" of Mr. Ricks's dangerousness in incarceration while awaiting trial. *Id.* at 124. But the State knew that Mr. Ricks was permitted to have a soft pencil; that this soft pencil was allowed because it was unlikely to pose a threat; and that Mr. Ricks had not displayed any violent behavior whatsoever in the Tarrant County Jail. Without Deputy Moore's misleading testimony, the State could not have argued that there was a pattern supporting a finding of future dangerousness in a prison environment. Because the State's misrepresentation of the jail-provided soft pencil as a dangerous weapon was material to the State's future dangerousness case, Mr. Ricks is entitled to a new punishment phase.

### B.    The State introduced the false and misleading testimony that Mr. Ricks had forced his high school girlfriend into a car against her will.

#### 1.    The State elicited testimony that Mr. Ricks had forced his high school girlfriend, Tina Brown, into a car against her will.

At the punishment phase of trial, the State elicited testimony from former high school

security guard James Cooper that Mr. Ricks had forced his then-high school girlfriend, Tina Brown, into a car against her will. Mr. Cooper testified that he had been a security guard at Richards High School, where Mr. Ricks and Tina Brown both attended as students. 36 RR 7. Mr. Cooper told the jury that, on September 13, 1991, he had taken Mr. Ricks home after he was suspended. *Id.* at 9. Mr. Cooper testified that when he returned to the school, however, he received a radio call that Mr. Ricks had come back to the school and was "pulling his girlfriend out of the building[.]" *Id.* at 13. Mr. Cooper agreed with the State that Mr. Ricks was "forcibly removing" his girlfriend, Tina Brown. *Id.*

Mr. Cooper testified that when he got back to the school, Mr. Ricks was already driving off, and Tina Brown was in the passenger seat of the car. 36 RR 14. Mr. Cooper testified that he then "was able to meet the car and stop the car and get her out of the car." *Id.* Mr. Cooper told the jury that he "jumped the hood, reached in [through the sunroof], cut off the ignition" and pulled Mr. Ricks out of the car. *Id.* at 15. Mr. Cooper testified that he then handcuffed Mr. Ricks and the Oak Lawn Police Department brought Mr. Ricks into custody. *Id.* In closing, the State argued to the jury that Mr. Ricks "was a future danger in high school after he kidnapped his girlfriend[.]" 40 RR 104.

### 2.    The State knew this testimony was false.

According to a contemporaneously prepared police report, Mr. Ricks could not be prosecuted on the charge of unlawful restraint. Ex. 21. Indeed, contrary to Mr. Cooper's testimony, Mr. Ricks never forced Tina Brown into the car he was driving on the day of the incident, and her father accordingly did not press charges. Ex. 29. Furthermore, the State spoke with Tina Brown's mother, Rodia Brown, ahead of the trial. Ex. 62. Rodia Brown never believed that Mr. Ricks had kidnapped her daughter or held her against her will. *Id.* Tellingly, the State called neither Tina Brown nor her parents to testify. Moreover, "Officer Cooper had a reputation for trying to be a

tough guy and being hard on the high school students." Ex. 29.[44]

### 3. Mr. Cooper's false testimony was material.

False testimony is deemed material where it "may have had an impact on the outcome of the trial." *Napue*, 360 U.S. at 272. In closing, the State argued to the jury that, in answering the future dangerousness special issue, the jury could "go back even further" than Mr. Ricks's adulthood because Mr. Ricks was "a future danger in high school after he kidnapped his girlfriend[.]" 40 RR 104. Hence, this false testimony was material because it enabled the State to argue to the jury that Mr. Ricks had "kidnapped" his high school girlfriend, thereby establishing that Mr. Ricks was a future danger even as a teenager. As evidenced by the jury's note during its deliberations on punishment, asking for clarification on the future dangerousness special issue, future dangerousness weighed on the jurors' minds. 2 CR 519.

### C. The State elicited false and misleading testimony to obscure the circumstances surrounding the brutal beating of Mr. Ricks at the Garvin County jail.

