IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CEDRIC ALLEN RICKS, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. 4:20-CV-01299-O |
| | § | |
| BOBBY LUMPKIN, Director, | § | DEATH PENALTY CASE |
| Texas Department of Criminal | § | |
| Justice, Correctional Institutions | § | |
| Division, | § | |
| Respondent. | § | |

**RESPONDENT'S ANSWER TO AMENDED PETITION
(ECF NO. 35) WITH BRIEF IN SUPPORT**

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General for
Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

GEORGETTE HOGARTH*
Assistant Attorney General
State Bar No. 24007129

* Counsel of Record

P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936-1400
(512) 936-1280 (Facsimile)

*Counsel for Respondent*

1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................ v

ANSWER .................................................................................... 1

RICKS'S ALLEGATIONS ............................................................ 1

STATEMENT OF THE CASE ....................................................... 2

STATEMENT OF FACTS ............................................................. 3

    I.    Facts Relating to Guilt ................................................. 3

    II.   Facts Relating to Punishment ...................................... 6

        A.    The State's punishment case ............................. 6

            1.    Ricks's violence against Sanchez.................... 6

            2.    Ricks's violent attack of M.F........................... 9

            3.    Ricks's violence against Tina Brown ....................... 10

            4.    Ricks's violence against Tashana Singleton .......... 10

            5.    Ricks's violence against Tamara Partridge............ 13

            6.    Ricks's relationship with Jennifer Clark................ 15

            7.    Ricks's conduct in jail ................................... 16

            8.    Texas Department of Criminal Justice (TDCJ) security measures ...................................... 17

        B.    Ricks's punishment case.................................. 18

            1.    Response to jail conduct................................ 18

            2.    Ricks's childhood friends.............................. 19

            3.    Sunday school teacher and football coaches .......... 20

            4.    Family friends and extended family ........................ 21

            5.    Immediate Family ........................................ 23

            6.    Expert testimony .......................................... 29

            7.    Ricks's testimony.......................................... 31

ARGUMENT.............................................................................. 33

    I.    Deference Applies to State Court Findings .................. 35

II.      Ricks's New Evidence Is Barred from Review .............................. 37

III.     Ricks's *Batson* Claim Is Unexhausted, Procedurally Defaulted and Without Merit. (Claim 1)................................................................. 39

     A.     Procedural Bar ........................................................ 40

     B.     Relevant State Court Findings ............................... 45

     C.     *Batson* caselaw...................................................... 46

     D.     Ricks failed to make a prima facie case of racially-based strikes. ........................................................... 47

     E.     A. Stafford and W. Stafford were struck for race neutral reasons........................................................ 52

         1.     A. Stafford ................................................ 52

         2.     W. Stafford ............................................... 54

     F.     Ricks's allegations of racial motivation are unpersuasive. ............................................................................ 55

         1.     A. Stafford ................................................ 56

         2.     W. Stafford ............................................... 58

IV.     The State Court Reasonably Determined that Appellate Counsel Was Not Ineffective for Not Challenging the State's Use of Peremptory Strikes.  (Claim 2). ........................................................ 60

     A.     The *Strickland* standard under AEDPA ............................. 61

     B.     The state court reasonably determined that appellate counsel's decision was sound. ................................. 63

     C.     The state court reasonably found no prejudice. ............... 65

V.     Ricks's Claim of Ineffective Assistance of Trial Counsel for Failing to Raise a *Batson* Objection on the Basis of Gender Is Unexhausted, Procedurally Defaulted, and Meritless. (Claim 3). ............................................................................ 66

     A.     Procedural bar......................................................... 66

     B.     The *Strickland* Standard Under AEDPA............................ 68

C.   Ricks cannot show IATC for not raising a *Batson* objection based on gender.................................................... 68

  1.   The stricken veniremembers ...................................... 69

  2.   Ricks cannot establish a pattern of discrimination ........................................................................ 73

D.   Ricks fails to show prejudice ................................. 76

E.   Conclusion ........................................................... 77

VI.   Ricks's Claim that His Shackling During Trial Violated His Fifth, Sixth, and Fourteenth Amendment Rights Is Procedurally Defaulted, Alternatively, Meritless. (Claim 4)............................ 78

A.   Procedural Bar ................................................... 79

B.   No Due Process violation .................................... 82

  1.   State court findings ...................................... 82

  2.   The state habeas court's determinations were not unreasonable. ............................................... 84

VII.   The State Court Reasonably Rejected Ricks's Claim of IATC for Failing to Object to the Shackling. (Claim 5). .............................. 88

VIII.   The State court reasonably rejected Ricks's IATC Penalty-Stage Claim. (Claim 6). .................................................... 91

A.   The claim is exhausted ....................................... 92

B.   State habeas record ........................................... 95

C.   The *Strickland* standard .................................. 104

D.   The state court reasonably determined that trial counsel were not deficient. .................................................. 105

  1.   Trial counsel conducted an extensive investigation. ............................................. 108

  2.   Retaining Dr. McGarrahan ........................... 111

  3.   Trauma evidence ....................................... 112

  4.   Mental health ........................................... 114

  5.   Individualized defense ................................ 115

  6.   Catch-all expert ....................................... 117

iii

7.    Future Dangerousness ................................... 119

E.    The state court reasonably rejected Ricks's claim that he was prejudiced by counsels' actions. .................................. 122

1.    Trial counsel's presentation of expert testimony 123

2.    Lay witness testimony. ............................... 124

3.    Other experts. ....................................... 129

4.    Extraneous Offenses .................................. 130

5.    Ricks fails to meet his burden under *Strickland*. 131

IX.    Ricks's Claims Regarding the Use of False Testimony Are Procedurally Barred and Meritless. (Claim 7). .......................... 132

A.    Procedural Bar ........................................ 132

B.    The State did not introduce false or misleading testimony. ...................................................... 132

1.    Deputy Moore ........................................ 133

2.    Tina Brown .......................................... 136

3.    Garvin County Jail ................................... 138

4.    Cumulative error. ................................... 141

X.    Ricks's *Brady* Claim Is Procedurally Barred and Meritless. (Claim 8). ............................................... 141

A.    Procedural Bar ........................................ 142

B.    *Brady* caselaw ....................................... 142

C.    Ricks has failed to show suppression or materiality ..... 143

XI.    Ricks's Challenge to the Constitutionality of the Texas Death Penalty Scheme Is Without Merit. (Claim 9). ............................ 144

XII.    Ricks's Challenge to the Constitutionality of the Texas Mitigation Special Issue Is Without Merit. (Claim 10). .......... 145

XIII.    Ricks's Requests for Discovery and an Evidentiary Hearing Should Be Denied. ................................... 147

CONCLUSION ............................................... 150

CERTIFICATE OF SERVICE ................................... 151

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

Alexander v. Johnson,
211 F.3d 895 (5th Cir. 2000) ...................................................... 150

Allen v. State,
108 S.W.3d 281 (Tex. Crim. App. 2003)................................ 145

Amos v. Scott,
61 F.3d 333 (5th Cir. 1995) ...................................................... 81

Anderson v. Collins,
18 F.3d 1208 (5th Cir. 1994) ................................................ 105

Andrus v. Texas,
140 S. Ct. 1875 (2020) ................................................ 106, 120

Austin v. Davis,
876 F.3d 757 (5th Cir. 2017) .......................................... 48, 86

Ayestas v. Davis,
138 S. Ct. 1080 (2018) ............................................................ 93

Ayestas v. Davis,
933 F.3d 384 (5th Cir. 2019) .............................................. 115

Bass v. Estelle,
705 F.2d 121 (5th Cir. 1983) .................................................. 81

Batson v. Kentucky,
476 U.S. 79 (1986) ...................................................... passim

Beatty v. Stephens,
759 F.3d 455 (5th Cir. 2014) .......................................... 78, 88

Beazley v. Johnson,
242 F.3d 248 (5th Cir. 2001) ................................ 40, 131, 146

Bell v. State,
415 S.W.3d 278 (Tex. Crim. App. 2013)................................ 90

Blanton v. Quarterman,
543 F.3d 230 (5th Cir. 2008) .............................................. 110

Blystone v. Pennsylvania,
494 U.S. 299 (1990) .............................................................. 117

Bobby v. Van Hook,
558 U.S. 4 (2009) (per curiam ................................ 108, 109

Bracy v. Gramley,
520 U.S. 899 (1997) .............................................................. 148

Bradshaw v. Richey,
546 U.S. 74 (2005) ................................................................ 148

Brady v. Maryland,
373 U.S.  (1963) ...................................................... 2, 6, 42

v

*Brecht v. Abrahamson*,
   507 U.S. 619 (1993) ................................................................... 85, 86
*Broadnax v. Lumpkin*,
   987 F.3d 400 (5th Cir. 2021) ........................................................ passim
*Brown v. Davenport*,
   142 S. Ct. 1510 (2022) ................................................................ 86, 88
*Brown v. Director*, TDCJ-CID,
   No. 3:19-CV-2301, 2022 WL 509352 (N.D. Tex. Jan. 28, 2022) ............................ 43
*Brown v. Thaler*,
   684 F.3d 482 (5th Cir. 2012) ........................................................... 114
*Buck v. Davis*,
   137 S. Ct. 759 (2017) .................................................................. 111
*Burger v. Kemp*,
   483 U.S. 776 (1987) ................................................................... 110
*Busby v. Dretke*,
   359 F.3d 708 (5th Cir. 2004) ............................................................ 80
*Canales v. Stephens*,
   765 F.3d 551 (5th Cir. 2014) ............................................................ 41
*Charles v. Thaler*,
   629 F.3d. 494 (5th Cir. 2011) ........................................................... 90
*Chavez v. Cockrell*,
   310 F.3d 805 (5th Cir. 2002) ............................................................ 85
*Clark v. Johnson*,
   202 F.3d 760 (5th Cir. 2000) ............................................................ 35
*Coleman v. Thompson*,
   501 U.S. 722 (1991) .................................................................. passim
*Cullen v. Pinholster*,
   563 U.S. 170 (2011) .................................................................. passim
*Davila v. Davis*,
   137 S. Ct. 2058 (2017) .................................................................. 41
*Davis v. Ayala*,
   576 U.S. 257 (2015) .................................................................. passim
*Deck v. Missouri*,
   544 U.S. 622 (2005) .................................................................. passim
*Derden v. McNeel*,
   978 F.2d 1453 (5th Cir.1992) (en banc ................................................... 141
*Dowthitt v. Johnson*,
   230 F.3d 733 (5th Cir. 2000) ....................................................... 107, 131
*Druery v. Thaler*,
   647 F.3d 535 (5th Cir. 2011) ........................................................ 79, 87
*Eddings v. Oklahoma*,
   455 U.S. 104 (1982) ............................................................ 117, 119, 120
*Edwards v. Carpenter*,
   529 U.S. 446 (2000) ..................................................................... 41

vi

*Escamilla v. Stephens*,
　749 F.3d 380 (5th Cir. 2014) ................................................................. 93
*Ex parte Brown*,
　205 S.W.3d 538 (Tex. Crim. App. 2006).............................................. 36
*Ex parte Chavez*,
　560 S.W.3d 191 (Tex. Crim. App. 2018).............................. 80, 81, 86, 90
*Ex parte Gardner*,
　959 S.W.2d 189 (Tex. Crim. App. 1996).......................................... 79, 80
*Ex parte Townsend*,
　137 S.W. 3d 79 (Tex. Crim. App. 2004)............................................... 79
*Felkner v Jackson*,
　562 U.S. 594 (2011) ............................................................................. 47
*Fields v. Thaler*,
　588 F.3d 270 (5th Cir. 2009) ......................................................... 55, 60
*Flowers v. Mississippi*,
　139 S. Ct. 2228 (2019) ......................................................................... 55
*Ford v. Wainwright*,
　477 U.S. 399 (1986) ............................................................................. 36
*Freeney v. Davis*,
　737 F. App'x 198 (5th Cir. 2018) ........................................................ 36
*Fry v. Pliler*,
　551 U.S. 112 (2007) ............................................................................. 85
*Gallo v. State*,
　239 S.W.3d 757 (Tex. Crim. App. 2007)............................................ 145
*Garcia v. Stephens*,
　793 F.3d 513 (5th Cir. 2015) ......................................................... 55, 60
*Garza v. Stephens*,
　738 F.3d 669 (5th Cir. 2013) ............................................................... 78
*Giglio v. United States*,
　405 U.S. 150 (1972) ........................................................................... 133
*Goode v. Shoukfeh*,
　943 S.W.2d 441 (Tex. 1997).................................................... 42, 50, 51
*Grant v. Dretke*,
　151 F. App'x 344 (5th Cir. 2005) ...................................................... 116
*Green v. Johnson*,
　116 F.3d 1115 (5th Cir. 1997) .......................................................... 118
*Hall v. Thaler*,
　504 F. App'x 269 (5th Cir. 2012) ........................................................ 77
*Halprin v. Davis*,
　911 F.3d 247 (5th Cir. 2018) ............................................................ 117
*Hardy v. Cross*,
　565 U.S. 65 (2011) ............................................................................... 33
*Harper v. Lumpkin*,
　19 F.4th 771 (5th Cir. 2021) ............................................................... 80

*Harrington v. Richter*,
   562 U.S. 86 (2011) ........................................................................ passim
*Harris v. Reed*,
   489 U.S. 255 (1989) ................................................................... 80, 145
*Hassan v. State*,
   369 S.W.3d 872 (Tex. Crim. App. 2012)................................... 49, 63, 64
*Hatten v. Quarterman*,
   570 F.3d 595 (5th Cir. 2009) ........................................................ 85, 88
*Herbert v. Rogers*,
   890 F.3d 213 (5th Cir. 2018) ............................................... 68, 73, 77
*Hernandez v. New York*,
   500 U.S. 352 (1991) ..................................................................... 47, 55
*Higgins v. Cain*,
   720 F.3d 255 (5th Cir. 2013) ................................................................ 63
*Hinton v. Alabama*,
   571 U.S. 263 (2014) ................................................................... 115, 118
*Hoffman v. Cain*,
   752 F.3d 430 (5th Cir. 2014) ............................................... 47, 55, 60
*Holberg v. Davis*,
   No. 2:15-CV-285-Z, 2021 WL 3603347 (N.D. Tex. Aug. 13, 2021)................. 36, 131
*Hopkins v. Cockrell*,
   325 F.3d 579 (5th Cir. 2003) ............................................................. 115
*Hudson v. Quarterman*,
   273 F. App'x 331 (5th Cir. 2008) ......................................................... 35
*J.E.B. v. Alabama*,
   511 U.S. 127 (1994) ............................................................................ 68
*Johnson v. California*,
   545 U.S. 162 (2005) ............................................................................ 47
*Johnson v. Cockrell*,
   306 F.3d 249 (5th Cir. 2002) ............................................................. 110
*Jurek v. Texas*,
   428 U.S. 262 (1976) ................................................................... 144, 146
*Kelly v. Lynaugh*,
   862 F.2d 1126 (5th Cir. 1988) ........................................................... 145
*Kernan v. Hinojosa*,
   136 S. Ct. 1603 (2016) ........................................................................ 33
*King v. Lynaugh*,
   868 F.2d 1400 (5th Cir. 1989) ............................................... 61, 63, 64
*Kitchens v. Johnson*,
   190 F.3d 698 (5th Cir. 1999) ............................................................. 107
*Knowles v. Mirzayance*,
   556 U.S. 111 (2009) ..................................................................... 64, 65
*Koch v. Puckett*,
   907 F.2d 524 (5th Cir. 1990) ...................................................... 133, 135

*Kyles v. Whitley,*
  514 U.S. 419 (1995) ................................................................. 143
*Ladd v. Cockrell,*
  311 F.3d 349 (5th Cir. 2002) ................................................... 115
*Lave v. Dretke,*
  416 F.3d 372 (5th Cir. 2005) ................................................... 147
*Lockett v. Ohio,*
  438 U.S. 586 (1978) ................................................ 116, 117, 146
*Martinez v. Dretke,*
  99 F. App'x 538 (5th Cir. 2004) ............................................. 116
*Martinez v. Quarterman,*
  481 F.3d 249 (5th Cir. 2007) ................................................... 123
*Martinez v. Ryan,*
  566 U.S. 1 (2012) ...................................................... 66, 69, 71, 72
*McCleskey v. Zant,*
  499 U.S. 467 (1991) ................................................................. 41
*McCoskey v. Thaler,*
  478 F. App'x 143 (5th Cir. 2012) ........................................... 146
*McDonald v. Johnson,*
  139 F.3d 1056 (5th Cir. 1998) ................................................. 149
*Michael) Williams,*
  529 U.S. ......................................................................... 44, 148
*Michigan v. Chestnut,*
  486 U.S. 567 (1988) ................................................................. 80
*Miller-El v. Cockrell,*
  537 U.S. 322 (2003) ................................................................. 46
*Miller-El v. Dretke,*
  545 U.S. 231 (2005) ...................................................... 46, 47, 60
*Milton v. Procunier,*
  744 F.2d 1091 (5th Cir.1984) ................................................. 146
*Miniel v. Cockrell,*
  339 F.3d 331 (5th Cir. 2003) .......................................... 123, 124
*Moawad v. Anderson,*
  143 F.3d 942 (5th Cir. 1998) ................................................... 105
*Moreno v. Dretke,*
  450 F.3d 158 (5th Cir. 2006) ..................................................... 63
*Murphy v. Davis,*
901 F.3d 578 (5th Cir. 2018) ...................................................... 131
*Murphy v. Dretke,*
  416 F.3d 427 (5th Cir. 2005) ..................................................... 47
*Murphy v. Johnson,*
  205 F.3d 809 (5th Cir. 2000) ................................................... 147
*Murray v. Carrier,*
  477 U.S. 478 (1986) ................................................................. 41

*Murray v. Giarratano,*
  492 U.S. 1 (1989) ................................................................................................ 37
*Napue v. Illinois,*
  360 U.S. 264 (1959) ......................................................................................... 133
*Neal v. Puckett,*
  286 F.3d 230 (5th Cir. 2002) ............................................................................ 35
*Nelson v. Davis,*
  952 F.3d 651 (5th Cir. 2020) .......................................................................... 112
*Neville v. Dretke,*
  423 F.3d 474 (5th Cir. 2005) ..................................................................... 79, 92
*Nobles v. Johnson,*
  127 F.3d 409 (5th Cir. 1997) ................................................... 40, 78, 79, 88
*Norman v. Stephens,*
  817 F.3d 226 (5th Cir. 2016) ................................................................ 107, 149
*Norris v. Davis,*
  826 F.3d 821 (5th Cir. 2016) .......................................................................... 136
*Padilla v. Kentucky,*
  559 U.S. 356 (2010) ......................................................................................... 131
*Panetti v. Quarterman,*
  551 U.S. 930 (2007) ........................................................................................... 36
*Paredes v. Quarterman,*
  574 F.3d 281 (5th Cir. 2009) ................................................................ 146, 147
*Pennsylvania v. Finley,*
  481 U.S. 551 (1987) ........................................................................................... 37
*Pondexter v. State,*
  942 S.W.2d 577 (Tex. Crim. App. 1996) ......................................................... 42
*Porter v. McCollum,*
  558 U.S. 30 (2009) .......................................................................................... 106
*Prible v. Lumpkin,*
  43 F.4th 501 (5th Cir. 2022) ..................................................................... 43, 142
*Purkett v. Elem,*
  514 U.S. 765 (1995) ................................................................................... 46, 53
*Raby v. Davis,*
  907 F.3d 880 (5th Cir. 2018) .......................................................................... 111
*Raby v. Davis,*
  No. H-02-0349, 2018 WL 10550608 (S.D. Tex. Apr. 5, 2018)........................ 111
*Ramey v. Davis,*
  942 F.3d 241 (5th Cir. 2019) ..................................................................... 67, 70
*Ramey v. Lumpkin,*
  7 F.4th 271, 281 (5th Cir. 2021), cert. denied, 142 S. Ct. 1442 (2022) .................. 44
*Ransom v. Johnson,*
  123 F.3d 716 (5th Cir. 1997) .......................................................................... 105
*Reed v. Quarterman,*
  555 F.3d 364 (5th Cir. 2009) ............................................................................ 68

*Renico v. Lett,*
  559 U.S. 766 (2010) ........................................................... 47
*Rhoades v. Davis,*
  914 F.3d 357 (5th Cir. 2019) ..................................... passim
*Rice v. Collins,*
  546 U.S. 333 (2006) .................................................... 46, 53
*Ries v. Quarterman,*
  522 F.3d 517 (5th Cir. 2008) ........................................ 62
*Roe v. Flores-Ortega,*
  528 U.S. 470 (2000) ...................................................... 116
*Rompilla v. Beard,*
  545 U.S. 374 (2005) ...................................................... 105
*Schriro v. Landrigan,*
  550 U.S. 465 (2007) ................................................ 65, 149
*Sheppard v. Davis,*
  967 F.3d 458 (5th Cir. 2020) ......................... 55, 60, 107
*Shinn v. Martinez Ramirez,*
  142 S. Ct. 1718 (2022) .............................................. passim
*Shoop v. Twyford,*
  142 S. Ct. 2037 (2022) ................................................. 149
*Simmons v. Epps,*
  654 F.3d 526 (5th Cir. 2011) ...................................... 117
*Smith v. Robbins,*
  528 U. S. 259 (2000) ................................................ 61, 64
*Smith v.Cockrell,*
  311 F.3d 661 (5th Cir. 2002) ...................................... 111
*Smith v. Collins,*
  977 F.2d 951 (5th Cir. 1992) ...................................... 110
*Snyder v. Louisiana,*
  552 U.S. 472 (2008) ........................................................ 47
*Soliz v. Davis,*
  750 F. App'x 282 (5th Cir. 2018) ................................. 79
*Soria v. Johnson,*
  207 F.3d 232 (5th Cir. 2000) ........................................ 48
*Spence v. Johnson,*
  80 F.3d 989 (5th Cir. 1996) ........................................ 138
*Stevens v. Epps,*
  618 F.3d 489 (5th Cir. 2010) .................................. 55, 60
*Strickland v. Washington,*
  466 U.S. 668 (1984) .................................................. passim
*Strickler v. Greene,*
  527 U.S. 263 (1999) ...................................................... 143
*Teague v. Lane,*
  489 U.S. 288 (1989) ........................................................ 77

*Thomas v. Lumpkin,*
   995 F.3d 432 (5th Cir. 2021) ............................................................ 105
*Thompson v. Quarterman,*
   629 F. Supp. 2d 665 (S.D. Tex. 2007) ............................................... 111
*Trevino v. Johnson,*
   168 F. 3d 173 (5th Cir. 1999) ............................................................ 35
*Trevino v. Thaler,*
   569 U.S. 413 (2013) ........................................................................... 66
*Trottie v. Stephens,*
   720 F.3d 231 (5th Cir. 2013) ............................................................ 107
*Tyler v. Cain,*
   533 U.S. 656 (2001) ........................................................................... 77
*United States v. Bagley,*
   473 U.S. 667 (1985) ......................................................................... 143
*United States v. Bennett,*
   874 F.3d 236 (5th Cir. 2017) ............................................................ 136
*United States v. Bernard,*
   762 F.3d 467 (5th Cir. 2014) ...................................................... 61, 123
*United States v. Brown,*
   650 F.3d 581 (5th Cir. 2011) ............................................................ 143
*United States v. Delgado,*
   672 F.3d 320 (5th Cir.2012) ............................................................. 141
*United States v. Diecidue,*
   603 F.2d 535 (5th Cir. 1979) ................................................... 85, 87, 91
*United States v. Green,*
   272 F.3d 748 (5th Cir.2001) ....................................................... 79, 91
*United States v. Hill,*
   35 F.4th 366 (5th Cir. 2022) ........................................................ 87, 91
*United States v. Kimler,*
   167 F.3d 889 (5th Cir. 1999) ............................................................. 67
*United States v. O'Keefe,*
   128 F.3d 885 (5th Cir. 1997) ..................................................... 133, 137
*United States v. Runyan,*
   290 F.3d 223 (5th Cir. 2002) ............................................................ 143
*United States v. Stanford,*
   823 F.3d 814 (5th Cir. 2016) ..................................................... 133, 141
*United States v. Stavroulakis,*
   952 F.2d 686 (2d Cir. 1992) ............................................................... 51
*United States v. Cronic,*
   466 U.S. 648 (1984) ........................................................................... 77
*Valdez v. Cockrell,*
   274 F.3d 941 (5th Cir. 2001) .......................................... 35, 36, 48, 50
*Vasquez v. Thaler,*
   No. SA-09-CA-930-XR, 2012 WL 2979035 (W.D. Tex. July 19, 2012) .................. 77

*Walker v. United States,*
   433 F.2d 306 (5th Cir. 1970) ............................................... 90
*Ward v. Stephens,*
   777 F.3d 250 (5th Cir. 2015) ........................................... 93, 94
*Ward v. Whitley,*
   21 F.3d 1355 (5th Cir. 1994) ............................................. 147
*Weaver v. Massachusetts,*
   137 S. Ct. 1899 (2017) ....................................................... 77
*Wiggins v. Smith,*
   539 U.S. 510 (2003) ........................................ 104, 105, 108
*Wiley v. Epps,*
   625 F.3d 199 (5th Cir. 2010) ............................................... 36
*Williams v. Cain,*
   359 F. App'x 462 (5th Cir. 2009) ........................................ 48
*Williams v. Taylor,*
   529 U.S. 362 (2000) ........................................................... 34
*Williams v. Thaler,*
   602 F.3d 291 (5th Cir. 2010) ................................... 40, 66, 70
*Wong v. Belmontes,*
   558 U.S. 15 (2009) ............................................................. 62
*Woodford v. Visciotti,*
   537 U.S. 19 (2002) ............................................................. 35
*Woodfox v. Cain,*
   609 F.3d 774 (5th Cir. 2010) ............................................... 86
*Woodward v. Epps,*
   580 F.3d 318 (5th Cir. 2009) ............................................... 49
*Young v. Davis,*
   835 F.3d 520 (5th Cir. 2016) ............................................... 40

**Statutes**

28 U.S.C. § 2254 ............................................................... passim
Tex. Code Crim. Proc. Art.11.071 § 5(a) ...................... 132, 142
Tex.Code Crim. Proc. Art. 37.071 ................................... 2, 145

**Rules**

Fed. R. Evid. 606(b) ............................................................ 147
Tex. R. Evid. 404 ............................................................... 137
Tex. R.Evid. 606(b) ............................................................ 147
Tex. R.Evid. 609 ............................................................... 137

# ANSWER

Petitioner Cedric Allen Ricks was convicted and sentenced to death for the murders of Roxann Sanchez and her son A.F. during the same criminal transaction. In his amended petition, Ricks challenges his presumptively valid capital murder conviction and death sentence by filing a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent Bobby Lumpkin ("the Director") denies all of Rick's assertions of fact except those supported by the record or admitted herein. Further, some of Ricks's claims are procedurally barred because they were not properly raised in state court, and he has failed to show that any of his claims have merit or that he is entitled to further factual development. The Director respectfully requests that Ricks's petition be denied with prejudice and that he be denied a certificate of appealability.

# RICKS'S ALLEGATIONS

The Director understands Ricks to assert the following claims for relief:

1. The State exercised peremptory strikes on the basis of race in violation of the Fourteenth Amendment.

2. Direct appeal counsel was ineffective for failing to challenge the State's unconstitutional use of its peremptory strikes, in violation of the Sixth Amendment right to counsel.

3. Trial counsel were ineffective during jury selection in violation of the Sixth Amendment right to counsel.

4. Ricks's shackling during trial violated his Fifth, Sixth, and Fourteenth Amendment rights.

5. Trial counsel's failure to object to Ricks's shackling and require that the trial court identify the justification for shackling Ricks violated his Sixth Amendment rights.

1

6. Ricks's Sixth Amendment right to counsel was violated by trial counsel's ineffectiveness at the penalty phase trial.

7. The State relied on false testimony to secure a death sentence against Ricks in violation of the Fourteenth Amendment.

8. The State violated *Brady v. Maryland*, 373 U.S. 67 (1963), by failing to disclose to defense counsel information regarding Ricks possessing a pencil in jail.

9. Ricks's death sentenced was imposed by an unconstitutionally arbitrary and discriminatory system in violation of the Eighth and Fourteenth Amendment.

10. Texas Code of Criminal Procedure Article 37.071 is unconstitutional because jurors do not understand the penalty phase instructions.

ECF No. 35 at 1–123 (as paginated by Ricks).

## STATEMENT OF THE CASE

Ricks was convicted and sentenced to death for capital murder in a judgment from the 371st District Court of Tarrant County, entered on May 16, 2014. 2 CR[1] 526–29. The Texas Court of Criminal Appeals (CCA) affirmed Ricks's conviction on direct appeal. *Ricks v. State*, No. AP-77,040, 2017 WL 4401589, at *1 (Tex. Crim. App. Oct. 4, 2017). On June 13, 2016, Ricks filed a state application for a writ of habeas corpus raising eleven claims for relief. 1 SHCR 16–190. After receiving a response from the State, including affidavits, *see generally* 3 SHCR and 4 SHCR, the trial court entered findings of fact and conclusions of law recommending that relief be denied. 4

---

[1] "CR" denotes the clerk's record on appeal preceded by volume number and followed by the relevant page number. "RR" refers to the Reporter's Record of transcribed rial proceedings, preceded by the volume number and followed by page number(s). "SX" refers to State's Exhibits and "DX" refers to Defendant's Exhibits that were admitted at trial, followed by exhibit number(s). "SHCR" refers to the state habeas clerk's record preceded by the volume number and followed by the page number. "Supp.SHCR" refers to the supplemental state habeas clerk's record, preceded by volume number and followed by page number.

SHCR 1899–67 (State's proposed findings); 2 Supp.SHCR 4 (order adopting State's proposed findings). The CCA issued an order and denied habeas relief based on the trial court's findings and conclusions and on its own review. *Ex parte Ricks*, No. WR-85,278-01, 2020 WL 6777958, at *2 (Tex. Crim. App. Nov. 18, 2020). Ricks then initiated the instant federal habeas proceeding and filed his initial petition on November 17, 2021. ECF No. 18. Ricks filed his amended petition on May 18, 2022. ECF No. 35. The instant Answer follows.

## STATEMENT OF FACTS

### I.    Facts Relating to Guilt

On direct appeal, the CCA provided the following summary of the facts:

The evidence at trial showed that [Ricks] and Roxann Sanchez lived together at the Colonial Village Apartments in Bedford, Texas. [Ricks] and Sanchez had a child together, nine-month-old [I.R]. Sanchez's two sons from a previous marriage also lived with them: eight-year-old [A.F.] and twelve-year-old [M.F.].

Shortly after 7:00 p.m. on May 1, 2013, Sanchez and her three sons arrived home from the grocery store. Sanchez carried [I.R.] and some of the groceries upstairs to their third floor apartment, leaving some of the groceries in the car. [A.F], [M.F.], and [I.R.] went to their bedroom to play while Sanchez cooked dinner.

Between 7:10 and 7:20 p.m., a neighbor heard [Ricks] yelling expletives and stating something to the effect of, "Don't have me fucking come down here and waste my mother-fucking time on this bullshit." [Ricks] had stopped yelling once the neighbor passed [Ricks] and Sanchez on the stairwell. Sanchez, who was carrying two bags of groceries, appeared distraught.

While the boys remained in their bedroom, [Ricks] and Sanchez began arguing in the apartment. When the yelling turned into screaming, [A.F.] and [M.F.] ran to the living room. [Ricks] and Sanchez were hitting each other, and [Ricks] pushed Sanchez to the floor. [A.F.] and [M.F.] tried to get between them to break up the fight, but [Ricks] pushed [M.F.] down and continued hitting Sanchez with his fists. [Ricks]

3

then got a knife from a kitchen drawer and stabbed Sanchez multiple times while she tried to protect herself. [M.F.] ran to his bedroom closet and tried to call the police, but [Ricks] followed him and pulled the closet door open. [M.F.] dropped the phone, and in an effort to protect himself, grabbed the knife that [Ricks] was holding, but the knife cut his hand.

[Ricks] chased [M.F.] back into the living room. [A.F.] was standing next to the couch with blood on his face and asking [M.F.] to get help. [Ricks] pushed [M.F.] to the ground, held his head down, and stabbed him multiple times in the back of his neck. [Ricks] then pushed [A.F.] to the ground next to [M.F.] and [Ricks] stabbed [A.F.] while [M.F.] watched. [Ricks] stopped stabbing [A.F.] after [A.F.] made a "gargling noise." When [M.F.] tried to get up, [Ricks] got on top of him and began stabbing him again. [Ricks] finally stopped stabbing [M.F.] after [M.F.] played dead by imitating the gargling noise [A.F.] had made.

