1              REPORTER'S RECORD

2           VOLUME 40 OF 46 VOLUMES

3         TRIAL COURT CAUSE NO. 1361004R

4       COURT OF CRIMINAL APPEALS NO. AP-77,040

5  THE STATE OF TEXAS         |   IN THE DISTRICT COURT OF

6  VS.                        |   TARRANT COUNTY, TEXAS

7  CEDRIC ALLEN RICKS         |   371ST JUDICIAL DISTRICT

8  ========================================================

9           TRIAL ON PUNISHMENT CONTINUED

10 ========================================================

11     On May 16, 2014, the following proceedings came on

12 to be heard in the above-entitled and numbered cause

13 before the said Honorable Mollee Westfall, Judge of the

14 371st District Court, held in Fort Worth, Tarrant

15 County, Texas:

16     Proceedings reported by computerized stenotype

17 machine.

18 ========================================================

19

20

21

22
              Brenda C. Hein, Texas CSR #2077
23            Official Court Reporter
              371st District Court
24            401 West Belknap
              Fort Worth, Texas  76196-7118
25            (817) 884-2895

```
 1   APPEARANCES:

 2   ATTORNEY(S) FOR THE STATE OF TEXAS:
     HON. ROBERT GILL
 3   SBOT No. 07921600
     AND
 4   HON. ROBERT HUSEMAN
     SBOT No. 24036035
 5   Assistant District Attorneys
     401 West Belknap
 6   Fort Worth, Texas  76196-0201
     Telephone:  817-884-1400
 7
     ATTORNEY(S) FOR THE DEFENDANT:
 8   HON. WILLIAM H. RAY
     SBOT No. 16608700
 9   Attorney at Law
     512 Main Street, Suite 308
10   Fort Worth, Texas  76102
     Telephone:  817-698-9090
11   AND
     HON. STEVE GORDON
12   SBOT No. 00785918
     Attorney at Law
13   2101 Moneda Street
     Fort Worth, Texas  76102
14   Telephone:  817-877-0610

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              CHRONOLOGICAL INDEX

 2           TRIAL ON PUNISHMENT CONTINUED
              VOLUME 40 OF 46 VOLUMES
 3
     May 16, 2014                        PAGE   VOL
 4
     Caption.............................  1     40
 5
     Appearances.........................  2     40
 6
     Chronological Index.................  3     40
 7
     Alphabetical Venireperson List......  4     40
 8
     Alphabetical Witness List...........  4     40
 9
     Exhibits List.......................  5     40
10
     Proceedings.........................  6     40
11
     DEFENDANT'S WITNESSES       DREX  CREX  VDEX  VOL
12
     JOHN L. MCGEE                 7    13          40
13
     GARY KORHONEN                15    22          40
14
     CEDRIC ALLEN RICKS                       25    40
15                                 27    48          40

16   Defendant rests....................  85    40

17   STATE'S WITNESSES           DREX  CREX  VDEX  VOL

18   DIANA MCGREWE                86                40

19   KENDALL NOVAK                93                40

20   Both sides rest and close..........  97    40

21   Objections to Court's charge.......  97    40

22   Court's charge read in open court..  99    40

23   State's opening argument by Mr. Huseman.......  99    40

24   Defendant's opening argument by Mr. Ray....... 106    40

25   Defendant's closing argument by Mr. Gordon.... 113    40
```

```
 1   CHRONOLOGICAL INDEX CONTINUED                PAGE   VOL

 2   State's closing argument by Mr. Gill.......... 118    40

 3   Jury deliberations........................... 131    40

 4   Verdict...................................... 133    40

 5   Jury polled.................................. 135    40

 6   Sentencing................................... 137    40

 7   Jury discharged.............................. 138    40

 8   Jury polled.................................. 138    40

 9   Jury discharged.............................. 140    40

10   Proceedings concluded........................ 140    40

11   Reporter's certificate....................... 141    40

12   ========================================================

13            ALPHABETICAL VENIREPERSON LIST

14   VENIREPERSON                                 PAGE   VOL

15   (None.)

16   ========================================================

17             ALPHABETICAL WITNESS LIST

18   WITNESSES                       DREX  CREX  VDEX   VOL

19   KORHONEN, GARY                   15    22           40

20   MCGEE, JOHN L.                    7    13           40

21   MCGREWE, DIANA                   86                 40

22   NOVAK, KENDALL                   93                 40

23   RICKS, CEDRIC ALLEN                           25    40
                                      27    48           40
24   ========================================================

25
```

```
 1                        EXHIBITS LIST

 2   STATE'S EXHIBITS
     NO.     DESCRIPTION              OFD   ADD   VOL
 3
     276     Defendant's statement
 4           dated November 12, 2013   72    72    40

 5   277     Computer diskette
             containing video footage  90    91    40
 6
     DEFENDANT'S EXHIBITS
 7   NO.     DESCRIPTION              OFD   ADD   VOL

 8   35A     Page redacted from
             Defendant's Exhibit
 9           No. 35                     6    6*    40

10   36A     Page redacted from
             Defendant's Exhibit
11           No. 36                     6    6*    40

12   37A     Page redacted from
             Defendant's Exhibit
13           No. 37                     6    6*    40

14   38A     Pages redacted from
             Defendant's Exhibit
15           No. 38                     6    7*    40

16   39      Power Point presentation  132   132   40

17

18

19

20

21

22

23

24
      * For purposes of the record.
25   ** Excluded.
```

```
 1                          PROCEEDINGS
 2                     (The following proceedings commenced at
 3                     7:59 a.m., Friday, May 16, 2014:)
 4                     (OPEN COURT, DEFENDANT PRESENT, JURY NOT
 5                     PRESENT:)
 6                     THE COURT:  Let's go on the record.
 7                     Both sides ready to proceed?
 8                     MR. GILL:  State's ready.
 9                     MR. RAY:  Judge, before we bring the jury
10      in, I'd just like to offer for the record Defendant's
11      Exhibits 35A, 36A, 37A, which are the front pages of
12      those three -- they're Dr. Lewine's reports, and it's
13      the front three -- excuse me -- the first page of each
14      one of those documents that does not have the redaction
15      of the history, which the prosecutor requested be
16      removed.  I'd ask that be admitted for the record.
17                     MR. GILL:  No objection.
18                     THE COURT:  35A, 36A, 37A are admitted
19      for the record.
20                     MR. RAY:  And also 38A which is the
21      remainder of the Power Point that was used with
22      Mrs. Ricks, Helen Ricks, which contains the matters that
23      the State objected to as hearsay, which the Court
24      sustained, for the record only, as well.  38A.
25                     THE COURT:  38A.  Any objection?
```

```
 1                    MR. GILL:  No objection.

 2                    THE COURT:  38A is admitted for the

 3    record.

 4                    MR. RAY:  We're ready to proceed now.

 5                    THE COURT:  Bring in the jury, please.

 6                    THE BAILIFF:  Yes, Judge.

 7                    (OPEN COURT, DEFENDANT AND JURY PRESENT:)

 8                    THE COURT:  You may be seated.

 9                    Defense may proceed.

10                    MR. RAY:  The Defense calls John McGee.

11    He's in the courtroom.

12                    THE BAILIFF:  Step right over there.

13    She'll swear you in.

14                    THE COURT:  Do you solemnly swear or

15    affirm the testimony you are about to give in the cause

16    now on trial will be the truth, the whole truth, and

17    nothing but the truth, so help you God?

18                    WITNESS MCGEE:  I do.

19                    THE COURT:  Have a seat, sir.

20                         JOHN L. MCGEE,

21    having been first duly sworn, testified as follows:

22                    DIRECT EXAMINATION

23    BY MR. GORDON:

24        Q.    Can you state your name for the record, sir?

25        A.    My name is John L. McGee.
```

1    Q.    And, Mr. McGee, where do you live?

2    A.    I live in Chicago, Illinois.

3    Q.    And what kind of work do you do up there now?

4    A.    Well, I work with the Department of

5    Transportation, which I'm retired from.  Now I'm working

6    with the City of Chicago.

7    Q.    All right.  And did you coach football at one

8    point in your life?

9    A.    Yes, sir.  Coached football.  I started

10   coaching Pop Warner Football in 1984.  I continued

11   until '88, and then I started coaching high school

12   football.  I stopped coaching high school football in

13   1999.

14   Q.    Did you have a -- did you have a love for the

15   game?

16   A.    Greatest love in the world for the game.

17   Q.    Did you -- do you know the person to my

18   right?

19   A.    Yes, I do.

20   Q.    And who is that?

21   A.    Cedric Ricks.

22   Q.    How do you know Cedric Ricks?

23   A.    I coached him.

24   Q.    About how old was Cedric when you -- when you

25   were coaching him?

1    A.    I want to say eight, nine, because he had

2    played a year or two before I got there, on the Nunads

3    (phonetics), and when I got there and replaced the

4    Nunads, he came in, and I renamed him.  That's how I

5    know him.  I called him Dirty Red.

6        Q.    Red because of his hair?

7        A.    No.  Because what we do with football,

8    defense players used to get names, and I was known to

9    name my players.  And Cedric had a knack for being a

10   great defensive back.  And I gave him the name "Dirty

11   Red" because it just fit him at that time.

12       Q.    He was a tough kid?

13       A.    Very physical kid when -- when I had him to

14   play the game.

15       Q.    As a matter of fact, you had other players

16   about his age.  Do you know a gentleman by the name of

17   Cortland Byrd?

18       A.    Yes, I do.

19       Q.    Were there other friends of his that played

20   together on your team?

21       A.    All very competitive young men.  And my job

22   is just to instruct, teach.  I had six other coaches

23   that broke the game down and gave them the aspects of

24   the X's and O's, and I basically just worked with their

25   physical abilities, the techniques, and stuff of this

1   nature, to make sure that these kids understood the
2   game, the intricacies of what football is all about, and
3   the unity and brotherhood that football is supposed to
4   bring to these kids so they would be prepared for the
5   next level.
6         Q.    How many kids do you have?
7         A.    I have seven kids of my own.
8         Q.    So working with kids has always been part of
9   your life.  Is that fair?
10        A.    It's a joy.
11        Q.    What were you attempting to do when working
12  with the kids like Cedric?
13        A.    Get these kids prepared for their future and
14  basically give them the skills -- the motor skills for
15  the sport that I truly love, the sport that gave me the
16  opportunity to go to college, the sport that's opened up
17  doors for me that I didn't have open before.  So I felt
18  like there was so many young men that I would be
19  coaching would have that same ability to be able to move
20  on and let them take them farther in life.
21        Q.    Did you try to instill that into Cedric and
22  all the boys?
23        A.    It worked at that time.
24        Q.    When he was with you, either practicing or
25  playing, was Cedric able to pay attention?

1    A.    Cedric was a kid -- a normal kid that gave me

2    his best at the time that I asked of him.  Like I said,

3    he told me, "I want to be a running back, Coach."  I

4    said, "You're not a running back."  He said, "Coach, I

5    want to be a running back, because I know I can run that

6    ball."  I said, "Son, you're going to play defense, and

7    that's what you're going to play for me.  Case closed."

8    He played defense.

9    Q.    And this is almost 30 years ago?

10    A.    Thirty-something years ago.

11    Q.    After Cedric had left y'all's league, did you

12    have much contact with him after that?

13    A.    No, I did not.  I did not.  I heard some

14    things of the kids from Richards, because I would, from

15    time to time, visit Richards High School games, because

16    I had kids throughout the city in different systems.  So

17    I'd go by and check different programs to see them, and

18    I got to be known from different cultures for that said

19    reason.

20    Q.    Well, essentially, you were feeding a lot of

21    the schools and helping the high schools --

22    A.    Yes, sir.

23    Q.    -- develop their programs --

24    A.    Yes, sir.

25    Q.    -- by developing the kids when they were

```
1   young?

2         A.    Yes, sir.

3         Q.    And you were able to keep up with, at least

4   through the grapevine, how the other kids were doing?

5         A.    Pretty much so.

6         Q.    Were you proud of what you were able to

7   accomplish with them?

8         A.    Yes.  You know, you know, when you're dealing

9   with youth -- we don't put enough time into youth,

10  anyway.  So that was another reason I thank God that I

11  was be able to have the time necessary to give back and

12  the will to want to give back to these kids, to give

13  these kids an opportunity to do something.  It could be

14  a glorified babysitting job, but I don't consider it

15  that.  I consider it taking these kids, giving these

16  kids the tools to work with, the ones that really had

17  the football ability.  And the ones that didn't have it,

18  I would be honest and frank and tell them, "You may need

19  to choose another way, because football may not be the

20  thing for you."

21        Q.    Were there times when -- when Cedric was

22  playing, was he -- did he get to a point where he was so

23  intense that he would -- could almost hurt himself?

24        A.    No.  Cedric was just a typical kid at that

25  age.  I don't know what he would be today after that
```

1    point of high school, but when he was in the presence of

2    me -- and that's what I come to speak to you about, the

3    presence of what he was when he was with me.  I can only

4    speak about that character, because, after that, I know

5    nothing else about Cedric after that point.  But up

6    until that particular point, he did as I instructed,

7    because I was pretty firm with the kids.  I didn't play

8    with these kids.  I came out there to teach these kids

9    something.  And if I was going to give my time and my

10   effort to do this, they had to be willing to listen.  If

11   not, they wouldn't have been with me.  So he did pretty

12   much everything I asked him.

13              MR. GORDON:  Pass the witness, Your

14   Honor.

15              MR. HUSEMAN:  Just briefly, Your Honor.

16                   CROSS-EXAMINATION

17   BY MR. HUSEMAN:

18        Q.    How you doing, sir?

19        A.    Fine.  How you doing?

20        Q.    How many kids would you say you've mentored,

21   coached, throughout your life?

22        A.    Maybe about 300.

23        Q.    And the last time you saw Cedric Ricks, how

24   old was he?

25        A.    About 13-and-a-half, 14.

1      Q.   So I wouldn't imagine that you know much

2   about the crime that he's here for today, do you?

3      A.   Well, I spoke with the attorney.  He told me

4   it was a gruesome -- gruesome thing to happen.  I hate

5   to hear that.  I wouldn't like it myself, but that's

6   what happened then.

7           But I didn't come here to express what

8   he's doing now.  I'm here to let you know what he was,

9   the character of him as a young person under my

10  tutelage, because I don't know too much about anything

11  other than that.

12          This is a gruesome situation to be here,

13  but I have a love for the game, but I had a love for

14  teaching.  I had a love for him.  And the fact is I

15  wanted to tell the truth about what he was as a kid, and

16  that's what he was with me.  He was just a kid, like all

17  the other kids I coached.

18     Q.   And we appreciate you for doing that.  Thank

19  you for being here, sir.

20     A.   Appreciate it.

21          MR. HUSEMAN:  That's all I have, Your

22  Honor.

23          MR. GORDON:  No further questions.

24          THE COURT:  You may step down, sir.

25          WITNESS MCGEE:  Thank you.

```
 1                    (Witness McGee excused from the witness

 2                    stand.)

 3                    MR. RAY:  Defense calls Gary Korhonen.

 4                    THE COURT:  Do you solemnly swear or

 5      affirm the testimony you are about to give in the cause

 6      now on trial will be the truth, the whole truth, and

 7      nothing but the truth, so help you God?

 8                    WITNESS KORHONEN:  I do.

 9                    THE COURT:  Have a seat, sir.

10                    GARY KORHONEN,

11      having been first duly sworn, testified as follows:

12                    DIRECT EXAMINATION

13      BY MR. RAY:

14           Q.    Would you state your name, sir.

15           A.    Gary Korhonen.

16           Q.    Mr. Korhonen, where do you live?

17           A.    Palos Park, Illinois.

18           Q.    And you also have a home in Naples, Florida?

19           A.    Well, we -- that's our -- that's, like, our

20      second home right now.  We only spend about three months

21      there.  Not long enough, but with the cold weather up

22      north.

23           Q.    Okay.  You came into Fort Worth last night?

24           A.    Yes.

25           Q.    With --
```

1          A.    Yes, I did.

2          Q.    With Coach McGee?

3          A.    Yeah, Coach McGee.  Right.  I knew -- Coach

4    McGee is a great coach.  He was a grade school coach.

5    As a matter of fact, the people in grade school aren't

6    recognized enough, because they -- they really do all

7    the work, and, I mean, we get a finished product.  They

8    do all the work, and they mold the character and

9    everything.  You know, we just -- we just take it from

10   there.

11         Q.    Did y'all talk about football while y'all

12   were on the plane?

13         A.    Pardon me?

14         Q.    Did y'all talk about football while you were

15   on the plane?

16         A.    Yeah.  I didn't -- I didn't -- actually, I

17   didn't know, ironically, he was sitting in front of me

18   on the plane.  I mean, I thought I recognized him, but

19   it's been many years since I've seen him, and we got

20   together when we were picked up at the airport, and

21   we -- you know, we probably bored everybody by talking

22   about a lot of football.

23         Q.    All right.  We had a conversation last night

24   about how you have the ability to somehow get some free

25   tickets to some basketball games sometimes?

1          A.    Yeah.   Yeah.   Dewayne Wade was one of my -- I

2     coached Dewayne Wade.   And for those of you who don't

3     know who he is, he's a pretty good basketball player in

4     the NBA.   And I had the courtside tickets about three

5     weeks ago, and I got pictures of him coming up.   Here's

6     a billionaire coming up and giving me a hug, just an old

7     high school coach, you know.   It was quite a thrill.   My

8     family was very thrilled by it.   And, you know, it's one

9     of the many things that happen, you know, when you're in

10    coaching.

11          I -- this is my forty-ninth year.   I

12    taught U.S. history for 45 years.   I stayed in it, and I

13    do it because I like it.   I like working with young men.

14    My first rule is it's not all about me.   It's about the

15    young men I work with.   You try and make them better

16    people and a finished product by the time they leave.

17    And if they become better people by the time they leave

18    and go on --

19          And one of the thrills, euphoria

20    experiences, I have is when I come back and see what

21    Cedric did a couple of times, you know, coming back, you

22    know.   He was --

23          Q.    Let me --

24          A.    I'm sorry?

25          Q.    Let me stop you for just a second.   I meant

1    to ask you a couple of things before we got started.

2    You were a coach in Chicago, correct?

3         A.    Yeah.  Well, the Chicago area, right.  In the

4    suburban area, right.

5         Q.    And were you Cedric's high school coach?

6         A.    Yes.

7         Q.    Okay.  And what school was that in?

8         A.    Richards High School.  It's in Oak Lawn.

9         Q.    That's kind of on the south side of Chicago?

10        A.    Yes, sir.  Southwest Suburb, right.

11        Q.    And when he -- did he play football all four

12   years in high school?

13        A.    Well, he did.  I only coached him his junior

14   and senior year.  I don't -- outside of saying hi and

15   what kids to watch, freshman, sophomore game.

