

852798-01

# ELECTRONIC RECORD

RECEIVED IN
COURT OF CRIMINAL APPEALS

JUL 16 2019

Deana Williamson, Clerk

# CLERK'S RECORD

VOLUME 1 of 5

Writ Number: **C-371-W010796-1361004-A**

Filed In the **371ST DISTRICT COURT**
of Tarrant County, Texas
Hon. **MOLLEE WESTFALL**, Presiding Judge

DISTRICT COURT OF TARRANT COUNTY, TEXAS

**EX PARTE: CEDRIC ALLEN RICKS**

vs.

THE STATE OF TEXAS

Appealed to the Court of Criminal Appeals
for the State Of Texas
at Capitol Station
AUSTIN, TEXAS

ATTORNEY FOR THE APPELLANT

**CATHERINE CLARE BERNHARD, APPOINTED**
**P.O. BOX 2817**
**RED OAK, TEXAS 75154**

| | |
|---|---|
| **PHONE:** | **972-617-5548** |
| **FAX:** | **972-421-1604** |
| **SBOT:** | **02216575** |

**Attorney for CEDRIC ALLEN RICKS, Appellant**

BEST COPY AVAILABLE

Delivered to the Court of Criminal Appeals for the State Of Texas At Capitol Station, AUSTIN, Texas, on the

11 day of July, 2019

THOMAS A. WILDER, DISTRICT CLERK,
TARRANT COUNTY, FORT WORTH, TEXAS

DAVID PULLIAM
Deputy District Clerk

(Court of CRIMINAL APPEALS)
Cause No. ________________
Filed in the Court of Criminal Appeals for the State of Texas, at Capitol Station, AUSTIN, Texas, this

______ day of ____________, ______

DEANA WILLIAMSON

Clerk

By ____________________, Deputy

# ELECTRONIC RECORD

# CLERK'S RECORD

VOLUME 1 of 5

Writ Number: **C-371-W010796-1361004-A**

Filed In the **371ST DISTRICT COURT**
of Tarrant County, Texas
Hon. **MOLLEE WESTFALL**, Presiding Judge

**EX PARTE: CEDRIC ALLEN RICKS**

vs.

THE STATE OF TEXAS

Appealed to the Court of Criminal Appeals
for the State Of Texas
at Capitol Station
AUSTIN, TEXAS

## ATTORNEY FOR THE APPELLANT

**CATHERINE CLARE BERNHARD, APPOINTED**
**P.O. BOX 2817**
**RED OAK, TEXAS 75154**

**PHONE:** 972-617-5548
**FAX:** 972-421-1604
**SBOT:** 02216575
**Attorney for CEDRIC ALLEN RICKS, Appellant**

Delivered to the Court of Criminal Appeals for the State Of Texas At Capitol Station, AUSTIN, Texas, on the

11 day of July, 2019

THOMAS A. WILDER, DISTRICT CLERK,
TARRANT COUNTY, FORT WORTH, TEXAS

DAVID PULLIAM
Deputy District Clerk

(Court of CRIMINAL APPEALS)
Cause No. ______________________
Filed in the Court of Criminal Appeals for the State of Texas, at Capitol Station, AUSTIN, Texas, this

________ day of ______________, ________

DEANA WILLIAMSON
Clerk

By ______________________, Deputy

Application for Writ of Habeas Corpus
from Tarrant County, Texas

371ST DISTRICT COURT
Ex Parte:
CEDRIC ALLEN RICKS

WRIT NO. C-371-W010796-1361004-A

# CLERK'S SUMMARY SHEET

**APPLICANT'S NAME:** CEDRIC ALLEN RICKS

**OFFENSE:** CAPITAL MURDER-MULTIPLE

**CAUSE NO:** 1361004R

**PLEA:** NOT GUILTY

**SENTENCE:** DEATH

**SENTENCE DATE:** MAY 16, 2014

**TRIAL DATE:** **MAY 16, 2014**

**TRIAL JUDGE'S NAME:** HONORABLE MOLLEE WESTFALL

**APPEAL NO:** AP-77,040

**CITATION TO OPINION:** N/A **S.W. N/A**

**HEARING HELD:** YES BY WAY OF AFFIDAVIT

**FINDINGS & CONCLUSIONS ENTERED BY HABEAS JUDGE:** YES

**RECOMMENDATION:** DENY

**HABEAS JUDGE'S NAME:** HONORABLE MOLLEE WESTFALL

**NAME OF COUNSEL IF APPLICANT IS REPRESENTED:**

**I certify that all applicable requirements of Texas Rule of Appellate Procedure 73.4 have been complied with in this habeas proceeding, including the requirement to serve on all the parties in the case any objections, motions, affidavits, exhibits, proposed findings of fact and conclusions of law, findings of fact and conclusions of law, and any other orders entered or pleadings filed in the habeas case.**

[signature]
Signature of District Clerk or Clerk's Representative

July 11, 2019
Date Signed

# INDEX

## Volume 1

Clerk's Record Cover Page ........ 1

Summary ........ 2

Index ........ 3

Indictment – 02/28/2014 ........ 10
Capital Judgment – 05/16/2014 ........ 11

Caption ........ 15

Application for Writ of Habeas Corpus ........ 16

Back Cover Page ........ 500

# INDEX

## Volume 2

Clerk's Record Cover Page ....................501

Index ....................502

Application for Writ of Habeas Corpus (Continued from Volume 1) ....................503

Back Cover Page ....................1000

# INDEX

## Volume 3

Clerk's Record Cover Page ........ 1001

Index ........ 1002

Application for Writ of Habeas Corpus (Continued from Volume 3) ........ 1003

State's Reply to Application for Writ of Habeas Corpus ........ 1221

**INSTRUMENTS FILED IN CAUSE NUMBER 1361004R**

Court's Charge – Guilt/Innocence – 05/07/2014 ........ 1464
Court's Charge – Punishment – 05/16/2014 ........ 1469
Trial Court Certification of Defendant's Right of Appeal – 05/16/2014 ........ 1476
Court of Criminal Appeals – Opinion – 10/05/2017 ........ 1477

Back Cover Page ........ 1500

# INDEX

## Volume 4

Clerk's Record Cover Page ........ 1501

Index ........ 1502

Court of Criminal Appeals – Opinion – 10/05/2017 (Continued from Volume 3) ........ 1505
Criminal Docket Sheet ........ 1522

Wavier of Service ........ 1530

Affidavit of Stephen Gordon in Response to Writ of Habeas Corpus ........ 1531

Affidavit from Mary B. Thornton ........ 1534

Affidavit of William H. "Bill" Ray ........ 1568

Findings of Indigency and Order for Appointment of Habeas Counsel ........ 1579

Order Appointing Counsel for the Appeal ........ 1580

Letter from Office of Capital Writs ........ 1581

Letter from William H. "Bill" Ray to Catherine Bernhard ........ 1586

Supplemental Order ........ 1588

Order on Applicant's Request for Trial Counsel File and State of Texas ........ 1590

Ex Parte Motion/Order for an Investigator ........ 1591

Ex Parte Funding Motion/Order for Mitigation Specialist ........ 1596

Ex Parte Funding Motion/Order for Expert Assistance ........ 1636

Order on Applicant's Request for Jury Questionnaires ........ 1652

Second Ex Parte Funding Motion/Order for Mitigation Specialist ........ 1653

Ex Parte Funding Motion/Order for Expert Assistance ........ 1662

Ex Parte Funding Motion/Order for Expert Assistance ........ 1699

Third Ex Parte Funding Motion/Order for Mitigation Specialist ........ 1710

Ex Parte Funding Motion/Order for Expert Assistance ........ 1718

Ex Parte Motion/Order for an Investigator ........ 1730

Pro Se Motion for Post-Conviction Relief and for Ineffective Assistance of Trial Counsel and Direct Appeal Counsel ........ 1735

Motion/Order for Extension of Time to File Art. 11.071 Writ Application ........ 1739

Second Ex Parte Funding Motion/Order for Expert Assistance ........ 1745

Ex Parte Funding Motion/Order for Research Assistance ........ 1750

Ex Parte Funding Motion/Order for Expert Assistance ........ 1756

Ex Parte Funding Motion/Order for Expert Assistance ........ 1769

Ex Parte Funding Motion/Order for Expert Assistance ........ 1790

Ex Parte Motion/Order Requesting Defense Pschologist to turn Over Raw Test Data to Another Defense Psychologist ........ 1810

State's Motion for Affidavits of Applicant's Trial and Appellate Counsel ........ 1814

Second Ex Parte Funding Motion/Order for Research Assistance ........ 1818

Letter from Court of Criminal Appeals with Pro Se Documents Attached ........ 1824

Memorandum and Order ........ 1848

Letter from Court of Criminal Appeals with Pro Se Documents Attached ........ 1851

Letter from Sharen Wilson about DNA Mixture Review ........ 1857

Certified Mail Return Receipt Requested – Comptroller Judiciary Attn: Mary Hand ........ 1862

Motion/Order for Extension of Time to File Affidavit in Response to Writ of Habeas Corpus ........ 1863

Motion/Order for Extension of Time to File Affidavit ........ 1867

Second Motion/Order for Extension of Time to File Affidavit ........ 1873

Unopposed Motion to Extend Time to File the State's Reply to Application for Writ of Habeas Corpus ........ 1878

Memorandum and Order ........ 1883

Certified Mail Return Receipt Requested – Catherine Bernard ........ 1884

State's Motion for Court to Order Preparation of Proposed Findings of Fact and Conclusions of Law ........ 1885

State's Motion for Court to Order Preparation of Proposed Findings of Fact and Conclusions of Law ........ 1889

Memorandum and Order ........ 1894

Certified Mail Return Receipt Requested – Steve Gordon, Mary B. Thornton, Catherine Bernard, and William H. Ray ........ 1895

State's Proposed Memorandum, Findings of Fact, and Conclusion of Law ........ 1899

Applicant's Proposed Findings of Fact and Conclusions of Law ........ 1970

Back Cover Page ........ 2000

# INDEX

## Volume 5

Clerk's Record Cover Page .......... 2001

Index .......... 2002

Applicant's Proposed Findings of Fact and Conclusions of Law (Continued from Volume 4).......... 2003

Application for Subpoenas.......... 2011

Copy of Sealed Invoices filed in Case .......... 2026

Clerk's Certificate.......... 2053

Back Cover Page.......... 2054

DIRECT REINDICTMENT 1325203

NAME CEDRIC ALLEN RICKS
ADDRESS 1436 PARK PLACE AVE, #734
BEDFORD TX 76022
RACE B SEX M AGE 39 DOB 9/8/1974
CASE NO. 1361004 DATE FILED 2/28/2014
CID NO. 0819770

OFFENSE MURDER - CAPITAL MULTIPLE
DATE 5/1/2013
I.P. ROXANN SANCHEZ, ANTHONY FUGUEROA
AGENCY Bedford PD
OFFENSE NO. 2013-15605
COURT 371st District Court

INDICTMENT NO. 1361004R

IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

**THE GRAND JURORS OF TARRANT COUNTY, TEXAS,**

duly elected, tried, empaneled, sworn, and charged to inquire of offenses committed in Tarrant County, in the State of Texas, upon their oaths do present in and to the 213th DISTRICT COURT

of said County that CEDRIC ALLEN RICKS, hereinafter called Defendant, in the County of Tarrant and State aforesaid, on or about the 1st day of May 2013, did

THEN AND THERE INTENTIONALLY OR KNOWINGLY CAUSE THE DEATH OF AN INDIVIDUAL, ANTHONY FIGUEROA, BY STABBING HIM WITH A KNIFE AND DID THEN AND THERE INTENTIONALLY OR KNOWINGLY CAUSE THE DEATH OF AN INDIVIDUAL, ROXANN SANCHEZ, BY STABBING HER WITH A KNIFE AND BY STRANGLING HER WITH HIS HAND AND HANDS, AND BOTH MURDERS WERE COMMITTED DURING THE SAME CRIMINAL TRANSACTION,

Filed (Clerk's use only)
FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS
FEB 28 2014
TIME 1:03
BY B DEPUTY

AGAINST THE PEACE AND DIGNITY OF THE STATE.

Criminal District Attorney
Tarrant County, Texas
INDICTMENT - ORIGINAL

Foreman of the Grand Jury

CASE NO. 1361004R

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 371ST |
| | § | |
| VS | § | DISTRICT COURT |
| | § | |
| CEDRIC ALLEN RICKS | § | TARRANT COUNTY, TEXAS |

# CAPITAL JUDGMENT

On May 5, 2014 this cause was called for trial and the State by her Criminal District Attorney, Assistants ROBERT GILL and ROBERT HUSEMAN, and the attorneys for the Defendant, CEDRIC ALLEN RICKS, Honorable WILLIAM RAY and STEVE GORDON, announced ready for trial; and the State having made known that it would seek the Death Penalty in this cause and the Defendant having been heretofore arraigned; and, it appearing to the Court that the Defendant was mentally competent and the Defendant having been charged in the Indictment with Capital Murder; thereupon, a jury of good and lawful men and women, to-wit: RICHARD E. GUCKEL, Foreperson, and eleven others, was duly selected, impaneled and sworn as the law directs, and the said Criminal District Attorney read to the Jury, COUNT ONE of the Indictment herein, and the Defendant entered his plea of Not Guilty to COUNT ONE of the Indictment, hereto; and the Jury, after hearing the evidence, and being duly charged by the Court, retired to consider its verdict, and after deliberation, returned into open Court on the 7TH day of May, 2014, the following verdict, to-wit:

## VERDICT FORM

We the Jury, find the Defendant, CEDRIC ALLEN RICKS, guilty of the offense of Capital Murder, as charged in the Indictment.

Signed: Richard E. Guckel
Foreperson of the Jury

The parties announced ready for the second phase of the trial, and the Jury, having heard all the evidence, and being duly charged by the Court, retired to consider its verdict, and after due deliberation, returned into open court, on the 16TH day of MAY, 2014, their answers to the following Special Issues, and their verdict:

SPECIAL ISSUE NO. 1

Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?

In your verdict you will answer "Yes" or "No" Answer: YES

SPECIAL ISSUE NO. 2

Taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

In your verdict you will answer "Yes" or "No" Answer: NO

**VERDICT FORM**

We, the Jury, having unanimously agreed upon the answer to the foregoing issues do hereby return the same into court as our verdict.

Signed: Richard E. Guckel
Foreperson of the Jury

After an individual poll of the Jurors, the Court duly accepted the verdicts and ORDERED the same to be filed.

The Jury having answered Special Issue One "YES" and Special Issue TWO, "NO", it being mandatory that the punishment be death, the Court assessed the punishment at Death.

The Defendant, CEDRIC ALLEN RICKS, was asked by the Court, whether he had anything to say why sentence should not be pronounced against him, and the Defendant answered nothing in bar thereof;

The Court proceeded, in the presence of the said Defendant CEDRIC ALLEN RICKS, and his counsel of record, to pronounce sentence against him as follows:

The jury having answered Special Issue #1 "Yes," and Special Issue #2 "No," it is mandatory that the punishment be set at death.

IT IS THE ORDER, JUDGMENT AND DECREE OF THIS COURT that you, CEDRIC ALLEN RICKS, having been found guilty of the offense of Capital Murder and the jury having answered Special Issue #1 "Yes," and Special Issue #2 "No," and it being mandatory that your punishment be set at death, that your punishment be assessed at death, and that at any time before 6:00 P.M. on a date to be determined by this Court upon a mandate of affirmance issued by the Texas Court of Criminal Appeals, at the State Penitentiary at Huntsville, you shall be caused to die by intravenous injection of a substance or substances in a lethal quantity sufficient to cause your death and until you, CEDRIC ALLEN RICKS are dead, said execution procedure to be determined and supervised by the Director of the Institutional Division of the Texas Department of Criminal Justice.

HON. MOLLEE WESTFALL
PRESIDING JUDGE
371ST DISTRICT COURT
TARRANT COUNTY, TEXAS

May 16, 2014
Date Signed

CASE NO. 1361004R COUNT ONE
INCIDENT NO./TRN: 9047733940

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 371ST DISTRICT COURT |
| | § | |
| V. | § | |
| | § | |
| CEDRIC ALLEN RICKS | § | TARRANT COUNTY, TEXAS |
| | § | |
| STATE ID NO.: TX50178423 | § | Date: MAY 16 2014 |

Right Thumbprint

Right Thumbprint

x Craig Martin - 73098

PERSON TAKING PRINT

# JUDGMENT AND SENTENCE FINGERPRINT PAGE

Clerk

KW

# CAPTION

THE STATE OF TEXAS §

COUNTY OF TARRANT §

At a term of the **371ST DISTRICT COURT** of Tarrant County, Texas, the Honorable **MOLLEE WESTFALL** sitting as Judge of said court, the following proceedings were had, to-wit:

Writ Number: **C-371-W010796-1361004-A**

EX PARTE:

**CEDRIC ALLEN RICKS**

VS.

THE STATE OF TEXAS



FILED
HOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS
JUN 1 3 2013
TIME 10:00am
BY ______ DEPUTY

C-371-010796-1361004-A

WRIT NO. ____________

TRIAL COURT NO. 1361004

---

**IN THE 371st JUDICIAL DISTRICT COURT**
**TARRANT COUNTY, TEXAS**

**and returnable to**

**THE COURT OF CRIMINAL APPEALS**
**OF TEXAS**

---

**EX PARTE CEDRIC ALLEN RICKS**

**APPLICATION FOR WRIT OF HABEAS CORPUS**

**pursuant to Article 11.071 of the**
**Texas Code of Criminal Procedure**

---

**THIS IS A DEATH PENALTY CASE**

**Catherine Clare Bernhard**
**P.O. Box 2817**
**Red Oak, Texas 75154**
**972-617-5548**
**fax – 972-421-1604**
**cbernhard@sbcglobal.net**
**State Bar No. 02216575**

**ATTORNEY FOR APPLICANT**

WRIT NO. ___________
TRIAL COURT NO. 1361004

---

IN THE 371st JUDICIAL DISTRICT COURT
TARRANT COUNTY, TEXAS

and returnable to

THE COURT OF CRIMINAL APPEALS
OF TEXAS

---

EX PARTE CEDRIC ALLEN RICKS

APPLICATION FOR WRIT OF HABEAS CORPUS

pursuant to Article 11.071 of the
Texas Code of Criminal Procedure

---

THIS IS A DEATH PENALTY CASE

Catherine Clare Bernhard
P.O. Box 2817
Red Oak, Texas 75154
972-617-5548
fax – 972-421-1604
cbernhard@sbcglobal.net
State Bar No. 02216575

ATTORNEY FOR APPLICANT

## TABLE OF CONTENTS

HISTORY OF THE CASE....................................................................1

INTRODUCTION…..........................................................................2

STATEMENT OF FACTS FROM TRIAL...............................................4

**FIRST GROUND FOR RELIEF**......................................................26

TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO SUFFICIENTLY DEVELOP AND PRESENT SIGNIFICANT MITIGATING EVIDENCE IN VIOLATION OF CEDRIC RICKS' SIXTH AMENDMENT RIGHT TO COUNSEL.

I. THE JURY NEVER HEARD ABOUT HELEN'S DRINKING WHEN SHE WAS PREGNANT WITH CEDRIC.

II. THE JURY NEVER HEARD ABOUT GERALDINE AND BOOKER, CEDRIC'S PRIMARY CARE-TAKERS UNTIL THE AGE OF FIVE.

III. THE JURY NEVER HEARD DETAILS ABOUT CEDRIC'S BEHAVIOR PROBLEMS AS A YOUNG CHILD.

IV. THE JURY NEVER HEARD DETAILS ABOUT CEDRIC'S WHIPPINGS.

V. THE JURY NEVER HEARD DETAILS ABOUT CEDRIC'S PROBLEMS IN SCHOOL.

VI. THE JURY NEVER HEARD DETAILS ABOUT CEDRIC'S BEHAVIOR PROBLEMS AS A TEEN.

VII. THE JURY NEVER HEARD DETAILS OF CEDRIC'S CONTINUED BEHAVIORAL PROBLEMS AS AN ADULT.

VIII. THE JURY NEVER HEARD ABOUT CEDRIC'S FAMILY HISTORY OF MENTAL ILLNESS.

IX. THE JURY HEARD NOTHING ABOUT THE NEIGHBORHOODS WHERE CEDRIC LIVED BEFORE CALUMET PARK.

X. THE JURY NEVER HEARD ABOUT POTENTIAL LEAD EXPOSURE IN CEDRIC'S NEIGHBORHOODS.

XI. THE JURY NEVER HEARD ANYONE EXPLAIN THE PSYCHOLOGICAL SIGNIFICANCE OF CEDRIC'S LIFE EXPERIENCES.

**SECOND GROUND FOR RELIEF**........................................................81

THE APPEARANCE OF CEDRIC RICKS IN SHACKLES BEFORE THE JURY VIOLATED DUE PROCESS.

**THIRD GROUND FOR RELIEF**........................................................87

TRIAL COUNSEL WAS INEFFECTIVE FOR NOT OBJECTING TO MR. RICKS' APPEARANCE IN SHACKLES IN FRONT OF THE JURY.

**FOURTH GROUND FOR RELIEF**........................................................89

TRIAL COUNSEL WAS INEFFECTIVE FOR PRESENTING INACCURATE TESTIMONY ABOUT MR. RICKS' FUTURE DANGEROUSNESS RISK.

**FIFTH GROUND FOR RELIEF**.......................................................94

THE TEXAS DEATH PENALTY STATUTE IS UNCONSTITUTIONAL BECAUSE JURORS DO NOT UNDERSTAND THE PENALTY PHASE INSTRUCTIONS.

**SIXTH GROUND FOR RELIEF**.......................................................106

TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THE ISSUE THAT THE USE OF THE TERM "PROBABILITY" IN THE "FUTURE DANGEROUSNESS" SPECIAL ISSUE DILUTES THE REASONABLE DOUBT STANDARD.

**SEVENTH GROUND FOR RELIEF**.......................................................111

TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THE ISSUE THAT THE DEFINITION OF "MITIGATION" IS UNCONSTITUTIONALLY NARROW.

**EIGHTH GROUND FOR RELIEF**.......................................................117

APPELLATE COUNSEL WAS INEFFECTIVE FOR NOT RAISING THE TRIAL COURT'S FAILURE TO CHARGE THE JURY ON THE BURDEN OF PROOF FOR EXTRANEOUS OFFENSES AT PUNISHMENT.

**NINTH GROUND FOR RELIEF**.......................................................125

APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO CHALLENGE THE TRIAL COURT'S EXCLUSON OF GENETIC EVIDENCE.

**TENTH GROUND FOR RELIEF**.........................................131

APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THE BATSON ISSUE.

**ELEVENTH GROUND FOR RELIEF**.....................................145

MR. RICKS' SENTENCE OF DEATH WAS IMPOSED BY AN UNCONSITUTIONALLY ARBITRARY SYSTEM.

PRAYER.........................................................................................155

VERIFICATION.............................................................................156

CERTIFICATE OF SERVICE...........................................................157

JUDGMENT..............................................................APPENDIX A



## EXHIBITS

(contained in separate volumes or DVD)

Exhibit 1.................................. Curriculum Vitae of Mairead Burke, LMSW

Exhibit 2.................................. Affidavit of Mairead Burke, LMSW

Exhibit 3.................................. Affidavit of Helen Ricks

Exhibit 4.................................. Affidavit of Joseph Sanders

Exhibit 5.................................. Affidavit of Deborah Sanders

Exhibit 6.................................. Affidavit of Dwayne Ricks

Exhibit 7.................................. Affidavit of Stephanie Halverson

Exhibit 8.................................. Affidavit of Tammy Hall

Exhibit 9.................................. Affidavit of Shederick Ricks

Exhibit 10................................ Affidavit of Tamara Butts

Exhibit 11................................ Affidavit of Sharon Speedwell

Exhibit 12................................ Affidavit of Donna Ree

Exhibit 13................................ Affidavit of Christine Sudduth

Exhibit 14................................ Curriculum Vitae of Amy Brown Nguyen

Exhibit 15................................ J. David Hawkins et al., U.S. Dep't of Justice, Predictors of Youth Violence (2000)

Exhibit 16..............................Affidavit of Amy Brown Nguyen and Attached maps

Exhibit 17..............................Chicago Department of Public Health lead poisoning data

Exhibit 18..............................Homicide Report for Melanie Brown dated May 13, 1977

Exhibit 19..............................Newspaper article "South side girl found strangled"

Exhibit 20..............................Letter from Helen to Shederick dated Sept. 22, 1991

Exhibit 21..............................Curriculum Vitae of Dr. Felicia Rabito

Exhibit 22..............................Affidavit of Dr. Felicia Rabito

Exhibit 23..............................Curriculum Vitae of Joann Murphey

Exhibit 24..............................Affidavit of of Dr. Joann Murphey

Exhibit 25..............................Affidavit of Paula Cook

Exhibit 26..............................Curriculum Vitae of Dr. Jon Sorensen

Exhibit 27..............................Affidavit of Dr. Jon Sorensen

Exhibit 28..............................William J. Bowers & Wanda D. Foglia, Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing, 39 Crim. L. Bull. 51(2003)

Exhibit 29 ..............................Affidavit of Ladell Prince Barnes

Exhibit 30..............................Redacted questionnaire excerpts

Exhibit 31..................................Batson strike zone chart

Exhibit 32..................................Curriculum Vitae of Dr. John Fabian

Exhibit 33..................................Affidavit of Dr. John Fabian

## INDEX OF AUTHORITIES

CASES

Abdul-Kabir v. Quarterman, 550 U.S. 233, 240-44 (2007) .......................130

Adanandus v. State, 866 S.W.2d 210, 233-34 (Tex. Crim. App. 1993) .....119

Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984)(opinion on rehearing) .......................................................................................122

Arline v. State, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986)..................122

Avery v. Georgia, 345 U.S. 559, 562 (1953) ...........................................135

Batson v. Kentucky, 476 U.S. 79 (1986)...................................132, 133, 143

Bell v. State, 415 S.W.3d 278 (Tex. Crim. App. 2013.................................88

Boyde v. California, 494 U.S. 370 (1990)........................................108, 114

Burks v. State, 876 S.W.2d 877, 909 (Tex. Crim. App. 1994) ...................119

Cage v. Louisiana, 498 U.S. 39, 41 (1990) ..............................................110

California v. Brown, 479U.S. 538, 541 (1987);........................................147

Cantu v. State, 939 S.W.2d 627 (Tex. Crim. App. 1997) ..................110, 116

Deck v. Missouri, 544 U.S. 622 (2005)......................................................83

Eddings v. Oklahoma, 455 U.S 104, 112 (1982) ............................84,97 113,

Elkins v. State, 647 S.W.2d 663, 665 (Tex. Crim. App. 1983)..................120

Elledge v. Dugger, 823 F.2d 1439, 1450 (11th Cir. 1987)...........................87

Ernster v. State, 308 S.W.2d 33, 34-35 (1957) .........................................121

Estelle v. McGuire, 502 U.S. 62, 73 n.4 (1991) ........ 110

Evitts v. Lucey, 469 U.S. 387 (1985) ........ 118, 125, 128, 131, 132, 145

Fernandez v. Roe, 286 F.3d 1073, 1079 (9th Cir. 2002) ........ 138

Furman v. Georgia, 408 U.S. 238 (1972) ........ 95, 146

Godfrey v. Georgia, 446 U.S. 420 (1980) ........ 96

Goodwin v. Johnson, 132 F.3d 162, 1270 (5th Cir. 1998) ........ 118

Gregg v. Georgia, 428 U.S. 153, 189 (1976) ........ 147, 150

Harrell v. State, 884 S.W.2d 154 (Tex. Crim. App. 1994) ........ 119

Hartman v. State, 946 S.W.2d 60, 62-63 (Tex. Crim. App. 1997) ........ 128

Horne v. State, 607 S.W.2d 556, 565 (Tex. Crim. App. 1980) ........ 109

Hughes v. State, 24 S.W.3d 833 (Tex. Crim. App. 2000) ........ 119

Huizar v. State, 12 S.W.3d 479, 482 n.3 (Tex. Crim. App. 2000) ........ 119

Hutchinson v. State, 86 S.W.3d 636, 638-39 (Tex. Crim. App. 2002) ........ 145

Jackson v. State, 992 S.W.2d 469 (Tex. Crim. App. 1999) ........ 119, 121

Jasper v. State, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001) ........ 134

Johnson v. California, 545 U.S. 162, 170 (2005) ........ 137

Jones v. State, 843 S.W.2d 487, 496 (Tex. Crim. App. 1992); ........ 110

Jordan v. State, 950 S.W.2d 210 (Tex. App. – Fort Worth 1997, pet. ref'd) ........ 129

Jurek v. Texas, 428 U.S. 262, 270 (1976) ........ 113, 147, 148, 150

Keeton v. State, 749 S.W.2d 861, 868 (Tex. Crim. App. 1988)....................134

Kelly v. State, 824 S.W.2d 568, 572-573 (Tex. Crim. App. 1992)..........128

Kemp v State, 846 S.W.2d 289 (Tex. Crim. App. 1992)............110, 119, 120

King v. State, 953 S.W.2d 266, 274 (Tex. Crim. App. 1997)......................116

Ladd v. State, 3 S.W.3d 547, 573 (Tex. Crim. App. 1999).................116, 119

Lagrone v. State, 942 S.W.2d 602, 616 (Tex. Crim. App. 1997) .......110, 128

Lankford v. State, 248 S.W. 389, 389-90 (1923).......................................121

Lawton v. State, 913 S.W.2d 542, 555-56 (Tex. Crim. App. 1995)...........116

Lewis v. Dretke, 355 F.3d 364 (5th Cir. 2003) ..........................................27

Lockett v. Ohio, 438 U.S. 586 (1978)....................................................84, 96

Lockhart v. McCree, 476 U.S. 162, 171 (1986)..........................................98

Lombard v. Lynaugh, 868 F.2d 1475, 1479 (5th Cir. 1989)........................118

Maynard v. Cartwright, 486 U.S. 356 (1988) ............................................96

McCann v. State, 606 S.W.2d 897, 900 (Tex. Crim. App. 1990)...............120

McCleskey v. Kemp, 481 U.S. 279 (1987) ..................................................98

McKoy v. North Carolina, 494 U.S. 433, 440 (1990).................................114

Miller v. State, 53 S.W.2d 790, 791-92 (1932)...........................................121

Miller-El v. Dretke, 545 U.S. 231, 241 (2005)...........................133, 134, 135

Mills v. Maryland, 486 U.S. 367 (1988) ...........................................97, 147

Nenno v. State, 970 S.W.2d 549, 560-561 (Tex. Crim. App. 1998)..........128

Nichols v. State, 136 S.W.2d 221, 221-22 (1940) ........................................121

Penry v. Lynaugh, 492 U.S. 302, 319 (1989)........................................97, 113

Powers v. Ohio, 499 U.S. 400, 402 (1991) ........................................133

Price v. Cain, 560 F.3d 284, 287 (5th Cir. 2009). ........................................137

Purkett v. Elem, 514 U.S. 765, 767-68 (1995) ........................................133, 134

Ransom v. State, 503 S.W.2d 810, 813 (Tex. Crim. App. 1974)................120

Rayford v. State, 125 S.W.3d 521, 534 (Tex. Crim. App. 2003)................110

Renteria v. State, 206 S.W.3d 689, 698 & n.7 (Tex. Crim. App. 2006).....129

Rompilla v. Beard, 545 U.S. 374 (2005)........................................27

Sanders v. State, 604 S.W.2d 108, 111 at n.5 (Tex. Crim. App. 1980)......120

Simpson v. State, 119 S.W.3d 262 (Tex. Crim. App. 2003) ...............133, 134

Skipper v. South Carolina, 476 U.S. 1 (1986)..............................97, 114, 130

Sosa v. State, 769 S.W.2d 909, 917 (Tex. Crim. App. 1989) ....................110

Spence v. Fenchler, 107 Tex. 443, 457 (Tex. 1915) ..................................115

State v. Finch, 975 P.2d 967 (Wash. 1999)........................................85, 87

Stephenson v. State, 864 N.E.2d 1022, 1034 (Ind. 2007)..............................86

Strickland v. Washington, 466 U.S. 668, 687 (1984) ................111, 116, 119

Tennard v. Dretke, 542 U.S. 274, 284 (2004)....................................114, 130

Thomas v. State, 209 S.W.3d 268, 270 (Tex. App.-Houston [1st Dist.] 2006, no pet.) ........................................134

Turner v. Marshall, 63 F.3d 807, 813 (9th Cir. 1995)....139, 143

Turner v. State, 754 S.W.2d 668, 673 (Tex. Crim. App. 1988)....120

United States v. Battle, 836 F.2d 1084,1085 (8th Cir. 1987)....143

United States v. Cruse, 805 F.3d 795, 807 (7th Cir. 2015)....137

United States v. Mitchell, 502 F.3d. 931, 1004 (9th Cir. 2007)....136

Vaughn v. State, 118 S.W.2d 312 (1938)....121

Weatherred v. State, 15 S.W.3d 540 (Tex. Crim. App. 2000)....128, 129

Wiggins v. Smith, 539 U.S. 510 (2003)....27

Witherspoon v. Illinois, 391 U.S. 510 (1968)....97

Woodson v. North Carolina, 428 U.S. 280, 304–305 (1976)....84, 96, 116

Yick Wo v. Hopkins, 118 U.S. 356, 373 (1886)....155

STATUTES

Tex. Code Crim. Proc. art. 11.071....i, 1

Tex. Code Crim. Proc. art. 11.071 § 4(a)....2

Tex. Code Crim. Proc. art. 11.071 § 4(b)....2

Tex. Code Crim. Proc. art. 35.261....132, 133

Tex. Code Crim. Proc. art. 35.261(a)....133

Tex. Code Crim. Proc. art. 37.071....119

Tex. Code Crim. Proc. art. 37.071 § 2(b)(1)....107

Tex. Code Crim. Proc. Ann. art. 37.071 § 2(c) .......................................... 108

Tex. Code Crim. Proc. art. 37.071§2(e)(1) .................................................. 85

Tex. Code Crim. Proc. art. 37.071 §2(f)(3) ...................................... 112, 114

Tex. Code Crim. Proc. Art. 37.0711 §3(e) .................................................. 112

Tex. Penal Code § 12.31(a). ............................................................... 86

OTHER AUTHORITIES

Adam Gershowitz, Statewide Capital Punishment: the Case for Eliminating Counties' Role in Death Penalty, 63 Vand. L. Rev. 307 (2010) ...... 149, 151

American Bar Association Death Penalty Due Process Review Project, Evaluating Fairness and Accuracy in State Death Penalty Systems: The Texas Capital Punishment Assessment Report, (2013) .................... 104, 153

Capital Jury Project Website at http://www.albany.edu/scj/13194/php (last visited June 2, 2016) ................................................................ 99

Commentary to Guideline 10.11 in the American Bar Association's Guidelines for the Appointment and Performance of Counsel in death Penalty Cases (2003), reprinted in 31 Hofstra L. Rev. 913, 1061, ............ 93

Commentary to Guideline 10.7 in the American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (2003), reprinted in, 31 Hofstra L. Rev. 913, 1025, ........... 58

David Baldus, et al., Race and Proportionality Since *McCleskey v. Kemp*: Different Actors with Mixed Strategies of Denial and Avoidance, 39 Colum. Hum. Rts. L. Rev. 143 (2007) ............................................. 152

Elizabeth S. Vartkessian, Jon R. Sorensen & Christopher E. Kelly, Tinkering with the Machinery of Death: An Analysis of Juror Decision-Making in Texas Death Penalty Trials During Two Statutory Eras, Justice Quarterly (2014), DOI: 10.1080/07418825.2014.958188 at 11. ............................. 102

Index Crime Analysis 2013, Tex. Dep't. Pub. Safety, www.dps.texas.gov/crimereports/13/citCh2.pdf (last visited May 25, 2016) ............................................................. 148

Isaac Unah, Choosing Those Who Will Die: The Effect of Race, Gender, and Law in Prosecutorial Decision to Seek the Death Penalty in Durham County, North Carolina, 15 Mich. J. Race & L. 135 (2009) ................... 152

Jack Glaser, et al., Possibility of Death Sentene Has divergent Effect on Verdicts for Black and White Defendants 5-6 (June 24, 2009, https://gspp.berkeley.edu/assets/uploads/research/pdf/SSRN-id1428943.pdf) ............................................................................ 154

Jennifer L. Eberhardt, et al., Looking Deathworthy, 17 Psych. Sci. 383 (2006) ................................................................................ 155

Jules Epstein, Death-Worthiness and Prosecutorial Discretion in Capital Case Charging, 19 Temple Pol. & Civ. Rts. L. Rev. 389 (2010)............149

Katherine Barnes, et al., Place Matters (Most): An Empirical Study of Prosecutorial Decision-Making in Death-Eligible Cases, 51 Ariz. L. Rev. 305, 309-11 (2009) ........................................................................149

Kovarsly, Lee, The Local Concentration of Capital Punishment, (Feb. 26, 2016), Duke L. J., Forthcoming, U. of Maryland Legal Studies Research Paper 2016-14 (available at SSRN: http://ssrn.com/abstract=2738958) ..........................................................................................149, 151

Marla Sandys & Scott McClelland, Stacking the Deck for Guilt and Death: The Failure of Death Qualification to Ensure Impartiality , in America's Experiment With Capital Punishment, Ch. 13, (Carolina Academic Press, 2d ed., 2003) ..........................................................................100

N. Kerr, Severity of Prescribed Penalty and Mock Jurors' Verdicts, 36 J. Personality & Soc. Psych. 1431 (1978)..............................................155

Offenders on Death Row, Tex. Dep't Crim. Just., www.tdcj.state.tx.us/death_row/dr_offenders_on_dr.html (last visited May 25, 2016). .........................................................................................148

Robert J. Smith, The Geography of the Death Penalty and Its Ramifications, 92 Boston U. L. Rev. 227 (2012) ................................................149

Scott Phillips, Continued Racial Disparities in the Capital of Capital Punishment: The Rosenthal Era, 50 Hous. L. Rev. 131, 134 (2012).......153

Scott Phillips, Racial Disparities in the Capital of Capital Punishment, 45 Hous. L. Rev. 807 (2008) ....................................................................153

Stephen P. Garvey, Sheri Lynn Johnson, & Paul M.F., Correcting Deadly Confusion: Responding to Jury Inquiries in Capital Cases, 85 Cornell L. Rev. 627 (1999-2000)......................................................................104

Total Number of Offenders Sentenced to Death from Each County, Tex. Dep't. Crim. Just., https://www.tdcj.state.tx.us/death_row/dr_number_sentenced_death_county.html (last visited May 25, 2016)..................................................148

William J. Bowers & Wanda D. Foglia, Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing, 39 Crim. L. Bull. 51, 66-71 (2003) ..................................................................101, 103

RULES

Tex. R. App. P. 44.2(a)...........................................................129, 130, 131

Tex. R. Evid. 702.........................................................................................128

CEDRIC ALLEN RICKS, Applicant, is currently confined on death row in the Texas Department of Criminal Justice – Correctional Institutions Division, pursuant to a conviction for capital murder and sentence of death. (See Appendix A - Judgment). Applicant now seeks relief from that judgment and files this Application for Writ of Habeas Corpus pursuant to Article 11.071 of the Texas Code of Criminal Procedure.

## HISTORY OF THE CASE

Cedric Allen Ricks was charged with capital murder in cause no. 1361004 in the 371st Judicial District Court of Tarrant County, Texas. Mr. Ricks' indictment read, in pertinent part, that he did "then and there intentionally or knowingly cause the death of an individual, [A.F.], by stabbing him with a knife and did then and there intentionally or knowingly cause the death of an individual, Roxann Sanchez, by stabbing her with a knife and by strangling her with his hand and hands, and both murders were committed during the same criminal transaction." The offense was alleged to have occurred on or about May 1, 2013. (I C.R. at 11[1]). Mr. Ricks entered a plea of not guilty, but was convicted by a jury and subsequently sentenced to death on May 16, 2014. (II C.R. at 526-29).

[1] Applicant requests that this court take judicial notice of the record in this case on direct appeal.

Mr. Ricks' direct appeal is still pending in the Court of Criminal Appeals in cause no. AP-77,040. The State's brief was filed on January 28, 2016.

Applicant's initial writ application deadline was March 13, 2016. However, the trial court granted a 90-day extension, as permitted by Art. 11.071 § 4(b). Therefore, this application should be considered timely if filed on or before June 11, 2016.

This is Mr. Ricks' first application for a writ of habeas corpus.

## INTRODUCTION

Cedric Ricks' jury heard that he grew up in an environment described as "utopia". He had a wonderful life with two parents who loved him and did all that they could to help him. But unfortunately, Cedric had a "broken brain" that left him predisposed to violence and aggression. This was the defense case on punishment.

However, the jury should have heard that Cedric's "utopia" was not all that it was cracked up to be. His mother drank heavily during her pregnancy with Cedric. After he was born, Cedric was left in the care of an aunt with a boyfriend who drank heavily and sexually abused several of the children in her care. Lead contamination was also an issue in Cedric's

"utopia". But the jury never heard about any of this because his trial attorneys failed to discover it.

During his trial, the jury observed Cedric in leg shackles. The prosecutor then argued to the jury that the shackles showed that Cedric was dangerous.

As is the case with most capital juries, Cedric's jurors did not understand the penalty phase instructions and thought that they had no choice but to sentence Cedric to death.

There were numerous other constitutional deficiencies that were not raised by both trial and appellate counsel. Considering the totality of constitutional violations in this case, to execute Cedric Allen Ricks would be an affront to the constitution and the laws of this land.

## STATEMENT OF FACTS FROM TRIAL

In May of 2013, Cedric Ricks was in a relationship with Roxann Sanchez. They lived together with Roxann's two sons from a previous relationship – A.F., age 8, and M.F., age 12. Cedric and Roxann also had a son, I. R., age 9 months. (XXXI R.R. at 61). In the early evening of May 1, 2013, Roxann arrived home with some groceries and began preparing dinner. The boys were in their room playing. (XXXII R.R. at 23). An argument erupted between Roxann and Cedric. (XXXII R.R. at 25). When the boys heard their mother scream, they ran into the living room and saw Roxann and Cedric hitting each other. (XXXII R.R. at 26). The boys tried to intervene and told Cedric to stop. Cedric went to the kitchen and got a knife. (XXXII R.R. at 28). He then proceeded to stab Roxann multiple times. (XXXII R.R. at 29). M.F. ran to his bedroom closet to hide and try to call 911, but Cedric followed and pulled the closet door open before M.F. could call. (XXXII R.R. at 33). M.F. ran back to the living room, where he found his brother A.F. covered with blood. (XXXII R.R. at 34-35). Cedric proceeded to stab both M.F. and A.F. multiple times. According to M.F., Cedric did not say anything during the attack. (XXII R.R. at 37). M.F. finally made a gurgling noise like he heard his brother A.F. make. After he

made that noise, Cedric stopped stabbing M.F. (XXXII R.R. at 41). As M.F. played dead, he heard Cedric go to the kitchen and wash up. (XXXII R.R. at 42). Cedric then went to the bedroom and changed clothes. M.F. heard Cedric make a phone call but could not hear what was said. (XXXII R.R. at 43). After M.F. heard Cedric go out the front door, M.F. ran to the window and saw that Roxann's car was gone. (XXXII R.R. at 46). M.F. then called for help. (XXXII R.R. at 47).

Tamara Butts was Cedric's cousin. Tamara had moved with her parents to the Fort Worth area from Chicago in 2006. (XXXI R.R. at 59). Cedric moved to the area from Chicago a few years later. (XXXI R.R. at 60). Around 7:00 PM on May 1, 2013, Tamara got a phone call from Cedric. He told her that he "did something bad", and then asked to speak with her father. (XXXI R.R. at 64). Joseph Sanders, Tamara's father and Cedric's uncle, got on the phone. Cedric told him, "I messed up. I killed Roxann and the boys." Cedric wanted them to go check on his son I. R. (XXXI R.R. at 78). Tamara got back on the phone and told Cedric he should turn himself in. Cedric told her his hands were injured, but would not answer her questions about how it happened. He said he was stressed and expressed some remorse. (XXXI R.R. at 72-73). However, Cedric would not tell her

where he was, but did say he would die before he went to jail. (XXXI R.R.at 67-68). Tamara called the police. (XXXI R.R. at 69).

Having received calls from both M.F. and Tamara, Bedford police responded to the apartment where Cedric lived with Roxann and the boys. (XXXI R.R. at 87). Officer Baxley was the first to arrive, but in no time most of the Bedford police department followed suit. (XXXI R.R. at 92-93). Officer Baxley opened the apartment door to find M.F. alive, but covered with blood. (XXXI R.R. at 95). After getting M.F. out of the apartment, officers entered the apartment to retrieve I. R., who was crying but uninjured, and to conduct a protective sweep. The bodies of Roxann and A.F. showed no signs of life. (XXXI R.R. at 97).

Meanwhile, Tamara and her parents had gone to the Bedford police station. Tamara sent some texts to Cedric while Officer Mack contacted Cedric's cell phone provider to try to obtain location information for the phone. (XXXI R.R. at 71, 153). They were able to determine that the phone was located along I-35 in Oklahoma, heading north. (XXXI R.R. at 153). Bedford police broadcast this information to police in Oklahoma and Cedric was soon pulled over by two Oklahoma state troopers. (XXXI R.R. at 125-130, 153). Cedric was taken into custody without incident. (XXXI R.R. at 135).

Tasha Greenburg conducted the autopsies on Roxann and A.F. She determined that Roxann's cause of death was stab wounds to the neck, blunt force injuries to the head, and asphyxia. (XXXII R.R. at 150). A.F.'s cause of death was stab wounds to the head and neck. (XXXII R.R.at 176). Both Roxann and A.F. had wounds to their hands which Dr. Greenburg said were defensive injures. (XXXII R.R. at 131, 174-75). She did not remember telling the defense investigator in a pretrial meeting that she could not tell if these were defensive wounds. (XXXII R.R. at 195).

Carolyn Van Winkle, a DNA analyst with the Tarrant County Medical Examiner's Office told the jury that multiple bloody items from the crime scene contained Cedric's DNA profile. (XXXII R.R. at 54-89). A bloody knife found in the sink, (state's exhibit 138), showed profiles for Cedric and M.F. (XXXII R.R. at 76-80). Another knife with blood found in a kitchen drawer, (state's exhibit 139) revealed profiles for Cedric and A.F. (XXXII R.R. at 84-87).

Amy Lee, a DNA analyst with Serological Research Institute testified for the defense about two additional knives from the crime scene. (XXXIII R.R. at 10-24). Another bloody knife found in a kitchen drawer, (defense exhibit 7), contained DNA profiles of Cedric, Roxann, and A.F. (XXXIII R.R. at 17-19). Another bloody knife from the kitchen sink, (defense exhibit

8), contained profiles from Cedric, A.F., M.F., and Roxann. (XXXIII R.R. at 23-24).

The jury found Mr. Ricks guilty of capital murder as charged in the indictment. (XXXIII R.R. at 71).

During the punishment phase, the jury learned that Cedric had been accused of assaulting Roxann and I. R. in November of 2012. (XXXVI R.R. at 46-48). Diane McGrewe, Roxann's mother, told the jury that she took Roxann to the police department to report the assault, and later to the hospital where Roxann received treatment for her injuries. (XXXIV R.R. at 23-25). Roxanne Carillo with Child Protective Services (CPS) interviewed Cedric as part of the investigation. (XXXIV R.R. at 51). Cedric told her that he got into an argument with Roxann after she accused him of hitting I. R. The argument escalated and he started strangling Roxann. He stopped when he realized that what he was doing was crazy. (XXXIV R.R. at 60-61). He apologized to Roxann and they talked. (XXXIV R.R. at 62). He later went to anger management classes and the two got some counseling. (XXXIV R.R. at 63).

Cedric was fired from his job as a medical assistant when he was arrested for the assault on Roxann. (XXXIV R.R. at 85). He had already

been placed on "final written warning" for improperly accessing a female co-worker's patient record. (XXXIV R.R. at 86).

Diane McGrewe, Roxann's mother, told the jury that when she was cleaning out Roxann's apartment, she found some blank signed prescription pads in Cedric's nightstand, along with some filled out prescription forms. (XXXIV R.R. at 19). The doctors whose signatures appeared on the forms, testified that they never wrote any prescriptions for Cedric. (XXXVII R.R. at 73-75, 90).

The jury also learned that when Roxann's vehicle was searched after Cedric's arrest, a duffle bag filled with samples of prescription drugs was found in the trunk. There was a bag containing needles, syringes and vials. (XXXV R.R. at 42-43). There were sample packs of Cialis, bottles of Nexium, vials of depo-medrol, ceftriazone, testosterone cyanocobalamin, and xylocaine. (XXXV R.R. at 66-69). There were also prescription bottles of terbinafine, levofloxacin, and metronidazole. (XXXV R.R. at 68).

The jury also heard about M.F.'s extensive injuries. He had multiple stab wounds to his head and neck. One of the wounds penetrated his skull. (XXXV R.R. at 75-76). He required several hundred sutures and was in surgery for six hours. (XXXV R.R. at 90). He required additional surgeries on his hand. (XXXV R.R. at 81). He had to go to counseling and therapy

sessions for his hands. (XXXIV R.R. at 16). His grandmother thought M.F. was a lot quieter than he used to be. (XXXIV R.R. at 30). His father said he was not "as joyful". (XXXVII R.R. at 202).

Jennifer Clark met Cedric through an online dating service. (XXXV R.R. at 109). Cedric was living in Chicago at the time. (XXXV R.R. at 116). In March of 2009, Cedric moved to Texas and moved in with Jennifer. (XXXV R.R. at 118). Cedric went to school to become a medical assistant. (XXXV R.R. at 119). After about a year, the relationship soured. Jennifer thought that Cedric was not being faithful. They fought. During one such fight Jennifer brandished a shotgun. Cedric moved out shortly after that. (XXXV R.R. at 130-31).

Tamara Partridge testified about her dating relationship with Cedric. She met Cedric when she was 19 and he was 29. (XXXVI R.R. at 23). She also experienced violence in her relationship with Cedric. (XXXVI R.R. at 32). On one occasion Cedric broke her phone and choked her. (XXXVI R.R. at 33). She told the jury that Cedric was jealous and controlling. (XXXVI R.R. at 32). He also had an explosive temper and got into confrontations with others. (XXXVI R.R. at 42-46).

Tashana Singleton was Cedric's ex-wife. (XXXVII R.R. at 8). She met Cedric at church when she was 15 and he was 18. (XXXVII R.R. at 10).

They began dating and eventually moved in together and then got married. (XXXVI R.R. at 13-14). They had a son in 2001. (XXXVII R.R. at 16). Tashana also experienced violence in their relationship. During one argument, Cedric threatened her with a knife. (XXXVII R.R. at 17). On another occasion he punched her in the jaw and broke her tooth. (XXXVII R.R. at 21). In 2002, Tashana filed for divorce. (XXXVII R.R. at 20). Tashana would frequently bring her father when she met with Cedric to exchange custody of their child because Cedric would make threats and frighten her. On one occasion Cedric threatened to kill her father. (XXXVII R.R. at 25). The couple eventually started to make the exchanges in the parking lot of the local police station. (XXXVII R.R. at 27). On one occasion, Cedric became enraged and started choking Tashana. (XXXVII R.R. at 32). Several police officers ran out and pulled Cedric off of her. (XXXVII R.R. at 51). Cedric was arrested, but ultimately received probation for this offense. (XXXVII R.R. at 37). Tashana had no further contact with Cedric. (XXXVII R.R. at 39).

The jury also heard that on the first day of jury selection, Cedric brought a pencil to court. (XXXVI R.R. at 59). This was not allowed since a pencil could be used as a weapon. (XXXVI R.R. at 72). On another

occasion, Cedric's jail cell was searched and an envelope with 13 pills was found under his mattress. (XXXVI R.R. at 80-81).

Steven Rogers, a retired correctional officer, told the jury about life in TDCJ. (XXXVII R.R. at 117-152). He explained the various security classifications. (XXXVII R.R. at 124-144). G1 is the least restrictive classification and G5 is the worst. Inmates sentenced to life without parole can never be classified lower than G3. (XXXVII R.R. at 126). G3 inmates can still live in a dormitory setting and get contact visits with family. (XXXVII R.R. at 128-130). However, even the most restrictive custody status does not prevent violence in prison. (XXXVII R.R. at 144). On cross-examination, Mr. Rogers explained that the current classification system was developed after the "Texas Seven" escaped from the Connally Unit and killed a police officer. (XXXVII R.R. at 157). The current G3 classification for life without parolers appears to be working. When something doesn't work in the prison system, it gets changed. (XXXVII R.R. at 190).

The defense began its punishment presentation by calling Bedford detective William Mack. Officer Mack testified that he and Officer Shelley went to Oklahoma after learning of Cedric's arrest. He told the jury that initially Cedric had refused to waive extradition. (XXXVIII R.R. at 12). The undersheriff told the Bedford detectives that Cedric would be placed in a cell

with another inmate who was charged with murder. The undersheriff would let them know if Cedric said anything. (XXXVIII R.R. at 18). The next day, Det. Mack learned that Cedric had been brutally attacked by other inmates in the jail. After that, Cedric decided to waive extradition and return to Texas. (XXXVIII R.R. at 20).

The state later presented testimony from Sgt. Niya Cordoso who booked Cedric into the Oklahoma jail. (XXXIX R.R. at 235). She told the jury that she was planning to place Cedric in a single cell, but he requested to be in a tank with other inmates. (XXXIX R.R. at 237). She complied with his request but told him not to talk about his charges. (XXXIX R.R. at 238).

Michael Rose was one of the other inmates in the Oklahoma jail. He told the jury that when Cedric was placed in the cell, Cedric started talking about what he had done and sounded like he was bragging. (XXXIX R.R. at 251-56). Rose told the jury that some of the other inmates then got into an altercation with Cedric. (XXXIX R.R. at 256).

The defense presented testimony from several friends and family members about Cedric. Jane Crossley was Cedric's Sunday school teacher. (XXXVIII R.R. at 26). She told the jury that Cedric and his family were "good church people". (XXXVIII R.R. at 27).

Courtland Byrd had played football with Cedric in high school. (XXXVIII R.R. at 44). Cedric was very competitive. He had a short fuse if there was a bad call, but Courtland didn't think it was anything out of the ordinary. (XXXVIII R.R. at 48). He still kept in touch with Cedric and had spoken to him on the phone a few days before the murders. (XXXVIII R.R. at 53). He thought Cedric seemed concerned about something. He didn't sound as "jovial" as he usually did. (XXXVIII R.R. at 54-55).

Edna McCullough grew up with Cedric's parents and had known Cedric since he was born. (XXXVIII R.R. at 62). She recalled an occasion when Cedric was about 8 or 9 and he started a small fire in a car. When she asked him why he did that, he said he didn't know. Ms. McCullough thought there was something wrong with Cedric. (XXXVIII R.R. at 64). He got into trouble a lot at school. The family kept hoping he would grow out of it, but at some point they realized it was more than youthful mischievousness. (XXXVIII R.R. at 66-67).

Steven Ware also grew up with Cedric. (XXXVIII R.R. at 73). He recalled Cedric as the class clown who got in trouble a lot. (XXXVIII R.R. at 75). In 2007, Mr. Ware was in a bad car wreck and was in a coma for a while. Cedric came to visit him in the hospital and brought him a unique pair of shoes like the ones he lost in the accident. Cedric also brought reading

material for Mr. Ware's girlfriend at the time. Those gestures meant a lot to Mr. Ware. (XXXVIII R.R. at 78-79).

Thomas Abner was Cedric's first cousin. (XXXVIII R.R. at 80). Cedric had called him a few weeks before the murders on Mr. Abner's 50th birthday. (XXXVIII R.R. at 83). He thought Cedric seemed stressed over money. (XXXVIII R.R. at 84).

Kimberly McCullough was also a cousin. (XXXVIII R.R. at 89). She recalled that Cedric had some discipline problems growing up, but going to a therapist was just something you didn't do back then. (XXXVIII R.R. at 91-92). Cedric would do bad things and when you asked him why he would say he didn't know. Ms. McCullough thought there was some sort of "disconnect". (XXXVIII R.R. at 93).

Curtis Crossley, Jr. knew Cedric from church and was also in his Sunday school class. (XXXVIII R.R. at 101). Curtis thought that sometimes Cedric's aggression could be a little extreme. (XXXVIII R.R. at 103). In fact, Curtis thought it was abnormal. (XXXVIII R.R. at 105).

Keith Griffin also grew up and played sports with Cedric. (XXXVIII R.R. at 152-53). He recalled Cedric as being very intense with a short fuse. (XXXVIII R.R. at 156).

The jury also heard from two of Cedric's football coaches. John McGee coached Cedric when he was 8 or 9. (XL R.R. at 9). He thought Cedric was a typical kid and did pretty much whatever Coach McGee told him to do. (XL R.R. at 13). Coach Gary Korhonen coached Cedric in high school. (XL R.R. at 80). He remembered that Cedric had a good sense of humor and was a "great young man". (XL R.R. at 18-20).

Shederick Ricks was Cedric's father. (XXXVIII R.R. at 107). Before he retired, Shederick had a well-paying union job installing fire sprinklers. (XXXVIII R.R. at 108). His wife of 45 years, Helen, also worked while Cedric was growing up. (XXXVIII R.R. at 111, 115). Cedric also had an older brother, Dwayne. (XXXVIII R.R. at 113). One of Helen's aunts would usually keep the kids while Shederick and Helen worked. (XXXVIII R.R. at 115). Shederick recalled that when he went to pick Cedric up from the first day of preschool, he was told not to bring Cedric back. (XXXVIII R.R. at 117). Shederick thought Cedric was just being mischievous and needed more discipline. (XXXVIII R.R. at 117-18). Shederick recalled one time when Cedric was 8 or 9 and set fire to a small bush. When they asked Cedric why he did that he told them there was something in his head that told him to do it. (XXXVIII R.R. at 123-24). Cedric also ran away from home on a couple of occasions. One time after Shederick had disciplined him, Cedric ran out

of the house and threw a brick through the window. (XXXVIII R.R. at 130). When the boys were older, Shederick was able to get both of them good jobs through the union. However, when the recession hit, both of his sons were laid off. (XXXVIII R.R. at 133-36). Shederick had not known about the domestic violence in Cedric's relationships and was still having a hard time believing it all. (XXXVIII R.R. at 141-145).

Dwayne Ricks[2] was Cedric's older brother. (XXXVIII R.R. at 176). Growing up, he and Cedric were very different. Cedric was into sports and Dwayne was more of a loner. (XXXVIII R.R. at 180). But family and church were important to them both. (XXXVIII R.R. at 181). Dwayne recalled that when Cedric was in a rage, he was like a different person. (XXXVIII R.R. at 186). Dwayne thought that the family kept a lot of things private. As he explained, what happened behind closed doors, stayed behind closed doors. (XXXVIII R.R. at 192). Dwayne became estranged from his parents because he was gay and they could not accept his lifestyle. However, that was not an issue with Cedric. (XXXVIII R.R. at 191).

Helen Ricks was Cedric's mother. (XXXIX R.R. at 185). She told the jury that in 1976 the family moved to the Calumet Park neighborhood. It was a great place to raise a family because there were lots of activities for

[2] Although the name is spelled Dewayne in the reporter's record, the correct spelling appears to be Dwayne.

children at the rec center. (XXXIX R.R. at 188). She smoked cigarettes when she was pregnant with Cedric and she recalled him being a sickly child who got bronchitis a lot. (XXXIX R.R. at 191-92). As Cedric got older he was mischievous, aggressive, and could not sit still. They didn't realize the seriousness of it until Cedric started attending school. (XXXIX R.R. at 192). Helen would go to work and pray that the school did not call. But they were always calling about Cedric. (XXXIX R.R. at 198). One doctor suggested Ritalin, but Helen didn't think Cedric needed to be drugged. (XXXIX R.R. at 194). The doctors also told them that they needed to be firm with Cedric. Helen did most of the disciplining. Cedric would get "whippings" or have things taken away from him. (XXXIX R.R. at 196). But no matter what Cedric did, his family always supported him. (XXXIX R.R. at 198). On a few occasions, Cedric witnessed his father hitting or shoving Helen. (XXXIX R.R. at 204). Cedric thought his father did not show enough respect for his mother. (XXXIX R.R. at 200). Helen recalled Cedric as a loving child. On Thursday nights, Shederick would go bowling, so Helen and the boys would go get "Polish specials" and watch Hill Street Blues and Cheers. Cedric would crawl in bed with his mother until his father came home. (XXXIX R.R. at 218). Even after Cedric struck out on his own, he would still come back home and Shederick and Helen would let him in. (XXXIX

R.R. at 220). The night of the murders, Helen had a "tense" conversation with Cedric. Helen said she never told Cedric that he couldn't come home, but told him he should "man up and take care of his child". (XXXIX R.R. at 227). In retrospect, Helen thought maybe they had enabled Cedric too much, but he was still the same little boy to her and she still loved him. (XXXIX R.R. at 228-29).

The jury also heard from Dr. Jeffery Lewine, a research scientist in neuroscience at the Mind Research Network. (XXXIX R.R. at 91). MINDSET was a for-profit consulting arm of the Mind Research Network. (XXXIX R.R. at 95). MINDSET provides neuroscience consulting services in both civil and criminal cases. (XXXIX R.R. at 98). MINDSET worked and consulted with numerous other experts in their field. (XXXIX R.R. at 97-100). In Mr. Ricks' case the defense had asked that MINDSET examine Mr. Ricks and look for any evidence of traumatic brain injury. They were also looking for any markers that would be associated with a biological predisposition toward aggression and violence or anything that would be consistent with a diagnosis of psychopathy. (XXXIX R.R. at 100-101). To do this, they used advanced brain imaging using magnetic resonance imaging technology, electrophysiology testing using EEG, and behavioral evaluations. (XXXIX R.R. at 102).

Dr. Lewine told the jury that they found no evidence of traumatic brain injury in Cedric. (XXXIX R.R. at 115). However, they did find an enlarged putamen – an area of the brain that is involved with impulse control and aggression. (XXXIX R.R. at 118). Dr. Lewine acknowledged that both environment and heredity can affect the brain. (XXXIX R.R. at 123). He thought that the size of the putamen was not likely to be affected by the environment, but he could not say that Cedric was born with an enlarged putamen. (XXXIX R.R. at 124, 183-84).

Dr. Lewine also talked about psychopathy. He explained that psychopaths lack moral judgment. (XXXIX R.R. at 121-22). Dr. Lewine did not think that Cedric was a psychopath. Dr. Lewine relied on some psychological testing done by Dr. Antoinette McGarrahan. Dr. McGarrahan had used the Hare psychopathy checklist to evaluate Cedric. Dr. Lewine explained that on this checklist – normal people score a 4, incarcerated individuals score around 21-22, and "clear psychopaths" score above 30. Dr. McGarrahan scored Cedric at a 25. (XXXIX R.R. at 125). Dr. McGarrahan also conducted a MSCEIT test. This test measures "emotional intelligence". (XXXIX R.R. at 126). Cedric scored a 61 on this test which put him in the lowest 1%. (XXXIX R.R. at 127). This meant that his ability to form and maintain interpersonal relationships was impaired. (XXXIX R.R. at 127).

MINDSET also looked at the electrical activity of Cedric's brain. An EEG was done on May 7, 2014 – which was also the same day that the jury found Mr. Ricks guilty of capital murder. (XXXIX R.R. at 134). Dr. Lewine did not think that this invalidated the results they obtained. (XXXIX R.R. at 135). Dr. Lewine went on to explain that psychopaths typically have increased delta activity in their brains. Cedric had low delta activity but increased beta activity. (XXXIX R.R. at 130-32). Increased beta activity was associated with impulse control and aggression. (XXXIX R.R. at 132). Dr. Lewine concluded that Cedric appeared to have a predisposition toward violence and aggression, but was not a psychopath. (XXXIX R.R. at 133).

MINDSET also looked at Cedric's sensory gating, or the ability of his brain to filter out background noise. (XXXIX R.R. at 136-37). This was done by playing two identical sounds and measuring the brain's response. The neurotypical person shows a strong response to the first tone and a weaker response to the second one. (XXXIX R.R. at 137). This is because the brain recognizes the second tone as redundant. However, Cedric showed an equally strong response to the second tone. (XXXIX R.R. at 138). Cedric also had an accelerated response to tone loudness. (XXXIX R.R. at 141). Dr. Lewine explained that when sounds become too loud for the brain to

process, it causes system overload and impulse control goes down. (XXXIX R.R. at 142-43).

Dr. Lewine also told the jury that he looked at actuarial studies and the various risk factors for violence in prison. Cedric only had two of those risk factors – more than one victim and a history of prior assaults. Dr. Lewine thought this would put Cedric "somewhere in the middle" when it came to being a future danger in prison. (XXXIX R.R. at 149).

On cross-examination, Dr. Lewine agreed that prison was a noisy environment. His test results suggested that Cedric was likely to have problems processing information in a noisy environment and this could affect his impulse control. (XXXIX R.R. at 155).

Dr. Lewine also admitted that the scoring on the Hare psychopathy checklist can be somewhat subjective. (XXXIX R.R. at 161). Dr. McGarrahan had given Cedric a 0 in several categories, such "criminal versatility", "revocation of conditional release", and "lack of empathy". (XXXIX R.R. at 160, 164). Another assessor could have scored these categories as "2s" which would have put Cedric's score in the psychopath range. (XXXIX R.R. at 160-162).

Cedric Ricks chose to take the stand at the conclusion of the defense case. (XL R.R. at 29). He told the jury that he was stressed and depressed

when he got in a fight with Roxann in November of 2012. His car had been repossessed even though he had $6000 to make the payments current. He had no friends. He felt like less than a man without a car. He wanted to leave Roxann but she didn't want him to. She grabbed him and he choked her. Then they sat down on the couch and talked. (XL R.R. at 30-31). Cedric said he went to the police station the next day because he wanted to be sure that they heard his side of the story. (XL R.R. at 33). Later, when the police came and arrested Cedric at work, it upset him because they had his phone number. (XL R.R. at 35). Roxann helped him bond out of jail. Cedric enrolled in anger management even though he had to pay for it. Cedric moved back in with Roxann and they were trying to work things out. (XL R.R. at 37).

Cedric told the jury he was sorry about everything. (XL R.R. at 37). He couldn't explain why things turned physical. He thought sometimes he overreacted when he probably should have let things go. (XL R.R. at 44). He told the jury that when he was stabbing Roxann and the boys all he was thinking was that he was angry. (XL R.R. at 45). He told the jury that he turned down life without parole because he wanted "to face what he needed to face." He asked the boys' family for forgiveness and told his family "thanks for trying." (XL R.R. at 46).

On cross-examination, Cedric told the jury that it did not matter how it had happened because Roxann and A.F. were gone. He couldn't fix that. (XL R.R. at 48-49). He said that he and Roxann had been fine the day before, on April 30, even though on that day, he had a court date on the November assault. (XL R.R. at 30). According to Cedric, Roxann had tried to drop those charges but the prosecutor's office would not let her. (XL R.R. at 51). Cedric thought that Roxann had used her portion of their rent money to lease a new apartment. But he was trying to move out as well, and sold $700 worth of gold on the Saturday before the offense. (XL R.R. at 52). Cedric said that on May 1, he was "defending himself against the whole house". (XL R.R. at 77). He even got stabbed in the head, but never told anyone. (XL R.R. at 79).

Cedric admitted that he had been arrested 8 or 9 times – once or twice for disorderly conduct, once for theft, 5 or 6 times for domestic violence, and maybe once for violation of a protective order. (XL R.R. at 58-59). Cedric would not say that he "got lucky" with the criminal justice system in Illinois. He still had to pay for probation. (XL R.R. at 63).

Regarding the signed prescription pads found in his nightstand, Cedric told the jury that the doctors' nurses had given him the pads. The doctors were always running around between clinics and it was easier to just reach

them by phone when patients needed prescriptions. But he never used them to write prescriptions for himself. (XL R.R. at 83-84). Cedric said that the doctors were lying when they said otherwise because they did not want to lose their licenses. (XL R.R. at 84).

## FIRST GROUND FOR RELIEF

### TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO SUFFICIENTLY DEVELOP AND PRESENT SIGNIFICANT MITIGATING EVIDENCE IN VIOLATION OF CEDRIC RICKS' SIXTH AMENDMENT RIGHT TO COUNSEL.

Although Cedric's trial attorneys did hire a mitigation specialist, the mitigation investigation that was conducted missed critical aspects of Cedric's early life. At trial, witnesses described Cedric's family as being like the fictional TV sitcom family the Huxtables. (XXXV R.R. at 138; XXXVIII R.R. at 192). The neighborhood where Cedric grew up, Calumet Park, was described as great place to raise children. (XXXVIII R.R. at 154; XXXIX R.R. at 188). In closing arguments, the prosecutor stated that Cedric had a "wonderful life" and grew up in "utopia". (XL R.R. at 105). But there were cracks in this façade that the jury never heard about. The jury never heard that up until the age of 5, Cedric was cared for by an aunt in a household where physical and sexual abuse occurred to many of the children in her care. Cedric's severe behavioral problems were apparent even at this young age. Alcohol abuse and mental illness ran through Cedric's family tree and young Cedric was frequently exposed to their effects. Trial counsel should have been alerted to serious problems in Cedric's early life when

they learned that his parents were told not to bring him back on the first day of preschool. The failure of his attorneys to explore and present the story of Cedric's early life violated his Sixth Amendment right to effective assistance of counsel. U.S. Const. amend. VI, VIII, XIV; Strickland v. Washington, 466 U.S. 668 (1984); Wiggins v. Smith, 539 U.S. 510 (2003); Rompilla v. Beard, 545 U.S. 374 (2005); Lewis v. Dretke, 355 F.3d 364 (5th Cir. 2003).

The post-conviction mitigation investigation was conducted by Mairead Burke. (See Exh. 1 – Curriculum Vitae of Mairead Burke, LMSW). The details of her investigation are included in her attached affidavit. (Exh. 2 – Affidavit of Mairead Burke, LMSW). She discovered many aspects of Cedric's early life that were missed by the trial mitigation investigation.

## I. THE JURY NEVER HEARD ABOUT HELEN'S DRINKING WHEN SHE WAS PREGNANT WITH CEDRIC.

Cedric's mother, Helen Ricks, drank heavily on a regular basis throughout her pregnancy with Cedric. But the jury never heard about this. As Helen herself states,

> Back when I was pregnant with Cedric, my doctor didn't tell me not to drink alcohol, so I continued drinking throughout my pregnancy. I usually drank two nights a week – Friday and Saturday – and had about 4-5 mixed drinks each night, usually with gin, scotch, or brandy. I also smoked cigarettes during my

> pregnancy with Cedric, about 1/3 of a pack a day. I smoked marijuana about once or twice a month.

(Exh. 3 – Affidavit of Helen Ricks). This was substantiated by Cedric's uncle and aunt, Joseph and Deborah Sanders. Joseph stated that,

> My wife Debbie and I got married and had kids around the same time that Helen and Shederick did. During the time Helen was pregnant with Cedric we saw her and Shederick probably every weekend. Back then we drank alcohol when we got together on the weekends. I remember Helen drank on the weekends while she was pregnant with Cedric.

(Exh. 4 – Affidavit of Joseph Sanders). Deborah related a similar story, stating, "During the time Helen was pregnant with Cedric, the four of us got together probably every weekend. Back then, we drank alcohol when we were together on the weekends, and Helen continued to drink alcohol throughout her pregnancy with Cedric...." (Exh. 5 – Affidavit of Deborah Sanders).

## II. THE JURY NEVER HEARD ABOUT GERALDINE AND BOOKER, CEDRIC'S PRIMARY CARE-TAKERS UNTIL THE AGE OF FIVE.

The jury also never heard about Geraldine Sanders and her live-in boyfriend Booker. As Helen explained:

> When Cedric was four months old I had to return to work at Illinois Bell Telephone Company. Cedric and Dwayne stayed

> with my paternal aunt, Geraldine Sanders. Geraldine and her live-in boyfriend, Booker, lived at 6202 S. Vernon Avenue in Chicago. The boys stayed with Geraldine on weekdays and sometimes spent the night. Geraldine babysat other kids in our extended family, too. I don't remember Booker's last name, but I remember he drank a lot.

(Exh. 3– Affidavit of Helen Ricks). Geraldine and Booker's apartment at 6202 S. Vernon Ave. was far removed from the utopia of Calumet Park. It was here that Cedric spent the majority of his days until the age of five when he began kindergarten. (Exh. 3 – Affidavit of Helen Ricks).

Cedric's older brother Dwayne was also among the kids cared for by Geraldine. He recalled:

> [Booker] drank heavily on a daily basis and sometimes we saw him passed out after drinking.
> Auntie Geraldine also babysat other children. One of the children was a girl named Diane who was older than me. Diane molested me; I remember her rubbing herself against me. I don't know if this happened to Cedric, too. When I was older, my mother told me that I did or said something to our family doctor that led him to ask if I was molested. My mother told me she did not follow-up about the doctor's concern.

(Exh. 6 – Affidavit of Dwayne Ricks).

Stephanie Halverson, formerly Stephanie Rodriguez, was another child in the care of Geraldine and Booker. Cedric was the great-nephew of Stephanie's foster parents, Sheridan and Marie Sanders. She recalled:

> Cedric and I were both babysat by Geraldine Sanders. She had us most weekdays and we usually went home on the weekends. Geraldine also babysat Dwayne Ricks, Tammy Hall, Larry



Hall, Racquel Sanders, and Randy Sanders. They also babysat a cousin named Diane. I don't remember Diane's last name.

...

Geraldine had a live-in boyfriend named Booker who sexually abused me. The abuse usually happened when Geraldine left us alone with Booker. When Geraldine left, I started locking myself in the bathroom, hiding, or going to the downstairs neighbor's apartment to escape the abuse. The abuse went on for years, and only ended when Booker died.

There was another girl, whose name I don't remember, who was also sexually abused by Booker. The girl told Geraldine about the abuse, but Geraldine did not believe her. The girl was not allowed to come back, and I never saw her again. I was afraid that if I reported the abuse I wouldn't be believed. I also didn't report the abuse because I was scared I'd be removed and put in another foster home.

I don't know if Booker abused other children in the home, because I hid or left the apartment to get away from him and the abuse.

Cedric's parents, Shederick and Helen Ricks, came to pick him and Dwayne up from Geraldine and Booker's apartment late at night, around 2:00 am. Back then, they drank, smoked marijuana, and partied a lot. They were often both drunk when they came to pick up their children. They yelled and screamed at each other in front of us when they were drunk. It was chaotic. I felt scared watching them fight.

(Exh. 7 – Affidavit of Stephanie Halverson).

Tammy Hall, another child who was cared for by Geraldine, had this to say:

Geraldine Sanders babysat both Cedric and I; she was my great-grandfather's sister and was Cedric's grandfather's sister. Geraldine also watched other children. The children who were at her home the most were: Dwayne Ricks, Larry Hall, Racquel Sanders, Randy Sanders, and Stephanie Rodriguez.

I am about 4-5 years older than Cedric, and I remember when he was a toddler. He was a hot head and couldn't control his

> emotions. He had tantrums, cried all the time, and his whole face turned bright red.
>
> Cedric had trouble sitting still. When he was fidgety and got up, Geraldine popped him. Even after she popped him for getting up, he still continued to do it.
>
> I remember Cedric used to sit and rock back and forth a lot. To fall asleep, he used to bang his head against the couch or a pillow.
>
> Cedric did not follow directions well. Sometimes, Geraldine told him not to do something, disciplined him, and then he went back and did the same thing again. He continued to get in trouble for the same things over and over again.
>
> Cedric got in more trouble than the other kids at Geraldine's, so he was punished more than the other kids at her home.
>
> Geraldine punished Cedric by whipping him with a white extension cord. He was very young and small when Geraldine started disciplining him with the extension cord. I remember that when he sat on the couch his little legs couldn't reach the end of the seat.
>
> I think Cedric needed help when he was a little boy, but instead he got punished.

(Exh. 8 – Affidavit of Tammy Hall).

Although Geraldine Sanders was Cedric's primary caretaker up until the age of 5, there were also other family members who cared for young Cedric. Helen's paternal uncle, Sheridan Sanders, and his wife Marie were also called upon for babysitting duties. Cedric's brother Dwayne recalled:

> My parents both worked full-time, so soon after I was born they both returned to work and babysitters cared me for [sic]. When I was very young my family lived on the bottom floor of a two-flat and my great-uncle and his wife, Sheridan and Marie Sanders, and their adoptive daughter, Stephanie Rodriquez, lived above us. I remember Marie was cruel and verbally abusive to Stephanie. I remember Marie babysitting me and spanking me.



(Exh. 6- Affidavit of Dwayne Ricks).

Stephanie herself had a similar recollection of Marie and Sheridan:

> I lived with Sheridan and Marie from about 3rd grade until I left for college. When Cedric was very young, our families lived in two flat; my family lived upstairs and the Ricks lived downstairs.
> Marie was violent; she was emotionally and physically abusive to me. She was cold: she did not show any love or affection. Looking back as an adult, I think she was a very sick woman. Sheridan was not as violent as Marie, and there were times I felt warmth from him.
> Sometimes, when they were young and lived below us, Cedric and Dwayne came to my family's apartment. I think they may have spent the night a few times. I was in elementary school during the day, so I do not know how often they came over during the day.

(Exh. 7 – Affidavit of Stephanie Halverson).

Other members of the family noticed Marie's meanness as well.

Tammy Hall recalled:

> Sheridan Sanders, Geraldine's bother, was my great-grandfather. Sheridan's wife was Marie Sanders. Once I saw her beat down her adoptive daughter, Stephanie, for not making her bed how Marie liked. As a child, I remember felling scared of Marie. She was mean and cold. Her home was covered in plastic and no one was allowed to touch anything.

(Exh. 8 – Affidavit of Tammy Hall).

When Cedric started kindergarten, his older brother Dwayne – who was eight at the time – became his afterschool caretaker. Helen recalled:



> Cedric stopped going to Auntie Geraldine's home when he was 5 years because he started going to kindergarten. Cedric and Dwayne went to the same school, Burr Oak Elementary. Cedric was in kindergarten and Dwayne was 8 years old and in 2nd grade. The boys came home by themselves after school and Dwayne was in charge until Shederick and I got home from work.

(Exh. 3 – Affidavit of Helen Ricks).

The jury heard next to nothing about Geraldine and Booker and the apartment on S. Vernon or Cedric's other caretakers because the trial attorneys failed to discover these critical details. When they learned that Cedric was turned away from preschool because of his behavior problems, this should have operated as a big red flag that something was going on in Cedric's very early life. Cedric's father, Shederick Ricks related,

> I noticed something was different about Cedric, that he had some issues that weren't like other kids his age, when Helen and I tried to enroll him in daycare the daycare turned him away. The people at the daycare told us not to bring him back because they couldn't handle his behavior – he didn't listen, fought with other kids, and was unruly. Cedric went back to stay with Auntie Geraldine after daycare turned him away.

(Exh. 9 – Affidavit of Shederick Ricks).

## III. THE JURY NEVER HEARD DETAILS ABOUT CEDRIC'S BEHAVIOR PROBLEMS AS A YOUNG CHILD.



It seems clear that his behavior problems were evident from a very early age, but the jury learned very little about this. Helen and Shederick both testified that they didn't realize Cedric's problems were as bad as they were until he started school and the teachers began to complain. (XXXVIII R.R. at 117; XXXIX R.R. at 192). Although Helen and Shederick may not have realized the severity of Cedric's problems early on, there were numerous other witnesses who did. The jury should have heard from them.

Although Joseph Sanders did testify at trial, his punishment testimony was limited to Cedric's behavior as an adult after he had already moved to Texas. Had Joseph been asked about Cedric's childhood behavior he could have told the jury:

> From the time Cedric was a toddler, Helen said he was just bad and that she was praying for him. He ran around, didn't follow rules, and was a hard child to raise. Back then, we just thought a kid like that was bad. These days, the type of problems Cedric had would have signaled that he needed real help.
> Cedric was not able to slow down, and think things through like other people. From the time he was a little boy, he'd have an outburst or an episode and later realize what he did was wrong, but the same sort of outburst or episode still happened again. It seemed like he couldn't integrate what had happened before and learn from experience.

(Exh. 4 – Affidavit of Joseph Sanders).

Joseph's wife Deborah could have told the jury this:

> I remember Cedric when he was a toddler. He had a very short attention span and a temper. He ran around all over the place,

> fidgeted, couldn't sit still or stay in one place, and could not follow directions. Helen was exhausted taking care of him and it made me tired just watching him run around.
> I had daughters, so at first I thought Cedric might be different because he was a boy, but Dwayne didn't have problems like Cedric did. Then I thought, and hoped, that Cedric would grow out of his problems, but they actually got worse as he got older. It became clear he was not going to grow out of whatever was going on with him. He needed help. Helen tried to help Cedric, but she was at a loss for how to deal with him. Helen said he was just bad and that she was praying for him. If Cedric was a child nowadays, he would've been referred to treatment or counseling because something was clearly wrong, but back then he was just seen as a bad kid.

(Exh. 5 – Affidavit of Deborah Sanders).

Joseph and Deborah's daughter, Tamara Butts also could have told the jury about Cedric's early behavior. She recalled that:

> I remember when he was about 5, 6, and 7 years old. He was hyperactive and couldn't sit still. He also couldn't manage his emotions and got upset easily.
> Cedric was fearless as a little boy. Once we were at my great-grandmother's house and Cedric jumped off a high porch. Even as a kid, I knew that jumping off a high porch was dangerous and a bad idea, but Cedric didn't think things through like other kids his age. As a kid, and later as a teen and adult, it felt like Cedric was missing the part of the brain that tells you to slow down and think.

(Exh. 10 – Affidavit of Tamara Butts).

Cedric's reckless behavior was also noticed by Stephanie. She recalled:

> I am about 9-10 years older than Cedric. I remember when he was a toddler; he was fearless. When he was about 3 years old,

> we were on the second floor balcony and he climbed on top of the railing, stood up, and put his arms out and wanted to fly. I grabbed him and stopped him from jumping off.

(Exh. 7 – Affidavit of Stephanie Halverson).

## IV. THE JURY NEVER HEARD DETAILS ABOUT CEDRIC'S WHIPPINGS.

Cedric's seemingly constant behavioral problems led to frequent disciplinary measures. Geraldine Sanders was not the only one to whip Cedric with extension cords. Helen Ricks was the primary disciplinarian in the Ricks household. As Dwayne recalled:

> Our mother usually handled discipline when we were young. She whipped us with belts and extension cords. She used to take us into the bathroom and then lock the door so we couldn't get out. The whippings hurt so badly; I remember crying, screaming, and hitting the locked door to try and get out when she whipped us.
> When Cedric got whipped for doing something bad, two days later he did the same thing as before and got whipped again. The whippings didn't seem to make a difference with his behavior; he didn't learn from them.
> The whippings hurt Cedric too, but eventually, because he was getting in trouble and getting whipped so often, he just learned to take them. I remember once I did something and blamed it on Cedric; he didn't argue and just took the whipping.

(Exh. 6 – Affidavit of Dwayne Ricks).

Helen herself had this to say:

> With Cedric's ongoing behavior problems, I tried to discipline him many different ways. However, Cedric just didn't learn, no matter what I did. My mother and grandmother disciplined me with belts and switches, and sometimes my father hit me, so I used physical discipline with Cedric, too. When he was about 8-9 years old I started bringing him into the bathroom and whipping him with a belt. Sometimes when I was whipping Cedric, Shederick came in, said it was enough, and made me stop. This frustrated me because it felt like another way for Shederick to try and control me. I don't remember Cedric crying very much when I whipped him. I also tried other forms of discipline, like taking away TV or sports practice, but nothing I tried improved his behavior.

(Exh. 3 – Affidavit of Helen Ricks).

> Shederick recalled:
>
> Helen and I tried to handle Cedric's behavior problems with discipline. Helen was mostly in charge of the discipline; she usually used a belt and I usually hit Cedric with my hands. Helen wouldn't discipline Cedric for a few days, and then she'd snap and whip him for everything that happened over the course of a few days. I remember she would bring him into the bathroom, lock the door, and whip him with a belt. I remember hearing her list off all the bad things he did while she whipped him. Sometimes Cedric had the tub running and Helen came in and whipped him. Sometimes the whippings were really bad, and I came in and made Helen stop. When Cedric was little he cried when she beat him but as he got older he just took it. Sometimes I wonder if we were too tough on Cedric. I tried to raise Cedric the way I was raised, but Cedric was different than other kids and he was a hard child to raise. Helen and I felt ill equipped to raise him.
>
> Cedric started to run away to escape physical discipline at home. One time, when he was in elementary school, he jumped out of a first floor window in his underwear, which was probably a 5-6 foot drop, because I told him he was going to get a whooping. I searched for him and hours later found him hiding in a neighbor's garage, still just in his underwear.

(Exh. 9 – Affidavit of Shederick Ricks).

Tammy Hall and her mother were the neighbors who found Cedric in his underwear. She recalled, "My family and Cedric's family both lived in the same neighborhood in Calumet Park. When I was in high school, and Cedric was in elementary school, my mother and I found him hiding in our garage, wearing only a pair of white underwear." (Exh. 8 – Affidavit of Tammy Hall).

## V. THE JURY NEVER HEARD DETAILS ABOUT CEDRIC'S PROBLEMS IN SCHOOL.

Cedric's behavior was no better at school. He was a source of constant frustration to his teachers. His brother Dwayne recalled, "Cedric was in special education when he went to Burr Oak. I remember the special education teacher punished Cedric by putting him in a closet." (Exh. 7 – Affidavit of Dwayne Ricks). Throughout his school career, Cedric's teachers sent home notes and made phone calls to his parents about his problematic behavior. At trial, his mother Helen told the jury that she would go to work every day and pray that the school did not call – but they were always calling. (XXXIX R.R. at 198). She saved the letters and notes sent home by his teachers. Trial counsel attempted to show the jury some of these notes,

but the State's hearsay objections were sustained. (XXXIX R.R. at 205-212). His mother then testified to some of this information, but only in a very perfunctory way. (XXXIX R.R. at 213-214).

Mairead Burke summarized the information Helen should have told the jury:

> During first grade, Cedric's grades ranged from As to a D. His teacher noted he needed improvement: following directions, accepting responsibility, exercising self-control, observing school and classroom rules, working well with others, taking pride in work, respecting rights and property of others, and caring for books and materials. His teacher commented:
>
> *"I don't really know what to say about Cedric. I don't think I understand him. He doesn't seem to respond or react to anything. I think he is capable of more than he is producing. His written work is usually done well but he does not attend to or contribute to oral work...*
>
> *I continue to constantly battle for his attention here at school. He has some good days but the bad ones are still the majority. He's really rough on the other children-- not physically but with his comments and laughter...*
>
> *Cedric is certainly not working up to his potential. His listening and attending are so poor. He's so busy making noises and playing around that he isn't aware of what he's supposed to be doing. This is really hurting him academically...*
>
> *Cedric's behavior needs improvement. He is often inattentive and disruptive in class."* (Calumet Public Schools Dist132 progress notes. 1980-1987. rcvd from Helen and Shederick Ricks)

In 2nd grade Cedric's grades ranged from As to Ds. His problems persisted; his teacher noted he continued to need improvement: working well with others, following directions, exercising self-control, listening skills, using time wisely, and observing school and classroom rules (Calumet Public Schools Dist132 progress notes. 1980-1987. rcvd from Helen and Shederick Ricks). His teacher sent notes home to his parents updating them on his good days and bad days, and his teacher scheduled a weekly call with Helen to keep up on Cedric's behavior. Helen did not keep up the calls, however the teacher continued to send notes home. One note from a bad day described his problems at school:

*"Cedric has been acting out whenever I have to reprimand him. He is also bringing toys, like little cars, to play with during class. He makes noises, claps his hands + refuses to do his work. I wanted to tell you this all Friday but you didn't give me a call like you said you were going to do every Friday. As far as grade wise his only problem is a C- in Math and a lot of that is because he doesn't pay attention to directions. Please call this Friday."* (Young 2nd grade, Swanson, Madrigal notes. 1982 and undated. rcvd from Helen and Shederick Ricks)

In 3rd grade Cedric's problems at school continued. His grades dropped lower and ranged from Bs to a D. Like previous years, teachers continued to note he needed improvement behaviorally, specifically with listening, time management, self-control, following directions, and obeying rules. (Calumet Public Schools Dist 132 progress notes. 1980-1987. rcvd from Helen and Shederick Ricks)

In 4th grade Cedric's grades ranged from As to Fs. After years of ongoing behavior problems, he was referred to a special education classroom mid-year and his teacher recommended that he get counseling. (Calumet Public Schools Dist 132 progress notes. 1980-1987. rcvd from Helen and Shederick Ricks)....

In 5th grade Cedric's parents withdrew him from Burr Oak and enrolled him at Seven Holy Founders School, a local Catholic school.... There are no recorded grades from this year, but Cedric was recognized for his work at the science fair and received a Presidential Physical Fitness Award. He was suspended from school for two days for *"throwing snow and playing on the snow hill."* (Letter from Seven Holy Founders re CR suspension. 1985.1.31. rcvd from Helen and Shederick Ricks).

Cedric stayed at Seven Holy Founders for 6th grade, and his problems with academics and behavior continued. His grades ranged from an A to a D; teachers identified similar behavioral problems as his previous schools including: listening, following directions, taking initiative, working independently, heeding suggesting for improvement, and creating a pleasant learning atmosphere (Seven Holy Founders records. 1985-1986. rcvd from Helen and Shederick Ricks). He was suspended from school for one day for disrupting the class and showing disrespect (Letter from Seven Holy Founders re suspension. 1986.02.27. rcvd from Helen and Shederick Ricks). Cedric's teacher sent a note home about Cedric's problems paying attention and completing homework, and about his failing grades. In order to be promoted to 7th grade, Cedric was required to go to summer school and the teacher, like teachers before, recommended he get counseling (School letter re failure to pay attention and complete homework. undated. rcvd from Helen and Shederick Ricks).

Toward the end of his 6th grade year, Cedric was screened for a variety of problems at the Chicago Clinic for Child Development. The evaluators noted problems with math and auditory perception and recommended a comprehensive evaluation and 40 sessions of therapy (Chicago Clinic for Child Development screening summary. 1986.04.05. rcvd from Helen and Shederick Ricks). A few weeks later, the school sent a letter home alerting Helen and Shederick that Cedric could not return the following year if his behavior issues were not

professionally addressed. They required that he be tested at Mercy Hospital so the school could learn *"more specific strategies/interventions in order to be more effective..."* (Letter from Seven Holy Founders re evaluation at Mercy Hospital. 1986.05.13. rcvd from Helen and Shederick Ricks). Helen and Shederick complied with the school and took Cedric for testing. He received a psychological evaluation and the Ricks began parent counseling. Helen remembers a doctor recommended prescribing Ritalin to Cedric, however she objected and he did not start the medication. After a few months of treatment at Mercy Hospital, Helen and Shederick terminated treatment for unknown reasons. (Letter from Mercy Hospital School Consultation re terminating services. 1987.02.03. rcvd from Helen and Shederick Ricks).

After summer school, Cedric was promoted to 7th grade. He started the academic year at Seven Holy Founders, and his problems persisted. He struggled in the regular classroom; his grades ranged from As to an F and his behavior problems increased. Teachers noted he needed improvement: respecting authority, creating a pleasant learning atmosphere, coming prepared for class, accepting responsibility in independent activities, taking initiative, working independently, heeding suggestions for improvement, listening, applying concepts, showing sportsmanship, cooperating, and coming properly dressed for physical education (Ricks, Cedric. Archdiocese of Chicago Seven Holy Founders. rcvd 2015.06.06).

Cedric was referred for academic testing and was given the WISC-R. His verbal IQ score was 100, performance IQ score was 138, and Full Scale IQ score was 120. The tester noted:

*"... nails chewed; says he disturbs class; talking back; feet tapping; constant motion; doesn't hold pencil correctly... Cedric gets along best with mom. Mom hollers at me sometimes when I'm bad."* (WISC-R. 1986.12.22. rcvd from Helen and Shederick Ricks)....

> Mid-school-year in 7th grade, Cedric's parents withdrew him from Seven Holy Founders and enrolled him at Calumet School, a local public school. Cedric continued to receive special education services; his annual goal for the school year was *"to develop and reinforce basic social/emotional skills"* (IEP Instructional Objectives. 1986-1987. rcvd from Helen and Shederick Ricks). However, even with the additional special education support, Cedric's problems worsened. The principal sent letters home informing the Ricks of the seriousness of Cedric's academic problems. The final letter said:
>
> *"... we have found that a strong possibility exists that Cedric may fail the seventh grade. We are now passed the half-way point of the final quarter of the school term and we are greatly concerned about your child's placement for the 1987-1988 school term"* (Letter from Calumet Public Schools Dist 132 B Jumbeck re failing 7th grade. 1987.05.15. rcvd from Helen and Shederick Ricks).
>
> After the increase in the severity of Cedric's problems at Calumet School, the school district held a meeting and determined they could no longer meet his special education needs (Special education evaluation. 1987-1988. rcvd from Helen and Shederick Ricks). He was placed at Spaulding School, an out-of-district special education school specifically tailored to serve students with severe emotional and behavioral disorders.

(Exh. 2 – Affidavit of Mairead Burke).

None of Cedric's teachers were ever contacted by trial counsel so the jury never heard any first hand reports about Cedric's behavior at school. Sharon Speedwell, Cedric's 8th grade teacher and author of many notes to his parents, could have told the jury:

> My name is Sharon Speedwell. Cedric Ricks was an 8th grade student in my class at Spaulding School from 1987-1998 [sic]. I

taught special education for 23 years with the Eisenhower Cooperative and am now retired.

Spaulding School was a separate special education school for students with emotional and behavioral problems. Students went to Spaulding when their home school's special education program could not handle their emotional and behavioral issues. Their issues had to be pretty severe to go to Spaulding, as their home district paid for them to go out of district to the school. Spaulding was one of the most restrictive school environments available. The building that housed Spaulding only served students with severe emotional and behavioral disorders. The staff was specially trained and accredited to work with kids with intense emotional and behavioral issues.

My class was a self-contained special education class, which means I taught all subjects to my students and was with them all day. The school had a high adult/student ratio; there were usually 10-15 kids in the class and 3 adults, I taught with another teacher and we had a full-time aide. Spaulding was a small school with only a few kids from each grade, so the classes were mixed with kids from a few grades. In Cedric's class, for example, there were students from 6th, 7th, and 8th grade in one classroom.

Spaulding was a very intense program. Every child had an individual plan with a purpose, program, objectives, and rewards. I reviewed old notes and records from Cedric's time in my class; they refreshed my memory about the plan and supports we had in place for Cedric.

I reviewed Cedric's 10//13/1987 intervention plan (attachment 1). I remember Cedric's main problem was he could not handle being in the classroom, and I had to send him to the intervention area to calm down to a point where he could return to the classroom. Cedric struggled in the classroom because he had a hard time ignoring other people and was easily pulled into situations. When I noticed that Cedric was struggling, first, I tried to help him in the classroom with reminders about what he should be doing, a discussion, or some extra support. If he could not calm down and control his behavior, then he went to intervention. Intervention was a separate room outside the classroom where there were specially trained interventionists who worked one-on-one to help him calm down and get back in

the classroom. Cedric's goal was to have a maximum of one intervention in the morning and one intervention in the afternoon.

I reviewed the handwritten notes I sent home with Cedric (attachment 2). I remember that part of Cedric's plan was sending a note home everyday to his parents. The notes were brief because they were written at the end of the day before kids caught the bus. When a note said Cedric had a "good day" it meant he met the goal of having one or less interventions in the morning and one or less interventions in the afternoon. If a note said Cedric has a "difficult day" that meant he needed more time in intervention to get back in the classroom. There is one note that I wrote that Cedric had four interventions in one day; that would've been a difficult day for Cedric.

Cedric had rewards for meeting his goal and consequences for not meeting his goal. From the intervention plan (attachment 1), I remember if Cedric went over the allotted interventions he had to make up time in the quiet area carrel during his lunchtime or during his free time. His reward for meeting his goal was to play football. In one of my notes home I wrote, "Cedric had a great day! He earned football practice tonight."

I reviewed Cedric's Individual Education Program (IEP) Instruction Objectives from 1987-1988 (attachment 3). Cedric had three plans: two were academic plans and one was a non-academic behavioral plan. That Cedric had academic plans means that he was below grade level. The goal of his non-academic behavioral plan was to improve classroom behaviors. The objectives were to: 1) improve the ability to accept responsibility and consequences for his behaviors 50% of the time, 2) improve appropriate interactions with staff and peers 75% of the time, and 3) identify and express feelings appropriately at least 50% of the time. Those objectives illustrate that he had serious problems socially and emotionally.

In addition to the interventions, daily notes home, and detailed IEP, I met individually with Cedric once a week and the class had group therapy together once a week.

When I think of Cedric, I remember his smile. He had a sweet smile, but I think it was masking some of the issues he struggled with. I don't remember Cedric being aggressive or having to physically restrain him. There were some kids who

needed physical restraint every day; compared to those kids, Cedric was not as severe. However, Cedric needed to be at Spaulding and needed extra attention. At the beginning of the school year it felt like he tried to test me, see how far he could push, and how I would react. Over the course of the year, I felt like he began to trust me and connect with me. I saw him progress over the course of the year with the intensive special education programming Spaulding offered.
Cedric transferred to a regular education school after his 8th grade year at Spaulding. It was unusual for a student to go to Spaulding for just one year. It appears that Cedric's improvement with the intense programming, support, intervention, and resources at Spaulding led him to be transferred out of the school and back to a regular school for 9th grade.
The goal in special education is to give kids the opportunity to succeed in the least restrictive environment, but sometimes kids cannot handle a regular school and fail; it appears that was the case with Cedric. Cedric was the kind of kid that fell between the cracks. In a special education school he wasn't the most severe compared to his peers, and he may not have been seen severe enough to justify the extra cost of a special education school. In a regular school, he was too disordered and didn't have enough support and resources to succeed.

(Exh. 11 – Affidavit of Sharon Speedwell).

Mairead Burke continues:

Sharon's concern about Cedric's special education needs not being met in a regular school unfortunately became a reality. Cedric's upward trajectory from the intense special education environment at Spaulding was short-lived. He enrolled at Harold L. Richards High School for 9th grade, a regular school where he received special education services for his behavioral/emotional disorder and special classes for his mild cognitive impairment (Special education evaluation. 1988.05.10. rcvd from Helen and Shederick Ricks; Community 218 HS letter explaining records. 2013.09.17). Within two weeks he received his first referral to the Dean for *"silliness,*

*laughing, and lack of control"* that caused classroom disruption. Over the course of the year he received nine additional referrals for behavior including: dangerous running in the halls, eating candy without permission, not having his identification card, fighting, tardiness, cutting class, talking, horseplay, and attitude. He was suspended eleven days during the school year (Disciplinary referrals to dean and suspensions. 1988-1989. rcvd from Helen and Shederick Ricks). Despite the clear issues he had managing his emotions and behavior, additional special education resources for his emotional disorder were rejected (Special education evaluation. 1989.04.07. rcvd from Helen and Shederick Ricks).

Cedric continued at Harold L. Richards High School for 10th grade, and like all previous years, his behavioral and emotional problems persisted. As he got older, the seriousness of his problems escalated. Within a week of school starting, Cedric was referred to the Dean for disrespect and classroom disturbance. His teacher wrote:

*"Cannot stay in proper place. Roams from 1 line to another- is constantly talking- does not participate properly (& the exercises) Swings so hard with a golf club he broke it. I have spoken to him at least every day. He is a hazard to the class"* (Disciplinary referrals to dean and suspensions. 1988-1989. rcvd from Helen and Shederick Ricks).

He was referred to the office seven more times this year for behavior including skipping class, belligerence and yelling, insolence, and threats; and he was suspended for eight days total this school year. One teacher noted he was *"almost a daily behavior problem"* (Disciplinary referrals to dean and suspensions. 1988-1989. rcvd from Helen and Shederick Ricks). Despite the constant behavioral and emotional problems reported by teachers, Cedric remained in the same level of care for his severe emotional disorder.

Cedric was promoted to 11th grade and continued to struggle behaviorally, emotionally, and academically at Harold L. Richards High School with the same level of special education

services. His grades ranged from Bs to Fs, and through the course of the year he was referred to the office four times, and suspended for eight days (Harold L Richards records. 2013.09.19). Like 10th grade, teachers continued to report serious concerns about Cedric's daily behavior. A teacher at the school wrote in her referral:

*"First of all, Cedrick [sic] is not in my class, yet everyday he is in the theatre with Tina. I am constantly kicking him out, breaking up their fights, following them into the hall, watching him sneak in from every door in the theatre. Today, he was chasing her around the theatre at a dangerous rate of speed knocking down microphones, lighting equipment, etc. When told to leave he continued to fool with Tina until a student told him to leave so he wouldn't get in more trouble. This is an everyday occurrence and is getting worse!"* (Disciplinary referrals and suspensions. 1990-1991. rcvd from Helen and Shederick Ricks).

After additional reports were made about his *"loud and boisterous behavior"* and issues with Tina, a multidisciplinary conference was held about how to meet Cedric's special education needs. The district determined that Cedric's chronic and severe emotional disturbance was too severe to be met by a district or co-op program. They recommended Cedric finish the year at a therapeutic day school, *"a more restrictive environment for students with behavior/emotional disorders,"* where he could receive adaptive physical education, a weekly psychologist consult, weekly social worker direct services, transitional services, and special vehicle transportation. Cedric's parents were invited to the meeting, but did not attend. Helen and Shederick informed the school they did not support the school's recommendation for a special education school (Special education evaluation. 1991.02.15. rcvd from Helen and Shederick Ricks; Special education evaluation. transfer to Independence HS. 1991.03.12. rcvd from Helen and Shederick Ricks). Consequently, Cedric stayed at Harold L. Richards High School, where it was established he could not function successfully.

One month after the Cedric's parents denied the new special education placement, another multidisciplinary conference was held.  The representatives from the school and district noted Cedric's behavior was getting worse and he was failing his regular education classes:

*"Discussed staff recommendations for alternative programming and concerns with escalating behaviors. He is very manipulative of staff and failing mainstream classes. Discussed problems of BD [behavioral disorder] instructional program at Richards. Dist 218 is ready to place Cedric at Independence HS [therapeutic day school]. Parents not supportive of referral and placement. In the remainder of the year, Cedric will be placed in the BD Instructional program; attempt to schedule condensed day periods 1 thru 5 if possible. Parents understand Cedric will be liable for natural consequences of his behavior"* (Special education evaluation. 1991.04.12. rcvd from Helen and Shederick Ricks).
....

In August 1991 Cedric returned to Harold L. Richards High School for his senior year. At the beginning of the year another multidisciplinary conference was held to review his special education services. For the third time, faculty and staff found that the school could not meet Cedric's needs:

*"BD [behavior disordered] Program at Richards HS rejected. BD resource program does not meet the kind of behavioral needs evidenced. A change in total school environment best meets his needs. Staff discussed concern for Cedric's history of disruptive behavior. Also concerned for his aggressive behavior. An alternative placement is being considered to meet his behavioral needs. Staff consensus is continued placement at R.C. as scheduled with the contingency for an immediate alternative placement following any instance of aggressive behavior or gross insubordination toward staff. We will plan on a monthly meeting to discuss progress. Counseling services will be made available in school. Cedric has an understanding of the natural consequences of his acts or their acts violate or conform to school rules. ADDENDUM The school district is requesting parental involvement in monthly meetings held with*

*Cedric. The school district will also be available to consult with the family's private therapist on Cedric's behalf* " (Special education evaluation. 1991.08.28. rcvd from Helen and Shederick Ricks; 1991.08.28 IEP addendum from W Kopec. rcvd from Helen and Shederick Ricks).

....

[Finally] HL Richards refused to keep Cedric and insisted he be placed at a more restrictive school environment, like they had recommended for the past 7 months. They recommend that he be tutored at home pending placement at a therapeutic day school.

*"Referrals will be made to alternate day schools programs appropriate for BD/ED [behaviorally disordered/emotionally disordered] students. Cedric is considered to be a threat to others in his current school, and is recommended to be tutored pending his placement"* (Special education evaluation. 1991.09.20. rcvd from Helen and Shederick Ricks).

....

Cedric enrolled in Christ Hospital's School Program during the months he received inpatient and outpatient care at the hospital. He received some academic testing at the school. He was given the Diagnostic Achievement Test for Adolescents (DATA) in reading comprehension only, and the Wide Range Achievement Test- Revised (WRAT-R). In Reading Recognition/Word Identification he scored in the 66th percentile, grade equivalent 12+. In Reading Comprehension he scored in the 63rd percentile. In Spelling Recall he scored in the 53rd percentile, grade equivalent 11E. In Mathematics he scored in the 27th percentile, grade equivalent 9B. For accuracy he received an A and B grades, for effort he received C grades. His teacher noted:

*"Academically Cedric is a bright student who can handle the demands of regular education coursework with the exception of math work. Math is an area of relative weakness according to test results. Overall basic skills are adequate to good. Behaviorally Cedric demonstrated great difficulty responding appropriately to authority and working independently. Cedric was initially resistant to most tasks and often complained about*

*his workload. On occasion he refused to work and made rude, sarcastic comments to teachers. Positively noted, Cedric demonstrated the discipline to complete approximately 75% of his assigned work. Working independently was problematic for Cedric as he constantly sought attention from females and staff. It was observed that Cedric was not comfortable sitting alone. Discharge recommendations: Cedric's behavior and performance improved within the presence of strict structure and limits. It is recommended by this writer that Cedric be enrolled in a therapeutic day school given his previous school behavior record. This recommendation is supported by Cedric's physician."* (Christ Hospital School records, rcvd from Helen and Shederick Ricks)

Upon discharge from Christ Hospital School Program, the school district reviewed Cedric's special education services:

*"Recommendations are that a therapeutic day program is the least restrictive appropriate special education placement. Cedric will be placed at McKinley Libra School for the remainder of the 91-92 school year"* (Special education evaluation. 1992.01.06. rcvd from Helen and Shederick Ricks).

(Exh. 2 – Affidavit of Mairead Burke).

After Cedric's admission to Christ Hospital, he withdrew from Harold L. Richards High School and was enrolled in McKinley Libra School.

McKinley Libra School was a special education therapeutic day school for students with behavioral disorders, emotional disturbances, and learning disabilities.

Students came to McKinley Libra School because their home public schools could not provide the resources to meet their special needs. The school usually had about 70 students total; there were no more than 10 students per classroom.

When a student graduated from McKinley Libra School, their home school issued a diploma in addition to McKinley Libra School's diploma so the stigma of attending a special education school would not follow the student.

(Exh. 12- Affidavit of Donna Ree).

## VI. THE JURY NEVER HEARD DETAILS ABOUT CEDRIC'S BEHAVIOR PROBLEMS AS A TEEN.

Cedric's behavior problems continued unabated in his teenage years but the jury heard only the barest details. His brother Dwayne told the jury that he and Cedric once had a "drag out fight" but was never asked to explain why. He could have told the jury:

> Cedric and I had a fight at our aunt and uncle's house when I was about 17 or 18 years old and he was about 14 or 15 years old. I was talking with our cousin Tamara, and out of nowhere he jumped on me and started fighting me. He was convinced that I was talking badly about him and he freaked out.

(Exh. 6 – Affidavit of Dwayne Ricks). Tamara recalled:

> Cedric was paranoid at times. He thought people were against him and had it out for him. Once when we were teenagers, Cedric, Dwayne, and I were hanging out together and Cedric left to another room. When he came back, he was convinced that Dwayne had said something about him, and jumped on him and started fighting him.

(Exh. – 10 – Affidavit of Tamara Butts).

There were also mood swings which the jury never heard about. His father Shederick could have told the jury:

> When Cedric got older I noticed he became very emotional and moody – it was like Cedric had two sides. Sometimes he was upbeat and the nicest guy in the world and then there was the

> other side where he was irritable, defensive, edgy, and anything could set him off. He was tightly would and always ready to spring. His big mood swings started to happen when he was in high school. It seemed like his problems became worse when he started having dating relationships with girls.
> Cedric had an outburst about every two or three weeks. There were times that he knocked things off tables, and once he pulled a phone off the wall which left hole in the wall. Cedric was remorseful after he had an episode, and he felt bad for disappointing people. However, a few days or weeks later he'd have an outburst again. It was like he wasn't learning or he couldn't stop himself once he was set off. He got caught up and didn't think things through, plan, or think rationally.

(Exh. 9 – Affidavit of Shederick Ricks).

Helen told the jury that they finally admitted Cedric to Christ Hospital for inpatient psychiatric treatment, but she never related the incident that precipitated that admission. She recalls:

> Cedric's behavior problem got worse as he got older. He had episodes as a teenager where he knocked things off tables and once put a hole in the wall. Once, soon before I admitted him to the psychiatric hospital, he had an episode at home where I called the police because his behavior was so out of control.

(Exh. 3 – Affidavit of Helen Ricks). She further described the incident in a letter to her husband dated September 22, 1991:

> ...When Cedric and I got home from Church, he was downstairs and I picked up the phone, he was talking to Tina, he heard me pick up. So I went downstairs and started to tell him how your father had just talked to him about talking to Tina and he said that was the first he had talked to her, and I told him he was lying and that I was going to tell you about it. Well, he told me I wish you would stay the hell out of his business, that I don't know what the hell I'm talking about.

> Then he started shouting and screaming how he is just sick of me and this house, so he started ranting and raving and hitting things. He knocked the poles a loose on the steps and then he took one pole and hit the cocktail table as hard as he could. So I picked up one of the sticks trying to stop him and he pushed me and hit me on the leg all the while pushing me and shoving me. He was swinging the stick as hard as he could. So I told him that he couldn't stay here and want to fight me. I told him to leave, and he said he didn't have to leave. So I told him I was going to call the police and each time I tried to dial the police he would pull the phone off the wall and tell me what he wasn't going to do. So finally I went upstairs and locked the bedroom door and called the police. When the police came he went out the back door. After the police left, he came back but I wouldn't let him in. He went from window to window saying he wanted to talk to me but I told him I wouldn't let him in as long as you weren't here. I hate bothering you with this but he can't stay here and have me be afraid to say anything to him. If he can't abide by the rules, he has to go, it doesn't make sense for us to be tussling and fighting in this house. He is supposed to do what I say regardless whether he thinks I'm right or not. And you know yourself I will bend over backwards for all of you, all I ask is for some respect. I shouldn't have to tell you everything, I am supposed to enforce these rules that are set down for our home. You shouldn't have to go to work, bowling etc, and have to worry about us in the home. I'm not trying to worry you but he cannot stay here and not obey me when you're not here. He called a few times for me to let him in, but I didn't let him in. He doesn't have a key, nor did he take any clothes. I told him that he had to talk to you before anything is decided.

(Exh. 20- Letter from Helen to Shederick dated Sept. 22, 1991). Helen later explained:

> Cedric's problems escalated in his senior year of high school. I didn't know what else to do but to admit him to a psychiatric hospital. Cedric spent a month inpatient at Christ Hospital. When he was discharged he had a prescription for lithium. I



> remember finding the medication in the trash; he didn't take it because he didn't like how it made him feel. I tried to tell Cedric that he needed help and needed to take the medication, but I was unable to convince him to continue taking it.

(Exh. 3 – Affidavit of Helen Ricks).

## VII. THE JURY NEVER HEARD DETAILS OF CEDRIC'S CONTINUED BEHAVIORAL PROBLEMS AS AN ADULT.

Cedric's behavior continued to be problematic into adulthood. While the jury heard about Cedric's arrests and run-ins with the law, they never heard from witnesses who continued to notice signs of mental illness in Cedric, particularly his mood swings. Tamara Butts could have told the jury:

> Cedric has mood swings. When he lived with me for a few months in Texas I noticed the ups and downs. He was up more often than he was down. When he was depressed he seemed sad and withdrawn; he'd spend the whole day in his room. At one point before the incident, I was concerned he was suicidal because he was so down and he said he didn't know if he could keep going. When Cedric was up he was hilarious, the life of the party, over the top, and very intense. When he was up he thought he was the best at everything and openly talked about being the best.
> Cedric was paranoid at times....Another time, when he was living with me in Texas, he almost started a fight with a neighbor because he was convinced the neighbor was looking at him. I knew the neighbor, he was a friend of mine, and he was not doing anything out of the ordinary, but Cedric was convinced the man had a problem with him and was going to do something bad.

(Exh. 10 – Affidavit of Tamara Butts).

His uncle Joseph also noticed Cedric's mood swings and impulsive behavior. He recalled:

> Cedric didn't think thing through and wasn't good at planning. When he did try to be clever or sly, his ideas were poorly planned and fell apart easily. He thought more like a naïve teenager than like an adult. For example, when he came to stay with us in Texas he brought his car from Illinois. He thought that because he was moving states, the bill collector wouldn't know he was in Texas, and he could stop making payments and just keep the car. He didn't understand that there was plenty of information that showed he was living in Texas, and a bill collector could easily locate him. When the bill collector did finally come to collect, Cedric had spent all of his money on other things.
>
> ....
>
> I noticed that Cedric had mood swings when he lived with us. When he was depressed his mood seemed low and he was quiet. When he was up he seemed irritable and he could not handle being overwhelmed."
>
> (Exh. 4 – Affidavit of Joseph Sanders).

## VIII. THE JURY NEVER HEARD ABOUT CEDRIC'S FAMILY HISTORY OF MENTAL ILLNESS.

The jury never heard from Cedric's maternal grandmother, Christine Sudduth. She could have told about the early history of the Sanders' family who were originally from Kosciusko, Mississippi. There they farmed and worked in the fields. As she tells it, "We made our own clothes, canned our

own food, and lived off the land. We learned to cook hog feet and liver because those were the parts of the pig that were usually given away. We learned to treat sickness with home remedies, like onion tea, goose grease, and turpentine." Her mother's father, Charlie Peteet was the backbone of the family. But "he drank a lot, and sometimes fell off his horse because he was too drunk." Ms. Sudduth also revealed that one of her brothers, Robert "Mike" Sudduth suffered from probable mental illness. As she described it, "he had problems with his nerves and had a breakdown. He was not very talkative, and he used to pick at his ears and say something was in them when I could see there wasn't anything there." (Exh. 13 – Affidavit of Christine Sudduth).

However, Robert "Mike" Sudduth was not the only family member that suffered from mental illness. Cedric's brother Dwayne stated, "I've also had struggled [sic] with my mental health. I attempted suicide in 2012, got mental health care, and was diagnosed with bipolar disorder". (Exh. 6 – Affidavit of Dwayne Ricks). Cedric's mother, Helen Ricks also admitted to being treated for depression. (Exh. 3 – Affidavit of Helen Ricks).

This family background information was important to a complete and constitutional mitigation investigation in a capital case. As stated in the Commentary to Guideline 10.7 in the American Bar Association's

Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (2003), reprinted in, 31 Hofstra L. Rev. 913, 1025, "A multi-generational investigation extending as far as possible vertically and horizontally frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment."

## IX. THE JURY HEARD NOTHING ABOUT THE NEIGHBORHOODS WHERE CEDRIC LIVED BEFORE CALUMET PARK.

There were also other risk factors impacting Cedric's early life which the jury never heard about. When Cedric was born the family lived at 7755 South Evans Avenue in Chicago. A few months after his birth, the family moved to 6850 South Wood Street, also in Chicago. Then in 1976, the family moved to 12341 South Bishop Street in Calumet Park – otherwise known as "utopia". Even after moving to "utopia", young Cedric was still spending the majority of his time at Geraldine's 6202 S. Vernon Ave. apartment. (Exh. 3 – Affidavit of Helen Ricks).

Amy Nguyen is a Geographic Information Systems (GIS) Analyst specializing in capital sentencing mitigation maps. (See Exh. 14 –

Curriculum Vitae of Amy Brown Nguyen). She uses census and other available data to map community risk factors identified by the United States Department of Justice for predicting violence. (Exh. 15 – J. David Hawkins et al., U.S. Dep't of Justice, Predictors of Youth Violence (2000)). Ms. Nguyen analyzed and mapped the various risk factors associated with the places young Cedric lived and spent time. She noted the following:

> As an infant, the first address where Mr. Ricks lived was in the Greater Grand Crossing neighborhood of Chicago on 7755 South Evans Avenue. The area was predominantly African American at 98.24%. Single mother families made up 19.21% of all families in his home census tract which was 21% higher than the Cook County Average of 15.85%. Education in this tract was the same as the county average, with 32.53% of adults age 25+ having less than a 9th grade education. This was the same as the Cook County average.
> When analyzing adults age 25+ with no diploma or GED the home tract was higher than the county average by 9%. Poverty was not a concern in this tract with an average of 9.22% of families living at or below poverty, which was lower than the Cook county average of 10.54%, however it is important to note the family only lived here for a few months before moving.
> When Mr. Ricks was only a few months old the family moved to the West Englewood neighborhood on the west side of Chicago and lived at 6850 South Woods Street for two years. This area had an African American population of 1.86% in 1970 but by the 1980 Census the neighborhood was predominately African American. Single mother families – at 17.07% - were higher by 8% than the Cook County average of 15.85%. Adults age 25+ with less than a 9th grade education averaged almost 40% which was 20% higher than the Cook County average. Adults age 25+ with no diploma or GED averaged 21.21% which was also 20% higher than the Cook County average. Families living at or below poverty averaged

> 13.85% in this tract, which was 31% higher than the Cook County average of 10.54%.
> In addition to the two addresses above Mr. Ricks also spent a great deal of time at this babysitter's house – Ms. Geraldine Sanders, who lived in the West Woodlawn neighborhood at 6202 South Vernon Avenue, about three miles east of his home at 6850 South Woods. This area was 99% African American. Single mother families were 74% higher here than the Cook County average. Adults with less than a 9th grade education averaged 42.05% which was 29% higher than the county average of 32.53%.

(Exh. 16 – Affidavit of Amy Brown Nguyen and attached maps).

Ms. Nguyen also looked at violent crime data for Cedric's neighborhoods and found this:

> Between 1965 and 1995 there were 19,693 homicides in Chicago. An analysis of this data showed that the South Evans area was 13th highest (1,091 homicides) of 28 districts. The South Woods area was 3rd highest (2,343) and the babysitter's location was 5th highest (1,880).

(Exh. 16 – Affidavit of Amy Brown Nguyen and attached maps).

In fact, the homicidal violence in Geraldine's neighborhood hit very close to home. In 1977, an 11-year-old girl who lived above Geraldine and Booker was found murdered, strangled and naked in her bed. (Exh. 18 – Homicide Report for Melanie Brown dated May 13, 1977; Exh. 19 - Newspaper article "South Side girl found strangled"). This violence did not go unnoticed by the children in Geraldine's care. Tammy Hall recalled, "Geraldine lived on the

second floor of a three-floor apartment building on S. Vernon Avenue in Chicago. At some point, the little girl who lived above her in the building was raped and murdered." (Exh. 8 – Affidavit of Tammy Hall).

## X. THE JURY NEVER HEARD ABOUT POTENTIAL LEAD EXPOSURE IN CEDRIC'S NEIGHBORHOODS.

However, violent crime was not the only risk factor associated with Cedric's early addresses. Amy Nguyen also found:

> An additional concern for Mr. Ricks' family was lead exposure. Homes built prior to the 1970s are at higher risk for lead. The average median year homes were built in the South Evans neighborhood was 1939, South Woods median home age was 1959 as well as the home of Geraldine Sanders and the family home in Calumet Park. The City of Chicago Department of Public Health published lead poisoning data in 2008 which was used to make the lead exposure map....The neighborhood encompassing the South Evans address showed 31.7% of children had blood lead levels higher than 10 mcg/dL (micrograms per deciliter), only eleven districts scored higher. The West Englewood neighborhood (South Woods address) was the 4th worst of 77 testing areas, and the Woodlawn neighborhood where the babysitter lived was 9th highest in lead exposure. While Mr. Ricks was well into adulthood by the time the study was conducted, the incidences of high lead levels would have been even higher in the 1970s and 1980s when less abatement work had been done. It should be noted that since the initial data was reported the Centers for Disease Control (CDC) has subsequently lowered the blood lead level of concern from 10 mcg/dL to 5 mcg/dL. The CDC now says there is no safe blood lead level.

> While Calumet Park address was outside the study area, there was also concern here as well. In 1999 the United State [sic] Environment Protection Agency (EPA) declared a 5 acre site roughly 8/10th of a mile northeast of the Ricks home on South Bishop a superfund site. This site was a paint manufacturing plant from 1894 to 1980 and manufactured lead paint. Lead and other heavy metals were detected in the air and soil on-site and in surface soils and on residential streets offsite near the complex, which was unfenced. During demolition of one of the buildings on-site high levels of lead and asbestos were detected and demolition work ceased as the actions posed a hazard to the area around site. The Chicago Department of Public Health notified the EPA and testing in and around the site began. Of the 200 houses tested in the neighborhood 78 came back with high levels of lead. Children often cut through the site to get to the nearest school bus stop. Additionally, during demolition three male salvage workers, three of their children, two former Dutch Boy employees, and a teenage girl who lived near the site were diagnosed with lead poisoning between 1985 and 1986).

(Exh. 16 – Affidavit of Amy Brown Nguyen and attached maps (citations omitted); Exh. 17 - Chicago Department of Public Health lead poisoning data).

Dr. Felicia Rabito, an epidemiologist with expertise in lead exposure explains the significance of childhood lead exposure as follows: (Exh. 21 – Curriculum Vitae of Dr. Felica Rabito).

> Lead is a known environmental toxin which can effect multiple organ systems and is a particular threat to the neurocognitive and behavioral health of low-income children in the U.S. Unlike many environmental hazards that are of public health concern, and for which toxicity and epidemiologic studies are still underway (e.g. phthalates, volatile organic compounds), lead's toxicity has been known for centuries and in modern

times has been proven in both animal and human models. As a point of reference, exposure to leaded paint in the home was identified in 1892 as a source of lead poisoning for children and as early as 1943 the first reports of an association with neurocognitive impairment and behavioral disorders were published. When tetraethyl lead was added as an anti-knock agent to gasoline in the early 1920s, the public health community warned that massive environmental contamination of urban centers and subsequent lead poisoning of populations was a likely consequence. Since that time, research has coalesced on the primary exposure sources and pathways, populations at risk, human reference values for blood lead concentration, and the consequences of lead exposure over the life course. Public health efforts are currently focused on the primary prevention of exposure in order to avoid the numerous adverse health effects associated with lead.

Exposure Sources. Lead is a natural component of the earth's crust. In its natural state it is essentially immobile. The human body has no need for lead and it is toxic to most organ systems at a range of exposure levels starting at levels as low as 2 µg/dL. Lead was one of the earliest metals discovered by man and has been mined for industrial use for centuries; the oldest lead artifact is estimated to be 6,000 years old. Despite evidence of its toxic nature, lead has been extensively used due to properties including a low melting point, resistance to corrosion, and easy workability. By the 20th century, the U.S. was the world's leading producer and consumer of refined lead. It has been widely used in many industries including automotive and paint, ceramics and plastics. Human exposure occurs through various sources including leaded gasoline, industrial processes such as lead smelting and coal combustion, lead-based paints, lead containing pipes and/or lead-based solder in water supply systems, battery recycling, grids and bearings. The non-biodegradable nature of lead is the prime reason for its prolonged persistence in the environment.

The primary source of childhood lead exposure in the U.S. today is lead-based paint in residential settings, especially in homes built prior to 1950 before the amount of lead allowed in paint was regulated. Prior to 1940, paints contained high levels of lead. In the 1950s federal regulations were enacted to lower

the permissible amount of lead allowed in paint. In 1978, federal regulations were enacted that banned lead in residential paints. Therefore, homes built prior to 1978 may have lead-based paint hazards and homes built prior to 1950 likely have high concentrations of lead. Intact lead does not pose an immediate health hazard, it is the deterioration of leaded paint that poses a health risk along with renovation activities that disturb lead-based paint and that are performed without using lead-safe practices. Dry sanding of old homes painted with lead creates massive amounts of lead-laden dust that persist in the environment. Renovation and gentrification of inner cities pose a new hazard for urban residents. Given this history, it is clear why the major risk factor for elevated blood lead in the U.S. today is living in substandard housing built prior to 1950. There are, however, other sources of lead hazards, most notably, lead in water is an important exposure source for communities with lead in their water distribution system.

Children are at highest risk of lead exposure due to the ingestion of lead contaminated dust from lead-based paint in the home. Lead that is peeling or caulking, or on windows can easily be ground up into particles that become airborne. Lead particles quickly settle. They cannot be seen and are difficult to completely clean up. Therefore, children are routinely exposed through normal hand-to-mouth behavior as contaminated dust settles on floors, on their toys, and on items they put into their mouths. Lead contaminated soil around the home is another important exposure source. Soil becomes contaminated because of the deterioration of external paint that is peeling or flaking. Contamination can also occur from repainting or renovation of old structures or because the home is located near a thoroughfare where contamination is the result of emissions of cars that used leaded gasoline. Lead was banned as a gasoline additive in 1986 but persists in the environment today and is a reservoir for continued exposure. Contaminated soil is an additional exposure source because children ingest contaminated soil during routine play activities. Lead laden soil is also tracked into the home by people and pets adding to the lead burden in the home.

Population at highest risk. Children less than 72 months of age are at greatest risk for both lead exposure and for lead's adverse

health effects. There are several factors that put them at greatest risk. First, as a result of normal hand to mouth behavior, as described above, they ingest lead contaminated dust and soil to a greater degree than adolescents or adults. Secondly young children absorb a higher fraction of lead into the gastrointestinal tract. It is estimated that children absorb approximately 40-50% of ingested lead and adults 3 – 10%. Finally, lead's neurotoxic effects are enhanced because of its ability to substitute for calcium ions which allows lead to pass through the developing blood/brain barrier.

Although all children living in older housing are at risk, low income, minority children living in inner cities of the U.S. are at greatest risk of elevated blood lead. There are profound racial and ethnic disparities in lead exposure and blood lead levels. The percentage of non-Hispanic black children estimated to have blood lead levels ≥ 5µg/dL is 5.6% versus 2.4% for non-Hispanic white children. The percent of poor children is estimated to be 4.4% versus 1.2% of non-poor children. Poor children more often live in substandard homes with excessive lead hazards. Living in deteriorating housing is known to be a significant driver of the disparities in lead exposure. Another reason children reared in impoverished households are at greatest risk for lead's adverse effects is the role that environment plays in the course of disease. Experimental studies in animal models show that being reared in a stimulating environment can reduce the severity of lead-associated deficits and being reared in a stressful environment can exacerbate lead-associated deficits. Epidemiological studies suggest that the characteristics of the rearing environment might also influence the outcomes of lead-exposed children. The failure to take into account factors that affect the severity and form in which lead toxicity is expressed could explain the large inter-individual variability in observed outcomes.

<u>Health effects and blood lead level of concern</u>. The health problems associated with lead exposure are well documented and occur over a range of exposures and have been widely studied. Lead negatively impacts multiple organ systems and effects occur throughout the life course. Lead is a known neurotoxin and for children, the most important and most

immediate concern is neurologic insult leading to behavior and learning problems, lower IQ and hyperactivity. The blood lead value is the most common biomarker of lead exposure. Lead has a half-life in blood of approximately 27-45 days and as such, is a biomarker only of recent lead exposure. The major storage site for lead is in bone where the half-life is 30 years. Bone lead level is a maker of a person's total lead burden. Lead can be mobilized from the bone into the bloodstream at any time, therefore, lead in the bone is a reservoir of exposure throughout life. Childhood lead exposure is known to impact adult health through this process, particularly in times when the body requires calcium, and has been linked to hypertension, renal effects, and reproductive outcomes primarily through mobilization of bone lead store. Maternal blood lead crosses the placenta and is a source of lead exposure to the developing fetus.

Considerable research has focused on identifying "safe" levels lead in the human body. Over the years, as research on lead's deleterious effects has emerged, the Centers for Disease Control and Prevention (CDC) has responded by lowering the acceptable, or threshold, blood lead level. From 1960 to 1990, the designated blood lead level of concern was incrementally lowered by the CDC from 60 µg/dL, a level often associated with symptomatic lead toxicity, to 10 µg/dL in 1991. The notion of a threshold level of lead exposure, the level below which no adverse effects are expected, was dismissed by the CDC in 2012 because they concluded there is sufficient evidence that there is no safe level of lead in the human body and it is widely accepted that adverse effects occur at levels below 5 µg/dL.

The developing brain of young children is supremely vulnerable to the toxic effects of lead. Lead exposure can have a devastating effect on the growth and development of young children. Lead-associated deficits have been reported in most domains of function, including verbal IQ, performance IQ, academic skills such as reading and mathematics, visual/spatial skills, problem-solving skills, executive functions, fine and gross motor skills, and memory and language skills. These effects occur even at low doses of exposure and after controlling for other factors known to influence neurocognition

including maternal IQ, birth weight, pre-term birth, maternal education, measures of the quality of emotional and cognitive stimulation in the home, and sociodemographic variables. Chronic exposure, or mean lifetime blood lead is a predictor of IQ in older children. Therefore, the effects of lead exposure during childhood on neurocognition, even at low levels, persists throughout life. Proposed mechanisms for toxicity involve fundamental biochemical processes. These include lead's ability to inhibit or mimic the actions of calcium (which can affect calcium-dependent or related processes) and through oxidative stress.

Lead's ability to impact behavior has been suggested for decades. A body of scientific evidence has now established that lead's insult to the developing brain affects behavior control as well as cognition and that lead exposure results in antisocial behavior. The evidence is based on data compiled from many different studies, using different study designs, in different geographic regions and populations. The disparities in lead exposure reflected in higher mean blood lead levels in minority children compared to white children likely reflects disparities in poverty rates in the inner-city. Similarly, the effect of lead exposure on children's achievement and behavior are amplified in children from low-income families and communities.

Conclusion: The adverse effects of lead exposure on the health of children and adults throughout the life course is well documented. Recent advances in our understanding of the biologic mechanisms underpinning lead toxicity may eventually lead to remedies, however, the effects of lead exposure are currently irreversible. Lead impacts multiple organ systems but it is lead's impact on the neurodevelopment of a child with consequent negative effect on intellectual and academic achievement and the promotion of antisocial behavior that is the most important concern of the public health community. Primary prevention of exposure to lead is an urgent child health issue. With the continued deterioration of inner-city structures and concerns about the possible contamination of the water supply in older communities, excessive exposure to lead hazards will continue to be an issue for inner-city communities in the U.S.

(Exh. 22 – Affidavit of Dr. Felicia Rabito (footnotes omitted)).

## XI. THE JURY NEVER HEARD ANYONE EXPLAIN THE PSYCHOLOGICAL SIGNIFICANCE OF CEDRIC'S LIFE EXPERIENCES.

Not only did the jury not hear about many aspects of Cedric's early life, no one explained why these things were significant to Cedric's psychological makeup and development. In post-conviction, Dr. Joann Murphey, a psychologist with significant forensic experience, examined the psycho-social history compiled by Mairead Burke and provided a report explaining why these things mattered. (Exh. 23 – Curriculum Vitae of Joann Murphey; Exh. 24 – Affidavit of Dr. Joann Murphey). She stated:

> A complex of influences shown in this record could have contributed to the inexplicable and inexplicably brutal killings for which Cedric now faces punishment. While it is possible to highlight these influences, it is beyond the scope of psychological science to extract inferences about how they might have interacted in contributing to particular behaviors. The potential influences that appear hypothetically from the available record will be discussed separately.
>
> Hypothetically Cedric could have been affected to some extent initially by his mother's alcohol use during the pregnancy. While not described as a full-blown alcoholic, Helen's reported regular episodes of binge drinking are a concern. No school professional who worked with or evaluated Cedric suspected Fetal Alcohol Syndrome (FAS). However, FAS is not the only

possible consequence of a mother bingeing on alcohol during pregnancy.

A condition known as Alcohol Related Neuro-developmental Disorder (ARND) has been reported in the professional research literature. While no particular amount of alcohol consumption necessarily results in ARND owing to individual circumstances surrounding the mother's drinking, alcohol consumption during the first trimester can be particularly damaging because that period is when the infant's brain begins developing. The fetus at that stage tends to receive a high concentration of alcohol through the mother's blood stream and to retain alcohol concentrations longer than in the mother's system. Behavioral indicators for ARND may include behavior and/or cognitive abnormalities inconsistent with typical development, such as learning difficulties, school problems, poor impulse control, social problems, deficits in higher-level language skills and cognitive/ abstracting ability, specific deficits in math skills, and/or problems with memory, attention, or judgment.  Several such problems are prominently reported in the school records in this case.

Generally ARND is not considered where behavioral or cognitive anomalies are better explained by some other condition. Other conditions will be discussed that could hypothetically contribute to the sort of behavioral and emotional anomalies exhibited by persons like Cedric. What is most persuasive for the existence of ARND under this set of hypothetical facts is the record of a math disability, and an astronomical 38-point discrepancy between verbal and non-verbal abilities on IQ testing - a level of discrepancy that ordinarily would require further school evaluation for a potential neuro-developmental disability. No such follow-up evaluation is reported to have taken place. Medication for hyperactivity and distractibility reportedly was suggested to Cedric's parents but never used insofar as the record discloses. The undersigned considers it likely that ARND was a contributing factor to early behavioral and academic problems, and perhaps to an extent, to the otherwise inexplicable crimes committed in this case.

Moreover, research into Cedric's history reportedly uncovered

information tending to establish that Cedric was exposed to dangerous concentrations of lead during his early childhood. There is general agreement in the scientific community that lead exposure, particularly occurring prior to age 6 years, causes abnormal brain development with associated learning disability developmental delay, and irritability. Very high levels of exposure can be fatal. Studies conducted in various countries have tended to establish a connection between lead exposure, primarily through once-widespread use of leaded gasoline, and relatively elevated population rates of violent crime that decreased with the introduction of unleaded gasoline. It is noted that there exist many ways a child can be exposed to toxic amounts of lead, including dust and leaded paint used in older buildings. Younger children are at considerably higher risk of exposure than other age groups. In addition to ARND in Cedric's history, further neurological issues and behavioral instability would most likely follow early childhood exposure to toxic amounts of environmental lead resulting in his pattern of irritability and erratic assaultive and homicidal actions.

In addition to cognitive developmental issues that seem evident from facts such as those presented here, it seems clear that a child who experiences the kinds of parental or substitute parental interactions would almost certainly experience a Post-Traumatic Stress Disorder (PTSD). Children who experience both physical abuse of their person, and family violence involving physical assault and battery between adult caregivers on a regular basis, and who lack adult supports, are thought to be at the highest risk according to the National Center for PTSD. Reports suggest Cedric had such experiences beginning in his preschool years and continuing through adolescence. His pattern of running away, impulsively at first and later for longer periods of time, suggest extreme levels of experienced anxiety and stress. Younger children may or may not experience symptoms such as flashbacks and re-enacting traumatic events, but as these children with PTSD grow older, feelings of isolation, flashbacks, and re-enacting of traumatic events can become more prevalent as they attempt to integrate their bizarre experiences into their current perceptions of the environment.

While some children with PTSD spontaneously recover, those

who experience more severe and prolonged stress may express symptoms for years unless they receive targeted treatment. Persistent symptoms may include feelings of isolation, low self-worth, anger, mistrust, aggression, self-harm, and inappropriate sexual behaviors. It is possible that neurologically-based cognitive issues contributed to Cedric's persistent symptoms suggestive of PTSD. His parents left him in an abusive caretaking environment early in his life. When he returned primarily to reside with his parents, the record suggests the relationship between Helen and Shederick had deteriorated and continued to deteriorate, with Shederick drinking excessively and beating up on Helen when Cedric was present. For her part, Helen kept up the previous pattern of abusive physical discipline, but did so possibly as a function of her own mood states and not in such a way as to target any specific behavior infractions by Cedric. In this setting Cedric began the escape behaviors that persisted through his school years. As he reached adolescence and young adulthood he began repeating with his female partners the behaviors he had observed throughout his childhood.

In some sense, it would seem probable under this hypothetical set of facts that Cedric's physical abuse of his female partners reflected his history of experiencing similar trauma among adult caregivers as a child that, while traumatic, had become over a period of years the effective behavioral "norm" in his construction of the world concerning male and female partners. And researchers have begun to explore ramifications of lasting neuro-cognitive effects on children exposed to protracted chronic family violence. Preliminarily such research tends to show that children so exposed have brain differences that predispose both a higher incidence of committing violent acts as adults, and a pattern of cognitive distortion where their violence feels internally natural and justified.

Such a pattern also could have involved attempts to cope with barely suppressed rage toward Helen's abandonment and later abuses, which finally erupted in a dramatic scene between the two of them where Cedric vented his pent-up anger toward Helen in physically destructive and assaultive ways. It is

perhaps not coincidental that Cedric and Helen engaged in a hostile texting interaction before Cedric, for virtually no apparent reason disclosed by the records, murdered Roxann and her son seemingly for the sole reason that he was ready to explode as he had done once before with Helen.

Along with neuro-developmental concerns and issues of PTSD, at least one psychiatrist was sufficiently concerned about the possibility of a bipolar disorder to prescribe Cedric Lithium, a medication very commonly used in treatment of bipolar disorders. This prescription, and the presumptive diagnosis that prompted its use, occurred during the only period - a period of psychiatric hospitalization and outpatient day care - when Cedric had regular exposure to mental health evaluation and treatment. It is unclear to what extent Cedric benefitted from this medication since he decided to quit taking it as soon as he could, and his parents could not force him to take it. Helen's perception that the medication made him appear "lethargic" to her suggests that adjustments to the dosing of the medication could have been helpful, but without Cedric having taken the medication over a period of time this is unfortunately speculative.

The emergence of a bipolar disorder, primarily manic type, could help explain Cedric's development of a new modality for domestic violence and threats, i.e. use of knives for intimidation. Such behaviors do not seem to have been present between his adult caregivers despite other forms of partner violence observed by Cedric. It is not beyond the experience of the undersigned to observe manic patients develop delusional thought patterns, and it is possible as Cedric's apparent manic incidents flowered after his departure from public school that he became delusional. Fighting with police, attempting to ram a car through a compound gate, and running about in the street interfering with traffic suggest highly atypical thinking consistent with a form of thought disorder involving a mix of both grandiose and self-destructive ideations. Since his involuntary commitment and incarceration Cedric appears to have perhaps cycled into a depressive phase with several incidents of record suggesting suicidal thinking.

(Exh. 24 – Affidavit of Dr. Joann Murphey).

Dr. John Fabian is a neuropsychologist with significant forensic experience. (Exh. 32 – Curriculum Vitae of Dr. John Fabian). He also reviewed the psycho-social history provided by Mairead Burke and could have provided additional information about the neuropsychological significance of Cedric's life experiences. He concluded:

> The research has been consistent over time that the effects and condition of Fetal Alcohol Spectrum Disorder (FASD) depends on the severity of damage to an individual child is based on factors including quantity of alcohol consumed by the mother during pregnancy and the time of drinking during the gestation of the child, such as heavier amounts of alcohol consumed during specific days when a particular anatomical feature of the fetus is developing.
> Recent research indicates that the quantity of alcohol consumed, particularly in short periods of time, as in binge drinking, is a major factor in producing FASD. When considering frequency of alcohol use, research indicates there must be frequent and heavy drinking over the course of the pregnancy and not just a few isolated episodes. Regular occurrence of drinking is requisite for a diagnosable condition or of FASD. The timing of maternal drinking is also critical during pregnancy. Drinking during critical periods of gestation will produce various anatomic deficits or brain-based cognitive or behavioral deficit and dysfunction in offspring. Critical drinking periods may affect vital regions of brain development in the offspring, such as the hippocampus and the frontal lobes. There are key windows in time when damage can result from heavy binge or chronic drinking by the mother. Therefore, the most significant determinants of maternal risk factors for producing a child with diagnosable FASD are the quantity of alcohol consumed per occasion, the frequency with which drinking occurs, and the timing of these drinking episodes as

they occur in relation to the specific gestational stages of the developing fetus.

It is my understanding that Mr. Ricks' mother smoked about ten cigarettes per day and used marijuana once or twice per month during pregnancy. Similarly to alcohol, cigarettes and marijuana have potential effects on neurodevelopment in the fetus. Prenatal cigarette smoking affects the fetal central nervous system development, predisposing offspring to neurobehavioral deficits measured as irritability or difficult temperament during infancy and poor self-regulation during childhood. Smoking is consistent with neuropsychological effects on behavior, such as hyperactivity and attention deficit, and predicts other difficulties in self-regulation, as well as aggressive behavior and chronic problems in childhood and adolescence, and antisocial behavior in adults. Nicotine provokes alterations in offspring neuronal cell replication and deficits in synaptic neurochemistry and results in behavioral dysfunction....Similarly, maternal marijuana use during pregnancy affects the fetus, as cigarette smoking does. The effects of marijuana on pregnancy include abnormal fetal brain development including neurotransmitter efficiency and neuronal proliferation, migration and differentiation. Prenatal marijuana exposure to fetal brain development may disrupt normal brain development and the en utero exposure may include impaired cognition relevant to visual problem solving, visual motor coordination, and visual analysis in young children. Prenatal marijuana exposure is associated with decreased attention span, memory, and learning problems.

...Another area of concern in this case has been potential exposure to lead and the effects of lead poisoning on Mr. Ricks' development. Mr. Ricks grew up in the Calumet Park area in Chicago near a Dutch Paint factory. Similarly to prenatal substance use exposure, lead toxicity can affect brain development, especially during critical times of pediatric development in children. Literature suggests that significant insults to the brain of children occurs at very low levels of lead toxicity. The effects of lead poisoning on the brain may cause the risk of neurodevelopmental conditions, such as learning disability and ADHD. Research also suggests an associated of prenatal and childhood blood lead concentration with criminal

arrests in early adulthood.

....

It should be noted that different witnesses have reported that Mr. Ricks had serious behavioral problems as a youth, even during toddler years through early school years. The manifestation and potential ideological factors of these behavioral problems are very important to consider in this case. He was at risk for neurodevelopmental disorders due to prenatal exposure, as noted above, as well as a combination of physical abuse and other dysfunctional risk factors, such as inconsistent caretakers and parental substance use.

As discussed above, Mr. Ricks was at risk even during the prenatal period for neurodevelopmental disorders, such as ADHD and learning disability. He, again, had significant behavioral and learning problems as a youth. Witnesses and records indicate that he had symptoms of ADHD, such as being hyper, being restless and having trouble staying still, problems with following directions, as well as having severe temperamental problems, reckless behaviors, and excessive motor movements. A more thorough neuropsychological assessment during the trial phase would have been beneficial. It is my opinion with a reasonable degree of neuropsychological certainty that the best standard of neuropsychological assessment for the examination of ADHD includes review of background records, especially school records, interview of family members, retrospective evaluation of patient and family members concerning childhood ADHD symptomatology, self-report analysis by the patient currently to assess adulthood ADHD symptomology, as well as current functional neuropsychological assessment examining areas of attention, memory, and executive functioning. Further assessment should also include the consideration of commonly known comorbid psychiatric conditions, as well as substance abuse and addiction conditions that are commonly found with ADHD.

The records indicate that Mr. Ricks experienced significant and consistent severe behavioral, emotional, cognitive, and learning problems throughout early childhood through adolescence. He continued to be described as not behaving in school and lacking

the capacity to follow directions. Teacher notes and school records document difficulties with following directions, accepting responsibility, self-control, following rules, working well with others, taking pride in work, respecting rights and property of others, and caring for books and materials. The teachers have documented that he had difficulty with attention and listening. These symptoms are consistent with ADHD, as well as experiencing trauma within the home, as a child who is very distracted and acting out. The school records document issues with behavioral problems, self-control, and inability to follow rules or directions are consistent throughout his schooling history and, again, are often the product of both a combination of neurodevelopmental conditions such as ADHD and learning disability as well as the effects of childhood trauma.

...

When considering learning disorder issues for Mr. Ricks, he did have a full scale IQ WISC-R score of 120 with a verbal IQ of 100 and a performance IQ of 138. This significant difference with lower verbal IQ than performance IQ is very common among defenders. This 38-poing difference is very rare among the general population. He has a history of special education services and Individualized Education Programming (IEP). He had multiple school placements and some of these transfers were due to his severe emotional and behavioral disorders. When a student is placed in special education for emotional and behavioral problems, they often have evidence of ADHD and learning disability. The comorbidity of both of those disorders with one another is markedly high. He had three plans in his special education programming, including two academic plans and a behavioral plan. His academic plan suggested that he was below grade level. The behavioral plan suggested improvement in classroom behaviors. By 9th grade, he was described as again needing special education services for behavior/emotional disorder and special classes for his mild cognitive impairment. Most significantly were behavioral dysregulation and loss of control over behaviors. The markers for the behavioral dyscontrol are typically ADHD, poor language skills and social skill deficits, and trauma within the home which are all present in this case.

> ...
> His family described him as having serious mood swings, outbursts, and paranoid thinking. They even described him as having outbursts that were cyclical in nature that appeared to be consistent with a bipolar disorder/manic episode. He continued to suffer behavioral problems, both at home and at school. The combination of paranoid thinking and mood lability raised a concern as to early onset of severe mental illness. Family members described Mr. Ricks' behaviors and emotional outbursts as becoming worse over time. His mood and behavioral dyscontrol became so significan that the police were called or he was hospitalized on a psychiatric unit.
> ....
> [T]he issue of dual diagnosis also should be considered in this case. Mr. Ricks suffered from a long-term history of unresolved trauma, likely complex trauma and PTSD, and underlying mood disorder that appears to be bipolar disorder, and these disorders together placed him at risk for developing a substance abuse problem and chronic addiction. Similarly, an individual is at heightened risk to abuse substances with more psychiatric symptoms and disorders they have. Mr. Ricks appeared to have evidence of neurodevelopmental disorders of ADHD, a long history of PTSD and trauma, polytrauma, and evidence of a serious mood disorder such as bipolar disorder. About 50% of individuals with ADHS suffer from comorbid substance abuse problems. About the same numbers are affected with evidence of bipolar disorder and PTSD. Therefore, his conditions of ADHS, mood disorder, and TPSD collectively placed him at even higher risk that one disorder alone to abuse substances.

(Exh. 33 – Affidavit of Dr. John Fabian).

Dr. Fabian also reviewed the neuropsychological testing that was done at the trial level. He concluded that there was not a sufficient assessment of either PTSD or bi-polar disorder, both of which should have been concerns given Cedric's history. Dr. Fabian concluded that "Mr. Ricks appeared to

have evidence of neurodevelopmental disorders of ADHD, a long history of PTSD and trauma, polytrauma, and evidence of a serious mood disorder such as bipolar disorder." Sufficient testing for these conditions was simply not done. Based on his review Dr. Fabian concluded that "[Mr. Ricks] appears to have had a definite condition of ADHD, which obviously is related to low frustration tolerance, impulsivity, difficulties with shifting mental set and organizing, mood lability, low self-esteem, inability to appreciate consequences before they act among other symptoms." (Exh. 33 - Affidavit of Dr. John Fabian).

Both Dr. Murphey and Dr. Fabian could have helped the jury understand why things like prenatal exposure to alcohol, physical abuse, and exposure to domestic violence were significant factors to consider in mitigation.

Instead, Cedric's jury heard about an idyllic life for young Cedric. The family lived in a great neighborhood where activities for children abounded. (XXXVIII R.R. at 154; XXXIX R.R. at 188). The Ricks' were described as "good church people", "some of the best people you would want to meet." (XXXVIII R.R. at 27; XXXVIII R.R. at 38). Cedric's family was supportive and his parents attended all of his football games. (XXXVIII R.R. at 75; XXXIX R.R. at 201).

The family took vacations together and "did things together as a family". (XXXIX R.R. at 219). This was the image that the Ricks' projected and presented to the world. But as Cedric's brother Dwayne explained, it was not the reality behind closed doors.

> There was a disconnect between me and Cedric, and our parents. Our parents provided all the material things we needed but emotionally there was something missing. It was important for our parents to create the image of a perfect family, and that often took priority over dealing with the real problems that affected our family. We became very good at keeping secrets, hiding what was going on behind closed doors, and just plain ignoring what was going on in order to maintain the image of perfection. I think the family's concern about image and looking perfect got in the way of Cedric getting help. The family was embarrassed of Cedric's behavior and tried to hide it, and eventually it became another family secret. The hiding and ignoring didn't work and over the years he got worse.

(Exh. 6 – Affidavit of Dwayne Ricks). The failure of trial counsel's mitigation investigation to pierce this utopic façade and discover and present the real story of Cedric's early life deprived Cedric of his Sixth Amendment right to effective assistance of counsel. U.S. Const. amend. VI, VIII, XIV.

In assessing the mitigation investigation conducted for trial, Mairead Burke concluded:

> The mitigation evidence discovered in post-conviction directly contradicts the assertions made at trial that Cedric lived in Utopia and had a wonderful live. Trial counsel did not discover information about: multigenerational family history, prenatal and childhood exposure to high levels of lead, community violence, exposure to an alcoholic and sexually abusive

environment, early childhood physical abuse, exposure to parental substance abuse, inconsistent caretakers, physical abuse at home by both parents, running away from home at an early age, emotional neglect, and a family history of mental illness. Having not discovered this information it was not possible for trial counsel to present this information to the jurors charged with determining Cedric's sentence.

There were important issues identified by the trial mitigation specialist, however trial counsel was deficient in not learning the nature, depth, and meaning of those issues and their effect on Cedric and then presenting that information to the jury. The fact that trial counsel acquired some information does not necessarily render counsel effective. Trial counsel must have sufficient information from which they could make a reasoned strategic decision not to pursue additional evidence about mitigation issues.

The mitigation evidence presented at Cedric's trial was substantially incomplete. Trial counsel failed to investigate and present compelling mitigation and mental health evidence. Consequently, critical mitigation evidence, which was readily available at the time of trial, was never presented to the jury that sentenced Cedric to death.

(Exh. 2 – Affidavit of Mairead Burke).

## SECOND GROUND FOR RELIEF

### THE APPEARANCE OF CEDRIC RICKS IN SHACKLES BEFORE THE JURY VIOLATED DUE PROCESS.

Cedric Ricks had his ankles chained during his trial. When Mr. Ricks testified in the punishment phase, his shackles were visible to the jury when he walked back to counsel table. Cedric's brother Dwayne recalled seeing the shackles when Cedric walked in front of the jury. (Exh. 6 – Affidavit of Dwayne Ricks). Post-conviction investigator, Paula Cook, took some measurements and photos of the courtroom to illustrate the jury's views. She determined that the distance Mr. Ricks would have had to walk from the witness stand to counsel table was over 29 feet – in full view of all the jurors. During trial, there was a skirt placed on the front of the defense table. However, no such skirt was placed on the State's table. (Exh. 25 – Affidavit of Paula Cook and attached diagram and photos).

At no time did the trial court ever make any findings about the need for any shackles. The State then used the fact that Mr. Ricks was shackled to argue to the jury that Mr. Ricks was dangerous. The prosecutor stated during closing arguments, "You saw him walk back to counsel table this morning with shackles on. Everywhere he goes in the Tarrant County jail, he's

shackled and handcuffed. He's not going to be like that in the penitentiary". (XL R.R. at 128). The shackling of Mr. Ricks during his trial violated his due process rights to a fair trial. U.S Const. amends. V, VI, VIII, XIV.

In Deck v. Missouri, 544 U.S. 622 (2005), the United States Supreme Court held that the constitutional prohibition on shackling a criminal defendant during his trial applied with equal force in the punishment phase of a capital trial. The Court noted that the shackling of a defendant during the guilt phase implicated three fundamental legal principles. First, the Court notes that "Visible shackling undermines the presumption of innocence and the related fairness of the fact finding process." Id. at 630. Second, shackles interfere with the accused's right to counsel by interfering with his ability to communicate with counsel. Id. at 631. And third, the use of shackles at trial "affronts the 'dignity and decorum of judicial proceedings"'. Id. The Court found that all three of these principles applied with like force in the penalty phase of a capital trial. Id. at 632. Regarding the presumption of innocence, the court noted that although guilt may have been decided, the jury was still faced with a decision between life and death. This decision in a capital case was no less important and the need for accuracy just as high. Id. at 632. The Court stated:

> The appearance of the offender during the penalty phase in shackles...almost inevitably implies to a jury, as a matter of

> common sense, that court authorities consider the offender a danger to the community – often a statutory aggravator and nearly always a relevant factor in jury decision-making, *even where the State does not specifically argue the point.* It also almost inevitably affects adversely the jury's perception of the character of the defendant. And it hereby inevitably undermines the jury's ability to weigh accurately all relevant considerations that are often unquantifiable and elusive – when it determines whether a defendant deserves death. In these ways, the use of shackles can be a "thumb [on] death's side of the scale."

Id. at 633 (citations omitted and emphasis supplied). This clear prohibition applies unless the use of shackles is "'justified by an essential state interest' – such as the interest in courtroom security – specific to the defendant on trial." Id. at 624.

"The fundamental respect for humanity underlying the Eighth Amendment…requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." Eddings v. Oklahoma, 455 U.S 104, 112 (1982)(quoting Woodson v. North Carolina, 428 U.S. 280, 304 (1976). The evidence considered during the penalty phase of a capital case is of a more subjective nature, dealing with not only the nature of the crime involved, but also with the personal history and the character of the Defendant. See Lockett v. Ohio. 438 U.S. 586 (1978).

Shackling is not only a direct commentary on a defendant's future dangerousness, it also affects the assessment of a defendant's character. An inquiry into the defendant's character must be made in answering the mitigation special issue. This issue asks:

> Whether taking, into account all of the evidence, including the circumstances of the offense, the defendant's character and background, and the person moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.

Tex. Code Crim. Proc. art. 37.071§2(e)(1). The jury must assess the defendant's character in answering this special issue. Shackling speaks to the court's opinion of a defendant's character. As one court has said, "Shackling sends a message to the jury that in the court's view, the defendant is so dangerous that he or she cannot be allowed to attend the proceedings, even with other security measures, without physical restraints." State v. Finch, 975 P.2d 967 (Wash., 1999).

In Ricks' case, there can be no dispute that Mr. Ricks was shackled and that the shackles were visible to the jury. It is also clear that the trial court never made any findings regarding the need for Mr. Ricks to be shackled. The error, therefore is clearly established. The prejudicial nature of this error was magnified by the State's argument. Even if individual jurors had not noticed the shackles when Mr. Ricks walked in front of the jury box,

the State's argument informed all the jurors that Mr. Ricks was, indeed, shackled in the courtroom. As one court has stated, "We see little significance to whether the jurors learned of the [shackles] by seeing the restraint or by being informed of it. In either case the defendant is branded as a dangerous individual". Stephenson v. State, 864 N.E.2d 1022, 1034 (Ind. 2007).

In the penalty phase, the jury was specifically tasked with determining whether or not Cedric Ricks posed a future danger. Once the jury found him guilty of capital murder, the only sentencing options for the jury to consider were life without parole or the death penalty. Tex. Penal Code § 12.31(a). The State argued that Mr. Ricks would be a danger even in the penitentiary – especially since he would not be in shackles there. In making this argument, the State chose to highlight the fact that Mr. Ricks was shackled in the courtroom. The State also chose to highlight the very factors that make shackling in front of the jury a due process violation. As one court has stated, "The issue is the possible impact which shackling the Defendant may have had on the sentencing decision, particularly in connection with the question of future dangerousness. It is undisputed that placing the defendant in restraints indicates to the jury that the defendant is viewed as a 'dangerous' and 'unmanageable' person, in the opinion of the court, who

cannot be controlled, even in the presence of courtroom security." State v. Finch, 975 P.2d 967 (Wash. 1999). Another court has stated that, "A jury might view the shackles as first hand evidence of future dangerousness and uncontrollable behavior which if unmanageable in the courtroom may also be unmanageable in prison, leaving death as a proper decision." Elledge v. Dugger, 823 F.2d 1439, 1450 (11th Cir. 1987). That is exactly what the State argued in Mr. Ricks' case. Mr. Ricks' appearance before the jury with shackles on his legs clearly violated due process and his right to a fair trial. U.S. Const. amends. V, VI, VIII, XIV.

## THIRD GROUND FOR RELIEF

TRIAL COUNSEL WAS INEFFECTIVE FOR NOT OBJECTING TO MR. RICKS' APPEARANCE IN SHACKLES IN FRONT OF THE JURY.

Trial counsel never objected to Mr. Ricks' appearance before the jury in shackles. Nor did counsel object when the prosecutor commented on the shackles in closing argument. This failure to object to these clear constitutional violations was deficient performance on the part of trial counsel that resulted in prejudice to Mr. Ricks. U.S. Const. amend. VI, VIII, XIV; Strickland v. Washington, 466 U.S. 668 (1984).

Had trial counsel objected to the shackles and the prosecutor's comments, the trial court would have been duty bound to declare a mistrial. If the trial court failed to grant a mistrial, on direct appeal this issue would have been reviewed as constitutional error. Bell v. State, 415 S.W.3d 278 (Tex. Crim. App. 2013). Reversal would have been required unless the court could determine beyond a reasonable doubt that the error made no contribution to the verdict or punishment. In this case, when the State argued that the fact that Mr. Ricks was shackled proved that he would be a future danger, the shackling clearly contributed the jury's verdict on punishment.

Had Mr. Ricks not been shackled during the penalty phase of his capital murder trial, there is a reasonable probability that at least one of the jurors would have made a different decision on either Mr. Ricks' future dangerousness or his character. Most of Mr. Ricks' violence could be attributed to problems he had in intimate relationships with females. Since it was unlikely that Mr. Ricks would have intimate relationships with females in TDCJ, the jury had to decide if Mr. Ricks would be dangerous to other people as well. Shackling Mr. Ricks while he was in a courtroom setting told the jurors that Mr. Ricks could be a danger anytime and anywhere. There is certainly a reasonable probability that without the shackles, at least one juror would have reached a different conclusion about Mr. Rick's future dangerousness. Trial counsel's failure to object to the shackles and the state's argument was deficient conduct that resulted in prejudice to Mr. Ricks. U.S. Const. amend. VI, VIII, XIV; Strickland v. Washington, 466 U.S. 668 (1984).

## FOURTH GROUND FOR RELIEF

### TRIAL COUNSEL WAS INEFFECTIVE FOR PRESENTING INACCURATE TESTIMONY ABOUT MR. RICKS' FUTURE DANGEROUSNESS RISK.

At trial, the defense presented the testimony of Dr. Jeffery Lewine. He, together with other experts working with MINDSET, conducted numerous tests on Mr. Ricks. He concluded that Mr. Ricks had certain brain abnormalities that were associated with an increased risk for violence and aggression. (XXXIX R.R. at 118). He did not, however, think that Mr. Ricks' brain looked like the brain of a psychopath. (XXXIX R.R. at 122). Dr. Lewine also testified that he looked at actuarial data on future dangerousness and concluded that Cedric was "somewhere in the middle". In making this assessment, Dr. Lewine cited some research done by Sorensen and Pilgrim in 2000, as well as some other studies. (XXXIX R.R. at 148-150). When Dr. Lewine suggested that Mr. Ricks' dangerousness stemmed from being in a relationship with a female partner, the State's objection that this was outside of his area of expertise was sustained. (XXXIX R.R. at 152). However, had trial counsel actually consulted with an actuarial risk assessment expert – such as Jon Sorensen – counsel would

have learned that Cedric's risk for future violent behavior in prison was low. Presenting testimony to the contrary from Dr. Lewine was deficient performance and resulted in ineffective assistance of counsel. U.S. Const. amend. VI, VIII, XIV; Strickland v. Washington, 466 U.S. 668 (1984).

Dr. Jon Sorensen is a respected social scientist who studies criminal justice issues, specifically focusing on risk assessments for violence. (See Exh. 26 – Curriculum Vitae for Dr. Jon Sorensen). At the request of habeas counsel, he conducted an individualized risk assessment for Mr. Ricks based on a review of the records. He concluded:

> Various characteristics associated with capital murderers have been found to increase or decrease the odds of a capital defendant committing acts of violence while incarcerated. The presence of multiple homicide victims, an additional contemporaneous attempted murder, and the use of a knife or hands only, as opposed to a gun, in the commission of the murder have all been shown to increase the level of risk for prison violence among convicted capital murderers. In the case of Cedric Ricks there are several counteracting factors that suggest a positive adjustment is likely. Intellectual ability, educational attainment, and prior employment serve as insulators against prison violence. Cedric graduated with a high school degree, participated in college-level training for a medical career, and has generally had a stable record of employment. Tests of his mental ability indicate that Cedric is in the average range for the general population and above average than the norm for prisoners. There is no evidence in the record of Cedric associating with street gangs or other disruptive groups during his brief periods of prior incarceration, which again suggests a higher likelihood for positive prison adjustment. Overall, Cedric's future risk for committing acts of

> violence in the prison system given his characteristics, on balance, appears to be low.

(Exh. 27 – Affidavit of Dr. Jon Sorensen). Dr. Sorensen used the "group statistical method" to assess Mr. Ricks' likelihood of committing violent acts in the future. As he explained:

> The method involved identifying groups of inmates with characteristics similar to those of Mr. Ricks that have been shown to be influential determinants of prison violence in previous empirical studies. The institutional record of behavior among matched comparison groups is then scrutinized and their involvement in various types of prison violence over the course of their incarceration documented. Mr. Ricks' propensity to commit violent acts can be extrapolated from the behavior of inmates among these matched comparison groups. By comparing the rate of violent acts committed among matched comparison groups to the base rate of the population of inmates from which they were extracted a measure of relative risk can be calculated.

(Exh. 27 – Affidavit of Dr. Jon Sorensen).

After comparing Mr. Ricks' characteristics to data collected in four separate studies, Dr. Sorensen concluded:

> Evidence from each of these analyses show that inmates with background characteristics similar to those of Mr. Ricks commit violent acts, regardless of how narrowly or broadly defined, less often than the larger population of inmates serving their sentences under similar conditions of confinement. Evidence from the scientific literature on prison misconduct and the group statistical analyses employed…suggests that Mr. Ricks' likelihood of committing future acts of violence is low. Relative to the typical lifetime prevalence among inmates convicted of capital murder, his likelihood of committing any assaultive violation is below 20-30%, and his likelihood of

> committing an aggravated assault on a staff member is below 1%. His lifetime likelihood of killing another inmate is less than 1%, and his likelihood of killing a staff member is less than the baseline rate of 1 per 1,000,000 annually. The facts described above suggest that Mr. Ricks will experience positive adjustment if sentenced to life in prison.

(Exh. 27 – Affidavit of Dr. Jon Sorensen).

Trial counsel in Mr. Ricks case, presented the testimony of only one expert in the penalty phase, Dr. Jeffery Lewine. Dr. Lewine was to testify on a myriad of topics. In addition to the actuarial risk factors for violence, his proposed testimony included magnetic resonance imaging data, the results of some genetic testing, electoencephalography and evoked potentials, and the results of some behavioral testing. (XXXIX R.R. at 9). The trial court ruled that the genetic information was not reliable enough to be admissible, but the rest of his testimony was allowed. (XXXIX R.R. at 76). Dr. Lewine was not an actuary, nor had he studied prison populations. (XXXIX R.R. at 34). Perhaps as a result, his assessment of Mr. Ricks' propensity for violence based on actuarial factors was wrong. If trial counsel sought to present actuarial testimony, counsel should have sought out a qualified expert to do so. As stated in the Commentary to Guideline 10.11 in the American Bar Association's Guidelines for the Appointment and Performance of Counsel in death Penalty Cases (2003), reprinted in 31 Hofstra L. Rev. 913, 1061, "Counsel should choose experts who are tailored specifically to the needs of

the case, rather than relying on an "all-purpose" expert who may have insufficient knowledge or experience to testify persuasively." The failure of trial counsel to seek out an expert to testify accurately to Mr. Ricks' risk for violence, deprived Mr. Ricks of effective assistance of counsel. U.S. Const. amend. VI, VIII, XIV; Strickland v. Washington, 466 U.S. 668 (1984).

## FIFTH GROUND FOR RELIEF

### THE TEXAS DEATH PENALTY STATUTE IS UNCONSTITUTIONAL BECAUSE JURORS DO NOT UNDERSTAND THE PENALTY PHASE INSTRUCTIONS.

The United States Supreme Court has devoted an extraordinary amount of its time granting *certiorari* in state death penalty cases so as to articulate precisely what the Constitution requires for a lawful jury death sentence verdict. The Court has ruled on a plethora of procedural and substantive constitutional questions addressed to various provisions of the Fifth, Sixth, Eighth, and Fourteenth Amendments. The Court has articulated firmly established constitutional imperatives which must be met for a lawful jury determined sentence of death.

I. CONSTITUTIONAL PRINCIPLES ESTABLISHED SINCE FURMAN V. GEORGIA

The modern death penalty era began when Furman v. Georgia, 408 U.S. 238 (1972), struck down capital sentencing as it had been historically applied by the states. The Furman Court concluded that capital punishment was being applied in an unconstitutional manner. The system of unfettered

discretion to sentence capital defendants to die had resulted in a jury decision-making system that was so freakishly wanton, so arbitrary and capricious, and so unreviewable on appeal, that it violated the Cruel and Unusual Punishment Clause of the Eighth Amendment.

In the decades since Furman, the Court has made it clear that the "vesting of standardless sentencing power in the jury violates the Eighth and Fourteenth Amendments." Woodson v. North Carolina, 428 U.S. 280, 302 (1976). A capital jury's sentencing discretion must be channeled by clear and objective standards which provide specific and detailed guidance for the jury and render the capital sentencing process one that can be rationally reviewed. Godfrey v. Georgia, 446 U.S. 420 (1980); Maynard v. Cartwright, 486 U.S. 356 (1988). The Court's jurisprudence has made it clear that capital sentencing decisions must be made according to criteria that are sufficiently clear to permit ordinary citizens to understand and apply them.

Beginning with Lockett v. Ohio, 438 U.S. 586 (1978), the Court has repeatedly made it clear that capital jurors must be permitted to consider a wide range of mitigating circumstances in deciding whether death is the appropriate sentence. The Eighth and Fourteenth Amendments dictate that there be an individualized determination of the appropriate sentence. Just as

the statutory scheme cannot preclude consideration of mitigating evidence, so too, "the sentencer [may not] refuse to consider, as a matter of law, any relevant mitigating evidence." Eddings v. Oklahoma, 455 U.S. 104, 114 (1982). Simply allowing the mitigating evidence to be admitted is not enough. "The sentencer must also be able to consider and give effect to that evidence in imposing sentence." Penry v. Lynaugh, 492 U.S. 302, 319 (1989); see also, Skipper v. South Carolina, 476 U.S. 1 (1986) ("Evidentiary ruling excluding relevant mitigating evidence of defendant's adjustment to prison setting violates Eddings); Mills v. Maryland, 486 U.S. 367 (1988) (Requirement of unanimous jury finding on mitigating factors created unconstitutional barrier to consideration of relevant mitigating evidence). Only when the capital juror is free to consider and give effect to all mitigating evidence is there an assurance that there has been an individualized sentencing determination.

## II. SOCIAL SCIENCE AND THE LAW IN THE ERA BEFORE THE CAPITAL JURY PROJECT

Since Witherspoon v. Illinois, 391 U.S. 510 (1968), the Supreme Court has periodically been presented with studies by litigants who hoped to shed some objective, experiential, outside-the-courtroom, fact-based light on whatever particular legal issue was before the Court. In the past, the Court

has rejected these studies. Initially this evidence was rejected because the field of study was too new and there was insufficient data to support the relief being requested. See Witherspoon at 517 (three studies offered to support claim that death-qualified juries were guilt-prone juries rejected as "too tentative and fragmentary" to support *per se* constitutional ruling). However, as the field gained acceptance, it was rejected by the Court because it did not address the question of how "actual jurors sworn under oath apply the law to facts of an actual case involving the fate of an actual capital defendant." Lockhart v. McCree, 476 U.S. 162, 171 (1986). In essence, the Court said data from artificial jurors in an artificial setting was unpersuasive even when drawn from scientifically sound and statistically valid mathematical equations. See McCleskey v. Kemp, 481 U.S. 279 (1987) (studies showing race influences capital decision-making do not answer question of how jurors eligible for service in McCleskey's case are likely to approach issues when sworn).

The clear message from Lockhart and McCleskey was that the Court would reject studies unless the research removed itself from the experimental and addressed the actual. To have persuasive force, social science research on capital juries needed to interview actual jurors from actual capital trials. Hence, the Capital Jury Project [hereafter "CJP"] was

created in 1990, with funding from the Law and Social Sciences Program of the National Science Foundation (grant NSF SES-9013252). The CJP researched the decision-making of actual capital jurors. The CJP's interviews chronicle the jurors' experiences and decision making over the course of the trial, identify points at which various influences come into play, and reveal the ways in which jurors reach their final sentencing decisions.

The CJP research covered a total of fourteen states, including Texas. States were chosen for the CJP research to reflect the principal variations in guided discretion capital statutes. Within each state, 20 to 30 capital trials were picked to represent both life and death sentencing outcomes. From each trial, a target sample of four jurors was systematically selected for in-depth three-to-four-hour personal interviews. Interviewing began in the summer of 1991. Since 1993, some 50 articles presenting and discussing the findings of the CJP have been published in scholarly journals. See Capital Jury Project Website at http://www.albany.edu/scj/13194/php (last visited June 2, 2016) for an updated listing of CJP related articles, commentaries, and doctoral dissertations.

## III. HOW REAL CAPITAL JURORS ACTUALLY MAKE THEIR DECISIONS

The CJP data reveal profound discrepancies between what the federal and state constitutions require and how actual capital jurors make their decisions. Moreover, this data reveals that these discrepancies exist on every measure which the federal and Texas constitutions impose, both in terms of what jurors are required to do, and in terms of what jurors are prohibited from doing.

Capital jurors fail to comprehend and/or follow penalty instructions

The CJP research demonstrates that capital jurors fail to understand and/or follow the instructions given in capital trials. This is consistent with pre-CJP and non CJP data and conclusions that significant numbers of capital jurors fail to understand the concept and role of mitigation in capital cases. See, e.g., Marla Sandys & Scott McClelland, Stacking the Deck for Guilt and Death: The Failure of Death Qualification to Ensure Impartiality, in America's Experiment With Capital Punishment, Ch. 13, (Carolina Academic Press, 2d ed., 2003).

The CJP found that Texas capital jurors fail to understand that they are not only allowed to consider mitigation, but they are required to do so even if it does not excuse or lessen the capital defendant's culpability for the murder. Most jurors (72.9%) failed to understand that the jury did not have to be unanimous about individual mitigating factors before they were

allowed to consider them. Moreover, well over half of all Texas jurors (66%) believed mitigating factors had to have been proven to them beyond a reasonable doubt before they could be considered. William J. Bowers & Wanda D. Foglia, Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing, 39 Crim. L. Bull. 51, 66-71 (2003) (Attached as Exhibit 28).

Some of the findings of the CJP research are summarized in the following table:

| Table [3] | Percentages of Jurors Failing to Understand Guidelines for Considering Aggravating and Mitigating Evidence |
|---|---|

JURORS WHO FAILED TO UNDERSTAND THAT THEY . . .

| State | Could consider any mitigating evidence | Need not be unanimous on mitigating evidence | Need not find mitigation beyond reas. Doubt | Must find aggravation beyond reas.doubt | N* | |
|---|---|---|---|---|---|---|
| Alabama | 54.7% | 55.8% | 53.8% | 40.0% | 52 | |
| California | 24.2% | 56.4% | 37.6% | 41.7% | 149 | |
| Florida | 49.6% | 36.8% | 48.7% | 27.4% | 117 | |
| Georgia | 40.5% | 89.0% | 62.2% | 21.6% | 73 | |
| Indiana | 52.6% | 71.4% | 58.2% | 26.8% | 97 | |
| Kentucky | 45.9% | 83.5% | 61.8% | 15.6% | 109 | |
| Missouri | 36.8% | 65.5% | 34.5% | 48.3% | 57 | |
| N. Carolina | 38.7% | 51.2% | 43.0% | 30.0% | 79 | |
| Pennsy. | 58.7% | 68.0% | 32.0% | 41.9% | 74 | |
| S. Carolina | 51.8% | 78.9% | 48.7% | 21.9% | 113 | |
| Tenn | 41.3% | 71.7% | 46.7% | 20.5% | 44 | |
| Texas | 39.6% | 72.9% | 66.0% | 18.7% | 47 | ** |

3 Still Singularly Agonizing at 68.



| Virginia | 53.3% | 77.3% | 51.2% | 40.0% | 43 |
|---|---|---|---|---|---|
| All States | 44.6% | 66.5% | 49.2% | 29.9% | 1185 |

* The number of subjects answering each question varied slightly, and the number (N) for each state is the lowest number of subjects answering any of the questions.
** The number of Texas jurors is reduced in this table because these two questions were replaced by others while the interviewing in Texas was underway.

The CJP research also shows that 68.4% of Texas jurors mistakenly believed that the death penalty was required by law if they determined the defendant would be dangerous in the future. Still Singularly Agonizing at 72-73. This percentage remained virtually the same even after the addition of the post-Penry mitigation special issue. Elizabeth S. Vartkessian, Jon R. Sorensen & Christopher E. Kelly, Tinkering with the Machinery of Death: An Analysis of Juror Decision-Making in Texas Death Penalty Trials During Two Statutory Eras, Justice Quarterly (2014), DOI: 10.1080/07418825.2014.958188 at 11.

The net effect of these misunderstandings is that capital jurors are skewed toward a sentence of death.

> The misunderstandings reflected in these incorrect responses on the questions regarding how to handle mitigating and aggravating evidence all make a death sentence more likely. It is more difficult to find mitigating evidence than the law contemplates when jurors think they are limited to



> enumerated factors, must be unanimous, and need to be satisfied beyond a reasonable doubt. The CJP data show that nearly half (44.6%) of the jurors failed to understand the constitutional mandate that they be allowed to consider any mitigating evidence. Two-thirds (66.5%) failed to realize they did not have to be unanimous on findings of mitigation. Nearly half (49.2%) of the jurors incorrectly thought they had to be convinced beyond a reasonable doubt on findings of mitigation ... The constitutional mandate of Gregg and companion cases to guide jurors' exercise of sentencing discretion is not being satisfied when jurors do not understand the guidance.

Still Singularly Agonizing at 71.

Death penalty statutes are not effectively guiding discretion when jurors misunderstand the instructions, mistakenly believe death is required by law, and do not appreciate their responsibility for the sentence imposed. The CJP finding that a large majority of jurors believe the law is "primarily responsible for the sentence is particularly ironic considering their lack of understanding of the law." Still Singularly Agonizing at 75.

As applied in the real world of capital trials, actual capital jurors are not making sentencing decisions consistent with state and federal constitutional mandates. For these very reasons, the American Bar Association Death Penalty Due Process Review Project recommended that Texas revise the jury instructions that are typically given in capital cases. Specifically, they advised that Texas' instructions should provide a better

explanation of the issues clearly identified as problematic by the Capital Jury Project. American Bar Association Death Penalty Due Process Review Project, Evaluating Fairness and Accuracy in State Death Penalty Systems: The Texas Capital Punishment Assessment Report, 299 (2013).

IV. CEDRIC RICKS' JURORS DID NOT UNDERSTAND THE PENALTY PHASE INSTRUCTIONS IN HIS CASE

During penalty phase deliberations, the jury sent out two notes specifically asking for clarification of the special issues. One note asked for an additional explanation of "would commit criminal acts of violence". (II C.R. at 124). The second note asked for a definition of "personal moral culpability". (II C.R. at 127). The only answer provided by the court to these questions was to tell the jurors to simply refer to the instructions they already had. (II C.R. at 125, 128). But as one researcher has pointed out, "When members of a capital jury ask the trial judge to clarify a sentencing instruction, chances are good they didn't understand the instruction. Why else would they have asked the question?" Stephen P. Garvey, Sheri Lynn Johnson, & Paul M.F., Correcting Deadly Confusion: Responding to Jury Inquiries in Capital Cases, 85 Cornell L. Rev. 627 (1999-2000).

Garvey, et. al. conducted a study in which they looked at a jury's understanding of capital instructions. Id. When jurors asked questions about

the instructions and were simply referred back to the instructions, this did little to improve their comprehension. The result was a jury with an unconstitutional belief that the law required a death sentence. Id. at 638-39.

Cedric Ricks' jurors suffered a similar fate. They did not understand the law. They asked the trial judge for help. The answer they got likely did not clarify their understanding of what the law required.

Juror Ladell Barnes explained some of the confusion:

> We deliberated for approximately six and a half hours. Two women and I were holdouts, voting for life instead of death. I was the last holdout and only changed my vote because although I believed that Mr. Ricks should not be sentenced to death, based on my understanding of the jury instruction, I felt I had no other choice.
>
> Based on the testimony and my observations of Cedric Ricks at the trial, I believed that something was wrong with him mentally. At times he appeared remorseful, turning away when the pictures were shown. Other times he did not appear to be all there mentally. There was no change in his mood or demeanor after being convicted or sentenced to death. I found this to be a mitigating factor and would have voted for life if not for the jury instructions.
>
> The jury instructions we were given led me to believe that the defense had to prove that there was a specific mitigating factor. I did not think that my belief that something was mentally wrong with Mr. Ricks was enough to spare his life, but rather, based on the jury instructions, it was my understanding that the defense would have to prove what it was that was wrong with him in order for me to vote life.
>
> Had the jury instructions made it clear that anything could be mitigating and that it was not required for there to be evidence proving it beyond a reasonable doubt, I would have voted for life.

> Although I did not believe that Mr. Ricks should be sentenced to death, I voted that way because I felt as though I had to in order to follow the law. I did not believe I could vote for life based on my observations and instinct as the jury instructions were not clear.
> I was not the only juror who struggled with the instructions. The two women who also were holdouts believed as I did. We tried to find the evidence that would allow us to vote for life thinking that was required.

(Exh. 29 – Affidavit of Ladell Prince Barnes). When jurors do not understand the instructions that are required to make the death penalty operate in a constitutional manner, any resulting death verdict is unconstitutional. U.S. Const. amends. VI, VIII, XIV.

## SIXTH GROUND FOR RELIEF

TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THE ISSUE THAT THE USE OF THE TERM "PROBABILITY" IN THE "FUTURE DANGEROUSNESS" SPECIAL ISSUE DILUTES THE REASONABLE DOUBT STANDARD.

Although trial counsel filed a pretrial motion addressing the lack of definition for the term "probability" as used in the "future dangerousness" issue, Tex. Code Crim. Proc. Art. 37.071 § 2(b)(1), (I C.R. at 151-54), this motion did not address the fact that the use of the term "probability" in this issue dilutes the reasonable doubt standard and confuses jurors. The failure to raise this deficiency in the capital murder statute amounted to ineffective assistance. U.S. Const. amends. VI, VIII, XIV; Strickland v. Washington, 466 U.S. 668 (1984).

In compliance with the Texas statutory scheme, the jury was instructed to answer the following question in the punishment jury charge:

> SPECIAL ISSUE NUMBER 1: Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?

(II C.R. at 513). Tex. Code Crim. Proc. Ann. art. 37.071 § 2(b)(1). The jury was further instructed that:

> The prosecution has the burden of proving that the answer to Special Issue Number 1 should be "Yes," and it must do so by proving a "Yes" answer to Special Issue Number 1 beyond a reasonable doubt, and if it fails to do so, you must answer Special Issue Number 1 "No."

(II C.R. at 514). Tex. Code Crim. Proc. Ann. art. 37.071 § 2(c). This use of the term "probability" in what is commonly referred to as the "future dangerousness" special issue dilutes the reasonable doubt standard in violation of due process. U.S. Const. amends. VIII, XIV.

Its appearance of the term "probability" in conjunction with the reasonable doubt standard relieves the State of its constitutional burden to prove every element of the offense beyond a reasonable doubt. The term eviscerates the reasonable doubt standard, rendering it a nullity or, at best, a preponderance of the evidence standard. In addition, the term undermines the vital role the reasonable doubt standard plays in reducing the risk of erroneous factual determinations.

Placing competing burdens of proof in such close proximity to each other can produce only confusion and frustration in jurors' minds as they grapple with the incomprehensible concept of proof of a probability beyond a reasonable doubt. The Supreme Court recognized in Boyde v. California, 494 U.S. 370 (1990), that:

> Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be

> thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

Id. at 380-81. The concept of "probability beyond a reasonable doubt" was described as "execrable" and "absurd" by Judge Roberts in Horne v. State, 607 S.W.2d 556, 565 (Tex. Crim. App. 1980) (Roberts, J., concurring). When average lay jurors are faced with such an illogical instruction, the commonsense understanding most likely to prevail in their minds would focus on the more familiar concept of "probability," to the detriment of a less familiar, legal term of art like "reasonable doubt." Jurors would quickly abandon any "technical hairsplitting" once they realized the futility of attempting to determine what quantum of evidence would constitute proof of a future event's probability beyond a reasonable doubt. Jurors will be no more successful at deciphering the "execrable" and "absurd" than was Judge Roberts in Horne.

Merely having the phrase "beyond a reasonable doubt" in the jury instructions to describe the burden of proof on the future dangerousness special issue neither adequately safeguards a defendant's Fourteenth Amendment due process rights nor advances the vital interests served by the reasonable doubt standard. The critical inquiry is not whether the phrase "beyond a reasonable doubt" appears in the instructions. Instead, it is

whether the reasonable doubt standard has been tainted by other instructions that may allow the jury to find an element of the crime based on a burden of proof that is below that required by the due process clause. See Cage v. Louisiana, 498 U.S. 39, 41 (1990) (instructions equating "reasonable doubt" with "grave uncertainty" and "actual substantial doubt" violate due process), overruled on other grounds by Estelle v. McGuire, 502 U.S. 62, 73 n.4 (1991) (clarifying that standard of review for erroneous jury instructions is whether they had a "reasonable likelihood" of misleading the jury). Use of the term "probability" in this special issue creates just such a problem and violates due process under the Fourteenth Amendment. U.S. Const. amends. VIII, XIV.

The failure to raise this claim in a pretrial motion was clearly deficient. This issue has been raised repeatedly and is one that competent counsel should have known to raise. See, e.g., Rayford v. State, 125 S.W.3d 521, 534 (Tex. Crim. App. 2003); Lagrone v. State, 942 S.W.2d 602, 618 (Tex. Crim. App. 1997); Cantu v. State, 939 S.W.2d 627, 643 (Tex. Crim. App. 1997); Kemp v. State, 846 S.W.2d 289, 309 (Tex. Crim. App. 1992); Jones v. State, 843 S.W.2d 487, 496 (Tex. Crim. App. 1992); Sosa v. State, 769 S.W.2d 909, 917 (Tex. Crim. App. 1989).

This failure to raise this issue also resulted in prejudice. See Strickland v. Washington, 466 U.S. 668, 687 (1984). The use of the term "probability" in Tex. Code Crim. Proc. Ann. art. 37.071 § 2(b)(1), effectively renders the statute unconstitutional. An indictment based on an unconstitutional statute should be quashed. See White v. State, 440 S.W.2d 660, 667 (Tex. Crim. App. 1969). Trial counsel's failure to raise this issue deprived Mr. Ricks of his due process rights. U.S. Const. amends. VI, VIII, XIV.

## SEVENTH GROUND FOR RELIEF

## TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THE ISSUE THAT THE DEFINITION OF "MITIGATION" IS UNCONSTITUTIONALLY NARROW.

Art. 37.071 § 2(e)(1) of the Texas Code of Criminal Procedure requires the court to instruct the jury:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

Tex. Code Crim. Proc. Art. 37.071 § 2(e)(1).

Art. 37.071 § 2(f)(4) defines mitigating evidence to be "evidence that a juror might regard as reducing the defendant's moral blameworthiness." This statutory definition violates the Eighth and Fourteenth Amendments to the United States Constitution. However, trial counsel failed to challenge this definition of mitigation as being unconstitutionally narrow. This failure to raise this issue amounted to ineffective assistance of counsel. U.S. Const. amends. VI, VIII, XIV; Strickland v. Washington, 466 U.S. 668 (1984).

Defining "mitigation" as evidence that reduces a defendant's moral blameworthiness impermissibly instructs jurors to disregard mitigating

evidence that is unrelated to a defendant's moral blameworthiness. The instruction unconstitutionally narrows the jury's discretion in sentencing, to factors that concern only moral blameworthiness.

The Eighth and Fourteenth Amendments to the United States Constitution require that the sentencer "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Eddings v. Oklahoma, 455 U.S. 104, 110 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604 (1978)).

The Supreme Court of the United States found the Texas death penalty statute to be constitutional on the basis of guarantees that sentencing juries would be able to consider "whatever mitigating circumstances" the defendant might be able to show. Lockett, 438 U.S. at 607 (referring to Jurek v. Texas, 428 U.S. 262 (1976)). The Court held that these mitigating circumstances were necessary to ensure that the death penalty was not imposed in an arbitrary or capricious manner. This belief was based on the principle that "defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." Penry v. Lynaugh, 492 U.S. 302, 319 (1989). It is, therefore, well established that a sentencer

"may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'" Skipper v. South Carolina, 476 U.S. 1, 4 (1986) (quoting Eddings, 455 U.S. at 114). The Supreme Court of the United States has held that relevant mitigating evidence is "evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." Tennard v. Dretke, 542 U.S. 274, 284 (2004)(quoting McKoy v. North Carolina, 494 U.S. 433, 440 (1990)). The Supreme Court of the United States has further ruled that once the "low threshold for relevance is met, the Eighth Amendment requires that the jury be able to consider and give effect to a capital defendant's mitigating evidence." Tennard, 542 U.S. at 285 (quoting Boyde v. California, 494 U.S. 370, 377-378 (1990)). It is therefore unconstitutional for a state to exclude or limit a defendant's ability to present relevant mitigating evidence.

However, Art. 37.071 § 2(f)(4) of the Texas Code of Criminal Procedure essentially instructs jurors to disregard any potentially relevant mitigating evidence that does not relate to the defendant's moral blameworthiness. The instruction can only reasonably be interpreted as a limitation on the mitigating circumstances, referred to in Art. 37.071 § 2(e)(1), that a jury can consider to warrant a sentence of life imprisonment rather than a death sentence. If the clause is not read as a limitation on what

mitigating evidence can be considered it is rendered completely superfluous when read in conjunction with Art 37.071 § 2(e)(1). "It is an elementary rule of construction that, when possible to do so, effect must be given to every sentence, clause and word of a statute so that no part thereof be rendered superfluous or inoperative." Spence v. Fenchler, 107 Tex. 443, 457 (Tex. 1915). The only way to give effect to Art. 37.071 § 2(f)(4) without rendering it superfluous is to read it as a limitation on Art 37.071 § 2(e)(1).

Limiting the jury's consideration of mitigating evidence to factors that reduce the defendant's moral blameworthiness creates an unacceptable risk that the death penalty would be imposed despite the existence of evidence that would support a sentence less than death. "When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." Lockett, 438 U.S. at 605 (1978). The Supreme Court of the United States has held that "the sentencing process must permit consideration of the 'character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death' . . . in order to ensure the reliability, under Eighth Amendment standards, of the determination that 'death is the appropriate punishment in a

specific case.'" Lockett, 438 U.S. at 601, (quoting Woodson v. North Carolina, 428 U.S. 280, 304–305 (1976)).

This issue has been raised in numerous capital cases. See, e.g., Ladd v. State, 3 S.W.3d 547, 573 (Tex. Crim. App. 1999); King v. State, 953 S.W.2d 266, 274 (Tex. Crim. App. 1997); Cantu v. State, 939 S.W.2d 627, 648-49 (Tex. Crim. App. 1997); Lawton v. State, 913 S.W.2d 542, 555-56 (Tex. Crim. App. 1995). Thus, reasonably competent counsel should have been aware of the issue and raised it.

This failure to raise this issue also resulted in prejudice. See Strickland v. Washington, 466 U.S. 668, 687 (1984). The limited definition of "mitigating" in Tex. Code Crim. Proc. Ann. § Art. 37.071 § 2(f)(4), effectively renders the statute unconstitutional. An indictment based on an unconstitutional statute should be quashed. See White v. State, 440 S.W.2d 660, 667 (Tex. Crim. App. 1969).

Additionally, the limited definition of "mitigation" effectively precluded Mr. Ricks' jury from considering the mitigating evidence that he presented through Justin Crooks. (XXXVIII R.R. at 170-172). The fact that Mr. Ricks had generally behaved well in jail, had little relevance to his "moral blameworthiness". If a juror followed these instructions, the juror would not consider a good jail or prison record as "mitigating". This would

clearly violate Eighth Amendment jurisprudence. Trial counsel's failure to

challenge this limited definition of "mitigating" deprived Mr. Ricks of his

rights to effective assistance of counsel and due process. U.S. Const.

amends. VI, VIII, XIV.

## EIGHTH GROUND FOR RELIEF

### APPELLATE COUNSEL WAS INEFFECTIVE FOR NOT RAISING THE TRIAL COURT'S FAILURE TO CHARGE THE JURY ON THE BURDEN OF PROOF FOR EXTRANEOUS OFFENSES AT PUNISHMENT.

At trial, defense counsel requested that the jury be instructed that they must find extraneous offenses to be true beyond a reasonable doubt before they could be considered. The trial court denied this request. (XXXIX R.R. at 270-272). Despite being properly preserved for review, appellate counsel did not raise this issue on appeal. This failure amounted to ineffective assistance of appellate counsel.

A criminal defendant is entitled to constitutionally effective assistance of counsel on direct appeal. Evitts v Lucey, 469 U.S. 387, 394 (1985); Goodwin v. Johnson, 132 F.3d 162, 1270 (5th Cir. 1998); Lombard v. Lynaugh, 868 F.2d 1475, 1479 (5th Cir. 1989). The failure to provide effective assistance of counsel on direct appeal violates a defendant's rights to due process under the Fourteenth Amendment. U.S. Const. amends. VI, XIV; Evitts v. Lucey at 396. In order to prove ineffective assistance of counsel, a petitioner must first show that his attorney's performance was

deficient and second, demonstrate that such deficiency caused him prejudice. Strickland v. Washington, 466 U.S. 668, 687 (1984).

In the past, numerous opinions from the Texas Court of Criminal Appeals have construed Tex. Code Crim. Proc. art. 37.071 to allow the admission of unadjudicated extraneous offenses at the punishment phase of a capital murder trial when the State merely shows "clear proof" that the offense was committed and the defendant was the perpetrator. See e.g. Hughes v. State, 24 S.W.3d 833 (Tex. Crim. App. 2000); Ladd v. State, 3 S.W.3d 547, 575 (Tex. Crim. App. 1999); Burks v. State, 876 S.W.2d 877, 909 (Tex. Crim. App. 1994); Adanandus v. State, 866 S.W.2d 210, 233-34 (Tex. Crim. App. 1993); Kemp v State, 846 S.W.2d 289, 307-08 (Tex. Crim. App. 1992). Numerous cases have likewise held that no burden of proof instruction concerning extraneous offenses is required in a capital case. See e.g. Huizar v. State, 12 S.W.3d 479, 482 n.3 (Tex. Crim. App. 2000); Ladd at 575; Jackson v. State, 992 S.W.2d 469, 477-78 (Tex. Crim. App. 1999); Burks at 909.

In Harrell v. State, 884 S.W.2d 154 (Tex. Crim. App. 1994), the Court found "some authority for interpreting 'clear' proof to mean proof beyond a reasonable doubt." Id. at 158. Although Harrell dealt with the admission of extraneous offenses at the guilt / innocence stage of a non-capital case, there

is no reason why the standard of "clear proof" should be defined differently in capital murder cases. Support for this proposition can be found in the fact that most cases that cite "clear proof" as the standard of admissibility for extraneous offenses in a capital case, ultimately derive this standard from non-capital cases. The opinion in Burks attributes the "clear proof" standard in capital cases to Kemp v. State, 846 S.W.2d 289, 307 (Tex. Crim. App. 1992). Burks at 909. Although Kemp was a capital case, it relied on a string on non-capital cases: Turner v. State, 754 S.W.2d 668, 673 (Tex. Crim. App. 1988); Elkins v. State, 647 S.W.2d 663, 665 (Tex. Crim. App. 1983); McCann v. State, 606 S.W.2d 897, 900 (Tex. Crim. App. 1990); Sanders v. State, 604 S.W.2d 108, 111 at n.5 (Tex. Crim. App. 1980); and Ransom v. State, 503 S.W.2d 810, 813 (Tex. Crim. App. 1974). Kemp at 307. If "clear proof" in the non-capital context means proof beyond a reasonable doubt, it should also have that meaning in the capital context. Certainly, the Eighth Amendment's requirement of heightened reliability in capital cases should mandate that the burden of proof may not be less in a capital case than in a non-capital case.

In Harrell the Court also noted that the standard of admissibility for extraneous offenses was "indivisibly connected" to the requirement of a jury instruction for extraneous offenses. Id. at 157 n.6. If extraneous offenses

must be proven beyond a reasonable doubt to be admissible, jurors must be instructed that they must find them so proven before they can consider them. That courts continue to hold that no such separate instruction is required in capital cases cannot be supported.

In Jackson v. State, 992 S.W.2d 469 (Tex. Crim. App. 1999), the court stated that "a jury in a non-capital case receives no instruction comparable to the special issues instructions in a capital case; this distinction explains the requirement in noncapital cases that the jury be separately instructed not to consider extraneous offenses unless they are proven beyond a reasonable doubt." Jackson at 477. However, that explanation does not pass muster. If that were so, there would be no need to separately instruct juries on the burden of proof for extraneous offenses in the guilt / innocence phase of trial. Certainly in that situation the jury is already instructed that they must find guilt beyond a reasonable doubt. Nevertheless, a long line of cases has required that juries be instructed not to consider extraneous offense unless they believe beyond a reasonable doubt that the defendant committed those offenses. See e.g., Ernster v. State, 308 S.W.2d 33, 34-35 (1957); Nichols v. State, 136 S.W.2d 221, 221-22 (1940); Vaughn v. State, 118 S.W.2d 312 (1938); Miller v. State, 53 S.W.2d 790, 791-92 (1932); Lankford v. State, 248 S.W. 389, 389-90 (1923). Simply because juries are already given an

instruction on the burden of proof to apply in deciding the ultimate issue, does not mean that no such instruction is required when deciding what evidence they can consider in deciding the ultimate issue.

Since trial counsel in this case requested such an instruction, if appellate counsel had raised this issue, only a showing of "some harm" would have been required to warrant reversal. Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984)(opinion on rehearing); Arline v. State, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986). To determine if there is any harm, the reviewing court must weigh the degree of harm in light of the entire jury charge, the state of the evidence, counsel's arguments, and any other relevant information revealed by the trial record as a whole. Almanza at 171.

In Mr. Ricks' case, there were numerous unadjudicated extraneous offenses that were offered by the State in punishment. There was the domestic violence incident with Roxann that occurred in November of 2012. Roxann's mother and the hospital nurse both testified over hearsay and confrontation clause objections about this alleged assault. (XXXIV R.R. at 20-28, 36-37, XXXV 16-19).

Jennifer Clark testified about an incident when Mr. Ricks exposed his penis in an internet chat room. (XXXV R.R. at 113). She also testified to

various fights as their relationship deteriorated. (XXXV R.R. at 130). She told the jury that Mr. Ricks was using marijuana. (XXXV R.R. at 133).

There was testimony from James Cooper about discipline problems with Mr. Ricks when he was in high school. In particular, there was an incident when Mr. Ricks kidnapped his girlfriend, Tina, from school. (XXXVI R.R. at 11-15).

Tamara Partridge testified about numerous assaults during her relationship with Mr. Ricks. (XXXVI R.R. at 31-42)

Sheriff deputy M.F. Moore testified about Mr. Rick's possession of a pencil in violation of jail regulations. (XXXVI R.R. at 58-59). Another deputy testified about Mr. Ricks being found with a week's supply of pills in violation of the jail regulations. (XXXVI R.R. at 78-81).

Tashana Singleton testified about numerous assaults committed by Mr. Ricks during and after her relationship with him. (XXXVII R.R. at 13-40).

Additionally, there was testimony from two different doctors who worked with Mr. Ricks about his unauthorized possession of prescription pads and filled prescriptions. (XXXVII R.R. at 74-82, 90-95).

In his testimony, Mr. Ricks said that many of these assaults were exaggerated, and some just did not happen. (XL R.R. at 55-56, 59, 62). He

also denied that there was anything improper in his possession of the prescription pads. (XL R.R. at 83-84).

In closing arguments the State emphasized many of these extraneous offenses. The prosecutor argued that the prescription pads, possession of pills and pencils were not impulse control problems, and thus, made Mr. Ricks a future danger. (XL R.R. at 103-104).

Had the jury been properly instructed about the burden of proof required to consider the extraneous offenses, there is a reasonable probability that at least one juror might have answered the special issues in a different way. Had the jury found the evidence insufficient to consider some of these extraneous offense, they might have come to another conclusion about whether Mr. Ricks was going to be a future danger. This is especially true for the seemingly minor offenses like the prescription pads and the possession of pills and pencils. The state singled these offenses out because they did not involve the impulse control problems that lead to his domestic violence assaults. If the jury did not consider these offenses, they might have answered the mitigation question differently since the impulse control issues seemed to stem from a biological problem with Mr. Ricks' brain. In short, Mr. Ricks suffered some harm from the failure to charge the jury on the extraneous offense burden.

Appellate counsel's failure to raise this issue amounted to deficient performance from which Mr. Ricks' suffered prejudice. The result was a violation of Mr. Ricks' due process rights. U.S. Const. amends. VI, XIV; Evitts v. Lucey at 396.

## NINTH GROUND FOR RELIEF

### APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO CHALLENGE THE TRIAL COURT'S EXCLUSON OF GENETIC EVIDENCE.

Outside the jury's presence the defense presented the testimony of Dr. Jeffery Lewine. He was a neuroscientist who had been conducting research for over thirty years. (XXXIX R.R. at 7-8). He and other scientists working for a company called MINDSET, were asked to conduct a variety of tests on Mr. Ricks in a search for mitigating evidence. One of the things that they did was to conduct some genetic testing on a sample of Mr. Ricks' saliva. A sample of his saliva was sent to some scientists in Italy. (XXXIX R.R. at 12). One of the things the scientists in Italy looked at was Mr. Ricks' catecholamine metabolism. Mr. Ricks had what was called a Val/Met profile. These results showed reduced activity in a particular enzyme which alters neurotransmitter function. Dr. Lewine cited a study done by Rujescu, et al., in 2003, and another conducted by Soerio-de-Souza, et al., in 2013, that suggested that this profile increased the risk for violence and aggression. There was also data that maternal smoking during pregnancy increased the

risk of this genetic variation. Mr. Ricks was born with this genetic profile. (XXXIX R.R. at 13-15).

Dr. Lewine testified that although he was not a geneticist, neurogenetics was part of his neuro training. (XXXIX R.R. at 39-40). He relied on the testing conducted by the scientists in Italy in forming his conclusions. (XXXIX R.R. at 39-40). In the studies that indicated that Mr. Ricks' Val/Met profile was associated with aggression, Dr. Lewine stated that the P values were below .05 which indicated that there was a 95% probability that the association existed. (XXXIX R.R. at 46). Although he was not familiar with a 2014 paper authored by the same scientists in Italy, Dr. Lewine agreed that the paper reported that there was a lot of inconsistency in the research in these areas. (XXXIX R.R. at 48). Dr. Lewine also agreed that most of the studies had been conducted on persons with schizophrenia, which Mr. Ricks did not have. (XXXIX R.R. at 49). However, Dr. Lewine stated that the same trends that were seen in patients with schizophrenia were also seen in patients without schizophrenia. (XXXIX R.R. at 49). Dr. Lewine also admitted that some of these studies were on the low side of a good statistical sample. (XXXIX R.R. at 50). Dr. Lewine added that he was persuaded of the reliability of the genetic testing because the results were also consistent with all the other testing that was

done on Mr. Ricks. (XXXIX R.R. at 52, 65). He believed it was reliable based on peer-reviewed studies. (XXXIX R.R. at 69).

The trial court excluded Dr. Lewine's testimony about the genetic testing that was done on Mr. Ricks because it was not sufficiently reliable. (XXXIX R.R. at 76). Appellate counsel failed to challenge this ruling on appeal. This failure resulted in ineffective assistance of appellate counsel. U.S. Const. amends. VI, XIV; Evitts v. Lucey, 469 U.S. 387, 394 (1985).

Had this issue been raised on appeal, the appellate court would have reviewed the trial judge's ruling for an abuse of discretion. Lagrone v. State, 942 S.W.2d 602, 616 (Tex. Crim. App. 1997). The trial court's ruling must be upheld if it was within the zone of reasonable disagreement. Weatherred v. State, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

Under Tex. R. Evid. 702, the proponent of scientific evidence must show, by clear and convincing proof, that the evidence he is proffering is sufficiently relevant and reliable to assist the jury in accurately understanding other evidence or in determining a fact in issue. Nenno v. State, 970 S.W.2d 549, 560-561 (Tex. Crim. App. 1998); Hartman v. State, 946 S.W.2d 60, 62-63 (Tex. Crim. App. 1997); Jordan v. State, 928 S.W.2d 550, 553-555 (Tex. Crim. App. 1996); Kelly v. State, 824 S.W.2d 568, 572-573 (Tex. Crim. App. 1992). The reliability of "soft" science evidence may

be established by showing that (1) the field of expertise involved is a legitimate one, (2) the subject matter of the expert's testimony is within the scope of that field, and (3) the expert's testimony properly relies upon or utilizes the principles involved in that field. Nenno v. State, 970 S.W.2d at 561.

As a neuroscientist engaged in research, it was certainly appropriate and common in his field for Dr. Lewine to rely on the research of others. He cited studies by name that supported his opinions regarding Mr. Ricks' genetic test results. (XXXIX R.R. at 14). Cf. Weatherred v. State, 15 S.W.3d 540 (Tex. Crim. App. 2000)(trial court did not abuse discretion in excluding expert testimony where the witness failed to produce or name any of the studies, researchers, or writings on which he relied); Jordan v. State, 950 S.W.2d 210 (Tex. App. – Fort Worth 1997, pet. ref'd) (court did not err in excluding testimony where the expert failed to mention by name any other person who purported to be an expert in the field or produce or name the studies he relied on).

The erroneous exclusion of constitutionally relevant mitigating evidence offered by a defendant facing a possible death sentence is analyzed for harm under Texas Rule of Appellate Procedure 44.2(a). See Renteria v. State, 206 S.W.3d 689, 698 & n.7 (Tex. Crim. App. 2006) (citing Tennard v.

Dretke, 542 U.S. 274, 284-87 (2004), and applying a Rule 44.2(a) harm analysis to an erroneous exclusion of constitutionally relevant mitigating evidence); see also Abdul-Kabir v. Quarterman, 550 U.S. 233, 240-44 (2007) (describing expert witness' testimony as mitigating evidence and finding constitutional error when the trial judge refused to give an instruction that would have enabled the jury to give it meaningful consideration); Skipper v. South Carolina, 476 U.S. 1, 8 (1986) (holding that erroneous exclusion of lay witnesses' testimony that might have affected the jury's decision to impose the death sentence constituted reversible error "under any standard"). Such error requires reversal unless the court determines beyond a reasonable doubt that it did not contribute to the punishment. Tex. R. App. P. 44.2(a).

In this case, although the court allowed Dr. Lewine to testify about his other findings that similarly showed Mr. Ricks had a propensity for violence and aggression, what was unique about the genetic testing is that it established that this propensity was something that was genetically wired into Mr. Ricks from birth. This was important because the prosecutor questioned whether the brain scan results showing an enlarged putamen were something that developed later in Mr. Ricks' life. Dr. Lewine was not

able to say that the enlarged putamen was something that Mr. Ricks was born with. (XXXIX R.R. at 183).

The exclusion of the genetic testing evidence which showed that Mr. Ricks was born with a certain propensity for aggression and violence was not harmless beyond a reasonable doubt. Failing to raise this issue on appeal violated Mr. Ricks' due process rights to effective assistance of counsel on appeal. U.S. Const. amends. VI, XIV; Evitts v. Lucey, 469 U.S. 387, 394 (1985).

**TENTH GROUND FOR RELIEF**

APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THE BATSON ISSUE.

At trial, the defense made a Batson objection to the state's peremptory strikes of veniremembers No. 13 – Alicia Stafford and No. 28 – Wanda Stafford. The defense noted that both were African-American. (XXX R.R. at 26). The defense also made a Batson objection to the state's strikes of veniremember No. 10 – Ray Flores who was Hispanic. (XXX R.R. at 26). The state responded that it did not strike veniremembers No. 22 – Raymond Bean or No. 25 – Ladell Barnes who were both African-American. (XXX R.R. at 30). The state also noted that it did not strike No. 20 - Felicia Hernandez or No. 34 – Justin Dawson – who were both Hispanic. (XXX R.R. at 30-31). The state argued that the defense had not presented a prima facie case and the court agreed. (XXX R.R. at 34-5). This overruled objection was not challenged on appeal. The failure to raise this issue amounted to ineffective assistance of appellate counsel. U.S. Const. amends. VI, XIV; Evitts v. Lucey, 469 U.S. 387, 394 (1985).

The State is prohibited from exercising a peremptory strike on the basis of the person's race. Tex. Code Crim. Proc. art. 35.261; Batson v. Kentucky, 476 U.S. 79 (1986). When the defense raises a Batson

objection, a three-step process is engaged. Purkett v. Elem, 514 U.S. 765, 767-68 (1995); Simpson v. State, 119 S.W.3d 262, 268 (Tex. Crim. App. 2003). The defendant must first make a prima facie case of racial discrimination, based on the totality of relevant facts about the prosecutor's conduct during the trial. Miller-El v. Dretke, 545 U.S. 231, 239 (2005); Purkett, 514 U.S. at 767; Simpson, 119 S.W.3d at 268; see Tex. Code Crim. Proc. art. 35.261.

This may be established "solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial . . . showing [the defendant] is a member of a cognizable racial group . . . and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." Batson, 476 U.S. at 96. In addition, "a criminal defendant may object to race-based exclusions of jurors . . . whether or not the defendant and the excluded jurors share the same race." Powers v. Ohio, 499 U.S. 400, 402 (1991).

If the defendant makes a prima facie case, the burden of production shifts to the State to present a race-neutral reason for its challenged strike, a reason that is "a clear and reasonably specific explanation of [the] legitimate reasons" for exercising its strike. Miller-El, 545 U.S. at 239; see Tex. Code Crim. Proc. art. 35.261(a). A reason is deemed race neutral if no

discriminatory intent is inherent in the prosecutor's explanation. Purkett, 514 U.S. at 768; Thomas v. State, 209 S.W.3d 268, 270 (Tex. App.-Houston [1st Dist.] 2006, no pet.).

When the prosecutor responds by offering a race-neutral explanation, the inquiry of whether the defendant has made a prima facie case becomes moot, and the defendant may then rebut the State's explanation. Simpson, 119 S.W.3d at 268; Jasper v. State, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001).

In the third and final step, the trial court must decide whether the defendant carried the burden to establish purposeful discrimination. Miller-El, 545 U.S. at 239; Purkett, 514 U.S. at 768; Simpson, 119 S.W.3d at 268. The trial court's inquiry addresses whether the neutral reasons provided by the prosecutor for the peremptory challenge were contrived in order to conceal racially discriminatory intent. Jasper, 61 S.W.3d at 421.The court cannot merely accept the reasons given by the prosecutor at face value. The court must consider whether the facially neutral explanations are contrived to avoid admitting discrimination. Keeton v. State, 749 S.W.2d 861, 868 (Tex. Crim. App. 1988). When determining whether a race-neutral explanation was a pretext for purposeful discrimination, the court can examine whether comparative evidence demonstrates disparate treatment of

minority veniremembers. See Miller-El v. Dretke, 545 U.S. 231, 241 (2005). If a prosecutor's race-neutral reason for striking a minority veniremember applies equally to an otherwise similar non-minority veniremember whom the prosecutor does not challenge, this may be evidence that the race-neutral reason is a pretext for purposeful discrimination. See Id.

In the instant case, the focus is on step one and whether the defense established a prima facie case. Under Batson, in order to establish a prima facie case, a defendant must show that he is a member of a cognizable racial group, and that the State has exercised peremptory challenges to remove members of that group from the jury; is entitled to rely on the fact "that peremptory challenges constitute a jury selection practice that permits `those to discriminate who are of a mind to discriminate'"; and that these facts and circumstances raise an inference that the State exercised peremptory challenges on the basis of race. Batson at 96 (quoting Avery v. Georgia, 345 U.S. 559, 562 (1953)).

Mr. Ricks is a member of a cognizable racial group, namely African American. The State exercised peremptory challenges on two of the four panel members of that same racial group. The fact that they struck 50% of the members of that race (and arguably 66.67% as discussed below) raises an inference that the State struck them based on race.

In addition to the defense's objection to the State's striking of African Americans, the defense also objected to the striking of Hispanic veniremembers. When the State strikes jurors of one race, it is relevant to assess strikes of jurors of another race to determine a discriminatory intent. This is especially true in cases such as this one, when the total number of jurors of a racial group is small resulting in the challenges against jurors in that group being insufficient to support an inference of discrimination. U.S. v. Mitchell, 502 F.3d. 931, 1004 (9th Cir. 2007). Both African-Americans and Hispanics, which are the racial groups at issue in this case, are cognizable groups.

Although the number of Hispanic veniremembers was disputed as discussed in detail below, there was only one and he was struck by the State. As a result, the State used a peremptory challenge to strike 100% of the Hispanic veniremembers which certainly raises an inference of discrimination.

The Supreme Court did not intend the first step to be so onerous that a defendant would have to persuade the judge – on the basis of all the facts, some of which are impossible for the defendant to know with certainty – that the challenge was more likely than not the product of purposeful discrimination. Instead, a defendant satisfies the requirements of Batson's

first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred. Johnson v. California, 545 U.S. 162, 170 (2005). In fact, the defendant's prima facie case should be simple and without frills, showing only that the facts and circumstances give rise to an inference that the State exercised peremptory challenges on the basis of race. Price v. Cain, 560 F.3d 284, 287 (5th Cir. 2009). In fact, "the trial judge should have only required petitioner to proffer enough evidence to support an 'inference' of discrimination." Johnson at 166.

In U.S. v. Cruse, the court found that the defendant made a prima facie case simply by objecting to the striking of 2 out of 4 African-American veniremembers who were not self-evidently unfavorable to the government. U.S. v. Cruse, 805 F.3d 795, 807 (7th Cir. 2015). A prima facie case was made despite the fact that the remaining two black veniremembers were seated on the jury. Although ultimately the Batson challenge was denied based on the prosecutor's reasons for striking the jurors, the court cautioned that the racial makeup of the panel and seated jury could not be the sole consideration, because the Equal Protection Clause is violated when even a single juror is excluded as the result of invidious racial discrimination. Id at 809. While a member of the racial group at issue remaining on the jury is helpful to the State's assertion that a defendant failed to make a prima facie

case, it is not dispositive nor may a trial court rely solely on that fact when ruling. Fernandez v. Roe, 286 F.3d 1073, 1079 (9th Cir. 2002).

In the instant case, the trial court erred when it sustained the State's objection to the prima facie case. In Mr. Ricks' case, as in Cruse, two out of four African American veniremembers were struck. Of the remaining two veniremembers, one was seated on the jury. The fact that one black juror was seated does not negate the Batson objection or result in a failure to establish a prima facie case. Furthermore, the fact that the State did not strike the fourth juror does not help their assertion that a prima facie case was not made. This is because the State knew the defense would strike the fourth juror, as the defense request to dismiss that juror for cause was denied and that veniremember indicated he would vote for death no matter what the facts of the case were. (XX R.R. at 7-69; XXX R.R. at 35).

When the trial court denied the defense's Batson objection without requiring the State to offer race-neutral reasons, it did so because "just based on the numbers, I do not find that the State has struck a disproportionate number of persons on the prospective jury panel of a cognizable race, minority." (XXX R.R. at 35). This reasoning is defective on its face.

As in Turner, based on the court's ruling, it is clear that the judge may have impermissibly relief on the fact that an African American juror

remained on the jury without considering other factors and came to the decision by merely reviewing the racial and ethnic makeup and the excluded veniremembers and the seated jury. Turner v. Marshall, 63 F.3d 807, 814 (9th Cir. 1995). "In denying a Batson motion, however, a trial court may not rely solely on the fact that some African-Americans remain on the jury. Regardless of the final racial makeup of the jury, the exclusion of a single minority juror on account of race would constitute a Batson violation. With only the trial court's incomplete analysis upon which to rely, we cannot foreclose the possibility of discrimination." Id. (citations omitted).

Also erroneous, was the way in which the trial court classified veniremembers as minorities and then used the incorrect classifications when determining whether the State struck a disproportionate number of minority jurors. When the defense stated that the State used a peremptory challenge on Carol Argurieo who was Hispanic, the Court stated that on her "jury questionnaire, she identifies herself as white." (XXX R.R. at 26). This would indicate that the trial court felt that a veniremember's self-identification on the juror questionnaire is what determines his or her race, not the surname. Mr. Ricks would argue that this is the correct and is the only way to identify a veniremember's race. The judge did bring Ms.

Argurieo back into the courtroom and confirmed that she was white. (XXX R.R. at 28-29).

The problem arises with veniremembers Felicia Hernandez and Justin Dawson. Despite the fact that all members of a cognitive group do not have to be struck in order for a prima facie case for a <u>Batson</u> violation to be made, the State used the fact that they did not strike Veniremembers Hernandez and Dawson to reject the defense's objection. (XXX R.R. at 30-31). The court erred by not only using the State's argument in determining whether they struck a disproportionately number of minorities, but also by labeling these two veniremembers as Hispanic. Both veniremembers self-identified on the juror questionnaires as white. (Exh. 30 – Redacted questionnaire excerpts). The fact that Hernandez sounds like a Hispanic surname or that the State asserted that Mr. Dawson "appears to be Hispanic" despite having an Anglo surname, in no way permits the court to classify them as Hispanic for <u>Batson</u> purposes. (XXX R.R. at 31). The court did not inquire as to Ms. Hernandez's race although it did question Mr. Dawson at which time record reflected that "Mr. Dawson has a heritage that includes half-Hispanic." (XXX R.R. at 34). Clearly, Ms. Hernandez should be classified as white as that is how she identified herself and that court cannot change her race based on surname alone. With respect to Mr. Dawson, he identifies as white and

172

that is how he should be classified. Furthermore, at the time the State accepted Mr. Dawson, the fact was that he was identified as white. Questioning him after the fact to see if he was Hispanic is self-serving and irrelevant.

In making its ruling, the court took into account the State's assertion that they "exercised a peremptory challenge on one person with a Hispanic surname and accepted two Hispanics" despite the fact that it was completely false. There was only one Hispanic verniremember, Ray Flores. The state used a peremptory challenge on him, thus striking 100% of the Hispanic veniremembers, not 33% as the State would have the court believe. The two veniremembers the State told the court they accepted even though they were Hispanic (Hernandez and Dawson), self-identified as white on the juror questionnaires and thus should not have been included as minorities.

In addition, when "reflecting on the [race of] the prospective venireperson" the court noted that Faye Jeanne-Raglin was African American, Cynthia Lopez was Hispanic, and Tommy Bush was half-Asian. (XXX R.R. at 31). These three veniremembers have no bearing on the Batson objection as the first two veniremembers were not in the strike zone and the latter was not a member of a minority group that was included in the objection.

The race provided when the veniremembers self-identified on the juror questionnaires is what should be used to determine race in a Batson objection, not the race attributed by the court or the State based on their assumptions about a surname, nor the race disclosed through questioning after the State already used their peremptory challenges. Based on the juror questionnaires, the State used a peremptory challenge on the only Hispanic veniremember. Even if viewed in the light most favorable to the State, and Mr. Dawson who admitted to being half-Hispanic after questioning by the court was included in the analysis, the State still struck 50% of the Hispanic veniremembers which provides an inference of discrimination strong enough to make a prima facie case.

Furthermore, although one African American veniremember was seated on the juror, the State did exercise two peremptory challenges against African Americans. We would argue that the State struck 66.67% of the African American veniremembers, despite there being four in the strike zone. This is because the defense challenged the fourth African American for cause, and when the judge denied the request, the defense clearly would strike him. As such, the State did not have to decide whether or not to strike him. (XX R.R. at 67-69; XXX R.R. at 19). If that veniremember is included in the calculation, then the State used peremptory challenges on 50% of the

African American veniremembers which again would establish a prima facie case.

Although there is no magic number of challenged jurors which shifts the burden to the State and requires them to provide race-neutral reasons for their strikes, a "pattern of exclusion of minority venirepersons provides support for an inference of discrimination. Batson, 476 U.S. at 97, 106 S.Ct. at 1723; United States v. Battle, 836 F.2d 1084,1085 (8th Cir. 1987)." Turner, at 812. In the instant case, the defense made a prima facie case as there was clearly an inference of discrimination.

In addition to examining the percentage of minorities challenged by the State, some courts have also looked to see if the percentage of peremptory challenges used by the State against minorities was disproportionately higher than the percentage of the minority group in the venire, when determining if there was an inference of discrimination. Turner v. Marshall, 63 F.3d 807, 813 (9th Cir. 1995). Given the low number of Hispanic and African American veniremembers, even if the State struck every single one of them, the percentage of peremptory challenges that would have been used on minorities would be relatively low. Nevertheless, in the instant case, the percentage of strikes used on Hispanics and African American vernimembers was still greater than the percentage in the panel.

Specifically, the percentage of veniremembers who were African American was 11.11% and the percentage of strikes used by the State on African Americans was 15.38 %, while the percentages for Hispanics were 2.78% and 7.69% respectively. (Exh. 31 – Batson strike zone chart).

Furthermore, the State's entire argument against the defense's prima facie case consisted of pointing to the number of African Americans or Hispanics struck by the defense and the fact that one African American juror was seated. While this may be taken into account when considering the State's arguments for non-racial reasons for striking a veniremember, it is not dispositive and completely irrelevant during step one of the Batson inquiry.

The defense is allowed to use all relevant facts when establishing a prima facie case. In addition to the number of African American veniremembers struck by the State, the State's voir dire of veniremember Alicia Stafford is significant. Although she "qualified rather well," the State's examination of her took approximately an hour and a half. (XXX R.R. at 32). This is much more time than they spent with other jurors, including those more difficult to qualify. (XXX R.R. at 32). This demonstrates the State's desire to disqualify her despite there being no valid reason other than her race. When attempts to disqualify her failed, they were

forced to strike her.

An analysis of the records establishes that the court should have found the defense made a prima facie showing of discrimination. Had this issue been raised on appeal, the appellate court should have abated the appeal and remanded for a full Batson hearing. Hutchinson v. State, 86 S.W.3d 636, 638-39 (Tex. Crim. App. 2002). By not raising this issue on appeal, appellate counsel rendered ineffective assistance. U.S. Const. amends. VI, XIV; Evitts v. Lucey, 469 U.S. 387, 394 (1985).

## ELEVENTH GROUND FOR RELIEF

### MR. RICKS SENTENCE OF DEATH WAS IMPOSED BY AN UNCONSITUTIONALLY ARBITRARY SYSTEM.

In 1972 the Supreme Court struck down the death penalty because there was no principled basis to distinguish the few people sentenced to death from the thousands of others who committed crimes just as bad but were not sentenced to death. Furman v. Georgia, 408 U.S. 238 (1972). In his concurring opinion, Justice Stewart stated:

> These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For all of the people convicted of rapes and murders in 1967 and 1968, many just as reprehensible as these, the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed....I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.

Id. at 309-10(Stewart, J., concurring).

Four years later when the court approved new death penalty statues, it held that state legislatures had confronted these problems by drafting statutes that provided the sentencer with guidance in determining the appropriate

sentence and narrowed the sentencer's discretion to impose the death penalty. Jurek v. Texas, 428 U.S. 262, 270 (1976); Gregg v. Georgia, 428 U.S. 153, 189 (1976)("Furman mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."). Over the years, the Supreme Court has continued to assess capital sentencing schemes to determine whether they include suitable safeguards to prevent the arbitrary imposition of the death penalty. See, e.g. California v. Brown, 479U.S. 538, 541 (1987); Mills v. Maryland, 486 U.S. 367, 374 (1988).

But one aspect of death penalty administration remains unregulated – prosecutorial discretion. And when one looks to the actual administration of the current death penalty system in Texas, one can only conclude that determining who gets sentenced to death is still akin to "being struck by lightning". Such a system violates the constitution. U.S. Const. amends. VIII, XIV.

Defense counsel in Mr. Ricks' case filed a pretrial motion objecting to the unconstitutionally arbitrary nature of the Texas death penalty scheme. (I C.R. at 147-150). This motion was denied. (V R.R. at 69).

In 2013, the year that Mr. Ricks' offense occurred, there were 1,151 murders committed in Texas. Index Crime Analysis 2013, Tex. Dep't. Pub. Safety, www.dps.texas.gov/crimereports/13/citCh2.pdf (last visited May 25, 2016). And yet, in 2014, the year Mr. Ricks was tried, only 11 people were sentenced to death in Texas. Offenders on Death Row, Tex. Dep't Crim. Just., www.tdcj.state.tx.us/death_row/dr_offenders_on_dr.html (last visited May 25, 2016). Within these statistics one finds at work factors that have no place in the "evenhanded, rational, and consistent imposition of death." Jurek, 428 U.S. at 276.

I. GEOGRAPHIC DISPARITIES

Since 1976, 1,132 defendants have been sentenced to death in Texas. Total Number of Offenders Sentenced to Death from Each County, Tex. Dep't. Crim. Just., https://www.tdcj.state.tx.us/death_row/dr_number_sentenced_death_county.html (last visited May 25, 2016). Collectively, less than half of Texas' 254 counties account for these 1,132 sentences. Id. (listing 120 Texas counties). Four counties – Harris, Dallas, Bexar, and Tarrant – account for over 50% of these sentences.

Texas is not alone in this phenomenon. Multiple studies conducted throughout the country have identified intra-state geographic disparities in

the imposition of the death penalty. See, e.g., Kovarsly, Lee, The Local Concentration of Capital Punishment, (Feb. 26, 2016), Duke L. J., Forthcoming, U. of Maryland Legal Studies Research Paper 2016-14 (available at SSRN: http://ssrn.com/abstract=2738958); Robert J. Smith, The Geography of the Death Penalty and Its Ramifications, 92 Boston U. L. Rev. 227 (2012); Jules Epstein, Death-Worthiness and Prosecutorial Discretion in Capital Case Charging, 19 Temple Pol. & Civ. Rts. L. Rev. 389 (2010) (discussing studies in Arizona, Missouri, Pennsylvania, and South Carolina); Adam Gershowitz, Statewide Capital Punishment: the Case for Eliminating Counties' Role in Death Penalty, 63 Vand. L. Rev. 307 (2010).

In one study, researchers found that over a four-year period in Missouri, 76% of cases charged as either first-degree murder, second-degree murder, or involuntary manslaughter met that State's statutory definition to the eligible for the death penalty. Katherine Barnes, et al., Place Matters (Most): An Empirical Study of Prosecutorial Decision-Making in Death-Eligible Cases, 51 Ariz. L. Rev. 305, 309-11 (2009). However, only 5% of those cases occasioned a death penalty trial. Id. at 309. As a result, prosecutors throughout the state made the decision not to seek death in 95% of death-eligible cases. Id. This discretion was not spread evenly, however,

as prosecutors in the City of St. Louis and Jackson County charged capital cases far less frequently, (6.5%), than the prosecutors in the rest of the state, 20%). Id. at 344.

In Jurek and Gregg, the Supreme Court considered whether impermissible arbitrariness in capital sentencing resulted from prosecutorial discretion to choose those cases in which a death sentence would be sought. Gregg, 428 U.S. at 199; Jurek, 428 U.S. at 274. The Court determined that this decision-making served to remove defendants from the risk of death and did not violate the U.S. Constitution, provided the "decision to impose [death was] guided by standards so the that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." Gregg, 428 U.S. at 199. Justice White, in his concurrence, noted that the decision of prosecutors would likely reflect that of juries and be rooted in the seriousness of the offense:

> Absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts. Unless prosecutors are incompetent in their judgments, the standards by which they decide whether to charge a capital felony will be the same as those by which the jury will decide the questions of guilt and sentence.

Id. at 225 (White, J., concurring).

The experience of the last forty years has shown that the practical consequence of prosecutorial discretion has not been to narrow the field of death-eligible defendants to the most serious and heinous cases. It strains credulity to believe that Texas' four most populous counties have had as many heinous crimes within their borders as have Texas' remaining 250 counties. Far more likely, factors such as ideology, experience litigating capital cases, and resource availability exert significant influence on prosecutors' decisions to seek the death penalty. See Gershowitz at 319-23 (noting several instances in which prosecutors have declined to pursue the death penalty based on resource limitations). Lee Kovarsky in his paper noted:

> The geographic distribution of death sentences and executions does not reflect the concentration of population, the distribution of homicides, or locally differentiated punishment norms. The driving force behind the concentration is more bureaucratic than democratic, and more path dependent than pragmatic. It results from what I have called local muscle memory, which is correlated decision-making across local sites of discretion.

Kovarsky at 24-5. Kovarsky concluded that one of the biggest sources of local variation is the discretion of the local prosecutor. Id. at 29. But the variations are not driven solely by prosecutorial discretion. As Kovarsky explained:

> In certain localities, capital litigation can represent a source of political and professional opportunity for the police,

> prosecutors, judges, and executives that collectively perform the law-enforcement function. In those localities, the bureaucracy is simply *good at* capital process. To phrase my explanation in the cold economic terms necessary for maximum clarity – if a capital outcome is an asset, localities that produce many death sentences and executions do so because of heavy political demand and cheap bureaucratic supply.

Id. at 33. Kovarsky concluded that, "In light of such correlated and path dependent decision-making, capital outcome concentration reflects severe violations of the basic punishment norm that similarly blameworthy offenders be treated equally." Id. at 67.

II. RACIAL DISPARITY

In addition to geography, studies continue to show that race is a motivating factor behind jury verdicts in capital cases. See, e.g., David Baldus, et al., Race and Proportionality Since *McCleskey v. Kemp*: Different Actors with Mixed Strategies of Denial and Avoidance, 39 Colum. Hum. Rts. L. Rev. 143 (2007); Isaac Unah, Choosing Those Who Will Die: The Effect of Race, Gender, and Law in Prosecutorial Decision to Seek the Death Penalty in Durham County, North Carolina, 15 Mich. J. Race & L. 135 (2009) (finding that prosecutors were more likely to pursue capital cases for white victims than black victims).

One study specific to Texas examined the influence of race in Harris County capital cases from 1992 to 1999. Scott Phillips, Racial Disparities in

the Capital of Capital Punishment, 45 Hous. L. Rev. 807 (2008). Using statistical techniques, the study showed that "black defendants who committed crimes *less* likely to lead to a death trial tended to face a capital trial *more* frequently than their white and Hispanic counterparts." American Bar Association Death Penalty Due Process Review Project, Evaluating Fairness and Accuracy in State Death Penalty Systems: The Texas Capital Punishment Assessment Report, 353 (2013)(citing Phillips, 45 Hous. L. Rev. at 830). A defendant also faced increased odds of receiving a death sentence if he was black than if he was white or Hispanic. Phillips at 834. The study also confirmed that those convicted of killing a white victim were more likely to receive a death sentence than those convicted of killing a black victim. Id.

A subsequent study conducted largely the same analysis for the period beginning January 1, 2001, and ending February 15, 2008. Scott Phillips, Continued Racial Disparities in the Capital of Capital Punishment: The Rosenthal Era, 50 Hous. L. Rev. 131, 134 (2012). While the race of the defendant no longer appeared to influence the prosecution's charging decisions and the juries' sentencing decisions, the race of the victim still proved to be a controlling factor. Id. at 148. Specifically, this study found that "the death penalty was imposed on behalf of white victims at more than

twice the rate one would expect if the system were blind to race, and... on behalf of white female victims at more than five times the rate one would expect if the system were blind to race and gender." Id. at 145.

In a third study – one that used a controlled experiment to examine the subtle influence of race on juror decision-making – researchers at the University of California at Berkeley found that members of a random sample of 276 adults were more inclined, after reviewing a file summary of a triple-murder case and being told that the maximum punishment was death, to find a defendant guilty based on the evidence provided if the defendant had a name traditionally associated with minorities than if he had a more race-neutral name. Jack Glaser, et al., Possibility of Death Sentene Has divergent Effect on Verdicts for Black and White Defendants 5-6 (June 24, 2009, https://gspp.berkeley.edu/assets/uploads/research/pdf/SSRN-id1428943.pdf). By contrast, other members of that same random sample were no more likely, after reviewing the same file and being told that the maximum punishment was life without the possibility of parole, to find a defendant guilty if his name happened to be one traditionally associated with minorities. Id.

Although the precise casual mechanism at work only could be guessed at, the researchers nevertheless postulated that "a more severe penalty raises

the juror's estimated 'cost' of a wrongful conviction". Id. (citing N. Kerr, Severity of Prescribed Penalty and Mock Jurors' Verdicts, 36 J. Personality & Soc. Psych. 1431 (1978)). Or, perhaps, "for participants with Black defendants, wrongful conviction was a lesser concern, and instead the death penalty reinforced the brutality of the crime." Id. at 6. Still more perverse, "capital punishment may feel more appropriate for Black defendants, given that they are overrepresented on death row, and ...research has indicat[ed] that convicted capital defendants who look more stereotypically Black are more likely to be given a death sentence." Id. (citing Jennifer L. Eberhardt, et al., Looking Deathworthy, 17 Psych. Sci. 383 (2006)).

Whatever the participants' motivation, the conclusion compelled by this study and the other studies mentioned is inescapable: Race continues to influence the imposition of the death penalty, regardless of whether that influence is conscious or unconscious. When a law is applied in such a way that it becomes more directed at a "particular class of persons" – particularly when that class of persons is distinguished by race – the application of that law violates an individual's right to equal protection under the law. See Yick Wo v. Hopkins, 118 U.S. 356, 373 (1886).

**PRAYER**

WHEREFORE, Applicant prays that the convicting court issue the writ of habeas corpus, conduct a hearing, order discovery relevant to these claims, make findings of fact and conclusions of law, and recommend that Applicant should be entitled to relief from his conviction for capital murder and sentence of death. Applicant further prays that after review by the Court of Criminal Appeals, that court enter a judgment ordering Applicant's release.

Respectfully submitted,

Catherine Clare Bernhard
P.O. Box 2817
Red Oak, Texas 75154
972-617-5548
fax – 972-421-1604
cbernhard@sbcglobal.net
State Bar No. 02216575

ATTORNEY FOR APPLICANT

**VERIFICATION**

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this date personally appeared Catherine Clare Bernhard, attorney of record in the above-styled and numbered cause, who upon her oath does hereby swear and affirm upon her personal knowledge that all statements of fact contained in the foregoing Application are in all respects true and correct.

Catherine Clare Bernhard

STATE OF TEXAS
COUNTY OF DALLAS

SUBSCRIBED AND SWORN BEFORE ME, the undersigned Notary Public, on this the 10th of June, 2016.

CLINTON J. STAFFORD
MY COMMISSION EXPIRES
December 5, 2017

Notary Public in and for the State of Texas.

## CERTIFICATE OF SERVICE

I hereby certify to the Court that a true and correct copy of the foregoing Application was served on the Office of the District Attorney for Tarrant County by placing it in the U.S. mail addressed to Ms. Helena Faulkner, Assistant Criminal District Attorney, 401 W. Belknap, Fort Worth, Texas 76196, on June 10, 2016.

Catherine Clare Bernhard

# APPENDIX A

## COPY OF JUDGMENT

 

CASE NO. 1361004R

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 371ST |
| | § | |
| VS | § | DISTRICT COURT |
| | § | |
| CEDRIC ALLEN RICKS | § | TARRANT COUNTY, TEXAS |

# CAPITAL JUDGMENT

On May 5, 2014 this cause was called for trial and the State by her Criminal District Attorney, Assistants ROBERT GILL and ROBERT HUSEMAN, and the attorneys for the Defendant, CEDRIC ALLEN RICKS, Honorable WILLIAM RAY and STEVE GORDON, announced ready for trial; and the State having made known that it would seek the Death Penalty in this cause and the Defendant having been heretofore arraigned; and, it appearing to the Court that the Defendant was mentally competent and the Defendant having been charged in the Indictment with Capital Murder; thereupon, a jury of good and lawful men and women, to-wit: RICHARD E. GUCKEL, Foreperson, and eleven others, was duly selected, impaneled and sworn as the law directs, and the said Criminal District Attorney read to the Jury, COUNT ONE of the Indictment herein, and the Defendant entered his plea of Not Guilty to COUNT ONE of the Indictment, hereto; and the Jury, after hearing the evidence, and being duly charged by the Court, retired to consider its verdict, and after deliberation, returned into open Court on the 7TH day of May, 2014, the following verdict, to-wit:

## VERDICT FORM

We the Jury, find the Defendant, CEDRIC ALLEN RICKS, guilty of the offense of Capital Murder, as charged in the Indictment.

Signed: Richard E. Guckel
Foreperson of the Jury

SCANNED



The parties announced ready for the second phase of the trial, and the Jury, having heard all the evidence, and being duly charged by the Court, retired to consider its verdict, and after due deliberation, returned into open court, on the 16TH day of MAY, 2014, their answers to the following Special Issues, and their verdict:

SPECIAL ISSUE NO. 1

Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?

In your verdict you will answer "Yes" or "No" Answer: YES

SPECIAL ISSUE NO. 2

Taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

In your verdict you will answer "Yes" or "No" Answer: NO

**VERDICT FORM**

We, the Jury, having unanimously agreed upon the answer to the foregoing issues do hereby return the same into court as our verdict.

Signed: Richard E. Guckel
Foreperson of the Jury

After an individual poll of the Jurors, the Court duly accepted the verdicts and ORDERED the same to be filed.

The Jury having answered Special Issue One "YES" and Special Issue TWO, "NO", it being mandatory that the punishment be death, the Court assessed the punishment at Death.

The Defendant, CEDRIC ALLEN RICKS, was asked by the Court, whether he had anything to say why sentence should not be pronounced against him, and the Defendant answered nothing in bar thereof;

The Court proceeded, in the presence of the said Defendant CEDRIC ALLEN RICKS, and his counsel of record, to pronounce sentence against him as follows:

The jury having answered Special Issue #1 "Yes," and Special Issue #2 "No," it is mandatory that the punishment be set at death.

IT IS THE ORDER, JUDGMENT AND DECREE OF THIS COURT that you, CEDRIC ALLEN RICKS, having been found guilty of the offense of Capital Murder and the jury having answered Special Issue #1 "Yes," and Special Issue #2 "No," and it being mandatory that your punishment be set at death, that your punishment be assessed at death, and that at any time before 6:00 P.M. on a date to be determined by this Court upon a mandate of affirmance issued by the Texas Court of Criminal Appeals, at the State Penitentiary at Huntsville, you shall be caused to die by intravenous injection of a substance or substances in a lethal quantity sufficient to cause your death and until you, CEDRIC ALLEN RICKS are dead, said execution procedure to be determined and supervised by the Director of the Institutional Division of the Texas Department of Criminal Justice.

HON. MOLLEE WESTFALL
PRESIDING JUDGE
371ST DISTRICT COURT
TARRANT COUNTY, TEXAS

May 16, 2014
Date Signed

CASE NO. 1361004R COUNT ONE
INCIDENT NO./TRN: 9047733940

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 371ST DISTRICT COURT |
| | § | |
| v. | § | |
| | § | |
| CEDRIC ALLEN RICKS | § | TARRANT COUNTY, TEXAS |
| | § | |
| STATE ID NO.: TX50178423 | § | Date: MAY 16 2014 |

Right Thumbprint

Right Thumbprint

x Craig Martin - 73098
PERSON TAKING PRINT

# JUDGMENT AND SENTENCE FINGERPRINT PAGE

Clerk KW

Page 4 of 4

C-371-010796-1361004-A

WRIT NO. ____________

TRIAL COURT NO. 1361004

---

IN THE 371st JUDICIAL DISTRICT COURT
TARRANT COUNTY, TEXAS

and returnable to

THE COURT OF CRIMINAL APPEALS
OF TEXAS

---

EX PARTE CEDRIC ALLEN RICKS

---

EXHIBITS 1-2

---

Catherine Clare Bernhard
P.O. Box 2817
Red Oak, Texas 75154
972-617-5548
fax – 972-421-1604
cbernhard@sbcglobal.net
State Bar No. 02216575

ATTORNEY FOR APPLICANT

WRIT NO. __________
TRIAL COURT NO. 1361004

---

IN THE 371st JUDICIAL DISTRICT COURT
TARRANT COUNTY, TEXAS

and returnable to

THE COURT OF CRIMINAL APPEALS
OF TEXAS

---

EX PARTE CEDRIC ALLEN RICKS

---

EXHIBITS 1-2

---

Catherine Clare Bernhard
P.O. Box 2817
Red Oak, Texas 75154
972-617-5548
fax – 972-421-1604
cbernhard@sbcglobal.net
State Bar No. 02216575

ATTORNEY FOR APPLICANT

Exhibit 1

Curriculum Vitae of Mairead Burke, LMSW

**MAIREAD BURKE, LMSW**
P.O. Box 11543 · Austin, TX 78711-1543
858-705-0338 · mairead@burkemitigation.com

## EXPERIENCE

**Mitigation Specialist and Case Consultant** — Austin, TX
*Burke Mitigation and Consulting, LLC* — October 2014- Present
*Independent Contractor* — January 2014- October 2014

- Engage clients and their families in mitigation investigations by developing collaborative working relationships
- Research, locate, and interview mitigation witnesses
- Work with experts and legal teams to document and preserve information provided by mitigation witnesses
- Develop biopsychosocial histories with clients' personal, medical, psychological, educational, and familial history
- Collect, analyze, and digest documentary evidence
- Create multi-generational genograms to present historical familial information
- Integrate witness, documentary, and expert evidence into a thorough life history narrative
- Assist legal teams in preparing for trial, hearings, or post-conviction proceedings

**Adult Case Manager** — Chicago, IL
*Howard Brown Health Center* — June 2013- April 2014

- Maintained current knowledge of HIV-related information, provided treatment education and adherence counseling to 40+ clients to improve health outcomes in a compassionate, culturally sensitive manner
- Intervened in client crises, including medical, psychiatric, financial, housing, and lack of food
- Engaged clients in intensive case management through building rapport and trust to form productive, strong, collaborative relationships
- Screened for mental health issues, evaluated for suicidality and homicidality, and connected clients to mental health care
- Responded to client needs with a problem solving approach, providing alternative resources and solutions in the absence of established procedures
- Coordinated home services to allow HIV+ individuals with disabilities to stay out of nursing homes and remain in their homes
- Partnered with medical team, mental health providers, and outside agencies to leverage resources, meet client needs, and improve overall health
- Organized and updated client files, documented client progress, and collected data for grants and funding

**Graduate Social Work Intern: Therapist** — Chicago, IL
*Jewish Child and Family Services* — September 2012- May 2013

- Provided client-centered psychotherapy to individuals experiencing anxiety, depression, loss, trauma, and other issues
- Engaged clients and conducted intake and mental health assessments
- Collaborated with clients to develop and implement individualized treatment plans
- Led Moms and Tots group for teen mothers who were wards of the State.

**Graduate Social Work Intern** — Chicago, IL
*ACCESS Community Health Network Clinic at Sullivan High School* — October 2011- June 2012

- Conducted biopsychosocial assessments for new clients
- Facilitated psychoeducational groups for students in in-school suspension
- Co-led teen parenting and LGBTQ support groups
- Collaborated with medical, mental health, and school staff to provide holistic approach to care and engage multiple systems in clients' welfare.

**Mitigation Specialist and Forensic Investigator** New Orleans, LA
*NOLA Investigates* August 2008- September 2011

- Engaged men on Death Row in their guilt and penalty phase investigation through a client-centered relationship
- Conducted biopsychosocial assessments and extensive life history investigations
- Performed interviews with clients' family members, friends, teachers, employers, and other relevant individuals
- Gathered, analyzed, and presented educational, medical, and mental health records in a comprehensive and compelling life history narrative
- Prepared for trials and appeals with multi-disciplinary teams of investigators, mitigation specialists, lawyers, doctors, and other experts to provide effective comprehensive representation

**Jesuit Volunteer Corps Intern** New Orleans, LA
*NOLA Investigates* August 2007- August 2008

- Investigated inhumane conditions at a juvenile detention center that resulted in center's agreement to provide mental health counseling, adequate nutrition, effective medical care, and individualized education to incarcerated children
- Organized and maintained extensive hard and electronic files of complex capital cases

## EDUCATION

**University of Chicago** Chicago, IL- 2013
Master of Arts, School of Social Service Administration
Concentration: Clinical Social Work

**Santa Clara University** Santa Clara, CA- 2007
Bachelor of Arts
Major: Communication
Minor: Women's and Gender Studies

## LICENSURE AND MEMBERSHIPS

Licensed Master Social Worker with the Texas State Board of Social Worker Examiners since July 2014.
License #: 59512

Licensed Private Investigator with the Louisiana State Board of Private Investigator Examiners since January 2009.
License #: 7026-011209-LA

National Association of Social Workers, member since 2013.
Identification #: 886632596

## PRESENTATIONS

**The John Marshall Law School**
**JD-287MI-1: Mass Incarceration and Race** Chicago, IL- April 2014
Led presentation and discussion on the connection between race, poverty, access to education, and the death penalty.

**Life in the Balance: Defending Death Penalty Cases** New Orleans, LA- March 2009
**National Legal Aid & Defender Association**
Co-led presentation entitled "Client Interviews: Staying Present with Your Client." Presentation covered building rapport with clients and developing effective client and witness interview skills.

## SEMINARS, TRAININGS, AND CONFERENCES ATTENDED

**FASD Awareness Day Training** — Austin, TX- September 2014
*Texas Association for Infant Mental Health*

**Fetal Alcohol Spectrum Disorders: Making the Invisible Visible** — Webinar- August 2014
*National Association of Social Workers*

**Self Regulation and Executive Functioning in Youth with FASD: Implications for the Criminal Justice System**
*National Organization on Fetal Alcohol Syndrome* — Webinar- May 2014

**Trauma and Recovery: A Guide to Creating Groups for Survivors**
*Womencare Counseling Center* — Evanston, IL- October 2013

**Online Training Course for Cognitive Processing Therapy**
*The Medical University of South Carolina* — Online- May 2013

**Online Training Course for Trauma-Focused Cognitive-Behavioral Therapy**
*The Medical University of South Carolina* — Online- January 2012

**The Fourth National Seminar on Mental Health and the Criminal Law**
*Sponsored by the Administrative Office of the United States Courts* — New Orleans, LA- January 2011

**Intellectual Disability Workshop for Capital Defense Mitigation Specialists**
*Co-sponsored by the American Association on Intellectual and Developmental Disabilities- Louisiana Chapter and the Center for Capital Assistance* — New Orleans, LA- October 2010

**Forensic Social Work: Integrating Research, Policy and Practice**
*National Organization of Forensic Social Work* — Atlanta, GA- April 2010

**Life in the Balance: Defending Death Penalty Cases**
*National Legal Aid & Defender Association* — New Orleans, LA- March 2009

**American Academy of Forensic Sciences Annual Meeting**
*American Academy of Forensic Sciences* — Denver, CO- February 2009

**Entomological Evidence from the Death Scene: A Forensic Entomology Workshop** — Rensselaer, IN- June 2008
*Dr. Neal Haskell*

**Life in the Balance: Defending Death Penalty Cases**
*National Legal Aid & Defender Association* — Atlanta, GA- March 2008

# Exhibit 2

## Affidavit of Mairead Burke, LMSW



# AFFIDAVIT OF MAIREAD T. BURKE, LMSW
# MITIGATION SPECIALIST

My name is Mairead T. Burke. I am a Licensed Master Social Worker (LMSW) in the State of Texas. I have a Master of Arts Degree in Social Work from the University of Chicago. Since 2007, I have been providing Mitigation Investigation services to attorneys representing clients charged with Capital Murder where the State is seeking the death penalty.

I was asked by Catherine Bernhard, Mr. Cedric Ricks' counsel, to complete a mitigation investigation of Cedric's life for the purpose of determining what possible factors could have affected his development, behavior, and functioning. Ms. Bernhard also asked that I evaluate the mitigation investigation that was conducted, and the mitigating circumstances that were presented, at Cedric's trial, and identify if there were mitigating circumstances that were not discovered or presented to the jurors charged with determining Cedric's sentence.

In preparing my report and reaching my professional opinion, I visited with Cedric several times at Polunsky Unit in Livingston, TX, where he is currently housed. I travelled to Chicago five times and Mansfield, TX twice to conduct in-person interviews with family members, friends, teachers, and relevant life history witnesses. I reviewed thousands of pages of records including: trial transcripts, documents provided by trial counsel, and documents collected in post-conviction.

## POST-CONVICTION MITIGATION INVESTIGATION

## MULTIGENERATIONAL FAMILY HISTORY

Cedric's maternal grandmother, Christine Sudduth, was born and raised in Kosciusko, MS. Christine's family was poor, but they worked hard as sharecroppers and tried their best to get by as Blacks in the Jim Crow South. Christine Sudduth described her childhood and family history in her affidavit:

> *"My parents were Robert Sudduth and Florida Peteet; I am the oldest of their eight children. I've made my home in Chicago, but I am originally from Kosciusko, MS. When I was growing up in Mississippi in the 1930s and 1940s, African American children were only allowed to go to school through the 8th grade, while white children could go through 12th grade and graduate high school. I went as far as I was allowed and I finished 8th grade.*
>
> *My family and I worked in the fields and farmed. We made our own clothes, canned our own food, and lived off the land. We learned to cook hog feet and liver because those were the parts of the pig that were usually given away. We learned to treat sickness with home remedies, like onion tea, goose grease, and turpentine.*



> *My mother's parents were Charlie Peteet and Daisy Teague Peteet. My grandfather Charlie was the backbone of our family. He drank a lot, and sometimes fell off his horse because he was too drunk, but he was a respected member of the community. He and one of my uncles used to care for cows and mules in the area by helping them give birth. He also made poke salad root tea to treat people with syphilis.*
>
> *My family has a long history of serving our country in the military. Three of my uncles served in the Army during World War II: Fleming Peteet, Henry Peteet, and William Peteet. My husband, Rogers Sanders, and a cousin served in the Navy during World War II. Later, my son, Joseph Sanders, served in the Marines.*
>
> *I met my first husband, Rogers Sanders, while he served in the Navy with my cousin. Rogers started writing to me and I fell in love with him through his beautiful letters. He came to Mississippi when he returned from service and we got married."*

Cedric's mother, Helen Ricks (née Sanders), was born to Christine Sudduth and Rogers Sanders in Kosciusko, MS on August 5, 1946. Helen's birth certificate lists Christine as a field worker and Rogers as a day laborer (Sanders, Helen. birth certificate. 1946.08.05). After Helen's birth, along with thousands of other southern African-Americans in the Great Migration, Rogers, Christine, and Helen moved to the northern United States in search of more opportunity. Over the coming years, the rest of Christine's family migrated north. Christine and Rogers assisted Christine's seven siblings and parents in their journeys north by hosting each person for months at a time and helping them settle into a new way of life. With the strength and resilience in the family, there were also problems. Christine's brother, Robert "Mike" Sudduth, had problems when he arrived. He had a mental breakdown, was hospitalized, and died early. Christine stated in her affidavit:

> *"Soon after marrying, Rogers and I moved to Chicago to join his family. Many, many African Americans moved from the southern United States to the northern United States for better opportunities. I was the first in my family to move north, and then my brothers, sisters, parents, and uncles made their way north too. Many of my family members stayed with me in Chicago when they first came north, and then they went out on their own and settled. Some of my family stayed in Chicago, and some moved to Michigan. My brother, Robert "Mike" Sudduth, died in Michigan in 1964. I don't know exactly what he died of, but he had problems with his nerves and had a breakdown. He was not very talkative, and he used to pick at his ears and say something was in them when I could see there wasn't anything there."*

Around 1949, Christine and Rogers got an apartment in the Dearborn Homes, a new Chicago Housing Authority building made to house Blacks after World War II. Though the Dearborn Homes were a nice place to live when they originally opened, in the late 1950s there were already reports of gangs and vandalism. Christine and Rogers had two

more children, Joseph and Sherann. Later, Christine and Rogers divorced, partly due to his gambling problem that affected the family's financial stability. Christine stated in her affidavit:

> *"Rogers and I had three children together: Helen, Joe, and Sherann. We raised our family in the Dearborn Homes, a housing project in Chicago. We moved into the Dearborn homes when they were new; back then it was a nice place to live. Rogers and I both worked; he was a doorman on Michigan Avenue and I did food preparation at the Westin Hotel after our youngest child was born.*
>
> *Rogers and I divorced after 29 years of marriage, but we remained friends. Rogers gambled, but I felt he was a good father to the children. A few years after our divorce, I met and married Patrick Jones. Pat died of cancer in 1994."*

Cedric's father, Shederick Ricks, also came from a family that migrated north to Illinois for better opportunities. His parents, Emma Doris and Fred Ricks, were both originally from Mississippi. Shederick was born in Chicago on February 3, 1948. His parents had five other children: Geraldine, Jacqueline, Frederick, Doris, and Michael. His father abandoned the family when Cedric was very young. Shederick's family also lived in the Dearborn Homes, and that is where he met Helen. Shederick discussed his childhood and adolescence in his affidavit; he stated:

> *"Helen and I met when we were kids. We both grew up in the Dearborn Homes housing project in Chicago, IL; I was, and still am, very close friends with her younger brother, Joseph Sanders.*
>
> *I lived in the Dearborn Homes with my mother, brothers, and sisters. My father left when I was about six years old, and I didn't really know him. My uncles on my mother's side helped raise me because I didn't have a father. They encouraged me to work so I'd have some money, stay off the streets, and stay out of trouble.*
>
> *I started working in high school to help my mother pay the bills. The Urban League helped me get a job working on the railroads after school. While I was in high school I started a mentoring program to get kids from the housing projects into little league. Growing up without a father, I've always wanted to help kids, especially young men. This has made Cedric's problems very difficult to deal with; I wish I could've helped Cedric more."*

Helen and Shederick married in 1969. Helen and Shederick both worked full-time. They had their first son, Dwayne Elliot Ricks, on May 19, 1971. Shederick stated in his affidavit:

*Helen and I married in 1969. I continued working on the railroads, and later applied for a trade job and was selected for an opening in the sprinkler fitter union. I was the third black sprinkler fitter in the union. I worked 7 days a week, splitting my time at the railroad and the sprinkler fitter apprenticeship. Helen worked full time at the Illinois Bell Telephone Company.*

*On May 19, 1971, Helen and I had our first child, Dwayne Ricks."*

Soon after Dwayne's birth, Helen and Shederick returned to work full-time and babysitters cared for Dwayne. Later, Dwayne lived full-time with Helen's paternal aunt, Geraldine Sanders.

## PRENATAL EXPOSURE TO ALCOHOL

Helen's pregnancy with Cedric was unplanned. She drank alcohol throughout her pregnancy with Cedric, smoked cigarettes, and occasionally smoked marijuana. Helen stated in her affidavit:

*"My pregnancy with Cedric was unplanned. We knew we wanted another child in the future, but at that time we were not trying or planning for a pregnancy. I learned I was pregnant when I was about two months along.*

*Back when I was pregnant with Cedric, my doctor didn't tell me not to drink alcohol, so I continued drinking throughout my pregnancy. I usually drank two nights a week—Friday and Saturday—and had about 4-5 mixed drinks each night, usually with gin, scotch, or brandy. I also smoked cigarettes during my pregnancy with Cedric, about 1/3 of a pack a day. I smoked marijuana about once or twice a month.*

*Cedric was born full-term. I don't remember exactly how much Cedric weighed when he was born, but it was around 6 lbs."*

Cedric's uncle, Joseph Sanders, confirms that Helen consumed alcohol on a weekly basis during her pregnancy with Cedric. He stated in his affidavit:

*"My wife Debbie and I got married and had kids around the same time that Helen and Shederick did. During the time Helen was pregnant with Cedric we saw her and Shederick probably every weekend. Back then we drank alcohol when we got together on the weekends. I remember Helen drank on the weekends while she was pregnant with Cedric."*

Cedric's aunt, Deborah Sanders, also remembers that Helen drank alcohol on a weekly basis throughout her pregnancy with Cedric. She stated in her affidavit:

*"Helen and Shederick Ricks are not only family, they're close friends too. The four of us have been close friends since before we got married and before the kids were born.*

*During the time Helen was pregnant with Cedric, the four of us got together probably every weekend. Back then, we drank alcohol when we were together on the weekends, and Helen continued to drink alcohol throughout her pregnancy with Cedric when we were together on weekends."*

Prenatal exposure to alcohol, particularly at this dose and frequency, is a serious concern. The disorders that fall under the Fetal Alcohol Spectrum Disorder umbrella can cause significant and life long persistent effects on an individual's abilities and functioning including: learning, memory, attention span, communication, hearing, behavior, judgment, and poor impulse control. Prenatal exposure to alcohol can also cause characteristic facial abnormalities including a smooth philtrum, thin upper lip, and small palpebral fissures.

Above: Helen and baby Cedric



Above: Cedric as a toddler



Above: Cedric's kindergarten school picture



Above: Cedric in early childhood

**PRENATAL AND CHILDHOOD EXPOSURE TO HIGH LEVELS OF LEAD**

Helen reported the family's residential history in her affidavit:

*"During the time I was pregnant with Cedric we lived at 7755 South Evans Avenue in Chicago. Soon after Cedric was born we moved to 6850 South Wood Street, also in Chicago. And in 1976 we moved to 12341 South Bishop Street in Calumet Park and we stayed there until 1996."*

Helen also reported in her affidavit that Cedric's babysitter, with whom he spent every weekday, from 4 months to 5 years old, lived at 6202 S. Vernon Avenue in Chicago IL.

The photos below are present day photos of Cedric's early addresses:



Above: 7755 South Evans Avenue



Above: 6850 South Wood Street (home no longer exists, photo of nearby addresses on the block where home likely stood)



Above: 6202 S. Vernon Avenue

In her evaluation of lead levels at Cedric's addresses, Amy Nguyen, a Geographic Information Systems Analyst; found that the children in the South Evans, South Wood, and South Vernon neighborhoods all had elevated blood lead levels. She stated in her affidavit:

> *"An additional concern for Mr. Ricks' family was lead exposure... The neighborhood encompassing the South Evans address showed 31.7% of children had blood lead levels higher than 10 mcg/dL (micrograms per deciliter), only eleven districts scored higher. The West Englewood neighborhood (South Woods*



*address) was the 4th worst of 77 testing areas, and the Woodlawn neighborhood where the babysitter lived was 9th highest in lead exposure. While Mr. Ricks was well into adulthood by the time the study was conducted, the incidences of high lead levels would have been even higher in the 1970s and 1980s when less abatement work had been done. It should also be noted that since the initial data was reported the Centers for Disease Control (CDC) has subsequently lowered the blood lead level of concern from 10 mcg/dL to 5 mcg/dL. The CDC now says there is no safe blood lead level. (CDC, 2010)"*

Of additional concern, Nguyen found that the family's Calumet Park home was also exposed to neurotoxins. She stated in her affidavit:

> *"While Calumet Park address was outside the study area, there was also concern here as well. In 1999 the United State Environmental Protection Agency (EPA) declared a 5 acre site roughly 8/10th of a mile northeast of the Ricks home on South Bishop a superfund site. This site was a paint manufacturing plant from 1894 to 1980 and manufactured lead paint. (EPA, 2002) Lead and other heavy metals were detected in the air and soil on-site and in surface soils and on residential streets offsite near the complex, which was unfenced. During demolition of one of the buildings on-site high levels of lead and asbestos were detected and demolition work ceased as the actions posed a hazard to the area around site. The Chicago Department of Public Health notified the EPA and testing in and around the site began. Of the 200 houses tested in the neighborhood 78 came back with high levels of lead. Children often cut through the site to get to the nearest school bus stop. Additionally, during demolition, three male salvage workers, three of their children, two former Dutch Boy employees, and a teenage girl who lived near the site were diagnosed with lead poisoning between 1985 and 1986. (CDC-ATSDR 2009)"*

The devastating effects of lead poisoning on children's developing nerves and brains are well documented. They include lowered IQ, learning disabilities, hyperactivity, aggressiveness, impulsivity, behavioral problems, and emotional problems.



Above: Site of the now demolished paint manufacturing plant.

**COMMUNITY VIOLENCE**

In her review of Cedric's addresses, Nguyen also concluded crime exposure was of concern at the family's South Evans and South Wood addresses and at Geraldine's Sander's South Vernon address. She stated in her affidavit:

> *"Between 1965 and 1995 there were 19,693 homicides in Chicago. An analysis of this data showed that the South Evans area was 13th highest (1,091 homicides) of 28 districts. The South Woods area was 3rd highest (2,343) and the babysitter's location was 5th highest (1,880)."*

The violence in Geraldine's neighborhood reached close to home. When Cedric was 2 years and 8 months old, Melanie Brown, the 11-year-old girl who lived above Geraldine and Booker was found murdered, strangled and naked in her bed on a Friday morning.

According to Chicago Police Department records and the local newspaper, there was little follow-up into the child's murder (Brown, Melanie. Homicide incident report 1977.05.13; South Side girl found strangled. May 14 1977). This sort of violence barely made a blip on the radar.

Melanie Brown

**South Side girl found strangled**

## MEDICAL PROBLEMS IN EARLY CHILDHOOD

Cedric had breathing problems and high fevers as an infant and toddler. He was diagnosed with bronchiolitis when he was a few months old and hospitalization was necessary on some occasions. His mother Helen stated in her affidavit:

> *"Cedric had severe bronchiolitis as a child. He wheezed and had high fevers, and he had to be hospitalized a few times. He went to both Cook County hospital and Mercy Hospital for care. I remember one time he was hospitalized for 2-3 nights at the county hospital."*

## ALCOHOLIC AND SEXUALLY ABUSIVE ENVIRONMENT

Helen returned to work full-time when Cedric was four months old; Shederick also worked full-time. Helen's aunt, Geraldine Sanders, and her boyfriend, Booker, became Cedric and Dwayne's primary caretakers. Helen stated in her affidavit:

> *"When Cedric was four months old I had to return to work at Illinois Bell Telephone Company. Cedric and Dwayne stayed with my paternal aunt, Geraldine Sanders. Geraldine and her live-in boyfriend, Booker, lived at 6202 S. Vernon Avenue in Chicago. The boys stayed with Geraldine on weekdays and sometimes they spent the night. Geraldine babysat other kids in our extended family, too. I don't remember Booker's last name, but I remember he drank a lot everyday."*

Cedric's brother Dwayne also remembers that Booker was an alcoholic. He stated in his affidavit that *"sometimes we saw him passed out after drinking."*

In addition to drinking in front of the children to the point of unconsciousness, Booker also preyed on at least two of the children in his care. One of his victims, Cedric's cousin Stephanie Halverson (née Rodriquez), stated in her affidavit:

> *"Geraldine had a live-in boyfriend named Booker who sexually abused me. The abuse usually happened when Geraldine left us alone with Booker. When Geraldine left, I started locking myself in the bathroom, hiding, or going to the downstairs neighbor's apartment to escape the abuse. The abuse went on for years, and only ended when Booker died.*
>
> *There was another girl, whose name I don't remember, who was also sexually abused by Booker. The girl told Geraldine about the abuse, but Geraldine did not believe her. The girl was not allowed to come back, and I never saw her again. I was afraid that if I reported the abuse I wouldn't be believed. I also didn't report the abuse because I was scared I'd be removed and put in another foster home.*
>
> *I don't know if Booker abused other children in the home, because I hid or left the apartment to get away from him and the abuse."*

Lack of supervision was clearly a pervasive problem at Geraldine's home, as another child in the home sexually abused Cedric's brother Dwayne. He stated in his affidavit:

> *"Auntie Geraldine also babysat other children. One of the children was a girl named Diane who was older than me. Diane molested me; I remember her rubbing herself against me. I don't know if this happened to Cedric, too. When I was older, my mother told me that I did or said something to our family doctor that led him to ask if I was molested. My mother told me that she did not follow-up about the doctor's concern."*



Above, from left: Cedric, Stephanie, Dwayne, Georgia B. Sanders (Cedric's great-grandmother)

**EARLY CHILDHOOD PHYSICAL ABUSE**

In the affidavits provided by Cedric's mother, father, cousin, aunt, and uncle, each of these witnesses describe behavior problems that started when Cedric was a toddler. In response to this behavior, Geraldine disciplined Cedric with her hands and whipped him with extension cords beginning when he was approximately 3 years old. Cedric's distant cousin, Tammy Hall, who was also babysat by Geraldine, stated in her affidavit:

> *"Cedric had trouble sitting still. When he was fidgety and got up, Geraldine popped him. Even after she popped him for getting up, he still continued to do it."*
>
> *"Cedric did not follow directions well. Sometimes, Geraldine told him not to do something, disciplined him, and then he went back and did the same thing again. He continued to get in trouble for the same things over and over again.*
>
> *Cedric got in more trouble than the other kids at Geraldine's, so he was punished more than the other kids at her home. Geraldine punished Cedric by whipping him with a white extension cord. He was very young and small when Geraldine started disciplining him with the extension cord. I remember that when he sat on the couch his little legs couldn't reach the end of the seat.*

*I think Cedric needed help when he was a little boy, but instead he got punished."*

Marks are evident on Cedric's face in photos from around this time. Cedric is about 2-3 years old in the photo below; he is the child on the right. It appears there was no follow-up by his parents into how the marks occurred.

Above: Dwayne and Cedric



## EXPOSURE TO PARENTAL SUBSTANCE ABUSE

Cedric and Dwayne spent weekdays at Geraldine and Booker's home and went home with their parents on weekends. When Helen and Shederick came to pick up the boys it was often late, and they were often drunk and fighting. Stephanie stated in her affidavit:

> *"Cedric's parents, Shederick and Helen Ricks, came to pick him and Dwayne up from Geraldine and Booker's apartment late at night, around 2:00am. Back then, they drank, smoked marijuana, and partied a lot. They were often both drunk when they came to pick up their children. They yelled and screamed at each other in front of us when they were drunk. It was chaotic. I felt scared watching them fight."*

Dwayne also remembers their parents' substance abuse. He stated in his affidavit:

> *"My parents used to party on the weekends. There were times when they smoked marijuana and drank alcohol in front of us when we were kids. There were times that my parents were drunk and high and drove us home."*

## ADDITIONAL INCONSISTENT CARETAKERS

While Geraldine and Booker were Cedric's primary caretakers, there were also times that Cedric and Dwayne were watched by other relatives. Helen's paternal uncle, Sheridan Sanders, and his wife, Marie Sanders, lived above the Ricks family when Cedric was very young. Dwayne remembers that at times Marie babysat him and Cedric. He stated in his affidavit:

> *"My parents both worked full-time, so soon after I was born they both returned to work and babysitters cared me for. When I was very young my family lived on the bottom floor of a two-flat and my great-uncle and his wife, Sheridan and Marie Sanders, and their adoptive daughter, Stephanie Rodriquez, lived above us. I remember Marie was cruel and verbally abusive to Stephanie. I remember Marie babysitting me and spanking me."*

Sheridan and Marie's adoptive daughter Stephanie remembers Marie as cruel and violent. She stated in her affidavit:

> *"I lived with Sheridan and Marie from about 3rd grade until I left for college. When Cedric was very young, our families lived in two-flat; my family lived upstairs and the Ricks lived downstairs.*
>
> *Marie was violent; she was emotionally and physically abusive to me. She was cold; she did not show any love or affection. Looking back as an adult, I think she was a very sick woman. Sheridan was not as violent as Marie, and there were times I felt warmth from him.*

*Sometimes, when they were young and lived below us, Cedric and Dwayne came to my family's apartment. I think they may have spent the night a few times. I was in elementary school during the day, so I do not know how often they came over during the day."*

The physical and emotional abuse in Sheridan and Marie's home was well known throughout the family. Tammy stated in her affidavit:

*"Sheridan Sanders, Geraldine's brother, was my great-grandfather. Sheridan's wife was Marie Sanders. Once I saw her beat down her adoptive daughter, Stephanie, for not making her bed how Marie liked. As a child, I remember feeling scared of Marie. She was mean and cold. Her home was covered in plastic and no one was allowed to touch anything."*

When Cedric was about four years old, his parents attempted to enroll him in daycare. The daycare reported Cedric had serious behavioral problems and refused to accept him back after his first day. When daycare would not take him, Cedric went back to stay with Geraldine and Booker until he could enroll in kindergarten. Helen stated in her affidavit:

*"We hoped Cedric would grow out of his problems and get better once he started school, but he didn't, and the problems actually got worse. When he was about 4 years old we took him to daycare, and at the end of the day we were told not to bring him back. The person at the daycare told us he didn't listen, was unruly, had problems with other children, and they couldn't handle him. After he was turned away from daycare, he went back to stay with his Auntie Geraldine."*

Shederick also remembered the incident at the daycare. He stated in his affidavit:

*"I noticed something was different about Cedric, that he had some issues that weren't like other kids his age, when Helen and I tried to enroll him in daycare the daycare turned him away. The people at the daycare told us not to bring him back because they couldn't handle his behavior—he didn't listen, fought with other kids, and was unruly. Cedric went back to stay with Auntie Geraldine after daycare turned him away."*

The following year, when Cedric started kindergarten, he and Dwayne moved to Calumet Park to live full-time with their parents. Dwayne, 8 years old at the time, became Cedric's caretaker when school let out. Helen stated in her affidavit:

*"Cedric stopped going to Auntie Geraldine's home when he was 5 years old because he started kindergarten. Cedric and Dwayne went to the same school, Burr Oak Elementary. Cedric was in kindergarten and Dwayne was 8 years old*

*and in 2nd grade. The boys came home by themselves after school and Dwayne was in charge until Shederick and I got home from work."*

Dwayne confirmed this caretaking arrangement in his affidavit:

*"When I was 8 years old in 2nd grade and Cedric was 5 years old in kindergarten we went to the same school, Burr Oak Elementary, and I became his babysitter. I had a key to the house and was in charge of both of us until our parents got home from work in the evening."*

**EARLY BEHAVIORAL AND LEARNING ISSUES**

From the time Cedric was a toddler, and onward, he had serious behavioral and learning problems. In their affidavits, witnesses say he was fidgety, hyper, had trouble sitting still, struggled to follow directions, had trouble integrating corrections, had frequent and severe tantrums, rocked back and forth, banged his head, and was fearless. These behaviors could be indicative of myriad issues, especially with Cedric's history of prenatal exposure to alcohol, prenatal and childhood exposure to high lead levels, early childhood neglect and abuse, and multiple caretakers.

His mother stated in her affidavit:

*"Cedric had behavior problems from as early as I can remember. We knew something was wrong, but we didn't know what it was. Back then we said kids like that were 'bad.' He couldn't follow directions well, was fidgety and couldn't sit still, was hyperactive, and had tantrums. Sometimes when he misbehaved he said that something in his head told him to do it."*

Cedric's father stated in his affidavit:

*"Cedric was very active and hyper as a little boy. When he was a little boy and did something bad, I asked him why he did it and he said that something in his head told him to do it. I hoped he would grow out of his problems, but as he got older the problems seemed to get worse."*

Cedric's Aunt Deborah stated in her affidavit:

*"I remember Cedric when he was a toddler. He had a very short attention span and a temper. He ran around all over the place, fidgeted, couldn't sit still or stay in one place, and could not follow directions. Helen was exhausted taking care of him and it made me tired just watching him run around.*

*I had daughters, so at first I thought Cedric might be different because he was a boy, but Dwayne didn't have problems like Cedric did. Then I thought, and hoped, that Cedric would grow out of his problems, but they actually got worse as*

*he got older. It became clear he was not going to grow out of whatever was going on with him. He needed help. Helen tried to help Cedric, but she was at a loss for how to deal with him. Helen said he was just bad and that she was praying for him. If Cedric was a child nowadays, he would've been referred to treatment or counseling because something was clearly wrong, but back then he was just seen as a bad kid."*

Cedric's Uncle Joseph stated in his affidavit:

> *"From the time Cedric was a toddler, Helen said he was just bad and that she was praying for him. He ran around, didn't follow rules, and was a hard child to raise. Back then, we just thought a kid like that was bad. These days, the type of problems Cedric had would've signaled that he needed real help.*
>
> *Cedric was not able to slow down and think things through like other people. From the time he was a little boy, he'd have an outburst or an episode and later realize what he did was wrong, but the same sort of outburst or episode still happened again. It seemed like he couldn't integrate what had happened before and learn from experience."*

Cedric's cousins, who were children at the time, also noticed his behavior was a problem and was not normal. Tammy stated in her affidavit:

> *"I am about 4-5 years older than Cedric, and I remember when he was a toddler. He was a hot head and couldn't control his emotions. He had tantrums, cried all the time, and his whole face turned bright red.*
>
> *Cedric had trouble sitting still. When he was fidgety and got up, Geraldine popped him. Even after she popped him for getting up, he still continued to do it.*
>
> *I remember Cedric used to sit and rock back and forth a lot. To fall asleep, he used to bang his head against the couch or a pillow.*
>
> *Cedric did not follow directions well. Sometimes, Geraldine told him not to do something, disciplined him, and then he went back and did the same thing again. He continued to get in trouble for the same things over and over again."*

Stephanie stated in her affidavit:

> *"I remember when he was a toddler; he was fearless. When he was about 3 years old, we were on the second floor balcony and he climbed on top of the railing, stood up, and put his arms out and wanted to fly. I grabbed him and stopped him from jumping off."*

Cedric's cousin, Tamara Butts (née Sanders), stated in her affidavit:



*"I'm a few years older than Cedric. I remember when he was about 5, 6, and 7 years old. He was hyperactive and couldn't sit still. He also couldn't manage his emotions and got upset easily.*

*Cedric was fearless as a little boy. Once we were at my great-grandmother's house and Cedric jumped off a high porch. Even as a kid, I knew that jumping off a high porch was dangerous and a bad idea, but Cedric didn't think things through like other kids his age. As a kid, and later as a teen and adult, it felt like Cedric was missing the part of the brain that tells you to slow down and think."*

**DOMESTIC VIOLENCE**

Cedric's stress at home increased when he was about 8 years old. Shederick's long-standing verbal abuse of Helen escalated to physical abuse. Cedric and Dwayne witnessed the domestic violence. Dwayne stated in his affidavit:

*"Our father had a temper, and it got worse when he drank alcohol. I didn't have friends over for sleepovers or to hang out because I was worried he might come home angry. Sometimes when he drank he hit our mother in front of us."*

Helen stated in her affidavit:

*"Shederick was verbally abusive to me at times when Cedric was a little boy, and when Cedric was about 8 years the verbal abuse escalated to physical abuse, too. Shederick shoved, slapped, and hit me. I believe Cedric saw and heard the abuse because he used to cry and tell me that Shederick shouldn't hit me. When he got older he told me to leave Shederick. I didn't report the physical abuse or tell anyone about the problems at home because I felt ashamed, and the situation was complicated because we had kids."*

Shederick stated in his affidavit:

*"Helen and I had struggles in our marital relationship too. Sometimes, usually when I came home after drinking, our verbal fights escalated and got physical. I did shove and push Helen; sometimes I pushed her into things and she fell."*

**PHYSICAL ABUSE AT HOME**

In addition to the abuse Cedric observed Shederick inflict on Helen, Cedric and Dwayne were also victims of physical abuse. Affidavits provided by Helen, Shederick, and Dwayne describe a home environment where Cedric was subjected to unpredictable, inconsistent, and severe physical discipline. Dwayne stated in his affidavit:

*"Our mother usually handled discipline when we were young. She whipped us with belts and extension cords. She used to take us into the bathroom and then lock the door so we couldn't get out. The whippings hurt so badly; I remember crying, screaming, and hitting the locked door to try and get out when she whipped us.*

With Cedric's long-standing problems with behavior and following directions, he got in trouble more often than Dwayne, thus was whipped more often Dwayne. The severe physical discipline did not change Cedric's behavior. Dwayne stated in his affidavit:

*When Cedric got whipped for doing something bad, two days later he did the same thing as before and got whipped again. The whippings didn't seem to make a difference with his behavior; he didn't learn from them.*

*The whippings hurt Cedric too, but eventually, because he was getting in trouble and getting whipped so often, he just learned to take them. I remember once I did something and blamed it on Cedric; he didn't argue and just took the whipping."*

Helen confirms the severe physical discipline and that Cedric's behavior did not improve with whippings. She stated in her affidavit:

*"With Cedric's ongoing behavior problems, I tried to discipline him many different ways. However, Cedric just didn't learn, no matter what I did. My mother and grandmother disciplined me with belts and switches, and sometimes my father hit me, so I used physical discipline with Cedric, too. When he was about 8-9 years old I started bringing him into the bathroom and whipping him with a belt. Sometimes when I was whipping Cedric, Shederick came in, said it was enough, and made me stop. This frustrated me because it felt like another way for Shederick to try and control me. I don't remember Cedric crying very much when I whipped him. I also tried other forms of discipline, like taking away TV or sports practice, but nothing I tried improved his behavior."*

Shederick remembers that Helen's whippings were unpredictable, and so severe that at times he intervened and made her stop whipping Cedric. He stated in his affidavit:

*"Helen and I tried to handle Cedric's behavior problems with discipline. Helen was mostly in charge of the discipline; she usually used a belt and I usually hit Cedric with my hands. Helen wouldn't discipline Cedric for a few days, and then she'd snap and whip him for everything that happened over the course of a few days. I remember she would bring him into the bathroom, lock the door, and whip him with a belt. I remember hearing her list off all the bad things he did while she whipped him. Sometimes Cedric had the tub running and Helen came in and whipped him. Sometimes the whippings were really bad, and I came in and made Helen stop. When Cedric was little he cried when she beat him, but as he got older he just took it."*

*"Sometimes I wonder if we were too tough on Cedric. I tried to raise Cedric the way I was raised, but Cedric was different than other kids and he was a hard child to raise. Helen and I felt ill equipped to raise him."*

Cedric is in elementary school in the photos below. In the first photo he has a scratch across his face. In the second photo he has a large mark near his hairline.





## RUNNING AWAY

Likely in response to the violence at home, Cedric started running away when he was about 8 years old. Family members remember one particular incident when Cedric

jumped out a window in his underwear and hid for hours. Shederick stated in his affidavit:

> *"Cedric started to run away to escape physical discipline at home. One time, when he was in elementary school, he jumped out of a first floor window in his underwear, which was probably a 5-6 foot drop, because I told him he was going to get a whooping. I searched for him and hours later found him hiding in a neighbor's garage, still just in his underwear."*

Cedric hid from his father in his cousin Tammy's family's garage. She stated in her affidavit:

> *"My family and Cedric's family both lived in the same neighborhood in Calumet Park. When I was in high school, and Cedric was in elementary school, my mother and I found him hiding in our garage, wearing only a pair of white underwear."*

Cedric continued running away from home as he got older. He started leaving for longer periods of time; 2-3 weeks on one occasion. Neither Helen nor Shederick alerted the authorities when Cedric went missing for weeks at a time. Helen stated in her affidavit:

> *"Cedric started running away from home when he was young. Later, around 9th grade, he started running away for longer periods of time, sometimes for one to two weeks. I am not sure where he stayed when he ran away; I think he may have stayed with friends. I did not call the police when he ran away."*

Shederick stated in his affidavit:

> *"There were other times that Cedric ran away when he was older. The longest time he was gone was about 2-3 weeks when he was about 16 years old. I don't know where he went during that time; we didn't call the police about him running away."*

## EMOTIONAL NEGLECT AND A FAMILY CULTURE OF AVOIDANCE

Dwayne recalls a long history of sexual abuse that went without intervention even after alerting his mother to the abuse. He stated in his affidavit:

> *"Auntie Geraldine also babysat other children. One of the children was a girl named Diane who was older than me. Diane molested me; I remember her rubbing herself against me. I don't know if this happened to Cedric, too. When I was older, my mother told me that I did or said something to our family doctor that led him to ask if I was molested. My mother told me that she did not follow-up about the doctor's concern."*



*"A friend's brother molested me throughout elementary, middle, and high school. Finally, in high school I told my mother about the abuse, but she didn't react or do anything about it."*

Dwayne identified a pervasive pattern of avoidance of problems, particularly problems that could garner negative attention from the outside world. He reports that Cedric's problems were minimized in order to avoid the stigma and shame that can come with a child who has problems. Dwayne stated in his affidavit:

*"There was a disconnect between me and Cedric, and our parents. Our parents provided all the material things we needed, but emotionally there was something missing. It was important for our parents to create the image of a perfect family, and that often took priority over dealing with the real problems that affected our family. We became very good at keeping secrets, hiding what was going on behind closed doors, and just plain ignoring what was going on in order to maintain the image of perfection. I think the family's concern about image and looking perfect got in the way of Cedric getting help. The family was embarrassed of Cedric's behavior and tried to hide it, and eventually it became another family secret. The hiding and ignoring didn't work, and over the years he got worse."*

The seriousness of problems for both Cedric and Dwayne that went without intervention are concerning. This pattern illustrates a family culture of avoidance and emotional neglect.

## SEVERE AND PERSISTENT BEHAVIORAL, EMOTIONAL, AND LEARNING PROBLEMS THROUGHOUT CHILDHOOD AND ADOLESCENCE

The severe behavioral, emotional, and learning problems that Cedric exhibited throughout early childhood continued throughout elementary, middle, and high school; and they worsened as he got older. Helen stated in her affidavit:

*"When Cedric was in kindergarten, his teacher visited me at home about his behavior. His teacher described the same problems we noticed—that Cedric was not behaving and couldn't follow directions. The teacher told me I needed to be firmer with him, and I tried, but it didn't work.*

*Cedric's behavior problems continued on into elementary school. I got calls from the school about Cedric's behavior constantly, attended conferences, and met with teachers, but it seemed like nothing worked. At some point we took him to a doctor who wanted to prescribe Ritalin for Cedric's problem, but I objected."*

During first grade, Cedric's grades ranged from As to a D. His teacher noted he needed improvement: following directions, accepting responsibility, exercising self-control, observing school and classroom rules, working well with others, taking pride in work,



respecting rights and property of others, and caring for books and materials. His teacher commented:

> *"I don't really know what to say about Cedric. I don't think I understand him. He doesn't seem to respond or react to anything. I think he is capable of more than he is producing. His written work is usually done well but he does not attend to or contribute to oral work...*
>
> *I continue to constantly battle for his attention here at school. He has some good days but the bad ones are still the majority. He's really rough on the other children-- not physically but with his comments and laughter...*
>
> *Cedric is certainly not working up to his potential. His listening and attending are so poor. He's so busy making noises and playing around that he isn't aware of what he's supposed to be doing. This is really hurting him academically...*
>
> *Cedric's behavior needs improvement. He is often inattentive and disruptive in class."* (Calumet Public Schools Dist132 progress notes. 1980-1987. rcvd from Helen and Shederick Ricks)

In 2nd grade Cedric's grades ranged from As to Ds. His problems persisted; his teacher noted he continued to need improvement: working well with others, following directions, exercising self-control, listening skills, using time wisely, and observing school and classroom rules (Calumet Public Schools Dist132 progress notes. 1980-1987. rcvd from Helen and Shederick Ricks). His teacher sent notes home to his parents updating them on his good days and bad days, and his teacher scheduled a weekly call with Helen to keep up on Cedric's behavior. Helen did not keep up the calls, however the teacher continued to send notes home. One note from a bad day described his problems at school:

> *"Cedric has been acting out whenever I have to reprimand him. He is also bringing toys, like little cars, to play with during class. He makes noises, claps his hands + refuses to do his work. I wanted to tell you this all Friday but you didn't give me a call like you said you were going to do every Friday. As far as grade wise his only problem is a C- in Math and a lot of that is because he doesn't pay attention to directions. Please call this Friday."* (Young 2nd grade, Swanson, Madrigal notes. 1982 and undated. rcvd from Helen and Shederick Ricks)

In 3rd grade Cedric's problems at school continued. His grades dropped lower and ranged from Bs to a D. Like previous years, teachers continued to note he needed improvement behaviorally, specifically with listening, time management, self-control, following directions, and obeying rules. (Calumet Public Schools Dist 132 progress notes. 1980-1987. rcvd from Helen and Shederick Ricks)

In 4th grade Cedric's grades ranged from As to Fs. After years of ongoing behavior problems, he was referred to a special education classroom mid-year and his teacher recommended that he get counseling. (Calumet Public Schools Dist 132 progress notes. 1980-1987. rcvd from Helen and Shederick Ricks) Unfortunately, the special education teacher's behavior management techniques were more harmful than helpful. Dwayne, who went to the same school, stated in his affidavit:

> *"Cedric was in special education when he went to Burr Oak. I remember the special education teacher punished Cedric by putting him in a closet."*

In 5th grade Cedric's parents withdrew him from Burr Oak and enrolled him at Seven Holy Founders School, a local Catholic school. In a health examination before starting the school year, Cedric's pediatrician noted he bit his nails and had *"difficulty with interactions with others."* (Certificate of Child Health Examination. 1984.08.20. rcvd from Helen and Shederick Ricks) There are no recorded grades from this year, but Cedric was recognized for his work at the science fair and received a Presidential Physical Fitness Award. He was suspended from school for two days for *"throwing snow and playing on the snow hill."* (Letter from Seven Holy Founders re CR suspension. 1985.1.31. rcvd from Helen and Shederick Ricks)

Cedric stayed at Seven Holy Founders for 6th grade, and his problems with academics and behavior continued. His grades ranged from an A to a D; teachers identified similar behavioral problems as his previous schools including: listening, following directions, taking initiative, working independently, heeding suggesting for improvement, and creating a pleasant learning atmosphere (Seven Holy Founders records. 1985-1986. rcvd from Helen and Shederick Ricks). He was suspended from school for one day for disrupting the class and showing disrespect (Letter from Seven Holy Founders re suspension. 1986.02.27. rcvd from Helen and Shederick Ricks). Cedric's teacher sent a note home about Cedric's problems paying attention and completing homework, and about his failing grades. In order to be promoted to 7th grade, Cedric was required to go to summer school and the teacher, like teachers before, recommended he get counseling (School letter re failure to pay attention and complete homework. undated. rcvd from Helen and Shederick Ricks).

Toward the end of his 6th grade year, Cedric was screened for a variety of problems at the Chicago Clinic for Child Development. The evaluators noted problems with math and auditory perception and recommended a comprehensive evaluation and 40 sessions of therapy (Chicago Clinic for Child Development screening summary. 1986.04.05. rcvd from Helen and Shederick Ricks). A few weeks later, the school sent a letter home alerting Helen and Shederick that Cedric could not return the following year if his behavior issues were not professionally addressed. They required that he be tested at Mercy Hospital so the school could learn *"more specific strategies/interventions in order to be more effective..."* (Letter from Seven Holy Founders re evaluation at Mercy

Hospital. 1986.05.13. rcvd from Helen and Shederick Ricks). Helen and Shederick complied with the school and took Cedric for testing. He received a psychological evaluation and the Ricks began parent counseling. Helen remembers a doctor recommended prescribing Ritalin to Cedric, however she objected and he did not start the medication. After a few months of treatment at Mercy Hospital, Helen and Shederick terminated treatment for unknown reasons. (Letter from Mercy Hospital School Consultation re terminating services. 1987.02.03. rcvd from Helen and Shederick Ricks).

After summer school, Cedric was promoted to 7th grade. He started the academic year at Seven Holy Founders, and his problems persisted. He struggled in the regular classroom; his grades ranged from As to an F and his behavior problems increased. Teachers noted he needed improvement: respecting authority, creating a pleasant learning atmosphere, coming prepared for class, accepting responsibility in independent activities, taking initiative, working independently, heeding suggestion for improvement, listening, applying concepts, showing sportsmanship, cooperating, and coming properly dressed for physical education (Ricks, Cedric. Archdiocese of Chicago Seven Holy Founders. rcvd 2015.06.06).

Cedric was referred for academic testing and was given the WISC-R. His verbal IQ score was 100, performance IQ score was 138, and Full Scale IQ score was 120. The tester noted:

> "*... nails chewed; says he disturbs class; talking back; feet tapping; constant motion; doesn't hold pencil correctly... Cedric gets along best with mom. Mom hollers at me sometimes when I'm bad.*" (WISC-R. 1986.12.22. rcvd from Helen and Shederick Ricks).

There are no notes about how the testing was interpreted, like the significance of a 38-point difference in verbal and performance IQ scores, or if the results were integrated into Cedric's educational plan.

Mid-school-year in 7th grade, Cedric's parents withdrew him from Seven Holy Founders and enrolled him at Calumet School, a local public school. Cedric continued to receive special education services; his annual goal for the school year was "*to develop and reinforce basic social/emotional skills*" (IEP Instructional Objectives. 1986-1987. rcvd from Helen and Shederick Ricks). However, even with the additional special education support, Cedric's problems worsened. The principal sent letters home informing the Ricks of the seriousness of Cedric's academic problems. The final letter said:

> "*... we have found that a strong possibility exists that Cedric may fail the seventh grade. We are now passed the half-way point of the final quarter of the school term and we are greatly concerned about your child's placement for the 1987-1988 school term*" (Letter from Calumet Public Schools Dist 132 B Jumbeck re failing 7th grade. 1987.05.15. rcvd from Helen and Shederick Ricks).



After the increase in the severity of Cedric's problems at Calumet School, the school district held a meeting and determined they could no longer meet his special education needs (Special education evaluation. 1987-1988. rcvd from Helen and Shederick Ricks). He was placed at Spaulding School, an out-of-district special education school specifically tailored to serve students with severe emotional and behavioral disorders.

In 8th grade Cedric went to a Spaulding School. Sharon Speedwell, his 8th grade teacher at the school, stated in her affidavit:

> *"Spaulding School was a separate special education school for students with emotional and behavioral problems. Students went to Spaulding when their home school's special education program could not handle their emotional and behavioral issues. Their issues had to be pretty severe to go to Spaulding, as their home district paid for them to go out of district to the school.*
>
> *Spaulding was one of the most restrictive school environments available. The building that housed Spaulding only served students with severe emotional and behavioral disorders. The staff was specially trained and accredited to work with kids with intense emotional and behavioral issues.*
>
> *My class was a self-contained special education class, which means I taught all subjects to my students and was with them all day. The school had a high adult/student ratio; there were usually 10-15 kids in the class and 3 adults, I taught with another teacher and we had a full-time aide. Spaulding was a small school with only a few kids from each grade, so the classes were mixed with kids from a few grades. In Cedric's class, for example, there were students from 6th, 7th, and 8th grade in one classroom."*

Spaulding was an intensive program. Cedric had a specialized plan to meet his special education needs. Sharon reviewed Cedric's plan in her affidavit:

> *"I remember Cedric's main problem was he could not handle being in the classroom, and I had to send him to the intervention area to calm down to a point where he could return to the classroom. Cedric struggled in the classroom because he had a hard time ignoring other people and was easily pulled into situations. When I noticed that Cedric was struggling, first, I tried to help him in the classroom with reminders about what he should be doing, a discussion, or some extra support. If he could not calm down and control his behavior, then he went to intervention. Intervention was a separate room outside the classroom where there were specially trained interventionists who worked one-on-one to help him calm down and get back in the classroom. Cedric's goal was to have a maximum of one intervention in the morning and one intervention in the afternoon."*

Sharon also sent notes home everyday about Cedric's behavior. She stated in her affidavit:

*"I reviewed the handwritten notes I sent home with Cedric (attachment 2). I remember that part of Cedric's plan was sending a note home everyday to his parents. The notes were brief because they were written at the end of the day before kids caught the bus. When a note said Cedric had a "good day" it meant he met the goal of having one or less interventions in the morning and one or less interventions in the afternoon. If a note said Cedric had a "difficult day" that meant he needed more time in intervention to get back in the classroom. There is one note that I wrote that Cedric had four interventions in one day; that would've been a difficult day for Cedric.*

*Cedric had rewards for meeting his goal and consequences for not meeting his goal. From the intervention plan (attachment 1), I remember if Cedric went over the allotted interventions he had to make up time in the quiet area carrel during his lunchtime or during his free time. His reward for meeting his goal was to play football. In one of my notes home I wrote, "Cedric had a great day! He earned football practice tonight." "*

Cedric's Individual Education Program plans at Spaulding reflect serious problems with academics and behavior. There were specific objectives and goals to work on his issues. Sharon stated in her affidavit:

*"I reviewed Cedric's Individual Education Program (IEP) Instruction Objectives from 1987-1988 (attachment 3). Cedric had three plans: two were academic plans and one was a non-academic behavioral plan. That Cedric had academic plans means he was below grade level. The goal of his non-academic behavioral plan was to improve classroom behaviors. The objectives were to: 1) improve the ability to accept responsibility and consequences for his behaviors 50% of the time, 2) improve appropriate interactions with staff and peers 75% of the time, and 3) identify and express feelings appropriately at least 50% of the time. Those objectives illustrate that he had serious problems socially and emotionally.*

*In addition to the interventions, daily notes home, and detailed IEP, I met individually with Cedric once a week and the class had group therapy together once a week."*

Cedric progressed with the intensive programming at Spaulding. However, with his progress, he lost access to the valuable resources that allowed him to succeed. Sharon stated in her affidavit:

*"When I think of Cedric, I remember his smile. He had a sweet smile, but I think it was masking some of the issues he struggled with. I don't remember Cedric being aggressive or having to physically restrain him. There were some kids who needed physical restraint every day; compared to those kids, Cedric was not as*

*severe. However, Cedric needed to be at Spaulding and needed extra attention. At the beginning of the school year it felt like he tried to test me, see how far he could push, and how I would react. Over the course of the year, I felt like he began to trust me and connect with me. I saw him progress over the course of the year with the intensive special education programming Spaulding offered.*

*Cedric transferred to a regular education school after his 8th grade year at Spaulding. It was unusual for a student to go Spaulding for just one year. It appears that Cedric's improvement with the intense programming, support, interventions, and resources at Spaulding led him to be transferred out of the school and back to a regular school for 9th grade.*

*The goal in special education is to give kids the opportunity to succeed in the least restrictive environment, but sometimes kids cannot handle a regular school and fail; it appears that was the case with Cedric. Cedric was the kind of kid that fell between the cracks. In a special education school he wasn't the most severe compared to his peers, and he may not have been seen severe enough to justify the extra cost of a special education school. In a regular school, he was too disordered and didn't have enough support and resources to succeed."*

Above: Cedric's 9th grade school picture

Sharon's concern about Cedric's special education needs not being met in a regular school unfortunately became a reality. Cedric's upward trajectory from the intense special education environment at Spaulding was short-lived. He enrolled at Harold L. Richards High School for 9th grade, a regular school where he received special education services for his behavioral/emotional disorder and special classes for his mild cognitive

impairment (Special education evaluation. 1988.05.10. rcvd from Helen and Shederick Ricks; Community 218 HS letter explaining records. 2013.09.17). Within two weeks he received his first referral to the Dean for *"silliness, laughing, and lack of control"* that caused classroom disruption. Over the course of the year he received nine additional referrals for behavior including: dangerous running in the halls, eating candy without permission, not having his identification card, fighting, tardiness, cutting class, talking, horseplay, and attitude. He was suspended eleven days during the school year (Disciplinary referrals to dean and suspensions. 1988-1989. rcvd from Helen and Shederick Ricks). Despite the clear issues he had managing his emotions and behavior, additional special education resources for his emotional disorder were rejected (Special education evaluation. 1989.04.07. rcvd from Helen and Shederick Ricks).

Cedric continued at Harold L. Richards High School for 10th grade, and like all previous years, his behavioral and emotional problems persisted. As he got older, the seriousness of his problems escalated. Within a week of school starting, Cedric was referred to the Dean for disrespect and classroom disturbance. His teacher wrote:

> *"Cannot stay in proper place. Roams from 1 line to another- is constantly talking- does not participate properly (& the exercises) Swings so hard with a golf club he broke it. I have spoken to him at least every day. He is a hazard to the class"* (Disciplinary referrals to dean and suspensions. 1988-1989. rcvd from Helen and Shederick Ricks).

He was referred to the office seven more times this year for behavior including skipping class, belligerence and yelling, insolence, and threats; and he was suspended for eight days total this school year. One teacher noted he was *"almost a daily behavior problem"* (Disciplinary referrals to dean and suspensions. 1988-1989. rcvd from Helen and Shederick Ricks). Despite the constant behavioral and emotional problems reported by teachers, Cedric remained in the same level of care for his severe emotional disorder.

Cedric was promoted to 11th grade and continued to struggle behaviorally, emotionally, and academically at Harold L. Richards High School with the same level of special education services. His grades ranged from Bs to Fs, and through the course of the year he was referred to the office four times, and suspended for eight days (Harold L Richards records. 2013.09.19). Like 10th grade, teachers continued to report serious concerns about Cedric's daily behavior. A teacher at the school wrote in her referral:

> *"First of all, Cedrick [sic] is not in my class, yet everyday he is in the theatre with Tina. I am constantly kicking him out, breaking up their fights, following them into the hall, watching him sneak in from every door in the theatre. Today, he was chasing her around the theatre at a dangerous rate of speed knocking down microphones, lighting equipment, etc. When told to leave he continued to fool with Tina until a student told him to leave so he wouldn't get in more trouble. This*



*is an everyday occurrence and is getting worse!"* (Disciplinary referrals and suspensions. 1990-1991. rcvd from Helen and Shederick Ricks).

After additional reports were made about his *"loud and boisterous behavior"* and issues with Tina, a multidisciplinary conference was held about how to meet Cedric's special education needs. The district determined that Cedric's chronic and severe emotional disturbance was too severe to be met by a district or co-op program. They recommended Cedric finish the year at a therapeutic day school, *"a more restrictive environment for students with behavior/emotional disorder,"* where he could receive adaptive physical education, a weekly psychologist consult, weekly social worker direct services, transitional services, and special vehicle transportation. Cedric's parents were invited to the meeting, but did not attend. Helen and Shederick informed the school they did not support the school's recommendation for a special education school (Special education evaluation. 1991.02.15. rcvd from Helen and Shederick Ricks; Special education evaluation. transfer to Independence HS. 1991.03.12. rcvd from Helen and Shederick Ricks). Consequently, Cedric stayed at Harold L. Richards High School, where it was established he could not function successfully.

One month after the Cedric's parents denied the new special education placement, another multidisciplinary conference was held. The representatives from the school and district noted Cedric's behavior was getting worse and he was failing his regular education classes:

> *"Discussed staff recommendations for alternative programming and concerns with escalating behaviors. He is very manipulative of staff and failing mainstream classes. Discussed problems of BD [behavioral disorder] instructional program at Richards. Dist 218 is ready to place Cedric at Independence HS [therapeutic day school]. Parents not supportive of referral and placement. In the remainder of the year, Cedric will be placed in the BD Instructional program; attempt to schedule condensed day periods 1 thru 5 if possible. Parents understand Cedric will be liable for natural consequences of his behavior"* (Special education evaluation. 1991.04.12. rcvd from Helen and Shederick Ricks).

Though the level and frequency of Cedric's problems at school were increasing, his parents did not comply with the district's request to place him in a special therapeutic day school. Helen stated in her affidavit:

> *"I remember when Cedric was in high school at HL Richards and they wanted him to go to a special school. I don't remember why I didn't agree for him to go there. I assume I just thought he'd have the same problems anywhere, because he'd always had them and nothing had helped before."*

While the school made clear they did not have the resources to meet Cedric's needs, they made adjustments and tried to accommodate him.

In August 1991 Cedric returned to Harold L. Richards High School for his senior year. At the beginning of the year another multidisciplinary conference was held to review his special education services. For the third time, faculty and staff found that the school could not meet Cedric's needs:

> *"BD [behavior disordered] Program at Richards HS rejected. BD resource program does not meet the kind of behavioral needs evidenced. A change in total school environment best meets his needs. Staff discussed concern for Cedric's history of disruptive behavior. Also concerned for his aggressive behavior. An alternative placement is being considered to meet his behavioral needs. Staff consensus is continued placement at R.C. as scheduled with the contingency for an immediate alternative placement following any instance of aggressive behavior or gross insubordination toward staff. We will plan on a monthly meeting to discuss progress. Counseling services will be made available in school. Cedric has an understanding of the natural consequences of his acts or their acts violate or conform to school rules. ADDENDUM The school district is requesting parental involvement in monthly meetings held with Cedric. The school district will also be available to consult with the family's private therapist on Cedric's behalf"* (Special education evaluation. 1991.08.28. rcvd from Helen and Shederick Ricks; 1991.08.28 IEP addendum from W Kopec. rcvd from Helen and Shederick Ricks).

Just two weeks after the meeting, Cedric's behavior escalated to a new level of seriousness. After being suspended from school for issues with Tina, he drove back to school, pulled Tina out of class, and put her into his car. The incident ended when a school security guard entered the car through the sunroof and removed the keys from the ignition. Cedric had his first contact with law enforcement; he was arrested for Criminal Trespass to State Land, Reckless Conduct, and Disorderly Conduct (Oak Lawn Police Department).

After the incident and arrest at school, HL Richards refused to keep Cedric and insisted he be placed at a more restrictive school environment, like they had recommended for the past 7 months. They recommend that he be tutored at home pending placement at a therapeutic day school.

> *"Referrals will be made to alternate day schools programs appropriate for BD/ED [behaviorally disordered/emotionally disordered] students. Cedric is considered to be a threat to others in his current school, and is recommended to be tutored pending his placement"* (Special education evaluation. 1991.09.20. rcvd from Helen and Shederick Ricks).

Just two days after the school's determination that Cedric could not return and had to go to a special school for students with behavioral/emotional disorders, Cedric had an episode at home. Helen wrote Shederick a letter describing Cedric's erratic behavior, which included: screaming, shouting, ranting, hitting things, shoving her, and running

away. Helen called the police, but Cedric was gone when they arrived. She reported to Shederick that Cedric came back after the police left and went "*from window to window saying he wanted to talk,*" but Helen did not let him in. Helen responded to Cedric's manic episode by asking Shederick to pray for him:

> "*You know Shederick, you have never seen one of his rages, but I am believing God for his deliverance. Please pray with me for him. He really can't control himself he needs Jesus to help him. I do believe he is really sorry after he does something, but while it is happening he is unable to stop himself. He really needs the power of the supernatural Jesus to help him. Please offer a word of prayer for our son whom we both love dearly. I'm not angry, but I realized I'm going to have to pray more for him and I want you to pray with me. Where one and two are gathered together and praying to Jesus he is in the midst. Let's try prayer (together). Love, Helen*" (Letter from Helen to Shederick re CR. 1991.09.22. rcvd from Helen and Shederick Ricks)

In October 1991, the month following the incidents at home and at school, Helen admitted Cedric to Christ Hospital's inpatient psychiatric ward. Cedric enrolled in Christ Hospital's School Program during the months he received inpatient and outpatient care at the hospital. He received some academic testing at the school. He was given the Diagnostic Achievement Test for Adolescents (DATA) in reading comprehension only, and the Wide Range Achievement Test- Revised (WRAT-R). In Reading Recognition/Word Identification he scored in the 66th percentile, grade equivalent 12+. In Reading Comprehension he scored in the 63rd percentile. In Spelling Recall he scored in the 53rd percentile, grade equivalent 11E. In Mathematics he scored in the 27th percentile, grade equivalent 9B. For accuracy he received an A and B grades, for effort he received C grades. His teacher noted:

> "*Academically Cedric is a bright student who can handle the demands of regular education coursework with the exception of math work. Math is an area of relative weakness according to test results. Overall basic skills are adequate to good. Behaviorally Cedric demonstrated great difficulty responding appropriately to authority and working independently. Cedric was initially resistant to most tasks and often complained about his workload. On occasion he refused to work and made rude, sarcastic comments to teachers. Positively noted, Cedric demonstrated the discipline to complete approximately 75% of his assigned work. Working independently was problematic for Cedric as he constantly sought attention from females and staff. It was observed that Cedric was not comfortable sitting alone. Discharge recommendations: Cedric's behavior and performance improved within the presence of strict structure and limits. It is recommended by this writer that Cedric be enrolled in a therapeutic day school given his previous school behavior record. This recommendation is supported by Cedric's physician.*" (Christ Hospital School records, rcvd from Helen and Shederick Ricks)



Upon discharge from Christ Hospital School Program, the school district reviewed Cedric's special education services:

> *"Recommendations are that a therapeutic day program is the least restrictive appropriate special education placement. Cedric will be placed at McKinley Libra School for the remainder of the 91-92 school year"* (Special education evaluation. 1992.01.06. rcvd from Helen and Shederick Ricks).

Cedric was placed at McKinley Libra School in the beginning of 1992, a special education therapeutic day program for students with behavioral disorders, emotional disturbances, and learning disabilities. Donna Ree worked for Ada McKinley Community Services, the organization that ran McKinley Libra School. She stated in her affidavit:

> *"In 1992, Ada McKinley Community Services ran McKinley Libra School. McKinley Libra School was a special education therapeutic day school for students with behavioral disorders, emotional disturbances, and learning disabilities.*
>
> *Students came to McKinley Libra School because their home public schools could not provide the resources to meet their special needs. The school usually had about 70 students total; there were no more than 10 students per classroom."*

Cedric stopped taking his prescribed lithium after he was discharged from Christ Hospital's care. Cedric got into more trouble with the police. Tina reported to police that while she was waiting for the bus on April 6, 1992, Cedric pulled her into an alley and forced her into his car. He drove her around, questioned her about her sexual relationship with her boyfriend, and said he watched Tina and her boyfriend while they were at her boyfriend's house. Tina maced Cedric's face, got out of the car, and ran away. Cedric was arrested for disorderly conduct, battery, and assault (Calumet Park PD records).

Cedric graduated from the special education school in 1992. He received diplomas from both McKinley Libra School and Harold L Richards High School. Donna Ree stated in her affidavit:

> *When a student graduated from McKinley Libra School, their home school issued a diploma in addition to McKinley Libra School's diploma so the stigma of attending a special education school would not follow the student."*

## SEVERE MENTAL ILLNESS

Cedric's teachers first recommended that he receive counseling when he was in 4th grade (Calumet Public Schools Dist 132 progress notes. 1980-1987. rcvd from Helen and Shederick Ricks). However, it appears that his parents did not get him into counseling until the summer before 12th grade when behavioral and emotional problems had reached

a peak. In June 1991 he began therapy at Southside Christian Counseling Center, and was initially diagnosed with Adjustment Disorder with mixed disturbance of emotions and conduct (Southside Christian Counseling Center receipts. 1991. rcvd from Helen and Shederick Ricks).

Around this time, Cedric's problems worsened and family members started to notice mood swings, outbursts, and paranoia. Shederick stated in his affidavit:

> *"When Cedric got older I noticed he became very emotional and moody—it was like Cedric had two sides. Sometimes he was upbeat and the nicest guy in the world and then there was the other side where he was irritable, defensive, edgy, and anything could set him off. He was tightly wound and always ready to spring. His big mood swings started to happen when he was in high school. It seemed like his problems became worse when he started having dating relationships with girls.*
>
> *Cedric had an outburst about every two or three weeks. There were times that he knocked things off tables, and once he pulled a phone off the wall, which left hole in the wall. Cedric was remorseful after he had an episode, and he felt bad for disappointing people. However, a few days or weeks later he'd have an outburst again. It was like he wasn't learning or he couldn't stop himself once he was set off. He got caught up and didn't think things through, plan, or think rationally."*

Cedric's cousin Tamara remembers Cedric was paranoid. She stated in her affidavit:

> *"Cedric was paranoid at times. He thought people were against him and had it out for him. Once when we were teenagers, Cedric, Dwayne, and I were hanging out together and Cedric left to another room. When he came back, he was convinced that Dwayne had said something about him, and jumped on him and started fighting him."*

Dwayne recalled the same incident at his aunt and uncle's home when Cedric was paranoid and out of touch. He stated in his affidavit:

> *"Cedric and I had a fight at our aunt and uncle's house when I was about 17 or 18 years old and he was about 14 or 15 years old. I was talking with our cousin Tamara, and out of nowhere he jumped on me and started fighting me. He was convinced that I was talking badly about him and he freaked out."*

While Cedric began to exhibit paranoia and mood lability, his behavioral problems continued and serious problems occurred at school and at home. Two days after the incident at Harold L. Richards High School with Tina, Cedric had an incident at home. Helen described his erratic behavior in a letter to his father:

> *"...shouting and screaming how he is just sick of me and this house, so he started ranting and raving and hitting things. He knocked the poles a loose on the steps*

> *and then he took our pole and hit the coffee table as hard as he could. So I picked up one of the sticks trying to stop him and he pushed me and hit me on the leg all the while pushing me and shoving me. He was swinging the stick as hard as he could."* (Letter from Helen to Shederick re CR. 1991.09.22. rcvd from Helen and Shederick Ricks)

In the same letter describing Cedric's erratic and dangerous episode, Helen asked Shederick to pray for Cedric's behavior to get better. Cedric's behavior did not improve, and the following month, on October 18, 1991, Helen had Cedric admitted to Christ Hospital for inpatient psychiatric care. Helen stated in her affidavit:

*"Cedric's behavior problem got worse as he got older. He had episodes as a teenager where he knocked things off tables and once put a hole in the wall. Once, soon before I admitted him to the psychiatric hospital, he had an episode at home where I called the police because his behavior was so out of control.*

*Cedric's problems escalated in his senior year of high school. I didn't know what else to do but to admit him to a psychiatric hospital. Cedric spent a month inpatient at Christ Hospital."*

Dr. Sudhir Gokhale, the supervising psychiatrist at Southside Christian Counseling Center where Cedric received outpatient counseling, was the facility director and treating doctor at Christ Hospital (Christ Hospital admission and discharge summary. 1991.10.81. rcvd from Helen and Shederick Ricks; Southside Christian Counseling Center receipts. 1991. rcvd from Helen and Shederick Ricks). When treated at Southside Christian Counseling Center, Cedric was diagnosed with Adjustment Disorder with mixed disturbance of emotions and conduct. The psychiatrist seemingly updated Cedric's diagnosis, as he was prescribed lithium, a mood stabilizer used to treat and prevent episodes of mania in people with bipolar disorder. Shederick and Dwayne remember visiting Cedric when he was inpatient at Christ Hospital. Dwayne stated in his affidavit:

> *"I remember when Cedric went to Christ Hospital for a month for inpatient psychiatric treatment. He was on lithium while he was there; I remember it made him lethargic, but also that is [sic] calmed him down."*

Shederick stated in his affidavit:

> *"When Cedric was in high school, Helen and I had him admitted to Christ Hospital for inpatient psychiatric treatment. I visited him in the hospital, and it broke my heart to see him. He was like a zombie, and I didn't know if he recognized me. The medication he was on made him appear sluggish, slow, and confused. Now, I wonder if the medication slowing him down might have actually made him more normal."*

Cedric stayed inpatient for one month and then continued to receive psychiatric services on an outpatient basis and attend Christ Hospital School Program until the end of the 1991. Upon discharge from the hospital Dr. Sudhir Gokhale wrote:

> *"The patient has been an inpatient under my care at Christ Hospital. The patient's stay during the hospital showed severe deficits on the patient's part as far as his impulse control goes, his mood lability goes and his trouble with manipulative behavior towards peers and adult members on the unit and outside of the family. The patient appeared to go through a great degree of trouble on an ongoing basis with his tendency to sabotage and act out in the milieu. The patient needed a great degree of firm structure and strong limit setting. The patient appeared to have poor capacity to function on an ongoing basis with issues relating to his narcissistic behavior, seemed to be very intensely caught up in getting negative attention from peers. Seemed to be very angry and upset when not able to get his demands met immediately. Work was done on these issues on an ongoing basis and the patient was placed on lithium to which he was following the inpatient program and during the outpatient program somewhat noncompliant and was confronted about it and encouraged to follow through. The patient needs ongoing support and help at this point to have the structure to continue with his schooling and the least restrictive program at this point I could suggest would be the therapeutic day school along with ongoing counseling and the medication management on an ongoing basis that he is going to deal with his therapist and with me"* (Christ Hospital admission and discharge summary. 1991.10.81. rcvd from Helen and Shederick Ricks).

When Cedric was discharged from the hospital he stopped taking the lithium he was prescribed. Noncompliance with medication is, unfortunately, a very common problem for people living with severe mental illness. Many individuals with severe mental illness stop taking their medication due to lack of insight into their illness. Another common reason for noncompliance is the side effects that come with some psychotropic medications. Helen and Shederick remember that Cedric did not like the medications side effects. Helen stated in her affidavit:

> *"When he was discharged he had a prescription for lithium. I remember finding the medication in the trash; he didn't take it because he didn't like how it made him feel. I tried to tell Cedric that he needed help and needed the medication, but I was unable to convince him to continue taking it."*

Shederick stated in his affidavit:

> *"Once Cedric was out of the hospital, he stopped taking the medication he was prescribed at the hospital because he didn't like how it made him feel."*



Cedric continued to live with his parents after high school and his problems continued. Similar to how she had responded in the past, his mother blamed the devil for his problems. Helen wrote in a letter to Cedric:

> *"You lay around all day, and if we don't tell you to do anything specific you won't do anything and we mean absolutely nothing... you are going to have to make a choice, are you going to serve God or the devil. If you be willing and obedient you shall get the good of the Lord, but if you rebel you shall be cursed... we are not going to just give you to the devil, we are going to fight for you... It seems like you have been doing it the devil's way for so long, and what has he gotten for you. If anything he has made you miserable... Stop listening to him, it is time to let him go!!!"* (Letter from Helen to Cedric. 1992.10.23. rcvd from Helen and Shederick Ricks)

Years later, family members continued to notice Cedric's mood lability, paranoia, and grandiosity; all indicators of bipolar disorder. Tamara stated in her affidavit:

> *"Cedric has mood swings. When he lived with me for a few months in Texas I noticed the ups and downs. He was up more often than he was down. When he was depressed he seemed sad and withdrawn; he'd spend the whole day in his room. At one point, before the incident, I was concerned he was suicidal because he was so down and he said he didn't know if he could keep going. When Cedric was up he was hilarious, the life of the party, over the top, and very intense. When he was up he thought he was the best at everything and openly talked about being the best.*
>
> *Cedric was paranoid at times... Another time, when he was living with me in Texas, he almost started a fight with a neighbor because he was convinced the neighbor was looking at him. I knew the neighbor, he was a friend of mine, and he was not doing anything out of the ordinary, but Cedric was convinced the man had a problem with him and was going to do something bad."*

Uncle Joseph also remembered Cedric's mood swings. He stated in his affidavit:

> *"I noticed that Cedric had mood swings when he lived with us. When he was depressed his mood seemed low and he was quiet. When he was up he seemed irritable and he could not handle being overwhelmed."*

## FAMILY HISTORY OF MENTAL ILLNESS

Two of Cedric's first-degree relatives have also dealt with mental illness. His brother was diagnosed with bipolar disorder and his mother was treated for depression. This information is significant as genetic factors are known to influence individual's vulnerability to having a mood disorder. Dwayne stated in his affidavit:



> *"I've also had struggled with my mental health. I attempted suicide in 2012, got mental health care, and was diagnosed with bipolar disorder."*

Helen stated in her affidavit:

> *"There is some history of mental health problems in my family. My maternal uncle, Mike Sudduth, had some sort of mental illness and died young. I've been treated for depression."*

Cedric's grandmother supplied more information about her brother's mental health problems. Christine stated in her affidavit:

> *"My brother, Robert "Mike" Sudduth, died in Michigan in 1964. I don't know exactly what he died of, but he had problems with his nerves and had a breakdown. He was not very talkative, and he used to pick at his ears and say something was in them when I could see there wasn't anything there. "*

**SUBSTANCE ABUSE**

Cedric was arrested for possession of cannabis in 1995 (Calumet Park PD records). Witnesses report that he used marijuana frequently. His relative Stephanie stated in her affidavit:

> *"The last time I saw Cedric was in 2007 at his grandmother's 80th birthday party. I remember that he smelled strongly of marijuana."*

When Cedric lived with Jennifer Clark in 2009 he smoked marijuana every day, or every other day (Trial Transcript). Additionally, Cedric reported a history of alcoholism to hospital staff in 2014 (JPS Hospital rcvd 2016).

In retrospect, family members wonder if Cedric was using steroids in the months before the incident because his physical appearance changed. Tamara Butts stated in her affidavit:

> *"In the months before the incident, Cedric's face changed drastically. I initially did not recognize him when I saw him on TV because his face was so round and different. I wondered if he was using steroids."*

Deborah Sanders stated in her affidavit:

*"Cedric's face shape changed significantly during the months I didn't have contact with him. His face looked much rounder when I saw photos of him after the incident."*

Above: Cedric at his 2011 graduation from Remington College

Above: Cedric in May 2013

When Cedric was arrested after the incident in May 2013, multiple prescription and non-prescription drugs were found in his possession including: 25 sample packs of Cialis, Nexium, Terbinafine- 250 mg tabs prescribed to Cedric, Levofloxacin 500 mg tabs prescribed to Cedric, Metronidazole 500 mg tabs prescribed to Cedric, 3 bottles marked "Vigour" 300 mg, 14-5ml vials of Depo-medrol, 80 mg per ml; 5 vials of ceftriaxone, 500 mg; 2-10ml vials of testosterone, 5-1ml vials of cyanocobalamin, 1,000 microgram ml; 1-20ml vial of xylocaine, one percent solution, and one vial labeled testosterone (Trial Transcript). Cedric's blood was not drawn or tested when he received medical care after his arrest; it is unclear which, if any, of these substances he was using.

## TRIAL MITIGATION INVESTIGATION

There was a Mitigation Specialist hired by the original defense team in Cedric's case, Mary Burdette, MSSW. Ms. Burdette died before there was an opportunity to meet and discuss her work on Cedric's case. I've relied on Ms. Burdette's work product and bills in my review of her work on Cedric's case.

From Ms. Burdette's bills, it appears she travelled to Chicago on two occasions for Cedric's case. On her first trip she had a one-on-one meeting with one witness, and then met with a group of thirteen witnesses at once. She noted in her report, *"due to the size of the group, few people volunteered anything other than positive remarks about Cedric."* On the second trip to Chicago she spent one day (9 hours) meeting with 10 witnesses. From her notes and bills, it appears she met with five witnesses, including Cedric, one-on-one and in-person in preparation for the trial. The remaining interviews were in groups or on the phone.

The American Bar Association's Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases say that *"team members must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death."* These in-person, one-on-one interviews help establish the rapport necessary for witnesses to disclose the type information that is necessary for a thorough investigation in a capital case.

In her interviews and review of records, Burdette discovered information about Cedric's mother smoking and drinking during her pregnancy, physical and verbal abuse by Cedric's father against his mother, physical abuse against Cedric and Dwayne by their father, a 38-point gap between Cedric's verbal IQ score and performance score at age 12, history of special education, history of substance use, serious behavioral/criminal problems in adulthood, and a history of inpatient hospitalization.

However, though this information was in trial counsel's possession, there was no further exploration about the meaningfulness of this information. There is no indication that

these issues were discussed to be presented to the jury so they could better understand Cedric.

## MITIGATION PRESENTATION AT TRIAL

At trial, the mitigation theme presented was that Cedric was born with a bad brain that made him the way he was and that being born with a bad brain was not his fault. Defense witness, Dr. Jeffrey Lewine, stated that what Cedric has *"appears to be a biological predisposition towards aggression and violence, but it's not so bad that we're in the psychopathy range."* Defense presented that Cedric had a supportive, caring family in a utopic neighborhood, but those environmental supports could not overcome his biological problems. In closing arguments Cedric's attorney, William Ray, stated:

> *"And so you look at Cedric Ricks when he's sitting up here on the stand today, and Mr. Gill's talking to him, and Mr. Huseman says, "Well, he's a psychopath," and nobody's really ever said, you know, exactly what that is, other than you don't accept responsibility, or you're mean, you're arrogant, you don't care what happens to everybody else. That's kind of a thumbnail sketch of it. What would you expect with somebody whose brain's not right? What did Dr. Lewine tell you? He got a bad hand.... He got a bad hand. Don't you hope your child doesn't get a bad hand or your grandchild who is not born yet? ... The very thing that ought to be sufficiently mitigating is the fact that it was never his control or his desire to be born that way. It just wasn't."*

In the prosecution's arguments Mr. Robert Huseman stated:

> *"There's been no mitigation evidence in this case, ladies and gentleman. Absolutely zero. He wasn't raised in a gutter. His mother wasn't a drug addict. His father wasn't in prison. Every one of their witnesses came in here and told you he had a wonderful upbringing. He lived in Utopia, as one of the witnesses called it. His father made good money. They loved him. They took him to Disney World with his brother. He had a wonderful life. But he's just the way that he is. He's a murderer, and he's a psychopath."*

## PROFESSIONAL OPINION

The mitigation evidence discovered in post-conviction directly contradicts the assertions made at trial that Cedric lived in Utopia and had a wonderful live. Trial counsel did not discover information about: multigenerational family history, prenatal and childhood exposure to high levels of lead, community violence, exposure to an alcoholic and sexually abusive environment, early childhood physical abuse, exposure to parental substance abuse, inconsistent caretakers, physical abuse at home by both parents, running away from home at an early age, emotional neglect, and a family history of mental

illness. Having not discovered this information it was not possible for trial counsel to present this information to the jurors charged with determining Cedric's sentence.

There were important issues identified by the trial mitigation specialist, however trial counsel was deficient in not learning the nature, depth, and meaning of those issues and their effect on Cedric and then presenting that information to the jury. The fact that trial counsel acquired some information does not necessarily render counsel effective. Trial counsel must have sufficient information from which they could make a reasoned strategic decision not to pursue additional evidence about mitigation issues.

The mitigation evidence presented at Cedric's trial was substantially incomplete. Trial counsel failed to investigate and present compelling mitigation and mental health evidence. Consequently, critical mitigation evidence, which was readily available at the time of trial, was never presented to the jury that sentenced Cedric to death.

Clearly, without completing an adequate investigation into what mitigating circumstances might have been available to present at punishment, no strategic decisions could be made by counsel about what information could or could not be presented. Counsel's performance was deficient in their failure to even complete an investigation into readily available information. Thus, the verdict reached by the jury at punishment is not worthy of confidence.

, LMSW

Mairead T. Burke, LMSW

Subscribed and sworn to this 6 day of June 2016.

Notary public, State of Texas

GINA ENDREOLA
Notary Public, State of Texas
Comm. Expires 01-28-2020
Notary ID 130514736

Sources

- Affidavit of Christine Sudduth
- Affidavit of Deborah Sanders
- Affidavit of Donna Ree
- Affidavit of Dwayne Ricks
- Affidavit of Helen Ricks
- Affidavit of Joseph Sanders
- Affidavit of Sharon Speedwell
- Affidavit of Shederick Ricks
- Affidavit of Stephanie Halverson
- Affidavit of Tamara Butts
- Affidavit of Tammy Hall
- Brown, Melanie. Homicide incident report 1977.05.13
- Calumet Park PD records
- Calumet Public Schools Dist132 progress notes. 1980-1987. rcvd from Helen and Shederick Ricks
- Certificate of Child Health Examination. 1984.08.20. rcvd from Helen and Shederick Ricks
- Chicago Clinic for Child Development screening summary. 1986.04.05. rcvd from Helen and Shederick Ricks
- Christ Hospital admission and discharge summary. 1991.10.81. rcvd from Helen and Shederick Ricks
- Christ Hospital School records, rcvd from Helen and Shederick Ricks
- Community 218 HS letter explaining records.2013.09.17
- Disciplinary referrals and suspensions. 1990-1991. rcvd from Helen and Shederick Ricks
- Disciplinary referrals to dean and suspensions. 1988-1989. rcvd from Helen and Shederick Ricks
- Harold L Richards records. 2013.09.19
- IEP Instructional Objectives. 1986-1987. rcvd from Helen and Shederick Ricks
- IEP Instructional Objectives. 1987-1988. rcvd from Helen and Shederick Ricks
- Intervention plan. 1987.10.13. rcvd from Helen and Shederick Ricks
- JPS Hospital rcvd 2016
- Letter from Calumet Public Schools Dist 132 B Jumbeck re failing 7th grade. 1987.05.15. rcvd from Helen and Shederick Ricks
- Letter from Helen to Cedric. 1992.10.23. rcvd from Helen and Shederick Ricks
- Letter from Helen to Shederick re CR. 1991.09.22. rcvd from Helen and Shederick Ricks
- Letter from Mercy Hospital School Consultation re terminating services. 1987.02.03. rcvd from Helen and Shederick Ricks
- Letter from Seven Holy Founders re CR suspension. 1985.1.31. rcvd from Helen and Shederick Ricks
- Letter from Seven Holy Founders re evaluation at Mercy Hospital. 1986.05.13. rcvd from Helen and Shederick Ricks

- Letter from Seven Holy Founders re suspension. 1986.02.27. rcvd from Helen and Shederick Ricks
- Oak Lawn Police Department
- Ricks, Cedric. Archdiocese of Chicago Seven Holy Founders. rcvd 2015.06.06
- Sanders, Helen. birth certificate. 1946.08.05
- School letter re failure to pay attention and complete homework. undated. rcvd from Helen and Shederick Ricks
- Seven Holy Founders records. 1985-1986. rcvd from Helen and Shederick Ricks
- South Side girl found strangled. May 14 1977
- Southside Christian Counseling Center receipts. 1991. rcvd from Helen and Shederick Ricks
- Special education evaluation. 1987-1988. rcvd from Helen and Shederick Ricks
- Special education evaluation. 1988.05.10. rcvd from Helen and Shederick Ricks Community 218 HS letter explaining records. 2013.09.17
- Special education evaluation. 1989.04.07. rcvd from Helen and Shederick Ricks
- Special education evaluation. 1991.02.15. rcvd from Helen and Shederick Ricks
- Special education evaluation. 1991.04.12. rcvd from Helen and Shederick Ricks
- Special education evaluation. 1991.08.28. rcvd from Helen and Shederick Ricks 1991.08.28 IEP addendum from W Kopec. rcvd from Helen and Shederick Ricks
- Special education evaluation. 1991.09.20. rcvd from Helen and Shederick Ricks
- Special education evaluation. 1992.01.06. rcvd from Helen and Shederick Ricks
- Special education evaluation. transfer to Independence HS. 1991.03.12. rcvd from Helen and Shederick Ricks
- Speedwell and Miller notes. 1987-1988. rcvd from Helen and Shederick Ricks
- The American Bar Association's Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases
- Trial transcript
- WISC-R. 1986.12.22. rcvd from Helen and Shederick Ricks
- Young 2nd grade, Swanson, Madrigal notes. 1982 and undated. rcvd from Helen and Shederick Ricks

# SOURCES NOT OTHERWISE IN THE RECORD




MISSISSIPPI STATE DEPARTMENT OF HEALTH
VITAL RECORDS

DEPARTMENT OF COMMERCE
Bureau of the Census

SHOWING HOSPITAL REPORT

# STANDARD CERTIFICATE OF LIVE BIRTH

STATE OF MISSISSIPPI

State File Number 28298
Registrar's Number 495

FOR LIVE BIRTH ONLY — USE SPECIAL BLANK FOR RECORDING STILL BIRTH

1. PLACE OF BIRTH County Attala
City or Town Kosciusko Inside or Outside Corporate Limits? Inside
Hospital Montfort Jones Memorial Street and No. Bell & Adams
or Rural Precinct
Mother's Stay Before Delivery—(a) In Hospital 2 hrs (b) In the Community lifetime

2. USUAL RESIDENCE OF MOTHER
State Mississippi
County Attala
City or Town Mc Adams
or Rural Precinct

3. FULL NAME OF CHILD Helen Sanders
4. DATE OF BIRTH Aug. 5, 1946
5. Boy or Girl? Girl
6. Twin or Triplet? — If so—born 1st., 2d., or 3d. —
7. Number Months of Pregnancy 9
8. Is Mother Married? yes

FATHER OF CHILD
9. Full Name Roger L. Sanders (col.)
10. Color or Race negro
11. Age at Time of this Birth 36 Yrs.
12. Where Born? Clarksdale, Miss.
13. Usual Occupation Public work
14. Industry or Business Day laborer

MOTHER OF CHILD
15. Full Maiden Name Christine Suddeuth
16. Color or Race negro
17. Age at Time of this Birth 18 Yrs.
18. Where Born? Mc Adams, Miss.
19. Usual Occupation Field work.
20. Industry or Business

21. CHILDREN BORN TO THIS MOTHER:
(a) How many other children of this mother are now living? 0
(b) How many other children were born alive but are now dead? 0
(c) How many children were born dead? 0

22. Mother's Mailing Address for Registration Notice (col.) Christine Suddeuth McAdams
Mc Adams, Miss.

23. I hereby certify that I attended the birth of this child who was born alive at the hour of 1:20 a. M. on the date above stated, and that the information given was furnished by Florida Suddeuth related to this child as mother.

Signature A. Barnes #77 Attendant
Address Kosciusko, Miss.

24. Date Received by Registrar Aug. 27 1946
25. Mrs. Elnu R. Patts Signature of Registrar

The Above Record is Correct? Christine Sanders Signature of Mother

Form VS 1A

THIS IS TO CERTIFY THAT THE ABOVE IS A TRUE AND CORRECT COPY OF THE CERTIFICATE ON FILE IN THIS OFFICE.

Alton B. Cobb, M.D.
Alton B. Cobb, M.D.
STATE HEALTH OFFICER

July 3, 1992

David Lohrisch
David Lohrisch
STATE REGISTRAR

WARNING: A REPRODUCTION OF THIS DOCUMENT RENDERS IT VOID AND INVALID. DO NOT ACCEPT UNLESS EMBOSSED SEAL OF THE MISSISSIPPI STATE BOARD OF HEALTH IS PRESENT. IT IS ILLEGAL TO ALTER OR COUNTERFEIT THIS DOCUMENT.

Calumet Public schools Dist 132 progress notes. 1980-1987. Rcvd from Helen and Shederick Ricks

## PARENT COMMENTS

1st QUARTER

2nd QUARTER

3rd QUARTER

Your signature means only that you have examined the report; it does not indicate approval or disapproval. Please keep the enclosed report and return this envelope to the school within three days after it is issued. A cumulative report will be issued at each marking period.

PARENT'S SIGNATURE

1st Quarter Mrs. Helen R. Ricks

2nd Quarter Mr. Sheferick J. Ricks

3rd Quarter Mrs. Helen R. Ricks

Promoted ✓ to (in) Grade 2

Assigned ______ on June 12, 1981 Date

Retained ______ Jean Minter Teacher's Signature

CALUMET PUBLIC SCHOOLS DISTRICT 132

## STUDENT PROGRESS REPORT

District 132

Cook County, Illinois

Burr Oak School
1440 W. 125th Street

Calumet School
1440 Vermont Street

Calumet Park
60643

Grades 1 – 8

STUDENT'S NAME Cedric Ricks

| | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter |
|---|---|---|---|---|
| Days Absent | 2 | 1 | 5 | 0 |
| Times Tardy | 1 | 6 | 2 | 0 |

To our Parents:

The enclosed report is designed to indicate your child's progress in the various areas of the school's program. This report, plus the parent-teacher-student conferences scheduled during the school year, should indicate achievement according to your teacher's estimate of your child's potential. If you desire additional conferences please call the school for an appointment. (388-8010)

George Swanson
Principal

Milton George,
Superintendent

000060

**TEACHERS COMMENTS**

**1st Quarter**

I don't really know what to say about Cedric. I don't think I understand him. He doesn't seem to respond or react to anything.

I think he is capable of more than he is producing. His written work is usually done well but he does not attend to or contribute to oral work.

I have seen a definite improvement in his reading since you began doing extra work with him. Keep it up!

**2nd Quarter**

Thanks for helping Cedric and please keep it up. Mrs. Swanson

The help you've give Cedric at home in reading has really improved his work here! Keep it up!

I continue to constantly battle for his attention here at school. He has some good days but the bad ones are still the majority. He's really rough on the other children — not physically but with his comments and laughter.

**3rd Quarter**

Cedric is certainly not working up to his potential. His listening and attending are so poor. He's so busy making noises and playing around that he isn't aware of what he's supposed to be doing. This is really hurting him academically.

— from Miss Horvath

Cedric's behavior needs improvement. He is often inattentive & disruptive in class.

**4th Quarter**

I hope that in the future Cedric can learn to put all that energy he has to work in a more positive way. He has the potential to be an "A" student. Right now his attitude and behavior are interfering with him working up to his capabilities.

000061

Case 4:20-cv-01299-O Document 52-1 Filed 12/21/22 Page 259 of 502 PageID 10096

CALUMET PUBLIC SCHOOLS — DISTRICT 132

PROGRESS REPORT 19 __ — 19 __

STUDENT'S NAME [illegible] Grade 1 Teacher [illegible]

**Grading Explanation:**
A or 9 = Superior
B or 7, 8 = Above Average
C or 4, 5, 6 = Average
D or 2, 3 = Below Average
U or 1 = Unsatisfactory
√ = Improvement Needed

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| READING | | | B | B |
| Reads with understanding | D | C+ | C+ | C+ |
| Uses word attack skills | C- | B | B | B |
| Dictation | | | C+ | C+ |
| | | | | |
| SPELLING | | | | |
| Does well on weekly tests | A | A | A | A |
| Does well on daily work | B- | B | B | B |
| HANDWRITING | B+ | B | C+ | B+ |
| ENGLISH | | | | |
| Has knowledge of grammar | C | C | C | C |
| Constructs a sentence | | B | B- | B- |
| Constructs a paragraph | | | | |
| Uses oral language correctly | 5 | B | B | B |
| | | | | |
| Listening [illegible] | C | B | B | C+ |
| SOCIAL STUDIES | C | C | B | C |
| | | | | |
| | | | | |
| MATHEMATICS | | | | |
| Knows facts | B | B | B- | B |
| Computes accurately | C | C | C- | C |
| Can solve word problems | | | | |
| | | | | |
| | | | | |
| SCIENCE | C | B- | C+ | B |

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| HEALTH AND SAFETY EDUCATION | C- | C | C | |
| PHYSICAL EDUCATION | U | C- | C | |
| ART | B | C | | |
| MUSIC | | | S | |

3rd quarter - Middle reading group
4th " " " "

√ = Improvement needed

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| WORK HABITS | | | | |
| Has necessary supplies | | | | |
| Works well with others | | | √ | |
| Has good listening habits | | | | |
| Follows directions | √ | √ | √ | |
| Uses time wisely | | | | |
| Takes pride in work | | | √ | |
| | | | | |
| SOCIAL HABITS | | | | |
| Accepts responsibilities | √ | | √ | |
| Respects rights & property of others | | | √ | |
| Exercises self-control | √ | √ | √ | |
| Observes school & classroom rules | √ | √ | √ | |
| Cares for books and materials | | | √ | |

000082

## PARENT COMMENTS

1st QUARTER

2nd QUARTER

3rd QUARTER I hope Cedric continues to behave. I also want to see some improvement in his grades — he seems to be going down in some areas.

Your signature means only that you have examined the report; it does not indicate approval or disapproval. Please keep the enclosed report and return this envelope to the school within three days after it is issued. A cumulative report will be issued at each marking period.

### PARENT'S SIGNATURE

1st Quarter Mr. & Mrs. Shedrick J. Ricks

2nd Quarter Mr. & Mrs. Shedrick J. Ricks

3rd Quarter Mr. & Mrs. Shedrick J. Ricks

Promoted ✓ to (in) Grade 3

Assigned ______ on 6-14-82
Date

Retained ______ Mrs. Young
Teacher's Signature

## CALUMET PUBLIC SCHOOLS — DISTRICT 13

### STUDENT PROGRESS REPORT

District 132

Cook County, Illinois

Burr Oak School
1440 W. 125th Street
Calumet Park, IL
60643-6099
388-8010

Calumet School
1440 Vermont Street
Calumet Park, IL
60643-6398
388-8820

Grades K — 8

STUDENT'S NAME Ricks Cedric

| | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter |
|---|---|---|---|---|
| Days Absent | 0 | 1 | 0 | 2 |
| Times Tardy | 0 | 0 | 0 | 1 |

To our Parents:

The enclosed report is designed to indicate your child's progress in the various areas of the school's program. This report, plus the parent-teacher-student conferences scheduled during the school year, should indicate achievement according to your teacher's estimate of your child's potential. If you desire additional conferences please call the school for an appointment.

George Swanson
Principal

Milton George
Superintendent

000063

## TEACHERS COMMENTS

**1st Quarter**

**2nd Quarter**

Reading - Behavior needs improvement.

**3rd Quarter**

I hope Cedric will be good enough next qtr to get on good citizenship.
Reading - Has been well behaved :)

**4th Quarter**

Cedric was acting very stubborn this qtr.

000064

CALUMET PUBLIC SCHOOLS — DISTRICT 132

PROGRESS REPORT 1981 – 1982

STUDENT'S NAME Ricks Cedric Grade 2 Teacher Young

Grading Explanation:
A or 9 = Superior
B or 7, 8 = Above Average
C or 4, 5, 6 = Average
D or 2, 3 = Below Average
U or 1 = Unsatisfactory
√ = Improvement Needed

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| READING | B | A | B | B |
| Reads with understanding | | | | |
| Uses word attack skills | | | | |
| Dictation | C | A | A | B |
| | | | | |
| SPELLING | C+ | B+ | D | C- |
| Does well on weekly tests | | | | |
| Does well on daily work | | | | |
| HANDWRITING | B+ | B | [illegible] | B- |
| ENGLISH | C | D | C | B- |
| Has knowledge of grammar | | | | |
| Constructs a sentence | | | | |
| Constructs a paragraph | | | | |
| Uses oral language correctly | | | | |
| | | | | |
| | | | | |
| SOCIAL STUDIES | B | C- | A | A+ |
| | | | | |
| | | | | |
| MATHEMATICS | C+ | B+ | B | B+ |
| Knows facts | | | | |
| Computes accurately | | | | |
| Can solve word problems | | | | |
| | | | | |
| | | | | |
| SCIENCE | B- | [illegible] | [illegible] | C |
| | | | | |
| | | | | |

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| HEALTH AND SAFETY EDUCATION | B+ | A | B+ | B |
| PHYSICAL EDUCATION | A | A+ | B+ | B |
| ART | A | A | B- | |
| MUSIC | | | | |
| | | | | |
| | | | | |

√ = Improvement needed

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| WORK HABITS | | | | |
| Has necessary supplies | | | | |
| Works well with others | ✓ | | ✓ | |
| Has good listening habits | | | ✓ | |
| Follows directions | ✓ | | ✓ | |
| Uses time wisely | | | | |
| Takes pride in work | | | | |
| | | | | |
| | | | | |
| SOCIAL HABITS | | | | |
| Accepts responsibilities | | | | |
| Respects rights & property of others | | | | |
| Exercises self-control | ✓ | | ✓ | |
| Observes school & classroom rules | | | ✓ | |
| Cares for books and materials | | | | |
| | | | | |
| | | | | |

000065

## PARENT COMMENTS

1st QUARTER

2nd QUARTER

3rd QUARTER

Your signature means only that you have examined the report; it does not indicate approval or disapproval. Please keep the enclosed report and return this envelope to the school within three days after it is issued. A cumulative report will be issued at each marking period.

PARENT'S SIGNATURE

1st Quarter Helen R. Ricks

2nd Quarter Helen R. Ricks

3rd Quarter Mrs. Helen R. Ricks

Promoted ✓ to (in) Grade 4

Assigned ______ on June 9 1983
Date

Retained ______

Mrs. R. Beavers
Teacher's Signature

CALUMET PUBLIC SCHOOLS — DISTRICT 132

## STUDENT PROGRESS REPORT

District 132

Cook County, Illinois

Burr Oak School
1440 W. 125th Street
Calumet Park, IL
60643-6099
388-8010

Calumet School
1440 Vermont Street
Calumet Park, IL
60643-6398
388-8820

Grades K – 8

STUDENT'S NAME Ricks, Cedrick

| | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter |
|---|---|---|---|---|
| Days Absent | 1 | 5 | 1 | 2 |
| Times Tardy | 1 | 1 | 0 | 2 |

To our Parents:

The enclosed report is designed to indicate your child's progress in the various areas of the school's program. This report, plus the parent-teacher-student conferences scheduled during the school year, should indicate achievement according to your teacher's estimate of your child's potential. If you desire additional conferences please call the school for an appointment.

Helen Thomas
Principal

Milton George,
Superintendent

000066

TEACHERS COMMENTS

1st Quarter

3rd Quarter

2nd Quarter

4th Quarter

000067

CALUMET PUBLIC SCHOOLS — DISTRICT 132

PROGRESS REPORT 19 82 – 19 83

STUDENT'S NAME Ricks, Cedrick Grade 3 Teacher Mrs. Beavers

Grading Explanation:
A or 9 = Superior
B or 7, 8 = Above Average
C or 4, 5, 6 = Average
D or 2, 3 = Below Average
U or 1 = Unsatisfactory

√ = Improvement Needed

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| READING | B | | | |
| Reads with understanding | | | | |
| Uses word attack skills | | | | |
| | | | | |
| | | | | |
| SPELLING | C | | | |
| Does well on weekly tests | | | | |
| Does well on daily work | | | | |
| HANDWRITING | B | | | |
| ENGLISH | C+ | | | |
| Has knowledge of grammar | | | | |
| Constructs a sentence | ✓ | | | |
| Constructs a paragraph | | | | |
| Uses oral language correctly | | | | |
| | | | | |
| | | | | |
| SOCIAL STUDIES | C | | | |
| | | | | |
| | | | | |
| MATHEMATICS | C- | | | |
| Knows facts | ✓ | | | |
| Computes accurately | ✓ | | | |
| Can solve word problems | | | | |
| | | | | |
| | | | | |
| SCIENCE | C | | | |
| | | | | |
| | | | | |

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| HEALTH AND SAFETY EDUCATION | C+ | | | |
| PHYSICAL EDUCATION | C- | | | |
| ART | | | | |
| MUSIC | S- | | | |
| LIBRARY | U | | | |
| | | | | |

√ = Improvement needed

| | | | | |
|---|---|---|---|---|
| WORK HABITS | | | | |
| Has necessary supplies | | | | |
| Works well with others | GYM | | | |
| Has good listening habits | GYM ✓ | | | |
| Follows directions | GYM | | | |
| Uses time wisely | ✓ | | | |
| Takes pride in work | | | | |
| | | | | |
| | | | | |
| SOCIAL HABITS | | | | |
| Accepts responsibilities | | | | |
| Respects rights & property of others | GYM | | | |
| Exercises self-control | GYM ✓ | | | |
| Observes school & classroom rules | ✓ | | | |
| Cares for books and materials | | | | |
| | | | | |
| | | | | |

000068

CALUMET PUBLIC SCHOOLS — DISTRICT 132

PROGRESS REPORT 19 [illegible] – 19 [illegible]

STUDENT'S NAME [illegible] Grade 3 Teacher [illegible]

Grading Explanation:
A or 9 = Superior
B or 7, 8 = Above Average
C or 4, 5, 6 = Average
D or 2, 3 = Below Average
U or 1 = Unsatisfactory
√ = Improvement Needed

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| READING | B | C+ | C+ | B- |
| Reads with understanding | | | | |
| Uses word attack skills | | | | |
| | | | | |
| | | | | |
| SPELLING | C | C+ | B+ | C |
| Does well on weekly tests | | | | |
| Does well on daily work | | | | |
| HANDWRITING | [illegible] | B | B | B |
| ENGLISH | [illegible] | C+ | C+ | C |
| Has knowledge of grammar | | | | |
| Constructs a sentence | √ | | | |
| Constructs a paragraph | | | | |
| Uses oral language correctly | | | | |
| | | | | |
| | | | | |
| SOCIAL STUDIES | [illegible] | C | C+ | C |
| | | | | |
| | | | | |
| MATHEMATICS | C- | C+ | B | C+ |
| Knows facts | √ | | | |
| Computes accurately | √ | | | |
| Can solve word problems | | | | |
| | | | | |
| | | | | |
| SCIENCE | C | [illegible] | [illegible] | C |
| | | | | |
| | | | | |

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| HEALTH AND SAFETY EDUCATION | C+ | B | B | B |
| PHYSICAL EDUCATION | [illegible] | C | B- | [illegible] |
| ART | | | C- | |
| MUSIC | [illegible] | D | | |
| LIBRARY | B | U | S+ | |

√ = Improvement needed

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| WORK HABITS | | | | |
| Has necessary supplies | | | | |
| Works well with others | | | | |
| Has good listening habits | [illegible] | [illegible] | [illegible] | [illegible] |
| Follows directions | | [illegible] | [illegible] | |
| Uses time wisely | √ | | | |
| Takes pride in work | | | | |
| | | | | |
| | | | | |
| SOCIAL HABITS | | | | |
| Accepts responsibilities | | | | |
| Respects rights & property of others | | | | |
| Exercises self-control | [illegible] | [illegible] | [illegible] | |
| Observes school & classroom rules | √ | | | |
| Cares for books and materials | | √ | | |
| | | | | |

000069

## PARENT COMMENTS

1st QUARTER

2nd QUARTER

3rd QUARTER

Your signature means only that you have examined the report; it does not indicate approval or disapproval. Please keep the enclosed report and return this envelope to the school within three days after it is issued. A cumulative report will be issued at each marking period.

PARENT'S SIGNATURE

1st Quarter Mrs. Helen R. Ricks

2nd Quarter Mrs. Helen R. Ricks

3rd Quarter Mrs. Helen R. Ricks

Promoted ____ to (in) Grade ____

Assigned ____ on ____ Date

Retained ____

Teacher's Signature

## CALUMET PUBLIC SCHOOLS DISTRICT 1:

## STUDENT PROGRESS REPORT

District 132

Cook County, Illinois

Burr Oak School
1440 W. 125th Street

Calumet School
1440 Vermont Street

Calumet Park
60643

Grades 1 — 8

STUDENT'S NAME Cedric Ricks

| | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter |
|---|---|---|---|---|
| Days Absent | 1 | 1 | 0 | 2 |
| Times Tardy | 1 | 2 | 2 | 2 |

To our Parents:

The enclosed report is designed to indicate your child's progress in the various areas of the school's program. This report, plus the parent-teacher-student conferences scheduled during the school year, should indicate achievement according to your teacher's estimate of your child's potential. If you desire additional conferences please call the school for an appointment. (388-8010)

Principal

Milton George,
Superintendent

000070

## TEACHERS COMMENTS

**1st Quarter**

**2nd Quarter**

Will be referred to a special classroom setting, if behavior does not improve.

Suggest that Cedric go for counseling for behavior problem.

**3rd Quarter**

His grades for this quarter are based upon my observations and the material he's been doing for me during the brief period he has been in attendance.

**4th Quarter**

CALUMET PUBLIC SCHOOLS — PROGRESS REPORT 19 83 – 19 84 — DISTRICT 13

STUDENT'S NAME Cedric Ricks Grade 4 Teacher Mrs. Griffin

Grading Explanation:
A or 9 = Superior
B or 7, 8 = Above Average
C or 4, 5, 6 = Average
D or 2, 3 = Below Average
U or 1 = Unsatisfactory
√ = Improvement Needed

Effort Grade Explanation:
1 Exceptional Effort
2 Satisfactory Effort
3 Making Little Effort

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| READING – (LEVEL 4M) | | | | |
| Reads with understanding | B | | | |
| Uses word attack skills | B | | | |
| | | | | |
| | | | | |
| SPELLING | | | | |
| Does well on weekly tests | B | | | |
| Does well on daily work | C+ | | | |
| HANDWRITING | B | | | |
| ENGLISH | | | | |
| Has knowledge of grammar | C+ | | | |
| Constructs a sentence | B | | | |
| Constructs a paragraph | B | | | |
| Uses oral language correctly | B | | | |
| | | | | |
| | | | | |
| SOCIAL STUDIES | F | | | |
| | | | | |
| | | | | |
| MATHEMATICS – (LEVEL ____) | | | | |
| Knows facts mult. | A | | | |
| Computes accurately | B | | | |
| Can solve word problems | | | | |
| | | | | |
| | | | | |
| SCIENCE | D | | | |
| | | | | |
| | | | | |

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| HEALTH AND SAFETY EDUCATION | C | | | |
| PHYSICAL EDUCATION | B- | | | |
| ART | | | | |
| MUSIC | A | | | |
| Library | S- | | | |
| | | | | |

√ = Improvement needed

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| WORK HABITS | | | | |
| Has necessary supplies | | | | |
| Works well with others | √ | | | |
| Has good listening habits | PE √ | | | |
| Follows directions | √ | | | |
| Uses time wisely | PE √ | | | |
| Takes pride in work | | | | |
| | | | | |
| | | | | |
| SOCIAL HABITS | | | | |
| Accepts responsibilities | | | | |
| Respects rights & property of others | | | | |
| Exercises self-control | √ | | | |
| Observes school & classroom rules | √ | | | |
| Cares for books and materials | | | | |
| | | | | |
| | | | | |

000072

CALUMET PUBLIC SCHOOLS — PROGRESS REPORT 19 83 – 19 84 — DISTRICT 1

STUDENT'S NAME Cedric Ricks Grade 4 Teacher Mrs. Griffin

**Grading Explanation:**
A or 9 = Superior
B or 7, 8 = Above Average
C or 4, 5, 6 = Average
D or 2, 3 = Below Average
U or 1 = Unsatisfactory
√ = Improvement Needed

**Effort Grade Explanation:**
1 Exceptional Effort
2 Satisfactory Effort
3 Making Little Effort

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| **READING – (LEVEL 14M)** | | | | |
| Reads with understanding | B | B- | | |
| Uses word attack skills | B | C | | |
| | | | | |
| | | | | |
| **SPELLING** | | | | |
| Does well on weekly tests | B | A | | |
| Does well on daily work | C+ | C | | |
| **HANDWRITING** | B | B | | |
| **ENGLISH** | | | | |
| Has knowledge of grammar | C+ | C- | | |
| Constructs a sentence | B | B | | |
| Constructs a paragraph | B | B | | |
| Uses oral language correctly | B | B | | |
| | | | | |
| | | | | |
| **SOCIAL STUDIES** | F | B | | |
| | | | | |
| | | | | |
| **MATHEMATICS – (LEVEL )** | | | | |
| Knows facts | A | A | | |
| Computes accurately | B | B- | | |
| Can solve word problems | | | | |
| | | | | |
| | | | | |
| **SCIENCE** | D | C | | |

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| HEALTH AND SAFETY EDUCATION | C | F | | |
| PHYSICAL EDUCATION | B- | B- | | |
| ART | | | | |
| MUSIC | A | A | | |
| Library | S- | S- | | |

√ = Improvement needed

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| **WORK HABITS** | | | | |
| Has necessary supplies | | | | |
| Works well with others | √ | √ | | |
| Has good listening habits | √ | √ | | |
| Follows directions | √ | √ | | |
| Uses time wisely | √ | √ | | |
| Takes pride in work | | | | |
| | | | | |
| | | | | |
| **SOCIAL HABITS** | | | | |
| Accepts responsibilities | | | | |
| Respects rights & property of others | | | | |
| Exercises self-control | √ | √ | | |
| Observes school & classroom rules | √ | √ | | |
| Cares for books and materials | | √ | | |

000073

CALUMET PUBLIC SCHOOLS — PROGRESS REPORT 19 83 – 19 84 — DISTRICT 1

STUDENT'S NAME Cedric Ricks — Grade 4 — Teacher Mrs. Griffin

**Grading Explanation:**
A or 9 = Superior
B or 7, 8 = Above Average
C or 4, 5, 6 = Average
D or 2, 3 = Below Average
U or 1 = Unsatisfactory
√ = Improvement Needed

**Effort Grade Explanation:**
1 Exceptional Effort
2 Satisfactory Effort
3 Making Little Effort

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| READING – (LEVEL NM) | | | | |
| Reads with understanding | B | B- | B+ | |
| Uses word attack skills | B | C | B | |
| SPELLING | | | | |
| Does well on weekly tests | B- | A | A | |
| Does well on daily work | C+ | C | C | |
| HANDWRITING | B | B | B | |
| ENGLISH | | | | |
| Has knowledge of grammar | C+ | C- | B | |
| Constructs a sentence | B | B | B | |
| Constructs a paragraph | B | B | | |
| Uses oral language correctly | B | B | | |
| SOCIAL STUDIES | F | B | — | |
| MATHEMATICS – (LEVEL ____) Math | | | | |
| Knows facts | A | A | A | |
| Computes accurately | B | B+ | B | |
| Can solve word problems | | | | |
| SCIENCE | D | U | — | |

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| HEALTH AND SAFETY EDUCATION | C | F | | |
| PHYSICAL EDUCATION | B- | B- | B- | |
| ART | | | INC | |
| MUSIC | A | A | | |
| Library | S- | S- | S- | |

√ = Improvement needed

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| WORK HABITS | | | | |
| Has necessary supplies | | | | |
| Works well with others | √ | √ | | |
| Has good listening habits | E √ | √ | | |
| Follows directions | √ | √ | | |
| Uses time wisely | C √ | √ | | |
| Takes pride in work | | | | |
| SOCIAL HABITS | | | | |
| Accepts responsibilities | | | | |
| Respects rights & property of others | | | | |
| Exercises self-control | √ | √ | | |
| Observes school & classroom rules | √ | √ | | |
| Cares for books and materials | | √ | | |

000074

CALUMET PUBLIC SCHOOLS — PROGRESS REPORT 19 83 – 19 84 — DISTRICT 1

STUDENT'S NAME [illegible]

Grade 4 Teacher Mrs. Griffin

Grading Explanation:
A or 9 = Superior
B or 7, 8 = Above Average
C or 4, 5, 6 = Average
D or 2, 3 = Below Average
U or 1 = Unsatisfactory
√ = Improvement Needed

Effort Grade Explanation:
1 Exceptional Effort
2 Satisfactory Effort
3 Making Little Effort

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| READING – (LEVEL 4.1 ) | | | | |
| Reads with understanding | B | B- | B+ | B |
| Uses word attack skills | B | C | B | |
| | | | | |
| | | | | |
| SPELLING | | | | |
| Does well on weekly tests | B | A | A | A |
| Does well on daily work | C+ | C | C | |
| HANDWRITING | B | B | B | B |
| ENGLISH | | | | |
| Has knowledge of grammar | C+ | C- | B | B |
| Constructs a sentence | B | B | B | |
| Constructs a paragraph | B | B | | |
| Uses oral language correctly | B | B | | |
| | | | | |
| | | | | |
| SOCIAL STUDIES | F | B | — | — |
| | | | | |
| | | | | |
| MATHEMATICS – (LEVEL ____ ) | | | | |
| Knows facts | A | A | A | A |
| Computes accurately | B | B+ | B | |
| Can solve word problems | | | | |
| | | | | |
| | | | | |
| SCIENCE | D | D | — | |

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| HEALTH AND SAFETY EDUCATION | C | F | | |
| PHYSICAL EDUCATION | B- | B- | B- | B |
| ART | | | INC | |
| MUSIC | A | A | | |
| Library | S- | S- | S- | S |

√ = Improvement needed

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| WORK HABITS | | | | |
| Has necessary supplies | | | | |
| Works well with others | √ | √ | | |
| Has good listening habits | √ | √ | | |
| Follows directions | √ | √ | | |
| Uses time wisely | √ | √ | | |
| Takes pride in work | | | | |
| | | | | |
| SOCIAL HABITS | | | | |
| Accepts responsibilities | | | | |
| Respects rights & property of others | | | | |
| Exercises self-control | √ | √ | | |
| Observes school & classroom rules | √ | √ | | |
| Cares for books and materials | | √ | | |

000076

**CALUMET PUBLIC SCHOOLS** **DISTRICT 132**

**PROGRESS REPORT 19** 86 **— 19** 87

**STUDENT'S NAME** Cedric Ricks **Grade** 7 **Teacher** L. Gagner

**Grading Explanation:**
A or 9 = Superior
B or 7, 8 = Above Average
C or 4, 5, 6 = Average
D or 2, 3 = Below Average
U or 1 = Unsatisfactory
√ = Improvement Needed

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| **READING** | | D+ | C | |
| Reads with understanding | | | | |
| Uses word attack skills | | | | |
| | | | | |
| **SPELLING** | | D | C | |
| Does well on weekly tests | | | | |
| Does well on daily work | | | | |
| **HANDWRITING** | | | | |
| **ENGLISH** | | D | C | |
| Has knowledge of grammar | | | | |
| Constructs a sentence | | | | |
| Constructs a paragraph | | | | |
| Uses oral language correctly | | | | |
| | | | | |
| Public Speaking √ | | C | | |
| **SOCIAL STUDIES** | | D | D | |
| Government | | | D | |
| Il Constitution Test 84% | | | | |
| **MATHEMATICS** | | F | D | |
| Knows facts | | √ | √ | |
| Computes accurately | | √ | √ | |
| Can solve word problems | | | | |
| | | | | |
| **SCIENCE** | | D | D | |
| | | | | |
| | | | | |

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| **HEALTH AND SAFETY EDUCATION** | | D | | |
| **PHYSICAL EDUCATION** | | B | B | |
| **ART** | | | | |
| **MUSIC** | | | | |
| | | | | |
| | | | | |
| Quarterly Grade Point Average | | 1.14 | | |
| Cumulative Grade Point Average | | 1.14 | | |

You must improve!
[signature]

√ = Improvement needed.

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| **WORK HABITS** | | | | |
| Has necessary supplies | | | | |
| Works well with others | | | SK | |
| Has good listening habits | | | SK LG | |
| Follows directions | | | SK LG | |
| Uses time wisely | | | SK LG | |
| Takes pride in work | | | | |
| | | | | |
| | | | | |
| **SOCIAL HABITS** | | | | |
| Accepts responsibilities | | | | |
| Respects rights & property of others | | | | |
| Exercises self-control | | | LG | |
| Observes school & classroom rules | | | LG SK | |
| Cares for books and materials | | | | |
| | | | | |

000076

Young 2nd grade, Swanson, Madrigal notes. 1982 and undated. Rcvd from Helen and Shederick Ricks

Mrs. Rikes, 5-10-82
I want you to know Cedric was wonderful all day after that trouble at Noon. I think he realizes why I was so upset + I don't think it will happen again
Thanks for your Co-operation
Mrs. Y.

Mrs. Ricks,
Cedric doing excellent for everyone today.

Mrs. Young
800 423-4444
Herbert Armstrong
Pasadena
, 91123

Cedric was perfect.
I love you
Mrs. Y.

Mrs Ricks,
I guess Linda has already talked to you. The reason I am not writing notes because I'm trying to show Cedric trust. Please feel free to call me on Fridays between 9:40 + 10:00 or 11:20 - 12:50 (11:30) to see if he's been telling you the truth (only if you doubt something he's told you) Today he was perfect.
I Love you sticker is on left hand

Mrs. Y.

Mrs. Ricks
He was fine today
Mrs. Y

Mrs Rubs,
Cedric has been acting out whenever I have to reprimand him. He is also bringing toys, like little cars, to play with during class. He makes noises, claps his hands & refuses to do his work. I wanted to tell you this all Friday but you didn't give me a call like you said you were going to do every Friday. As far as grade wise his only problem is a C- in Math. And a lot of that is because he doesn't pay

attention to directions. Please
call this Friday.

Thank You.
Mrs. Y.

10-16-03

Mrs Ricks,

Cedric has been perfect all day today. Isn't that great!!

George Swanson

P.S. Please remember to call Mrs Young each Friday.
G.S.

Mrs Ricks,

I would like to speak with you about Cedric's behavior.

Mr. Madrigal

Great!!

Mr. Swanson

Certificate of child Health Examination. 1984.08.20. Rcvd from Helen and Shederick Ricks

PLEASE PRINT/TYPE

# CERTIFICATE OF CHILD HEALTH EXAMINATION

(INFORMATION ON THIS [...] BE SHARED WITH APPROPRIATE PERSONNEL FOR HEAL[TH AND ED]UCATIONAL PURPOSES)

PUPIL'S NAME: (LAST) (FIRST) (MIDDLE) BIRTHDATE: [...] 8 [...] (MO DAY YR) SEX: M / F GRADE LEVEL: 5

ADDRESS: 12341 S Bishop (STREET) (CITY) 60643 (ZIP CODE) PARENTS TELEPHONE: 371-7985 (HOME) 280-8057 (WORK) SCHOOL: Seven Holy Founders

PARENT OR GUARDIAN: ______ ADDRESS: ______

## MEDICAL HISTORY

TO BE COMPLETED BY PARENT

| | |
|---|---|
| CHICKEN POX ... YEAR: | 1984 |
| SCARLET FEVER/STREP ... YEAR: | 6-78 |
| T.B. / T.B. CONTACT ... YEAR: | NO |
| CONGENITAL DEFECTS | NO |
| DIABETES | NO |
| EPILEPSY | NO |
| HEART DISEASES | NO |
| FREQUENT EAR INFECTION | NO |
| INJURIES/ACCIDENTS ... YEAR: | - |
| RESULTS | |
| PERMANENT DISABILITY ... YEAR: | - |
| TYPE | - |
| RESULTS | - |
| SURGERY (OPERATIONS) ... YEAR: | - |
| TYPE | |
| RESULTS | |
| ALLERGIES (LIST) | - |
| ROUTINE MEDICATIONS (LIST) | - |
| OTHER | - |

PARENT'S SIGNATURE ______ DATE ______

IMMUNIZATION: PLEASE PROVIDE THE MONTH DAY AND YEAR FOR EVERY DOSE ADMINISTERED. THE DAY AND MONTH IS REQUIRED IF YOU CANNOT DETERMINE IF THE VACCINE WAS GIVEN PRIOR TO THE MINIMUM INTERVAL OR AGE.

| DOSE | 1 MO | 1 DAY | 1 YR | 2 MO | 2 DAY | 2 YR | 3 MO | 3 DAY | 3 YR | 4 MO | 4 DAY | 4 YR | 5 MO | 5 DAY | 5 YR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DIPHTHERIA, PERTUSSIS AND TETANUS (DPT) | 11 | 15 | 74 | 2 | 21 | 75 | 3 | 22 | 75 | 6 | 7 | 76 | 11 | - | 79 |
| DIPHTHERIA AND TETANUS (Td) OR (TD) | 8 | 20 | 84 | | | | | | | | | | | | |
| ORAL POLIO | 2 | 21 | 75 | 4 | 26 | 75 | 6 | 28 | 75 | 6 | 7 | 76 | 11 | - | 78 |
| COMBINED MEASLES/MUMPS/RUBELLA (MMR) | | | | | | | | | | | | | 11 - 79 / 8 20 84 | | |
| COMBINED MEASLES AND RUBELLA (MR) | | | | | | | | | | | | | | | |
| RUBEOLA (RED MEASLES) LIVE VIRUS VACCINE | 1 | 20 | 78 | | | | | | | | | | | | |
| RUBELLA (3DAY OR GERMAN MEASLES) | 10 | 4 | 76 | | | | | | | | | | | | |
| MUMPS | 2 | 7 | 76 | | | | | | | | | | | | |
| *TB SKIN TEST | 8 | 20 | 84 | RESULTS | | | | | | | | | | | |

*MANDATED FOR CHILD CARE FACILITIES

1. CLINICAL DIAGNOSIS IS ACCEPTABLE IF VERIFIED BY PHYSICIAN.

MEASLES ______ (MONTH DAY YEAR)

MUMPS ______ (MONTH DAY YEAR)

2. LABORATORY CONFIRMATION OF ANY DISEASE IS ACCEPTABLE.

DISEASE ______ (MONTH DAY YEAR)

LAB RESULT ______

PHYSICIAN'S SIGNATURE ______ DATE ______

HEALTH PROVIDER SIGNATURE (PHYSICIAN, SCHOOL HEALTH PROFESSIONAL OR HEALTH OFFICIAL) (VERIFYING THAT IMMUNIZATIONS WERE GIVEN)

Billie W Adams MD 8-20-84 DATE

PEDIATRIC ASSOCIATES, S.C.
Billie W. Adams, M.D.
Lowell M. Zollar, M.D.
7141 So. Jeffery Blvd.
Chicago, Ill. 60649
Phone: 288-4824

SIGNATURE ______ DATE ______

## PHYSICAL EXAMINATION

TO BE COMPLETED BY PHYSICIAN

EVALUATION: (REQUIRED)

| | NORMAL | ABNORMAL | FOLLOW-UP – COMMENT |
|---|---|---|---|
| HEIGHT 51 WEIGHT 59½ | | | |
| SKIN | ✓ | | |
| EYES | ✓ | | |
| EARS | ✓ | | |
| NOSE | ✓ | | |
| THROAT | ✓ | | |
| THROAT/DENTAL | ✓ | | |
| CARDIOVASCULAR B/P 100/66 | ✓ | | |
| RESPIRATORY | ✓ | | |
| GASTROINTESTINAL | ✓ | | |
| GENITO-URINARY | ✓ | | |
| NEUROLOGICAL | ✓ | | |
| MUSCULAR SKELETAL | ✓ | | |
| SCOLIOSIS SCREENING | ✓ | | |
| NUTRITIONAL STATUS | ✓ | | |
| OTHER | | | |

(STRONGLY RECOMMENDED)

| | DATE | NORMAL | ABNORMAL RESULTS |
|---|---|---|---|
| HEMOGLOBIN | | | |
| HEMATOCRIT | 8-20-84 | 40% | |
| URINALYSIS | 8-20-84 | | Protein + |
| LEAD SCREENING | 9-13-84 | – | |
| SICKLE CELL | | | |

MEDICATIONS: none

DIET RESTRICTION / NEEDS

SPECIAL EQUIPMENT NEEDED

ALLERGIES: None

OTHER

GENERAL COMMENTS: [illegible]

ON THE BASIS OF THIS EXAMINATION ON THIS DAY I APPROVE THIS CHILD'S PARTICIPATION IN
IF NO, PLEASE ATTACH EXPLANATION.

INTERSCHOLASTIC SPORTS (FOR 1 YEAR): ☑ YES ☐ NO
PHYSICAL EDUCATION: ☑ YES ☐ NO

PHYSICIAN'S SIGNATURE: Billie W Adams DATE: 8-20-84

ADDRESS: PEDIATRIC ASSOCIATES, S.C. Billie W. Adams, M.D. Lowell M. Zollar, M.D. 7141 So. Jeffery Blvd. Chicago, Ill. 60649 Phone: 288-4824 TELEPHONE: ______

## VISION AND HEARING SCREENING DATA

THIS SECTION TO BE COMPLETED BY I.D.P.H. CERTIFIED SCREENING TECHNICIAN ONLY IF PRE-EXISTING APPROVED FORM BY I.D.P.H. IS NOT AVAILABLE.

PRE-SCHOOL – DURING FIRST YEAR OF ENROLLMENT; SCHOOL AGE – DURING SCHOOL YEAR AT REQUIRED GRADE LEVEL

| DATE | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GRADE | | | | | | | | | | | | | | | | | | |
| | R | L | R | L | R | L | R | L | R | L | R | L | R | L | R | L | R | L |
| VISION | | | | | | | | | | | | | | | | | | |
| HEARING | | | | | | | | | | | | | | | | | | |

CODE
P – PASS
F – FAIL
R – REFERRED

ILLINOIS DEPARTMENT OF PUBLIC HEALTH
ILLINOIS STATE BOARD OF EDUCATION
ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES
ILLINOIS HIGH SCHOOL ASSOCIATION

000084

IDPH • ISBE • DCFS • IHSA • 001.2 • 10/80

Letter from Seven Holy Founders re CR suspension. 1985.1.31. Rcvd from Helen and Shederick Ricks

SEVEN HOLY FOUNDERS SCHOOL
12440 SOUTH ADA STREET
CALUMET PARK, ILLINOIS 60643

January 31, 1985

Mr. & Mrs. Ricks,

Cedrick is suspended from school for two days for throwing snow and playing on the snow hill. He is suspended for Friday, February 1st and Monday, February 4, 1985.

Norma de la Cruz
Norma de la Cruz,
Principal

Seven Holy Founders records. 1985-1986. Rcvd from Helen and Shederick Ricks

ARCHDIOCESE OF CHICAGO
OFFICE OF CATHOLIC EDUCATION
GRADES 4-8

Catholic Education is concerned with all aspects of the child's growth and development. It is our goal to prepare the child to live in our contemporary society within the context of a Christian Educational Community, a community in which children can develop their unique gifts and through which they can cooperate in the transformation of society in justice and peace. Recognizing that parents are the first and foremost educators of the child, we welcome your helpful suggestions for the improvement of your child's education.

This form gives you a brief report of your child's progress in school. It deserves your careful attention. Because parent-teacher conferences are an ideal way for the teacher and you to review your child's progress, the report card should serve only as a supplement to the detailed information discussed at the conferences.

SCHOOL SEVEN HOLY FOUNDERS
STUDENT CEDRIC RICKS
TEACHER MR. J. WATTS
PRINCIPAL MS. DE LA CRUZ
GRADE 6TH 19 85 - 19 86
Promoted to Grade ______

| PARENT'S/GUARDIAN'S SIGNATURE | COMMENTS (See Code) |
|---|---|
| 1st [signature] | |
| 2nd | |
| 3rd | |

Comment Code: (1) The report has been reviewed with my child noting accomplishments and needs.
(2) Request a conference with the teacher.

ACHIEVEMENT CODE
A – Consistently does superior work in accomplishing goals, objectives, and requirements
B – Usually does above average work in accomplishing goals, objectives, and requirements
C – Usually does average work in accomplishing goals, objectives, and requirements
D – Usually does below average work in accomplishing goals, objectives and requirements
U – Usually does unsatisfactory work in accomplishing goals, objectives and requirements

Effort Code
These marks are indicators for the sub-topics in all subject areas.
+ Commendable • Satisfactory √ Needs Improvement

| | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| Days Absent | 0 | | | |
| Days Tardy | 4 | | | |

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| **RELIGION** | B+ | | | |
| Knows doctrine, Scripture, data presented | • | | | |
| Completes assignments on time | • | | | |
| Participates in class discussions | • | | | |
| **READING** | C+ | | | |
| Participates in class discussion | • | | | |
| Comprehends materials read | • | | | |
| Applies skills taught | • | | | |
| Reads well orally | • | | | |
| Does independent reading | √ | | | |
| Completes assignments on time | • | | | |
| **ENGLISH** | B- | | | |
| Understands language concepts | • | | | |
| Applies oral language skills | • | | | |
| Applies written language skills | • | | | |
| Shows creativity | • | | | |
| Completes assignments on time | • | | | |
| **SPELLING** | A | | | |
| Masters assigned lists | • | | | |
| Knows meaning of the words | • | | | |
| Applies spelling in written work in subject areas | • | | | |
| Completes assignments on time | | | | |
| **MATHEMATICS** | B+ | | | |
| Knows content area | • | | | |
| Applies learned concepts to new material | • | | | |
| Computes accurately | • | | | |
| Uses reasoning skills in problem solving | • | | | |
| Completes assignments on time | • | | | |

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| **SCIENCE** | C | | | |
| Knows, understands concepts | • | | | |
| Applies concepts | • | | | |
| Participates in class discussion | PA | | | |
| Completes assignments on time | • | | | |
| **SOCIAL STUDIES** | B | | | |
| Knows content area of subject | • | | | |
| Shows ability to use maps, charts, graphs | • | | | |
| Participates in class discussion | + | | | |
| Completes assignments on time | • | | | |
| **PHYSICAL EDUCATION** | P | | | |
| Shows growth in skill development | • | | | |
| Shows sportsmanship | • | | | |
| Cooperates during class instruction | • | | | |
| Comes properly dressed for class | • | | | |
| **ART** | B+ | | | |
| Understands and applies art concepts | • | | | |
| Completes and evaluates work | • | | | |
| **MUSIC** | D | | | |
| Perceives musical elements through listening | • | | | |
| Understands and applies music concepts | √ | | | |
| Participates during instruction | √ | | | |
| COOPERATES | √ | | | |

| PERSONAL AND SOCIAL GROWTH | RELIGION | READING | ENGLISH | SPELLING | HANDWRITING | MATHEMATICS | SCIENCE | SOCIAL STUDIES | PHYSICAL EDUCATION | ART | MUSIC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| TEACHER | Hill | Bueun | Bueun | Watts | Watts | Hill | Watts | Watts | Martin | Watts | Slank |
| Respects authority | | | | | | | | | | | |
| Respects peers | | | | | | | | | | | |
| Respects property | | | | | | | | | | | |
| Helps create pleasant learning atmosphere | | | | | | | √ | | | | |
| Comes prepared for class | | | | | | | | | | | |
| Participates in group work | | | | | | | | | | | |
| Accepts responsibility in independent activities | | | | | | | | | | | |
| Does neat and accurate work | | | | | | | | | | | |
| Attends school regularly | | | | | | | | | | | |
| Listens to and follows directions | | √ | √ | | | | | | | | |
| Takes initiative & works independently | | √ | | | | | √ | | | | |
| Needs suggestion for improvement | | √ | √ | | | | | | | | |
| Listens attentively | | √ | | | | | | √ | | | |

(Each subject has quarter columns 1–4; all marks are in quarter 1.)

+ Commendable • Satisfactory √ Needs Improvement

RC

000088

SUMMER SESSION REPORT
JUNE- JULY -1986

NAME Cedric Ricks GRADE 6
SUMMER SESSION WORK IN math

PROGRESS WAS :
commendable ✓
satisfactory
unsatisfactory
ATTITUDES AND WORK HABITS(ACCEPTABLE UNLESS CHECKED)
made good use of time and materials
completed at least minmum assignments
volunteered for additional practice to develop skills
took proper share in group activities
became increasingly responsible for checking and proofreading written assignments
was genuinely interested in own progress

ADDITIONAL COMMENTS: Cedric's work was excellent during summer school. He is capable of doing excellent work. There were times when his behavior did pose a problem but after our phone conference it did improve

Promoted to Grade 7

TEACHER Mrs. Pamela P. [illegible]

000089

SUMMER SESSION REPORT
JUNE- JULY -1986

NAME Cedric Ricks GRADE 6
SUMMER SESSION WORK IN Reading

PROGRESS WAS :
commendable ____
satisfactory ✓
unsatisfactory ____
ATTITUDES AND WORK HABITS(ACCEPTABLE UNLESS CHECKED)
made good use of time and materials ✓
completed at least minmum assignments ✓
volunteered for additional practice to develop skills ✓
took prpper share in group activities ✓
became increasingly responsible for checking and proofreading written assignments ✓
was genuinely interested in own progress ✓

ADDITIONAL COMMENTS: Students wasted valuable class time.

TEACHER Ms. Stapleton

000090

SUMMER SESSION REPORT
JUNE- JULY -1986

NAME Cedric Picks GRADE End of Grade 6 going into Grade 7
SUMMER SESSION WORK IN

PROGRESS WAS :
commendable ✓
satisfactory
unsatisfactory
ATTITUDES AND WORK HABITS(ACCEPTABLE UNLESS CHECKED)
made good use of time and materials ✓
completed at least minmum assignments
volunteered for additional practice to develop skills
took prpper share in group activities
became increasingly responsible for checking and proofreading written assignments
was genuinely interested in own progress

ADDITIONAL COMMENTS: Cedric has an excellent understanding of grammar. He could use more help with writing skills. His attitude toward his work is if he is in the mood, he will work diligently. If he is not in the mood, his output his slim to none. Cedric could be an excellent student with the right motivation by his seventh grade teacher.

TEACHER Mrs. K. Schatz

000091

Mrs. Schatz
English

# PROGRESS REPORT

PUPIL'S NAME: Cedric Picks Date: June 27, 1986

| CLASSROOM CONDUCT: | Religion | Math | Spelling | English | Reading | Science | Social Studies |
|---|---|---|---|---|---|---|---|
| 1. Good | | | | ✓ | | | |
| 2. Occasionally Disturbs | | | | | | | |
| 3. Frequently Disturbs | | | | | | | |
| 4. Does Not Respect Authority | | | | | | | |
| **CLASS PARTICIPATION:** | | | | | | | |
| 1. Satisfactory | | | | ✓ | | | |
| 2. Fair | | | | | | | |
| 3. Not Attentive | | | | | | | |
| **WRITTEN WORK:** | | | | | | | |
| 1. Usually Neat and Complete | | | | ✓ | | | |
| 2. Incomplete-Occasionally | | | | | | | |
| Incomplete-Frequently | | | | | | | |
| 3. Does Not Hand Work in Occasionally | | | | | | | |
| Frequently | | | | | | | |
| **ATTITUDE TOWARDS OTHERS:** | | | | | | | |
| 1. Satisfactory | | | | ✓ | | | |
| 2. Needs Improvement | | | | | | | |
| **TESTS:** | | | | | | | |
| 1. Doing Well | | | | ✓ | | | |
| 2. Passing | | | | | | | |
| 3. Failing | | | | | | | |

TEACHER COMMENTS: __________

000092

PROGRESS REPORT

PUPIL'S NAME: Cedric Ricks Date: June 27, 1986

| CLASSROOM CONDUCT: | Religion | Math | Spelling | English | Reading | Science | Social Studies |
|---|---|---|---|---|---|---|---|
| 1. Good | | | | | | | |
| 2. Occasionally Disturbs | | ✓ | | | | | |
| 3. Frequently Disturbs | | | | | | | |
| 4. Does Not Respect Authority | | | | | | | |

| CLASS PARTICIPATION: | Religion | Math | Spelling | English | Reading | Science | Social Studies |
|---|---|---|---|---|---|---|---|
| 1. Satisfactory | | ✓ | | | | | |
| 2. Fair | | | | | | | |
| 3. Not Attentive | | | | | | | |

| WRITTEN WORK: | Religion | Math | Spelling | English | Reading | Science | Social Studies |
|---|---|---|---|---|---|---|---|
| 1. Usually Neat and Complete | | ✓ | | | | | |
| 2. Incomplete-Occasionally | | | | | | | |
| Incomplete-Frequently | | | | | | | |
| 3. Does Not Hand Work in Occasionally | | | | | | | |
| Frequently | | | | | | | |

| ATTITUDE TOWARDS OTHERS: | Religion | Math | Spelling | English | Reading | Science | Social Studies |
|---|---|---|---|---|---|---|---|
| 1. Satisfactory | | ✓ | | | | | |
| 2. Needs Improvement | | | | | | | |

| TESTS: | Religion | Math | Spelling | English | Reading | Science | Social Studies |
|---|---|---|---|---|---|---|---|
| 1. Doing Well | | ✓ | | | | | |
| 2. Passing | | | | | | | |
| 3. Failing | | | | | | | |

TEACHER COMMENTS: Cedric's behavior has improved since our phone conversation. I have also spoken to Cedric about his behavior. His math grades are good. Mrs Hill

000083

Letter from Seven Holy Founders re suspension. 1986.02.27. Rcvd from Helen and Shederick Ricks

SEVEN HOLY FOUNDERS SCHOOL
12440 SOUTH ADA STREET
CALUMET PARK, ILLINOIS 60643

February 27, 1986

Mr. & Mrs. Ricks,

Cedric is suspended from school tomorrow for disrupting the class and showing disrespect to the music teacher.

Ms. de la Cruz
Ms. de la Cruz,
Principal

**School letter re failure to pay attention and complete homework. Undated. Rcvd from Helen and Shederick Ricks**

Cedric Ricks

Cedric's 2 major problems are
1. failure to pay attention
2. failure to complete homework

Language - 15 failing grades out of 42. Also many scores between 65-69 (D). Failed his first English test for quarter 4.

Reading - 14 failures out of 41. See Skilpak from page 61.

It is recommended that some counseling be obtained for Cedric. Perhaps of Fiorente might help.
Summer school required.

**Chicago Clinic for Child Development screening summary. 1986.04.05. Rcvd from Helen and Shederick Ricks**

CHICAGO CLINIC FOR CHILD DEVELOPMENT, INC.
1525 EAST 53RD STREET SUITE 1003
CHICAGO, ILLINOIS 60615
312-241-5771

SCREENING SUMMARY

NAME OF CHILD: Cedric Reck DATE: 4/5/94
SCHOOL: ________ AGE: 11 GRADE: ________

The following are results of a screening which this child participated in at the Chicago Clinic for Child Development. This screening is administered by a team of professionals including educational therapists, optometrists, occupational therapists, psychologists, and speech/language therapists. The purpose of the screening is to inform parents of the level at which their child is functioning, possible perceptual, speech, language, or visual difficulties, and need for evaluation. This should not, under any circumstances, be considered an evaluation of a problem.

Thank you,
Jean A. Fisk, Director

ACADEMIC AREAS:

(Grade level on the Wide Range Achievement Test)
Reading 8B (Word Recognition)

Math 4S (Computation)

Spelling 6B

VISION:

Acuity Right eye 20/20 (Pass) Fail
Left eye 20/20 (Pass) Fail

Functional Vision (Pass) Fail

Suggest Comprehensive Visual Analysis Yes No

VISUAL MOTOR:

Age level on Beery Buktenica Visual Motor Integration Test 8yr. 7mo.

VISUAL PERCEPTION:

Tests Administered: Jordan Left Right Reversal Test
ICD Figure Ground Discrimination

Strong ____ Adequate ____ Weak 1h OM

SPEECH AND LANGUAGE DEVELOPMENT:

Articulation Pass

Language Development Pass

Auditory Reception Pass

Auditory Association Pass

AUDITORY PERCEPTION:

Discrimination Borderline

Memory Borderline

Sound Blending Weak

RECOMMENDATIONS AND COMMENTS:

Comprehensive evaluation

$2400
40 session therapy
30 sessions

$900 sliding
20 session

**Letter from Seven Holy Founders re evaluation at Mercy Hospital. 1986.05.13. Rcvd from Helen and Shederick Ricks**

SEVEN HOLY FOUNDERS SCHOOL
12440 SOUTH ADA STREET
CALUMET PARK, CHICAGO, ILLINOIS
60643

Dear Mr. & Mrs. Shederick Rick,

To help us make a professional judgement about CEDRIC Ricks future academic program at this school, we feel that he should be tested at Mercy Hospital.

We need more specific strategies/interventions in order to be more effective with CEDRIC.

We feel that he will not be allowed to return to Seven Holy Founders unless testing has been done in June of 1986.

CEDRIC will also be in a one month provision after the testing.

Please sign and return. Thank you.

Ms. de la Cruz
Ms. de la Cruz,
Principal

Mr. Shederick J. Rick
Parent's signature

5/13/86
Date

Letter from Mercy Hospital School Consultation re terminating services. 1987.02.03. Rcvd from Helen and Shederick Ricks

Mercy Hospital and Medical Center
Stevenson Expressway at King Drive
Chicago, Illinois 60616
(312) 567-2000

Caring with Mercy since 1852

February 3, 1987

Mr. & Mrs. Shederick Ricks
12341 S. Bishop
Calumet Park, Illinois  60643

                        Re:  Cedric Ricks
                        Birthdate:  9/08/74

Dear Mr. & Mrs. Ricks:

It is my understanding that you telephoned Dr. Sarma on Saturday,
January 31, 1987, to cancel your appointment for parent counseling on that
date as well as to inform Dr. Sarma of your decision to terminate counseling
at the School Consultation Center.  Therefore, we have closed our files
on Cedric's case.

Please find enclosed a copy fo the report of my Psychological Evaluation
of Cedric.  The findings and recommendations were discussed in detail
with you.

It has been a pleasure to work with you and Cedric.  If we can be of any
further assistance, please do not hesitate to contact us.

                        Sincerely,

                        Dorothy L. DeBoer, Ph.D.

                        Dorothy L. DeBoer, Ph.D.
                        Director
                        School Consultation Center

DDB:vs
Enclosure

Ricks, Cedric. Archdiocese of Chicago Seven Holy Founders. Rcvd 2015.06.06

# ARCHDIOCESE OF CHICAGO



Joseph Cardinal Bernardin
Archives & Records Center
711 West Monroe
Chicago, Illinois 60661
(312) 534-4400
Fax (312) 831-0610

School Records Ext. 4410
Sacramental Records Ext. 4410
Archival Services Ext. 4411
Secretary Ext. 4450
Researchers Ext. 4440

May 19, 2015

Mairead Burke, Burke Mitagation & Consulting
Attn: Mairead Burke
P.O. Box
Austin, TX 78711

To Whom It May Concern:

Enclosed please find the school transcript you requested for Cedric Ricks. Please review the enclosed records for accuracy. Should you have any questions please do not hesitate to contact our office. The Archives & Records Center is dedicated to providing timely and accurate information while protecting the privacy of individuals.

Sincerely,

LaTasha Powell
School Records Clerk

enclosure

# ARCHDIOCESE OF CHICAGO

Archdiocese of Chicago – Office of Catholic Education – Christian Educational Community

## REPORT OF STUDENT PROGRESS

GRADES 4 – 8

*Catholic Education is concerned with all aspects of the child's growth and development. It is our goal to prepare the child to live in our contemporary society within the context of a Christian Education Community, a community in which children can develop their unique gifts and through which they can cooperate in the transformation of society in justice and peace. Recognizing that parents are the first and foremost educators of the child, we welcome your helpful suggestions for the improvement of your child's education.*

*This form gives you a brief report of your child's progress in school. It deserves your careful attention. Because parent-teacher conferences are an ideal way for the teacher and you to review your child's progress, the report card should serve only as a supplement to the detailed information discussed at the conferences.*

SCHOOL Seven Holy Founders

STUDENT Cedric Ricks

TEACHER D. Puch

PRINCIPAL Mr. R. Culen

GRADE 7 19 86 - 1987

RC2

### PERSONAL AND SOCIAL GROWTH

+ Commendable • Satisfactory ✓ Needs Improvement

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Respects authority | ✓ | | | |
| Respects peers | | | | |
| Respects property | | | | |
| Helps create pleasant learning atmosphere | ✓ | | | |
| Comes prepared for class | ✓ | | | |
| Participates in group work | | | | |
| Accepts responsibility in independent activities | ✓ | | | |
| Does neat and accurate work | | | | ✓ |
| Attends school regularly | | | | |
| Listens to and follows directions | | | | |
| Takes initiative & works independently | ✓ | | | |
| Heeds suggestion for improvement | ✓ | | | |
| Listens attentively | ✓ | | | |
| | | | | |

| | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| Days Absent | 2 | | | |
| Days Tardy | 3 | | | |

| PARENT'S/GUARDIAN'S SIGNATURE | COMMENTS (See Code) |
|---|---|
| 1st | |
| 2nd | |
| 3rd | |

Comment Code: (1) The report has been reviewed with my child noting achievements and needs.
(2) Request a conference with the teacher.

FINAL PROGRESS REPORT

Promoted to Grade ____

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| **RELIGION** | B | | | |
| Knows doctrine, Scripture, data presented | • | | | |
| Completes assignments on time | • | | | |
| Participates in class discussions | • | | | |
| **READING** | B | | | |
| Participates in class discussion | • | | | |
| Comprehends materials read | • | | | |
| Applies skills taught | • | | | |
| Reads well orally | • | | | |
| Does independent reading | • | | | |
| Completes assignments on time | • | | | |
| **ENGLISH** | C | | | |
| Understands language concepts | • | | | |
| Applies oral language skills | • | | | |
| Applies written language skills | • | | | |
| Shows creativity | • | | | |
| Completes assignments on time | ✓ | | | |
| **SPELLING** | B | | | |
| Masters assigned lists | • | | | |
| Knows meaning of the words | • | | | |
| Applies spelling in written work in subject areas | • | | | |
| Completes assignments on time | ✓ | | | |
| **MATHEMATICS** | B+ | | | |
| Knows content area | • | | | |
| Applies learned concepts to new material | • | | | |
| Computes accurately | • | | | |
| Uses reasoning skills in problem solving | • | | | |
| Completes assignments on time | ✓ | | | |
| **SCIENCE** | | | | |
| Knows, understands concepts | | | | |
| Applies concepts | | | | |
| Participates in class discussion | | | | |
| Completes assignments on time | | | | |

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| **SOCIAL STUDIES** | C | | | |
| Knows content area of subject | • | | | |
| Shows ability to use maps, charts, graphs | • | | | |
| Participates in class discussion | • | | | |
| Completes assignments on time | ✓ | | | |
| **PHYSICAL EDUCATION** | | | | |
| Shows growth in skill development | • | | | |
| Shows sportsmanship | ✓ | | | |
| Cooperates during class instruction | ✓ | | | |
| Comes properly dressed for class | ✓ | | | |
| **ART** | A | | | |
| Understands and applies art concepts | • | | | |
| Completes and evaluates work | • | | | |
| **MUSIC** | | | | |
| Perceives musical elements through listening | | | | |
| Understands and applies music concepts | | | | |
| Participates during instruction | | | | |

**ACHIEVEMENT CODE**

A - Consistently does superior work in accomplishing goal objectives, and requirements.

B - Usually does above average work in accomplishing goal objectives. and requirements.

C - Usually does average work in accomplishing goals, objectives, and requirements.

D - Usually does below average work in accomplishing goal objectives, and requirements.

U - Consistently does unsatisfactory work in accomplishir goals, objectives, and requirements.

**Effort Code**

These marks are indicators for the sub-topics in all subject areas.

\+ Commendable • Satisfactory ✓ Needs improvement

## PERSONAL AND SOCIAL GROWTH

+ Commendable • Satisfactory ✓ Needs Improvement

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Respects authority | ✓ | | | |
| Respects peers | | | | |
| Respects property | | | | |
| Helps create pleasant learning atmosphere | ✓ | | | |
| Comes prepared for class | ✓ | | | |
| Participates in group work | | | | |
| Accepts responsibility in independent activities | ✓ | | | |
| Does neat and accurate work | | | | |
| Attends school regularly | | | | |
| Listens to and follows directions | | | | |
| Takes initiative & works independently | ✓ | | | |
| Heeds suggestion for improvement | ✓ | | | |
| Listens attentively | ✓ | | | |

| | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| Days Absent | 2 | | | |
| Days Tardy | 3 | | | |

| PARENT'S/GUARDIAN'S SIGNATURE | COMMENTS (See Code) |
|---|---|
| 1st Mr. Frederick J. Rick | 1 |
| 2nd | |
| 3rd | |

Comment Code: (1) The report has been reviewed with my child noting achievements and needs.
(2) Request a conference with the teacher.

FINAL PROGRESS REPORT

Promoted to Grade ____

## ARCHDIOCESE OF CHICAGO

Office of Catholic Education · Archdiocese of Chicago · Relating · Praying · Serving · Learning · Christian Educational Community

### REPORT OF STUDENT PROGRESS

### GRADES 4 – 8

*Catholic Education is concerned with all aspects of the child's growth and development. It is our goal to prepare the child to live in our contemporary society within the context of a Christian Education Community, a community in which children can develop their unique gifts and through which they can cooperate in the transformation of society in justice and peace. Recognizing that parents are the first and foremost educators of the child, we welcome your helpful suggestions for the improvement of your child's education.*

*This form gives you a brief report of your child's progress in school. It deserves your careful attention. Because parent-teacher conferences are an ideal way for the teacher and you to review your child's progress, the report card should serve only as a supplement to the detailed information discussed at the conferences.*

SCHOOL Seven HolyFounders

STUDENT Cedric Ricks

TEACHER D. Puch

PRINCIPAL Sr. S. Culen

GRADE 7 19 86 – 19 87

RC2

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| **RELIGION** | B | | | |
| Knows doctrine, Scripture, data presented | • | | | |
| Completes assignments on time | • | | | |
| Participates in class discussions | • | | | |
| **READING** | B | | | |
| Participates in class discussion | • | | | |
| Comprehends materials read | • | | | |
| Applies skills taught | • | | | |
| Reads well orally | • | | | |
| Does independent reading | • | | | |
| Completes assignments on time | • | | | |
| **ENGLISH** | C | | | |
| Understands language concepts | • | | | |
| Applies oral language skills | • | | | |
| Applies written language skills | • | | | |
| Shows creativity | • | | | |
| Completes assignments on time | ✓ | | | |
| **SPELLING** | B | | | |
| Masters assigned lists | • | | | |
| Knows meaning of the words | • | | | |
| Applies spelling in written work in subject areas | • | | | |
| Completes assignments on time | ✓ | | | |
| **MATHEMATICS** | B+ | | | |
| Knows content area | • | | | |
| Applies learned concepts to new material | • | | | |
| Computes accurately | • | | | |
| Uses reasoning skills in problem solving | • | | | |
| Completes assignments on time | ✓ | | | |
| **SCIENCE** | F | | | |
| Knows, understands concepts | • | | | |
| Applies concepts | ✓ | | | |
| Participates in class discussion | + | | | |
| Completes assignments on time | • | | | |

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| **SOCIAL STUDIES** | C | | | |
| Knows content area of subject | • | | | |
| Shows ability to use maps, charts, graphs | • | | | |
| Participates in class discussion | • | | | |
| Completes assignments on time | ✓ | | | |
| **PHYSICAL EDUCATION** | | | | |
| Shows growth in skill development | • | | | |
| Shows sportsmanship | ✓ | | | |
| Cooperates during class instruction | ✓ | | | |
| Comes properly dressed for class | ✓ | | | |
| **ART** | A | | | |
| Understands and applies art concepts | • | | | |
| Completes and evaluates work | • | | | |
| **MUSIC** | | | | |
| Perceives musical elements through listening | | | | |
| Understands and applies music concepts | | | | |
| Participates during instruction | | | | |

**ACHIEVEMENT CODE**

A - Consistently does superior work in accomplishing goals objectives, and requirements.
B - Usually does above average work in accomplishing goals objectives. and requirements.
C - Usually does average work in accomplishing goals, objectives, and requirements.
D - Usually does below average work in accomplishing goals objectives, and requirements.
U - Consistently does unsatisfactory work in accomplishing goals, objectives, and requirements.

**Effort Code**

These marks are indicators for the sub-topics in all subject areas.

+ Commendable • Satisfactory ✓ Needs improvement

6

**SCHOOL CARD**

Name: Ricks, Cedric    Birth Date: 9-8-74    Phone:

Address:

**IMMUNIZATIONS**

| DPT/DT (5) | OPV (4) |
|---|---|
| 1. 11-15-74 | 1. 2-21-75 |
| 2. 2-21-75 | 2. 4-26-75 |
| 3. 3-22-75 | 3. 6-28-75 |
| 4. 6-2-76 | 4. 6-2-76 |
| 5. 11- 79 | 5. 11 - |
| 6. 8-20-84 | 8-20-84 TBN |

Measles (1)

Mumps (1) 2-7-76

Rubella (1) 10-4-76

Rubeola - 1-20-78

Other: Chicken Pox - 1984, Scarlet ? Strep - 6-78

| | Date | Result |
|---|---|---|
| 1. | 8/20/84 | — |
| 2. | | |
| 3. | | |

| Grade | Date P.E. | Date Dental | Ht. | Wt. | Vision P | Vision F | Hearing P | Hearing F |
|---|---|---|---|---|---|---|---|---|
| K | | | | | | | | |
| 1 | | | | | | | | |
| 2 | | | | | | | | |
| 3 | | | | | | | | |
| 4 | | | | | | | | |
| 5 | 8/20/84 | 8/20/84 | | | ✓ | | ✓ | |
| 6 | | | | | | | | |
| 7 | | | | | | | | |
| 8 | | | | | | | | |

**FLAGGING CODE**

Yellow-Med. Prob.    Red-Immunization Missing    Blue-Vision Failed    Green-Hearing

Tan-Wears Classes    Comments-Reverse Side

of an original document in the ARCHIVES OF THE ARCHDIOCESE OF CHICAGO
This is a

WISC-R. 1986.12.22. Rcvd from Helen and Shederick Ricks

# WISC-R RECORD FORM

Wechsler Intelligence Scale for Children—Revised

NAME Cedric Ri[illegible] AGE 12-3 SEX M
ADDRESS 12341 S. Bishop
PARENT'S NAME Cedric, Helen
SCHOOL Founders GRADE 7
PLACE OF TESTING School TESTED BY Man[illegible]
REFERRED BY Parent

## WISC-R PROFILE

Clinicians who wish to draw a profile should first transfer the child's scaled scores to the row of boxes below. Then mark an X on the dot corresponding to the scaled score for each test, and draw a line connecting the X's.*

VERBAL TESTS: Information, Similarities, Arithmetic, Vocabulary, Comprehension, Digit Span

PERFORMANCE TESTS: Picture Completion, Picture Arrangement, Block Design, Object Assembly, Coding, Mazes

Scaled Score: 19 18 17 16 15 14 13 12 11 10 9 8 7 6 5 4 3 2 1

7/12

*See Chapter 4 in the manual for a discussion of the significance of differences between scores on the tests.

| | Year | Month | Day |
|---|---|---|---|
| Date Tested | 86 | 12 | 22 |
| Date of Birth | 74 | 9 | 8 |
| Age | 12 | 3 | 14 |

| | Raw Score | Scaled Score |
|---|---|---|
| **VERBAL TESTS** | | |
| Information 10-10 | 15 | 9 |
| Similarities 15-6 | 20 | 13 |
| Arithmetic 11-6 | 13 | 9 |
| Vocabulary 10-10 | 32 | 9 |
| Comprehension 12-6 | 22 | 10 |
| (Digit Span) | ( ) | ( ) |
| Verbal Score | | 50 |
| **PERFORMANCE TESTS** | | |
| Picture Completion 16-10 | 23 | 14 |
| Picture Arrangement 16-10 | 42 | 16 |
| Block Design 13-6 | 38 | 11 |
| Object Assembly 16-10 | 33 | 19 |
| Coding 16-10 | 74 | 17 |
| (Mazes) | ( ) | ( ) |
| Performance Score | | 77 |

| | Scaled Score | IQ |
|---|---|---|
| Verbal Score | 50 | 100 |
| Performance Score | 77 | 138 |
| Full Scale Score | 127 | 120 |

*Prorated from 4 tests, if necessary.

NOTES brother Dwayne 15; right handed
nails chewed; says he disturbs class; talking back; feet tapping;
constant motion
doesn't hold pencil correctly

Copyright © 1971, 1974 by The Psychological Corporation.
All rights reserved. No part of this record form may be reproduced in any form of printing or by any other means, electronic or mechanical, including, but not limited to, photocopying, audiovisual recording and transmission, and portrayal or duplication in any information storage and retrieval system, without permission in writing from the publisher. See Catalog for further information.
The Psychological Corporation

Printed in U.S.A. 74-103AS 9-990334

[illegible]

INDIVIDUAL RECORD

by Lloyd M. Dunn, Ph.D. [illegible]

NAME Ricks, Celisa (last) (first) SEX

SCHOOL (or agency or address)

TEACHER (or counselor or supervisor)

EXAMINER

TESTING TIME (min.) GRADE (or phone) CODE

AGE DATA

[illegible]

TEST SCORES

| [illegible] | Raw Score | [illegible] | Percentile Rank | Standard Score |
|---|---|---|---|---|
| | 42 | 47 | | |
| | 60 | 8.9 | | |
| | 46 | 5.8 | | |
| | 55 | 7.7 | | |

Chronological Age | Grade Placement

13.0, 12.5, 12.0, 11.5, 11.0, 10.5, 10.0, 9.5, 9.0, 8.5, 8.0, 7.5, 7.0, 6.5, 6.0, 5.5, 5.0

SAMPLE

A

B

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|

SAMPLE

| 2 | 1 | 4 | 6 | 3 | 5 | 2 | 1 | 3 | 4 | 2 | 1 | 3 | 1 | 2 | 3 | 1 | 4 | 2 | 6 | 3 | 1 | 2 | 5 | 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| 3 | 1 | 5 | 4 | 2 | 7 | 4 | 6 | 9 | 2 | 5 | 8 | 4 | 7 | 6 | 1 | 8 | 7 | 5 | 4 | 8 | 6 | 9 | 4 | 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| 1 | 8 | 2 | 9 | 7 | 6 | 2 | 5 | 4 | 7 | 3 | 6 | 8 | 5 | 9 | 4 | 1 | 6 | 8 | 9 | 3 | 7 | 5 | 1 | 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| 9 | 1 | 5 | 8 | 7 | 6 | 9 | 7 | 8 | 2 | 4 | 8 | 3 | 5 | 6 | 7 | 1 | 9 | 4 | 3 | 6 | 2 | 7 | 9 | 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Cedric - gets along best with mom
Mom - hollers at me sometimes when I'm bad.

Mom

Dad

Cedric

Dwayne

Playing ball in the house



## Obtained Test Scores

Raw score. . . . . . . . .
(from page 4)

Standard score equivalent. . . . . . . . .
(from Table 1, Appendix A)

Percentile rank. . . .
(from Table 3, Appendix A)

Stanine . . . . . . . . . .
(from Table 3, Appendix A)

Age equivalent. . . . . 0-2
(from Table 4, Appendix A)

TRUE

Mark the obtained standard score equivalent on the top scale. Then draw a heavy, straight, vertical line through it, and across the three scales. The line will extend through the three obtained deviation-type test scores. Depending upon the obtained standard score, shade in a band on both sides of the vertical line, using the schedule to the right. An example is given in Figure 1.4 of the Manual.

| Obtained Standard Score |
| --- |
| Below 6[illegible] |
| 65-74 |
| 75-84 |
| 85-99 |
| 90-99 |

40 45 50 55 60 65 70 75 80

1 5 10

1 2

EXTREMELY LOW SCORE | MODERATELY LOW SCORE

## Data from Other Tests

| Test | Date | Results |
| --- | --- | --- |
| PPVT-R FORM M | | |

## Observations

Briefly describe the subject's test behavior, such as interest in task, quickness of response, signs of perseveration, work habits, etc.:

IEP Instructional Objective. 1986-1987. Rcvd from Helen and Shederick Ricks

:o ______ of ______

dent: ______

# ______

?. Case Manager Kopec

ANNUAL GOAL To develop and reinforce basic social/emotional skills

School Year 86-87

Evaluation Period: From 9-86 To 6-87

I.E.P. Implementer C. Garding

Title P.D. Teacher

| SHORT TERM OBJECTIVES | METHODS & MATERIALS | EVALUATION (Specify Method, Criterion and Schedule for Measuring Progress) | DATE OBJECTIVE MASTERED |
|---|---|---|---|
| . The student will not miss more ian 15 days per quarter. | Positive Point Reinforcement<br>Teacher initiated positive verbal reinforcement | Positive Point Reinforcement based on possible 40 points daily. | |
| . Be on time for scheduled class ariods. | | Teacher observation | |
| . Observe class and school rules. | | Student Handbook-CHSD 218 | |
| . Decrease number of discipline referrals. | | | |
| . Complete academic assignments. | | | |
| . Succeed in mainstreaming tuations. | | | |
| Increase appropriate responses, ile decreasing inappropriate isposes. | | | |
| Develop a realistic/appropriate ans of dealing with problems. | | | |

000119

Letter from Calumet Public Schools Dist 132 B Jumbeck re failing 7th grade. 1987.05.15. Rcvd from Helen and Shederick Ricks

**BURR OAK SCHOOL**
1440 W. 125th Street
Calumet Park, Illinois 60643-6099
(312) 388-8010

Helen Thomas, Prin.
Asst. Supt./Curriculum

Mary Ann Walsh
Adm. Asst./Special Education

**CALUMET SCHOOL**
1440 Vermont Street
Calumet Park, Illinois 60643-6396
(312) 388-8820

Bernard J. Jumbeck, Prin.
Administrative Asst.

**CALUMET PUBLIC SCHOOLS**
**District 132**

Milton George
Superintendent

**DISTRICT OFFICE**
1440 Vermont Street
Calumet Park, Illinois 60643-6396
(312) 388-8920

February 11, 1987

Mr. & Mrs. Shederick Ricks
12341 Bishop
Calumet Park, IL 60643

Dear Mr. & Mrs. Ricks:

An evaluation of your child's report card following the second marking period of the school term indicates a strong possibility that Cedric may fail the 7th grade. Our goal at this point in time is to prevent failure and assist you and your youngster in effecting whatever changes are necessary in order for your child to complete the school year successfully.

A variety of programs are offered at Calumet School that can help your child meet with success. If not already involved, I encourage you to enroll your child in the after-school tutoring, after-school homework room or weekly evaluation sheet programs. I also urge you to contact the school office to arrange a conference with your child's teachers as soon as possible.

It is hoped that through the cooperative efforts of both the home and school we can help Cedric realize his full academic potential.

Sincerely,

Bernard J. Jumbeck
BJJ:pm

Special Education evaluation. 1987-1988. Rcvd from Helen and Shederick Ricks

Student Ciska Cedric Date of conference 6-11-87
Student I.D. # RIC 09087400 I.E.P. Case Manager [illegible signature]

| RELATED SERVICES Type | ASSESSMENT Pending | Complete | Date Completed | SERVICES Consult. | | Direct Service | Projected Date of Initiation | # Proj. Min. Per Week | # Proj. Wks. Per Year |
|---|---|---|---|---|---|---|---|---|---|
| Adaptive Physical Education | ☐ | ☐ | | ☐ | A | ☐ | | | |
| Aide — Class | ☐ | ☒ | 8-87 | ☐ | B | ☒ | 8-87 | full time | 36 |
| Aide — Individual Student | ☐ | ☐ | | ☐ | C | ☐ | | | |
| Audiologist | ☐ | ☐ | | ☐ | E | ☐ | | | |
| Braillist/Reader | ☐ | ☐ | | ☐ | F | ☐ | | | |
| Counselor | ☐ | ☐ | | ☐ | G | ☐ | | | |
| Driver Education (Adapted) | ☐ | ☐ | | ☐ | I | ☐ | | | |
| Interpreter | ☐ | ☐ | | ☐ | J | ☐ | | | |
| Media Services | ☐ | ☐ | | ☐ | K | ☐ | | | |
| Occupational Therapist | ☐ | ☐ | | ☐ | M | ☐ | | | |
| Orientation/Mobility | ☐ | ☐ | | ☐ | O | ☐ | | | |
| Behavior Disorder/Resource | ☐ | ☐ | | ☐ | P | ☐ | | | |
| Educably Mentally Hdcp./Resource | ☐ | ☐ | | ☐ | P | ☐ | | | |
| Educational Hdcp./Resource | ☐ | ☐ | | ☐ | P | ☐ | | | |
| Hearing Itinerant | ☐ | ☐ | | ☐ | P | ☐ | | | |
| Learning Dis./Resource | ☐ | ☐ | | ☐ | P | ☐ | | | |
| Medical (Specify) | ☐ | ☐ | | ☐ | P | ☐ | | | |
| Psychologist | ☐ | ☐ | | ☐ | R | ☐ | | | |
| Physical Therapist | ☐ | ☐ | | ☐ | S | ☐ | | | |
| Psychiatric Services | ☐ | ☐ | | ☐ | T | ☐ | | | |
| School Health Services/Nurse | ☐ | ☐ | | ☐ | V | ☐ | | | |
| Speech/Language Pathologist | ☐ | ☐ | | ☐ | W | ☐ | | | |
| Social Worker | ☐ | ☐ | | ☐ | X | ☐ | | | |
| Vocational Coordinator | ☐ | ☐ | | ☐ | Z | ☐ | | | |
| Vision Itinerant | ☐ | ☐ | | ☐ | P | ☐ | | | |
| Vocational/Rehab. | ☐ | ☐ | | ☐ | 2 | ☐ | | | |
| Transitional Services | ☐ | ☐ | | ☐ | 3 | ☐ | | | |
| Other (Specify) | ☐ | ☐ | | ☐ | P | ☐ | | | |
| Transportation ☐ Walk ☐ Parent ☐ Regular district vehicle ☒ Special vehicle alpha | | | | | Y | ☐ | | | |

Vehicle Adaptation (Sepcify)

PARTICIPATION IN STANDARD EDUCATION PROGRAM

Full Time, In Standard Education Program, Except Support Services ☐

Participation in Standard Education Program Not Appropriate At This Time ☒

| Subject | Grade Level | Projected Date of Initiation | Projected Duration |
|---|---|---|---|
| Standard P.E. | | | |
| Art | | | |
| Music | | | |
| Reading | | | |
| Math | | | |
| Spelling | | | |
| Other Language Arts | | | |
| Social Studies | | | |
| Science | | | |
| Other (Specify) | | | |

Student Name (Last Name First) RICKS, CEDRIC
*Ethnic Code ___ *Language Code ___ Sex ___
Address 12341 S BISHOP
CALUMET PARK IL
Parents/Guardians CEDRIC & HELEN
Address (if different) ___

Sponsor of Multidisciplinary Conference
☒ District ☐ Joint Agreement ☐ SMA ☐ IPP
☐ Multidisciplinary Conference Date ___
☒ Individualized Education Program Date 5-10-88
☒ Annual Review Date 5-10-88
I.D. # RIC09087400 District of Residence 132
Birthdate 09 / 08 / 74 (Month Day Year) Phone (Area Code) ( ) 371-7965
Joint Agreement ☐ ECHO ☒ Eisenhower ☐ Southwest ☐ SPEED

**EXCEPTIONAL CHARACTERISTICS:**

| | Primary | Secondary |
|---|---|---|
| 1. Trainably Mentally Handicapped | ☐ | ☐ |
| 2. Educably Mentally Handicapped | ☐ | ☐ |
| 3. Physically Handicapped | ☐ | ☐ |
| 4. Learning Disabled | ☐ | ☐ |
| 5. Visually Impaired | ☐ | ☐ |
| 6. Hard-of-Hearing | ☐ | ☐ |
| 7. Deaf | ☐ | ☐ |
| 8. Deaf/Blind | ☐ | ☐ |
| 9. Speech/Language Impaired | ☐ | ☐ |
| 10. Educationally Handicapped | ☐ | ☐ |
| 11. Behavior/Emotional Disorder | ☒ | ☐ |
| 12. Other Health | ☐ | ☐ |
| 13. Severe/Profound Mentally Handicapped | ☐ | ☐ |
| 14. Developmentally Delayed (Only Students Birth Through 2) | ☐ | ☐ |

**PRIMARY SPECIAL EDUCATION PLACEMENT**
☒ New ☐ Continuing ☐ Change ☒ Transfer ☐ Discontinued
☒ District Prog. ☐ Joint Agreement Prog. ☐ SMA ☐ IPP
*Program Code ☐ BD instructional
School RC District 215
Building Code 11-142-15003 *Funding Source Code A
*Least Restrictive Environment Code ___
Specify: BD Eng Core I, Math Core I, Science Core, Soc Stud Core I
Program Initiation/Duration Dates From: 9-88 To: 6-89
Projected Annual Review Date Jan 1989
Re-evaluation Due Date 1989
**STANDARD EDUCATIONAL PLACEMENT** District 215
School RC

**PARTICIPANTS**

Director/Designee Susan Radtke / [illegible]
Principal/Designee ___
Parent(s), Guardian(s) Mrs. [illegible]
Student ___
Teacher(s) B. Parker

Psychologist W. Kopec
Social Worker [illegible]
Counselor ___
Speech/Language Pathologist ___
Other (Specify Title) ___

Purpose for Staffing Annual review to determine needs and high school program.

Options Considered And Rejected With Rationale Contractual alternate school rejected due to age and grades.

Recommendations/Reasons For Determination (Complete ISBE 34-57D) Placement in the BD instructional program at Rich Central H.S. as listed above. Dist 132 9' Spalding will fund spec ed services to Dist 215 upon graduation.

| Yes | No | The following were explained: |
|---|---|---|
| | | ☒ Multidisciplinary conference ☒ Recommended placement ☒ Individual education program |
| X | | I/We give consent to implement the conference recommendations including placement.** |
| X | | I/We have received a copy of the multidisciplinary conference report form. |
| X | | I/We have received a copy of my child's educational program. |
| X | | Procedural safeguards, including the right to object to placement, were explained and offered in writing. |
| X | | A summary of rights, including the right to independent evaluation, is outlined on back of Page 1. |
| | | I/We agree to waive the ten (10) calendar day preplacement period. |

Mrs. Helen [illegible] Date 5-10-88
Signature, Parent or Guardian

___ Date ___
Signature, Parent or Guardian

Walter Kopec Date 5-10-88
Staff Member Preparing Conference Report

___ Date ___
Student (e.g. 18 years or older)

* See Instructions for Codes.
** If initial placement, complete ISBE 34-57E.

Student [handwritten name] I.E.P. Case Manager [handwritten] Date 5/10/88

Student I.D. # ______ Current Chronological Age (optional) ______ Current Grade (optional) ______

PRESENT LEVEL OF EDUCATIONAL PERFORMANCE

| AREA | LEVEL | INSTRUMENT/DATE | ESTIMATE |
|---|---|---|---|
| Math: Computation | 6.8 | Keymath | 4-88 ☐ |
| Reasoning | | | ☐ |
| Reading: Recognition | 9.7 | Woodcock | 4-88 ☐ |
| Comprehension | 7.9 | Woodcock | 4-88 ☐ |
| Spelling | | | ☐ |
| Expressive Language | | | ☐ |
| Receptive Language | | | ☐ |
| Speech | | | ☐ |

| AREA | LEVEL | INSTRUMENT/DATE | ESTIMATE |
|---|---|---|---|
| Written Expression | | | ☐ |
| Gross Motor | | | ☐ |
| Fine Motor | | | ☐ |
| Visual Perception | | | ☐ |
| Auditory Perception | | | ☐ |
| Pre/Vocational Skills | | | ☐ |
| Other | | | ☐ |
| | | | ☐ |

Social/Emotional Development ______ ☐

Cognitive Skills Avg verbal skills, Non-verbal above avg to superior WISC-R ☐

Date of last vision screening ______ ☒ Pass ☐ Not Pass ☐ Corrected

Date of last hearing screening ______ ☒ Pass ☐ Not Pass ☐ Aided

Date of last case study evaluation 1986

Case study reevaluation due: (date) 1989

Date of last medical evaluation ______

Medical findings ______

If conference is IEP/Annual Review, note MDC date ______ and proceed to Placement Decision below.

To be completed for case study evaluation

Language Pattern, Mode of Communication, Cultural Background: ☐ Date ______

Parent Consultation/Concerns: ☐ Date ______

Child Interview: ☐ Date ______

Social Developmental Study: ☐ Date ______

Adaptive Behavior: ☐ Date ______

Academic History: ☐ Date ______

Learning Environment/Observation: ☐ Date ______

☐ Specialized/Independent Evaluation(s), if any Specify ______ Date ______

SUMMARY NARRATIVE OPTION

Any participant disagreeing with these recommendations must sign below and submit a separate minority report indicating which areas of the report they disagree with and the reasons for their disagreement.

Name/Title ______ Name/Title ______

PLACEMENT DECISION:
- ☐ A. Student is Not Eligible for Special Education Services at this time. RECOMMENDATIONS FOR STANDARD PROGRAM ON Page 1.
- ☐ B. Student is Eligible for Special Education. Proceed to page 3 and 4.
- ☒ C. Continue in Special Education. Proceed to page 3 and 4.

000125

Special education evaluation. 1988.05.10 Rcvd from Helen and Shederick Ricks

Student Name (Last Name First) [illegible]
*Ethnic Code [illegible] *Language Code X Sex M
Address [illegible]
Parents/Guardians [illegible]
Address (if different)

Sponsor of Multidisciplinary Conference
☒District ☐Joint Agreement ☐SMA ☐IPP
☐Multidisciplinary Conference Date
☒Individualized Education Program Date [illegible]
☒Annual Review Date [illegible]
I.D. # [illegible] District of Residence [illegible]
Birthdate [illegible] (Month Day Year) Phone Area Code ( ) [illegible]
Joint Agreement ☐ECHO ☒Eisenhower ☐Southwest ☐SPEED

**EXCEPTIONAL CHARACTERISTICS:**

| | Primary | Secondary |
|---|---|---|
| 1. Trainably Mentally Handicapped | ☐ | ☐ |
| 2. Educably Mentally Handicapped | ☐ | ☐ |
| 3. Physically Handicapped | ☐ | ☐ |
| 4. Learning Disabled | ☐ | ☐ |
| 5. Visually Impaired | ☐ | ☐ |
| 6. Hard-of-Hearing | ☐ | ☐ |
| 7. Deaf | ☐ | ☐ |
| 8. Deaf/Blind | ☐ | ☐ |
| 9. Speech/Language Impaired | ☐ | ☐ |
| 10. Educationally Handicapped | ☐ | ☐ |
| 11. Behavior/Emotional Disorder | ☒ | ☐ |
| 12. Other Health | ☐ | ☐ |
| 13. Severe/Profound Mentally Handicapped | ☐ | ☐ |
| 14. Developmentally Delayed (Only Students Birth Through 2) | ☐ | ☐ |

**PRIMARY SPECIAL EDUCATION PLACEMENT**
☒New ☐Continuing ☐Change ☒Transfer ☐Discontinued
☒District Prog. ☐Joint Agreement Prog. ☐SMA ☐IPP
*Program Code ☐ [illegible]
School [illegible] District [illegible]
Building Code [illegible] *Funding Source Code [illegible]
*Least Restrictive Environment Code
Specify: [illegible]
Program Initiation/Duration Dates From: [illegible] To: [illegible]
Projected Annual Review Date [illegible]
Re-evaluation Due Date [illegible]
STANDARD EDUCATIONAL PLACEMENT District [illegible]
School [illegible]

**PARTICIPANTS**

Director/Designee [illegible signature]
Principal/Designee
Parent(s), Guardian(s) [illegible signature]
Student
Teacher(s) [illegible signature]

Psychologist W. [illegible]
Social Worker
Counselor
Speech/Language Pathologist
Other (Specify Title)

Purpose for Staffing [illegible handwriting]

Options Considered And Rejected With Rationale [illegible handwriting]

Recommendations/Reasons For Determination (Complete ISBE 34-57D) [illegible handwriting]

| Yes | No | The following were explained: |
|---|---|---|
| | | ☒Multidisciplinary conference ☒Recommended placement ☒Individual education program |
| X | | I/We give consent to implement the conference recommendations including placement.** |
| X | | I/We have received a copy of the multidisciplinary conference report form. |
| X | | I/We have received a copy of my child's educational program. |
| X | | Procedural safeguards, including the right to object to placement, were explained and offered in writing. |
| X | | A summary of rights, including the right to independent evaluation, is outlined on back of Page 1. |
| | | I/We agree to waive the ten (10) calendar day preplacement period. |

[illegible signature] Date 5 10 88
Signature, Parent or Guardian

Date
Signature, Parent or Guardian

[illegible signature] Date 5-10-88
*Staff Member Preparing Conference Report

Date
Student (e.g. 18 years or older)

* See Instructions for Codes.
** If initial placement, complete ISBE 34-57E.

PARENT MDC/IEP 887

000127

Student [handwritten, illegible] I.E.P. Case Manager [handwritten, illegible] Date 5-12-95
Student I.D. # ______ Current Chronological Age (optional) ______ Current Grade (optional) ______

PRESENT LEVEL OF EDUCATIONAL PERFORMANCE

| AREA | LEVEL | INSTRUMENT/DATE | ESTIMATE |
|---|---|---|---|
| Math: Computation | 6.5 | [handwritten] | 4-95 ☐ |
| Reasoning | | | ☐ |
| Reading: Recognition | 9.7 | [handwritten] | 4-95 ☐ |
| Comprehension | 7.9 | [handwritten] | 4-95 ☐ |
| Spelling | | | ☐ |
| Expressive Language | | | ☐ |
| Receptive Language | | | ☐ |
| Speech | | | ☐ |

| AREA | LEVEL | INSTRUMENT/DATE | ESTIMATE |
|---|---|---|---|
| Written Expression | | | ☐ |
| Gross Motor | | | ☐ |
| Fine Motor | | | ☐ |
| Visual Perception | | | ☐ |
| Auditory Perception | | | ☐ |
| Pre/Vocational Skills | | | ☐ |
| Other | | | ☐ |
| | | | ☐ |

Social/Emotional Development ______ ☐
Cognitive Skills [handwritten, illegible] WISC-R ☐

Date of last vision screening ______ ☒ Pass ☐ Not Pass ☐ Corrected
Date of last hearing screening ______ ☒ Pass ☐ Not Pass ☐ Aided
Date of last case study evaluation 7-96
Case study reevaluation due: (date) 7-97
Date of last medical evaluation ______
Medical findings ______

If conference is IEP/Annual Review, note MDC date ______ and proceed to Placement Decision below.

To be completed for case study evaluation

Language Pattern, Mode of Communication, Cultural Background: ☐ Date ______

Parent Consultation/Concerns: ☐ Date ______

Child Interview: ☐ Date ______

Social Developmental Study: ☐ Date ______

Adaptive Behavior: ☐ Date ______

Academic History: ☐ Date ______

Learning Environment/Observation: ☐ Date ______

☐ Specialized/Independent Evaluation(s), if any Specify ______ Date ______

SUMMARY NARRATIVE OPTION

Any participant disagreeing with these recommendations must sign below and submit a separate minority report indicating which areas of the report they disagree with and the reasons for their disagreement.

Name/Title ______ Name/Title ______

PLACEMENT DECISION:
☐ A. Student is Not Eligible for Special Education Services at this time. RECOMMENDATIONS FOR STANDARD PROGRAM ON Page 1.
☐ B. Student is Eligible for Special Education. Proceed to page 3 and 4.
☒ C. Continue in Special Education. Proceed to page 3 and 4.

Community 218 HS letter explaining records. 2013.09.17

COMMUNITY HIGH SCHOOL DISTRICT 218 CHSD 218

Dwight D. Eisenhower • Harold L. Richards • Alan B. Shepard • Delta • Summit

Office of the Superintendent

Administrative Center
10701 S. Kilpatrick Avenue
Oak Lawn, Illinois 60453
Phone: 708-424-2000
Fax: 708-424-6389

*William H. "Bill" Ray, P. C.*
*Attorney At Law*
*512 Main Street, Ste. 308*
*Fort Worth, Texas 76102*

*September 17, 2013*

*Dear Mr. Ray,*

*In response to your request for records for Cedric Ricks we are sending you a copy of Mr. Ricks' transcript and a copy of his health records. The transcript records show that Mr. Ricks was in Special Education classes and was mildly cognitively impaired.*

*Community High School District 218 identifies Special Ed curriculum with the 900 series as reflected on the attached transcripts. This curriculum was developed for children with an IEP (Individual Education Placement) and was created by the Special Ed. Department.*

*In order to qualify for these courses Cedric Ricks would have completed at the consent of his parents, a complete case study including cognitive and emotional evaluations. This evaluation would help parents and staff at school to determine the appropriate classes to meet his abilities. As stated above, these courses would indicate that he was mildly cognitively impaired.*

*He withdrew from our school January 9, 1992.*

*There are no other records or information available for this student.*

*Sincerely,*

[signature]

*Dr. John Byrne*
*Superintendent of Schools*
*Community High School District 218*
*10701 S. Kilpatrick*
*Oak Lawn, IL 60453*
*708 424-7361*

Disciplinary referrals to dean and suspensions. 1988-1989. Rcvd from Helen and Shederick Ricks

CHSD 218

COMMUNITY HIGH SCHOOL DISTRICT

# REFERRAL TO DEAN

ID# [illegible]

Student Cedric Ricks Date 9/13/88 Bldg. [illegible]

Have you referred this student before? No ✓ Yes ______ Reason ______

## REASON FOR REFERRAL

Gross Insubordination ______ Fighting ______ Smoking ______ Insubordination, Insolence ______

Disrespect ______ Cuts ______ Class, Hall, Cafeteria Disturbance ______ Failure to Report After School ______ Tardiness ______

### Description of Problem

Yesterday 9/[illegible] Cedric had to be sent to your office for class disruption. He has been warned numerous times about his silliness, laughter and lack of control. He will laugh out loud at the slightest humor. When he is told to stop laughing and control himself, he thinks its more funny & he is uncontrollable causing classroom disruption.

### Action Taken by Teacher before Referral

Conference with pupil ______ Parent conference ______

Phone Call home ______ Referred student to counselor ______

Letter to Parents ______ Other * have spoken with Mr. Thomas, Cedric's cross country coach about his behavior

Class Social Studies Period 3B Teacher [illegible] Parker

## DEAN'S ACTION

1. Reprimanded
2. Assigned to appropriate punishment
   a. Detention
   b. Suspended from class / school for ______ day(s)
   c. Other ______
3. Discussed the misbehavior pattern with the parent over the phone.
4. Arranged a parental conference
5. Referred to the Supt. for possible expulsion

Comments ______

Dean's Signature [signature] Date 9/16/88

Dear parent:
The behavior described on this sheet interferes with the educational program of your student and of other students in our school. We want your help in our effort to give your son/daughter the best education possible. We are using this method to inform you of this incident. If you have any questions, please feel free to call the students counselor or the dean.

COPIES TO: Dean (White) Parents (Canary) Guidance (Pink) Teacher (Gold)

000132

CHSD 218

# REFERRAL TO DEAN

ID#

Student CEDRIC RICKS Date 10/3/88 Bldg.

Have you referred this student before? No X Yes ____ Reason ____

REASON FOR REFERRAL

Gross Insubordination____ Fighting____ Smoking____ Insubordination, Insolence, Disrespect____ Cuts____ Class, Hall, Cafeteria Disturbance____ Failure to Report After School____ Tardiness____

Description of Problem

GAVE PASS TO LRC DID NOT SHOW

Action Taken by Teacher before Referral

Conference with pupil ____ Parent conference ____
Phone Call home ____ Referred student to counselor ____
Letter to Parents ____ Other ____

Class WR Period 6B Teacher Baker

## DEAN'S ACTION

✓ 1. Reprimanded
2. Assigned to appropriate punishment
a. Detention 30
b. Suspended from class/school for ____ day(s)
c. Other ____

3. Discussed the misbehavior pattern with the parent over the phone.
4. Arranged a parental conference
5. Referred to the Supt. for possible expulsion

Comments

Dean's Signature ____ Date 10/4

Dear parent:
The behavior described on this sheet interferes with the educational program of your student and of other students in our school. We want your help in our effort to give your son/daughter the best education possible. We are using this method to inform you of this incident. If you have any questions, please feel free to call the students counselor or the dean.

COPIES TO: Dean (White) Parents (Canary) Guidance (Pink) Teacher (Gold)

000133

CHSD 218
COMMUNITY HIGH SCHOOL DISTRICT

# REFERRAL TO DEAN

ID# 260654

Student Cedric Ricks Date 10/4 Bldg RC

Have you referred this student before? No ✓ Yes ______ Reason ______

## REASON FOR REFERRAL

Gross Insubordination ______ Fighting ______ Smoking ______ Insubordination, Insolence, Disrespect ______ Cuts ______ Class, Hall, Cafeteria Disturbance ______ Failure to Report After School ______ Tardiness ✓

### Description of Problem

Tardy to class

9/13 - 9/15 - 9/21 - 9/22 + 10/4 — 9/6, 22, 27 (6)

### Action Taken by Teacher before Referral

Conference with pupil ______ Parent conference ______
Phone Call home ______ Referred student to counselor ______
Letter to Parents ______ Other ______

Class Intro to Ind Tec Period 7 Teacher [signature]

## DEAN'S ACTION

✓ 1. Reprimanded
2. Assigned to appropriate punishment
(a.) Detention 3
b. Suspended from class / school for ______ day(s)
(c.) Other mailed

mailed 3. Discussed the misbehavior pattern with the parent over the phone.
______ 4. Arranged a parental conference
______ 5. Referred to the Supt. for possible expulsion

Comments ______

Dean's Signature [signature] Date 10/5/88

Dear parent:
The behavior described on this sheet interferes with the educational program of your student and of other students in our school. We want your help in our effort to give your son/daughter the best education possible. We are using this method to inform you of this incident. If you have any questions, please feel free to call the students counselor or the dean.

COPIES TO: Dean (White) Parents (Canary) Guidance (Pink) Teacher (Gold)

000134

CHSD 218 COMMUNITY HIGH SCHOOL DISTRICT

# REFERRAL TO DEAN

ID# 260654

Student Cedric Ricks Date 10-5 Bldg. HLR

Have you referred this student before? No ______ Yes ______ Reason ______

REASON FOR REFERRAL

Gross Insubordination______ Fighting______ Smoking______ Insubordination, Insolence, Disrespect___ Cuts___ Class, Hall, Cafeteria Disturbance___ Failure to Report After School___ Tardiness___

Description of Problem

Cedric was running rapidly in the hall And reached his arms out hitting my shoulder and knocking me out of the way. I told him to stop but he continued running & knocking other people out of the way. He also was not carrying an i.d. when I asked for it.

Action Taken by Teacher Before Referral

Conference with pupil ______ Parent conference ______
Phone Call home ______ Referred student to counselor ______
Letter to Parents ______ Other ______

Class ______ Period 5B 6A Teacher ENRIETT

passing

## DEAN'S ACTION

X 1. Reprimanded
2. Assigned to appropriate punishment.
a. Detention
b. Suspended from class/school for ___ day(s) Ext
c. Other 10/11-12-13 [illegible]

[illegible] 10/11 10/6
3. Discussed the misbehavior pattern with the parent over the phone.
4. Arranged a parental conference
5. Referred to the Supt. for possible expulsion

Comments Dangerous Behavior - Insubordination Cedric stated that I didn't know Ms. Kinaseki was a teacher. She is short.

Dean's Signature [signature] Date 10/6/88

Dear parent:
The behavior described on this sheet interferes with the educational program of your student and of other students in our school. We want your help in our effort to give your son/daughter the best education possible. We are using this method to inform you of this incident. If you have any questions, please feel free to call the students counselor or the dean.

COPIES TO: Dean (White) Parents (Canary) Guidance (Pink) Teacher (Gold)

000135

COMMUNITY HIGH SCHOOL DISTRICT 218
EISENHOWER – RICHARDS – SHEPARD HIGH SCHOOLS

BUILDING Richards High School

DATE October 11, 1988

**REPORT OF SUSPENSION**

Dear Sir or Madam:

In accordance with the provisions of the Rules of the Board of Education Cedric Ricks, a student in this school, residing at 12341 South Bishop, age 14, grade 9, has been suspended from school this day for a period of 3 school days. He/she may apply for reinstatement on October 14, 19 88. The cause of suspension is: Dangerous Behavior/Insubordination

Cedric was running rapidly in the hall and reached his arms out hitting my shoulder and knocking me out of the way. I told him to stop but he continued running and knocking down other people. He also was not carrying an I.D. card. A. Knowski - Teacher

You are invited to discuss the matter of this suspension with me at a mutually convenient time.

Sincerely,

Parent Conference on No answer 10/6-11

D. LONG
~~Principal~~ DEAN OF STUDENTS

NOTICE: A parent or guardian has the right to request a review of this suspension. If you desire a review, your written request should be sent to the Superintendent, Community High School, 10701 South Kilpatrick, Oak Lawn, Illinois 60453

SUSPENSION 10/11, 12, 13

Mr. Cedric Ricks
Parent or Guardian

12341 South Bishop
Address

Calumet Park, Illinois 60643
City or Town

213785 White-Parent Blue-Bd. and Supt. Green-Asst. Supt.-Adm. Canary-Principal Pink-Bd. Supt. Personnel Goldenrod-Dean

CHSD 218
COMMUNITY HIGH SCHOOL DISTRICT

# REFERRAL TO DEAN

ID#

Student Cedric Ricks Date 10/18/88 Bldg. R C

Have you referred this student before? No ______ Yes ______ Reason ______

**REASON FOR REFERRAL**

Gross Insubordination______ Fighting______ Smoking______ Insubordination, Insolence, Disrespect___ Cuts___ Class, Hall, Cafeteria Disturbance___ Failure to Report After School___ Tardiness___

**Description of Problem**

Eating candy in class without permission — sold by Laura Kaplan

**Action Taken by Teacher before Referral**

Conference with pupil ______ Parent conference ______
Phone Call home ______ Referred student to counselor ______
Letter to Parents ______ Other ______

Class Math Period 4 Teacher Mr. Parker

## DEAN'S ACTION

X 1. Reprimanded
X 2. Assigned to appropriate punishment
a. Detention 2D
b. Suspended from class / school for ______ day(s)
c. Other ______

______ 3. Discussed the misbehavior pattern with the parent over the phone.
______ 4. Arranged a parental conference
______ 5. Referred to the Supt. for possible expulsion

Comments ______

Dean's Signature [signature] Date 10/18/88

Dear parent:
The behavior described on this sheet interferes with the educational program of your student and of other students in our school. We want your help in our effort to give your son/daughter the best education possible. We are using this method to inform you of this incident. If you have any questions, please feel free to call the students counselor or the dean.

COPIES TO: Dean (White) Parents (Canary) Guidance (Pink) Teacher (Gold)

000137

CHSD 218
COMMUNITY HIGH SCHOOL DISTRICT

# REFERRAL TO DEAN

Student Cedric Ricks Date 10/3/88 Bldg. RC

Have you referred this student before? No ______ Yes ______ Reason ______

*REASON FOR REFERRAL*

Gross Insubordination ______ Fighting ______ Smoking ______ Insubordination, Insolence, Disrespect ___ Cuts ___ Class, Hall, Cafeteria Disturbance ___ Failure to Report After School ___ Tardiness ___

*Description of Problem*

No I.D.
Removed from Detention S.H.
2nd Time

*Action Taken by Teacher before Referral*

Conference with pupil ______
Phone Call home ______
Letter to Parents ______
Parent conference ______
Referred student to counselor ______
Other ______

Class ______ Period ______ Teacher ______

## DEAN'S ACTION

X 1. Reprimanded
2. Assigned to appropriate punishment
a. Detention
b. Suspended from class / school for ______ day(s)
c. Other ______

Mailed 3. Discussed the misbehavior pattern with the parent over the phone.
______ 4. Arranged a parental conference
______ 5. Referred to the Supt. for possible expulsion

Comments Sent to Sat detention

Dean's Signature ______ Date 11/1/88

Dear parent:
The behavior described on this sheet interferes with the educational program of your student and of other students in our school. We want your help in our effort to give your son/daughter the best education possible. We are using this method to inform you of this incident. If you have any questions, please feel free to call the students counselor or the dean.

COPIES TO: Dean (White) Parents (Canary) Guidance (Pink) Teacher (Gold)

000138

# SATURDAY DETENTION CONTRACT

I, Cedric Ricks, have been assigned to serve my detention(s) on Saturday, Nov 12, 1988, do understand and agree to comply with the following regulations:

1. I will report promptly at 8:00 a.m. to the cafeteria on the south side of the school and check in with the supervisor. (No one will be allowed into detention after 8:00 a.m.). Students will be dismissed at 12:00 noon.
2. I will provide school work or proper reading materials sufficient to keep me occupied for the entire four hour period. (Newspapers, Time, Newsweek, etc are considered proper reading materials. Final discretion will be left to the supervisor).
3. I will study or read quietly without any talking, sleeping, or disruptive behavior.
4. I will secure the supervisor's permission to leave the room for any reason.
5. I understand that no "walkman," "watchman," or other types of radios/TV's are allowed.
6. I will not bring food or beverages to detention.
7. I will agree to adhere to all school rules regarding behavior as outlined in the student discipline handbook.
8. If I am ill on the day of my Saturday detention, I will bring a doctor's excuse on the following Monday morning to explain the circumstances. Failure to comply will result in an out-of-school suspension.
9. I realize that I am responsible for providing my own transportation to and from detention.
10. If I am suspended for missing the detention (or removed for misbehavior) my parents are required to bring me to school for a conference with the Deans on the first school day following my out-of-school suspension.

If I fail to comply with any of the above stated regulations, I understand that my detention will automatically revert to an out-of-school suspension.

My assigned date(s) is on Nov 12, 1988.

Signed Cedric Ricks
Student Signature

[signature]
Dean

000139

CHSD 218
COMMUNITY HIGH SCHOOL DISTRICT

# REFERRAL TO DEAN

ID#

Student Cedric Ricks Date 2/14/89 Bldg. R

Have you referred this student before? No ______ Yes ______ Reason ______

**REASON FOR REFERRAL**

Gross Insubordination ______ Fighting X ______ Smoking ______ Insubordination, Insolence, Disrespect ___ Cuts ___ Class, Hall, Cafeteria Disturbance ___ Failure to Report After School ___ Tardiness ___

*Description of Problem*

Saw Cedric hitting Tiffany Watkins on the head.

*Action Taken by Teacher before Referral*

Conference with pupil ______
Phone Call home ______
Letter to Parents ______
Parent conference ______
Referred student to counselor ______
Other ______

Class Lunch Period 6B Teacher [illegible]

## DEAN'S ACTION

1. Reprimanded
2. Assigned to appropriate punishment
a. Detention
b. Suspended from class/school/sic (days)
c. Other 2/15-16-17-20-21/89

3. Discussed the misbehavior pattern with the parent over the phone. Father 2/14/89
4. Arranged a parental conference
5. Referred to the Supt. for possible expulsion

Comments Fighting

Dean's Signature [signature] Date 2/14/89

Dear parent:
The behavior described on this sheet interferes with the educational program of your student and of other students in our school. We want your help in our effort to give your son/daughter the best education possible. We are using this method to inform you of this incident. If you have any questions, please feel free to call the students counselor or the dean.

COPIES TO: Dean (White) Parents (Canary) Guidance (Pink) Teacher (Gold)

000140

**COMMUNITY HIGH SCHOOL DISTRICT 218**

**EISENHOWER — RICHARDS — SHEPARD HIGH SCHOOLS**

BUILDING Richards High School

DATE February 15, 1989

**REPORT OF SUSPENSION**

Dear Sir or Madam:

In accordance with the provisions of the Rules of the Board of Education Cedric Ricks, a student in this school, residing at 12341 South Bishop, age 14, grade 9, has been suspended from school this day for a period of 5 school days. He/she may apply for reinstatement on February 22, 1989. The cause of suspension is: Fighting

Cedric was involved in a fight with another student in the cafeteria 2/14/89.

T. Heniff - Teacher

You are invited to discuss the matter of this suspension with me at a mutually convenient time.

Sincerely,

D. LONG

~~Principal~~ DEAN OF STUDENTS

Parent Conference on Father 2/14

NOTICE: A parent or guardian has the right to request a review of this suspension. If you desire a review, your written request should be sent to the Superintendent, Community High School, 10701 South Kilpatrick, Oak Lawn, Illinois 60453

SUSPENSION 2/15, 16, 17, 20, 21

Mr. Shederick Ricks
Parent or Guardian

12341 South Bishop
Address

Calumet Park, Illinois 60643
City or Town

White-Parent Blue-Bd. and Supt. Green-Asst. Supt.-Adm. Canary-Principal Pink-Bd. Supt. Personnel Goldenrod-Dean

213785

218 COMMUNITY HIGH SCHOOL DISTRICT

# REFERRAL TO DEAN

Student Cedric Ricks Date 3-9-89 ID# Bldg.

Have you referred this student before? No ______ Yes ______ Reason ______

## REASON FOR REFERRAL

Gross Insubordination ______ Fighting ______ Smoking ______ Insubordination, Insolence, Disrespect ______ Cut ✓ Class, Hall, Cafeteria Disturbance ______ Failure to Report After School ______ Tardiness ______

Description of Problem

Left Class at 1:35 — Returned at 2:55

Action Taken by Teacher before Referral

Conference with pupil ______ Parent conference ______
Phone Call home ______ Referred student to counselor ______
Letter to Parents ______ Other ______

Class ______ Period ______ Teacher (S08) BAKER

## DEAN'S ACTION

✓ 1. Reprimanded
2. Assigned to appropriate punishment
a. Detention 2
b. Suspended from class / school for ______ day(s)
c. Other

3. Discussed the misbehavior pattern with the parent over the phone.
4. Arranged a parental conference
5. Referred to the Supt. for possible expulsion

Comments

Dean's Signature [signature] Date 3/10/89

Dear parent:
The behavior described on this sheet interferes with the educational program of your student and of other students in our school. We want your help in our effort to give your son/daughter the best education possible. We are using this method to inform you of this incident. If you have any questions, please feel free to call the students counselor or the dean.

000142

CHSD 218

COMMUNITY HIGH SCHOOL DISTRICT

# REFERRAL TO DEAN

ID#

Student RICKS, CEDRIC (D) Date 3/16 Bldg. 6

Have you referred this student before? No ____ Yes ____ Reason ____

## REASON FOR REFERRAL

Gross Insubordination ____ Fighting ____ Smoking ____ Insubordination, Insolence, Disrespect ____ Cuts ____ Class, Hall, Cafeteria Disturbance ____ Failure to Report After School ____ Tardiness X

### Description of Problem

Tardy to class on3/1 (5), 2/23,18,3/8 (13) 3/13,14 (7)

### Action Taken by Teacher before Referral

Conference with pupil ____
Phone Call home ____
Letter to Parents ____
Parent conference ____
Referred student to counselor ____
Other ____

Class ____ Period ____ Teacher C. THEODOROU (JG)

## DEAN'S ACTION

✓ 1. Reprimanded
2. Assigned to appropriate punishment
(a.) Detention 3
b. Suspended from class / school for ____ day(s)
(c.) Other Original

mild 3. Discussed the misbehavior pattern with the parent over the phone.
____ 4. Arranged a parental conference
____ 5. Referred to the Supt. for possible expulsion

Comments ____

Dean's Signature [signature] Date 3/16/89

Dear parent:
The behavior described on this sheet interferes with the educational program of your student and of other students in our school. We want your help in our effort to give your son/daughter the best education possible. We are using this method to inform you of this incident. If you have any questions, please feel free to call the students counselor or the dean.

COPIES TO: Dean (White) Parents (Canary) Guidance (Pink) Teacher (Gold)

For Re-Order: Call Doctors Printing & Office Supply (312) 697-2060

CHSD 218
COMMUNITY HIGH SCHOOL DISTRICT

# REFERRAL TO DEAN

Student Eddie Ricks Date 1/19/88

Have you referred this student before? No ____ Yes ____ Reason ____

REASON FOR REFERRAL

Gross Insubordination ____ Fighting ____ Smoking ____ Insubordination, Insolence, Disrespect ____ Cuts ____ Class, Hall, Cafeteria Disturbance ____ Failure to Report After School ____ Tardiness ____

Description of Problem

Failure to serve assign detention

Action Taken by Teacher before Referral

Conference with pupil ____ Parent conference ____
Phone Call home ____ Referred student to counselor ____
Letter to Parents ____ Other ____

Class ____ Period ____ Teacher ____

## DEAN'S ACTION

✓ 1. Reprimanded
2. Assigned to appropriate punishment
a. Detention
b. Suspended from class / school for ____ day(s)
c. Other 1/20-21-3 5th

3. Discussed the misbehavior pattern with the parent over the phone. 4/4
4. Arranged a parental conference
5. Referred to the Supt. for possible expulsion

Comments Assigned on 3/2 - No show
Reassigned on 4/3 - No show

Dean's Signature ____ Date 4/8/88

Dear parent:
The behavior described on this sheet interferes with the educational program of your student and of other students in our school. We want your help in our effort to give your son/daughter the best education possible. We are using this method to inform you of this incident. If you have any questions, please feel free to call the students counselor or the dean.

COPIES TO: Dean (White) Parents (Canary) Guidance (Pink) Teacher (Gold)

000144

White – Pa...
Yellow – Student File
Pink – Temporary File
Gold – Teacher

# HAROLD L. RICHARDS HIGH SCHOOL
OAK LAWN, ILLINOIS
SPECIAL REPORT TO PUPILS AND PARENTS

| LAST NAME | FIRST NAME OF STUDENT | GRADE LEVEL | STUDENT NUMBER |
|---|---|---|---|
| Ricks | CEDRIC | 9 | 260654 |

| COURSE | PERIOD | DATE |
|---|---|---|
| WOOD | 7 | 4/19 |

The items checked below seem to characterize your son's or daughter's performance in the course named.

**CONDITION OF WORK**

| | | |
|---|---|---|
| ______ Excellent | ______ Nearly Failing | ______ Quality Improving |
| ______ Very Good | ______ Failing | ______ No Change in Status |
| ______ Satisfactory | ______ Incomplete | ______ Quality Declining |

| Areas of Student Performance | Low | | | | High |
|---|---|---|---|---|---|
| Performance on tests/quizzes | | | | | |
| Completion of homework; study habits | X | | | | |
| Attention in class | | | | | |
| Participation in class | | | | | |
| Necessary materials brought to class | | | | | |
| Ability to read with comprehension | | | | | |
| Use of problem-solving skills | | | | | |
| Quality of oral expression | | | | | |
| Quality of written expression | | | | | |
| Classroom behavior | X can't stop talking & horseplay | | | | |
| Punctuality to class | | | | | |
| Cooperative/positive attitude | | | | | |
| Attendance | | | | | |
| Completion of make-up work | | | | | |

Additional Comments:

Aves 3 46

**COMMENDABLE POINTS**

- ______ Has genuine desire to learn
- ______ Makes good use of time and ability
- ______ Takes pride in being a good student
- ______ Is original and creative: shows initiative
- ______ Strives constantly for self improvement
- ______ Is dependable, confident and exhibits self control

**SUGGESTIONS FOR IMPROVING PERFORMANCE**

- ______ Complete assignments and fulfill responsibilities in class work
- ______ Develop improved study habits and a regular study routine
- ______ Improve attendance/punctuality
- ______ Improve behavior so that full effort is applied to class work
- ______ Come to class with necessary materials
- ______ Determine if time outside of school is effectively utilized
- ______ Receive assistance before or after school
- ______ Parent conference with teacher may be arranged by appointment: 499-2550

SIGNATURE OF TEACHER

000143

# COMMUNITY HIGH SCHOOL DISTRICT 218

EISENHOWER – RICHARDS – SHEPARD HIGH SCHOOLS

BUILDING Richards High School

DATE April 20, 1989

REPORT OF SUSPENSION

Dear Sir or Madam:

In accordance with the provisions of the Rules of the Board of Education Cedric Ricks, a student in this school, residing at 12341 South Bishop, age 14, grade 9, has been suspended from school this day for a period of 3 school days. He/she may apply for reinstatement on April 25, 1989. The cause of suspension is: Failure to report after school Cedric failed to report for assigned detentions. He was warned and aware of the consequences.

You are invited to discuss the matter of this suspension with me at a mutually convenient time.

Sincerely,

Parent Conference on Mother 4/19

D. LONG
~~XXXXXX~~ DEAN OF STUDENTS

NOTICE: A parent or guardian has the right to request a review of this suspension. If you desire a review, your written request should be sent to the Superintendent, Community High School, 10701 South Kilpatrick, Oak Lawn, Illinois 60453

SUSPENSION 4/20, 21, 24

Mr. Shederick Ricks
Parent or Guardian

12341 South Bishop
Address

Calumet Park, IL. 60643
City or Town

213786 White-Parent Blue-Bd. and Supt. Green-Asst. Supt.-Adm. Canary-Principal Pink-Bd. Supt. Personnel Goldenrod-Dean
BACC Printing and Graphic Services

000146

CHSD 218
COMMUNITY HIGH SCHOOL DISTRICT

# REFERRAL TO DEAN

ID# 260654

Student Cedric Riggs Date 5/26 Bldg. RC

Have you referred this student before? No X Yes ______ Reason ______

**REASON FOR REFERRAL**

Gross Insubordination____ Fighting____ Smoking____ Insubordination, Insolence, Disrespect X Cuts___ Class, Hall, Cafeteria Disturbance X Failure to Report After School___ Tardiness___

**Description of Problem**

Cedric was constantly belittling a classmate while playing softball. I told him to stop. He continued — this time being face-to-face. I told him to take a lap running. He gave me "his look." I told him again. He continued to walk. I told him again. When I walked around the corner, he was standing next to the fence. He had not moved. This is typical of his cocky attitude. Things are fine when he wants to do something. If not, he is hard to deal with.

**Action Taken by Teacher before Referral**

Conference with pupil ______ Parent conference ______
Phone Call home ______ Referred student to counselor ______
Letter to Parents ______ Other ______

Class PE Period 3 Teacher [illegible]

## DEAN'S ACTION

X 1. Reprimanded
2. Assigned to appropriate punishment
a. Detention 10
b. Suspended from class / school for ______ day(s)
c. Other ______

3. Discussed the misbehavior pattern with the parent over the phone.
4. Arranged a parental conference
5. Referred to the Supt. for possible expulsion

Comments ______

Dean's Signature [signature] Date 6/6/89

Dear parent:
The behavior described on this sheet interferes with the educational program of your student and of other students in our school. We want your help in our effort to give your son/daughter the best education possible. We are using this method to inform you of this incident. If you have any questions, please feel free to call the students counselor or the dean.

COPIES TO: Dean (White) Parents (Canary) Guidance (Pink) Teacher (Gold)

000147

CHSD 218
COMMUNITY HIGH SCHOOL DISTRICT

# REFERRAL TO DEAN

ID# 260654

Student Ricks Cedric Date 9/8 Bldg. HLR

Have you referred this student before? No ✓ Yes ______ Reason ______

**REASON FOR REFERRAL**

Gross Insubordination ______ Fighting ______ Smoking ______ Insubordination, Insolence, Disrespect ✓ Cuts ______ Class, Hall, Cafeteria Disturbance ✓ Failure to Report After School ______ Tardiness ______

*Description of Problem*

Cannot stay in proper place - comes from 1 line to another - is constantly talking - does not participate properly (of the exercises) swung so hard with a golf club he broke it I have spoken to him at least every other day. He is a hazard to the class

*Action Taken by Teacher before Referral*

Conference with pupil ______ Parent conference ______
Phone Call home ______ Referred student to counselor ______
Letter to Parents ______ Other ______

Class PE Period day 4 Teacher Kal[illegible]

## DEAN'S ACTION

✓ 1. Reprimanded
✓ 2. Assigned to appropriate punishment
(a.) Detention 2
b. Suspended from class / school for ______ day(s)
c. Other ______

✓ 3. Discussed the misbehavior pattern with the parent over the phone.
______ 4. Arranged a parental conference
______ 5. Referred to the Supt. for possible expulsion

Comments 9:50 [illegible]

Dean's Signature [signature] Date 9/11/89

Dear parent:
The behavior described on this sheet interferes with the educational program of your student and of other students in our school. We want your help in our effort to give your son/daughter the best education possible. We are using this method to inform you of this incident. If you have any questions, please feel free to call the students counselor or the dean.

000148

CFB 218

CARROLLTON-FARMERS BRANCH SCHOOL DISTRICT

# REFERRAL TO DEAN

ID# 260654

Student Cedric Ricks Date 9/15/89 Bldg. RC

Have you referred this student before? No ✓ Yes ____ Reason ____

## REASON FOR REFERRAL

Gross Insubordination ____ Fighting ____ Smoking ____ Insubordination; Insolence; Disrespect ____ Cuts ✓ Class, Hall, Cafeteria Disturbance ____ Failure to Report After School ____ Tardiness ____

### Description of Problem

Cedric was given a pass to the counselor. I talked with Mr. Shoemake & Mrs. Klutchard and Cedric did not ~~come~~ go to the counseling dept. Sept 13. On Sept 14 I asked Cedric if he went to the counseling office. He claimed he saw and talked with Mrs. Klutchard that period. Then when I stated that Mrs. Klutchard said she had not seen Cedric, he did not deny it.

### Action Taken by Teacher before Referral

Conference with pupil ____ Parent conference ____
Phone Call home ____ Referred student to counselor ____
Letter to Parents ____ Other ____

Class Workroom Period 6B Teacher [illegible]

## DEAN'S ACTION

✓ 1. Reprimanded
2. Assigned to appropriate punishment
(a.) Detention 2
b. Suspended from class / school for ____ day(s)
(c.) Other [illegible]

[illegible] 3. Discussed the misbehavior pattern with the parent over the phone.
____ 4. Arranged a parental conference
____ 5. Referred to the Supt. for possible expulsion

Comments ____

Dean's Signature [signature] Date 9/18/89

Dear parent:
The behavior described on this sheet interferes with the educational program of your student and of other students in our school. We want your help in our effort to give your son/daughter the best education possible. We are using this method to inform you of this incident. If you have any questions, please feel free to call the students counselor or the dean.

COPIES TO: Dean (White) Parents (Canary) Guidance (Pink) Teacher (Gold)

For Re-Order Call [illegible] Printing & Office Supply (972) [illegible]

Special education evaluation. 1989.04.07. Rcvd from Helen and Shederick Ricks

Student Name (Last Name First) RICKS, CEDRI[redacted]
*Ethnic Code __ *Language Code X Sex M
Address 12341 S BISHOP
CALUMET PARK IL
Parents/Guardians CEDRIC & HELEN
Address (if different) ____

Sponsor of Multidisciplinary Conference
☒District ☐Joint Agreement ☐SMA ☐IPP
☐Multidisciplinary Conference Date ____
☒Individualized Education Program Date 4-7-89
☒Annual Review Date 4-7-89
I.D. # RIC09087400 District of Residence 218
Birthdate 09 / 08 / 74 (Month Day Year) Phone (Area Code) ( ) 371-798[?]
Joint Agreement ☐ECHO ☐Eisenhower ☐Southwest ☐SPEED

**EXCEPTIONAL CHARACTERISTICS:**

| | Primary | Secondary |
|---|---|---|
| 1. Trainably Mentally Handicapped | ☐ | ☐ |
| 2. Educably Mentally Handicapped | ☐ | ☐ |
| 3. Physically Handicapped | ☐ | ☐ |
| 4. Learning Disabled | ☐ | ☐ |
| 5. Visually Impaired | ☐ | ☐ |
| 6. Hard-of-Hearing | ☐ | ☐ |
| 7. Deaf | ☐ | ☐ |
| 8. Deaf/Blind | ☐ | ☐ |
| 9. Speech/Language Impaired | ☐ | ☐ |
| 10. Educationally Handicapped | ☐ | ☐ |
| 11. Behavior/Emotional Disorder | ☒ | ☐ |
| 12. Other Health | ☐ | ☐ |
| 13. Severe/Profound Mentally Handicapped | ☐ | ☐ |
| 14. Developmentally Delayed (Only Students Birth Through 2) | ☐ | ☐ |

**PRIMARY SPECIAL EDUCATION PLACEMENT**
☐New ☐Continuing ☒Change ☐Transfer ☐Discontinued
☒District Prog. ☐Joint Agreement Prog. ☐SMA ☐IPP
*Program Code 2 BD [illegible]
School RC District 218
Building Code IL1421900[?] *Funding Source Code A
*Least Restrictive Environment Code ____
Specify: BD - English, Health
Program Initiation/Duration Dates From: 5-89 To: 6-90
Projected Annual Review Date April 1990
Re-evaluation Due Date 1991
**STANDARD EDUCATIONAL PLACEMENT** District 218
School RC

**PARTICIPANTS**

Director/Designee W. Kopen
Principal/Designee ____
Parent(s), Guardian(s) Helen A. Ricks
Student [illegible]
Teacher(s) Bill Parker

Psychologist Walter Kopen
Social Worker ____
Counselor [illegible]
Speech/Language Pathologist ____
Other (Specify Title) ____

Purpose for Staffing Annual review, IEP for 1989-90

Options Considered And Rejected With Rationale BD instructional rejected due to progress made during this year.

Recommendations/Reasons For Determination (Complete ISBE 34-57D) Cedric will be in the BD resource program for the 1989-90 school year.

| Yes | No | The following were explained: |
|---|---|---|
| | | ☒Multidisciplinary conference ☒Recommended placement ☒Individual education program |
| | | I/We give consent to implement the conference recommendations including placement.** |
| | | I/We have received a copy of the multidisciplinary conference report form. |
| | | I/We have received a copy of my child's educational program. |
| | | Procedural safeguards, including the right to object to placement, were explained and offered in writing. |
| | | A summary of rights, including the right to independent evaluation, is outlined on back of Page 1. |
| | | I/We agree to waive the ten (10) calendar day preplacement period. |

Helen A. Ricks Date 4-7-89
Signature, Parent or Guardian

____ Date ____
Signature, Parent or Guardian

Walter Kopen Date 4-7-89
Staff Member Preparing Conference Report

____ Date ____
Student (e.g. 18 years or older)

* See Instructions for Codes.
** If initial placement, complete ISBE 34-57E.

000151

PARENT MODIFIED 087

Student Cedric Ricks    I.E.P. Case Manager [illegible]    Date 4-?-99

Student I.D.# ____ Current Chronological Age (optional) ____ Current Grade (optional) ____

PRESENT LEVEL OF EDUCATIONAL PERFORMANCE

| AREA | LEVEL | INSTRUMENT/DATE | ESTIMATE |
|---|---|---|---|
| Math: Computation | 6.8 | Keymath 4-98 | ☐ |
| Reasoning | | | ☐ |
| Reading: Recognition | 5.7 | Woodcock 4-98 | ☐ |
| Comprehension | 7.9 | Woodcock 4-98 | ☐ |
| Spelling | | | ☐ |
| Expressive Language | | | ☐ |
| Receptive Language | | | ☐ |
| Speech | | | ☐ |
| Social/Emotional Development | | | ☐ |
| Cognitive Skills | | | ☐ |

| AREA | LEVEL | INSTRUMENT/DATE | ESTIMAT |
|---|---|---|---|
| Written Expression | | | ☐ |
| Gross Motor | | | ☐ |
| Fine Motor | | | ☐ |
| Visual Perception | | | ☐ |
| Auditory Perception | | | ☐ |
| Pre/Vocational Skills | | | ☐ |
| Other | | | ☐ |

Date of last vision screening 10/98 ☒ Pass ☐ Not Pass ☐ Corrected

Date of last hearing screening 10/98 ☒ Pass ☐ Not Pass ☐ Aided

Date of last health exam ____

Date of latest/current case study evaluation ____

Next case study reevaluation due: (date) ____

If conference is IEP/Annual Review, note MDC date ____ and proceed to Placement Decision below.

TO BE COMPLETED FOR CASE STUDY EVALUATION

Language Pattern, Mode of Communication, Cultural Background: ☐ Date ____

Parent Consultation/Concerns: ☐ Date ____

Child Interview: ☐ Date ____

Social Developmental Study: ☐ Date ____

Adaptive Behavior: ☐ Date ____

Academic History: ☐ Date ____

Learning Environment/Observation: ☐ Date ____

Medical Review: ☐ Date ____

☐ Specialized/Independent Evaluation(s), if any Specify ____ Date ____

SUMMARY NARRATIVE OPTION

Any participant disagreeing with these recommendations must sign below and submit a separate minority report indicating which areas of the report they disagree with and the reasons for their disagreement.

Name/Title ____    Name/Title ____

PLACEMENT DECISION:* ☐ A. Student is Not Eligible for Special Education Services at this time. RECOMMENDATIONS FOR STANDARD PROGRAM ON Page 1.

☐ B. Student is Eligible for Special Education. Proceed to page 3 and 4.

☒ C. Continue in Special Education. Proceed to page 3 and 4.

*If L.D. Eligibility Decision and/or Separate Facility Placement, complete page 2c.

Student Cedric Keefe Date of conference 4-1-94

Student I.D. # I.E.P. Case Manager

**PROGRAM/RELATED SERVICES**

| Type | Assessment: Date Completed | SERVICES Consult. | | Direct Service | Projected Date of Initiation | # Proj. Min. Per Week | # Proj. Wks. Per Year |
|---|---|---|---|---|---|---|---|
| Adaptive Physical Education | | ☐ | A | ☐ | | | |
| Aide – Class | | ☐ | B | ☐ | | | |
| Aide – Individual Student | | ☐ | C | ☐ | | | |
| Audiologist | | ☐ | E | ☐ | | | |
| Braillist/Reader | | ☐ | F | ☐ | | | |
| Counselor | | ☐ | G | ☐ | | | |
| Driver Education (Adapted) | | ☐ | I | ☐ | | | |
| Interpreter – | | ☐ | J | ☐ | | | |
| Media Services | | ☐ | K | ☐ | | | |
| Occupational Therapist | | ☐ | M | ☐ | | | |
| Orientation/Mobility | | ☐ | O | ☐ | | | |
| Behavior Disorder/Resource | | ☐ | P | ☐ | | | |
| Educably Mentally Hdcp./Resource | | ☐ | P | ☐ | | | |
| Educational Hdcp./Resource | | ☐ | P | ☐ | | | |
| Hearing Itinerant | | ☐ | P | ☐ | | | |
| Learning Dis./Resource | | ☐ | P | ☐ | | | |
| Medical (Specify) | | ☐ | P | ☐ | | | |
| Psychologist | | ☐ | R | ☐ | | | |
| Physical Therapist | | ☐ | S | ☐ | | | |
| Psychiatric Services | | ☐ | T | ☐ | | | |
| School Health Services/Nurse | | ☐ | V | ☐ | | | |
| Speech/Language Pathologist | | ☐ | W | ☐ | | | |
| Social Worker | | ☐ | X | ☐ | | | |
| Vocational Coordinator | | ☐ | Z | ☐ | | | |
| Vision Itinerant | | ☐ | P | ☐ | | | |
| Vocational/Rehab. | | ☐ | 2 | ☐ | | | |
| Transitional Services | | ☐ | 3 | ☐ | | | |
| Other (Specify) | | ☐ | P | ☐ | | | |
| Transportation ☐ Walk ☐ Parent ☒ Regular district vehicle ☐ Special vehicle | | | Y | ☐ | | | |

Vehicle Adaptation (Sepcify)

**PARTICIPATION IN STANDARD EDUCATION PROGRAM**

Full Time, In Standard Education Program, Except Support Services ☐

Participation in Standard Education Program Not Appropriate At This Time ☐

| Subject | Grade Level | Projected Date of Initiation | Projected Duration |
|---|---|---|---|
| Standard P.E. ✓ | | | |
| Art | | | |
| Music | | | |
| Reading | | | |
| Math Gen. Math | | | |
| Spelling | | | |
| Other Language Arts | | | |
| Social Studies | | | |
| Science | | | |
| Other (Specify) | | | |
| ~~Health~~ | | | |
| Driver Ed | | | |
| 1/2 units practical arts | | | |
| 1 unit fine arts | | | |

000153

Harold L Richards records. 2013.09.19



CHSD 218

COMMUNITY HIGH SCHOOL DISTRICT

**Office of the Principal**

**Harold L. Richards High School**
10601 S. Central Ave.
Oak Lawn, IL 60453
*Phone:* (708) 499-2550
*Fax:* (708) 499-6941

RECEIVED
OCT 08 2013
By

September 19, 2013

William H. Ray, P.C.
Attorney at Law
512 Main Street, Suite 308
Fort Worth, Texas 76102

Dear Mr. Ray:

I received the packet of information from your office requesting records for Cedric Ricks. I have enclosed Mr. Ricks' transcript which will confirm his education while attending Richards High School. Please note that he enrolled in our school on 8/29/88 and withdrew on 1/9/92. Since he did not complete the graduation requirements of 19 credits, he did not graduate. Also, in 1992, we were required to maintain student records for 7 years, therefore, Mr. Ricks' files have been destroyed.

The subpoena I received is requesting contact information for teachers who were in contact with Mr. Ricks. Mr. Gary Korhonen, Dr. Carol Garding and Ms. Connie Orient have all retired many years ago and their contact information is not available. Mr. Walter Kopec remains in our school district as School Psychologist and can be reached at the Summit Learning Center, 3940 W. Midlothian Turnpike, Crestwood, Illinois, 60472. The phone number is (708) 371-1986.

Please do not hesitate to contact me at 708-499-2550, Ext. 5510, if any further information is required in this matter.

Sincerely,

Mr. John Hallberg
Principal

JH/dac

Attachment

**Community High School District 218:** Providing Quality Education for Today – and Tomorrow

Dwight D. Eisenhower High School | Harold L. Richards High School | Alan B. Shepard High School | Summit Learning Center | Aspen High School

000155

351

# COMMUNITY HIGH SCHOOL DISTRICT 218

Dwight D. Eisenhower High School | Aspen High School | Polaris School For Individual Education
Harold L. Richards High School | Summit Learning Center | Alan B. Shepard High School

| Student No. | Student Name | Grade | Sex | Birthdate | Birthplace |
|---|---|---|---|---|---|
| 009260654 | CEDRIC RICKS | 12 | M | 8/08/74 | |

| Parent/Guardian | Address | City/State/Zip | Area/Phone |
|---|---|---|---|
| SHEDERICK RICKS | 12341 S. BISHOP | CALUMET PARK, IL 60827 | 708-371-7985 |

| Current Date | Enrolled | Withdrawn | Graduated | Grade Point Average | Rank in Class | Total Credits |
|---|---|---|---|---|---|---|
| 8/19/05 | 8/29/88 | 1/09/92 | 0/00/00 | 2.96550 | of | 14.250 |

Send To:

Official Transcript
Permanent Record

SYSTEM OF GRADING

| | |
|---|---|
| 5 = A - Excellent | 6 = Pass |
| 4 = B - Good | 7 = Excused |
| 3 = C - Average | 8 = Incomplete |
| 2 = D - Poor | 9 = Audit |
| 1 = F - Failure | |

| | SEMESTER 1 | | | | | SEMESTER 2 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Year | School | Course | Description | Grade | Credits Earned | School | Course | Description | Grade | Credits Earned |
| 88-89 | 006 | 261F | PHYS ED 1 | 3 | .250 | 006 | 261F | PHYS ED 1 | 2 | .250 |
| 88-89 | 006 | 420S | IND MAT/RP | 3 | .500 | 006 | 371F | SCI SURVEY | 3 | .500 |
| 88-89 | 006 | 940F | ENG CORE 1 | 2 | .500 | 006 | 427S | WOODWORKNG | 3 | .500 |
| 88-89 | 006 | 967F | MATH CORE | 4 | .500 | 006 | 940F | ENG CORE 1 | 3 | .500 |
| 88-89 | 006 | 974F | SCIENCE | 4 | .500 | 006 | 967F | MATH CORE | 4 | .500 |
| 88-89 | 006 | 980F | SS CORE I | 4 | .500 | 006 | 980F | SS CORE I | 4 | .500 |
| | | | | Total Credits | 2.750 | | | | Total Credits | 2.750 |
| 89-90 | 006 | 220S | DRAMA WKSP | 4 | .500 | 006 | 266S | DRIVER ED | 4 | .500 |
| 89-90 | 006 | 269S | HEALTH ED | 4 | .500 | 006 | 325F | GENRL MATH | 2 | .500 |
| 89-90 | 006 | 291F | PHYS. ED | 2 | .250 | 006 | 428F | CABINET MK | 2 | .500 |
| 89-90 | 006 | 325F | GENRL MATH | 3 | .500 | 006 | 511S | INT TO BUS | 3 | .500 |
| 89-90 | 006 | 428F | CABINET MK | 3 | .500 | 006 | 941F | ENG CORE 2 | 3 | .500 |
| 89-90 | 006 | 941F | ENG CORE 2 | 4 | .500 | | | | | |
| | | | | Total Credits | 2.750 | | | | Total Credits | 2.500 |
| 90-91 | 006 | 291F | PHYS. ED | 3 | .250 | 006 | 291F | PHYS. ED | 2 | .250 |
| 90-91 | 006 | 328F | ALGEB SRVY | 2 | .500 | 006 | 373F | BIOLOGY | 1 | .000 |
| 90-91 | 006 | 373F | BIOLOGY | 2 | .500 | 006 | 941F | ENG CORE 2 | 3 | .500 |
| 90-91 | 006 | 481F | AM HST REM | 4 | .500 | 006 | 968F | MATH CORE 2 | 1 | .000 |
| 90-91 | 006 | 581F | SPANISH 1 | 1 | .000 | 006 | 983F | S.S.CORE 2A | 4 | .500 |
| 90-91 | 006 | 941F | ENG CORE 2 | 2 | .500 | | | | | |
| | | | | Total Credits | 2.250 | | | | Total Credits | 1.250 |

* Successful completion of American Government 489, 501, 748 or 884 constitutes a passing grade on an examination of the Federal Constitution, the State Constitution, the Declaration of Independence and the U.S. Flag.

* District 218 identifies courses of instruction by levels of complexity. Honors courses carry weighted grades effective 1980-81. Advanced Placement courses carry weighted grades effective 1982-83.

ENROLLMENT HISTORY

| School | Entered | Withdrawn | Reason |
|---|---|---|---|

OUTSTANDING ACTIVITIES, HONORS, AWARDS

| Organization | Office Or Honor | 09 | 10 | 11 | 12 |
|---|---|---|---|---|---|

ATTENDANCE HISTORY

| Year | Days Enrolled | Days Absent | Times Tardy |
|---|---|---|---|
| 91-92 | 81 | 8.00 | 0 |

000156

# COMMUNITY HIGH SCHOOL DISTRICT 218

Dwight D. Eisenhower High School | Aspen High School | Polaris School For Individual Education
Harold L. Richards High School | Summit Learning Center | Alan B. Shepard High School

| Student No. | Student Name | Grade | Sex | Birthdate | Birthplace |
|---|---|---|---|---|---|
| 009260654 | CEDRIC RICKS | 12 | M | 9/08/74 | |

| Parent/Guardian | Address | City/State/Zip | Area/Phone |
|---|---|---|---|
| SHEDERICK RICKS | 12341 S. BISHOP | CALUMET PARK, IL 60827 | 708-371-7985 |

| Current Date | Enrolled | Withdrawn | Graduated | Grade Point Average | Rank In Class | Total Credits |
|---|---|---|---|---|---|---|
| 8/19/05 | 8/29/88 | 1/09/92 | 0/00/00 | 2.96550 | of | 14.250 |

ATTENDANCE HISTORY

| Year | Days Enrolled | Days Absent | Times Tardy |
|---|---|---|---|

COLLEGE ENTRANCE EXAM SCORES

000157



Community High School District 218
Harold L. Richards High School
10601 S. Central Avenue
Oak Lawn, Illinois 60453-5038

Mr. William H. Ray, P.C.
Attorney at Law
512 Main Street, Suite 308
Fort Worth, TX 76102

76102393083

Disciplinary referrals and suspensions. 1990-1991. Rcvd from Helen and Shederick Ricks

CHSD 218
COMMUNITY HIGH SCHOOL DISTRICT

# REFERRAL TO DEAN

ID# ______

Student Cedric Ricks Date 2/7/90 Bldg. HLR

Have you referred this student before? No ✓ Yes ______ Reason ______

**REASON FOR REFERRAL**

Gross Insubordination ✓ Fighting ____ Smoking ____ Insubordination, Insolence, ____ Disrespect ____ Cuts ____ Class, Hall, Cafeteria Disturbance ✓ Failure to Report After School ____ Tardiness ____

*Description of Problem*

Student was talking when I asked him to go to the desk. He became belligerent, started yelling and walked out of the LRC. His yelling at me included plenty of "shits" "fucks" and other unsavory language.

*Action Taken by Teacher before Referral*

Conference with pupil ✓ Parent conference ______
Phone Call home ✓ Referred student to counselor ______
Letter to Parents ______ Other ______

Class LRC Period 6B Teacher Zuchowski

## DEAN'S ACTION

✓ 1. Reprimanded
2. Assigned to appropriate punishment
a. Detention
b. Suspended from class/school for ______ day(s)
c. Other ______ Saturday Feb 17

3. Discussed the misbehavior pattern with the parent over the phone.
4. Arranged a parental conference
5. Referred to the Supt. for possible expulsion

Comments ______

Dean's Signature Paul Arn Date 2-8-90

Dear parent:
The behavior described on this sheet interferes with the educational program of your student and of other students in our school. We want your help in our effort to give your son/daughter the best education possible. We are using this method to inform you of this incident. If you have any questions, please feel free to call the students counselor or the dean.

COPIES TO: Dean (White) Parents (Canary) Guidance (Pink) Teacher (Gold)

000160

**DETENTION ASSIGNMENT**

I have been assigned *Saturday* detentions for the violation of school rules checked below:

____ TARDINESS

____ TRUANCY

✓ CLASS/HALL/CAFETERIA/DISTURBANCE

____ LEAVING THE BUILDING

____ INSUBORDINATION

____ FAILURE TO REPORT AFTER SCHOOL

____ REFUSAL TO COMPLY WITH A STAFF DIRECTIVE

____ OTHER ____

**STUDENT PLEASE READ CAREFULLY:**

I have chosen the dates and the period during which I will serve, these detentions.

IF I DO NOT REPORT ON THE ASSIGNED TIME AND DATES I UNDERSTAND THAT I WILL BE SUBJECT TO A THREE DAY EXTERNAL SUSPENSION.

*Cedric Ricks* — STUDENT SIGNATURE

*2-7-90* — DATE

*10* — LEVEL

Dates: *Feb 17*

PERIOD: 1 or 9 or 1 & 9 *Saturday*

ASSIGNED BY: ~~BHL~~ *PA* ____

CAT ____

DATES PRESENT:

1. ____ 6. ____
2. ____ 7. ____
3. ____ 8. ____
4. ____ 9. ____
5. ____ 10. ____

DATES MISSED:
(List only if student in not on absence list)

1. ____

Extra Warning On ____

INITIAL ____ DATE

2. ____

Suspended ____ DATE

INITIAL ____

ROOM 202

WORK PROGRAM COORDINATOR ____ ROOM 218

SACC Printing & Graphic Services 22078SP3

000161

CHSD 218
COMMUNITY HIGH SCHOOL DISTRICT

OFFICE OF THE PRINCIPAL
HAROLD L. RICHARDS HIGH SCHOOL
10601 Central Avenue
Oak Lawn, Illinois 60453-5068

2/8/90
Date

Dear Parent/Guardian:

[handwritten name] 10 has been assigned to a Saturday School Detention penalty on 2/17/90. Your son/daughter received this disciplinary action as a result of a school violation.

Saturday School Detention is an alternative to an out of school suspension. We prefer this option because it does not affect your child's attendance in school. Students and parents should clearly understand that an out of school suspension will occur if any of the following violations take place.

1. Tardiness-arrival after 8:00 A.M.
2. Failure to attend
3. Misconduct
4. Failure to be prepared for the study session
5. Lack of cooperation during the work detail

Your child is to report to the student cafeteria on the date(s) indicated above with sufficient school work to remain actively involved for four hours. School materials for the study session must be brought from home. STUDENT LOCKERS ARE NOT AVAILABLE. Students are to enter the building by way of the student cafeteria on the south side of the building. Transportation to and from Saturday School is the sole responsibility of the student/parent. Bus transportation will not be provided.

Should you have any questions regarding the incident causing this penalty or the Saturday S-hool procedure, please call 499-2550-extension 607.

Sincerely,

Paul Arvia

Paul Arvia/Carol A. Theodorou/Harry McDaniel
Assistant Principal
HAROLD L. RICHARDS HIGH SCHOOL

000162

CHSD 218
COMMUNITY HIGH SCHOOL DISTRICT

[TEMP]ORARY MODIFICATION OF STUDENT PRO[GRAM]

____ DE ____ OM
✓ RC ____ RE
____ SC ____ SN
3-15-90 DATE

10

DEAR PARENT:

Cedric Ricks (Student) has been assigned to room 250 for all classes starting May 23 and ending on 25. Total days 3.

This action has been taken because Cedric's behavior has been unacceptable while following a regularly assigned program.

In our conference we discussed the following violations:

- ____ Tardies
- ____ Truancy
- ____ Smoking
- ____ Leaving the building
- ✓ Failure to serve detentions
- ____ Minor classroom disruption
- ____ Refusal to comply with a staff directive
- ✓ Insubordination
- ✓ Other Excessive horseplay in halls

[signature] Student

Paul Ams [signature] Dean of Students

cc: Parent—white
Dean—canary
Principal—pink
Counselor—gold

For Reorder DANIELS PRINTING & OFFICE SUPPLY 887-3089

000163

CUSD 218
COMMUNITY HIGH SCHOOL DISTRICT

# REFERRAL TO DEAN

ID# ____

Student: Cedric Ricks (10) Date: 3/22/90 Bldg. HLR

Have you referred this student before? No ____ Yes ____ Reason: class distr.

## REASON FOR REFERRAL

Gross Insubordination ____ Fighting ____ Smoking ____ Insubordination, Insolence ____

Disrespect ____ Cuts ____ Class, Hall, Cafeteria Disturbance ____ Failure to Report After School ____ Tardiness ____

## Description of Problem

Cedric refused to do his English assignment despite several promptings from me. At one point he told me, "This is bullshit". I call his mother at work and left a message for her to call me. It was at this time Cedric ripped a page out of his vocabulary book and tossed it to the floor exclaiming, "DAMN". After his referral was written he called me a liar. When I sent for security he threatened to injure them.

Refused to report to the office — student is extremely defiant & violent. D. Wise

## Action Taken by Teacher before Referral

Conference with pupil ____ Parent conference ____
Phone Call home ____ Referred student to counselor ____
Letter to Parents ____ Other ____

Class: English Period: 5 Teacher: Carding

# DEAN'S ACTION

✓ 1. Reprimanded
✓ 2. Assigned to appropriate punishment
a. Detention
b. Suspended from class / school for ____ day(s)
c. Other ____

March 22, 23, 26, 27, 28

____ 3. Discussed the misbehavior pattern with the parent over the phone
____ 4. Arranged a parental conference
____ 5. Referred to the Supt. for possible expulsion

Comments ____

Dean's Signature: Paul Ann[illegible] Date: 3-22-90

Dear parent:
The behavior described on this sheet interferes with the educational program of your student and of other students in our school. We want your help in our effort to give your son/daughter the best education possible. We are using this method to inform you of this incident. If you have any questions, please feel free to call the students counselor or the dean.

COPIES TO: Dean (White) Parents (Canary) Guidance (Pink) Teacher (Gold)

D218 COMMUNITY HIGH SCHOOL DISTRICT

# REFERRAL TO DEAN

ID# 260654

Student Cedric Rucks Date 4/3/90 Bldg. RC

Have you referred this student before? No _____ Yes _____ Reason _____

**REASON FOR REFERRAL**

Gross Insubordination _____ Fighting _____ Smoking _____ Insubordination, Insolence, Disrespect _____ Cuts _____ Class, Hall, Cafeteria Disturbance _____ Failure to Report After School _____ Tardiness _____

**Description of Problem**

Bus Disturbance on the 4:30 Activities Bus on 4/2/90

**Action Taken by Teacher before Referral**

Conference with pupil _____
Phone Call home _____
Letter to Parents _____
Parent conference _____
Referred student to counselor _____
Other _____

Class _____ Period _____ Teacher [signature]

## DEAN'S ACTION

✓ 1. Reprimanded
2. Assigned to appropriate punishment
(a.) Detention 2
b. Suspended from class / school for _____ day(s)
(c.) Other [handwritten]

mailed 3. Discussed the misbehavior pattern with the parent over the phone.
_____ 4. Arranged a parental conference.
_____ 5. Referred to the Supt. for possible expulsion

Comments _____

Dean's Signature [signature] Date 4/3/90

Dear parent:
The behavior described on this sheet interferes with the educational program of your student and of other students in our school. We want your help in our effort to give your son/daughter the best education possible. We are using this method to inform you of this incident. If you have any questions, please feel free to call the students counselor or the dean.

COPIES TO: Dean (White) Parents (Canary) Guidance (Pink) Teacher (Gold)

CHSD 218
COMMUNITY HIGH SCHOOL DISTRICT

# REFERRAL TO DEAN

ID# 10

Student ________ Date 4-11 Bldg. ________

Have you referred this student before? No ________ Yes ________ Reason ________

## REASON FOR REFERRAL

Gross Insubordination ________ Fighting ________ Smoking ________ Insubordination, Insolence, Disrespect ____ Cuts ____ Class, Hall, Cafeteria Disturbance ____ Failure to Report After School ____ Tardiness ____

*Description of Problem*

...in the hall. His inappropriate behavior has become a daily occurrence.

*Action Taken by Teacher before Referral*

Conference with pupil X
Phone Call home ________
Letter to Parents ________
Parent conference ________
Referred student to counselor ________
Other ________

Class Workroom Period 6.2 Teacher A. Boone

## DEAN'S ACTION

✓ 1. Reprimanded
2. Assigned to appropriate punishment
a. Detention 2 days
b. Suspended from class / school for ________ day(s)
c. Other ________

3. Discussed the misbehavior pattern with the parent over the phone.
4. Arranged a parental conference
5. Referred to the Supt. for possible expulsion

Comments ________

Dean's Signature ________ Date 4-..-..

Dear parent:
The behavior described on this sheet interferes with the educational program of your student and of other students in our school. We want your help in our effort to give your son/daughter the best education possible. We are using this method to inform you of this incident. If you have any questions, please feel free to call the students counselor or the dean.

COPIES TO: Dean (White) Parents (Canary) Guidance (Pink) Teacher (Gold)

000166

CHSD 218
COMMUNITY HIGH SCHOOL DISTRICT

# REFERRAL TO DEAN

ID# 260654

Student Cedric Ricks Date April 11 Bldg. RC

Have you referred this student before? No ____ Yes X Reason classroom disturbance

## REASON FOR REFERRAL

Gross Insubordination____ Fighting____ Smoking____ Insubordination, Insolence, Disrespect____ Cuts____ Class, Hall, Cafeteria Disturbance X Failure to Report After School____ Tardiness____

**Description of Problem**

Cedric used profanity in the classroom and said "shut the fuck up". He is almost a daily behavior problem. His actions include harassment of girls, quiet intimidation, inappropriate comments sometimes of a sexual manner. I have tried isolating him and

**Action Taken by Teacher before Referral**

Conference with pupil ____
Phone Call home ____
Letter to Parents ____
Parent conference ____
Referred student to counselor ____
Other ____

Class ____ Period ____ Teacher A Borne

## DEAN'S ACTION

✓ 1. Reprimanded
✓ 2. Assigned to appropriate punishment
a. Detention 2 days
b. Suspended from class / school for ____ day(s)
c. Other ____

____ 3. Discussed the misbehavior pattern with the parent over the phone.
____ 4. Arranged a parental conference
____ 5. Referred to the Supt. for possible expulsion

Comments ____

Dean's Signature Paul Aur Date 4-17-90

Dear parent:
The behavior described on this sheet interferes with the educational program of your student and of other students in our school. We want your help in our effort to give your son/daughter the best education possible. We are using this method to inform you of this incident. If you have any questions, please feel free to call the students counselor or the dean.

COPIES TO: Dean (White) Parents (Canary) Guidance (Pink) Teacher (Gold)

000157

CHSD 218
COMMUNITY HIGH SCHOOL DISTRICT

# REFERRAL TO DEAN

ID# 18

Student Cedric Ricks Date 4-11 Bldg. ______

Have you referred this student before? No ______ Yes ______ Reason ______

## *REASON FOR REFERRAL*

Gross Insubordination______ Fighting______ Smoking______ Insubordination, Insolence, Disrespect____ Cuts____ Class, Hall, Cafeteria Disturbance____ Failure to Report After School____ Tardiness____

*Description of Problem*

Confrontation in the hall. His inappropriate behavior has become an almost daily occurrence.

*Action Taken by Teacher before Referral*

*Conference with pupil* X
*Phone Call home* ______
*Letter to Parents* ______
*Parent conference* ______
*Referred student to counselor* ______
*Other* ______

*Class* Workroom *Period* 6-B *Teacher* A. Boone

# DEAN'S ACTION

V 1. Reprimanded
2. Assigned to appropriate punishment
a. Detention 2 days
b. Suspended from class / school for ______ day(s)
c. Other ______

3. Discussed the misbehavior pattern with the parent over the phone.
4. Arranged a parental conference
5. Referred to the Supt. for possible expulsion

Comments ______

Dean's Signature Paul Ainn Date 4-11-?

Dear parent:
The behavior described on this sheet interferes with the educational program of your student and of other students in our school. We want your help in our effort to give your son/daughter the best education possible. We are using this method to inform you of this incident. If you have any questions, please feel free to call the students counselor or the dean.

COPIES TO: Dean (White) Parents (Canary) Guidance (Pink) Teacher (Gold)

000168

CHSD 218 COMMUNITY HIGH SCHOOL DISTRICT

# REFERRAL TO DEAN

ID# ____________

Student Cedric Ricks Date 5/15/90 Bldg. [illegible]

Have you referred this student before? No ____ Yes X Reason [illegible]

*REASON FOR REFERRAL*

Gross Insubordination ____ Fighting ____ Smoking ____ Insubordination, Insolence, Disrespect X Cuts ____ Class, Hall, Cafeteria Disturbance ____ Failure to Report After School ____ Tardiness ____

*Description of Problem*

Refused to participate [illegible] newspapers) when I [illegible] "If you don't [illegible]

*Action Taken by Teacher before Referral*

*Conference with pupil* ____ *Parent conference* ____
*Phone Call home* ____ *Referred student to counselor* ____
*Letter to Parents* ____ *Other* ____

*Class* Eng *Period* [illegible]

## DEAN'S ACTION

V 1. Reprimanded
✓ 2. Assigned to appropriate punishment
a. Detention
b. Suspended from class / school for ____ day(s) 3/14
c. Other ____

3. Discussed the misbehavior pattern with the parent over the phone
4. Arranged a parental conference
5. Referred to the Supt. for possible expulsion

Comments ____________

Dean's Signature Paul [illegible] Date 5-15-90

Dear parent:
The behavior described on this sheet interferes with the educational program of your student and of other students in our school. We want your help in our effort to give your son/daughter the best education possible. We are using this method to inform you of this incident. If you have any questions, please feel free to call the students counselor or the dean.

COPIES TO: Dean (White) Parents (Canary) Guidance (Pink) Teacher (Gold)

CHSD 218
COMMUNITY HIGH SCHOOL DISTRICT

# TEMPORARY MODIFICATION OF STUDENT PROGRAM

___ DDE ___ OM
✓ RC ___ RE
___ SC ___ SN

3-15-90 DATE

10

DEAR PARENT:

Cedric Ricks (Student) has been assigned to room 237 for all classes starting May 23 and ending on 25. Total days 3.

This action has been taken because Cedric's behavior has been unacceptable while following a regularly assigned program.

In our conference we discussed the following violations:

- ___ Tardies
- ___ Truancy
- ___ Smoking
- ___ Leaving the building
- ✓ Failure to serve detentions
- ___ Minor classroom disruption
- ___ Refusal to comply with a staff directive
- ✓ Insubordination
- ✓ Other Excessive horseplay in halls

[signature]
Student

Paul Auer
Dean of Students

cc: Parent—white
Dean—canary

# TEMPORARY MODIFICATION RULES & PROCEDURES

**1986-1987**

**Please read all these rules very carefully. You are responsible for knowing them.**

1. Students are to report to room 278 by 8:25 a.m. A tardy will be recorded as your first infraction on your log sheet if you are late.

2. Students are dismissed for lunch during 5A.

3. Students are entitled to only one 4 minute break.

4. Students must bring books and materials to T.M. in order to complete all assignments sent by their teachers. They must also bring additional, appropriate reading material to keep busy during the entire day.

5. Students are responsible for returning work to teachers for proper credit upon return to regular classes.

6. Students will not be allowed to leave the room to go to their lockers or speak with their regular teachers once they enter at 8:25 a.m.

7. All school rules apply while a student is in T.M.

8. Students may not talk, sleep, eat, chew gum, leave their seat, or disrupt the class in any manner during the school day.

9. Any student who enters school after 9:15 a.m. is considered a half day absent and will receive an infraction notice on his/her log sheet.

10. Students in T.M. will not be marked absent from school.

* UPON THE THIRD INFRACTION, YOU WILL BE EXTERNALLY SUSPENDED FROM SCHOOL FOR THE REMAINDER OF YOUR T.M.

Your assigned dates are: May 23, 24, 25

**I HAVE READ THESE RULES CAREFULLY AND UNDERSTAND THE CONDITIONS.**

[signature]
(Student's Signature)

May 15, 1990
(Date)

AISD Printing & Graphic Services 287780P3

000171



# REFERRAL TO ASSISTANT PRINCIPAL

3

ID# 260654

Student CEDRIC RICKS Date 12/11/98 Bldg. RC

Have you referred this student before? No ______ Yes ______ Reason ______

*REASON FOR REFERRAL*

Gross Insubordination______ Fighting______ Smoking______ Insubordination, Insolence, Disrespect___ Cuts___ Class, Hall, Cafeteria Disturbance___ Failure to Report After School ✓ Tardiness___

*Description of Problem*

CEDRIC WAS ASSIGNED A DETENTION FOR TUESDAY 12/1/98 AND DIDN'T REPORT.

*Action Taken by Teacher before Referral*

| | |
|---|---|
| Conference with pupil ______ | Parent conference ______ |
| Phone Call home ______ | Referred student to counselor ______ |
| Letter to Parents ______ | Other ______ |

Class 8th/H ALG SUPPORT Period 8 Teacher [signature]

# ASSISTANT PRINCIPAL'S ACTION

______ 1. Reprimanded
______ 2. Assigned to appropriate punishment
a. Detention 2 days
b. Suspended from class / school for ______ day(s)
c. Other______

______ 3. Discussed the misbehavior pattern with the parent over the phone.
______ 4. Arranged a parental conference
______ 5. Referred to the Supt. for possible expulsion

Comments ______

Assistant Principal's Signature Paul Ann Date 12-11-98

Dear parent:
The behavior described on this sheet interferes with the educational program of your student and of other students in our school. We want your help in our effort to give your son/daughter the best education possible. We are using this method to inform you of this incident. If you have any questions, please feel free to call the students counselor or the assistant principal.

COPIES TO: Assistant Principal (White) Parents (Canary) Guidance (Pink) Teacher (Gold)

D218 COMMUNITY HIGH SCHOOL DISTRICT

# REFERRAL TO ASSISTANT PRINCIPAL

ID# 260654-11

Student CEDRIC RICKS Date 12-18-90 Bldg. RC.

Have you referred this student before? No ______ Yes ✓ Reason TARDIES

## REASON FOR REFERRAL

Gross Insubordination ______ Fighting ______ Smoking ______ Insubordination, Insolence, Disrespect ______ Cuts ______ Class, Hall, Cafeteria Disturbance ______ Failure to Report After School ______ Tardiness ✓

## Description of Problem

6TH TARDY DECEMBER 18, 1990 / TUESDAY

## Action Taken by Teacher before Referral

Conference with pupil ______ Parent conference ______
Phone Call home ______ Referred student to counselor ______
Letter to Parents ______ Other ______

Class AM. HIST. /481 Period 2 Teacher KORHONEN

# ASSISTANT PRINCIPAL'S ACTION

______ 1. Reprimanded
______ 2. Assigned to appropriate punishment
a. Detention
b. Suspended from class / school for ______ day(s)
c. Other ______

______ 3. Discussed the misbehavior pattern with the parent over the phone.
______ 4. Arranged a parental conference
______ 5. Referred to the Supt. for possible expulsion

Comments Suspended 3 days for another incident

Assistant Principal's Signature Paul Arm[illegible] Date 12-20-90

Dear parent:
The behavior described on this sheet interferes with the educational program of your student and of other students in our school. We want your help in our effort to give your son/daughter the best education possible. We are using this method to inform you of this incident. If you have any questions, please feel free to call the students counselor or the assistant principal.

COPIES TO: Assistant Principal (White) Parents (Canary) Guidance (Pink) Teacher (Gold)

000173

CHSD 218 COMMUNITY HIGH SCHOOL DISTRICT

# REFERRAL TO ASSISTANT PRINCIPAL

ID#

Student Cedrick Ricks Date 12-19-90 Bldg. RC

Have you referred this student before? No ✓ Yes ____ Reason ____

**REASON FOR REFERRAL**

Gross Insubordination ____ Fighting ____ Smoking ____ Insubordination, Insolence, Disrespect ____ Cuts ____ Class, Hall, Cafeteria Disturbance ✓ Failure to Report After School ____ Tardiness ____

**Description of Problem**

First of all, Cedrick is not in my class, yet everyday he is in the theatre with them. I am constantly kicking him out, breaking up their fights, following them into the hall, watching him sneak in from every door in the theatre. Today, he was chasing her around the theatre at a dangerous rate of speed knocking down microphones, lighting equipment, etc. When told to leave he continued to fool with them until the student told him to leave so he wouldn't get in more trouble. This is an every day occurrence and is getting worse!

**Action Taken by Teacher before Referral**

Conference with pupil ✓
Phone Call home ____
Letter to Parents ____
Parent conference ____
Referred student to counselor ____
Other ____

Class Drama Period 7 Teacher [signature]

## ASSISTANT PRINCIPAL'S ACTION

✓ 1. Reprimanded
2. Assigned to appropriate punishment Dec 20
a. Detention
b. Suspended from class / school for ____ day(s) Jan 4
c. Other ____

3. Discussed the misbehavior pattern with the parent over the phone.
4. Arranged a parental conference
5. Referred to the Supt. for possible expulsion

Comments ____

Assistant Principal's Signature Paul [signature] Date 12-19-9

Dear parent:
The behavior described on this sheet interferes with the educational program of your student and of other students in our school. We want your help in our effort to give your son/daughter the best education possible. We are using this method to inform you of this incident. If you have any questions, please feel free to call the students counselor or the assistant principal.

COPIES TO: Assistant Principal (White) Parents (Canary) Guidance (Pink) Teacher (Gold)

CHSD 218
COMMUNITY HIGH SCHOOL DISTRICT

# REFERRAL TO ASSISTANT PRINCIPAL

ID# 260654-71

Student CEDRIC RICKS Date 12-20-90 Bldg. RC

Have you referred this student before? No ______ Yes ✓ Reason TARDIES

## REASON FOR REFERRAL

Gross Insubordination ______ Fighting ______ Smoking ______ Insubordination, Insolence, Disrespect ___ Cuts ___ Class, Hall, Cafeteria Disturbance ___ Failure to Report After School ___ Tardiness ✓

### Description of Problem

CUT DECEMBER 20, 1990 / THURSDAY

### Action Taken by Teacher before Referral

Conference with pupil ______ Parent conference ______
Phone Call home ______ Referred student to counselor ______
Letter to Parents ______ Other ______

Class Am. Hist. / 481 Period 2 Teacher Korhonen

## ASSISTANT PRINCIPAL'S ACTION

______ 1. Reprimanded
______ 2. Assigned to appropriate punishment
a. Detention
b. Suspended from class / school for ___ day(s)
c. Other ______

______ 3. Discussed the misbehavior pattern with the parent over the phone.
______ 4. Arranged a parental conference
______ 5. Referred to the Supt. for possible expulsion

Comments Suspended from school Dec 20, 21 and Jan 2

Assistant Principal's Signature Paul An Date 1/1/21/4

Dear parent:
The behavior described on this sheet interferes with the educational program of your student and of other students in our school. We want your help in our effort to give your son/daughter the best education possible. We are using this method to inform you of this incident. If you have any questions, please feel free to call the students counselor or the assistant principal.

COPIES TO: Assistant Principal (White) Parents (Canary) Guidance (Pink) Teacher (Gold)

000175

**COMMUNITY HIGH SCHOOL DISTRICT 218**

**EISENHOWER – RICHARDS – SHEPARD HIGH SCHOOLS**

BUILDING Richards High School

DATE December 20, 1990

**REPORT OF SUSPENSION**

Dear Sir or Madam:

In accordance with the provisions of the Rules of the Board of Education Cedric Ricks, a student in this school, residing at 12341 South Bishop, age 16, grade 11, has been suspended from school this day for a period of 3 school days. He/she may apply for reinstatement on January 7, 1991. The cause of suspension is: Class Disturbanco

Cedric created a class disturbanco in 7th period Drama class 12/19/90.

C. Palla - Teacher

Tardy to 2nd period American History class (#6) 12/18/90.

G. Korhonon - Teacher

You are invited to discuss the matter of this suspension with me at a mutually convenient time.

Sincerely,

Parent Conference on 12/19

DR. ROMAYNE BAKER R. Baker
Principal

NOTICE: A parent or guardian has the right to request a review of this suspension. If you desire a review, your written request should be sent to the Superintendent, Community High School, 10701 South Kilpatrick, Oak Lawn, Illinois 60453

Mr. Shederick Ricks
Parent or Guardian

12341 South Bishop
Address

SUSPENSION 12/20, 21, 1/4

Calumet Park, Illinois 60643
City or Town

White-Parent Blue-Bd. and Supt. Green-Asst. Supt. Adm. Canary-Principal Pink-Bd. Supt. Personnel Goldenrod-Assistant Principal

000176

**COMMUNITY HIGH SCHOOL DISTRICT 218**

**EISENHOWER — RICHARDS — SHEPARD HIGH SCHOOLS**

**BUILDING** Richards High School

**DATE** January 25, 1991

**REPORT OF SUSPENSION**

Dear Sir or Madam:

In accordance with the provisions of the Rules of the Board of Education Cedric Ricks, a student in this school, residing at 12341 South Bishop, age 16, grade 11, has been suspended from school this day for a period of 5 school days. He/she may apply for reinstatement on February 1, 19 91. The cause of suspension is: Insubordination

Cedric was approached by a teacher in the hall and asked to stop the loud and boisterous behavior he was exhibiting with a young lady. Cedric disregarded the teacher and ran off. It was later determined that the interaction in the hallway was with the same young lady he was warned to stay away from. You are invited to discuss the matter of this suspension with me at a mutually convenient time.

Sincerely,

Parent Conference on 1/24

DR. ROMAYNE BAKER *RBaker*
Principal

NOTICE: A parent or guardian has the right to request a review of this suspension. If you desire a review, your written request should be sent to the Superintendent, Community High School, 10701 South Kilpatrick, Oak Lawn, Illinois 60453

Mr. Shederick Ricks
Parent or Guardian

12341 South Bishop
Address

SUSPENSION 1/25, 28, 29, 30, 31

Calumet Park, Illinois 60643
City or Town

White-Parent Blue-Bd. and Supt. Green-Asst. Supt. Adm. Canary-Principal Pink-Bd. Supt. Personnel Goldenrod-Assistant Principal

CHSD 218
COMMUNITY HIGH SCHOOL DISTRICT

# REFERRAL TO ASSISTANT PRINCIPAL

ID#

Student Cedric Ricks Date 1-24-91 Bldg. Richards

Have you referred this student before? No ______ Yes ______ Reason ______

REASON FOR REFERRAL

Gross Insubordination ______ Fighting ______ Smoking ______ Insubordination, Insolence, Disrespect ___ Cuts ___ Class, Hall, Cafeteria Disturbance ___ Failure to Report After School ___ Tardiness ___

Description of Problem

Cedric was approached by a teacher in the hall and asked to stop the loud and boisterous behavior he was exhibiting with a young lady. Cedric disregarded the teacher and ran off. It was later determined that the altercation in the hallway was with the same young lady he was warned to stay away from.

Action Taken by Teacher Before Referral

Conference with pupil ✓
Phone Call home ✓
Letter to Parents ✓
Parent conference ______
Referred student to counselor ______
Other ______

Class ______ Period ______ Teacher ARVIA

## ASSISTANT PRINCIPAL'S ACTION

✓ 1. Reprimanded
✓ 2. Assigned to appropriate punishment
a. Detention
b. Suspended from class / school for 5 Friday day(s) Jan 25, 28, 29, 30, 31
c. Other ______

______ 3. Discussed the misbehavior pattern with the parent over the phone.
______ 4. Arranged a parental conference
______ 5. Referred to the Supt. for possible expulsion

Comments ______

Assistant Principal's Signature Paul Arvia Date 1-24-91

Dear parent:
The behavior described on this sheet interferes with the educational program of your student and of other students in our school. We want your help in our effort to give your son/daughter the best education possible. We are using this method to inform you of this incident. If you have any questions, please feel free to call the students counselor or the assistant principal.

COPIES TO: Assistant Principal (White) Parents (Canary) Guidance (Pink) Teacher (Gold)

000178

**COMMUNITY HIGH SCHOOL DISTRICT 218**

**EISENHOWER — RICHARDS — SHEPARD HIGH SCHOOLS**

**BUILDING** Richards High School

**DATE** March 22, 1990

**REPORT OF SUSPENSION**

Dear Sir or Madam:

In accordance with the provisions of the Rules of the Board of Education Cedric Ricks, a student in this school, residing at 12341 South Bishop, age 15, grade 10, has been suspended from school this day for a period of 5 school days. He/she may apply for reinstatement on March 29, 19 90. The cause of suspension is: Gross Insubordination

Cedric refused to do his English assignment despite several promptings from me. At one point he told me, "This is bullshit." I called his mother at work and left a message for her to call me. It was at this time Cedric ripped a page out of his vocabulary book and tossed it to the floor exclaiming, "Damn."
C. Garding - Teacher

You are invited to discuss the matter of this suspension with me at a mutually convenient time.

Sincerely,

Parent Conference on ____________

P. ARVIA Paul Arvia
~~Principal~~ ASSISTANT PRINCIPAL

NOTICE: A parent or guardian has the right to request a review of this suspension. If you desire a review, your written request should be sent to the Superintendent, Community High School, 10701 South Kilpatrick, Oak Lawn, Illinois 60453

Mr. Shederick Ricks
Parent or Guardian

12341 South Bishop
Address

SUSPENSION 3/22, 23, 26, 27, 28

Calumet Park, Illinois 60643
City or Town

White-Parent Blue-Bd. and Supt. Green-Asst. Supt.-Adm. Canary-Principal Pink-Bd. Supt. Personnel Goldenrod-Dean

CHSD 218
COMMUNITY HIGH SCHOOL DISTRICT

# REFERRAL TO ASSISTANT PRINCIPAL

ID# 260654

Student Cedric Ricks Date 4/30 Bldg. Ricks

Have you referred this student before? No ______ Yes ______ Reason ______

*REASON FOR REFERRAL*

Gross Insubordination______ Fighting______ Smoking______ Insubordination, Insolence______

Disrespect___ Cuts___ Class, Hall, Cafeteria Disturbance___ Failure to Report After School___ Tardiness X

*Description of Problem*

2/?, 3/11, 3/21, 4/25

*Action Taken by Teacher before Referral*

Conference with pupil ✓

Phone Call home ______

Letter to Parents ______

Parent conference ______

Referred student to counselor ______

Other ______

Class P.E. Period 1 Teacher Ricks

## ASSISTANT PRINCIPAL'S ACTION

______ 1. Reprimanded

______ 2. Assigned to appropriate punishment

a. Detention 3 days

b. Suspended from class / school for ______ day(s)

c. Other ______

______ 3. Discussed the misbehavior pattern with the parent over the phone

______ 4. Arranged a parental conference

______ 5. Referred to the Supt. for possible expulsion

Comments ______

Assistant Principal's Signature Paul Arn Date 5/1/91

Dear parent:
The behavior described on this sheet interferes with the educational program of your student and of other students in our school. We want your help in our effort to give your son/daughter the best education possible. We are using this method to inform you of this incident. If you have any questions, please feel free to call the students counselor or the assistant principal.

COPIES TO: Assistant Principal (White) Parents (Canary) Guidance (Pink) Teacher (Gold)

000180

Special education evaluation. 1991.02.15 Rcvd from Helen and Shederick Ricks

Last Name First) ... Ethnic Code B *Language ... X Sex M

Address ... Calumet Park, IL 60643

Parents/Guardians Cedric & Helen

Address (if different)

Sponsor of Multidisciplinary Conference 2
☒District ☐Joint Agreement ☐SMA ☐IPP
☒Multidisciplinary Conference Date ... 91
☐Individualized Education Program Date
☐Annual Review Date

I.D. # RIC09087400 District of Residence 218

Birthdate 09 / 08 / 74 (Month Day Year) Phone Area Code (708) 371-7985

Joint Agreement ☐ECHO ☐Eisenhower ☐Southwest ☐SPEED

**EXCEPTIONAL CHARACTERISTICS:**

| | Primary | Secondary |
|---|---|---|
| 1. Trainably Mentally Handicapped | ☐ | ☐ |
| 2. Educably Mentally Handicapped | ☐ | ☐ |
| 3. Physically Handicapped | ☐ | ☐ |
| 4. Learning Disabled | ☐ | ☐ |
| 5. Visually Impaired | ☐ | ☐ |
| 6. Hard of Hearing | ☐ | ☐ |
| 7. Deaf | ☐ | ☐ |
| 8. Deaf/Blind | ☐ | ☐ |
| 9. Speech/Language Impaired | ☐ | ☐ |
| 10. Educationally Handicapped | ☐ | ☐ |
| 11. Behavior/Emotional Disorder | ☒ | ☐ |
| 12. Other Health | ☐ | ☐ |
| 13. Severe/Profound Mentally Handicapped | ☐ | ☐ |
| 14. Developmentally Delayed (Only Students Birth Through 2) | ☐ | ☐ |

**PRIMARY SPECIAL EDUCATION PLACEMENT**

☐New ☐Continuing ☐Change ☐Transfer ☐Discontinued
☐District Prog. ☐Joint Agreement Prog. ☐SMA ☐IPP

*Program Code

School District

Building Code *Funding Source Code

*Least Restrictive Environment Code

Specify:

Program Initiation/Duration Dates From: To:

Projected Annual Review Date

Re-evaluation Due Date

STANDARD EDUCATIONAL PLACEMENT District

School

**PARTICIPANTS**

J. Radtke (2/18/91)

Director/Designee W. Kopec

Principal/Designee [signature]

Parent(s), Guardian(s)

Student

Teacher(s) [signature]

[signature]

Psychologist W. Kopec

Social Worker

Counselor [signature]

Speech/Language Pathologist

Other (Specify Title) [signature] R.N.

Purpose for Staffing Review progress of Cedric in current program

Options Considered And Rejected With Rationale BD program at Rich ... HS considered and rejected due to need for more structured environment and ... behavioral classes.

Recommendations/Reasons For Determination (Complete ISBE 34-57D) Cedric has approximately 8 days of suspension and has had 2 suspensions for ... held recent problems relating to ... authority and ... female student. Staff ... he cannot cope ... with a less restrictive environment. Recommend a more restrictive environment appropriate for students with behavior/emotional disorder. ... will ... appropriate alternative program. Recommend a homebound program pending alternative placement should Cedric commit ... suspendable offense.

| Yes | No | The following were explained: |
|---|---|---|
| | | ☒Multidisciplinary conference ☐Recommended placement ☐Individual education program |
| ✓ | | I/We give consent to implement the conference recommendations including placement.** |
| ✓ | | I/We have received a copy of the multidisciplinary conference report form. |
| DNA | | I/We have received a copy of my child's educational program. |
| ✓ | | Procedural safeguards, including the right to object to placement, were explained and offered in writing. |
| | | A summary of rights, including the right to independent evaluation, is outlined on back of Page 1. |

Mrs. Helen ... Date 2-18-91
Signature, Parent or Guardian

Date
Signature, Parent or Guardian

Walter Kopec Date 2-15-91
Staff Member Preparing Conference Report

Date
Student (e.g. 18 years or older)

See Instructions for Codes.
If initial placement, complete ISBE 34-57E.

Student Cedric Ricks — I.E.P. Case Manager W Kyle — Date — Chronological Age (optional) — Current Grade (optional)

**PRESENT LEVEL OF EDUCATIONAL PERFORMANCE**

| AREA | LEVEL | INSTRUMENT/DATE | ESTIMATE |
|---|---|---|---|
| Math: Computation | 98 | SS 91 WRAT 11/89 | ☐ |
| Reasoning | | | ☐ |
| Reading: Recognition | 12E | SS 07 " " | ☐ |
| Comprehension | 2.6 | Gates 11/89 | ☐ |
| Spelling | | | ☐ |
| Expressive Language | | | ☐ |
| Receptive Language | | | ☐ |
| Speech | | | ☐ |
| Social/Emotional Development | | | ☐ |
| Cognitive Skills | Average | Slosson 11/89 | ☐ |

| AREA | LEVEL | INSTRUMENT/DATE | ESTIMATE |
|---|---|---|---|
| Written Expression | | | ☐ |
| Gross Motor | | | ☐ |
| Fine Motor | | | ☐ |
| Visual Perception | | | ☐ |
| Auditory Perception | | | ☐ |
| Pre/Vocational Skills | | | ☐ |
| Other | | | ☐ |

Date of last vision screening 11/89 ☒ Pass ☐ Not Pass ☐ Corrected

Date of last hearing screening 11/89 ☒ Pass ☐ Not Pass ☐ Aided

Date of last health exam ______

Date of latest/current case study evaluation ______

Next case study reevaluation due: (date) ______

If conference is IEP/Annual Review, note MDC date ______ and proceed to Placement Decision below.

**TO BE COMPLETED FOR CASE STUDY EVALUATION**

Language Pattern, Mode of Communication, Cultural Background: ☐ Date ______

Parent Consultation/Concerns: ☐ Date ______

Child Interview: ☐ Date ______

Social Developmental Study: ☐ Date ______

Adaptive Behavior: ☐ Date ______

Academic History: ☐ Date ______

Learning Environment/Observation: ☐ Date ______

Medical Review: ☐ Date ______

☐ Specialized/Independent Evaluation(s), if any Specify ______ Date ______

**SUMMARY NARRATIVE OPTION**

Any participant disagreeing with these recommendations must sign below and submit a separate minority report indicating which areas of the report they disagree with and the reasons for their disagreement.

Name/Title ______ Name/Title ______

**PLACEMENT DECISION:*** ☐ A. Student is Not Eligible for Special Education Services at this time. RECOMMENDATIONS FOR STANDARD PROGRAM ON Page 1.

☐ B. Student is Eligible for Special Education. Proceed to page 3 and 4.

☒ C. Continue in Special Education. Proceed to page 3 and 4.

*If L.D. Eligibility Decision and/or Separate Facility Placement, complete page 2c.

Special education evaluation. Transfer to Independence HS. 1991.03.12. Rcvd from Helen and Shederick Ricks

COMMUNITY HIGH SCHOOL DISTRICT 218

School Harold L. Richards High School Date 3/20/91

Dear Mrs. Ricks : RE: Cedric Ricks

9-8-74

Date of Birth Date of Referral

In accordance with the multidisciplinary conference that was held on

3/12/91 at H. L. Richards High School,
Date Location

It was determined that your child:

___ does not require a special education program or service.

___ does not require special education services any longer. Services will cease on ________________. If a transition plan is required, please refer to the IEP.

___ requires special education services; which will be implemented as soon as possible but not later than the beginning of the next school semester. Interim services are being proposed as indicated on the IEP.*

___ requires placement in a special education program. This program is ________________.

___ will continue in the current special education placement.

_X_ requires a change of special education program. This change is Independence H.S. program

___ is recommended for secondary graduation and/or has reached the age of 21.

Please refer to your copy of the conference report which contains a) the results of the case study evaluation; b) the reasons for this determination, which includes the options considered and reasons rejected; and c) the evaluation procedures, tests, records or reports used as a basis to make this decision and the IEP, if appropriate, for more details. (Specify name and date of report(s) ________________.)

If you disagree with the determination noted above, you have a right to request a due process hearing. Please review your rights included with this letter. The request for a due process hearing should state the reasons the hearing is being requested and all other pertinent information. The request should be sent to

Dr. J. D. Petersen, 10701 S. Kilpatrick Ave., Oak Lawn. However, prior to
Superintendent's Name/School Address

requesting such a hearing, you are urged to contact Mr. Walter G. Kopec, 499-2550, ext. 618
Name/Phone

to discuss any concerns or questions you may have regarding the above determination.

Sincerely

Walter Kopec
(Name and Position)
School Psychologist

*Copy of notice must be sent to State Superintendent of Education, E-216.

cc: Student's temporary record
Disposition of Placement

ISBE 34-57 D (5/87)

April 12, 1991

1:30

000185

Student Name (Last Name First) RICKS, CEDRIC
*Ethnic Code B *Language Code X Sex M
Address 12341 S. Bishop
Calumet Park, Il 60643
Parents/Guardians Cedric and Helen
Address (if different) same

Sponsor of Multidisciplinary Conference
☐ District ☐ Joint Agreement ☐ SMA ☐ IPP
☒ Multidisciplinary Conference Date 3/12/91
☒ Individualized Education Program Date 3/12/91
☐ Annual Review Date
I.D. # RIC09087400 District of Residence 218
Birthdate 09/08/74 (Month Day Year) Phone Area Code (708 371-7985
Joint Agreement ☐ ECHO ☒ Eisenhower ☐ Southwest ☐ SPEED

**PRIMARY SPECIAL EDUCATION PLACEMENT**
☐ New ☐ Continuing ☐ Change ☐ Transfer ☐ Discontinued
☐ District Prog. ☐ Joint Agreement Prog. ☐ SMA ☐ IPP
*Program Code 7 Independence High School
School Homewood-Flossmoor N District 801
Building Code IL-14-0233-02 Funding Source Code C
*Least Restrictive Environment Code J
Specify: Therapeutic Day School

Program Initiation/Duration Dates From: 4/91 To: 6/91
Projected Annual Review Date Spr 1991
Re-evaluation Due Date
**STANDARD EDUCATIONAL PLACEMENT** District
School

**EXCEPTIONAL CHARACTERISTICS:**

| | Primary | Secondary |
|---|---|---|
| 1. Trainably Mentally Handicapped | ☐ | ☐ |
| 2. Educably Mentally Handicapped | ☐ | ☐ |
| 3. Physically Handicapped | ☐ | ☐ |
| 4. Learning Disabled | ☐ | ☐ |
| 5. Visually Impaired | ☐ | ☐ |
| 6. Hard-of-Hearing | ☐ | ☐ |
| 7. Deaf | ☐ | ☐ |
| 8. Deaf/Blind | ☐ | ☐ |
| 9. Speech/Language Impaired | ☐ | ☐ |
| 10. Educationally Handicapped | ☐ | ☐ |
| 11. Behavior/Emotional Disorder | ☒ | ☐ |
| 12. Other Health | ☐ | ☐ |
| 13. Severe/Profound Mentally Handicapped | ☐ | ☐ |
| 14. Developmentally Delayed (Only Students Birth Through 2) | ☐ | ☐ |

**PARTICIPANTS**

Director/Designee W. Kopen
Principal/Designee
Parent(s), Guardian(s) Invited but did not attend
Student
Teacher(s)

Psychologist Walter Kopen
Social Worker Robert B. Riddle
Counselor
Speech/Language Pathologist
Other (Specify Title)

Purpose for Staffing To determine educational placement for remainder of 90-91 School year

Options Considered And Rejected With Rationale A district or Coop based program does not appear to meet Cedric's psycho-educational needs at this time.

Recommendations/Reasons For Determination (Complete ISBE 34-57D) 1. District and IHS staff believe Cedric to be in need of and appropriate for placement at SMA-IHS.
2. By Phone Mrs. Ricks expressed her desire to not support the above recommendation at this time.

| Yes | No |
|---|---|
| | |
| | |
| | |
| | |
| | |

The following were explained:
☐ Multidisciplinary conference ☐ Recommended placement ☐ Individual education program
I/We give consent to implement the conference recommendations including placement.**
I/We have received a copy of the multidisciplinary conference report form.
I/We have received a copy of my child's educational program.
Procedural safeguards, including the right to object to placement, were explained and offered in writing.
A summary of rights, including the right to independent evaluation, is outlined on back of Page 1.

Signature, Parent or Guardian Date
Signature, Parent or Guardian Date

Robert T B Riddle Date 3/12/91
Staff Member Responsible for Conference Report

Student (e.g. 18 years or older) Date

000186

Student Cedric Ricks I.E.P. Case Manager Dave Wilson Date 3/12/91

Student I.D.# ______ Current Chronological Age (optional) ______ Current Grade (optional) ______

PRESENT LEVEL OF EDUCATIONAL PERFORMANCE

| AREA | LEVEL | INSTRUMENT/DATE | ESTIMATE |
|---|---|---|---|
| Math: Computation | 9B | WRAT 11/89 | ☐ |
| Reasoning | | | ☐ |
| Reading: Recognition | 12 E | | ☐ |
| Comprehension | 7.6 | GATES | ☐ |
| Spelling | | | ☐ |
| Expressive Language | | | ☐ |
| Receptive Language | | | ☐ |
| Speech | | | ☐ |

| AREA | LEVEL | INSTRUMENT/DATE | ESTIMATE |
|---|---|---|---|
| Written Expression | | | ☐ |
| Gross Motor | | | ☐ |
| Fine Motor | | | ☐ |
| Visual Perception | | | ☐ |
| Auditory Perception | | | ☐ |
| Pre/Vocational Skills | | | ☐ |
| Other | | | ☐ |
| | | | ☐ |

Social/Emotional Development ______ ☐

Cognitive Skills Average Slosson 11/89 ☐

Date of last vision screening ______ ☐ Pass ☐ Not Pass ☐ Corrected

Date of last hearing screening ______ ☐ Pass ☐ Not Pass ☐ Aided

Date of last health exam ______

Date of latest/current case study evaluation ______

Next case study reevaluation due: (date) ______

If conference is IEP/Annual Review, note MDC date ______ and proceed to Placement Decision below.

TO BE COMPLETED FOR CASE STUDY EVALUATION

Language Pattern, Mode of Communication, Cultural Background: ☐ Date ______

Parent Consultation/Concerns: ☐ Date ______

Child Interview: ☐ Date ______

Social Developmental Study: ☐ Date ______

Adaptive Behavior: ☐ Date ______

Academic History: ☐ Date ______

Learning Environment/Observation: ☐ Date ______

Medical Review: ☐ Date ______

☐ Specialized/Independent Evaluation(s), if any Specify ______ Date ______

SUMMARY NARRATIVE OPTION

Any participant disagreeing with these recommendations must sign below and submit a separate minority report indicating which areas of the report they disagree with and the reasons for their disagreement.

Name/Title ______ Name/Title ______

PLACEMENT DECISION:*

☐ A. Student is Not Eligible for Special Education Services at this time. RECOMMENDATIONS FOR STANDARD PROGRAM ON Page 1.

☐ B. Student is Eligible for Special Education. Proceed to page 3 and 4.

☒ C. Continue in Special Education. Proceed to page 3 and 4.

000187

Name Cedric Ricks Conference Date 3/12/91

I.D. # ______

ADDITIONAL CONSIDERATIONS — for completion at Multidisciplinary Conference

A. LEARNING DISABILITIES

☐ When determining eligibility for special education check this box if the student is suspected of having a Learning Disability and complete the following items (1-5) in addition to other required Case Study Evaluation Components.

1. Relevant Behavior Noted During Observation ______

2. Relationship of Behavior to Academic Functioning ______

3. Educationally Relevant Medical Findings ______

4. Discrepancy Between Achievement and Ability ______

5. Effects of Environmental, Cultural or Economic Disadvantage ______

CHECK APPROPRIATE BOX

☐ Eligible for L.D. services ☐ Not eligible for L.D. services

Return to Page 1 and state the basis for this determination under "Recommendations/Reasons for Determination".

B. SEPARATE FACILITY

☒ Check this box if recommended placement is in a separate public or private facility and complete the following items (1-3):

1. Describe the nature and severity of the student's handicap which preclude placement in a regular education school building

Chronic and severe (3) emotional disturbance.

2. Describe the specific supplementary aids and services, if any, considered for use in the regular classroom

District based school social work and psychological support services.

3. Explain why the student cannot be educated in the regular classroom with supplementary aids and services

The level and frequency of support services provided by district based programming is not sufficient to meet the student's psycho-educational needs.

000188

Student Cedric Kidd Date of conf. 3/12/91

Student I.D. # I.E.P. Case Manager Dana Wilson

## PROGRAM/RELATED SERVICES

| Type | Assessment: Date Completed | Consult. | | Direct Service | Projected Date of Initiation | # Proj. Min. Per Week | # Proj. Wks. Per Year |
|---|---|---|---|---|---|---|---|
| Adaptive Physical Education | | ☐ | A | ☒ | | 250 | 36 |
| Aide — Class | | ☐ | B | ☐ | | | |
| Aide — Individual Student | | ☐ | C | ☐ | | | |
| Audiologist | | ☐ | E | ☐ | | | |
| Braillist/Reader | | ☐ | F | ☐ | | | |
| Counselor | | ☐ | G | ☐ | | | |
| Driver Education (Adapted) | | ☐ | I | ☐ | | | |
| Interpreter | | ☐ | J | ☐ | | | |
| Media Services | | ☐ | K | ☐ | | | |
| Occupational Therapist | | ☐ | M | ☐ | | | |
| Orientation/Mobility | | ☐ | O | ☐ | | | |
| Behavior Disorder/Resource | | ☐ | P | ☐ | | | |
| Educably Mentally Hdcp./Resource | | ☐ | P | ☐ | | | |
| Educational Hdcp./Resource | | ☐ | P | ☐ | | | |
| Hearing Itinerant | | ☐ | P | ☐ | | | |
| Learning Dis./Resource | | ☐ | P | ☐ | | | |
| Medical (Specify) | | ☐ | P | ☐ | | | |
| Psychologist | | ☒ | R | ☐ | | 5 | |
| Physical Therapist | | ☐ | S | ☐ | | | |
| Psychiatric Services | | ☐ | T | ☐ | | | |
| School Health Services/Nurse | | ☐ | V | ☐ | | | |
| Speech/Language Pathologist | | ☐ | W | ☐ | | | |
| Social Worker | | ☐ | X | ☒ | | 50 | |
| Vocational Coordinator | | ☐ | Z | ☐ | | | |
| Vision Itinerant | | ☐ | P | ☐ | | | |
| Vocational/Rehab. | | ☐ | 2 | ☐ | | | |
| Transitional Services | | ☒ | 3 | ☐ | | 5 | |
| Other (Specify) | | ☐ | P | ☐ | | | |
| Transportation ☐ Walk ☐ Parent ☐ Regular district vehicle ☒ Special vehicle | | | Y | ☒ | | daily round trip | |

Vehicle Adaptation (Sepcify)

## PARTICIPATION IN STANDARD EDUCATION PROGRAM

Full Time, In Standard Education Program, Except Support Services ☐

Participation in Standard Education Program Not Appropriate At This Time ☐

| Subject | Grade Level | Projected Date of Initiation | Projected Duration |
|---|---|---|---|
| Standard P.E. | | | |
| Art | | | |
| Music | | | |
| Reading | | | |
| Math | | | |
| Spelling | | | |
| Other Language Arts | | | |
| Social Studies | | | |
| Science | | | |
| Other (Specify) | | | |

000189

**I.E.P. INSTRUCTIONAL OBJECTIVES** — DISTRICT 989 — Page 4A

Page ____ of ____

Student Cedric Ricks

I.D.# ____ District # 218

I.E.P. Case Manager Dean Wilson

Annual Goal To increase the students' level of social-emotional functioning.

School Year 90-91 Date 3/12/91

Evaluation Period: From ____ To ____

I.E.P. Implementer ____

Title ____

| DATE | SHORT TERM OBJECTIVES | INSTRUCTIONAL METHODS & MATERIALS | CRITERION REQUIRED FOR MASTERY | EVALUATION METHOD (Specify Test/Procedure) | EVALUATION SCHEDULE | NOT EXISTING | EMERGING (SPECIFY CRITERION REACHED) | MASTERED (SPECIFY DATE) |
|---|---|---|---|---|---|---|---|---|
| | The student will increase age-appropriate affective behaviors. | Psychotherapy in individual and/or group sessions. | 80% of I.D.'ed Symptoms scored mild or "E" | Clinical staff developed Diagnostic Supplement Section I | Semester | | | |
| | The student will increase age-appropriate inter-personal behaviors. | " | " | " Sect. III | " | | | |
| | The student will increase adaptive behavior and age-appropriate role performance. | " | " | " Sect. IV | " | | | |

000190

I.E.P. INSTRUCTIONAL OBJECTIVES

DISTRICT 989

Page ______ of ______

Student Cedric Ricks

I.D.# ______ District # 228

I.E.P. Case Manager Dave Wilson

Annual Goal: To improve life management skills

School Year 90-91 Date 3/12/91

Evaluation Period: From ______ To ______

I.E.P. Implementer ______

Title ______

| DATE | SHORT TERM OBJECTIVES | INSTRUCTIONAL METHODS & MATERIALS | CRITERION REQUIRED FOR MASTERY | EVALUATION METHOD (Specify Test/Procedure) | EVALUATION SCHEDULE | NOT EXISTING | EMERGING (SPECIFY CRITERION REACHED) | MASTERED (SPECIFY DATE) |
|---|---|---|---|---|---|---|---|---|
| | The student will participate in the development of a classroom community. | Teacher made materials & student handbook | 80% | Teacher made tests<br>Class discussion<br>Teacher obs. | Semester | | | |
| | The student will demonstrate skills in problem solving. | I.D.E.A.L. method | 80% | " | Semester | | | |
| | The student will increase interpersonal communication skills | Teacher made materials & film strips. | 80% | " | Semester | | | |
| | The student will understand roles & responsibilities of family & social relationships | " | 80% | " | Semester | | | |
| | The student will understand independent living skills | " | 80% | " | Semester | | | |

000191

Special education evaluation. 1991.04.12. Rcvd from Helen and Shederick Ricks

Student Name (Last Name First) RICKS, CEDRIC

*Ethnic Code B *Language X Sex M

Address 12341 S. Bishop
Calumet Park, IL 60643

Parents/Guardians Cedric & Helen

Address (if different)

Sponsor of Multidisciplinary Conference
☐District ☐Joint Agreement ☐SMA ☐IPP

☒Multidisciplinary Conference Date 4-12-91

☐Individualized Education Program Date

☐Annual Review Date

I.D. # RIC09087400 District of Residence 218

Birthdate 09 / 08 / 74 (Month Day Year) Phone Area Code (708) 371-27985

Joint Agreement ☐ECHO ☒Eisenhower ☐Southwest ☐SPEED

**PRIMARY SPECIAL EDUCATION PLACEMENT**

☐New ☐Continuing ☒Change ☐Transfer ☐Discontinued

☒District Prog. ☐Joint Agreement Prog. ☐SMA ☐IPP

*Program Code 7 BD instructional program

School RC District 218

Building Code IL 14218003 *Funding Source Code 1

*Least Restrictive Environment Code 6

Specify: BD: Eng Core, Math, History, Science

Program Initiation/Duration Dates From: 4/91 To: 6/91

Projected Annual Review Date Spr 1991

Re-evaluation Due Date 1992

STANDARD EDUCATIONAL PLACEMENT District P.A.

School DNA

**EXCEPTIONAL CHARACTERISTICS:**

| | Primary | Secondary |
|---|---|---|
| 1. Trainably Mentally Handicapped | ☐ | ☐ |
| 2. Educably Mentally Handicapped | ☐ | ☐ |
| 3. Physically Handicapped | ☐ | ☐ |
| 4. Learning Disabled | ☐ | ☐ |
| 5. Visually Impaired | ☐ | ☐ |
| 6. Hard-of-Hearing | ☐ | ☐ |
| 7. Deaf | ☐ | ☐ |
| 8. Deaf/Blind | ☐ | ☐ |
| 9. Speech/Language Impaired | ☐ | ☐ |
| 10. Educationally Handicapped | ☐ | ☐ |
| 11. Behavior/Emotional Disorder | ☒ | ☐ |
| 12. Other Health | ☐ | ☐ |
| 13. Severe/Profound Mentally Handicapped | ☐ | ☐ |
| 14. Developmentally Delayed (Only Students Birth Through 2) | ☐ | ☐ |

**PARTICIPANTS**

Director/Designee W. Kopec

Principal/Designee Mr. Arnold Ricks

Parent(s), Guardian(s) Mr. & Mrs. Cedric Ricks

Student

Teacher(s) Carl Sandberg, Bill Parker

Psychologist Walter Kopec

Social Worker [illegible]

Counselor [illegible]

Speech/Language Pathologist

Other (Specify Title)

Purpose for Staffing Review educational needs & disciplinary concerns; review previous recommendations.

Options Considered And Rejected With Rationale Alternative placement at Independence rejected as per the wishes of Mr. & Mrs. Ricks.

Recommendations/Reasons For Determination (Complete ISBE 34-57D) Discussed staff recommendation for alternative programming and concerns with escalating of behaviors. He is very [illegible] to staff and failing [illegible] classes. Discussed options of BD instructional program at [illegible]. Dist 218 is willing to place Cedric at Independence H.S. Parents not [illegible] of referral & placement. For the remainder of the year, Cedric will be placed in the BD instructional program; attempt to schedule on a condensed day period 1 thru 5 if possible. Parents understand Cedric will be liable for natural consequences of his behavior.

| Yes | No | The following were explained: |
|---|---|---|
| ✓ | | ☒Multidisciplinary conference ☒Recommended placement ☐Individual education program |
| ✓ | | I/We give consent to implement the conference recommendations including placement.** |
| ✓ | | I/We have received a copy of the multidisciplinary conference report form. |
| ✓ | | I/We have received a copy of my child's educational program. |
| ✓ | | Procedural safeguards, including the right to object to placement, were explained and offered in writing. |

A summary of rights, including the right to independent evaluation, is outlined on back of Page 1.

Mr. & Mrs. Shedrick Ricks Date 4-12-91
Signature, Parent or Guardian

Signature, Parent or Guardian Date

Walter Kopec Date 4-12-91
Staff Member Preparing Conference Report

Student (e.g. 18 years or older) Date

* See Instructions for Codes.
** If initial placement, complete ISBE 34-57E.

000193

Student ________ I.E.P. Case Manager ________ Date ________

Student I.D.# ________ Current Chronological Age (optional) ________ Current Grade (optional) ________

PRESENT LEVEL OF EDUCATIONAL PERFORMANCE

| AREA | LEVEL | INSTRUMENT/DATE | ESTIMATE |
|---|---|---|---|
| Math: Computation | 9th | WRAT 11/89 | ☐ |
| Reasoning | | | ☐ |
| Reading: Recognition | 12 E | WRAT 11/89 | ☐ |
| Comprehension | 7.6 | GATES | ☐ |
| Spelling | | | ☐ |
| Expressive Language | | | ☐ |
| Receptive Language | | | ☐ |
| Speech | | | ☐ |

| AREA | LEVEL | INSTRUMENT/DATE | ESTIMATE |
|---|---|---|---|
| Written Expression | | | ☐ |
| Gross Motor | | | ☐ |
| Fine Motor | | | ☐ |
| Visual Perception | | | ☐ |
| Auditory Perception | | | ☐ |
| Pre/Vocational Skills | | | ☐ |
| Other | | | ☐ |
| | | | ☐ |

Social/Emotional Development ________ ☐

Cognitive Skills Average ☐

Date of last vision screening 11/89 ☒ Pass ☐ Not Pass ☐ Corrected

Date of last hearing screening 11/89 ☒ Pass ☐ Not Pass ☐ Aided

Date of last health exam ________

Date of latest/current case study evaluation ________

Next case study reevaluation due: (date) ________

If conference is IEP/Annual Review, note MDC date ________ and proceed to Placement Decision below.

TO BE COMPLETED FOR CASE STUDY EVALUATION

Language Pattern, Mode of Communication, Cultural Background: ☐ Date ________

Parent Consultation/Concerns: ☐ Date ________

Child Interview: ☐ Date ________

Social Developmental Study: ☐ Date ________

Adaptive Behavior: ☐ Date ________

Academic History: ☐ Date ________

Learning Environment/Observation: ☐ Date ________

Medical Review: ☐ Date ________

☐ Specialized/Independent Evaluation(s), if any Specify ________ Date ________

SUMMARY NARRATIVE OPTION

Any participant disagreeing with these recommendations must sign below and submit a separate minority report indicating which areas of the report they disagree with and the reasons for their disagreement.

Name/Title ________ Name/Title ________

PLACEMENT DECISION:* ☐ A. Student is Not Eligible for Special Education Services at this time. RECOMMENDATIONS FOR STANDARD PROGRAM ON Page 1.

☐ B. Student is Eligible for Special Education. Proceed to page 3 and 4.

☒ C. Continue in Special Education. Proceed to page 3 and 4.

*If L.D. Eligibility Decision and/or Separate Facility Placement, complete page 2c.

000194

Student Cedric Ricks [handwritten] Date of conference 4-12-91

Student I.D. # _______ I.E.P. Case Manager _______

| PROGRAM/RELATED SERVICES Type | Assessment: Date Completed | SERVICES Consult. | | SERVICES Direct Service | Projected Date of Initiation | # Proj. Min. Per Week | # Proj. Wks. Per Year |
|---|---|---|---|---|---|---|---|
| Adaptive Physical Education | | ☐ | A | ☐ | | | |
| Aide — Class | | ☐ | B | ☐ | | | |
| Aide — Individual Student | | ☐ | C | ☐ | | | |
| Audiologist | | ☐ | E | ☐ | | | |
| Braillist/Reader | | ☐ | F | ☐ | | | |
| Counselor | | ☐ | G | ☐ | | | |
| Driver Education (Adapted) | | ☐ | I | ☐ | | | |
| Interpreter | | ☐ | J | ☐ | | | |
| Media Services | | ☐ | K | ☐ | | | |
| Occupational Therapist | | ☐ | M | ☐ | | | |
| Orientation/Mobility | | ☐ | O | ☐ | | | |
| Behavior Disorder/Resource | | ☐ | P | ☐ | | | |
| Educably Mentally Hdcp./Resource | | ☐ | P | ☐ | | | |
| Educational Hdcp./Resource | | ☐ | P | ☐ | | | |
| Hearing Itinerant | | ☐ | P | ☐ | | | |
| Learning Dis./Resource | | ☐ | P | ☐ | | | |
| Medical (Specify) | | ☐ | P | ☐ | | | |
| Psychologist | | ☐ | R | ☐ | | | |
| Physical Therapist | | ☐ | S | ☐ | | | |
| Psychiatric Services | | ☐ | T | ☐ | | | |
| School Health Services/Nurse | | ☐ | V | ☐ | | | |
| Speech/Language Pathologist | | ☐ | W | ☐ | | | |
| Social Worker | | ☐ | X | ☐ | | | |
| Vocational Coordinator | | ☐ | Z | ☐ | | | |
| Vision Itinerant | | ☐ | P | ☐ | | | |
| Vocational/Rehab. | | ☐ | 2 | ☐ | | | |
| Transitional Services | | ☐ | 3 | ☐ | | | |
| Other (Specify) | | ☐ | P | ☐ | | | |
| Transportation ☐ Walk ☐ Parent ☒ Regular district vehicle to school ☒ Special vehicle | | | Y | ☐ | | | |

Vehicle Adaptation (Sepcify) as necessary for early release.

## PARTICIPATION IN STANDARD EDUCATION PROGRAM

Full Time, In Standard Education Program, Except Support Services ☐

Participation in Standard Education Program Not Appropriate At This Time ☐

| Subject | Grade Level | Projected Date of Initiation | Projected Duration |
|---|---|---|---|
| Standard P.E. ✓ | | | |
| Art | | | |
| Music | | | |
| Reading | | | |
| Math | | | |
| Spelling | | | |
| Other Language Arts | | | |
| Social Studies | | | |
| Science | | | |
| Other (Specify) | | | |

000195

**Special education evaluation. 1991.08.28. Rcvd from Helen and Shederick Ricks, including 1991.08.28 EIP addendum from W Kopec. Revd from Helen and Shederick Ricks**

Last Name First: RICKS CEDRIC
*Ethnic Code B *Language Code X Sex M
Address 12341 S Bishop
Calumet Pk Il 60643
Parents/Guardians Cedric/Helen
Address (if different)

Sponsor of Multidisciplinary Conference
☒District ☐Joint Agreement ☐SMA ☐IP
☒Multidisciplinary Conference Date 8/23/91
☒Individualized Education Program Date 8/28/91
☐Annual Review Date
I.D. # RIC09087400 District of Residence 218
Birthdate 9/8/74 (Month Day Year) Phone Area Code (708) 3717985

EXCEPTIONAL CHARACTERISTICS:

| | Primary | Secondary |
|---|---|---|
| 1. Trainably Mentally Handicapped | ☐ | ☐ |
| 2. Educably Mentally Handicapped | ☐ | ☐ |
| 3. Physically Handicapped | ☐ | ☐ |
| 4. Learning Disabled | ☐ | ☐ |
| 5. Visually Impaired | ☐ | ☐ |
| 6. Hard-of-Hearing | ☐ | ☐ |
| 7. Deaf | ☐ | ☐ |
| 8. Deaf/Blind | ☐ | ☐ |
| 9. Speech/Language Impaired | ☐ | ☐ |
| 10. Educationally Handicapped | ☐ | ☐ |
| 11. Behavior/Emotional Disorder | ☒ | ☐ |
| 12. Other Health | ☐ | ☐ |
| 13. Severe/Profound Mentally Handicapped | ☐ | ☐ |
| 14. Developmentally Delayed (Only Students Birth Through 2) | | |

Joint Agreement ☐ECHO ☒Eisenhower ☐Southwest ☐SPEED

PRIMARY SPECIAL EDUCATION PLACEMENT
☐New ☐Continuing ☒Change ☐Transfer ☐Discontinue
☒District Prog. ☐Joint Agreement Prog. ☐SMA ☐IPP
*Program Code E BD monitor
School RC District 218
Building Code L1420003 *Funding Source Code A
*Least Restrictive Environment Code
Specify: All regular classes with BD monitor services.
Program Initiation/Duration Dates From: 8/91 To: 6/92
Projected Annual Review Date Spr 1992
Re-evaluation Due Date 1992
STANDARD EDUCATIONAL PLACEMENT District 218
School RC

## PARTICIPANTS

Director/Designee [signature]
Principal/Designee [signature]
Parent(s), Guardian(s) [signature]
Student [signature]
Teacher(s) [signature], [illegible]
Psychologist W. Koper
Social Worker [signature]
Counselor [signature]
Speech/Language Pathologist
Other (Specify Title) [illegible] Dir. Std. Svc.
[illegible], Asst. Principal

Purpose for Staffing Review special education recommendations

Options Considered And Rejected With Rationale BD program at Richards HS rejected. BD [illegible] program does not meet the kind of behavioral needs evidenced. A change in total school environment best meets his needs.

Recommendations/Reasons For Determination Staff discussed concern for Cedric's history of disruptive behavior. Also concerned for this aggressive behavior. An alternative placement is being [illegible] to meet his behavioral needs. Staff consensus in continued placement at R.C. on schedule with the contingency for an immediate alternative placement following any instance of aggressive behavior or insubordination toward staff. We will plan on a monthly meeting to discuss progress. Counseling services will be made available in school. Cedric has an understanding of the natural consequences of his acts or [illegible] violate or [illegible] to school rules. SEE ADDENDUM

Yes No The following were explained:
☐Multidisciplinary conference ☐Recommended placement ☐Individual education program
I/We give consent to implement the conference recommendations including placement.
I/We have received a copy of the multidisciplinary conference report form.
I/We have received a copy of my child's educational program.
Procedural safeguards, including the right to object to placement, were explained and offered in writing.
A summary of rights, including the right to independent evaluation, is outlined on back of Page 1.
I/We agree to waive the ten (10) calendar day preplacement period.

[signature] Date 8/28/91
Signature, Parent or Guardian

Date
Signature, Parent or Guardian

[signature] Date 8/23/91
Staff Member Preparing Conference Report

Date
Student (e.g. 18 years or older)

*See Instructions for Codes.

DISTRICT SMA 986

000197

Student [handwritten name] Date of conference 8/23/91

Student I.D. # ______ I.E.P. Case Manager ______

PROGRAM/RELATED SERVICES

| Type | Assessment: Date Completed | SERVICES Consult. | | Direct Service | Projected Date of Initiation | # Proj. Min. Per Week | # Proj. Wks. Per Year |
|---|---|---|---|---|---|---|---|
| Adaptive Physical Education | | ☐ | A | ☐ | | | |
| Aide – Class | | ☐ | B | ☐ | | | |
| Aide – Individual Student | | ☐ | C | ☐ | | | |
| Audiologist | | ☐ | E | ☐ | | | |
| Braillist/Reader | | ☐ | F | ☐ | | | |
| Counselor | | ☐ | G | ☐ | | | |
| Driver Education (Adapted) | | ☐ | I | ☐ | | | |
| Interpreter | | ☐ | J | ☐ | | | |
| Media Services | | ☐ | K | ☐ | | | |
| Occupational Therapist | | ☐ | M | ☐ | | | |
| Orientation/Mobility | | ☐ | O | ☐ | | | |
| Behavior Disorder/Resource | | ☐ | P | ☐ | | | |
| Educably Mentally Hdcp./Resource | | ☐ | P | ☐ | | | |
| Educational Hdcp./Resource | | ☐ | P | ☐ | | | |
| Hearing Itinerant | | ☐ | P | ☐ | | | |
| Learning Dis./Resource | | ☐ | P | ☐ | | | |
| Medical (Specify) | | ☐ | P | ☐ | | | |
| Psychologist | | ☒ | R | ☐ | As necessary | | |
| Physical Therapist | | ☐ | S | ☐ | | | |
| Psychiatric Services | | ☐ | T | ☐ | | | |
| School Health Services/Nurse | | ☐ | V | ☐ | | | |
| Speech/Language Pathologist | | ☐ | W | ☐ | | | |
| Social Worker | | ☐ | X | ☐ | | | |
| Vocational Coordinator | | ☐ | Z | ☐ | | | |
| Vision Itinerant | | ☐ | P | ☐ | | | |
| Vocational/Rehab. | | ☐ | 2 | ☐ | | | |
| Transitional Services | | ☐ | 3 | ☐ | | | |
| Other (Specify) | | ☐ | P | ☐ | | | |
| Transportation ☐ Walk ☒ Regular district vehicle ☐ Parent ☐ Special vehicle | | | Y | ☐ | | | |

Vehicle Adaptation (Sepcify) ______

PARTICIPATION IN STANDARD EDUCATION PROGRAM

Full Time, In Standard Education Program, Except Support Services ☒

Participation in Standard Education Program Not Appropriate At This Time ☐

| Subject | Grade Level | Projected Date of Initiation | Projected Duration |
|---|---|---|---|
| Standard P.E. ✓ | | | |
| Art | | | |
| Music | | | |
| Reading | | | |
| Math | | | |
| Spelling | | | |
| Other Language Arts | | | |
| Social Studies | | | |
| Science | | | |
| Other (Specify) | | | |
| Book keeping | | | |
| Chemistry | | | |
| Eng. | | | |
| Govt – Econ | | | |
| Elective | | | |

8/28/91 MDC ADDENDUM

Recommendations

The school district is requesting parental involvement in monthly meetings held with Cedric. The school district will also be available to consult with the family's private therapist on Cedric's behalf.

W. Kopec

Oak Lawn Police Department

CAUSE NO. 1325203

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 371ST |
| VS. | § | DISTRICT COURT |
| Cedric Allen Ricks | | TARRANT COUNTY, TEXAS |

AFFIDAVIT

Before me, the undersigned authority, personally appeared Nancy Born who, being by me duly sworn, deposed as follows:

My name is Nancy Born I am of sound mind, capable of making this affidavit, ~~and~~ personally acquainted with the facts herein stated:

I am the custodian of the records of Oak Lawn P.D. Attached hereto are 4 pages/discs of records from Oaklawn Police Dept. These said 4 pages/discs of records are kept by Oaklawn P.D., in the regular course of business and it was the regular course of business of Oak Lawn P.D., for an employee or representative Oak Lawn P.D., with knowledge of the act, event, condition, opinion or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original.

Nancy Born
AFFIANT

SWORN TO AND SUBSCRIBED before me on the 4th day of December, 2013.

OFFICIAL SEAL
CARMIE A. O'LEARY
Notary Public - State of Illinois
My Commission Expires Feb 10, 2015

Carmie A. O'Leary
Notary Public,
State of Illinois

My commission expires Feb. 10, 2015

NOV 2 7 2013
OAKLAWN POLICE DEPARTMENT

# TARRANT COUNTY

OFFICE OF THE
CRIMINAL DISTRICT ATTORNEY
www.tarrantda.com

Joe Shannon
CRIMINAL DISTRICT ATTORNEY
817/884-1400

JUSTICE CENTER
401 W. BELKNAP
FORT WORTH, TX 76196-0201

Date: November 26, 2013

Attn: Oak Lawn Police Department – Records Division
ATTN: Nancy
Office 708-499-7805
FAX: 708-422-4225

## DOCUMENTS REQUEST

We are investigation a Capital Murder involving Cedric Allen Ricks 9/8/74 SSN 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. Please forward a copy of the following items if they are still available.

Oak Lawn Police report and a copy of the original case file to include but not limited any and all photos, statements, evidence lists on an arrest date of 09/13/1991 for the following offenses;

Criminal Trespass
Reckless Conduct
Disorderly Conduct

Please forward these records to the attention of INVESTIGATOR MARIA HINOJOSA. You can reach me at 817-884-1646 if you have any questions. My e-mail address is **mehinojosa@tarrantcounty.com** and fax number is 817-884-1803.

Sincerely,

Scanned/Email
Mug & Rpt.
C557746
#628-91

Maria Hinojosa
Criminal Investigator
Cell 469-877-3411



BEST RPAM
10601 South Central AVE
13 Sept 91
H.L. Richards high School south parking lot
402

VICTIM: BROWN TINA Q — F B 4-12-75 H.S. student 708 499-2550 9am 3:30pm
12345 So. Honore, Calumet Park Ill 60643 708 385-1458 4pm
BROWN Kodia (mother) F B 12345 So. Honore Cal PK. 708 385-1458 874-5515

WITNESS: Davis Ponchinetta F B 12514 So Throop Cal PK 708 597-2558 424-2000
COOPER JAMES M B 10601 So Central AVE. 708 424-2000 163
Boston LEONARD M B 10601 So. CENTRAL AVE. 708 424-2000 163

OFFENDER: Ricks Cedric A M B 17 5'06 130 BRO BLK MED
12341 So. Bishop Cal. PK. NONE. D/L R-200-1017-4256 708 371-7985 75113
1989 Lincoln 4dR Blue IRH7990 Ill. 8-92 ILNBM93E6K16734 628-91

School hallway

On Sept. 13 1991 At 1151 hours I officer Twomey was dispatched to 10601 So. Central AVE H.L. Richards high school to meet officer D. Doyle unit #619 in the south parking lot

Officer Doyle and James Cooper security At H.L Richards high school along with Leonard Boston also security at the school

Said:

1155

D. Twomey 177 D. Twomey

13 Sept 91 1155

13 Sept 91 1645

REFER TO INCIDENT REPORTING GUIDE FOR PROPER CLASSIFICATION

that at 1030 hours this morning, Cedric A Ricks, a student at H.L Richards high school, was told by Carol Theodore, assistant principal of the school, he Cedric A. Ricks, was not to come back to school with out his parents due to a discipline problem. Cedric A. Ricks was then taken home by James Cooper and was told to stay away from the school.

that at approx 11:30 hours Cedric Ricks returned to the school building, entered the hallway and approached his girlfriend, Tina Brown, and asked her to come with him. She refused, Cedric Ricks then picked her up and removed her from the building and took her to the parking lot and his vehicle.

that James Cooper attempted to stop Cedric Ricks who refused and was driving W/B in lot. Cooper had to jump on the hood of the car and went in the sun roof to grab the ignition keys to stop the vehicle. Cedric Ricks was detained by Officer D Doyle and Cooper and Boston and he was transported O.L P.D Station.

that Officer D. Doyle notified Tina Brown's mother Radia Brown on the above incident and she is willing to sign a complaint.

Cedric Ricks was transported to O.L.P.D Station by unit 402 and complaints signed by James Cooper for the following.

Criminal Trespass to State land Ch. 38-21-5
Reckless Conduct Ch 38 12-5
Disorderly Conduct Ch 38 26-1A-1

Court date is Oct 28 1991 At 2:30PM RM 105 10220 So. 76th Ave

I called the felony review State's Attorney's office to [illegible] the offense of unlawful restraint Ch [illegible] Sec 10-3A [illegible] Ed Barrett Asst. State's Attorney did an interview with [illegible] Brown and Cedric Ricks at the O.L.P.D. station on Sept. 14 1991. After the interview Mr. Barrett would not approve the charge of unlawful restraint, due to the victim would not cooperate as to the State's prosecution of the case.

[illegible]ness #4. [illegible] FIB 1253 [illegible]

C-55774

000208

**THE FACTS FOR PROBABLE CAUSE TO ARREST INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING:**

That on Sept. 13 1991 at 1130 hours. Cedric Ricks entered H.L Richards high school after being told by James Cooper security at 1030 hour 9-13-91 he was not allowed to, then Cedric Ricks physically picked up Tina Brown and removed her from the school to the parking lot. James Cooper attempted to stop Cedric Ricks who was in his vehicle, Mr Cooper had to jump onto the vehicle and he went thru the sunroof to grab the ignition keys to stop the vehicle.

I do solemnly, sincerely, and truly declare and affirm that the facts stated herein are accurate to the best of my knowledge.

First Arresting/Appearing Officer's Signature

D. Twomey #177

Deputy Clerk

Aurelia Plucinski 9-13-91 [signature]

72
70
68
66
64
62
72
70
68
66
64
62
60
58
OAK LAWN POLICE DEPT.
OAK LAWN, IL

Imaging Request

Cause # ☒ 132-55203

Incident # ☐

(Insert Cause or Incident # Above)

Defendant

Work Product: ☐ Yes ☒ No RUSH ☐ Yes ☒ No

Return to ☐ Case File or ☒ Specific Individual (Listed Below)

Person Req.:

Tel. Ext.:

☐ Shred

ICE DEPT.
VISION
ND AVE.
. 60453

Tarrant County
Justice Center
401 W. Belknap
Fort Worth, TX 76196-0201

Attn: M. Hinojosa

Special education evaluation.1991.09.20. Rcvd from Helen and Shedercik Ricks

Student Name (Last Name, First) Bickes, Cedric

*Ethnic Code B *Language Code Sex M

Address 1201 Bishop

Calumet Park, IL 60643

Parents/Guardians Cedric/Helen

Address (If different)

Sponsor of Multidisciplinary Conference

☒District ☐Joint Agreement ☐SMA ☐IPP

☐Multidisciplinary Date 9/20/91

☐Individualized Education Program Date

☐Annual Review Date

I.D. # RIC09087400 District of Residence 218

Birthdate 9 / 8 / 74 (Month Day Year) Phone (Area Code) (708) 3717985

EXCEPTIONAL CHARACTERISTICS: Primary Secondary

| | Primary | Secondary |
|---|---|---|
| 1. Trainably Mentally Handicapped | ☐ | ☐ |
| 2. Educably Mentally Handicapped | ☐ | ☐ |
| 3. Physically Handicapped | ☐ | ☐ |
| 4. Learning Disabled | ☐ | ☐ |
| 5. Visually Impaired | ☐ | ☐ |
| 6. Hard-of-Hearing | ☐ | ☐ |
| 7. Deaf | ☐ | ☐ |
| 8. Deaf/Blind | ☐ | ☐ |
| 9. Speech/Language Impaired | ☐ | ☐ |
| 10. Educationally Handicapped | ☐ | ☐ |
| 11. Behavior/Emotional Disorder | ☒ | ☐ |
| 12. Other Health | ☐ | ☐ |
| 13. Severe/Profound Mentally Handicapped | ☐ | ☐ |
| 14. Developmentally Delayed (Only Students Birth Through 2) | | |

Joint Agreement: ☐ECHO ☒Eisenhower ☐Southwest ☐SPEED

PRIMARY SPECIAL EDUCATION PLACEMENT

☐New ☐Continuing ☐Change ☐Transfer ☐Discontinued

☐District Prog. ☐Joint Agreement Prog. ☐SMA ☐IPP

*Program Code ☐

School *District

Building Code *Funding Source Code

*Least Restrictive Environment Code

Specify:

Program Initiation/Duration Dates From: To:

Projected Annual Review Date

Re-evaluation Due Date

STANDARD EDUCATIONAL PLACEMENT District

School

## PARTICIPANTS

Director/Designee Susan M. Rettle

Principal/Designee [illegible], Assist. Principal

Parent(s), Guardian(s) Cleveland J. Reid

Student

Teacher(s) [illegible]

Psychologist W. Kopec

Social Worker W. Wallace

Counselor

Speech/Language Pathologist

Other (Specify Title)

Purpose for Staffing Review recommendation for educational advice, following his disciplinary problems.

Options Considered And Rejected With Rationale Continued [illegible] at [illegible] rejected [illegible] the recommendation of MDC of 5/23/91.

Recommendations/Reasons For Determination As per MDC of 5/23/91 Cedric is presently recommended for a more restrictive placement, due to the disciplinary incident of 9/13/91. Referrals will be made to alternative day school programs appropriate for BD/ED students. Cedric is considered to be a threat to others in his present school, and is recommended to be tutored pending his placement.

| Yes | No | The following were explained: |
|---|---|---|
| | | ☐Multidisciplinary conference ☐Recommended placement ☐Individual education program |
| | | I/We give consent to implement the conference recommendations including placement. |
| | | I/We have received a copy of the multidisciplinary conference report form. |
| | | I/We have received a copy of my child's educational program. |
| | | Procedural safeguards, including the right to object to placement, were explained and offered in writing. |
| | | A summary of rights, including the right to independent evaluation, is outlined on back of Page 1. |
| | | I/We agree to waive the ten (10) calendar day preplacement period. |

Cleveland J. Reid Date 9/20/91
Signature, Parent or Guardian

Date
Signature, Parent or Guardian

W. Kopec Date 9/20/91
Staff Member Preparing Conference Report

Date
Student (e.g. 18 years or older)

*See Instructions for Codes

PARENT GMA 000

000210

**I.E.P. INSTRUCTIONAL OBJECTIVES**

DISTRICT EISENHOWER 985

Page 4

Page ______ of ______

Student: Cedric Ricks

I.D.# ______

I.E.P. Case Manager Walter Kopec

ANNUAL GOAL The student is expected to mainstream classes, with passing grades, while exerting the required amount of effort needed to pass.

School Year 91-92

Evaluation Period: From 9/91 To 6/92

I.E.P. Implementer ______

Title Special Education Teacher

| SHORT TERM OBJECTIVES | METHODS & MATERIALS | EVALUATION (Specify Method, Criterion and Schedule for Measuring Progress) | DATE OBJECTIVE MASTERED |
|---|---|---|---|
| The student shall meet with the special education teacher to develope a schedule of conference times. | The student shall be made aware of the resource time and place available to him or her. | Student monitor/resource obligations have been fulfilled with 80% accuracy on a monthly basis. | |
| The student is expected to complete classroom requirements successfully, and provide the necessary effort needed to be successful. | The regular classroom teacher should work with the student and special education teacher to monitor student progress through written and/or verbal communication.<br><br>Meetings between student and teacher are expected to occur a minimum of once per month, unless the student fails to meet his or her meeting obligations. | Quarter and/or semester grades reflect success with regard to the requirements.<br><br>I ______, have read this document and fully understand that I am responsible for coming to my scheduled monitor/resource period as follows, ______. | |

000211

Christ Hospital School Program records. Rcvd from Helen and Shederick Ricks

CHRIST HOSPITAL and MEDICAL CENTER

HOSPITAL SCHOOL PROGRAM

Report Card for

Cedric Ricks

Grade 12

Age 17

Dates of Attendance: 10/18/91 to 11/17/91 (In-patient)

11/18/91 to 12/13/91 (outp[illegible]

Days absent -0-

000213

## ACADEMIC PERFORMANCE

The following grades reflect effort:

A = Excellent — D = Unsatisfactory
B = Above Average — E = Unacceptable (failing)
C = Average/Satisfactory

Accuracy/Effort

Subject: Math — Grade: A/C
Comments: Completed lessons in factoring, monomials, binomials, ch. 5 Text: Algebra structure & Method Book 1, Houghton Mittlin, 1988

Subject: English — Grade: B/C
Comments: Completed vocabulary, reading and writing assignments.

Subject: Government — Grade: B/C
Comments: Completed Federal Gov't unit. Unit 3, ch. 1-9. Text: Exploring U.S. History, Globe, 1986.

Subject: — Grade:
Comments:

Subject: — Grade:
Comments:

Subject: — Grade:
Comments:

Subject: — Grade:
Comments:

## Additional Comments-General Academic Behavior/Performance

Academically Cedric is a bright student who can handle the demands of regular education course-work with the exception of math work. Math is an area of relative weakness according to test results. Overall basic skills are adequate to good.

Behaviorally Cedric demonstrated great difficulty responding appropriately to authority and working independently. Cedric was initially resistive to most tasks and often complained about his workload. On Occasion he refused to work and made rude, sarcastic comments to teachers. Positively noted, Cedric demonstrated the discipline to complete approximately 75% of his assigned work. Working independently was problematic for Cedric as he constantly sought attention from females and staff. It was observed that Cedric was not comfortable sitting alone.

### DISCHARGE RECOMMENDATIONS

Cedric's behavior and performance improved within the presence of strict structure and limits. It is recomended by this writer that Cedric be enrolled in a therapeutic day school given his previous school behavior record. This recommendation is supported by Cedric's physician.

Jeanne M Axelrod, MA — Certified Teacher
12/30/91 — Date

000218

ACHIEVEMENT TEST RESULTS

CHRIST HOSPITAL and MEDICAL CENTER

____ Peabody Individual Achievement Test-Revised (PIAT-R)

_X_ Diagnostic Achievement Test for Adolescents (DATA) Reading Comprehension only.

_X_ Wide Range Achievment Test-Revised (WRAT-R)

| | Std.Sc. (10 avg) | %ile | G/E |
|---|---|---|---|
| Reading Recognition/ Word Identification | 106 | 66 | 12+ |
| Reading Comprehension | 11 | 63 | - |
| Spelling Recall | 101 | 53 | 11E |
| Mathematics | 91 | 27 | 9B |
| Math Calculation/(DATA) Arithmetic | -- | -- | |
| Math Problem Solving/ (DATA) | -- | -- | |

HOSPITAL SCHOOL PROGRAM

Report Card for

Cedric Ricks

Grade 12

Age 17

Jeanne M Axelrod, MA
Learning Specialist

12/30/91
Date

Dates of Attendance: 10/18/91 to 11/17/91 (In-patient)
11/18/91 to 12/13/91 (outpt

Days absent -0-

000215

Special education evaluation. 1992.01.06. Rcvd from Helen and Shederick Ricks

(Last Name First)
*Ethnic Code
*Language Code
Sex
Address
Parents/Guardians
Address (if different)

Sponsor of Multidisciplinary Conference
☒ District ☐ Joint Agreement ☐ SMA ☐ IPP
Multidisciplinary Conference Date 1-6-92
☐ Individualized Education Program Date
☐ Annual Review Date
I.D. # R(C090874
Birthdate 9-18-74 (Month Day Year)
Phone
Joint Agreement ☐ ECHO ☐ Eisenhower ☐ Southwest ☐ SPEED

**EXCEPTIONAL CHARACTERISTICS**

| | Primary | Secondary |
|---|---|---|
| 1. Trainably Mentally Handicapped | ☐ | ☐ |
| 2. Educably Mentally Handicapped | ☐ | ☐ |
| 3. Physically Handicapped | ☐ | ☐ |
| 4. Learning Disabled | ☐ | ☐ |
| 5. Visually Impaired | ☐ | ☐ |
| 6. Hard-of-Hearing | ☐ | ☐ |
| 7. Deaf | ☐ | ☐ |
| 8. Deaf/Blind | ☐ | ☐ |
| 9. Speech/Language Impaired | ☐ | ☐ |
| 10. Educationally Handicapped | ☐ | ☐ |
| 11. Behavior/Emotional Disorder | ☒ | ☐ |
| 12. Other Health | ☐ | ☐ |
| 13. Severe/Profound Mentally Handicapped | ☐ | ☐ |
| 14. Developmentally Delayed (Only Students Birth Through 2) | ☐ | ☐ |

**PRIMARY SPECIAL EDUCATION PLACEMENT**
☐ New ☐ Continuing ☒ Change ☐ Transfer ☐ Discontinued
☐ District Prog. ☐ Joint Agreement Prog. ☐ SMA ☒ IPP
*Program Code ☒ McKinley School
School McKinley
District
Building Code
*Funding Source Code
Least Restrictive Environment Code
Specify Alternative therapeutic day school program
Program Initiation/Duration Dates From: 1/92 To: 6/92
Projected Annual Review Date 5-1992
Re-evaluation Due Date 11/93
**STANDARD EDUCATIONAL PLACEMENT** District
School

**PARTICIPANTS**

Director/Designee W. Kopec
Principal/Designee
Parent(s), Guardian(s)
Student
Teacher(s)
Psychologist W. Kopec
Social Worker
Counselor
Speech/Language Pathologist
Other (Specify Title)

Purpose for Staffing Review placement for special education services

Options Considered And Rejected With Rationale

Recommendations/Reasons For Determination [illegible] ... hospital discharge report was reviewed. Recommendations are that a therapeutic day program is the least restrictive appropriate special education placement. [illegible] will be placed at McKinley [illegible] school for the remainder of the 91-92 school year. Short term goals will further be developed within 30 days.

| Yes | No | The following were explained: |
|---|---|---|
| | | ☒ Multidisciplinary conference ☒ Recommended placement ☒ Individual education program |
| ✓ | | I/We give consent to implement the conference recommendations including placement. |
| ✓ | | I/We have received a copy of the multidisciplinary conference report form. |
| ✓ | | I/We have received a copy of my child's educational program. |
| ✓ | | Procedural safeguards, including the right to object to placement, were explained and offered in writing. |
| ✓ | | A summary of rights, including the right to independent evaluation, is outlined on back of Page 3. |
| ✓ | | I/We agree to waive the ten (10) calendar day preplacement period. |

Signature, Parent/or Guardian — Date 1-6-92
Signature, Parent or Guardian — Date
Walter Kopec — Staff Member Preparing Conference Report — Date 1-6-92
Student (e.g. 18 years or older) — Date

*See Instructions for Codes.

PARENT SMA 986

Student ____ Date of conference ____

Student I.D. # ____ I.E.P. Case Manager ____

**PROGRAM/RELATED SERVICES**

| Type | Assessment: Date Completed | SERVICES Consult. | | Direct Service | Projected Date of Initiation | Proj. Min. Per Week | Proj. Wks. Per Year |
|---|---|---|---|---|---|---|---|
| Adaptive Physical Education | | ☐ | A | ☐ | | | |
| Aide – Class | | ☐ | B | ☐ | | | |
| Aide – Individual Student | | ☐ | C | ☐ | | | |
| Audiologist | | ☐ | E | ☐ | | | |
| Braillist/Reader | | ☐ | F | ☐ | | | |
| Counselor | | ☐ | G | ☐ | | | |
| Driver Education (Adapted) | | ☐ | I | ☐ | | | |
| Interpreter | | ☐ | J | ☐ | | | |
| Media Services | | ☐ | K | ☐ | | | |
| Occupational Therapist | | ☐ | M | ☐ | | | |
| Orientation/Mobility | | ☐ | O | ☐ | | | |
| Behavior Disorder/Resource | | ☐ | P | ☐ | | | |
| Educably Mentally Hdcp./Resource | | ☐ | P | ☐ | | | |
| Educational Hdcp./Resource | | ☐ | P | ☐ | | | |
| Hearing Itinerant | | ☐ | P | ☐ | | | |
| Learning Dis./Resource | | ☐ | P | ☐ | | | |
| Medical (Specify) | | ☐ | P | ☐ | | | |
| Psychologist | | ☐ | R | ☒ | 1/92 | 30 | 20 |
| Physical Therapist | | ☐ | S | ☐ | | | |
| Psychiatric Services | | ☒ | T | ☐ | 1/92 | | |
| School Health Services/Nurse | | ☒ | V | ☐ | 1/92 | Med. administration | |
| Speech/Language Pathologist | | ☐ | W | ☐ | | | |
| Social Worker | | ☐ | X | ☐ | | | |
| Vocational Coordinator | | ☐ | Z | ☐ | | | |
| Vision Itinerant | | ☐ | P | ☐ | | | |
| Vocational/Rehab. | | ☐ | 2 | ☐ | | | |
| Transitional Services | | ☐ | 3 | ☒ | 1/92 | 30/3 WKS | 20 |
| Other (Specify) Family Counseling | | ☐ | P | ☐ | | | |
| Transportation ☐ Walk ☐ Regular district vehicle ☐ Parent ☒ Special vehicle | | | Y | ☐ | | | |

Vehicle Adaptation (Sepcify) ____

**PARTICIPATION IN STANDARD EDUCATION PROGRAM**

Full Time, In Standard Education Program, Except Support Services ☐

Participation in Standard Education Program Not Appropriate At This Time ☐

| Subject | Grade Level | Projected Date of Initiation | Projected Duration |
|---|---|---|---|
| Standard P.E. | | | |
| Art | | | |
| Music | | | |
| Reading | | | |
| Math | | | |
| Spelling | | | |
| Other Language Arts | | | |
| Social Studies | | | |
| Science | | | |
| Other (Specify) | | | |

PARENT 888

000218

Calumet Park PD records

VILLAGE OF CALUMET PARK DEPARTMENT OF POLICE — 12409 THROOP STREET CALUMET PARK, ILLINOIS 60827
TELEPHONE: (708) 385-6862 FAX: (708) 385-6992

**Police Department**

RONALD DENSON - Mayor
MARK DAVIS - Chief of Police
KENNETH MANN – Asst. Chief of Police
GERARD CORRIGAN – Coordinator of Patrol

December 2, 2013

Criminal District Attorney's Office
Tarrant County Justice Center
**ATTN: Inv. Maria Hinojosa**
401 W. Belknap
Fort Worth, TX 76196-0201

RE – Cedric Ricks

Maria,

Enclosed per your request are copies of any criminal arrest reports on file with the Calumet Park Police Department. You will also find the original signed and notarized Affidavit reference those reports.

Very truly yours,

Linda Krzewicki
Police Administration

lk
file
enc

CAUSE NO. 1325203

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 371ST |
| VS. | § | DISTRICT COURT |
| Cedric Allen Ricks | | TARRANT COUNTY, TEXAS |

AFFIDAVIT

Before me, the undersigned authority, personally appeared Linda Krzewicki who, being by me duly sworn, deposed as follows:

My name is Linda Krzewicki. I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

I am the custodian of the records of the Calumet Park Police Department. Attached hereto are __16__ pages of records from The Calumet Park Police Department. These said ___16___ pages of records are kept by Linda Krzewicki in the regular course of business and it was the regular course of business of The Calumet Park Police Department, for an employee or representative Linda Krzewicki, with knowledge of the act, event, condition, opinion or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original.

Linda Krzewicki
AFFIANT

SWORN TO AND SUBSCRIBED before me on the 2nd day of December, 2013.

Donna M. Davis
Notary Public,
State of Illinois

DONNA M. DAVIS
OFFICIAL SEAL
Notary Public - State of Illinois
My Commission Expires
September 17, 2017

My commission expires ____________



**Calumet Park Police Dept**
**12409 S. Throop Street**
**Calumet Park, IL 60827**
**708-385-6862**

To: Maria Hinojosa
Fax number: 1-817-884-1803

From: Linda Krzewicki
Lkrzewicki@calumetparkvillage.org
Fax number: 708-385-6992

Date: **December 2, 2013**
Time: 1130 hrs

Regarding: Cedric Ricks

Phone number for follow-up:
708-385-6862

**Comments:**

Maria,

Per your formal request, here a copies of all criminal arrests made by the Calumet Park Police Department of Cedric Ricks.

Linda

The Criminal Identification and Investigation Act requires that arresting agencies submit the Arrest Fingerprint Card to the Bureau of Identification for all felony, class A misdemeanor or class B misdemeanor arrests.

308329

## ARREST

| STATE USE FP / FBI / PP | ARRESTING AGENCY - ORI | State Use Only | Process Control Number |
|---|---|---|---|
| | IL 0161800 | | 921868640 |

| Document Control Number | Department Name | Subject's Name LAST - FIRST - MIDDLE | Birthdate MONTH DAY YEAR |
|---|---|---|---|
| 257269078 | CALUMET PARK P.D. | RICKS CEDRIC A | 09 08 1974 |
| Document Control Number | | Also Known As - AKA | Alias DOB MONTH DAY YEAR |

State Use Only

| Sex | Race | POB | Hair Color | Skin Tone | Height | Weight | Eyes |
|---|---|---|---|---|---|---|---|
| M | B | IL | BLK | LBR | 507 | 150 | BRO |

Photo Taken: ☒ Yes / No ☐ — Scars, Marks, Tattoos — Miscellaneous Number

| Social Security Number | Driver's License Number | State |
|---|---|---|
| 357624518 | R200-1017-4256 | IL |

| SID Number | FBI Number |
|---|---|
| IL 30662924 | 516425NA4 |

| Agency's Offender Identification Number | Agency's Case Number |
|---|---|
| 95-16137 | 95-00613 |

Official's Signature: [signature] — I.D. Number: 525 — Subject's Signature - NOTE: This Information May Be Compared with Local, State & Federal Files — Date Printed MONTH DAY YEAR

| | STATUTE CITATION | CBA | CLASS | OFFENSE DESCRIPTION | WARRANT TYPE | COUNTY ISSUING WARRANT | WARRANT COURT CASE NUMBER | STATE USE ONLY | ARREST CHARGE DISPOSITION |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 625-11-907 | | | FAILURE TO YIELD TO EMERGENCY VEHICLE | | | | | ☐ Direct Filed ☐ Referred to S.A. |
| 2 | 625-3-707 | | | NO INSURANCE | | | | | ☐ Direct Filed ☐ Referred to S.A. |
| 3 | 625-12-503(A) | | | OBSTRUCTED WINDOWS | | | | | ☐ Direct Filed ☐ Referred to S.A. |
| 4 | 625-3-413(A) | | | IMPROPER DISPLAY NO FRONT PLATE | | | | | ☐ Direct Filed ☐ Referred to S.A. |
| 5 | 720-550 4(A) | | | POSSESSION OF CANIBES | | | | | ☐ Direct Filed ☐ Referred to S.A. |

| Date of Arrest MONTH DAY YEAR | Date of Offense MONTH DAY YEAR | County of Prosecution | Caution | Basis for Caution |
|---|---|---|---|---|
| 03 24 95 | 03 24 95 | 016 | ☐ Yes / No ☒ | |

Minor's Fingerprints submitted: ☐ By Law ☐ Court Order — Post Sentence Fingerprints: ☐ Yes ☐ No — Inquiry Only: ☐ Yes ☐ No

Date Bond Deposited MONTH DAY YEAR — Bond Receipt Number — Bond Amount — Cash Bond Deposited — Bond Type Posted: Cash (04) ☐ No Bond (01) ☐ Drivers License (02) ☐ Recognizance (03) ☐ 10% Bond (06) ☐ Other (13) ☐

Send Copy of CHRI To: AGENCY — NCIC

AGENCY — NCIC — Number of Pages

IL 493-0662 — ISP-402 (1/91)

## COPY#1 BUREAU OF IDENTIFICATION

| RESISTED YES/NO | ASSAULTED YES/NO | INJURED YES/NO | SOBER YES/NO | NARCOTICS YES/NO |
|---|---|---|---|---|
| ☐ ☒ | ☒ ☐ | ☐ ☒ | ☒ ☐ | ☐ ☒ |

TYPE WEAPON

WARRANT CLEARED LEADS: ☒ YES NO ☐

PHOTO NUMBER

| ARRESTING OFFICER NAME | ID NUMBER | COURT DATE | TIME |
|---|---|---|---|
| R. REAL | 525 | 3-17-95 | 9:00 AM |

STATE USE ONLY

JACKET

000213

PAGE ____ OF ____

LEADS NO. ____

# CALUMET PARK POLICE DEPARTMENT
## GENERAL OFFENSE REPORT

ISPERN NO. ____

| OFFENSE/INCIDENT—PRIMARY CLASSIFICATION | SECONDARY CLASSIFICATION | R.D. NO. | Zone of Occurrence |
|---|---|---|---|
| NARCOTICS | POSSESSION OF CANNABIS 30 GMS OR LESS | 95-00613 | 3 |

**SCENE**

| Address of Occurrence | Apt. No. | Place | Circumstance | | | Date Reported | Date Occurred |
|---|---|---|---|---|---|---|---|
| 126TH & ASHLAND | | 304 | 0 | 0 | 9 | 01 24 95 | 01 24 95 |
| **Type of Location or Premises Where Offense Occurred (give name of location if applicable)** | | **Premise** | **Activity Type** | | | **Time Reported** | **Time Occurred** |
| STREET | | 1 | | | | 1907 | 1907 |

All information, descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

**VICTIM/OFFENDER/WITNESS**

| NO. | V.O.W.C. | Type | Name (Firm Name If Business) | Sex | Race | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|---|
| 1. | V | S | PEOPLE OF THE STATE OF ILLINOIS | | | | | | |

| Gang | Injury Code | Bias | Address | DOB | Age | Home Telephone |
|---|---|---|---|---|---|---|
| | | | | | | ( ) |

| O/A Number | Arrest Type | City | State | Zip | Alias | Work Telephone |
|---|---|---|---|---|---|---|
| | | | | | | ( ) |

| Relationship | Weapons | If Business Name of Company Rep. | DL# | Social Security Number |
|---|---|---|---|---|
| | | | | |

| NO. | V.O.W.C. | Type | Name (Firm Name If Business) | Sex | Race | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|---|
| 1 | O | I | CEDRIC A RICKS | M | B | 507 | 150 | BLK | BRO |

| Gang | Injury Code | Bias | Address | DOB | Age | Home Telephone |
|---|---|---|---|---|---|---|
| U | N | 99 | 12341 SOUTH BISHOP | 09 08 74 | 20 | ( ) |

| O/A Number | Arrest Type | City | State | Zip | Alias | Work Telephone |
|---|---|---|---|---|---|---|
| | O | CALUMET PARK | IL | 60643 | | ( ) |

| Relationship | Weapons | If Business Name of Company Rep. | DL# | Social Security Number |
|---|---|---|---|---|
| ST | | | R200 1017 4256 | 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 |

| NO. | V.O.W.C. | Type | Name (Firm Name If Business) | Sex | Race | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|---|
| 1 | W | I | DONALD J. RUSH | M | B | 601 | 190 | BLK | BRO |

| Gang | Injury Code | Bias | Address | DOB | Age | Home Telephone |
|---|---|---|---|---|---|---|
| N | N | 99 | 12409 SOUTH THROOP | 01 16 56 | 39 | ( ) 385 6862 |

| O/A Number | Arrest Type | City | State | Zip | Alias | Work Telephone |
|---|---|---|---|---|---|---|
| | | CALUMET PARK | IL | 60643 | | ( ) |

| Relationship | Weapons | If Business Name of Company Rep. | DL# | Social Security Number |
|---|---|---|---|---|
| ST | | | | |

| NO. | V.O.W.C. | Type | Name (Firm Name If Business) | Sex | Race | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

| Gang | Injury Code | Bias | Address | DOB | Age | Home Telephone |
|---|---|---|---|---|---|---|
| | | | | | | ( ) |

| O/A Number | Arrest Type | City | State | Zip | Alias | Work Telephone |
|---|---|---|---|---|---|---|
| | | | | | | ( ) |

| Relationship | Weapons | If Business Name of Company Rep. | DL# | Social Security Number |
|---|---|---|---|---|
| | | | | |

**VEHICLE**

| Type | Year | Manufacturer | Model | Vehicle Color | License Number | State | Year | Vehicle ID Number |
|---|---|---|---|---|---|---|---|---|
| 7 | 86 | MERC | SABLE | BLU | CR6640 | IL | 95 | 1MEBP87UXGG654581 |
| | | | | | | | | |

In Summary, not in its entirety nor verbatim; R/O'S responded to a call from Calumet Park F.D. Ambulance for a reckless driver who would not yield to their emergency vehicle. R/O's arrived at above location and found the offender yelling profanities at Donald J. Rush DOB 01 16-56, who

| Reporting Officer's Name | Star No. | Officer's Name | Star No. | Typed By |
|---|---|---|---|---|
| REAL | 525 | | | NAGEL |
| **Officer's Name** | **Star No.** | **Officer's Name** | **Star No.** | |
| TEWS | 504 | | | |
| **Shift Supervisor** | **No.** | **Approval Signature** | **Date Approved** | |
| SGT. GODBOUT | 5 | [signature] | 1-25-95 | |

☐ ☐ F.B. ☒ 00224 ☐ ☐ FILE ☐ ☐ ☒ ☐ ☐ ☐ ☐ ☐ ALL UNITS

420

is the driver of the ambulance. Mr. Rush explained the offender had ignored his vehicles' emergency flashing lights and sped up in front of His vehicle, causing His vehicle to swerve into oncoming traffic, narrowly missing another vehicle. Mr. Rush wished at that time to sign complaints against the offender. R/O inquired to the offender as to why he had failed to stop and the offender replied " they weren't going anywhere, they were just parking the ambulance ". R/O then asked for the offenders D.L. & proof of insurance, which he could not produce.

R/O noticed a green, leafy, substance strewn about the back seat of the offenders vehicle. R/O placed the offender in custody and inquired about the substance in his vehicle, to which the offender could not answer.

The substance was taken back to this PD where it was field tested positive for cannabis. The offender was charged with unlawful possession of cannabis, operation of an uninsured motor vehicle, tinted windows, no front license plates and failure to yield to an emergency vehicle.

The offender was processed at Calumet Park Police Department and given an appearence date of 03-17-95 at :

MARKHAM COURTHOUSE
16501 SOUTH KEDZIE PARKWAY
MARKHAM, IL
ROOM 205   0900 AM

Cannabis was entered into evidence # E 95-014

306653 to the Bureau of Identification for all felony, class A misdemeanor or class B misdemeanor arrests.

**ARREST**

STATE USE: FP | FBI | PP
ARRESTING AGENCY - ORI: IL 0161800
State Use Only
Process Control Number: 908732693

Document Control Number: 255038047
Department Name: CALUMET PARK P.D.
Subject's Name — LAST: RICKS FIRST: CEDRIC MIDDLE: A
Birthdate: 07 08 1974
Document Control Number:
Also Known As - AKA:
Alias DOB: MONTH DAY YEAR

State Use Only

| Sex | Race | POB | Hair Color | Skin Tone | Height | Weight | Eyes |
|---|---|---|---|---|---|---|---|
| M | B | IL | BLK | LBR | 507 | 150 | BRO |

Photo Taken: X Yes / No ☐
Scars, Marks, Tattoos:
Miscellaneous Number:

Social Security Number: 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
Driver's License Number: R200-1017-4256
State: IL
SID Number: IL 30662921 0
FBI Number: 516425NA4
Agency's Offender Identification Number: 94-15991
Agency's Case Number: 94-10453

Official's Signature: [signature]
I.D. Number: 525
Subject's Signature - NOTE: This Information May Be Computerized In Local, State & Federal Files
Date Printed: MONTH DAY YEAR

| CHARGE NO. | STATUTE CITATION | C/A | CLASS | OFFENSE DESCRIPTION | WARRANT TYPE | COUNTY ISSUING WARRANT | WARRANT COURT CASE NUMBER | STATE USE ONLY | ARREST CHARGE DISPOSITION |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 720-5/12-1-(A) | | | ASSAULT | | | | | ☐ Direct Filed ☐ Referred to S.A. |
| 2 | | | | | | | | | ☐ Direct Filed ☐ Referred to S.A. |
| 3 | | | | | | | | | ☐ Direct Filed ☐ Referred to S.A. |
| 4 | | | | | | | | | ☐ Direct Filed ☐ Referred to S.A. |
| 5 | | | | | | | | | ☐ Direct Filed ☐ Referred to S.A. |

Date of Arrest (MONTH DAY YEAR): 12 11 94
Date of Offense (MONTH DAY YEAR): 12 11 94
County of Prosecution: 0716
Caution: X Yes / No ☐
Basis for Caution: COMBATIVE

Minor's Fingerprints submitted: ☐ By Law ☐ Court Order
Post Sentence Fingerprints: ☐ Yes ☐ No
Inquiry Only: ☐ Yes ☐ No

Date Bond Deposited (MONTH DAY YEAR) | Bond Receipt Number | Bond Amount | Cash Bond Deposited | Bond Type Posted: Cash (04) ☐ No Bond (01) ☐ Drivers License (02) ☐ Recognizance (03) ☐ 10% Bond (06) ☐ Other (13) ☐

Send Copy of CHRI To: AGENCY NCIC
AGENCY NCIC
Number of Pages

IL 493-0892

COPY#1 BUREAU OF IDENTIFICATION

ISP-402 (1/91)

SUBJECT'S ADDRESS / CITY / STATE / ZIP: 12341 S. BISHOP CALUMET PARK IL. 60643
ARREST LOCATION: 12603 S. ADA
TIME: 2152

RESISTED YES/NO: ☐ X
ASSAULTED YES/NO: X ☐
INJURED YES/NO: ☐ X
SOBER YES/NO: X ☐
NARCOTICS YES/NO: ☐ X
TYPE WEAPON:
WARRANT CLEARED LEADS: X YES NO ☐
PHOTO NUMBER:

ARRESTING OFFICER NAME: R. REAL
ID NUMBER: 525
COURT DATE: 1-5-95
TIME: 9:00AM

STATE USE ONLY

TACKET

600226

# CALUMET PARK POLICE DEPARTMENT
## GENERAL OFFENSE REPORT

ADS NO. ______ ISPERN NO. ______

| Offense/Incident—Primary Classification | Secondary Classification | R.D. No. | Zone of Occurrence |
|---|---|---|---|
| ASSAULT | SIMPLE | 94-10453 | 2 |

| Address of Occurrence | Apt. No. | Place | Circumstance | | | Date Reported | Date Occurred |
|---|---|---|---|---|---|---|---|
| 12603 S ADA | | 304 | 0 | 0 | 2 | 12-11-94 | 12-11-94 |

| Type of Location or Premises Where Offense Occurred (give name of location if applicable) | Premise | Activity Type | Time Reported | Time Occurred |
|---|---|---|---|---|
| STREET | 1 | | 21:52 | 21:52 |

All information, descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

| NO. | V.O.W.C. | Type | Name (Firm Name if Business) | Sex | Race | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|---|
| 1. | V | P | OFC ROBERT M REAL | | | | | | |

| Gang | Injury Code | Bias | Address | DOB | Age | Home Telephone |
|---|---|---|---|---|---|---|
| | N | | 12409 S THROOP ST | | | ( ) |

| O/A Number | Arrest Type | City State Zip | Alias | Work Telephone |
|---|---|---|---|---|
| | | CALUMET PARK, IL 60643 | | (708) 385-6862 |

| Relationship | Weapons | If Business Name of Company Rep. | DL# | Social Security Number |
|---|---|---|---|---|
| ST | | | | |

| NO. | V.O.W.C. | Type | Name (Firm Name if Business) | Sex | Race | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|---|
| 1 | O | I | CEDRIC A RICKS | M | B | 5'07 | 150 | BLK | BRO |

| Gang | Injury Code | Bias | Address | DOB | Age | Home Telephone |
|---|---|---|---|---|---|---|
| U | N | 99 | 12341 S BISHOP | 09-08-74 | 20 | ( ) |

| O/A Number | Arrest Type | City State Zip | Alias | Work Telephone |
|---|---|---|---|---|
| | O | CALUMET PARK, IL 60643 | | ( ) |

| Relationship | Weapons | If Business Name of Company Rep. | DL# | Social Security Number |
|---|---|---|---|---|
| | 01 | | R200-1017-4256 | 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 |

| NO. | V.O.W.C. | Type | Name (Firm Name if Business) | Sex | Race | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

| Gang | Injury Code | Bias | Address | DOB | Age | Home Telephone |
|---|---|---|---|---|---|---|
| | | | | | | ( ) |

| O/A Number | Arrest Type | City State Zip | Alias | Work Telephone |
|---|---|---|---|---|
| | | | | ( ) |

| Relationship | Weapons | If Business Name of Company Rep. | DL# | Social Security Number |
|---|---|---|---|---|
| | | | | |

| NO. | V.O.W.C. | Type | Name (Firm Name if Business) | Sex | Race | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

| Gang | Injury Code | Bias | Address | DOB | Age | Home Telephone |
|---|---|---|---|---|---|---|
| | | | | | | ( ) |

| O/A Number | Arrest Type | City State Zip | Alias | Work Telephone |
|---|---|---|---|---|
| | | | | ( ) |

| Relationship | Weapons | If Business Name of Company Rep. | DL# | Social Security Number |
|---|---|---|---|---|
| | | | | |

| Type | Year | Manufacturer | Model | Vehicle Color | License Number | State | Year | Vehicle ID Number |
|---|---|---|---|---|---|---|---|---|
| 7 | 86 | MERCURY | SABLE | BLUE | CR6640 | IL | 95 | 1MEBP87UXG6654581 |

n Summary, not in its entirety nor verbatim; R/O WAS LEAVING THE CALUMET PARK PD TO ANSWER A 911 CALL WIT OTATING ACTIVATED, THE OFFENDER DROVE HIS VEHICLE ADJECENT TO R/O's AND SIGNALED R/O TO OME TO HIM. R/O INSTRUCTED THE OFFENDER TO ENTER THE STATION TO FILE A COMPLAINT AND R/o

| Reporting Officer's Name | Star No. | Officer's Name | Star No. | Typed By |
|---|---|---|---|---|
| REAL | 525 | | | WARN |
| Officer's Name | Star No. | Officer's Name | Star No. | |
| | | | | |
| Supervisor | Star No. | Approval Signature | Date Approved | |
| MURPHY | | [signature] | 12-12-94 | |

000227

WOULD RETURN AS SOON AS POSSIBLE. R/O THEN CONTINUED SOUTHBOUND ON THROOP ST TO ANSWER TH CALL. R/O WAS INFORMED VIA RADIO THAT ADDITIONAL UNITS WOULD ANSWER THE 911 CALL AND R/O COULD RETURN TO CALUMET PARK PD TO HANDLE THE OFFENDER COMPLAINT. AS R/O TURNED AROUNG THE OFFENDERS VEHICLE SPED PAST R/O AT A HIGH RATE OF SPEED. R/O THEN TURNED AROUND AGAIN AND ATTEMPTED TO CATCH UP WITH THE OFFENDER. AS R/O TURNED THE CORNER AT 126TH AND ADA R/( NOTICED THE OFFENDER HAD PARKED HIS VEHICLE AT THE ABOVE ADDRESS AND BEGAN TO WALK TOWARB A HOUSE THERE. R/O THEN ASKED THE OFFENDER WHY HE WAS DRIVING AT SUCH A HIGH RATE OF SPEEI AND WHY HE HAD SIGNALED R/O IN THE FIRST PABEB. THE OFFENDER EXPLAINED "I DON'T NEED @OUR FUCKIN' HELP". R?O REPLAED HE STILL NEEDED TO KNOW WHY HE WAS TRAVELING AT X HIGH RATE OF SPEBB. THE OFFENDER REPLIED "LOOK YOU PUSSY MOTHER FUCKER, I DON'T NEED YOU FUCKIN'HHELP." R/O INFORMED THE OFFENDER HE WOULD HAVE TO CALM DOWN, TO WHICH THE OFFENDER REPLIED "WHAT THE FUCK ARE YOU GONNA DO YOU PUSSY MOTHER FUCKER". AT THIS TIME, AS THE OFFENDER WAS R RESPONDING, HE WAS ALSO WALKING WOWARB R/O WITH CLENCHED FISTS AND R/O FELT THE OFFENDER WAS-BEING-PLACE WOULD BECOME VIOLENT. R/O THEN INFORMED THE OFFENDER HE WAS BEING PLACED INTO CUSTODY FOR ASSAULT AND SEATED THE OFFENDER IN THE BACK OF RTHE R/O's SQUAD CAR. THE OFFENDER CONTINUED TO SHOUT PROFANITIES AND KICKED THE INSIDE OF THE DOOR. R/O TRANSPORTED THE OFFENDER TO CALUMET PARK PD WHERE HE WAS PROCESSED FOR ASSAULT. THE OFFENDE WAS ISSUED AN APPEARANCE DATE OF 01-05-95 AT MARKHAM IN ROO #205 AT 9:00AM. THE OFFENDER's VEHICLE WAS TOWED.

Document Control Number 225803 01X
Document Control Number
Department: Calumet Park

Name (Last, First, Middle): Ricks Cedric A
Birthdate: 11 19 1974
Also Known As - AKA
Alias DOB

| Sex | Race | POB | Hair Color | Skin Tone | Height | Weight | Eyes |
|---|---|---|---|---|---|---|---|
| M | B | IL | BRO | LBR | 506 | 140 | BRO |

Photo Taken: Yes ✓ / No
Scars, Marks, Tattoos
Miscellaneous Number
Social Security Number: 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
Driver's License Number / State
SID Number: IL 3066292
FBI Number: 853324RA0
Agency's Offender Identification Number: 93-14512
Agency's Case Number: 93-4945
Official's Signature: George Brown
I.D. Number: 571
Subject's Signature
Date Printed: 06 20 93

| SEQ | STATUTE CITATION | | CLASS | OFFENSE DESCRIPTION | WARRANT TYPE | COUNTY ISSUING WARRANT | WARRANT COURT CASE NUMBER | STATE USE ONLY | ARREST CHARGE DISPOSITION |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 720/26-1A(1) | | C | Disorderly Conduct | | | | | ☒ Direct Filed ☐ Referred to S.A. |
| 2 | | | | | | | | | ☐ Direct Filed ☐ Referred to S.A. |
| 3 | | | | | | | | | ☐ Direct Filed ☐ Referred to S.A. |
| 4 | | | | | | | | | ☐ Direct Filed ☐ Referred to S.A. |
| 5 | | | | | | | | | ☐ Direct Filed ☐ Referred to S.A. |

Date of Arrest: 06 20 93
Date of Offense: 06 20 93
County of Prosecution: 076
Caution: Yes / No ☒
Basis for Caution

Minor's Fingerprints submitted: ☐ By Law ☐ Court Order
Post Sentence Fingerprints: ☐ Yes ☐ No
Inquiry Only: ☐ Yes ☐ No

Date Bond Deposited (Month / Day / Year)
Bond Receipt Number
Bond Amount: 75
Cash Bond Deposited
Bond Type Posted: Cash (04) ☐ No Bond (01) ☐ Drivers License (02) ☐ Recognizance (03) ☐ 10% Bond (08) ☐ Other (13) ☐

Send Copy of CHRI To: AGENCY NCIC
AGENCY NCIC
Number of Pages

SUBJECT'S ADDRESS / CITY / STATE / ZIP: 12341 S. Bishop Calumet Park 60643

ARREST LOCATION: 127th and Ashland
TIME: 2157

| RESISTED YES/NO | ASSAULTED YES/NO | INJURED YES/NO | SOBER YES/NO | NARCOTICS YES/NO |
|---|---|---|---|---|
| NO | NO | NO | YES | NO |

TYPE WEAPON: NONE

WARRANT CLEARED LEADS: ☐ YES NO ☐

PHOTO NUMBER: 14512

ARRESTING OFFICER NAME: George Brown
ID NUMBER: 571

COURT DATE: 15 July 93
TIME: 10:30 AM

STATE USE ONLY

IL 493-0392
COPY #2 ARRESTING AGENCY
000220
ISP 4-02 (6/90)

CADS NO.

GENERAL OFFENSE REPORT

| Offense/Incident - Primary Classification | Secondary Classification | RD No. | Page |
|---|---|---|---|
| DISORDERLY CONDUCT | | 93-4945 | 3 |

| Address of Occurrence | Apt. No. | Place | Circumstance | Date Reported | Date Occurred |
|---|---|---|---|---|---|
| 127TH ST. ASHLAND | | 304 | | 06-20-93 | 06-20-93 |

| Type of Location or Premises Where Offense Occurred (give name of location if applicable) | Premise | Activity Type | Time Reported | Time Occurred |
|---|---|---|---|---|
| STREET | | | 21:57 | 21:57 |

All information, descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

VICTIM/OFFENDER/WITNESS

| NO. | V.O.W.C. | Type | Name (Firm Name if Business) | Sex | Race | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|---|
| 1. | V | S | PEOPLE OF THE STATE OF ILLINOIS | | | | | | |

Address: | DOB: | Age: | Home Telephone: ( )
City: | State: | Zip: | Alias: | Work Telephone: ( )
If Business Name of Company Rep.: GEORGE BROWN #511 | DL#: | Social Security Number:

| NO. | V.O.W.C. | Type | Name (Firm Name if Business) | Sex | Race | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|---|
| 1 | O | | CEDRIC RICKS A | M | B | 506 | 150 | BLK | BRO |

Address: 12341 S. BISHOP | DOB: 11-19-74 | Age: 18 | Home Telephone: (708) 371-7985
Arrest Type: O | City/State/Zip: CALUMET PARK IL 60643 | Alias: | Work Telephone: ( )
DL#: | Social Security Number: 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

| NO. | V.O.W.C. | Type | Name (Firm Name if Business) | Sex | Race | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|---|
| 2 | O | | MARVIN R. ONEAL | M | B | 508 | 160 | BLK | BRO |

Address: 12333 S. LOOMIS | DOB: 11-18-74 | Age: 18 | Home Telephone: (708) 389-2223
Arrest Type: O | City/State/Zip: CALUMET PRK IL 60643 | Alias: | Work Telephone: ( )
DL#: | Social Security Number: 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

| NO. | V.O.W.C. | Type | Name (Firm Name if Business) | Sex | Race | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

Gang | Injury Code | Bias | Address | DOB | Age | Home Telephone ( )
O/A Number | Arrest Type | City | State | Zip | Alias | Work Telephone ( )
Relationship | Weapons | If Business Name of Company Rep. | DL# | Social Security Number

VEHICLE

| Type | Year | Manufacturer | Model | Vehicle Color | License Number | State | Year | Vehicle ID Number |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

NARRATIVE

R/O WHILE ON ROUTINE PATROL OBSERVED THE ABOVE TWO OFFENDERS AT THE ABOVE TIME AND LOCATION OF OCCURRENCE CAUSING A DISTURBANCE BY STOPPING MOTOR VEHICLES IN THE TRAFFIC. WHEN TOLD BY R/O TO LEAVE STREET, OFFENDER(S) REFUSED TO COMPLY AND AFTER AND AMBULANCE SWERVED TO AVOID

POLICE PERSONNEL

| Reporting Officer's Name | Star No. | Officer's Name | Star No. | Typed By |
|---|---|---|---|---|
| BROWN | 511 | | | POLLY |
| Officer's Name | Star No. | Officer's Name | Star No. | |
| | | | | |
| Shift Supervisor | Star No. | Approval Signature | Date Approved | |
| STALEY | 7 | [signature] | 6-21-93 | |

☐ NEWSPAPER ☐ F.D. ☐ DCFCR ☐ IDASA ☐ INV. ☐ FILE ☐ UCR ☐ EVID. ☐ VILLAGE CLERK ☐ OFFICIALS

000230

[illegible]

OFFENDERS THEY WERE PLACED UNDER ARREST AND OFFENDER'S CHARGED WITH DISORDERLY CONDUCT COURT DATE SET FOR 07-15-93 IN MARKHAM ROOM #205/

[illegible]

[illegible] [illegible]

[illegible] [illegible]

[illegible] [illegible]

[illegible] [illegible]

[illegible]

[illegible] [illegible]

[illegible] [illegible]

[illegible] [illegible]

ARREST

| Document Control Number | Department Name | Subject's Name LAST - FIRST - MIDDLE | Birthdate MONTH DAY YEAR |
|---|---|---|---|
| 225659555 | Calumet Park P.D. | RICKS CEDRIC A | 01 08 1974 |
| Document Control Number | | Also Known As - AKA | Alias DOB |

| Sex | Race | POB | Hair Color | Skin Tone | Height | Weight | Eyes |
|---|---|---|---|---|---|---|---|
| M | B | IL | BRK | MED | 507 | 180 | BRW |

Photo Taken: Yes / No — Yes
Scars, Marks, Tattoos
Miscellaneous Number

| Social Security Number | Driver's License Number | State |
|---|---|---|
| 357624518 | R200-1017-4256 | IL |

| SID Number | FBI Number |
|---|---|
| IL 3066292 | 516642 5MA4 |

| Agency's Offender Identification Number | Agency's Case Number |
|---|---|
| 92-13416 | 92-1955 |

| Official's Signature | I.D. Number | Subject's Signature | Date Printed |
|---|---|---|---|
| Ptl. J A Kraft | 20 | Cedric Ricks | 04 07 92 |

| STATUTE CITATION | | CLASS | OFFENSE DESCRIPTION | WARRANT TYPE | COUNTY ISSUING WARRANT | WARRANT COURT CASE NUMBER | STATE USE ONLY | ARREST CHARGE DISPOSITION |
|---|---|---|---|---|---|---|---|---|
| 38 26-1(a)(1) | M | A | Disorderly Conduct | | | | | ☑ Direct Filed ☐ Referred to S.A. |
| 38 12-3(A) | M | A | Battery | | | | | ☐ Direct Filed ☐ Referred to S.A. |
| 38 12-1(a) | M | A | Assault | | | | | ☐ Direct Filed ☐ Referred to S.A. |
| | | | | | | | | ☐ Direct Filed ☐ Referred to S.A. |
| | | | | | | | | ☐ Direct Filed ☐ Referred to S.A. |

Date of Arrest: 04 07 92 | Date of Offense: 04 07 92 | County of Prosecution: COOK | Caution: ☐ Yes / No ☐ | Basis for Caution

Fingerprints submitted: ☐ By Law ☐ Court Order | Post Sentence Fingerprints: ☐ Yes ☐ No | Inquiry Only: ☐ Yes ☐ No

Date Bond Deposited (Month Day Year) | Bond Receipt Number | Bond Amount: 1,000 | Cash Bond Deposited | Bond Type Posted: Cash (04) ☐ No Bond (01) ☐ Drivers License (02) ☐ Recognizance (03) ☐ 10% Bond (05) ☑ Other (13) ☐

Send Copy of CHRI To: AGENCY / NCIC / AGENCY / NCIC / Number of Pages

| SUBJECT'S ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| 12341 Bishop | Calumet Park | IL | 60643 |

| ARREST LOCATION | TIME |
|---|---|
| 12409 Throop | 8:50 PM |

| RESISTED YES/NO | ASSAULTED YES/NO | INJURED YES/NO | SOBER YES/NO | NARCOTICS YES/NO | TYPE WEAPON |
|---|---|---|---|---|---|
| No | No | No | Yes | No | |

WARRANT CLEARED LEADS ☐ YES NO ☐ | PHOTO NUMBER

| ARRESTING OFFICER NAME | ID NUMBER | COURT DATE | TIME |
|---|---|---|---|
| Ptl. J.A. Kraft | 20 | MAY 21, 1992 | 9:00 AM |

STATE USE ONLY

000232

JACKET

HO-0692

COPY #2 ARRESTING AGENCY

CALUMET PARK POLICE DEPARTMENT

GENERAL OFFENSE CASE REPORT

Offense/Incident—Primary Classification: Unlawful Restraint
Secondary Classification:
R.D. No.: 92 1955
Zone of Occurrence:

**SCENE**

Address of Occurrence: 12519 Honore
Apt. No.:
Date R.O. Arrived: 4/6/92
Time: 11:01
Type of Location or Premises Where Offense Occured (give name of location if applicable): sidewalk
Isparn-Message No.:
Unit Assigned: 771

All information, descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

**COMPLAINTANT VICTIM**

| No. Vic. | Victim's Name (Firm Name if Business) | Sex | Race | Date of Birth | Business Phone | D/L # |
|---|---|---|---|---|---|---|
| 1 | Tina Brown | F | B | 4/12/75 | | |

Victim's Address: 12345 Honore
Apt. No. (If Business Name Company Rep.):
Home Phone: 385 1458
S.S. #:

Parent/Guardian, If Juv.: Luther Brown ☐ Contacted ☐ DNA
Sex: M Race: B Home Address: 12345 Honore Apt. No.:
Home Phone: 385 1458 Business Phone:

Victim's Vehicle: Year: Make: Body Style: Color: State Lic. No.: State: Year: V.I.N. No.:

| No. Vic. | Victim's Name (Firm Name if Business) | Sex | Race | Date of Birth | Business Phone | D/L # |
|---|---|---|---|---|---|---|
| | | | | | | |

Victim's Address: Apt. No. (If Business Name Company Rep.): Home Phone: S.S. #:

Parent/Guardian, If Juv.: ☐ Contacted ☐ DNA Sex: Race: Home Address: Apt. No.: Home Phone: Business Phone:

**WITNESS**

| No. Wit. | Witness' Name | Sex | Race | Date of Birth | Business Phone | D/L # |
|---|---|---|---|---|---|---|
| | victim ☐ Reported ☐ Witnessed | | | | | |

DNA ☐ Witness' Address: Apt. No.: Home Phone: S.S. #:

| No. Wit. | Witness' Name | Sex | Race | Date of Birth | Business Phone | D/L # |
|---|---|---|---|---|---|---|
| | Michael Bozeman ☐ Discovered ☒ Witnessed | M | B | | | |

DNA ☐ Witness' Address: 124 Honore Apt. No.: Home Phone: S.S. #:

**OFFENDER**

| No. Off. | Offender's Name ☐ UNK (or describe clothing, etc.) | Sex | Race | DOB | Height | Weight | Eyes | Hair | Complexion |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Cedric A Ricks | M | B | 9/8/74 | | | | | |

DNA ☐ Offender's Address: 12341 Bishop
TX Phone No.: 371 7983
Alias Marks, Scars, Deformities, etc.:

UNK ☐ Offender's Vehicle ☐ UNK ☐ Stolen
Year: 89 Make: Linc Body Style: cont Color: blue State Lic. No.: RH 7990 State: IL Year: 92 Other Identifying Marks:

| No. Off. | Offender's Name ☐ UNK (or describe clothing, etc.) | Sex | Race | DOB | Height | Weight | Eyes | Hair | Complexion |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

DNA ☐ Offender's Address: TX Phone No.: Alias Marks, Scars, Deformities, etc.:

| No. Off. | Offender's Name ☐ UNK (or describe clothing, etc.) | Sex | Race | DOB | Height | Weight | Eyes | Hair | Complexion |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

DNA ☐ Offender's Address: TX Phone No.: Alias Marks, Scars, Deformities, etc.:

**NARRATIVE**

Narrative (Do not duplicate or repeat above information — for explanation or additional information only)

The victim came into our PD at approx. 11:00 HRS. with her father and explained the following: The victim left the house at approx. 07:40 HRS. and proceeded to 127th & Honore to wait for the school bus. While walking in the area of 12519 Honore, an offender came from behind and began pulling on the victims left arm. The victim turned and observed the offender (ex-boyfriend). The offender began pulling her and stated: "your coming with me". The victim struggled and stated "I'm not." The offender continued to pull on the victims arm and stated "be quiet and hurry up". The offender

**POLICE PERSONNEL**

| Reporting Officer's Name | Star No. | Officer's Name | Star No. | Time Assigned | Assigned By |
|---|---|---|---|---|---|
| Groszek | 23 | | | 11:01 | L.J. |

| Officer's Name | Star No. | Officer's Name | Star No. | Typed By | Star No. |
|---|---|---|---|---|---|
| | | | | L.J. | 606 |

| Shift Supervisor | Star No. | Approval Signature | Date Approved | No. of Copies |
|---|---|---|---|---|
| Sgt. Godbout | 5 | [signature] | 4-8-92 | 1 Newspaper 1 INV S.A. R.O. |

000333

then pulled the victim by force to 12501 Honore and then E/B on 125th. The victim then observed the offenders fathers vehicle parked in the alley behind 12501 Honore. The offender pulled the victim in the vehicle and forced the victim into the back seat. The offender then locked the door and entered the drivers seat of the vehicle. The offender proceeded to 127th street. and W/B on 127th until reaching Western and then N/B Western. The offender stated "I broke your boyfriends window saturday night, I;m not gonna let you get out of a relationship, I'll make everyday miserable". The offender continued to ride around demanding to know what the victim is sexually doing with her boyfrien The offender also explained that he has been watching them when they are inside the boyfriends house. The offender continued to reide around the area of 95th and Western stating that he has her now and theres nothing she can do. After a period of time, the victim convinced the offender to allow her to climb to the front seat. While the offender continued to ride around, the victim removed a canister of mace from her purce and placed the canister in her coat pocket. As the offender proceeded back S/B on Western, the offender stated that he should take her to his hou and lock her in and she would not be able to do anything about it. The offender began to approach a red signal at 109th and Western. The victim began to worry that the offender would proceed to the house and force her inside. As The offender stopped for the light, the victim removed the canister and sprayed the offender in the face. The victim immediately exited the vehicle and began running N/B Western to 111th. The victim telephoned her father at home andrequested his help. The father picked her up and she explained the incident. RO learned from the father that he recieved the telephone call for held around 9:30-10:00 hrs. The father then proceeded to 111th and Western to pick up the victim and find out about the incident. The father informed RO that he wished to pursue the matter. RO recieved the canister from the victim. RO observed that the canister is a 1 1/2 oz. canister of Halt Dog repellent. RO secured the canister into evidence under evidence #91-148 RO conducted patrol at the offenders residence with negative findings.

VILLAGE OF CALUMET PARK / DEPARTMENT OF POLICE — 12409 Throop Street Calumet Park, Illinois 60643 — 385-6882

CALUMET PARK POLICE

RONALD P. ROMANOWSKI, Mayor
THOMAS M. ZIELINSKI, Chief of Police

RD# 92-1955

CONSTITUTIONAL RIGHTS AND WARNINGS

DATE 4-7-92 PLACE Calumet Park P.D. TIME 08:10

NAME Cedric A. Ricks DATE OF BIRTH 9-8-74

1. That I have the right to remain silent and not make any statement at all.

I understand this segment(initial CR

2. That anything I say can and will be used against me in a court or courts of Law for the offense or offenses by which this warning is executed.

I understand this segment (initial) CR

3. That I can hire a lawyer of my own choice to be present and advise me before and during any statement.

I understand this segment(initial) CR

4. That if I am unable to hire a lawyer I can request and receive appointment of a lawyer by the proper authority, without cost or charge to me.

I understand this segment(initial) CR

5. That I can refuse to answer any questions or stop giving statement any time I want to.

I understand this segment(initial) CR

I have read or have had read to me the five (5) segments, stipulating my Constitution rights and understand each to the fullest extent.

Cedric Ricks
SIGNATURE

Witnessed:

Inv. J.A. Kett #20

1 PRP
1 RO

000235

# VOLUNTARY STATEMENT

DATE April 7, 1992 PLACE Calumet Park Police Dept TIME STARTED 08:15 A M.

I, the undersigned Cedric A. Ricks, am 17 years of age, having been born on Sept. 8, 1974 at Mercy Hospital in Chicago Il.

I now live at 12341 Bishop, Calumet Park, Il.

I have been duly warned and advised by Inv. J. A. Kraft #20, a person who has identified himself as Calumet Park Police Officer, that I do not have to make any statement at all, nor answer any questions or do anything that might tend to go against me or incriminate me in any manner, and that any statement I make, can and will be used against me on the trial or trials for the offense or offenses concerning which the following statement is herein made. I was also warned and advised of my right to the advice and presence of a lawyer of my own choice before or at any time during my questioning or statement I make, and if I am not able to hire a lawyer I may request and have a lawyer appointed for me, by the proper authority, without cost or charge to me.

I do not want to talk to a lawyer, and I hereby knowingly and purposely waive my right to the advice and presence of a lawyer before and during any questioning or at any time before or while I voluntarily make the following statement to the aforesaid person, knowing that anything I say can and will be used against me in a court or courts of law.

I declare that the following voluntary statement is made to the aforesaid person of my own free will without promise of hope or reward, without fear or threat of physical harm, without coercion, favor or offer of favor, without leniency or offer of leniency, by any person or persons whomsoever.

On Monday, April 6th, at about 7:50am I walked up behind Tina Brown at 125th Honore at the bus stop. I grabbed her by the right arm, Tina was scared. I ~~xxxxx~~ [JAK CR] took Tina to the car that was parked about a block away. The car was parked in the alley at the end of the block between Honore and Wood St. I put Tina in the back seat because I ~~xxxxx~~ [JAK CR] thought she would jump out while I was driving. I drove around Palos by Sheppard High School. We talked for ~~xxx~~ [JAK CR] awhile. Tina asked if she could get in the front seat, I said "yeh". Tina got in the front and said she wanted to go to school. I drove towards Ford City. We stopped at McDonalds and talked somemore. I ~~xxxx~~ [JAK CR] stopped for gas at the Amoco and bought Tina a strawberry pop. While we were driving around, we made up a story ~~xxx~~ [JAK CR] so Tina wouldn't get in trouble with school or [JAK CR] her parents. Then I dropped Tina off at 109th & Western by Baskin-Robins. Then I drove home.

X Cedric Ricks

I have read this statement consisting of 1 page(s), and I certify that the facts contained therein are true and correct. I further certify that I made no request for the advice or presence of a lawyer before or during any part of this statement, nor at any time before it was finished did I request that this statement be stopped. I also declare that I was not told or prompted what to say in this statement.

This statement was completed at 8:35 A M. on the 7th day of April, 19 92

WITNESS: Inv. J. A. Kraft #20 X Cedric Ricks

WITNESS: ______ Signature of person giving voluntary statement

000236

R.D.# 92-1955

**SUPPLEMENTARY REPORT / CALUMET PARK POLICE**

| OFFENSE/CLASSIFICATION ON LAST PREVIOUS REPORT | OFFENSE/CLASSIFICATION AS OF THIS DATE (IF SAME AS NO. 1, WRITE 'DNA') | BEAT OR UNIT ASSIGNED | BEAT OF OCCURRENCE |
|---|---|---|---|
| UNLAWFUL RESTRAINT | | 777 | 3 |

| VICTIM'S NAME | VICTIM'S ADDRESS / APT. NO | DATE REPORTING OFF. ARR.—ORIGINAL CASE | TIME |
|---|---|---|---|
| TINA BROWN | 12345 S. HONORE, CALUMET PK | 04-06-92 | 11:01 |

STATUS (CHECK ONE): CLEARED 1 [X] UNFOUNDED 2 [ ] NOT CLEARED 3 [ ]
IS FURTHER POLICE ACTION REQUIRED? 1 [ ] YES [X] NO
IF CASES IS CLEARED, HOW CLEARED? (USE THIS BOX FOR SINGLE CLEAR-UP OR FIRST CLEAR-UP OF MULTIPLE CLEAR-UP LIST.) 1 [X] ARREST & PROSC. 2 [ ] PETITIONED TO JUV. CT. 3 [ ] COMPLT. REFUSED TO PROSECUTE 4 [ ] STATION ADJUSTMENT 5 [ ] OTHER EXCEPTIONAL

MULTIPLE CLEARANCES: LIST ALL MULTIPLE CLEARANCES IN THE BOXES PROVIDED AND EXTEND THE LIST BELOW IF NECESSARY. START THE NARRATIVE SECTION OF THE REPORT IMMEDIATELY FOLLOWING THE MULTIPLE CLEAR-UP LIST.

| R.D. NO | BEAT OF OCC. | OFFENSE (GIVE THE OFFENSE/CLASSIFICATION OF LAST REPORT) | CLEARED BY ARREST | CLEARED EXCEPTIONAL: REFUSED TO PROSECUTE | PETITIONED TO JUV. CT. | STATION ADJUST-MENT | OTHER EXCEPT-IONAL |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

NARRATIVE

R/I WAS ASSIGNED TO FOLLOW-UP ON ABOVE CASE. R/I's WENT TO 12341 BISHOP AND WERE ALLOWED ENTRY BY OWNER, SHEDRIC RICKS. R/I's ADVISED MR. RICKS OF FACTS AS KNOWN AND REQUESTED TO SPEAK TO HIS SON CEDRIC TO WHICH HE AGREED. R/I's REQUESTED CEDRIC RICKS TO ACCOMPANY THEM TO C.P.P.D. TO WHICH HE AGREED. AT THIS P.D. RICKS WAS READ HIS MIRANDA RIGHTS WHICH HE EXPLAINED HE UNDERSTOOD AND WAIVED. RICKS EXPLAINED THAT HE DID GRAB MS. BROWN BY THE ARM AT 125th AND HONORE AND HE DID LOCK HER IN THE BACK SEAT HOWEVER HE DENIES THREATENING HER. MR. RICKS EXPLAINED THAT WHILE HE HAD VICTIM IN HIS AUTO, THAT THEY TALKED ABOUT GETTING BACK TOGETHER. R/I THEN INTERVIEWED VICTIM WHO ADVISED THAT MR. RICKS WAS LYING, THAT INCIDENT OCCURRED AS REPORTED. R/I THEN SPOKE TO WITNESS: MICHAEL BOZEMAN, M/B, DOB/05-28-76, 12511 S. HONORE, TK/389-1618. MR. BOZEMAN ADVISED THAT VICTIM, TINA BROWN WAS WALKING BEHIND HIM, BOZEMAN TURNED TO SEE OFFENDER (RICKS) RUN FROM AROUND THE CORNER, GRAB VICTIM BY THE COAT COLLAR AT WHICH TIME VICTIM ASKED "WHERE YOU TAKING ME"? BOTH VICTIM AND RICKS DISAPPEARED BACK AROUND CORNER. A FEW MINUTES LATER BOZEMAN SAW VICTIM IN REAR SEAT OF A BLUE LINCOLN DRIVEN BY RICKS GOING THE WRONG WAY ON THE 12600 BLOCK OF HONORE. R/I CONFRONTED OFFENDER WITH ABOVE. OFFENDER STOOD BY THE EXPLANATION HE HAD GIVEN R/I EARLIER. OFFENDER THEN GAVE R/I A WRITTEN STATEMENT. (ATTACHED). R/I THEN CONTACTED A.S.A SHEILA MCGUINESS, ADVISED HER OF SITUATION, BECAUSE OF CONFLICTING STORIES ARRANGEMENT WERE MADE TO HAVE A.S.A KEN GOFF INTERVIEW VICTIM, OFFENDER AND WITNESS AT C.P.P.D. ON THE EVENING OF 04-07-92. AT APPROX. 19:00hrs. VICTIM, MS.BROWN

RECORD ALL DEVELOPMENTS IN THE CASE SINCE THE LAST REPORT WAS FILED. IF THE CLASSIFICATION IS CHANGED, EXPLAIN WHY. GIVE THE DESCRIPTION, DISPOSITION, & INVENTORY NUMBERS OF ALL PROPERTY RECOVERED.

| EXTRA COPIES REQUIRED, IF ANY (NO. & RECIPIENT) | | DATE OF THIS REPORT | TIME | SUPERVISOR APPROVING | STAR NO. |
|---|---|---|---|---|---|
| L.EVANS | 607 | 04-07-92 | | [signature] | |
| **REPORTING OFFICER** | **STAR NO.** | **REPORTING OFFICER** | **STAR NO.** | **DATE** | **TIME** |
| INV.J.A. KRAFT | 20 | SGT. THEIS | | 4-9-92 | |

000237

AND WITNESS ARRIVED AT C.P.P.D. R/I PLACED SUBJECTS IN COUNSIL AREA SEPERATED AND AWAITED THE ARRIVAL OF A.S.A. AT APPROX. 2000hrs A.S.A KEN GOFF ARRIVED. A.S.A GOFF CONDUCTED INTER VIEWS WITH WITNESS, VICTIM AND OFFENDER, AFTER INTERVIEWS AND A REVIEW OF THE FACTS, ASA. GOFF ADVISED TO CHARGE OFFENDER WITH MISD. CHARGES:

1). DISORDERLY CONDUCT, (2). BATTERY, (3). ASSAULT

BOND SET R.O.C. $1000.00-10% APPLIES. COURT DATE OF MAY 21,1992, IN ROOM 205 COURT KEY K-1. A.S.A. GOFF ADVISED BOTH VICTIM AND OFFENDER THAT THERE SHOULD BE NO CONTACT BETWEEN THEM. VICTIM'S MOTHER WAS ALSO ADVISED OF THE RESULTS OF THE INTERVIEWS AND A.S.A GOFF'S RECOMMEN DATIONS.

CASE CLOSED, CLEARED BY ARREST.



Calumet Park Police Department
12409 South Throop Street
Calumet Park, IL 60827

Criminal District Atto[illegible]
Tarrant County J[illegible]
ATTN. Maria [illegible]
401 W Belkn[illegible]
Fort Worth



Cause # ☒ 1325203
Incident # ☐
(Insert Cause or Incident # Above)

[handwritten, illegible]
Defendant

Work Product: ☐ Yes ☒ No RUSH ☐ Yes ☒ No
Return to ☐ Case File or ☒ Specific Individual
(Listed Below)

Person Req.: Gill Tel. Ext.: 1622

☐ Shred [handwritten, illegible]

Southside Christian Counseling Center receipts. 1991. Rcvd from Helen and Shederick Ricks

| DATE | PROCEDURE CODE | DESCRIPTION | FEE | PAYMENT | ADJUSTMENT | BALANCE | NAME |
|---|---|---|---|---|---|---|---|
| 10-24-? | | KOA (10/X) | | 75 | | -0- | Cedric Ricks |

SOUTHSIDE CHRISTIAN COUNSELING CENTER

PLEASE PAY THIS AMOUNT ____

8951 W. 151st. STREET
ORLAND PARK, IL 60462
(708) 403-3373
TAX ID # 36-3464464

BRIDGE TO WHOLENESS

SUDHIR M. GOKHALE, M.D.
SUPERVISING PSYCHIATRIST
ID# 36-3464464
IL LIC# 036-058850
MEDICARE# 669858
BC OF IL PROVIDER# 816-12178-88

CLARA T. PEREZ, M.D.
SUPERVISING PSYCHIATRIST
ID# 36-3464464
IL LIC# 036-067468
MEDICARE# 777540
BC of IL PROVIDER# 66-31666158

Helen Ricks
12341 S. Bishop
Calumet Park IL 60643

DX: Thank You!

IF UNABLE TO KEEP THIS APPOINTMENT KINDLY GIVE TWENTY-FOUR HOUR NOTICE. IF NOT NOTIFIED, CHARGE WILL BE MADE FOR TIME RESERVED.

YOUR NEXT APPOINTMENT WILL BE

| PATIENT NAME | DATE | DAY | TIME |
|---|---|---|---|
| | | | |

PLEASE RETAIN FOR YOUR RECORDS

10792

000242

| DATE | PROCEDURE CODE | DESCRIPTION | FEE | PAYMENT | ADJUSTMENT | BALANCE | | NAME |
|---|---|---|---|---|---|---|---|---|
| 6/14/1 | | Therapy | 75 | 75 | | 0 | | Ellie Rikes |

SOUTHSIDE CHRISTIAN COUNSELING CENTER

PLEASE PAY THIS AMOUNT

8951 W. 151st. STREET
ORLAND PARK, IL 60462
(708) 403-3373
TAX ID # 36-3464454

SUDHIR M. GOKHALE, M.D.
SUPERVISING PSYCHIATRIST
ID# 36-3464454
IL LIC# 036-066868
MEDICARE# 668830
SC of IL PROVIDER# 016-18179-82

CLARA T. PEREZ, M.D.
SUPERVISING PSYCHIATRIST
ID# 36-3464454
IL LIC# 036-067462
MEDICARE# 777648
SC of IL PROVIDER# 08-3158015a

331-2150

DX:

IF UNABLE TO KEEP THIS APPOINTMENT
KINDLY GIVE TWENTY-FOUR HOUR NOTICE.
IF NOT NOTIFIED, CHARGE WILL BE MADE FOR TIME RESERVED.

| YOUR NEXT APPOINTMENT WILL BE | | | |
|---|---|---|---|
| PATIENT NAME | DATE | DAY | TIME |

PLEASE RETAIN FOR YOUR RECORDS

9007

| DATE | PROCEDURE CODE | DESCRIPTION | FEE | PAYMENT | ADJUSTMENT | BALANCE | | NAME |
|---|---|---|---|---|---|---|---|---|
| 6-25-91 | 90844 | Therapy | 75 - | 150 - | | -0- | | Cedric Ricks |

SOUTHSIDE CHRISTIAN COUNSELING CENTER
6951 W. 151st. STREET
ORLAND PARK, IL 60462
(708) 403-3373
TAX ID # 36-3464464

BRIDGE TO ENCLOSURE

PLEASE PAY THIS AMOUNT ____ $

SUDHIR M. GOKHALE, M.D.
SUPERVISING PSYCHIATRIST
ID# 36-3464464
IL LIC# 036-058556
MEDICARE# 989850
BC OF IL PROVIDER# 019-18179-60

CLARA T. PEREZ, M.D.
SUPERVISING PSYCHIATRIST
ID# 36-3464464
IL LIC# 036-067488
MEDICARE# 777540
BC of IL PROVIDER# 00-31590156

DX: ____

IF UNABLE TO KEEP THIS APPOINTMENT
KINDLY GIVE TWENTY-FOUR HOUR NOTICE.
IF NOT NOTIFIED, CHARGE WILL BE MADE FOR TIME RESERVED.

YOUR NEXT APPOINTMENT WILL BE

| PATIENT NAME | DATE | DAY | TIME |
|---|---|---|---|
| | | | |

PLEASE RETAIN FOR YOUR RECORDS

9270

000244

| DATE | PROCEDURE CODE | DESCRIPTION | FEE | PAYMENT | ADJUSTMENT | BALANCE | NAME |
|---|---|---|---|---|---|---|---|
| 1-4-91 | 40844 | Therapy | 75 - | -0- | | 75 - | Cedric Ricks |

SOUTHSIDE CHRISTIAN COUNSELING CENTER

PLEASE PAY THIS AMOUNT $

BRIDGE TO WHOLENESS

8951 W. 151st. STREET
ORLAND PARK, IL 60462
(708) 403-3373
TAX ID # 36-3464454

SUDHIR M. GOKHALE, M.D.
SUPERVISING PSYCHIATRIST
ID# 36-3464454
IL LIC# 036-053054
MEDICARE# 868858
BC Of IL PROVIDER# 016-18179-68

CLARA T. PEREZ, M.D.
SUPERVISING PSYCHIATRIST
ID# 36-3464454
IL LIC# 036-067458
MEDICARE# 777548
BC of IL PROVIDER# 00-31000158

DX: DSM III-R 309.40

IF UNABLE TO KEEP THIS APPOINTMENT KINDLY GIVE TWENTY-FOUR HOUR NOTICE. IF NOT NOTIFIED, CHARGE WILL BE MADE FOR TIME RESERVED.

YOUR NEXT APPOINTMENT WILL BE

| PATIENT NAME | DATE | DAY | TIME |
|---|---|---|---|
| | | | |

PLEASE RETAIN FOR YOUR RECORDS

9417

| DATE | PROCEDURE CODE | DESCRIPTION | FEE | PAYMENT | ADJUSTMENT | BALANCE | | NAME |
|---|---|---|---|---|---|---|---|---|
| 7-2-91 | 40844 | Therapy | 75 | 75 | | -0- | | Cedric Ricks |

SOUTHSIDE CHRISTIAN COUNSELING CENTER

PLEASE PAY THIS AMOUNT $

BRIDGE TO WHOLENESS

8951 W. 151st. STREET
ORLAND PARK, IL 60462
(708) 403-3373
TAX ID # 36-3464454

SUDHIR M. GOKHALE, M.D.
SUPERVISING PSYCHIATRIST
ID# 36-3464454
IL LIC# 036-068058
MEDICARE# 089058
DC OF IL PROVIDER# 218-18178-08

CLARA T. PEREZ, M.D.
SUPERVISING PSYCHIATRIST
ID# 36-3464454
IL LIC# 036-067481
MEDICARE# 777840
DC of IL PROVIDER# 36-31668188

DX:

IF UNABLE TO KEEP THIS APPOINTMENT
KINDLY GIVE TWENTY-FOUR HOUR NOTICE.
IF NOT NOTIFIED, CHARGE WILL BE MADE FOR TIME RESERVED.

| YOUR NEXT APPOINTMENT WILL BE | | | |
|---|---|---|---|
| PATIENT NAME | DATE | DAY | TIME |

PLEASE RETAIN FOR YOUR RECORDS

9338

| DATE | PROCEDURE CODE | DESCRIPTION | FEE | PAYMENT | ADJUSTMENT | BALANCE | | NAME |
|---|---|---|---|---|---|---|---|---|
| 7.18.91 | 40844 | Therapy | 75 - | 150 - | | -0- | TC | Cedric Richs |

SOUTHSIDE CHRISTIAN COUNSELING CENTER

PLEASE PAY THIS AMOUNT ___ $

8951 W. 151st. STREET
ORLAND PARK, IL 60462
(708) 403-3373
TAX ID # 36-3464464

BRIDGE TO WHOLENESS

SUDHIR M. GOKHALE, M.D.
SUPERVISING PSYCHIATRIST
ID# 36-3464464
IL LIC# 036-058859
MEDICARE# 889658
BC OF IL PROVIDER# 019-18179-68

CLARA T. PEREZ, M.D.
SUPERVISING PSYCHIATRIST
ID# 36-3464464
IL LIC# 036-057466
MEDICARE# 777540
BC of IL PROVIDER# 09-31698158

DX: DSM III-R 309.40

IF UNABLE TO KEEP THIS APPOINTMENT
KINDLY GIVE TWENTY-FOUR HOUR NOTICE.
IF NOT NOTIFIED, CHARGE WILL BE MADE FOR TIME RESERVED.

YOUR NEXT APPOINTMENT WILL BE

| PATIENT NAME | DATE | DAY | TIME |
|---|---|---|---|
| | | | |

PLEASE RETAIN FOR YOUR RECORDS

9512

| DATE | PROCEDURE CODE | DESCRIPTION | FEE | PAYMENT | ADJUSTMENT | BALANCE | | NAME |
|---|---|---|---|---|---|---|---|---|
| 8/3/94 | | [illegible] | 75 | 75 | | 0 | | Cedric Richo |

**SOUTHSIDE CHRISTIAN COUNSELING CENTER**

PLEASE PAY THIS AMOUNT ____ $

8951 W. 151st. STREET
ORLAND PARK, IL 60462
(708) 403-3373
TAX ID # 36-3464454

BRIDGE TO WHOLENESS

SUDHIR M. GOKHALE, M.D.
SUPERVISING PSYCHIATRIST
ID# 36-3464454
IL LIC# 036-060184
MEDICARE# 060456
BC of IL PROVIDER# 016-18179-00

CLARA T. PEREZ, M.D.
SUPERVISING PSYCHIATRIST
ID# 36-3464454
IL LIC# 036-067488
MEDICARE# 777546
BC of IL PROVIDER# 06-31088150

DX:

IF UNABLE TO KEEP THIS APPOINTMENT
KINDLY GIVE TWENTY-FOUR HOUR NOTICE.
IF NOT NOTIFIED, CHARGE WILL BE MADE FOR TIME RESERVED.

YOUR NEXT APPOINTMENT WILL BE

| PATIENT NAME | DATE | DAY | TIME |
|---|---|---|---|
| | | | |

PLEASE RETAIN FOR YOUR RECORDS

9727

000248

| DATE | PROCEDURE CODE | DESCRIPTION | FEE | PAYMENT | ADJUSTMENT | BALANCE | | NAME |
|---|---|---|---|---|---|---|---|---|
| 8-6-9[illegible] | | [illegible] | 75 | 75 | | 0 | | Cedric Hicks |

SOUTHSIDE CHRISTIAN COUNSELING CENTER

PLEASE PAY THIS AMOUNT ____ $

8951 W. 151st. STREET
ORLAND PARK, IL 60462
(708) 403-3373
TAX ID # 36-3464454

BRIDGE TO WHOLENESS

SUDHIR M. GOKHALE, M.D.
SUPERVISING PSYCHIATRIST
ID# 36-3464454
IL LIC# 036-056556
MEDICARE# 999056
BC of IL PROVIDER# 018-18178-01

CLARA T. PEREZ, M.D.
SUPERVISING PSYCHIATRIST
ID# 36-3464454
IL LIC# 036-057466
MEDICARE# 777546
BC of IL PROVIDER# 00-21600150

DX: ____

IF UNABLE TO KEEP THIS APPOINTMENT
KINDLY GIVE TWENTY-FOUR HOUR NOTICE.
IF NOT NOTIFIED, CHARGE WILL BE MADE FOR TIME RESERVED.

| YOUR NEXT APPOINTMENT WILL BE | | | |
|---|---|---|---|
| | | | |
| PATIENT NAME | DATE | DAY | TIME |

PLEASE RETAIN FOR YOUR RECORDS

09802

000249

Case 4:20-cv-01299-O Document 52-1 Filed 12/21/22 Page 447 of 502 PageID 10284

| DATE | PROCEDURE CODE | DESCRIPTION | FEE | PAYMENT | ADJUSTMENT | BALANCE |
|---|---|---|---|---|---|---|
| 8-13-91 | | Therapy | 75 — | 75 — | | 0 |

NAME: Cedric Ricks

**SOUTHSIDE CHRISTIAN COUNSELING CENTER**

PLEASE PAY THIS AMOUNT ____ $

BRIDGE TO WHOLENESS

8951 W. 151st. STREET
ORLAND PARK, IL 60462
(708) 403-3373
TAX ID # 36-3484484

SUDHIR M. GOKHALE, M.D.
SUPERVISING PSYCHIATRIST
ID# 36-3484484
IL LIC# 036-059658
MEDICARE# 983655
BC OF IL PROVIDER# 013-16178-86

CLARA T. PEREZ, M.D.
SUPERVISING PSYCHIATRIST
ID# 36-3484484
IL LIC# 036-057488
MEDICARE# 777940
BC of IL PROVIDER# 08-31680184

DX: ____

IF UNABLE TO KEEP THIS APPOINTMENT
KINDLY GIVE TWENTY-FOUR HOUR NOTICE.
IF NOT NOTIFIED, CHARGE WILL BE MADE FOR TIME RESERVED.

| YOUR NEXT APPOINTMENT WILL BE | | | |
|---|---|---|---|
| | | | |
| PATIENT NAME | DATE | DAY | TIME |

PLEASE RETAIN FOR YOUR RECORDS

09868

000250

Christ Hospital admission and discharge summary. 1991.10.81. Rcvd from Helen and Shederick Ricks

EHS

Christ Hospital & Medical Center

Cedric Ricks 510E-1

## APPLICATION BY AN ADULT FOR THE ADMISSION OF A MINOR

Name of minor Cedric Ricks Birthdate 9-08-974

Minor's complete address 12341 S. Bishop ~~Chi~~ Calumet PK, IL. 60643

Name of parent, guardian or person in loco parentis Helen Ricks

Complete address 12341 S. Bishop Calumet PK, IL. 60643

Phone (708) 371-7985

I hereby request that this facility admit and provide inpatient services to:

Cedric Ricks
NAME

Date 10-18-91 Signed X Helen R. Ricks

Relationship to minor X Mother

If the applicant is NOT the parent, guardian, or person in loco parentis of the minor he/she must certify, by signing below, that he/she believes the minor is in such condition that immediate hospitalization is necessary and has made diligent but unsuccessful effort to locate the minor's parent, guardian, or person in loco parentis.

Signed

The minor was:
☒ admitted
☐ denied admission

on October 18, (date) 19 91 at 5:35 P.M. (time)

Signed X Linda Luckett

Title Crisis/Adm. C.

Facility Director Dr. Gokhale

I have explained the rights on the back of this form to the person executing this application and to the minor (if 12 or older), and have given each a copy of this form.

I have also provided them with a copy of Rights of Recipients (MHDD-1) and explained those rights to them.

Signed Linda Luckett

Title Crisis/Adm. C.

IMPORTANT INFORMATION IS ON THE BACK OF THIS APPLICATION

APPLICATION BY AN ADULT FOR THE ADMISSION OF A MINOR

80-MH-6
Ref.: Sections 3-503, 3-504

1174 - 12/88

000252

## RIGHTS OF MINOR ADMITTEE

If you are 12 or older you have the right to object to your admission to the facility at any time; or any interested person over 18 may object or request a discharge on your behalf. Your objection or request must be in writing. When an objection or request for discharge is made, you should be discharged at the earliest appropriate time, but not longer than 15 days — excluding Saturdays, Sundays and holidays, unless:

1.  You withdraw the objection.

2.  The facility files a petition and two certificates with the court for review of your admission. You will then have an attorney appointed to represent you and the court will decide if you should be discharged.

If you are still a patient in 30 days, the Facility Director will review your record. If he/she determines you need further hospitalization, he/she will talk to the person who signed your admission form. That person must agree to have you stay in the facility or it will be considered as request for discharge (above). Every 60 days, until you are discharged, the Facility Director will review your record and talk to the person who signed the admission form.

A Guardianship and Advocacy Commission has been created which consists of three divisions: Legal Advocacy Service, Human Rights Authority and the Office of the State Guardian. The commission is located at:

305 Stratton Building  
Springfield, IL 62706  
Telephone (217) 785-1540

527 S. Wells, Suite 300  
Chicago, IL 60607-3922  
Telephone (312) 793-5900

EHS
Christ Hospital & Medical Center

Cedric Ricks 510E-1

## APPLICATION BY AN ADULT FOR THE ADMISSION OF A MINOR

Name of minor Cedric Ricks Birthdate 9-08-974

Minor's complete address 12341 S. Bishop Calumet PK, IL. 60643

Name of parent, guardian or person in loco parentis Helen Ricks

Complete address 12341 S. Bishop Calumet PK, IL. 60643

Phone (708) 371-7985

I hereby request that this facility admit and provide inpatient services to:

Cedric Ricks
NAME

Date 10-18-91 Signed X Helen R. Ricks

Relationship to minor X Mother

If the applicant is NOT the parent, guardian, or person in loco parentis of the minor he/she must certify, by signing below, that he/she believes the minor is in such condition that immediate hospitalization is necessary and has made diligent but unsuccessful effort to locate the minor's parent, guardian, or person in loco parentis.

Signed

The minor was:
- [x] admitted
- [ ] denied admission

on October 18, 19 91 at, 5:35 P.M.
(date) (time)

Signed X Linda Luckett

Title Crisis/Adm. C.

Facility Director Dr. Gokhale

I have explained the rights on the back of this form to the person executing this application and to the minor (if 12 or older), and have given each a copy of this form.

I have also provided them with a copy of Rights of Recipients (MHDD-1) and explained those rights to them.

Signed Linda Luckett

Title Crisis/Adm. C.

IMPORTANT INFORMATION IS ON THE BACK OF THIS APPLICATION

APPLICATION BY AN ADULT FOR THE ADMISSION OF A MINOR

80-MH-6
Ref.: Sections 3-503, 3-504

1174 - 12/88

000254

## RIGHTS OF MINOR ADMITTEE

If you are 12 or older you have the right to object to your admission to the facility at any time; or any interested person over 18 may object or request a discharge on your behalf. Your objection or request must be in writing. When an objection or request for discharge is made, you should be discharged at the earliest appropriate time, but not longer than 15 days — excluding Saturdays, Sundays and holidays, unless:

1. You withdraw the objection.

2. The facility files a petition and two certificates with the court for review of your admission. You will then have an attorney appointed to represent you and the court will decide if you should be discharged.

If you are still a patient in 30 days, the Facility Director will review your record. If he/she determines you need further hospitalization, he/she will talk to the person who signed your admission form. That person must agree to have you stay in the facility or it will be considered as request for discharge (above). Every 60 days, until you are discharged, the Facility Director will review your record and talk to the person who signed the admission form.

A Guardianship and Advocacy Commission has been created which consists of three divisions: Legal Advocacy Service, Human Rights Authority and the Office of the State Guardian. The commission is located at:

305 Stratton Building
Springfield, IL 62706
Telephone (217) 785-1540

527 S. Wells, Suite 300
Chicago, IL 60607-3922
Telephone (312) 793-5900

EHS

Christ Hospital & Medical Center

## RIGHTS OF RECIPIENTS

Following are some of your rights. You have other rights that concern procedures of admission and discharge. These rights do not appear on these pages. However, you DO have a copy of these procedural rights; if you have admitted yourself voluntarily, look on the back of your voluntary (80-MH-2) or administrative application (80-DD-1). If you are here involuntarily, look on the back of the Petition for Admission, and also look at both sides of any court orders you have received or may receive.

## RIGHTS OF RECIPIENTS OF MENTAL HEALTH AND DEVELOPMENTAL DISABILITIES SERVICES

RETENTION OF RIGHTS

1. As a general rule, you lose none of your rights, benefits, or privileges simply because you are a recipient of mental health or developmental disabilities services. For example, you do not lose your right to vote or to attend religious services. However, you should know that persons admitted to mental health facilities will be disqualified from receiving firearm owner's identification cards, or may lose such cards possessed prior to admission.

HUMANE CARE SERVICES PLAN

2. You are entitled to adequate and humane care and services in the least restrictive environment and an individual services plan.

MAIL/PHONE CALLS

3. You have the right to communicate with other people in private, without obstruction or censorship by the staff at the facility. This right includes mail, telephone calls, and visits.

VISITS

There are limits upon this right. They are:
(a) communication by these means may be reasonably restricted by the Director of the facility, but only to protect you or others from harm, harassment, or intimidation.

PROPERTY

4. You are entitled to receive, possess, and use personal property unless it is determined that certain items are harmful to you or others.

When you are discharged, all lawful property must be returned to you.

MONEY

5. You may use your money as you choose, unless you are under 18 or prohibited from doing so under a court guardianship order.

BANKING

You may deposit your money at a bank or place it for safe keeping with the facility. If the facility deposits your money, any interest earned will be yours.

Neither this facility nor any of its employees may act as payee to receive any payment or assistance directed to you, including Social Security and pension, annuity, or trust fund payments without your informed consent.

LABOR

6. You must be paid for work you are asked to perform which benefits the facility. But note: You may be required to do personal housekeeping chores without being paid.

REFUSING SERVICES

7. You (or your guardian on your behalf) have the right to refuse services, including medication. If you refuse, you will not be given such services, except when necessary to prevent you from causing serious harm to yourself or others.

RESTRAINTS

8. Restraints may be used only to protect you from physically harming yourself or others, or as a part of a medical/surgical procedure.

SECLUSION

9. Seclusion will only be used to prevent you from physically harming yourself or others.

UNUSUAL SERVICES

10. You will not receive electro-convulsive therapy (electroshock) without your informed consent.

Any unusual, hazardous, or experimental services require your written and informed consent.

**IMPORTANT INFORMATION IS ON THE BACK OF THIS FORM**

## RIGHTS OF RECIPIENTS

80-MHDD-1
Ref.: Section 2-200

1171 - 12/88

000258

MEDICAL OR DENTAL SERVICES

11. Except in emergencies, no medical or dental services will be provided to you without your informed consent.

RESTRICTIONS OF RIGHTS

12. If your rights are restricted, the facility must notify:
(a) your parent or guardian, if you are under 18;
(b) you and the person of your choice;
(c) the Guardianship and Advocacy Commission if you say you want the Commission to be contacted.

A Guardianship Advocacy Commission has been created which consists of three divisions: Legal Advocacy Service, Human Rights Authority and the Office of the State Guardian. The Commission is located at:

305 Stratton Building
Springfield, IL 62706
Telephone (217) 785-1540

527 S. Wells, Suite 300
Chicago, IL 60607-3922
Telephone (312) 793-5900

EHS
Christ Hospital & Medical Center

# DISCHARGE SUMMARY

SEDGEWICK, RICK
MR # 244-40-61

ADMISSION DATE: DISCHARGE DATE:

HISTORY: The patient has been an inpatient under my care at Christ Hospital. The patient's stay during the hospital showed severe deficits on the patient's part as far as his impulse control goes, his mood lability goes and his trouble with manipulative behavior towards peers and adult members on the unit and outside of the family.

The patient appeared to go through a great degree of trouble on an ongoing basis with his tendency to sabotage and act out in the milieu. The patient needed a great degree of firm structure and strong limit setting. The patient appeared to have poor capacity to function on an ongoing basis with issues relating to his narcissistic behavior, seemed to be very intensely caught up in getting negative attention from peers. Seemed to be very angry and upset when not able to get his demands met immediately.

Work was done on these issues on an ongoing basis and the patient was placed on lithium to which he was following the inpatient program and during the outpatient program somewhat noncompliant and was confronted about it and encouraged to follow through. The patient needs ongoing support and help at this point to have the structure to continue with his schooling and the least restrictive program at this point. ~~at this point~~ I could suggest would be the therapeutic day school along with ongoing counseling and the medication management on an ongoing basis that he is going to deal with his therapist and with me.

RESIDENT:
ms:DTI-#TS-
DD: 01/03/92, DT: 01/03/92

S. GOKHALE, M.D.

0660 R 5/89

COPY DISCHARGE SUMMARY

## ACADEMIC PERFORMANCE

The following grades reflect effort:

A = Excellent
B = Above Average
C = Average/Satisfactory
D = Unsatisfactory
E = Unacceptable (failing)

Accuracy/Effort

Subject: Math Grade: A/C
Comments: Completed lessons in factoring, monomials, binomials, ch. 5
Text: Algebra structure & Method Book 1, Houghton Mittlin, 1988

Subject: English Grade: B/C
Comments: Completed vocabulary, reading and writing assignments.

Subject: Government Grade: B/C
Comments: Completed Federal Gov't unit. Unit 3, ch. 1-9. Text: Exploring U.S. History, Globe, 1986.

Subject: ____ Grade: ____
Comments: ____

Subject: ____ Grade: ____
Comments: ____

Subject: ____ Grade: ____
Comments: ____

Subject: ____ Grade: ____
Comments: ____

## Additional Comments-General-Academic Behavior/Performance

Academically Cedric is a bright student who can handle the demands of regular education course-work with the exception of math work. Math is an area of relative weakness according to test results. Overall basic skills are adequate to good.

Behaviorally Cedric demonstrated great difficulty responding appropriately to authority and working independently. Cedric was initially resistive to most tasks and often complained about his workload. On Occasion he refused to work and made rude, sarcastic comments to teachers. Positively noted, Cedric demonstrated the discipline to complete approximately 75% of his assigned work. Working independently was problematic for Cedric as he constantly sought attention from females and staff. It was observed that Cedric was not comfortable sitting alone.

### DISCHARGE RECOMMENDATIONS

Cedric's behavior and performance improved within the presence of strict structure and limits. It is recomended by this writer that Cedric be enrolled in a therapeutic day school given his previous school behavior record. This recommendation is supported by Cedric's physician.

Jeanne M Axelrod, MA — Certified Teacher
12/30/91 — Date

000259

**CHRIST HOSPITAL and MEDICAL CENTER**

## ACHIEVEMENT TEST RESULTS

___ Peabody Individual Achievement Test-Revised (PIAT-R)

_x_ Diagnostic Achievement Test for Adolescents (DATA) Reading Comprehension only.

_x_ Wide Range Achievment Test-Revised (WRAT-R)

| | Std.Sc. (10 avg) | %ile | G/E |
|---|---|---|---|
| Reading Recognition/ Word Identification | 106 | 66 | 12+ |
| Reading Comprehension | 11 | 63 | - |
| Spelling Recall | 101 | 53 | 11E |
| Mathematics | 91 | 27 | 9B |
| Math Calculation/(DATA) Arithmetic | -- | -- | |
| Math Problem Solving/ (DATA) | -- | -- | |

**HOSPITAL SCHOOL PROGRAM**

Report Card for

Cedric Ricks

Grade 12

Age 17

Jeanne M Axelrod, MA
Learning Specialist

12/30/91
Date

Dates of Attendance: 10/18/91 to 11/17/91 (In-patient)
11/18/91 to 12/13/91 (outpt

Days absent -0-

000280

Understanding Your Benefits
Group Medical Claim Analysis

Sheet Number 5

| Employee (Last Name First) | Dependent | Relationship |
|---|---|---|
| [illegible] | Cedric | Son |

| Policyholder AUTOMATIC SPRINKLER LOCAL 281, U.A.W.F. | S.S. or Tax I.D. No. | Issue Date | Claim Number |
|---|---|---|---|
| | | 1-6-92 | 2411 |

Patient I.D. Hospital

| Charges By | Assignment | Dates of Expense | Total Expense | Expense not covered by Plan | Basic Benefit Payment | Covered Expenses Reimbursable at ___% | ___% |
|---|---|---|---|---|---|---|---|
| | | | 30 days | | RB | | |
| Christ Hosp. | / | 10-18-91 11-11-91 | 15240.00 | | 15240.00 | | |
| | | | 6549.25 | 14.40 | H.M. 1000.00 | 5534.85 | |
| | | 11-17-91 11-18-91 | 1 day 508.00 | | 508.00 | | |
| | | | 290.20 | Tot. Charge | | 290.20 | |
| CH Med Serv Plan | / | 10-18-91 | 150.00 | | | 150.00 | |
| OLRSC | / | 10-18-91 11-14-91 | 36.00 | | 36.00 | | |

* Cafeteria & phone NC

| | Total Expense | Not covered | Basic | Covered | |
|---|---|---|---|---|---|
| Total | 22773.45 | 14.40 | $ 16784.00 | $ 5975.05 | $ |
| Deductible | | | | $ met | $ |
| Amount Previously Applied | | | | $ | $ |
| Amount Still To Be Satisfied | | | | $ | $ |
| SUB TOTAL | | | | $ 5975.05 | $ |
| x | | | | 90% | % |
| $ | | | | 5377.55 | $ |

Your Benefit Payments to Date

| | Total Major Medical | Basic | Diagnostic |
|---|---|---|---|
| This Cause | $ | $ | $ 36.00 |
| All Causes | $ | $ | $ |
| Total Paid | $ | $ | $ 36.00 |

| | |
|---|---|
| Major Medical Benefit Payment | $ 5377.55 |
| Total Medical Payments (Basic and Major Medical) | $ 22161.55 |
| Amount Paid by Other Insurance (If Coordination of Benefits Apply) | $ — |
| Total Payment | $ 22161.55 |

☐ $ ______ SENT TO HOSPITAL

☐ $ ______ SENT TO DOCTOR

BENEFIT PERIOD SUMMARY

15748.00 + 1000.00 + 5242.55 = 21990.55

| DENTAL | REGULAR | SUPP. | |
|---|---|---|---|
| POLICY MAX | 9408 | 36-2169147 | Christ Hosp. |
| POLICY DED | | | |
| PRIOR PAYMENTS | 3848 | 36-3601853 | CH Med. Serv. Plan 135.00 |
| THIS TRANSACTION | | | |
| PAID TO DATE | 4123 | 36-3372680 | O.L.R.S.C. 36.00 |

000261

Letter from Helen to Cedric.1992.10.23. Rcvd from Helen and Shederick Ricks

DIANE 333-2300 EXT2523

①

Oct. 23, 1992

NO smoking, drinking or swearing in the house, no loud music. No striking of matches in the house.

Keep garbage emptied in all the rooms except parents room. That includes basement also. We do not want to have to tell you to do this, check them to see when they need emptying.

Keep kitchen clean, no cups, silverware or anything should be left in sink. Wash all ~~utensil~~ utensils, before we come home from work, keep sink cleaned out and kitchen swept.

Please check all areas before you leave, to make sure you haven't left something that doesn't belong there, put everything in its proper place, you shouldn't have to have people cleaning up after you. That includes dryer sheets, that you drop on floor, who is suppose to pick them up??! Start to think for yourself, start to care about yourself.

Tuesday, Friday and Sunday are church days, be aware of this and do not make any plans on those days, you are expected to attend, so don't come up with any excuses. You need this more than you need anything in your life.

If your Daddy or I tell you to do something, we don't mean when you feel like it, we mean now. Usually when ~~you~~ we tell you to do something and you want to wait till later, it doesn't get done, because you tend to forget about it. Cedric, we don't know what you have on your mind, but if you stop and think about it yourself, it really doesn't mean you a whole lot of Good. You're letting the devil destroy you.

No, No, No long distance telephone calls period. Who is suppose to pay for all this. Our phone bill went up 100% since you came home. And tell your friends not to call after 11:00 you know we have to go to work and those calls disturb us. Don't be so selfish.

(2)

We agreed to let you come home because we thought you wanted to make a change, and you now appreciated home a little more. But the longer you stay, you ~~seem~~ seem to be reverting back to your old self. You had better learn how to be a happy camper. We are all going to have to work together on this.

The yard work needs to be done, notice things and make an effort to do them without being told. We don't mind doing for you if only you would show how much you appreciate it, by doing the little things, like picking up after yourself and keeping the house clean without being told.

Do not wear anything of Dwayne's including his socks and underwear. Put everything back of his that doesn't belong to you.

Everyday next week you are going to have to look for you a job. We will be praying that you find a job, but you have got to go looking

The weather is still warm, so you can go to Jewels, or walgreen or even down to the plaza, to try to find a job.

You lay around all day, and if we don't tell you to do anything specific you won't won't do anything and we mean absolutely nothing. You are not going to be able to get by like this all your life, you have the potential to do a lot of things, but you are going to have to make a choice, are you going to serve God or the devil.

If you be willing and obedient you shall eat the good of the land, but if you rebel ye shall be cursed.

Cedric, God will cause you to prosper if you just obey Him.

Honor thy father and thy mother that thy days may be long. that you may prosper here on this earth. Cedric we both love you so so much, and we are not going to just give you to the devil, we are going to fight for you

Love Mom and Dad

(3)

What we are asking you to do, does not ~~[illegible]~~ take anything but a willing and obedient spirit, why not try it this way for awhile and see how this works for you. It may be hard, but make up in your mind and ask the Lord for help, and the more you do it the easier it will get and the more you will be blessed by just being willing and obedient.

It seems like you have been doing it the devil's way for so long, and what has he gotten for you. If anything he has made you miserable. No TV in your room, no drivers license, all he knows how to do is take ~~for~~ from you until there is nothing left. ~~Stop~~ Stop listening to him, it is time to let him go!!!

These are the rules, and you are going to have to follow them, we want you to sign this letter, your signature represents your willingness to obey these rules while you are living ~~[illegible]~~ here at home. Cedric we are believing God for you, we are going to fight for you!!

Curfew time is 2:30 no later
than 3:00. If you can't make
arrangements to be home by then,
then you should come to another
decision about not going.

C-371-010796-1361004-A

WRIT NO. __________
TRIAL COURT NO. 1361004

---

IN THE 371st JUDICIAL DISTRICT COURT
TARRANT COUNTY, TEXAS

and returnable to

THE COURT OF CRIMINAL APPEALS
OF TEXAS

---

EX PARTE CEDRIC ALLEN RICKS

---

EXHIBIT 2 con't

---

Catherine Clare Bernhard
P.O. Box 2817
Red Oak, Texas 75154
972-617-5548
fax – 972-421-1604
cbernhard@sbcglobal.net
State Bar No. 02216575

ATTORNEY FOR APPLICANT

**WRIT NO. ____________**
**TRIAL COURT NO. 1361004**

---

**IN THE 371st JUDICIAL DISTRICT COURT**
**TARRANT COUNTY, TEXAS**

**and returnable to**

**THE COURT OF CRIMINAL APPEALS**
**OF TEXAS**

---

**EX PARTE CEDRIC ALLEN RICKS**

---

**EXHIBIT 2 con't**

---

Catherine Clare Bernhard
P.O. Box 2817
Red Oak, Texas 75154
972-617-5548
fax – 972-421-1604
cbernhard@sbcglobal.net
State Bar No. 02216575

ATTORNEY FOR APPLICANT

JPS Hospital rcvd 2016



HealthPort
P.O. Box 409740
Atlanta, Georgia 30384-9740
Fed Tax ID 58 - 2659941
(770) 754 - 6000

HealthPort

INVOICE

Invoice #: 0182644021
Date: 12/13/2015
Customer #: 1887133

**Ship to:**
MAIREAD BURKE
BURKE MITIGATION CONSULTING
PO BOX 11543
AUSTIN, TX 78711-1543

**Bill to:**
MAIREAD BURKE
BURKE MITIGATION CONSULTING
PO BOX 11543
AUSTIN, TX 78711-1543

**Records from:**
JOHN PETER SMITH HOSPITAL
1500 SOUTH MAIN STREET
FORT WORTH, TX 76104

**Requested By:** BURKE MITIGATION CONSULTING  **SSN:** *****4518
**Patient Name:** RICKS CEDRIC

| Description | Quantity | Unit Price | Amount |
|---|---|---|---|
| Basic Fee | | | 45.74 |
| Retrieval Fee | | | 0.00 |
| Per Page Copy (Paper) 2 | 50 | 1.54 | 77.00 |
| Per Page Copy (Paper) 3 | 10 | 0.00 | 0.00 |
| Per Page Copy (Paper) 1 | 254 | 0.76 | 193.04 |
| Shipping | | | 12.52 |
| Certification Fee | | | 1.00 |
| Subtotal | | | 329.30 |
| Sales Tax | | | 0.00 |
| Invoice Total | | | 329.30 |
| Balance Due | | | 329.30 |

corrected amount
$148.25

Pay your invoice online at www.HealthPortPay.com

Terms: Net 30 days  Please remit this amount : ~~$ 329.30~~ (USD)

148-25

---

HealthPort
P.O. Box 409740
Atlanta, Georgia 30384-9740
Fed Tax ID 58 - 2659941
(770) 754 - 6000

Invoice #: 0182644021

Check # ____________

Payment Amount $____________

**Please return stub with payment.**
Please include invoice number on check.
To pay invoice online, please go to www.HealthPortPay.com or call (770) 754 6000.
Email questions to Collections@healthport.com.

## CERTIFICATE OF CUSTODIAN TO COPY OF OFFICIAL RECORDS

Under authority of Rule 902 (10)
Texas Rules of Evidence

State of Texas
County of Tarrant

My name is Judy Thomas. I am of sound mind, capable of making this affidavit and personally acquainted with the facts herein stated:

I am the undersigned Custodian of Records for JPS Health Network and in the performance of the function of my office, hereby certify that the attached document(s) is/are a full and correct copy of all of the records (including 314 pages) kept in the regular course of business and held by this organization regarding Cedric A. Ricks

It was the regular course of business of JPS Health Network for an employee or representative of this organization with knowledge of the act, event, condition, opinion, diagnosis, assessment, service or treatment recorded to make the record or to transmit information thereof to be included in such record. The record was made at or near the time of the event or reasonably soon thereafter. The records attached hereto are the original records or exact duplicates of the original.

Signed this the 23 day of December, 2015.

Judy Thomas
(Affiant)

Sworn and subscribed before me this the 24th day of December, 2015

LaKiesha Brister
(Notary Public)

LAKIESHA BRISTER
Notary Public, State of Texas
Comm. Expires 12-27-2019
Notary ID 126360597

127927125

51028804

BURKE MITIGATION & CONSULTING, LLC
P.O. Box 11543 Austin, TX 78711-1543
(858) 705-0338 · mairead@burkemitigation.com · Fax (512) 842-7098

Bill

November 30, 2015

JPS Health Network
Attn: Health Information Management
1500 S Main
Fort Worth, TX 76104
Via Fax (817) 702-4948

CERTIFY
CERTIFY

RE: Request for Records

To Whom it May Concern:

I am writing to request the release of any and all records in your possession from November 2013- December 2014 pertaining to the following former patient:

PT)

Cedric Allen Ricks
DOB: 9/8/1974
SSN: 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

Please find attached HIPAA-compliant releases authorizing me to receive these records on behalf of this patient. I would like to specifically request all medical and mental health records.

This request includes, but is not limited to the following:

> dates of service, intake notes, ambulance reports, progress reports, nurses' notes, physicians orders, prescription information, diagrams, testing, evaluations, psychiatric or psychological evaluations and/or counseling, information on referrals to other doctors, social services notes, waiver or consent forms, discharge reports, and any other types of records contained in this patient's file. I request these records whether they are maintained off-site or in the possession of doctors or other individuals formerly employed at the medical facility, or otherwise stored or maintained.

I would appreciate it if you could send a complete, certified copy of these records, using the attached Business Records Affidavit, to me at the above address. If pre-payment is required prior to the fulfillment of this request please fax an invoice to me at (512) 842-7098.

Please do not hesitate to call me at (858) 705-0338 should you have any questions.

Best regards,

Mairead Burke

Page 1 of 1

ReceivedBy
NOV 30 2015

000272

**CONSENT FOR RELEASE OF CONFIDENTIAL RECORDS & INFORMATION**

Cedric Allen Ricks
Patient's Name

Date of Birth: 9/8/1974

Social Security Number: 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

1. I hereby consent for JPS Health Network to release information and records to my attorneys and their agents:

| | |
|---|---|
| Catherine Clare Bernhard | Mairead Burke |
| PO Box 2817 | PO Box 11543 |
| Red Oak, Texas 75154 | Austin, TX 78711-1543 |
| 972-617-5548 | 858-705-0338 |
| Fax 972-617-5547 | Fax 512-842-7098 |

2. I consent to the disclosure of protected health information and records by JPS Health Network, to the persons and agency specified above. I understand that information and records related to the following may and will be included: medical, psychiatric, psychological, dental, social, financial, Medicaid, demographic, HIV/AIDS testing/diagnosis/treatment, substance abuse treatment, office based information, charts, laboratory & diagnostic findings, treatment plans, progress notes, medications and therapies, CT scans, MRI's, X-rays, EEGs, emergency room admissions, and any out-patient treatment.

3. I understand that my records may be protected under the federal regulations governing Confidentiality of Alcohol and Drug Abuse Patient Records, 42 CFR Part 2, and cannot be disclosed without my written consent unless otherwise provided for in the regulations. I also understand that I may revoke this consent at any time except to the extent that action has been taken in reliance on it. I specifically waive the protection of 42 CFR Part 2 with regards to the requested records and consent that they be delivered to the aforementioned recipients.

4. This consent authorizes disclosure for use by the aforementioned recipients in connection with the legal representation of Cedric Ricks. Information will be used for any purpose deemed appropriate by the recipients in connection with their representation of Cedric Ricks, which may include redisclosure without my further authorization.

5. This consent is subject to revocation in writing at any time except to the extent that action has been taken in reliance upon it.

6. This consent will expire when the recipients cease to represent Cedric Ricks, except to the extent that action has been taken in reliance on this authorization.

7. I understand that this consent is voluntary. I have read this consent and fully understand the results of and any risks of the actions I am taking.

8. You are instructed not to furnish these documents or this information to anyone other than the persons named above, without a written authorization from me.

9. A copy of this document shall serve as the original for the purpose of obtaining records from any and all custodians of records included in this release. A photocopy of this release may be honored.

SIGNED: [signature]

DATE: Jan 29, 2015

WITNESS: [signature]

**AUTHORIZATION FOR RELEASE OF CONFIDENTIAL RECORDS & INFORMATION**

To: JPS Health Network

I, Cedric Allen Ricks
date of birth 9/8/1974, Social Security # 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, hereby consent to the release of any and all records and documents and to the release of any and all information pertaining to me which is considered confidential, including but not limited to the following: Vital, Educational; Employment; Unemployment Compensation, Social Security and other Welfare/Benefits; Financial; Social Services; Medical and Dental; Military; Psychiatric/Psychological; Department of Corrections; Institutional; Criminal; Housing; Social/Personal; Legal; and any other.

**You are authorized to disclose this information to my legal representatives:**

Catherine Clare Bernhard
PO Box 2817
Red Oak, Texas 75154
972-617-5548
Fax 972-617-5547

Mairead Burke
PO Box 11543
Austin, TX 78711-1543
858-705-0338
Fax 512-842-7098

This consent authorizes disclosure for use by the aforementioned recipients in connection with the legal representation of Cedric Ricks. I understand that my records may be protected under the federal regulations governing Confidentiality of Alcohol and Drug Abuse Patient Records, 42 CFR Part 2, and cannot be disclosed without my written consent unless otherwise provided for in the regulations. I also understand that I may revoke this consent in writing at any time except to the extent that action has been taken in reliance on it. I specifically waive the protection of 42 CFR Part 2 with regards to the requested records and consent that they be delivered to the aforementioned recipients.

I hereby waive my privilege of confidentiality as to the information and records in your possession and authorize you to make full disclosure to the above-named persons only. This authorization is valid for 10 years. **You are instructed not to furnish these documents or this information to anyone other than the persons named above, without a written authorization from me.**

A copy of this document shall serve as the original for the purpose of obtaining records from any and all custodians of records included in this release.

Signed: [signature]

Date: Jan 29, 2015

Witness: [signature]

# CONSENT FOR RELEASE OF CONFIDENTIAL RECORDS & INFORMATION

Patient's Name: Cedric Allen Ricks

Date of Birth: 9/8/1974 • Social Security Number: 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

1. I hereby consent for JPS Health Network to release information and records to my attorneys and their agents:

   Catherine Clare Bernhard
   PO Box 2817
   Red Oak, Texas 75154
   972-617-5548
   Fax 972-617-5547

   Mairead Burke
   PO Box 11543
   Austin, TX 78711-1543
   858-703-0338
   Fax 512-842-7098

2. I consent to the disclosure of psychotherapeutic notes of counseling sessions by JPS Health Network to the persons and agency specified above.

3. This consent authorizes disclosure for use by the aforementioned recipients in connection with the legal representation of Cedric Ricks. Information will be used for any purpose deemed appropriate by the recipients in connection with their representation of Cedric Ricks, which may include redisclosure without my further authorization.

4. I understand that my records may be protected under the federal regulations governing Confidentiality of Alcohol and Drug Abuse Patient Records, 42 CFR Part 2, and cannot be disclosed without my written consent unless otherwise provided for in the regulations. I also understand that I may revoke this consent at any time except to the extent that action has been taken in reliance on it. I specifically waive the protection of 42 CFR Part 2 with regards to the requested records and consent that they be delivered to the aforementioned recipients.

5. This consent is subject to revocation in writing at any time except to the extent that action has been taken in reliance upon it.

6. This consent will expire when the recipients cease to represent Cedric Ricks, except to the extent that action has been taken in reliance on this authorization.

7. I understand that this consent is voluntary. I have read this consent and fully understand the results of and any risks of the actions I am taking.

8. You are instructed not to furnish these documents or this information to anyone other than the persons named above, without a written authorization from me.

9. A copy of this document shall serve as the original for the purpose of obtaining records from any and all custodians of records included in this release. A photocopy of this release may be honored.

SIGNED: [signature]

DATE: Jan. 29, 2015

WITNESS: [signature]

DATE: 1/29/2015



JPS ROI SERVICE AREA
1500 South Main St
FORT WORTH TX 76104

RICKS,CEDRIC ALLEN
MRN: 51028804
DOB: 9/8/1974, Sex: M

**Patient Demographics**

| Name | Patient ID | SSN | Sex | Birth Date |
|---|---|---|---|---|
| Ricks, Cedric Allen | 51028804 | xxx-xx-0000 | Male | 09/08/74 (41 yrs) |

| Address | Phone | EMail | Employer |
|---|---|---|---|
| 100 N. Lamar St FORT WORTH TX 76102 | 817-884-3000 (H) | | NOT EMPLOYED |

| Reg Status | PCP | Date Last Verified | Next Review Date |
|---|---|---|---|
| ELAPSED | Pcp, Unknown | 03/28/14 | 04/27/14 |

**Patient Demographics**

| Name | Patient ID | SSN | Sex | Birth Date |
|---|---|---|---|---|
| Ricks, Cedric Allen | 51028804 | xxx-xx-0000 | Male | 09/08/74 (38 yrs) |

| Address | Phone | EMail | Employer |
|---|---|---|---|
| 100 N. Lamar St FORT WORTH TX 76102 | 817-884-3000 (H) | | NOT EMPLOYED |

| Reg Status | PCP | Date Last Verified | Next Review Date |
|---|---|---|---|
| Verified | | 03/28/14 | 04/27/14 |

**Admission Information - Hospital Account/Patient Record**

| | | | | | |
|---|---|---|---|---|---|
| Arrival Date/Time: | 05/03/2013 7:20 AM | Admit Date/Time: | 05/03/2013 10:25 AM | IP Adm. Date/Time: | None |
| Admission Type: | Elective | Point of Origin: | Physician Or Clinic Referral | Admit Category: | None |
| Means of Arrival: | None | Primary Service: | None | Secondary Service: | None |
| Transfer Source: | None | Service Area: | None | Unit: | None |
| Admit Provider: | Dafe, Frank, RN | Attending Provider: | Mills, John Gerald, DO | Referring Provider: | None |

**Discharge Information - Hospital Account/Patient Record**

| Discharge Date/Time | Discharge Disposition | Discharge Destination | Discharge Provider | Unit |
|---|---|---|---|---|
| 10/29/2013 | Home Or Self Care | None | None | Jps Tarrant Correctional Facility |

**Final Diagnoses (ICD-9-CM)**

| Principal | Code | Name | POA | CC | HAC | Affects DRG |
|---|---|---|---|---|---|---|
| [P] | V70.5 | Health examination of defined subpopulation | | | | |

**Visit Summary**

**Reason for Visit**

**Gastrophageal Reflux**

**Diagnoses**

**Diagnosis unknown** - Primary

**Allergies as of 11/21/2012** **Never Reviewed**



JPS ROI SERVICE AREA
1500 South Main St
FORT WORTH TX 76104
Amb Encounter Report

RICKS,CEDRIC ALLEN
MRN: 51028804
DOB: 9/8/1974, Sex: M
Enc. Date: 11/21/12

## Visit Summary (continued)

**Allergies as of 11/21/2012 (continued)** — **Never Reviewed**

Not on File

## ORDERS AND RESULTS

**ALL ORDERS AND RESULTS EXCEPT MEDICATION**

No orders and results found

## Notes

**Physician Notes**

No notes of this type exist for this encounter.

### Nurses Notes

**Progress Notes by Dafe, Frank, RN at 11/21/2012 5:31 PM** — **Version 1 of 1**

Author: Dafe, Frank, RN
Service: (none)
Author Type: Registered Nurse
Filed: 11/21/2012 5:32 PM
Note Time: 11/21/2012 5:31 PM
Status: Signed
Editor: Dafe, Frank, RN (Registered Nurse)

IM RELEASED FROM CUSTODY AS PER POD OFFICER.

**Other Notes**

No notes of this type exist for this encounter.

**Encounter-Level Documents:**

There are no encounter-level documents.

**Patient-Level E-Signatures:**

OP Annual Consent Form - Received on 10/1/2013

An error occurred while rendering the e-signature document.
Details: Could not find valid device to read signatures.

**Encounter-Level E-Signatures:**

There are no encounter-level e-signatures.



JPS ROI SERVICE AREA
1500 South Main St
FORT WORTH TX 76104
Amb Encounter Report

RICKS,CEDRIC ALLEN
MRN: 51028804
DOB: 9/8/1974, Sex: M
Enc. Date: 05/03/13

**Patient Demographics**

| Name | Patient ID | SSN | Sex | Birth Date |
|---|---|---|---|---|
| Ricks, Cedric Allen | 51028804 | xxx-xx-0000 | Male | 09/08/74 (38 yrs) |

| Address | Phone | EMail | Employer |
|---|---|---|---|
| 100 N. Lamar St<br>FORT WORTH TX 76102 | 817-884-3000 (H) | | NOT EMPLOYED |

| Reg Status | PCP | Date Last Verified | Next Review Date |
|---|---|---|---|
| Verified | Pcp, Unknown | 03/28/14 | 04/27/14 |

**Admission Information - Hospital Account/Patient Record**

| | | | | | |
|---|---|---|---|---|---|
| Arrival Date/Time: | 05/03/2013 10:17 PM | Admit Date/Time: | 05/03/2013 10:25 AM | IP Adm. Date/Time: | None |
| Admission Type: | Elective | Point of Origin: | Physician Or Clinic Referral | Admit Category: | None |
| Means of Arrival: | None | Primary Service: | None | Secondary Service: | None |
| Transfer Source: | None | Service Area: | None | Unit: | None |
| Admit Provider: | Julian-Conley, Zahra, RN | Attending Provider: | Mills, John Gerald, DO | Referring Provider: | Pcp, Unknown |

**Discharge Information - Hospital Account/Patient Record**

| Discharge Date/Time | Discharge Disposition | Discharge Destination | Discharge Provider | Unit |
|---|---|---|---|---|
| 10/29/2013 | Home Or Self Care | None | None | Jps Tarrant Correctional Facility |

**Final Diagnoses (ICD-9-CM)**

| Principal | Code | Name | POA | CC | HAC | Affects DRG |
|---|---|---|---|---|---|---|
| [P] | V70.5 | Health examination of defined subpopulation | | | | |

## Visit Summary

**Diagnoses**

**Screening** - Primary

**Allergies as of 5/3/2013** **Never Reviewed**

Not on File

Most recent update: 5/3/2013 10:22 PM by Julian-Conley, Zahra, RN

**Vital Signs**

| BP | Pulse | Temp(Src) | Resp | SpO2 |
|---|---|---|---|---|
| 126/85 mmHg | 86 | 99.2 °F (37.3 °C) | 18 | 98% |

## ORDERS AND RESULTS

**ALL ORDERS AND RESULTS EXCEPT MEDICATION**

No orders and results found



JPS ROI SERVICE AREA
1500 South Main St
FORT WORTH TX 76104
Amb Encounter Report

RICKS,CEDRIC ALLEN
MRN: 51028804
DOB: 9/8/1974, Sex: M
Enc. Date: 05/03/13

**ORDERS AND RESULTS (continued)**

**Notes**

**Physician Notes**

No notes of this type exist for this encounter.

**Nurses Notes**

**Progress Notes by Julian-Conley, Zahra, RN at 5/3/2013 10:24 PM** Version 2 of 2

Author: Julian-Conley, Zahra, RN Service: (none) Author Type: Registered Nurse
Filed: 5/3/2013 10:29 PM Note Time: 5/3/2013 10:24 PM Status: Addendum
Editor: Julian-Conley, Zahra, RN (Registered Nurse)
Related Notes: Original Note by Julian-Conley, Zahra, RN (Registered Nurse) filed at 5/3/2013 10:24 PM

**Nursing Treatment Protocol**

**Hospital/JPS Clinic Returns**

May 3, 2013

Cedric Allen Ricks

Allergies as of 05/03/2013

- (Not on File)

No current outpatient prescriptions on file.

**Procedure:**

1. JPS has been instructed to call the Resource nurse to give report prior to the inmate being released.
2. The Resource nurse will call the Medical Director or on-call provider for acceptance prior to JPS discharge.
3. When the inmate returns from the ED, hospital admission or clinic, they are to have return orders and physician notes with them. If the notes do not accompany the inmate, the Resource nurse must call the appropriate department to obtain copies of these documents.
4. The Resource Nurse will check vital signs, as well as any dressings, incisions, etc. All findings are to be documented.
5. If the inmate is not stable or does not appear stable for housing, the on-call provider is to be notified immediately.
6. If the inmate returns with medication orders, the Resource Nurse will give the first dose immediately, unless it has been given at the hospital or clinic.
7. If any medications are non-formulary, call the Medical Director or on-call provider for instructions.
8. If ordered medications are narcotics or PRNs, contact the on-call provider for instructions.
9. All other orders should be initiated and documented by the Resource Nurse.
10. Place the inmate on the clinic list as a Star 1.
11. If the inmate is housed at another facility, the Resource Nurse at the Lamar jail is responsible for getting all records to the receiving facility.



JPS ROI SERVICE AREA
1500 South Main St
FORT WORTH TX 76104
Amb Encounter Report

RICKS,CEDRIC ALLEN
MRN: 51028804
DOB: 9/8/1974, Sex: M
Enc. Date: 05/03/13

Nurses Notes (continued)

Progress Notes by Julian-Conley, Zahra, RN at 5/3/2013 10:24 PM (continued) Version 2 of 2

12. If the Resource Nurse has any concerns regarding the inmate's care or safety, the on-call provider will be called for instructions.

Document Findings: I/M RETURNED FROM JPS ER. NO RESTRICTIONS GIVEN. I/M ALERT AND ORIENTED WITH SEVERAL CO'S ESCORTING HIM. I/M RETURNED TO CLASSIFICATION FOR HOUSING.

TORADOL 30MG INJECTION GIVEN 2000 AT JPS ER

Progress Notes by Julian-Conley, Zahra, RN at 5/3/2013 10:24 PM Version 1 of 2

Author: Julian-Conley, Zahra, RN Service: (none) Author Type: Registered Nurse
Filed: 5/3/2013 10:24 PM Note Time: 5/3/2013 10:24 PM Status: Signed
Editor: Julian-Conley, Zahra, RN (Registered Nurse)
Related Notes: Addendum by Julian-Conley, Zahra, RN (Registered Nurse) filed at 5/3/2013 10:29 PM

**Nursing Treatment Protocol**

**Hospital/JPS Clinic Returns**

May 3, 2013

Cedric Allen Ricks

Allergies as of 05/03/2013
- (Not on File)

No current outpatient prescriptions on file.

**Procedure:**

1. JPS has been instructed to call the Resource nurse to give report prior to the inmate being released.
2. The Resource nurse will call the Medical Director or on-call provider for acceptance prior to JPS discharge.
3. When the inmate returns from the ED, hospital admission or clinic, they are to have return orders and physician notes with them. If the notes do not accompany the inmate, the Resource nurse must call the appropriate department to obtain copies of these documents.
4. The Resource Nurse will check vital signs, as well as any dressings, incisions, etc. All findings are to be documented.
5. If the inmate is not stable or does not appear stable for housing, the on-call provider is to be notified immediately.
6. If the inmate returns with medication orders, the Resource Nurse will give the first dose immediately, unless it has been given at the hospital or clinic.
7. If any medications are non-formulary, call the Medical Director or on-call provider for instructions.
8. If ordered medications are narcotics or PRNs, contact the on-call provider for instructions.



JPS ROI SERVICE AREA
1500 South Main St
FORT WORTH TX 76104
Amb Encounter Report

RICKS,CEDRIC ALLEN
MRN: 51028804
DOB: 9/8/1974, Sex: M
Enc. Date: 05/03/13

**Nurses Notes (continued)**

Progress Notes by Julian-Conley, Zahra, RN at 5/3/2013 10:24 PM (continued) Version 1 of 2

9. All other orders should be initiated and documented by the Resource Nurse.
10. Place the inmate on the clinic list as a Star 1.
11. If the inmate is housed at another facility, the Resource Nurse at the Lamar jail is responsible for getting all records to the receiving facility.
12. If the Resource Nurse has any concerns regarding the inmate's care or safety, the on-call provider will be called for instructions.

Document Findings: I/M RETURNED FROM JPS ER. NO RESTRICTIONS GIVEN. I/M ALERT AND ORIENTED WITH SEVERAL CO'S ESCORTING HIM. I/M RETURNED TO CLASSIFICATION FOR HOUSING.

**Other Notes**

No notes of this type exist for this encounter.

**Transcription**

| Type | ID | Date and Time |
|---|---|---|
| Outside Facility Records | 51028804_14 | 5/7/2013 9:58 PM |

Document Text

Display only: Transcription (51028804_14) on 5/7/2013 9:58 PM

**Transcription**

| Type | ID | Date and Time |
|---|---|---|
| Outside Facility Records | 51028804_13 | 5/7/2013 9:58 PM |

Document Text

Display only: Transcription (51028804_13) on 5/7/2013 9:58 PM

**Transcription**

| Type | ID | Date and Time |
|---|---|---|
| Referrals | 51028804_12 | 5/7/2013 9:58 PM |

Document Text



JPS ROI SERVICE AREA
1500 South Main St
FORT WORTH TX 76104
Amb Encounter Report

RICKS,CEDRIC ALLEN
MRN: 51028804
DOB: 9/8/1974, Sex: M
Enc. Date: 05/03/13

**Transcription (continued)**

Display only: Transcription (51028804_12) on 5/7/2013 9:58 PM

**Transcription**

| Type | ID | Date and Time |
|---|---|---|
| Misc Documents | 51028804_10 | 5/7/2013 9:46 PM |

Document Text

Display only: Transcription (51028804_10) on 5/7/2013 9:46 PM

**Transcription**

| Type | ID | Date and Time |
|---|---|---|
| Misc Documents | 51028804_11 | 5/7/2013 9:46 PM |

Document Text

Display only: Transcription (51028804_11) on 5/7/2013 9:46 PM

**Transcription**

| Type | ID | Date and Time |
|---|---|---|
| Misc Documents | 51028804_9 | 5/7/2013 9:46 PM |

Document Text

Display only: Transcription (51028804_9) on 5/7/2013 9:46 PM

**Encounter-Level Documents - 05/03/2013:**

Referrals - Scan on 5/7/2013 9:58 PM (below)



JPS ROI SERVICE AREA
1500 South Main St
FORT WORTH TX 76104
Amb Encounter Report

RICKS,CEDRIC ALLEN
MRN: 51028804
DOB: 9/8/1974, Sex: M
Enc. Date: 05/03/13

CSW 46171178

DTB045

**CONSULT AND CHANGE OF SERVICE ORDERS**

**REQUEST**

1. PCP: A. McGuffee PA-C
2. Date of order: 5/3/13 3. Time of order: 1815 4. Location of patient: TCJ
5. Requested by: Service ______ Teaching Staff ______ Resident ______
6. Reason For Request: (check as appropriate)

INPATIENT
- ☐ CONSULTATION (Opinion/Recommendations)
- ☐ CONCURRENT MGMT.
- ☐ CHANGE/TRANSFER SERVICE
- ☐ PERFORM PROCEDURE LISTED

OUTPATIENT
- ☐ CONSULTATION (Opinion/Recommendations)
- ☐ PERFORM PROCEDURE LISTED
- ☐ REFERRAL (Transfer of Care)
- ☐ IP/OP PATIENT EDUCATION

r/confusion, ? post-traumatic amnesia

DETAILS: I/M s/p assault while incarcerated elsewhere. Had already received sutures in hand from prior injury. Now c nausea, dizziness, inability to open/see from L eye. Needs Head CT / Facial CT / c-spine. Due to trauma. Anterior tooth avulsed during assault.

7. Vital Signs taken at: ______ (Date/Time) (a.m./p.m.) Pulse 88 BP 136/92 Temp ______
8. Urgency: Routine ______ Urgent ______ STAT ______
9. REASON STAT REQUESTED: ______
10. WORKING DIAGNOSES/SYMPTOMS:

| DIAGNOSES/SYMPTOMS | ICD-9-CM CODES Outpatient Only |
|---|---|
| R/O CHI, cervical spine injury, eye injury | |
| needs CT head/neck | |

11. Request Made to: JPS ER (name of service/clinic) Discussed with: ______
12. Date & Time consult or change of service discussed: ______ (a.m./p.m.)
13. Date & Time consultant ______ (Name) agreed to consult: ______ (a.m./p.m.)
14. Date & Time change of service agreed to be operational by receiving team: ______ (a.m./p.m.)

Attending ______ (Name) Per Resident ______ (Name)

America McG PA-C (Requestor's Signature and Credentials) 5/3/13 1815 (Date/Time) America McGuffee, PA-C (Printed Name)

DOCUMENT RESPONSE ON PAGE TWO

TARRANT COUNTY HOSPITAL DISTRICT
Fort Worth, Texas 76104
CONSULT AND CHANGE OF SERVICE ORDER
501240 Orig. 01/03 Rev. 02/07 Page 1 of 2

Ricks, Cedric
0819770
MR- 51028804



JPS ROI SERVICE AREA
1500 South Main St
FORT WORTH TX 76104
Amb Encounter Report

RICKS,CEDRIC ALLEN
MRN: 51028804
DOB: 9/8/1974, Sex: M
Enc. Date: 05/03/13

Outside Facility Records - Scan on 5/7/2013 9:58 PM (below)



JPS ROI SERVICE AREA
1500 South Main St
FORT WORTH TX 76104
Amb Encounter Report

RICKS,CEDRIC ALLEN
MRN: 51028804
DOB: 9/8/1974, Sex: M
Enc. Date: 05/03/13

CSN 441778

**PAULS VALLEY GENERAL HOSP LIVE**
**Patient Discharge Instructions**

Patient Name: RICKS, CEDRIC A.
Visit ID: 001035000 MR Number: 000503670 DOB: 09/08/1974
Discharged: Attending: MICHAEL JOHN BOGER DO
Diagnosis: Laceration / Puncture

| Allergies | Reaction | Date |
|---|---|---|
| No Known Drug Allergies | | 05/02/2013 |

| Immunizations | Date |
|---|---|
| tetanus toxoid | 05/02/2013 |

**Discharge Instructions**

| | |
|---|---|
| Activity | Resume Normal Activities |
| Discharge Diagnosis | Laceration to Left and Right Fingers |
| Diet | No Restrictions |
| Return To Emergency Department for | Fever Greater than or Equal to 101.5 degrees |
| | Worsening of Symptoms |
| | Questions or Concerns |
| Nurse Verifying D/C Orders Received | G.Wilson RN |
| Medication Orders | keflex 500 mg take 1 by mouth 3 times a day for 7 days finish all medications |
| Follow Up Appointment | for suture removal in 10 days |

SIGNATURE/DATE

Department: ______________ Patient/Significant Other: ______________
Caregiver: ______________ Discharge Coordinator: ______________
Physician: ______________

05/02/2013 06:14 NOTE: All strikeouts were executed by person making original entry. Page 1 of 2



JPS ROI SERVICE AREA
1500 South Main St
FORT WORTH TX 76104
Amb Encounter Report

RICKS,CEDRIC ALLEN
MRN: 51028804
DOB: 9/8/1974, Sex: M
Enc. Date: 05/03/13

Outside Facility Records - Scan on 5/7/2013 9:58 PM (below)



JPS ROI SERVICE AREA
1500 South Main St
FORT WORTH TX 76104
Amb Encounter Report

RICKS,CEDRIC ALLEN
MRN: 51028804
DOB: 9/8/1974, Sex: M
Enc. Date: 05/03/13

CSN 44177178

**PAULS VALLEY GENERAL HOSP LIVE**
**Patient Discharge Instructions**

Patient Name: RICKS, CEDRIC A.
Visit ID: 001035000 MR Number: 000503670 DOB: 09/08/1974
Discharged: Attending: MICHAEL JOHN BOGER DO
Diagnosis: Laceration / Puncture

**Discharge Instructions**

Person Receiving Discharge Instructions: self

Wound/Incision Care Group Note: Keep dressing on till 5/3/2013 then keep clean/dry do not soak hands. May apply triple antibiotic ointment daily

Wound/Incision Care: Other See hand out given

Referral Required: None

Patient/Significant Other Verbalized Understanding: Yes

SIGNATURE/DATE

Department: ____ Patient/Significant Other: ____
Caregiver: ____ Discharge Coordinator: ____
Physician: ____

05/02/2013 06:14 NOTE: All strikeouts were executed by person making original entry. Page 2 of 2



JPS ROI SERVICE AREA
1500 South Main St
FORT WORTH TX 76104
Amb Encounter Report

RICKS,CEDRIC ALLEN
MRN: 51028804
DOB: 9/8/1974, Sex: M
Enc. Date: 05/03/13

Misc Documents - Scan on 5/7/2013 9:46 PM (below)

Generated on 12/11/2015 2:03 PM

Page 13

000289

487



JPS ROI SERVICE AREA
1500 South Main St
FORT WORTH TX 76104
Amb Encounter Report

RICKS,CEDRIC ALLEN
MRN: 51028804
DOB: 9/8/1974, Sex: M
Enc. Date: 05/03/13

CSD 46177178

**Tarrant County Confinement Bureau**
**Hospital Tracking Log**

Name: Ricks, Cedric    DOB: 9-8-74    CID: 0819770

Date/Time Departed: 05/3/13    Escorting Officers Name: Norton / Parrish / Hardy

Admitted Yes/No    Location (s)    Date/Time

**Returned From Hospital**    May return to classification for housing

Date/Time Returned: 5-3-13/2200    Escorting Officers Name: Deputy Cox / Parrish / Norton

**Medical**    May return to classification for housing. ∅ restrictions at this time

Reviewing Nurse/Number: [signature] RN    Date/Time: 5-3-13 @ 2210

Future Appointments

Medical Clinic:

Medication Prescribed (Yes) ______ (No) ______

Transcribed to Medsheet(Yes) ______ (No) ______

**Classification**

Reassigned Tank/Cell    Employee Name/Number    Date/Time

Chief or appointed authority review required prior to placing in inmate's file

Printed Name    Signature    Date/Time

[illegible contact numbers]



JPS ROI SERVICE AREA
1500 South Main St
FORT WORTH TX 76104
Amb Encounter Report

RICKS,CEDRIC ALLEN
MRN: 51028804
DOB: 9/8/1974, Sex: M
Enc. Date: 05/03/13

Misc Documents - Scan on 5/7/2013 9:46 PM (below)



JPS ROI SERVICE AREA
1500 South Main St
FORT WORTH TX 76104
Amb Encounter Report

RICKS,CEDRIC ALLEN
MRN: 51028804
DOB: 9/8/1974, Sex: M
Enc. Date: 05/03/13

CSN 461771178

# TARRANT COUNTY SHERIFF'S OFFICE

## DETENTION OPERATIONS COMMAND

☐ OFFENSE ☐ INCIDENT ☐ MISCONDUCT ☒ MEDICAL REPORT

DATE: 5-3-13 TIME: ______ SERVICE NUMBER ______

SUBJECT: Ricks, Cedric SUBJECT: ______

CID: 0819770 RACE: B SEX: M CID: ______ RACE: ___ SEX: ___

DOB: 9-8-74 LOCATION: ______ DOB: ______ LOCATION: ______

NARRATIVE: To JPS ER via Squad car) per PA McGuffee

REPORTING OFFICER'S SIGNATURE: Smith [signature] PRINT NAME: J. Smith, R.) EMPLOYEE #: 103016

CORRECTIONAL PROCEDURES ______

SUPERVISOR'S SIGNATURE ______ PRINT NAME ______ EMPLOYEE # ______

WATCH COMMANDER'S SIGNATURE ______ PRINT NAME ______ EMPLOYEE # ______

REVIEWED BY ______ PRINT NAME ______ EMPLOYEE # ______

Ver 1.3 08/2004

Misc Documents - Scan on 5/7/2013 9:46 PM (below)

JPS ROI SERVICE AREA
1500 South Main St
FORT WORTH TX 76104
Amb Encounter Report

RICKS,CEDRIC ALLEN
MRN: 51028804
DOB: 9/8/1974, Sex: M
Enc. Date: 05/03/13

CSN 46177178

# TARRANT COUNTY SHERIFF'S OFFICE

## DETENTION OPERATIONS COMMAND

☐ OFFENSE ☐ INCIDENT ☐ MISCONDUCT ☒ MEDICAL REPORT

DATE: 5-3-13 TIME: ______ SERVICE NUMBER ______

SUBJECT: Ricks, Cedric SUBJECT: ______

CID: 0819770 RACE: B SEX: M CID: ______ RACE: ___ SEX: ___

DOB: 9-8-74 LOCATION: ______ DOB: ______ LOCATION: ______

NARRATIVE: To JPS ER via Squad car per PA McGuffee

REPORTING OFFICER'S SIGNATURE: JSmith PRINT NAME: J Smith, E.J. EMPLOYEE #: 103016

CORRECTIONAL PROCEDURES ______

SUPERVISOR'S SIGNATURE ______ PRINT NAME ______ EMPLOYEE # ______

WATCH COMMANDER'S SIGNATURE ______ PRINT NAME ______ EMPLOYEE # ______

REVIEWED BY ______ PRINT NAME ______ EMPLOYEE # ______

Ver 1.3 08/2004



JPS ROI SERVICE AREA
1500 South Main St
FORT WORTH TX 76104
Amb Encounter Report

RICKS,CEDRIC ALLEN
MRN: 51028804
DOB: 9/8/1974, Sex: M
Enc. Date: 05/03/13

**Patient-Level E-Signatures:**

OP Annual Consent Form - Received on 10/1/2013
An error occurred while rendering the e-signature document.
Details: Could not find valid device to read signatures.

**Encounter-Level E-Signatures:**

There are no encounter-level e-signatures.



JPS ROI SERVICE AREA
1500 South Main St
FORT WORTH TX 76104
Amb Encounter Report

RICKS,CEDRIC ALLEN
MRN: 51028804
DOB: 9/8/1974, Sex: M
Enc. Date: 05/06/13

## Patient Demographics

| Name | Patient ID | SSN | Sex | Birth Date |
|---|---|---|---|---|
| Ricks, Cedric Allen | 51028804 | xxx-xx-0000 | Male | 09/08/74 (38 yrs) |

| Address | Phone | EMail | Employer |
|---|---|---|---|
| 100 N. Lamar St<br>FORT WORTH TX 76102 | 817-884-3000 (H) | | NOT EMPLOYED |

| Reg Status | PCP | Date Last Verified | Next Review Date |
|---|---|---|---|
| Verified | Pcp, Unknown | 03/28/14 | 04/27/14 |

## Admission Information - Hospital Account/Patient Record

| | | | | | |
|---|---|---|---|---|---|
| Arrival Date/Time: | 05/03/2013 5:53 PM | Admit Date/Time: | 05/03/2013 10:25 AM | IP Adm. Date/Time: | None |
| Admission Type: | Elective | Point of Origin: | Physician Or Clinic Referral | Admit Category: | None |
| Means of Arrival: | None | Primary Service: | None | Secondary Service: | None |
| Transfer Source: | None | Service Area: | None | Unit: | None |
| Admit Provider: | McGuffee, America E, PAC | Attending Provider: | Mills, John Gerald, DO | Referring Provider: | Pcp, Unknown |

## Discharge Information - Hospital Account/Patient Record

| Discharge Date/Time | Discharge Disposition | Discharge Destination | Discharge Provider | Unit |
|---|---|---|---|---|
| 10/29/2013 | Home Or Self Care | None | None | Jps Tarrant Correctional Facility |

## Final Diagnoses (ICD-9-CM)

| Principal | Code | Name | POA | CC | HAC | Affects DRG |
|---|---|---|---|---|---|---|
| [P] | V70.5 | Health examination of defined subpopulation | | | | |

## Visit Summary

### Diagnoses

**Headache**

**Facial pain**

**Vision loss, left eye**

### Allergies as of 5/6/2013

Reviewed on: 5/6/2013

No Known Allergies

### Vital Signs

Most recent update: 5/6/2013 5:53 PM by Odell, Ashley N, LVN

| BP | Pulse | Temp(Src) | Resp | Ht | Wt |
|---|---|---|---|---|---|
| 123/88 mmHg | 104 | 98.8 °F (37.1 °C) (Oral) | 16 | 5' 7" (1.702 m) | 178 lb (80.74 kg) |

| BMI | SpO2 |
|---|---|
| 27.87 kg/m2 | 100% |

### Medications



JPS ROI SERVICE AREA
1500 South Main St
FORT WORTH TX 76104
Amb Encounter Report

RICKS,CEDRIC ALLEN
MRN: 51028804
DOB: 9/8/1974, Sex: M
Enc. Date: 05/06/13

## Medications (continued)

### Medications Ordered This Encounter

| | Disp | Refills | Start | End |
|---|---|---|---|---|
| **ibuprofen (ADVIL,MOTRIN) 800 MG tablet**<br>Take 1 tablet (800 mg total) by mouth 2 (two) times daily. - Oral | 28 tablet | 0 | 5/6/2013 | 5/20/2013 |

## Outpatient Referral - ALL ORDERS AND RESULTS EXCEPT MEDICATION

### Ambulatory referral to Ophthalmology [21353515]

Electronically signed by: **McGuffee, America E, PAC on 05/06/13 1812** Status: **Active**

This order may be acted on in another encounter.

Ordering user: McGuffee, America E, PAC 05/06/13 1812 Authorized by: McGuffee, America E, PAC

Ordering mode: Standard

Frequency: 05/06/13 -

Diagnoses:

Vision loss, left eye

## Physician Notes

### Progress Notes by McGuffee, America E, PAC at 5/6/2013 6:12 PM Version 1 of 1

Author: McGuffee, America E, PAC Service: (none) Author Type: Physician Assistant
Filed: 5/6/2013 7:58 PM Note Time: 5/6/2013 6:12 PM Status: Signed
Editor: McGuffee, America E, PAC (Physician Assistant)

**Subjective:**

**Patient ID:** Cedric Allen Ricks is a 38 y.o. male.

HPI - High profile, red-suit, SPC-1 w/2 guards.
IM is JPS return, evaluated due to severe facial trauma after assault.
JPS records indicate IM w/ no acute intracranial abnormalities, no fractures, no acute cardiopulmonary processes. CT of face/head:
**1. No suggestion of acute facial fractures noted. Significant soft tissue swelling left frontal, temporal scalp. Significant soft tissue swelling left malar, periorbital area, with focus of air within left periorbital soft tissues. Significant soft tissue swelling left masseter and parotid Gland.**
IM states he cannot see from left eye - no vision at all.
C/o headache.
Requests a "new tooth."

IM also w/ lacerations to hand that have been sutured.
IM states he has not eaten or had anything to drink in about 3 days. "I have nothing to live for." "I don't want anyone to have to take care of me." "I want to die."



JPS ROI SERVICE AREA
1500 South Main St
FORT WORTH TX 76104
Amb Encounter Report

RICKS,CEDRIC ALLEN
MRN: 51028804
DOB: 9/8/1974, Sex: M
Enc. Date: 05/06/13

**Physician Notes (continued)**

**Progress Notes by McGuffee, America E, PAC at 5/6/2013 6:12 PM (continued)** Version 1 of 1

Review of Systems

**Objective:**

Physical Exam

Constitutional: He is oriented to person, place, and time. He appears well-developed and well-nourished. No distress.

HENT:

Right Ear: External ear normal.

Left Ear: External ear normal.

Nose: Nose normal.

Mouth/Throat: Oropharynx is clear and moist.

**Ecchymosis to bilateral orbits**

**Swelling and other facial ecchymosis much improved.**

**Avulsed upper left incisor**

Eyes:

**Right eye - pupil is reactive, EOMs full**

**Left eye - pupil not reactive, EOMs are reduced and abnormal in all directions**

**Denies being able to see light, color, or shapes**

**conjunctival/subdconjunctival hemorrhage bilaterally**

Cardiovascular: Normal rate and regular rhythm.

Pulmonary/Chest: Effort normal and breath sounds normal.

Abdominal: Soft. Bowel sounds are normal.

Musculoskeletal: He exhibits no edema.

**Sutures on bilateral hands noted**

**Skin in clean and dry w/no evidence of infection.**

Neurological: He is alert and oriented to person, place, and time.

Skin: He is not diaphoretic.

Psychiatric:

**Suicidal ideations**

**Flat affects**

**Began to tear when stating he had nothing to live for**

**Assessment and Plan:**

| | |
|---|---|
| 1. Headache | ibuprofen (ADVIL,MOTRIN) 800 MG tablet |
| 2. Facial pain | ibuprofen (ADVIL,MOTRIN) 800 MG tablet |
| 3. Vision loss, left eye | Ambulatory referral to Ophthalmology |

Generated on 12/11/2015 2:03 PM Page 22

000298

496



JPS ROI SERVICE AREA
1500 South Main St
FORT WORTH TX 76104
Amb Encounter Report

RICKS,CEDRIC ALLEN
MRN: 51028804
DOB: 9/8/1974, Sex: M
Enc. Date: 05/06/13

**Physician Notes (continued)**

**Progress Notes by McGuffee, America E, PAC at 5/6/2013 6:12 PM (continued)** Version 1 of 1

Plan:
1) Ibuprofen 800mg po bid x 14 days
2) Initiate Food log
3) Daily VS NSD
4) Istat, Urine dip
5) ophthalmology referral
6) f/u 1 week

**Nurses Notes**

**Progress Notes by Odell, Ashley N, LVN at 5/6/2013 9:09 PM** Version 1 of 1

Author: Odell, Ashley N, LVN Service: (none) Author Type: Licensed Vocational Nurse
Filed: 5/6/2013 9:09 PM Note Time: 5/6/2013 9:09 PM Status: Signed
Editor: Odell, Ashley N, LVN (Licensed Vocational Nurse)

Provider's orders have been completed and noted.

**Other Notes**

No notes of this type exist for this encounter.

**Transcription**

| Type | ID | Date and Time |
| --- | --- | --- |
| Medication Records - Scanned | 51028804_36 | 5/25/2013 12:33 PM |

Document Text

Display only: Transcription (51028804_36) on 5/25/2013 12:33 PM

**Follow-up and Disposition History**

| User | Date & Time |
| --- | --- |
| MCGUFFEE, AMERICA E | 5/6/2013 6:05 PM |

**Disposition:**

N/A

**Follow-up:**

N/A



JPS ROI SERVICE AREA
1500 South Main St
FORT WORTH TX 76104
Amb Encounter Report

RICKS,CEDRIC ALLEN
MRN: 51028804
DOB: 9/8/1974, Sex: M
Enc. Date: 05/06/13

**Follow-up: (continued)**

**Instructions:**
N/A

**Check-out Note:**
N/A

**Send Reminder:**
N/A

**Encounter-Level Documents - 05/06/2013:**

Medication Records - Scanned - Scan on 5/25/2013 12:33 PM (below)

Lamar [illegible] 5/2013

Ibuprofen 800mg
1 PO BID
x14days

5-21-13

[illegible]

Name: RICKS,CEDRIC ALLEN
MRN: 51028804
DOB: 09/08/1974 SEX: M

CSN 44181704

**Patient-Level E-Signatures:**

OP Annual Consent Form - Received on 10/1/2013

An error occurred while rendering the e-signature document.
Details: Could not find valid device to read signatures.



JPS ROI SERVICE AREA
1500 South Main St
FORT WORTH TX 76104
Amb Encounter Report

RICKS,CEDRIC ALLEN
MRN: 51028804
DOB: 9/8/1974, Sex: M
Enc. Date: 05/06/13

**Patient-Level E-Signatures: (continued)**

**Encounter-Level E-Signatures:**

There are no encounter-level e-signatures.

500