### 1. The State elicited testimony that Mr. Ricks was beaten because he bragged about the offense.

At the punishment phase of trial, the State presented jailer Niya Arellano Cardoso to testify about Mr. Ricks's booking into the Garvin County jail following his arrest on the night of May 1, 2013. Ms. Cardoso, who was working as a jailer on the night of Mr. Ricks's booking, testified that she initially determined that Mr. Ricks should be placed in a single cell because of the facts of the offense. 39 RR 236. Ms. Cardoso told the jury that, after she informed Mr. Ricks that he would be placed in a single cell, he asked to be placed in general population instead. *Id.* at 238. Ms. Cardoso said she agreed to place Mr. Ricks with other inmates but advised him that he should not speak

---

[44] Records reflect that Officer Cooper has been arrested at least twice. Ex. 58. These records were obtained via an Illinois Freedom of Information Act request.

about the facts of the offense. *Id.* at 238. Ms. Cardoso told the jury that her shift then ended and she was not the person who "actually placed him in the cell" with other inmates. *Id.* Ms. Cardoso testified that, upon returning to work the next day, she learned that Mr. Ricks had been involved in a "fight" the night before. *Id.* at 239. Ms. Cardoso testified that Mr. Ricks then asked her to waive extradition proceedings. *Id.* at 240.

Immediately following Ms. Cardoso, the State introduced the testimony of Michael Rose, a former Garvin County inmate who was in the general population cell where Mr. Ricks was placed and beaten. 39 RR 251. Mr. Rose testified that Mr. Ricks told the inmates about the offense "willingly, like he was proud of it or something[.]" The State continued:

> Q.    Was he bragging about it?
>
> A.    To me, yes, sir. That's what it seemed like.
>
> [. . .]
>
> Q.    Okay. And he wasn't crying when he was telling you the story, was he, about this murder?
>
> A.    No, sir, no emotion at all.
>
> Q.    Well, but there was an emotion of bragging about it, right?
>
> A.    Yes, sir.
>
> Q.    And that's when he was talking about killing the woman and the kids, as well, correct?
>
> A.    Yes, sir.

*Id.* at 256–57. Mr. Rose testified that, at that point, he walked out of the cell and sat further down the hallway to listen to the radio. *Id.*

### 2.    The State knew the picture painted by this testimony was false.

In combination, Ms. Cardoso's and Mr. Rose's testimony represented to the jury that Mr. Ricks was placed in general population at his own request and was then beaten because he bragged

103

about the offense. That picture, however, is squarely contradicted by the State's own reports. Indeed, law enforcement reports establish that Mr. Ricks was beaten, at least in part, because of his race.

The Garvin County jail booking paperwork establishes that Mr. Ricks was booked into a single cell. Ex. 26. But according to Bedford Police Detective Mack, Garvin County Undersheriff Mullett then moved Mr. Ricks to a cell with other inmates so that those inmates could report any statements made by Mr. Ricks. 38 RR 18–19. That general population cell housed only white inmates, at least one of whom belongs to the Universal Aryan Brotherhood, a white supremacist gang.[45] Ex. 54. A report by Garvin County jailer Royce Glass shows that Mr. Ricks was beaten, at least in part, because of his race:

> On May 2, 2013 at approximately 1630 hours, I was working in the Garvin County Detention Center when I heard an inmate screaming. . . I observed one inmate striking another inmate in the head repeatedly. . . Sheriff Rhodes ordered all inmates out of the cells and into the hallways against the wall. During this time, I heard inmate Jones make the statement; **"That nigger got what he deserved** for killing a 12 year old." . . . Both Inmate Jones and Morrison made statements referring to how proud they were that they attacked Inmate Ricks and **continually used racial slurs in reference to Inmate Ricks**.

Ex. 26 (emphasis added). Unlike Ms. Cardoso, Mr. Glass was at the jail at the time of the assault against Mr. Ricks and reviewed the video surveillance:

> Upon review of the tape I observed Inmate Ricks lying in his bunk as Inmate Morrison struck him with a closed fist **without provocation**. I noticed Inmate Steven Paul Exum block the view of the camera in cell 6 **in an attempt to keep deputies from being able to see the fight taking place**. I also witnessed Justin Hammer hold the door to cell 6 shut **to keep Inmate Ricks inside the cell so that he could not get away from his attacker**.

---

[45] https://www.adl.org/education/references/hate-symbols/universal-aryan-brotherhood.