[Ricks] then put the knife in the kitchen and washed his hands before going to the master bedroom and taking a shower. [Ricks] made a telephone call, packed his clothes, placed [I.R.] in his crib, and eventually left the apartment. Although [M.F.] was bleeding badly, he remained still because he was afraid that [Ricks] would stab him again if he got up. [M.F.] stayed on the floor until he was confident that [Ricks] would not return. When [M.F.] finally got up and looked out the window, his mother's car was gone.

After leaving the apartment, [Ricks] called his cousin, Tamara Butts, who lived with her parents in Mansfield, Texas. He told Butts that he "did something bad" and asked to speak to her father, Joseph Sanders. [Ricks] told Sanders that he "messed up" and that he "killed [Sanchez] and the boys." [Ricks] asked Sanders to get [I.R.] from the Bedford apartment. When [Ricks] spoke with Butts again, he told her that he killed Sanchez, [A.F.], and [M.F.] and that his hands were injured and cut. [Ricks] refused to tell Butts how he killed them or where he was. He insisted that Butts go to the Bedford apartment to get [I.R.]. When Butts urged [Ricks] to turn himself in, [Ricks] stated that he would die before he went to jail.

After [Ricks] hung up, Butts called 911 and then headed with her parents to the Bedford apartment to get [I.R.]. As they drove to Bedford, the police called and asked them to go to the police station instead. At the station, Butts and Sanders told the police about their telephone conversations with [Ricks]. Butts gave the police [Ricks]'s cellular telephone number, and she continued to text [Ricks] in an attempt to help the officers locate him.

4

Meanwhile, in response to Butts' 911 call, Bedford Police officers Clayton Baxley, Brian Meaders, Brett Bowen, Noel Scott, and Crowell were dispatched to [Ricks]'s apartment at 8:42 p.m. on a welfare check. Baxley arrived first and heard a baby screaming inside the apartment, but he was instructed over his radio not to enter until a back-up officer arrived at the scene. During this time, [M.F.] called 911 from inside the apartment and told the operator that his "mom's boyfriend killed [his] mom and [his] other brother," that he stabbed them, and that he "took [Sanchez's] car" and left. The 911 operator relayed this information to Baxley at the scene while she talked to [M.F.]. [M.F.] was unable to open the apartment door for Baxley due to the injuries to his hands, but he gave the operator permission for Baxley to open the door. When Baxley opened the door, he found [M.F.] covered in blood from head to toe. Baxley called to [M.F.] to exit the apartment. When [M.F.] came through the door, Baxley saw that the back of [M.F.'s] head, neck, and shoulders were severely lacerated and that he was bleeding profusely. [M.F.] was unable to sit down because he was in shock.

When Meaders arrived at the scene, he and Baxley entered the apartment to make a quick sweep for additional victims or suspects and to locate the baby. There was blood on the linoleum tile just inside the doorway. Sanchez's and [A.F.'s] bodies were lying on the floor in copious amounts of blood. The officers found [I.R.] crying in a crib in the back bedroom. Having determined the apartment was safe, they left [I.R.] there because he appeared uninjured and they were more concerned about getting medical attention for [M.F.].

Meaders and Baxley cared for [M.F.] until the paramedics and other officers arrived. Due to the severity of [M.F.'s] injuries, he was flown by helicopter to Cook Children's Medical Center. He later recovered physically from his injuries. [I.R.] was also taken to Cook Children's Medical Center as a precautionary measure, but was found to be unharmed.

Autopsies were conducted on Sanchez and [A.F.]. Sanchez had suffered an instantly fatal stab wound to her neck that transected her upper cervical spinal column at the brain stem, and a potentially fatal stab wound to her neck that transected her right carotid artery. She had suffered multiple other stab wounds and defensive wounds, and there was evidence of blunt force injuries and manual strangulation. Her cause of death was "stab wounds of the neck, blunt force injuries of the head, and asphyxia as a combination." [A.F.] had suffered several potentially fatal stab wounds: a head wound penetrated [A.F.'s] skull

into the temporal lobe of his brain; a neck wound injured his external jugular vein and part of his carotid artery, and penetrated his larynx; and a second head wound penetrated the left side of his nose down through the cartilage of his septum into the oral cavity toward the base of his tongue and the back of his throat. [A.F.] had suffered numerous other non-fatal stab wounds and various contusions. His cause of death was "[s]tab wound[s] to the head and neck."

*Ricks,* 2017 WL 4401589, at \*1–3.

## II.     Facts Relating to Punishment

### A.     The State's punishment case

#### 1.     Ricks's violence against Sanchez

Amanda Gomez, Sanchez's best friend, testified that Sanchez fell in love with Ricks after meeting him at work, and Sanchez became pregnant a few months later. 35 RR 140, 147, 150–51. Ricks did not like Gomez and did not allow her at the apartment—they had to selectively talk on the phone because otherwise, it caused problems for Sanchez. *Id.* at 147–48, 151–52. Before the baby, Ricks would show up without warning when Sanchez and Gomez went out together. *Id.* at 148. Gomez recalled a time when they went out and she was surprised to see Ricks in a corner just watching Sanchez who was talking to a bouncer at the time—Ricks accused Gomez of prompting Sanchez to do something wrong. *Id.* at 149.

Ricks testified that on November 11, 2012, he and Sanchez got into an argument because she did not want him to leave and she proceeded to grab him and "it turned physical." 40 RR 30, 32, 71. Ricks agreed that on this occasion he choked Sanchez to the point of unconsciousness and beat her head on the bathroom floor—while the boys slept in their bedroom. *Id.* at 32–33, 37, 72–73; *see* 34 RR 61–62.

6

Sanchez's mother, Diane McGrewe, testified that Sanchez had to pretend she was going to work the next morning so Ricks would let her leave the apartment. 34 RR 6, 36. Sanchez had sent her some concerning text messages the night before, prompting McGrewe to go and wait for Sanchez the next morning when she dropped off the boys at school. *Id.* at 21–22. When McGrewe saw her, Sanchez had a "blank look on her face like she couldn't talk, like she couldn't turn her neck . . . it was just like she was scared, that something had happened." *Id.* at 23. They went to the police station to make a report, and photographs were taken of Sanchez's injuries, which included: bruising to her neck; red spots all over her neck; injuries on her scalp; and a large bruise on her left arm. *Id.* at 23-24, 33, 36–40; 44 RR SX 169–77. When Ricks walked into the police station to give his own version of events, Sanchez became scared, was shaking, and tried to hide. 34 RR 24; 40 RR 34.

Next, Sanchez and McGrewe went to the emergency room to check for any head injuries and to have the baby observed. 34 RR 25; 35 RR 12–13. Cynthia Crowe, the triage nurse, testified that Sanchez told her that the previous night her boyfriend had strangled her, pounded her head on the floor, and choked her until she passed out; that her boyfriend had been arrested that morning; and that domestic violence was involved. 35 RR 13, 17–19. Sanchez obtained an emergency protective order prohibiting Ricks from going to her apartment, her work, her children's school, and her mother's house. 34 RR 26–27; 45 RR SX 230. Sandra Brainerd, who hired Ricks at Medical Clinics of North Texas (MCNT), testified that Ricks was terminated in

November of 2012 when he was arrested at the office for domestic violence and child abuse. 34 RR 84–86.

Sanchez, who still loved Ricks and wanted a father for the baby, asked for Gomez's help to bond Ricks out of jail, but Gomez refused because she did not want the responsibility on her shoulders. 35 RR 152–53. After Ricks's release from jail, Gomez, while on the phone with Sanchez, heard Ricks knocking on Sanchez's door, calling her names, wanting to be let in. *Id.* at 153–54. Ricks admitted that he violated the protective order. 40 RR 37, 66. They then reconciled. 34 RR 26, 28; 35 RR 154.

Roxanne Carillo, an investigator with the Department of Family and Protective Services (CPS), testified that on November 15, 2012, a referral came in regarding the baby and Ricks. 34 RR 44, 46, 48. When Carrillo interviewed Ricks, he said that he only had two prior misdemeanors, no prior assault cases, no CPS history, no mental-health or substance-abuse issues, no domestic-violence history, no medical problems, and that he had not been abused or neglected as a child. *Id.* at 51, 53, 56–57, 64–66. As to the assault of Sanchez, Ricks claimed that Sanchez became defensive after seeing him throw the baby across the bed and punch him in the chest, which started an argument that turned into a physical assault: he strangled Sanchez as she held the baby but stopped when the baby slipped—he grabbed and put down the baby. *Id.* at 60–61, 64–65. Ricks then moved Sanchez to the bed and continued strangling her until he thought to himself, "What am I doing? This is crazy." *Id.* Ricks maintained that he had already begun anger-management classes and individual counseling, *Id.* at 63. He signed a written CPS safety plan agreeing to comply with

8

Sanchez's protective order, to refrain from all physical altercations, to continue counseling and anger management, and to cooperate with any services CPS might identify for him. *Id.* at 66–67. He insisted that he "would do anything to work it out" with Sanchez. *Id.* at 69. The case was closed in January of 2013, when CPS concluded that the children were safe. *Id.* at 67–68.

Gomez testified that Sanchez was making plans to leave Ricks and that on the Friday before the murders, Gomez went with Sanchez for her to sign a lease to move into a new apartment during the first week of June 2013. 35 RR 155.

### 2.  Ricks's violent attack of M.F.

When M.F. was helicoptered to the hospital following Ricks's attack he was in "very critical condition"—needing immediate life-saving medical intervention for his significant injuries. 35 RR 74, 79, 87–89, 92–94. M.F. required surgery; hundreds of sutures to close his wounds; and another surgery the next day for nerve repair to his hands. *Id.* at 80, 90. After about a week in the hospital, M.F. was discharged in good condition, although his hands were in splints and he wore a cervical collar due to ligament damage in the back of his neck. *Id.* at 81. According to McGrewe, after his release from the hospital, M.F. needed counseling, several surgeries on his hands, and physical therapy to regain the use of his hands. 34 RR 16. McGrewe explained that following the attacks, M.F. was no longer the typical happy boy; he kept to himself, was afraid to sleep alone at night, did not trust people, and did not want to be left alone. *Id.* at 30.

9

### 3.    Ricks's violence against Tina Brown

Tina Brown dated Ricks when they were in high school, and around this time, his junior year, Ricks started becoming "a disciplinary problem."  36 RR 10–11, 16; *see* 38 RR 119. James Cooper, head of security at the high school, testified that on September 13, 1991, he had to drive Ricks home because he received a five-day suspension. 36 RR 7, 9, 11–12, 15. Cooper dropped Ricks off at his house, saw Ricks go inside, and went back to the school. *Id.* at 12. However, as Cooper entered the building, he got a call that Ricks had returned to school—in his father's car—and was "pulling his girlfriend out of the building." *Id.* at 12–13; *see* 38 RR 144. In response, Cooper went and stopped Ricks's car, removed Brown who was distraught, pulled Ricks out of the car, and handcuffed him. 36 RR at 13–15. The Oak Lawn, Illinois, Police arrested Ricks, and Cooper never saw him at school again. *Id.* at 15–16. Ricks, during his testimony, confirmed that he was arrested a couple of times for incidents involving Brown. 40 RR 62.

### 4.    Ricks's violence against Tashana Singleton

Tashana Singleton, Ricks's ex-wife, testified that she met Ricks at church—she was fifteen at the time, he was eighteen—and they dated for about a year before her parents learned of their relationship. 37 RR  9–11. Singleton moved out of town after she graduated high school, met someone else, and had his child. *Id.* at 12. However, soon after having her baby, Singleton returned, reunited with Ricks, and they moved in together in Chicago Heights, Illinois. *Id.*at 12–13.

On April 6, 1998, Ricks "got upset because [she] wanted to end the relationship" and punched Singleton in the jaw. *Id.* at 13. They married in 1999 and

10

eventually moved to Orland Park, Illinois, where he assaulted her on May 5, 2000. *Id.* at 14. On this occasion, Ricks came home drunk and wanted to talk to Singleton, but when she refused, he knocked Singleton out of her chair, kicked her, punched her, and pushed her head into the wall while her young daughter was in the room. *Id.*at 14–15. When she called 911, Ricks got a butcher knife from the kitchen and held it to her. *Id.* at 14–15. The police arrested Ricks that night. *Id.* at 15.

They separated for a period but reconciled after Singleton became pregnant. *Id.* at 15–16. After several texts and calls from Singleton, Ricks showed up at the hospital when his baby was born and told her, "I hope it [the baby] dies." *Id.* at 44.

When Singleton came home from work on September 11, 2001, Ricks wanted to argue and before Singleton knew what happened she and the one-and-a-half-month-old baby she was holding were on the kitchen floor. *Id.* at 17. Ricks got a butcher knife from the kitchen, stabbed the knife into the floor next to Singleton's head multiple times, and threatened to kill her. *Id.* at 17–19. Singleton did not recall whether she called the police. *Id.* at 18. On November 17, 2001, Ricks punched Singleton in the jaw and broke her tooth, but she testified she did not believe she called the police. *Id.* at 19–20. On February 23, 2002, while driving to Chicago with Singleton, his son, and her daughter, Ricks became upset, began driving erratically, and threatened to kill them all by driving off a cliff. *Id.* at 22–23.

Ricks and Singleton then separated and began divorce proceedings. *Id.*at 20–21. Ricks constantly violated Singleton's protective orders and threatened her entire family. *Id.* at 21–22, 40. When they would meet at Ricks's parents' home to exchange

their son for visitations, Ricks would become upset, say horrible things, and terrify Singleton. *Id.* at 23–24. Ricks behaved differently when his parents were present, making those exchanges easy, but without them, he was horrible. *Id.* at 24. On December 15, 2002, Singleton had her father, Calvin Thompson, accompany her, which upset Ricks who threatened to kill Thompson. *Id.*at 25–26, 63. On July 23, 2003, Singleton had the police escort her and Thompson to the exchange: Ricks threatened them when they arrived and broke Singleton's cell phone when she tried to show his mother the text messages Ricks sent her. *Id.* at 25–26. Ricks became irate with the police and was arrested. *Id.* at 25, 27. Following, they changed the exchange location to the police station. *Id.* at 27.

On May 15, 2004, during a visitation exchange in front of the police station, Ricks became upset when he saw that Singleton arrived driving another man's car. *Id.* at 28–32. He choked Singleton and beat her in the face and head with his fists until she was unconscious—their son stood outside the car crying and screaming. *Id.* at 32, 47–48, 50, 53. A passer-by observed the attack and yelled at Ricks to stop, but he continued to beat Singleton, with Ricks appearing to hold Singleton up by the throat with his left hand. *Id.* at 47, 50. Minutes later, police officers came out to assist. *Id.* at 51. Ricks continued assaulting Singleton even as the police officers tried to pull him off her. *Id.* at 51–52. The officers eventually subdued Ricks and arrested him. *Id.* at 53. Singleton was transported by ambulance to the hospital, where she received stitches to her head. *Id.* at 33–34; 45 RR SX 271–74. Ricks received probation for this assault, with conditions to serve jail time and to participate in domestic-violence

counseling. 37 RR 37–38. Singleton then moved and kept her location a secret because she feared Ricks. *Id.* at 38–39.

Ricks had choked Singleton on other occasions, but when she would call the police and have Ricks arrested, the cases were dismissed because she was not informed that she had to personally appear in court the next day to swear out a complaint or she was still in the hospital. *Id.* at 36–37.

Thompson testified that on May 14, 2003, while at the courthouse for an assault case involving Ricks and Singleton, Ricks threatened to kill him—a threat he took seriously and reported to police. 37 RR 60–62. Singleton testified that on August 15, 2003, while in court for divorce proceedings, Ricks threatened Thompson as he was leaving by motioning with his hand across his throat, suggesting that he would cut Thompson's throat. *Id.* at 28. Thompson recalled that one time they all—Ricks, Singleton, and both sets of parents—went to pastoral counseling at the church, but it did not go well because Ricks was arrogant, disrespectful toward the pastor, and did not like Singleton's parents being there. *Id.* at 65–66

Despite all the assaults, Singleton stayed with Ricks because she "loved him" and "it just wasn't all bad." *Id.* at 41. Singleton confirmed that Ricks responded to situations a lot more seriously than was called for and his reactions were over the top and impulsive. *Id.* at 42. He had explosive responses to little things, and she did not know when he would explode. *Id.* at 42–44.

### 5.   Ricks's violence against Tamara Partridge

Tamara Partridge testified that she began a four-year relationship with Ricks in June of 2004 when she was a nineteen-year-old college student at the University

of Illinois. 36 RR 22–24. Partridge met Ricks at a carwash when he approached her—he was charming and generous, and their relationship was fine in the beginning. *Id.* at 22, 27. Some six months in, Ricks told Partridge that he had to go to jail because of a fight, which she later learned involved domestic violence against his ex-wife. *Id.* at 27. While visiting Ricks in jail, Partridge learned he had been cheating on her when she met his other girlfriend, whom he had been dating for about a year. *Id.* at 27, 29. Nevertheless, they continued dating. *Id.* at 31.

About a year into their relationship, Ricks began to hurt Partridge. *Id.* On one occasion, he "smacked" her across the face, knocking her to the ground, because she had confronted him about being on the phone with another woman. *Id.* at 31–32. Ricks apologized, so Partridge let it go. *Id.* Ricks would become jealous about a lot of things, including Partridge visiting with a friend from high school. *Id.* In response to her visiting this friend, Ricks smashed her laptop to the ground and bruised her leg. *Id.* Partridge called the police but let it go when Ricks's begged her to not file a report. *Id.* During his birthday in 2007, Ricks, after seeing that Partridge had a missed call from a male friend, broke her phone, held her against the wall, and choked her with his hands around her neck. *Id.* at 33–34. Partridge struggled to get away, eventually made it outside the apartment, and found a neighbor so she could call the police. *Id.* Instead of letting her file a report, the responding officers told her and Ricks "to listen to some R. Kelly music and make up." *Id.* at 35. Partridge had to watch everything she said and did around Ricks—he called her names and said hurtful things to her "all the time." *Id.* Partridge felt in danger during their relationship and walked on

14

eggshells trying not to make Ricks angry. *Id.* at 52. Partridge agreed that Ricks was aggressive and impulsive at times. *Id.* at 49–50. Their relationship ended four years later, in 2008, because Partridge could no longer endure his jealousy and abuse. 36 RR 38. While they dated, she got to know Ricks's family and described them as "amazing people." *Id.* 36–37.

### 6.   Ricks's relationship with Jennifer Clark

Jennifer Clark testified that she met Ricks in late 2008, through an online dating service where Clark worked, and they eventually became a couple and lived together for some fifteen months. 35 RR 109–11, 118. Ricks was kicked out of the dating service's chat room for exposing his penis, and for verbal altercations with other members; however, Clark, who was a system administrator, allowed him back in after a warning. *Id.* at 113, 116–17, 134–35. After a successful visit to Texas and continued correspondence, Ricks moved from Illinois to Texas to live with Clark. *Id.* at 118. While living with her, Ricks "[b]asically stayed at home" and, in the later part, attended school to become a medical assistant. *Id.* at 110, 116, 119. He frequently used marijuana during his stay. *Id.* at 133.

During their relationship, Clark's ex-husband was murdered, but Ricks offered her no emotional support and became upset with Clark for being so hysterical about his death and was jealous that Clark and her daughters still had feelings for her ex, their father. *Id.* at 120–22, 138. Clark "didn't have time to grieve" the death for fear of upsetting Ricks. *Id.* at 121.

About a year into their relationship, they broke up. *Id.* at 130. The relationship wasn't working, and Clark felt Ricks was unfaithful, based on his text messages and

photographs with other women. *Id.* During their relationship, Ricks would not take responsibility for things, and toward the end, their disagreements got physical. *Id.* at 132. During one fight, Clark threw a candle at Ricks for saying mean things to her and asked him to leave, but Ricks threatened to kill her when she went to call the police. *Id.* at 131, 133. Clark took his threat seriously and grabbed her shotgun—Ricks backed off when Clark told him that she was not going to die first. *Id.* at 131, 133. He moved out a few weeks later. *Id.*

Clark described Ricks's family as nice, loving people. *Id.* at 137. When asked if Ricks appeared to get along with his parents, Clark replied that it was not how she "maybe hoped he would get along" and that she did not think he got along as well with his dad as he did with his mom. *Id.* at 123–24. She agreed that though his folks look like good people, more things went on than appeared outwardly. *Id.* at 139.

### 7.   Ricks's conduct in jail

Ricks was initially arrested in Oklahoma and taken to Garvin County Detention Center (GCDC). 38 RR 14–15. Sergeant Niya Arellano-Cardoso, who booked him in at the GCDC, testified that she planned to house Ricks alone, but he requested to be placed with other people because he did not want to have to sit with his thoughts. 39 RR 233–38. Cardoso acquiesced but warned Ricks, for his own safety, not to tell his cellmates why he was at the GCDC. *Id.* at 238–39. When Cardoso returned the next night, she learned that Ricks had been in a fight and went to check on him. *Id.* at 239–40. At that point, Ricks, who initially did not waive extradition from Oklahoma to Texas, told her that he wanted to sign his extradition papers. 38 RR 12; 39 RR 239–40.

16

Michael Rose, who was in custody at the GCDC at the same time, recalled that he and the other inmates were listening to the radio and learned of a stabbing in Texas involving someone that had been apprehended in Oklahoma; however, the broadcast provided no further details. 39 RR 251–53. Sometime that night, Ricks was placed in the same cell, and started talking—telling the cellmates that he had been in a high-speed pursuit, that his life ended, and that he had stabbed his wife and kids to death. *Id.* at 254–55. Ricks talked, unsolicited, and acted "like he was proud of it" and showed no emotion other than bragging about the killings. *Id.* at 256–57. Realizing that things were going to happen, Rose stepped out of the cell as Ricks got into an altercation with the other cellmates. *Id.*

While in Tarrant County Jail, during a shakedown of his cell on February 8, 2014, deputies found thirteen pills in an envelope hidden under Ricks's mattress. 36 RR 78, 80—81. Ricks was not allowed to hoard pills, even if prescribed—they can be used as jail currency or as drugs for themselves. *Id.* at 81, 84.

On March 25, 2014, Ricks was transported to the courtroom's holdover cell for voir dire proceedings, and while he changed into civilian clothes, the guards heard a pencil drop, which Ricks later admitted to having concealed in his smock. *Id.* at 57–60. Ricks was not allowed to have a pencil because he was on suicide watch and could use it to harm himself or others. *Id.* at 59, 72–73.

### 8. Texas Department of Criminal Justice (TDCJ) security measures

Steven Rogers, a former State Classification Committee member, testified about the prison system, including the facilities, the prison population, and the type

of staff employed. 37 RR 118–22. Rogers explained that inmates are given a classification grouping based on security and treatment needs. *Id.* at 124. The grouping proceeds from G1 status, the least restrictive type of custody, to G5 to administrative segregation. *Id.* at 126–27. He described that a capital murderer—sentenced to life without parole—receives G3 custody but can be reduced to a G4 or G5 based on disciplinary violations. *Id.* at 126–28. A G3 inmate is housed with other G3 and G2 offenders, gets commissary, is eligible for contact visits, and has almost all rights and privileges of G1 and G2 custody. *Id.* at 129–30. G3 inmates can go to the day room, school, church, or commissary, and can work in agriculture outside the prison perimeter with an armed guard or in the dining hall, kitchen, laundry, or commissary. *Id.* at 130–313. Loss of classification status or privileges cannot happen unless he commits a disciplinary infraction and goes through proper procedures. *Id.* at 137–38. Death row is managed as administrative segregation—inmates remain in their cells all day, with one hour for recreation. *Id.* at 127, 144.

###### B. Ricks's punishment case

####### 1. Response to jail conduct

Regarding the altercation at the GCDC in Oklahoma, evidence was introduced that Ricks's hands were bandaged and hurt prior to the fight, as well as the jail video footage of the fight depicting that Ricks had not started things. 38 RR 17–25; 46 RR DX 16–17. A stipulation of evidence was entered reflecting that he had been taken to the hospital before the fight to treat his hands and was taken back to the hospital after the fight to have the injuries he received while in custody treated. 38 RR 22; 46 RR DX 18. Officer Justin Crooks, with the Tarrant County Detention Center, oversaw

Ricks twice a week for the year prior, and he encountered no issues with Ricks, nor did he observe Ricks act aggressively. 38 RR 170–72.

### 2. Ricks's childhood friends

Cortland Byrd, Jr., from the Chicago area, testified that he grew up with Ricks—they attended the same schools and played on the same high school football team. 38 RR 40–46. Byrd described Ricks as a competitive player, with a "mean streak about him" but nothing too out of the ordinary for the sport where one has to have "some type of anger." *Id.* at 47–48. On one occasion, when they were thirteen or fourteen years old, Ricks and his cousin tried to fight Byrd, but it didn't go well for them since Byrd is bigger and restrained them both in a headlock. *Id.* at 49–51. He kept in touch with Ricks—speaking a couple of times a month—and talked to Ricks a few days before the murders. *Id.* at 52–53. In this conversation, Ricks said he wanted to come back to Chicago, which seemed peculiar to Byrd because he thought Ricks was doing well in Texas. *Id.* at 54.

Steven Ware testified that he became friends with Ricks in the fourth grade when he moved to the same neighborhood. 38 RR 72–74. Ware agreed that they had a lot of activities in the neighborhood, and it was a good place to grow up. *Id.* at 74. He recalled that Ricks was a "class clown" and got in trouble a lot at school but was also "very smart", and his parents were supportive. *Id.* at 75. They kept in touch after high school though they talked less as they got older and married. *Id.* at 76–77. When Ware was in a bad car accident in 2007, Ricks came to visit him every day in the hospital and even replaced the shoes in lost during the accident. *Id.* at 78.

19

Keith Griffin, who now resides in Texas, testified that he and Ricks have been good friends for some thirty years. 38 RR 152. They lived in the same neighborhood, which was "a Utopia," a beautiful place to grow up where the kids participated in all kinds of sports. *Id.* at 153–54, 162. He described Ricks as athletic—they played a lot of ball together. *Id.* at 153. Because Ricks was smaller in stature, he was more aggressive when playing sports so that he could prove himself. *Id.* at 155. Ricks was also intense off the court—he had a short fuse but was a great friend. *Id.* at 156. Griffin eventually moved to Texas in 2003 and last spoke to Ricks a year or two after his move. *Id.* at. 157–58. They reconnected after Ricks's arrest for the murders, and when Griffin went to visit, Ricks broke down and cried before they even started talking. *Id.* at 160–62.

Curtis Crossley, II testified that he knew Ricks from church where his mother taught Sunday school and described Ricks as "jovial" and "competitive." 38 RR 100–01. They played basketball together, and he recalled Ricks as a "tough little guy" who was "very intense," so that he could compete with the taller players. *Id.* at 102. Ricks was aggressive, and at times seemed out of control. *Id.* at 104.

### 3.    Sunday school teacher and football coaches

Jane Crossley, Curtis Crossley's mother and a professor at Chicago State University, taught Ricks's Sunday school class for many years, which he attended as a teenager. 38 RR 26–28. Ricks and his family were regular, faithful churchgoers. *Id.* Ricks was very much involved and was even a member of the church choir. *Id.* at 28.

John McGee, a former football coach, knew Ricks from coaching his team when Ricks was eight to nine years old. 40 RR at 7–9, 12–14. He described Ricks as a typical

kid at that age and expressed that he "had a love for him." *Id.* at 12–14. Ricks gave McGee his best and did pretty much everything he asked. *Id.* Gary Korhonen was Ricks's high school football coach during Ricks junior and senior years. *Id.* at 15–18. He described Ricks as "funny" and remembers him vividly because the team was very good at the time. *Id.* at 18–19. Ricks was not a starter, but he accepted his role well and always did what was asked. *Id.* at 15, 18–19, 23. Korhonen recalled a time when Ricks helped a seriously hurt player and remarked that Ricks was well-liked and compassionate. *Id.* at 20. Korhonen emphasized that no one had to ask him to testify for Ricks, he wanted to do it. *Id.* at 20–21.

### 4.  Family friends and extended family

Edna McCullugh, a lifelong friend of the family who had contact with Ricks until he was around twelve years old, testified about an incident where Ricks, who was some nine-years old at the time, started a fire in the car by lighting a tissue with the cigarette lighter. 38 RR 61–64, 67, 71. When asked why he did it, he responded that he did not know. *Id.* at 65. She expressed her concerns to Ricks's mother that something was wrong with him beyond just being a mischievous child. *Id.* at 64–66. His parents were trying to figure out what to do with him during this time because he was getting in trouble and had daily calls from Ricks's school. *Id.* at 66.

Kimberly McCullough, who lives in Illinois and is first cousins with Ricks, has known him his whole life and babysat him as a child. 38 RR 88–89. Her mother, Jaqueline Dennis (Aunt Jackie), Shedrick Ricks's older sister, was protective of Ricks and kept him from getting spankings, though Ricks was disciplined when he got into trouble. *Id.* at 89–90, 93, 95. Growing up their families were very close and did a lot

21

together. *Id.* at 90. She described Ricks as a "mischievous" little kid; she was not surprised he had discipline problems, and she explained that he was very much like one of her children who was "overactive" and "always touching something" or "getting into thing". *Id.*at 91–92. Ricks's parents supported him—there was love and discipline—but people just didn't go to therapists and doctors back then. *Id.* at 90–92, 95. Though she did not encounter his explosiveness, Ricks was a concern as a young child; he was impulsive and appeared to have a disconnect with the reasons for why he did things. *Id.* at 92–93. She remembered that Aunt Jackie expressed her concerns about Ricks to his mother. *Id.* at 93. McCullough maintained contact with Ricks after he moved to Texas. *Id.* at 94.

Thomas Abner, Ricks's first cousin who is eleven years older than Ricks, testified that he and Ricks were close, and that Ricks had spent a lot of time at his home in Chicago as an adult. 38 RR 79, 81–82. Ricks called him eight days before the murders and seemed stressed about money—his unemployment had been denied. *Id.* at 83–84, 86–87. Because Ricks only called when he needed something, Abner knew something was probably wrong and it seemed odd that Ricks wanted to give him some jewelry. *Id.* at 84–86. He did not send Ricks money. *Id.* at 87.

Joe Sanders, Ricks's uncle who also lives in Texas and had testified in the guilt phase about talking to Ricks on the night of the murders, added that Ricks lived with him for about six months while going to school to be a medical tech—after his relationship with Clark ended. 31 RR 76, 80–82; 38 RR 164–65, 169. Ricks graduated with honors and the whole family came down from Chicago for his graduation. *Id.*

22

Sanders testified about a vacation the family—Sanders, his wife, Ricks's parents, Ricks, and Sanchez—went on to New York, which he described as a great trip. *Id.* at 165-66. As far as he knew, Ricks got along with his family. *Id.* at 168.

### 5. Immediate Family

Ricks's only sibling, Dwayne[2] Ricks, who is three years older and resides in Chicago, described their upbringing as fortunate in that they had the material things kids needed. 38 RR 176–79. He and Ricks were very different; Dwayne was into arts and academics, while Ricks liked being outside playing. *Id.* at 180–81. He explained that when young, they stayed with their aunt during the school year and the parents picked them up on weekends; and that during summertime, their dad dropped them off daily with their aunt. *Id.* Church was a big part of the family's life, attending a couple of times a week. *Id.* at 181.

Dwayne explained that the family was "private" and did not discuss matters outside the home. *Id.* at 180. Back then, they didn't discuss things that happened but just dealt with it, and he and Ricks did not want to disappoint their parents. *Id.* at 189–90. It was important for their family to look perfect—no one saw their "dirt"— and what happened behind closed doors stayed behind closed doors. *Id.* at 180, 191– 92. This affected how they grew up—keeping certain things they did secret—and Dwayne's coming out as gay was a point of tension in the family. *Id.* at 192–93.

Although Ricks was aggressive and had a chip on his shoulder, they just kept their problems to themselves and "didn't trouble anybody else with it." *Id.* at 183.

---

[2]   The family members that share the Ricks last name will be referred to by their first name.

They had two fights growing up—with one "drag-out" fight when they were teenagers, where Ricks just attacked Dwayne out of nowhere. *Id.* at 185–86.  He recalled that when Ricks got in a rage, he was a different person until he worked through it. *Id.* at 186. They went to therapy as kids but didn't follow through, thinking it would all go away, so they didn't know to pay attention to things. *Id.* at 189. Ricks and Dewayne went their separate ways as they got older. *Id.* at 187. After they were grown, Ricks apologized to Dwayne about how Dwayne was treated during their youth. *Id.* at 188. Dwayne did not know about Ricks's prior relationships with girls. *Id.* at 190. Although Ricks had anger issues and didn't know why he did certain things, Dwayne expressed shock over what happened here. *Id.* at 188. Dwayne recalled that Ricks was dependable, had a work ethic, and worked hard for what he had. *Id.* at 184–85.