16               But I can only say the best of Cedric

17   when he was in high school.  I mean, he -- he was funny.

18   He -- you know, a lot of teams don't have personality.

19   That team had personality.  And, you know, I really

20   remember the team very vividly.  I'm 73 years old.  And

21   I know, for some people in the courtroom, it's difficult

22   to understand how I can remember things, every teammate

23   in '73, and I can't remember where I put my eyeglasses

24   three minutes ago, but -- which happens often to me.

25               But I remember Cedric quite vividly,

1  because that team was very good.  It was ranked second

2  in *USA Today*, and which puts out a national publication

3  in high schools.  And he was not a starter, and he

4  accepted his role very well.

5          And he was very -- I mean, there were two

6  players that were his best friends.  I affectionately

7  called them the Bermuda Triangle.  Cedric and Cortland

8  Byrd and Marvin O'Neal.  And they were -- they were

9  quite a trio.  Cortland went to Purdue, and Marvin went

10  to Western Illinois.

11          And Cedric always did what he was asked

12  to do.  He was -- I mean, I -- two stories I can

13  remember about him.  I remember he used to be a

14  defensive back.  He was a really good tackler, really

15  good coverer.  He could have started on any other team

16  in the state of Illinois.

17          And he got burned one time in a practice

18  session, and our offensive coordinator was never for a

19  loss for words, and said, "Ricks, you got toasted that

20  time.  You know, you got toasted."  And Cedric took it

21  upon himself -- nobody told him to do it.  He took his

22  practice jersey home and painted "toast" on it and came

23  to practice the next day.  And word around, it was

24  pretty humorous.  It was something I'll never forget.

25          And I can remember, you know, on the

1    compassion side of it, one time we had a player down who

2    was hurt pretty seriously, and I remember him running

3    out to the field down alongside me.

4        Q.    Let me ask you.  When you say --

5        A.    Sorry?

6        Q.    When you say you remember him, are you

7    talking about Cedric?

8        A.    Yeah, Cedric.  Yeah.  Cedric ran out to the

9    field just wanting to assist and do something, and I

10   almost looked at him like, "What are you doing here?"

11   Because it's unusual.  Usually the trainer is out there

12   and so on.  But, you know, it was just a compassionate

13   move on his part.

14              He was well-liked.  I just -- I mean, he

15   was -- he was -- he was a great young man when he was in

16   high school.

17       Q.    We didn't have to twist your arm to get you

18   here, did we?

19       A.    Pardon me?

20       Q.    When I found you in Naples, Florida, Mary

21   Burdette, our mitigation specialist, she didn't even ask

22   you if you wanted to come.  You told her you wanted to

23   come here.

24       A.    That's right.  I would like to make that

25   perfectly clear to everybody.  Nobody asked me to be

1   here.  I wanted to be here.  I volunteered to come.  I

2   said, "Do you want me to come?"  And Mary Burdette said,

3   "That would be great.  Would you?"  And that's why I'm

4   here.

5        Q.   When these young men play football -- you

6   heard what John McGee said.  That's true in high school,

7   too, isn't it?  You're teaching them more than football.

8   It's kind of some lessons in life.

9        A.   With me, it's -- it's -- it's -- as I said

10  before, it's not about me.  It's not about X's and O's.

11  It's not about wins and losses.  Yes, we won a few games

12  there at Richards, but we -- we -- it's just trying to

13  make them productive people, you know.

14            I -- I -- I mean, I can remember if -- if

15  somebody who was a fourth team player on the 1967 team

16  that I coached would come back and say hi, that makes my

17  day as much as a Dewayne Wade walking in the door or Joe

18  Montgomery.  If I -- I've coached five kids who made

19  professional rosters.  You know, that means as much to

20  me as anybody else.  I get just as excited about those

21  people as anybody else.

22        Q.   You haven't seen Cedric since he was in high

23  school, have you?

24        A.   A couple of times, he came back.  A couple of

25  times, he came back.  He and Marvin, I believe, came

```
 1   back a couple of times.
 2         Q.   That was, like, 20 years ago?
 3         A.   Yeah, that was quite a while.  See, '90 and
 4   '91 were his fall seasons.  I believe he graduated
 5   in '92, if my memory serves me correctly.  And maybe a
 6   few years back, he was there a couple of times with
 7   Marvin.
 8                   MR. RAY:  I pass the witness.
 9                   Thank you, Coach.  They may want to ask
10   you something.
11                   WITNESS KORHONEN:  Yeah.
12                        CROSS-EXAMINATION
13   BY MR. HUSEMAN:
14         Q.   Just a few questions for you.
15         A.   Pardon me?
16         Q.   Just a few questions.
17         A.   Sure.
18         Q.   How many young men do you think you mentored
19   and gave life lessons to throughout your career?
20         A.   Oh, God.  It would be 49 -- coming up 48
21   times 50.  Whatever that -- I never had math in college,
22   so I -- my wife -- my wife is also the -- but, I mean,
23   quite a few.  Hundreds.
24         Q.   Probably more than that.  Probably thousands.
25         A.   Yeah.
```

1    Q. And when was the last time you saw Cedric?  I

2 wasn't clear.

3    A. I want to say it was probably two, three

4 years after high school.  Couple times, he came back,

5 but not since then.

6    Q. Okay.  So you don't know much about his life

7 after that, do you?

8    A. No, not really.

9    Q. And I would imagine that you were quite

10 shocked to learn that he stabbed the mother of his son.

11    A. Yes.  Yes, I was.  Yes, I was.  That was

12 terrible.  Right.

13    Q. An eight-year-old boy and a 12-year-old boy?

14    A. Pardon me?

15    Q. An eight-year-old boy and a 12-year-old boy.

16 You were shocked to hear that, weren't you?

17    A. Yes.  Yes.  I know that.

18    Q. Okay.  Thank you, sir.  I appreciate it.

19      MR. HUSEMAN:  No further questions, Your

20 Honor.

21      MR. RAY:  That's all we have.

22      THE COURT:  You may step down.

23      WITNESS KORHONEN:  Thank you.

24      I'd like to thank the Judge.  Thank you,

25 Your Honor.  Thank you on the jury and the Prosecution

```
 1    and the Defense for allowing me to come here really.
 2    It's been a very nice experience.  Thank you.
 3                    (Witness Korhonen excused from the witness
 4                    stand.)
 5                    MR. RAY:  Can we -- I need to confer with
 6    Mr. Gordon.
 7                    THE COURT:  Yes.
 8                    MR. RAY:  Judge, we need to take up a
 9    short matter outside the presence of the jury.
10                    THE COURT:  Okay.  Jury, if you would
11    step out.
12                    (OPEN COURT, DEFENDANT PRESENT, JURY NOT
13                    PRESENT:)
14                    MR. RAY:  Judge, can the coaches be
15    finally excused?
16                    THE COURT:  Any objection?
17                    MR. HUSEMAN:  No, Your Honor.
18                    THE COURT:  And they are excused.
19                    MR. RAY:  We need to confer with our
20    client.
21                    THE COURT:  Yes.
22                    MR. RAY:  See if he wants testify.  Can
23    we do that back in the holdover?
24                    THE COURT:  You may.  You're not going to
25    have much privacy back there.
```

1              MR. RAY:  That's fine.  We talked this
2    morning.
3              THE COURT:  Okay.
4              (Recess from 8:21 a.m. to 8:28 a.m.)
5              (OPEN COURT, DEFENDANT PRESENT, JURY NOT
6              PRESENT:)
7              THE COURT:  Let's go on the record.
8              Defense.
9              MR. RAY:  Judge, I would just like to ask
10   Mr. Ricks on the record if he wants testify.  I think
11   we've already placed him under oath.
12             THE COURT:  Yes.
13             You're already sworn, Mr. Ricks.  You
14   continue to be under oath.
15             You may proceed.
16             MR. RAY:  Can he stay seated?
17             THE COURT:  Yes.
18               CEDRIC ALLEN RICKS,
19   having been first duly sworn, testified as follows:
20               VOIR DIRE EXAMINATION
21   BY MR. RAY:
22        Q.   Cedric, now comes the time for you to decide
23   whether you want to testify at the punishment phase of
24   your trial.  You understand that?
25             You have to say yes or no.

1    A.    Yes.

2    Q.    If you testify, I told you that the

3    Prosecutors can ask you about any criminal acts that

4    you've been convicted of, about any other acts that

5    they're aware of, about anything to do with this offense

6    and any extraneous matters.  You understand they get

7    pretty much free game for them, anything they want to

8    know?  You understand that?

9    A.    Yes.

10    Q.    If you don't understand -- excuse me.  If you

11    don't testify, it will be like the last phase of the

12    trial.  The Judge will instruct the jury to not consider

13    the fact that you didn't testify, and the Prosecutors

14    will not refer to that during their -- their final

15    arguments.  Be just like last time.  You understand

16    that?

17    A.    Yes.

18    Q.    Okay.  Do you want to testify, or do you want

19    to exercise your right to remain silent?

20    A.    I want to testify.

21    Q.    You want to testify?

22    A.    Yes.

23    Q.    Okay.  And we talked about that before we

24    came out here, and you're sure this is what you want to

25    do?

```
 1          A.    Yes.
 2          Q.    There's not going to be any time-outs when
 3   you're up there.
 4          A.    I understand.
 5                MR. RAY:  Okay.  I guess we'll call the
 6   Defendant.
 7                THE COURT:  Okay.  Bring in the jury.
 8                MR. RAY:  Judge, he's going to need to be
 9   up there.
10                THE COURT:  Come on up.
11                (Defendant seated at the witness stand.)
12                THE COURT:  Ready?
13                MR. RAY:  We're ready.
14                THE COURT:  State?
15                THE BAILIFF:  Judge, give me just one
16   moment.
17                THE COURT:  Oh, bailiffs aren't ready.
18                (Pause.)
19                THE COURT:  Bring in the jury, please.
20                (OPEN COURT, DEFENDANT AND JURY PRESENT:)
21                THE COURT:  You may be seated.
22                This witness has been previously sworn.
23                Defense may proceed.
24                CEDRIC ALLEN RICKS,
25   having been first duly sworn, testified as follows:
```

```
 1                    DIRECT EXAMINATION
 2   BY MR. RAY:
 3        Q.    For the record, tell the jury your name.
 4        A.    Cedric Ricks, Allen Ricks.
 5        Q.    Okay.  Allen's your middle name?
 6        A.    Yes, sir.
 7        Q.    Okay.  And, Cedric, it's obvious from being
 8   in the courtroom, but for the record, you're the person
 9   that's on trial, correct?
10        A.    Yes, sir.
11        Q.    Okay.  And you've been here all during the
12   trial, correct?
13        A.    Yes, sir.
14        Q.    And I explained to you, before you got up to
15   testify, that you don't have to testify if you don't
16   want to.
17        A.    Yes, sir.
18        Q.    And I explained to you, on the record, just a
19   few minutes ago, that if you did not testify, that the
20   Judge would instruct the jury in the written
21   instructions to not consider that fact, just like she
22   did at the guilt/innocence phase.  You understand that?
23        A.    Yes.
24        Q.    And I explained to you that the Prosecutors
25   would not comment on the fact that you did not testify
```

1    in your final arguments, which is the way things went at

2    the guilt/innocence phase.  You understand that?

3         A.   Yes, sir.

4         Q.   Okay.  I told you the decision was yours and

5    yours alone, correct?

6         A.   Yes, sir.

7         Q.   Okay.  And you told me just a few minutes

8    ago -- or you told the Court, in everyone's presence,

9    that you wanted testify; is that correct?

10        A.   Yes, sir.

11        Q.   One of the things that you had indicated to

12   me was that you wanted to say some things to your -- to

13   your folks and to Roxie's family about how you feel

14   about this; is that correct?

15        A.   Yes, sir.

16        Q.   Okay.  So why don't you tell us:  How do you

17   feel about what happened back on May the 1st of last

18   year?

19        A.   I mean, I feel probably like, you know, I

20   just -- you know, I --

21        Q.   Well, let me ask you this.  What happened on

22   May the 1st of last year?  What was it that caused Roxie

23   and Anthony to be killed and for Marcus to be almost

24   killed?  What went on that day?

25        A.   Well, you know, everybody knows about

1    November the 13th.  You know, we got in an argument that

2    night, and -- you know, typical argument, but, you know,

3    there was a lot of yelling.  The kids was in the bed --

4    I mean, the boys was in the bed.

5         Q.    Are you talking about in November of 2012

6    now?

7         A.    Yes, sir.

8         Q.    Okay.  Go ahead and tell me about that.

9         A.    So I said I was going to leave, you know,

10   because -- you know, everybody knows about my past, you

11   know, going over everything, and, you know, I didn't

12   want to get in that situation again, you know.  I've

13   been there, done that, and I wanted to leave.  And, you

14   know, Roxie didn't want me to leave.  She wanted me to

15   stay.

16              And I said, well, you know, my car just

17   got repo'd because I couldn't keep up with the payment.

18   The payment was, like, $800, and I paid 40,000 for it,

19   but I put 25,000 in it.  And I came out one morning, and

20   the car was gone.  And she was -- she was on -- she had

21   had the baby, so she was off work.  But long story

22   short, you know, I owed 15,000 on it.  I had 6,000 that

23   I could have gave them.

24        Q.    What?  Did the car get stolen, or did

25   somebody --

1      A.    No, they repo'd it.  So I called the United

2   Credit Union.  That's the people that financed the car.

3   I said, "I have $6,000."  And the guy said, "Well, I've

4   got to talk to the Board of Directors.  I'll get back to

5   you," and everything like that.  So...

6      Q.    So let me ask you this.  Would the car

7   finance company -- were they willing to take the -- a

8   payment on the car, or did they just want the car?

9      A.    Well, they wanted the whole 15 after he got

10  back to me, because the car is in Texas now.  They

11  didn't want to have to, you know, track the car out-of-

12  state again, so they wanted the whole 15,000 to be done

13  with it, even though I offered them 6,000.  That would

14  have brought it current.

15     Q.    Let's get back -- let's get back to November

16  of last year.  So the car gets repossessed.

17     A.    Right.

18     Q.    And so you and Roxie got in an argument.  Is

19  that what happened?

20     A.    We got in an argument, because, you know, at

21  that point, I was stressed.  I mean, I been stressed

22  probably for two-and-a-half years not knowing how

23  depressed and stressed I was, because I lost my job.  I

24  lost my condo.  I lost -- I had to move away from my

25  family.  I didn't have any friends up here, because, you

1    know, they all the way in Chicago, I mean.  And I work

2    with all women.  That's all I work with, was women.  So

3    I couldn't have friends -- you know, I couldn't have

4    women friends because, I mean, sometimes it works out,

5    sometimes it doesn't.  So it was just me and Roxie, and,

6    you know, the boys would be at their dad's house for one

7    week, and then they'd be with us.  And --

8          Q.    Cedric, tell us how you get in an argument

9    with Roxie.

10         A.    Well, we got in an argument because I wanted

11   to leave.  So Roxie didn't want me to leave.  So I was

12   putting on my clothes to leave, and, you know, Roxie

13   confronted me, like, "No, you can't leave.  We've got a

14   baby.  You can't leave me here like this."  And I said,

15   "Well, I don't know what else to do."  I mean, I felt --

16   I felt like less than a man.  Here, I'm losing my car.

17   I have a baby.  I don't even have a car.  I've got to

18   get to work.  I'm working at probably 20 different

19   clinics during the week.

20               So she grabbed me, and, you know, I was

21   putting on my button-up shirt or whatever, and it turned

22   physical.  And we can go into details about it.  I

23   choked her.  And after it was over, we -- we sat down on

24   the couch, and we was talking about it.  And, you know,

25   of course, she was -- you know, she was all

1    discombobulated, and, you know, I was in shock.

2                    And, you know, the next morning, I guess

3    that's when she went and told her mom when she dropped

4    her boys off at school.

5        Q.    So let me ask you this.  Her mom testified

6    here, I guess it was last week, that -- or a few days

7    ago, that Roxie came and picked her up or came to her at

8    school and they went over to the police station.

9        A.    Yes, sir.

10       Q.    Okay.  And then Ms. McGrewe said that while

11   they were there talking to the police, you showed up at

12   the police station.

13       A.    Yes, sir.

14       Q.    Okay.  Why did you do that?

15       A.    Because I wanted to give my statement, too,

16   you know, stating that, you know, it wasn't, you know,

17   just a one-sided story.  So I just went up there to

18   give, you know, my version of the story.

19       Q.    Well, let me ask you this.  You just said

20   here a minute ago that you choked Roxie -- excuse me --

21   choked Roxie during the fight; is that right?

22       A.    Yes, sir.

23       Q.    Okay.  So you were going to tell the police

24   that?

25       A.    I told them everything.

1    Q.    Okay.  So -- and then what did the police do?

2    A.    Well, they took -- they took my statement.

3    They took pictures of me and -- because I had some

4    abrasions on me or whatever.  And he said, "You're not

5    under arrest.  We just going to look into the matter,"

6    and everything like that.  And I gave my cell phone

7    number as I walked out the door.  And he said he'll call

8    me if we need to talk to you.  So --

9    Q.    They didn't call.  They just came and

10   arrested you, right?

11   A.    Well, I was in Plano working for a doctor, a

12   rheumatologist, and I -- my regional manager called me,

13   and she said, "You need to come down to the CBO office,"

14   which is the Central Business Office in North Richland

15   Hills.

16          And prior to that conversation I had with

17   her, me and Roxie was texting back and forth, and that's

18   when we met Mitzi Ellington.  She referred -- Roxie told

19   me about Mitzi Ellington, because she used to counsel

20   some of the pregnant women up at her clinic.  So I made

21   an appointment with her that day.

22          And then maybe half-hour later, I'm

23   getting a call from the Central Business Office.  So I

24   immediately said, "Okay.  I'll be down there."  They

25   wanted me to be down there at 3:30.  It was maybe 2:15,

1    and the doctor was through seeing patients.  So I get

2    down to the CBO office, and the lady that testified,

3    Sandra Dehu, the human resource lady that retired -- I

4    don't know if the jury remembers her or not, but the

5    police were in her office.

6         Q.    So the police arrested you.

7         A.    Right.  In her office.

8         Q.    Okay.  Now -- and the police took you to

9    jail?

10        A.    Yes, sir.

11        Q.    Okay.  Did you -- did that upset you, that

12   the police took you to jail?

13        A.    The only -- the thing that upset me was the

14   fact that they came to my job.  I mean, I gave them my

15   number.  I told them -- I mean, they knew where I lived

16   at.  I gave them the address and everything.  But, you

17   know, they took it upon them self to go to my job, to my

18   human resource department, and just...

19        Q.    Well, so they arrest you.

20        A.    Yes, sir.

21        Q.    And at the time of the case here, that case

22   was still pending, right?