*Id.* (emphasis added). According to Officer Glass's report, none of the inmates involved in the beating required medical attention. *Id.* By contrast, Mr. Ricks had to be transported to Pauls Valley hospital, where records reflect that his eye was swollen shut and that one of his front teeth had been knocked out. ECF No. 18, Ex. 28. Upon returning to the Garvin County jail, Mr. Ricks "was placed in a suicide gown and given a suicide blanket." Ex. 26. Soon after, Mr. Ricks, who had previously sought to exercise his right to an extradition hearing, spoke to jailer Cardoso about waiving his right to extradition proceedings. 39 RR 240.

### 3. This false testimony is material.

False testimony is deemed material where it "may have had an impact on the outcome of the trial." *Napue*, 360 U.S. at 272. Here, the false testimony was material because it enabled the State to present to the jury a false narrative that Mr. Ricks was beaten for showing a lack of remorse about the offense, and also to conceal that Mr. Ricks was deliberately placed in general population and then beaten because of his race. Mr. Ricks's lack of remorse was a key theme throughout the State's closing argument. *See* 40 RR 101 (describing Mr. Ricks as a "monster"). That this incident was on the jurors' minds during their punishment deliberations is established by the fact that the jury requested to see records from Mr. Ricks's hospital treatment in Oklahoma. 2 CR 521.

### D. This false testimony is cumulatively material.

As argued *supra*, each instance of false testimony was material to the State's case at the penalty phase. At minimum, the cumulative effect of this false testimony was material, even if this Court determines that the individual instances are not. *See Kyles v. Whitley*, 514 U.S. 419, 421 (1995) (explaining that in the related context of assessing materiality for a violation under *Brady v. Maryland*, 373 U.S. 83 (1963), the assessment is done cumulatively across each individual violation).

### E.    This claim is unexhausted.

This claim was not presented to the state courts during Mr. Ricks's post-conviction proceedings. Mr. Ricks anticipates filing a motion seeking to stay and abey his federal proceedings so that he may return to state court and exhaust this and other unexhausted claims. *See Rhines v. Weber*, 544 U.S. 269, 278–79 (2005) (holding that district courts have discretion to stay habeas proceedings in federal court to allow the petitioner to present unexhausted claims in state court). Because he can plausibly excuse his failure to present this claim in a prior application, thereby allowing him to litigate the claim in a subsequent state application, it would be premature to determine that this claim is procedurally defaulted. Even if this claim is eventually defaulted, Mr. Ricks can establish cause and prejudice to overcome that default.

**Claim Eight        The State violated *Brady v. Maryland* by failing to disclose information regarding the pencil incident to defense counsel.**

The State violated Mr. Ricks's due process rights when it suppressed materially favorable evidence that Mr. Ricks was allowed pencils while at Tarrant County Jail and that the type of pencil he had was "soft." *See* Claim Seven, *supra*. The failure to turn over this evidence allowed the State to present a misleading narrative to the jury about the purported danger of the pencil found in Mr. Ricks's possession, which it then emphasized in closing in support of its future dangerousness case. 40 RR 104. Mr. Ricks is entitled to a new penalty phase based on this violation.

### A.    The State's suppression of the evidence relating to the pencil violated *Brady*.

In *Brady v. Maryland*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). "There are three components of a true *Brady* violation: The evidence at issue

must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1985) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)). Evidence meets the materiality standard when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. This standard parallels the prejudice requirement from *Strickland* for prevailing on an ineffective assistance of counsel claim. *Id.*

### 1.    The information about the pencil found on Mr. Ricks was exculpatory.

Mr. Ricks is able to establish all three elements of his Brady claim. The State knew that the pencil to which it referred as a "weapon," 36 RR 59, was actually a soft pencil that was issued to Mr. Ricks by the jail. Ex. 24; 25. This incident represented the only incident the State could point to that purported to touch on any kind of "violent" behavior of Mr. Ricks while he was incarcerated. Thus, had defense counsel been informed about the true nature of the pencil, they could have undercut a key part of the State's case on future dangerousness. This evidence is therefore exculpatory.