Ricks's father, Shedrick, testified that he had been married to Ricks's mother, Helen, for some forty-five years; that when they first married, they lived in the projects; and that they moved to other parts of the Chicago area where Dwayne, then Ricks were born. 38 RR 111–13. Because Helen worked, her aunt watched the boys at her apartment; Shedrick dropped them off in the mornings, picked them up in the evenings, then got Helen from work. *Id.* at 115–16. They were very busy. *Id.* Shedrick eventually retired from a well-paying union job as a sprinkler fitter—he was instrumental in getting Ricks a job with the union where Ricks worked for some time before getting laid off due to the economic downturn. *Id.* at 107–09, 133–39.

Shedrick and Helen had many discussions about Ricks, especially when they first took him to kindergarten and were told not to return after the first day, but they

24

thought he was just mischievous and just needed more discipline. 38 RR 117–18. On one occasion, Shedrick came home from work to find that Ricks, who was eight or nine years old at the time, had started a fire in the bushes in front of their house. *Id.* at 123. When Ricks saw Shedrick, he ran, but Shedrick caught him and questioned him about the fire; however, all Ricks could explain was that something in his head told him to do it. *Id.* at 124. When Ricks was about ten or eleven years old, he ran away from home when Shedrick was going to discipline him, and as Ricks ran out the back door, he threw a brick through the kitchen window. *Id.* at 130.

Shedrick described Ricks as impulsive. *Id.* at 131. Ricks was hyper but back then people did not think of it as a developmental problem. *Id.* at 118. At the time, they just thought he was very mischievous so they would discipline him, but it "got to a point where . . . you just can't discipline them all the time." *Id.* Shedrick explained that he could not "chastise him all the time, physically" so he would restrict things. *Id.* at 121–22. As Ricks got older, disciplining him included taking things away from him because "the hands-on thing wasn't going to work, because . . . he was getting a little larger." *Id.* at 130. Ricks ran away from home a couple of times. *Id.*

According to Shedrick, things started to change when Ricks got into a relationship with Brown. *Id.* at 119. It disturbed Shedrick that Ricks helped Brown around her house but did little to help Shedrick. *Id.* at 120. They tried to get outside help for Ricks and had him admitted to a hospital for a month around the time of the Brown incident at the high school. *Id.* at 124–26, 142–43. Although Ricks took his medication while at the hospital, he wouldn't take it when released. *Id.* at 143.

Shedrick explained that Ricks would do well with consistent help for a couple of weeks, but then something would happen to derail him. *Id.* at 127. Shedrick knew Ricks and Singleton had a strained relationship but did not realize the extent of things. *Id.* at 132. When looking back, Shedrick feels that they thought they were doing all they could for Ricks, but they weren't privy to "what was really needed for him[.]" *Id.* at 140–41. Shedrick recalled that Ricks called him after the murders but couldn't remember what he told him on the phone. *Id.* at 147–49.

Helen testified that she grew up with Shedrick; they married; they initially lived in the projects; they moved a couple of times while the kids were young; and, in 1976, they settled in Calumet Park, Illinois—a good location for African Americans at the time—where they raised their boys. 39 RR 185–88. Helen smoked during her pregnancy with Ricks, and as a child, he was sickly and had bronchiolitis a lot. *Id.* at 191–92. As he got older, Ricks was "aggressive, mischievous" and hyperactive. *Id.* at 192. As a toddler, Ricks couldn't sit still or follow directions and would do things for no reason like kicking his brother. *Id.* at 193. At the age of six or seven, Ricks was setting fires. *Id.* at 195.

Helen explained that they didn't realize the seriousness of his problems until he started going to school. *Id.* at 192–93. On his first day of nursery school, they were told not to bring Ricks back because he wouldn't listen, and the daycare worker didn't know what to do. *Id.* at 193. In kindergarten, Ricks's teacher came to the house one day and told Helen that Ricks was not behaving and to be firm with him. *Id.* at 194. Things progressed, and they kept saying that something was wrong. *Id.* They took

him to a doctor who wanted to put Ricks on Ritalin, but Helen didn't think he needed to be drugged. *Id.* at 194. They took him to counselors and went to doctors, but they did not find anything wrong with his brain at the time;[3] they just kept telling Ricks's parents to be firm with him, so they punished him if he did wrong. *Id.* at 196. Punishments included whippings at times and taking things away from him. *Id.* Helen did most of the disciplining since she was home most of the time. *Id.* Helen supported Ricks the best that she could and saw the seriousness of Ricks's problems more than Shedrick did: he did not take this as seriously as she did. *Id.* at 195, 199–200. Ricks kept doing things, like running away and throwing a brick through a window, among other things. *Id.* at 202.

Though they had troubles, she and Ricks had love for each other, and from a young age—seven or eight years old—Ricks expressed his view that Shedrick did not love or respect Helen enough and was protective of Helen, especially when Shedrick argued with her. *Id.* at 199–200. Ricks did see some violence between the parents when his dad shoved Helen and slapped her one time. *Id.* at 204.

Helen testified that Ricks's school always called her at work, so Helen would often pray that she would have a day without a call. *Id.* at 198. The school, as well as Helen, wanted to do what they could to help Ricks—he would do well, and then "all of a sudden . . . do something disruptive." *Id.* at 199. There were times when the school sent letters home, which Helen kept, about his disruptive behavior. *Id.* at 213–14. Helen received numerous letters with ideas and suggestions from the school as to how

---

[3]     Helen testified they obtained "an MRI . . . to see if anything was really wrong with the brain at that time." 39 RR 196.

to deal with Ricks. *Id.* at 214. Football was a positive outlet for Ricks and Helen was able to use that to get him to act ok. *Id.* at 215–16.

Helen testified that she had Ricks admitted to the hospital when she reached the end of her rope. *Id.* at 202. Helen explained that things got "rocky" with Ricks's relationship with Brown and recalled that he came upon Brown one day with another guy in the car and Ricks broke the car window with his fist. *Id.* at 203. A piece of glass lodged in his hand, and he finally called and told Helen about it when the pain to his hand got too much. *Id.* Helen took him to the hospital and seized the opportunity to have him admitted to a psychiatric ward for thirty days. *Id.* During his stay, they went to counseling with him. *Id.* at 204. After his release, Ricks stopped taking the medication. *Id.* Helen didn't know what to do and kept telling Ricks he needed help. *Id.* Ricks would still come home even after he was old enough to be on his own. *Id.* at 220. He would eventually leave because he did not like their rules. *Id.* at 221.

Helen described that Ricks met Singleton at church, but her parents did not want him to see her. *Id.* at 221. Helen asked Ricks why he would reunite with Singleton after she left him and came back with a child, but Ricks cared about her and her baby. *Id.* at 222. Helen encouraged them to get married rather than just live together but then the relationship wasn't going well, and Helen learned of some, but not the full extent, of the abuse, and they separated. *Id.* at 222–23. Ricks had the union job at the time and was doing well. *Id.* Helen felt that Ricks was improving as an adult because no one was telling them that he was doing anything. *Id.* at 224. Helen explained that Ricks kept a lot from them, and they did not know what was

going on. *Id.* at 228. Helen tried to help but there were times they wouldn't bail him out of jail hoping it would send a message. *Id.* at 228–29.

According to Helen, when Ricks got laid off and said he was moving to Texas to be with Clark, they didn't approve. *Id.* at 224–25. Later, when Ricks brought Sanchez up for a visit, she recalled that they got along well. *Id.* at 226. On May 1st, the date of the murders, Helen had a tense conversation with Ricks about Dwayne staying at their home but not Ricks; however, she never told Ricks that "he couldn't come home." *Id.* at 226–27. Rather, she told him to "man up" and take care of his child. *Id.* She didn't take him that seriously and figured he'd be "all right." *Id.* Helen still loved Ricks, and they did everything they knew to help him—counseling, punishment—but never thought it would end up like this. *Id.* at 229.

### 6.    Expert testimony

Dr. Jeffrey Lewine, a neuroscientist, testified about neurological and other testing performed on Ricks, including magnetic resonance imaging (MRI) data, diffusion tensor imaging (DTI), electro-encephalography (EEG), evoked potentials, and behavioral testing. 39 RR 91, 99–101 The results showed that Ricks had a "biological predisposition towards aggression and violence[.]" *Id.* at 131–33, 145. The MRI scan and EEG of Ricks's brain showed no evidence of gross structural lesions such as a tumor or major traumatic brain injury (TBI). *Id.* at 115, 123, 131, 167. Brain imaging reflected a deviation from normal in the putamen area of the brain, which is consistent with his history of violent and aggressive behavior. *Id.* at 118–19, 121–22. Ricks's brain imagining was not consistent with clear psychopathy. *Id.* at 122. The Hare Psychopathy Test score for Ricks was 25, below the cut-off range of 30 for those

with clear psychopathy. *Id.* at 125. Ricks scored a 61 on the MSCEIT, which is questionnaire designed to measure emotional intelligence, putting him in the lowest one percent of the population. *Id.* at 126–27. This score indicates that Ricks has impaired emotional intelligence, consistent with somebody who has trouble with relationships. *Id.* at 127–28. Ricks was also tested for sensory gating, which tests the ability to filter out background noise. *Id.* at 136–37. Ricks goes into sensory overload at a lower level of sound intensity than neurotypical individuals, so he cannot control his impulses during a heated argument and would theoretically fall back on impulsive and aggressive tendencies in a noisy environment. *Id.* at 142–43, 155. Dr. Lewine attributed the sensory overload to biology since none of the testing supported a finding of TBI, which was the other possible cause. *Id.* at 138, 144.

Dr. Lewine explained that various things go into the way the brain looks, such as heredity, early and late environmental factors—like an impoverished environment—and that most "volumetric changes are more closely related to very early life history as opposed to late life history." 39 RR 123–24, 182-83. Biological underpinning as well as early environment contributed to Ricks's predisposition to aggression and violence. *Id.* at 124, 145. Dr. Lewine clarified that Ricks "clearly has a biological profile" and based on the data, he could not "explicitly contribute it to at birth as opposed to the first few years of life." *Id.* at 181. But Ricks did not have a normal brain. *Id.*

Regarding future dangerousness while in prison, referring to a study by Sorensen and Pilgrim, Dr. Lewine testified that the likelihood as very small for killing

again, and up to about 16% for aggressive behavior. *Id.* at 148. Dr. Lewine opined that, if Ricks were sentenced to life without parole, his future risk was "probably somewhere in the middle" of the risk scale. *Id.* at 147–52. If Ricks were in the same situation in a relationship, this could happen again; however, prison society would lower this prospect. *Id.* at 151–52.

### 7.   Ricks's testimony

Ricks had been stressed and depressed for some two and a half years prior to the murders because he lost his job, lost his condo, moved away from his family, didn't have many friends in Texas, and his car got repossessed in October. 40 RR 31–32, 38, 67. When he and Sanchez argued in November of 2012, it was because he wanted to leave, but she didn't want him to go. *Id.* at 30, 32. She grabbed Ricks and the argument turned physical with Ricks choking her. *Id.* at 32. The children were asleep in the apartment when this happened. *Id.* at 37. When Sanchez went to the police station the next day, Ricks showed up because he wanted to give his side of the story. *Id.* at 33. He did not know Sanchez would be at the police station, but just happened to have shown up to give a report. *Id.* at 75. Ricks admitted that in his statement he had not included that he choked Sanchez to the point of unconsciousness and then beat her head on the bathroom floor. *Id.* at 73. 76–77. The police did not arrest him then, but instead showed up at his work to arrest him. *Id.* at 34–36.  Still, Sanchez bailed him out of jail, and they tried to work things out. *Id.* at 36.

Ricks was "sorry about everything." *Id.* at 37. Ricks explained that he was fine but started having anger issues when he began dating. *Id.* at 39. Ricks agreed that Dr. Lewine was accurate about his impulsiveness and aggressiveness. *Id.* at 44. He

has had trouble letting go of things and controlling his anger as far back as early elementary school. *Id.* at 39, 44, 47. Every time he lost control with a girlfriend, his ex-wife, or Sanchez, it began as an argument. *Id.* at 44. Ricks attended a couple of anger management classes in Illinois and even signed up for one after his assault of Sanchez in November. *Id.* at 63–64.

> Ricks explained his decision to testify:
>
> I didn't testify at the first phase for the simple fact that Roxie and [A.F.] are not here. Thank God [M.F.] is here. But that heated argument turned into a loud situation where . . . I feared for my life. But it doesn't matter, because they're gone, and . . . I have to move forward. That's the reason I'm up here. I have to move forward, because, you know, they offered me life without parole, and I told them no. I said I didn't want that, because I wanted to face what I needed to face today.

*Id.* at 45–46. He added that he did not want to go "to some prison" and "never say anything to anybody." *Id.* at 46. He was sorry for what happened, and he knows he can't fix this. *Id.* at 46, 49. He even tried to kill himself two or three times. *Id.* at 49. He had to turn down life without parole because he did not want to live. *Id.* at 80.

Ricks admitted that he was in a rage and could not control himself when he stabbed Sanchez and her boys. 40 RR 45, 49. He stopped when he saw his nine-month-old son come around the corner of the bedroom. *Id.* at 50. Ricks maintained that he stabbed Sanchez and her sons because he feared for his life and was defending himself when the "whole house" ganged up on him. *Id.* at 45, 77–79, 81. Ricks stated that he got stabbed in the head but had refrained from providing a full account of what happened. *Id.* at 79–80.

32

Ricks admitted that he had overreacted when he murdered Sanchez and her son, when he punched Partridge for having a message on her telephone, when he choked Singleton in the police station parking lot, and when he forcibly took Brown from the high school campus.[4] *Id.* at 54–56. When asked about his history of doing things only to realize later that he overreacted, Ricks retorted: "Well, once you analyze every situation, yeah, you always think you could have done something different. That's—that's everybody's life. . . . I mean, nobody's perfect . . .everybody has skeletons in the closet." *Id.* at 56.

## ARGUMENT

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 562 U.S. 86, 97 (2011). AEDPA "requires a state prisoner seeking federal habeas relief first to 'exhaus[t] the remedies available in the courts of the State.'" *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1604 (2016) (per curiam) (alteration in original). State court adjudication, in turn, requires review under § 2254(d). *Richter*, 562 U.S. at 98–99. This section "imposes a highly deferential standard of review for evaluating state court rulings and demands that state court decisions be given the benefit of the doubt," *Hardy v. Cross*, 565 U.S. 65, 66 (2011) (per curiam) (quotation omitted), and

---

[4]      Ricks agreed that he had been arrested five or six times for domestic violence, that he could not remember how many times he had been arrested for violating a protective order, and that he had been arrested five times for resisting arrest or resisting a police officer. 40 RR 59.

"is limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Under § 2254(d), relief may not be granted unless the state court adjudication (1) "'was contrary to' federal law then clearly established in the holdings of" the Supreme Court, (2) "'involved an unreasonable application of' such law," or (3) "'was based on an unreasonable determination of the facts' in light of the record before the state court." *Richter*, 562 U.S. at 100 (quoting § 2254(d)(1)–(2)) (citing (*Terry*) *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A state court decision is contrary to clearly established federal law if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or confronts facts that are "materially indistinguishable" from relevant Supreme Court precedent yet reaches an opposite result. (*Terry*) *Williams*, 529 U.S. at 405–06. A state court unreasonably applies clearly established federal law if it correctly identifies the governing Supreme Court precedent but unreasonably applies it to the facts of a particular case. *Id.* at 407–09. To analyze unreasonable application, a federal court "must determine what arguments or theories supported or . . . could have supported[] the state court's decision[] and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Richter*, 562 U.S. at 102. Thus, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree" on the correctness of the state court's decision. *Id.* at 101 (quotation omitted).

Further, it is the state court's "ultimate decision" that is to be tested for unreasonableness, not every jot of its reasoning. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc). Indeed, state courts are presumed to "know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). And, even if the state court's decision lacks reasoning, § 2254(d) applies and must be overcome by the inmate. *Richter*, 562 U.S. at 98.

AEDPA also provides that state court factual findings "shall be presumed to be correct" unless an inmate carries "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). This presumption is "especially strong" where, as here, the state trial judge and the state habeas judge are one and the same. *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000); *see* 1 SHCR 2 (listing Judge Westfall as trial and habeas judge). "The presumption of [factual] correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

## I.       Deference Applies to State Court Findings

Contrary to Ricks's assertion that § 2254(d) should not apply, ECF No. 35 at 6–8, deference applies to the trial court's findings. *See Hudson v. Quarterman*, 273 F. App'x 331, 335 (5th Cir. 2008) (rejecting assertion that deference was not required because state court adopted respondent's proposed findings and conclusions (citing *Trevino v. Johnson*, 168 F. 3d 173, 180 (5th Cir. 1999)). Moreover, Ricks ignores that the CCA denied habeas relief "[b]ased upon the trial court's findings and conclusions

and *[its] own review of the record.*" *Ex parte Ricks*, 2020 WL 6777958, at *2 (emphasis

added); *see also Ex parte Brown*, 205 S.W.3d 538, 546 (Tex. Crim. App. 2006) ("Upon

submission to this Court, we review the factual findings with deference" but, "we are

not bound by the habeas judge's findings…when they are not supported by the

record") (internal citation omitted). Further, the Fifth Circuit has firmly rejected

Ricks's contention that AEDPA deference does not apply due to alleged state habeas

deficiencies. *Freeney v. Davis*, 737 F. App'x 198, 205 (5th Cir. 2018). As the Fifth

Circuit reiterated:

> We have held that "a full and fair hearing in state court is not a
> prerequisite to applying AEDPA's deferential scheme." That is because
> "[t]he term 'adjudication on the merits' . . . refers solely to whether the
> state court reached a conclusion as to the substantive matter of a claim,
> as opposed to disposing of the matter for procedural reasons. It does not
> speak to the quality of the process."

*Id.* at 204–05 (citing *Valdez*, 274 F.3d at 952); *Wiley v. Epps*, 625 F.3d 199, 207 (5th

Cir. 2010)).

Ricks also argues that under *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007),

deference to the state court's adjudication is not required. ECF No. 35 at 6, 9. But

*Panetti* is inapposite. There, the Supreme Court explained that the state court's

failure to provide the petitioner the process mandated by *federal law* was an

unreasonable application of clearly established law—in that case, the Supreme

Court's holding in *Ford v. Wainwright*, 477 U.S. 399 (1986), that the Eighth

Amendment confers a right not to be executed if insane and that minimum

procedures are required to protect that right where a petitioner makes a threshold

showing of insanity. *Panetti*, 551 U.S. at 948–50, 952; *see also Holberg v. Davis*, No.

36

2:15-CV-285-Z, 2021 WL 3603347, at *26 (N.D. Tex. Aug. 13, 2021). Ricks cites no such antecedent constitutional right that the state court's adjudication of his claims violated. Indeed, the absence of *any* constitutional right to a state habeas proceeding necessarily means Ricks cannot rely on any such right. *See Murray v. Giarratano*, 492 U.S. 1, 7–8 (1989) ("The additional safeguards imposed by the Eighth Amendment at the trial stage of a capital case are, we think, sufficient to assure the reliability of the process by which the death penalty is imposed."); *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987). The Court should reject Ricks's argument. Deference applies to the claims the state court adjudicated on the merits.

## II.   Ricks's New Evidence Is Barred from Review

Some of Ricks's claims rely on new evidence not presented to the state court.[5] Specifically:

| | |
|---|---|
| Exhibit 1 | (Sealed): Juror Panel List (with notes) |
| Exhibit 2 | (Sealed): Juror Seating Chart (with notes) |
| Exhibit 3 | (Sealed): A. Stafford Juror Questionnaires (with notes) |
| Exhibit 4 | (Sealed): Lopez Juror Questionnaires (with notes) |
| Exhibit 5 | (Sealed): Invoice |
| Exhibit 6 | Attorney Correspondence with McGarrahan |
| Exhibit 7 | Attorney Correspondence with Kiehl |
| Exhibit 8 | Memorandum of Understanding |
| Exhibits 9-11 | Attorney Correspondences with Kiehl |
| Exhibit 12 | Billing Note MRI |
| Exhibit 13 | (Sealed): MRI Funding |
| Exhibit 14 | Court Order |
| Exhibit 15 | Court Order |
| Exhibit 16 | Attorney Correspondence with McGarrahan |
| Exhibit 17 | Mitigation Specialist Burdette's Memo to Attorneys |
| Exhibit 18 | Attorney Correspondence with Womack |

---

[5]   The exhibits include new items and some that were presented in state court without clear specification as to which is which. The undersigned has done her best to identify the above items and welcomes Ricks to provide record cites if anything above has been included in error.

Exhibit 19 Tarrant County MHMR Recs (JPS Records part of state writ)
Exhibit 20 Attorney Correspondence with Kiehl
Exhibit 22 News Article
Exhibit 23 Notes
Exhibit 24 Notes
Exhibit 25 Garvin County Release Sheet
Exhibit 26 Garvin County Jail Incident Report
Exhibit 28 Declaration of Tommy Maracich
Exhibit 29 Declaration of Luther Brown
Exhibit 30 Declaration of Christine Sudduth*[6]
Exhibit 31 Declaration of Debbie Abner
Exhibit 32 Declaration of Helen Ricks*
Exhibit 33 Declaration of Thomas Abner*
Exhibit 34 Declaration of Keith Griffin*
Exhibit 35 Declaration of Tamara Butts*
Exhibit 36 Declaration of Teshana Singleton*
Exhibit 37 Declaration of Courtland Byrd*
Exhibit 38 8th Administrative Judicial Region records for Bill Ray
Exhibit 39 Email Confirmation of 10-Pax Limousine Rental
Exhibits 40-45 Payment Invoices (itemized portions only)
Exhibit 47 Harold L. Richards High School Diploma
Exhibit 50 Remington College Transcript
Exhibit 53 Sprinkler Fitters Local 281 Records
Exhibit 54 Criminal and Court Docket Report - Casey Brian Morrison
Exhibit 55 Cedric Ricks Stressors
Exhibit 58 Criminal History Records of James Cooper
Exhibit 59 Report of Laura N. Elmore, LMSW-AP
Exhibit 60 Dr. Robert Ouaou's Report
Exhibit 62 Burdette's Notes Re: Rodia Brown

Where any of the above evidence is used to support a claim the state court adjudicated on the merits, it is barred under *Pinholster*, 563 U.S. at 181, 185 ("review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," thus "evidence introduced in federal court has no bearing on § 2254(d)(1) review"). Where any of the above evidence is used to

---

[6] "*" denotes persons that either testified at trial or provided affidavits in the state writ but have now provided updated declarations with additional information. This additional material is barred from consideration.

support an unexhausted or procedurally defaulted claim, it is barred by 28 U.S.C. § 2254(e)(2) and the Supreme Court's recent decision in *Shinn v. Martinez Ramirez*, 142 S. Ct. 1718 (2022). There, the Court held "that, under § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel." *Id*. at 1734. That is because "under § 2254(e)(2), a prisoner is 'at fault' even when state postconviction counsel is negligent." *Id*. at 1735. So "a federal court may order an evidentiary hearing or otherwise expand the state-court record only if the prisoner can satisfy § 2254(e)(2)'s stringent requirements." *Id*.

Thus, Ricks's state habeas counsel's failure to raise claims on habeas review does not permit him to rely on new evidence in support of unexhausted/procedurally defaulted claims. Further, Ricks's claims do not rely on any new constitutional rule, and his inaction forecloses any argument that his claims rely on "a factual predicate that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2)(A). Even if Ricks could satisfy one of those two conditions, he could not demonstrate that his new evidence establishes his actual innocence for the reasons addressed below, 28 U.S.C. § 2254(e)(2)(B).

## III.  Ricks's *Batson* Claim Is Unexhausted, Procedurally Defaulted and Without Merit. (Claim 1).

Ricks argues the prosecution exercised racially-based peremptory strikes against venirepersons A. Stafford and W. Stafford, in violation of *Batson v. Kentucky,* 476 U.S. 79 (1986). ECF No. 35 at 9–23. As will be addressed below, this claim is

procedurally barred from federal habeas review, the newly presented evidence Ricks proffers is barred by § 2254(e)(2), and the claim is meritless.

### A.    Procedural Bar

Although Ricks raised a *Batson* objection at trial, he did not raise a standalone *Batson* claim on direct appeal or in his state habeas application; thus, this claim is unexhausted and procedurally defaulted. *See Young v. Davis*, 835 F.3d 520, 525–26 (5th Cir. 2016) (denying a certificate of appealability as to *Batson* claim that was not presented in state court and therefore defaulted). A procedural default occurs "when a prisoner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement' would now find the claims procedurally barred.'" *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997) (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991). Ricks's unexhausted *Batson* claim is defaulted because the Texas's abuse-of-the-writ doctrine, codified in Article 11.071 § 5(a) of the Texas Code of Criminal Appeals, would procedurally bar his attempt to raise the claim in a subsequent writ application. *See Williams v. Thaler*, 602 F.3d 291, 305–06 (5th Cir. 2010) (holding that petitioner's ineffective-assistance claim was defaulted because, if he returned to state court, the court would not consider its merits under Article 11.071, § 5(a)), *abrogated on other grounds by Thomas v. Lumpkin*, 995 F.3d 432, 440 (5th Cir. 2021); *Beazley v. Johnson*, 242 F.3d 248, 264 (5th Cir. 2001) (unexhausted claims are barred under state law procedural ground).

Therefore, Ricks must demonstrate "cause and prejudice" to overcome the bar or show a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. "Cause"

requires a petitioner to show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017) (a factor is only considered external "if it cannot fairly be attributed to the prisoner"). "Examples of these objective factors include 'interference by officials that makes compliance with the State's procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to counsel.'" *Canales v. Stephens*, 765 F.3d 551, 562 (5th Cir. 2014) (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991) (citation and internal quotation marks omitted)). "[T]he question is whether [the] petitioner possessed, or by reasonable means could have obtained, a sufficient basis to allege a claim in the first petition and pursue the matter through the habeas process." *Id.* (quoting *McCleskey*, 499 U.S. at 498).

Ricks attempts to excuse his failure to properly raise this claim by claiming the prosecution suppressed its jury selection material.[7] ECF No. 35 at 22–23. However, he cites to no authority that he was entitled to the prosecution's work product and, more importantly, the notes were not necessary for Ricks to raise a *Batson* claim. *Cf. Broadnax v. Lumpkin*, 987 F.3d 400, 409 (5th Cir. 2021) (concluding newly discovered spreadsheet indicating the prosecutor memorialized veniremembers races and genders did not fundamentally alter the petitioner's *Batson*

---

[7]    Ricks does not assert that the failure to review the merits of this claim would result in a fundamental miscarriage of justice. ECF 35 at 22–23. He could not make such a showing because he is not innocent. *See Coleman*, 501 U.S. at 748. Nor does he argue in his petition that ineffectiveness of his appellate counsel constitutes cause and prejudice for the default of the *Batson* claim. ECF No. 35 at 22–23; *see Edwards v. Carpenter*, 529 U.S. 446, 452 (2000). Such an argument would fail for the reasons discussed below, Section IV.

41

claim, as it was "no smoking gun" that rendered the prosecution's race-neutral reasons pretextual).

Under state law, the production of a prosecutor's juror selection notes is permitted in limited circumstances—the production of the notes may be "necessary and proper" when the prosecutor refreshes his or her memory regarding the exercise of peremptory challenges by reviewing those notes before the *Batson* hearing. *Pondexter v. State*, 942 S.W.2d 577, 582 (Tex. Crim. App. 1996) ("[A]ppellant is only entitled to the notes if they were actually used by the prosecutor to refresh his memory."); *cf. Goode v. Shoukfeh*, 943 S.W.2d 441, 449 (Tex. 1997) ("[T]he voir dire notes are privileged work product, and the movant may not examine them" without a showing that the notes were relied upon in giving sworn or unsworn testimony). Indeed, the Fifth Circuit has acknowledged that some material developed during jury selection, even if relevant under *Batson*, may be shielded by concerns such as the attorney work product doctrine. *See Broadnax*, 987 F.3d at 407.

Here, at trial, Ricks failed to make a prima facie case and the prosecution did not provide any testimony for its strikes; thus, the production of the notes was not warranted, and the prosecution did not improperly withhold its notes at trial. 30 RR 36–37. Further, the prosecution's jury selection notes do not pertain to Ricks's guilt or innocence and do not fall under *Brady* disclosure requirements. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Broadnax*, 987 F.3d at 407 ("The spreadsheet [containing the prosecutor's jury selection notes] does not pertain to Broadnax's guilt or innocence and therefore fell outside the prosecution's *Brady* disclosure obligations."). In

42

addition, the existence of the notes was discussed during trial, 30 RR 36–37, which Ricks's federal counsel obtained when viewing the physical copy of the prosecution's file, ECF No. 38 at 3–4, and nothing shows that state habeas counsel could not have done the same or asked for the notes directly—especially considering that the State's answer was filed two and a half years prior to the trial court's findings. 2 Supp.SHCR 4 (Order entered July 19, 2019); 4 SHCR 1899 (Proposed Findings filed July 24, 2018); 3 SHCR 1221, 1461–63 (State's Answer, with affidavit, filed December 12, 2016); *see* ECF 44 at 6–12.

More importantly, that Ricks was not precluded from raising a *Batson* claim is evidenced by his state habeas application ground ten, asserting an ineffective-assistance-of-appellate-counsel (IAAC) claim for not raising a *Batson* claim on direct appeal. 1 SHCR 164–77. Rather, appellate counsel made a reasoned decision not to pursue the matter—finding it meritless, 3 SHCR 1448–59. This fact precludes Ricks from establishing cause for failing to raise independent *Batson* claims in state court. *See Brown v. Director*, TDCJ-CID, No. 3:19-CV-2301, 2022 WL 509352, at *6 (N.D. Tex. Jan. 28, 2022), *rec. adopted by*, 2022 WL 504170, at *1 (N.D. Tex. Feb. 18, 2022); *see also Prible v. Lumpkin*, 43 F.4th 501, 516 (5th Cir. 2022) (rejecting district court's finding that petitioner established cause for the default of *Brady* claims because, *inter alia*, the district court "conflated availability of the factual basis for [the] claims with access to evidence supporting them"). This claim is therefore defaulted.

43

Also, Ricks's newly presented evidence to support this claim, PX 1-4, including the complete juror questionnaires,[8] is barred from consideration by § 2254(e)(2) because he failed to develop the evidence in state court. *Martinez Ramirez*, 142 S. Ct. at 1734; *see supra* Section II. Additionally, Ricks cannot satisfy § 2254(e)(2)'s "stringent requirements." *Martinez Ramirez*, 142 S. Ct. at 1734 (quoting *(Michael) Williams*, 529 U.S. at 433). His *Batson* claim does not rely on a new, retroactive rule of constitutional law. 28 U.S.C. § 2254(e)(2)(A)(i). And as discussed above, Ricks fails to show the factual predicate of the claim was previously undiscoverable. 28 U.S.C. § 2254(e)(2)(A)(ii). Nor can Ricks demonstrate through his *Batson* claim that his new evidence "would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(B); *see Broadnax*, 987 F.3d at 407. Indeed, this evidence does not pertain to Ricks's guilt. Therefore, the Court is precluded from considering his new evidence.

In sum, Ricks has failed to demonstrate cause to excuse the default of this claim, i.e., an objective external factor impeded his counsel's efforts to comply with state procedural rules. And for the reasons addressed below, his claim has no merit and, consequently, he cannot demonstrate prejudice. This claim should be denied.

---

[8]   The Director is filing the juror questionnaires under seal pursuant to this Court's Order, ECF No. 16, but it does not appear that the complete questionnaires were forwarded as part of the state appellate record and are thus barred. *See* 2 CR 546. In his state writ, Ricks provided only the first page of the questionnaires and did not engage in an extensive comparative analysis. 3 SHCR 1063—1186; 4 SHCR 1652 (order providing counsel access), 1962 (findings). *See Ramey v. Lumpkin*, 7 F.4th 271, 281 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 1442 (2022) (finding no clear federal law that requires a state court to "*sua sponte* find and consider all facts and circumstances" relating to a peremptory strike challenge).