23        A.    Yes, sir.

24        Q.    You hadn't been to court on that case yet?

25        A.    I been to court, like, three or four times.

1      Q.    Right.  But it was not resolved.

2      A.    No, sir, it was not resolved.

3      Q.    It was still pending, right?

4      A.    Yes, sir.

5      Q.    Okay.  And so -- and Roxie helped you get out

6   of jail, right?

7      A.    Well, I had -- I had $5,000 at home, so I

8   told her where the money was, and she said, "Well, I got

9   to get somebody to sign," because, in Illinois, it's a

10  little different.  I mean, all you've got to do is go to

11  the counter and give them the money, and you sign out.

12  But, here, you have to get a bail bondsman.  You have

13  to -- you have to go through a lot more detail to get

14  out of jail, so...

15     Q.    So did Roxie help you get out of jail?

16     A.    Yes, sir.

17     Q.    Did y'all try to work things out?

18     A.    Yes, sir.  We -- we actually -- the

19  appointment I made with Mitzi Ellington, I had to make

20  another appointment, so I end up calling her back, and

21  we made another appointment.  And then I had to get in

22  touch with CPS, because they were calling.  So I went up

23  there and saw them.  And that's when she said I saw them

24  December 11th.  So December 12th, I actually jumped in

25  the program, and I had to pay for that.  It was, like,

1    $300.

2         Q.    Let me ask you this.  Are you sorry about

3    what happened in November with Roxie?

4         A.    Absolutely.  I'm sorry about everything.

5         Q.    Were either of her two sons -- Marcus or

6    Anthony, were they at the apartment when that happened,

7    when the assault in November happened?  Were either one

8    of them there?

9         A.    They were there, but they were sleeping.

10        Q.    Okay.  All right.  And so at some point --

11    she had a protective order.  She got a protective order,

12    right?

13        A.    Yes, sir.

14        Q.    Okay.  And at some point, did she allow you

15    to come back and live with her?

16        A.    I mean, as soon as I -- as soon as she picked

17    me up from down here, I mean, I went straight back to

18    the apartment.

19        Q.    Did y'all try to work things out?

20        A.    Yes, sir.

21        Q.    Okay.  Were you going to counseling together?

22        A.    Yes, sir.

23        Q.    Did you think y'all were getting something

24    out of it, both of y'all?

25        A.    I mean, it gave us a chance for -- you know,

1  you throw your cards on the table, I throw my cards on

2  the table, and -- and -- and see, you know, what issues

3  I'm having and what issues she's having.

4        Q.    Well, what -- what issues were you having?

5        A.    Well, my issues was just basically in terms

6  of financial.  I mean, I just -- you know, I felt like a

7  failure, like I -- I mean, everything I was doing, it

8  was like I was just -- I kept back peddling, like.  I

9  mean, I finally got out of school, and I get a job, and

10 then, you know, I'm finally catching up with, you know,

11 bills and everything like that, and then my car gets

12 gone, and that was like (snaps fingers).

13       Q.    Well, Cedric, the prosecutor is going to ask

14 you this question if I don't.  Your car gets

15 repossessed.  Roxie didn't repossess your car.

16       A.    No, sir.

17       Q.    Okay.  Roxie didn't not make the payment on

18 the car, right?

19       A.    No, sir.

20       Q.    Okay.  And so whoever you had it financed

21 with in Illinois, they get a guy and he comes and

22 repossesses the car.  Well, how does that equate to

23 Roxie getting choked?  What -- what -- how does that --

24 how do we get to that?

25       A.    I can't explain, you know, why, I mean, it

1  turned physical and --

2      Q.   Well, let me ask it this way. Your father,

3  when he was on the stand, said that he took you to a

4  nursery school when you were preschool.

5      A.   Yes, sir.

6      Q.   And the nursery school told your father,

7  "Don't ever bring him back here." You probably don't

8  remember that conversation, do you?

9      A.   Well, no.

10      Q.   Okay. Did you have some problems when you

11  were growing up that are -- deal with controlling your

12  anger?

13      A.   You know, listening to everything that I've

14  heard in the last two weeks, I -- I mean, yes. I

15  mean -- I mean, you hear it once, you're like nah, but

16  I've heard it enough times to realize, I mean, yes, I

17  did.

18      Q.   Well, before you ever met Roxie, did you have

19  problems with your -- with anger issues?

20      A.   Yes.

21      Q.   Before you ever got out of high school?

22      A.   Well, it started when I started dating, I

23  guess. I mean, I was fine up until that point, because

24  when I got to high school, I mean, I had a lot more

25  extracurricular activities, and it kept me occupied.

1    And then, you know, you think you're in love, and, you

2    know, love -- love is blind sometimes, and I guess I

3    wasn't ready for that.  I guess I never was ready for

4    that.  And I can't explain that.

5         Q.   Well, did you get in fights when you were in

6    school?

7         A.   I didn't initiate fights, nah.  If you -- if

8    I felt like you were, you know, invading my space or if

9    you were bullying me -- because I wasn't that big.  I

10   mean, I started lifting weights when I got to high

11   school, but, you know, growing up, I mean, I was a

12   pretty thin kid.  I mean, I didn't even like to eat.  I

13   mean, I even told my parents, "I'm never going to be

14   fat."  But I just -- you know, I -- I always wanted to

15   be the best, I mean, because I had a lot of competitive

16   friends.  So, I mean, we -- we -- I mean, we -- we went

17   at it.  I mean, we -- I mean, I don't know if anybody's

18   ever, you know, been a part of a team, but it's -- it's

19   for the love of the game, man.  It's --

20        Q.   Well, Cortland -- Cortland Byrd testified two

21   days ago that if y'all were playing football and

22   somebody on the other team did something they shouldn't

23   have done, his analogy or memory was that the next play,

24   y'all's team was going to get a penalty because you were

25   going to go get on somebody.  Is that true, or is he

1    exaggerating?

2        A.    I mean, we -- we took turns.  I mean, whoever

3    was on the field at the time.  I mean, if it was

4    warranted, I mean, just like baseball, somebody hits

5    your guy with a ball, you can bet nine times out of ten,

6    the next, I think's somebody's going to get hit with a

7    baseball.  I mean, it just -- it just -- it kind of like

8    evens the keel.  And now the coaches get involved, and

9    they say, "Look, enough is enough," and that kind of --

10   that kind of, like, draws the line.

11               I mean, but the answer to your question,

12   I mean, have I retaliated because one of my -- I felt

13   like one of my teammates were done wrong?  I mean, yeah.

14   I mean, if I made a tackle, and under the tackle, I

15   might have twisted the guy's ankle --

16       Q.    The question is:  It was like -- I think it

17   was Tamara Partridge said y'all were on the subway going

18   to the Cubs game or the White -- I guess she said the

19   White Sox game.  And she said somebody was making a

20   comment on the subway about y'all's interracial

21   relationship.  When she testified, did you know what she

22   was talking about?  Do you remember that?

23       A.    Yes, sir.

24       Q.    Okay.  And so my question to you is:  Was

25   Ms. Partridge -- did she accurately say what had

1    happened?  Was she accurate?  Do you know what she was

2    talking about?

3           A.    Pretty much so.

4           Q.    And whoever this person was on the other side

5    of the subway or sitting next to you, wherever they --

6    wherever they were, did that cause you to get more angry

7    than maybe you should have, looking back on it?

8           A.    You know, I'll answer your question, but, you

9    know, when I grew up --

10          Q.    Well, answer my question.

11          A.    I'll answer your question.

12          Q.    Did it make you angrier looking -- first of

13   all, did it make you angry when the girl did that?

14          A.    Yeah.

15          Q.    Okay.

16          A.    It did.

17          Q.    All right.  And looking back on it now -- and

18   I guess that's been seven, eight years maybe, however

19   long it was.  You feel like you overreacted to that

20   situation?

21          A.    No, sir.

22          Q.    Okay.  You felt the anger was warranted?

23          A.    Well, it was a shouting match, but I think --

24   you know, I -- for me to -- to let her know that, you

25   know, we all live under one world, and we can't help the

1    color that we were born into, so...

2         Q.    Let me ask you this.  Remember Dr. Lewine

3    testified yesterday?

4         A.    Yes, sir.

5         Q.    Okay.  He testified that there was this part

6    of your brain that was enlarged generally, right?  You

7    understand that?

8         A.    Yes, sir.

9         Q.    Okay.  And I had told you, before he

10   testified, that's what his testimony was going to be.

11   We've had that conversation, correct?

12        A.    Yes, sir.

13        Q.    And I explained to you that what he was going

14   to say was that because that part of your brain came

15   that way -- okay?

16        A.    Right.

17        Q.    -- that he would testify that that would tend

18   to make you more volatile or more impulsive or

19   aggressive than a normal person.  You remember that?  We

20   talked about that, right?

21        A.    Yes, sir.

22        Q.    And that's essentially what he said

23   yesterday, right?

24        A.    Yes, sir.

25        Q.    Okay.  So do you feel like that what he said

1    is accurate in that when you're in a situation where

2    something happens and it makes you mad, that you -- that

3    you either respond to it appropriately or you sometimes

4    react more than you probably should after you've thought

5    about it?

6         A.    I mean, he was accurate.  I mean, there's a

7    lot of things that I should have let go that, I guess,

8    was out of my control, and I just --

9         Q.    Do you have trouble letting go of things

10   sometimes?  Have you found yourself obsessed with a

11   situation and -- and you lose control of your emotions?

12   Has that ever happened?

13        A.    Yes, sir.

14        Q.    Okay.  Has that happened a lot?

15        A.    It has, yes, sir.

16        Q.    Okay.  I mean, is it fair to say, if I asked

17   you about every one of these incidents with a girlfriend

18   or with your ex-wife or with Roxie, every time you lost

19   your temper with one of them, it was -- it was -- began

20   as an argument?

21        A.    Yes, sir.

22        Q.    Okay.  And at some point, you were unable to

23   control yourself?

24        A.    Yes, sir.

25        Q.    Okay.  Let me ask you this.  The jury's heard

1    testimony from Marcus that -- that you stabbed his mom

2    and him and Anthony, and you did that kind of in a rage.

3    Is that -- is that a fair statement?

4         A.    Yes, sir.

5         Q.    Okay.  Were you able to control yourself when

6    you were doing that?

7         A.    No, sir.

8         Q.    Okay.  Did you want to stop, or did you even

9    think about it, or did it even cross your mind?  What

10   were you thinking when that was going on?  You must have

11   been thinking something.

12        A.    I was angry.  I don't know.

13        Q.    Well, Mr. Gill is going to ask you this if I

14   don't.  What -- what were you mad at Anthony about?

15        A.    Well --

16        Q.    I mean, he was eight years old.

17        A.    I know.  You know, I didn't testify at the

18   first phase for the simple fact that Roxie and Anthony

19   are not here.  Thank God Marcus is here.  But that

20   heated argument turned into a loud situation where, you

21   know, I -- I feared for my life.  But it doesn't matter,

22   because they're gone, and I can't -- I have to move

23   forward.  That's the reason I'm up here.  I have to move

24   forward, because, you know, they offered me life without

25   parole, and I told them no.  I said I didn't want that,

1    because I wanted to face what I needed to face today.  I

2    needed to face all of it.  I didn't want to take life

3    without parole, go to some prison, and -- and never say

4    anything to anybody.

5         Q.    All right.  Well, we're all here now.  So

6    tell the jury:  Are you sorry about what happened?

7         A.    Absolutely.  I mean, who wouldn't be?  I

8    mean, I took -- I took Marcus, Anthony -- I took them to

9    Rangers games.  I went to their games.  I took them to

10   the park.  I mean, we -- I bought them radio-controlled

11   monster trucks.  We used to go out in the parking lot,

12   and I used to play with a replica of the car I had.  I

13   mean, we had helicopters.  We would fly helicopters

14   outside.  I mean, PlayStation, Call of Duty.  I mean,

15   Jesus, I -- I mean --

16        Q.    So if you were to say something to Marcus and

17   Anthony's father, Roxann's parents, what would you say?

18        A.    I know they will never forgive me probably,

19   but I ask for their forgiveness one day.  I don't know

20   how that's going to happen, because I will probably

21   never hear it, but --

22        Q.    What would you say to your mom and your dad

23   and your brother and these two coaches, family?  What do

24   you want to tell them?

25        A.    Just thanks for trying.

1    Q.    Did your -- did your mom and your dad -- they

2    testified that -- that they had a lot of problems with

3    you.  And your mom testified yesterday about how she --

4    she would go to work and she would -- she would -- she

5    would pray that the phone would not ring with the

6    school.  What was she talking about?  What was she

7    afraid of?

8    A.    She just didn't want to hear it.  She just

9    wanted me to do good.  She -- she -- she -- she -- she

10   just was tired.  She just wanted somebody to call and

11   say, "Oh, he's doing good.  I mean, whatever you guys is

12   doing is working."  I don't know how many calls she got

13   like that, but I'm pretty sure she can count them,

14   but...

15   Q.    So did you have trouble even when you were in

16   the first, second, third grade controlling your temper?

17   A.    I think so, yes, sir.

18   Q.    Okay.  Did you wonder why you would not be

19   able to control your temper sometimes?

20   A.    I can't.  I don't know.  I mean, I don't

21   know.  I don't know.  I mean, I can't answer that, sir.

22   Q.    You wish things had kind of turned out

23   different?

24   A.    Oh, in a heartbeat.  You know, they would

25   still be here if I never came to Texas.  I think about

1    that, too.  I mean, I only been here, like, three years,

2    three-and-a-half years.  That would be -- I've been here

3    a year.

4          Q.   Hold on just a second.

5                MR. RAY:  I'll pass the witness.

6                     CROSS-EXAMINATION

7    BY MR. GILL:

8          Q.   Good morning, Mr. Ricks.

9          A.   Good morning.

10         Q.   First chance we've had to talk about this,

11   isn't it?

12         A.   Yes, sir.

13         Q.   You were testifying how you were in a rage on

14   May 1st of 2013, inside that apartment.

15         A.   Yes, sir.

16         Q.   You recall telling the jury about that?

17         A.   No.  It -- I want to explain it to you

18   verbatim, but Roxie and Anthony are gone.  It don't

19   matter how it happened or when it happened.  They're

20   gone.  That's what I got to live with.

21                Explaining my rage, I was upset.  Things

22   happen.  I don't know.  I don't know.  I don't know.  I

23   wish I could bring them back, like, right now.  Pull

24   them back.  Get them back, and I could go, but I can't

25   do that.  I can't do it.  I can't do it.  I used to be

```
 1   able to fix things.  I used to be able to -- I'll go
 2   here, I'll buy you whatever you want.  I'll do this.
 3   I'll do that.  But I can't fix this.  I can't fix it.  I
 4   can't fix it.  For all the money in the world, I can't
 5   fix it.  That's how I grew up.  You fix it.  You fix it.
 6   And I can't fix it.
 7                   And I'm sorry I have to meet everybody
 8   like this.  I'm tired of everybody looking at me like
 9   "You're a animal.  You're a monster."  I'm tired of it.
10   I don't want to -- I don't want to be like that.  That's
11   why we here.  I tried to kill myself two or three times.
12   I've been in solitary since I've been here.
13        Q.   Can't even do that right, can you?
14        A.   Well, no, I guess not.
15        Q.   So you were in a rage on May 1st of 2013, is
16   what you testified to?
17        A.   Yes, sir.
18        Q.   And you said you were unable to stop that
19   rage; is that right?
20        A.   Yes, sir.
21        Q.   So what made you stop?  At some point, you
22   stopped.
23        A.   You know what stopped me?
24        Q.   No, I don't know.  I'm asking you why you
25   stopped.
```

1    A.    Because Isaiah was -- was -- was -- he came

2    out of the bedroom, around the corner, and he was coming

3    towards me.  And I looked out the corner of my eye, and

4    at that instance, everything opened up again, I guess.

5    Q.    So your one-year-old son saw you murdering

6    three people inside that apartment; is that right?

7    A.    He didn't see.  He was in the room.  He

8    was -- he didn't see.  He didn't see.

9    Q.    But, somehow, that rage stopped when you got

10   down to the -- having the knife in your hand and seeing

11   Isaiah, right?

12   A.    Yes, sir.

13   Q.    Isaiah was the only person in that apartment

14   that wouldn't have been able to tell what happened in

15   there if they had survived, right?

16   A.    Yes, sir.

17   Q.    He was only nine months old, wasn't he?

18   A.    Yes, sir.

19   Q.    That was May 1st of 2013; is that right?

20   A.    Yes, sir.

21   Q.    Now, on April 30th, the day before, you had a

22   court date in this very building, didn't you?

23   A.    Yes, sir.

24   Q.    And you came down here because you were

25   charged with a felony crime of assaulting Roxann

1    Sanchez; isn't that right?

2         A.   Yes, sir.

3         Q.   And you were in court that day, just down the

4    hall from here; isn't that right?

5         A.   Yes, sir.

6         Q.   And Roxann wasn't dropping that case, was

7    she?

8         A.   She tried, but, I mean, I think your office

9    does things different.  They -- they wouldn't -- they

10   wouldn't drop it.  She even sent a letter, but -- she

11   even took a class, I think, but --

12        Q.   You couldn't get out of that like you could

13   get out of it in Illinois, could you?

14        A.   No.

15        Q.   No.  You were on the hook for a felony crime

16   in Tarrant County, Texas, on April 30th of 2013; isn't

17   that right?

18        A.   Yes, sir.

19        Q.   And you knew about that when you got into

20   that argument with Roxann on May 1st; isn't that

21   correct?

22        A.   Yes, sir.  But we -- I mean, Tuesday, April

23   30th, I mean, we were fine, I mean, you know, going

24   through this case.  I mean, you have your puzzle to put

25   together.  I have my puzzle to put together.

1          And, you know, Friday, when her best

2     friend testified about she signed the lease that

3     Friday -- you remember that?  She signed the lease that

4     Friday.

5          So we got paid on the same day.  Okay?

6     So every time I got paid, we had a joint account.  So I

7     would take $600 out of my checking account and transfer

8     it to a joint account for the -- for the rent.  Now,

9     when she signed that lease on Friday, her half of the

10    rent went to that.

11         So that Saturday, I had a whole bunch of

12    gold.  I mean, I don't know how much I had.  I had quite

13    a -- quite a -- so I took it out to The Highlands at the

14    gold place, and I pawned it, and I got almost $700.

15         So, now, in between that time, I'm

16    looking to get out, too.  I went and looked at a place.

17    I was moving out a week later.

18         So when she -- Wednesday, that day, she

19    texts me, and she says, "Are you going to give me half

20    of the rent money?"  And I said, "Well, I just gave you

21    half of the rent money Friday."  And she goes, "Okay.

22    Are we still going to the zoo on Sunday?"  I said,

23    "That's the plan."

24         So knowing what I know now, the reason

25    she was asking me for more rent money, because she had

1    already gave her half Friday for the new lease payment.