### 2.    The State suppressed the exculpatory information it had about the pencil.

The exculpatory evidence about the pencil was suppressed by the State. Trial counsel filed a pretrial motion requesting all available *Brady* material. 1 CR 115–21. The trial court granted this motion on January 31, 2014. 5 RR 62. The notes describing the pencil as "soft" and indicating that the pencils are routinely provided to inmates at the Tarrant County Jail were located in the District Attorney's file, dated April 11, 2014, and to the best of Mr. Ricks's knowledge were never provided to the defense. Ex. 25.

### 3.      The suppressed exculpatory evidence was material.

Third, the undisclosed exculpatory evidence about the pencil was material, as there is a reasonable probability that the failure to disclose it affected the outcome of the penalty phase. *See Bagley*, 473 U.S. at 682. During the penalty phase of a capital murder trial in Texas where the death penalty is sought, the State must prove to the jury that the defendant would be a future danger to society, whether in or out of prison. *See* Tex. Code Crim. Proc. art. 37.071, § 2(b)(1); *Estrada*, 313 S.W.3d at 282. The State emphasized Mr. Ricks's possession of this pencil, calling it a "weapon" and telling the jury during closing "I don't know whose neck that pencil was intended for or what he intended to do with that pencil." 36 RR 59; 40 RR 104. The State further argued that the pencil, when coupled with the ibuprofen found in Mr. Ricks's cell, indicated a "pattern" of Mr. Ricks's dangerousness while incarcerated. 40 RR 124. It is also clear that the jury struggled with the future dangerousness question, as evidenced by the first note the jury sent during the penalty phase, which read "Special Issue number 1 – need additional explanation of 'would commit criminal acts of violence . . .'" 2 CR 519. Had the jury learned that this so-called "weapon" was actually a soft pencil provided to Mr. Ricks by the jail, it would have significantly undercut the State's case on future dangerousness. Mr. Ricks is therefore entitled to a new punishment phase.

### B.      This claim is unexhausted.

This claim was not presented to the state courts in state habeas proceedings. Mr. Ricks anticipates filing a motion seeking to stay and abey his federal proceedings to return to state court and exhaust this and other unexhausted claims. *See Rhines v. Weber*, 544 U.S. 269, 278–79 (2005) (holding that district courts have discretion to stay habeas proceedings in federal court to allow the petitioner to present unexhausted claims in state court). Because plausible arguments exist regarding his failure to have previously presented this claim to the state courts that could allow it

to proceed as a successive state habeas application, it would be premature to determine that this claim is procedurally defaulted. Even if this claim is eventually defaulted, Mr. Ricks can establish cause and prejudice to overcome this default based on the State's failure to disclose this evidence. *See Strickler*, 527 U.S. at 289 (holding that cause to overcome procedural default was established in part on the state's failure to turn over *Brady* material).

| Claim Nine | **Mr. Ricks's death sentenced was imposed by an unconstitutionally arbitrary and discriminatory system in violation of the Eighth and Fourteenth Amendment.** |
|---|---|

Mr. Ricks's death sentence was imposed by a geographically and racially discriminatory system, in violation of the Eighth Amendment and the Equal Protection Clause of the Fourteenth Amendment. In Texas, the death penalty has been disproportionately sought and carried out against Black and Hispanic defendants. The statistics are even starker in Tarrant County, where Mr. Ricks was sentenced to death. Tarrant County has disproportionately sought and obtained the death penalty against Black and Hispanic defendants.[46] Similarly, just four Texas counties, including Tarrant County, account for over half of all death sentences in Texas since 1976.[47] These numbers make clear that the Texas death penalty system is racially and geographically discriminatory, in violation of the Eighth Amendment and the Equal Protection Clause of the Fourteenth Amendment.

Mr. Ricks raised this claim as Claim Thirteen on direct appeal. *See* Appellant's Brief, *Ricks v. State*, No. AP-77,040 (Tex. Crim. App. Aug. 3, 2015). Mr. Ricks understands that Supreme Court and Fifth Circuit precedent forecloses this claim. *See generally Jurek v. Texas*, 428 U.S. 262, 275–77 (1976); *see also Kelly v. Lynaugh*, 862 F.2d 1126, 1135 (5th Cir. 1988) (rejecting

---

[46] https://www.tdcj.texas.gov/death_row/dr_offenders_on_dr.html.
[47] https://www.tdcj.texas.gov/death_row/dr_number_sentenced_death_county.html.

argument that Texas's death penalty system has been applied in an arbitrary and capricious manner since 1973). Mr. Ricks includes this claim in order to preserve the issue for further appellate review. *See generally Penry v. Lynaugh*, 492 U.S. 302 (1989) (holding Texas death penalty statute unconstitutional as applied to petitioner thirteen years after *Jurek* was decided), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002).