### B.      Relevant State Court Findings

In state court, Ricks bootstrapped his *Batson* claim to an IAAC claim. Appellate counsel provided a responsive affidavit, 4 SHCR 1534–67, and the state habeas court entered relevant findings, *id*. at 1958–66. The state court noted that at trial, Ricks requested a *Batson* hearing challenging the prosecution's peremptory strikes against A. Stafford and W. Stafford, both African American females, and Flores, who had a Hispanic surname. *Id*. at 1960; 30 RR 25–26. The record further reflects: that Ricks struck Hernandez, a Hispanic female, Bean, an African-American male, and Dawson, who was half Hispanic; that the prosecution accepted two African-Americans and two Hispanics, and struck one person with a Hispanic surname and two African Americans; and that the trial court found that Ricks "failed to make a *prima facie* case of racial discrimination because, 'just based on the numbers,' the State did not strike 'a disproportionate number of persons on the prospective jury panel of a cognizable race, minority.'" 4 SHCR 1960; 30 RR 30–35. The habeas court also considered the habeas affidavit filed by prosecutor, Robert Huseman, providing explanations for the strikes he would have given had he been called to do so, and determined that the record supports the articulated reasons and that the court "would not have found that the State's explanations for exercising its peremptory challenges on [A.] Stafford, [W.] Stafford, or [R.] Flores were a mere pretext for racial discrimination" and that the "State did not exercise peremptory challenges on [A.] Stafford, [W.] Stafford, or [R.] Flores for racial reasons."[9] 4 SHCR 1962.

---

[9]      The prosecution's stated reasons will be address below, subsection E.

## C. *Batson* caselaw

Claims of race-based use of peremptory strikes are governed by the three-step test enunciated in *Batson*, 476 U.S. 96–98. *See Rice v. Collins*, 546 U.S. 333, 973 (2006). A defendant must first make out a *prima facie* case that race motivated the challenged strikes. *Batson*, 476 U.S. at 96–97. A prima facie case is one that raises an adverse inference of racial discrimination. *Id.* at 96. *Batson* lists factors that might undergird a prima facie case, such as a party's pattern of strikes, a party's statements during voir dire and when exercising a strike, and whether "any other relevant circumstances raise an inference that [a party] used [peremptory strikes] to exclude the veniremen from the petit jury on account of their race." *Id.* at 96–97. If such a showing is made, the prosecutor must then provide race neutral explanations for the strikes in question. *Id.* at 97–98. "The second step of this process does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 767–68 (1995) (per curiam). "[S]o long as the reason is not inherently discriminatory, it suffices." *Rice*, 546 U.S. at 974. Finally, the trial court must weigh the evidence and determine whether the race neutral explanation is credible or whether it is merely pretext for purposeful discrimination. *Batson*, 476 U.S. at 98. The final step "largely will turn on evaluation of credibility." *Id.* at 98 n.21.

In turn, "[c]redibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) (*Miller-El I*). In short, the trial court considers the relevant circumstances bearing upon racial animosity. *Miller-El v. Dretke*, 545

46

U.S. 231, 239 (2005) (*Miller-El II*). But "the best evidence often will be the demeanor of the attorney who exercises the challenge." *Hernandez v. New York*, 500 U.S. 352, 365 (1991) (plurality opinion).

A trial court's denial of a *Batson* claim "is entitled to 'great deference' and 'must be sustained unless clearly erroneous.'" *Felkner v Jackson*, 562 U.S. 594, 598 (2011) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008)). That, however, "is the standard on direct review," but AEDPA imposes an even higher standard of review which "'demands that state-court decisions be given the benefit of the doubt.'" *Id.* (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)). "Therefore, the federal court's role is to 'determine whether the trial court's determination of the prosecutor's neutrality with respect to race was objectively unreasonable and has been rebutted by clear and convincing evidence to the contrary.'" *Hoffman v. Cain*, 752 F.3d 430, 448–49 (5th Cir. 2014) (quoting *Murphy v. Dretke*, 416 F.3d 427, 432 (5th Cir. 2005)).

**D.  Ricks failed to make a prima facie case of racially-based strikes.**

Before shifting the burden to the prosecution to provide racially neutral explanations for strikes of venirepersons based on race, Ricks must establish a prima facie case of discriminatory strikes. *Batson*, 476 U.S. at 96. He must demonstrate that a totality of the relevant circumstances gives rise to an "inference of discriminatory purpose." *Johnson v. California*, 545 U.S. 162, 168 (2005) (quoting *Batson*, 476 U.S. at 93–94). The Supreme Court in *Batson* expressed its "confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination." *Batson*, 476 U.S. at 97. Moreover, the state court's determination

47

that Ricks failed to make a prima facie case, 4 SHCR 1966, is presumptively correct, and Ricks has the burden of rebutting the presumption with clear and convincing evidence. *Austin v. Davis*, 876 F.3d 757, 778 (5th Cir. 2017) (AEDPA's presumption of correctness applies "even if no claims were presented on direct appeal or state habeas"); *Williams v. Cain*, 359 F. App'x 462, 465–66 (5th Cir. 2009) (citing *Soria v. Johnson*, 207 F.3d 232, 239 (5th Cir. 2000)); *see Valdez*, 274 F.3d at 948 n.11.

Looking to the totality of the relevant facts, Ricks fails to establish that the trial court incorrectly determined that the prosecution's use of peremptory strikes did not raise an inference of discriminatory intent. At trial, Ricks challenged the strikes of A. and W. Stafford, 30 RR 26, and noted that the questioning of A. Stafford lasted an hour and a half, which was "probably the longest voir dire", *id*. at 32. The record supports the trial court's finding that Ricks did not make a prima facie case. *Id*. at 35, 37. Specifically, the prosecution exercised ten of its thirteen peremptory strikes (or 77%) on white venirepersons, two of the thirteen strikes (or 15%) against African American venire persons, and the prosecution accepted two African American persons, one of whom was empaneled on the jury (the other was struck by Ricks, 30 RR 19). 30 RR 14–25, 34.  Of the 120-member panel, fifteen were African American, or 12.5%. 3 SHCR 1063-1186 (redacted juror questionnaire excerpts); ECF No. 18-1, PX 1.[10] Similarly, if only the members within the strike zone are considered, African Americans comprised of 11%, or four out of the first thirty-six persons. *Id*. As noted,

---

[10]     "PX" refers to petitioner's exhibits filed with his federal petition, followed by the exhibit number(s). *See also* 3 SHCR 1188-89 (spreadsheet prepared by Ricks's habeas counsel noting the strikes made within the strike zone).

the prosecution exercised 15% of its strikes on African Americans, consistent with the group's representation. Though the prosecution struck two of the four, or 50%, African Americans within the strike zone, Ricks cannot show purposeful discrimination based on these small numbers. *See also Hassan v. State*, 369 S.W.3d 872, 876–77 (Tex. Crim. App. 2012) (observing that small sample sizes hinder the reliability of statistical disparities and that "a prima facie case can rarely, if ever be based solely on a statistical analysis when fewer than three strikes have been used".); *see also Woodward v. Epps*, 580 F.3d 318, 339 (5th Cir. 2009) ("For example, if there are only 3 black members of a 100-member venire panel, i.e., 3% black, there is a weaker argument that exclusion of 100% of the black members evidences purposeful discrimination.").

As for the prosecution's longer questioning of A. Stafford, the record reflects that the questioning in general was anywhere from forty-five minutes to an hour, with others going over the one-hour mark. *See* 18 RR 94 (prosecutor informing veniremember Harward that questioning anticipated at forty-five minutes to one hour), 201 (defense noting that an hour spent talking to Harward, questioning resumed when challenge for cause denied), 294 (court remarking to venireperson Fry that it may take thirty minutes to two and one-half hours); 20 RR 51 (forty minutes of questioning of Bean), 75 (prosecutor anticipating an hour of questioning for Mason), 334 (an hour of questioning of Blagg); 21 RR 90 (over an hour of questioning of Stevens); 29 RR 66 (an hour for Guckel, noting some went to an hour and half to two hours). Though the trial court did not explicitly address this comment in its

ruling, 30 RR 36, the denial of Rick's objection suggests the trial court did not find it persuasive and Ricks has failed to show otherwise. *See Valdez*, 274 F.3d at 948 n.11 ("The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact."); *Davis v. Ayala*, 576 U.S. 257, 273–74 (2015) ("A trial court is best situated to evaluate both the words and the demeanor of jurors who are peremptorily challenged, as well as the credibility of the prosecutor who exercised those strikes . . . and 'in the absence of exceptional circumstances, we [will] defer to the trial court.'") (citations omitted).

Finally, Ricks's reliance on the prosecution's jury selection notes to challenge the state court's determination is inappropriate because the notes were specifically not made part of the state record when the trial court denied trial counsel's request. 30 RR 37; *see Broadnax*, 987 F.3d at 407 (declining to extend an exception to *Pinholster* in review of a *Batson* claim based on federal habeas counsel's newly obtained prosecutor's jury selection spreadsheet). Here, the prosecutor did not provide reasons at a *Batson* hearing by relying on his notes. *See, e.g., Goode*, 943 S.W.2d at 449. Even if the court were to consider these additional documents, they do not support an inference of discrimination. *See* ECF No. 18-1, PX 1–4. Ricks maintains that the notations of the race and gender of these venire members on the jury selection material shows a discriminatory intent; however, the list of veniremembers, *id.*, PX 1, includes the gender and race of all the first 120 members that were within the selection zone, and nothing stands out about A. and W. Stafford.

50

Further, the jury seating chart appears to have notations consistent with the discussions that occurred during the *Batson* challenge. *Id.* at PX 2; 30 RR 26–34. In accord, the chart reflects notations of the reasons the prosecutor gave to the *Batson* allegation, noting the African American veniremember struck by the defense as well as the ones struck by the State.[11] *Id.* Additionally, the question marks reflected on this chart are consistent with the questions that took place in court as to the ethnicity of said venire persons.[12] 30 RR 26-31. These exhibits reflect nothing more than a memorialization of the ethnicity and gender of the venire panel and do not render the reasons provided by the prosecutor as pretextual. *See Broadnax*, 987 F.3d at 410 ("The spreadsheet alone is no smoking gun; it fails to render all those reasons merely pretextual."); *see also Moore v. Vanno*y, c, 491 (5th Cir. 2020) (citing *United States v. Stavroulakis*, 952 F.2d 686, 696 (2d Cir. 1992) ("Reference merely to the race of one excused venireman, without more, is insufficient to raise an inference of discrimination.").

In sum, Ricks fails to show that the trial court incorrectly determined that he failed to make a prima facie case of discriminatory strikes. ECF No. 35 at 9–23; *see Batson*, 476 U.S. at 96–97. The state court's determination that Ricks failed to make a prima facie showing is a factual finding entitled to a presumption of correctness

---

[11]     Further, no notations were made beyond those discussed in court, including no indication of the race of other minority members such as number 41, Raglin, an African American (JQ 1641). ECF No. 18-1, PX 2.

[12]     The question mark for Aguiero appears to have been crossed off, consistent with the record reflecting her responses that she was not Hispanic. 30 RR 29.

which can only be rebutted by clear and convincing evidence. § 2254(e)(1); *Ayala*, 576 U.S. at 271. Ricks has not met his burden.

### E.   A. Stafford and W. Stafford were struck for race neutral reasons.

Importantly, the state court's determination that the prosecution's reasons for the strikes were neutral is reasonable. 4 SHCR 1962; 28 U.S.C. § 2254(d). As discussed below, Ricks fails to show the prosecution's strikes violated *Batson*.

### 1.   A. Stafford

In his habeas affidavit, the prosecutor explained his reasons as follows:

> **Veniremember Alicia Stafford**: She indicated in her juror information sheet that she was not in favor of the death penalty. She was 45 years old with no children. I generally do not want to accept veniremembers who have no have children because it is my belief that they are not as invested in the community. She had a brother who received a 25-year prison sentence for murder. I generally do not want to accept veniremembers with relatives or friends who are in trouble with the law with family members who have been convicted of a crime. She had prior jury service that resulted in a not guilty verdict. She expressed distrust in the criminal justice system in her questionnaire. She stated that she did not always feel that everyone is treated fairly in the criminal justice system. She stated that there is much room for improvement in the criminal justice system.

3 SHCR 1462. On her questionnaire, A. Stafford marked that she was not in favor of the death penalty, did not provide arguments for or against the death penalty, and indicated that she believed that the death penalty had been used in an unfair or discriminatory manner. JQ[13] 386 (#s 10, 17, 18, 20). She expressed her opinion, that the criminal justice system does not always treat everyone fairly and there was much

---

[13]     "JQ" refers to the juror questionnaires followed by the blue page number at the bottom of the document: the undersigned added the blue page numbers. Per this Court's Order, ECF No. 16 at 4, these documents will be filed under seal.

room for improvement. JQ 399 (#123). She also noted that her brother was incarcerated for murder. JQ 401 (#142). At voir dire, she confirmed she had prior jury service on a sexual assault case and an evading arrest case. 15 RR 71. She testified that the evading arrest trial took place a couple of years prior in the same building, though she did not remember the court or judge, and it resulted in a verdict of not guilty because the prosecution had not proved the case beyond reasonable doubt. *Id.* at 71–73, 102–03. As for her brother, he was on parole for a murder conviction—he received a twenty-five-year sentence of which he served eighteen years. *Id.* at 82–83, 86. She explained that her brother had taken a plea deal on the advice of his lawyer, but she did not feel that it was a fair outcome. *Id.* at 83–85. She also had a brother-in-law incarcerated but was not close to him. *Id.* at 87.

This record supports the habeas court's finding of race neutral explanations. 4 SHCR 1962 (#s16–19). Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral. *Purkett*, 514 U.S. at 768 (citation omitted); *see also Rice*, 546 U.S. at 338 (*Batson* "does not demand an explanation that is persuasive, or even plausible; so long as that reason is not inherently discriminatory, it suffices.") (citing *Purkett*, 514 U.S. at 767–68). Opposition to the death penalty is a race-neutral explanation, as are prior jury service where it could give the prosecutor "pause" and a veniremember's family member's "carceral status." *Ayala*, 576 U.S. at 271–72, 284; *Rhoades v. Davis*, 914 F.3d 357, 382–83 (5th Cir. 2019). So too is a venireperson's vacillation on whether he or she could impose a death sentence: "The prosecution's reluctance to take a chance that [a

venire member] would ultimately be willing to consider the death penalty in accordance with state law did not compel the trial judge to find that the strike of [the venire member] was based on race." *Ayala*, 576 U.S. at 280.

### 2.   W. Stafford

The prosecutor addressed W. Stafford in his affidavit as follows:

> **Veniremember Wanda Stafford:** She was an ordained minister whose discussion regarding forgiveness caused me concern. She discussed her concept of grace and her belief that it extends to everyone. When discussing the mitigation issue, she stated that her idea of grace or the idea that somebody is just a human being could be enough to spare their life. Her mother was at one time incarcerated in prison. I generally do not want [to] accept veniremembers with relatives or friends who are in trouble with the law or with family members who have been convicted of a crime. She also had spent six days in the Tarrant County Jail after being booked on a theft-by-check case.

3 SHCR 1462. W. Stafford responded in the questionnaire that she is in favor of the death penalty, that the best argument against the death penalty was that "God is the ultimate judge"; and that "God has allowed the laws of the land by man" and "[w]e have to honor that." JQ 1048 (#s 10, 17,18). During voir dire, she explained that she was an ordained minister at a church consisting of some twenty-five to thirty members. 20 RR 218. On her views, she stated that she would "allow God to do the judging, because [she doesn't] judge." *Id.* at 268. But then confirmed she could sit on the jury and answer the special issues where the death penalty was imposed. *Id.* at 268–70. She agreed that "the idea of grace or the idea that somebody is just a human being, that could be enough to spare someone's life." *Id.* at 280. W. Stafford's mother went to prison for arson when Stafford was young. *Id.* at 271. She had also been the victim of domestic violence. *Id.* at 274. W. Stafford confirmed that her bankruptcy

54

and her son's diagnosis of schizophrenia were causing her stress, though she did not think it would interfere with her being on the jury. *Id.* at 214–17; JQ 1053–54. She also believed she could put aside her personal issues with domestic violence if she were on the jury. 20 RR 221–22.

The prosecution was under no obligation to believe W. Stafford, or trust that she, even with her best effort, could set aside her feelings if she were actually empaneled. *See Hoffman*, 752 F.3d at 449; *Garcia v. Stephens*, 793 F.3d 513, 529 (5th Cir. 2015). The record supports the prosecution's race-neutral explanations and the trial court's finding. *See Rhoades v.* 914 F.3d at 378 ("A state court's *Batson* ruling is a finding of fact "accorded great deference" on habeas review.") (citing *Hernandez v. New York*, 500 U.S. 352, 364 (1991)). Given this substantial record-based evidence, Ricks has certainly not rebutted by clear and convincing evidence the presumption that the State acted properly.

### F.    Ricks's allegations of racial motivation are unpersuasive.

As stated by the Supreme Court,

> To be clear, disparate questioning or investigation alone does not constitute a *Batson* violation. The disparate questioning or investigation of black and white prospective jurors may reflect ordinary race-neutral considerations. But the disparate questioning or investigation can also, along with other evidence, inform the trial court's evaluation of whether discrimination occurred.

*Flowers v. Mississippi*, 139 S. Ct. 2228, 2248 (2019). "[A] *Batson* claim will not succeed where the defendant fails to rebut each of the prosecutor's legitimate reasons." *Sheppard v. Davis*, 967 F.3d 458, 472 (5th Cir. 2020) (citing *Fields v. Thaler*, 588 F.3d 270, 277 (5th Cir. 2009) and *Stevens v. Epps*, 618 F.3d 489, 500 (5th Cir. 2010)).

1.    **A. Stafford**

Relying on *Miller-El II*, Ricks challenges the prosecution's explanation by comparing A. Stafford with several other jurors. ECF No. 35 at 13–19. Ricks begins by contrasting A. Stafford with white juror Attebery contending that A. Stafford's answers on her questionnaire were more favorable to the death penalty; that A. Stafford's views on the criminal justice system "were markedly similar" to Attebery's; Attebery believed her uncle had been falsely convicted; that both had close family members who had been convicted of a crime; and that they were disparately questioned about their impressions of the criminal justice system with A. Stafford being questioned at length while Atterby was only asked a few questions. ECF No. 35 at 13–19

The two had important differences, however. Although Attebery had reservations about the death penalty, she had a child, and she did not believe that the death penalty had been applied unfairly. JQ 99, 102. Atterbery's prior juror service resulted in a guilty verdict. JQ 110–11. Attebery testified that she had an uncle that may have been falsely convicted of abusing his son in Missouri but explained that she was not close to them. 12 RR 197–98. Although Attebery's son was charged with domestic violence against his girlfriend, he received deferred adjudication, and Attebery expounded that he had to take ownership of the situation and the consequences. *Id.* at 198–204; JQ 108.  In contrast A. Stafford's brother had been incarcerated for murder and served a significant time in prison, and she did not think it a fair outcome. 15 RR 83–86. The Fifth Circuit has rejected similar claims where the stricken veniremembers were more closely related or connected to people

56

they knew who had served time in prison compared to the seated jurors. *Rhoades*, 914 F.3d at 382–83.

Ricks next compares juror Flint, who answered on his questionnaire that he had a son who was or had been in prison or jail but was not questioned about his son's time in jail. ECF No. 35 at 18. To begin, Flint was in favor to the death penalty and had several children. JQ 674 (#10), 677 (#32). Flint noted on the questionnaire that his son had been to jail for "minor traffic violations and warrants," JQ 684 (#95), whereas A. Stafford's brother spent several years in prison for murder. 15 RR 83–86; *see also Rhoades*, 914 F.3d at 383 ("A prospective juror's family member's carceral status has been credited as a race-neutral rationale for a peremptory strike and when comparing seated jurors who a defendant argues were similarly situated, this court has countenanced distinguishing between the crimes of those related to veniremembers.") (citations omitted).

Ricks contends that the prosecutor's reason that he did not want jurors with no children was pretextual because jurors Twietmeyer, Lemay and alternate juror Smith indicated they had no children. ECF No. 35 at 18. However, unlike A. Stafford, Twietmeyer, JQ 33 (#10), Lemay, JQ 1223 (#10), and Smith, JQ 1621 (#10), were in favor of the death penalty. Moreover, the State did accept other African American veniremembers with children: Bean, JQ 831, and Barnes, JQ 963.

Finally, Ricks contrasts the questioning of A. Stafford's prior juror service, with the questioning of jurors Flint, Dorman, and Attebery who were not questioned about their prior service. ECF No. 35 at 18. However, A. Stafford's unclear responses to the

57

questionnaire, reflecting a possible not guilty verdict from a Tarrant County case, invited further questioning. JQ 397–98 (#103–11). Specifically, A. Stafford indicated that she had served on two prior juries—a sexual assault of a child in Denton, Texas, and an evading arrest in Tarrant County; that she did not remember the dates; that a verdict was reached in Tarrant County, but the jury did not assess punishment; and that the defendant left in the Denton case. *Id.* Unlike A. Stafford's more relevant jury service in Tarrant County, JQ 398, Flint's prior juror service, was a distant 1983, property damage case, JQ 684–85, and Dorman's a DUI from a few years prior, JQ 154–55. Finally, Attebery clearly noted her service involved a 1995 juvenile capital murder case where they entered a verdict of guilt and sentence of thirty years, JQ 110–11. Ricks fails to show a racial motivation when the prosecution had legitimate concerns to address regarding Stafford's more recent juror service. *See also Rhoades*, 914 F.3d at 382–83.

### 2.   W. Stafford

Ricks claims the prosecution disparately questioned W. Stafford by identifying Ricks in the courtroom and repeatedly asking if she understood that the State was asking for him to be executed; by expressing concern with her involvement in church ministry but not objecting to seating jurors Hedrick and Dorman; and by not striking juror Attebery, a white woman who also had a family member serve time in prison. ECF No. 35 at 19–22. This claim is without merit.

To begin, the prosecutor also identified Ricks to Hedrick, pointed him out at the defense table, and alerted that "we're going to stand up at some point during the trial and ask a jury to vote on those special issues in such a way that person receives

58

the death penalty. Okay? By lethal injection." *Compare* 24 RR 129, *with*, 20 RR 270 (W. Stafford). The prosecutor had concerns regarding Hedrick's ability to follow the law, as shown by the linked questions. 24 RR 129 (Q: "You know you're active in your church. So you have a strong faith, right? .... Can you take part in this process? A. Yes."); *see also* 20 RR 268 (asking W. Stafford if her training in the ministry would interfere with her ability to follow the law on death penalty).

More concerning, in her questionnaire W. Stafford based both her responses to the argument in favor or against the death penalty on God as the ultimate judge and man as the follower, JQ 1048, indicated that she had studied for the ministry, JQ 1052, and expressed that her political preference and philosophical views sided with what the bible says, JQ 1053. Neither Dorman nor Hedrick noted such strong philosophical views on their questionnaires. JQ 147–48, 1560. Also at voir dire, upon inquiry by the prosecutor, W. Stafford stated that she would "allow God to do the judging" because she did not judge yet could sit on the jury. 20 RR 268. Dorman, however, did not express conflicting answers in voir dire, and indicted that some people were "beyond rehabilitation". 13 RR 108–11, 116–18; JQ 143 (#12). As for Hedrick, when asked about being a youth minister, he replied that he is an IT director, but he works with students and was setting up the online stream for the service including chatting online, and he did not believe his church had a position on the death penalty. 24 RR 118–19. Unlike Stafford, Hedrick did not have such a prominent role in church and did not give conflicting answers. The prosecution was under no obligation to believe, or trust that W. Stafford, even with her best effort,

59

could set aside her feelings if she were empaneled. *See Hoffman*, 752 F.3d at 449; *Garcia*, 793 F.3d at 529.

As for Attebery's family member in prison, as discussed, it was a distant uncle, 12 RR 197–98, unlike W. Stafford's mother, JQ 1058. Finally, W. Stafford herself spent time in jail. JQ 1058; 3 SHCR 1462. In light of this record, Ricks again fails to rebut the prosecutor's race neutral reasons. *See Ayala*, 576 U.S. at 271–72, 284; *Rhoades*, 914 F.3d at 382–83.

In short, this claim is defaulted and without merit. As noted, Ricks fails to rebut each of the prosecutor's reasons. *See Sheppard*, 967 F.3d at 472 (citing *Fields*, 588 F.3d at 277, and *Stevens*, 618 F.3d at 500 ("[A] *Batson* claim will not succeed where the defendant fails to rebut each of the prosecutor's legitimate reasons.")). Finally, as distinguished from *Miller-El II*, 545 U.S. at 263, Ricks presented no evidence that the district attorney's office had "a specific policy of systematically excluding blacks from juries," nor did the prosecution employ manipulative questioning or "jury shuffles" to remove African Americans, *id*. at 254, 261. The claim should be denied.

## IV.   The State Court Reasonably Determined that Appellate Counsel Was Not Ineffective for Not Challenging the State's Use of Peremptory Strikes. (Claim 2).

In his second claim for relief, Ricks incorporates by reference the facts alleged in support of claim one above and raises an IAAC claim alleging counsel failed to challenge the trial court's ruling that Ricks failed to make a prima facie case under *Batson*. ECF No. 35 at 23–27.  Ricks raised the IAAC claim as his tenth ground in his state habeas application, and the CCA denied relief, finding that Ricks had not met

60

his burden under *Strickland v. Washington*, 466 U.S. 668 (1984). *Ex parte Ricks*, 2020 WL 6777958 at *1. Ricks fails to rebut the presumption of correctness afforded to the state court's factual findings or show the state court's rejection of the claim was an unreasonable application of federal constitutional law. 28 U.S.C. § 2254(d)(1) and (e)(1). Finally, to the extent he incorporates evidence from his claim one that was not presented in state court, in particular the new exhibits and extended juror questionnaires discussed above, it is barred pursuant to *Pinholster*, 563 U.S. at 181.

### A.   The *Strickland* standard under AEDPA

The same two-pronged standard for evaluating ineffective assistance claims against trial counsel announced in *Strickland*, applies to complaints about the performance of counsel on appeal. *See Smith v. Robbins*, 528 U. S. 259, 285 (2000) (holding a petitioner arguing ineffective assistance by his appellate counsel must establish both his appellate counsel's performance was objectively unreasonable and there is a reasonable probability that, but for appellate counsel's objectively unreasonable conduct, the petitioner would have prevailed on appeal); *see also United States v. Bernard*, 762 F.3d 467, 471 (5th Cir. 2014).To demonstrate deficient performance, Ricks must show "counsel's representation fell below an objective standard of reasonableness," i.e., "prevailing professional norms." *Strickland*, 466 U.S. at 688.

The Supreme Court has admonished that judicial scrutiny of counsel's performance "must be highly deferential," with every effort made to avoid "the distorting effect of hindsight." *Id.* at 689. "[S]econd-guessing is not the test for ineffective assistance of counsel." *King v. Lynaugh*, 868 F.2d 1400, 1405 (5th Cir.

61

1989). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688–89. Accordingly, there is a "strong presumption" that the alleged deficiency "falls within the wide range of reasonable professional assistance." *Id.* at 689. Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. *Strickland*, 466 U.S. at 690–91. Appellate "[c]ounsel need not raise every nonfrivolous ground of appeal, but should instead present solid, meritorious arguments based on directly controlling precedent." *Ries v. Quarterman*, 522 F.3d 517, 531–32 (5th Cir. 2008) (internal quotation marks and citation omitted).

Finally, Ricks must affirmatively prove prejudice that is "so serious as to deprive him of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. This requires him to show a "reasonable probability that but for counsel's deficiencies, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is one sufficient to undermine confidence in the outcome. *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citation omitted). Moreover, when evaluating prejudice, a reviewing court must "consider all the relevant evidence that the jury would have had before it if [the inmate] had pursued a different path—not just the . . . evidence [the inmate] could have presented, but also the . . . evidence that almost certainly would have come in with it." *Wong v. Belmontes*, 558 U.S. 15, 20 (2009). To show prejudice

in the context of an IAAC claim, Ricks "must show that with effective counsel, there was a reasonable probability that he would have won on appeal." *Moreno v. Dretke*, 450 F.3d 158, 168 (5th Cir. 2006).

## B. The state court reasonably determined that appellate counsel's decision was sound.

Ricks cannot overcome the presumption that appellate counsel made a sound strategic decision not to present the *Batson* issue. *See Higgins v. Cain*, 720 F.3d 255, 265–68 (5th Cir. 2013). As found by the state habeas court, appellate counsel, Mary Thornton, upon review of the record, agreed with the trial court's finding that no prima facie case of discrimination had been made and did not believe that the questioning of A. Stafford tilted in favor of such a showing; thus, she made a reasoned strategic decision to not assert the claim. 4 SHCR 1961–62. Specifically, in her affidavit, Thornton, a very experienced criminal attorney, detailed her extensive review of the record and her documentation of every potential point of error, of which she ultimately raised twenty points. 3 SHCR 1426–29. Thornton had marked *Batson* as a potential point of error, but upon review of the record and caselaw, determined that the statistics did not support an inference of discriminatory intent. *Id*. at 1453–54. In particular, she relied on the CCA opinion in *Hassan*, 369 S.W.3d 872, which made clear that "when dealing with a small number of the venire members from a particular racial minority . . . a prima facie case can rarely be made based on statistics alone." *Id*. at 1457. Thornton pointed out that within the strike zone, four veniremembers were African American and one was Hispanic and that even using the percentages provided by Ricks, there was no significant disparity between the

63

strikes used by the prosecution (15% or two of thirteen) to the percent of African Americans on the panel (11%). *Id.* at 1458. Thornton then looked to anything else to demonstrate a case for discrimination, including the hour and a half questioning of A. Stafford, but did not believe that this "one fact tilted the scales in favor of finding that a prima facie case had been made." *Id.* After thorough review, Thornton did not believe that the claim had merit and made the decision not to raise it. *Id.* at 1459. As discussed, *see supra* Section III.D–F, the record supports Thornton's evaluation.

Ricks faults Thornton for relying on *Hassan*—though Ricks does not challenge the holding in *Hassan* but counsel's application of it—claiming she failed to consider other relevant factors beyond the numbers. ECF No. 35 at 26. However, this is inconsistent with Thornton's statement that she reviewed the record for other circumstances to support a *Batson* claim but did not find enough to make a meritorious argument. 3 SHCR 1458–59. As discussed in detail, Section III.D–F, and reincorporated herein, the claim is meritless. *See Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009) ("The law does not require counsel to raise every available nonfrivolous defense. Counsel also is not required to have a tactical reason—above and beyond a reasonable appraisal of a claim's dismal prospects for success—for recommending that a weak claim be dropped altogether.") (internal citations omitted); *Robbins*, 528 U. S. at 285, 288 (counsel is not ineffective for failing to raise every possible point on appeal; instead counsel should raise and brief only those issues he believes have the best chance of success).

Ricks cannot show counsel's performance was deficient. Ricks's conclusory assertion that the state court unreasonably rejected the claim is insufficient. Thus, this Court should conclude the state court reasonably determined Ricks did not satisfy the *Strickland* standard. *Knowles*, 556 U.S. at 123.

### C.   The state court reasonably found no prejudice.

Further, Ricks cannot establish that counsel's decision resulted in prejudice. Had this issue been abated for a hearing, the prosecution would have offered the race-neutral reasons that are supported by the record. *See* 4 SHCR 1961–62. Importantly, the habeas court entered findings that it would not have found the prosecutor's explanations as pretext for racial motivation. 4 SHCR 1962. The trial court's findings are entitled to deference. *See Ayala*, 576 U.S. at 271 ("The opponent of the strike bears the burden of persuasion regarding racial motivation and a trial court finding regarding the credibility of an attorney's explanation of the ground for a peremptory challenge is entitled to 'great deference.'"); *Batson*, 476 U.S. at 98 n.21 (same). Under AEDPA, even more deference must be shown. *Ayala*, 576 U.S. at 271; *Schriro v. Landrigan*, 550 U.S. 465, 473–74 (2007) ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'").

In light of these facts, including the prima facie case determination, and the deferential standard afforded the state court's determination, Ricks cannot meet his burden in showing that had appellate counsel pursued the *Batson* argument on appeal, the result of the proceeding would have differed or that the state's determination was an "unreasonable application" of *Strickland*, nor has he shown

65

that the state habeas court made an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d).

**V.    Ricks's Claim of Ineffective Assistance of Trial Counsel for Failing to Raise a *Batson* Objection on the Basis of Gender Is Unexhausted, Procedurally Defaulted, and Meritless. (Claim 3).**

Ricks argues that the State struck women from serving on the jury based on their gender in violation of the Equal Protection Clause of the Fourteenth Amendment, and counsel's failure to raise a *Batson* objection constituted ineffective assistance of trial counsel (IATC) in violation of the Sixth Amendment. ECF No. 35 at 27–31. This claim is unexhausted, procedurally defaulted, and meritless.