2    So that closed that door for why she was asking me for

3    more rent money.

4         Q.   Well, since I didn't ask that and you brought

5    it up, --

6         A.   Uh-huh.

7         Q.   -- did that make you angry?

8         A.   No, because I just told her no.  I wasn't

9    angry.

10         Q.   Okay.  It didn't bother you at all when you

11    thought she took your money and put it down on an

12    apartment for herself?

13         A.   I didn't know that until her friend

14    testified, sir.

15         Q.   A lot of this is about money to you, isn't

16    it?

17         A.   It has nothing to do with money.  It has

18    something to do with you had a plan, I had a plan, and

19    we were both -- we were both trying to perfect our plan.

20    We -- we -- we both were unaware of, you know, what our

21    tendency was at the time.  She -- she wanted a place of

22    her own, and I knew it wasn't working, so I was going to

23    get my own place, and we'll figure out what we had to do

24    after that.

25         Q.   So y'all were in the process of splitting

1    up; --

2         A.    Yes, sir.

3         Q.    -- is that right?

4         A.    Yes, sir.  One week.

5         Q.    One week.

6         A.    That would have been --

7         Q.    If she could have just kept alive for one

8    week, she would have made it away from you; is that

9    right?

10        A.    I mean, I don't look at it like that.  I look

11   as it as we were both at a point where, you know, it

12   wasn't working, and we -- we -- we -- we were making

13   preparations to move on.

14        Q.    Well, she never had a chance to do that, did

15   she?

16        A.    No, sir.

17        Q.    Because something called murder got in

18   between her and her plans; isn't that right?

19        A.    Yes, sir.

20        Q.    Did you overreact?

21        A.    Looking at it now, yes, sir.

22        Q.    You didn't think so at the time?

23        A.    Like I say, sir, it's more details than I

24   could have --

25        Q.    That's a simple question.  Did you think, at

1    the time, when you were standing in that apartment,

2    looking at blood on every wall and on every fiber of

3    carpet and on every piece of furniture, looking at three

4    people laying there on the floor lifeless, did you think

5    you might have overreacted?

6         A.    Yes, sir.

7         Q.    So you didn't just think about that now.  You

8    thought about that then.

9              Did you think you overreacted when you

10   punched Tamara Partridge because she had a message on

11   her phone?

12        A.    Yes, sir.

13        Q.    Did you think you might have overreacted when

14   you ran up to Tashana Singleton and choked her half to

15   death in the parking lot of a police department?

16        A.    Yes, sir.

17        Q.    You thought about that at the time?  You

18   thought you might have overreacted?

19        A.    Well, after it was all over with, yes, sir.

20   Once I thought about it, yes, sir.

21        Q.    Did you think you might have overreacted when

22   you were 18 years old and you went up to your school and

23   you grabbed Tina Brown and you grabbed her against her

24   will and took her out and put her in a car and tried to

25   drive her off the campus?

1   A.   I'll answer your question, but, you know, a

2   lot of stuff, you know, gets exaggerated, but, yes, sir.

3   Q.   So you got a long history in your life,

4   according to your testimony here today, where you did

5   something and knew afterwards you overreacted.  Is that

6   your testimony?

7   A.   Well, once you analyze every situation, yeah,

8   you always think you could have done something

9   different.  That's -- that's everybody's life.  They

10  all -- I mean, nobody's perfect.  I mean, considering

11  what I'm here today for, everybody has skeletons in the

12  closet that they wish they never did or -- or -- or it

13  just so happens, my closet's open.  You've got it.  You

14  know, it's there.

15  Q.   Your closet is pretty full, isn't it?

16  A.   I mean, I'm pretty sure everybody's closet's

17  pretty full.  Mine is just -- is -- is -- is out in the

18  open.

19  Q.   You don't think yours is any fuller than

20  anybody else's?

21  A.   Oh, yeah.  I'm not questioning that at all,

22  sir.

23  Q.   It's overflowing, isn't it?

24  A.   I'm not going to say it's overflowing, but

25  it's -- it's -- it's -- it's maxed out.

1    Q.   It's maxed out.  So you feel like you've done

2    pretty well with your life?

3    A.   As far as relationships concerned, no.  Now,

4    as far as going to work every day and getting up at 5:30

5    and paying bills and -- and -- and giving my all at work

6    and on the field or whatever I did, I gave my all.  If

7    somebody called me and asked me -- they needed me, I was

8    there.

9    Q.   I don't think anybody questioned the fact

10   that you gave your all once you put yourself into it,

11   but not a whole lot of people find themselves sitting in

12   a courtroom charged with capital murder of multiple

13   victims.

14   A.   No, sir.

15   Q.   What was your first touch with the criminal

16   justice system?

17   A.   I was with some friends, and I think we were

18   all together.  We went to the store, and one of my other

19   friends -- I won't say his name, but he decided he was

20   going to take some -- we were together, and they caught

21   up with us, and they charged us both with retail theft.

22   Q.   And what had y'all stolen?

23   A.   What he stole?  Well --

24   Q.   Oh, you didn't steal anything.  Let's --

25   let's get that straight.

1    A.   Well, I mean, at the time, they asked us both

2   who took it, and we didn't want to tell on each other,

3   so they actually charged us both with it.  But,

4   actually, it was just a coat, I think, a jacket.

5        Q.   But you didn't take it?

6        A.   No, sir.

7        Q.   It was that other guy.  The other guy took

8   it.

9        A.   I mean, I was just as guilty.  I was watching

10  out.  I mean, I was just as guilty.

11       Q.   And you ended up on a felony probation for

12  the offense of retail theft for that crime, didn't you?

13       A.   I think so, yes, sir.

14       Q.   Is it hard to remember?

15       A.   Not really, because I know I had to -- I had

16  to talk to a guy every month.  So I guess that considers

17  probation.

18       Q.   So how many times, over the course of your

19  life, would you say you were arrested?

20       A.   I'll say at least eight or nine times.

21       Q.   That's a pretty conservative estimate, isn't

22  it?  How many times did you get arrested for disorderly

23  conduct?

24       A.   Maybe once or twice.

25       Q.   How many times did you get arrested for

1    theft?

2        A.    That I know of, once.  Yeah.  Once.

3        Q.    Well, there was another incident later in

4    your life, wasn't there?  You got arrested for theft?

5        A.    I don't know.  Refresh my memory.  I don't

6    know.  I mean --

7        Q.    Well, if I dig around in the records long

8    enough, I can refresh your memory on that.

9              How about for the domestic violence or

10   domestic battery?

11       A.    I say five or six times.

12       Q.    How about violation of a protective order?

13       A.    Like I say, stuff has got exaggerated.  I --

14       Q.    Well, I'm asking you.

15       A.    I mean, honestly, I would say maybe one.  I

16   don't know what it did consist of, but I think I

17   followed the rules as far as the order of protective --

18   but if I violated, it might have been one, and I don't

19   know if I had to explain it later or whatever, but --

20       Q.    How about resisting arrest or resisting a

21   police officer?  How many arrests?

22       A.    I don't know, sir.  I'm being honest with

23   you.  I don't know.

24       Q.    Well, how many?  One?  Two?  Five?

25       A.    I don't think it was that -- five.  I don't

1    know, sir.  I mean, if you have it there, you can tell

2    me.

3        Q.    Well, you have been arrested for that,

4    haven't you?

5        A.    If that was the charge, I guess.  I mean,

6    like I said, I can't remember that, sir.

7        Q.    One night, you got into a fight at Knockouts,

8    the bar in Matteson, right?

9        A.    Yes, sir.

10       Q.    When the police showed up, you fought the

11   police, right?

12       A.    It wasn't a fight, sir.

13       Q.    All right.  Well, what did you do?

14       A.    I mean, we got into a verbal, you know,

15   argument about the situation that was going on.  And if

16   that's what he wrote up, when I -- you know, he took me

17   to the Matteson jail, I guess that's what it was, but, I

18   mean --

19       Q.    Well, you went to jail that night, right?

20       A.    Yes, sir.

21       Q.    And just like Tamara Partridge said, you got

22   out of jail, and you went over to Troy's Auto, and you

23   tried to get your car out, right?

24       A.    Well, actually, she came and got me out of

25   jail.

1      Q.    Yeah.

2      A.    She didn't remember, but she bailed me out of

3    jail.

4      Q.    Okay.

5      A.    And I went to the -- to the pound, and, you

6    know, I had called from Matteson.  It was a guy there.

7    So when I got there, the front door was open, so I went

8    through the front door.  And I could see my vehicle to

9    the right.  And I went and got in my vehicle, and you

10   know the rest of the story.  I tried to get it out the

11   lot, but, you know, I -- that was one of the times I

12   thought about it.  And I left the vehicle there, and I

13   came back out, and Tamara took me home, and the next

14   morning, I went and got my vehicle.

15            And the guy -- I talked to the guy, and

16   the guy was like, "You know, no harm, no foul, but, you

17   know what you did was wrong," and that was the end of

18   it.  There was no damage to his gate.

19      Q.    Except they filed a case on you for criminal

20   damage of property.

21      A.    Well, at the time, because they didn't know

22   who I was.  You know, they had my vehicle, but they

23   didn't know who -- you know, they just ran my license

24   plate or whatever.

25      Q.    And they filed the case on you, didn't they?

1        A.    At the time, yeah.  I had to answer to that,

2   yes, sir.

3        Q.    Well, you got arrested a couple of times for

4   your -- the things that happened to Tina Brown, right?

5        A.    Well, at the school, yes, sir.

6        Q.    The things at the school.  And then there was

7   another thing with her, wasn't there, where you drove

8   her around in the car for a while, and she had to mace

9   you to get away?

10        A.    The mace part didn't happen, sir, but if

11   that's what's in the report, yes.  But she never maced

12   me.

13        Q.    That's what's in the report.  She had to mace

14   you to get away.

15        A.    I've never been maced in my life, sir.

16        Q.    You got arrested for that, too, didn't you?

17        A.    If that's what you have, sir, I mean, yeah.

18        Q.    Well, apparently, you just don't remember

19   this all very well.  You were arrested so many times,

20   you don't remember all these things; is that right?

21        A.    I remember, but I don't remember, you know,

22   verbatim what was written in the reports or what it

23   was -- what the charges were and everything like that.

24   I know I had to go to court, and, you know, I stood up

25   there, and half the time, I -- you know, I listened half

1    the time.  I just wanted to get out of there.  But, I

2    mean, I answered to all of it.

3         Q.    And you got pretty lucky with the court

4    system up in Illinois, didn't you?

5         A.    I wouldn't say lucky.  I mean, you know, in

6    your terms probably, yes, but I had to pay money.  I had

7    to -- you know, I -- the probation.  I had to report.  I

8    had to pay money for that.  I even get anger management

9    classes.  I had to pay for that.

10         Q.    How many times have you been through anger

11    management classes?

12         A.    Two.

13         Q.    And you went through some domestic violence,

14    domestic abuse programs up in Illinois, too, didn't you?

15         A.    No.  They were just anger management classes.

16    I think I did 18, 29 weeks in one, and then I did the

17    eight weeks here.

18         Q.    Why would anyone think that you needed to go

19    to anger management classes?

20         A.    Well, considering how the courts are set up,

21    they -- you know, they try to label everything, whereas,

22    you know, he has anger issues, so he needs to go to

23    anger management classes.  That's a stipulation to your

24    offense.  And you sign up, and you go, and you listen to

25    what -- you know, it's other people there, and you

1    listen to them.  You listen to your problem.  And, you

2    know, everybody kind of like just try to come up with

3    better situations.

4        Q.    So it's the court system you had -- the court

5    system's fault you had to go to anger management?

6        A.    No, not saying that at all.  I'm not saying I

7    didn't -- I wanted to go.

8        Q.    And you wanted to go, after you choked Roxann

9    Sanchez on November the 12th of 2012, because you wanted

10   to get back into that house with her; isn't that right?

11       A.    I was already in the house, sir.  She bailed

12   me out.  I went to anger management class because that's

13   what I wanted to do.  I signed up for anger management

14   class before the courts even got involved in it.

15       Q.    All right.

16       A.    I did that on my own.

17       Q.    You did that because you knew you had an

18   anger problem, right?

19       A.    Yes, sir.  I wanted -- I wanted -- I wanted

20   to work it out, sir.  That's why I signed up for

21   counseling and anger management.  I made every

22   appointment to that -- to Mitzi Ellington.

23       Q.    And when you got arrested for that crime,

24   there was a protective order put in place, wasn't there?

25       A.    Yes, sir.

1    Q.    There was a document called an emergency
2    protective order?
3    A.    Yes, sir.
4    Q.    And that protective order told you, Cedric
5    Ricks, to stay away from Roxann Sanchez, didn't it?
6    A.    Yes, sir.
7    Q.    And it told you to stay away from her
8    children; isn't that right?
9    A.    Yes, sir.
10    Q.    And away from her apartment; isn't that
11    right?
12    A.    Yes, sir.
13    Q.    And away from her place of work; isn't that
14    right?
15    A.    Yes, sir.
16    Q.    And away from her mother's house; isn't that
17    right?
18    A.    Yes, sir.
19    Q.    And that document was served on you while you
20    were still in the Tarrant County Jail; isn't that right?
21    A.    Yes, sir.
22    Q.    And you can read and write the English
23    language, can't you?
24    A.    Yes, sir.
25    Q.    And you've read that document, didn't you?

1      A.    Yes, sir.

2      Q.    And you knew what that document prohibited

3 you from doing; isn't that right?

4      A.    Yes, sir.

5      Q.    And as soon as you got out of jail, you went

6 and violated it; isn't that right?

7      A.    Yes, sir.

8      Q.    Took you a while to come to that answer,

9 didn't it?

10     A.    Because it's a -- it's a two answer to that

11 question, but I'll -- I'll -- I'll answer it for me.

12     Q.    Well, let me -- let me answer it for you.

13 It's Roxann's fault you violated that, right?

14     A.    No.   I mean, she wanted me there, and we --

15 she -- she -- she picked me up, and she said, "I don't

16 want you to go anywhere else.   I want you here."

17     Q.    She bailed you out with your own money,

18 right?

19     A.    It was our money, but, yes, sir.

20     Q.    You said you had $5,000.

21     A.    I told her -- I always -- I always kept money

22 at home just in case, you know, you're dealing with

23 computers and everything, you can't get to the bank.  I

24 always kept money like that.

25     Q.    Yeah.

1              Well, it was a kind of blow to you.

2   You've mentioned this several times about how, when your

3   car was repossessed, that that was a big factor in your

4   life that caused you to go into this downhill spiral

5   that you went into, right?

6         A.   Basically that was icing on -- that was the

7   icing on the cake.  It wasn't the biggest blow that I --

8         Q.   When was that car repossessed?

9         A.   I would say October.

10         Q.   Okay.  Would you say it was approximately a

11   month before you assaulted Roxann?

12         A.   Yes, sir.

13         Q.   You had bought that car up in the state of

14   Illinois, hadn't you?

15         A.   Yes, sir.

16         Q.   You know it was up in the state of Illinois?

17         A.   Yes, sir.

18         Q.   You were making payments on that car to an

19   outfit that was based in Illinois?

20         A.   Yes, sir.

21         Q.   And you thought, since you were down here in

22   Texas, they weren't going to catch up to you and you

23   didn't have to make the payments on that car; isn't that

24   right?

25         A.   I always made my payments.  If I got the

```
 1    money, I'm going to pay it.

 2         Q.    All right.  Well, you didn't make your

 3    payments, did you?

 4         A.    Well, at the time, she was pregnant, so every

 5    time I got paid, I went to Babies R Us, and I bought

 6    diapers.  We had -- we had everything that he possibly

 7    needed by the time he got here, and I made sure of that.

 8    I bought everything out of my -- even though I was

 9    stressed for cash, because I was already paying $600 to

10    my ex-wife.  That was coming straight out -- well,

11    actually, it was almost 900, because I had to pay for

12    his medical, too.

13         Q.    And your son, Isaiah, was born in August; is

14    that right?

15         A.    Yes, sir.

16         Q.    And what date was that?

17         A.    That was August 6th, sir.

18         Q.    You told Dr. McGarrahan in an interview a

19    little while back that the proudest moments of your life

20    were the two days your sons were born; isn't that right?

21         A.    I might -- I don't know if I said that.

22         Q.    Well, if you told Dr. McGarrahan that, were

23    you lying at the time, or have you just changed your

24    mind?

25         A.    I don't -- I mean, at the time, I didn't talk
```

1    to so many psychiatrist people.  I mean, was I happy

2    when my kids were born?  Did it bring tears to my eyes?

3    Yeah, because I saw it.  I was in there.  I saw it when

4    it came out.  It was unbelievable.

5         Q.   And you said that the morning after you

6    choked Roxann, that you went to the Bedford Police

7    Department --

8         A.   Yes, sir.

9         Q.   -- because you wanted them to know your side

10   of the story; isn't that right?

11        A.   Yes, sir.

12        Q.   And you said, when Mr. Ray was asking you

13   questions, that you went in that police department and

14   you told them everything, right?

15        A.   To my knowledge, yes, I did.

16        Q.   You told them -- you told them everything

17   about what had happened that night, right?

18        A.   Well, actually, I didn't -- you know, I keep

19   a lot of stuff personal, so I don't -- I told them

20   the -- the -- the significance of the -- the offense,

21   yes, sir.

22        Q.   So now you didn't tell them everything.

23   Which is it?  Did you tell them everything, or did you

24   not tell them everything?

25        A.   I told them what they asked.

1      Q.    In fact, you gave them a written statement,
2  didn't you?
3      A.    Yes, sir.
4      Q.    It's on a form called "voluntary statement."
5      A.    If that's what -- yes, sir.
6      Q.    Well, do you recognize your own handwriting?
7      A.    Sure.
8              MR. GILL:  May I approach the witness?
9              THE COURT:  You may.
10     Q.    (BY MR. GILL:)  Do you recognize that?
11     A.    Can I read it?
12     Q.    Sure.
13     A.    Thanks.
14     Q.    Is that it?
15     A.    Yes, sir.
16     Q.    Is that the statement you gave to the Bedford
17  Police Department on November the 12th of 2012?
18     A.    Yes, sir.
19     Q.    It's your handwriting?
20     A.    That's it, sir.
21     Q.    Did they ask you to write it out in your own
22  writing?
23     A.    Yes, sir.
24     Q.    You signed it at the bottom?
25     A.    Yes, sir.

1    Q.    Can you read it?

2    A.    I just read it.

3    Q.    Can you read it -- you want to read it out

4    loud to the jury?

5    A.    You want me to?

6    Q.    Yeah, go ahead.

7    A.    "I, Cedric Ricks, am not under arrest for,

8    nor am I suspect in any criminal offense concerning the

9    facts I'm to make known to the detective" -- I don't

10   even think that was the detective.

11            "I hereby volunteer the following

12   information of my own free will.  For whatever purpose

13   it may serve, I am 38 years of age.  I can read, write,

14   and understand the English language.