**Claim Ten**          **Texas Code of Criminal Procedure Article 37.071 is unconstitutional because jurors do not understand the penalty phase instructions.**

The special issues set forth in Texas Code of Criminal Procedure Article 37.071 are set forth in a manner that leaves juries unable to understand the meaning of the terms contained therein and gives juries the false impression that they are not entitled to consider the full range of mitigating evidence that could result in a life verdict, all in violation of the Eighth Amendment. This was evident at Mr. Ricks's trial. During the penalty phase deliberations, the jurors sent two notes asking for clarification of the special issues. The first note said "need additional explanation of [would commit criminal acts of violence . . .[,]" 2 CR 519, and the second note asked "[w]hat is the definition of 'personal moral culpability," 2 CR 522. These notes make clear that the jury did not understand how to apply either special issue. Moreover, one of the jurors submitted an affidavit in state habeas explaining that "[t]he jury instructions we were given led me to believe that the defense had to prove that there was a specific mitigating factor." 3 SHCR 1058 ¶ 5. He further stated that "I did not believe I could vote for life based on my observations and instinct as the jury instructions were not clear." *Id.* ¶ 7. The Supreme Court has made clear that the "vesting of standardless sentencing power in the jury violates the Eighth and Fourteenth Amendments," *Woodson v. North Carolina*, 428 U.S. 280, 302 (1976), and further that juries in death penalty cases must be allowed to consider the full range of mitigating evidence before imposing a death sentence, *Lockett v. Ohio*, 438 U.S. 586 (1978). The vagueness of the language in the special issues

and their failure to allow the jury to consider a full range of mitigating evidence violated Mr. Ricks's rights under the Eighth and Fourteenth Amendments.

This claim was presented as Claim Five in Mr. Ricks's state habeas application. 1 SHCR 127–38. Mr. Ricks understands that Fifth Circuit precedent forecloses this claim. *See, e.g.*, *Paredes v. Quarterman*, 574 F.3d 281, 294 (5th Cir. 2009) (holding, *inter alia*, that "criminal acts of violence" have a plain meaning and affirming the constitutionality of Article 37.071); *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir. 2001) (holding that the mitigation special issue does not preclude the jury's consideration of mitigating evidence) (citing *Lockett*, 438 U.S. at 604). Mr. Ricks includes this claim in order to preserve the issue for further appellate review as the Supreme Court has not yet ruled on this claim. *See, e.g.*, *Teague v. Lane*, 489 U.S. 288, 296 (1989) (observing that denials of certiorari do not have precedential value); *see also United States v. Garza-De La Cruz*, 16 F.4th 1213 (Mem), 2021 WL 5232387, at *2 (5th Cir. Nov. 10, 2021) (Costa, Ho, and King, JJs, concurring) ("We see nothing wrong with litigants diligently taking whatever steps they deem necessary to preserve their legal rights.").

## PRAYER FOR RELIEF

WHEREFORE, Cedric Ricks, requests that this Court consider his Amended Petition for Writ of Habeas Corpus and grant the following remedies and such other relief as the Court deems appropriate:

1. Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and be relieved of his unconstitutional sentence of death;

2.  Allow Petitioner leave to conduct discovery pursuant to Rule 6 of the Rules Governing 28 U.S.C. § 2254 Cases to more fully develop the factual bases demonstrating the constitutional infirmities in his conviction and sentence;

3.  Conduct an evidentiary hearing pursuant to Rule 8 of the Rules Governing 28 U.S.C. § 2254 Cases; and

4.  Grant such other relief as law and justice require.

Respectfully submitted,

DATED: May 18, 2022                               Respectfully submitted,

                                                  JASON D. HAWKINS
                                                  Federal Public Defender