**A.    Procedural bar**

Ricks did not challenge trial counsel's decision not to raise a gender-based *Batson* claim on direct appeal nor on state writ, and his claim is unexhausted and procedurally barred, as he acknowledges. ECF No. 35 at 30. This claim is procedurally barred from review because the Texas's abuse-of-the-writ doctrine, codified in Article 11.071 § 5(a) of the Texas Code of Criminal Appeals, would procedurally bar his attempt to raise the claim in a subsequent writ application. *See Williams*, 602 F.3d at 305–06; *see supra* Section III.A (discussing bar).

Nor can Ricks meet the *Martinez v. Ryan,* 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), exception because he cannot show that (1) his underlying IATC claim is "substantial," *Martinez,* 566 U.S. at 14; or (2) his initial state habeas counsel was ineffective in failing to present this claim in his application. *See id.; Trevino*, 569 U.S. at 429. "To demonstrate that his [IATC] claim 'has some merit,' [the petitioner] must also show that he was 'actual[ly] prejudiced' by trial counsel's

allegedly ineffective assistance," which means not merely a possibility of prejudice but that counsel's actions "infect[ed] his entire trial with error of constitutional dimension." *Ramey v. Davis*, 942 F.3d 241, 255–56 (5th Cir. 2019). For the reasons addressed below, Ricks fails to show that trial counsel were ineffective for not presenting this *Batson* issue. His claim is not "substantial," state habeas counsel was not ineffective for failing to present it, and Ricks cannot show that he was actually prejudiced by trial counsel's alleged omissions.

Ricks cannot show a substantial claim that he was prejudiced by his trial counsel's alleged failure to raise *Batson* objections regarding gender at trial. *See United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument thus cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue"). As will be detailed below, counsel would have had no success in making a *Batson* challenge on gender, and Ricks's conclusory statement that he can establish cause and prejudice, ECF No. 35 at 31, carries no weight; thus, this claim is barred from review.[14] Additionally, the evidence Ricks relies on—the complete juror questionnaires—was not fully developed in state court and is barred by § 2254(e)(2), *see supra* note 8.

---

[14]   Ricks did not brief this claim in his motion seeking a stay of these proceedings. ECF No. 38. Ricks necessarily fails to show good cause for his failure to properly raise this claim, and any subsequent request to stay these proceedings to exhaust this claim would be plainly dilatory since Ricks failed to include it in his motion for a stay.

### B.     The *Strickland* Standard Under AEDPA

The Sixth Amendment, together with the Due Process Clause, guarantee a defendant both the right to a fair trial and the right to effective assistance of counsel. *Strickland*, 466 U.S. at 668. A defendant's claim that he was denied constitutionally effective assistance requires him to affirmatively prove both that (1) counsel rendered deficient performance, and (2) his actions resulted in actual prejudice. *Id.* at 687–88, 690. Importantly, failure to prove either deficient performance or resultant prejudice will defeat an IATC claim, making it unnecessary to examine the other prong. *Id.* at 687. For brevity, the Director incorporates the standard as stated previously in claim 2. *See supra* Section IV.A.

### C.     Ricks cannot show IATC for not raising a *Batson* objection based on gender.

The Supreme Court has extended its ruling in *Batson* to prohibit gender discrimination in the exercise of peremptory challenges. *J.E.B. v. Alabama*, 511 U.S. 127 (1994). In raising a claim of IATC for failure to raise an objection under *J.E.B.*, the Fifth Circuit has said that "[i]f [a petitioner] fails to show that a *J.E.B.* violation occurred, . . . then he also fails to show that [his] attorney's performance was deficient or that she was prejudiced thereby." *Herbert v. Rogers*, 890 F.3d 213, 220 (5th Cir. 2018). A gender discrimination review uses the same analysis as a *Batson* claim. *See J.E.B.*, 511 U.S. at 144. *See supra* Section III.C.

To start, "[t]he petitioner must present a prima facie case that the state discriminated on the basis of gender during the jury selection." *See Hebert*, 890 F.3d at 221 (citing *Reed v. Quarterman*, 555 F.3d 364, 368 (5th Cir. 2009)). Ricks contends

68

that the State used its strikes in a gender discriminatory manner and points out that the prosecution exercised nine of the thirteen peremptory strikes it used against women within the strike zone. 30 RR 15 (Nelson & Chance), 16 (Fought),17 (A. Stafford, Rush, and Benedetti), 19 (Argurieo), 20–21 (W. Stafford), and 21 (Stevens). However, of the thirty-six venirpersons within the strike zone, eighteen were women, or 50%, and the prosecution accepted nine other women. 30 RR 14 (Atterbery), 15 (Dorman and Pence), 16 (Fry), 18 (Hernandez and Harward), 21 (Slezak and Lemay), and 22 (Bowles). Although the prosecution used more than half of its strikes on women, because of their higher percentage of distribution within the strike zone, as compared with the entire pool, the strikes are far from discriminatory and did not result in an under-representation of women on the jury panel, even accounting for the women struck by the defense. The defense struck four of the nine women accepted by the prosecution—Pence, *id.* at 15, Hernandez, *id.* at 18, Haward, *id.,* and Bowles, *id.* at 22. As Ricks acknowledges, 43% of the jury pool comprised of women, ECF No. 35 at 28, and consistent with this distribution, five of the twelve seated jurors, or 41%, were women. 40 RR 138–39. As such, Ricks cannot show that trial counsel could have established a prima facie case of discrimination, and as further discussed below, he cannot show other circumstances or a pattern of discrimination that would support a challenge.

### 1.     The stricken veniremembers.

A review of the record concerning the nine-stricken veniremembers reveals gender-neutral reasons that would lead a prosecutor to believe that they likely would

not look favorably on the State. As already discussed, A. and W. Stafford presented several concerns for the prosecution and, for brevity, that analysis is reincorporated here. *See supra* Sections III.E & F. The remaining seven members (Nelson, Chance, Fought, Benedetti, Aguiero, Rush and Stevens) are discussed in turn.

Nelson indicated on her questionnaire that she was not in favor of the death penalty and that it has been applied in an unfair and biased manner. JQ 77. During voir dire, she confirmed that she is not generally in favor of the death penalty but understood why it could be an option for the parties involved. 12 RR 262–63. Nelson indicated it would be a difficult decision for her to follow the law on capital murder, knowing the possible punishment. *Id.* at 272. After further explanation, Nelson again expressed that because this meant the death penalty, it would be difficult for her to answer the special issues, although if the evidence were there, she could. *Id.* at 289, 293. She then offered that she did not know if she could make the decision— emotionally—and she did not feel that this was the case for her and had a lot of anxiety about this, though she was trying to follow the law. *Id.* at 295–301. When the court inquired if she could follow the law and render a verdict based on the facts, she eventually said yes. *Id.* at 323–27. The court denied the State's challenge for cause. *Id.* at 328.

In her questionnaire, Chance marked that she was not in favor of the death penalty and that she had come to this position five years earlier after reading an autobiography and learned that "so many people were on death row that were innocent." JQ 121. During voir dire, Chance revealed that the book in question was

70

Autobiography of an Execution, by David Dow, and acknowledged Dow's role in that book was to get inmates off death row, not so much to determine innocence. 13 RR 17–19. She had not read or researched cases from the viewpoint of the victim's family. *Id.* at 20. Although she confirmed she could sit on the jury, she appeared to have some misgivings about sending someone to prison for life. *Id.* at 45. Regarding, future "criminal acts of violence" as to special issue one, Chance expressed a personal preference for harm to another rather than property. *Id.* at 50.

Fought expressed favorable responses to the death penalty in her questionnaire, JQ 364, though she missed answering a page, JQ 369; 15 RR 42. When questioned about special issue one including the prison population, she expressed hesitation, 15 RR 35-36, nonetheless she did indicate she would answer the issues appropriately, *id.* at 40. Further, she had a potential date conflict with the trial: she had an out-of-town wedding to attend within days of the anticipated conclusion and a vacation planned not long after. 15 RR 7–8, 10, 45. The timeline of her trip was addressed again by the defense. *Id.* 49, 61.

Although Benedetti indicated on her questionnaire that she was in favor of the death penalty, it was "in rare instances" and she preferred life without parole. JQ 540. When questioned regarding special issue one, Benedetti expressed hesitation and explained that she wanted to be "very sure" and would like to think she could "look at everything . . . very methodically" but recognized it would be emotional for her, although she ultimately would follow the law and not heighten the State's burden of proof. 16 RR 51–52, 53–55. When discussing mitigation, she expressed that she

71

"might be" someone inclined to give a life sentence instead of the death penalty, and then remarked that she may be holding the State to a higher standard. *Id.* at 63–64. After further inquiry, Benedetti testified she could sentence someone to death depending on "how heinous the crime" but then she questioned what weight such a decision would have on her. *Id.* at 67. Benedetti also had plans for a trip in the week after the trial was scheduled for completion. *Id.* at 22.

Aguiero was not in favor of the death penalty and found that it had been used in a discriminatory manner. JQ 850. During voir dire, she explained that the parameters for the death penalty included "cold, callous" crimes with "no passion" and killing for "killing's sake" but that she would have hard time with a "crime of passion." 19 RR 15. She elaborated that she would rather assess a life sentence in a "rage" or "emotional" situation. *Id.* at 17–18. She expressed reservations about the death penalty, although she believed she could follow the law, but hoped the case would not deserve the death penalty. *Id.* at 30, 36, 45–46, 51–52. Aguiero served as a juror in a murder case in the 1990's, which resulted in a verdict of not guilty because the State did not prove an intentional killing since the shooting was random. *Id.* at 23–24. Aguiero's questionnaire indicated her nephew was convicted of murder and serving a seventy-year sentence for killing a two-year-old child. JQ 859; 19 RR 24–26. She explained her belief that her nephew didn't intentionally kill the child—he was "roughhousing." 19 RR 24. And although she agreed he should be punished, she believed his punishment was too severe. *Id.* at 24–26. Regarding future

dangerousness, she expressed that "criminal acts of violence" against people were in a different category than violence toward property. *Id.* at 41.

In her questionnaire, Rush indicated she was not in favor of the death penalty and did not believe that the death penalty should be assessed but would assess it under the proper circumstances and then filled in that she did not "want to condemn someone to death." JQ 474–75. During voir dire, though she said she could sit on a capital murder trial, the prosecutor noted some hesitation. 15 RR 276. The prosecutor remarked that based on her response on the juror questionnaire he had concerns she would place a higher burden on the State than the law required. *Id.* at 287. Rush responded that she could follow the law. *Id.* at 288.

Stevens indicated that she was not in favor of the death penalty and that God was "the judge for man's length of life." JQ 1114. During voir dire, Stevens could not provide a clear answer on her position and needed to "have all the information" before making a decision. 21 RR 16–17. When asked about her juror questionnaire referring to God, she became emotional on the stand and explained that she has prayed on this and would do what she needed to do, basing all her decisions on how her faith leads her. *Id.* at 19–20. Regarding her reply of "private" on the questionnaire as to the discriminatory use of the death penalty, she elaborated mistakes have been made. *Id.* at 22. Stevens showed some confusion over the special issues and their determination. *Id.* at 64–67, 75–79. Stevens began "laughing and crying" when discussing her parents, recounting that she had witnessed abuse in their marriage. *Id.* at 82–83.

### 2.   **Ricks cannot establish a pattern of discrimination**.

Ricks's attempts to show discriminatory intent fall short. Just on a practical level, it makes no sense that the prosecution would want to exclude women from serving on a jury involving the violent attack of a mother and her two young children. Nevertheless, Ricks challenges the strikes, pointing to the juror questionnaires where three of the women (Fought, Benedetti, and W. Stafford) indicated that they were in favor of the death penalty and believed it served a legitimate interest, as did the similarly situated five male jurors (Twietmeyer, Duckett, Flint, Barnes, and Fry) and both male alternates (Hedrick and Smith). ECF No. 35 at 28. For one, the prosecution accepted several women who answered that they were in favor of the death penalty: Dorman, JQ 143; Pence, JQ 210; N. Fry, JQ 320; Hernandez, JQ 740; Harward, JQ 784; Lemay, JQ 1223; and Bowles, JQ 1399. Twietmeyer, JQ 33–34, Duckett, JQ 55–56, Flint, JQ 872–73, Barns, JQ 960–61, and Fry, JQ 982–83, expressed more favorable opinions about the death penalty. More importantly, as noted above, Benedetti indicated that she would prefer to give a life sentence and may hold the State to a higher standard, 16 RR 63–64; Stafford showed a strong religious influence, 20 RR 268, 280; and Fought hesitated on the special issue and had potential date conflicts, 15 RR 7–8, 10, 42, 49, 61.

Next, Ricks claims four of the women (Nelson, Chance, A. Stafford, Rush) indicated that they were not in favor of the death penalty but that the death penalty served a legitimate interest, just as seated male juror Guckel. ECF No. 35 at 28. Again, Ricks discounts that the prosecution did accept Atterbery, a female juror, who made the same selection. JQ 77. Additionally, Guckel qualified his "not in favor"

74

selection on the juror questionnaire by stating that he would be in favor under "special circumstances." JQ 2084. During voir dire, Guckel explained that the death penalty was appropriate for multiple murders. 29 RR 13.

Ricks adds that several women (Chance, Fought, A. Stafford, Benedetti and W. Stafford) indicated their belief that the death penalty was appropriate in some cases, similar to the male jurors (Twietmeyer, Duckett, Flint, Barnes, Fry, Guckel, and Schubert) and both alternates (Hedrick and Smith). ECF No. 35 at 28. Again, Ricks overlooks that several of the women seated on the jury also answered the question this way: Dorman, JQ 144; Fry, JQ 321; Slezak, 1137; and Lemay, JQ 1224. Additionally, the prosecution did not strike Pence, JQ 211, Hernandez, JQ 741, Harward, JQ 785, and Bowles, JQ at 1400, who also provided the same answer. 30 RR 15 (Pence), 16 (Fry), 18 (Hernandez and Harward), 21 (Slezak and Lemay), 22 (Bowles). Again, as pointed out above, the struck venirepersons posed other concerns regarding their willingness to impose a death sentence.

Next Ricks argues that several struck women (Chance, Fought, Argurieo, W. Stafford, and Stevens) expressed positive opinions about the justice system, and were thus similarly situated to male jurors (Duckett, Flint, Barnes, Hedrick), and that others (Rush and A. Stafford) answered in a way that was similar to several male jurors (Schubert, Fry, Smith). ECF No. 35 at 29. Ricks adds that several of struck women (Chance, Fought, A. Stafford, Benedetti, and W. Stafford) answered that punishment by the criminal justice system was "just about right," similarly to several male jurors (Flint, Barnes, Fry) and alternate (Smith). *Id.* Again, Ricks's allegations

do not support a discriminatory intent when women that were seated on the jury or accepted by the prosecution also had similar views. For instance, female jurors Dorman, JQ 143–44, N. Fry, JQ 320–21, and Lemay, JQ 1223–24, also expressed positive views on the death penalty. In addition, Dorman, JQ 156, N. Fry, JQ 333, Slezak, JQ 1149, and Lemay, JQ 1236, indicated in question 125 of the questionnaire that the punishment was "just about right". Veniremembers Hernandez, JQ 753, and Bowles. JQ 1412, struck by the defense, also answered similarly. Again, as summarized above, the stricken veniremembers presented hesitation about the death penalty.

As for the prosecutor's longer questioning of A. Stafford, as already noted, Ricks fails to explain how this supports a discriminatory practice in light of the questioning in general. *See supra* Section III.D.

In sum, the record supports gender-neutral concerns for the prosecution. "The prosecution's reluctance to take a chance that [a venire member] would ultimately be willing to consider the death penalty in accordance with state law did not compel the trial judge to find that the strike of [the venire member] was based on [gender]." *Ayala,* 576 U. S. at 280.

### D.    Ricks fails to show prejudice

Without showing a violation of *J.E.B.,* Ricks has failed to show that his attorney's representation was prejudicial when he did not object to the State's use of its peremptory strikes based on gender. Ricks argues that his burden is met if he establishes a *Batson* violation, and no harm analysis is necessary. ECF No. 35 at 30. Any argument that this particular IATC claim should be examined for harm under

anything other than *Strickland* prejudice is barred as a new rule in federal constitutional law. *Teague v. Lane*, 489 U.S. 288, 310 (1989); *see Tyler v. Cain*, 533 U.S. 656, 666 (2001) ("There is no second case that held that all structural-error rules apply retroactively or that all structural-error rules fit within the second *Teague* exception."), 666 n.7 ("Classifying an error as structural does not necessarily alter our understanding of these bedrock procedural elements."); *see also Hall v. Thaler*, 504 F. App'x 269, 277 n.16 (5th Cir. 2012); *Vasquez v. Thaler*, No. SA-09-CA-930-XR, 2012 WL 2979035, at *47 (W.D. Tex. July 19, 2012) ("[E]xtending the presumed prejudice rule of [*United States v.*] *Cronic*[, 466 U.S. 648 (1984)] to claims of ineffective assistance like those asserted by petitioner herein would run afoul of the non-retroactivity doctrine announced in *Teague* . . ."); *cf Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017) (applying *Strickland* prejudice to an IATC claim that trial counsel allowed structural error by not objecting to courtroom closure).

### E.   Conclusion

To successfully prove IATC for failure to challenge the State's use of peremptory strikes, Ricks must demonstrate an actual *J.E.B.* violation occurred. *Herbert*, 890 F.3d at 220. Ricks does not surmount this hurdle. He fails to show deficient performance and wholly fails to show *Strickland* prejudice. 466 U.S. at 691, 694. More importantly, Ricks acknowledges this claim is unexhausted,[15] ECF No. 35 at 30–31, and simply makes a conclusory assertion that he can establish cause and

---

[15]      Ricks did not request a stay of these proceedings to allow him to exhaust this claim. ECF No. 38. *See supra* note 14.

prejudice under *Martinez/Trevino* for the resulted procedural default. *Id*. As discussed, because the claim is plainly meritless, state habeas counsel could not have been ineffective for not raising it. *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013) Importantly, this Court's review of this claim is limited to the state court record. *Martinez Ramirez*, 142 S. Ct. at 1734–35. Therefore, the claim should be denied as procedurally defaulted.

## VI. Ricks's Claim that His Shackling During Trial Violated His Fifth, Sixth, and Fourteenth Amendment Rights Is Procedurally Defaulted, Alternatively, Meritless. (Claim 4).

Ricks claims that he wore shackles and a shock belt[16] throughout his trial, yet his attorney never objected nor asked the trial court to make the required findings under the Due Process Clause, despite having been granted a pre-trial motion prohibiting shackling. ECF 35 at 31. Specifically, Ricks asserts that during the punishment phase of trial, the jury saw him walk in shackles when he returned to

---

[16]    In state court, Ricks did not claim that he wore a shock belt in the jury's presence.  1 SHCR 114–19. Ricks now relies on a pre-trial discussion where he requested to be moved to a different detention facility because he did not like that he had to wear shackles and a shock cuff when he left his single cell. ECF 35 at 32 (citing 9 RR 19). The trial court responded that it would do what it could regarding his request but that the court did not have authority about the safety measures implemented in the jail. 9 RR 19–20. Nothing in this exchange supports the statement that Ricks wore a shock belt during trial. As a matter of fact, the affidavits submitted by Ricks during his habeas proceeding nowhere mention the shock belt. 2 SHCR 809 (Dwayne Ricks Aff'd, mentions shackles only), 981–84 (Paula Cook's Aff'd referencing shackling of legs only). Although Ricks, without explanation, tacks on the "shock belt" to this sentence, his argument focuses solely on the shackling, therefore, the response above will focus on the shackling. However, to the extent his claim can be construed as making a new allegation as to the shock belt, that allegation is procedurally barred because it was not raised in state court in either the direct appeal or habeas. If Ricks returned to state court to exhaust his claim by filing a successive state application, the application would be dismissed for abuse of the writ. *Coleman*, 501 U.S. at 735 n.1; *Beatty v. Stephens*, 759 F.3d 455, 465 (5th Cir. 2014); *Nobles*, 127 F.3d at 422. Alternatively, as just noted, the record contains no evidence that he wore a shock cuff in either the guilt or punishment phase of trial; thus Ricks's claim is conclusory, and without merit.

trial counsel's table after his testimony. *Id.*; *see* 40 RR 85. Ricks adds that in its closing argument, the State seized on this to support their case on future dangerousness, ECF 35, at 32–33. Ricks claims that this violated his rights under the Fifth, Sixth, and Fourteenth Amendments and that he is entitled to a new penalty phase, citing *Deck v. Missouri*, 544 U.S. 622, 634–35 (2005). This claim is procedurally barred and without merit.

## A.   Procedural Bar

Ricks raised this claim as ground two in his state writ application; however, the state habeas court concluded that Ricks's complaint should have been raised on direct appeal and review for the first time in his habeas application was not proper.[17] 4 SHCR 1946. In accord, the CCA declined to address the merits of the claim directly stating that Ricks had not raised the claim on direct appeal. *Ex parte Ricks*, 2020 WL 6777958, at *1. The CCA has repeatedly held that claims that could have been raised on direct appeal may not be raised in a post-conviction writ of habeas corpus. *Ex parte Gardner*, 959 S.W.2d 189, 198, 200 (Tex. Crim. App. 1996); *see also Ex parte Townsend*, 137 S.W. 3d 79, 81 (Tex. Crim. App. 2004) (writ of habeas corpus should

---

[17]     The doctrine of invited error likewise precludes review of this claim. The state trial court entered additional findings that any potential exposure of the shackles was of Ricks's own doing, thus applying the doctrine of invited error. 4 SHCR 1947 (#5). Under the invited-error doctrine, a defendant is precluded from complaining "on appeal of alleged errors which he invited or induced, especially where the defendant may not have been prejudiced by the error." *Druery v. Thaler*, 647 F.3d 535, 545 (5th Cir. 2011) (quoting *United States v. Green*, 272 F.3d 748, 754 (5th Cir.2001)); *see Soliz v. Davis*, 750 F. App'x 282, 296–97 (5th Cir. 2018). The doctrine applies to federal habeas review as well. *Druery*, 647 F.3d at 546. The Fifth Circuit has held that the invited-error doctrine functions as a state procedural bar, which can only be overcome by the petitioner showing "'cause for the default and actual prejudice as a result of the alleged violation of federal law' or 'that failure to consider the claims will result in a fundamental miscarriage of justice.'" *Id.* (quoting *Neville v. Dretke*, 423 F.3d 474, 480 (5th Cir. 2005)). Ricks cannot meet this showing.

not be used in matters that should have been raised on appeal). The Fifth Circuit has recognized this state procedural bar. *See Harper v. Lumpkin*, 19 F.4th 771, 780–81 (5th Cir. 2021); *Busby v. Dretke*, 359 F.3d 708, 719 (5th Cir. 2004) (recognizing that the rule was firmly established when *Gardner* was decided in 1998).

Federal review of a habeas claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default. *Harris v. Reed*, 489 U.S. 255, 265 (1989); *Michigan v. Chestnut*, 486 U.S. 567, 571 n.3 (1988). For the claim to be barred, the state court's opinion must contain a "plain statement" that its decision rests upon adequate and independent state grounds. *Harris*, 489 U.S. at 263, 266. However, if the state court explicitly invokes a procedural bar and alternatively reaches the merits of a defendant's claim, a federal court is bound by the state procedural default. *Id.* at 264 n.10.

In considering Ricks's claim, the CCA plainly stated that it was relying on a procedural bar. *Ex parte Ricks*, 2020 WL 6777958, at *1. Ricks maintains, however, that because the CCA chose to analyze a freestanding shackling claim in *Ex parte Chavez*, 560 S.W.3d 191, 200–03 (Tex. Crim. App. 2018), the state bar is not firmly and regularly applied and his claim is not defaulted. ECF No. 35 at 49. Ricks's argument is unpersuasive because the procedural bar was applied in that case, and the shackling issue was simply reevaluated to properly address the ineffective-assistance claims raised by Chavez. *See Chavez*, 560 S.W.3d at 200 (stating that "Applicant has procedurally defaulted this claim" but addressed because of his ineffective-assistance claims). In *Chavez*, the CCA disagreed with the lower court's

80

ruling and reexamined the record. *Id.* at 202–03. On its review, the CCA determined that the trial court heard reasons for the shackling, acted within its discretion, ordered that the jury's view of the shackles blocked, and made efforts to ensure the effectiveness of its remedy. *Id.* Based on this, the CCA then held that Chavez had not shown ineffective assistance of counsel, as the habeas court had found. *Id.* at 204. Thus, the CCA both acknowledged the bar and considered the merits of the claim but did not excuse the procedural default. *Id.* at 200; *see Amos v. Scott*, 61 F.3d 333, 341 (5th Cir. 1995) (when CCA uses language addressing both the procedural bar and the merits, "such language must be viewed as signaling an alternative holding independent of federal law, not as an indication that the state court is excusing the procedural default."). Further, even if the CCA occasionally excuses a bar in a particular case, the Fifth Circuit has affirmed that "'regularly' is not synonymous with 'always' . . . and 'we do not regard an occasional act of grace by the Texas court in entertaining the merits of a claim that might have been viewed as waived by procedural default to constitute such a failure to strictly or regularly follow the state's contemporaneous objection rule." *Amos*, 61 F.3d at 342 (citing *Bass v. Estelle*, 705 F.2d 121 (5th Cir. 1983)).

Here, because the CCA clearly relied on a firmly established state procedural bar when addressing Ricks's shackling claim, his claim is procedurally barred unless he can demonstrate cause and prejudice or a miscarriage of justice. *Coleman,* 501 U.S. at 750. Ricks has failed to demonstrate the requisite cause and prejudice, as

Ricks fails to show that he is actually innocent of the crime for which he was convicted or ineligible for capital punishment.

**B.     No Due Process violation**

Alternatively, Ricks's rights were not violated during the punishment phase of his trial because the jury's view of the shackles was obscured by the curtain placed around counsel table and exposure, if any, was a result of Ricks's own volitional conduct of walking back to counsel table following his testimony, even though he knew he was not to be seen by the jury in shackles. 4 SHCR 1941–44. More importantly, Ricks cannot show that the potential of a brief, inadvertent exposure to the jurors of the shackles influenced the jury's punishment verdict.

**1.     State court findings**

Though the CCA found this claim defaulted, the state trial court also addressed the claim on the merits. Ricks challenged the shackling and counsel's alleged failure to object to the shackling—grounds two and three—in his state writ. 1 SHCR 114-21. The state court addressed the claims together. 4 SHCR 1940. Prior to trial, defense counsel asked the trial court to use the least amount of restraint as possible and that if the court felt that Ricks should be "leg ironed" that a curtain be placed around the tables so that the jury would not see them—the request was granted. 4 SHCR 1941; 5 RR 73–74; 1 CR 171. On habeas review, the court found that Ricks did not lodge any objections to the use of shackles; that Ricks did not request the trial court to make any specific findings on the record regarding the use of shackles; that Ricks "never entered or exited the courtroom in the jury's presence while wearing shackles"; and that "[t]hree-sided floor-length skirts were placed around the State's and the

defense's tables throughout the trial to shield [Ricks]'s shackles from the jury's view."

4 SHCR 1941–42. The habeas court also relied on affidavits from Bill Ray (defense

counsel), James Hunter Van Zandt (Deputy), and Randall G. Bannister (Bailiff). 3

SHCR 1371–82 (Ray Aff'd); 1418-19 (Van Zandt Aff'd); 1420-21 (Bannister Aff'd). The

additional findings included:

7. [Ricks] "was well aware that he was not supposed to be seen in front of the jury with shackles on." [Ray's affidavit at 6–7.]

8. When [Ricks] decided to testify at the punishment phase of the trial, he was seated at the witness stand outside the jury's presence so that jurors would not see him in shackles. [Ray's affidavit at 7; RR 40: 26–27.]

9. When [Ricks] finished testifying, "he got up and paraded back to counsel table before anyone could stop him," which "was a complete surprise" to Ray. [Ray's affidavit at 6.]

10. [Ricks]'s actions in returning to the defense's counsel table in the jury's presence "were of his own volition" and "caught everyone by surprise." [Ray's affidavit at 6.]

11. Any exposure of [Ricks]'s shackles to the jury was solely the result of his own volitional conduct of getting up after he testified before anyone could stop him and walking back to the defense table in the jury's presence even though he knew that the jury was not supposed to see him wearing shackles. [Ray's affidavit at 6.]

12. No one in the courtroom took any action as [Ricks] walked back to counsel table that would have indicated to the jury that [Ricks] posed a danger in the courtroom. [RR 40: 85.]

13. Any potential viewing by the jury of [Ricks]'s shackles as he returned to the defense table would have been brief as evidenced by the State's accurate diagram of the courtroom's measurements. [State's Exhibit 6: Courtroom Diagrams of 371st Judicial District Court.]

4 SHCR 1941–43. The court also found that the occurrence was not particularly

impactful as neither of the two bailiffs assigned to the trial even recalled the event

and "no breach-of-protocol report was written to document any such incident"; that Juror Barnes, who submitted an affidavit, was silent on the matter; that by the time Ricks testified, Crooks, a detention officer, "had already testified at the punishment phase that he had not experienced any issues with [Ricks] in the Tarrant County jail . . . and that Ricks was handcuffed and shackled when he was transported out of the area." *Id.* Additionally, the habeas court found: no evidence that the jury was aware of the shackles during the trial other than when the State briefly mentioned them; that the State's argument was based on matters before the jury, in response to prior argument, and a plea for law enforcement; that the court did not create an environment for the potential viewing of the shackles; that the shackling did not prevent Ricks from testifying and did not impact his testimony in anyway; and that Ricks had informed the jury through his testimony that the State had offered him a life sentence, limiting the impact of any potential harm; and thus found no due process violation. *Id.* at 1944–45. These findings are entitled to deference and Ricks retains the burden of rebutting their presumption of correctness in asserting his adjudicated claim. 28 U.S.C. § 2254(e)(1). Ricks fails to overcome that presumption.

### 2. The state habeas court's determinations were not unreasonable.

The United States Supreme Court has held that the appearance of a defendant in shackles before a jury during a trial may violate the defendant's Fifth and Fourteenth Amendment rights to due process. *Deck*, 544 U.S. at 626. Visible shackling is permissible only in the presence of a special need. *Id.* The same principles apply to the punishment phase of a capital trial. *Id.* at 632. "[C]ourts cannot routinely

place defendants in shackles or other physical restraints visible to the jury during the penalty phase of a capital proceeding," absent special circumstances such as security concerns or escape risks specifically related to the defendant on trial. *Id.* at 633. However, the use of restraints does not undermine the presumption of innocence, and no specific finding of a state interest is required if the restraints are obscured from the view of jurors because only "[v]isible shackling undermines the presumption of innocence and the related fairness of the factfinding process." *Id.* at 630; *Chavez v. Cockrell*, 310 F.3d 805, 808–09 (5th Cir. 2002). Moreover, the Fifth Circuit has held that "brief and inadvertent exposure to jurors of defendants in handcuffs is not so inherently prejudicial as to require a mistrial, and defendants bear the burden of affirmatively demonstrating prejudice." *United States v. Diecidue*, 603 F.2d 535, 549 (5th Cir. 1979).

Specifically, Ricks must show that the use of restraints had "a substantial and injurious effect or influence in determining the jury's verdict." *Hatten v. Quarterman*, 570 F.3d 595, 604 (5th Cir. 2009) (quoting *Fry v. Pliler*, 551 U.S. 112, 121–22 (2007) (employing the *Brecht v. Abrahamson*, 507 U.S. 619 (1993), standard)). Further, overwhelming evidence of a petitioner's guilt may be sufficient to render harmless any error in shackling a defendant. *Id.* Recently, the Supreme Court clarified that, "[w]hen a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test this Court outlined in

*Brecht* and the one Congress prescribed in AEDPA."[18] *Brown v. Davenport*, 142 S. Ct. 1510, 1517 (2022).  These are analytically distinct inquiries, and if the petitioner fails to make either showing, then his request for relief must be denied. *Id.* at 1524.