15            "I, Cedric Ricks, was involved in an

16   altercation with my girlfriend last night.  The date was

17   November 11th, 2012.  We were arguing.  I decided to

18   leave Roxann.  I decided to leave.  Roxann grabbed me

19   around the neck as I was leaving out the bedroom.  We

20   pushed and shoved each other a few times.  Afterwards,

21   we both calmed down, and I talked -- we talked through

22   the night.

23            "This morning everything seemed okay, but

24   I decided to file a report with the City of Bedford

25   police.  That's my statement."

```
 1                      And I initialed it.  And I initialed
 2   another page for whatever reason.
 3                      (Exhibit marked.)
 4        Q.   (BY MR. GILL:)  And that's State's
 5   Exhibit 276; is that right?
 6        A.   Yeah.  That's what she just put on there.
 7                      MR. GILL:  We offer 276.
 8                      MR. RAY:  We don't have any objection.
 9                      THE COURT:  State's 276 is admitted.
10        Q.   (BY MR. GILL:)  Statement's in your
11   handwriting, right?
12        A.   Yes.
13        Q.   And they told you just write whatever you
14   needed to write in there, right?
15        A.   At the time, yes, that's what he told me to
16   do.
17        Q.   At the time.
18                      The fact of the matter is, on direct
19   examination, when Mr. Ray was asking you about this, you
20   said you went down to the police department and told
21   them that you had choked Roxann; isn't that right?
22        A.   If that's what I said, yes.
23        Q.   The fact of the matter is, it went beyond
24   choking.  You choked her to the point of
25   unconsciousness, didn't you?
```

1      A.    Yes, sir.

2      Q.    And then, when she came to, you choked her

3  some more, didn't you?

4      A.    No, sir.

5      Q.    You beat her head on the floor of the

6  bathroom that night, didn't you?

7      A.    Yes, sir.

8      Q.    How many times did you beat her head on the

9  floor of that bathroom?  Is that a funny question?

10     A.    No, because I'm -- I'm -- I'm trying to

11  answer your questions, and I'm going to answer them,

12  because we're going to get through this, but, yes, sir.

13  I don't know how many times, sir.

14     Q.    Is there something amusing about that

15  question?

16     A.    No.  I just -- I'm -- I'm getting through

17  your questions, sir.  Yes, sir.  I don't know how many

18  times, sir.

19     Q.    How many times do you think it was?

20     A.    I can't answer that, sir.

21     Q.    Can't answer -- was it more than one?

22     A.    No, sir.

23     Q.    Just once?

24     A.    I don't -- I don't know, sir.

25     Q.    You don't know.  Okay.  But you banged her

1    head on the floor of the bathroom; is that right?

2         A.    Yes, sir.

3         Q.    And when she came to, you were afraid she was

4    going to call the police; isn't that right?

5         A.    Yes, sir.

6         Q.    And you made sure, that whole night, that she

7    didn't call the police; isn't that right?

8         A.    No, sir.

9         Q.    So she was free to call the police whenever

10   she wanted.  Is that your testimony?

11        A.    Yes, sir.

12        Q.    And she was free to get up and leave that

13   apartment whenever she wanted to.  Is that your

14   testimony?

15        A.    Yes, sir.

16        Q.    The next morning, before she left to take the

17   kids to school, you and she put makeup on her injuries,

18   didn't you?

19        A.    She did.  She put makeup on, yes, sir.

20        Q.    You didn't have anything to do with that, did

21   you?

22        A.    I never put makeup on a woman, sir, but I was

23   there.

24        Q.    You wanted her to put that makeup on, didn't

25   you?

1    A.    Well, she -- she initiated the makeup, and I

2  was just standing there, you know.

3    Q.    Because you didn't want anybody to know what

4  had happened that night, did you?

5    A.    We both didn't, sir.

6    Q.    And you know that as soon as she got away

7  from you, she went and found her mother, and they went

8  up to the Bedford Police Department; isn't that right?

9    A.    That's what I found out, yes, sir.

10    Q.    Well, the way you found that out was you

11  drove by there to see if she was there and saw her car

12  in the parking lot; isn't that right?

13    A.    No.  I went there on my own, sir.

14    Q.    And that's why you went into the Bedford

15  Police Department, because you knew she was already

16  there.

17    A.    I did not know she was there, sir.  I had no

18  recollection of Roxie being at the police station, sir.

19    Q.    So your testimony is that you just went up

20  there out of the goodness of your heart to tell the

21  Bedford Police Department what had gone on that night;

22  is that right?

23    A.    I didn't go there to -- to just say, you

24  know, this is what happened in our home.  I went there

25  just to give a report, just in case it came back to me

1    because of the history that I've had.  So that was the

2    best way of, you know, being forthcoming to what was

3    going on, just to let them know, because when you hide

4    stuff, it feels like, you know, you're doing something

5    wrong.

6        Q.    So your -- your estimation, the best way to

7    be forthcoming is to go lie about something?

8        A.    I didn't lie.  I told them exactly -- I mean,

9    if I wanted to lie, I wouldn't have told of them -- I

10   would have never went there.

11       Q.    Well, you want to show me in that statement

12   where there's something in there about you choking

13   Roxann?

14       A.    It's not in there.

15       Q.    You want to show me in that statement where

16   there's something in there about you banging her head on

17   the floor?

18       A.    That's not in there, sir.

19       Q.    That's right.  It's not, is it?

20       A.    No, sir.

21       Q.    Mr. Forthcoming forgot to put that in there.

22       A.    I'm not saying I forgot.

23       Q.    Well, I'm not saying you forgot either.

24   Let's get that straight.  I'm saying you purposely left

25   it out.  Which is what happened, right?

1      A.    Did I go in detail with the statement?  No,
2  sir.
3      Q.    Well, it's because you left some major things
4  out of it, didn't you?
5      A.    Well, at the time, I just put what he wanted
6  me to put or what I thought I should put.
7      Q.    Okay.  So it was the detective's fault that
8  you wrote --
9      A.    I'm not blaming anybody, sir.  I accept full
10  responsibility.
11      Q.    Let's talk about something else that you --
12  I'm sure you want to take full responsibility for.  You
13  testified, in response to some of Mr. Ray's questions,
14  that on May the 1st of 2013, you were defending
15  yourself.
16      A.    Yes, sir.
17      Q.    You were defending yourself, right?
18      A.    Yes, sir.
19      Q.    You were afraid of a couple of eight- and
20  12-year-old kids, right?
21      A.    No, sir.
22      Q.    So who were you defending yourself against
23  then?
24      A.    Pretty much the whole house, sir.
25      Q.    Were they all ganging up, coming after you?

1    A.    I mean, I'm not going to -- I'm not going to

2    go into detail, sir, but, you know, we're through with

3    the guilt/innocence phase.

4    Q.    Yeah, there was a guilt/innocence phase.

5    A.    We're -- we're done with that.  I'm already

6    convicted for that.

7    Q.    You're kind of convicted for that.

8    A.    Right.  So it's -- it's irrelevant to exactly

9    what happened that night, because --

10    Q.    Well, it's really not, because the jury still

11    has to make some decisions.

12    A.    Yes, sir.

13    Q.    And if you want to maintain that you were

14    defending yourself that night, then you owe it to this

15    jury to explain to them exactly how you feel you were

16    defending yourself, because you brought it up.

17    A.    The jury made a decision to convict me on the

18    facts that was presented.  Now, if I had testified,

19    maybe it would have made a difference.  But it's still

20    not going to bring Roxie and Anthony back.

21    Q.    Yeah, I think we're pretty clear on that.

22    A.    Right.  And I'm clear on that, too.  I'm very

23    clear.

24    Q.    Well, what you're not clear on is who you

25    were defending yourself against.

1      A.    The whole house, sir.  I mean, you -- you --

2  you saw the evidence.  You saw how all the stuff that

3  was played into the evidence.  I only got two hands,

4  sir.

5      Q.    Right.

6      A.    I mean, it was more to it than that.  But it

7  doesn't matter.  Roxie and them are gone.  I'm -- I'm --

8  I'm a grown man.  They're gone.

9      Q.    So the whole house attacked you?

10      A.    Initially.

11      Q.    All four?  Did they just kind of gang up on

12  you?

13      A.    Pretty much.

14      Q.    And you were scared of a five-foot woman and

15  a 55-pound boy.  And what did Marcus weigh?  What did he

16  weigh?  Sixty-five pounds?

17      A.    Well, Marcus was a little heavier than that,

18  but I don't think he was -- this is the -- this is --

19  this is what I want you to understand, sir.  This is

20  what I want you to understand.  No matter what happened

21  in that house that day -- I mean, I even got stabbed in

22  the head, too, but nobody -- I never told that.  I

23  basically just told my attorneys three weeks ago exactly

24  what happened.  And you can ask them off the record or

25  on the record.

1          The psychiatrist lady has been on me for

2    months to tell what happened that night, and I refused

3    to tell what happened that night, because Roxie and

4    Anthony are gone.  That's the whole point.  That's the

5    whole point.

6          I had to turn down life without parole

7    because I didn't want to live.  So I'm sitting here

8    trying to tell you exactly why I'm here.

9          Now, they could have heard their version

10   of the story.  They could have came up with it, but it

11   didn't matter.  It doesn't matter.  That's what I'm

12   trying to get you to understand.

13        Q.    Well, I guess I'm a little thickheaded.

14        A.    Well, you -- you have that personality.

15        Q.    Why don't you ask me how many times I've been

16   arrested?

17        A.    I can ask you a whole bunch of questions.

18   Your lifestyle probably was different from mine.  Have

19   you ever lost anything?  Have you ever -- have you ever

20   lost a job, a career job?  Have you ever realized that

21   your bank account was at 10,000, now it's down to 500,

22   and you've got all these bills on the table?

23        Q.    You really think your circumstances are any

24   different from any other person's?

25        A.    I'm not saying it is, sir, but certain people

1    deal with stress differently than others, sir.

2        Q.    Well, I think we've established that.

3        A.    I mean, do you -- do you understand the stock

4    market?  When the stock market goes, that's when jobs

5    go.  When companies merge, that's when jobs go.  When

6    they brought in those tellers at -- those automatic

7    tellers at Wal-Mart and everything like that, jobs went

8    with that, too, because everything wants to be

9    automated.

10            They're building toll roads out here,

11   sir.  You know why they're building these toll roads?

12   So we can pay China back.

13       Q.    Well, actually it's Spain, but you're not too

14   far off.

15       A.    You know, we can send a person to the moon,

16   but we can't find this plane that crashed in the Indian

17   Ocean.

18       Q.    And does this have what to do with the fact

19   that you claimed you were defending yourself against --

20       A.    Sir, that's what I'm saying.  But I'm not

21   going to go into details, because I have to accept --

22   I'm a grown man.  Yes.  Did I overpower all of them?

23   Yes.  Was I fearing for my life?  Yes.  Do I have anger

24   issues?  Yes.  Have I ever stabbed anybody in my life?

25   No.  Have I ever picked up a gun and tried to kill

```
 1   somebody?  No.

 2        Q.   I thought you just said you never stabbed

 3   anybody in your life.

 4        A.   I never stabbed anybody with a knife.  Never.

 5        Q.   So you stood in that apartment and witnessed

 6   three suicides?

 7        A.   Well, I'm talking about before May 1st.

 8        Q.   Well, you never quite hit Tashana with that

 9   knife that you were swinging at her, did you?

10        A.   You know --

11        Q.   That was a pretty direct question.  Did you

12   ever stab Tashana with a knife?

13        A.   No.  Do I remember doing that around her

14   head?  No.

15        Q.   You remember hitting her?

16        A.   I have hit Tashana before, yes.

17        Q.   You remember choking her to the point she was

18   unconscious?

19        A.   Yes.

20        Q.   Did you regret that at the time?

21        A.   Of course.  I regret every bad thing that

22   I've done.

23        Q.   The ones you can remember?

24        A.   I have a great memory.  I'm just -- I mean,

25   I'm 30 -- I'll be 40 years old this year, sir.  The
```

1  older you get, the more you can't remember.  That's just

2  the laws of physics.

3      Q.    Did you hear the testimony in court here

4  about the prescription forms that you had?

5      A.    Yes, sir.

6      Q.    Those were yours, weren't they?

7      A.    Well, Dr. Hays is a liar, because his nurse,

8  Lana, actually had him write those scrips.  I can't

9  forge his name.  I didn't work for him that much to

10 forge his name.

11     Q.    What about the forms -- the blank forms you

12 had in your apartment?

13     A.    Eureka, Dr. Teng's nurse, she left those

14 because she had gall bladder surgery.  I never used

15 those forms.  She left his DEA number so I could have

16 it, because Dr. Teng goes into different hospitals all

17 the time.  You have patients come in all the time,

18 asking for this and asking for that.  And all I have to

19 do is have the form right there, call him or page him,

20 and he call back and say that's fine.  But they still

21 need his signature, especially if it's a controlled

22 substance.  You always need a doctor's signature.  You

23 can't stamp it.  You just can't.  You can't call it in.

24 You can e-scribe it, but you still need a doctor

25 authorization for controlled substances.

1    Q.    And they told you to go home and take it --

2    go ahead and take it?

3    A.    Well, they're in my pocket.  You're not going

4    to leave that around.  Once somebody get their DEA

5    number, I mean, they can do something with it.  You

6    don't leave that -- you don't leave stuff laying around.

7    I'm not going to leave that stuff out on the desk, and

8    Eureka comes back, and it trails her back.  When I got

9    back around to his clinic, if I got referred to his

10   clinic to go back and work, he can have his scrips.

11   Q.    So that's all their fault, too, right?

12   A.    I'm not blaming anybody for that.  I don't

13   see -- I don't see any dishonesty in that.  I never used

14   his -- his -- his forms to write prescriptions for

15   myself or anything like that.

16          And as far as Dr. Hays goes, he's going

17   to lie about it because he doesn't want to lose his

18   license.

19          If you go back and look at that company,

20   that's all those doctors did, is write scrips for

21   people.  They encouraged us to go to those doctors.  I

22   mean, you're working for rheumatologist, you're working

23   for oncologist, you're working for family medicine,

24   you're working for internal medicine, you're working for

25   pediatric.  And when you join a big physicians group,

1  they want you to use that insurance because it all

2  circulates.  If I refer you down the hallway, use that

3  insurance.  It never goes to the outside.  It stays all

4  in house.  So -- but basically they're paying each other

5  back.

6      Q.  And it was pretty easy for you to write

7  yourself a prescription for Xanax and carry it down to

8  the pharmacy in Mansfield and fill it, wasn't it?

9      A.  I never wrote a prescription for Xanax.  Like

10 I said, Lana -- you have to have a scrip with a doctor's

11 signature on it.  Now, she can call in Xanax, but when I

12 pick up that, you have to give them -- you have to show

13 them that actual prescription.

14     Q.  And you know all that, right?

15     A.  I know exactly how it works.

16     Q.  You know exactly how it works.

17     A.  Yes, sir.

18         MR. GILL:  We pass the witness.

19         MR. RAY:  Nothing further.

20         THE COURT:  You may step down, sir.

21         (Defendant returned to counsel table.)

22         MR. RAY:  I need to speak to Mr. Gordon

23 for a second.

24         (Pause.)

25         MR. RAY:  Defendant rests its case in

```
 1    punishment.

 2              MR. GILL:  We have a brief witness, Your

 3    Honor.

 4              THE COURT:  Are you ready with your

 5    witness?

 6              MR. GILL:  We are.

 7              THE COURT:  Call your witness.

 8              MR. GILL:  Diane McGrewe.

 9              THE COURT:  You remain under oath, ma'am.

10              WITNESS MCGREWE:  Yes.

11              THE COURT:  Have a seat, ma'am.

12                        DIANA MCGREWE,

13    having been first duly sworn, testified as follows:

14                      DIRECT EXAMINATION

15    BY MR. GILL:

16         Q.   Go ahead and tell us your name again, please.

17         A.   Diana McGrewe.

18         Q.   And, Ms. McGrewe, you testified earlier in

19    the course of this trial.  You are the mother of Roxann

20    Sanchez, right?

21         A.   Yes.

22         Q.   And the grandmother of Anthony and Marcus?

23         A.   Right.

24         Q.   And you saw your daughter and Anthony and

25    Marcus nearly every day; --
```

```
 1            A.    Yes.
 2            Q.    -- is that right?
 3                  The kids went to school where you worked?
 4            A.    Right.
 5            Q.    And you kept them after school?
 6            A.    Right.
 7            Q.    And your daughter would come home to you and
 8     pick her kids up on her way home from work?
 9            A.    Yes.
10            Q.    Okay.  Is today a special day in your family?
11            A.    It is.  Today would have been Anthony's tenth
12     birthday.
13            Q.    Did we happen to show you a -- a
14     videorecording that had been taken on your daughter's
15     cell phone?
16            A.    Yes.
17            Q.    Did you watch that videorecording?
18            A.    I did.
19            Q.    Do -- did you recognize the people contained
20     in that videorecording?
21            A.    Yes.
22            Q.    Who were they?
23            A.    Roxann, the three boys, and Cedric.
24            Q.    And in the videorecording -- it was a
25     videorecording -- a recording your daughter made of the
```

1    three boys?

2        A.    Yes.

3        Q.    And what were they doing?

4        A.    They were just in the living room, playing,

5    carrying on like three boys and their mother always did.

6        Q.    And can the boys be heard on the

7    recording, --

8        A.    Yes.

9        Q.    -- playing?

10       A.    Yes.

11       Q.    Can your daughter be heard on the recording?

12       A.    Oh, yes.

13       Q.    And she was talking to the boys.

14       A.    Right.

15       Q.    And, in fact -- in fact, you said that Cedric

16   was also there.  Can his voice also be heard on that --

17   on that videorecording?

18       A.    Yes.

19       Q.    Now, are they just -- just a family

20   interacting, watching the kids play?

21       A.    Right.

22       Q.    And do you know where the videorecording was

23   made?

24       A.    In her living room, at the apartment.

25       Q.    At the same apartment where she was murdered?

1       A.    Yes.

2       Q.    Were there some toys in the -- in the video

3  that were there at the time that the murders occurred?

4       A.    Yes.

5       Q.    In fact, there's a giant kind of a tube thing

6  that the kids are all crawling through; is that right?

7       A.    Right.  Like a tunnel thing they played in.

8       Q.    Did you see that in the -- in the photographs

9  that were shown to the jury?  Did you see that toy?  The

10  crime scene photographs that we showed for the jury?

11      A.    Yes.

12      Q.    Is that --

13      A.    Yes.

14      Q.    Generally, what color is that -- is that

15  item?

16      A.    Red and blue.

17      Q.    And when you looked at the videorecording,

18  did we have you put your initials on it so that you

19  could authenticate it for court?

20      A.    Yes.

21            (Exhibit marked.)