                                                  */s/ Jeremy Schepers*
                                                  Jeremy Schepers (TX 24084578)
                                                  Supervisor, Capital Habeas Unit

                                                  Naomi Fenwick (TX 24107764)
                                                  Assistant Federal Public Defender

                                                  Office of the Federal Public Defender
                                                  Northern District of Texas
                                                  525 S. Griffin St., Ste. 629
                                                  Dallas, TX 75202
                                                  214-767-2746 (tel)
                                                  214-767-2886 (fax)
                                                  jeremy_schepers@fd.org

                                                  *Counsel for Petitioner*

113

**EXHIBIT LIST**

Exhibit 28    Declaration of Tommy Maracich

Exhibit 29    Declaration of Luther Brown

Exhibit 30    Declaration of Christine Sudduth

Exhibit 31    Declaration of Debbie Abner

Exhibit 32    Declaration of Helen Ricks

Exhibit 33    Declaration of Thomas Abner

Exhibit 34    Declaration of Keith Griffin

Exhibit 35    Declaration of Tamara Butts

Exhibit 36    Declaration of Teshana Singleton

Exhibit 37    Declaration of Courtland Byrd

Exhibit 38    8th Administrative Judicial Region records for Bill Ray

Exhibit 39    SEALED Email Confirmation of 10-Pax Limousine Rental (Jan 6, 2014)

Exhibit 40    SEALED Itemized billing for Mary Burdette (May 31, 2013 - August 29, 2013)

Exhibit 41    SEALED Itemized billing for Mary Burdette (Sept 3, 2013 - March 4, 2014)

Exhibit 42    SEALED Itemized billing for Mary Burdette (March 6, 2014 - April 8, 2014)

Exhibit 43    SEALED Payment Claim, June 2, 2014

Exhibit 44    SEALED Itemized Billing for Mary Burdette (April 7, 2014 - April 24, 2014)

Exhibit 45    SEALED Itemized Billing for Mary Burdette (April 25, 2014 - May 19, 2014)

Exhibit 46    Burr Oak Elementary School Records

Exhibit 47    Harold L. Richards High School Diploma

Exhibit 48    Richards L. High School Records

Exhibit 49    Seven Holy Founders Records

Exhibit 50    Remington College Transcript

Exhibit 51    Mercy Hospital Medical Record

Exhibit 52    EEG Photo of Cedric Ricks

Exhibit 53    Sprinkler Fitters Local 281 Records

Exhibit 54     Criminal and Court Docket Report - Casey Brian Morrison

Exhibit 55     Cedric Ricks Stressors

Exhibit 56     Teacher's Notes

Exhibit 57     Screening Summary, Chicago Clinic for Child Development

Exhibit 58     Criminal History Records of James Cooper

Exhibit 59     Report of Laura N. Elmore, LMSW-AP

Exhibit 60     Dr. Robert Ouaou's Report

Exhibit 61     Christ Hospital Medical Records

Exhibit 62     Memo of Rodia Brown

**VERIFICATION BY ATTORNEY**

I, the undersigned, am an attorney at the office appointed by this Court pursuant to 18 U.S.C. § 3599 to represent Petitioner Cedric Ricks in these proceedings. Our office has met with Mr. Ricks, consulted with other staff in the Federal Defender's Office regarding the case, and we have directed experts and investigators regarding the circumstances of Mr. Rick's conviction and sentence of death. It is in that capacity that I verify this Amended Petition. I declare under penalty of perjury that the foregoing allegations in this Amended Petition are true and correct to the best of my knowledge and that this Amended Petition for Writ of Habeas Corpus is being filed using this Court's CM/ECF system on May 18, 2022.

> Subscribed by me May 18, 2022,
> in Dallas, Texas.
>
> */s/ Jeremy Schepers*
> Jeremy Schepers

116

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Amended Petition for a Writ

of Habeas Corpus has been served by CM/ECF upon counsel for Respondent on May 18, 2022:

Georgette Hogarth
Office of the Attorney General of Texas
Habeas Corpus Division
P.O. Box 12548
Capitol Station
Austin, TX 78711
georgette.hogarth@oag.texas.gov

*/s/ Jeremy Schepers*
Jeremy Schepers