Ricks cannot meet his burden. As reflected by the trial court's findings, Ricks never entered or exited the courtroom in shackles during the jury's presence, and a three-sided table skirt shielded the jury's view of his leg shackles. 4 SHCR 1941. Unlike in *Deck*—where from the first day of trial, Deck was shackled in leg irons, handcuffs, and a belly chain—Ricks only wore leg shackles which were hidden from the jury's view. *Deck*, 544 U. S. at 625. As for Ricks's complaint that the trial court did not articulate any reasons for the shackling, the trial court had considered and granted Ricks's request at trial—the use of the least amount of restraints with a curtain around counsel table. 4 SHCR 1941; 5 RR 73–74; 1 CR 171; *see, e.g., Chavez*, 560 S.W.3d at 203 (finding no trial court error in failing to enter explicit findings when trial court fashioned a remedy agreed to by defense).[19] Nonetheless, the trial court acted within reason. Following the murders, Ricks fled and was apprehended out of state; he attempted to sneak a pencil while attending a pre-trial hearing; he hoarded medicine; he was on suicide watch; and he had a history for escalating violence; thus, the trial court was acting within its discretion to impose shackles. 36

---

[18]     To the extent the state court adjudicated this claim on the merits in the alternative, deference to the state court's decision is required. *Woodfox v. Cain*, 609 F.3d 774, 795 n.7 (5th Cir. 2010); *see Austin*, 876 F.3d at 776–79 (deference given to factual findings even when state high court rejected claims on procedural grounds).

[19]     Though the State had articulated some reasons in *Chavez* for the shackling, 560 S.W.3d at 203, in this case, the issue was not contested after the trial court provided the remedy. 5 RR 73–74.

RR 58, 80; 40 RR 104; 2 CR 450; Statement of Facts, Sections I, & II.A. More importantly, the trial court did not create a circumstance that placed Rick's shackles in view of the jury; it took measures to keep their view obscured; and the court found no evidence that the jury was aware of the shackles during the trial other than when the State briefly mentioned them in closing argument. 4 SHCR 1944–45. Further, any potential viewing of Ricks's shackles was of his own making when he, of his own volition and knowing that the jury was to not see the shackles, returned to counsel table after his testimony at punishment.[20] *Id.*at 1947; *see Druery*, 647 F.3d at 545 (the invited error doctrine precludes complaints of errors induced by defense).

Indeed, any exposure of the shackles as Ricks returned to defense table would have been brief, inadvertent and not inherently prejudicial. *See Diecidue*, 603 F.2d at 549; *see also United States v. Hill*, 35 F.4th 366, 377 (5th Cir. 2022) (even if the jury saw defendant's "shackles when he was removed from the courtroom, this was a brief and inadvertent exposure and an isolated incident."). Although Ricks claims that the State capitalized on this occurrence to argue that he was a future danger, upon review, the state court found that the State's argument was part of a larger argument based on unobjected to trial testimony, in response to defense argument, and a plea for law enforcement. 4 SHCR 1944 (#25). Additionally, Ricks's testimony that the State had offered him a life sentence which he refused further minimized any

---

[20]    Ricks argues that he stepped down from the jury box because the trial court directed him to, ECF No. 35 at 35, when at the conclusion of his testimony, the court stated, "you may step down", 40 RR 8. This statement says nothing about the timing of Ricks's descent and the habeas judge, who presided over the trial, found that Ricks contributed to any potential viewing, 4 SHCR 1942 (#11).Ricks fails to rebut the correctness of the habeas court's findings.

potential harm. *Id.* at 1945 (#34). Finally, the strength of the aggravating evidence of future dangerousness, evidenced by Ricks's lengthy pattern of escalating violence against women, would render harmless any possible error. *See supra* Statement of Facts, Section II.A. As such, Ricks does not present any evidence showing that he was actually prejudiced, let alone that the use of shackles had "a substantial and injurious effect or influence in determining the jury's verdict." *Hatten*, 570 F.3d at 604; *see Brown*, 142 S. Ct. at 1517. In sum, Ricks has failed to meet his burden and show *Coleman* prejudice. 501 U.S. at 750. This claim is procedurally barred and meritless.

## VII.   The State Court Reasonably Rejected Ricks's Claim of IATC for Failing to Object to the Shackling. (Claim 5).

Incorporating the facts from above, Ricks claims that trial counsel was ineffective for failing to object to his appearance at trial in shackles and a shock belt.[21] ECF 35 at 38. Ricks adds that although counsel filed a written pretrial motion, he did not object when Ricks appeared in shackles and did not move the trial court to enter findings on the record for the shackles.[22] *Id.* The state habeas court's denial of this claim was not unreasonable, and Ricks fails to rebut the presumption of correctness afforded to the state court's findings. 28 U.S.C. § 2254(d), (e)(1).

---

[21]   Ricks again expands that he wore a shock belt, a claim not made in state court, and as noted, no evidence supports that a shock belt was worn during trial, let alone that the jury saw it. To the extent his claim incorporates a shock belt allegation, that portion of the claim is procedurally barred and completely lacking in merit. *See Coleman*, 501 U.S. at 735 n.1; *Beatty,* 759 F.3d at 465; *Nobles*, 127 F.3d at 422.

[22]   Ricks did not argue in state court that counsel should have requested the trial court enter findings regarding the need for shackles 1 SHCR 120-21; thus, this argument is also procedurally defaulted., *see Coleman*, 501 U.S. at 735 n.1, and, as will be addressed above, without merit.

The relevant facts outlined in the previous claim, are incorporated herein. *See* Section VI.B.1; *see also* 4 SHCR 1940–49. In addition, the state habeas court determined that defense counsel, not knowing if anyone saw the shackles, made the "sound strategic decision" not to object when Ricks walked back to defense table so not to call attention to the shackles. 4 SHCR 1943 (#16); that trial counsel could have reasonably decided not to object to the State's brief closing argument referring to the shackles to not draw attention to the matter, *id.* at 1944 (#24); that counsel's decisions not to object were reasonable and Ricks failed to meet his burden. *id.* at 1947–49 (#s9–14). The CCA denied relief because Ricks had not met his burden under *Strickland. Ex parte Ricks*, 2020 WL 6777958 at *2. This determination is reasonable.

To establish deficient performance by trial counsel, an inmate must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. There is a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.* at 689. Ricks must also establish that he was prejudiced in that the outcome of the proceedings would have been different. *See id.* An inmate's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

This record supports the state court's finding that trial counsel's actions were neither deficient nor prejudicial. To begin, trial counsel could have reasonably determined that once the trial court granted his request to obscure from the jury's view any leg irons, that additional objections were unnecessary as any error would

have been deemed harmless. *See Chavez*, 560 S.W.3d at 203 (finding no trial court error when trial court took measures to obscure shackles from jury's view); *Bell v. State*, 415 S.W.3d 278 (Tex. Crim. App. 2013) (explaining that error in ordering the defendant to be shackled during the guilt phase of his trial was harmless because there was no "reasonable probability that the jury was aware of the defendant's shackles[ ]"). Further, a trial judge is permitted "in the exercise of his or her discretion, to take account of special circumstances, including security concerns, that may call for shackling." *Deck*, 544 U.S. at 633. The record here showed that Ricks had fled the State to escape punishment for this offense, tried to sneak a pencil during pre-trial hearings, was able to hoard pills while in detention, was on suicide watch, and had a pattern of violence. *See supra* Statement of Facts, Section II.A. Thus, Ricks cannot show that any additional objections on this matter would have had any merit.

In addition, trial counsel made a reasoned and strategic decision not to object to Ricks's shackles as he walked back to counsel table to not draw attention to them if they had not been seen by the jurors. 3 SHCR 1378. Similarly, counsel may have chosen not to object to the State's brief mention of the shackles in closing argument, and as found by the trial court, the State's argument was proper and any potential harm was mitigated by other testimony, including Ricks's affirmance that the State had offered him a life sentence. *See supra* Section VI.B; *see also, e.g., Charles v. Thaler*, 629 F.3d 494, 502 (5th Cir. 2011) (citing *Walker v. United States*, 433 F.2d 306, 307 (5th Cir. 1970), which held that "[s]ince an objection may tend to emphasize a particular remark to an otherwise oblivious jury, the effect of objection may be more

90

prejudicial than the original remarks of opposing counsel"). As noted above, the shackles were hidden from the jury's view, any exposure was of Ricks's own making, was brief, and it was unknown if seen by the jurors. *See also United States v. Green*, 272 F.3d 748, 754 (5th Cir. 2001) (The doctrine of invited error provides that "a defendant cannot complain on appeal of alleged errors which he invited or induced, especially where the defendant may not have been prejudiced by the error.") (citation omitted). Moreover, even assuming that some jurors observed the shackles as Ricks returned to counsel table, such occurrence was brief and not inherently prejudicial. *See Diecidue*, 603 F.2d at 549; *Hill*, 35 F.4th at 377.

In sum, Ricks fails to demonstrate the state habeas court's denial of his claim was an unreasonable application of federal constitutional law or based on an unreasonable determination of the facts. The claim should be denied.

## VIII. The State court reasonably rejected Ricks's IATC Penalty-Stage Claim. (Claim 6).

Ricks challenges trial counsel's chosen strategy—that Ricks came from a loving and supportive home, but was biologically predisposed to violence—and claims deficient performance because counsel: (1) imposed unreasonable limitations on their investigation; (2) retained a neuropsychologist who in another capital murder case testified that "minority status" was a risk factor for future dangerousness; (3) failed to develop and present any trauma or trauma-related neurodevelopmental evidence; (4) failed to develop an individualized defense; and (5) conceded future dangerousness. ECF No. 35, at 43–75. However, as concluded by the state habeas court, counsel performed a thorough investigation, employed a reasoned strategy, and

provided effective assistance. Ricks provides no more than impermissible second-guessing of counsel's decisions and relies on new evidence that is barred from consideration. The claim should be denied.

## A.     The claim is exhausted

Ricks claims this issue is unexhausted even though he challenged counsel's effectiveness at punishment in his state writ application because he now claims his new legal and factual assertions make the claim unexhausted, and that any procedural bar can be overcome by habeas counsel's ineffectiveness for failing to present this substantial claim. ECF No. 35 at 97.[23] However, a comparison of the state habeas claims one and four with this federal claim reveals he challenged the very same investigation, decisions, and presentation in state court. *Compare* 1 SHCR 59–113, 122–26, *with* ECF No. 35, at 43–95.

In his state writ, Ricks argued that counsel was ineffective for portraying Ricks's life as idyllic and not presenting evidence of his mother's drinking; his primary caretakers until the age of five; his behavior problems as a young child; details about his whippings; his problems in school; his behavior problems as a teen; behavior problems as an adult; his family history of mental illness; the prior neighborhoods he lived in; his potential lead exposure; and expert testimony about the psychological significance of his life experiences (including trauma). 1 SHCR 59–

---

[23]     Ricks cites to *Neville v. Dretke*, 423 F.3d 474, 479 (5th Cir. 2005), in support that the claim is unexhausted, ECF No. 35 at 97, but in *Neville*, the petitioner had not explicitly raised the claim in state court; "[r]ather, the state court, of its own initiative pursuant to state law, reviewed his case without the assistance of a brief from the petitioner." *Id.* Here, not only was the IATC claim raised, but extensive evidence was provided in support. 1 SHCR 59–113.

113. In Ground four, he added that counsel were ineffective for presenting inaccurate testimony about his future dangerousness, focusing on Dr. Lewine's testimony, faulting him for not obtaining other experts on the matter. *Id.* 122–26.

The claims overlap with the claim presented here, where he again faults counsel for portraying Ricks's life as loving and supporting and not providing evidence to the contrary, including the newly attached declarations—some of which are from the same persons who provided trial testimony or affidavits in the state habeas proceeding—maintaining that counsel did not introduce evidence of his physical, domestic violence, his behavior as a young child and teenager, sexual and substance abuse, and experts to give context of his life. ECF No. 35 at 76–95. Ricks simply reorganizes what was presented in state court and supplements with additional facts. This does not render the claim unexhausted. *See Ward v. Stephens*, 777 F.3d 250, 259 (5th Cir. 2015) (holding IATC claim was exhausted where federal habeas petition was supported by affidavits from new witnesses and based on a different diagnosis than that alleged in state habeas because the new evidence did not place the claim in a significantly different legal posture), *abrogated on other grounds by Ayestas v. Davis*, 138 S. Ct. 1080, 1093 (2018).

This Circuit's law is clear: "once a claim is considered and denied on the merits by the state habeas court, *Martinez* is inapplicable, and may not function as an exception to *Pinholster's* rule . . . ." *Escamilla v. Stephens*, 749 F.3d 380, 395 (5th Cir. 2014). Ricks's bare assertion that his new evidence fundamentally alters this claim from the claim he presented in state court thereby rendering it unexhausted is

erroneous because the new evidence, at most, puts his claim in a stronger evidentiary posture. *See Broadnax*, 987 F.3d at 408–09; *Ward*, 777 F.3d at 258. In *Broadnax*, the Fifth Circuit held that *Pinholster* "confirms limitations on a federal habeas court's consideration of new evidence when reviewing claims that have been adjudicated on the merits in state court," such that "the petitioner must demonstrate that habeas relief is warranted under § 2254(d) *on the state court record alone*." 987 F.3d at 406–07 (footnote omitted) (emphasis in original). The court also rejected Broadnax's attempt to carve out a new-evidence exception premised on a *Pinholster* footnote "which recognized that in some instances new evidence may present a new claim of which federal habeas courts may take cognizance" because the Supreme Court "declined in that footnote 'to draw the line between new claims and claims adjudicated on the merits.'" *Id.* (quoting *Pinholster*, 563 U.S. at 186 n.10). As this claim was adjudicated on the merits in state court, full § 2254(d) deference should be given to the habeas court's determination, and this claim should be denied without consideration of Ricks's newly presented evidence, *see supra* Section II, PX 5–17, 20, 22–26, 28–37, 40-45, 47, 50, 55, 60, 62.

Even if Rick's claim is considered unexhausted, he could not satisfy the *Martinez/Trevino* exception. *See supra* Section V.A (discussing this exception). For the reasons addressed below, Ricks fails to show that trial counsel were ineffective for not presenting Ricks's new evidence. His claim is not "substantial," state habeas counsel—who did raise the claim—was not ineffective for failing to present this

additional evidence, and Ricks cannot show that he was actually prejudiced by trial counsel's alleged omissions.

Lastly, *Martinez Ramirez* precludes consideration of this new evidence because Ricks is "at fault" for failing to properly present it. 142 S. Ct. at 1734–35. Ricks does not show that habeas relief could be premised on the state-court record alone, or that his claim falls within the exceptions to § 2254(e)(2). He does not rely on any new constitutional rule, and the claim does not rely on "a factual predicate that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2)(A)(ii). And furthermore, Ricks fails to show he is actually innocent of capital murder, as his IATC-punishment claim does not allege innocence of the crime or death penalty. 28 U.S.C. § 2254(e)(2)(B).

### B.    State habeas record

In his state writ, claim one, Ricks raised an IATC claim alleging counsel failed to present sufficient mitigation evidence, including additional testimony from family members, schoolteachers, and professionals, in order to present a clear picture of his mother's drinking; his primary caretakers until the age of five; his behavioral problems in youth, teen and adult years; his whippings; his problems in school; his family history of mental illness; the neighborhood he lived prior to Calmut Park; his potential led exposure; and the psychological significance of his life experiences. 1 SCHR-01 at 59–113. In ground four, he challenged counsel's future dangerousness presentation. 1 SHCR 122–25. Ricks provided affidavits from, family members Helen, Shedrick, Dwayne, Christine Sudduth, Tamara Butts, Joseph Sanders, Deborah Sanders (Deborah), Stephanie Halverson and Tammy Hall, 2 SHCR 796–828; former

teacher Sharon Speedwell and Donna Ree, former employee at McKinley Libra School, *id.* at 829–869; habeas mitigation specialist Mairead Burke, *id.* at 202–52; experts including Amy Nguyen, a Geographic Information Systems Analyst, *id.* at 890–892, Dr. Felicia Rabito, an epidemiologist with expertise in lead exposure, *id.* at 955–62, Dr. Joanne Murphey, a clinical psychologist, *id.* at 963–80, Dr. John Fabia, a forensic and clinical psychologist, 3 SHCR 1207–19, and Dr. Jon Sorensen, a social scientist focusing on risk assessment, *id.* at 1012–19.

In response, trial counsel Ray and Gordon provided affidavits, as well as Dr. Randall Price, a neuropsychologist. 3 SHCR 1384–86 (Gordon), 1372–82 (Ray), 1388–1417 (Price). After considering the evidence, the state habeas court adopted lengthy findings of facts, summarized as follows. 4 SHCR 1901–40.

The state court documented defense counsel's extensive investigation, including the evidence presented to the jury. *Id.* at 1902–10. The team went to Chicago twice to meet witnesses and locate any favorable documents; the family was very helpful with the defense team and on the first Chicago trip they arranged to meet at the family home; the family was informed that the defense team wanted to know everything about Ricks to get a complete history for punishment; on the second trip, they rented a conference room at a hotel and talked to anyone that would come; they also provided their contact information and expressed that they wanted full information; counsel initiated attempts to contact teachers and coaches and the team investigator and mitigation specialist made numerous attempts to locate such persons, and were able to secure two coaches who came and testified at trial; during

the Chicago trip, counsel focused on obtaining any juvenile records, adult criminal records and medical records to assist their defense. 3 SHCR 1372–77, 1384–86; 4 SHCR 1902-03. The psychological team and a medical doctor reviewed Ricks files for any organic or other disabilities that counsel did not know about. 4 SHCR 1903. Ricks underwent neuropsychological testing with Dr. McGarrahan and scientific testing for biological markers in his brain was conducted by Dr. Lewine. *Id.*

Ricks relied on Helen's and Joe and Deborah Sanders's affidavits to claim that the jury never heard about Helen's drinking while pregnant with Ricks. 4 SHCR 1902. The trial court fount that: all these family members talked to the defense team and presented no evidence that they informed the team of the extent of Helen's drinking; the defense team's retained psychological team and medical doctor reviewed Ricks's records for any disability and there was no  evidence that the retained experts advised the defense to pursue such an avenue; evidence of prenatal alcohol exposure would have simply provided another explanation to the jury in addition to that presented of Ricks's life-long problems stemming from a prenatal source beyond his control: and thus, found neither deficient performance nor prejudice. *Id.* at 1912–13.

As for the "primary caregivers" until the age of five, Ricks relied on affidavits from Dwayne and his distant cousins Halverson and Hall. *Id.* at 1913. They recounted that Geraldine Sanders and her boyfriend Booker were the caregivers; that Ricks's behavior caused Geraldine to whip him; that another relative was cold and mean; and that they or someone they knew were sexually abused, though they did not know if

97

Ricks had been. 2 SHCR 808–18. The court found that: no evidence showed that this information had been relayed to counsel; these statements do not provide that Ricks was aware of, witnessed, or suffered sexual abuse himself; counsel's not presenting this evidence was not due to an inadequate investigation; and thus, Ricks failed to show that the introduction of such evidence would have persuaded the jury to answer "yes" on the mitigation special issue. 4 SHCR 1914.

Regarding his claim that counsel did not make the jury aware of his behavioral issues during his youth—relying on affidavits from Joseph and Deborah Sanders, Butts, and Halverson—the trial court found "considerable overlap" between the affidavits and the testimony at trial; that contrary to Ricks's assertion, the jury was aware of his behavioral problems from the time he was a toddler; that there was no evidence that Butts or Sanders shared this additional information with counsel; and that Ricks did not meet his burden to show deficient performance or that introduction of such evidence would have changed the jury's answer on mitigation. *Id.* at 1915–16.

As for the alleged whippings Ricks received from Helen—relying on affidavits from Helen, Shedrick and Dwayne—the trial court found that these family members had all talked to the defense team and did not claim to have divulged the severity of the beatings at that time and, even so, this would not have added any significant weight to the mitigation evidence presented, thus finding Ricks did not meet his burden. *Id.* at 1916–17.

With respect to his school career, Ricks submitted affidavits from Sharon Speedwell, his eighth-grade teacher (who authored many notes to his parents), and

Donna Ree, an employee from the high school Ricks graduated. *Id.* at 1917–18. The court found that the defense team made numerous efforts to locate teachers who could assist and did locate two former coaches that testified at the punishment phase of trial; that the jury was aware of Ricks's troubles in school and life-long behavior issues; and concluded that Ricks did not meet his burden to show either deficient performance or prejudice. *Id.* at 1918.

Next, Ricks claimed the jury "only heard the barest of details" of his teenage behavioral problems, relying on affidavits of Helen, Shedrick, Dewayne, and Butts. *Id.* at 1919. The state court found significant overlap between matters alleged in the affidavits and the evidence introduced at trial; that the jury was well aware of his teenage problems, including Ricks's own testimony and that Ricks failed to meet his burden. *Id.* at 1919–20.

As to additional testimony about his mental illness, including mood swings, Ricks relied on Sanders and Butts's affidavits. *Id.* at 1920. The trial court found no evidence that either Butts or Sanders informed counsel of these additional matters even though they had the opportunity, that the jury was well informed about Ricks's behavior problems and other issues from the testimony of Dr. Lewine and other witnesses—including Ricks's testimony—and thus counsel were not deficient and no showing was made that this additional information would have persuaded the jury to answer differently. *Id.* at 1921.

Regarding his family's history of mental issues, including a great uncle's probable mental illness, his brother's struggles with mental health, and his mother's

depression, Ricks relied on affidavits from Sudduth, Dwayne, and Helen. 1 SHCR 89–91. The trial court found no evidence that these persons informed counsel of these matters; that Ricks provided no records of diagnoses; that his own records were reviewed by the psychological and medical teams; that Ricks provided no evidence that the retained professionals gave counsel any indication that the family's history had any impact on Ricks or much less that it was mitigating; that Ricks had not shown that he had been diagnosed with a hereditary mental illness that would convince a jury to spare his life; and that Ricks had failed to meet his burden. 4 SHCR 1922–23.

In addition, regarding Ricks's claim that the jury should have heard about risk factors from his neighborhoods prior to Calmut Park—relying on Nguyen's affidavit providing statistics and maps analyzing two neighborhoods where Ricks lived until he was two years old, and Hall's affidavit referencing a 1977 rape and murder—the habeas court found that this claim consisted of speculative and irrelevant information that would not have benefited his case. *Id.* at 1924–25.

Similarly, the state court found Ricks's claim that the jury should have heard evidence about the potential for lead exposure, as contained in the affidavits of Nguyen and Rabito, speculative and nondeterminative. *Id.* at 1925. Also, the state court found that the defense had retained professionals to review Ricks's records for any undiagnosed matter; that counsel found no evidence that Ricks had been exposed to lead or suffered from lead poisoning; that Ricks failed to show that counsel were

deficient for not presenting such evidence and that Ricks failed to show that such evidence was relevant much less persuasive to the jury. *Id.* at 1925–26.

Finally, Ricks argued that counsel failed to present expert testimony to explain how various aspects of his life were significant to his psychological makeup and development. 1 SHCR 101–13. Ricks presented affidavits of two psychologists, Dr. Murphey and Dr. Fabian, about how various aspects of his early life were significant to his development, including potential prenatal exposure to alcohol, exposure to lead, mental illness in the family, and possible diagnoses of bipolar disorder and post-traumatic stress disorder (PTSD). *Id.* In response, the State presented the expert affidavit of Dr. Price, a clinical and forensic psychologist, who reviewed a combination of all available data and had also conducted a face-to-face evaluation of Ricks in May of 2014. 3 SHCR 1388–1417.

The habeas court noted that neither of Ricks's experts had conducted a face-to-face interview and relied, at least in part, on affidavits of persons not discovered by trial counsel and facts not revealed at the time of trial, thus neither doctor provided testimony or opinion that could have been provided at the time of trial. 4 SHCR 1926–27. The state court gave Dr. Price's opinion greater weight; found that the only evidence of prenatal alcohol exposure was from Helen's affidavit and that Ricks's behavior was not specific to Fetal Alcohol Spectrum Disorder (FASD) and can be explained by other potential diagnoses; that a thirty-eight-point disparity between the verbal and nonverbal abilities on IQ testing done when Ricks was twelve is not persuasive evidence of Alcohol-Related Neurodevelopmental Disorder (ARND) and

such discrepancy was not observed by Dr. McGarrahn's more recent testing; that subsequent evaluations failed to identify academic challenges in math as Dr. Murphy noted; that no objective evidence supported a confirmation of lead exposure; that the alleged family history of mental illness, although would increase Ricks's risk for mental illness, the extent to which this attributed to Ricks's behavior difficulties was unclear; that as for ADHD as a diagnosis, it remained a possible but unconfirmed diagnosis; that the symptoms of mood lability, paranoia, and grandiosity as reported by Dr. Fabian as suspected of a bipolar diagnosis, overlap with other conditions—Dr. Gokhale, who treated Ricks during his psychiatric hospitalization diagnosed him with adjustment disorder and documented symptoms with a personality disorder, and never indicated he had bipolar disorder; that Ricks did not appear to experience symptoms of PTSD, and the history of running away and irritability which Dr. Murphy attributed to PTSD are also compatible with conduct disorder; that there was no evidence that his special education was due to his history of learning disability rather than behavior disturbances since his achievement tests were within normal limits; that the research on the protracted effect of family violence was mixed; that Ricks met the DSM-5 criteria for antisocial personality disorder, and periodically suffers from depression and alcohol/substance abuse; that although features of Ricks's history are relevant to his psychological functioning, they cannot be causally linked to this instant offense; that Ricks gave no evidence of actual diagnosis of the conditions discussed by Drs. Fabian and Murphy; that Ricks did not show that

probing further into these matters would have yielded mitigating evidence; and thus, counsel was not deficient nor did their actions result in prejudice. *Id.* at 1927–33.

Following this extensive review, 4 SHCR 1901–40, the trial court, among other things, entered findings that:

36. [Ricks]'s trial counsel acted well within the wide range of reasonable professional assistance in conducting a thorough mitigation investigation.

37. Trial counsel made reasonable strategic decisions based on all of the relevant mitigating evidence they discovered during their thorough investigation to explain and demonstrate through [Ricks]'s life-long history of behavioral problems and through state-of-the-art scientific testing that [Ricks] had a bad brain from birth, that his environment may have contributed to his problems, and that he had no control over his life-long impulsivity, violence, and aggression.

38. [Ricks]'s habeas allegations impermissibly second-guess what his trial counsel allegedly did not do while largely ignoring the scope of the investigation and mitigation case they developed, even when faced with a lack of full candor or cooperation from [Ricks] and his family members.

4 SHCR 1933.

In ground four, Ricks raised an IATC claim alleging counsel failed to present accurate testimony about future dangerousness, specifically for failing to retain an expert such as Dr. Sorensen to present actuarial data. *Id.* at 1949. The habeas court found that counsel presented testimony through Dr. Lewine and the State's classification expert, that Ricks posed only a moderate to low risk of future violence if sentenced to death and reminded the jury of said testimony in closing; that counsel did not believe that showing percentages of low risk would be helpful because Ricks showed no remorse; that counsel believed that presenting hard facts of a disease or

dysfunction was better than offering an opinion about future danger; that counsel made a reasoned decision; that Dr. Lewine's testimony was more easily understood by a jury; that Sorensen's calculations were open to attack by the State; that the State proved overwhelming aggravating facts; and that counsel's conduct was neither deficient nor prejudicial. *Id.* at 1950–51.

The CCA, on these findings and on its review of the record, determined that Ricks had not met his burden to show either deficient performance or prejudice under *Strickland*, 466 U.S. 668. *Ex parte Ricks*, 2020 WL 6777958, at *1. This decision is objectively reasonable.

### C.   The *Strickland* standard

The *Strickland* standard has been set out above. *See* Section IV.A. Regarding errors at the sentencing phase of a death-penalty trial, the relevant prejudice inquiry is "whether there is a reasonable probability, that absent the errors, the sentencer [ ] would have concluded the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *see Wiggins v. Smith*, 539 U.S. 510, 534 (2003). But on federal habeas review, relief is not warranted even if a federal court believes Ricks has satisfied *Strickland*. Instead, Ricks is entitled to relief only if a federal court concludes that the state court's determination that Ricks did not satisfy *Strickland* is objectively unreasonable under § 2254(d). *Richter*, 562 U.S. at 101. Thus, under the statute, a federal court's review of a state court's resolution of an IATC claim is "doubly deferential." *Pinholster*, 563 U.S. at 190.

104

**D.      The state court reasonably determined that trial counsel were not deficient.**

Counsel "has a duty to make a reasonable investigation of defendant's case or to make a reasonable decision that a particular investigation is unnecessary." *Ransom v. Johnson*, 123 F.3d 716, 723 (5th Cir. 1997) (citation omitted); *see Rompilla v. Beard*, 545 U.S. 374, 380–81 (2005) (emphasizing counsel's duty under *Strickland* to make reasonable investigation); *Wiggins*, 539 U.S. at 523 (same). To meet this burden, a defendant must do more than merely allege a failure to investigate; he must affirmatively prove that the investigation counsel actually conducted fell below minimum professional standards. *Strickland*, 466 U.S. at 690 ("A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."); *see also id.* at 687 (explaining that as to deficient performance, "the defendant must show . . . that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"). He must also state with specificity what additional evidence would have resulted from further investigation and how such evidence would have altered the outcome of the case. *Moawad v. Anderson*, 143 F.3d 942, 948 (5th Cir. 1998); *Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994).

Establishing deficient performance under *Strickland* requires more, however, than a mere showing that a criminal defendant's trial counsel could have done more investigation or presented additional mitigating evidence. *See Thomas v. Lumpkin*, 995 F.3d 432, 454 (5th Cir. 2021) ("Our concern is not whether counsel at trial could

have done more. This is often, almost always, the case."). Though Ricks likens his case to *Andrus, Porter* and *Wiggins*, those cases are distinguishable and did not involve this level of mitigation investigation. ECF No. 35 at 55. For instance, in *Andrus*, counsel performed almost no mitigation investigation, ignored "vast tranches of mitigating evidence," and when questioned, counsel provided no reason for his failure to investigate or tactical reason to justify his conduct. *Andrus v. Texas*, 140 S. Ct. 1875, 1881 (2020); *see also Porter v. McCollum*, 558 U.S. 30, 39–40 (2009) (trial counsel failed to interview any witnesses or to request any of the defendant's school, medical, or military records and ignored information in a report on the defendant's competency evaluation); *Wiggins*, 539, U.S. at 524–26 (counsel failed to investigate the defendant's background beyond review of summary records from competency evaluation, presentence report, and records from the state foster care system, failed to compile a social history of the defendant, and presented no mitigating evidence concerning the defendant's background).

A review of the record reflects that the state court reasonably rejected Ricks's claim of IATC. Although Ricks asserts that counsel portrayed a lop-sided account of his life leaving him with no mitigation evidence, the record, *see* Statement of Facts, Section II.B., reflects otherwise: a reasoned trial strategy based on an extensive investigation into mitigation. After thoroughly vetting their options, the defense team arrived at a reasoned strategy that Ricks suffered from a "bad brain" that predisposed him to violence but that was not his doing and deserved a life sentence. *See* 4 SHCR

1937–40; 40 RR 112–13. This is not a case where counsel failed to investigate or presented little or no mitigation evidence.

Importantly, reviewing courts "must be particularly wary of 'arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing.'" *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000) (quoting *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999)) (alteration marks omitted). Ricks's claim—including the new evidence that is barred under *Pinholste*r—though providing more details, still returns to the same core theory—factors beyond Ricks's control contributed to his conduct. *See* ECF No. 35 at 76–96. This is a fundamental defect in Ricks's claim that precludes relief. Indeed, counsel's failure to present more of the same, or cumulative evidence, is inadequate to demonstrate ineffective assistance. *Sheppard*, 967 F.3d at 469 ("[W]e 'give appropriate deference' to [the state court's] finding that the additional mitigating evidence was cumulative."); *Norman v. Stephens*, 817 F.3d 226, 233 (5th Cir. 2016); *Trottie v. Stephens*, 720 F.3d 231, 248 (5th Cir. 2013) ("[A]lthough the jury may not have had all of the facts that Trottie now wishes it had, Trottie's counsel did offer meaningful information regarding Trottie's childhood and how it may have impacted Trottie's decisions on the day of the incident.").Thus, Ricks has not shown deficient performance and cannot rebut the presumption of correctness afforded to the state court's finding that counsel made reasoned decisions following a thorough investigation.

### 1.   Trial counsel conducted an extensive investigation.

Ricks claims counsel set unreasonable limitations on their investigation, faulting the timing of the Chicago trips, and that the interviews were conducted in groups or by phone, alleging counsel's conduct fell below the American Bar Association (ABA) Guidelines. ECF No. 35 at 51-53. While it is true that Supreme Court decisions refer approvingly to the ABA Guidelines, *Wiggins*, 539 U.S. at 524, the Court has rejected the notion that the Guidelines are an "inexorable command with which all capital defense counsel must fully comply" to be constitutionally effective. *Bobby v. Van Hook*, 558 U.S. 4, 17 (2009) (per curiam) (internal quotation marks omitted). The same is true of all state and private organization rules. Indeed, they are "free to impose whatever specific rules they see fit to ensure that criminal defendants are well represented," but "the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Id.* (quotation omitted).