22      Q.    (BY MR. GILL:)  Let me show you what's now

23  been marked as State's Exhibit No. 277 and ask if you

24  recognize that as being the videorecording that you

25  looked at.

```
1              A.    Yes, it is.
2              Q.    And it contains the video that you described
3    to the -- to the jury?
4              A.    Yes.
5                    MR. GILL:  We offer 277.
6                    MR. RAY:  Can we approach the bench?
7                    THE COURT:  Yes.
8                    (At the bench, on the record:)
9                    MR. RAY:  We would make exactly the same
10   objection that the State made to what became
11   Defendant's 38A.  This is hearsay.  It's out-of-court
12   statements.  And we object to it based on that.
13                   MR. GILL:  We are not offering it for the
14   truth of the matter asserted, because there's really
15   nothing said on there except a bunch of giggling, a
16   bunch of -- a bunch of kids playing.  It's just to go --
17   it's just to show that -- it's further victim impact
18   evidence.
19                   MR. RAY:  We will --
20                   MR. GILL:  This is along the future
21   dangerousness issue.
22                   MR. RAY:  Still can't get around the
23   hearsay rule.  The Court sustained the State's
24   objections to out-of-court documents that we had, and we
25   are making exactly the same objection.  I want to make
```

1    sure the record bears that out.  Just because you find

2    something later, you still can't get around the hearsay

3    rule.  The fact that it proves one thing, they've still

4    got a hearsay objection to deal with, and we do not

5    believe they have satisfied that, and we object to it.

6              THE COURT:  What statements are made on

7    this?

8              MR. GILL:  There aren't any.  It's kids

9    saying, "Hey, Isaiah, crawl through here."  And Roxann

10   saying, "Hey, kids having fun?"  And just like that.

11             MR. RAY:  Well, it's just like he said,

12   they're offering it to prove dangerousness.  And that's

13   something they have to prove in this case, and they

14   can't just -- I mean, our objection is hearsay, and it's

15   the same objection they made.  I want to make sure the

16   record indicates that.

17             THE COURT:  That objection is overruled.

18   State's 277 is admitted.

19             MR. GILL:  May we publish it?

20             THE COURT:  That's granted.

21             (Open court:)

22             (State's Exhibit No. 277 published in open

23             court.)

24        Q.   (BY MR. GILL:)  So, Ms. McGrewe, obviously,

25   the -- the toddler we saw in that video was Isaiah?

1      A.    Yes.

2      Q.    Isaiah Ricks?

3      A.    Yes.

4      Q.    And then we also saw a young man in a red

5  shirt?

6      A.    Yes.  That was Anthony.

7      Q.    Okay.  And then a child in a white T-shirt?

8      A.    And that was Marcus.

9      Q.    We could hear a -- an adult female voice?

10      A.    And that was Roxann, my daughter.

11      Q.    Okay.  And we also heard an adult male voice.

12      A.    That would be Cedric.

13      Q.    And was this how everybody looked and sounded

14  on -- on May 1st of 2013?

15      A.    No.

16      Q.    Well, that wasn't on May 1st, but is that --

17      A.    Before.

18      Q.    Okay.  Do you know how long before that video

19  would have been made?

20      A.    No.

21      Q.    Just -- is that how they looked, though, at

22  that -- at the time?

23      A.    Yes.

24      Q.    The kids were around the same age, size,

25  appearance they were on -- on May 1st?

```
1          A.    Yes.
2                    MR. GILL:  We pass the witness.
3                    MR. RAY:  We don't have anything.
4                    THE COURT:  You may step down, ma'am.
5                    (Witness McGrewe excused from the witness
6                    stand.)
7                    MR. GILL:  Kendall Novak.
8                    THE COURT:  Do you solemnly swear or
9    affirm the testimony you are about to give in the cause
10   now on trial will be the truth, the whole truth, and
11   nothing but the truth, so help you God?
12                   WITNESS NOVAK:  Yes, ma'am.
13                   THE COURT:  Have a seat, sir.
14                        KENDALL NOVAK,
15   having been first duly sworn, testified as follows:
16                   DIRECT EXAMINATION
17   BY MR. GILL:
18         Q.    Tell the jury your name, please, sir.
19         A.    Kendall Novak.
20         Q.    How are you employed?
21         A.    I'm employed here at the district attorney's
22   office.
23         Q.    And are you a criminal investigator with the
24   Tarrant County DA's office?
25         A.    Yes, sir.  I'm assigned to special crimes
```

1    unit.

2        Q.   And as part of the special crimes unit, have

3    you learned and been trained to extract data off of

4    cellular telephones?

5        A.   Yes, sir.

6        Q.   And do you use a computer program to

7    accomplish that?

8        A.   Yes, sir.

9        Q.   And have you been trained in the use of that

10   program?

11       A.   I have.

12       Q.   What's the name of that program?

13       A.   This one, Cellebrite.

14       Q.   And in connection with this case, did you

15   have occasion to look at a -- at a cellular telephone

16   I'm going to hand you as State's Exhibit No. 159?

17       A.   Yes, sir, I did.

18       Q.   And did you use the Cellebrite program to

19   remove data from State's Exhibit No. 159?

20       A.   Yes, sir.

21       Q.   And through the course of your investigation,

22   did you understand State's Exhibit No. 159 to be a

23   cellular telephone that belonged to a victim in this

24   case by the name of Roxann Sanchez?

25       A.   Yes, sir.

1       Q.   And were you able to extract some video from

2  that cellular telephone?

3       A.   Yes, sir.

4       Q.   And in connection with that, has one of the

5  videos from that cell phone been taken and placed on a

6  separate disk?

7       A.   It has.

8       Q.   And have you had an opportunity to view that

9  particular disk and compare it to the original data that

10  you removed from that cell phone?

11       A.   I did.

12       Q.   And is it identical?

13       A.   Yes, sir.

14       Q.   And is State's Exhibit No. 277 the -- one of

15  the videos that you removed from that cell phone?

16       A.   Yes, sir, it is.

17       Q.   And do you recognize State's Exhibit No. 277

18  by the fact that your initials appear on it?

19       A.   Yes, sir, I do.

20       Q.   And you have viewed it and -- and verified

21  its authenticity; is that correct?

22       A.   Yes, sir.

23       Q.   Now, when a cellular telephone creates a data

24  file, such as a video file, does it -- does it imprint

25  date/time information?

1          A.    Yes, sir.

2          Q.    And does that -- does that particular type of

3     information have a name?

4          A.    Yes, sir.

5          Q.    A trade name?

6          A.    Meta data or file name.

7          Q.    Are you, as an investigator, able to verify

8     and -- or are you able to learn the meta data associated

9     with a particular file?

10         A.    Yes, sir.

11         Q.    Have you had an opportunity to investigate or

12    determine the meta data, that is, date and time stamp,

13    for the particular file that we're talking about here in

14    State's Exhibit No. 277?

15         A.    Yes, sir.

16         Q.    And on what date and time was the file

17    contained in State's Exhibit No. 277 created on that

18    cellular telephone?

19         A.    It was created on 4/28, 2013, at 5:30 p.m.

20         Q.    So April 28th --

21         A.    It was actually 5 -- I'm sorry -- 5:53 p.m.

22         Q.    So on April 28th, 2013, at 5:53, in the

23    afternoon?

24         A.    Yes, sir.

25               MR. GILL:  We pass the witness.

```
 1                    MR. RAY:  We don't have any questions.

 2                    THE COURT:  You may step down, sir.

 3                    WITNESS NOVAK:  Thank you.

 4                    THE COURT:  Just leave it.

 5                    (Witness Novak excused from the

 6                    courtroom.)

 7                    MR. GILL:  We rest, Judge.

 8                    MR. RAY:  We rest and close.

 9                    MR. GILL:  We close.

10                    THE COURT:  Ladies and gentlemen, that

11   concludes the testimony that you're going to hear.  We

12   need a few moments to finalize the charge.  And I'm

13   going to allow each side 30 minutes for summation, so it

14   will be a good time to take a stretch break, as well.

15   So let's go ahead and take a ten-minute break.

16                    (Recess from 10:05 a.m. to 10:14 a.m.)

17                    (OPEN COURT, DEFENDANT PRESENT, JURY NOT

18                    PRESENT:)

19                    THE COURT:  Let's go on the record.

20                    Have both sides received a copy of the

21   Court's revised proposed charge?

22                    MR. RAY:  Defendant has.

23                    MR. GILL:  State has.

24                    THE COURT:  Has everyone had an

25   opportunity to review it?
```

1          MR. RAY:  Defendant has.

2          MR. GILL:  Yes, we have.

3          THE COURT:  Any further objections or

4    requests?

5          MR. GILL:  None from the State.

6          MR. RAY:  We just want to maintain our

7    request for the extraneous offense charge based on

8    conversations we had yesterday.

9          THE COURT:  Okay.  And that request is

10   denied as per the ruling yesterday.

11         I'm going to allow each side 30 minutes

12   for summation.

13         State.

14         MR. HUSEMAN:  Your Honor, if you could

15   tell me when I've used ten minutes, please.

16         MR. GILL:  When I have five remaining,

17   please.

18         MR. RAY:  We're going to both argue.

19   I'll argue first.  If you would give me a -- tell me

20   when I've used ten minutes.

21         MR. GORDON:  Two minutes remaining, Your

22   Honor.

23         THE COURT:  Are both sides ready for the

24   jury?

25         MR. RAY:  We're ready.

```
1              MR. GILL:  Yes.

2              THE COURT:  Bring in the jury, please.

3              THE BAILIFF:  Yes, Your Honor.

4              THE COURT:  Okay.  Everyone can be

5    seated.  We're going to wait on the jury for a couple of

6    minutes.

7              (Pause.)

8              THE BAILIFF:  We're ready, Judge.

9              THE COURT:  Bring in the jury.

10             (OPEN COURT, DEFENDANT AND JURY PRESENT:)

11             THE COURT:  You may be seated.

12             (Court's charge read in open court.)

13             THE COURT:  I've allowed each side 30

14   minutes for summation.

15             And State may proceed.

16             MR. HUSEMAN:  Thank you, Your Honor.

17             Please this Court?

18             Ladies and gentlemen, I believe it was

19   March -- March the 20th.  That's what I wrote down.  The

20   day we all met in the Central Jury Room, over 200 people

21   were in there.  And day by day, after that, we whittled

22   it down, and we have you 14 people.  And we talked to

23   you individually during voir dire at length about these

24   special issues I'm going to go over in a minute, and

25   each and every one of you told us that depending on the
```

1    facts and circumstances of the case, you could return a

2    verdict in which the Judge could sentence this Defendant

3    to death.  And that's why you're here, because you said

4    you could follow the law.  Okay?

5              Now, after hearing the evidence in the

6    case at the guilt/innocence phase, I think you probably

7    had a pretty good idea of why we were seeking the death

8    penalty.  And, today, you have a rare occurrence or -- I

9    won't call it a rare treat, because it was quite

10   disturbing, but you were able to hear from a psychopath.

11   That's what you heard from today when this man took the

12   stand.  The only person that Cedric Ricks cares about is

13   himself.  We'll talk more about that in a minute.

14             Let's talk about the special issues in

15   this case.  Special Issue Number 1, which is in your

16   charge and the Judge just read to you, and I'll read it

17   to you again.  "Do you find beyond a reasonable doubt

18   that there's a probability that the Defendant would

19   commit criminal acts of violence that would constitute a

20   continuing threat to society?"

21             Now, what's also in the charge, before

22   you get to the Special Issue Number 1, it says right

23   here, and I'll read it to you.  "In deliberating on the

24   issues submitted, the jury shall consider all the

25   evidence admitted at the guilt or innocence stage and

1    the punishment stage, including evidence of the

2    Defendant's background or character or the circumstances

3    of the offense that mitigates for" -- spelling's

4    wrong -- "militates for or mitigates against the

5    imposition of the death penalty."

6                Now, what you note from there is that the

7    facts and circumstances of this offense alone gives you

8    what you need to know to answer that question yes.  The

9    brutality in which this Defendant committed these

10   murders -- I'm not going to show you the photographs

11   again, because you've seen them enough.  The multiple

12   stab wounds to this eight-year-old child.  The multiple

13   stab wounds to Marcus.  And you heard testimony in the

14   punishment phase of the trial about those injuries.

15   Some of those injuries to Marcus' neck were through and

16   through.  And the testimony from Marcus about how this

17   Defendant made a phone call, walked around the

18   apartment, sees him moving, sees him breathing, and goes

19   back and does it again.

20                I think at the closing of the

21   guilt/innocence phase, I told you he's a monster.  He is

22   a monster, and we know now, from hearing from him, that

23   he's a psychopath.

24                There's something else in those

25   photographs that you may not have seen or we may not

1    have pointed out to you, but there are some Band-Aid

2    wrappers on that kitchen table.  And I think you saw the

3    Neosporin in the bathroom.

4                    While Marcus was laying there bleeding to

5    death and these other victims were already dead, this

6    Defendant is in there patching his wounds from this

7    attack that he calls -- he now calls self-defense.

8                    After you heard his testimony today, I

9    think you can understand what kind of person can do

10   that, when they walk in a bathroom and bandage their

11   wounds with Neosporin.

12                   But you have other evidence in this case

13   that helps you answer that question, Special Issue

14   Number 1.

15                   You heard from his ex-wife, Tashana, and

16   I won't go over it in great detail again, because you've

17   heard it enough.  You know what he did to her.  He

18   abused her repeatedly, took out a knife, stabbed it

19   around her head.  And when she's about to give birth to

20   his son, what does he say to her?  "I hope it dies."

21                   Now, anybody in this courtroom that heard

22   that might think to themselves, "How could anybody say

23   something like that?  How could anybody feel that?"

24   But, again, after he testified, now you know what kind

25   of person says something like that and what kind of

1    person thinks that way.  His wife is about to give birth

2    to his son, and he tells her, "I have no sympathy for

3    you."  That's because he's a psychopath.  And he says to

4    her, "I hope it dies."

5                    And on 9/11, 2001, when everybody else in

6    this country was mourning over those towers coming

7    down -- we all remember where we were.  This Defendant,

8    later on that day, was in his kitchen with a knife,

9    stabbing it around her head after he beat her.

10                   Now, Defense Counsel is going to get up

11   here, and they're going to talk to you about this expert

12   they called, this impulse control expert or -- I'm not

13   sure if he said he was the data vampire or one of his

14   partners, but they're going to talk to you about impulse

15   control and say that he can't control himself.

16                   Well, you heard plenty of evidence in

17   this case about other crimes that he committed that you

18   can't say are impulse-control-problem crimes.  He stole

19   medicine from his doctors, smuggled it out of their

20   offices.  That takes thought and planning.  He stole

21   prescription pads from his doctor so he could get

22   whatever drugs he wanted, because he doesn't need a

23   doctor to administer drugs to him.  He's smarter than

24   everybody else in this room, everybody else he's ever

25   worked for.  So he does his own prescriptions.

1           And he smuggled a pencil over to this

2   courtroom -- or another courtroom where we were doing

3   voir dire, where we all did individual voir dire.  That

4   takes thought and planning.  Now, I don't know whose

5   neck that pencil was intended for or what he intended to

6   do that with that pencil, but he's got one provided for

7   him right over there, but he brought another one to

8   court.

9           He hoards pills while he's in jail, 23-

10  and-a-half-hour-day custody.  He hoards pills so he can

11  trade with other contraband.

12          You have plenty of evidence in front of

13  you to answer this question yes.  There is no other

14  answer to this question when it comes to Cedric Ricks.

15  He is a future danger.  And he was a future danger when

16  he left Chicago.  Well, let's go back even further.  He

17  was a future danger in high school after he kidnapped

18  his girlfriend, and he was a future danger when he met

19  Tashana and married her.  And when he came to Texas, he

20  was a future danger.  And as he sits here right now,

21  he's a future danger.

22          So the next question you have to answer

23  is the mitigation question.  And we've talked at length

24  about this also in voir dire.

25          Well, it may not come up.  Let me just

1    read it to you.  We've had some technical issues during

2    this trial.

3            Special Issue Number 2.  "Taking into

4    consideration all the evidence, including the

5    circumstances of the offense" -- that's the important

6    part there.  Again, "the circumstances of the offense,

7    the Defendant's character and background, and the

8    personal moral culpability of the Defendant, do you find

9    from the evidence that there's a sufficient mitigating

10   circumstance or circumstances to warrant that a sentence

11   of life imprisonment without parole rather than the

12   death sentence be imposed?"

13           The question is:  Does this Defendant

14   deserve life rather than parole -- does he deserve death

15   rather than life without parole?  Or excuse me.  Does he

16   deserve life without parole rather than the death

17   penalty?  I apologize.

18           There's been no mitigation evidence in

19   this case, ladies and gentlemen.  Absolutely zero.  He

20   wasn't raised in the gutter.  His mother wasn't a drug

21   addict.  His father wasn't in prison.  Every one of

22   their witnesses came in here and told you he had a

23   wonderful upbringing.  He lived in a Utopia, as one of

24   the witnesses called it.  His father made good money.

25   They loved him.  They took him to Disney World with his

1    brother.  He had a wonderful life.  But he's just the

2    way that he is.  He's a murderer, and he's a psychopath.

3    There is no reason that this Defendant should not be --

4    should not receive the death penalty.

5                    Now, he testified in court just a few

6    minutes ago, and you heard his testimony.  And, you

7    know, something that stood out to me, he was talking

8    about how everybody has skeletons in the closet.  And

9    that may be true.  We have skeletons in our closets.

10   But, ladies and gentlemen, this Defendant's skeletons,

11   they're in a cemetery south of here, in Bedford, and

12   it's the skeleton of Roxann Sanchez and Anthony

13   Figueroa, and they're buried side by side.  And last

14   Mother's Day, just a few days ago, Ray and his son,

15   Marcus, had to go to that cemetery to visit their

16   mother, their son, little brother.

17                   Ladies and gentlemen, you know what you

18   have to do in this case.  We're asking you to answer yes

19   to Special Issue Number 1 and no to Special Issue

20   Number 2.

21                   Thank you.

22                   MR. RAY:  I want to read you a couple of

23   things out of this charge.  In the first one, it's on

24   page four, and it's in paragraph five.  You'll have a

25   copy of this.  The last sentence says, "Do not give up

1    your honest beliefs as to the weight of the -- or weight

2    or effect of the evidence solely because of the opinion

3    of your fellow jurors or for the mere purpose of

4    answering the special issues."

5              What that's telling you is you've got

6    your own mind.  And you would not have got to this

7    position had you not been able to convince both the

8    District Attorney and Mr. Gordon and myself that you

9    would do that, because the reality of the way this

10   works -- and we may have told you some of this.  We get

11   a long list of what we call death-penalty qualified.