Contrary to Ricks's assertion, the record reflects a thorough investigation. The defense team was comprised of two attorneys (Ray and Gordon), a mitigation specialist (Mary Burdette) and an investigator (Stanley Keeton). 4 SHCR 1532. Trial counsel communicated with Ricks extensively, interviewed Ricks's immediate family by phone and in person many times, though the family was not completely forthcoming with the family history. 3 SHCR 1372–77, 1384–86; 4 SHCR 1902–03. Counsel explained that most of their time went to building a mitigation case and they visited Chicago with the dual purpose of locating witnesses and documentary evidence. 3 SHCR 1384-5. Although counsel were open with Ricks, at one point he

refused to speak with them and told them that he wanted no further investigation on his case, but counsel continued with their investigation and plans to travel to Chicago, Florida, and New Mexico. [24] *Id.* at 1385. Dr. Lewine expanded that he was contacted to see what technology he could use to help with mitigation; that they specifically looked for any TBI and brain damage; and that other expert also reviewed the material. 39 RR 100–01,169–72. Following their extensive investigation, counsel called several witnesses on Ricks's behalf during punishment. *See supra* Statement of Facts, Section II.B; 4 SHCR 1902–1910 (state court findings outlining the defense).

Further, the investigation began before the scheduled trips to Chicago, and Ricks ignores that the family had substantial involvement in the process and many opportunities to provide additional feedback. *See* 4 SHCR 1911–33 (state court findings addressing new information from witnesses and experts). As for the witnesses feeling uncomfortable in groups, a review of the new and barred exhibits shows that Burdette specifically documented that she would follow up after the interviews. ECF No. 18-1 at 22–23, PX 17. Sudduth, the grandmother, makes no mention of being uncomfortable when talking to the attorneys. ECF No. 35-1 at 9, PX 30. Although Debbie Abner attests that it was awkward when talking to the attorney at the hotel in Chicago, she also told them she did not know Ricks as a child, so she could not provide them with information about his upbringing or childhood. *Id.* at 11–12, PX 31. Griffin, a friend of Ricks's who met the team in Chicago and testified at trial, though mentions it was uncomfortable talking in the group setting, affirmed

---

[24] Under seal, counsel prepared a Memorandum of Understanding with Ricks about the need to present a complete psychological history and background evidence. 9 RR 5–7; PX 8.

that he talked to the attorneys a couple of times over the phone and makes no mention that he was uncomfortable then to fully cooperate. *Id.* at 23–24, PX 34.

Despite all the time spent with family members, including Helen's substantial involvement with the defense team, and counsel's repeated requests for any and all information about Ricks's life, these family members failed to provide the information they have now added. Trial counsel cannot be faulted for making reasonable decisions on the information provided to them. *See Burger v. Kemp*, 483 U.S. 776, 795 (1987) ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.") (quoting *Strickland,* 466 U.S. at 691). The Fifth Circuit "has consistently refused to hold attorneys responsible for introducing mitigation evidence that their client and other witnesses fail to disclose." *Johnson v. Cockrell*, 306 F.3d 249, 252–53 (5th Cir. 2002); *see also Blanton v. Quarterman*, 543 F.3d 230, 238–39 (5th Cir. 2008) (trial counsel could not have uncovered abuse-of-inhalant evidence where neither petitioner nor his family mentioned it). Moreover, "[t]he defense of a criminal case is not an undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources." *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992). Ricks cannot show that the state court unreasonably determined that counsel's investigation was thorough.

110

## 2. Retaining Dr. McGarrahan

Ricks faults counsel for retaining Dr. McGarrahan because she had testified in Steven Nelson's trial that Nelson's "minority status" as a Black man was a risk factor for future dangerousness. ECF No. 35 at 54. Ricks relies on evidence not presented in state court, and the claim is meritless.

Dr. McGarrahan did not testify at Ricks's trial, and Ricks's reliance on counsel's decisions in a different case does not bear on counsel's performance here. *See Raby v. Davis*, 907 F.3d 880, 884–85 (5th Cir. 2018) (denying a certificate of appealability regarding denial of a motion for relief from judgment and distinguishing *Buck v. Davis*, 137 S. Ct. 759 (2017), on the ground that the petitioner did not allege racial discrimination in his case);[25] *Thompson v. Quarterman*, 629 F. Supp. 2d 665, 680 n.9 (S.D. Tex. 2007) ("The issue is how [Petitioner]'s trial counsel performed in his trial, not in other cases.").[26] Ricks makes no showing that counsel's reliance on Dr. McGarrahan was deficient. Indeed, "[c]ounsel should be permitted to rely upon the objectively reasonable evaluations and opinions of expert witnesses without worrying that a reviewing court will substitute its own judgment, with the inevitable hindsight that a bad outcome [i.e., conviction] creates, and rule that his performance was substandard for doing so." *Smith v. Cockrell*, 311 F.3d 661, 676-77 (5th Cir. 2002), *abrogated on other grounds*, *Tennard v. Dretke*, 542 U.S. 274 (2004). Further, counsel retained other experts, including Dr. Lewine, who reviewed and assessed Ricks for

---

[25]   *See Raby v. Davis*, No. H-02-0349, 2018 WL 10550608, at *2–3 (S.D. Tex. Apr. 5, 2018).

[26]   This also holds true with regard to Ricks's assertion that trial counsel Ray has been found ineffective in another case. ECF No. 35 at 58 n.23.

any potential beneficial evidence they could present at punishment. Moreover, as Ricks acknowledges, the Fifth Circuit in the *Nelson* case concluded counsel were not ineffective for hiring Dr. McGarrahan. *Nelson v. Davis*, 952 F.3d 651, 663–64 (5th Cir. 2020). This contention is meritless.

### 3.   Trauma evidence

Ricks claims counsel failed to follow up on "red flags" of trauma related concerns. ECF No. 35 at 55–57. The state court, after reviewing all this material and entering extensive findings on the matter, determined that Ricks had not shown deficient performance. 4 SHCR 1913–37. The trial court findings are entitled to deference. 28 U.S.C. § 2254(d).   Ricks fails to rebut these findings, and his new evidence is just more of the same.

For one, Rick's "red flags" are derived from documents contained in counsel's trial file—suggesting that counsel's investigation was adequate since this was work prepared by their mitigation expert. ECF No. 35 at 55–57, PX 55. Although Ricks claims that counsel failed to present evidence of the problems in Ricks's life, as summarized by the state habeas court, the record reflects otherwise:

> Contrary to Applicant's allegations, the jury was aware that Applicant had behavioral problems from the time he was a toddler, that his parents knew from the time he was young that something was wrong with him, that Applicant's problems worsened as he got older, that he had behavioral problems in school from the first day of daycare, that he set fires on three occasions when he was between six and eight years old, that he could never explain why he did something bad, that his parents physically disciplined him, that he would run away from home to escape physical discipline, and that he witnessed his father abuse his mother. [*See, e.g.*, RR 38: 63–65, 75, 92, 116–18, 121–24, 130–31; RR 39: 193–96, 198–99,202, 213–14.]

4 SHCR 1915 (#27c). The court also highlighted that:

i.   Helen Ricks testified that Applicant "got a whipping sometimes" and that on other occasions she took things away from him. [RR 39:196.]

ii.   Shederick Ricks testified that: (a) when Applicant was younger, the thinking was that more discipline would solve his problems (b) Applicant would run away from home to escape physical discipline; (c) there came a time when he could not physically discipline Applicant all the time; (d) when Applicant was older, hands-on discipline was not going to work, so he would take things away; and (e) on one occasion, Applicant ran out of the house to avoid being disciplined, threw a brick through a kitchen window, and ran away. [RR 38: 118,121–22,129–30.]

*Id.* at 1916 (#28a). The jury also heard that Ricks had been evaluated by doctors from a young age, who suggested he take Ritalin; that he was hyperactive, impulsive, and couldn't explain why he did things; and that he was hospitalized in a psychiatric ward for a month after his encounter with Brown. 39 RR 193–94, 203–04. Counsel, on crosse-examination, brought out that domestic abuse and neglect may contribute to one's adult conduct, that some don't handle stress well and that can be from either environment or genes, and that although the family was looked good on the outside, more was going on that what appeared. 4 SCHR 1908. Dr. Lewine testified that their expert team specifically looked for any evidence of trauma but found no evidence of TBI in the scans. 39 RR 115, 123, 131, 161. More importantly, Dr. Lewine explained that Ricks did not have a normal brain and that he could not "explicitly contribute it to at birth as opposed to the first few years of life." *Id.* at 181. Thus, the jury was aware that either the early years or biology led to this development. Ricks cannot show that the trial court's denial of his claim was unreasonable, and his new evidence is barred from consideration.

### 4.      Mental health

Ricks claims counsel failed to follow up on and present evidence regarding Ricks's mental health difficulties. ECF No. 35 at 57–59. Ricks's possible mental illness was considered in state court. 4 SHCR 1920–21. As already discussed, the jury heard about his troubled behavior, including his hospitalization in a psychiatric ward.[27] *Id.* Moreover, Ricks had been evaluated not only through psychological testing, but with MRI and EEG scans to locate any potential issues that could be presented to the jury. 39 RR 91, 99–100. Dr. Lewine, using state-of-the art machinery, testified that the imaging showed no sign of brain trauma. *Id.* at 115, 123, 131, 167. Further, Dr. Price did not find that Ricks exhibited symptoms of PTSD and noted, among other things, that research on the impact of environmental factors on an individual's development is mixed. 4 SHCR 1930–32. He determined that Ricks met the DSM-5 criteria for antisocial personality disorder and suffered periodically from depression and possible alcohol/substance abuse. *Id.* at 1932.

Moreover, evidence of mental illness can be a "double edge sword," in that it could be both aggravating and mitigating. *See Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012) (mitigating evidence is "double-edged" when it might permit an inference that the defendant is not as morally culpable for his behavior but also might suggest that, as the product of his environment, the defendant is likely to continue to

---

[27]     The jury was also aware of Ricks's "depression" and the "stressors" that Ricks alleges aggravated his mental illness at the time he murdered Sanchez and A.F. ECF No. 35 at 59; *see* 38 RR 83–87; 39 RR 226–27; 40 RR 31–32, 38, 67. The jury was also aware that his parents sought mental health counseling for Ricks but did not follow through with it. 38 RR 188–92; 39 RR 196, 198, 203–04, 229.

be dangerous in the future); *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002) ("Although the evidence of Ladd's inadequate supervision as a child might permit an inference that he is not as morally culpable for his behavior, it also might suggest Ladd, as a product of his environment, is likely to continue to be dangerous in the future."). Failure to present evidence that is double-edged in nature generally lies within the discretion of trial counsel. *See Ayestas v. Davis*, 933 F.3d 384, 392 (5th Cir. 2019) ("[T]his Court has repeatedly denied claims of ineffective assistance of counsel for failure to present 'double edged' evidence where counsel has made an informed decision not to present it.") (quoting *Hopkins v. Cockrell*, 325 F.3d 579, 586 (5th Cir. 2003)). Here, as found by the state court, counsel made a reasonable tactical decision to pursue their chosen mitigation strategy and Ricks is not entitled to habeas relief.

### 5.   Individualized defense

Ricks relies on evidence not presented in state court to criticize counsel's strategy, and in particular focuses on other cases tried by counsel where they used a similar strategy. ECF No. 35 at 60–71. While Ricks frames this allegation as a failure to present an individualized defense, the allegation is actually nothing more than a challenge to trial counsels' strategy. This highlights the impermissible hindsight Ricks uses to attack trial counsels' decisions. *See Hinton v. Alabama*, 571 U.S. 263, 275 (2014) ("The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'") (quoting *Strickland*, 466 U.S. at 690).

Nonetheless, that counsel retained similar experts in other cases does not diminish the defense presented here. Ricks must show that counsel was ineffective in

his case, and whatever decisions counsel made in other cases are not relevant here nor could such claims even be adequately evaluated when those cases involve completely different records. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 690 (emphasis added); *see Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (reviewing court must "judge . . . counsel's challenged conduct on the facts of the particular case") (quoting *Strickland*, 466 U.S. at 690); *Grant v. Dretke*, 151 F. App'x 344, 345 (5th Cir. 2005) ("counsel's misconduct in other cases is insufficient to show that trial counsel was ineffective in this particular case.") (citation omitted). That counsel may have used similar experts or arguments in other cases or that the strategy was not successful in the end does not equate with deficient performance. *Strickland*, 466 U.S. at 689; *see Martinez v. Dretke*, 99 F. App'x 538, 543 (5th Cir. 2004) ("Again, an unsuccessful strategy does not necessarily indicate constitutionally deficient counsel.").

Use of similar strategies did not preclude individualized sentencing. Ricks simply cites to *Lockett v. Ohio*, 438 U.S. 586, 602 (1978), to support his claim. ECF No. 35 at 60. In that case, the Supreme Court recognized that "the concept of individualized sentencing in criminal cases generally, although not constitutionally required, has long been accepted in this country." *Lockett*, 438 U.S. at 602. As explained, "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's

116

character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (quoting *Lockett*, 438 U.S. at 604); *see Blystone v. Pennsylvania*, 494 U.S. 299, 307 (1990) ("requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence"). The Fifth Circuit has "interpreted the *Lockett* and *Eddings* line of cases to apply to 'the exclusion of specific *types* of evidence rather than specific *items* in evidence.'" *Halprin v. Davis*, 911 F.3d 247, 256 (5th Cir. 2018) (emphasis in original) (quoting *Simmons v. Epps*, 654 F.3d 526, 544 (5th Cir. 2011)).

Counsel, as already recounted, presented extensive evidence specific to Ricks's upbringing, behavior issues, adult life issues, expert evaluations, and Ricks's own testimony. *See supra* Statement of Facts Section II.B. This mitigation presentation followed an extensive and thorough investigation. 3 SHCR 1375–77, 1384–86; 4 SHCR 1901–40. Ricks cannot show that the jury was deprived of the ability to consider "as a mitigating factor, any aspect of [his] character or record [or] any of the circumstances of the offense." *Lockett*, 438 U.S. at 604–05. Ricks does nothing more than second-guess counsel's strategic decisions about the evidence presented. He fails to rebut the presumption of correctness afforded to the state court's findings regarding counsels' mitigation investigation, and he fails to show the state court's denial of the claim was unreasonable. This claim is meritless.

### 6. Catch-all expert

Here, counsel, after a thorough mitigation investigation and consultations with experts, decided to call Dr. Lewine to testify. 3 SHCR 1375–79, 1385. Trial counsel's

selection of witnesses that would testify to support this defensive theory is the kind of "paradigmatic example" of strategic choice the case law counsels against second-guessing. *Hinton*, 571 U.S. at 275. In fact, such decisions by counsel are "virtually unchallengeable." *Strickland*, 466 U.S. at 689–90; *see Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997) ("A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness."). What is more, Ricks's counsel conducted—and presented—a robust mitigation investigation that included aspects of Ricks's childhood, his family life, his adult life as well as state-of-the art evaluations by experts. *See* Statement of the Facts, Section II.B. Counsel, through his research, found that he could present "hard science" to support a "more believable analysis" that one was predisposed to violence due to matters out of their control. 3 SHCR 1379–80. Though Dr. Lewine had not testified in a criminal trial, he was well qualified, and his firm had done "a lot of civil cases involving traumatic brain injury . . . and have been on both sides for that, as well." 39 RR 98. Also, the mobile MRI machine was brought down because local machines did not have the proper optimization, and as to the qEEG testing performed at the time of trial—though not before the jury—Dr. Lewine accounted for the conditions to obtain accurate results. 39 RR 107–08,133–35. As for actuarial data, the state court found that counsel did present evidence through Dr. Lewine and the State's classification expert that Ricks posed only a moderate to low risk, and that Dr. Lewine's "less complex testimony was likely more easily understood." 4 SHCR 1949–

118

50 (#2,7). The record supports the state court's finding that counsel made reasoned decisions on presenting their case. 4 SCHR-01 at 1933 (#s37–38), 1949–52. Ricks does nothing more than impermissibly second-guess counsel's strategy, and he fails to rebut the trial court's findings or show that he state court's rejection of his claim was unreasonable.

### 7. Future Dangerousness

### a. Counsel did not concede future danger

Ricks maintains that counsel conceded future dangerousness by their strategy of portraying Ricks as having poor impulse control and a propensity for violence and aggression. ECF No. 35 at 71–74. To the contrary, counsel did not concede future dangerousness and instead provided the jury with hard science showing that Ricks was not to blame since circumstances out of his control contributed to his conduct, which could be a basis on which a juror might vote for a life sentence. In his habeas affidavit, counsel imparted that in his opinion, it was better to present "hard facts of a disease or disfunction of the mind" through an expert such as Dr. Lewine, rather than opinion as to future danger. 3 SHCR 1379–80. Counsel presented evidence through Dr. Lewine and the State's classification expert that Ricks posed a moderate to low risk of future violence if sentenced to life.  37 RR 190–97; 39 RR 147–51. Counsel stressed that Ricks's bad acts occurred outside of prison and involved romantic relationships with women, thus if a life sentence were imposed no such relationship would likely arise in prison, so he would not be a danger. 40 RR 115–117. The testimony regarding his brain went to mitigation and counsel imparted on the jury that it was not Ricks's fault that he did what he did. *Id.* at 118. Counsel

emphasized in closing that the State had no one to refute Dr. Lewine's findings of an enlarged brain. *Id.* at 110. Although his parents did all they thought they could at the time, they always thought there was something wrong with Ricks and Dr. Lewine corroborated that. *Id.* at 111, 118. Counsel reminded the jury that the thing that "makes [Ricks] a danger or a threat might be mitigating" and that Ricks "was born with that condition." *Id.* at 112.

As with all Ricks's IATC claims, he relies on nothing but hindsight to allege trial counsel performed deficiently. This is starkly demonstrated by virtue of his argument that trial counsel unreasonably pursued a strategy of demonstrating Ricks was not to blame for his violent acts due to a predisposition to violence that was outside his control. ECF No. 35 at 71–74. Yet Ricks now claims trial counsel should have put on evidence that he has cognitive deficits that contributed to his violent reactions to high stress situations. *Id.* at 91–92. Trial counsel cannot be deemed deficient for choosing the strategy they did, i.e., attributing Ricks's violent predisposition to a different cause than his current counsel does, particularly when faced with that task of seeking leniency for an unremorseful defendant with a long and disturbing history of violence.

Ricks's reliance on *Andrus*, 140 S. Ct. at 1883, is unpersuasive because in *Andrus* counsel "performed almost no mitigation investigation" and what little evidence he offered backfired. *Id.* at 1881. In particular, at *Andrus's* habeas hearing, counsel admitted that he had first met Andrus's mother when subpoenaed to testify and his father when he showed up at the courthouse to testify. *Id.* at 1882. Here,

counsel conducted a thorough investigation, presented several witnesses, including consulting several experts and then deciding to present hard science to help support a life sentence. *See* Statement of Facts Section II.B; 4 SHCR 1949–51.

### b.  Examination of extraneous offenses

Ricks claims counsel failed to investigate extraneous incidents involving his ex-wife Singleton, the incident at the Garvin County jail, and a pretrial incident where deputies found a pencil in Ricks's possession. ECF No. 35 at 75. Ricks simply speculates that counsel failed to investigate without crediting reasonable trial strategy and relies on barred evidence that was not presented in state court (*see infra* Section IX (claim seven), *see also supra* Section II). Regardless, the claim lacks merit.

Contrary to Ricks's assertion, it appears that attempts were made by the defense to reach Singleton. *See* ECF No. 37 at 13, PX 41 (Burdette's invoice reflecting attempted calls to ex-wife). Further, Singleton's new declaration adds little to her testimony—even assuming such material would have been admissible. ECF No. 35-1 at 28, PX 36. Her recounting that Ricks had bipolar disorder and mental health issues and that she has anger issues that justified his violence against her would have carried little weight in the face of the escalating violence he inflicted on her— particularly the strangulation event at the police station requiring several officers to remove Ricks. *Id.*; 37 RR 32, 47–48, 50–53; *see* Statement of Facts, Section II.A.4. Counsel could have reasonably determined that Singleton was not the best witness to explore Ricks's mental health issues, especially when she was not qualified to make such determinations. Further, she did inform the jury that despite all the assaults, Singleton stayed with Ricks because she "loved him" and "it just wasn't all bad." 37

RR 41. Helen testified that Ricks kindly reunited with Singleton after she had left him and had a baby with another man. 39 RR 222. Finally, Ricks, in his testimony about these murders, claimed that Sanchez and her children ganged up on him and he feared for his life. 40 RR 45, 77–79, 81. Thus, the jury was aware of Rick's justification that arguments with his girlfriends precipitated his violence, which surely would have carried little, if any, mitigating value. 40 RR 44.

As for the Gavin County incident, as discussed *infra* Section IX.B.3, counsel contested the event and presented evidence that Ricks was not the instigator and was beaten by the other inmates. *See also* Statement of Facts, Section II.B.1. Similarly, counsel addressed the pencil incident, emphasizing to the jury that he posed no danger and was allowed to have a felt-tip pencil in the court room. *Id.* at Section IX.B.1. The record reflects that counsel addressed these matters and used sound strategy. In sum, the totality of the record shows that the state court's no-deficiency finding is not objectively unreasonable. Thus, § 2254(d) forecloses habeas relief.

### E. The state court reasonably rejected Ricks's claim that he was prejudiced by counsels' actions.

After thoroughly considering Ricks's claims, the state court determined not only that counsel's actions were not deficient, but that Ricks had failed to show prejudice. 4 SHCR 1939–40. These findings are presumed correct, and Ricks fails to rebut "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The State's case on punishment was substantial and the facts of the crime horrific. *See supra* Statement of Facts, Sections I & II. Although Ricks testified and tried to take some responsibility for his conduct, his testimony was self-serving—

especially his outlandish claim of self-defense—which likely persuaded the jury that he was not in fact remorseful. *See* Statement of Facts, Section II.7; 3 SHCR 1378, 1380–81. Given all the above, there is not a reasonable likelihood that additional evidence of abuse, alcoholism, and family dysfunction would have persuaded the jury to return a life sentence. *United States v. Bernard*, 762 F.3d 467, 476 (5th Cir. 2014) ("[G]iven the horrific nature of the crime, reasonable jurists could not debate that the additional, cumulative evidence would in reasonable probability have influenced the jury's balancing of aggravating and mitigating factors."); *Martinez v. Quarterman*, 481 F.3d 249, 259 (5th Cir. 2007) (holding that the unpresented mitigating evidence "was not so compelling, especially in light of the horrific facts of the crime, that the sentencer would have found a death sentence unwarranted"); *Miniel v. Cockrell*, 339 F.3d 331, 347 (5th Cir. 2003) (holding petitioner not prejudiced "[w]hen we compare Miniel's violent history including the cruel manner in which he killed Manier with the potential testimony of his family members that centered on his childhood abuse and substance abuse"). At the very least, the state court's rejection of the claim is not objectively unreasonable. Thus, relief should be denied.

### 1.    Trial counsel's presentation of expert testimony

Ricks criticizes counsel for presenting the testimony of Dr. Lewine, ECF No. 35 at 77. As already discussed, subsection 7.a, counsel did not concede future danger. Counsel highlighted to the jury that the factors which contributed to Ricks's violence—romantic relationships with women—would not be present in prison and he should not pose future harm with life imprisonment. *Id.* Counsel made a reasoned decision to provide the jury with hard evidence, to help guide the jury to a finding of

mitigation—that Ricks had something inherently wrong with him and that it was not his fault. *Id.* Further, Dr. Lewine provided significant evidence to help the jury understand why factors outside of Ricks's control contributed to his behavior. *See supra* Statement of Facts, Section II.6. Ricks's current strategy of blaming his violent predisposition on a different cause outside of his control does nothing to establish prejudice. As further addressed *infra* subsection 3, Ricks fails to show that the state court unreasonably denied this claim.

> ### 2.    Lay witness testimony.

Ricks claims counsel presented inaccurate testimony that he had a supportive family, claiming that witnesses could or would have provided far more detail of abuse and neglect. ECF No. 35 at 78–79.  Ricks relies on affidavits submitted in his state habeas and supplements with additional declarations attached to his petition from Thomas Maracich (friend), Luther Brown (Tina Brown's father), Christine Sudduth (his grandmother), Debbie Abner (cousin by marriage), Helen (his mother), Thomas Abner (cousin), Keith Griffin (friend), Tamara Butts (cousin) Teshana Singleton (ex-wife), and Cortland Byrd (friend). ECF No. 35-1, PX 28–37. Of these persons, Helen, Thomas Abner, Griffin, Butts, Singleton and Byrd testified at trial. 31 RR 58 (Butts); 37 RR 8 (Singleton); 38 RR 40 (Byrd), 79 (Abner); 39 RR 185 (Helen). Additionally, Helen, Butts, and Sudduth provided affidavits for the state habeas proceeding. 1 SHCR 22. The additional material contained in these updated declarations is barred. *See* Argument, Section II; *Martinez Ramirez*, 142 S. Ct. 1718; *Broadnax*, 987 F.3d at 406–10. Consequently, in assessing the reasonableness of the state court decision, this Court is foreclosed from considering this new evidence and Ricks fails to show

that the trial court's determination as unreasonable. 4 SHCR 1930–40. Even considering this new material, the claims still lack merit. Like the affidavits provided in state court, these new declarations add little to the trial. And as addressed further below, Ricks fails to show that this information would have persuaded the jury.

### a.  Abuse by his parents

Here, Ricks relies on information that was submitted and evaluated by the state trial court. ECF No. 35 at 79–80. In her state habeas affidavit, Helen recounted her drinking, verbal and physical abuse by Shedrick, her physical abuse of Ricks, and some history of mental issues. 2 SHCR 795–99. The state court, highlighting the evidence introduced at trial, determined Ricks had not shown "that the addition of evidence that Helen Ricks allegedly severely whipped [Ricks] would have persuaded the jury to answer the special issues differently." 4 SHCR 1917; *see also supra* Subsection D.3. The addition of the barred declaration from Helen, PX 32, though it again provides more of the same, including that she laughed at Ricks when he cried, adds little to what was previously presented.

### b.  Caregivers

Ricks, referring to affidavits submitted with his state writ, argues that the jury could have heard from his cousin Hall that Geraldine punished Ricks by whipping him. ECF No. 35 at 81. He now adds that a teacher hit him in the face with keys one time. *Id.* Ricks cannot show that the addition of this evidence would have persuaded the jury on punishment in his favor, and more importantly he cannot rebut the trial court's findings that he failed to meet his burden. 4 SHCR 1914; *see also supra* Subsection B.

### c.   Domestic violence

Ricks maintains that his parent's relationship was extremely violent and relies on the new declarations of Helen and Sudduth, as well as Halverson's affidavit submitted in state court. ECF No. 35 at 81-82. Helen's new declaration expands on her and Shedrick's troubled relationship, PX 32, and Sudduth recalls that Shedrick would not come home right after work causing him and Helen to fight, PX 30.  Though this adds more detail, the jury was aware that more went on with the family than they admitted. When given the opportunity, Helen testified that Ricks had witnessed his father hit her "one time" and that he became protective of her because he did not like how Shedrick treated her. 39 RR 199–200, 204. Clark testified that Ricks did not get along as well with his dad, and though they looked like good people, more things went on than appeared outwardly. 35 RR 123–24, 139. Dwayne testified that things went on that no one talked about—no one saw their "dirt." 38 RR 180, 191–92. As such, Ricks cannot meet his burden of showing that additional testimony about the parents fighting in front of the kids would have persuaded the jury in his favor and thus  cannot show the state court's determination was unreasonable.

### d.   Running away from home

Ricks relies on affidavits submitted with his state habeas application to argue that the jury would have heard about his running away for days and then weeks at a time. ECF No. 35 at 82–83. However, as the state habeas court found, this information did not to rise to the level of prejudice. 4 SHCR 1916–17. Further, the jury did hear that Ricks ran away from home to avoid discipline. 38 RR 118–30. Ricks cannot rebut the state court's finding of no prejudice.

### e.    Emotional, medical and physical neglect

Ricks claims he endured neglect and relies on new evidence to supplement the trial evidence. ECF No. 35 at 83. However, the jury heard about the parents providing material things, but that they did not know how to help Ricks and just hoped things would improve. *See* Statement of Facts, Section II.B.4&5. For instance, Helen testified that Shedrick left the child-raising to her and that when doctors recommended medication for Ricks or additional therapy, they did not follow through, thinking he would grow out of it. *Id.* When Ricks had his episode in high school with Brown, his mother did admit him into the hospital, but Ricks refused to take the medication upon his release. *Id.* Ricks cannot show that additional testimony about domestic difficulties in the family would have persuaded the jury differently on punishment.

### f.    Exposure to sexual and substance abuse

Ricks claims he was exposed to sexual abuse, ECF No. 35 at 85, but as addressed in state court, these allegations do not pertain specifically to Ricks. As noted by the state court, none of the affidavits provide that Ricks himself was exposed to sexual abuse. 4 SHCR 1914 (#26g–h). Further, the jury heard that Ricks used drugs, even if the family did not provide testimony of their own drug use. *See* Statement of Facts, Section II.A.6. Finally, Ricks fails to show how evidence that others may have used drugs while Ricks was young would have persuaded the jury in his favor, especially in light of the facts of this crime and other aggravating factors.

### g.    Structured environment

Ricks claims counsel failed to introduce evidence that he could function in a structured environment. ECF No. 35 at 87. Ricks, however, ignores that Helen testified that she worked with the schoolteachers to provide a support structure for Ricks and that he did do well at times. 39 RR 199–216. Also, two of his youth coaches testified that he did well in that environment—arguably structured. *See* Statement of Facts, Section II.B.3. Similarly, the jury heard that he had a good work ethic and graduated form medical tech school. *Id.* Section II.B.4&5. Additionally, several childhood friends testified about his good qualities, including visiting his friend Ware when in the hospital. *Id.* Section II. B.2. Finally, the jury heard that he sought help from family and friends before the murders. *Id.* Section II.B.4.5. Ricks fails to show that presenting more of the same would have swayed the jury in Ricks's favor.

### h.    Support system

Ricks argues the jury was misled about the support system he had. ECF No. 35 at 89.  Contrary to Ricks's assertion, the jury did hear about his troubles growing up, *see supra* Subsection D.3. *See also* Statement of Facts Section II.B.2,4–5. Again, as noted by Dr. Price, the evidence as it exists is mixed on what effect childhood trauma has on one's development. 4 SHCR 1930–32.  Ricks himself testified that he had been depressed and was under stress prior to these murders, 40 RR 31–32, 38, 67, and his mother confirmed that he had called her the day of the murders, but she told him to "man up" and take care of his child, 39 RR 227. In light of this record, Ricks cannot show prejudice and fails to rebut the trial court's findings.

128

### 3.    Other experts

Ricks again asserts that a trauma expert could have explained to the jury the impact of his upbringing. ECF No. 35 at 90–93. In state court Ricks provided affidavits from different experts—who also opined that FASD and other environmental factors and trauma may have contributed to his behavior—however, the state court determined Ricks failed to show either deficient performance or prejudice. *See supra* Subsections B & D.3; 2 SHCR 972–80; 3 SHCR 1208–18; 4 SHCR 1926–33. Ricks cannot rebut the trial court's findings and has simply retained other experts to provide more of the same, meanwhile ignoring evidence to the contrary.[28] *See supra* Subsection B; Statement of Facts, Section II.B.6. For instance, his new expert only reviewed select material, *compare* ECF No. 35-1, PX 60 *with* 3 SHCR 1414–15 (Dr. Price Aff'd), and concludes that Ricks has a "worsening ability to comport himself" and operates in "fight or flight" mentality, that environmental stressors are magnified, and that he has cognitive deficits consistent with damage to the "frontal -limbic areas of the brain."[29] ECF No. 35-1, PX 60. Even taking this evaluation at face value, it still comes to the same conclusion: that Ricks has poor impulse control. *See* 39 RR 142–43, 155.

As already discussed, the jury heard that Rick's had many behavioral issues growing up, *see supra* Subsection D.3, and that factors other than biology may have

---

[28]    Elmore's Report relies on select statements in reaching her results. ECF 35-1; PX 59 at 1–2. As already noted, at the time of trial family members were not so forthcoming with details about their home life. 4 SHCR 1903–04.