12   You-all met that, or you wouldn't have ever got to the

13   second part, which is where you say you could give the

14   death penalty or not give the death penalty, depending

15   on the facts.  And you-all said that, or you wouldn't be

16   here.  And then each side gets up to 15 strikes that we

17   don't have to give a reason for.  And we go down the

18   list.

19             When you came back the last day, we went

20   down the list.  Mr. Guckel was the last one, and then we

21   have two alternate jurors.  Neither one of us ran out of

22   strikes.  We didn't use all our 15.  You don't have to.

23   And what that means is:  Even though you were qualified

24   under the law, as far as what your answers were, either

25   the Prosecutors or Mr. Gordon and I, we could have still

1    removed you from the jury.

2                    And those that were in between some of

3    you, that were at the beginning and at the end, that

4    were out there, we exercised one of those strikes

5    against one of those persons, because we felt you could

6    follow that law.

7                    Do not give up your personal beliefs.

8    You have no greater calling in life today than to

9    exercise your personal beliefs, no matter how hard that

10   may be.

11                   Second thing I want to talk to you about

12   is in paragraph two, which is on page two.  The words

13   "jury" and "juror" are used, and I want to point out the

14   distinction, because this is the fine print of this

15   charge.

16                   "The jury may not answer Special Issue

17   Number 1 no unless ten or more jurors agree."  That's

18   pretty evident.  "The jurors need not agree on what

19   particular evidence supports a no answer."  That's true.

20   You understand you don't have to agree what's no or, in

21   the second question, what's a yes.  "If any juror has a

22   reasonable doubt as to the answer to the special -- to

23   the above special issue," it's talking about Special

24   Issue 1, "the juror shall vote no as to that issue."

25                   Now, that may cause you to not have a

1    10-2 or a 12-0 vote, but your obligation and your

2    instruction is to vote your conscience on Special Issue

3    Number 1.  And the jury can only answer in the blanks if

4    it's a 10-2 or a 12-0 respectively, but that does not

5    change the way you vote, and you do not change your vote

6    just to get out of here.  That's the point I want to get

7    to you.

8              I look across this room, and I see -- I

9    see a lot of pain.  And I see a lot of sorrow.  And I

10   see some hate.  And I see some vengeance.  And there is

11   no vengeance.  That word is not in that jury

12   instruction.  Your obligation, your oath, and your

13   convincing us that you would follow the rules without

14   regard to that.

15             And we brought you something very unique

16   in the case, and that was the testimony of Dr. Lewine.

17   And the prosecutor called him the data monster -- I

18   forget what he said -- a few minutes ago when he sat up

19   here.  But if they had had one person, if they had had

20   one person who could refute it -- and they were there

21   when we wheeled that truck in.  This was not a surprise.

22   They could have got their radiologist.  They could have

23   got their psychologist.  They could have got whoever

24   they want to review that EEG and those lines.  Let's do

25   another CAT scan or an MRI or a PET scan.  Let's see if

1   his brain's really enlarged.  That was not a surprise.

2   We don't have to disclose that until the witness

3   testifies, but they knew several days before that, in

4   the interest of time.

5               And the rebuttal evidence of Dr. Lewine

6   was a convict from Oklahoma who owes his father $10,000,

7   who sat outside the cell and watched a bunch of arrogant

8   SOB's assault this man to the point of death.  You might

9   not like Cedric Ricks.  You may hate him, like some of

10  the others.  But that's the rebuttal witness.

11              You might want to take him back in the

12  jury room and do that very same thing.  That's not what

13  you're here to do.  And if you do that, then I have made

14  a serious misjudgment in this case by allowing you to be

15  here, because I could have excluded anyone up here.  And

16  I didn't do that because I didn't believe you were that

17  way.

18              I see the pain in this family.  I've seen

19  Ms. McGrewe, and I see Marcus and Anthony's dad, Ray,

20  get up here, and I see those tears, and they are real,

21  and they are awful.  And I saw these pictures many more

22  times than you did.  I -- and there's more than that.

23  They just took -- they just showed you a lot less.  We

24  looked at all of them.  And I see that pain.  And I see

25  that sorrow.

1          And I see that -- that pain in the face

2     of Mr. and Mrs. Ricks who had a child they hoped they

3     would be able to care for and to bring into this world

4     and try to do things that we all want to do for our

5     kids.

6          And what did Mr. Ricks tell you?  The

7     most compelling part of his testimony is he says, "I

8     took my son to nursery school, and the first day, they

9     said, 'Don't ever bring him back.'"  He's so bad the

10    nursery school won't take him when he's three or four

11    years old.

12          We think there's something the matter

13    with him.  Dr. Lewine says there was.  They can't refute

14    it.

15          One of the things Mr. Gill told almost

16    all of you is that, when he was talking to you about how

17    you could see how Special Issue 1 could be yes and

18    Special Issue 2 could be yes, as well, because the very

19    thing that makes him violent might be mitigating.  You

20    remember that question?

21          That's how you get to that, because the

22    question was always:  You found somebody guilty of

23    capital murder, and now you found him -- that he's a --

24    he's a future danger no matter where he is.  How could

25    it ever be mitigating?  And the example, which was a

1  good example -- and we talked to you about the age, and
2  that's really not what it was.  The example is the very
3  thing that makes him a danger or a threat might be
4  mitigating.  And it would seem that the very thing ought
5  to be enough when it is something that the Defendant
6  doesn't have under his own control because he was born
7  with that condition.  And if that wasn't the case, you
8  would have heard about it.
9              They talk about how Dr. Lewine was paid.
10  And, yeah, he was paid.  And he was paid with your
11  money.  And they could have took some of your money,
12  too.  He's not the only psychologist that's ever lived.
13  And that's not the only MRI machine that lives.
14              Don't you know, if that was not a
15  condition from birth, you'd have heard about it?  And it
16  causes people to be the way they are.
17              And so you look at Cedric Ricks when he's
18  sitting up here on the stand today, and Mr. Gill's
19  talking to him, and Mr. Huseman says, "Well, he's a
20  psychopath," and nobody's really ever said, you know,
21  exactly what that is, other than you don't accept
22  responsibility, or you're mean, you're arrogant, you
23  don't care what happens to everybody else.  That's kind
24  of a thumbnail sketch of it.
25              What would you expect with somebody whose

1    brain's not right?  What did Dr. Lewine tell you?  He

2    got a bad hand.

3                    THE COURT:  Counsel, you've used ten

4    minutes.

5                    MR. RAY:  Thank you.

6                    He got a bad hand.  Don't you hope your

7    child doesn't get a bad hand or your grandchild who is

8    not born yet?

9                    I would submit to you the very thing that

10   makes him dangerous -- it wouldn't be mitigating if it

11   was something that he did after he was alive.  And

12   they've got some of that.  The very thing that ought to

13   be sufficiently mitigating is the fact that it was never

14   his control or his desire to be born that way.  It just

15   wasn't.

16                    Thank you.

17                    MR. GORDON:  May it please the Court?

18                    Counsel for the prosecution?

19                    Ladies and gentlemen, I want to echo a

20   little bit about what Mr. Ray spoke with you about.

21   We've been at this a long time, and you've heard a lot

22   of things that I'm sure repulsed you.  You've seen

23   things that I'm sure you never thought you would see.

24   And I submit to you that the intentional murder of

25   anyone is not a pretty thing.  It's never a pretty

1    thing.  It's ugly.  It's --

2                   We all want to explain.  We all want to

3    think that there's an explanation.  And for the first

4    time, there is an explanation.  There's something at his

5    core that he couldn't control.  And how do we know that?

6    How do we know that?

7                   This man had a family and a support

8    system that maybe most of us in this courtroom didn't

9    have.  He had all of that.  He had coaches that he

10   played for 30 years ago.  Thirty years ago.  They meant

11   so much to him, and he -- he presented them, and when we

12   asked them to come down and speak on his behalf, they

13   did.

14                  So the question then becomes:  How does

15   someone who has all of the things that maybe some of us

16   didn't even have, how does he become a murderer, a

17   double murderer, a child murderer?

18                  Well, I submit to you, ladies and

19   gentlemen, that if it weren't for his family, if it

20   weren't for the support system he had, he would have

21   been a car wreck a lot earlier.

22                  It was going to happen, unfortunately.

23   He was a train looking for a wreck.  And I -- and I wish

24   that it didn't happen to Roxie.  I wish it didn't happen

25   to Anthony or Marcus.  I wish it didn't affect their

1  lives as it did.  But there's nothing anyone in this

2  courtroom can do about that, because they're gone, and

3  they were -- they left this world in a most horrible

4  way.

5           But the issues, how you feel -- maybe you

6  feel vengeance.  Maybe you feel anger.  You have to

7  follow the law.

8           And evidence of being a future danger --

9  we spent time and time with you individually.  Future

10  danger is:  Where is the person going to be?  He's been

11  in the county jail, county lockup for a year.  If he had

12  done anything other than having a pen -- there was no

13  threat to use the pencil.  The pencil was the size of a

14  golf pencil.  He had hoarded some pills, possibly poor

15  suicide attempt.  Who knows.  No evidence that he was

16  trading it.  That's it.  That, by the definition you

17  have -- and it's here.  Take a look at it -- does not

18  add up to future danger.

19           Is Cedric Ricks a future danger for a

20  woman he's involved in a relationship with?  Absolutely.

21  Absolutely.  There's no doubt about that.  But if the

22  prison system is doing its job, he'll never have that

23  opportunity.

24           We have to remember that a life sentence

25  is the default position, and your verdict of a life

1  sentence will satisfy the result in this case.

2          They have to prove to you beyond a

3  reasonable doubt that he's going to be a future danger

4  in prison.  We -- Mr. Ray and I, we brought you a jailer

5  who said he saw him twice a week for a year.  He reads.

6  He's quiet.  He's in his room.  Any arguments with you?

7  No, sir.  Any fights?  No, sir.  And like Ray -- Mr. Ray

8  pointed out, had there been, had there been, you would

9  have heard about it.

10          There was a time when people like

11  Mr. Ricks, we just didn't know about.  We didn't know

12  how we got a person like this.  And the technology, just

13  like DNA, has -- has changed the way we identify, has

14  changed the way we find out who's -- who's the father of

15  who, or who committed an offense.  The same type of

16  evidence, the same type of scientific improvement is

17  telling us that sometimes these people have a biological

18  predisposition.  And from the time he was born, from the

19  time he showed up to preschool, there was nothing he can

20  do about that.  He was prone to impulsivity and acts of

21  aggression.  Certain circumstances, on a basketball

22  court or a football field, great.  It's good to have a

23  warrior out there.  It's good to have somebody on

24  your -- that has your back.  But that doesn't translate

25  to everyday life and certainly his relationships with

1  women.

2          I think we can all agree that this person

3  is not the one you want to see your daughter bring home.

4  That is a dangerous person in that situation.  But for

5  him to spend the rest of his life will satisfy this

6  case, because that's what the proof shows.

7          There is no evidence of future danger

8  outside of the prison setting.  If he were a future

9  danger, wouldn't you expect him to fight with guards?

10  Wouldn't you expect him to assault guards?  Because

11  that's the prison setting.  Pretty close situation over

12  here to the jail.  Wouldn't you expect him to spit at

13  guards?  None of that happened.

14          And if you remember, Dr. Lewine talked

15  about recidivism rates for people in Texas prisons.  He

16  says it's in the very, very low -- two percent for

17  murder and 16 percent for assaultive offenses.  That, in

18  combination with the State's own expert about prison

19  life and prison classifications, we went over that with

20  him.  And what did he tell you?  He told you a lot of

21  things.  Doesn't happen that often for a population of

22  150,000, if they're doing their job.

23          It's more expensive to keep somebody on

24  death row.  If someone were acting up, there are steps

25  that you can take to make sure that they don't do that

1    anymore.

2                What I'm asking you is, is to apply the

3    proof that you've heard to the evidence -- excuse me --

4    to the law that is given to you.  And if you do that,

5    without letting the emotion of a horrible act alone,

6    you're going to find that he's not a future danger.

7    You're going to find that the mitigation in this case is

8    something that he couldn't -- he couldn't control.

9                From the time that he was a young man,

10   everybody was trying to figure out what was wrong with

11   this guy, what was wrong with Cedric, what was wrong

12   with him.  We didn't figure out what was wrong with him

13   until two weeks ago, a week and a half ago, literally.

14               Please look at the evidence as it's

15   presented.  Look at what you've really got.  We know

16   we've got a horrible murder, yes, but answer those

17   questions based on the proof that's given to you.  As

18   much as we like to think we can hold onto our emotions,

19   sometimes it gets the better of us.  And your job is to

20   do it as dispassionately as possible.  You can't control

21   everything you feel, but we've got to do it this way.

22   It's the only way to do it.  I just hope you're able to

23   come to that conclusion.

24               Thank you.

25               MR. GILL:  Thank you, Your Honor.

1           Morning.

2           JUROR:  Good morning.

3           MR. GILL:  Once again, I'm the last

4   lawyer you're going to hear from, and then you'll begin

5   your deliberation.  And now you know why we're here.

6           We talked about this during voir dire on

7   several occasions with most of you, that the opinion of

8   most people is that the death penalty is the proper

9   punishment for the commission of crimes.  The crime in

10  this case being multiple murder, the murder of more than

11  one person.  All of you agreed that that's a proper

12  subject for a death penalty crime in the state of Texas.

13          And the death penalty is the kind of

14  penalty that ought to be reserved for the worst of the

15  worst.  This is not something we do often down here.

16  It's something that's reserved for the rare case.  This

17  is that rare case.  This is that case that deserves the

18  imposition of the ultimate punishment.

19          You've heard the facts of this case.  If

20  we would have asked you, on March 20th, when you came

21  down here, to sit down and think about the worst

22  possible way that two people could be murdered in the

23  state of Texas, picture a fact situation that is as

24  horrible as you can possibly picture, you couldn't have

25  dreamed this up.  You wouldn't have thought of this.

1  You wouldn't have thought of a eight-year-old and a

2  12-year-old.

3                And let's get something straight right

4  off the bat.  He fully intended to murder all three of

5  those people.  It's only by the grace of God that Marcus

6  survived.

7                So not only do you have the facts of that

8  case which point to his propensity for violence, you

9  also know, from him sitting right there this morning,

10 that he is a completely remorseless, unrepentant child

11 murderer.

12                How many times did Mr. Ray try to get him

13 to apologize, say something to this family for what he

14 had done?  The question, "Cedric, we understand there's

15 something you want to say to the family."  And the next

16 thing you know, he's launched into a discussion of what

17 he did to Roxann in November of 2012.

18                Then he asked him, again, another

19 softball question, trying to get him to show some

20 remorse to this family.  And the next thing you know,

21 he's talking about getting his car repossessed.

22                Try as he could, Mr. Ray could not get

23 this man to say "I'm sorry."  It was all about him.  And

24 that's what you learned from the testimony in this case

25 as we went through it.  It was all about him.

1      From the time he was little, his mom

2  caught him with candy, something about candy.  She said

3  it's all about what Cedric wanted.  We heard that time

4  and time again.  It's all about what Cedric wanted.  All

5  about what Cedric wanted.

6      His Uncle Joe, they called him back to

7  the witness stand the other day, Joe Sanders.  He owed

8  Joe Sanders some money.  Joe Sanders wanted to be paid

9  back that money.  All about Cedric.  Went out and bought

10  himself some shoes with that money.  You know, from

11  listening to this case, that's all he cared about.

12      You know, when Mr. Ray's trying to get

13  him to apologize to this family, he's adding up the

14  dollars and cents he spent trying to get those -- you

15  know, buying things for the kids and the $600 that

16  Roxann supposedly took from him to go get an apartment

17  when she was transferring to another apartment in the

18  same system and didn't have to put any money down on it.

19      He got his car repossessed, and he had

20  $5,000.  That's the kind of guy we're dealing with here.

21  A cunning, manipulative criminal.  He had $5,000 in his

22  pocket, and he let his car get repossessed.  Why?

23  Because he thought he could get away with it.  He

24  thought they weren't going to come down here from

25  Chicago and take that car away from him, and he could

1    get away with it.  But you know what, he didn't get away

2    with it.

3                    When he talked about all the stress he

4    was under and everything like that, you know what his

5    stress was?  He had lost his job.  You know why he lost

6    his job?  Because he choked his girlfriend out.

7                    And then what did he do?  He hustled down

8    to the Bedford Police Department to try to get there

9    before she did so he could be the first one to file a

10   report.  Well, she beat him down there, because she was

11   scared to death of him.  You heard her mother testify

12   how she was shaking when she picked her up from school

13   that morning.  They saw Cedric down at the police

14   station, saw him come in the front door, how she jumped

15   up and ran to the back of the police station.  She was

16   scared to death of this guy.

17                   And what else did we learn from that?  He

18   knows that when Roxann reports something to the police

19   department, that he's going to jail.  And he knew that a

20   little bit from his dealings in Illinois, because he got

21   in some trouble in Illinois with these domestic battery

22   things.  He got put on probation one time, but the State

23   of Illinois really hardly touched him for as many

24   different criminal offenses as he committed.

25                   But Roxann didn't drop that case.  And

1    the day before, the day before he murdered those people,

2    he had a court date down here. And when he got angry at

3    Roxann on May the 1st and started hitting her, he knew

4    at that point, if anyone in that apartment lived to tell

5    what had gone on in there, that he was going back to the

6    Tarrant County Jail.

7             The day before, he had been in this

8    courthouse. He knew that the State of Texas was not the

9    State of Illinois and we were not dropping his family

10   violence cases. And he knew, as soon as he touched her,

11   where he was headed.

12            And we talked about impulsivity and rage.

13   Let's talk about just not wanting to go to jail. Let's

14   talk about killing of witnesses, because that's exactly

15   what happened that night. Roxann, Anthony, and Marcus

16   were all competent witnesses to come down here and

17   testify in court against him and put him in jail where

18   he belonged. And as soon as he raised a hand to her

19   that night, he knew that's what was going to happen.

20   And he slaughtered them. He chased those kids down, and

21   he stabbed them till there was nothing left of them.

22   Except, luckily, Marcus survived.

23            You know about his attitude. Now the

24   thing with Tamara -- with Jennifer Clark starts to come

25   into focus. Why is that important? Remember, he told

124

1   Jennifer Clark, "You call the police, I'll kill you."
2   It all starts to come into focus.  He does not want to
3   go to jail in the state of Texas.
4                Well, he's found himself in jail.  He's
5   found himself in jail.  And, yes, he smuggled a pencil.
6   And, yes, he hoarded some pills.  And those things may
7   not sound like the crime of the century, but it's all a
8   pattern with him.
9                One of the things that most of you told
10  us in jury selection process was past performance is the
11  best indication of future performance, when we're
12  talking about future danger special issue.  A person
13  that's dangerous in the past is likely to be dangerous
14  in the future.
15               Remember, our burden of proof on that
16  question is not to prove that he's going to commit
17  crimes, to prove there was a probability that he would
18  commit criminal acts of violence that would constitute a
19  continuing threat to society.
20               Past performance is the best indication
21  of future performance.  They brought one jailer over
22  here, a guy that sees him two days a week for one shift,
23  to say that he's been all right in that jail.  Where's
24  the rest of his day?  Where's the rest of his night?
25               And, remember, he's been in jail awaiting

1    trial.  And one of the issues for this jury is future

2    dangerousness.  But look at the cunning, the

3    manipulation, the lies, everything else he engages in.