[29]    Dr. Lewine testified that Ricks's scans did not show a reduction in the frontal lobe volumes but did show an enlarged putamen volume. 39 RR 121–22.

contributed to his enlarged brain—Dr. Lewine explained that various things go into the way the brain looks, such as heredity, early and late environmental factors, like an impoverished environment, and that most "volumetric changes are more closely related to very early life history as opposed to late life history." 39 RR 123–24, 145, 182–83. He added that Ricks scored a 61 on the MSCEIT which indicates impaired emotional intelligence, *id.* at 127–28, and that Ricks goes into sensory overload at a lower level of sound intensity than neurotypical individuals, so he cannot control his impulses during a heated argument and would theoretically fall back on impulsive and aggressive tendencies in a noisy environment.[30] *Id.* at 142–43, 155.

The expert evaluations come down to the same core conclusion: either because of environment, biology, or both, factors beyond Rick's control contributed to his behavior. That Ricks's new expert would have attributed his behavior to some other factor fails to establish that jury would have answered the special issues differently and thus cannot show *Stricland* prejudice—especially in light of the horrific nature of this offense, his subsequent conduct, his testimony at punishment, and the other aggravating evidence. 466 U.S.at 695. Ricks fails to show that the state court's determination that counsel was effective was unreasonable. 4 SHCR 1932–36.

### 4.    Extraneous Offenses

Ricks claims that the State "heavily relied on each of these incidents in support of its case for future dangerousness in its closing argument": that Ricks physically assaulted Singleton; that he tried to sneak a pencil into court; and that he hoarded

---

[30]    Dr. Lewine attributed the sensory overload to biology since none of the testing supported a finding of TBI, which is the other possible cause. *Id.* at 138, 144.

pills. ECF No. 35 at 93.  He adds that had trial counsel investigated these incidents, they could have significantly undermined the State's future dangerousness case *Id.* at 94.  Ricks's assertion that counsel failed to adequately investigate these matters is conclusory and not supported by the record, especially considering counsel's effective cross-examination on these matters.[31] *See supra* subsection D.7.b; *see also infra* Section IX.B.1 &3, Section X.C. Significantly, Ricks ignores the horrific nature of the crime itself, which the State relied on heavily, along with all the other aggravating evidence introduced at punished that far exceeded these incidents. 40 RR 100–04; *see also* Statement of Facts, Section I & II.A. This claim is meritless.

### 5.    Ricks fails to meet his burden under *Strickland*.

"Surmounting Strickland's high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). As detailed above, trial counsel's presentation of evidence was neither deficient nor prejudicial. *See Strickland*, 466 U.S. at 689, 694–95. Ricks fails to defeat the doubly-deferential standard of *Strickland* and AEDPA. *Pinholster*, 563 U.S. at 202. And even with consideration of evidence that is barred by 28 U.S.C. § 2254(e)(2), Ricks cannot show that trial counsel were ineffective. Moreover, the state habeas court findings are presumed correct, even if this claim is reviewed *de novo*. 28 U.S.C. § 2254(e)(1); *Murphy v. Davis*, 901 F.3d 578, 595 (5th Cir. 2018). Ricks's IATC-punishment claim should be denied.

---

[31]    Ricks makes a stray comment in a footnote that the prosecution's argument regarding Ricks hoarding pills was false. ECF No. 35 at 93 n.40. If Ricks intended to raise a claim, he failed to do so, and any such claim is subject to dismissal as inadequately briefed. *See Beazley*, 242 F.3d at 270; *Dowthitt*, 230 F.3d at 752; *Holberg*, 2021 WL 3603347, at *91.

## IX.    Ricks's Claims Regarding the Use of False Testimony Are Procedurally Barred and Meritless. (Claim 7).

In the next set of claims, Ricks contends that, during the punishment, the State (1) introduced the false testimony of Deputy Moore that Ricks's improperly obtained a pencil in jail, (2) presented the false and misleading testimony that Ricks forced his high school girlfriend into his car, and (3) elicited false and misleading testimony to obscure the circumstances of his beating in Garvin County Jail.  ECF No. 35 at 98–105. The claims are unexhausted and procedurally defaulted. Even so, Ricks fails to show that testimony was false, let alone material and the claims are meritless.

### A.    Procedural Bar

Because Ricks did not raise these claims in state court, they are unexhausted and procedurally barred pursuant to the Texas abuse-of-the-writ doctrine, codified in Article 11.071 § 5(a) of the Texas Code of Criminal Procedure. *See supra* Section III.A. Therefore, Ricks must demonstrate "cause and prejudice" to overcome the bar or show a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. Ricks simply asserts that he meets this standard but provides no explanation.[32] ECF No. 35 at 106. Ricks does not point to a circumstance outside of his control that prevented him from properly raising these claims, and the claims do not allege he is actually innocent of capital murder or the death penalty. These claims are therefore clearly defaulted.

### B.    The State did not introduce false or misleading testimony.

It is well settled that the State may not knowingly use perjured testimony, and the State must correct perjured testimony if known. *Giglio v. United States*, 405 U.S.

---

[32]    Ricks did not brief this claim in his motion seeking a stay. *See supra* note 14.

150, 154 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959). "'[A] new trial based upon a *Napue* violation is proper only if (1) the statements in question are shown to be actually false; (2) the prosecution knew that they were false; and (3) the statements were material.'" *United States v. Stanford*, 823 F.3d 814, 838–39 (5th Cir. 2016) (quoting *United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir. 1997)). But "[e]ven assuming that the prosecution presented (or failed to correct) false testimony, the critical factor is materiality." *Id.* (parenthesis in original). Contradictory testimony from witnesses, inconsistencies within a witness's testimony, and conflicts between reports, written statements and the trial testimony of prosecution witnesses do not, standing alone, establish perjury. *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990).

As will be discussed below, the State did not present false evidence. Further, Ricks relies on evidence—PX 24—26, 28—29, 54, 62, *see also supra* Section II—that is barred by § 2254(e)(2), since it was not presented in state court. But even if such evidence were considered, as addressed below, Ricks's claims still fail.

### 1.   Deputy Moore

At punishment, the State called Deputy Moore, a sheriff's deputy whose duties included ensuring safety and taking care of Ricks during the trial. 36 RR 56. According to Moore, on March 25, 2014, Ricks was in a holdover cell changing from the prison smock (or "muumuu" assigned to suicidal inmates) to civilian clothes when a deputy heard something drop and observed a pencil on the floor. 36 RR 55, 58. Moore explained that "because of [Ricks's] classification, he's not allowed to have any implements, such as a pencil, pen, things like that" due to his being "on suicide watch," and that "obviously that can be something he can use to harm himself or

someone else." 36 RR 59. Moore agreed that this pencil "can be a weapon." *Id.* When Moore asked Ricks about the pencil a couple of weeks later, Ricks said he concealed it in the straps of his smock when he left his cell to come to the courtroom. 36 RR 59–60. On cross-examination, Moore agreed that Ricks, accompanied by two deputies was handcuffed and shackled while taken to court and that the pencil was tucked in his smock. *Id.* at 65–66. Moore confirmed that the pencil was small, maybe a couple of inches long and that during jury selection, and Ricks had a book in which he took notes with a felt-tip pen. *Id.* at 66–67. Moore acknowledged that Ricks did not do anything he was not supposed to with the pencil; he did not threaten them with it, and they had no incidence of violence while dealing with him. *Id.* at 68–69. On re-direct, in response to defense counsel's questions that Ricks could not reach the pencil while handcuffed, Moore agreed that when changing clothes, Ricks was not handcuffed and could access the pencil and could have used the pencil against them. *Id.* at 72. On re-cross, Moore confirmed that Ricks did not attack them, and the security measures in place were protocol and not specific to Ricks pulling a pencil. *Id.* at 73–74.

Ricks now argues that this testimony was false because the prosecutor knew that Ricks was allowed a soft pencil, that such pencils were allowed in jail, and that Ricks had not displayed violent behavior while in jail. ECF 35 at 100. Ricks relies on handwritten notes on yellow legal pad that were not submitted in state court, highlighting two statements: inmates get "soft" type pen and "indigent—gets short pencil & 3 sheets paper." ECF No. 35 at 99; ECF No.18-2, at 29, PX 24.

However, upon review of the notes, the statements also include, *inter alia*, as best as can be deciphered: "Δ probably smuggling pencil for bad purposes"; and, "all he should bring to court is paperwork & ID (not pen or pencil)." ECF No.18-2, PX 24, at 29. Additionally noted is "very little to search b/c of mental health status." *Id.* at 26. These notations do not undermine Moore's testimony that Ricks *improperly brought* the pencil to court—Moore testified specifically about transporting Ricks to court and not the jail environment—and the prosecutor asked about Ricks's possession of the pencil in the holdover cell at court, not jail. 36 RR 57–58. Moreover, the notes do not confirm that the pencil Ricks improperly possessed was a "soft" pencil. ECF No.18-2, PX 24, at 29. Nor do the notes do anything to indicate whether the pencil Ricks possessed could have been used as a weapon. *Id.* Importantly, Moore confirmed that he returned the pencil with Ricks when they took him back to jail, and he gave it to a jail officer. *Id.* at 59–60. When asked about it, Ricks agreed he concealed the pencil. *Id.* Even if Ricks could show some inconsistency in the testimony, it still would not amount to perjury. *See Koch*, 907 F.2d at 531. Because Ricks cannot meet his burden to show that the testimony was false, the State could not have knowingly presented false testimony.

Finally, the jury was not misled by the testimony or the prosecution's closing argument.  Ricks emphasizes the State's closing argument, which provides as follows:

> And he smuggled a pencil over to . . . another courtroom where we were doing voir dire  . . . . That takes thought and planning. I don't know whose neck that pencil was intended for or what he intended to do that with that pencil, but he's got one provided for him right over there, but he brought another one to court.

135

40 RR 104. This argument was a proper summation of the evidence presented and acknowledged that Ricks had access to a pencil in court. It is settled that an argument premised on a reasonable deduction from the trial evidence does not violate due process. *United States v. Bennett*, 874 F.3d 236, 254 (5th Cir. 2017); *Norris v. Davis*, 826 F.3d 821, 832 (5th Cir. 2016). The jury was aware from the testimony at trial that Ricks was permitted soft writing instruments, caused no harm with the pencil, and did not require any additional security. 36 RR 66–69. Importantly, Ricks cannot show materiality when the seriousness of the pencil incident pales in comparison with all the other aggravating evidence presented in punishment, including the brutality of the crime, and his disturbing and escalating violence against women and his murder and attempted murder of children. *See supra* Statement of Facts, Section II.A. Ricks cannot establish a due process violation.

### 2.   Tina Brown

Ricks argues that during punishment the State used the false testimony of high school security guard Cooper to contend that Ricks forced his then-girlfriend Tina Brown into his car. ECF No. 35 at 100–01. Ricks relies on police reports and statements made by Brown's father and mother that they did not *believe* that Ricks had kidnapped her.[33] ECF No. 35 at 101; ECF No. 35-1, PX 29 at 4–5, PX 62 at 238. In support of his allegation, Ricks also attaches a police report from the incident. ECF No. 18-2, PX 21 at 9–12. According to the report, Ricks, after being taken home by Cooper for disciplinary problems and instructed not to return, returned to the high

---

[33]   Ricks also makes an inappropriate attack on Cooper's character without showing such evidence would be admissible. ECF No. 35 at 102 n.44; Tex. R. Evid. 404; Tex. R. Evid. 609.

school, approached Brown who refused to go with him, so he picked her up, removed her from the building, and took her to his car. *Id.* at 11. Also reflected is that no prosecution ensued because the victim would not cooperate with the State. *Id.*

Notably, Ricks does not claim that he did not have the police report in question at the time of trial, and by his own account, the defense was aware of Brown's mother's unsubstantiated beliefs about the kidnapping. ECF No. 35-1, PX 62 at 238 (notes reflecting Brown's belief). Thus, counsel had all the information he needed to vet out possible false testimony. *See O'Keefe*, 128 F.3d at 894 (noting, in light of concerns about the importance of the adversarial system, a reluctance to find a *Napue* violation if the prosecution provided the defendant with the necessary information to vet allegedly false testimony at trial, but the defendant elected not to use it).

Even so, Cooper's testimony was brief and did not go into details about Ricks's interactions with Brown, and he simply stated that when he returned to the school after dropping off Ricks, he got a call that Ricks had returned and was "pulling his girlfriend out of the building." 36 RR 12–13; *see* 38 RR 144. Ricks fails to show Cooper's testimony regarding the facts of the incident was false. Brown's parents' second-hand recollections do nothing to show falsity in Cooper's testimony, nor does the victim's purported refusal to cooperate with the prosecution. Additionally, other testimony corroborated Ricks's acts of violence against Brown. 39 RR 203; 40 RR 62.

Ricks himself agreed during his testimony that he overacted when he grabbed Brown against her will and placed her in his car and confirmed that he was arrested a couple of times for things at school involving Brown. 40 RR 55–56, 62. Shedrick

137

recalled the kidnapping event with Brown. 38 RR 142. Helen, who provided details of another incident involving Brown, testified that Ricks came upon Brown one day with another guy in the car and Ricks broke the car window with his fist. 39 RR 203. In light of this record, Ricks, who relies on inadmissible hearsay and evidence barred from this Court's consideration, has failed to show that Cooper's testimony was false, let alone that the State knowingly presented false testimony. *See Spence v. Johnson*, 80 F.3d 989, 997 (5th Cir. 1996) (petitioner failed to show prosecution knowingly presented perjured testimony where witness's testimony was corroborated by other evidence).

Finally, Ricks cannot establish that this testimony was material, especially given the volume of evidence presented of Ricks's violence against other women, including his ex-wife Singleton, not to mention the horrific details of these murders. *See* Statement of Facts. The jury was not misled by Cooper's testimony, and Ricks cannot show that this alleged false testimony affected the outcome of his trial.

### 3.    Garvin County Jail

Ricks maintains that the State presented misleading testimony from jailer Cardoso and inmate Rose that Ricks, while in Garvin County Jail, was placed in the general population at his request and beaten because he bragged about the murders, when law enforcement reports show that Ricks was beaten, at least in part, due to his race. ECF No. 35. at 103–05. Even if other factors may have also contributed to the fight, they do not cast doubt on the validity of the testimony of Cardoso or Rose, nor was the jury left with an inaccurate account of what occurred, especially since video of the fight was admitted at trial.

138

Cardoso, who booked Ricks when entering the jail, testified that she wanted to place Ricks in a single cell because of the facts of this offense but that Ricks had asked to go to general population—she agreed but advised Ricks to not speak about the offense. 39 RR 236—38. Rose, who was also an inmate at this time, confirmed that Ricks bragged about the offense. 39 RR 255–57.

Now, Ricks, to counter the testimony of Cardoso and Rose, provides a report written by Officer Royce Glass and argues that the attack may have been racially motivated. ECF No. 18-2, PX 26 at 42. Glass documents in the report that he was working at the jail when he heard screaming, located the source, and observed an inmate hitting another. *Id.* After getting assistance to enter the area, he heard an inmate state that "n[***]er got what he deserved for killing a 12 year old" and another inmate say that "Ricks killing his 12 year old child was no accident, but [him] running into his fists . . . was an accident." *Id.* Glass recounted that both inmates were proud to have attacked Ricks and continued using "racial slurs" toward Ricks. *Id.*

This report does not show that false evidence was presented. The report does not refute Rose's testimony that Ricks bragged about his crime and showed a lack remorse or the testimony indicating Ricks was attacked for that reason. Moreover, Glass's report supports Cardoso's advice to Ricks to not mention the facts of his crime seeing that the inmates were proud for attacking Ricks because of his crimes. ECF No. 18-2, PX 26 at 42. Further, Glass makes no mention of being present when Cardoso talked to Ricks nor provides any insight about the single cell or general

population request made by Ricks—matters that Cardoso testified about. *Id.* Based on this record, Ricks cannot show that Cardoso gave false testimony.

More importantly, the jury was not misled about the attack when video footage of the fight was introduced at trial. The defense and State stipulated to the introduction of the two videos of the jail fight, as well as Ricks's medical records from before the fight and after the fight. 38 RR 23–24; DX 16, 17 (videos), 18 (stipulation) & 19 (medical records). The fight was videotaped both on the inside of the cell and the hallway outside the cell. 38 RR 17. Testimony was presented that someone who was inside the cell got in front of the video camera, obscuring part of the view. *Id.* Rose acknowledged that one of the cellmates was incarcerated for "chopp[ing] up somebody," realized there would be a fight but did nothing to help. 39 RR 259–60, 265. The jury heard that Ricks did not start the fight, and that an undersheriff at the jail told Bedford Detective Mack that he would place Ricks in that particular cell to see if he would make a statement. 38 RR 18. Mack confirmed that Ricks had had his hands bandaged when placed in the cell and would probably not want to start a fight with six or seven inmates. *Id.* at 16–17. Cardoso agreed that the jailers should have heard the screams from the cell. 39 RR 248. Additionally, Ricks waived extradition after this attack. 38 RR 20–21; 39 RR 240.

As such, Ricks cannot show that the State offered false testimony, let alone that the jury was misled where the report Ricks relies on supports the testimony that he was attacked (at least in part) because of his crime and considering that the jury saw footage of the attack, including the injuries Ricks had before and after, and that

soon after the attack Ricks just wanted to get out of Oklahoma. Further, Ricks cannot show that additional evidence was material to the punishment when it could not have affected the jury's decision in light of the brutality the crime itself and the abundance of aggravating evidence presented by the State, in particular Ricks's escalating violence against women. *See supra* Statement of Facts, Section II.A.

### 4.  Cumulative error.

As acknowledged by the Fifth Circuit:

> "We have repeatedly emphasized that the cumulative error doctrine necessitates reversal only in rare instances and have previously stated en banc that 'the possibility of cumulative error is often acknowledged but practically never found persuasive.'" *United States v. Delgado*, 672 F.3d 320, 344 (5th Cir.2012) (en banc) (quoting *Derden v. McNeel*, 978 F.2d 1453, 1456 (5th Cir.1992) (en banc)). More importantly, "non-errors have no weight in a cumulative error analysis." *Id.*

*Stanford*, 823 F.3d at 842–43. Because as discussed above, Ricks has failed to show that any false testimony was presented to the jury, let alone that such testimony was material to the punishment, his claim to a cumulative *Napue* error must fail as no error has no weight in this analysis.  *Id.* at 841, 843.

In sum, this claim is unexhausted and procedurally barred, relies on barred evidence, and Ricks has failed to overcome the bar or show a fundamental miscarriage of justice would result from the claim's dismissal. *See Coleman*, 501 U.S. at 750. Additionally, the claim is meritless and should be denied.

## X.  Ricks's *Brady* Claim Is Procedurally Barred and Meritless. (Claim 8).

Ricks claims that the State failed to disclose favorable evidence that he was allowed pencils while in Tarrant County Jail, as alleged in Claim Seven, and the failure to disclose this evidence allowed the State to present a misleading narrative

that Ricks posed a danger. ECF No. 35 at 106–09. This claim is procedurally defaulted, relies on barred evidence, and regardless, meritless.

### A.    Procedural Bar

Because Ricks did not raise this claim in state court, it is unexhausted and procedurally barred pursuant to the Texas abuse-of-the-writ doctrine, codified in Article 11.071 § 5(a) of the Texas Code of Criminal Procedure. *See supra* Section III.A. Therefore, Ricks must demonstrate "cause and prejudice" to overcome the bar or show a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. Ricks makes a conclusory assertion that he can meet his standard but provides no explanation. ECF No. 35 at 109. And as discussed below, Rick's failure to show the prosecution suppressed favorable evidence precludes him from establishing cause and prejudice. *See Prible*, 43 F.4th at 514. The claim is therefore clearly defaulted.[34] Also, the newly presented evidence Ricks offers to support his claim is barred from consideration. *See supra* Section II; PX 24-25.

### B.    *Brady* caselaw

"To establish a *Brady* violation, the defendant must prove that (1) the prosecution suppressed evidence, (2) it was favorable to the defendant, and (3) it was material." *United States v. Brown*, 650 F.3d 581, 587–88 (5th Cir. 2011); *see also Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). The Government's good or bad faith in withholding the evidence is irrelevant. *Brown*, 650 F.3d at 588 (citing *Kyles v. Whitley*, 514 U.S. 419, 432 (1995)). "[E]vidence is not suppressed 'if the defendant

---

[34]    Ricks failed to brief this claim in his motion seeking a stay. *See supra* note 14.

knows or should know of the essential facts that would enable him to take advantage of it.'" *Id.* (quoting *United States v. Runyan*, 290 F.3d 223, 246 (5th Cir. 2002)). Indeed, "[t]o have been suppressed, the evidence must not have been discoverable through the defendant's due diligence." *Id.* Evidence is "material" only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley,* 473 U.S. 667, 682–85 (1985). A "reasonable probability" results when nondisclosure places the case in a different light so as to undermine confidence in the verdict. *Kyles,* 514 U.S. 419, 434 (1995).

### C.     Ricks has failed to show suppression or materiality

To begin, Ricks fails to explain how it was not within his knowledge what writing instruments he was permitted to have while at Tarrant County Jail. *See Brown*, 650 F.3d at 588. The State gave notice prior to trial about its intent to introduce this incident. 2 CR 450 (#76). The State's handwritten notes, or work product, which were consistent with the testimony presented in court, as discussed above Section IX.B.1 (Deputy Moore) and reincorporated herein, do not rise to the level of a *Brady* violation. Importantly, as discussed in Section IX.B.1, the issue that was of concern at trial was that Ricks snuck a pencil in his smock to court, not what he could have one in jail. The notes confirm that he was not to bring a pen or pencil to court. ECF No.18-2 at 29, PX 24 ("All he should bring to court is paperwork & ID (not pen or pencil)"). Importantly, Ricks admitted to Moore that he hid the pencil, and Moore confirmed he returned the pencil to the jailer when he returned Ricks. 36 RR 59–60. Ricks has failed to show that favorable evidence was suppressed.

143

Even assuming Ricks meets the first two *Brady* requirements, he cannot show materiality. Moore acknowledged that Ricks did not do anything he was not supposed to with the pencil, did not threaten the guards with it, and they had no incidence of violence since dealing with him. 36 RR 68–69. Further, the jury was apprised that Ricks was allowed to have a felt tip pen in court, which he used to take notes. *Id.* at 66–67. In light of the brutality of this crime, along with the other aggravating evidence contributing to Ricks's punishment, he cannot show that any additional questioning about the pencil would have made a difference. *See* Statement of Facts Sections I & II; *see also Miller v. Dretke*, 251 (5th Cir. 2005) ("If the evidence provides only incremental impeachment value, it does not rise to the level of *Brady* materiality." (citations omitted)). As such, Ricks has not shown a *Brady* violation.

This claim is procedurally barred, relies on barred evidence, and more importantly, Ricks has failed to show a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.

## XI.   Ricks's Challenge to the Constitutionality of the Texas Death Penalty Scheme Is Without Merit. (Claim 9).

Ricks asserts that his "death sentence was imposed by a geographically and racially discriminatory system, in violation of the Eighth Amendment and the Equal Protection Clause of the Fourteenth Amendment." ECF No 35 at 109. Ricks understands that Supreme Court and Fifth Circuit precedent forecloses this claim but asserts the claim to preserve it for future appeal. *Id.* at 110. As acknowledged, Ricks's claim is without merit. *See, e.g., Jurek v. Texas*, 428 U.S. 262, 279 (1976) (reviewing and upholding the Texas death-penalty statutory scheme); *Kelly v.*

144

*Lynaugh*, 862 F.2d 1126, 1135 (5th Cir. 1988). Ricks exhausted this claim which was raised as Claim Thirteen on direct appeal. *See Ricks*, 2017 WL 4401589 at *13. The CCA, noting that Ricks conceded that the CCA previously rejected similar arguments, declined to reconsider its prior holding and rejected the claim. *Id.*; *see, e.g., Gallo v. State*, 239 S.W.3d 757, 779–80 (Tex. Crim. App. 2007); *Allen v. State*, 108 S.W.3d 281, 286–87 (Tex. Crim. App. 2003). Considering Ricks's concession, he fails to meet his burden under § 2254(d)(1), and this claim should be denied.

## XII.    Ricks's Challenge to the Constitutionality of the Texas Mitigation Special Issue Is Without Merit. (Claim 10).

Ricks argues that that the special issues of Texas Code of Criminal Procedure Article 37.071 leaves juries unable to understand the meaning of the terms contained and gives the false impression that the full range of mitigating evidence cannot be considered, in violation of the Eighth Amendment.  ECF No. 35 at 110. As discussed below, this claim is procedurally defaulted and, alternatively, without merit.

In state court, the CCA refused to address the merits of this claim (ground five in state writ) because it was not presented on direct appeal. *Ex parte Ricks*, 2020 WL 6777958, at *1 ("We will not review the merits of these habeas claims because Applicant failed to raise them on direct appeal."). Federal review of a habeas claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default. *Harris* 489 U.S. at 265. In considering Ricks's claim, the CCA plainly stated that it was relying on a procedural bar. *Ex Parte Ricks*, 2020 WL 6777958, at *1.  Accordingly, Ricks's claim is procedurally barred unless he can demonstrate cause and prejudice or a

miscarriage of justice. *Coleman*, 501 U.S. at 750. Ricks does not attempt to address this bar; thus, the claim is not subject to review.

Further, the Fifth Circuit has repeatedly upheld the constitutionality of the Texas capital sentencing scheme. *Paredes v. Quarterman*, 574 F.3d 281, 294 (5th Cir. 2009); *see also Jurek*, 428 U.S. at 276 (reviewing and upholding the Texas death-penalty statutory scheme). This Circuit has concluded that "the terms in Texas's second special issue 'have a plain meaning of sufficient content that the discretion left to the jury [is] no more than that inherent in the jury system itself.'" *Paredes,* 574 F.3d at 294 (citing *Milton v. Procunier*, 744 F.2d 1091, 1095–96 (5th Cir.1984)); *see also McCoskey v. Thaler*, 478 F. App'x 143, 150 (5th Cir. 2012) ("The capacious definition of 'mitigating evidence' employed in the Texas statute can 'encompass[ ] virtually any mitigating evidence.'").The definition includes "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Beazley*, 242 F.3d at 260 (quoting *Lockett*, 438 U.S. at 604). Moreover, the Fifth Circuit has "repeatedly concluded that, under that [future danger] special issue, a jury could give effect to good character evidence." *Id.* (citations omitted).

Ricks relies on two notes sent by the jurors asking for clarification and a juror affidavit submitted in state habeas. ECF No. 35 at 110. Although the CCA determined the claim was barred, the state habeas court did enter findings of fact and conclusions of law. 4 SCHCR 1053–55. The habeas court struck the juror affidavit because it did not meet the admissibility requirements under Texas Rule of Evidence

606(b). *Id.* (#1).  The CCA confirmed that the affidavit was not admissible.[35] *Ex parte Ricks*, 2020 WL 6777958, at *1, n. 3. The habeas court found that the Texas "death-penalty scheme is comprehensible to jurors" and that Ricks offered "no valid basis to overturn the Texas' current death-penalty scheme." 4 SHCR 1954 (# 9 & 13).

Ricks agrees that Fifth Circuit precedent forecloses this claim and only presents it to preserve the issue for appellate review. ECF No. 35 at 110. Based on the facts and law, the statute did not violate the Eighth Amendment. *See Paredes*, 574 F.3d at 294. As such, the claim is procedurally barred and meritless.

## XIII.   Ricks's Requests for Discovery and an Evidentiary Hearing Should Be Denied.

In his prayer for relief, Ricks requests that this Court "[a]llow Petitioner leave to conduct discovery" and "an evidentiary hearing". ECF No. 35 at 112. A judge may, "for good cause, authorize a party to conduct discovery[.]" Rule 6(a) of the Rules Governing § 2254 cases. But to show good cause, a "petitioner must demonstrate that 'a factual dispute, if resolved in the petitioner's favor, would entitle him to relief and the state has not afforded the petitioner a full and fair evidentiary hearing.'" *Lave v. Dretke*, 416 F.3d 372, 381 (5th Cir. 2005) (quoting *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994); *see Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997). Moreover, a petitioner's "factual allegations must be specific, as opposed to merely speculative or conclusory, to justify discovery under Rule 6." *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000); Rule 6(b) of the Rules Governing § 2254 Cases. Ricks provides no good

---

[35]     The affidavit is also inadmissible in these proceedings. Fed. R. Evid. 606(b).

cause for discovery, nor does he "specify any requested documents" as required by the rules governing § 2254 petitions.

Second, with regard to Ricks's adjudicated claims, § 2254(d)(1) forecloses the consideration of evidence—whether by way of discovery or evidentiary hearing—that was not before the state habeas court. *Pinholster,* 563 U.S. at 185. In addition, § 2254(e)(2) "restricts the discretion of federal courts to consider new evidence when deciding claims that were not adjudicated on the merits in state court. *Id.* at 186. This bar is triggered if the petitioner "has failed to develop the factual basis of a claim in State court proceedings. 28 U.S.C. § 2254(e)(2). The opening clause requires that the prisoner "was at fault for failing to develop the factual bases for his claims in state court, *Bradshaw v. Richey*, 546 U.S. 74, 79 (2005) (per curiam), meaning a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *(Michael) Williams*, 529 U.S. at 432. Further, the Supreme Court's recent decision in*, Martinez Ramirez*, 142 S. Ct. 1718, leaves no doubt as to the limitations on new evidence. In *Martinez Ramirez*, the Supreme Court held "that, under § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel." *Id.* at 1734. That is because "under § 2254(e)(2), a prisoner is 'at fault' even when state postconviction counsel is negligent." *Id.* at 1735. So "a federal court may order an evidentiary hearing or otherwise expand the state-court record only if the prisoner can satisfy § 2254(e)(2)'s stringent requirements." *Id.*

Ricks, as discussed above, fails to meet an exception to this evidentiary restriction—he does not rely on a new, retroactive rule of constitutional law or a previously undiscoverable factual basis of any claim using diligence combined with actual innocence. 28 U.S.C. § 2254(e)(2)(A)–(B). Accordingly, because the Court cannot consider whatever might be produced in discovery or an evidentiary hearing, the Court should deny his request. *See Shoop v. Twyford*, 142 S. Ct. 2037, 2043 (2022) ("AEDPA provides the governing rules for federal habeas proceedings, and our precedents explain that a district court must consider that statute's requirements before facilitating the development of new evidence.").

Finally, "if the record refutes applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Schriro*, 550 U.S. at 474–75. Even where no factual findings have been made by a state court, a district court does not abuse its discretion in refusing to grant an evidentiary hearing if there are sufficient facts before it to make an informed decision regarding the merits of a claim. *McDonald v. Johnson*, 139 F.3d 1056, 1060 (5th Cir. 1998). To be entitled to a hearing, a petitioner must show there is "a factual dispute which if resolved in [his] favor would entitle him to relief." *Norman v. Stephens*, 817 F.3d 226, 235 (5th Cir. 2016) (citation omitted).

As mentioned above, regarding Ricks's adjudicated claims, additional factual development would not be relevant to claims reviewed under § 2254(d)(1). Further, with regard to Ricks's procedurally defaulted claims, additional factual development would not entitle Ricks to relief, as his arguments to overcome the defaults are

meritless. For all the reasons discussed *supra*, there are "sufficient facts" presently before this Court to make an "informed decision" that Ricks's unadjudicated claims are also meritless. For these reasons, Ricks's requests for discovery, an expansion of the record, and an evidentiary hearing should be denied. *See Martinez Ramirez*, 142 S. Ct. at 1730 ("[O]nly rarely may a federal habeas court hear a claim or consider evidence that a prisoner did not previously present to the state courts in compliance with state procedural rules.").

## CONCLUSION

For the foregoing reasons, the Director respectfully requests that this Court deny Ricks's petition for federal habeas relief, deny his requests for an evidentiary hearing and discovery, and *sua sponte* deny a Certificate of Appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (explaining that the district court has the power to *sua sponte* deny a certificate of appealability without prior briefing and argument by counsel).

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Acting Deputy Attorney General for
Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

s/ Georgette Hogarth

150

* Counsel of Record

GEORGETTE HOGARTH*
Assistant Attorney General
State Bar No. 24007129

P. O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936-1400
(512) 936-1280 (Facsimile)

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2022, I electronically filed the foregoing

document with the clerk of the court for the U.S. District Court, Northern District of

Texas, using the electronic case filing system. The electronic case filing system sent

a "Notice of Electronic Filing" to lead counsel, who has consented in writing to accept

this Notice as service of this document by electronic means:

Naomi Fenwick
Assistant Federal Public Defender
naomi_fenwick@fd.org

Jeremy Schepers
Supervisor, Capital Habeas Unit
jeremy_schepers@fd.org

Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202

 s/ Georgette Hogarth
GEORGETTE HOGARTH*
Assistant Attorney General

151