4                    The prescription forms, writing his own

5    prescriptions.  Then he calls the doctor a liar.  It's

6    everyone else's fault but Cedric's.  It's his mother's

7    fault.  It's his brain's fault.  It's everyone's fault,

8    but it's not Cedric's fault.  This is never Cedric's

9    fault.  This is an exercise in blame-shifting the last

10   few days.

11                   And Dr. Lewine, $500 an hour to tell us

12   what we already know.  $500 an hour.  That's more than

13   the rest of us make in a day and maybe more than some of

14   us make in a week.  $500 an hour to tell us what we

15   already know.

16                   That's really quite an operation this

17   MINDSET group has.  Was there one of those people at

18   MINDSET that did not have their hand in this cookie jar?

19   It was amazing.  You send a case out there, and the next

20   thing you know, there's four or five people sending

21   bills in.  Dr. Kiehl's involved in it.  His wife's

22   involved in it.  They've got a guy up in Nevada

23   reading -- reading these radiograms for $500 an hour.

24   Then we've got Dr. Lewine coming up here, 30 or 35 hours

25   in it at $500 an hour.  To tell us what?  That he's

1    dangerous and that he's aggressive and that he's

2    impulsive?  You knew that from opening statement.  You

3    should send a bill in to the County for $500 an hour.

4    You knew all of those things.

5                    And the MRI that Mr. Ray likes to refer

6    to?  You know what that MRI showed?  I'll help him a

7    little bit with his evidence here.  The MRI showed he

8    had a normal brain.  The MRI was done on April 24th.

9    Remember that?  Showed he had a normal brain.  So what

10   do we do from that point on?  Well, we can't have that.

11   We've got to have something to blame it on for Cedric.

12   So they do the qEEG.

13                   Then we get Dr. Lewine up here with his

14   hand in the cookie jar for $500 an hour.  And they do

15   some EEG work, and old Dr. Lewine finds an obscure part

16   of the brain that he says is a little bit bigger than

17   the normal brain.  Dr. Lewine, does that mean -- does

18   that mean he's dangerous and violent and impulsive?

19   Well, it suggests that.  Well, certainly it suggests

20   that.  So does his behavior throughout his entire life.

21   Suggests he's impulsive and dangerous and violent.

22   That's not going to change.  Dr. Lewine says that's not

23   going to change.  He's going to be dangerous and

24   impulsive and violent for the rest of his life.  That's

25   just not going to change.  $500 an hour to tell us what

1   we already know.

2           And, you know, no one can refute what

3   Dr. Lewine says.  You know why?  Because we can't go

4   back and do an MRI or a qEEG on Mr. Cedric Ricks when he

5   was born.  Even Dr. Lewine had to admit, well, no, I

6   can't say his brain was like that when he was born, but

7   the indications are they were.  Well, yeah, the

8   indications were, because we heard the indications from

9   the witness stand, not from him.  We heard them from

10  everybody else.  We heard about it from his mom and dad

11  about lighting fires and throwing bricks, by Cooper, the

12  school guard, who had to chase him down and get him off

13  that girl, get that girl out of his car, from the

14  ex-girlfriends and ex-wives that he beat.  We knew those

15  things.  Lewine didn't tell us anything.

16          But Lewine and his group have a stake in

17  this, because you know they have another case.  You

18  heard that they did the MRI's on two people.  So if

19  Lewine and his group does good on this case, these hogs

20  get to come back and put their snouts in the trough

21  again up here in Tarrant County for $500 an hour.  So

22  there you go.  That's the show you got yesterday.

23          But, again, what is it worth?  Nothing

24  you didn't already know.  We know that Cedric Ricks is a

25  dangerous, impulsive, violent person.  And the best

1    indication of future performance is past performance.

2                    You know, if he'll do this to a woman and

3    a couple of children, he'll do anything to anyone

4    anywhere any time.

5                    The answer to Special Issue Number 1,

6    undoubtedly, should be yes.  This man is a continuing

7    threat wherever he is to whoever he is around.  And you

8    know in the general population of the Tarrant -- of the

9    Texas criminal justice system that he'll be out in

10   general population running around free, going to chow,

11   getting his e-mail, watching his TV, on a lot less

12   restrictive setting than he's in in the Tarrant County

13   Jail right now.

14                   You saw him walk back to counsel table

15   this morning with shackles on.  Everywhere he goes in

16   the Tarrant County Jail, he's shackled and handcuffed.

17   He's not going to be like that in the penitentiary.

18   It's a different setting.  It's completely different.

19                   And he's going to be down there enjoying

20   a whole lot of privileges that the people he murdered

21   will never enjoy.  And that's his goal in this thing,

22   just like it's been his goal -- everything in every

23   other criminal justice system he's found -- system

24   situation he's found himself in, to get himself out as

25   lightly as possible.  Except that this time, he's really

1    caught.  And the State of Texas has done its homework.

2              THE COURT:  Counsel, you have five

3    minutes remaining.

4              MR. GILL:  Thank you, Your Honor.

5              And we've done our work.  And we've done

6    our investigations.  And we've brought you this

7    information.  And you have everything you need to make

8    the right decision.  And it is absolutely critical that

9    you reach a verdict in this case.  You know that the

10   time and the money that has been spent on this

11   prosecution and on the defense, it is absolutely

12   critical that you deliberate and reach a verdict in this

13   case.  There is nothing more critical than coming to a

14   unanimous verdict on each of those special issues.  That

15   is what this case is -- that's what this family

16   deserves.  They've been destroyed.

17             And I don't mean to demean Mr. Ricks'

18   family and his friends, because he's destroyed two

19   families.  He has a wonderful family.  He has a very

20   nice family.  They did everything they could for him as

21   he was growing up.

22             He grew up, like Robert said, in a

23   Utopia, as his own people described it.  A Utopia in

24   south Chicago.

25             Those kids had everything they needed.

1    They had more than they needed.  He had a wonderful life

2    growing up.  His parents took him to everything they

3    needed to take him to.  They tried to figure out what

4    his problems were.  They tried to discipline him.  They

5    tried to get him treatment.

6                    He's been in treatment as an adult.  You

7    heard as long ago as a couple of months before he

8    murdered Roxann, he was in a treatment program, and he

9    successfully graduated from it.  He can parrot back what

10   he needs to say.  He learns the material.  But then it's

11   not what he wants to do.  He wants to act otherwise,

12   because it's all about Cedric Ricks, and that he wants

13   to do.

14                   There's nothing mitigating in this case.

15   He could control his behavior.  He could get himself out

16   of situations.  He just chose not to.  He just chose to

17   be violent to these women.  And when he murdered Roxann

18   and Anthony and Marcus, he did it for a reason.  So they

19   could not testify against him, because he knew what was

20   going to happen.  He knew.

21                   And that assault and murder, that wasn't

22   anything that took place in a couple of minutes.  You

23   saw those photographs.  There was a battle in that

24   apartment.  Those kids tried to save their lives.  They

25   tried to save their mother.  And then, as soon as it was

1   all over, he was on the phone to his dad, he was on the

2   phone to his relatives, and then he's out of town.  Down

3   the road.

4               I got to mention one other thing about

5   his future dangerousness prospects.  Remember how he

6   told his cousin, Tamara, "I'll die before I turn myself

7   in"?  Does that bode well for any law enforcement

8   officer that he comes into contact with, if he feels

9   like not surrendering, if he had a way out of it?

10  That's Mr. Cedric Ricks.  Can do anything to anyone any

11  time anywhere if he can commit a crime like this.

12              The answers to those special issues

13  should be Special Issue Number 1 yes beyond a reasonable

14  doubt and Number 2 no, there's no mitigating evidence,

15  and there's certainly not sufficient -- sufficient

16  mitigating evidence to outweigh who he is and what he

17  has done.

18              Ladies and gentlemen, we'll await your

19  verdict.  Thank you.

20              THE COURT:  You may now retire and

21  deliberate.

22              (Jury deliberations commenced at

23              11:22 a.m.)

24              (OPEN COURT, DEFENDANT PRESENT, JURY NOT

25              PRESENT:)

1        MR. RAY:  Judge, before you leave, I want

2   to put one thing on the record.

3        THE COURT:  Okay.  I just want to make

4   sure, as far as our alternates, that we're set up.

5        MR. RAY:  That's fine.

6        (Pause.)

7        MR. RAY:  Judge, Defendant's Exhibit 39

8   is the Power Point that we couldn't produce a copy of it

9   when Dr. Lewine was testifying.  And we had offered

10  this, and the Court -- the State had some objections,

11  and we made those changes, and this is what actually was

12  shown to the jury.  So we've -- I've just got it marked

13  now as 39, and the Court admitted it.

14       THE COURT:  Okay.  All right.  So 30 --

15  the Defense Power Point that's been previously offered

16  is admitted as Defense 39.

17       MR. RAY:  Yes, ma'am, that's correct.

18  Thank you.

19       THE COURT:  We're in recess.

20       (Recess taken at 11:24 a.m. to await

21            jury's verdict.)

22       (Jury deliberations recessed from

23            4:45 p.m. to 4:57 p.m.)

24       (Recess taken at 4:57 p.m. to await jury's

25            verdict.)

1              (Jury deliberations concluded at

2              6:16 p.m.)

3              (OPEN COURT, DEFENDANT PRESENT, JURY NOT

4              PRESENT:)

5              THE COURT:  Let's go on the record.

6              The Court has received a note indicating

7    the jury has reached a verdict.  Are both sides ready to

8    receive the verdict?

9              MR. GILL:  State's ready.

10             MR. RAY:  Defense is ready.

11             THE COURT:  And before we bring the jury

12   in, we've had a number of notes, a handful of notes from

13   the jury.  All of those responses to the notes have been

14   handled off the record, but by agreement between the

15   parties regarding the Court's responses and, also, the

16   evidence that was provided to the jury in response to

17   those notes.  Is that correct?  State?

18             MR. GILL:  Correct.

19             MR. RAY:  That's correct, Judge.

20             THE COURT:  Both sides ready for the

21   jury?

22             MR. GILL:  Yes.

23             MR. RAY:  We're ready.

24             THE COURT:  Bring them in.

25             (OPEN COURT, DEFENDANT AND JURY PRESENT:)

1        THE COURT:  You may be seated.

2        Mr. Guckel, I've received your note

3   indicating that the jury has reached a verdict.  Is that

4   correct, sir?

5        THE PRESIDING JUROR:  Yes, ma'am.

6        THE COURT:  And if you would hand that

7   verdict form to the bailiff, please, sir.

8        THE BAILIFF:  Thank you, sir.

9        THE COURT:  Answers to special issues.

10  "Special Issue Number 1.  Do you find from the evidence

11  beyond a reasonable doubt that there is a probability

12  that the Defendant would commit criminal acts of

13  violence that would constitute a continuing threat to

14  society?  Answer:  We, the jury, unanimously find and

15  determine beyond a reasonable doubt that the answer to

16  Special Issue Number 1 is yes.

17       "Special Issue Number 2.  Taking into

18  consideration all of the evidence, including the

19  circumstances of the offense, the Defendant's character

20  and background, and the personal moral culpability of

21  the Defendant, do you find from the evidence that there

22  is sufficient mitigating circumstances or --

23  circumstance or circumstances to warrant that a sentence

24  of life imprisonment without parole rather than a death

25  sentence be imposed?  Answer:  We, the jury, unanimously

1    find and determine that the answer to Special Issue

2    Number 2 is no."

3                    And each of the verdict forms is signed

4    by Mr. Guckel, the foreperson of the jury.

5                    Does either side wish a poll?

6                    MR. GILL:  State does not.

7                    MR. RAY:  We'd like a poll.

8                    THE COURT:  You may be seated.

9                    Ladies and gentlemen, I'm, again, going

10   to conduct a poll.  I'm going to ask you individually,

11   "Is this your verdict?"  And by that question, I mean,

12   is this your individual verdict as to each of the

13   special issues that you have answered?  And your answer

14   is either yes or no.

15                   Mr. Twietmeyer, is this your verdict?

16                   JUROR TWIETMEYER:  Yes.

17                   THE COURT:  Mr. Duckett, is this your

18   verdict?

19                   JUROR DUCKETT:  Yes.

20                   THE COURT:  Ms. Attebery, is this your

21   verdict?

22                   JUROR ATTEBERY:  Yes.

23                   THE COURT:  Ms. Fry, is this your

24   verdict?

25                   JUROR NANCY FRY:  Yes.

```
 1                    THE COURT:  Mr. Schubert, is this your
 2    verdict?
 3                    JUROR SCHUBERT:  Yes.
 4                    THE COURT:  Mr. Flint, is this your
 5    verdict?
 6                    JUROR FLINT:  Yes.
 7                    THE COURT:  Mr. Barnes, is this your
 8    verdict?
 9                    JUROR BARNES:  Yes.
10                    THE COURT:  Mr. Fry, is this your
11    verdict?
12                    JUROR ROGER FRY:  Yes.
13                    THE COURT:  Ms. Slezak, is this your
14    verdict?
15                    JUROR SLEZAK:  Yes.
16                    THE COURT:  Ms. Lemay, is this your
17    verdict?
18                    JUROR LEMAY:  Yes.
19                    THE COURT:  Mr. Guckel, is this your
20    verdict?
21                    JUROR GUCKEL:  Yes.
22                    THE COURT:  I find the verdict to be
23    unanimous and in proper order and order it filed.
24                    The jury, having answered Special Issue
25    Number 1 yes and Special Issue Number 2 no, it is
```

1    mandatory that the punishment be set at death.

2              Is there any reason sentence should not

3    be pronounced?

4              MR. RAY:  There's no legal reason, Judge.

5              THE COURT:  Defendant will rise.

6              It is the order, judgment, and decree of

7    this Court that you, Cedric Allen Ricks, having been

8    found guilty of the offense of capital murder and the

9    jury having answered Special Issue Number 1 yes and

10   Special Issue Number 2 no, and it being mandatory that

11   your punishment be set at death, that your punishment be

12   assessed at death, and that at any time before 6 p.m. on

13   a date to be determined by this Court, upon a mandate of

14   affirmance issued by the Texas Court of Criminal

15   Appeals, at the state penitentiary at Huntsville, you

16   shall be caused to die by intravenous injection of a

17   substance or substances in a lethal quantity sufficient

18   to cause your death and until you, Cedric Allen Ricks,

19   are dead.  Said execution procedure to be determined and

20   supervised by the director of the Institutional Division

21   of the Texas Department of Criminal Justice.

22             Appeal is automatic in this case.  An

23   attorney will be provided to you to prosecute that

24   appeal.

25             Sheriff, he is your prisoner.

```
 1                    THE COURT:  Let's go off the record.
 2                    (Elocution held off the record.)
 3                    THE COURT:  Ladies and gentlemen, that
 4   concludes the trial.  If you would step back to the jury
 5   room for some final instructions.
 6                    (Recess from 6:25 p.m. to 6:30 p.m.)
 7                    (OPEN COURT, DEFENDANT PRESENT, JURY NOT
 8                    PRESENT:)
 9                    THE COURT:  Bring in the jury, please.
10                    (OPEN COURT, DEFENDANT AND JURY PRESENT:)
11                    THE COURT:  You may be seated.
12                    Back on the record.
13                    Ladies and gentlemen, at the conclusion
14   of everything, when I stepped back to give you your
15   final instructions, it was brought to the Court's
16   attention that one of the jurors was not polled, and so,
17   to rectify that matter, I'm going to go back through the
18   entire poll.  It's the same procedure.  And, again, your
19   answer is either yes or no.
20                    Mr. Twietmeyer, is this your verdict?
21                    JUROR TWIETMEYER:  Yes.
22                    THE COURT:  Mr. Duckett, is this your
23   verdict?
24                    JUROR DUCKETT:  Yes.
25                    THE COURT:  Ms. Attebery, is this your
```

1  verdict?

2              JUROR ATTEBERY:  Yes.

3              THE COURT:  Ms. Dorman, is this your

4  verdict?

5              JUROR DORMAN:  Yes.

6              THE COURT:  Ms. Fry, is this your

7  verdict?

8              JUROR NANCY FRY:  Yes.

9              THE COURT:  Mr. Schubert, is this your

10  verdict?

11             JUROR SCHUBERT:  Yes.

12             THE COURT:  Mr. Flint, is this your

13  verdict?

14             JUROR FLINT:  Yes.

15             THE COURT:  Mr. Barnes, is this your

16  verdict?

17             JUROR BARNES:  Yes.

18             THE COURT:  Mr. Fry, is this your

19  verdict?

20             JUROR ROGER FRY:  Yes.

21             THE COURT:  Ms. Slezak, is this your

22  verdict?

23             JUROR SLEZAK:  Yes.

24             THE COURT:  Ms. Lemay, is this your

25  verdict?

1              JUROR LEMAY:  Yes.

2              THE COURT:  Mr. Guckel, is this your

3    verdict?

4              JUROR GUCKEL:  Yes.

5              THE COURT:  Have I covered everyone?

6              All right.  Anything further from either

7    side?

8              MR. RAY:  We don't have anything.

9              MR. GILL:  We don't.

10             THE COURT:  You may step back out.

11             (Jury discharged.)

12             (Proceedings concluded at 6:32 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1  THE STATE OF TEXAS      |

2  COUNTY OF TARRANT       |

3      I, Brenda C. Hein, Official Court Reporter in and

4  for the 371st District Court of Tarrant County, Texas,

5  do hereby certify that the foregoing contains a true,

6  correct, and complete transcription of all portions of

7  evidence and other proceedings requested in writing by

8  counsel for the parties to be included in this volume of

9  the Reporter's Record, in the above-styled and numbered

10  cause, all of which occurred in open court or in

11  chambers and were reported by me.

12      I further certify that this Reporter's Record of the

13  proceedings truly, correctly, and completely reflects

14  the exhibits, if any, admitted, tendered in an offer of

15  proof, or offered into evidence.

16      I further certify that the total cost for the

17  preparation of this Reporter's Record is $_____ and will

18  be paid by Tarrant County, Texas.

19      WITNESS MY OFFICIAL HAND this the 23rd day of

20  November 2014.

21      _____
        BRENDA C. HEIN, Texas CSR #2077
22      Expiration Date:  12/31/16
        Official Court Reporter
23      371st District Court
        Tarrant County, Texas
24      401 West Belknap
        Fort Worth, Texas  76196-7118
25      (817) 884-2895