

# ELECTRONIC RECORD

# CLERK'S RECORD

## VOLUME 4 of 5

Writ Number: C-371-W010796-1361004-A

### Filed In the 371ST DISTRICT COURT
of Tarrant County, Texas
Hon. MOLLEE WESTFALL, Presiding Judge

### EX PARTE: CEDRIC ALLEN RICKS

vs.

### THE STATE OF TEXAS

Appealed to the Court of Criminal Appeals
for the State Of Texas
at Capitol Station
AUSTIN, TEXAS

**RECEIVED IN**
**COURT OF CRIMINAL APPEALS**

JUL 16 2019

Deana Williamson, Clerk

## ATTORNEY FOR THE APPELLANT

**CATHERINE CLARE BERNHARD, APPOINTED**
**P.O. BOX 2817**
**RED OAK, TEXAS 75154**

| | |
|---|---|
| **PHONE:** | 972-617-5548 |
| **FAX:** | 972-421-1604 |
| **SBOT:** | 02216575 |

**Attorney for CEDRIC ALLEN RICKS, Appellant**

Delivered to the Court of Criminal Appeals for the State Of
Texas At Capitol Station, AUSTIN, Texas. on the

**11** day of **July** **2019**

THOMAS A. WILDER, DISTRICT CLERK,
TARRANT COUNTY, FORT WORTH, TEXAS

_____

**DAVID PULLIAM**
_____

Deputy District Clerk

BEST COPY AVAILABLE

(Court of CRIMINAL APPEALS)
Cause No. _____
Filed in the Court of Criminal Appeals for the State of Texas,
at Capitol Station, AUSTIN, Texas, this

_____ day of _____

**DEANA WILLIAMSON**

Clerk

By _____, Deputy

1501

## ELECTRONIC RECORD

# CLERK'S RECORD

### VOLUME 4 of **5**

Writ Number: **C-371-W010796-1361004-A**

Filed In the 371ST DISTRICT COURT
of Tarrant County, Texas
Hon. MOLLEE WESTFALL, Presiding Judge

### EX PARTE: CEDRIC ALLEN RICKS

vs.

### THE STATE OF TEXAS

Appealed to the Court of Criminal Appeals
for the State Of Texas
at Capitol Station
AUSTIN, TEXAS

### ATTORNEY FOR THE APPELLANT

**CATHERINE CLARE BERNHARD, APPOINTED**
**P.O. BOX 2817**
**RED OAK, TEXAS 75154**

| | |
|---|---|
| **PHONE:** | **972-617-5548** |
| **FAX:** | **972-421-1604** |
| **SBOT:** | **02216575** |

**Attorney for CEDRIC ALLEN RICKS, Appellant**

Delivered to the Court of Criminal Appeals for the State Of
Texas At Capitol Station, AUSTIN, Texas, on the

**11** day of **July** , **2019**



THOMAS A. WILDER, DISTRICT CLERK,
TARRANT COUNTY, FORT WORTH, TEXAS

DAVID PULLIAM
Deputy District Clerk

(Court of CRIMINAL APPEALS)
Cause No. _____
Filed in the Court of Criminal Appeals for the State of Texas,
at Capitol Station, AUSTIN, Texas, this

_____ day of _____, _____

DEANA WILLIAMSON

Clerk

By _____, Deputy


# INDEX

## Volume 4

Clerk's Record Cover Page ........................................................................................... 1501

Index ......................................................................................................................... 1502

    Court of Criminal Appeals -- Opinion -- 10/05/2017 (Continued from Volume 3)..................... 1505
    Criminal Docket Sheet............................................................................................... 1522

Wavier of Service ...................................................................................................... 1530

Affidavit of Stephen Gordon in Response to Writ of Habeas Corpus............................... 1531

Affidavit from Mary B. Thornton.................................................................................. 1534

Affidavit of William H. "Bill" Ray ................................................................................ 1568

Findings of Indigency and Order for Appointment of Habeas Counsel............................ 1579

Order Appointing Counsel for the Appeal..................................................................... 1580

Letter from Office of Capital Writs ............................................................................... 1581

Letter from William H. "Bill" Ray to Catherine Bernhard................................................ 1586

Supplemental Order .................................................................................................. 1588

Order on Applicant's Request for Trial Counsel File and State of Texas .......................... 1590

Ex Parte Motion/Order for an Investigator.................................................................... 1591

Ex Parte Funding Motion/Order for Mitigation Specialist................................................ 1596

Ex Parte Funding Motion/Order for Expert Assistance ................................................... 1636

Order on Applicant's Request for Jury Questionnaires ................................................... 1652

Second Ex Parte Funding Motion/Order for Mitigation Specialist ..................................... 1653

Ex Parte Funding Motion/Order for Expert Assistance .................................................... 1662

Ex Parte Funding Motion/Order for Expert Assistance ........................................................................ 1699

Third Ex Parte Funding Motion/Order for Mitigation Specialist ............................................................ 1710

Ex Parte Funding Motion/Order for Expert Assistance ........................................................................ 1718

Ex Parte Motion/Order for an Investigator............................................................................................ 1730

Pro Se Motion for Post-Conviction Relief and for Ineffective Assistance of Trial
Counsel and Direct Appeal Counsel .................................................................................................... 1735

Motion/Order for Extension of Time to File Art. 11.071 Writ Application ............................................. 1739

Second Ex Parte Funding Motion/Order for Expert Assistance ........................................................... 1745

Ex Parte Funding Motion/Order for Research Assistance .................................................................... 1750

Ex Parte Funding Motion/Order for Expert Assistance ........................................................................ 1756

Ex Parte Funding Motion/Order for Expert Assistance ........................................................................ 1769

Ex Parte Funding Motion/Order for Expert Assistance ........................................................................ 1790

Ex Parte Motion/Order Requesting Defense Pschologist to turn Over Raw Test Data to
Another Defense Psychologist ............................................................................................................. 1810

State's Motion for Affidavits of Applicant's Trial and Appellate Counsel.............................................. 1814

Second Ex Parte Funding Motion/Order for Research Assistance ....................................................... 1818

Letter from Court of Criminal Appeals with Pro Se Documents Attached............................................ 1824

Memorandum and Order........................................................................................................................ 1848

Letter from Court of Criminal Appeals with Pro Se Documents Attached............................................ 1851

Letter from Sharen Wilson about DNA Mixture Review ....................................................................... 1857

Certified Mail Return Receipt Requested – Comptroller Judiciary Attn: Mary Hand ........................... 1862

Motion/Order for Extension of Time to File Affidavit in Response to Writ of Habeas Corpus ............. 1863

Motion/Order for Extension of Time to File Affidavit............................................................................. 1867

Second Motion/Order for Extension of Time to File Affidavit ............................................................... 1873

Unopposed Motion to Extend Time to File the State's Reply to Application for Writ of Habeas Corpus ............................................................................................................... 1878

Memorandum and Order ............................................................................................. 1883

Certified Mail Return Receipt Requested – Catherine Bernard ........................................ 1884

State's Motion for Court to Order Preparation of Proposed Findings of Fact and Conclusions of Law ..................................................................................................................... 1885

State's Motion for Court to Order Preparation of Proposed Findings of Fact and Conclusions of Law ..................................................................................................................... 1889

Memorandum and Order ............................................................................................. 1894

Certified Mail Return Receipt Requested – Steve Gordon, Mary B. Thornton, Catherine Bernard, and William H. Ray ....................................................................................................... 1895

State's Proposed Memorandum, Findings of Fact, and Conclusion of Law ........................ 1899

Applicant's Proposed Findings of Fact and Conclusions of Law ...................................... 1970

Back Cover Page ....................................................................................................... 2000

the initial search is unreasonable merely because the exigencies have ceased to exist.[48]  We

hold that it is not.

Although this Court has not directly addressed the issue, the United States Supreme

Court has held:

> [W]hen a police officer has [lawfully] observed an object in "plain view," the
> owner's remaining interests in the object are merely those of possession and
> ownership. Likewise, ... requiring police to obtain a warrant once they have
> [lawfully] obtained a first-hand perception of contraband, stolen property, or
> incriminating evidence generally would be a "needless inconvenience," that
> might involve danger to the police and public.  We have said previously that
> "the permissibility of a particular law enforcement practice is judged by
> balancing its intrusion on . . . . Fourth Amendment interests against its
> promotion of legitimate governmental interests."[49]

In addition, the right to be present is not necessarily limited to just the officer or officers who

actually dealt with the exigency that permitted the initial entry, but may extend to officers

who have a different function from the original entrants.

Further, several Texas courts of appeals have held similarly and we find their

reasoning persuasive.  "[O]nce the privacy of a residence has lawfully been invaded during

an exigency, it makes no sense to require a warrant for other officers to enter and complete

what officers on the scene could have properly done."[50]

---

[48] We note that the trial court granted Appellant's motion to suppress pertaining to items
that had not been in plain view, but were discovered only after Gauger and Grice engaged in an
intrusive search for items in a bedroom night stand and under the bedcovers.

[49] *Texas v. Brown*, 460 U.S. 730, 739 (1983) (citations omitted).

[50] *Johnson v. State*, 161 S.W.3d 176, 183 (Tex. App.—Texarkana 2005), *aff'd on other
grounds*, 226 S.W.3d 439, 445 (Tex. Crim. App. 2007); *see also Rothstein v. State*, 267 S.W.3d

(continued...)

Ricks    25

Because the subsequent search by Grice and Gauger merely documented what had already been observed in plain view during the initial, reasonable search, we conclude that the trial court properly overruled Appellant's motion to suppress these items. Points of error three and four are overruled.

### Denial of Right to Counsel

In his fifth and sixth points of error, Appellant contends that the trial court erred in denying his motion to suppress all evidence seized because he was denied his right to counsel in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; Article I, section 10 of the Texas Constitution; and Articles 1.05, 15.17, and 38.23. In his seventh point of error, he argues that the trial court erred in denying the motion because he was denied his right to counsel in violation of Oklahoma statutes.

Appellant does not allege that he was not timely arraigned or advised of his right to counsel. Rather, he appears to complain that his May 3, 2013, videotaped interview with Mack and Shelley in Oklahoma should have been suppressed because Judge Misak did not timely appoint counsel for him at his arraignment on the fugitive-from-justice charge filed by the Garvin County District Attorney's Office.[51]

---

(...continued)
366, 375–76 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (holding that the subsequent entry to view contraband that had already been seen in plain view during an initial search was "incidental to and a valid continuation of the initial exigent circumstances search"); *Shoaf v. State*, 706 S.W.2d 170, 175 (Tex. App.—Fort Worth 1986, pet. ref'd) (concluding that picking up, tagging, and preserving items was an administrative duty incidental to the original entry).

[51] Appellant also alleges that his waiver of extradition was coerced by the Garvin County
(continued...)

1506

Appellant's argument has no merit. First, there is no evidence in the record that Appellant requested counsel on his fugitive-from-justice case. Second, even if Judge Misak were constitutionally or statutorily required to appoint counsel at the arraignment, the Sixth Amendment right to counsel is offense-specific so it would not apply to the capital murder charges.[52] Third, because his statement was never offered into evidence, Appellant received the relief he sought.[53]

To the extent Appellant argues that the denial of counsel in Oklahoma should have been grounds to suppress the evidence seized from the Bedford apartment or Sanchez's vehicle, his arguments also have no merit. The items from the Bedford apartment were seized after being seen in plain view during the responding officers' emergency entry and were not seized as a result of Appellant's alleged denial of counsel in Oklahoma. Regarding

---

(...continued)

Sheriff when the Sheriff deliberately put him into the general population to be beaten by other inmates. The record does not support this allegation. Jailor Arellano-Cardosa testified that Appellant was the one who specifically requested that he be placed with other inmates. She testified that she placed Appellant in the "tank" which is where she felt he would be the safest, and she warned him not to tell anyone why he was there so that he would remain safe. Appellant fails to explain how this issue relates to his denial of counsel claim. Therefore, this portion of Appellant's argument is inadequately briefed. TEX. R. APP. P. 38.1(h).

[52] *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991).

[53] *See Galitz*, 617 S.W.2d at 952 n.10 (equating the non-admission of evidence to the sustaining of an objection since the motion to suppress is a "specialized" form of objection). In the hypothetical alternative, Article 38.22 section 8 states: "[A] statement of an accused made as a result of a custodial interrogation is admissible . . . if: (1) the statement was obtained in another state and was obtained in compliance with the laws of that state or this state . . . ." Here, there are no grounds for suppression even if the May 3 interview was admitted. Appellant initiated contact with Detective Mack for an interview, was properly provided written *Miranda* warnings prior to the interview, and voluntarily waived his rights while being audio/video recorded.

the items seized from Sanchez's car, Appellant does not demonstrate that he has standing to contest the search in light of the unchallenged evidence that he had no ownership interest in the vehicle and took it without permission when he fled after committing the instant crime.[54] Points of error five, six, and seven are overruled.

## ADMISSION OF PHOTOGRAPHS

In points of error eight and nine, Appellant contends that the trial court erred in allowing the State to introduce State's Exhibits 225 and 226, autopsy photographs of an exposed portion of Anthony's brain and the interior of his skull. Appellant argues that the photographs' prejudicial effect greatly outweighed any probative value under Texas Rule of Evidence 403. Appellant does not challenge the relevancy of the photographs.

Dr. Tasha Greenberg, Deputy Medical Examiner for the Tarrant County Medical Examiner's Office, conducted Anthony's autopsy. During her testimony, the State sought to introduce photographs taken during the autopsy. Appellant objected to only two photographs as being more prejudicial than probative: State's Exhibit 225—a picture of the puncture wound to Anthony's brain, and State's Exhibit 226—a picture of the inside of Anthony's skull demonstrating the location and angle of the puncture wound. The State replied that the photographs were to "clarify observations and conclusions about the injuries, because they will show how they were received." The trial court agreed and overruled

---

[54] *See Walbey*, 926 S.W.2d at 312 (finding sufficient probable cause for both murder and auto theft against an accused found in possession of a vehicle reported to be stolen from the murder victim); *Hughes*, 897 S.W.2d at 305 (declaring a defendant to have no standing to contest a search because there is no reasonable privacy expectation in a stolen vehicle).

Appellant's objection. The State then said that it had informed defense counsel that, even though the photographs had been admitted into evidence, it did not plan on publishing any of the photographs to the jury.

The admissibility of photographs is within the sound discretion of the trial judge.[55] Generally, if verbal testimony as to a matter depicted in a photograph is admissible, the photograph is also admissible.[56] However, we do not reach whether the trial court abused its discretion in admitting State's Exhibits 225 and 226 because Appellant was not harmed by their admission.

Error in admitting photographs is non-constitutional error that requires reversal only if Appellant's substantial rights were affected.[57] "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict."[58] Substantial rights are not affected if, based on the record as a whole, the reviewing court has a fair assurance that the error did not influence the jury, or influenced the jury only slightly.[59]

Here, the State never displayed or published to the jury any of the autopsy photographs admitted into evidence, including State's Exhibits 225 and 226. Although the jury would have access to the photographs during deliberations, the prosecutor stated during

---

[55] *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007).

[56] *Id.*

[57] TEX. R. APP. P. 44.2(b).

[58] *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010).

[59] *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011).

jury argument that he did not think the jury needed to look at the autopsy photographs "[b]ecause they're horrible." Further, the record contains copious amounts of evidence of Appellant's guilt, including Marcus's graphic testimony and Appellant's admission to family members that he committed the murders. Therefore, we have a fair assurance that the jury's verdict was not affected in a substantial and injurious way by any alleged error in admitting the two autopsy photographs at issue. Points of error eight and nine are overruled.

## CHALLENGES TO THE TEXAS DEATH PENALTY

In points of error ten through fourteen, Appellant raises several challenges pertaining to the Texas death penalty scheme. In point of error ten, Appellant asserts that the "10–12" rule is unconstitutional because it creates an impermissible risk of the arbitrary imposition of the death penalty. In point of error eleven, he posits that Article 37.071 of the Texas Code of Criminal Procedure is unconstitutional because it shifts the burden of proof on the mitigation special issue to Appellant. In point of error twelve, he complains that the indictment was constitutionally defective because it did not allege the existence of the statutory special issues and the supporting facts necessary to impose a death sentence. In point of error thirteen, Appellant asserts the application of the Texas death penalty scheme has been arbitrarily imposed in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Finally, in point of error fourteen, Appellant contends that Article 37.071 violates "the jury trial guarantee of the Fourteenth Amendment, as interpreted

in *Apprendi v. New Jersey*,[60] *Ring v. Arizona*,[61] *Blakely v. Washington*,[62] *United States v. Booker*,[63] and *Cunningham v. California*[64] by failing to place upon the State the burden of proving beyond a reasonable doubt a negative answer to the mitigation special issue."

Appellant concedes that we have previously rejected these arguments. We decline to reconsider our holdings in these cases. Points of error ten through fourteen are overruled.

## CONFRONTATION CLAUSE AND HEARSAY

In his fifteenth and sixteenth points of error, Appellant argues that his right to confront a witness was violated under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, section 10 of the Texas Constitution, when Sanchez's mother, Diana McGrewe, testified regarding an extraneous offense during the punishment phase of trial. In his seventeenth point of error, Appellant contends that reversible error occurred when McGrewe testified regarding an extraneous offense during the punishment phase in violation of the hearsay rule. All three points of error are based on the same portion of the trial record.

During the punishment phase, McGrewe testified that Appellant had assaulted her daughter, Sanchez, approximately six months prior to the instant offense. After she

---

[60] 530 U.S. 466 (2000).

[61] 536 U.S. 584 (2002).

[62] 542 U.S. 296 (2004).

[63] 543 U.S. 220 (2005).

[64] 549 U.S. 270 (2007).

Ricks    31

described Sanchez's injuries and her own attempts to assist her daughter at that time,

McGrewe testified, in pertinent part:

[STATE]:    Did [Sanchez] get an emergency protective order?

A.    She did.

Q.    And what did that emergency protective order do?

A.    It kept [Appellant] from coming to [the] apartment or to school where the kids went to school, where I worked, or to our house. He couldn't come around us.

Q.    So was there – was there – was that an order issued by a court?

A.    Yes.

Q.    And was he ordered to stay away from [the] apartment?

A.    Yes. He was ordered to stay away from our house, our residence, the school, the boys, –

Q.    So he was ordered to stay away –

A.    – and her work. Also, he couldn't come to her work.

Q.    So he was ordered to stay away from her, from Anthony, from Marcus, and from Isaiah?

A.    Yes.

Q.    So he was ordered to stay away from [the] apartment?

A.    Yes.

Q.    And her place of business?

A.    Everywhere. Everywhere she went, he could not go.

1512

Q.    The kids' school?

A.    Yes.

Q.    And your house?

A.    Yes.

Q.    And that was in November of 2012?

A.    Yes.

Q.    And I guess, eventually [Appellant and Sanchez] got – they got back together; is that right?

A.    Yes, because he kept bothering her.  He kept talking to her, calling her and telling –

[Defense Counsel]:  Excuse me.  Excuse me.

I'm going to object to what somebody has told this lady.  I understand it's hard, but she's been admonished by the Court.  I'd ask that the – first of all, I'd object that it's nonresponsive and it's hearsay and it's confrontation.

THE COURT:    Sustained.

[Defense Counsel]:  I'd ask the jury to be instructed to disregard.

THE COURT:    Jury will disregard the last statement of the witness.

[Defense Counsel]:  And I'd respectfully ask for a mistrial.

THE COURT:    Denied.

Even if McGrewe's response violated the Confrontation Clause or contained hearsay, the trial court sustained Appellant's objections and instructed the jury to disregard.

Ricks     33

Therefore, the only question we consider is whether the trial court erred in denying Appellant's request for mistrial.

A mistrial is appropriate only in "extreme circumstances" for a narrow class of prejudicial and incurable errors.[65] Ordinarily, a prompt instruction to disregard is sufficient to cure error associated with an improper question and answer.[66] On appeal, we generally presume that the jury followed the trial court's instructions.[67] This presumption is refutable, but the Appellant must rebut the presumption by pointing to evidence in the record indicating that the jury failed to follow the trial court's instructions.[68]

Appellant fails to do so here.   Therefore, we presume the jury did not consider McGrowe's complained-of testimony in answering the special issues.  Points of error fifteen through seventeen are overruled.

In point of error eighteen, Appellant complains that the trial court improperly allowed Cynthia Crowe to testify to statements made by Sanchez regarding the November 2012 extraneous assault offense allegedly committed by Appellant. He contends that this violated his rights under the Confrontation Clause because Sanchez was not present at trial or subject to cross-examination.

---

[65] *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009).

[66] *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000).

[67] *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005); *Williams v. State*, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996).

[68] *Thrift*, 176 S.W.3d at 224; *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998).

The record shows that Crowe, a registered nurse in the emergency room at Texas Health Harris Methodist HEB in Bedford,[69] testified during the punishment phase of Appellant's trial. Crowe stated that on November 12, 2012, while she was on duty as a triage nurse, she saw a patient who identified herself as Sanchez. As a triage nurse, Crowe's duties were to "ask what brings you to the emergency room today," to take vital signs, to determine how high a priority the patient is, and to determine in what type of room to place the patient. She testified "absolutely" that the purpose of these questions was to elicit information from the patient that would assist in giving a proper medical diagnosis and treatment. She further stated that asking how the patient was injured or became ill was important to the patient's medical diagnosis or treatment.

Crowe testified that she asked Sanchez what brought her to the emergency room. When the State asked what Sanchez's answer was, Appellant requested to take Crowe on voir dire. Following a short voir dire, Appellant objected that Crowe had no independent recollection of Sanchez and that Crowe's testimony would relate Sanchez's inadmissible testimonial statements in violation of his Sixth Amendment Confrontation Clause rights. The State responded that Sanchez's statements met an exception to the hearsay rule and were non-testimonial. The State further noted that Crowe was testifying from a business record that she created. Appellant argued that hospital employees should be subject to the Confrontation

---

[69] In his brief, Appellant repeatedly refers to Crowe as a "Sexual Assault Nurse Examiner" or "SANE." However, the record shows that she is a Registered Emergency Room Nurse, and she did not testify regarding any specialty in sexual assault examinations or that she conducted such an examination in this case.

Clause. The trial court overruled Appellant's objection, but granted him a running objection.

Crowe then testified as follows, in pertinent part:

[STATE]:   Okay. Ms. Crowe, I had asked you: You had asked Ms. Sanchez what brought her to the emergency room that day. What was her response?

A.   Strangled last night and head was pounded on the floor.

Q.   She said that she was strangled?

A.   Uh-huh.

Q.   Is that a yes?

A.   Yes.

Q.   Did she indicate to you who had done that?

A.   I think, on the last page, it says, "Patient states boyfriend was arrested this morning, and it happened in Bedford."

Q.   Did you ask, during the course of your triage of Ms. Sanchez, whether or not there was domestic violence involved?

A.   Yes, I did.

Q.   And what was her response?

A.   She said yes.

Q.   Was she accompanied by anyone that morning?

A.   I documented that she was accompanied by a parent.

Q.   And based upon her – her statements to you about what brought her to the emergency room, what type of – what type of action did you take with regard to her case?

A.   Well, I triaged her, and I categorized her as a trauma, because

she was an injury instead of a sickness.    And she reported she lost consciousness, so that was a priority two.

Q.    When a patient reports that they lost consciousness, does that make it more serious to you as a triage nurse?

A.    It means they need to see the doctor more quickly.    So, yes, I guess it does.

* * *

Q.    Where did she tell you she was hurting?

A.    Head and neck.

Q.    And do you, as a triage nurse, ask the patient to categorize their pain in any fashion?

A.    Yes. One being minimal pain, ten being most possible pain, how much pain are you in now?

Q.    And how did she categorize her pain?

A.    I put ten, so she told me ten.

Q.    You told us earlier how you asked about the mechanism of injury. Did she tell you what the mechanism of injury was?

A.    I put down, "I was choked until I passed out."

Q.    So she told you she was choked?

A.    Uh-huh.

Q.    Is that yes?

A.    Yes.

In *Crawford v. Washington*, the United States Supreme Court held that a defendant's right to confrontation under the Sixth Amendment is violated when a witness is permitted to

1517

relate out-of-court "testimonial" hearsay statements unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant.[70] "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." Only testimonial statements cause the "declarant" to be a "witness" within the meaning of the Confrontation Clause.[71] We review *de novo* the trial court's ruling admitting evidence over a confrontation objection.[72]

Testimonial statements are those "that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."[73] When the primary purpose is something other than criminal investigation, "the Confrontation Clause does not require such statements to be subject to the crucible of cross-examination."[74] In determining if a hearsay statement is "testimonial," the primary focus is on the objective purpose of the interview or interrogation, not on the declarant's expectations.[75] Out-of-court statements made for the primary purpose of medical diagnosis

---

[70] 541 U.S. 36, 59 (2004); *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008).

[71] *Id.*

[72] *De La Paz*, 273 S.W.3d at 680; *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006).

[73] *Burch v. State*, 401 S.W.3d 634, 636 (Tex. Crim. App. 2013).

[74] *Michigan v. Bryant*, 562 U.S. 344, 361 (2011).

[75] *Davis*, 547 U.S. at 822–23; *De La Paz*, 273 S.W.3d at 680.

Ricks      38

or treatment are generally considered non-testimonial because they have a primary purpose other than the pursuit of a criminal investigation.[76]

Here, Appellant had no prior opportunity to cross-examine Sanchez. Therefore, the admissibility of her statements to Crowe rests on whether her statements were testimonial in nature. The record shows that Crowe testified that she was the emergency room triage nurse who saw Sanchez on November 12, 2012. Crowe testified that her questions to emergency room patients were designed to elicit information pertinent to providing the proper medical diagnosis and treatment. Sanchez's statements in response to those questions were made for the purpose of, and were pertinent to, her medical diagnosis or treatment.[77] The record does not support Appellant's contention that Crowe's questions constituted "a custodial examination in preparation for possible testimony against Appellant in court."[78]

Sanchez's non-testimonial statements were not subject to the Confrontation Clause.[79] Therefore, the trial court did not err in overruling Appellant's Confrontation Clause objection. Point of error eighteen is overruled.

In point of error nineteen, Appellant contends that his right to confrontation under Article I, section 10 of the Texas Constitution was violated when the trial court allowed

---

[76] *Bryant*, 562 U.S. at 362 n.9; *see also Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 312 n.2 (2009) (stating that medical records created for treatment purposes are not testimonial).

[77] *Melendez-Diaz*, 557 U.S. at 312 n.2.

[78] Appellant's Br., *Ricks v. State*, No. AP-77,030, 2015 WL 5075594, at *115 (Tex. Crim. App. Aug. 4, 2015).

[79] *Melendez-Diaz*, 557 U.S. at 312.

Crowe to testify to statements made by Sanchez regarding the November 2012 assault. As Appellant's trial objection was based solely on his Sixth Amendment right to confrontation, Appellant has not preserved this argument for review.[80] Further, Appellant concedes that the confrontation clauses of the federal and Texas constitutions provide "similar" protections.[81] Point of error nineteen is overruled.

## CUMULATIVE ERROR

In point of error twenty, Appellant claims that the previously alleged errors cumulatively harmed him and so his case should be reversed. While a number of errors may be harmful in their cumulative effect, "we have never found that 'non-errors may in their cumulative effect cause error.'"[82] Point of error twenty is overruled.

We affirm the judgment of the trial court.

DELIVERED: October 4, 2017

DO NOT PUBLISH

---

[80] TEX. R. APP. P. 33.1.

[81] *See, e.g.*, *Lagrone v. State*, 942 S.W.2d 602, 613–14 (Tex. Crim. App. 1997) (declining to address state constitutional claim separately when the defendant did not point out any meaningful distinctions between the federal and state confrontation clauses).

[82] *Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009) (citing *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999)); *see also Johnson v. State*, 68 S.W.3d 644, 657 (Tex. Crim. App. 2002).



FILED
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

OCT 05 2017

TIME _____9:14_____
BY _____ DEPUTY

**COURT OF CRIMINAL APPEALS**
P.O. BOX 12308, CAPITOL STATION
AUSTIN, TEXAS 78711

SHARON KELLER
PRESIDING JUDGE

MIKE KEASLER
BARBARA P. HERVEY
ELSA ALCALA
BERT RICHARDSON
KEVIN P. YEARY
DAVID NEWELL
MARY LOU KEEL
SCOTT WALKER
JUDGES

DEANA WILLIAMSON
CLERK
(512) 463-1551

SIAN SCHILHAB
GENERAL COUNSEL
(512) 463-1597

October 4, 2017

Adam Arrington
610 E. Weatherford St.
Forth Worth, TX 76102
* DELIVERED VIA E-MAIL *

Mary B. Thornton
Attorney at Law
3901 Race St.
Fort Worth, TX 76111
* DELIVERED VIA E-MAIL *

Helena F. Faulkner
Assistant District Attorney
401 W. Belknap
Fort Worth, TX 76196
* DELIVERED VIA E-MAIL *

Presiding Judge 371st District Court
401 W Belknap
Fort Worth, TX 76196-7118
* DELIVERED VIA E-MAIL *

Re: RICKS, CEDRIC ALLEN
CCA No. AP-77,040
Trial Court Case No. 1361004R

The court has issued an opinion on the above referenced cause number.

Sincerely,

*Deana Williamson*

Deana Williamson, Clerk

cc:    District Attorney Tarrant County (DELIVERED VIA E-MAIL)
District Clerk Tarrant County (DELIVERED VIA E-MAIL)
Catherine Clare Bernhard (DELIVERED VIA E-MAIL)

# RECORD OF CRIMINAL ACTIONS

**Vol. 1**

STATE OF TEXAS VS.     1361004R  RICKS,CEDRIC ALLEN
No. ___   CAPITAL MURDER-MULTIPL   TRN#9847735940
Offense ___   D371  CID 0819770   DOB-09/08/74
D371  NCIC#09999026   DFF #099926

DISPOSITION OF CASE:

1.
2.
3.

State's Attorney ___   Robert Gill Robert Huseman
On Probation Revocation ___
Defendant's Attorney ___   William Ray Steve Gordon
On Probation Revocation ___
Surety ___
Appeals Attorney ___

| Date | Action |
|---|---|
| 3-31-14 | Defense Motion and Order Granting Motion filed under Seal |
| 3-25-14 | Motion For Mistrial Due To Pretrial Publicity And Conviction To The Unselected Case |
| 3-25-14 | Defendant's Motion for Assessment of Punishment Filed |
| 3-25-14 | (Jury) Written Instructions To The Members |

DETAINER ___
(CRIMINAL) DISTRICT COURT 371st
TRANSFERRED TO ___
FEB 26 2014   INDICTMENT RETURNED AND FILED

| Date | Action |
|---|---|
| | Reindictment of Cause #1325203D |
| FEB 28 2014 | STATES ANNOUNCEMENT OF READY FILED |
| MAR 04 2014 | INDICTMENT RETURNED WARRANT ISSUED BOND SET AT $1,000,000 |
| 3-5-14 | Defense Claim Form |
| MAR 17 2014 | STATUS CONFERENCE |
| 3-17-14 | Receipt of Jury List filed |
| 3-17-14 | Courts Order on Motion to Suppress filed |
| 3-18-14 | Courts Amended Order on Motion to Suppress filed |
| *3-17-14 | States request filed under seal |
| | By Order of the court |
| MAR 19 2014 | STATUS CONFERENCE |
| 3-19-14 | Defendant Arraigned and Pled Guilty before court |
| 3-21-14 | Defense Second Amended Expert Witness Disclosure Filed |

**Thomas A. Wilder**
DISTRICT CLERK
TARRANT COUNTY, TEXAS

THESE ARE CRIMINAL DISTRICT COURT PAPERS AND MUST NOT BE REMOVED

1522

# RECORD
## OF
## CRIMINAL ACTIONS
### 1361004R

| | |
|---|---|
| 3-26-14 | Order of assignment by the presiding judge March 24, 2014, April 1, 2014, April 7, 2014, April 14, 2014, April 21, 2014, April 28, 2014 |
| 3-27-14 | Writ to issue Indictment |
| 3-28-14 | Motion And Order Sealed |
| 4-10-14 | Motion To Approve Additional Funds And Order |
| 4-10-14 | Motion To Approve Additional Funds And Order |
| 4-10-14 | Investigator Invoice filed Under Seal April 10, 2014 |
| 4-10-14 | Investigator Invoice filed under Seal April 10, 2014 |
| 4-15-14 | Defendant's Motion And Order To Transport Defendant filed under Seal April 15, 2014 |
| 4-15-14 | Sealed Ex Parte Motion And Order filed Under Seal April 15, 2014 |
| 4-15-14 | Notice of filing of Business Records filed under Seal April 15, 2014 |
| 4-17-14 | Itemization of Billing for Antoinette McCallahan filed under Seal Per Court Order April 17, 2014 and Not To be Unsealed without Further Order of the Court. |
| 4-17-14 | Order |
| 4-17-14 | Notice of Absence of Public Record And Affidavit And of Intent to Introduce Absence of Record through Affidavit filed under Seal Per Court Order April 17, 2014 |
| 4-28-14 | State's Answer To Defendant's Motion To List State's Witnesses (All Persons Contacted) |
| 4-28-14 | State's Answer to Defendant's Motion to Disclose Extraneous Offenses |
| 4-11-14 | States motion in limine on evidence of Jail confinement and Defendants Statement |
| 5-1-14 | Motion To Approve Additional Funds. |
| 5-1-14 | Itemization of Billing for Mary Burkette Mitigation Specialist, filed under Seal Per Court Order May 1, 2014 and not unsealed without further Order of the Court. |

## See Vol 2



A

**STATE OF TEXAS Vs.**
No.
Offense

1361004R   RICKS, CEDRIC ALLEN   371
CAPITAL MURDER-MULTIPL   TRN# 904773940
D371   CID   0819770   DOB   0908874
NCIC# 09990028   OFF# 099928

RECORD OF **Vol 2**   371
**CRIMINAL ACTIONS**

DETAINER
(CRIMINAL) DISTRICT COURT   371
TRANSFERRED TO
COMPLAINT FILED   BOND SET $

DISPOSITION OF CASE:
1.
2.
3.

State's Attorney   Robert Gill Robert Huseman
On Probation Revocation
Defendant's Attorney   William Ray Steve Gordon
On Probation Revocation
Surety
Appeals Attorney

| Date | Entry |
|---|---|
| 5-1-14 | Court's Docket Filed |
| 5-1-14 | Motion To Prohibit The Submission Of the Death Penalty As An Option For Punishment in this Case, As the Drugs And Procedures Used to Carry out The death penalty Violate The Guarantee Against Cruel and Unusual Punishment As Prohibited By the Eighth and Fourteenth Amendments To the United States Constitution |
| 5-2-14 | State's Supplemental Answer To Defendant's Motion To List State's Witnesses (All Persons Contact) |
| 5-2-14 | Disclosure of Information Sct |
| 5-5-14 | Motion To Approve Additional Funds, Order Approving Additional Funds. |

| Date | Entry |
|---|---|
| 5-5-14 | Defense Motion and Order Sled under Seal Per Courts May 5, 2014 |
| 5-5-14 | Ex Parte Motion and Order Filed Under Sea Per Court May 5, 2014 |
| 5-5-14 | Ex Parte Motion and Order Filed under seal Per Court May 5, 2014 |
| 5-5-14 | Motion To File and Seal Memos |
| | Order Sealing Defense Clk's Memos |
| 5-9-14 | Clk's Filed |
| 5-5-14 | Trial before one Jury Sworn |

**Thomas A. Wilder**
DISTRICT CLERK
TARRANT COUNTY, TEXAS

THESE ARE CRIMINAL DISTRICT COURT PAPERS AND MUST NOT BE REMOVED

# RECORD
## OF
## CRIMINAL ACTIONS
### # 1361004R

| Date | Entry |
|---|---|
| 5-5-14 | and instructed. Defendant arraigned before the jury and enters a plea of Not Guilty to Count One: Capital Murder - Multiple. Testimony begins. |
| 5-6-14 | Court's Order filed. |
| 5-7-14 | Defense Instructed Verdict denied. Testimony continues. Court's Charge filed. Verdict: Guilty of Capital Murder - Multiple. Punishment testimony commences. |
| 5-8-14 | State's Supplemental Answer to Defendant's Motion to Disclose Extraneous Offenses filed |
| 5-8-14 | State's Second Supplemental Answer To Defendant's Motion To List State's Witnesses (All Persons Contacted) |
| 5-12-14 | State's Motion In Limine On Evidence of Execution Impact And Plea Negotiations |
| 5-12-14 | State's Motion To Order Tarrant County Sheriff To Allow Psychological Interview of Inmate and Order |
| 5-14-14 | Defendant's Motion In Limine Concerning Criminal Records of Witnesses) |
| 5-14-14 | Court's Order granting Defendant's Motion In Limine Concerning Criminal Records of Witnesses. |
| 5-14-14 | Court's Order filed Re: Serological Research Institute Invoice filed. |
| 5-14-14 | Order For Payment To Lovelace Scientific Resources for Services for April 14, 2014 Thru April 30, 2014 |
| 5-14-14 | Itemization of Billing for Lovelace Scientific Resources (April 14, 2014 and April 30, 2014) - Sealed per Court Order |
| 5-14-14 | Motion To Approve Additional Funds and Order Approving Additional Funds. |

(inside)

1525

# RECORD
## OF
## CRIMINAL ACTIONS
1361004 R

| | |
|---|---|
| 5-14-14 | Order for Payment to Lovelace Scientific Resources (for Services for May 1, 2014 Thru May 9, 2014) |
| 5-14-14 | Itemization of Billing for Lovelace Scientific Resources Between May 1, 2014 And May 9, 2014 filed under Seal |
| 5-14-14 | Order for Payment To Lovelace Scientific Resources (for Services for All of March 2014 and thru April 13, 2014) |
| 5-14-14 | Itemization of Billing for Lovelace Scientific Resources for All of March 2014 thru April 13, 2014 filed under Seal |

See Volume 3

1526

**STATE OF TEXAS Vs.**

1361004R    RICKS, CEDRIC ALLEN    371
CAPITAL MURDER-MULTIPL    TRN# 904733940
No. _____    D371  CID  0819770    DOB    09/08/74
Offense _____    NCIC# 09990026    OFF#  099926
OFFENSE:  0501/13    FILED: 0228/14

## RECORD OF CRIMINAL ACTIONS

**DETAINER** _____    A

**(CRIMINAL) DISTRICT COURT** 371 Vol. 3

**TRANSFERRED TO** _____

**COMPLAINT FILED** _____    **BOND SET AT $** _____

| | |
|---|---|
| 5-16-14 | Court's Charge on Punishment filed. |
| 5-16-14 | Verdict the jury having found Defendant guilty of Count One, Capital Murder - Multiple now assesses punishment as follows: |
| | Answer to Special Issue Number 1: |
| | Yes |
| | Answer to Special Issue Number 2: |
| | No. |
| | It being Mandatory the punishment be Death the Court assesses the punishment at Death and that at any time before 6:00am on a date to be determined by this Court upon a mandate of difference issued by the Texas Courts of Criminal |

**DISPOSITION OF CASE:**

1. Death
2. _____
3. _____

**State's Attorney** Robert Gill Robert Huseman

**On Probation Revocation** _____

**Defendant's Attorney** William Ray Steve Gordon

**On Probation Revocation** _____

**Surety** _____

**Appeals Attorney** _____

| |
|---|
| Appeals to the State Penitentiary at |
| Huntsville, where you shall be caused to die |
| by intravenous injection of a substance |
| in a lethal quantity sufficient to cause |
| your death. Defendant advised of |
| appeal rights. |
| |
| |

**PRESIDING JUDGE, 371st DISTRICT COURT**

5-16-14    **NOTICE OF APPEAL**

## Thomas A. Wilder
### DISTRICT CLERK
### TARRANT COUNTY, TEXAS

**THESE ARE CRIMINAL DISTRICT COURT PAPERS AND MUST NOT BE REMOVED**

# RECORD
## OF
## CRIMINAL ACTIONS

1361004R

| Date | Action |
|------|--------|
| 5-16-14 | Trial Court's Certification of Defendant's Right to Appeal filed. |
| | MOTION FOR FREE REPORTER'S RECORD AND AFFIDAVIT OF INABILITY TO PAY FOR COUNSEL AND REPORTER'S RECORD |
| | ORDER APPOINTING COUNSEL FOR THE APPEAL AND ORDER FOR COURT REPORTER TO PREPARE REPORTER'S RECORD |
| 5-19-14 | Order Appointing Counsel for the Appeal |
| 5-19-14 | Findings of Indigency And Order for Appointment of Habeas Counsel |
| 5-28-14 | SCANNED |
| 5-29-2014 | Order Antoinette McGarrahan PhD |
| 5-29-2014 | Order - Wells Investigation |
| 5-29-2014 | Order - Mary Burdette |
| 5-29-2014 | Order - Terri Womack |
| 5-29-2014 | Notice of Appeal Pack Mailed to CCA & State |
| 5-30-2014 | Letter from Court of Criminal Appeals |
| 6-2-2014 | Motion for New Trial filed (to State - Pray that CCA |
| 6-2-2014 | Designation of Record (Appeal) |
| 6-2-2014 | Letter from Bill Ray |
| 9-12-2014 | TRANSMITTED TO Abel Acosta - Clerk of Criminal Appeals CMRRR |
| 10-16-2014 | wavmt of whole due Exhibits down't Finden's requested or in file |
| 10-16-2014 | Motion Requesting Order for Trial Counsel to turn over client file to Habeas Counsel |
| 10-21-2014 | Motion to Ellis Trial Counsel to retain Jury Information until Appeals are Exhausted and Order |
| 10-21-2014 | |
| 10-23-2014 | Order on Applicant's Request for Trial Counsel F.H. and Seth Lucas File |
| 10-27-2014 | 1st Supplemental Record TRANSMITTED TO Abel Acosta - CCA - CMRRR |
| 11-10-2014 | Supplemental Order |
| 11-10-2014 | Order on Applicant's Applicant's Request for Trial Counsel File and State of Texas F.H. |
| 11-10-2014 | Card from CCA - Received 1st Supplemental Record |
| 11-12-2014 | 2nd Supplemental Record TRANSMITTED TO Abel Acosta - CCA CMRRR |
| 11-13-2014 | Motion for Order - Sealing Jury Photos |
| 11-17-2014 | Document to Expose one to Court Ordered 11-17-2014 |

1528

SEND NOTHING
to 2nd COA

VOL 4

COURT __ 371

IF MUST HAVE
ORDER from
Jury into in Record

CRIMINAL Copied to put
Jury into in Record

STATE OF TEXAS Vs.   136100-4R   RICKS,CEDRIC ALLEN

| | | |
|---|---|---|
| No. | CAPITAL MURDER-MULTIPL | TRN# 904733940 |
| | D371   CID   0819770 | DOB: 09/08/74 |
| Offense | NCIC# 099990026 | OFF# 099026 |
| | OFFENSE   05/01/13 | FBI FD: 02/20/14 |

DISPOSITION OF CASE:

1. Death
2.
3.

4.

State's Attorney  Robert Gill, Robert Huseman

On Probation Revocation

Defendant's Attorney  William Ray, Eric Graddon

On Probation Revocation

Surety

Appeals Attorney  Nick. Thornby

| Date | Entry |
|---|---|
| 5-8-2015 | Ex-parte funding Motion for Expert Assistance |
| 5-8-2015 | Order on Applicants Ex-parte funding motion for Expert Assistance |
| 5-12-2016 | Order on Applicants Request for Jury Questionaires |
| 6-10-2015 | Motion to defendant's attorney on appeal below |
| | Sealed Volumes 7&8 ofte Reporters Record Phoebe |
| 3-9-16 | Pro Se Motion for State Conviction Relief |
| | And for Ineffective Assistance of Trial |
| | counsel and direct appeal Counsel |

**Thomas A. Wilder**
DISTRICT CLERK
TARRANT COUNTY, TEXAS

THESE ARE CRIMINAL DISTRICT COURT PAPERS AND MUST NOT BE REMOVED

1529

Writ Number: **C-371-010796-1361004-A**

## 371ST DISTRICT COURT

OF

TARRANT COUNTY, TEXAS

### EX PARTE

### *CEDRIC ALLEN RICKS*

### *WAIVER OF SERVICE*

Now comes SHAREN WILSON, Criminal District Attorney of Tarrant County, Texas and hereby acknowledges that he has this date, **June 13, 2016**, received from the District Clerk a copy of the petition for Writ of Habeas Corpus filed in the above entitled and numbered cause and he hereby waives delivery to him of said petition by certified mail.

It is further acknowledged that the answer to this petition, if any, will be filed within fifteen (15) days from this date.

*SHAREN WILSON*
*CRIMINAL DISTRICT ATTORNEY*

*TARRANT COUNTY, TEXAS*

BY _____

**FILED**
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

June 13, 2016

Time ___2:00PM___
By _____, Deputy

1530

FILED
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

SEP 1 4 2016

TIME____2:09pm____
BY_____ DEPUTY



C371-010796-1361004-A

EX PARTE:                          §        IN THE 371st JUDICIAL
                                   §
                                   §        DISTRICT COURT OF
                                   §
CEDRIC ALLEN RICKS                 §        TARRANT COUNTY TEXAS

---

### AFFIDAVIT OF STEPHEN GORDON IN RESPONSE TO WRIT OF HABEAS CORPUS

---

THE STATE OF TEXAS        §
                          §
COUNTY OF TARRANT         §

BEFORE ME, the undersigned authority, on this day personally appeared Stephen Gordon, known to me to be the person whose name is subscribed herein below, and after having been duly sworn, on oath states as follows:

"My name is Stephen Gordon. I am over the age of 18 years. I am an attorney duly licensed in the State of Texas with my principal office located in Fort Worth, Tarrant County, Texas. I am fully competent to give this Affidavit in the above-styled and numbered matter C-371-010796-1361004-A-entitled Ex Parte *"Cedric Allen Ricks."*

"I was an assistant district attorney in the Tarrant County District Attorney Office from 1993 -1998, serving as a Chief prosecutor from 1995-1998. I have tried four Death Penalty cases including this one. I have been trying Capital Murder cases since 2006. I have also tried over a 100 jury trials to verdict with 25 of those being aggravated felony cases. I have been a member of the State of Texas Criminal Defense Bar Board of Directors for 7 years and have served as president of the Tarrant County Criminal Defense Lawyer's Association, in Fort Worth, Texas.

I represented Cedric Allen Ricks in Case Number 1361004, entitled *The State of Texas vs. Cedric Allen Ricks*, in the 371st Judicial District Court of Tarrant County, Texas for the offense of Capital Murder, along with Bill Ray, Mary Burdette and Stanley Keeton. In our representation of Mr. Ricks, we became fully versed and knowledgeable as to the contents and information contained in the State's file against Mr. Ricks.

We knew from the initial review of the case that most of our time would be spent attempting to build a strong mitigation case due to the allegations of the indicted case. Mr. Ray and I visited the Defendant numerous times during the pendency of his case. We discussed our concerns and strategies with him, to inform him, but also to afford him every opportunity to

---

. SCANNED

1531

assist us in his defense.

We visited Chicago with a dual purpose: to speak with and locate witnesses if possible, as well as to get any possible documentary evidence that we could find. During our trips to Chicago we made it a point to locate any juvenile and adult criminal records and as well as any medical records that would assist us in formulating a strong mitigation Defense. We did find some records regarding his medical history and we collected all that we could find and had them all reviewed by members of our Psychological team as well as our retained medical doctor to assist in discovering any organic or other disabilities that we may have not known about or which had not been diagnosed.

As the trial got closer, it was our plan and our normal course of representation that we would keep the Defendant informed about any developments and inform him as to the motions that we drafted on his behalf as well as the general trial strategy. We advised him of his right to testify, and he explained that he understood all of the various issues that we brought to his attention. While we were open with him, he at times was not as open with us. For example, in March, 2014, he refused to speak with me or Bill Ray when we went to Tarrant County Jail to meet with him. The next day, he informed us that he wanted no further investigation on his behalf in order to develop the mitigation case. We continued with our investigation with our retained experts despite his request. We continued our plans to travel again to Chicago, Florida and New Mexico.

On August 21, 2013, Defense counsel filed a "Motion to Appear at All Phases of Pretrial and Trial in Civilian Clothes and Without Physical Restraints". Said Motion stated in part that "requiring the Defendant to appear in open Court before the public and press attired in the barb of, or under the restraints of a prisoner, tarnishes and is violative of the Defendant's rights to the presumption of innocence," and "The stigma attached to one who must involuntarily wear the clothes of a prisoner, or appear in shackles or restraints as he faces the public, press, or the tribunal that will judge his guild, prior to his adjudication or conviction, is violative of the Defendant's right to a fair and impartial trial . . ." Defendant's motion was granted in part and he was allowed to appear in civilian clothes although he was still shackled.

Mr. Ray and I specifically avoided using Deborah and Joseph because after meeting in my office early on in our representation of Cedric, they informed us that they specifically warned Roxanne after a prior assault not to bond Cedric out of jail and to leave him due to knowledge of his violent nature.

We are not aware of any information from anyone we spoke to in the family regarding Geraldine Booker or her boyfriend. After speaking with Cedric, Shedrick, Helen, Dewayne, Larry Hall or anyone associated with this case, I believed and still do believe, that Cedric's family, due to Cedric's actions, are having to come to terms with many issues that may have occurred that may explain what caused Cedric to turn out the way the he did. We met with his family via telephone and in person many times and were impressed by the cooperation and

AFFIDAVIT OF STEPHEN GORDON IN RESPONSE TO WRIT OF HABEAS CORPUS                    Page 2.

1532

courtesy afforded by his family. On a personal level, I enjoyed meeting them all without exception.

However, what is clear and consistent throughout our investigation was that the family would not be totally forthcoming regarding family history and secrets.

We initiated attempts early on to find teachers and mentors who were aware of Cedric's childhood development. Stanley Keeton, our investigator, and Mary Burdette, our mitigation expert, made numerous attempts to locate teachers who could assist in our defense. We were able to locate the coaches who testified.

Further, Cedric was offered a plea of life without parole and rejected that plea.

Through our investigations and evaluations of medical records and associated evaluations, we found no indications of lead poisoning indications of exposure to lead.

Further, Affiant said not.

_Stephen Gordon_

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, on this the _____ day of _____9/15/16_____, 2016, to certify which witness my hand and seal of office.

_Katherine C. Carroll_
NOTARY PUBLIC in and for
The State of Texas

> KATHERINE E. CARROLL
> Notary Public, State of Texas
> Comm. Expires 06-30-2019
> Notary ID 128660572

AFFIDAVIT OF STEPHEN GORDON IN RESPONSE TO WRIT OF HABEAS CORPUS                    Page 3.

1533

*Mary B. Thornton*
Attorney at Law
Board Certified, Criminal Law
Texas Board of Legal Specialization

*3901 Race Street*
*Fort Worth, Texas 76111*

*Tel: (817) 759-0400*
*Fax: (817) 831-3002*

CAUSE NO. <u>C-371-010796-1361004-A</u>

| | | |
|---|---|---|
| EX PARTE | * | IN THE 371ST JUDICIAL |
| | * | |
| | * | DISTRICT COURT OF |
| | * | |
| CEDRIC ALLEN RICKS | * | TARRANT COUNTY, TEXAS |

<u>**A F F I D A V I T**</u>

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

SEP 2 8 2016

TIME ___3:22pm___
BY _____ DEPUTY

STATE OF TEXAS

COUNTY OF TARRANT

On this day personally appeared **MARY B. THORNTON**, attorney at law, known to me,

who first being duly sworn upon oath to tell the truth, deposed and stated:

" I am **MARY B. THORNTON**, an attorney licensed to practice law in the State of Texas

and the court-appointed attorney who represented Applicant, **CEDRIC ALLEN RICKS**, in the

automatic appeal to the Texas Court of Criminal Appeals of his conviction for capital murder

and subsequence sentence of Death in cause number 1361004A. I was appointed to

represent Applicant in his appeal on May 19, 2014.

The Clerk's Record was filed on September 15, 2014; a Supplemental Clerk's Record

was subsequently filed on October 29, 2014. The Reporter's Record, after the granting of

three extensions, was filed on December 19, 2014. The appellate record in Applicant's case

consists of the three volumes of the Clerk's Record, a Supplemental Record, and forty-six

1

SCANNED

1534

volumes of the Reporter's Record. The three volumes of the Clerk's Record number 570 pages, all of which I reviewed. Volumes one through ten of the Reporter's Record contain the Pretrial Hearings. Volumes seven and nine were ordered sealed by the trial court. On June 10, 2015, I presented an Order to the trial court to unseal these volumes, which was granted. These eleven volumes consist of 563 pages, all of which I read. I took twenty pages of single-spaced, letter sized notes. Volumes eleven through thirty of the Reporter's Record contain the Jury Voir Dire proceedings. These twenty volumes consist of 4,593 pages, all of which I read. I took forty-one pages of single-spaced, letter sized notes on a legal pad. Volumes thirty-one through thirty-three contain the Trial on the Merits. These three volumes consist of 584 pages, all of which I read. I took thirty-eight pages of single-spaced, letter sized notes on a legal pad. Volumes thirty-four through thirty-seven contain the State's witnesses during the Trial on Punishment. These four volumes consist of 542 pages, all of which I read. I took fifty-six pages of single-spaced, letter sized notes on a legal pad. Volumes thirty-eight through forty contain the defense witnesses during the Trial on Punishment. These three volumes consist of 614 pages, all of which I read. I took fifty-two pages of single-spaced, letter-sized notes on a legal pad. Volume forty-one contains a hearing involving the post conviction writ attorney. This one volume consists of twenty-two pages, all of which I read. I took one page of single-spaced, letter sized notes on a legal pad. Volumes forty-two through forty-six contain the Exhibits. There are six court exhibits, sixteen State Pretrial Exhibits, two hundred seventy-seven State Exhibits, and thirty-nine Defense Exhibits, all of which I reviewed. In addition, there are four MP3 and MP4 files as well as three file folders that contain two interviews of Applicant by law

2

1535

enforcement when he was incarcerated in Oklahoma, two videos involving a fight between Applicant and other inmates while Applicant was incarcerated in Oklahoma, some chain of custody and forensic reports, and a video of Applicant's infant son, the eight-year-old decedent, and the surviving twelve-year-old child playing at their apartment that had been taken on the decedent mother's cellular telephone three days before this offense. *(RR. XL-93-96)*. During the note taking process my standard operating procedure in every appellate brief that I write is to document every potential point of error by placing a [POE] sign where it is preserved in the record. I followed my standard operating procedure in this case.

Prior to the writing process I made a separate list of every potential point of error that was properly preserved and could potentially be raised in Applicant's brief on appeal, which is also standard operating procedure for me. When I was researching and writing the various points of error in Applicant's brief I read and reread portions of the Reporter's Record so often that it was impossible to include and charge for these hours in my final statement to the trial court requesting payment. This is always the case in every appellate brief that I have written in my over thirty-two years of criminal law practice, including over twenty-seven years of private practice.

On August 3, 2015, I tendered Applicant's brief by electronic filing to the Court of Criminal Appeals. It was accepted on August 4, 2015. I elected to submit his brief on its merits without requesting oral argument because in my professional opinion I believed that waiving argument gave him a better chance of reversal on appeal. The requisite number of paper copies were personally tendered to the Court of Criminal Appeals on August 5, 2015.

3

1536

I mailed a copy of Applicant's brief to him on August 7, 2015. Applicant's brief contains twenty points of error, consists of one-hundred twenty-two pages, generating twenty-seven thousand one hundred twelve words pursuant to *Rule 9.4 (I) (2) (B) of the Texas Rules of Appellate Procedure.* The State's reply brief was accepted for filing in the Court of Criminal Appeals on January 28, 2016, and a copy of the reply brief was made and mailed to Applicant on the same day. A copy of Applicant's brief was also emailed to the Hon. Catherine Clare Bernhard, Applicant's appointed attorney on his post conviction writ pursuant to *art. 37.071 of the Texas Code of Criminal Procedure.* During the several months that I worked on the preparation of Applicant's brief I spoke with Ms. Bernhard approximately three times over the telephone regarding various matters. I also visited Applicant at the Allan B. Polunsky unit in Livingston, Texas around three weeks before I tendered his brief for filing. Applicant's case was submitted on March 2, 2016, and as of the date of this affidavit is still pending in the Court of Criminal Appeals. Thus, as of this date, on written opinion has been issued by the Court.

On June 13, 2016, Applicant filed a post-conviction writ of habeas corpus pursuant to art. 11.071 of the Texas Code of Criminal Procedure in cause number 1361004A alleging among other things that he received ineffective assistance of appellate counsel on three separate grounds for review: 1) that I was ineffective for not raising in my brief an issue pertaining to the trial court's failure to charge the jury on the burden of proof for extraneous offenses at punishment, 2) that I was ineffective for not raising an issue on the trial court's exclusion of genetic evidence during the punishment phase, and 3) that I was ineffective for

4

1537

not raising an issue on the trial court's ruling that the defense did not present a prima facie claim of racial discrimination as required in *Batson v Kentucky*. In order to respond thoroughly to Applicant's contentions, this Honorable Court has Ordered that I prepare an affidavit detailing any and all reasons that I elected not to raise the above three issues in my brief on behalf of Applicant filed in the Court of Criminal Appeals.  I will address each ground separately in order to explain my reasons for not raising these three points of error. In order to answer these allegations completely and thoroughly it was necessary to brief these points of error in order to show why I elected not to raise them in Applicant's brief.

### I. Standard of Review for Ineffective Assistance of Appellate Counsel

In order to show that appellate counsel was constitutionally ineffective for failing to raise any particular issue on appeal, the Applicant must prove that (1) "counsel's decision not to raise a particular point of error was objectively unreasonable," and (2) that there is a reasonable probability that, but for counsel's failure to raise that particular issue, he would have prevailed on appeal. *Ex parte Miller*, 330 S.W. 3d 610, 623 (Tex. Crim. App. 2009). An attorney "need not advance every argument, regardless of merit, urged by the appellant." *Ex parte Flores*, 387 S.W. 3d 626, 639 (Tex. Crim. App. 2012) (quoting *Evitts v Lucey*, 469 U.S. 387, 394, 105 S. Ct. 830, 834-35 (1985)) The mere fact that trial counsel made a proper objection, even strenuously, to a particular ruling of the trial court does not necessarily require appellate counsel to raise that issue on appeal. *Dorsey v Stephens*, 720 F. 3d 309, 320 (5th Cir. 2013). "[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select among them in order to maximize the likelihood of

5

1538

success on appeal." *Id.* Appellate counsel is ineffective for failing to raise an issue when it

"has indisputable merit under well-settled law and would necessarily result in reversible error."

*Miller,* 330 S.W. 3d at 624.

> A. Response to Applicant's Eighth Ground for Review
> The trial court's failure to charge the jury on
> the burden of proof for extraneous offenses
> in Punishment

Applicant complains in his Eighth Ground for Review that I provided ineffective

assistance of counsel on appeal for failing to raise an issue based on the trial court's failure

to charge the jury on the burden of proof for extraneous offenses at punishment. Defense

counsel preserved this argument for review as follows:

> [PROSECUTOR]:    And I do have an objection.
>
> THE COURT: You do have an objection. State your objection.
>
> [PROSECUTOR]: That the charge explaining extraneous offense charge requiring proof beyond a reasonable doubt before the jury, that the jury find beyond a reasonable doubt before they can consider extraneous offenses, and the law does not require it, because 37.071 does not require it.
>
> [DEFENSE ATTORNEY]: I don't think the - - he's objected to that. I submit it ought to be in there. I don't think the burden of proof should be less in a death penalty case than in a regular case, so we object. I mean, the law is clear, in an extraneous offense charge in any other kind of case we try in this state, the State has to prove it beyond a reasonable doubt. It seems to make it not so in a death penalty case is kind of oxymoronic. So we request that it stay in there.
>
> THE COURT: I'm going to overrule your objection.

6

1539

[PROSECUTOR]:    Well, let me say it's not oxymoron, because the statute, which was -- 37.07 was amended 20 years ago to require proof beyond a reasonable doubt. The legislature has met ten times since then and hasn't made a similar provision in 37.071. And the issues in the punishment phase of a non-death-penalty case are different than the issues in the penalty phase of a capital case.

We have a burden to prove beyond a reasonable doubt that the individual on trial is a -- is going to be a -- there's a probability he's going to be a continuing threat to society. That's why the extraneous offenses are admissible. But proof beyond a reasonable doubt is required before the jury can find the -- special issue. So there is a requirement of proof beyond a reasonable doubt in the punishment phase of a capital murder trial. It's just not placed upon the State to prove the extraneous offenses beyond a reasonable doubt.

So [defense counsel] has he due process that he requires at the punishment phase, but the statute specifically does not require proof beyond a reasonable doubt before the jury can consider the State's testimony.

THE COURT:    Okay. I understand your objection. I'm going to take it under advisement and --

[PROSECUTOR]:    If you want some cases, I will provide them to you.

THE COURT:    Yes, I would like some cases.

.    .    .

THE COURT:    Let's go on the record.

In regard to the State's objection to subsection -- what is now subsection seven that contains three paragraphs that's extraneous offense charge, that objection, after reviewing *Ladd v State* is sustained. I'm removing the three paragraphs regarding the extraneous offense charge.

7

1540

I know the Defense is against this decision. . . .

[DEFENSE COUNSEL]:        That's correct, Judge. And it does not look like that - - and I'm looking - - just for the Court's information, and it's part of my objection, doesn't look like Mr. Ladd was ever objection - - excuse me - - was ever executed. I'm trying to find out why he's not on death row, - -

[DEFENSE COUNSEL]: . . . Judge, Robert Ladd is still on death row.

*(RR. XXXIX-269-74).*

In my notes from this section of the Reporter's Record I marked this issue as a potential point of error. I included this issue in my list of potential points of error that could be raised in Appellant's brief. I also made a notation of the case that the prosecutor mentioned, *Ladd v State*. There was no citation provided in the record. I located the case and read it. *Ladd v State*, 3 S.W. 3d 547 (Tex. Crim. App. 1999) not only affirmed the State's position it also cited additional cases supporting the State's argument that an instruction on the burden of proof in extraneous offenses is not required in a capital murder case in which the State seeks the death penalty. *See, Jackson v State*, 992 S.W. 2d 469, 477 (Tex. Crim. App. 1999); *Burks v State*, 876 S.W. 2d 877, 911 (Tex. Crim. App. 1994), cert denied, 513 U.S. 1114, 115 S. Ct. 909, 130 L. Ed. 2d 791 (1995). The Court of Criminal Appeals wrote:

> . . .appellant argues that his death sentence violates his rights under the Eighth and Fourteenth Amendments because, at the punishment stage, the trial court admitted evidence of extraneous offenses but did not instruct the jury that it could consider such extraneous offenses only if they were proven by the State beyond a reasonable doubt.  We have rejected such arguments before.  As long as the punishment charge properly

8

1541

requires the State to prove the special issues, other than the mitigation issue, beyond a reasonable doubt, there is no unfairness in not having a burden of proof instruction concerning extraneous offenses.

*Ladd* at 574-75. *See also*, *Hunter v State*, *243 S.W. 3d 664, 674 (Tex. Crim. App. 2007)*, cert. denied, 555 U.S. 832 (2008); *Garcia v State*, 57 S.W. 3d 436, 442 (Tex. Crim. App. 2001), cert. denied, 537 U.S. 1195 (2003).

In conclusion, I saw that this issue had been raised in a plethora of capital murder cases in which the Death Penalty had been assessed, confirmed that the court's charge in this case did contain the proper instruction on the burden of proof in the special issue of future dangerousness, and elected not to raise it in Applicant's brief.

The Court of Criminal Appeals has long held that "there is no error in not having a burden of proof instruction concerning extraneous offenses as long as the punishment charge properly requires the State to prove the special issues, other than mitigation and affirmative defenses, beyond a reasonable doubt." *Hunter, 243 S.W. 3d at 674.* In fact, Applicant acknowledges in his writ that courts have continuously held that a burden of proof instruction on extraneous offenses are not required in capital cases, and Applicant cites to several cases in which the Court of Criminal Appeals has rejected his very argument. *See, Ladd. 3 S.W. 3d* at 574-75; *Burks v State*, 876 S.W. 2d 877, 911 (Tex. Crim. App. 1994), cert. denied, 513 U.S. 1114 (1995); *Adanandus v State*, 866 S.W. 2d 210, 234 (Tex. Crim. App. 1993), cert. denied, 510 U.S. 1215 (1994). [App. at 118].

In not raising this point of error it should not be found that I rendered Applicant

9

1542

constitutionally ineffective assistance of counsel. *See, Green v Johnson, 116 F. 3d 1115, 1125 (5th Cir. 1997)* (stating that counsel is not ineffective for failing to raise a claim that Texas courts have rejected repeatedly); *cf. Miller, 330 S.W. 3d at 624.*

### B. Response to Applicant's Ninth Ground for Review
### Challenging the Trial Court's Exclusion of
### Genetic Evidence

Applicant complains in his Ninth Ground for Review that I provided ineffective assistance of counsel on appeal for failing to raise an issue based on the trial court's exclusion of genetic evidence proffered by the Defense. Defense counsel preserved this argument for review as follows:

> [PROSECUTOR]:        Burden's on the proponent, Judge.
>
> THE COURT:   I understand.
>
> [DEFENSE ATTORNEY]:        Well, the testimony has been that the -- the evidence is reliable and substantiated by research. If this is the conclusion of our hearing there hasn't been anything otherwise, except arguably on the genetic issue.
>
> The fact of the matter is we're not trying to prove anything with this evidence other than potentially a lack of a future danger or a mitigating circumstance. The fact that Mr. Ricks has these conditions and that the studies tend to show or collectively show or suggestively show, as Mr. -- [the prosecutor] has pointed out, which is contrary to what Dr. Lewine says as far as what this data indicates and what it's consistent with, I think that's a matter for the jury's determination.
>
> Dr. Lewine has said the research backs it up. The fact that he has not testified before or that it hasn't been presented in a criminal case, I don't think that's the test. The test is whether or not it's reliable data by researchers in the field, and he's testified that it is. And so for that position, I think certainly it's all

1543

admissible.

The Court may have a back-step position on the genetic issue part of it; however, that's still certainly mitigating condition.

If it was inconsistent, [the prosecutor] would be parading it in front of - - you know, in the topic of cross-examination. I think it's all relevant, admissible, as to whether or not this Defendant is a future danger or whether it's a sufficient mitigating circumstance.

It's certainly a topic of cross-examination about the report from the Pellegrini person that indicated that it's a little bit inconsistent, but the fact of the matter is the testimony at this hearing has been that it's reasonably relied on by experts in the field, and that's the test, and so I would submit that it's admissible.

Excuse me just a minute.

Well, and - - and if we've both rested, then the Court has to make its decision based on what Dr. Lewine has testified to, and I haven't heard another witness that says it's not reliable, but maybe they've got one.

The fact that it hasn't been used before, the fact it hasn't been used in this court, any other court in Texas, that doesn't make it inadmissible. That just means it hasn't been done. Every expert that's ever testified, that concept started at some point, and maybe this is the time to start.

[PROSECUTOR][:      Thank you.

General acceptance is a Fry standard. We're not a Fry-standard state. We're a rule state.

Kelly is the leading - - the leading case in the state of Texas regarding the admissibility of scientific evidence and then novel scientific evidence.

The burden is on the proponent by clear and convincing

<div align="center">11</div>

evidence to show that this evidence is relevant and reliable and it's scientifically reliable enough to be admitted into a criminal court.

Research is research, and it's nothing more and nothing less. Until we get to the point where this - - this science is scientifically reliable enough for criminal court, then it ought - - it ought to stay on the fringes, which is where it is now.

We've heard testimony where the American Academy of Neurology has issued a statement saying this stuff is not ready for criminal court, not ready for forensics, and they've not backed off that statement. That is still their statement.

The fact that one finding here corroborates the other finding is irrelevant. If that were - - if that were the relevant test for the admissibility of scientific evidence, then we would be able to admit polygraphs. Polygraphs are corroborative of other facts in the case, but yet polygraphs themselves are not admissible, and they've been inadmissible for years, and they're not probably ever going to be admissible, because they're unreliable.

And there's not been any reliability of this methodology shown with regard to criminal cases. All these studies are extremely preliminary, especially the genetics. And even Dr. Lewine said all the research in that area is weak. And that's because it is. It's very preliminary research into the relationship between the genome and behavior.

It's also - - there's also a very weak connection, I would submit, between electrical activity in the brain and behavior. That is still being researched.

Dr. Lewine is here to talk about research in what I would say are very small statistical samples. The MRI database, over 500 people. He's talking about databases of 30 and 40 people that have other - - other underlying conditions that may or may not apply to this case.

So not only do these things have to be scientific, reliable, and relevant, there are some - - some scientific - - there are some

12

1545

additional scientific tests that have to be met, some general observations that have to guide the inquiry into scientific reliability: whether these things can be falsified; the existence of peer review and publications, which are inconsistent on these matters at best; the existence of methodological standards, including an error rate, which there's been no testimony on, to show that there's a valid margin of error here; and, also, if it's been - - one of the prongs is the general acceptance within a relative scientific community, which here is a research community, not a forensic community, and it apparently edges its way over into the clinical community.

Isn't that right?

Some of these things.

THE COURT:   No more testimony.

[PROSECUTOR]:      And something else that has to be kept in mind here is that not only are there these relevance and reliability concepts, there also has to be the concept of fit. The testimony has to fit the case.

If we're talking about databases and studies that are based on persons that don't - - that have underlying mental conditions that this Defendant doesn't have, then we don't have a fit between those studies and what we're looking at here. So those studies are irrelevant.

There also has to be a fit between the qualifications of the expert and what the expert seeks to testify to. Dr. Lewine, while he may be a neuroscientist, he not a penologist, he's not an actuary, and he's not a geneticist. So I would suggest that, at best, his qualifications render him able to testify to the qEEG findings, not genetics - - not genetics testimony and genetics data, not penology and actuarial science, but neuroscience.

So we would suggest that the Court find that the Defense has not proven by clear and convincing evidence that any of this testimony is relevant, reliable, or admissible under our rules of evidence, and certainly that any testimony regarding genetics

13

that's proposed to be given here is absolutely the weakest of all of this, as well as the actuarial science he is proposing to present.

THE COURT:   And the Court's ruling is that the Defense has not established by clear and convincing evidence that the genetic information - - actually, the witness suggested to the contrary himself. The genetic information is not reliable enough to go in front of the jury. The Court is going to allow all other proposed findings of Dr. Lewine.

*(RR. XXXIX-70-76).*

In my notes from this section of the Reporter's Record I marked this issue as a potential point of error. I included this issue in my list of potential points of error that could be raised in Appellant's brief. When I was reviewing my list of potential points of error and came to this point, I reread the portion of the record that contained Dr. Lewine's testimony before the jury. *(RR. XXXIX-90-184).* When I looked back at the portion of Dr. Lewine's testimony that was excluded by the trial court concerning the genetic evidence I was struck that it only covered four pages in his testimony outside the presence of the jury. *(RR. XXXIX-12-15).* That portion of direct testimony by defense counsel reads as follows:

Q.   . . . Then let's talk about the genetics. Tell us what we did there.

A.   So for the genetics testing, we acquired a saliva sample from Mr. Ricks. The sample was initially shipped to us at Mind Research Network, and we then actually shipped it to the University of Pisa in Italy where they did genetic testing to look at genes that are related to particular neurotransmitters.

Q.   Okay.

A.   Neurotransmitters   are   how   brain   cells communicate with each other. And in particular, we looked at

14

1547

genes that were related to one of the neurotransmitters known as serotonin and then genes related to another class of transmitters known as catecholamines.

Q.    And in that process that the University of Pisa conducted, once again, is that something that's relied upon by experts in the field?

A.    Yes.

Q.    Okay. And so what were your findings and your opinions based on that inquiry?

A.    So looking at the serotonin-related genes, some of the findings suggest risk for increased violence and aggression. Some of the findings actually suggest protection against that -- those qualities. So the serotonergic story was kind of a wash.

Q.    Okay.

A.    Looking at the genes related to catecholamine metabolism, the data suggests that Cedric has a genetic profile that is associated with reduced activity in a particular enzyme which alters neurotransmitter function. And there's a body of literature which suggests that individuals who have that profile again are at increased risk for aggression and violent behavior.

Q.    Okay. And I've got up here on the screen -- is that the --

A.    Yes. That's a -- that's a list of the various findings.

Q.    Okay. And this is contained -- I've got your Power Point, correct?

A.    Yes.

Q.    Okay. So, essentially, what is the -- the conclusion or opinions you're going to give in regards to genetics? It's down -- it's down here where the COMT, MET gene is.

15

1548

A.     Correct. So the conclusions are that things are kind of a wash with relationship to the serotonergic markers, but there are data which suggest that his genetic profile in relationship to the COMT gene is one which gives him a biological predisposition towards violence and aggressive behavior.

Q.     And on the screen here, we've got this Rujescu et al and Soeiro-de-Souza et al. Those are the studies that back that up?

A.     Those are examples of studies that back that up, right.

Q.     And once again, are they reasonably relied upon by experts in the particular field - -

A.     Yes.

Q.     - - to form opinions there?

A.     Yes.

Q.     All right. And, also, smoking during pregnancy, does that have anything to do with it?

A.     Yes. So there are data that suggests that history of maternal smoking during pregnancy augments the impact of having this particular genetic variation so it leads to additionally decreased activity of the COMT.

Q.     Okay. And Mr. Ricks has that particular gene in his body?

A.     He has the valmet profile, yes.

Q.     And that's something that he was born with, correct?

A.     Correct.

Q.     Okay. That's not something he can change or had

16

1549

any choice in the matter?

    A.    No.

    Q.    Okay. And if his mother smoked, it would be affected a little bit more?

    A.    Correct.

    Q.    Is there any other opinion about genetics you're going to talk about?

    A.    No, sir.

*(RR. XXXIX-12-15).*

I also reviewed Dr. Lewine's answers to the trial court's and prosecutor's questions regarding whether his genetics data was scientifically reliable and ready to be presented in criminal court. The record reflects:

    Q.    And I'm not saying that you're trying to change the data or modify the data in any way. The data's just not ready for criminal court, is it?

    A.    I believe that most of this data is ready for criminal court.

    Q.    Most of it.

    THE COURT:   Which part's not?

    WITNESS LEWINE:  I think the genetics is the weakest part of it, and, you know, the -- does it technically meet Fry, Daubert criteria, I'm not certain.

    THE COURT:  And as to your opinions, let me just use the catch phrase that I'm most familiar with. Do you have a reasonable degree of scientific certainty that that's reliable information to go in front of a jury?

WITNESS LEWINE:    Yes, ma'am.

.   .   .

Q. [PROSECUTOR] And what do you base that reasonable scientific certainty on? Anything other than what we've discussed here today?

A.    So, again, numerous peer-reviewed scientific publications.

Q.    Research publications.

A.    Research publications, yes, but that - - this is - - we're kind of at the cusp here. This is one of the first times that these data are being looked at in a case like this, but there's a substantial body of research literature accepted within the scientific field - -

Q.    Accepted within the research field.

A.    Within the scientific field, so research and clinical.

- - that these tests are appropriate, and that they are - - at some point, you have to make your - - at some point, these things have to be done first.

Q.    Or they don't, depending on their reliability.

A.    Yes.  And the data are - - I believe these data are reliable.

Q.    In what field?

A.    In neuroscience and psychology.

*(RR. XXXIX-68-70).*

*Rule 702 of the Texas Rules of Evidence* governs the admissibility of expert testimony.

*Tillman v State,* 354 S.W. 3d 425, 435 (Tex. Crim. App. 2011).  *Rule 702* states, "A witness

18

1551

who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." *Tex. R. Evid. 702.* The proponent of this evidence must demonstrate by clear and convincing evidence both that: (1) the testimony is based on a reliable scientific foundation, and (2) it is relevant to the issues in the case. *Tillman,* 354 S.W. 3d at 435.

The focus of the reliability analysis is to determine whether the evidence has its basis in sound scientific methodology such that testimony about "junk science" is excluded. *Id.* The Court of Criminal Appeals has set forth a three-prong reliability test and identified seven non-exclusive factors for consideration in assessing the reliability of scientific evidence.[1] *Kelly,* 824 S.W. 2d at 573. When the expertise involves a "soft" science, the reliability requirement applies "but with less rigor than to the hard sciences." *Nenno v State,* 970 S.W. 2d 549, 561

---

[1]

The *Kelly* three-part reliability test is used for "hard" sciences, as opposed to "soft" sciences, and contemplates whether (1) a scientific theory is valid, (2) application of the theory is valid, and (3) the technique has been properly applied. *Kelly v State,* 824 S.W. 2d 568, 573 (Tex. Crim. App. 1992).

"The 'hard' sciences, areas in which precise measurement, calculations, and prediction are generally possible, include mathematics, physical science, earth science, and life science. The 'soft' sciences, in contrast, are generally thought to include such fields as psychology, economics, political science, anthropology, and sociology." *Weatherred v State,* 15 S.W. 3d 540, 542 n. 5 (Tex. Crim. App. 2000).

Dr. Lewine's testimony about the genetic testing in this case is based on neuroscience and psychology and falls under the "soft" science category. *(RR. XXXIX-70).*

19

1552

*(Tex. Crim. App. 1998)*. The appropriate considerations for expert testimony involving a "soft" science are whether (1) the field of expertise at issue is a legitimate one, (2) the subject matter of the expert's testimony falls within the scope of that field, and (3) the expert's testimony properly relies on or utilizes the principles involved in that field. *Id.*

The following nonexclusive factors may be considered in determining reliability: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such community can be ascertained; (2) the testifying expert's qualifications; (3) the existence of literature supporting or rejecting the underlying scientific theory; (4) the technique's potential rate of error; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific technique can be explained to the court; and (7) the experience and skill of the person who applied the technique on the occasion in question. *State v Medrano*, 127 S.W. 3d 781, 784-85 & n. 4 *(Tex. Crim. App. 2004)*; *Nenno*, 970 S.W. 2d at 560-61. Four "general observations" guide the inquiry into scientific reliability: (1) falsifiability; (2) peer review and publication; (3) the existence of methodological standards, including the error rate; and (4) general acceptance within the relevant scientific field. *Coble v State*, 330 S.W. 3d 253, 273 (Tex. Crim. App. 2010) (citing *Daubert v Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-92, 113 S. Ct. 2786 (1993), *cert. denied*, 513 U.S. 829 (1994)). An abuse of discretion standard applies to the review of a trial court's decision to admit or exclude expert testimony. *Id. at 272.*

At the gate keeping hearing, Dr. Lewine referred to two studies supporting the theory that a specific genetic profile shown in Applicant's genetic testing correlates to a propensity

for violence; however, Dr. Lewine agreed that other studies cast doubt on whether this correlation exists. *(RR. XXXIX-14, 47-48).* And as for the studies supporting his testimony, he conceded that most of the research in this area has been performed on schizophrenic individuals. *(RR. XXXIX-39).* Notably, Applicant does not have schizophrenia. *(RR. XXXIX-49).* Dr. Lewine admitted that it is difficult to apply this genetic testing to non-schizophrenic individuals and that it is not a universally agreed upon strategy to do so. *(RR. XXXIX-55-56).*

There was also an issue of the reliability of the sample sizes of the studies showing that a correlation actually exists. Dr. Lewine explained that the sample sizes of individuals in these studies have been very small, which, of course, lessens the reliability of the research. *(RR. XXXIX-50-51).*

Dr. Lewine is a neuroscientist; he is not a geneticist. As a result, he does not conduct genetic testing. *(RR. XXXIX-39-40).*

Despite all of these obvious and conceded concerns with this genetic testing and with the application of this testing to Applicant in this case, Dr. Lewine opined that the testing results were reliable because the results of the brain and behavioral tests on Applicant also showed a propensity for violence and aggression. *(RR. XXXIX-52).* That is, because the EEG, the MRI, and the behavioral tests also revealed that Applicant had a propensity for violence and aggression, Dr. Lewine was confident that the genetic testing results revealing the same outcome were sufficiently reliable to present to the jury. *(RR. XXXIX-52, 55).* But as the prosecutor pointed out in arguments at *the Rule 705* hearing, polygraphs corroborate other facts in a case but have not been deemed admissible in court because of their inherent

21

1554

unreliability. *(RR. XXXIX-73)*.  Here, the results of other testing on Applicant can not corroborate the genetic testing to make it scientifically reliable for admissibility in a court of law. As Dr. Lewine conceded during the hearing, the reliability of the genetic testing was the "weakest" of all of the tests run on Applicant, and he himself was not certain that the data was, at this stage in its research, reliable enough to be presented to a jury. *(RR. XXXIX-69)*.

Based on this record, considering the factors for reliability under *Kelly* and *Nenno*, in my professional opinion the trial court did not abuse its discretion by ruling that the defense did not establish the scientific reliability of the genetic testing by clear and convincing evidence pursuant to *Rule 702*. Moreover, I noted that the overwhelming majority of the mitigating evidence that the defense wanted to present was actually presented before the jury during Dr. Lewine's testimony. *(RR. XXXIX-91-184)*.

Although Applicant, in his writ, did not raise the question of harm from the exclusion of this evidence, when deciding on whether I am going to include an issue in an appellate brief, I routinely consider the likelihood of whether an appellate court will find harm and thus reverse the case. *See*, *Tex. R. App. P. 44.2 (a)* (setting forth the constitutional harm standard); *Renteria v State*, 206 S.W. 3d 689, 698 & n. 7 *(Tex. Crim. App. 2006)* (applying *Rule 44.2 (a)* to the exclusion of "constitutionally relevant mitigating evidence" by a defendant facing a possible death sentence.). I considered whether the Court of Criminal Appeals would find harm in the trial court's exclusion of this evidence, and came to the conclusion that it would not.

The jury heard Dr. Lewine's expert opinion, based on the MRI and EEG testing, that

1555

Applicant has an increased risk for aggression and violence.[2] *(RR. XXXIX-101-02, 115-22, 124-33).* The genetic testing was only a small part of Dr. Lewine's intended testimony, and as he admitted at the gate keeping hearing, the genetic testing was not as strong as the other tests that showed a correlation to aggression and violence. Even under the heightened constitutional harm standard, it is unlikely that a court would render any error harmful to require reversal. *See, Mendoza v State,* No. AP-75,213, 2008 WL 4803471, at *23 *(Tex. Crim. App. November 5, 2008) (not designated for publication)* (in a harm analysis from excluded punishment evidence in a capital murder trial, considering that jury saw "glimpse of life" photographs similar to those excluded).

### C. Response to Applicant's Tenth Ground for Review Challenging the Trial Court's Ruling that Applicant did not make a prima facie case of discrimination pursuant to Batson v Kentucky

Applicant claims in his Tenth Ground for Review that I provided ineffective assistance of counsel on appeal for failing to raise a *Batson v Kentucky* issue in my brief. Defense counsel preserved this argument for review as follows:

> [DEFENSE ATTORNEY]:    We don't have any objections to what the Court stated, but we're going to want to have a Batson hearing.

---

[2] Applicant argues that the genetic testing testimony was uniquely important to his defense (even considering the other testing) because it suggested he was born with a propensity for aggression, whereas the EEG testing results were based on a large putamen that could have developed later in Applicant's life. [App. at 147]. But Dr. Lewine testified that Applicant was either born with the enlarged putamen or it developed during his first ten years of life. *(RR. XXXIX-124).*

THE COURT:   On?

[DEFENSE ATTORNEY]:     On - - first of all, I would submit that the Defendant is a member of an identifiable race, that being African-American.  And I would submit that it's a matter of fact that the State exercised peremptory challenges on Alicia Stafford, number 13, and Wanda Stafford, number 28, both of who [sic] are members of an identifiable race, that being African-American, the same as the Defendant.  State also used a peremptory challenge on Carol Argurieo, which is a Hispanic surname, minority, and Ray Flores, who - - Carol Argurieo was number nine.

THE COURT:   Carol - - she was number - -

[DEFENSE COUNSEL]:     Twenty-three.   Excuse me, Judge.  Ninth strike.  I apologize.  She was number 23.

And Ray Flores, who's also a member of an identifiable race, Hispanic - - he has a Hispanic surname, as well, juror number ten.  State struck all those people.

So we believe we've made a prima facie case to show the State used those strikes on - - first of all, the Defendant is a identifiable race, and the State excluded minorities based on race.

THE COURT:   Can I just ask for a clarification on number 39, Argurieo?  Her jury questionnaire, she identifies herself as white.

[DEFENSE COUNSEL]:     She has a Hispanic surname.

[PROSECUTOR]:     Judge, we're going to take issue with the fact that - - we don't believe she's Hispanic.  We're digging right - - in right now to try to figure out what her maiden name is.  But she does not appear to be Hispanic, and like you said, she self-identifies as white.

She doesn't list a maiden name on her questionnaire.  I suggest we might just want to bring her in and ask her.  We take

24

issue with that representation.

THE COURT:   Okay.  Do you still maintain that she is a member of - -

[DEFENSE ATTORNEY]:       I'll change my position.  I'll withdraw that as to her.

THE COURT:   Okay.  So your challenge remains as to numbers ten, 13, and 28; is that correct?

[DEFENSE ATTORNEY]:       I believe that's right, Judge.

THE COURT:   Okay.

THE COURT:   Does the State wish to respond?

[PROSECUTOR]:       Well, I'd like the record to reflect a couple of things before I respond, Judge.

THE COURT:   Yes.

[PROSECUTOR]:       First of all, Venireperson - - new number 20, original number 34 - - Felicia Hernandez, is Hispanic, and the State did not exercise a peremptory challenge on Felicia Hernandez, but the Defendant did.

Venireperson - - new number 22, original number 38 - - Raymond Bean, is an African-American, and the State did not exercise a peremptory challenge against Mr. Bean, but the Defendant did.

And Venireperson 25, Ladell Barnes, original number 44, is an African-American, and the State did not exercise a peremptory challenge against him.

Will the record reflect all three of those things, Judge?

25

THE COURT: The record will reflect all three of those things.

[PROSECUTOR][: The State also suggests that Venireperson 34, original number 60, Justin Dawson, may be partially Hispanic. Although he has an Anglo surname, he appears to be Hispanic. And the State did not exercise a peremptory challenge against Justin Dawson, but the Defendant did.

THE COURT: Let the record reflect that, as well.

[DEFENSE COUNSEL]: We dispute what he looks like, I don't have any - - I don't have any dispute with anything else he said about Mr. Dawson.

THE COURT: Okay. Sorry. I thought I had written down something at the time of his interview.

Go ahead. Did you have anything else?

[PROSECUTOR]: No, I don't have anything else, Judge. Although, if there's a question, we might bring him in like we did Ms. Argurieo, just ask him.

THE COURT: Also, just on - - in terms of reflecting on the prospective venireperson, I noted that number 41, Faye Jeanne Raglin, original number 76, is African-American and number 48, Cynthia Lopez, is Hispanic. Also venireperson number nine, Tommy Bush, indicated in his interview that he is of half-Asian origin. Those were the only other notes that I made of the venirepersons. And that was a Defense strike.

[DEFENSE COUNSEL]: Judge, also, we'd like the record to reflect the State used an hour and a half in their conversation with Ms. Alicia Stafford. That was probably the longest voir dire they had with anybody, and they spent a lot of time with her. She qualified rather well.

THE COURT: Okay. So just because the State exercised peremptories on a person who's of an identifiable group does not

26

necessarily mean that a prima facie case of discrimination has been made.

[PROSECUTOR]:    Well, that's our - - that's our next objection, Judge.

I don't know if we've gotten past what the - - what the record is going to reflect yet. I still don't know if the record reflects - - going to reflect that Justin Dawson is of Hispanic descent or not.

THE COURT:    I'm happy to bring him in and ask him. I - -

Just for clarity sake, can we bring him in and ask him, please?

.    .    .

THE COURT:    Okay. So the record will reflect that Mr. Dawson has a heritage that includes half-Hispanic.

[PROSECUTOR]:    Okay. So at this point, the record reflects that the State exercised a peremptory challenge on one person with a Hispanic surname and accepted two Hispanics, and we exercised peremptory challenges on two African-Americans, and we accepted two African-Americans. So we object. We do not believe that the Defense has made out a prima facie case of racial discrimination in the State's use of peremptory challenges.

[DEFENSE ATTORNEY]:    We disagree with that. I guess that's for you to decide. The Defendant is black, and the State struck two of the four blacks within range. Ms. Faye Jeanne-Raglin is not in the range.

[PROSECUTOR]:    I would point out that the race of the Defendant is irrelevant to this discussion.

[DEFENSE ATTORNEY]:    Well, I don't agree with that either. The fact of the matter is: There's four black people on the jury, and the State struck two of them, and the - - of the - - of the two that are left, we struck one. And on his questionnaire, he

27

said he would always kill every time, no matter what the facts were. We struck everybody that - - that said that, whether they ultimately qualified or not, him being one of them.

And Mr. Barnes, Ladell Barnes, is on the jury.

So two of the three that are left, the State Struck - - or two of the four total.

[PROSECUTOR]:   And the reason the Defense struck anybody is absolutely irrelevant to this discussion.

[DEFENSE ATTORNEY]:   Okay.

THE COURT:   Well, just based on the numbers, I do not find that the State has struck a disproportionate number of persons on the prospective jury panel of a cognizable race, minority. So your Batson Challenge is denied without the necessity of the State having to offer race-neutral reasons.

*(RR. XXX-25-35).*

In my notes from this section of the Reporter's Record I marked this issue as a potential

point of error; however, at the outset I was not certain whether the defense had legally

established a prima facie case of racial discrimination. I recognized that the defense's burden

to make such a showing was low. Yet in this case, there was a very small number of African

American and Hispanic venire members, and since the argument for discriminatory intent was

based exclusively on the numbers alone, the Court of Criminal Appeals' decision in *Hassan v*

*State, 369 S.W. 3d 872, 877 (Tex. Crim. App. 2012)* compelled me to agree with the trial

court's decision. In *Hassan,* the Court of Criminal Appeals explained that "a prima facie case

can rarely, if ever, be based solely on a statistical analysis when fewer than three strikes have

been exercised against persons belonging to the cognizable group." Applying *Hassan's*

28

1561

analysis to this case, as shown below, I did not believe that the statistics supported an inference of discriminatory intent.

I also wanted to narrow the focus of my brief to those issues that I thought were most important and more likely to result in reversal. Had I raised the *Batson* issue, I would have requested that the trial court be ordered to conduct a *Batson* hearing. See, *Linscomb v State,* *829 S.W. 2d 164, 167 (Tex. Crim. App. 1992)* (reversing and remanding for a *Batson* hearing upon finding that the defense made a prima facie showing) *Linscomb v State, No. A14-90-00025-CR, 1992 WL 310809, at * 1 (Tex. App. - - Houston [14th Dist.] October 29, 1992, no pet.) (not designated for publication)* (on remand after the trial court was ordered to conduct a *Batson* hearing per *Linscomb I,* holding that the trial court's denial of a *Batson* challenge was not clearly erroneous).

To be entitled to a *Batson* hearing, a defendant must first make a prima facie showing that a peremptory challenge has been exercised on the basis of race. *Batson v Kentucky, 476 U.S. 79, 96, 106 S. Ct. 1712 (1986); Hassan, 369 S.W. 3d at 875.* In deciding whether a prima facie case has been established, the trial court should consider all relevant circumstances. *Hassan, 369 S.W. 3d at 875* (citing *Batson, 476 U.S. at 96; 106 S. Ct. at 1712)* These include, but are not limited to, looking at the number of strikes to determine whether there is a pattern of strikes against venire members of a certain race and examining the striking party's questions and statements during voir dire. *Id.* At this step in the process, the circumstances need only give rise to an inference of discrimination; proof of discriminatory intent by a preponderance of the evidence is not required. *Id.*

29

1562

When reviewing whether a prima facie case has been made, courts often conduct a statistical analysis, comparing the percentage of strikes used against a specific racial group to the percentage of such persons on the panel. In *Hassan*, the Court of Criminal Appeals analyzed this statistical-comparison process and the problems it presents when applied to a venire panel comprised of only a few jurors of the race at issue:

> The Supreme Court has recognized that a *prima facie* case can be supported by a disparity with respect to the proportion of jurors of a particular race that are struck versus the proportion of that race in the venire. In *Miller-El*, the prosecutors struck ten African-Americans. These strikes resulted in the exclusion of ninety-one percent of the eligible African-American venire members despite the fact that African-Americans constituted less than twenty percent of the venire. The Supreme Court found that such a result was unlikely to occur by happenstance.
>
> But a statistical disparity could easily result from happenstance if the sample size is extremely small. In *United States v. Vaccaro*, the Ninth Circuit concluded that striking the only two African-Americans on the venire "does not constitute such a pattern indicating a systematic exclusion of blacks." The Ninth Circuit later explained this holding in *Fernandez v. Roe* "Two challenges out of two venirepersons are not always enough to establish a *prima facie* case. Because the numbers are so small (and, hence, potentially unreliable), two such challenges, standing alone, may not be sufficient to support an inference of discrimination." The court found, however, that the two strikes against the only African-Americans on the panel were enough to support an inference of discrimination in the case before it because the party had also struck four out of seven Hispanics, who were only about twelve percent of the venire.
>
> The Eleventh Circuit has explained that "an inference of discrimination based on the number of jurors of a particular race may arise where there is a substantial disparity between the percentage of jurors of one race struck and the percentage of their representation on the jury," but then it pointed to a case

30

1563

where the trial court found "although the percentage of black jurors struck from a jury panel might establish a *prima facie* case in some instances, here it does not because . . . the number of black persons on the regular panel was small." In *Bennett v. Gaetz*, the Seventh Circuit declined to find that a *prima facie* case had been established when the "only real evidence of discrimination" was that the prosecution "used two of its four peremptories, or 50%, against African-Americans, who comprised just five of the twenty-eight venire members, or 18%." The Seventh Circuit concluded that "it is difficult to draw significance from this disparity, given the relatively small numbers of African-American prospective jurors and peremptory challenges in this case."

In *People v. Bell*, the Supreme Court of California held that a *prima facie* case had not been established by a prosecutor's use of peremptory strikes against two out of three African-American women. The court remarked, "[T]he small absolute size of this sample makes drawing an inference of discrimination from this fact alone impossible." The court further explained: "Although circumstances may be imagined in which a *prima facie* case could be shown on the basis of a single excusal, in the ordinary case, including this one, to make a *prima facie* case after the excusal of only one or two members of a group is very difficult."

On the other hand, the District of Columbia Court of Appeals concluded that a *prima facie* case had been established when a party used *three* strikes to eliminate three of the only five non-African-Americans on the venire (and the only three within the strike zone), resulting in an all African-American jury.

We conclude that the statistics in the present case are not by themselves sufficient to establish a *prima facie* case of discrimination given the small sample sizes involved. Striking just one Asian in the present case results in a statistical disparity because there were only two Asians on the panel. Asians constituted only fourteen percent of the venire, but striking just one Asian results in an exclusion ratio of fifty percent of Asians. African-Americans were thirty-six percent of the panel. If we compared the percentage of the strikes exercised to the

1564

percentage of those type of jurors on the panel, then exercising one strike (thirty-three percent) against an African-American would be slightly less than the proportion of those persons on the panel, but exercising two strikes (sixty-seven percent) would be substantially greater than that proportion. On the other hand, there is no significant disparity if the proportion of African-Americans struck by the State (two out of five, or forty percent) is compared to the proportion of African-Americans on the panel (thirty-six percent).

Viewing the statistics from a different angle, one could observe that African-Americans constituted the largest racial group in the venire, so one would expect that more peremptory strikes would be exercised against African-Americans than against any of the other groups. With only three peremptory strikes, the only way for the State to exercise more strikes against African-Americans than any other group would be to strike two of them–as occurred in the present case.

The decisions discussed above suggest that a *prima facie* case can rarely, if ever, be based solely on a statistical analysis when fewer than three strikes have been exercised against persons belonging to the cognizable group. In the present case, the State struck only two African-Americans and only one Asian. Had the State struck three venire members belonging to a cognizable racial group (which could have occurred in the present case with either three African-Americans, three Hispanics, or three Caucasians), then we might agree that the statistical distribution of the strikes would have been minimally sufficient to establish a *prima facie* case. But that did not occur here.

369 S.W. 3d at 875-77 (footnotes omitted). <u>Hassan</u> makes clear that when dealing with a small number of venire members from a particular racial minority, as if the case here, a prima facie case can rarely be made based on the statistics alone.

A trial court's ruling on <u>**Batson**</u> challenge is reviewed under the "clearly erroneous" standard of review. <u>Gibson v State, 144 S.W. 3d 530, 534 (Tex. Crim. App. 2004).</u> The

32

1565

numbers of African American and Hispanic venire members in this case were small. Of the total venire members in the strike zone, four were African American and one was Hispanic. Using Applicant's statistics the percentage of venire members who were African-American totaled 11.11 percent and Hispanic, 2.78 percent. (App. at 143). Again, using Applicant's figures the percentage of African-Americans struck is 15.38 percent and Hispanics 7.69 percent. (App. at 143). But the extremely small sample sizes involved here make this comparison unreliable. *See, Fernandez v Roe, 286 F. 3d 1073, 1078 (9th Cir. 2002)* ("Two challenges out of two venirepersons are not always enough to establish a prima facie case when dealing with small, and consequently potentially unreliable, numbers.") (analyzing *United States v Vaccaro, 816 F. 2d 443, 457  (9th Cir. 1987)); Hassan, 369 S.W. 3d at 875.* Comparing the percentage of strikes exercised to the percentage of those types of jurors on the panel shows no significant disparity.

Finally, I looked at any other relevant circumstances offered by the defense to demonstrate a prima facie case of discrimination. *See, Hassan, 369 S.W. 3d at 878* (explaining that insufficient statistics combined with other relevant circumstances may give rise to a prima facie case of discrimination). Defense counsel pointed out that the State used an hour and a half in conversations with one of the African American venire members on whom the State ultimately used a peremptory strike. *(RR. XXX-32).* Defense counsel could point to no other circumstances, and I did not believe that this one fact tilted the scales in favor of finding that a prima facie case had been made.

Applying the analysis in *Hassan* to the facts in this case, considering the unreliability

33

1566

of the small sample sizes in this case, and the lack of other relevant circumstances showing discriminatory intent, this issue does not have "indisputable merit" to render my decision not to raise this issue ineffective."

Respectfully submitted,

Mary B. Thornton
Attorney for Applicant
3901 Race Street
Fort Worth, Texas 76111
Telephone No.: (817) 759-0400
Telecopier No.: (817) 831-3002
State Bar #19713700

"I certify that the above document is true and correct."

MARY B. THORNTON

SUBSCRIBED AND SWORN TO before me by the aforesaid attorney this ___ day of September, 2016, to certify which witness my hand and seal of office.

Notary Public, State of Texas

My commission expires:



DANIEL YOUNG
My Commission Expires
August 20, 2017

34



FILED
THOMAS A WILDER DIST CLERK
TARRANT COUNTY, TEXAS

JUL 2 7 2016

TIME _10:00am_
BY _____ DEPUTY

NO.C-371-010796-1361004-A

| EX PARTE | )( | IN THE 371ST JUDICIAL |
| | )( | |
| | )( | DISTRICT COURT OF |
| | )( | |
| CEDRIC ALLEN RICKS | )( | TARRANT COUNTY, TEXAS |

## AFFIDAVIT OF WILLIAM H. "BILL" RAY

Before me, the undersigned Notary Public, in and for the State of Texas, appeared William H. "Bill" Ray, who after being duly sworn, stated as follows:

"My name is William H "Bill" Ray. I am over the age of 21 years and competent to make this affidavit. I am familiar with the facts contained herein, and they are true and correct, and based on personal knowledge.

I am licensed to practice law in the State of Texas and have been licensed since November 8, 1985. I am also licensed to practice law before the U.S. District Courts for the Northern District of Texas, and the Eastern and Western District of Texas, the U.S. Court of Appeals for the Fifth Circuit in New Orleans, the U.S. Supreme Court in Washington, D.C., and the Chickasaw Indian Nation.

After I graduated from law school I was briefing attorney at the Court of Criminal Appeals in Austin, and a prosecutor for the Tarrant County Criminal District Attorney's Office for three and a half years. I have been in private practice, primarily in the field of criminal trial law since 1990. I am Board Certified by the Texas Board

Affidavit - Cedric Ricks - Post Conviction Writ - Page 1

SCANNED

of Legal Specialization in Criminal Law and Criminal Appellate Law.

I was appointed by the Hon. Mollee Westfall, judge of the 371st District Court Number of Tarrant County to represent Cedric Ricks for the offense of capital murder and the case was tried in 2014. Mr. Ricks was convicted and sentenced to death by lethal injection.

I have been ordered by Judge Westfall to address Applicant's claims in his first, third, fourth, sixth and seventh grounds.

Ground One alleges I did not present mitigating evidence about Applicant's mother's drinking and smoking, persons who babysat Applicant when he was under five, Applicant's behavior as a child, teenager, and adult, problems in school, the family history of mental illness, neighborhoods, lead exposure, and psychological significance of Applicant's life experiences.

First, I would like to point out that none of these items address a guilt/innocence subject, all are related to the issue of punishment. In that regard, Applicant was offered a life sentence on October 30, 2013. RR-2, Pages 1-10. Applicant was given some additional time and rejected that offer on November 4, 2013. RR-3, Pages 1-9. This was reaffirmed by Applicant on November 11, 2013. RR-4, Pages 1-9.

In series of affidavits attached to his application, Applicant has provided to the

Affidavit - Cedric Ricks - Post Conviction Writ - Page 2

Court several persons who all essentially claim that had I asked a specific question, those persons would have told me the bad upbringing that Applicant had and other matters that I have now alleged to have neglected to present. At the outset, I believe that these affidavits have not been authored by the affiant, but rather, the lawyer, Ms. Bernhard, or at her direction. Ms. Bernhard should be required to answer to the Court how these affidavits, given at different times, and in two different states, had almost the same language in each of them if the persons didn't talk to each other or Ms. Bernhard assisted them in writing the affidavits. In short, these statements, in my opinion, are an after the fact attack on counsel.

In more detail, these affidavits all have the same or very similar wording contained in them. As an example, Helen Ricks, (Applicant's mother), states in her affidavit "I spoke with Cedric's [Applicant] attorneys and Mary Burdette. [our mitigation specialist] I would have told them everything that is in this affidavit, which is the truth, if they had asked me about it." Ms. Ricks's affidavit appears to have been signed in Illinois on April 27, 2016. Writ Ex. 3.

Shedrick Ricks, Applicant's father, had the same language in his affidavit, dated the same day as his wife, Helen. Writ Ex. 9. Christine Sudderth has the same language in her affidavit. Writ Ex. 13.

Joseph Sanders' affidavit has the exact same language as Ms. Ricks, and

Affidavit - Cedric Ricks - Post Conviction Writ - Page 3

additionally states "I testified at Cedric's trial, and I would have been willing to testify about what is contained in this affidavit if I had been asked." Sanders' affidavit was signed in Texas on April 7, 2016. Writ Ex. 4

Deborah Sanders' affidavit has the same language as Ms. Ricks, and is signed on the same day before the same notary as Joseph Sanders. Writ Ex. 5

Applicant's brother, Dwayne Ricks, once again had the same language as Helen Ricks. Dwayne signed his affidavit one day after his mother in Illinois. Writ Ex. 6.

Deborah Halverson and Tammy Hall signed their affidavits on February 11, 2016. They both said the exact thing after stating several facts, which is that "I never met or talked to anyone working on Cedric Rick's [sic] case before his trial. If I had, I would have told them everything that is in this affidavit, which is the truth. I would been available and willing to testify at his trial if I had been asked." These two affidavits were signed two days apart, but had the exact same language in them as well. Writ Exs. 7 and 8. Sharon Speedwell had the exact language in her affidavit, Writ. Ex. 11. So does Donna Ree, Writ. Ex. 12.

Tamara Butts has similar language at the end of her affidavit, Writ Ex. 10.

Applicant and these witnesses make no mention that my entire mitigation team, Mr. Gordon, Ms. Burdette, Mr. Keeton, and myself, made two separate trips to

Affidavit - Cedric Ricks - Post Conviction Writ - Page 4

Chicago to interview Applicant's family, which included his mother, brother, and father. The first time, we went to their home in a suburb on the southern portion of Chicago. Prior to our journey, which was at taxpayer expense, and authorized without limitation by Judge Westfall, we made contact with Applicant's family and they arranged for several persons to meet with us at the Ricks' family home in Matteson, Illinois. Ms. Ricks was very helpful in getting these persons to her home. I specifically told these persons that we wanted to know the good and bad about Applicant and his family. We needed to have a full and complete history of Applicant so we could present his punishment case, if there was one, in a light best for Applicant, and in a way that I felt would most likely succeed.

The second time I rented a conference room at hotel we stayed in, which was near the Midway Airport in Chicago, and we interviewed everyone who would come. This meeting had persons present that were not at the first meeting. We provided the Ricks family with all our contact information and told them we wanted to know everything about Applicant, good and bad. At the time, I felt like they were forthcoming and provided information that was helpful.

I had mentioned to the Ricks family that if we could find a teacher or coach that might be able to say something about Applicant, that would also be helpful. We tracked down two coaches, one in Florida on vacation. I sent Ms. Burdette to

Affidavit - Cedric Ricks - Post Conviction Writ - Page 5

1572

interview one of the coaches in Naples, Florida. Both of these persons, as well as Applicant's friends and family were provided transportation, meals, and lodging to and from Dallas Love Field for the trial.

All of the items that we didn't ask about were things we didn't know about. These persons had every opportunity to tell us about Applicant, they chose not to. Those that said we didn't meet with them were persons that the Ricks family and Applicant did not tell us about. Those that said we didn't ask the right questions are overlooking the fact that when we asked about Applicant's background, good and bad, we were asking them everything they knew.

Concerning the lead paint allegation, I found no evidence the Applicant was exposed to or somehow consumed lead paint, and apparently, neither did Ms. Bernhard, because the allegation is simply that there was only a possibility of this event occurring.

Ground Three alleges that I was ineffective for not objecting to Applicant's appearance in shackles in front of the jury. I did not object because Applicant's actions, which were his of his own volition caught everyone by surprise. When Applicant's testimony was over, he got up and paraded back to counsel table before anyone could stop him. It was a complete surprise to me.

Applicant was well aware that he was not supposed to be seen in front of the

Affidavit - Cedric Ricks - Post Conviction Writ - Page 6

jury with shackles on. In RR-40, Pages 26-27, there was a pause in the proceedings specifically so Applicant could be brought to the jury stand when the jury was not in the courtroom. The reason was so the jury would not see Applicant with shackles. After his testimony, Applicant simply got up and walked back to his seat. At the time, and given the unapologetic nature of his testimony, I felt it was the best way to handle the matter.

Applicant volunteered that he had been offered a life sentence and refused it just so he could have a trial and tell his story. RR-40, Pages 45-46. I don't know whether anyone saw him or not, but I felt by saying anything would have only called attention to this issue. Of much greater significance was Applicant's refusal to accept any responsibility for his actions. Applicant had every opportunity to do this and never did so.

Applicant is correct that he did say he was "sorry about everything" RR-40, Page 37, but even though I gave him several opportunities, he refused to say he was sorry that he murdered his girlfriend and her child. Applicant testified that Dr. Lewine was correct about his lack of impulse control. RR-40, Pages 43-44.

Ladell Barnes, a juror provided an affidavit that says that he was not permitted to review any records, and was not properly instructed on the law involving the punishment phase issues. The trial court's instructions mirrored both Mr. Huseman's

Affidavit - Cedric Ricks - Post Conviction Writ - Page 7

1574

[state's attorney] and mine during jury selection. Specifically, Mr. Barnes was told that the individual jurors did not have to agree on what was a specific mitigating fact. RR-19, Pages 283-284. If one will look at Mr. Barnes voir dire interview, most of his answers are "uh-huh". However, in response to my instruction above, he answered "yes". Interestingly, Mr. Barnes did not mention anything about Applicant parading in front of the jury and how that fact somehow influenced his decision.

Ground Four alleges that I was ineffective for presenting inaccurate testimony about future dangerousness. The very first thing Ms. Bernhard asked me the when she and I first spoke was whether Judge Westfall refused to provide experts or mitigation. My answer, which Ms. Bernhard didn't sound like she liked, was that my last request I had made, which was not the initial or final bill, but an interim authorization for mental history investigations, was $70,000.00. This was in addition to other authorizations. Additionally, in preparation for this case, I had found through research, that there was a mobile imaging machine that I could have transported to Fort Worth, from Albuquerque, New Mexico. Applicant makes reference to this new MRI procedure but fails to observe or give any credit to its significance. We had this MRI procedure an EEG, and had Applicant's genetics tested and evaluated. To my knowledge, these tests represent a hard science presentation, which is new in Texas, that potentially support a more believable analysis for showing that persons can be

Affidavit - Cedric Ricks - Post Conviction Writ - Page 8

violent due to matters out of their control. In Applicant's case, these matters were not overwhelmingly helpful, but I believe necessary in current death penalty cases.

The reason the genetics was not admitted, was the Dr. Lewine did not believe the Applicant's genetic analysis, given the type genes he was born with, had sufficient support in the psychological community to support that Applicant's genetics played a part in the violent acts that Applicant committed. I cannot and would not sponsor a witness who would lie or allege matters that were not true. I believe that Dr. Lewine's testimony that one of the tests we performed was not necessarily helpful made his overall credibility better.

In my opinion, an expert who can show hard facts of a disease or disfunction of the mind is much better testimony than offering an expert opinion that someone is not a future danger, which appears to be the opinion of Dr. Jon Sorensen. Dr. Sorenson, from North Carolina, essentially provides data that claims that the older a person is, the less likely they will be violent. Dr. Sorenson does not explain how Applicant got in a fight in Oklahoma right after he was initially arrested for this offense, nor does Dr. Sorenson incorporate Applicant's history of violence against his other girlfriends and other, and there is a history of these events. I do not believe that percentages of low risk for violence are particularly helpful when the individual in question has no remorse. Applicant had a chance to be remorseful before the jury and

Affidavit - Cedric Ricks - Post Conviction Writ - Page 9

was not.

Ground Six alleges I was ineffective for failing to raise the issue that the use of the term "probability" in the "future dangerousness" special issue dilutes the reasonable doubt standard.    Applicant claims that Motion Number 30, entitled "Motion for Order 'In Limine' to Preserve the True and Correct Meaning of 'Probability' In the Future Dangerousness Instruction" did not adequately present this point.  Contrary to this claim, at the actual hearing, I specifically urged to the trial court that the statutory definition essentially lowered the burden of proof. I don't see a difference in "diluting the reasonable doubt standard" (Applicant's language) and "there's a probability, but it's low– you would agree it's extremely low, but it always exists, because it's at least possible, so there, you have a very, very, very minor probability?"  RR-5, Page 70, Lines 21-25.  It's the same exact argument.

Ground Seven alleges that I was ineffective for not raising the issue that the definition of mitigation is unconstitutionally narrow.  The statute is pretty clear.  I don't care for the wording but it is what we have.  In actuality, we argued that there was sufficient mitigation in Applicant's case.  The cases cited by Applicant do not support his contentions that I was ineffective for not raising this matter pretrial.

I will be glad to supplement this affidavit if the court desires.  I swear that the above statements are true, to the best of my memory, SO HELP ME GOD."

Affidavit – Cedric Ricks - Post Conviction Writ - Page 10

FURTHER AFFIANT SAYEHT NAUGHT.

WILLIAM H. "BILL" RAY
AFFIANT

SWORN to before me, the undersigned Notary Public, on the ◌5 day of July, 2016.

Suzanne Branson Williams NOTARY



SUZANNE BRANSON WILLIAMS
My Commission Expires
October 19, 2016

Affidavit - Cedric Ricks - Post Conviction Writ - Page 11

1578

THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

MAY 22 2014

Cause No. 1361004R

TIME ___8:00___

BY ___SA___ DEPUTY

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 371ST DISTRICT COURT |
| VS. | § | OF |
| CEDRIC RICKS | § | TARRANT COUNTY, TEXAS |

## FINDINGS OF INDIGENCY AND ORDER FOR APPOINTMENT OF HABEAS COUNSEL

The Court, having considered that the Defendant was sentenced to death in cause no.1361004R on the 16TH day of MAY, 2014, **FINDS** pursuant to TEX. CODE CRIM. PROC. ANN. art. 11.071, § 2:

a) that the Defendant is indigent, and

b) that the Defendant desires appointment of counsel for the purpose of habeas proceedings ancillary to cause no. 1361004R the primary case.

The Office of Capital Writs has declined to accept an appointment as counsel. Therefore, the Court **APPOINTS** the following attorney to represent the Defendant in capital habeas proceedings ancillary to cause no. 1361004R, the primary case

Catherine Clare Bernhard
P.O. Box 2817
Red Oak, TX 75154
972-617-5548

The Court **ORDERS** that a copy of this Court's order appointing habeas counsel be sent to appointed habeas counsel at the above-noted address and to Defendant at his current known address.

The Court **ORDERS**, pursuant to TEX. CODE CRIM. PROC. ANN. art. 11.071, § 2 (c), that the Clerk of the Court **immediately** forward to the Court of Criminal Appeals the following:

1. a copy of the judgment in cause no. 1361004R, and

2. this Court's order appointing habeas counsel.

SIGNED this 19th day of May, 2014.

_Mollee Westfall_

JUDGE MOLLEE WESTFALL
371st District Court
Tarrant County, Texas

SCANNED

1579



FILED
THOMAS A WILDER, DIST CLERK
TARRANT COUNTY, TEXAS

MAY 22 2014

TIME _8:00_
BY _SR_ DEPUTY

CAUSE No. 1361004R

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 371ST DISTRICT |
| V | § | COURT OF |
| CEDRIC RICKS | § | TARRANT COUNTY, TEXAS |

### ORDER APPOINTING COUNSEL FOR THE APPEAL

On this day, it being made known and appearing to the Court that the Defendant is without counsel of his own selection to represent him herein, and that he is financially unable to employ counsel, or give security therefor, to represent him herein and the Defendant having requested that an attorney be appointed to represent him in the above styled and numbered cause.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED,** by the Court that **Mary Thornton**, a regularly licensed and practicing attorney is hereby authorized to proceed to perform the duties of the Attorney for the Defendant in this cause.

IT IS SO ORDERED.

SIGNED AND ENTERED on 19TH day of MAY, 2014.

_Mollee Westfall_

JUDGE MOLLEE WESTFALL
371ST JUDICIAL DISTRICT COURT
TARRANT COUNTY, TEXAS

SCANNED

1580

# OCW

## Office of Capital Writs



Brad D. Levenson
Director

May 19, 2014

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

MAY 28 2014

TIME_____9:33_____

BY_____SP_____ DEPUTY

Judge Mollee Westfall
371st District Court
Tim Curry Justice Center, 5th Floor
401 W. Belknap
Ft. Worth, Texas 76196-7213

Dear Judge Westfall:

Regrettably, the Office of Capital Writs ("OCW") is unable to accept appointment as Article 11.071 counsel for Mr. Cedric Ricks, who received a capital sentence in your Court on Friday, May 16, 2014, due to the reasons outlined below.

Pursuant to Article 11.071 of the Code of Criminal Procedure, once a defendant is sentenced to death, and if the defendant is determined to be indigent, a court must appoint the OCW to represent the defendant. Tex. Code Crim. Proc. art. 11.071, § 2(a)-(c). However, according to Government Code section 78.054, the OCW may turn down an appointment if the office has insufficient resources to provide adequate representation for the defendant. Govt. Code § 78.054(a)(2). At present, the OCW is experiencing a lack of sufficient staffing resources and must turn down the appointment to Mr. Ricks's case.

The OCW is currently staffed with seven full time attorneys and one part-time attorney. However, one of the OCW's more senior attorneys has recently

Stephen F. Austin Building
1700 N. Congress Avenue, Suite 460 • Austin, Texas 78711
Phone (512) 463-8600 • Fax (512) 463-8590

SCANNED

1581

Judge Westfall
May 19, 2014
Page 2

given notice that she will be leaving the OCW at the end of August due to the birth of her son and thus, I am unable to assign her cases due to her announced departure (the OCW is currently searching for her replacement). Further, all of her cases must be reassigned to current staff. In addition, another senior attorney at the OCW will be taking paternity leave in August of this year for the birth of his child and thus, I am unable to assign him a new case until his return. With regard to our investigative staffing, the OCW normally has three full-time investigators on staff. However, our senior investigator recently left for a private sector job, and her replacement has not yet started.

Additionally, while the OCW anticipated being appointed to approximately ten capital cases in the 2014 calendar year, the OCW has already accepted five appointments in just the first four months of this year: George Curry, Harris County (2-26-14); Brandon Daniel, Travis County (2-28-14); Juan Balderas, Harris County (3-24-14); Jeffery Prevost, Harris County (4-10-14); and Carnell Petetan, Jr., McLennan County (4-29-14). Because of the early influx of cases, and our present staffing issues, there is no available staff to assign to work on Mr. Ricks case.

Beyond the recent influx of cases and the staffing issues explained above, the OCW is already experiencing a heavy work load for the next five months. In June, the OCW is presenting a week of evidence at a hearing in Brazos County (In re John Thuesen). And in July, the OCW will be presenting one week of evidence in a hearing in Dallas County (In re Gary Green). Further, in August and September of this year, the OCW will be filing four Article 11.071 applications: Kim Cargill (8-20-14 – Smith County); Tyrone Cade (9-10-14 - Dallas County); Roderick Cummings (9-13-14 – McClennan County); and Carl Buntion (9-26-14 – Harris County). In addition, the OCW has a client with a pending execution date of September 17, 2014, and will be working on her case throughout the summer.

Judge Westfall
May 19, 2014
Page 3

Therefore, even if staffing issues were not a concern, there would be a significant delay before the OCW could reasonably devote attention to Mr. Ricks's case.

When the OCW turns down an appointment, a court must appoint from a list of other competent counsel maintined by the presiding judges of the administrative judicial regions. Tex. Code Crim. Proc. art. 11.071, sec. (2)(c),(f). Attached to this letter is the current list of qualified attorneys maintained at http://www.txcourts.gov/courts/pdf/AttyList.pdf (last viewed on May 18, 2014).[1]

Please feel free to contact me with any questions or concerns.

Sincerely,

Brad D. Levenson
Director, Office of Capital Writs

---

[1] For purposes of state-wide record keeping, once the Court appoints an attorney to represent Mr. Ricks, the OCW requests to be notified of the name of the appointed attorney.

1583

**Approved Attorneys for 11.071 Appointment - Includes New Co-Counsel List**
Updated February 27, 2014

| LAST | FIRST | COMPANY | ADDRESS | CITY | ST. | ZIP | BAR NO. | PHONE NO. | FAX NO. | REGION |
|---|---|---|---|---|---|---|---|---|---|---|
| Bailey | Donald Lee | | 309 N. Willow | Sherman | TX | 75090 | 01520480 | 903-892-9185 | | ALL |
| Bernhard | Catherine Clare | | P.O. Box 2817 | Red Oak | TX | 75154 | 02216575 | 972-617-5548 | | ALL |
| Brandt | Lydia M.V. | | P.O. Box 850843 | Richardson | TX | 75085 | 00795262 | 972-699-7020 | | 1,2,8 |
| Cahoun | Alexander L. | | 4301 W. William Cannon Dr., B150-2 | Austin | TX | 78749-1473 | 00787187 | 512-420-8850 | | ALL |
| Charlton | Michael B. | | P.O. Box 51075 | Eugene | OR | 97405 | 04144800 | 541-636-2793 | | ALL |
| Dunn | Kevin Scott | | 594 Sawdust Road, Ste 332 | The Woodlands | TX | 77380 | 7893266 | 936-760-3300 | | ALL |
| Economidy | John M. | | 11 Soledad, Ste 348 | San Antonio | TX | 78205 | 06404500 | 210-299-7885 | | 4,7 |
| Ellis | Allen Richard | | 75 Magee Ave. | Mill Valley | CA | 94941 | 06560400 | 415-389-6771 | | ALL |
| Godinich, Jr. | Santo Jerome | | 929 Preston, Ste 200 | Houston | TX | 772002 | 08054700 | 713-237-8388 | 713-224-2889 | ALL |
| Gross | Michael C. | | 106 S. St. Mary's, Ste 260 | San Antonio | TX | 78205 | 08534480 | 210-354-1919 | 210-354-1920 | 3,4,5 |
| Haas | Jeffery L. | | 908 First Place | Tyler | TX | 75702 | 08659600 | 903-593-8338 | | 1 |
| Henry | Craig L. | | P.O. Box 3226 | Texarkana | TX | 75504 | 09479260 | 903-792-4645 | 903-792-5073 | ALL |
| Kase | Kathryn M. | Texas Defender Service | 510 S. Congress, # 304 | Austin | TX | 78704 | 11104050 | 713-222-7788, ext. 107 | 512-477-2153 | ALL |
| Lagarda | Alma | | P. O. Box 1300 | Denver City | TX | 79323 | 24055810 | 512-320-8300 | | ALL |
| Mansur | Paul E. | | 909 Texas Avenue, Ste 209 | Houston | TX | 77002 | 00796078 | 806-592-2797 | | 2 |
| McCann | Patrick F. | | 3303 Main Street, Ste. 305 | Houston | TX | 77002 | 00792680 | 713-223-3805 | 713-226-8097 | ALL |
| Rosenberg | Robert M. | | 819 Lovett Blvd. | Houston | TX | 77002 | 17272100 | 832-616-2955 | 713-528-4888 | 2,3 |
| Ryting | James Gregory | Hilder & Assoc. | 9311 N. FM 620, #254 | Houston | TX | 77006-3905 | 24002883 | 713-655-9111 | | 3,4,5 |
| Schmucker | Margaret Loraine | | P.O. Box 783 | Austin | TX | 78726 | 24003074 | 512-236-1690 | | ALL |
| Schulman | David A. | | 7301 Burnet Rd., #102-328 | Austin | TX | 78757 | 17833400 | 512-474-4747 | 512-474-8597 | ALL |
| Sheard | Hilary Ruth | | P.O. Box 121431 | Austin | TX | 78757 | 50511187 | 512-524-1371 | | 6,7,8,9 |
| Stickels | John W. | | P. O. Box 16918 | Arlington | TX | 76012 | 19225300 | 817-479-9282 | 817-222-3330 | ALL |
| Taylor | Stephen C. | | 1604 Golf Course Rd. SE | Rio Rancho | NM | 87124 | 19723380 | 800-223-8308 | 936-409-1079 | ALL |
| Vernay | Donald David | | 110 North College Ave. Suite 1850 | Tyler | TX | 75702 | 24035581 | 505-892-2766 | | ALL |
| Volberding | James W. | | 5629 FM 1960, Ste 115 | Houston | TX | 77069 | 00786313 | 903-597-6822 | 903-597-5522 | 1,3,8 |
| Wentz | Kurt | | 1301 San Jacinto St. | Houston | TX | 77069 | 21173300 | 281-587-0088 | | ALL |
| Williams | Kenneth A. | South Texas College of Law | 1301 San Jacinto St. | Houston | TX | 77002 | 24004128 | 713-646-1832 | | ALL |
| **CO-COUNSEL LIST** | | | | | | | | | | |
| Futrell | Forrest Alan | | 319 Maverick | San Antonio | TX | 78212 | 07562725 | 210-444-0202 | | 2,4,6,7 |

1584



OFFICE OF CAPITAL WRITS
Stephen F. Austin Building
1700 N. Congress Ave., Ste. 460
Austin, Texas 78711

OFFICIAL BUSINESS
STATE OF TEXAS
PENALTY FOR
PRIVATE USE

PRESORTED
FIRST CLASS

$ 00.40°

Judge Mollee Westfall
371st District Court
Tim Curry Justice Center, 5th Floor
401 W. Belknap
Ft. Worth, Texas 76196-7213

39  DQT-53B  76196

1585

# WILLIAM H. "BILL" RAY, P.C.
## ATTORNEY AT LAW
### 512 MAIN STREET, STE. 308
### FORT WORTH, TEXAS   76102

(817)698-9090                                    FAX (817)698-9092

*THOMAS A WILDER, DIST. CLERK*
*TARRANT COUNTY, TEXAS*
AUG 15 2014
TIME _____ 8:31
BY _____
_____ DEPUTY

August 14, 2014

Ms. Catherine Bernhard
P.O. Box 2817
Red Oak, TX   75154

Re: Cedric Ricks - Post Conviction Habeas

Dear Ms. Bernhard,

On July 9, 2014, you indicated that you had been appointed by the Court to represent Mr. Ricks in his state post conviction habeas matters and were going to send a release.

This letter is to inform you that I have never received a release from Mr. Ricks. I thought you indicated that you were going to send it via fax, and I also checked my email and junk folders, but have not seen it.

I did see a release that you sent to Ms. Burdette, and please be advised that before I release any medical matters, I need a HIPPA compliant release. The release that I saw that you sent Ms. Burdette is insufficient for those purposes.

Additionally, I told you on the phone that I would not release any item pertaining to the jury, or personal identification matters of witnesses without a court order. I will provide contact information of the witnesses, just not dates of birth and social security numbers. Additionally, and I did not tell you this but am telling you now, other than autopsies and police reports involving the two child victims, if you want any of their medical records, you will need to obtain a court order for that matter as well.

Finally, I have instructed all persons that assisted me in this case to release their items to me and I will in turn send them to you. Ms. Burdette is providing me her file in a few days, and if there are no HIPPA issues, I will send you her file promptly. I also need to be contacted and present should you want to interview any of the trial team.

Thank you.

SCANNED

Sincerely,

William H. "Bill" Ray

cc:    Steve Gordon

WRIT NO. _____

TRIAL COURT NO. 1361004

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

NOV 0 6 2014

TIME _____ 12:49 _____
BY _____ SR _____ DEPUTY

EX PARTE

CEDRIC RICKS

IN THE 371ST JUDICIAL

DISTRICT COURT OF

TARRANT COUNTY, TEXAS

### SUPPLEMENTAL ORDER

On this day _____ of November 2014, having reviewed its previous order entered in the above numbered and styed case, concerning Habeas Counsel's Request for Trial Counsel's File, which was entered on October 23, 2014, is of the opinion that said order should be supplemented.

It is **THEREFORE ORDERED, ADJUDGED, AND DECREED** that the previous order be supplemented in the following manner, to-wit: that any materials turned over to Habeas Counsel, Catherine Bernhard,  pursuant to this Court's previous order concerning materials that were in Trial Counsel's file, may be used by Habeas Counsel, her office staff, investigators, and/or experts in the defense of the defendant, CEDRIC RICKS, in the preparation and filing of his post-conviction writ of habeas corpus pursuant to Article 11.071 of the Texas Code of Criminal Procedure.

However, it is further ordered that any identifying information as to any witness, trial participant, juror, or potential juror, such as addresses, social security numbers, or drivers license numbers, may not be disclosed or viewed in any manner by the defendant, CEDRIC RICKS.

SCANNED

1588

It is also ordered that any materials turned over to Habeas Counsel from Trial Counsel's file may not be released in any physical form to CEDRIC RICKS, his relatives, associates, or witnesses.

**SIGNED AND ENTERED** on this the _____ day of November 2014.

Judge Mollee Westfall
371st Judicial District Court
Tarrant County, Texas

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

WRIT NO. _____

TRIAL COURT NO. 1361004

NOV 06 2014

TIME _____12:49_____

BY _____SR3_____ DEPUTY

EX PARTE

CEDRIC RICKS

IN THE 371ST JUDICIAL

DISTRICT COURT OF

TARRANT COUNTY, TEXAS

## ORDER ON APPLICANT'S REQUEST FOR TRIAL COUNSEL FILE AND STATE OF TEXAS FILE

The Court having considered the request of Catherine Clare Bernhard, state habeas counsel for Applicant, for all information in the possession of the Tarrant County District Attorney's Office returned to the office by attorney Bill Ray for Cedric Ricks' Capital Murder case, cause no. 1361004, the Court hereby specifically orders that any and all medical records of the child victim known as M.F., turned over to the state by Cedric Ricks trial attorney currently in possession of the Tarrant County District Attorney's Office be turned over to habeas counsel.

The above information is only for use in Applicant's habeas proceeding and is not to be disseminated beyond members of the defense team as designated by Catherine Clare Bernhard. The above information is to be turned over to Catherine Clare Bernhard or her designated agent by November 17, 2014.

Judge Mollee Westfall
371st Judicial District Court
Tarrant County, Texas

WRIT NO. _____

TRIAL COURT NO. 1361004

THOMAS A WILDER DIST CLERK
TARRANT COUNTY, TEXAS

JAN 2 1 2015

TIME _10 : 24_
BY_____ DEPUTY

| | | |
|---|---|---|
| EX PARTE | * | IN THE 371st JUDICIAL |
| | * | DISTRICT COURT |
| CEDRIC RICKS | * | TARRANT COUNTY, TEXAS |

## EX PARTE MOTION FOR AN INVESTIGATOR

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the indigent Applicant, by counsel, and pursuant to Tex. Code Crim. Proc. art. 11.071§3, the 5th, 6th, 8th and 14th Amendments to the United States Constitution and Sections 10, 13 & 19 of Article I of the Texas Constitution and other authority cited herein, and moves this Court to enter a finding that there is a reasonable necessity for hiring an investigator to assist him in the preparation of his writ application. Applicant hereby requests that the Court provide sufficient funds for doing so. In support of this motion Applicant would show:

### I.

Cedric Ricks was convicted of capital murder and sentenced to death. Undersigned counsel has been appointed to investigate expeditiously, the factual and legal grounds for the filing of an application for a writ of habeas corpus pursuant to Art. 11.071 of the Texas Code of Criminal Procedure.

### II.

In reviewing the case, Counsel realizes that there are a number of witnesses that should be contacted for interview, and that a thorough investigation must be made on behalf of the Applicant.

### III.

SCANNED

1591

The Applicant is totally indigent and without funds of his own to retain a private investigator.

## IV.

The funding that is requested will provide Counsel with essential tools necessary to investigate the legality of Applicant's confinement. The Guidelines and Standards for Texas Capital Counsel promulgated by the State Bar of Texas provide that state habeas counsel "must promptly obtain the investigative resources necessary to examine both phases, including the assistance of a fact investigator". Guidelines and Standards for Texas Capital Counsel 12.2(B)(3)(a)(2006). The ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases state that "Counsel should conduct interviews of potential witnesses in the presence of a third person so that there is someone to call as a defense witness at trial. Alternatively, counsel should have an investigator or mitigation specialist conduct the interviews." ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.7 (2003). This applies to post-conviction investigation as well. ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.51.1 (2003). The Texas Guidelines further state that "counsel has a duty to conduct a searching inquiry to assess whether any constitutional violations may have taken place, including – but not limited to – claims involving police and prosecutorial misconduct, faulty eyewitness evidence,…coerced confessions, dubious or flawed forensic scientific methods, ineffective assistance of trial and appellate counsel, and juror misconduct." Guidelines and Standards for Texas Capital Counsel 12.2(B)(1)(c)(2006). Counsel believes that all of these claims need to be

investigated. Applicant is entitled to such expert assistance upon a threshold showing that the assistance sought is relevant to a claim to be investigated and reasonable. Tex. Code Crim. Proc. Ann. art. 11.071 §3(b); cf. Ake v. Oklahoma, 470 U.S. 68, 105 S. Ct. 1087 (1985).

<div align="center">V.</div>

Counsel is requesting that this Court approve investigative expenses in the amount of $5000 at this time to conduct the required investigation in this case.

WHEREFORE, PREMISES CONSIDERED, the Applicant respectfully prays that this Court allow the Applicant sufficient funds to hire a private investigator to assist in the preparation of his defense.

Respectfully submitted,

Catherine Clare Bernhard
P.O. Box 2817
Red Oak, Texas 75154
972-617-5548
fax 972-617-6055
cbernhard@sbcglobal.net
State Bar No. 02216575

ATTORNEY FOR APPLICANT

Motion for an Investigator - page 3 of 5

# VERIFICATION

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this date personally appeared Catherine Clare Bernhard, attorney of record in the above-styled and numbered cause, who upon her oath does hereby swear and affirm upon her personal knowledge that all statements of fact contained in the foregoing Motion are in all respects true and correct.

Catherine Clare Bernhard

STATE OF TEXAS

SUBSCRIBED AND SWORN BEFORE ME, the undersigned Notary Public, on this the 24 day of September, 2014.

CLINTON J. STAFFORD
MY COMMISSION EXPIRES
December 5, 2017

Notary Public in and for the State of Texas.

Motion for an Investigator - page 4 of 5

1594

## ORDER

On ___9 26 14___, the Court having considered the above and foregoing motion, finds the same is hereby **GRANTED in an amount not to exceed** ___$5000___ / **DENIED** in which case Applicant requests that the court designate in writing the reasons for denying said motion, in whole or in part, as required by Tex. Code Crim. Proc. Ann. art. 11.071 § 3(c).

_____

Judge Presiding

1595

WRIT NO. _____

TRIAL COURT NO. 1361004

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

JAN 2 1 2015

TIME _____
BY _____ DEPUTY

EX PARTE                          IN THE 371st JUDICIAL

vs.                               DISTRICT COURT

CEDRIC RICKS                      TARRANT, COUNTY, TEXAS

EX PARTE

FUNDING MOTION FOR MITIGATION SPECIALIST

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the indigent Applicant, by counsel, and pursuant to Tex. Code

Crim. Proc. art. 11.071§3, the 5th, 6th, 8th and 14th Amendments to the United States

Constitution and Sections 10, 13 & 19 of Article I of the Texas Constitution and

other authority cited herein, moves this Court to enter a finding that there is a

reasonable necessity for expert assistance and funding as requested in this motion.

In support thereof, this Applicant would show:

I.

(a) Cedric Ricks was convicted of capital murder and sentenced to death.

Undersigned counsel has been appointed to investigate expeditiously, the factual and

legal grounds for the filing of an application for a writ of habeas corpus pursuant to

Art. 11.071 of the Texas Code of Criminal Procedure.

SCANNED                                                    1596

(b)  Part of that investigation must include Applicant's background, record, and the circumstances of the offense, including his general mental status, prior to and at the time of the offense. Expert assistance will be necessary to prepare and present this evidence. Applicant is requesting that this Court approve and provide funding for Applicant to retain a mitigation specialist to perform this investigation.

(c) This Court has determined that the Applicant is indigent.  His counsel is unable to retain any expert assistance due to Applicant's indigent status.

## II.

(a)  The funding that is requested will provide Counsel with essential tools necessary to investigate the legality of Applicant's confinement. Specifically, the claim to be investigated is that trial counsel was ineffective for failing to conduct a proper mitigation investigation and present such evidence at trial. Although trial counsel did consult a mitigation specialist, Applicant believes that this investigation was not as complete as it should have been. Applicant is entitled to such expert assistance upon a threshold showing that the assistance sought is relevant to a claim to be investigated. Cf. Ake v. Oklahoma, 470 U.S. 68 (1985).

(b) The American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (2003) state that the use of a mitigation specialist has become "part of the existing standard of care" in death

1597

penalty cases. The Guidelines apply with equal force to post-conviction investigation.

<center>III.</center>

(a) Counsel moves the Court for funding to hire a mitigation specialist who will:

(1) Investigate Cedric Ricks' background, assess and evaluate the dynamics of his family;

(2) obtain necessary releases for securing confidential records relating to any of the relevant histories;

(3) identify, obtain and evaluate all of those records that will establish and describe Cedric Ricks' contact with public and private institutions prior to the time of trial;

(4) assist counsel in locating, documenting and obtaining any evidence that would bear on the personal moral culpability of the defendant or would reduce his moral blameworthiness in the eyes of a jury.

(b) The evidence and records the mitigation investigator will collect and that are relevant will consist of:

(a) MENTAL AND PHYSICAL HEALTH: history of mental or physical illness or injury, alcohol and drug use, birth trauma, including fetal alcohol or drug syndrome, and developmental delays;

(b) EDUCATIONAL HISTORY: achievement, performance and behavior, special education needs, cognitive limitations, and learning disability;

(d) EMPLOYMENT: Employment and training history, including skills, performance and barriers to employability;

(e) FAMILY AND SOCIAL HISTORY: (i) physical, sexual or emotional abuse; (ii) prior adult and juvenile records; (iii) prior correctional experience including conduct in the institution and clinical services; (iv) religious and cultural influences; (v) verification, explanation and expansion of material through contact with collateral sources.

## IV.

The evidence that is to be collected by the mitigation investigator is made relevant by Tex. Code Crim. Pro. Ann. arts. 37.071 (2)(e)(1) & (f)(3) and Lockett v. Ohio, 438 U.S. 586 (1978); Penry v. Lynaugh, 492 U.S. 302 (1989) (overruled in part on other grounds); and Hitchcock v. Dugger, 481 U.S. 393 (1987).

## V.

In order to accomplish the required mitigation investigation, the mitigation specialists should have the following credentials and abilities:

(1) A social worker with a Masters Degree in Social Work and licensed by the State of Texas (LMSW);

(2) experience in working with those with mental health problems;

(3) the ability to obtain a psychological/social history from the accused;

(4) the ability to perform the activities that are describe in III above.

## VI.

(a) Counsel has spoken to Mairead Burke who has the above mentioned qualifications. She states that her usual fee for such service is $85 per hour. She has prepared a detailed estimate of what would be required to complete an adequate mitigation investigation in this case. Her curriculum vitae and estimate are attached and incorporated in this motion. Based on her statements, Counsel seeks funding in the amount of $21,025.

(b) If it is determined that additional funding is required counsel will inform the Court of the extent of the mitigation investigation performed to that time and an estimate of the hours that will be required to complete the investigation, preparation and implementation of the defense's mitigation plan.

## VII.

This motion is made ex parte pursuant to Tex. Code Crim. Proc. Ann. art. 11.071§3. It would be fundamentally unfair to require this indigent Defendant to divulge to the prosecution the nature of this motion for funding which will necessarily inform the State of defensive theories of mitigation. Williams v. State, 958 S.W.2d 186 (Tex. Crim. App. 1997). If the undersigned counsel were retained by the accused, there would be no requirement that the State be notified of the retention of expert assistance.

1601

WHERFORE PREMISES CONSIDERED, Movant prays that this Court:

(a) Find that a threshold showing has been made that a mitigation specialist is an essential tool in the investigation of the factual and legal grounds for the filing of an application for a writ of habeas corpus pursuant to Art. 11.071 of the Texas Code of Criminal Procedure.

(b) approve initial funding in the amount of $21,025.

(c) that the Movant have such other and further relief as he may show himself to be justly entitled.

Respectfully submitted,

Catherine Clare Bernhard
P.O. Box 2817
Red Oak, Texas 75154
972-617-5548
fax – 972-617-5547
State Bar No. 01226575
cbernhard@sbcglobal.net

ATTORNEY FOR APPLICANT

1602

## VERIFICATION

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this date personally appeared Catherine Clare Bernhard, attorney of record in the above-styled and numbered cause, who upon her oath does hereby swear and affirm upon her personal knowledge that all statements of fact contained in the foregoing Motion are in all respects true and correct.



Catherine Clare Bernhard

STATE OF TEXAS
COUNTY OF DALLAS

SUBSCRIBED AND SWORN BEFORE ME, the undersigned Notary Public, on this the 13th day of January, 2015.

CLINTON J. STAFFORD
MY COMMISSION EXPIRES
December 5, 2017

Notary Public in and for the
State of Texas.

1603

**BURKE MITIGATION & CONSULTING, LLC**

**CONFIDENTIAL MEMORANDUM**
Attorney-Client Privilege

### CEDRIC RICKS: PRELIMINARY MITIGATION BUDGET ESTIMATE

The proposed plan is for preliminary mitigation development. This first stage will focus on interviewing the client, his family, caregivers, and other relevant mitigation witnesses; gathering and analyzing documentary information, and identifying medical, neurological, psychiatric, psychological, substance abuse, educational, and developmental issues that warrant further investigation/assessment.

The client spent most of his life in the Chicago area, and many close family members still live there. It is critical to interview family members and other mitigation witnesses in-person, thus I will need to travel to Chicago at least twice in this first phase of mitigation investigation. From preliminary online research, it appears a round trip flight would cost approximately $310, hotel would cost approximately $90/night, and rental car would cost approximately $54/day. I estimate the cost of two three night/four day trips with reasonable meal expenses would be approximately $1900.

As detailed below, I estimate about 160 hours of on the ground investigation with witnesses and about 65 hours on document investigation and analysis. At $85/hour, that comes to $19,125. The estimated cost of this preliminary investigation plan, including travel to Chicago, comes to $21,025, plus expenses.

**I.   Client interviews- approximately 30 hours**
In-person interviews with client and phone contact between in-person visits.

**II.  Witness interviews- approximately 130 hours**
Travel to Chicago for interviews with immediate family and extended family; this is to include: mother, father, brother, grandmother, uncles, aunts, and cousins.

Return to Chicago for interviews with special education teachers, social workers, friends, employers, and other relevant witnesses identified from first round Chicago interviews and client records. Ongoing interviews with immediate and extended families

**III. Documents collection and analysis- approximately 50 hours**
Obtain signed releases from client and family members and request records including:
- Medical records
- Developmental records
- Psychological records
- Psychiatric records
- Educational and Special Educational records
- Employment records
- Military records
- CPS and other community agency records

---

BURKE MITIGATION & CONSULTING, LLC

- Foster care and other placement records
- Arrest, conviction and Correctional records
- Other information resources

Review and analyze collected records to identify signs and symptoms of mental illness, mitigation themes, and additional witnesses.

### IV. Biopsychosocial history- approximately 15 hours

Draft an initial biopsychosocial history with information gathered from interviews and documents. Assessment will be ongoing as we gather additional information from witnesses and documents.

(Mairead Burke, LMSW)

# MAIREAD BURKE, LMSW

P.O. Box 11543 · Austin, TX 78711-1543
858-705-0338 · mairead@burkemitigation.com

## EXPERIENCE

**Mitigation Specialist and Case Consultant** — Austin, TX
*Burke Mitigation and Consulting, LLC* — October 2014- Present
*Independent Contractor* — January 2014- October 2014
- Engage clients and their families in mitigation investigations by developing collaborative working relationships
- Research, locate, and interview mitigation witnesses
- Work with experts and legal teams to document and preserve information provided by mitigation witnesses
- Develop biopsychosocial histories with clients' personal, medical, psychological, educational, and familial history
- Collect, analyze, and digest documentary evidence
- Create multi-generational genograms to present historical familial information
- Integrate witness, documentary, and expert evidence into a thorough life history narrative
- Assist legal teams in preparing for trial, hearings, or post-conviction proceedings

**Adult Case Manager** — Chicago, IL
*Howard Brown Health Center* — June 2013- April 2014
- Maintained current knowledge of HIV-related information, provided treatment education and adherence counseling to 40+ clients to improve health outcomes in a compassionate, culturally sensitive manner
- Intervened in client crises, including medical, psychiatric, financial, housing, and lack of food
- Engaged clients in intensive case management through building rapport and trust to form productive, strong, collaborative relationships
- Screened for mental health issues, evaluated for suicidality and homicidality, and connected clients to mental health care
- Responded to client needs with a problem solving approach, providing alternative resources and solutions in the absence of established procedures
- Coordinated home services to allow HIV+ individuals with disabilities to stay out of nursing homes and remain in their homes
- Partnered with medical team, mental health providers, and outside agencies to leverage resources, meet client needs, and improve overall health
- Organized and updated client files, documented client progress, and collected data for grants and funding

**Graduate Social Work Intern: Therapist** — Chicago, IL
*Jewish Child and Family Services* — September 2012- May 2013
- Provided client-centered psychotherapy to individuals experiencing anxiety, depression, loss, trauma, and other issues
- Engaged clients and conducted intake and mental health assessments
- Collaborated with clients to develop and implement individualized treatment plans
- Led Moms and Tots group for teen mothers who were wards of the State.

**Graduate Social Work Intern** — Chicago, IL
*ACCESS Community Health Network Clinic at Sullivan High School* — October 2011- June 2012
- Conducted biopsychosocial assessments for new clients
- Facilitated psychoeducational groups for students in in-school suspension
- Co-led teen parenting and LGBTQ support groups
- Collaborated with medical, mental health, and school staff to provide holistic approach to care and engage multiple systems in clients' welfare.

**Mitigation Specialist and Forensic Investigator**                                    New Orleans, LA
*NOLA Investigates*                                                  August 2008- September 2011
- Engaged men on Death Row in their guilt and penalty phase investigation through a client-centered relationship
- Conducted biopsychosocial assessments and extensive life history investigations
- Performed interviews with clients' family members, friends, teachers, employers, and other relevant individuals
- Gathered, analyzed, and presented educational, medical, and mental health records in a comprehensive and compelling life history narrative
- Prepared for trials and appeals with multi-disciplinary teams of investigators, mitigation specialists, lawyers, doctors, and other experts to provide effective comprehensive representation

**Jesuit Volunteer Corps Intern**                                                    New Orleans, LA
*NOLA Investigates*                                                    August 2007- August 2008
- Investigated inhumane conditions at a juvenile detention center that resulted in center's agreement to provide mental health counseling, adequate nutrition, effective medical care, and individualized education to incarcerated children
- Organized and maintained extensive hard and electronic files of complex capital cases

## EDUCATION

**University of Chicago**                                                          Chicago, IL- 2013
Master of Arts, School of Social Service Administration
Concentration: Clinical Social Work

**Santa Clara University**                                                      Santa Clara, CA- 2007
Bachelor of Arts
Major: Communication
Minor: Women's and Gender Studies

## LICENSURE AND MEMBERSHIPS

Licensed Master Social Worker with the Texas State Board of Social Worker Examiners since July 2014.
License #: 59512

Licensed Private Investigator with the Louisiana State Board of Private Investigator Examiners since January 2009.
License #: 7026-011209-LA

National Association of Social Workers, member since 2013.
Identification #: 886632596

## PRESENTATIONS

**The John Marshall Law School**
**JD-287MI-1: Mass Incarceration and Race**                                        Chicago, IL- April 2014
Led presentation and discussion on the connection between race, poverty, access to education, and the death penalty.

**Life in the Balance: Defending Death Penalty Cases**                            New Orleans, LA- March 2009
**National Legal Aid & Defender Association**
Co-led presentation entitled "Client Interviews: Staying Present with Your Client." Presentation covered building rapport with clients and developing effective client and witness interview skills.

1607

# SEMINARS, TRAININGS, AND CONFERENCES ATTENDED

**FASD Awareness Day Training**                                      Austin, TX- September 2014
*Texas Association for Infant Mental Health*

**Fetal Alcohol Spectrum Disorders: Making the Invisible Visible**           Webinar- August 2014
*National Association of Social Workers*

**Self Regulation and Executive Functioning in Youth with FASD: Implications for the Criminal Justice System**
*National Organization on Fetal Alcohol Syndrome*                        Webinar- May 2014

**Trauma and Recovery: A Guide to Creating Groups for Survivors**
*Womencare Counseling Center*                                    Evanston, IL- October 2013

**Online Training Course for Cognitive Processing Therapy**
*The Medical University of South Carolina*                              Online- May 2013

**Online Training Course for Trauma-Focused Cognitive-Behavioral Therapy**
*The Medical University of South Carolina*                             Online- January 2012

**The Fourth National Seminar on Mental Health and the Criminal Law**
*Sponsored by the Administrative Office of the United States Courts*      New Orleans, LA- January 2011

**Intellectual Disability Workshop for Capital Defense Mitigation Specialists**
*Co-sponsored by the American Association on Intellectual and Developmental Disabilities- Louisiana Chapter and the Center for Capital Assistance*                           New Orleans, LA- October 2010

**Forensic Social Work: Integrating Research, Policy and Practice**
*National Organization of Forensic Social Work*                         Atlanta, GA- April 2010

**Life in the Balance: Defending Death Penalty Cases**
*National Legal Aid & Defender Association*                            New Orleans, LA- March 2009

**American Academy of Forensic Sciences Annual Meeting**
*American Academy of Forensic Sciences*                              Denver, CO- February 2009

**Entomological Evidence from the Death Scene: A Forensic Entomology Workshop**   Rensselaer, IN- June 2008
*Dr. Neal Haskell*

**Life in the Balance: Defending Death Penalty Cases**
*National Legal Aid & Defender Association*                            Atlanta, GA- March 2008

1608

# ORDER

On _1 21 15_ , the Court having considered the above and foregoing motion, finds the same is hereby **GRANTED** and funding is approved in the amount of $ _up to 21 026_ / **DENIED,** in which case Applicant requests that the court designate in writing the reasons for denying said motion, in whole or in part, as required by Tex. Code Crim. Proc. Ann. art. 11.071 § 3(c)

_____
Judge Presiding

to be
billed at
least every
time #5000 work
is completed

1609

First Choice Investigative Solutions
P.O. Box 850042
Richardson, TX 75085

Date   4/20/2015

Invoice #   14-000936-1

**Bill To**
Law Office of Catherine Bernhard
Catherine Bernhard, Esq.
P.O. Box 2817
Red Oak, TX  75154

**Ship To**
Law Office of Catherine Bernhard
Catherine Bernhard, Esq.
P.O. Box 2817
Red Oak, TX 75154

| P.O. # | RICKS, CEDRIC | Ship Date | 4/20/2015 |
|--------|---------------|-----------|-----------|
| Terms  | Due on receipt | Due Date | 4/20/2015 |
|        |               | Other     |           |

| Item | Description | Qty | Price | Amount |
|------|-------------|-----|-------|--------|
| Investigation | Court Appointed Investigation; Capital Writ; Ex Parte Cedric Ricks; 371st Judicial District Court of Tarrant County, Texas. | 1 | 2,165.47 | 2,165.47 |

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

APR 29 2015

TIME_____11:44____
BY_____SR____DEPUTY

THANK YOU FOR YOUR BUSINESS

*First Choice Investigative Solutions*
divaspy@msn.com

972-276-8863
Fax 972-494-0007

| Subtotal | $2,165.47 |
|----------|-----------|
| Sales Tax (0.0%) | $0.00 |
| Total | $2,165.47 |
| Payments/Credits | $0.00 |
| Balance Due | $2,165.47 |

Copy to Auditor
4/29/2015

Approved

SCANNED

**FIRST CHOICE INVESTIGATIVE SOLUTIONS - TIME SHEET**
**CASE: RICKS, CEDRIC  #14-000936**

| DATE | DESCRIPTION | TIME | RATE | TOTAL |
|---|---|---|---|---|
| 10/31/2014 | Receipt of new case and file set up; receipt and review of discovery materials | 1.2 | 50 | 60 |
| 2/25/2015 | Review of case file | 1 | 50 | 50 |
| 2/26/2015 | Travel to Livington, TX to meet with client; review of case file | 4.8 | 50 | 240 |
| | Mileage | 234 | 0.345 | 80.73 |
| 2/27/2015 | Travel to and from Polunski Unit of TDCJ to meet with client | 10 | 50 | 500 |
| | Mileage | 293 | 0.345 | 101.09 |
| 3/2/2015 | Preparation of report from prison visit notes; email same to counsel and mitigtaion expert | 1.4 | 50 | 70 |
| 3/11/2015 | Receipt and review report from mitigation expert | 0.4 | 50 | 20 |
| 4/17/2015 | Travel to Austin, TX to meet with counsel and mitigation expert | 4 | 50 | 200 |
| 4/18/2015 | Meeting with mitigation expert and counsel on status of mitigation interviews; comprise list of investigative responsibilities; review of discovery | 3.3 | 50 | 165 |
| 4/19/2015 | Return to Dallas | 3.4 | 50 | 170 |
| | Mileage | 481 | 0.345 | 165.95 |
| | Hotel Bill | 1 | 342.7 | 342.7 |
| | | | | |
| | | | | |
| | | | | |
| | | | | 2165.47 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

1611



# Hilton Garden Inn
## Austin NW/Arboretum

1617 Research Boulevard • Austin, TX 78759
Phone (512) 241-1600 • Fax (512) 241-1606
Reservations
www.austinnwarboretum.hgi.com or 1 877 STAY HGI

*Folio*

| Name & Address | |
|---|---|

BERNHARD, CATHERINE
618 Tator Brown Rd.

Red Oak, TX 75154
US

| | |
|---|---|
| Room | 330/K1 |
| Arrival Date | 4/17/2015  11:04:00AM |
| Departure Date | 4/19/2015  11:04:00AM |
| Adult/Child | 1/0 |
| Room Rate | 149.00 |

RATE PLAN        LV3
HH# 783232346 BLUE
AL:
CAR:

CONFIRMATION NUMBER : 3178915495

4/19/2015    PAGE    1

### HILTON HHONORS

| DATE | REFERENCE | DESCRIPTION | AMOUNT |
|---|---|---|---|
| 4/17/2015 | 1394878 | GUEST ROOM | $149.00 |
| 4/17/2015 | 1394878 | CITY TAX | $13.41 |
| 4/17/2015 | 1394878 | STATE TAX | $8.94 |
| 4/18/2015 | 1395181 | GUEST ROOM | $149.00 |
| 4/18/2015 | 1395181 | CITY TAX | $13.41 |
| 4/18/2015 | 1395181 | STATE TAX | $8.94 |
| 4/19/2015 | 1395361 | VS *8218 | ($342.70) |
| | | **BALANCE** | $0.00 |

### EXPENSE REPORT SUMMARY

| | '15 00:00:00 | 12:00:00AM | STAY TOTAL |
|---|---|---|---|
| ROOM & TAX | $171.35 | $171.35 | $342.70 |
| DAILY TOTAL | $171.35 | $171.35 | $342.70 |

You have earned approximately 2980 Hilton HHonors points for this stay. Hilton HHonors(R) stays are posted within 72 hours of checkout. To check your earnings or book your next stay at more than 3,900 hotels and resorts in 91 countries, please visit HHono

| ACCOUNT NO | | DATE OF CHARGE | FOLIO NO./CHECK NO. | |
|---|---|---|---|---|
| VS *8218 | | 4/17/15 | 341848 | A |
| CARD MEMBER NAME | | AUTHORIZATION | INITIAL | |
| BERNHARD, CATHERINE | | 01478C | | |
| ESTABLISHMENT NO. & LOCATION | ESTABLISHMENT AGREES TO TRANSMIT TO CARDHOLDER FOR PAYMENT | PURCHASES & SERVICES | | |
| | | TAXES | | |
| | | TIPS & MISC. | | |
| CARD MEMBER'S SIGNATURE | | TOTAL AMOUNT | -342.70 | |
| X | | | | |

MERCHANDISE AND/OR SERVICES PURCHASED ON THIS CARD SHALL NOT BE RESOLD OR RETURNED FOR A CASH REFUND.            PAYMENT DUE UPON RECEIPT

1612



# Account Details

☒ ☒

Select Account to view

☒

As of Apr 20,2015

**Available Balancedescription displayed in tooltip**

Posted Balance description displayed in tooltip

Average Statement Cycle Balancedescription displayed in tooltip

Interest Paid (YTD)

N/A

Interest Rate

N/A

Routing Number

******7694showfull routing number in tooltip

Account Number

******9243showfull account in tooltip

■ Manage Debit Cards
Manage My Alerts
Buy Quicken

1613

# I Want to...

Transfer MoneyMake PaymentsOrder Checks or Deposit Slips Open New AccountStop Payment on a Check View StatementSet up Direct Deposit (PDF)Dispute Debit Card TransactionYour Overdraft OptionsGo to Accounts Overview

- Currently displaying:Transaction Details
- Select to display:Bill Pay Checks

☒ ☒ ☒

View statements for this account

Export History

## Select range

Currently displaying transactions for past

30 days

Display transactions for past

60 days

Display transactions for past

90 days

Display transactions for past

6 months

switch to window displaying Advanced Search

| Transaction History | | | | | | |
|---|---|---|---|---|---|---|
| Date | Type | Check # | Description | Debit (±) | Credit (±) | Daily Posted Balance |
| **Pending** transaction date 04/17/2015 | Debit | | HILTON GARDEN INN AUST AUSTIN #2929 | $394.11 | | |

1614

Form **W-9**
(Rev. December 2014)
Department of the Treasury
Internal Revenue Service

**Request for Taxpayer
Identification Number and Certification**

Give Form to the
requester. Do not
send to the IRS.

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

Paula D. Cook

**2** Business name/disregarded entity name, if different from above

First Choice Investigative Solutions

**3** Check appropriate box for federal tax classification; check only **one** of the following seven boxes:

[✓] Individual/sole proprietor or single-member LLC   [ ] C Corporation   [ ] S Corporation   [ ] Partnership   [ ] Trust/estate

[ ] Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ _____

**Note.** For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.

[ ] Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.)

P.O. Box 850042

**6** City, state, and ZIP code

Richardson, TX 75042

Requester's name and address (optional)

**7** List account number(s) here (optional)

---

**Part I** | **Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

Social security number

4 5 7 – 3 5 – 3 9 4 7

or

Employer identification number

– 

---

**Part II** | **Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

Sign Here | Signature of U.S. person ▶ *[signature]*   Date ▶ 4-10-15

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at *www.irs.gov/fw9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

• Form 1099-INT (interest earned or paid)
• Form 1099-DIV (dividends, including those from stocks or mutual funds)
• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)
• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)
• Form 1099-S (proceeds from real estate transactions)
• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)
• Form 1099-C (canceled debt)
• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See* What is backup withholding? *on page 2.*

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting?* on page 2 for further information.

Cat. No. 10231X

Form **W-9** (Rev. 12-2014)

1615

# BURKE

## MITIGATION & CONSULTING, LLC

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

APR 29 2015

TIME _11:14_

BY _5R_ DEPUTY

4/14/2015

Invoice No. 0003

**INVOICE**

1/21/2015- up to $21,025 approved to be billed at least every time $5,000 work is completed.

**Services**

| Date | Description | Qty/Hrs |
|------|-------------|---------|
| 3/19/2015 | Draft requests; call with witness | 0.9 |
| 3/20/2015 | Update memo | 0.9 |
| 3/23/2015 | Prepare for trip | 0.9 |
| 3/24/2015 | Calls with witnesses; prepare requests | 2.5 |
| 3/25/2015 | Interview witness; locate and review records | 9.5 |
| 3/26/2015 | Interview witnesses; locate and review records; hand deliver requests | 8.5 |
| 3/27/2015 | Interview witness | 4.1 |
| 3/28/2015 | Interview witness | 5.1 |
| 4/3/2015 | Draft interview reports; update memos | 6.1 |
| 4/6/2015 | Draft interview reports;  update memos | 7.5 |
| | Total service hours= | 46 |
| | Total service hours @ $85/hr= | $3,910.00 |

**Travel (1/2 normal hourly rate)**

| Date | Description | Qty/Hrs |
|------|-------------|---------|
| 3/24/2015 | Travel from Austin to Chicago | 5.5 |
| 3/28/2015 | Travel from Chicago to Austin | 6 |
| | Total travel hours= | 11.5 |
| | Total travel hours @ $42.50/hr= | $488.75 |

SCANNED *copy to Auditor*

1616

## Expenses

| Date | Description | | Cost |
|------|-------------|---|------|
| 3/24/2015 | Meal | | 7.02 |
| 3/24/2015 | Printing | | 6.41 |
| 3/25/2015 | Meall | | 16.75 |
| 3/25/2015 | Meal | | 3.76 |
| 3/25/2015 | Printing | | 9.93 |
| 3/25/2015 | Printing | | 12.92 |
| 3/25/2015 | Meal | | 8.69 |
| 3/26/2015 | Meal | | 6.98 |
| 3/26/2015 | Meal | | 5.11 |
| 3/26/2015 | Meal | | 16.95 |
| 3/27/2015 | Meal | | 5.78 |
| 3/27/2015 | Meal | | 2.67 |
| 3/27/2015 | Meal | | 11.63 |
| 3/28/2015 | Meal | | 8.17 |
| 3/28/2015 | Parking | | 22.00 |
| 3/28/2015 | Checked bag | | 25.00 |
| 3/28/2015 | Rental car | | 405.31 |
| 3/28/2015 | Gas | | 25.02 |
| | | Total expenses= | $600.10 |

**Total amount due=  $4,998.85**

PAYMENT TERMS

Payment is due upon receipt. Please make check payable to Burke Mitigation and Consulting LLC. For your records my EIN is: 47-2215884.

ADDRESS

PO Box 11543
Austin, TX 78711-1543

APPROVED BY *Richard*

NAME  *Catherine Bernhard*

FOR  *Cedric Ricks, No 1361004*

DATE  *4-20-15*

*Approved*

```
              HMSHOST
         STARBUCKS COFFEE B9
    CHICAGO INTERNATIONAL AIRPORT

    312335 Keinessa
    ---------------------------------
    CHK 4851                    GST 1
            MAR24'15  9:28AM
    ---------------------------------
        TO GO

    1 COD MEDIUM G          2.40
    1 SND TURK BACON        3.95
       Turkey Bacon Sandwich

       SUBTOTAL             6.35
       TAX                  0.67
       AMOUNT PAID     7.02
       XXXXXXXXXXXX1B19
       VISA                 7.02
    --312335 Closed MAR24 09:28AM---

    THANK YOU FOR YOUR BUSINESS!

    TELL US ABOUT YOUR EXPERIENCE

              HARRY LU
           773-619-0050
       HARRY.LU@HMSHOST.COM
```

1618


**FedExOffice.**

March 24, 2015 18:27                    Page: 1
Receipt #: 3636999358
VISA #: XXXXXXXXXXXX1619
2015/03/24 18:15

| Qty | Description | Amount |
|-----|-------------|--------|
| 1 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.12 |
| 1 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.12 |
| 1 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.12 |
| 1 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.12 |
| 1 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.12 |
| 2 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.24 |
| 1 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.12 |
| 1 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.12 |
| 32 | PNG B&W S/S 8.5x11 & 8.5x14 | 3.84 |
| 8 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.96 |

|   |   |
|---|---|
| SubTotal | 5.88 |
| Taxes | 0.53 |
| Total | 6.41 |

The Cardholder agrees to pay the issuer of the charge
card in accordance with the agreement between the
Issuer and the Cardholder.

FedEx Office Print & Ship Centers

3524 N. Southport
Chicago,IL 60657
773-975-5031
www.FedExOffice.com

Tell us how we're doing and receive
20% off your next $25 print order
fedex.com/welisten or 1-800-398-0242
Offer Code:_____ Offer expires 6/30/2015

Please Recycle This Receipt

1619

# Walgreens

#03539 11 E 75TH ST
CHICAGO, IL 60619
773-224-1211

399      8559    0023   03/25/2015 8:51 AM

DELISH ELECTROLYTE WATER       1L
   04902260982           B      1.49 SALE
   REGULAR PRICE 1.59 or 2/3.00
   REWARDS SAVINGS 0.10
   RETURN VALUE 1.49
CHI BOTL WATER TAX
   00000007621                  0.05
WRIGLEY EXTRA SPEARMINT SF SLM15S
   02200000899           A      2.00 SALE
   2 @ 1.29 or 2/2.00
   REGULAR PRICE 1.49
   REWARDS SAVINGS 0.98
   RETURN VALUE 1.00 ea

   SUBTOTAL                     3.54
   SALES TAX A=9.25%            0.19
   SALES TAX B=2.25%            0.03

   TOTAL                        3.76
   VISA ACCT 1819               3.76
   CHANGE                        .00

BALANCE REWARDS SAVINGS         1.08

THANK YOU FOR SHOPPING AT WALGREENS

GET MORE WITH BALANCE REWARDS,
REDEEM POINTS FOR SOMETHING EXTRA
IN A FUTURE PURCHASE. RESTRICTIONS
APPLY. FOR TERMS AND CONDITIONS,
VISIT WALGREENS.COM/BALANCE.

   RFN# 0353-9236-5595-1503-2503

# Robust Coffee Lounge

6500 S. Woodlawn Ave.                March 25, 2015
Chicago, IL 60637                       11:07 AM
(773) 891-4240
@robustcoffee

---

Receipt MmwB
Authorization 02084G

---

| | |
|---|---|
| Soda Can | $1.00 |
| Herbie | $6.95 |
| Dine In | |
| | |
| Subtotal | $7.95 |
| Tax | $0.74 |

---

| | |
|---|---|
| **Total** | **$8.69** |
| Visa 1819 | $8.69 |

1621



**FedEx Office**

March 25, 2015 12:41                      Page: 1
Receipt #: 3609750294
VISA #: XXXXXXXXXXXXX1819
2015/03/25 12:33

| Qty | Description | Amount |
|-----|-------------|--------|
| 8 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.96 |
| 3 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.36 |
| 17 | PNG B&W S/S 8.5x11 & 8.5x14 | 2.04 |
| 3 | PNG Color S/S 8.5x11 & 8.5x14 | 1.77 |
| 3 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.36 |
| 1 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.12 |
| 11 | PNG B&W S/S 8.5x11 & 8.5x14 | 1.32 |
| 19 | PNG B&W S/S 8.5x11 & 8.5x14 | 2.28 |
| 17 | PNG B&W S/S 8.5x11 & 8.5x14 | 2.04 |
| 1 | PNG Color S/S 8.5x11 & 8.5x14 | 0.59 |

|  |  |  |
|--|--|--|
| SubTotal | 11.84 |
| Taxes | 1.08 |
| Total | 12.92 |

The Cardholder agrees to pay the issuer of the charge
card in accordance with the agreement between the
issuer and the Cardholder.

FedEx Office Print & Ship Centers

1315 E. 57th St.
Chicago,IL 60804
773-643-2424
www.FedExOffice.com

Tell us how we're doing and receive
20% off your next $25 print order
fedex.com/welisten or 1-800-398-0242
Offer Code:_____ Offer expires 6/30/2015

Please Recycle This Receipt

1622



**FedEx Office.**

March 25, 2015 13:00                          Page: 1
Receipt #: 3609750296
VISA #: XXXXXXXXXXXX1819
2015/03/25 12:42

| Qty | Description | Amount |
|-----|-------------|--------|
| 1 | PNG Color S/S 8.5x11 & 8.5x14 | 0.59 |
| 1 | PNG Color S/S 8.5x11 & 8.5x14 | 0.59 |
| 3 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.36 |
| 1 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.12 |
| 1 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.12 |
| 1 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.12 |
| 1 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.12 |
| 1 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.12 |
| 1 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.12 |
| 1 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.12 |
| 3 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.36 |
| 3 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.36 |
| 6 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.72 |
| 2 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.24 |
| 3 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.36 |
| 2 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.24 |
| 2 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.24 |
| 4 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.48 |
| 1 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.12 |
| 3 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.36 |
| 2 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.24 |
| 3 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.36 |
| 3 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.36 |
| 2 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.24 |
| 2 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.24 |
| 7 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.84 |
| 2 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.24 |
| 5 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.60 |
| 1 | PNG B&W S/S 8.5x11 & 8.5x14 | 0.12 |

|  | SubTotal | 9.10 |
|--|----------|------|
|  | Taxes | 0.83 |
|  | Total | 9.93 |

The Cardholder agrees to pay the Issuer of the charge
card in accordance with the agreement between the
Issuer and the Cardholder.

1623



**Noodles & Rice**

COZY NOODLES AND RICE
3456 N SHEFFIELD AVE
CHICAGO, IL 60657
(773)327-0100
www.cozychicago.com
Wednesday  3/25/2015

## ChK#: 5538
SVR:Train()
Table #: 21    Guest #: 2

Order Time: 03/25/2015 08:26:45 PM

| | | |
|---|---|---|
| 1 | Mix Appetizer | $ 7.25 |
| 1 | Golden Roll | $ 9.50 |
| | (Chicken:) | |
| 1 | Panang Curry/ | $ 9.35 |
| | (Chicken:) | |
| 1 | Jasmine Rice | |
| | -4 [D] from 8.35 | |

03/25/15 09:0  PM

Sub Total: $22.09
Tax: $2.06
Total: $24.15

CELEBRATE 11YEARS WITH US
Cozy Loves You
Cozychicago.com

1624

```
          STARBUCKS Store #2737
             1249 Torrence Ave.
        Calumet City, IL (708) 730-9512
-----------------------------------------
               CHK 725332
          03/26/2015 10:48 AM
        1723999   Drawer: 1  Reg: 1
-----------------------------------------
   Grk Yog Rl Parfait       3.45
   Tl Berry Hibiscus        2.95
   Visa                     6.98
   XXXXXXXXXXXX1819

   Subtotal               $6.40
   Tax 9%                 $0.58
   Total                  $6.98
   Change  Due            $0.00

---------- Check Closed -----------------
        03/26/2015 10:48 AM



    New members get a FREE DRINK
       Join our loyalty program
      Sign up for email rewards
     visit Starbucks.com/rewards
         or download our app
        at participating stores
       some restrictions apply
      My Starbucks Rewards (R)
```

1625

```
     BUY ONE GET ONE FREE QUARTER POUNDER
            W/CHEESE OR EGG MCMUFFIN
     Go to www.mcdvoice.com within 7 days
             and tell us about your visit.
            Validation Code:_____
        Expires 30 days after receipt date.
       Valid at participating US McDonald's.
              12700 SOUTH ASHLAND
                   CALUMET
                     IL
                   60827
              ! ! ! THANK YOU ! ! !
       TEL# 708  388  6114 Store# 7954


   KS# 13              Mar.26'15 (Thu) 15:04

   HFY SIDE 1  KVS Order 51

   QTY ITEM                     . TOTAL
     1 2 Chsburger Meal            4.69
       1 M Diet Coke

   Subtotal                       4.69
     Tax                          0.42

   Take-Out Total                 5.11

   Cashless                       5.11
   Change                         0.00

   MER# 22985202
   CARD ISSUER         ACCOUNT#
   Visa SALE      ************1019
   AUTHORIZATION CODE - 03285G
   SEQ# 815262



          McDonald's Restaurant
```

# Beatrix
519 N Clark St
Chicago, Il 60654
(312) 284-1377

1213 Lindsay

---

Tbl A1/1      Chk 3913         Gst  4
Mar26'15 07:38PM

---

## Dining Rm

| | | |
|---|---|---|
| 1 Hummus | | 6.95 |
| 1 Deviled Eggs | | 5.95 |
| 1 Chick Bebe | | 16.95 |
| 1 Pasta | | 16.95 |
| 1 Din Short Rib | | 22.95 |
| 1 Branzino | | 26.95 |
| 1 Choc Cake | | 7.95 |
| 3 GL S Vincent | | 27.00 |
| 2 GL Rickshaw | | 20.00 |
| 100 % | | |
| BDAY/ANNV | | 7.95- |

| | |
|---|---|
| SubTotal | 143.70 |
| Tax | 15.09 |
| Total Due | **158.79** |

For your convenience we are
providing the following
gratuity calculations:
18% is $27.30
20% is $30.33
22% is $33.36

```
+---------------------------+
| Lettuce Eats              |
| Mobile Code:_____ |
|                           |
| Add Points  _____ |
|                           |
| Spend Rewards             |
| Dollars     _____ |
+---------------------------+
```

===BEATRIX TEXT CLUB====
Text BEATRIX to 30364 for
exclusive offers and free eats!
Receive up to 6 msgs per month
from an automated system. Reply

1627

```
          STARBUCKS Store #2737
             1249 Torrence Ave.
     Calumet City, IL (708) 730-9512

             CHK 723262
          03/27/2015 12:41 PM
       1671992   Drawer: 2  Reg: 1

     Pellegrino 500M1           2.45
     Visa                       2.67
     XXXXXXXXXXXXX1819

     Subtotal              $2.45
     Tax 9%                $0.22
     Total                 $2.67
     Change Due         $0.00

     --------- Check Closed ------------
          03/27/2015 12:41 PM




        New members get a FREE DRINK
          Join our loyalty program
         Sign up for email rewards
        visit Starbucks.com/rewards
            or download our app
          at participating stores
          some restrictions apply
        My Starbucks Rewards (R)
```

1628

```
         Thanks for your business!
                 BK01232
             1323 Irving Park Rd.
               773-348-3669

           Order312

Host:                       03/27/2015
Order312                      4:59 PM
                               30231


BK Veggie Burger                  3.19
Medium Drink                      2.09
   Diet Coke


Survey Code:

  | 262 003 300 071 210 312 43 |


Subtotal                          5.28

Sales Tax                         0.50

Drive Thru Total 5.78
Visa #XXXXXXXXXXXX1819             5.78
  Auth:085696

         www.mybkexperience.com

        --- Check Closed ---
```

D.S. Tequila Co.
3352 N Halsted St
Chicago, IL 60657
773.697.9127

Server: Savannah              DOB: 03/27/2015
09:06 PM                            03/27/2015
Table 20/4                           6/60023

                    SALE

VISA                          5242910
Card #XXXXXXXXXXXX1819
Magnetic card present: BURKE MAIREAD
Card Entry Method:  S

Approval: 05425G

              Amount:        $ 9.83

  + Included Gratuity:       $ 1.80

    + Additional Tip    _____

         = Total:   __11.63__

     I agree to pay the above
   total amount according to the
      card issuer agreement.

X_____

       Thanks! Come again.

1630

```
    WELCOME TO SHELL
   TOUCHLESS CARWASH
     GIFT CARD & ATM
ARIZONA SODA    $0.99

    SALES RECEIPT
57 445 128200
SHELL
2815 W IRVING PARK
CHICAGO       IL 60618

DATE 03/28/15  6:08PM
INVOICE# 881151
AUTH#    07030G
   VISA
   ACCOUNT NUMBER
XXXX XXXX XXXX 1819
BURKE/MAIREAD

PUMP PRODUCT    $/G
  07   REGU  $3.069

GALLONS   FUEL TOTAL
  8.152      $ 25.02

E-CIG $ 4.99 & UP SA
```





CHICAGO O'HARE AIRPORT
2309 MOUNT PROSPECT RD
DES PLAINES, IL 60018
STORE: 00849  REG: 002 CASHIER: CHARISSE
ALIS PROTEIN PACK
850367002496     1 @ 7.99         7.99
SUBTOTAL                          7.99
SALES TAX (2.25000%)               .18
TOTAL                             8.17
AMOUNT TENDERED

Visa                             8.17
  SALE
  ACCT: ****************1819
  EXP: ******
  APPROVAL: 062076
  ENTRY METHOD: SWIPED

TOTAL PAYMENT                     8.17
Transaction: 730575      3/28/2015 8:22 PM

      Comments\Inquiries? (800)326-7711
      or Email comments@hudsongroup.com
        Thank You for shopping with us.


      Visit www.HudsonBooksellers.com
    Use Code SHIPNOW for FREE Shipping

7305750084900203282015

1633

# Hertz.

#01 MR  RR  153999882
RES  G51838420C5

CC

**MAIREAD BURKE**

**INITIAL CHARGES**
RENT RT  $ 208.00  / WEEK  @ 1  / WEEKS          $    208.00
SUBTOTAL                                         T$   208.00

**CHARGES ADDED DURING RENTAL**
LDW            ACCEPTED @ $   13.50 DAY          $     67.50
LIS            DECLINED
PAI, PEC       DECLINED
PREM RD SVC    DECLINED
* ADDITIONAL CHARGES
**SERVICE CHARGES/TAXES**
CONCESSION FEE RECOVERY                          T$     24.59
MVL TAX&CFC                                      $      42.75
                                                 T$      1.49
VEHICLE LICENSE COST RECOVERY                    T$     11.80
TAX        20.000%  ON TAXABLE TTL OF $   245.88 $      49.18
VOUCHER - I 1                                    $-    208.00
**TOTAL AMOUNT DUE**                             $     197.31
CHARGED ON  VISA         XXXXXXXXXXXX1819

**FOR EXPLANATION OF THE ABOVE CHARGES,**
**PLEASE ASK A REPRESENTATIVE OR GO TO**
**WWW.HERTZ.COM/CHARGEEXPLAINED**

VEHICLE:  02299  / 5727201    15 ACCENT HB  N
LICENSE:  IL  E225837
FUEL:     FULL      8/8 OUT   8/8 IN
MILEAGE IN:        266        TR-X MILES:
MILEAGE OUT:         6        MILES ALLOWED:
MILES DRIVEN:      260        MILES CHARGED:
CDP:  XXXXXXX

RENTED:     CHICAGO OHARE AP
RENTAL:     03/28/15  10:31
RETURN:     03/28/15  18:37
RETURNED:   CHICAGO OHARE AP
COMPLETED BY:    0418/ILORD10

PLAN IN:    VSTATW     RATE CLASS:   8
PLAN OUT:   VSTATW

**STATEMENT OF CHARGES - NOT VALID FOR RENTAL**

# Hertz.

#01 MR  RR  153999882
RES  G51838420C5



**108488**

**AUSTIN-BERGSTROM
INTERNATIONAL AIRPORT PARKING**
CITY OF AUSTIN

7332 03/27 05:11 03/20 23:43 $22.00 1019

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

MAY 0 8 2015
TIME_____9:27
BY_____COS____ DEPUTY

WRIT NO. _____

TRIAL COURT NO. 1361004

EX PARTE

CEDRIC RICKS

IN THE 371st JUDICIAL

DISTRICT COURT

TARRANT COUNTY, TEXAS

## EX PARTE

### FUNDING MOTION FOR EXPERT ASSISTANCE

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the indigent Applicant, by counsel, and pursuant to Tex. Code Crim. Proc. art. 11.071§3, the 5th, 6th, 8th and 14th Amendments to the United States Constitution and Sections 10, 13 & 19 of Article I of the Texas Constitution and other authority cited herein, moves this Court to enter a finding that there is a reasonable necessity for expert assistance and funding as requested in this motion. In support thereof, this Applicant would show:

I.

(a) Cedric Ricks was convicted of capital murder and sentenced to death. Undersigned counsel has been appointed to investigate expeditiously, the factual and

SCANNED

SCANNED

legal grounds for the filing of an application for a writ of habeas corpus pursuant to Art. 11.071 of the Texas Code of Criminal Procedure.

(b) This Court has determined that the Applicant is indigent. His counsel is unable to retain any expert assistance due to Applicant's indigent status.

## II.

The funding that is requested will provide Counsel with essential tools necessary to investigate the legality of Applicant's confinement. Specifically, the claim to be investigated is that Applicant's trial counsel rendered ineffective assistance in the investigation and presentation of brain imaging evidence. In order to investigate such a claim, counsel needs a mental health expert with knowledge of brain imaging to review the tests and reports that were presented at trial. To this end, Counsel has consulted Dr. John Talmadge, a psychiatrist with expertise in brain imaging science. Dr. Talmadge estimates that a review of the evidence in this case could be done for $5000. A copy of his curriculum vitae is attached and incorporated.

Applicant is entitled to such expert assistance upon a threshold showing that the assistance sought is relevant to a claim to be investigated and reasonable. Tex. Code Crim. Proc. Ann. art. 11.071 §3(b); cf. Ake v. Oklahoma, 470 U.S. 68 (1985).

WHERFORE PREMISES CONSIDERED, the Applicant respectfully prays that this Court allow the Applicant funds in the amount of $5000 to hire Dr. Talmadge to

assist in the preparation of his defense.

Respectfully submitted,

Catherine Clare Bernhard
P.O. Box 2817
Red Oak, Texas 75154
972-617-5548
fax 972-617-5547
cbernhard@sbcglobal.net
State Bar No. 02216575

ATTORNEY FOR APPLICANT

1638

## VERIFICATION

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this date personally appeared Catherine Clare Bernhard, attorney of record in the above-styled and numbered cause, who upon her oath does hereby swear and affirm upon her personal knowledge that all statements of fact contained in the foregoing Motion are in all respects true and correct.



Catherine Clare Bernhard

STATE OF TEXAS

SUBSCRIBED AND SWORN BEFORE ME, the undersigned Notary Public, on this the 4th day of May, 2015.

CLINTON J. STAFFORD
MY COMMISSION EXPIRES
December 5, 2017

Notary Public in and for the
State of Texas.

1639



## BIOGRAPHICAL SKETCH: JOHN M. TALMADGE, M.D.

Dr. John Talmadge is a graduate of Dartmouth College and The Duke University School of Medicine. He completed his residency training at Duke in 1976 and has been active in the teaching and practice of psychiatry for over thirty years. He has worked in public and private settings, psychiatric hospitals, addiction treatment programs, and his own successful private practice. Dr, Talmadge has served as an award-winning clinician, medical executive, educator, and practitioner in psychiatry and addiction medicine.

Dr. Talmadge was recruited to The University of Texas Southwestern Medical Center after 25 years of service in both the public and private sectors. At UT Southwestern he holds the rank of Professor of Psychiatry. He has been an examiner for The American Board of Psychiatry and Neurology, a teacher at five different medical schools in Texas, and a surveyor for the Joint Commission on Accreditation of Healthcare Organizations. He currently teaches medical students and residents at The Dallas Veterans Affairs Medical Center and at Parkland Hospital, as well as on the main campus at UT Southwestern. He consults privately in the fields of family psychiatry, addiction psychiatry, child and adolescent psychiatry, forensic psychiatry, and behavioral medicine.

Since joining the UT faculty, he has been nominated often for the honor of Outstanding Teacher of the Year in the Department of Psychiatry, and he won that award in 2002. His unit also was honored with the Outstanding Teaching Site Award that same year.  In 2005 he was honored with the Dean's Award for Excellence in Medical Education at Southwestern Medical School. He was elected by his peers to Best Doctors in America (http://www.bestdoctors.com) in 2003-2014, and he has been named one of the best doctors in the USA in the treatment of mood disorders (http://www.psycom.net). In the 2006 academic year he was nominated both as the outstanding clinical teacher in his department as well as the outstanding teacher and supervisor for inpatient psychiatry at The University of Texas Southwestern Medical Center. His peers have also honored him with the Arthur M. Griffin Award for Outstanding Contributions to Medical Education at The University of Texas Southwestern Medical School. In 2014 The Dallas Council on Alcohol and Drug Abuse presented him with their annual Agent of Change Award in recognition of service to the community.

In 2015 Dr. Talmadge joined the executive leadership team as Senior Medical Advisor for The Center for BrainHealth, and The Brain Performance Institute, at The University of Texas Dallas. His work there includes strategic planning, education, program development, consulting with staff, and outreach to the community.

More details regarding Dr. Talmadge's background, philosophy, recent activities, and career can be found on his website at http://johntalmadge.com. He can also be found on Facebook, LinkedIn, and Twitter.



# Curriculum Vitae 2015
## John M. Talmadge, M.D.

**Name: John M. Talmadge, M.D.**

Clinical Professor of Psychiatry, University of Texas Southwestern Medical Center
Director Emeritus, Addiction Psychiatry Fellowship Training Program, UTSW
Senior Medical Advisor, The University of Texas at Dallas, The Center for BrainHealth
        and The Brain Performance Institute
Diplomate, American Board of Psychiatry and Neurology (Psychiatry)
Diplomate, American Board of Psychiatry and Neurology (Addiction Psychiatry)
Diplomate, American Society of Addiction Medicine (ASAM-Addiction Medicine)

**Brief Biographical Sketch:**

John M. Talmadge, M.D., is Clinical Professor of Psychiatry and emeritus director of the Addiction Psychiatry Fellowship Training Program at The University of Texas Southwestern Medical Center in Dallas, Texas. He also is Senior Medical Advisor at The Center for BrainHealth and The Brain Performance Institute at The University of Texas at Dallas. His private practice office is on the campus of historical Old Parkland in Dallas.

Dr. Talmadge, a native Texan, is a graduate of Dartmouth College and The Duke University School of Medicine. He completed his residency training at Duke in 1976 and has been active in the teaching and practice of psychiatry for over thirty years. He entered the field of addictions in the 1980's and was among the first physicians certified by both The American Society of Addiction Medicine, and The American Board of Psychiatry and Neurology. Dr. Talmadge also trained in spiritual direction at The Anglican School of Theology. He has been in personal recovery since 1983.

In 2005 he was honored with the Dean's Award for Excellence in Medical Education at Southwestern Medical School. For the past ten years he has been selected as one of The Best Doctors in America. In 2010 Dr. Talmadge received the Arthur M. Griffin award for Outstanding Contribution to Medical Education at The University of Texas Southwestern Medical Center. In 2014, The Dallas Council on Alcohol and Drug Abuse presented him with their annual Agent of Change Award in recognition of outstanding service to the community.

**Professional Practice:**

John M. Talmadge, M.D. PLLC
The Nurses Quarters at Old Parkland
3949 Maple Avenue, Suite 300
Dallas, Texas 75219
214-661-8020 (office)   214-673-9250 (cell)

Website: http://johntalmadge.com

e-mail:
john.talmadge@utsouthwestern.edu (U.T. Southwestern Medical School)

John M. Talmadge, M.D.



johntalmadgemd@gmail.com (personal)
john.talmadge@utdallas.edu (Center for Brain Health & Brain Performance Institute)

Home:
3519 Brookline Lane
Farmers Branch, TX 75234
972-406-1938

**Education: Dartmouth College '69, Duke University School of Medicine '73**

| | |
|---|---|
| July 1975-June 1976 | Resident in Psychiatry<br>Duke University Medical Center<br>Durham, NC 27710 |
| July 1973-June 1975 | Resident in Psychiatry<br>The University of Wisconsin Medical Center<br>1600 University Avenue<br>Madison, WI 53706 |
| July 1969-June 1973 | Doctor of Medicine (M.D.)<br>Duke University Medical School<br>Durham, North Carolina |
| Sept. 1965-June 1969 | Bachelor of Arts (A.B.)<br>Dartmouth College<br>Hanover, New Hampshire 03755 |
| Current Position: | Adult and Family Psychiatrist, Addiction Psychiatrist, Consultant,<br>Educator, Addiction Medicine Specialist<br>Dallas, Texas |
| | Clinical Professor of Psychiatry<br>The University of Texas Southwestern Medical Center<br>Dallas, Texas |
| Board Certifications: | Diplomate, American Board of Psychiatry and Neurology<br>April 1978 |
| | Additional Qualifications in Addiction Psychiatry<br>Certified 1993, Re-certified 2003 |
| Additional Certifications: | Diplomate, American Society of Addiction Medicine<br>(ASAM Certification) June 1989 |
| | Surveyor, Joint Commission on Accreditation of Healthcare<br>Organizations<br>January 1990 |

1642

| Additional Expertise: | Examiner, American Board of Psychiatry and Neurology<br>Oral board examiner 1979-2009 |

**Faculty Appointments:**

| | |
|---|---|
| 1976-1978 | Assistant Professor of Psychiatry<br>The UT Health Science Center at Houston TX |
| 1978-1982 | Clinical Assistant Professor of Psychiatry<br>Baylor College of Medicine, Houston TX |
| 1978-1982 | Lecturer in Psychology and Criminal Justice<br>Sam Houston State University<br>Huntsville, Texas |
| 1982-1984 | Clinical Assistant Professor of Psychiatry<br>The UT Health Science Center at San Antonio TX |
| | Adjunct Associate Professor of Psychology<br>Southwest Texas State University, San Marcos TX |
| 1984-1990 | Adjunct Associate Professor<br>Departments of Psychology and Educational Psychology<br>Texas A&M University, College Station TX |
| | Lecturer in ethics, human sexuality, human behavior<br>Texas A&M School of Medicine, College Station TX |
| 1990-2000 | Adjunct Professor<br>Psychology and Counseling<br>Amber University, Dallas TX |
| 1997-present | Adjunct Professor<br>The University of North Texas<br>School of Community Service<br>Department of Criminal Justice<br>Division of Addiction and Rehabilitation |
| 2000-2007 | Professor of Psychiatry<br>Director, Addiction Psychiatry Fellowship Training<br>The University of Texas Southwestern Medical Center |
| 2008-present | Clinical Professor of Psychiatry<br>The University of Texas Southwestern Medical Center; and |
| | Psychiatrist and Consultant in Private Practice,<br>John M. Talmadge, M.D. PLLC<br>Dallas, Texas |

1643

John M. Talmadge, M.D. PLLC

Hospital Appointments:

| | |
|---|---|
| 1976-1978 | Hermann Hospital<br>Houston, Texas |
| | Houston International Hospital<br>Houston, Texas |
| 1978-1982 | Doctors Hospital<br>Conroe, Texas |
| | Montgomery County Medical Center<br>Conroe, Texas |
| | Huntsville Memorial Hospital<br>Huntsville, Texas |
| 1982-1984 | The Brown Schools Psychiatric Treatment Center<br>San Marcos, Texas |
| | Hays Memorial Hospital<br>San Marcos, Texas |
| 1984-1990 | Greenleaf Psychiatric Hospital<br>Bryan, Texas |
| | The Sandstone Center for Psychiatry<br>College Station, Texas |
| | St. Joseph Hospital<br>Bryan, Texas |
| | Humana Hospital<br>College Station, Texas |
| 1990-1992 | Charter Hospital of Dallas<br>Plano, Texas |
| | Twin Lakes Hospital<br>Denton, Texas |
| | RHD Memorial Hospital<br>Farmers Branch, Texas |
| 1992-1994 | Richardson Medical Center<br>Richardson, Texas |

1644

John M. Talmadge, M.D. PLLC



The Haven Psychiatric Hospital
Desoto, Texas

1992-1999                         Garland Community Hospital
                                  Garland, Texas

                                  Green Oaks Hospital
                                  Dallas, Texas

                                  Glen Oaks Hospital
                                  Greenville, Texas

2000-2008                         The North Texas Veterans Affairs Healthcare System
                                  Dallas, Texas

2009-2013                         The Richard Caron Foundation of Texas (Caron Texas)
                                  Dallas, Texas

2015-                             The Center for BrainHealth
                                  The Brain Performance Institute
                                  The University of Texas at Dallas (UTD)
                                  Dallas, Texas

## Administrative Appointments:

2015 - present          Senior Medical Advisor, The Center for BrainHealth and The Brain
                        Performance Institute, The University of Texas at Dallas

2009-2013               Medical Director, The Caron Foundation of Texas (Caron Texas)

2000-2009               Medical Education Committee, UT Southwestern Medical Center

2000-2008               Addiction Psychiatry Fellowship Program Director
                        North Texas VA Healthcare System

2000-2007               Director, Addiction Psychiatry Fellowship Training Program
                        The University of Texas Southwestern Medical Center

1997-2000               Medical Director
                             Hunt County MHMR Center
                             Greenville, Texas

                             Medical Director for community mental health center serving
                             clients from several rural counties.

1996-2000               Medical Director for Addiction Services
                             Glen Oaks Hospital
                             Greenville, Texas

John M. Talmadge, M.D. PLLC

| | |
|---|---|
| 1994-1996 | Medical Director for Psychiatric Services<br>Planned Behavioral Health Care, Inc.<br>Dallas, Texas |
| 1992-1994 | Medical Director for Addiction Treatment Services<br>Garland Community Hospital<br>Garland, Texas |
| 1990-1992 | Medical Director for Addiction Treatment Services<br>Twin Lakes Hospital<br>Denton, Texas |
| 1984-1990 | Owner, Chief Executive Officer, and<br>Chairman of the Board<br>The Sandstone Systems Corporation<br>College Station, Texas<br><br>Medical Director<br>Sandstone Psychiatric Center<br>College Station, Texas |
| 1982-1984 | Medical Director for Adolescent Intensive<br>Treatment Services<br>The San Marcos Treatment Center of the Brown Schools<br>Healthcare International, Inc.<br>San Marcos, Texas |

## Private Practice and Consulting

| | |
|---|---|
| 1977-1982 | Private Practice (Clinical Faculty, Baylor Medical School)<br>Conroe, Texas (1978-1982) |
| 1982-1984 | Private Practice (Clinical Faculty, UTHSC San Antonio)<br>San Marcos Psychotherapy Associates<br>San Marcos, Texas (1982-1984) |
| 1984-1990 | Sandstone Psychiatry, Inc. (Adjunct Faculty, Texas A&M)<br>College Station, Texas (1985-1990) |
| 1990-2000 | Independent Private Practice<br>Dallas, Texas (1990-2000) |
| 2009- | John M. Talmadge, M.D. PLLC<br>The Nurses Quarters at Old Parkland<br>3949 Maple Avenue, Suite 300<br>Dallas, Texas 75219<br>(214) 661-8020  http://johntalmadge.com<br>john.talmadge@utsouthwestern.edu<br>johntalmadgemd@gmail.com |

1646

John M. Talmadge, M.D. PLLC

Awards, Honors, and Recognitions:

2014        Dallas Council on Alcohol and Drug Abuse
            *2014 Agent of Change Award for Outstanding Service to the Community*

2010        *Arthur M. Griffin Award for Outstanding Contributions to Medical Education*
                    The University of Texas Southwestern Medical Center, Department of Psychiatry

2007-
2014        Election to Best Doctors in America (2005-2008)

            Among UT Southwestern faculty, 58 have been awarded this distinction. Best Doctors was
            founded by physicians from Harvard Medical School. Their goal is to provide greater access
            to dependable, high quality medical information and care for individuals with serious illness
            and injuries. Today, Best Doctors is the world's leading resource for patients, families,
            physicians seeking expert medical information and guidance to treat illnesses and injuries of
            all kinds. At http://www.bestdoctors.com. Selection is based on peer survey of doctors
            nationwide with regard to where doctors would refer their own families for help.

2008-
2012        Best Psychiatrists in the United States (specializing in mental illnesses)

            The best psychiatrist list compiled by distinguished psychopharmacologist Ivan Goldberg at
            http://www.psydoc.com and http://www.depressionalcentral.com.

2005                Excellence in Education Award, UT Southwestern Medical School
                    Award for Outstanding Contributions to Medical Student Education; one of two
                    recipients in the UT Southwestern Department of Psychiatry

2002-2003 Outstanding Teacher Award, Department of Psychiatry,
                    UT Southwestern Medical Center
                    Nominated 2001-2002-2003
                    Awarded by PGY2 Class 2002

2002 Outstanding Teaching Site, Dept of Psychiatry, UT Southwestern Medical Center
                    Mental Health Gold Team
                    Nominated 2001-2002-2003
                    Received award 2002

Samuel E. Ziegler Foundation Fellow in Human Rights and Civil Liberties 1969-1971
            "The Right to Health Concept in the United States"

Trent Prize in the History of Medicine, Duke University Medical School, 1970
            "A Political History of the Founding of the National Institutes of Health"

Page 8 of 11

John M. Talmadge, M.D.


John M. Talmadge, M.D. PLLC

Chief Resident in Psychiatry (Madison VA Medical Center)
    The University of Wisconsin Medical School
    Department of Psychiatry 1975

Montgomery (TX) County Medical Society
    Secretary, Treasurer, Vice-President, President-elect 1979-1981

American Academy of Pediatrics
    Elected as Specialty Fellow, 1988

Brazos Valley Chamber of Commerce
    Leadership Brazos Award, 1989
    Recognized for contributions to the community including:
- Conceptualizing, financing, designing, and building a new psychiatric hospital for the Brazos Valley (The Sandstone Center for Psychiatry)
- Leadership in the Breast Cancer Screening Project annually
- Service to Brazos Valley Council on Alcohol and Drug Abuse
- "Healthwatch," a weekly feature I produced as the health affairs reporter for the local CBS affiliate.
- Bryan-College Station School Suicide Prevention Committee
- Service to Texas A&M University (see above)
- Conceiving and organizing the first APA Chapter for The Brazos Valley

Texas A&M University
    Physician Appreciation Award, Texas Aggie Football 1987

Brazos Valley Chapter of the American Psychiatric Association
    Founder, first vice-president and president-elect, 1989

Texas A&M University Mentor 1987-1990

Hunt County (Texas) Mental Health and Mental Retardation Authority
    Distinguished Service Award for Service 1996-2000 to citizens and families of Northeast Texas

Texas Medical Association Committee on Physician Rehabilitation
    District Coordinator 1985-86
    Regional Coordinator 1986-87
    State Committee Member 1987-1991
    Speakers Bureau for the Committee 1985-1991

Major Committee Appointments:

2000-               Addiction Psychiatry Fellowship Program

2000-2007       Member, Residency Education Committee
               UT Southwestern Department of Psychiatry

Chair, Addiction Psychiatry Fellowship Training Committee
UT Southwestern Department of Psychiatry

Member, Medical Student Education Committee
UT Southwestern Department of Psychiatry

Member, Group Psychotherapy Education Committee

Member, Committee on Addiction Psychiatry Fellowship Training
American Academy of Addiction Psychiatry

## Community Service and Volunteer Work:

Member, Board of Directors, North Texas Council on Alcohol and Substance Abuse
(formerly The Dallas Council on Alcoholism)

Member of the Board of Directors, Another Solution Inc. (ASI)

Advocate for veterans in need of psychiatric care and addiction treatment since 1972.
Assisted veterans with problems of homelessness, family disruption, learning disabilities, and
services not covered by VA Health Care System.

Volunteer teaching of medical students and supervision of residents at Parkland Hospital.

Co-founder of Commission on Addictions for the Episcopal Diocese of North Texas (1993)

Helped organize emergency response of Department of Psychiatry to assist evacuated
Louisianans following Hurricane Kattina, September 2005

Over 100 presentations for schools, parent organizations, and recovery-related organizations.

Helped organize community responses, including town meetings, forums, and educational
events to the sudden rise in heroin related deaths in North Texas. Led or addressed over a
dozen community-wide events in 1997-98.

Delivered pro bono care to many schoolteachers, ministers, and law enforcement offices in
the Dallas community who could not afford outpatient treatment.

Volunteered time to assist community programs such as Homeward Bound (drug and
alcohol treatment for disadvantaged individuals), National Alliance for the Mentally Ill,
DMDA (Depressive Manic Depressive Association), Families Anonymous, Alcoholics
Anonymous, Narcotics Anonymous, Cocaine Anonymous.

Member of Boards of Directors or Advisory Boards of Non-profit Organizations in North
Texas since 1990:

The University of Texas (Austin) Center for Students in Recovery

Dallas Council on Alcohol and Drug Abuse

John M. Talmadge, M.D.

1649

John M. Talmadge, M.D. PLLC

Hunt County Family Services

C.A.R.E.
Adolescent Substance Abuse Prevention in Schools

Association of Persons Affected by Addictions

Another Solution, Inc.
Scholarships for teens who cannot afford treatment for addictions

The Ethel Daniels Foundation
Addiction Treatment and Rehabilitation for Women

North Texas Addiction Professionals Network

Recovery Advocates (Episcopal Diocese of Dallas)

WRIT NO. _____

TRIAL COURT NO. 1361004

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

MAY 08 2015

TIME_____9:25
BY_____ DEPUTY

EX PARTE

CEDRIC RICKS

IN THE 371st JUDICIAL

DISTRICT COURT

TARRANT COUNTY, TEXAS

ORDER ON APPLICANT'S EX PARTE FUNDING MOTION FOR EXPERT ASSISTANCE

On _____, the Court having considered the above and foregoing motion, finds the same is hereby **GRANTED in an amount not to exceed** $6000 / **DENIED** in which case Applicant requests that the Court designate in writing its reasons for denying this request as required by Tex. Code Crim. Proc. Ann. art. 11.071 §3 (c).

Judge Presiding

SCANNED

SCANNED

1651

WRIT NO. _____

TRIAL COURT NO. 1361004

EX PARTE                                    IN THE 371st JUDICIAL

                                            DISTRICT COURT

CEDRIC RICKS                                TARRANT COUNTY, TEXAS

### ORDER ON APPLICANT'S REQUEST FOR JURY QUESTIONNAIRES

The Court having considered the request of Catherine Clare Bernhard, state

habeas counsel for Applicant, for copies of the jury questionnaires for the above-

styled and numbered case, currently filed under seal with the District Clerk of

Tarrant County, hereby orders the Tarrant County District Clerk to provide a copy

of the jury questionnaires in this case to Catherine Clare Bernhard, state habeas

counsel for Cedric Ricks.  The jury questionnaires are only for use in Applicant's

habeas proceeding and are not to be disseminated beyond members of the defense

team as designated by Catherine Clare Bernhard.

Judge Mollie Westfall
371st Judicial District Court
Tarrant County, Texas

SCANNED

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

MAY 1 2 2015

TIME ___11:35___
BY_____ DEPUTY
4652

SCANNED

WRIT NO. _____

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

JUN 1 2 2015
TIME_____9.12
BY_____DEPUTY

TRIAL COURT NO. 1361004

EX PARTE

vs.

CEDRIC RICKS

IN THE 371st JUDICIAL

DISTRICT COURT

TARRANT, COUNTY, TEXAS

## SECOND EX PARTE

## FUNDING MOTION FOR MITIGATION SPECIALIST

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the indigent Applicant, by counsel, and pursuant to Tex. Code

Crim. Proc. art. 11.071§3, the 5th, 6th, 8th and 14th Amendments to the United States

Constitution and Sections 10, 13 & 19 of Article I of the Texas Constitution and

other authority cited herein, moves this Court to enter a finding that there is a

reasonable necessity for expert assistance and funding as requested in this motion.

In support thereof, this Applicant would show:

I.

(a) Cedric Ricks was convicted of capital murder and sentenced to death.

Undersigned counsel has been appointed to investigate expeditiously, the factual and

legal grounds for the filing of an application for a writ of habeas corpus pursuant to

Art. 11.071 of the Texas Code of Criminal Procedure.

SCANNED

1653

(b)  Part of that investigation must include Applicant's background, record, and the circumstances of the offense, including his general mental status, prior to and at the time of the offense. Expert assistance will be necessary to prepare and present this evidence. Applicant is requesting that this Court approve and provide funding for Applicant to retain a mitigation specialist to perform this investigation.

(c)  This Court has determined that the Applicant is indigent.  His counsel is unable to retain any expert assistance due to Applicant's indigent status.

## II.

Counsel has previously requested and this Court has previously approved funding for the purpose of conducting a mitigation investigation in the amount of $21,025. This previous motion was entitled Ex parte Funding Motion for Mitigation Specialist. Counsel requests that the legal basis for that motion and the contents of that motion be included and incorporated in this motion.

## III.

Mairead Burke, the mitigation specialist working on this case, has now spent the money previously requested. An accounting of the work done so far is attached along with an estimate of additional work that needs to be done on this case and the money that is necessary. Ms. Burke believes that an additional 220 hours are required to complete the mitigation investigation in this case. Also required will be some

1654

additional travel which Ms. Burke estimates will come to $3000. Therefore, counsel is requesting an additional $21,700.

## IV.

(a) The funding that is requested will provide Counsel with essential tools necessary to investigate the legality of Applicant's confinement. Specifically, the claim to be investigated is that trial counsel was ineffective for failing to conduct a proper mitigation investigation and present such evidence at trial. Although trial counsel did consult a mitigation specialist, Applicant believes that this investigation was not as complete as it should have been. Applicant is entitled to such expert assistance upon a threshold showing that the assistance sought is relevant to a claim to be investigated. Cf. Ake v. Oklahoma, 470 U.S. 68 (1985).

(b) The American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (2003) state that the use of a mitigation specialist has become "part of the existing standard of care" in death penalty cases. The Guidelines apply with equal force to post-conviction investigation.

## V.

This motion is made ex parte pursuant to Tex. Code Crim. Proc. Ann. art. 11.071§3.

WHERFORE PREMISES CONSIDERED, Movant prays that this Court:

(a) Find that a threshold showing has been made that a mitigation specialist is an essential tool in the investigation of the factual and legal grounds for the filing of an application for a writ of habeas corpus pursuant to Art. 11.071 of the Texas Code of Criminal Procedure.

(b) approve additional funding in the amount of $21,700.

(c) that the Applicant have such other and further relief as he may show himself to be justly entitled.

Respectfully submitted,

Catherine Clare Bernhard
P.O. Box 2817
Red Oak, Texas 75154
972-617-5548
fax – 972-617-5547
State Bar No. 01226575
cbernhard@sbcglobal.net

ATTORNEY FOR APPLICANT

1656

# VERIFICATION

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this date personally appeared Catherine Clare Bernhard, attorney of record in the above-styled and numbered cause, who upon her oath does hereby swear and affirm upon her personal knowledge that all statements of fact contained in the foregoing Motion are in all respects true and correct.



Catherine Clare Bernhard

STATE OF TEXAS
COUNTY OF DALLAS

SUBSCRIBED AND SWORN BEFORE ME, the undersigned Notary Public, on this the 9th day of June, 2015.

CLINTON J. STAFFORD
MY COMMISSION EXPIRES
December 5, 2017

Notary Public in and for the
State of Texas.

1657

BURKE MITIGATION & CONSULTING, LLC
P.O. Box 11543 Austin, TX 78711-1543
(858) 705-0338 · mairead@burkemitigation.com · Fax (512) 842-7098

**CONFIDENTIAL MEMORANDUM**
Attorney-Client Privilege

## CEDRIC RICKS: SUPPLEMENTAL MITIGATION BUDGET

This memo will review what work has been completed and information obtained in the preliminary mitigation investigation, and will provide an outline of issues that warrant further investigation.

As detailed below, I estimate about 220 service hours for witness interviews, document investigation, and analysis. At $85/hr, that comes to $18,700. In this next phase of investigation I estimate three trips to Chicago for in-person interviews with mitigation witnesses; I estimate the cost of three trips will come to approximately $3,000. The estimated cost of this supplementary investigation plan, including two trips to Chicago, comes to $21,700, plus expenses (mileage for client visits, cost of records, etc.).

## I. COMPLETED WORK:

- reviewed hundreds of pages of records and trial transcripts and integrated the information into a witness list, records log, and life chronology
- three in-person interviews and one phone interview with the client
- travelled to Chicago twice and interviewed nine mitigation witnesses. (client's: mother (twice), father, brother, maternal grandmother, best friend, cousin/friend, cousin/friend, aunt, cousin)
- obtained signed releases from client, mother, father, brother, and maternal grandmother and started the record collection process
  - o I've made 57 requests for medical, mental health, educational, earnings, and calls for service records. The client is 40 years old, so many records, particularly from childhood and adolescent treatment, require additional follow-up to locate the records or confirm the records have indeed been destroyed. Follow-up also give an opportunity to gather additional information re treatment, staff, and historical information about institutions/agencies that are now closed.

## II. INFORMATION OBTAINED DURING PRELIMINARY INVESTIGATION

- Client was prenatally exposed to alcohol, marijuana, and cigarettes
- Client had high fevers in early childhood that required overnight hospitalization
- Client lacked a consistent parental figure. His main caretaker from 0-4 years of age was his great-aunt
- Client's great-aunt used severe physical punishment to discipline him
- Client's great-aunt's live-in boyfriend sexually abused children in the home over a period of years while client was in their care
- Client's brother was sexually abused by another child while in the great-aunt's care
- Client was exposed to domestic violence in his home from an early age
- Client had a chaotic home environment

**Page 1 of 3**

1658

- Client was physically abused at home from an early age; he began running away from home in elementary school to avoid beatings
- Client was exposed to criminal activity/behavior from an early age
- Client has been enrolled in special education classes since early elementary school
- Client was moved out of district twice to special education schools because his home district was unable to provide the resources to meet his special needs
- Client was inpatient at a psychiatric hospital for one month as an adolescent
- Client and his brother have been diagnosed with bipolar disorder; client's great-uncle had 'mental breakdown'
- Client's childhood IQ testing shows 38 point gap between verbal and performance IQ

## III. ISSUES THAT WARRANT FURTHER INVESTIGATION

- Continue to investigate effects of client's prenatal exposure to alcohol. The amount and frequency of alcohol he was exposed to prenatally, along with his early behavioral/cognitive issues, call for further investigation
  - o Identify, locate, and interview witnesses
- Continue to investigate physical and sexual abuse at great-aunt's home
  - o Identify, locate, and interview witnesses
  - o Background research on abusers
- Continue to investigate client's mental health symptoms from infancy to present
  - o Identify, locate and interview witnesses
- Continue to investigate mental health issues in client's family
- Investigate client's special education history from elementary through high school
  - o Identify, locate, and interview special education teachers, social workers, and others involved in client's education and care from:
    - Burr Oak Elementary
    - Seven Holy Founders
    - Spaulding School
    - HL Richards High School
    - Christ Hospital School Program
    - McKinley Libra School
- Identify, locate, and interview witnesses re domestic violence at home, physical abuse, verbal abuse, emotional neglect
- Identify, locate, and interview witnesses re exposure to criminal activity
- Continue ongoing interviews with client
- Continue requesting and following up on client and family records
- Integrate witness and documentary evidence into life chronology and biopsychosocial assessment

## IV. HOURS ESTIMATE FOR ISSUES THAT WARRANT FURTHER INVESTIGATION

- Witness interviews (approximately 130 hours)
  - o Interview family, friends, teachers, social workers, and additional witnesses in Chicago and Texas
- Ongoing client interviews (approximately 30 hours)

1659

- Ongoing document collection/follow-up and integration into biopsychosocial history and life chronology (approximately 60 hours)

(Mairead Burke, LMSW)

1660

WRIT NO. _____

TRIAL COURT NO. 1361004

EX PARTE

vs.

CEDRIC RICKS

IN THE 371st JUDICIAL

DISTRICT COURT

TARRANT, COUNTY, TEXAS

## ORDER ON APPLICANT' S SECOND EX  PARTE
## FUNDING MOTION FOR MITIGATION SPECIALIST

On  _6-12-15_ , the Court having considered the above and foregoing motion, finds the same is hereby **GRANTED**  and funding is approved in the amount of $ _21,700_  / **DENIED,** in which case Applicant requests that the court designate in writing the reasons for denying said motion, in whole or in part, as required by Tex. Code Crim. Proc. Ann. art. 11.071 § 3(c).

Judge Presiding

1661

WRIT NO. _____

TRIAL COURT NO. 1361004

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

JUL 17 2015

TIME_____11:22am_____
BY_____ DEPUTY

EX PARTE

CEDRIC RICKS

IN THE 371st JUDICIAL

DISTRICT COURT

TARRANT COUNTY, TEXAS

EX PARTE

FUNDING MOTION FOR EXPERT ASSISTANCE

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the indigent Applicant, by counsel, and pursuant to Tex. Code Crim. Proc. art. 11.071§3, the 5th, 6th, 8th and 14th Amendments to the United States Constitution and Sections 10, 13 & 19 of Article I of the Texas Constitution and other authority cited herein, moves this Court to enter a finding that there is a reasonable necessity for expert assistance and funding as requested in this motion. In support thereof, this Applicant would show:

I.

(a) Cedric Ricks was convicted of capital murder and sentenced to death. Undersigned counsel has been appointed to investigate expeditiously, the factual and

SCANNED

1662

legal grounds for the filing of an application for a writ of habeas corpus pursuant to Art. 11.071 of the Texas Code of Criminal Procedure.

(b) This Court has determined that the Applicant is indigent. His counsel is unable to retain any expert assistance due to Applicant's indigent status.

## II.

The funding that is requested will provide Counsel with essential tools necessary to investigate the legality of Applicant's confinement. Specifically, the claim to be investigated is that Applicant's trial counsel rendered ineffective assistance in the failure to discover significant mitigating evidence. In order to investigate such a claim, counsel needs a neuropsychologist to evaluate the testing that was done at trial and conduct some additional tests. To this end, Counsel has consulted Dr. Joan Mayfield, a neuropsychologist with extensive forensic experience. Dr. Mayfield estimates that a review of the evidence in this case could be done for $10,000. A copy of her curriculum vitae is attached and incorporated.

Applicant is entitled to such expert assistance upon a threshold showing that the assistance sought is relevant to a claim to be investigated and reasonable. Tex. Code Crim. Proc. Ann. art. 11.071 §3(b); cf. Ake v. Oklahoma, 470 U.S. 68 (1985).

WHERFORE PREMISES CONSIDERED, the Applicant respectfully prays that this Court allow the Applicant funds in the amount of $10,000 to hire Dr. Mayfield to assist in the preparation of his defense.

1663

Respectfully submitted,

Catherine Clare Bernhard
P.O. Box 2817
Red Oak, Texas 75154
972-617-5548
fax 972-617-5547
cbernhard@sbcglobal.net
State Bar No. 02216575

ATTORNEY FOR APPLICANT

## VERIFICATION

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this date personally appeared Catherine Clare Bernhard, attorney of record in the above-styled and numbered cause, who upon her oath does hereby swear and affirm upon her personal knowledge that all statements of fact contained in the foregoing Motion are in all respects true and correct.

_____
Catherine Clare Bernhard

STATE OF TEXAS

SUBSCRIBED AND SWORN BEFORE ME, the undersigned Notary Public, on this the 16 day of July, 2015.

CLINTON J. STAFFORD
MY COMMISSION EXPIRES
December 5, 2017

_____
Notary Public in and for the
State of Texas.

1665

# CURRICULUM VITAE
## Joan Weaver Mayfield, Ph.D, ABN, ABPdN

| ADDRESS: | Residence | Professional |
|---|---|---|
| | 9735 Windham Dr. | Our Children's House at Baylor |
| | Dallas TX 75243 | 3301 Swiss Avenue |
| | | Dallas, TX 75204 |
| TELEPHONE: | (214) 570-9737 | (214) 820-9808 |
| MOBILE: | (972) 978-5290 | |
| FAX: | | (214) 820-9878 |
| E-mail | | joanmayfieldphd@gmail.com |

**CURRENT POSITION:**

August 1997-Present    Pediatric Neuropsychologist / Psychologist
Our Children's House at Baylor
Dallas, TX

Our Children's House is a pediatric specialty hospital with a 35-bed capacity. Children are admitted into one of several programs including acute rehabilitation (head injury, spinal cord injury, tumors, etc), sub-acute (coma monitoring and training of parents), ventilatory care, palliative care, and a feeding disorders (failure to thrive, feeding disorders).

Duties:  Responsibilities include assessment and development of treatment plans for inpatients, cognitive rehabilitation, monitoring of coma status, parent support, education, and training.  It also consists of being part of a multidisciplinary team treating all our children, as well as administering comprehensive neuropsychological evaluations for children with head injuries approximately 6-months after injury.

**EDUCATION:**

Ph.D.    Texas A&M University-College Station, TX
Degree:  Ph.D., August 1996
Major:  School Psychology (APA approved)
Specialization:  Child Clinical Psychology
                        Clinical Neuropsychology
Dissertation:    Are ethnic differences in diagnosis of childhood psychopathology an artifact of psychometric methods?  An experimental evaluation of Harrington's hypothesis using parent reported symptomatology.
Major Professor: Cecil R. Reynolds, Ph.D.

M.Ed.    University of Texas at Tyler-Tyler, TX
Degree: Masters of Education, May 1982
Major:  Special Education

BS    Midwestern State University-Wichita Falls, TX
Degree:  Bachelor of Science, May 1972
Major:  Elementary Education
Minor:  Music

1666

## OTHER EDUCATIONAL EXPERIENCES

| | |
|---|---|
| September 27, 2014 | Cultural competence and Health Care (Cultural Competence: Module 5). Presented by The National Register of Health Service Psychologists.<br>3 CE Units |
| September 6, 2014 | The WISC-V & Q-Interactive: The New System. Presented at the American Academy of Pediatric Neuropsychology Annual Conference.<br>3 CE Units |
| September 5, 2014 | Ethical Issues Facing Pediatric Clinical Neuropsychologist When Called Up to Provide Deposition of Courtroom Testimony: Staying Sane and Ethical in an Adversarial Environment. Presented at the American Academy of Pediatric Neuropsychology Annual Conference.<br>3 CE Units |
| April 25, 2014 | Bipolar and Borderline Personality Disorders. Presented by Paul E. Keck, Jr., MD and Lois Choi-Kain, MD, Med. McLean Hospital, Department of Postgraduate Continuing Education.       3 CE Units |
| April 1, 2014 | Ethics in Psychology. Presented by Elite Continuing Education.<br>3 CE Units |
| March 21, 2014 | Brain-Based Therapy & Practical Neuroscience: Attachment & Emotional Regulation. Presented by John B. Arden, Ph.D., PESI, Inc.<br>6 CE Units |
| January 29, 2014 | What Psychologists Need to Know About the Impact of Hearing Loss (Module 24, 2012). Presented by The National Register of Health Service Psychologists.<br>1 CE Unit |
| January 28, 2014 | Activism – Protecting Patient Privacy (Ethics: Module 22, 2013). Presented by The National Register of Health Service Psychologists.<br>1 CE Unit |
| January 28, 2014 | DOGS, DNA and DOMA: Supreme Court 2012-2013 (Legal Issues: Module 11, 2013). Presented by The National Register of Health Service Psychologists.<br>2 CE Units |
| January 23, 2014 | The Assessment of Childhood Trauma (Module 29, 2013). Presented by The National Register of Health Service Psychologists.<br>2 CE Units |
| July 15, 2013 | CE Exam: Assessing and Managing Risk in Psychological Practice, Second Edition. American Psychological Association Insurance Trust.<br>8 CE Units |
| July 11, 2013 | DSM-5. Presented as an interactive webinar sponsored by TZKSeminars.<br>3 CE Units |
| June 3, 2013 | New Developments in Ethics and the Law. Presented as an interactive webinar sponsored by TZKSeminars.       3 CE Units |

Cv: 2/18/2015

May 29, 2013              Introduction to Sports Neuropsychology. Presented by Robert L. Conder, PsyD.
                         National Academy of Neuropsychology webinar.
                                                              1.5 CE Units

March 11, 2012           Ethical/Legal Issues in Neuropsychological Practice: Update. Presented by
                         Theodore Wasserman, Ph.D. & Barry Crown, J.D., Ph.D. by the American
                         College of Professional Neuropsychology, Las Vegas, NV
                                                              3 CE Units

March 10, 2012           Enhancing Objectivity in Forensic Neuropsychological Assessment-A Workshop
                         Sponsored by PAR. Presented by David Schwartz, Ph.D. the by the American
                         College of Professional Neuropsychology, Las Vegas, NV
                                                              3 CE Units

March 10, 2012           Update on Third Party Observers: Practice and Ethical Considerations. Presented
                         by Robert J. McCaffrey, Ph.D. by the American College of Professional
                         Neuropsychology, Las Vegas, NV          1.5 CE Units

March 9, 2012            Montessori, Waldorf, and Reggio Emilia: Understanding and Working with
                         Children in Alternative Education Programs. Presented by Steve Hughes, Ph.D.
                         and Sarah Schnoebelen, Ph.D. by the American College of Professional
                         Neuropsychology, Las Vegas, NV          3 CE Units

March 9, 2012            Current Developments in the Public School Response to Intervention (RTI)
                         Movement and the Impact on Pediatric Neuropsychology Practice. Presented by
                         Elaine, Fletcher-Janzen, Ph.D. by the American College of Professional
                         Neuropsychology, Las Vegas, NV          3 CE Units

March 8, 2012            Diagnosing Autism and Related PDD's, Pediatric Bipolar Disorder, ADHD, and
                         Applications of BASC-2 in Behavioral RTI: Advanced Training of the BASC-2.
                         Presented by Cecil Reynolds, Ph.D., ABN, ABPdn, ABPP by the American
                         College of Professional Neuropsychology, Las Vegas, NV
                                                              6 CE Units

March 13, 2011           Current Ethical/ Legal Issues for Professional Neuropsychology. Presented by
                         Theodore Wasserman, Ph.D., ABPdN & Barry Crown, Ph.D., ABN, JD
                         sponsored by the American College of Professional Neuropsychology, Las
                         Vegas, NV                               3 CE Units

March 12, 2011           Pediatric Sleep Disorders: Assessment and Treatment Implications for
                         Neuropsychologists. Presented by Peter A. Dodzik, Psy.D., ABPdN, ABN
                         sponsored by the American College of Professional Neuropsychology, Las
                         Vegas, NV                               3 CE Units

March 12, 2011           Reframing Nonverbal Learning Disorders: Identifying Clinical Subgroups.
                         Presented by Gail M. Grodzinsky, Ph.D., ABPdN sponsored by the American
                         College of Professional Neuropsychology, Las Vegas, NV
                                                              3 CE Units

March 11, 2011           From Movement to Thought: Subcortical Contributions to Psychiatric and
                         Learning Disorders. Presented by Dana Chidekel, Ph.D., ABPdN, ABN and

1668

Deborah E. Budding, Ph.D., ABPdN, ABN sponsored by the American College of Professional Neuropsychology, Las Vegas, NV
3 CE Units

March 11, 2011    Neuropsychological Science and Forensic Competencies: Applications in Civil and Criminal Cases. Presented by Daniel A. Martell, Ph.D. ABPP sponsored by the American College of Professional Neuropsychology, Las Vegas, NV
3 CE Units

March 10, 2011    Management of Sports Related Brain Injury: The Evolving Role of Neuropsychology. Presented by Mark R. Lovell, Ph.D. sponsored by the American College of Professional Neuropsychology, Las Vegas, NV
3 CE Units

February 28, 2010    Current Ethical/Legal Issues in Neuropsychological Practice. Presented by Thomas Theodor Wasserman, Ph.D., ABPP, ABPdN & Robert J. McCaffrey, PhD., ABN; Barry Crown, Ph.D., ABN, JD-Moderator/ Discussant sponsored by the American College of Professional Neuropsychology, Las Vegas, NV
3 CE Units

February 27, 2010    Introduction to Empirically Based Assessment: Developing an EBA Model for AD/HD. Presented by Steven J. Hughes, Ph.D., LP, ABPdN: The Tova Company sponsored by the American College of Professional Neuropsychology, Las Vegas, NV    3 CE Units

February 27, 2010    Neuropsychology and the Death Sentenced Inmate. Presented by Michael B. Charlton, J.D. sponsored by the American College of Professional Neuropsychology, Las Vegas, NV    3 CE Units

February 26, 2010    Assessment of Executive Function with the BRIEF and the TEC. Presented by Gerald A. Gioia Ph.D., sponsored by the American College of Professional Neuropsychology, Las Vegas, NV    3 CE Units

February 26, 2010    Central Auditory Processing in Children and Adolescents. Presented by Teresa Bailey Ph.D., sponsored by the American College of Professional Neuropsychology, Las Vegas, NV    3 CE Units

November 13, 2009    The Gifted Brain: The state of the literature on neurobiological differences. Presented by Nadia Webb, Psy.D., ADPdN, ABN by the American College of Professional Neuropsychology at the National Academy of Neuropsychology, New Orleans, LA.    2 CE Units

November 11, 2009    CPT Update. Presented by Antonio E. Puente, Ph.D. sponsored by the National Academy of Neuropsychology, New Orleans, LA
1 CE Unit

April 19, 2009    Bottom-Line Ethics for Neuropsychologists. Presented by Larry Cohen, J.D, sponsored by the American College of Professional Neuropsychology, San Diego, CA    3 CE Units

April 18, 2009    An Updated Primer for Neuropsychologists on the Admission of clinical and Forensic Evidence. Presented by Larry Cohen, J.D, sponsored by the American College of Professional Neuropsychology, San Diego, CA
3 CE Units

Cv: 2/18/2015

| April 18, 2009 | Interpreting Neuropsychological Pattersn: Looking at something other than scores.  Presented by John Meyers, Psy.D.,FACPN, ABPdN sponsored by the American College of Professional Neuropsychology, San Diego, CA<br>1.5 CE Units |
|---|---|
| April 18, 2009 | Assessment of Executive Functioning with the Test of Verbal Conceptualization and Fluency (TVCF) and the Comprehensive Trailmaking Test (CTMT). Presented by Cecil Reynolds, Ph.D, ABN and A. Mac Horton, EdD, ABPP, ABN, sponsored by the American College of Professional Neuropsychology, San Diego, CA<br>1.5 CE Units |
| April 17, 2009 | Ethical, Professional and Scientific Issues to Consider in Adopting Revised/Updated Psychological/Neuropsychological Test. Presented by Robert McCaffrey, Ph.D, ABN, ABPdN sponsored by the American College of Professional Neuropsychology, San Diego, CA<br>1.5 CE Units |
| April 17, 2009 | 2007-2008 Psychopharmacology Update. Presented by John Courtney, Ph.D, ABN, sponsored by the American College of Professional Neuropsychology, San Diego, CA<br>1.5 CE Units |
| April 17, 2009 | Development and Application of the Reynolds Intellectual Assessment Scales (RIAS) and the Comprehensive Trailmaking Test (CTMT). Presented by Cecil Reynolds, Ph.D. ABN. sponsored by the American College of Professional Neuropsychology, San Diego, CA<br>1.5 CE Units |
| April 17, 2009 | Neuropsychological Assessment and Sports: New Clinical Opportunites. Presented by Mark Lovell, Ph.D, ABN, sponsored by he American College of Professional Neuropsychology, San Diego, CA  1.5 CE Units |
| October 24, 2008 | Executive Functions and How the Brain Deals with Novelty and Ambiguity. Presented by Eklhonon Goldberg, Ph.D., ABPP, sponsored by the American College of Professional Neuropsychology, New York City, New York.<br>2 CE Units |
| July 26, 2008 | Boundary Crossing: The Ethics of Race, Class, and Gender. Presented by Pamela Brandwein, Ph.D., sponsored by The Reunion Institute, Dallas, Texas.<br>3 CE Units |
| November 16, 2007 | The Neuropsychological IME: Tips from the "Inside." Presented by Tom McLaren, Ph.D., ABPN, by the American College of Professional Neuropsychology, Scottsdale, Arizona      2 CE Units |
| November 15, 2007 | Clinical Updates in Pediatric Epilepsy. Presented by Philip Fastenau, Ph.D., at the 27th Annual Meeting of the National Academy of Neuropsychology, Scottsdale, Arizona<br>1.5 Units |
| November 15, 2007 | Retirement, Planning, and Fringe Benefits for the Practitioner. Presented by Steven Swartz, CPA, PFS, CVA, at the 27th Annual Meeting of the National Academy of Neuropsychology, Scottsdale, Arizona<br>1 CE Unit |

Cv: 2/18/2015

| | |
|---|---|
| November 15, 2007 | Behavioral Teratology: Neuropsychological Effects of Prenatal Exposures. Presented by Sarah N. Mattson, Ph.D., at the 27th Annual Meeting of the National Academy of Neuropsychology, Scottsdale, Arizona<br>1.5 CE Units |
| October 19, 2007 | Ethics: A Musical Comedy. Presented by the Dancing Moose Productions at the Reunion Institute, Dallas, Texas        3 CE Units |
| July 13, 2007 | Using the Cognitive Hypothesis Testing Model in Neuropsychological Assessment. Presented by James B. Hale, Ph.D., ABSNP, at the Second National School Neuropsychology Conference, Grapevine, Texas.<br>3 CE Units |
| July 13, 2007 | The Neuropsychological Implications of Central Nervous System Infectious Diseases. Presented by David Lang, M.D., FAAP, FPID, at the Second National School Neuropsychology Conference, Grapevine, Texas<br>3 CE Units |
| July 12, 2007 | The Trajectory of Frontal Lobe Development: What is it and when does it all end? Presented by Cecil R. Reynolds, Ph.D., ABPN at the Second National School Neuropsychology Conference, Grapevine, Texas<br>2 CE Units |
| October 27, 2006 | The Meyers Neuropsychological Battery (MNB). Presented by John Meyers and Martin Rohling by the American College of Professional Neuropsychology, San Antonio, Texas        2 CE Units |
| October 26, 2006 | "War of the Words"—The Neuropsychological Deposition. Presented by John Courtney, James Ewbank, Bonny Forrest, and Cecil Reynolds at the 26th Annual Conference of National Academy of Neuropsychology, San Antonio, Texas<br>3 CE Units |
| October 25, 2006 | Recovery of Consciousness After Severe Brain Injury: From Coma to Confusion to Altered Awareness. Presented by Joseph Giacino and Mark Sherer at the 26th Annual Conference of National Academy of Neuropsychology, San Antonio, Texas        3 CE Units |
| July 28, 2006 | Ethical Issues Confronting Mental Health Professionals: Avoiding Risk and Dangerous Clients. Presented by Thomas L. Hartsell, Jr. at the Salesmanship Club, The Reunion Institute, Dallas, Texas        3 CE Units |
| January 21, 2006 | Is Neuropsychology going extinct? Presented by Sam Goldstein at the Coalition of Clinical Practitioners in Neuropsychology Annual Meeting, Las Vegas, Nevada        1.5 CE Units |
| January 21, 2006 | Psychoeducational Evaluations and Interventions. Presented by Deborah Kundert at the Coalition of Clinical Practitioners in Neuropsychology Annual Meeting, Las Vegas, Nevada        3 CE Unit |
| January 21, 2006 | Medical Informatics in Neuropsychology. Presented by Peter Gillman at the Coalition of Clinical Practitioners in Neuropsychology Annual Meeting, Las Vegas, Nevada        1 CE Unit |

| | |
|---|---|
| January 21, 2006 | Developing and Maintaining an Independent Practice in Forensic Neuropsychology. Presented by Randolph Price at the Coalition of Clinical Practitioners in Neuropsychology Annual Meeting, Las Vegas, Nevada<br>3 CE Units |
| January 20, 2006 | Developmental and Application of the Reynolds Intellectual Assessment Scales (RIAS) and the Comprehensive Trail Making Test (CTMT). Presented by Cecil R. Reynolds at the Coalition of Clinical Practitioners in Neuropsychology Annual Meeting, Las Vegas, Nevada      3 CE Units |
| October 21, 2005 | Assessing Executive Functioning with the Comprehensive Trailmaking Test (CTMT) and the Test of Verbal Conceptualization and Fluency (TVCF). Presented by Cecil R. Reynolds and Arthur MacNeil Horton, Jr. by the American College of Professional Neuropsychology      2 CE Units |
| October 20, 2005 | "News they can use": Translating Test Results Into Real-World Recommendations in Pediatric Neuropsychological Evaluations. Presented by Karen Wills at the National Academy of Neuropsychology 25th Annual Conference, Tampa FL      3 CE Units |
| October 20, 2005 | The Assessment of Effort and Test Taking Compliance in Children: An Acknowledgment of our Potential for Error. Presented by John Courtney, Paul Green, Lloyd Flaro, Martin Rohling, and Juliet Dinkins at the National Academy of Neuropsychology 25th Annual Conference, Tampa FL<br>3 CE Units |
| April 7-8, 2005 | Reprogramming the Human Brain: Translating Brain Plasticity Research into Clinical Practice. Presented by the Center for Brain Health, U of TX at Dallas<br>9 CE Units |
| January 16, 2005 | Legal and Ethics Updates for Neuropsychologists. Presented by Larry Cohen, J.D. at the Second Professional Neuropsychology Weekend and Annual Meeting of the Coalition of Clinical Practitioners in Neuropsychology, Las Vegas, NV.<br>3 CE Units |
| January 15, 2005 | Case Studies in Child/Adolescent Neuropsychology: LD/ADHD/Forensic. Presented by Lewis Etcoff, Ph.D. at the Second Professional Neuropsychology Weekend and Annual Meeting of the Coalition of Clinical Practitioners in Neuropsychology, Las Vegas, NV.      3 CE Units |
| January 15, 2005 | An Introduction to the Louisiana Prescription Authorization Bill: Lessons Learned. Presented by Cary Rostow, Ph.D. at the Second Professional Neuropsychology Weekend and Annual Meeting of the Coalition of Clinical Practitioners in Neuropsychology, Las Vegas, NV.<br>1 CE Unit |
| January 15, 2005 | An Update on ADHD Across the Lifespan: Science, Non-Science and Nonsense. Presented by Sam Goldstein, Ph.D. at the Second Professional Neuropsychology Weekend and annual Meeting of the Coalition of Clinical Practitioners in Neuropsychology, Las Vegas, NV.      3 CE Units |

Cv: 2/18/2015

| | |
|---|---|
| January 14, 2005 | Town Hall Meeting: Issues Related to Neuropsychology Standards of Care. Presented by A. MacNeill Horton, Jr., EdD. And Ralph M. Reitan, Ph.D. at the Second Professional Neuropsychology Weekend and Annual Meeting of the Coalition of Clinical Practitioners in Neuropsychology, Las Vegas, NV.<br><div align="right">1 CE Unit</div> |
| January 14, 2005 | From BASE to BASC2: Assessing Child Behavior Disorder, Personality, and Affect at the Second Professional Neuropsychology Weekend and Annual Meeting of the Coalition of Clinical Practitioners in Neuropsychology, Las Vegas, NV.<br><div align="right">3 CE Units</div> |
| November 19, 2004 | The Spectrum of Right Hemisphere Syndromes: Classification and Differential Diagnosis. Presented by Patricia A. Pimental, Psy.D., ABPN, by The American College of Professional Neuropsychology, Westin Hotel, Seattle, WA<br><div align="right">2 CE Units</div> |
| October 11, 2004 | Review of Ethical Principles & Situations. Presented by Thomas L. Rochat, Ph.D., Professional Association for Continuing Education, Dallas, TX<br><div align="right">3 CE Units</div> |
| October 18-19, 2003 | Current Issues within Private Practice in the HIPAA Era. Presented by Edward A. Peck, III, Ph.D., ABPN at the Fourth Annual Meeting of the Coalition of Clinical Practitioners in Neuropsychology, Adam's Mark Hotel, Dallas, TX<br><div align="right">2 CE Units</div> |
| October 17, 2003 | Ethical Issues in Neuropsychology: When Ethics and Practice Collide. Presented by Shane Bush, Ph.D., Grant Iverson, Ph.D., and Margaret Bogie at the 23rd Annual Meeting of the National Academy of Neuropsychology, Adam's Mark Hotel, Dallas, TX<br><div align="right">3 CE Units</div> |
| October 17, 2003 | Navigating Around Land Mines on the Ethics and Practice Highways. Presented by Larry Cohen, J.D., Ph.D. by the American College of Professional Neuropsychology. Adam's Mark Hotel, Dallas, TX<br><div align="right">2 CE Units</div> |
| October 16, 2003 | The Atkins Decision and the Forensic Evaluation of Mental Retardation: Roles for the Neuropsychologist and Special Educator. Presented by Randall Price, Ph.D. and Kay B. Stevens Ph.D. at the 23rd Annual Meeting of the National Academy of Neuropsychology, Adam's Mark Hotel, Dallas, TX<br><div align="right">3 CE Units</div> |
| March 20-23, 2003 | 13th Annual Nelson Butters' West Coast Neuropsychology Conference. Presented by the University of California, San Diego School of Medicine, San Diego, CA<br><div align="right">15 CE Units</div> |
| October 12, 2002 | Practice Survival in Clinical Neuropsychology: Legislative/Reimbursement Issues and the Art of the Possible. Presented by Patricia A. Pimental, PsyD at the Coalition of Clinical Practitioners in Neuropsychology 3rd Annual Meeting, Miami Beach, Florida<br><div align="right">2 CE Units</div> |
| October 12, 2002 | Making the Courtroom Safe for Neuropsychologists: Getting Heard and Being Believed. Presented by Larry J. Cohen, J.D., Ph.D. at the Coalition of Clinical Practitioners in Neuropsychology 3rd Annual Meeting, Miami Beach, Florida |

3 CE Units

| | |
|---|---|
| October 11, 2002 | The Clinical Assessment Scales for the Elderly, Development, Standardization, and Clinical Applications. Presented by Cecil R. Reynolds, Ph.D., ABPN, ABPP at the Coalition of Clinical Practitioners in Neuropsychology 3rd Annual Meeting, Miami Beach, Florida                    3 CE Units |
| October 9, 2002 | Town Hall Meeting. Presented by Leslie D. Rosentein, Ph.D.; Antonio E. Puente, Ph.D.; Jeffrey T. Barth, Ph.D., & Neil H. Pliskin, Ph.D. at the 22nd Annual National Academy of Neuropsychology Conference.                    1 CE Unit |
| October 9, 2002 | Reimbursement, Documentation, and Fraud Issues Involving the Reimbursement for Clinical Neuropsychological Services (or how Medicare dictates the practice of clinical neuropsychology). Presented by Antonio E. Puente, Ph.D. at the 22nd Annual National Academy of Neuropsychology Conference.                    1 CE Unit |
| April 25, 2002 | Ethical Principles in the Practice of the Mental Health Professional. Presented by Allan M. Tepper, J.D., Psy.D. for Medical Educational Services, Inc. in Dallas, Texas                    6 CE Units |
| November 3, 2001 | Current Issues in Clinical Neuropsychology. Presented by Cecil R. Reynolds, Ph.D. and Rosemarie S. Moser, Ph.D. at the Coalition of Clinical Practitioners in Neuropsychology 2nd Annual Meeting, San Francisco, California                    1 CE Unit |
| November 1, 2001 | Mild Head Injury in Children and Adolescents. Presented by Keith Owen Yeates, Ph.D. at the National Academy of Neuropsychology Annual Conference, San Francisco, California.                    3 CE Units |
| September 14, 2001 | Pediatric Medical Symposium. Sponsored by the University of Oklahoma College of Medicine, Office of Continuing Medical Education, Department of Pediatrics, University of Oklahoma College of Medicine—Tulsa, The Brain Injury Association of Oklahoma, Tulsa, Oklahoma.                    8 CE Units |
| August 2, 2001 | Cerebral Mysteries: Impulsive Behavior, Cognition, & Learning Disabilities. Presented by Nikita B. Katz, M.D., Ph.D. for the Institute for Natural Resources in Dallas, Texas.                    6 CE Units |
| November 19, 2000 | Understanding and Surviving the Daubert Challenge to Your Testimony. Presented by Cecil R. Reynolds, Ph.D. at the Coalition of Clinical Practitioners in Neuropsychology Conference, Orlando Florida.                    2 CE Units |
| November 18, 2000 | Town Hall Meeting: Open Discussion. Clinical Neuropsychology: What is our current status and do we have a future? Discussants: Gerald Goldstein, Cecil R. Reynolds, Robert J. McCaffrey, and Joan W. Mayfield. Presented at the Coalition of Clinical Practitioners in Neuropsychology, Orlando, Florida.                    1.5 CE Units |

Cv: 2/18/2015

1674

| | |
|---|---|
| November 17, 2000 | Woodcock-Johnson III: Overview and Neuropsychological Interpretation. Workshop presented by Raymond S. Dean, Ph.D. and Frederick A. Schrank, Ph.D. at the National Academy of Neuropsychology Annual Meeting, Orlando, Florida.                                 2 CE Units |
| September 18, 2000 | Treatment of Serious Mental Disorders. Another View of Empirically Supported Techniques. Telehealth Applications in Professional Practice. August 2000 Register Report, Volume 26, N. 2,3.              1 CE Unit |
| March 3, 2000 | Update on the Neuropsychology of Children: Diagnosis, Treatment and Promising Research.  Workshop presented by CEU Solutions, Austin, TX.                                          6 CE Units |
| November 13, 1999 | Developmental Framework for the Neuropsychological Assessment of the Child. Workshop presented by Jane H. Bernstein, Ph.D. at the National Academy of Neuropsychology Annual Meeting, San Antonio, TX                                          6 CE Units |
| July 8 & 9, 1999 | Critical Incident Stress Management—Basic Course presented by Paul Tabor, M.Miss., EMT-P, State CISM Coordinator, Texas Department of Health, Austin Texas.                                       16 CE Units |
| June 13, 1999 | Management of Pediatric Brain Injury.  Workshop moderated by Ann V. Deaton, Ph.D. at The 23rd Annual Williamsburg Conference: Cognitive, Neuromedical and Behavioral Aspects of Brain Injury Rehabilitation, Williamsburg, Virginia.                            3 CE Units |
| June 12, 1999 | Ecological Validity and Approaches to Cognitive Rehabilitation. Workshop presented by Rick J. Parente, Ph.D. at the 23rd Annual Williamsburg Conference: Cognitive, Neuromedical and Behavioral Aspects of Brain Injury Rehabilitation, Williamsburg, Virginia.                      2.25 CE Units |
| June 11, 1999 | Self-Awareness Assessment and Intervention. Workshop presented by Tessa Hart, Ph.D. at the 23rd Annual Williamsburg Conference: Cognitive, Neuromedical and Behavioral Aspects of Brain Injury Rehabilitation, Williamsburg, Virginia.                           2 CE Units |
| March 25, 1999 | WeeFIM System: Functional Assessment for Children and Adolescents with Acquired and Congenital Disability Training.  Cooks Children's Medical Center, Ft. Worth, TX |
| November 7, 1998 | Mild TBI: Diagnostic Challenges.  Workshop presented by Jeffrey Barth, Ph.D. and Ronald Ruff, Ph.D. at the National Academy of Neuropsychology Annual Conference, Washington, DC.                        3 CE Units |
| November 5, 1998 | Pervasive Developmental Disorders and Autistic Spectrum Disorders. Workshop presented by Valerie Scaramella-Nowinski, Ph.D.; Jeffrey Lewine, Ph.D.; Ricki Robinson, M.D.; & Porta Iverson at the National Academy of |

|                     | Neuropsychology Annual Conference, Washington, DC. |
|---------------------|----------------------------------------------------|
|                     | 6 CE Units |
| August 19, 1998     | The Grieving Child: What to Do When Death Enters the Life Of A Child. Workshop presented by Dr. James A. Fogarty of Carondelet Management Institute, Dallas, TX          3 CE Units |
| November 13, 1997   | A Process-Oriented Approach to Intelligence Testing: The WISC-III as a Neuropsychological Instrument. Workshop presented by Edith Kaplan, Ph.D. at the National Academy of Neuropsychology Annual Conference, Las, Vegas, NV          3 CE Units |
| November 11, 1997   | Neurobiological Basis of Reading Disabilities and ADHD. Workshop presented by George Hynd, Ph.D. at the National Academy of Neuropsychology Annual Conference, Las Vegas, NV          3 CE Units |
| November 11, 1997   | Pediatric Head Trauma: Integrating Research with Clinical Data. Workshop presented by Eileen Fennell, Ph.D. at the National Academy of Neuropsychology Annual Conference, Las Vegas, NV          3 CE Units |
| November 8, 1996    | Autism: Diagnosis, Treatment and Current Issues. Presented by Texas Education Agency |
| October 31, 1996    | Diagnosis and Treatment in Mild Head Injury. Workshop presented by Wiley Mittenberg, Ph.D. and Lori Miller, Ph.D. at the National Academy of Neuropsychology Annual Conference, New Orleans, LA          3 CE Units |
| April 11, 1995      | He did it because he wanted to.... Workshop presented by Joan McCord at the Nebraska Symposium of Motivation, Lincoln, NE April 11, 1995. Perspectives on the heterogeneity of antisocial behavior. Workshop presented by Michael Rutter at the Nebraska Symposium of Motivation, Lincoln, NE. |
| November 4, 1995    | Behavioral, developmental and emotional problems in the school setting. Workshop presentation by Sam Goldstein at the National Academy of Neuropsychology Annual Conference, San Francisco, CA          3 CE Units |
| November 2, 1995    | Psychosocial consequences of traumatic brain injury. Workshop presented by Murial Lezak, Ph.D. at the National Academy of Neuropsychology Annual Conference, San Francisco, CA          3 CE Units |
| August 25, 1995     | Assessment and Intervention Planning with the Behavior Assessment System for Children (BASC). Workshop presented by Randy Kamphaus, Ph.D., Omaha, NE |
| November 1994       | Practical Approaches to Puzzling Problems in Clinical Neuropsychology Using the Halstead-Reitan Neuropsychological Test Battery. Full-day workshop presented by Ralph Reitan, Ph.D. and Deborah Wolfson, Ph.D. at the National |

Academy of Neuropsychology Annual Conference, Orlando, FL
3 CE Units

November 1994    Neurobehavioral Characteristics of Diffuse Damage in Brain Disease. Workshop
presented by Muriel Lezak, Ph.D. at the National Academy of Neuropsychology
Annual Conference, Orlando, FL        3 CE Units

November 1993    Forensic Aspects of Minor TBI in Children.  Workshop presented by Lawrence
C. Hartlage, Ph.D., at the National Academy of Neuropsychology Annual
Conference, Phoenix, AZ        3 CE Units

November 1993    Life Goes On: Neuropsychological Sequelae of Childhood Diseases Workshop
presented by Greta N. Wilkening, Ph.D., at the National Academy of
Neuropsychology Annual Conference, Phoenix, AZ
3 CE Units

November 1993    Beyond Diagnosis:  Planning Interventions for Children's Neuropsychologically
Based Disorders.  Workshop presented by Cathy Telzrow, Ph.D. at the National
Academy of Neuropsychology Annual Conference, Phoenix, AZ
3 CE Units

April 1993    Play Therapy with Sexually Abused Children (Full-day), Workshop presented by
Family Psychological Consultants.  Byron E. Norton, Ed D, Austin, TX

## PROFESSIONAL EXPERIENCES
## TEACHING

Associate Professor         University of Nevada Las Vegas
2013 – 2018                 Las Vegas, Nevada

Adjunct Faculty             Richland College
Spring 1997                 Richardson, TX
Department of Psychology    Department of Psychology
                            Courses:  Understanding Human Sexuality
                                        Introduction to Psychology

Co-instructor               Texas A&M University
Fall 1994-Spring 1995       Department of Educational Psychology
                            Course:  Consultation: Theory and Techniques
                            Doctoral level course
                            Supervisor:  Jan Hughes, Ph.D.

                            Duties: Responsible for developing role plays, training
                            students through role play activities, supervise students
                            in consultation in the schools

Instructor                  Texas A&M University
Summer, 1994                Dept. of Educational Psychology
                            Course:  Educational Psychology
                            Junior/Senior level course (approximately 75 students)
                            Supervisor:  Patricia Alexander, Ph.D.

Cv: 2/18/2015

Duties: Responsible for all phases of teaching including the preparation and administration of lectures, the selection of reading materials and assignments, the creation of exams, and the assignment of course grade.

Graduate Teaching Assistant
Fall 1993-Spring 1994

Texas A&M University
Dept. of Educational Psychology
Course: Educational Psychology
Junior/Senior level course (approximately 20 students/lab)
Supervisor: Ernie Goetz, Ph.D. Fall, 1993
                    Stephanie Knight, Ph.D. Spring, 1994

Duties: Responsible for the instruction of the lab portion of of the course, working individually with students, grading assignments, and the assignment of course grade.

Director
1985-1987

Tokyo Student Center
Tokyo, Japan.

Duties: Management of English language training program for 320 Japanese students per week including registration, selection of materials, teaching classes, and supervision of other teachers.

Special Education Teacher
1981-1983

Mabank Middle School
Mabank, Texas

Duties: Resource room teacher for grades 6-8 children with mentally retardation, children with learning disabilities, and children who are severely emotionally disturbed.

Substitute Teacher
1974-1981

Tyrone Public Schools
Tyrone, Oklahoma.

Duties: Regular education teacher grades K-12

Band/Kindergarten Teacher
Fall 1975

Adams School District
Adams, OK

Duties: Half-day kindergarten teacher and half day middle school band teacher

Elementary Teacher
1972-1974

Ft. Worth Independent School District
Ft. Worth, TX

Duties: Regular education grades 3 and 4, and music grades 1-5.

## CLINICAL

Private Practice
Oct 1997-Present
Oct 1997-Sept 2000

Psychologist/ Neuropsychologist
Dallas, Texas
The Cornerstone Center, Sherman, Texas

Cv: 2/18/2015

| | |
|---|---|
| Post Doctoral Fellowship<br>In Neuropsychology<br>Aug 1996-July 1997 | UT Southwestern Medical Center<br>Supervisors: C. Munro Cullum, Ph.D., ABPP<br>Cheryl H. Silver, Ph.D. |
| Psychology Intern<br>July 1995-July 1996 | Nebraska Internship Consortium in Professional Psychology<br>Director: Jane Close Conoley, Ph.D.<br><br>Meyer Rehabilitation Center<br>University of Nebraska Medical Center<br>600 South 42nd Street<br>Omaha, NE 68198-5450<br><br>Duties: Neuropsychological assessment, psychological<br>screens for potential transplant patients for the Liver<br>Transplant team, developmental testing for Neonatal Intensive Care<br>Follow-up Clinic, provide psychological services in an<br>inter-disciplinary University Affiliated Program to children<br>and families presenting with behavioral, emotional, physical,<br>educational and cognitive disabilities. |
| Neuropsychology<br>Practicum<br>Jan 1995-May 1995 | Austin Neurological Clinic<br>Austin, TX<br>Supervisors: David R. Steinman, Ph.D., Cecil R. Reynolds, Ph..D.<br>Duties: Child and Adult Neuropsychological Evaluations |
| School Psychology<br>Intern<br>Aug 1994-May 1995 | Bryan Independent School District<br>Bryan, TX<br>Supervisors: Michael J. Ash, Ph.D., Jan Hughes, Ph.D.<br><br>Duties: Teacher consultation, Multidisciplinary Team meetings,<br>LD and ED assessments, individual child therapy. |
| Therapist<br>Aug 1994-May 1995 | Contract with Texas Department of Human Services<br>Texas A&M University<br>College Station, TX<br>Supervisor: Frances Worchel Prevatt<br><br>Duties: Provide group therapy with adolescents regarding<br>the necessary skills to successfully transition into independent<br>living. |
| Diagnostician/<br>Clinician<br>1993-1994 | Counseling and Assessment Clinic<br>Texas A&M University<br>College Station, TX<br>Supervisor: Cecil R. Reynolds<br><br>Duties: Psychoeducational testing |
| Therapist<br>Spring, 1994 | Counseling and Assessment Clinic<br>Texas A&M University<br>College Station, TX<br>Supervisor: Frances Worchel Prevatt |

Cv: 2/18/2015

Duties: Individual and family therapy

Private Practice          Tokyo, Japan
1988-1992

Duties: Specialized in educational evaluations and making
treatment recommendations.

**CONSULTATION**

Educational Diagnostician    Bastrop Independent School District
Spring 1994                  Special Education Services.
                             Bastrop, TX

Educational Diagnostician.   Gonzales Independent School District
Spring 1993                  Special Education Services
                             Gonzales, TX

Educational Consultant       Japan Baptist Mission
1988-1992                    Tokyo, Japan.

Duties: Provide educational diagnostic testing and evaluations;
make recommendations for remediations; prepare educational
budget needs for missionary children in Japan; serve as resource
person for teaching materials, textbooks, teaching aids; help in
selection of home school curriculum; coordinate ordering of home
school materials; maintain a resource library of materials; and
plan/conduct seminars/field trips for parents and home school
students.

Learning Improvement         The American School in Japan
Consultant.                  Tokyo, Japan
1991-1992

Responsibilities: provide faculty with educational profiles on
students with diagnosed learning difficulties; assist faculty by
providing educational modifications to use in the classroom;
monitor the progress of these students; consult with parents
and teachers; serve as a specialist on the child study team.

Editorial Consultant.        "Living in Tokyo"--published in 1988 by Publication Section
Fall, 1988                   Public Relations Division
                             Office of Information
                             Tokyo Metropolitan Government.
                             Tokyo, Japan

**ADMINISTRATIVE ACTIVITIES**

Intern Representative, 1995-1996, Nebraska Internship Consortium in Professional Psychology
Student Volunteer Coordinator, 1995, National Academy of Neuropsychology Program Committee.
Conference Chairman, 1994-1995, Educational Psychology Social Organization (EPSO),
        Texas A&M University
Treasurer, 1994-1995 Texas Student Council for Exceptional Children

Cv: 2/18/2015

**EDITORIAL ACTIVITIES**

Ad Hoc Reviewer (2011 to present) <u>International Journal of Developmental Neuroscience</u>
Ad Hoc Reviewer (2011 to present) <u>The Clinical Neuropsychologist</u>
Editorial Review Board. (2004 to present) <u>Applied Neuropsychology</u>
Editorial Review Board. (1997 to present) <u>Archives of Clinical Neuropsychology</u>.

**PUBLICATIONS**

Thaler, N.S., Terranova, J., Turner, A., Mayfield, J., & Allen, D.N. (20015). A comparison of IQ and memory cluster solutions in moderate to severe pediatric traumatic brain injury. <u>Applied Neuropsychology: Child</u> 4(1), 20-30.

Allen, D.N., Stolberg, P.C., Thaler, N.S., Sutton, G., & Mayfield, Joan (2014). Validity of the RIAS for assessing children with traumatic brain injury: Sensitivity to TIB and comparability to the WISC-III and WISC-IV. <u>Applied Neuropsychology: Child</u> 3 (2), 83-93.

Schiffmann, R., Mayfield, J., Swift, C., & Nestrasil, I. (2013). Quantitative neuroimaging in mucoliposis type IV., <u>Molecular Genetics and Metabolism,</u> http://dx.doi.org/10.1016/j.ymgme.2013.11.007.

Thaler, N.S., Reger, S.L., Ringdahl, E.N., Mayfield, J., Goldstein, G., & Allen, D.N. (2013). Neuropsychological profiles of children with ischemic and hypoxemic anoxic brain injury: Six case reports. <u>Child Neuropsychology</u> 19 (5), 479-494.

Allen, D.N., Thaler, N.S., Ringdahl, E.N., Barney, S., & Mayfield, J. (2012). Comprehensive Trail Making Test performance in children and adolescents with traumatic brain injury. <u>Psychological Assessment</u> 24 (3), 556-564.

Thaler, N.S., Mayfield, J., Reynolds, C.R., Hadland, Cora & Allen, D.N. (2012). Teacher reported behavioral disturbances in children with traumatic brain injury: An examination of the BASC-2. <u>Applied Neuropsychology: Child</u> 1 (1), 30-37.

Thaler, N.S., Allen, D.N., Hart, J.S., Boucher, J.R., McMurray, J.C., & Mayfield, J (2012). Neurocognitive correlates of the Trail Making Test for Older Children in patients with traumatic brain injury. <u>Archives of Clinical Neuropsychology 27</u> (4), 446-452.

Ensign, J., Maricle, D.E., Brown, C., & Mayfield, J. (2012). Psychosocial subtypes on the Behavior Assessment System for Children, Second Edition following pediatric traumatic brain injury. <u>Archives of Clinical Neuropsychology 27</u> (3), 277-292.

Rackley, Christopher, Allen, D.N., Fuhrman, L.J., & Mayfield, J. (2011). Generalizability of WISC-IV index and subtest score profiles in children with traumatic brain injury. <u>Child Neuropsychology,</u> DOI:10.1080/09297049.2011.628308.

Thaler, N.S., Barney, S. J., Reynolds, C.R., Mayfield, J., Allen, D.N. (2011). Differential sensitivity of TOMAL subtests and index scores to pediatric traumatic brain injury. <u>Applied Neuropsychology, 18</u> (3), 168-178.

Thaler, N.S., Bello, D.T., Randall, C., Goldstein, G., Mayfield, J., & Allen, D.N. (2010). IQ profiles are associated with differences in behavioral and emotional functioning following pediatric traumatic brain injury. <u>Archives of Clinical Neuropsychology, 25</u> (8), 781-790.

Brauman Johnson, W.L., Maricle, D.E., Miller, D.C., Allen, D.N., & Mayfield J (2010). Utilization of the Comprehensive Trail Making Test as a Measure of Executive Functioning in Children and Adolescents with Traumatic Brain Injuries. Archives of Clinical Neuropsychology, 25(7), 601-609.

Allen, D.N., Leany, B.D., Thaler, N.S., Cross, C., Sutton, G.P., & Mayfield, J. (2010). Attention and memory profiles in pediatric traumatic brain injury. Archives of Clinical Neuropsychology, 25(7), 618-633.

Thaler, N.S., Allen, D. N., Park, B.S., McMurray, J.C., & Mayfield, J. (2010). Attention processing abnormalities in children with TBI and ADHD: Differential impairment of component processes. Journal of Clinical and Experimental Neuropsychology, iFirst, 1-8.

Thaler, N.S., Allen, D.N., McMurray, J., & Mayfield, J. (2010). Sensitivity of the Test of Memory and Learning to attention and memory deficits in children with ADHD. Clinical Neuropsychologist, 24(20), 246-264.

Allen, D.N., Thaler, N.S., Donohue, B, & Mayfield, J (2010). WISC-IV profiles in children with traumatic brain injury: Similarities and differences to the WISC-III. Psychological Assessment, 22(1), 57-64.

Allen, D.N., Haderlie, M., Kazakov, D., & Mayfield, J. (2009). Construct and criterion validity of the Comprehensive Trail Making Test in children and adolescents with traumatic brain injury. Child Neuropsychology, 15, 543-553.

Park, B.S., Allen, D.N., Barney, S.J., Rindhahl, E.N., & Mayfield, J.W. (2009). Structure of attention in children with traumatic brain injury. Applied Neuropsycholgoy, 16 (1), 1-10.

Bello, D.T., Allen, D.N., & Mayfield, J.W. (2008). Sensitivity of the Children's Category Test Level 2 to brain dysfunction. Archives of Clinical Neuropsychology, 23 (3), 329-339.

Armstrong, C.M., Allen, D.N., Donohue, B., & Mayfield, J.W. (2008). Sensitivity of the comprehensive trail making test to traumatic brain injury in adolescents. Archives of Clinical Neuropsychology, 23 (3), 351-358.

Allen, D.N., Knatz, D.T., & Mayfield, J.W. (2006). Validity of the Children's Category Test-Level 1 in a clinical sample with heterogeneous forms of brain dysfunction. Archives of Clinical Neuropsychology, 21 (7 ), 711-720.

Mayfield, J. W. & Homack, S. (Summer 2005). Behavior considerations associated with traumatic brain injury. Special issue: traumatic brain injury in children and youth: Educational planning to ensure positive student outcomes. Preventing School Failure, 49 (4), 17-22.

Alexander, A. I. & Mayfield, J. W. (2005). Latent factor structure of the Test of Memory and Learning in a pediatric traumatic brain injured sample: Support for a general memory construct. Archives of Clinical Neuropsychology, 20 (5), 587-598.

Warzak, W.J. & Mayfield, J.W. (2005) Practice of child-clinical Neuropsychology: An introduction. Book Review. Journal of Child Neurology, 20(1), 85.

Shafer, M. E., Mayfield, J. W. & McDonald, F. (2005). Alternating hemiplegia of childhood: A study of neuropsychological functioning. Applied Neuropsychology, 12 (1), 49-56.

Lowther, J. L. & Mayfield, J. W. (2004). Memory functioning in children with traumatic brain injuries: A TOMAL validity study. Archives of Clinical Neuropsychology, 19(1), 105-118.

Lowe, P. A., Mayfield, J. W. & Reynolds, C. R. (2003).Gender differences in memory test performance among children and adolescents. Archives of Clinical Neuropsychology, 18(8), 865-878.

Kuhn, B. R., Mayfield, J. W., & Kuhn, R. H. (Summer 1999). Clinical assessment of child and adolescent sleep disturbance. Journal of Counseling and Development, 77(3), 359-368.

Mayfield, J. W. & Reynolds, C. R. (1998). Are ethnic differences in diagnosis of childhood psychopathology an artifact of psychometric methods? An experimental evaluation of Harrington's hypothesis using parent reported symptomatology. Journal of School Psychology, 36(3), 1-22.

Saine, K.C., Mayfield, J.W., Martin, K., Cullum, C.M., & Weiner, M.F. (1998). Effects of Aricept (donepezil) on cognitive and functional living skills in Alzheimer's disease. Journal of the International Neuropsychological Society, 4, 32.

Saine, K.C., Mayfield, J.W., Martin, K., Cullum, C.M., & Weiner, M.F. (1998). Validity of the Functional Living Scale in a sample of Alzheimer's patients. Archives of Clinical Neuropsychology, 13(1), 45

Mayfield, J. W. & Reynolds, C. R. (1997). Black-white differences in memory test performance among children and adolescents. Archives of Clinical Neuropsychology, 12(2),111-122.

**Educational Material**

Mayfield, J. W., & Murphy, P. K. (1994). Educational psychology: Lab manual for students. Texas A&M University: College Station, TX.

Mayfield, J. W., & Murphy, P. K. (1994). Educational psychology: Lab manual for instructors. Texas A&M University: College Station, TX.

**BOOKS**

Thaler, N.S., Allen, D.N., Reyhnolds, C.R. & Mayfield, J.W. (2013). Identifying neurodevelopmental stages of memory from childhood through adolescence with cluster analysis. In D.N. Allen & G. Goldstein (Eds). Cluster Analysis in Neuropsychological Research. New York: Springer.

Allen, D.N., Thaler, N.S., Cross, C.L.& Mayfield J.W. (2013). Classification of traumatic brain injury severity: A neuropsychological approach. In D.N. Allen & G. Goldstein (Eds). Cluster Analysis in Neuropsychological Research. New York: Springer.

Reynolds, C.R. & Mayfield, J.W. (2011). Neuropsychological assessment in genetically linked neurodevelopmental disorders. In S. Goldstein and C. R. Reynolds (Eds). Handbook of Neurodevelopmental and Genetic Disorders in Children 2nd Edition. New York: Guilford Press.

Mayfield, J.W., Pederson, L., McDonald, F. (2009). Neuropsychology and coma management. In C. R. Reynolds, and E. Fletcher-Janzen (Eds). Handbook of Clinical Child Neuropsychology 3rd Edition.

Reynolds, C. R. & Mayfield, J. W. (2009). Neuropsychological assessments. In T. B. Gutkin & C. R. Reynolds (Eds). The Handbook of School Psychology 4th Edition. New York: John Wiley & Sons.

Cv: 2/18/2015

1683

Reynolds, C. R. & Mayfield, J. W. (2005). Neuropsychological assessment in genetically linked neurodevelopmental disorders. In C. R. Reynolds & S. Goldstein (Eds.), Handbook of neurodevelopmental and genetic disorders in adults. New York: Guilford Press.

Mayfield, J. W. (2003). Contributing editor. In E. Fletcher-Janzens & C.R. Reynolds (Eds.), Childhood Disorders Diagnostic Desk Reference. New York: John Wiley & Sons.

Lowe, P. A. & Mayfield, J. W. (2000). Scott craniodigital syndrome with mental retardation. In C. R. Reynolds & E. Fletcher-Jansen (Eds.), Encyclopedia of special education (2nd ed., vol. 3, p.1602). New York: John Wiley & Sons.

Lowe, P. A. & Mayfield, J. W. (2000). Singleton-Merton syndrome. In C. R. Reynolds & E. Fletcher-Jansen (Eds.), Encyclopedia of special education (2nd ed., vol. 3, p.1652). New York: John Wiley & Sons.

Lowe, P. A. & Mayfield, J. W. (2000). Yunis-Varon syndrome. In C. R. Reynolds & E. Fletcher-Jansen (Eds.), Encyclopedia of special education (2nd ed., vol. 3, pp. 1645-1646). New York: John Wiley & Sons.

Reynolds, C. R. & Mayfield, J. W. (1999). Neuropsychological assessment in genetically linked neurodevelopmental disorders. In Goldstein, S & C. Reynolds (Ed.), Handbook of neurodevelopmental and genetic disorders in children (pp. 9-37). New York: Guilford.

Warzak, W. J., Mayfield, J. W., & McAllister, J. L. (1998). Central nervous system dysfunction: Brain injury, post-concussive syndrome, and seizure disorder. In T.S. Watson & F. M. Gresham (Eds.), Handbook of child behavior therapy (pp. 287-309). New York: Plenum Press.

Young, M. & Mayfield, J. W. (1998). Cornelia DeLange. In L. Phelps (Ed.), Health-related disorders in children and adolescents: A guidebook for understanding and educating (pp.179-184). Washington, DC: APA.

## ABSTRACTS

Mayfield, A., Reyes, A., Mayfield, J., & Allen, D. (2014). Improvements in executive function following traumatic brain injury in children. Archives of Clinical Neuropsychology 29 (6), 590 doi:10.1093/arclin/acu038.225

Parke, E., Call, E., Allen, D., & Mayfield, J. (2014). Social cognition in adolescents with traumatic brain injury. Archives of Clinical Neuropsychology 29 (6), 586 doi:10.1093/arclin/acu038.216

Vertinski, M., Allen, D., Farcello, C., & Mayfield, J. (2014). Factor Structure of the CPT-II in Pediatric Populations. Archives of Clinical Neuropsychology 29 (6), 570-571 doi:10.1093/arclin/acu038.179

Stolberg, P., Hart, J., Jones, W., Mayfield, J., & Allen D. (2012). Executive function predicts academic achievement in children with brain injuries. Archives of Clinical Neuropsychology 27 (6), 672.

Turner, A., Thaler, N.S., Ringhadl, E.N., Mayfield, J., & Allen, D.N. (2011). Discrete executive functional outcome in children with acquired brain disorders. Applied Neuropsychology 18 (3), 234-235.

Hart, J.S., Ringhadl, E.N., Thaler, N.S., Mayfield, J., & Allen, D.N. (2011). Criterion validity of the Comprehensive Trail-Making Test for traumatic brain injury. Applied Neuropsychology 18 (3), 234.

Boucher, J.R., Barney, S.J., Mayfield, J., & Allen, D.N. (2011). Trail-Making Tests: comparing versions in children with TBI. Applied Neuropsychology 18 (3), 233-234.

Terranova, J., Barney, S.J., Mayfield, J., & Allen, D.N. (2011). Construct validity of the Comprehensive Trail-Making Test in children with traumatic brain injury. Applied Neuropsychology 18 (3), 232-233.

Sutton, G.P., Allen, D.N., Strolberg, P.C., Thaler, N.S., & Mayfield, J. (2011). Comparability of IQ scores produced by different measures of intelligence in children with traumatic brain injury. Applied Neuropsychology 18 (3), 232.

Safko, E., Thaler, N.S., Terranova, J., Mayfield, J., & Allen, D. (2011). Cognitive and behavioral differences among ADHD subtypes. Applied Neuropsychology 18 (3), 231-232.

Stolberg, P., Hart, J., Jones, W., Mayfield, J., & Allen, D. (2011). Associations between executive functions and academic achievement in Children with traumatic brain injury (TBI). Archives of Clinical Neuropsychology, 26 (6), 521.

Sutton, G, Ringdahl, E., Thaler, N. Barney, S. Mayfield, J., Pinegar, J., & Allen, D. (2010). Differences in executive function profiles in normal children and those with traumatic brain injury. Archives of Clinical Neuropsychology, 25 (6), 492.

Terranova, J., Kazakov, D., McMurray, J., Mayfield, J., & Allen, D (2010). Construct validity of the Wechsler Intellicence Scale for Children – Fourth Edition in pediatric traumatic brain injury. Archives of Clinical Neuropsychology, 25 (6), 492.

Vertinshi, M., Smith, L., Thaler, N., Mayfield, & Allen, D. (2010). Criterion Validity of the Test of Memory and Learning (TOMAL) in pediatric TBI. Archives of Clinical Neuropsychology, 25 (6), 525.

Thaler, N., Lechuga, D., Cross, C., Salinas, C., Reynolds, C., Mayfield, J. & Allen, D. (2010). Memory profile patterns across developing youth: An examination of the Test of Memory and Learning. Archives of Clinical Neuropsychology, 25 (6), 550.

Barney, S., Allen, D., Stolberg, P., & Mayfield, J. (2010). Construct validity of Reynolds Intellectual Assessment Scales (RIAS) in brain-injured children. Archives of Clinical Neuropsychology, 25 (6), 528.

Stolberg, P., Thayer, S.P., Mayfield, J., Jones, W., & Allen, D. (2010). Achievement test profiles in children with traumatic brain injury. Archives of Clinical Neuropsychology, 25 (6), 491.

Neblina, C., Terranova, J., Mayfield, J., & Allen, D.N. (2010). Longitudinal stability of neurocognitive profiles in children with traumatic brain injury. Applied Neuropsychology, 17 (3), 212-213.

Barney, S.J., Pinegar, J., Thaler, N.S., McMurray, J.C., Mayfield, J., Allen, D.N. (2010). Differential impairment of attention component processes in children with TBI and ADHD. Applied Neuropsychology, 17 (3), 213-21.

Thaler, N.S., Terranova, J., Reynolds, C.R., Mayfield, J., & Allen, D.N. (2010). Behavioral disturbances in children with traumatic brain injury: teacher reports using the BASC-2. Applied Neuropsychology, 17 (3), 214.

Ringhadl, E.N., Thaler, N.S., Sanders, L.J., Mayfield, J., & Allen, D.N. (2010). Neuropsychological profiles of children with acquired anoxic brain injury: six case studies. Applied Neuropsychology, 17 (3), 219.

Stolberg, P., Jones, P., Mayfield, J., Allen, D.N. (2010). Pattern of Achievement in test performance of children following a traumatic brain injury. Applied Neuropsychology, 17 (3), 220-221.

Ringdahl, E. N., Thaler, N.S., Hodges, T. D., Mayfield, J., & Allen, D. N. (2009). WISC-IV GAI and CPI profile patterns in children with TBI. Archives of Clinical Neuropsychology, 24 (5), 478.

Barney, S. J., Thaler, N. S., Allen, D. N., Donohue, B., & Mayfield, J. (2009). Similarities and differences to the WISC-III. Archives of Clinical Neuropsychology, 24 (5), 475.

Kazakov, D., Haderlie, M. H., Terranova, J., Jones, P., Allen, D. N., & Mayfield, J. (2009). Factor structure of the Comprehensive Trail Making Testing in pediatric TBI. Archives of Clinical Neuropsychology, 24 (5), 479.

Stolberg, P., Terranova, J., Joones, P., Allen, D. N., & Mayfield, J. (2009). Performance on the Woodcock-Johnson Test of Achievement of Individuals with Traumatic Brain Injury. Archives of Clinical Neuropsychology, 24 (5), 476.

Kazakov, D., Duke, L.A., Field, R. B., Allen, D. N., & Mayfield, J. (2009). Verbal comprehension and perceptual reasoning deficits predict learning and memory impairment in children with TBI. Archives of Clinical Neuropsychology, 24 (5), 474-475.

Sutton, GP, Bello, DT, Mayfield, J, & Allen, DN. (2008). Criterion and construct validity of the DTVMI in children with brain injury. Archives of Clinical Neuropsychology, 23 (6), 643-644.

Knatz-Bello DT, Allen DN, Mayfield J (2007). Behavioral profiles of WISC-III cluster subtypes in pediatric traumatic brain injury. Archives of Clinical Neuropsychology, 22 (7), 805.

Shafer, M., Neumann, C.S., Mayfield, J.W., & Koch, S. (2007). Cluster analysis of the WISC-III factor index for children with TBI. Archives of Clinical Neuropsychology, 22 (7), 835

Randall C, Knatz-Bello DT, Allen DN, Mayfield J (2007). Attention and memory as predictors of behavioral functioning in pediatric traumatic brain injury. Archives of Clinical Neuropsychology, 22 (7), 837.

Leany B, Allen DN, Mayfield, J (2006). Further support for the validity of the Test of Memory and Learning (TOMAL) in children with tramatic brain injury and attention-deficit/hyperactivity disorder (Abstract). Archives of Clinical Neuropsychology, 21, (6), 533-537.

Randall C, Mayfield J, Strauss GP, Allen DN (2006). Sensitivity of behavioral ratings for brain dysfunction in children. Applied Neuropsychology, 13, 190-193.

Kantz, D.T., Allen, D.N., Mayfield, J.W. (2006). Sensitivity of the children's category test level 2 to brain damage. Archives of Clinical Neuropsychology, 21(6), 571.

Morrison, J.R., Mayfield, J.W., Lowther, J.L., Miller D.C., Bentz, B.B. (2006). Discriminate function analysis using the test of memory and learning: Comparisons between groups of TBI, ADHD, and control youth. Archives of Clinical Neuropsychology, 21(6), 535.

Leany, B.D., Allen D.N., Mayfield, J. W. (2006). Further support for the validity of the test of memory and learning (TOMAL) in children with traumatic brain injury and attention-deficit/hyperactivity disorder. Archives of Clinical Neuropsychology, 21(6), 533-534.

Knatz, D.T., Mayfield, J., Allen, D.N. (2005). Confirmatory factor analysis of the Children's Category Test Level 1. Archives of Clinical Neuropsychology, 20(7), 822.

Strauss, G.P., Mayfield, J, Caron, J, Allen, D.N. (2005). Behavioral differences among neuropsychological profiles of severe pediatric brain injury. Archives of Clinical Neuropsychology, 20(7), 872.

Park, B.S., Allen, D.N., Mayfield, J, Knatz, D.T. (2005). Recovery of memory function following traumatic brain injury in children. Archives of Clinical Neuropsychology, 20(7), 869.

Armstrong, C.M., Mayfield, J, Allen, D.N. (2005). Sensitivity of the Comprehensive Trail Making Test to brain injury in adolescents. Archives of Clinical Neuropsychology, 20(7), 834.

Park, B.S., Strauss, G.P., Mayfield, J, Caron, J, Allen, D.N. (2005). Teacher and parent intentional ratings are unrelated to neuropsychological measures of attention in pediatric brain injury. Archives of Clinical Neuropsychology, 20(7), 872.

Leany, B, Knatz, D.T., Allen, D.N., Mayfield, J (2005). Improvement of abstraction abilities following brain injury in children. Archives of Clinical Neuropsychology, 20(7), 868.

Newman, C. S., Shafer, M.E., Mayfield, J. W. (2003). Examining the factor structure of the Wechsler Intelligence Scale for Children—Third Edition: confirmatory factor analysis with a group of children with traumatic brain injuries. Archives of Clinical Neuropsychology, 18(7), 776.

Shafer, M. E., Mayfield, J.W., & McDonald, F. (2003). Alternating hemiplegia of childhood: a review of neuropsychological functioning. Archives of Clinical Neuropsychology, 18(7), 731-732.

Mayfield, J. W., & Reynolds, C. R. (1999). Are there differences in memory test performance among children and adolescents? Archives of Clinical Neuropsychology, 14(1), 86.

Saine, K., Mayfield, J. W., Martin, K., Cullum, C. M., & Weiner, M. F. (1998). Effects of Aricept (Donepezil) on cognitive and functional living skills in Alzheimer's disease. Journal of International Neuropsychological Society, 4(1), 32.

Barringer, M., Mayfield, J. W., & Reynolds, C. R. (1998). Performance of normal elderly on a verbal measure of set-shifting and executive function controlling gender and educational level. Archives of Clinical Neuropsychology, 13(1), 95-96.

Saine, K., Mayfield, J. W., Martin, K., Cullum, C. M., & Weiner, M. (1998). Validity of the functional living scale in a sample of alzheimer's patients. Archives of Clinical Neuropsychology, 13(1), 45.

Mayfield, J. W., Warzak, W. J., & McAllister, J. (1997). A case of Bruton's agammaglobulinemia with dementia. Archives of Clinical Neuropsychology, 12(4), 364-365.

Mayfield, J. W. & Reynolds, C. R. (1996). Black-white differences in memory test performance among children and adolescents. Archives of Clinical Neuropsychology, 11(422-423).

Reynolds, C. R., James, B. J., & Mayfield, J. W. (1995). Baseline performance of normal elderly on a verbal measurement of set-shifting and executive function. Archives of Clinical Neuropsychology, 10(4), 383.

## RESEARCH PROJECTS

| | |
|---|---|
| 2009-Present | Development of a Data Base to measure the efficiency of a cognitive day neuro rehabilitation program for children ages 5-18. |
| 1999-Present | Developing Data Base for testing of children with traumatic brain injury, ages 5-18 Currently have approximately 760 subjects with over 200 variables entered. |
| 1995-1996 | Research Assistant to Dr. William J. Warzak on 2 projects-- 1) Primary Nocturnal Enuresis Project--to determine how treating PNE affects psychosocial functioning in children  2) trends in neuropsychology training opportunities for school psychologists, including trends in psychology journals. |
| 1994-1996 | Research Assistant to Dr. Cecil R. Reynolds on 2 projects: 1) development of a standard clinical assessment of memory in the elderly (with Erin Bigler); 2) life-span development (and decline) of executive functions for ages 8 years to 90 years. |
| 1994-1995 | Research Assistant, Co-instructor, and Field Supervisor working with Dr. Jan Hughes on a federally funded grant. This grant, sponsored by the US Department of Education, supports activities necessary to develop and evaluate a model of conjoint, ecosystemic consultation. |

## PROFESSIONAL WORKSHOPS

Mayfield, J.W. (June 26, 2012). Behavior Management for Pediatric TBI Patients. Presented to the PM&R Residents at Baylor University Medical Center, Dallas, Texas.

Mayfield, J.W. (June 16, 2012). A Child's Journey to Recovery: School Reentry. Presented at the28th Annual Statewide Conferences of the Brain Injury Association of Texas, Austin, Texas.

Mayfield, J.W. (March 29, 2012). Neuropsychological Evaluation: Medical Model vs. School Model. Presented Social Workers and Case Managers at Our Children's House at Baylor, Dallas, Texas.

Mayfield, J.W. (January 25, 2012). School Re-Entry following a Traumatic Brain Injury. Presented to the PM&R Residents at Children Medical Center, Dallas, Texas.

Mayfield, J.W. (July 12, 2007). From Coma to the Classroom. Presented at the Second National School Neuropsychology Conference, Grapevine, Texas.

Cv: 2/18/2015

1688

Allen, D. N., Mayfield, J. W., & Strauss, G. P. (August 11, 2006). Neuropsychological subtypes of childhood traumatic brain injury. Presented APA, New Orleans, Louisiana.

Mayfield, J.W. (September 23, 2005). Traumatic Brain Injury and its Effects on the Behavior of Children and Youth. Presented at the Sixth International Conference on Children and Youth with Behavioral Disorders, Dallas, TX

Mayfield, J. W. (May 13, 2005). Pediatric Traumatic Brain Injury. Presented to the Lewisville Independent School District Psychological Staff. Lewisville, TX

Mayfield, J. W. (July 23, 2003). Coma—Administration and Scoring of the Rappaport Coma/Near Coma Scale. Presented to the staff of Our Children's House at Baylor, Dallas. TX

Mayfield, J. W., Croom, J, Poskey, G, McCann, J. (September 14, 2001). Innovative Team Approaches in Pediatric TBI. Presented at the 2001 Pediatric Medical Symposium. Tulsa, OK.

Mayfield, J. W. (Summer 2001). Pediatric Traumatic Brain Injury. Presented as part of a seminar on Traumatic Brain Injury: Educational Implications, EDSP 5800, at University of North Texas, Programs in Special Education.

Mayfield, J. W. (December 1, 2000). Pediatric Traumatic Brain Injury; Educational strategies to help families. Presented at the 2000 Pediatric Forum: Care of the Child with Neuro-Muscular Disorders, Temple, TX.

Goldstein, G., Reynolds, C. R., McCaffrey, R. J. & Mayfield, J. W. (November 18, 2000). Clinical Neuropsychology: What is our current status and do we have a future? Town Hall Meeting. Presented at the Coalition of Clinical Practitioners in Neuropsychology First Annual Meeting, Orlando, FL.

Mayfield, J. W. (October 21, 2000). Pediatric traumatic brain injury. Presented by Pro-Med: From Hospital to Home—The Pediatric Comprised Patient, Dallas, TX.

Mayfield, J. W. (June 28, 1996). Traumatic brain injury: Helping families with educational strategies. Presented at the Summer Institute for Support Personnel: Serving Student with Traumatic Brain Injury. University of Northern Colorado, Greeley, CO.

Mayfield, J. W. (April 25, 1996). An introduction to brain injury: Implications for education. Presented at the Nebraska Department of Education Annual Staff Development Conference, Lincoln, NE.

Kuhn, B. R. & Mayfield, J. W. (March 30 & 31, 1996). Teaching parents general behavior management skills. Presented at a VISINET Workshop, Omaha, NE.

Mayfield, J. W. (March 28, 1996, April 2, 1996). Normal development: Review of general development milestones and coping strategies, screening tools. Presented by Children's Hospital Educational Council, Omaha, NE.

Mayfield, J. W. (Feb. 9, 1996). Developing an effective IEP: Special issues in educating brain injured students. Presented at the Brain Injury Update: Contributions to Educational Planning funded by Nebraska Department of Education.

## PRESENTATIONS

Mayfield, A., Reyes, A., Mayfield, J., & Allen, D. (2014). Improvements in Executive Function Following Traumatic Brain Injury in Children. Poster presented at the 34[rd] Annual Meeting of the National Academy of Neuropsychology, Puerto Rico.

Parke, E., Call, E., Allen, D., & Mayfield, J. (2014). Social Cognition in Adolescents with Traumatic Brain Injury. Poster presented at the 34[rd] Annual Meeting of the National Academy of Neuropsychology, Puerto Rico.

Vertinski, M., Allen, D., Farcello, C., & Mayfield, J. (2014). Factor Structure of the CPT-II in Pediatric Populations. Poster presented at the 34[rd] Annual Meeting of the National Academy of Neuropsychology, Puerto Rico.

Vertinski, M., Allen D., & Mayfield, J. (2013). Factor structure of the CPT-II in a pediatric TBI sample. Poster presented at the 33rd Annual Meeting of the National Academy of Neuropsychology, San Diego, CA.

Stolberg, P., Hart, J., Jones, W., Mayfield, J., & Allen D. (2012). Executive function predicts academic achievement in children with brain injuries. Poster presented at the 32nd Annual Meeting of the National Academy of Neuropsychology, Nashville, TN.

Stolberg, P., Hart, J., Jones, W., Mayfield, J., & Allen, D. (2011). Associations between executive functions and academic achievement in Children with traumatic brain injury (TBI). Poster presented at the 31st Annual Meeting of the National Academy of Neuropsychology, Marco Island, FL.

Safko, E., Thaler, N.S., Terranova, J., Mayfield, J., & Allen, D.N. (2011). Cognitive and behavioral differences among ADHD subtypes. Poster presented at the American College of Professional Neuropsychology Annual Meeting, Las Vegas, NE.

Sutton, G.P., Allen, D.N., Stolberg, P.C., Thaler, N.S. & Mayfield, J. (2011) Comparability of IQ scores produced by different measures of intelligence in children with traumatic brain injury. Poster presented at the American College of Professional Neuropsychology Annual Meeting, Las Vegas, NE.

Terranova, J., Barney, S.J., Mayfield, J., & Allen, D.N. (2011). Construct validity of the Comprehensive Trail Making Test in children with traumatic brain injury. Poster presented at the American College of Professional Neuropsychology Annual Meeting, Las Vegas, NE.

Boucher, J.R., Barney, S.J., Mayfield, J., & Allen, D.N. (2011). Trail making tests: Comparing versions in children with TBI. Poster presented at the American College of Professional Neuropsychology Annual Meeting, Las Vegas, NE.

Hart, J.S., Thaler, N.S., Mayfield, J., & Allen, D.N. (2011). Criterion validity of the Comprehensive Trail Making Test for traumatic brain injury. Poster presented at the American College of Professional Neuropsychology Annual Meeting, Las Vegas, NE.

Turner, A., Thaler, N.S., Ringdahl, E.N., Mayfield, J., Allen, D.N. (2011). Discrete executive functions differentially predict functional outcome in children with acquired brain disorders. Poster presented at the American College of Professional Neuropsychology Annual Meeting, Las Vegas, NE.

Reger, S.L., Thaler, N.S., Mayfield, J., & Allen, D.N. (2011). Constructs mediating Trail Making Test performance in pediatric traumatic brain injury. Poster presented at the American College of Professional Neuropsychology Annual Meeting, Las Vegas, NE.

Vertinski, M., Terranova, J., Mayfield, J., & Allen, D.N.(2011). Factor structure of the Conner's Continuous Performance Test-II in children with traumatic brain injury. Poster presented at the American College of Professional Neuropsychology Annual Meeting, Las Vegas, NE.

Thaler, N.S., Mayfield, J., Allen, D.N. (2011). Factor structure of the Comprehensive Trail Making Test in children with traumatic brain injury. Poster presented at the American College of Professional Neuropsychology Annual Meeting, Las Vegas, NE.

Stolberg, P.C., Allen, D.N., Sutton, G.P., Thaler, N.S. & Mayfield, J. (2011) Validity of the Reynolds Intellectual Assessment Scales (RIAS) for assessment of children with traumatic brain injury. Poster presented at the American College of Professional Neuropsychology Annual Meeting, Las Vegas, NE.

Sutton, G, Ringdahl, E., Thaler, N. Barney, S. Mayfield, J., Pinegar, J., & Allen, D. (2010). Differences in executive function profiles in normal children and those with traumatic brain injury. Poster presented at the National Academy of Neuropsychology 30th Annual Conference, Vancouver, British Columbia.

Terranova, J., Kazakov, D., McMurray, J., Mayfield, J., & Allen, D (2010). Construct validity of the Wechsler Intellicence Scale for Children – Fourth Edition in pediatric traumatic brain injury. Poster presented at the National Academy of Neuropsychology 30th Annual Conference, Vancouver, British Columbia.

Vertinshi, M., Smith, L., Thaler, N., Mayfield, & Allen, D. (2010). Criterion Validity of the Test of Memory and Learning (TOMAL) in pediatric TBI. Poster presented at the National Academy of Neuropsychology 30th Annual Conference, Vancouver, British Columbia.

Thaler, N., Lechuga, D., Cross, C., Salinas, C., Reynolds, C., Mayfield, J. & Allen, D. (2010). Memory profile patterns across developing youth: An examination of the Test of Memory and Learning. Poster presented at the National Academy of Neuropsychology 30th Annual Conference, Vancouver, British Columbia.

Barney, S., Allen, D., Stolberg, P., & Mayfield, J. (2010). Construct validity of Reynolds Intellectual Assessment Scales (RIAS) in brain-injured children. Poster presented at the National Academy of Neuropsychology 30th Annual Conference, Vancouver, British Columbia.

Stolberg, P., Thayer, S.P., Mayfield, J., Jones, W., & Allen, D. (2010). Achievement test profiles in children with traumatic brain injury. Poster presented at the National Academy of Neuropsychology 30th Annual Conference, Vancouver, British Columbia.

Stolberg, P., Jones, P., Mayfield, J., & Allen, D. N. (2010). Pattern of achievement test performance of children following a traumatic brain injury. American College of Professional Neuropsychology Annual Meeting, Las Vegas, NE.

Sutton G., Thaler, N. S., Garcia, A. E., Mayfield, J., & Allen, D. N. (2010). Memory and attention profiles in pediatric traumatic brain injury. Poster presented at the American College of Professional Neuropsychology Annual Meeting, Las Vegas, NE.

Thaler, N. S., Terranova, J., Reynolds, C. R., Mayfield, J., & Allen, D. N. (2010). Behavioral disturbances in children with traumatic brain injury: Teacher reports using the BASC-2. Poster presented at the American College of Professional Neuropsychology Annual Meeting, Las Vegas, NE.

Ringhdal, E. N., Thaler, N. S., Sanders, L. J., Mayfield, J., & Allen DN (2010). Neuropsychological Profiles of Children with Acquired Anoxic Brain Injury: Six Case Studies. Poster presented at the American College of Professional Neuropsychology Annual Meeting, Las Vegas, NE.

Barney, S. J., Pinegar, J., Thaler, N. S., McMurray, J. C., Mayfield, J., & Allen, D. N. (2010). Differential impairment of attention component processes in Children with TBI and ADHD. Poster presented at the American College of Professional Neuropsychology Annual Meeting, Las Vegas, NE.

Neblina, C., Allen, D. N., & Mayfield, J. (2010). Longitudinal stability of neurocognitive profiles in children with traumatic brain injury. Poster presented at the American College of Professional Neuropsychology Annual Meeting, Las Vegas, NE.

Neblina, C., Thaler, N.S., Snaders, L. J., McMurray, J.C., Mayfield, J., & Allen, D. N. (2009). TOMAL Factor Structure of children with ADHD compared to controls. Poster presented at the National Academy of Neuropsychology 29th Annual Conference, New Orleans, LA.

Barney, S. J., Thaler, N. S., Allen, D. N., Donohue, B., & Mayfield, J. (2009). Similarities and differences to the WISC-III. Poster presented at the National Academy of Neuropsychology 29th Annual Conference, New Orleans, LA.

Kazakov, D., Haderlie, M. H., Terranova, J., Jones, P., Allen, D. N., & Mayfield, J. (2009). Factor structure of the Comprehensive Trail Making Testing in pediatric TBI. Poster to be presented at the National Academy of Neuropsychology 29th Annual Conference, New Orleans, LA.

Stolberg, P., Terranova, J., Joones, P., Allen, D. N., & Mayfield, J. (2009). Performance on the Woodcock-Johnson Test of Achievement of Individuals with Traumatic Brain Injury. Poster to be presented at the National Academy of Neuropsychology 29th Annual Conference, New Orleans, LA.

Kazakov, D., Duke, L.A., Field, R. B., Allen, D. N., & Mayfield, J. (2009). Verbal comprehension and perceptual reasoning deficits predict learning and memory impairment in children with TBI. Poster to be presented at the National Academy of Neuropsychology 29th Annual Conference, New Orleans, LA.

Kazakov, D., Allen, D. N., Haderlie, M., Barney, S., & Mayfield, J. (2009). Construct validity of the Comprehensive Trail Making Test. Poster presented at the American Psychological Association Annual Convention, Atlanta, Georgia.

Sutton, G.P., Bello, D.T., Mayfield, J, & Allen, D.N. (2008). Criterion and construct validity of the DTVMI in children with brain injury. Poster presented at the National Academy of Neuropsychology 28th Annual Conference, October 22-25, New York City, NY.

Shafer, M., Neumann, C.S., Mayfield, J.W., & Koch, S. (2007). Cluster analysis of the WISC-III factor index for children with TBI. Poster presented at the National Academy of Neuropsychology 27th Annual Conference, November 14–17, Scottsdale, AZ.

Randall, C., Knatz-Bello, D.T., Allen, D.N., & Mayfield, J. (2007). Attention and memory as predictors of behavioral functioning in pediatric traumatic brain injury. Poster presented at the National Academy of Neuropsychology 27th Annual Conference, November 14-17, Scottsdale, AZ.

Knatz-Bello, D.T., Allen, D.N., Mayfield, J. (2007). Behavioral profiles of WISC-III cluster subtypes in pediatric traumatic brain injury (Abstract). Poster presented at the National Academy of Neuropsychology 27th Annual Conference, November 14-17, Scottsdale, AZ.

Timko, C.J., Kamalani, L., Mayfield, J., Allen, D.N. (2007). Using TOMAL to examine sensitivity of memory and learning in children affected with anoxia. Poster presented at the Western Psychological Association 87th Annual Convention, May 3-6, Vancouver, BC, Canada.

Pace, S.A., Barnes, L.M., Mayfield, J., Allen, D.N. (2007). Using TOMAL to assess Autism Spectrum Disorder in children. Poster presented at the Western Psychological Association 87th Annual Convention, May 3-6, Vancouver, BC, Canada.

Barney, S.J., Jetha, S.S., Mayfield, J., Allen, D.N. (2007).The results of memeory and learning from TOMAL index with ADHD children. Poster presented at the Western Psychological Association 87th Annual Convention, May 3-6, Vancouver, BC, Canada.

Hoyt, T.E., Mayfield, J., Allen, D.N. (2007). The Test of Memory and Learning examining memory and learning in TBI. Poster presented at the Western Psychological Association 87th Annual Convention, May 3-6, Vancouver, BC, Canada.

Allen, D.N., Mayfield, J., Strauss, G.P. (2006). Neuropsychological subtypes of childhood traumatic brain injury. Poster presented at the American Psychological Association, August 10-13, New Orleans, LA.

Kantz, D.T., Allen, D.N., Mayfield, J.W. (2006). Sensitivity of the children's category test level 2 to brain damage. Poster presented at the 26th Annual Conference of the National Academy of Neuropsychology, October 25-28, San Antonio, Texas.

Morrison, J.R., Mayfield, J.W., Lowther, J.L., Miller D.C., Bentz, B.B. (2006). Discriminate function analysis using the test of memory and learning: Comparisons between groups of TBI, ADHD, and control youth. Poster presented at the 26th Annual Conference of the National Academy of Neuropsychology, October 25-28, San Antonio, Texas.

Leany, B.D., Allen D.N., Mayfield, J. W. (2006). Further support for the validity of the test of memory and learning (TOMAL) in children with traumatic brain injury and attention-deficit/ hyperactivity disorder. Poster presented at the 26th Annual Conference of the National Academy of Neuropsychology, October 25-28, San Antonio, Texas.

Randall, C., Mayfield, J.W., Strauss, G.P., Allen, D.N. (2006). Sensitivity of behavioral ratings for brain dysfunction in ADHD. Poster presented at the Annual Meeting of the Coalition of Clinical Practitioners in Neuropsychology, January 20-22, Las Vegas, Nevada.

Leany, B., Mayfield, J.W., Allen, D.N. (2006). Sensitivity of the Test of Memory and Learning (TOMAL) to attention disorders. Poster presented at the Annual Meeting of the Coalition of Clinical Practitioners in Neuropsychology, January 20-22, Las Vegas, Nevada.

Park, B., Leany, B., Mayfield, J.W., Allen, D.N. (2006). Structure of attention in children with traumatic brain injury. Poster presented at the Annual Meeting of the Coalition of Clinical Practitioners in Neuropsychology, January 20-22, Las Vegas, Nevada.

Knatz, D.T., Mayfield, J., Allen, D.N. (2005). Confirmatory factor analysis of the Children's Category Test Level 1. Poster presented at the 25th Annual Conference of the National Academy of Neuropsychology, October 19-22, Tampa, Florida.

Strauss, G.P., Mayfield, J, Caron, J, Allen, D.N. (2005). Behavioral differences among neuropsychological profiles of severe pediatric brain injury. Poster presented at the 25th Annual

Conference of the National Academy of Neuropsychology, October 19-22, Tampa, Florida.

Park, B.S., Allen, D.N., Mayfield, J, Knatz, D.T. (2005). Recovery of memory function following traumatic brain injury in children. Poster presented at the 25th Annual Conference of the National Academy of Neuropsychology, October 19-22, Tampa, Florida.

Armstrong, C.M., Mayfield, J, Allen, D.N. (2005). Sensitivity of the Comprehensive Trail Making Test to brain injury in adolescents. Poster presented at the 25th Annual Conference of the National Academy of Neuropsychology, October 19-22, Tampa, Florida.

Park, B.S., Strauss, G.P., Mayfield, J, Caron, J, Allen, D.N. (2005). Teacher and parent attentional ratings are unrelated to neuropsychological measures of attention in pediatric brain injury. Poster presented at the 25th Annual Conference of the National Academy of Neuropsychology, October 19-22, Tampa, Florida.

Leany, B, Knatz, D.T., Allen, D.N., Mayfield, J (2005). Improvement of abstraction abilities following brain injury in children. Poster presented at the 25th Annual Conference of the National Academy of Neuropsychology, October 19-22, Tampa, Florida.

Alexander, A. & Mayfield, J. (2003). CFA of the test of memory and learning in a TBI sample. Poster presented at the annual meeting of the National Academy of Neuropsychology, Dallas, TX.

Newman, C. S., Shafer, M.E., Mayfield, J. W. (2003). Examining the factor structure of the Wechsler Intelligence Scale for Children—Third Edition: confirmatory factor analysis with a group of children with traumatic brain injuries. Poster presented at the annual meeting of the National Academy of Neuropsychology, Dallas, TX.

Shafer, M. E., Mayfield, J.W., McDonald, F. (2003). Alternating hemiplegia of childhood: a review of neuropsychological functioning. Poster presented at the annual meeting of the National Academy of Neuropsychology, Dallas, TX.

Mayfield, J. W., Lowe, P.A., & Reynolds, C. R. (1998). Are there gender differences in memory test performance among children and adolescents. Poster presented at the annual meeting of the National Academy of Neuropsychology, Washington, DC.

Benton, S. B., Silver, C. H., Navarrete, M. G., & Mayfield, J. W. (1998). Diagnosing learning disabilities in adults: WJ-R versus SATA. Poster presented at the annual meeting of the American Psychological Association, San Franscisco, CA.

Saine, K., Mayfield, J. W., Martin, K., Cullum, C. M., & Weiner, M. F. (1998). Effects of Aricept (Donepezil) on cognitive and functional living skills in Alzheimer's disease. Poster presented at the annual meeting of the International Neuropsychological Society Convention, Honolulu, Hawaii.

Barringer, M., Mayfield, J. W., & Reynolds, C. R. (1997). Performance of normal elderly on a verbal measure of set-shifting and executive function controlling gender and educational level. Poster presented at the annual meeting of the National Academy of Neuropsychology Convention, Las Vegas, NE.

Saine, K., Mayfield, J. W., Martin, K., Cullum, C. M., & Weiner, M. (1997). Validity of the functional living scale in a sample of alzheimer's patients. Poster to be presented at the annual meeting of the National Academy of Neuropsychology Convention, Las Vegas, NE.

Mayfield, J. W., Warzak, W. J., Poler, M., & Ford, L. (1996). Trends in neuropsychological training opportunities for school psychologists. Poster presented at the 104th Annual Convention of the American Psychological Association, Toronto, Canada.

Warzak, W. J., Gimpel, G. A., Mayfield, J. W., Kuhn, B. R. & Zucker, S. (1996). Do children treated with enuresis alarms wake-up or do they learn to sleep through the night? Poster presented at the 22nd Annual Convention of the Association for Behavior Analysis, San Francisco, CA.

Warzak, W. J., Mayfield, J. W., & McAllister, J. (1996). Integrating neuropsychological and behavioral data to develop comprehensive assessment strategies in brain injured individuals. Poster presented at the annual meeting of the Association for Advancement of Behavioral Therapy, San Francisco, CA.

Mayfield, J. W., Warzak, W. J., & McAllister, J. (1996). A case of Bruton's agammaglobulinemia with dementia. Poster presented at the annual meeting of the National Academy of Neuropsychology Convention, New Orleans, LA.

Mayfield, J. W. & Warzak, W. (1996). Trends in neuropsychology training opportunities for school psychologists. Poster presented at the annual meeting of the American Psychological Association, Toronto, Canada.

Warzak, W. J., Gimpel, G., Mayfield, J. W., Kuhn, B. R., & Zucker, S. (1996). Do children treated with enuresis alarms learn to wake-up or do they learn to sleep through the night? Poster presented at the annual meeting of the Association of Behavior Analysis, San Francisco, CA.

Mayfield, J. W. & Reynolds, C. R. (1995). Black-white differences in memory test performance among children and adolescents. Poster presented at the annual meeting of the National Academy of Neuropsychology Convention, San Francisco, CA.

Mayfield, J. W. & Reynolds, C. R. (1995). Factor analytic investigation of ethnic bias on the test of memory and learning (TOMAL). Poster presented at the annual meeting of the National Association of School Psychologists, Chicago, IL.

Mayfield, J. W., Reynolds, C. R., & Barringer, M. (1994). Baseline performance of normal elderly on a verbal measure of set-shifting and executive function. Poster presented at the annual meeting of the National Academy of Neuropsychology Convention, Orlando, Florida.

Mayfield, J. W. (1991, October). We're all in this together. Presented at the American School in Japan Faculty In-Service, Tokyo, Japan.

Mayfield, J. W. (1989, July). Home schooling and preparing for boarding school. Presented at the Japan Baptist Mission, Tokyo, Japan.

Mayfield J. W. (1987-1988, 1992-1993) Living and working in Japan. Numerous presentations to churches, clubs, and schools in Japan, Texas, Oklahoma, & Missouri.

## PROFESSIONAL AFFILIATIONS

American Board of Professional Neuropsychology—Fellow
    Oral Examination Chairman (2007 to 2011)
    Chair of Long Range Planning Committee (2006-2009)

Member at Large (2006-2009, 2011-2012)
American Board of Pediatric Neuropsychology--Diplomate
American Psychological Association—Division 40 Member
Coalition of Clinical Practitioners in Neuropsychology
Chairman (2005)
Co-Chairman (2003-2004)
Member-at-Large
Membership Chairman
National Academy of Neuropsychology—Fellow
Membership Committee—(2005 to 2011)

## PROFESSIONAL HONORS

Distinguished Clinical Neuropsychologist—American Board of Professional Neuropsychology 2008
Nominated for Early Career Award—National Academy of Neuropsychology 2005
Nominated for the DFW Hospital Council Employee of the Year Award--2005
Notable Graduate of the Texas A&M College of Education 1999.
Outstanding Student Research Paper Award, National Academy of Neuropsychology
Annual Convention 1995.
Outstanding Student Research Paper Award, National Academy of Neuropsychology
Annual Convention 1994.
Phi Chi National Honor Society in Psychology, April 1993

## CREDENTIALS AND LICENSES

Diplomate—American Board of Pediatric Neuropsychology, 2006
Diplomate with Added Qualifications in Child and Adolescence—ABN, 2006
Diplomate—American Board of Professional Neuropsychology, 2002
Credentialed Health Service Provider in Psychology #46002—National Register, issued July 2000
Texas License #26888, issued September 1997
Professional Educational Diagnostician--Texas, Life, issued April 1988
Provisional Generic Special Education--Texas, Life, issued January 1983
Provisional Elementary (Grade 1-8)--Texas, Life, issued May 1972

1697

WRIT NO. _____

TRIAL COURT NO. 1361004

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

JUL 17 2015

TIME _____11:22 am_____
BY_____ DEPUTY

EX PARTE

CEDRIC RICKS

IN THE 371ˢᵗ JUDICIAL

DISTRICT COURT

TARRANT COUNTY, TEXAS

### ORDER ON APPLICANT'S EX PARTE FUNDING MOTION FOR EXPERT ASSISTANCE

On ___7 17 15___ , the Court having considered the above and foregoing motion, finds the same is hereby **GRANTED in an amount not to exceed** _10,000_ / **DENIED** in which case Applicant requests that the Court designate in writing its reasons for denying this request as required by Tex. Code Crim. Proc. Ann. art. 11.071 §3 (c).

_____
Judge Presiding

1698

WRIT NO. _____

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

SEP 16 2015

TIME_____**11:32**_____
BY_____**3P**_____ DEPUTY

TRIAL COURT NO. 1361004

EX PARTE

CEDRIC RICKS

IN THE 371st JUDICIAL

DISTRICT COURT

TARRANT COUNTY, TEXAS

## EX PARTE

## FUNDING MOTION FOR EXPERT ASSISTANCE

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the indigent Applicant, by counsel, and pursuant to Tex. Code

Crim. Proc. art. 11.071§3, the 5th, 6th, 8th and 14th Amendments to the United States

Constitution and Sections 10, 13 & 19 of Article I of the Texas Constitution and

other authority cited herein, moves this Court to enter a finding that there is a

reasonable necessity for expert assistance and funding as requested in this motion.

In support thereof, this Applicant would show:

I.

(a) Cedric Ricks was convicted of capital murder and sentenced to death.

Undersigned counsel has been appointed to investigate expeditiously, the factual and

SCANNED

legal grounds for the filing of an application for a writ of habeas corpus pursuant to Art. 11.071 of the Texas Code of Criminal Procedure.

(b) This Court has determined that the Applicant is indigent. His counsel is unable to retain any expert assistance due to Applicant's indigent status.

## II.

The funding that is requested will provide Counsel with essential tools necessary to investigate the legality of Applicant's confinement. Specifically, the claim to be investigated is that Applicant's trial counsel rendered ineffective assistance in the investigation and presentation of mitigating evidence. In order to investigate such a claim, counsel needs a data expert to assist in preparation of an effective mitigation presentation. To this end, Counsel has consulted Amy Nguyen, a Geographic Information Systems (GIS) analyst specializing in capital sentencing mitigation maps. She estimates that the work required for this case would take 50 hours at a rate of $110/hour for a total of $5,500.00. A copy of her curriculum vitae is attached and incorporated.

Applicant is entitled to such expert assistance upon a threshold showing that the assistance sought is relevant to a claim to be investigated and reasonable. Tex. Code Crim. Proc. Ann. art. 11.071 §3(b); cf. Ake v. Oklahoma, 470 U.S. 68 (1985).

WHERFORE PREMISES CONSIDERED, the Applicant respectfully prays that this Court allow the Applicant funds in the amount of $5,500.00 to hire Dr. Any Nguyen

1700

to assist in the preparation of his defense.

Respectfully submitted,

Catherine Clare Bernhard
P.O. Box 2817
Red Oak, Texas 75154
972-617-5548
fax 972-617-5547
cbernhard@sbcglobal.net
State Bar No. 02216575

ATTORNEY FOR APPLICANT

1701

## VERIFICATION

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this date personally appeared Catherine Clare Bernhard, attorney of record in the above-styled and numbered cause, who upon her oath does hereby swear and affirm upon her personal knowledge that all statements of fact contained in the foregoing Motion are in all respects true and correct.

_____
Catherine Clare Bernhard

STATE OF TEXAS

SUBSCRIBED AND SWORN BEFORE ME, the undersigned Notary Public, on this the 17th day of August, 2015.

CLINTON J. STAFFORD
MY COMMISSION EXPIRES
December 5, 2017

_____
Notary Public in and for the
State of Texas.

1702

**AMY BROWN NGUYEN**
**Owner/Analyst - Capital Maps, LLC**
**145 Kilmichael Drive**
**Coppell, TX 75019**
**972-839-7085**
**amy.nguyen@capitalmaps.com**

## EDUCATION

GIS Master's Certification – University of Texas at Dallas – August 2008

B.A. Physical Science - University of Houston - Clear Lake – August 1993

## PREVIOUS EMPLOYMENT

- Pollution Reporting Hotline Coordinator – EPA/Texas Water Commission
- Environmental Education Coordinator – Oglethorpe Power Corporation/Georgia Public Schools
- Researcher – Mapsco, Inc.
- Database Coordinator/FCC Compliance – Time Warner Cable
- Records Coordinator – Dr. Mark D. Cunningham, PhD

## AREAS OF EXPERTISE

| Community Risk Factors | Chaos Maps | Data Acquisition |
|---|---|---|
| Capital Sentencing Mitigation Maps | Crime Mapping | Remote Sensing |
| Demographic Analysis | Gang Mapping | Research |

## CASE ROSTER

**Federal Cases**

*United States v. Ricardo Sanchez Jr., et al,* CR 80171-DTKH-2, Miami, Florida

*United States v. Earl Whittley Davis,* CR RWT-07-0199, Washington, D.C.

*United States v. Williams et al (Antoine Lamont Johnson),* CR-00920-RSWL-002, Los Angeles, CA

*United States v. Jason Tisdale, et al.,* CR 07-10142-05-JTM, Wichita, Kansas

*United States vs. Maurice Phillips et al.,* CR 2:07-00549-JCJ, Eastern District of Pennsylvania, Philadelphia, PA – Testimony

7/22/2015

*Williams B. Leonard v. USA* (post conviction), Las Vegas, NV

*United States v. Steven Booth, Jr.,* United States District Court – District of Nevada (post conviction)

*United States v. Steven Parker,* United States District Court – District of Nevada (post conviction)

*United States v. Azibo Aquart,* CR 3:06CR160, Connecticut

*Patrick Charles McKenna v. E. K. McDaniel,* United States District Court – District of Nevada (post conviction)
*Robert Royce Byford  v. E. K. McDaniel,* United States District Court – District of Nevada (post conviction)

*United States v. Kaboni Savage et al.,* CR 07-550-3, Eastern District of Pennsylvania, Philadelphia, PA – Testimony

*United States v. Steven Northington,* 07-550-3, Eastern District of Pennsylvania, Philadelphia, PA

*United States v. Gerald Lee Sizemore,* No. 6:12-CR-59-SS-ART/REW-9, Eastern District of Kentucky, Southern Division, London

**State Cases**

*State of Arizona v. Isidro Sauceda,* CR2005-112128, Phoenix, Maricopa County

*State of Arizona v. Jonathan Garcia,* CR2006-013256, Phoenix, Maricopa County

*State of Arizona v. Jose Calvillo,* CR2006-158425, Phoenix, Maricopa County

*State of Arizona v. Stonney Biddings,* CR2006-169641, Phoenix, Maricopa County

*State of Arizona v. Jahmari Manuel,* CR2004-022846, Phoenix, Maricopa County

*People of the State of California v. Jose Mejorado,* TA-079230, Los Angeles, Los Angeles County

*State of Arizona v. Tyrell McDaniel,* CR2008-303235-001-DT, Phoenix, Maricopa County

*State of Arizona v. Larry Gary,* CR2007-048827-001, Phoenix, Maricopa County

*Commonwealth v. Maurice Patterson,* No. 1061-2008, Williamsport, Lycoming County

*State of Arizona v. Nashawn Campbell,* CR2009-137382-001-DT, Phoenix, Maricopa County

*State of Florida v. Edwin DeJesus, Jr.,*  Case No. 50-2008-CF-011701AXXXMB, West Palm Beach, Palm Beach County

*State of Washington v. Gary Lipsey,* Case No. 09-1-02790-7 KNT, Seattle, King County

7/22/2015

*State of Arizona v. Cory Morris,* Case No. CR2003-011506-001, Phoenix, Maricopa County

*State of Florida v. Jermaine Henderson,* Case No. 2006C-F006108-CXX, West Palm Beach, Palm Beach County

*Ex Parte Manuel Velez,* Cause No. 07-CR-721-G, Brownsville, Cameron County, TX

*State of Tennessee v. Tommie Phillips,* Case No. 09-05231, Memphis, Shelby County - Testimony

*State of Arizona v. Rudolpho Cano,* CR2009-160953, Phoenix, Maricopa County

*State of Arizona v. Johnny Farinas,* CR2005-006052-001 DT, Phoenix, Maricopa County

*State of California v. Daniel Torres,* Indio, Riverside County

*State of Louisiana v. Robert Coleman,* No. 226-818 Bossier, Caddo Parish

*State of Arizona v. Alfredo Herrera,* CR2007-007522-003 DT, Phoenix, Maricopa County

*State of Kansas v. Luis Aguirre,* CR2009-1072, Manhattan, Riley County - Testimony

*State of California v. Emilio Avalos,* Case. No. INF054346, Indio, Riverside County – Testimony

*State of Arizona vs. Gary Bivens,* CR 11-007903, Phoenix, Maricopa County

*State of Texas vs. Ricky Cummings,* Waco, McLennan County

*State of Indiana v. Kevin Isom,* Case No. 45G-0708-MR-00008, , Hammond, Lake County – Testimony

*State of Arizona vs. Shykeem Jones,* CR 11-124529, Phoenix, Maricopa County

*State of Arizona v. Michael Franklin,* CR 11-151823, Phoenix, Maricopa County

*State of Tennessee v. Joshua Cline,* CR 11-04822, Memphis, Shelby County

*State of Texas v. George Curry, Jr.* CR 122359601010, Houston, Harris County

*State of Texas v. Juan Balderas,* CR 105063 & 106485, Houston, Harris County – Testimony

*State of Wyoming v. Nathaniel Castellanos,* Docket No. 31-037, Cheyenne, Laramie County – Testimony

*State of California v. Erran West,* Docket No. 31-037, Bakersfield, Kern County CRS 148

*State of Texas v.  Warren Rivers,* CR# 047512201010, Houston, Harris County, Testimony

*State of Kansas v. Philip D. Cheatham, Jr.,* CR# 03-CR-26854, Topeka, Shawnee County

*State of Louisiana v. Lee Turner,* CR# 07110678, Baton Rouge, East Baton Rouge Parish – Testimony

*State of Arizona v. Danny Martinez,* CR# 2011-005528-001DT, Phoenix, Maricopa County

7/22/2015

## AWARDS

Environmental Science Research Institute - Assistantship – 2008

## PRESENTATIONS

March 2009 *Illustrating Developmental Adversity Using GIS.* Presentation delivered by invitation to the National Alliance of Sentencing Advocates & Mitigation Specialists - Life in the Balance Conference. New Orleans, LA with Tom Reidy, Ph.D.

November 2009 *Using Community Mapping to Provide More Effective Indigent Defense Representation* Presentation delivered by invitation to the National Legal Aid & Defenders Association Annual Conference. Denver, CO

March 2010 *Using Community Mapping in Capital Defense Representation and Mitigation.* Presentation delivered by invitation to the National Alliance of Sentencing Advocates & Mitigation Specialists - Life in the Balance Conference. Nashville, TN with Tom Reidy, Ph.D.

July 2010 *Illustrating for the Jury the Impact of Chaos in a Client's Life.* Presentation delivered by invitation to The Center for American and International Law  - The Mind and Criminal Defense Conference. Plano, TX.

July 2010 *Mapping Community Risk Factors.* Invited speaker to Nevada Federal Public Defender's Office. Las Vegas, NV.

April 2011 *New Tools for the Mitigation Toolkit.* Invited speaker to The Eighth National Seminar on the Development and Integration of Mitigation Evidence, Habeas Assistance and Training Counsel Project. Chicago, IL.

April 2011 *Illustrating Developmental Adversity Using Geographic Information Systems.* Invited speaker to the Capital Habeas Unit National Conference. Austin, TX.

June 2011 *Using Community Mapping* Invited speaker to the Capital Litigators Luncheon – Texas Criminal Defense Lawyers Association – Rusty Duncan Seminar. San Antonio, TX.

July 2011 *Telling the Client's Story with Maps* Invited speaker to The Center for American and International Law  - Capital Sentencing Trial – Our Experts, Their Experts for the Defense. Houston, TX.

February 2012 *High Risk Neighborhoods* Invited speaker to the City of Dallas GIS Users Group. Dallas, TX.

May 2012 *Mapping Community Risk Factors* Invited speaker to the Ohio State Bar Association. Columbus, OH.

7/22/2015

1706

July 2012  *Visualizing Your Mitigation*  Invited speaker to The Center for American and International Law - Capital Trial Mitigation – Plano, TX.

October 2012  *Using Mapping to Tell Your Client's Story.*  Presentation delivered by invitation to the National Alliance of Sentencing Advocates & Mitigation Specialists - Life in the Balance Conference.  St. Louis, MO.

June 2014  Mitigation presentation with Dani Waller at Clarence Darrow Death Penalty Defense College. DePaul University College of Law

June 2015  *Maps and Risk Factors*  Invited speaker to Darrow/Baldus Death Penalty Defense College. University of Iowa College of Law. Iowa City, IA.

July 2015  *Organizational Tools for the Mitigation Narrative* – Invited co-presenter with Laura Ferry of Texas Defender Service. Center for American and International Law. Plano, TX.

## MAPS IN PUBLICATION

Cunningham, M. D. (2010).  *Evaluation for capital sentencing.*  A volume in the *Oxford best practices in forensic mental health assessment* series, Series Editors: A. Goldstein, T. Grisso, and K. Heilbrun. New York: Oxford University Press.

Cunningham, M. D., & Goldstein, A. M. (*in press*). Sentencing determinations in death penalty cases. In R. Otto (Ed.), *Forensic psychology* (vol. 11 of 12). I. Weiner (Ed.), *Handbook of psychology, 2nd edition*. New York: John Wiley & Sons.

## PROFESSIONAL MEMBERSHIPS

Metro Area Arc Users Group

South Central Area Arc Users Group

Urban and Regional Information Systems Association

National Legal Aid & Defenders Association

National Alliance of Sentencing Advocates & Mitigation Specialists

## VOLUNTEER WORK

Remote Sensing for Nepal Earthquake Relief

Remote Sensing for Swaziland Malaria Elimination

7/22/2015

**AMY BROWN NGUYEN**
**Owner/Analyst – Capital Maps, LLC**
145 Kilmichael Drive
Coppell, TX 75019
972-839-7085
amy.nguyen@capitalmaps.com

## FEE SCHEDULE

GIS services are $110 per hour (billed in tenth of an hour increments) whether engaged in data acquisition, database development, evaluation, editing, analysis, documentation, consultation, literature search and review, report preparation, exhibit preparation, or other professional activities associated with GIS analysis. If travel is essential, reimbursement is required for coach airfare, rental car, taxi fares, $0.585 per mile by private automobile, standard-grade hotel accommodations, reasonable meals and miscellaneous expense allowance. Federal Express or other shipping charges, and pass-through expenses for literature search or exhibit production are also reimbursable. Bills are submitted monthly.

These rates are valid until 12/31/2015.

1708

WRIT NO. _____

TRIAL COURT NO. 1361004

EX PARTE                              IN THE 371st JUDICIAL

                                     DISTRICT COURT

CEDRIC RICKS                         TARRANT COUNTY, TEXAS

## ORDER ON APPLICANT'S EX PARTE FUNDING MOTION FOR EXPERT ASSISTANCE

On ___9 16 15___ , the Court having considered the above and foregoing motion, finds the same is hereby **GRANTED in an amount not to exceed** $5500 / **DENIED** in which case Applicant requests that the Court designate in writing its reasons for denying this request as required by Tex, Code Crim. Proc. Ann. art. 11.071 §3 (c).

_____
Judge Presiding

1709

WRIT NO. _____

TRIAL COURT NO. 1361004

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

JAN 2 5 2016

TIME_____ 9:21 AM
BY_____ ML _____ DEPUTY

EX PARTE

CEDRIC RICKS

IN THE 371st JUDICIAL

DISTRICT COURT

TARRANT, COUNTY, TEXAS

### THIRD EX PARTE
### FUNDING MOTION FOR MITIGATION SPECIALIST

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the indigent Applicant, by counsel, and pursuant to Tex. Code Crim. Proc. art. 11.071§3, the 5th, 6th, 8th and 14th Amendments to the United States Constitution and Sections 10, 13 & 19 of Article I of the Texas Constitution and other authority cited herein, moves this Court to enter a finding that there is a reasonable necessity for expert assistance and funding as requested in this motion. In support thereof, this Applicant would show:

I.

(a) Cedric Ricks was convicted of capital murder and sentenced to death. Undersigned counsel has been appointed to investigate expeditiously, the factual and legal grounds for the filing of an application for a writ of habeas corpus pursuant to Art. 11.071 of the Texas Code of Criminal Procedure.

SCANNED

1710

(b) Part of that investigation must include Applicant's background, record, and the circumstances of the offense, including his general mental status, prior to and at the time of the offense. Expert assistance will be necessary to prepare and present this evidence. Applicant is requesting that this Court approve and provide funding for Applicant to retain a mitigation specialist to perform this investigation.

(c) This Court has determined that the Applicant is indigent. His counsel is unable to retain any expert assistance due to Applicant's indigent status.

## II.

Counsel has previously requested and this Court has previously approved funding for the purpose of conducting a mitigation investigation in the amount of $42,725. These previous motions were entitled Ex Parte Funding Motion for Mitigation Specialist and Second Ex Parte Funding Motion for Mitigation Specialist. Counsel requests that the legal basis for those motions and the contents of those motions be included and incorporated in this motion.

## III.

Mairead Burke, the mitigation specialist working on this case has now exhausted the funds that were previously requested. An accounting of the work done so far is attached along with an estimate of additional work that needs to be done on this case and the money that is necessary. Ms. Burke believes that an additional 220 hours at a rate of $85 per hour are required to complete the mitigation investigation in

1711

this case. Also required will be some additional travel which Ms. Burke estimates will come to $3000. Therefore, counsel is requesting an additional $21,700.

## IV.

(a) The funding that is requested will provide Counsel with essential tools necessary to investigate the legality of Applicant's confinement. Specifically, the claim to be investigated is that trial counsel was ineffective for failing to conduct a proper mitigation investigation and present such evidence at trial. Although trial counsel did consult a mitigation specialist, Applicant believes that this investigation was not as complete as it should have been. Applicant is entitled to such expert assistance upon a threshold showing that the assistance sought is relevant to a claim to be investigated. Cf. Ake v. Oklahoma, 470 U.S. 68 (1985).

(b) The American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (2003) state that the use of a mitigation specialist has become "part of the existing standard of care" in death penalty cases. The Guidelines apply with equal force to post-conviction investigation.

## V.

This motion is made ex parte pursuant to Tex. Code Crim. Proc. Ann. art. 11.071§3. It would be fundamentally unfair to require this indigent Defendant to divulge to the prosecution the nature of this motion for funding which will

1712

necessarily inform the State of defensive theories of mitigation. <u>Williams v. State</u>, 958 S.W.2d 186 (Tex. Crim. App. 1997). If the undersigned counsel were retained by the accused, there would be no requirement that the State be notified of the retention of expert assistance.

WHERFORE PREMISES CONSIDERED, Movant prays that this Court:

(a) Find that a threshold showing has been made that a mitigation specialist is an essential tool in the investigation of the factual and legal grounds for the filing of an application for a writ of habeas corpus pursuant to Art. 11.071 of the Texas Code of Criminal Procedure.

(b) approve additional funding in the amount of $21,700.

(c) that the Movant have such other and further relief as he may show himself to be justly entitled.

Respectfully submitted,

Catherine Clare Bernhard
P.O. Box 2817
Red Oak, Texas 75154
972-617-5548
fax – 972-421-1604
State Bar No. 01226575
cbernhard@sbcglobal.net

**ATTORNEY FOR APPLICANT**

1713

## VERIFICATION

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this date personally appeared Catherine Clare Bernhard, attorney of record in the above-styled and numbered cause, who upon her oath does hereby swear and affirm upon her personal knowledge that all statements of fact contained in the foregoing Motion are in all respects true and correct.

_____
Catherine Clare Bernhard

STATE OF TEXAS
COUNTY OF DALLAS

SUBSCRIBED AND SWORN BEFORE ME, the undersigned Notary Public, on this the 18th day of January, 2016.

CLINTON J. STAFFORD
MY COMMISSION EXPIRES
December 5, 2017

_____
Notary Public in and for the
State of Texas.

1714

BURKE MITIGATION & CONSULTING, LLC
P.O. Box 11543 Austin, TX 78711-1543
(858) 705-0338 · mairead@burkemitigation.com · Fax (512) 842-7098

**CONFIDENTIAL MEMORANDUM**
Attorney-Client Privilege

1/15/16

## CEDRIC RICKS: SUPPLEMENTAL MITIGATION BUDGET

This memo reviews what work was completed with the additional funding ordered on 6/12/15 and what additional work needs to be completed.

I estimate about 220 service hours for witness interviews and affidavits, research, identifying and working with experts, preparing a report for the attorney, and continued meetings with the client and the defense team. At $85/hr, that comes to $18,700. There will be travel to Mansfield, TX and the Chicago area for interviews and affidavits. In previous budgets I estimated the cost of travel to Chicago (flight, rental car, travel time, meals, etc.) to come to approximately $1,000 per trip, however upon review of actual past travel the cost is closer to approximately $1,500 per trip. I estimate two trips for interviews and affidavits, with cost at approximately $3,000. The estimated cost of this supplementary investigation plan comes to $21,700, plus expenses (mileage for client visits, cost of records, etc.).

**I. The following work was completed with the last funding order:**

- Continued collecting and reviewing mitigation records (medical, employment, etc.), and integrating relevant information from the records into a chronology and biopsychosocial history
- Researched and attempted to gather any identifying information on client's sexually abusive caretaker through witnesses, private records, public records
- Located and interviewed teachers, and attempted to interview additional teachers
- Conducted additional interviews with family members
- Attempted interviews with additional witness to early childhood abuse
- Identified and consulted with expert re: prenatal exposure to alcohol; provided relevant information to expert
- Drafted comprehensive biopsychosocial history
- Continued meetings with client
- Continued meetings with defense team

**II. Requested additional funding to:**

- Meet with established mitigation witnesses for additional interviews and to finalize affidavits
- Interview additional life history witnesses, and possible have additional meetings for affidavits, with witnesses in Texas and Chicago area
- Research and document multigenerational family problems

1715

- Research the significance of new mitigation information on client's developmental trajectory
- Identify defense expert(s), develop specific questions for experts to evaluate and provide opinion about, contact and consult expert(s) regarding their role in the defense team, and provide relevant background data collected by the mitigation specialist to the expert
- Create final documentation of new mitigation evidence for attorney
- Continued meetings with client
- Continued defense team meetings

(Mairead Burke, LMSW)

1716

## ORDER

On ___1 2̶5̶ 1̶6̶___ , the Court having considered the above and foregoing motion, finds the same is hereby **GRANTED**  and funding is approved in the amount of $ ___21,700___ / **DENIED,** in which case Applicant requests that the court designate in writing the reasons for denying said motion, in whole or in part, as required by Tex. Code Crim. Proc. Ann. art. 11.071 § 3(c)

Judge Presiding

1717

WRIT NO. _____

TRIAL COURT NO. 1361004

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

JAN 2 5 2016

TIME _____ 9:21 am
BY _____ DEPUTY

EX PARTE

CEDRIC RICKS

IN THE 371ˢᵗ JUDICIAL

DISTRICT COURT

TARRANT COUNTY, TEXAS

EX PARTE

FUNDING MOTION FOR EXPERT ASSISTANCE

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the indigent Applicant, by counsel, and pursuant to Tex. Code Crim. Proc. art. 11.071§3, the 5ᵗʰ, 6ᵗʰ, 8ᵗʰ and 14ᵗʰ Amendments to the United States Constitution and Sections 10, 13 & 19 of Article I of the Texas Constitution and other authority cited herein, moves this Court to enter a finding that there is a reasonable necessity for expert assistance and funding as requested in this motion. In support thereof, this Applicant would show:

I.

(a) Cedric Ricks was convicted of capital murder and sentenced to death. Undersigned counsel has been appointed to investigate expeditiously, the factual and

SCANNED

1718

legal grounds for the filing of an application for a writ of habeas corpus pursuant to Art. 11.071 of the Texas Code of Criminal Procedure.

(b) This Court has determined that the Applicant is indigent. His counsel is unable to retain any expert assistance due to Applicant's indigent status.

## II.

The funding that is requested will provide Counsel with essential tools necessary to investigate the legality of Applicant's confinement. Specifically, the claim to be investigated is that Applicant's trial counsel rendered ineffective assistance in failing to discover significant mitigating evidence. In order to investigate such a claim, counsel needs a psychologist to assess the significance of some of mitigation evidence that has been discovered post trial. To this end, Counsel has consulted Dr. Joanne Murphey, a psychologist with extensive forensic experience. Dr. Murphey estimates that a review of the evidence in this case could be done for $2,500. A copy of her curriculum vitae is attached and incorporated.

Applicant is entitled to such expert assistance upon a threshold showing that the assistance sought is relevant to a claim to be investigated and reasonable. Tex. Code Crim. Proc. Ann. art. 11.071 §3(b); cf. Ake v. Oklahoma, 470 U.S. 68 (1985).

WHERFORE PREMISES CONSIDERED, the Applicant respectfully prays that this Court allow the Applicant funds in the amount of $2,500 to hire Dr. Murphey to assist in the preparation of his defense.

Respectfully submitted,

Catherine Clare Bernhard
P.O. Box 2817
Red Oak, Texas 75154
972-617-5548
fax 972-421-1604
cbernhard@sbcglobal.net
State Bar No. 02216575

ATTORNEY FOR APPLICANT

1720

# VERIFICATION

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this date personally appeared Catherine Clare Bernhard, attorney of record in the above-styled and numbered cause, who upon her oath does hereby swear and affirm upon her personal knowledge that all statements of fact contained in the foregoing Motion are in all respects true and correct.



_____
Catherine Clare Bernhard

STATE OF TEXAS

SUBSCRIBED AND SWORN BEFORE ME, the undersigned Notary Public, on this the ___ day of January, 2016.

CLINTON J. STAFFORD
MY COMMISSION EXPIRES
December 5, 2017

_____
Notary Public in and for the
State of Texas.

1721

# JOANN MURPHEY, PH.D., ABPP, FICPP

## DIPLOMATE IN CLINICAL PSYCHOLOGY  ACADEMY OF CLINICAL PSYCHOLOGY

Diplomate Fellow in Psychopharmacology – International College of Prescribing Psychologists
1202 West Bitters Road; Building 3
San Antonio, Texas 78216-7851
Telephone: (210) 495-0221;  Facsimile: (210) 495-0583
E-mail: jmurphey@drjmurphey.com

## EDUCATION:

| | |
|---|---|
| University of Tennessee Knoxville, TN December 1982 | Ph.D. in Clinical Psychology (APA Approved) |
| University of Tennessee Knoxville, TN June 1976 | Ph.D. in School Psychology (Course work and internship) |
| University of Tennessee Knoxville, TN August 1972 | M.S. in Counseling and Guidance |
| University of Tennessee Knoxville, TN December 1968 | B.S. in Elementary Education |
| Founder, American College of Advanced Practice Psychologists September 1998 – February 2001 | Completed coursework equivalent to M.S. degree in psychopharmacology. Passed National Examination and all practicum requirements. |
| The University of Texas Health Science Center at San Antonio, December 2003 | Completed requirement for doing competency evaluations |

## PROFESSIONAL CLINICAL EXPERIENCE

| | |
|---|---|
| Private Practice September 1983 - current | Provide general outpatient therapy. Particular interests include long-term analytical psychotherapy with adults, child psychotherapy and diagnostics, and family therapy; Forensic services |
| Family Counseling Center September 1990 - 2008 | Provide psychological services – diagnostic and treatment – to families who have completed the adoption process through the Department of Human Resources. |

January 2012

1722

The University of Texas Health Science Center, San Antonio
September 1982 – August 1983

Engaged in APA approved internship in clinical psychology (full time). Direct contact work encompassed both children and adults in inpatient and outpatient settings. Adult treatment responsibilities included intake interviewing for diagnostic and treatment planning, psychometric evaluations, individual, marital, family and group consultation and psychotherapy. A variety of treatment modalities were used; generally emphasis was given to insight oriented treatment where applicable. Child treatment responsibilities included intake interviewing for diagnostic and treatment planning, psychometric evaluation, individual, group, and family psychotherapy. Insight-oriented treatment was used while maintaining behavioral measures of evaluation. Treatment settings ranged from the medical school mental health facility to the State Hospital where services for chronic mental health patients were provided.

Helen Ross McNabb Center
Knoxville, TN
June 1979 – August 1982

Employed (coordinated by The Univ. Tennessee) as a clinical associate in an urban community mental health center (20+ hours per week). Obtained direct clinical experience in individual adult and child outpatient psychotherapy, and diagnostic assessment and treatment planning and adult group psychotherapy as well as family therapy.

Stephen Friedlander, Ph.D.
Clinical Psychologist
Private Practice
Knoxville, TN
June 1981 – August 1982

Administered psychological and neuro-psychological assessments for children and adults. Both Reitan and Luria-Nebraska batteries were used as well as other tests on inpatient and outpatient populations.

Little Tennessee Valley
Educational Cooperative
Lenoir City, TN
August 1973 – June 1982

Employed as a school psychologist (full and part time) for an urban school, including development and delivery of psychological services to a school system which had never before used psychological services. Services included preparation of grant applications, psychoeducational assessments of students aged 4- 21 for placement in various classes and programs, and consultation on emotionally disturbed, learning disabled, intellectually gifted, and other exceptional children.

2

## PRACTICUM CLINICAL TRAINING

University of Tennessee
Psychological Clinic
Knoxville, TN
September 1980 – August 1982

Practicum spanned two years of training: once a week sessions for three long-term cases with hour-to-hour supervision provided by three clinical psychology supervisors using videotape media.

Lakeshore Mental Health
Institute, Knoxville, TN
September 1980 – June 1981

Assessment practicum that spanned three academic quarters of training in administering full psychological test batteries to inpatient and outpatient populations.

## PROFESSIONAL HONORS

Bexar County Psychological
Association

Selected as the BCPA Fellow for the 2006-2007 year.

Buros Institute of Mental
Measurements
October 2002 – current

Selected as an independent reviewer of new psychological tests.

State Bar of Texas
Grievance Committee
July 1995 – July 2001

Appointed to sit on a six-member committee to hear grievances filed against local attorneys.

American Board of Professional
Psychology, Academy of
Clinical Psychology
June 1994 - current

Awarded the rank of Fellow.

American Board of Professional
Psychology
March 1993 - current

Appointed to Examination Committee with primary responsibility to insure the proper examination of applicants for Diplomate status.

American Board of Professional
Psychology
March 1993 - current

Elected to Committee on Work Samples. Primary duty is to develop and implement regulations regarding appropriate work samples for submittal by psychologists seeking Diplomate status.

Regional Council of the
American Board of Professional
Psychology
June 1991 – March 1993

Elected to the Intermountain Regional Council to assist with decision making policies in a 10-state region.

3

Texas State Board of Examiners
of Psychologists
October 1989 – January 2003

Selected as a private practice professional to supervise, evaluate, or provide psychotherapy to psychologists who have been found guilty of violations of ethical practices, including the review of case files.

The University of Texas Health
Science Center, San Antonio
Sept. 1993 – Sept. 2001

Clinical Assistant Professor with duties of supervising psychology and psychiatry residents on long-term psychotherapy cases. Also assist in teaching medical residents in their psychiatry rotation.

## OTHER PROFESSIONAL EXPERIENCE

Cedar Bluff Elementary School
Knoxville, TN
August 1972 – June 1973

School teacher for grades 5 and 6 teaching language arts in a team teaching setting

Aberdeen Elementary School
Aberdeen, MD
December 1968 – June 1971

School teacher with full academic teaching responsibilities for a self-contained heterogeneous fourth grade class.

## PROFESSIONAL CREDENTIALS

- Fellow in the International College of Prescribing Psychologists
- Fellow in the Academy of Clinical Psychology
- Diplomate in Clinical Psychology, American Board of Professional Psychology
- Licensed as a Clinical Psychologist in Texas by the Texas State Board of Examiners of Psychologists, License # 2934
- Licensed as a Psychological Examiner in Tennessee by the Tennessee State Board of Examiners of Psychologists, License # P.E. 318, License currently retired while living in Texas
- Tennessee Education Agency - Certified School Psychologist, given Permanent Certification
- Tennessee Education Agency - Certified Elementary School Teacher

4

## PROFESSIONAL AFFILIATIONS (Present or Past)

- American Board of Professional Psychology
- American Psychological Association
- Council for National Register of Health Service Providers in Psychology
- Texas Psychological Association
- San Antonio Psychological Association
- Founder - Texas Psychological Foundation
- Association of Family and Conciliation Courts
- Texas Psychology Political Action Committee
- Founding Fellow, American College of Advanced Practice Psychologists
- Founder, American College of Advanced Practice Psychologists

## DOCTORAL DISSERTATION

*The Effects of First Born Siblings on the Gender Differentiation of Second Born Children,* University of Tennessee, 1982

## PROFESSIONAL PAPERS, PUBLICATIONS, AND PRESENTATIONS

Murphey, J., On Phantom Crimes and Secret Science: The "Butner Study" and Child Pornography Sentencing Decisions, San Antonio Lawyer November-December 2011

Murphey, J., Expert Testimony in Custodial Evaluations, Presentation given at the 2010 Texas Academy of Family Law Specialists, February 2010

Murphey, J., Daubert In Court, Presentation given at the 2008 Advanced Family Law Seminar, August 2008

Murphey, J., Daubert In Court, Presentation given at the 15th Annual Bexar County Children's Court Ad Litem Training Seminar October 2009

Murphey, J., Expert Testimony in Custodial Evaluations, Presentation given at the 2009 Texas Academy of Family Law Specialists, January 2009

Murphey, J., Daubert In Court, Presentation given at the 2008 Advanced Family Law Seminar, August 2008

Murphey, J., The Expert Expert, Presentation given to San Antonio custody evaluators for the Forensic Psychology Advocacy Committee, May 2008

Murphey, J., *Family Custodial Studies with Psychological Testing,* Presentation given at the Extreme Family Law Makeover, February 2008

Murphey, J., *A Checklist For Supervised Access and Quality Care Possession Determinations* Journal of Child Custody, Volume 4, Issue 1/2, 2007

5



Murphey, J., *Book Review of Divorce Poison,* American Journal of Family Therapy, Volume 31, Number 5, October – December 2003

Ferrell, J. and Murphey, J., *Alternatives to Supervision,* Presentation given to Board Certified Family Practice Attorneys and District Judges, May 2003

Bowles, M., Hollis J. and Murphey, J., *Release of Children's Mental Health Records*, Presentation given for Lorman Education Services, June 2000

Murphey, J., *"Personal Empowerment for Women"* Presentation given to the Hills Women's Civic Club, Boerne, Texas, October 1996.

Murphey, J., Ferrell, J. and Reid, J., *How to Use (and not Misuse) Psychologists in Child Custody Issues*, Presentation given to Board Certified Family Practice Attorneys, October, 1995.

Murphey, J., and Ferrell, J., *Domestic Violence - What are Judges to Do*, Presentation given to San Antonio Civil and Criminal Judges, April, 1995.

Murphey, J., *Attorneys - How Can They Improve Their Image*, Presentation given to Texas Border Attorneys, May 1994.

Murphey, J., *Child Abuse in South Texas: Third Annual Conference*, Panel participant given in Mock Trial, February 1993.

Stedman, J. and Murphey, J., *Dealing with Specific Child Phobias During the Course of Family Therapy: An Alternative to Systematic Desensitization*, Family Therapy, Volume XI, Number 1, 1984.

Murphey, J., *Parental Attributes Which Add and Detract from Healthy Ego Functioning in Child Development*, Paper read at the Tennessee Association for Psychology in the Schools, March 1981.

Murphey, J., *The Role of the Father in Child Development*, Paper read at the Tennessee Association of Psychologists, November 1980.

Murphey, J., *Primary, Secondary, and Tertiary Mental Health Prevention*, Paper read at the Council of Exceptional Children's Annual Meeting, April 1980.

Murphey, J., *Clinical and Theoretical Views of Winnicott and Searles: How They Converge and Contrast in the Treatment of Primitive States Such as Schizophrenia*, Paper read at the Tennessee Association for Psychologists, September, 1979.

Murphey, J., *Hyperkinetic Children: Treatment Strategies for Professionals and Parents*, Paper read at the National Council of Exceptional Children's Meeting, March 1978.

Murphey, J., *Juvenile Hyperkinesis: The Effect of Caffeine*, Paper read at the National Association of School Psychologists Meeting, October, 1978

Murphey, J., *Learning Disabled, Intellectually Retarded and Emotionally Disturbed Children: Diagnostic Similarities and Differences*, Paper presented as Inservice Training to Resource Teachers and Psychologists represented in the Little Tennessee Valley Educational Cooperative, October, 1977.

6

Murphey, J., *Lying and Stealing Behaviors in Children: Differentiating Normal from Pathological Responses*, Paper presented to the Foster Parents of America Association of the Department of Human Resources, September, 1977.

WRIT NO. _____

TRIAL COURT NO. 1361004

EX PARTE                             IN THE 371st JUDICIAL

                                     DISTRICT COURT

CEDRIC RICKS                         TARRANT COUNTY, TEXAS

ORDER ON APPLICANT'S EX PARTE FUNDING MOTION FOR EXPERT
ASSISTANCE

On ___1 25 16___, the Court having considered the above and foregoing motion,
finds the same is hereby **GRANTED in an amount not to exceed** $2500 /
**DENIED** in which case Applicant requests that the Court designate in writing its reasons
for denying this request as required by Tex. Code Crim. Proc. Ann. art. 11.071 §3 (c).

_____
Judge Presiding

1729



FILED
THOMAS A WILDER, DIST CLERK
TARRANT COUNTY, TEXAS

JAN 2 5 2016

WRIT NO. _____

TRIAL COURT NO. 1361004

TIME_____ 9:41 am

BY_____ /DEPUTY

EX PARTE                     *        IN THE 371st JUDICIAL
                             *        DISTRICT COURT
CEDRIC RICKS                 *        TARRANT COUNTY, TEXAS

## EX PARTE MOTION FOR AN INVESTIGATOR

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the indigent Applicant, by counsel, and pursuant to Tex. Code Crim. Proc. art. 11.071§3, the 5th, 6th, 8th and 14th Amendments to the United States Constitution and Sections 10, 13 & 19 of Article I of the Texas Constitution and other authority cited herein, and moves this Court to enter a finding that there is a reasonable necessity for hiring an investigator to assist him in the preparation of his writ application. Applicant hereby requests that the Court provide sufficient funds for doing so.  In support of this motion Applicant would show:

### I.

Cedric Ricks was convicted of capital murder and sentenced to death. Undersigned counsel has been appointed to investigate expeditiously, the factual and legal grounds for the filing of an application for a writ of habeas corpus pursuant to Art. 11.071 of the Texas Code of Criminal Procedure.

### II.

In reviewing the case, Counsel realizes that there are a number of witnesses that should be contacted for interview, and that a thorough investigation must be made on behalf of the Applicant.

### III.

Motion for an Investigator - page 1 of 5

SCANNED                                                    1730

The Applicant is totally indigent and without funds of his own to retain a private investigator.

<p style="text-align:center">IV.</p>

The funding that is requested will provide Counsel with essential tools necessary to investigate the legality of Applicant's confinement. The Guidelines and Standards for Texas Capital Counsel promulgated by the State Bar of Texas provide that state habeas counsel "must promptly obtain the investigative resources necessary to examine both phases, including the assistance of a fact investigator". Guidelines and Standards for Texas Capital Counsel 12.2(B)(3)(a)(2006). The ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases state that "Counsel should conduct interviews of potential witnesses in the presence of a third person so that there is someone to call as a defense witness at trial. Alternatively, counsel should have an investigator or mitigation specialist conduct the interviews." ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.7 (2003). This applies to post-conviction investigation as well. ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.51.1 (2003). The Texas Guidelines further state that "counsel has a duty to conduct a searching inquiry to assess whether any constitutional violations may have taken place, including – but not limited to – claims involving police and prosecutorial misconduct, faulty eyewitness evidence,…coerced confessions, dubious or flawed forensic scientific methods, ineffective assistance of trial and appellate counsel, and juror misconduct." Guidelines and Standards for Texas Capital Counsel 12.2(B)(1)(c)(2006). Counsel believes that all of these claims need to be

Motion for an Investigator - page 2 of 5

investigated. Applicant is entitled to such expert assistance upon a threshold showing that the assistance sought is relevant to a claim to be investigated and reasonable. Tex. Code Crim. Proc. Ann. art. 11.071 §3(b); cf. Ake v. Oklahoma, 470 U.S. 68, 105 S. Ct. 1087 (1985).

<div align="center">V.</div>

This court had previously approved funding for an investigator in the amount of $5000. These funds have now been depleted and counsel is now requesting an additional $5000 for investigatory work still to be done.

WHEREFORE, PREMISES CONSIDERED, the Applicant respectfully prays that this Court allow the Applicant sufficient funds to hire a private investigator to assist in the preparation of his defense.

Respectfully submitted,

Catherine Clare Bernhard
P.O. Box 2817
Red Oak, Texas 75154
972-617-5548
fax 972-421-1604
cbernhard@sbcglobal.net
State Bar No. 02216575

ATTORNEY FOR APPLICANT

# VERIFICATION

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this date personally appeared Catherine Clare Bernhard, attorney of record in the above-styled and numbered cause, who upon her oath does hereby swear and affirm upon her personal knowledge that all statements of fact contained in the foregoing Motion are in all respects true and correct.

_____
Catherine Clare Bernhard

STATE OF TEXAS

SUBSCRIBED AND SWORN BEFORE ME, the undersigned Notary Public, on this the _____ day of January, 2016.



CLINTON J. STAFFORD
MY COMMISSION EXPIRES
December 5, 2017

_____
Notary Public in and for the
State of Texas.

Motion for an Investigator - page 4 of 5

1733

## ORDER

On __1 25 16__ , the Court having considered the above and foregoing motion, finds the same is hereby **GRANTED in an amount not to exceed** *$5 000* **/ DENIED** in which case Applicant requests that the court designate in writing the reasons for denying said motion, in whole or in part, as required by Tex. Code Crim. Proc. Ann. art. 11.071 § 3(c).

Judge Presiding

Motion for an Investigator - page 5 of 5

1734

Tarrant County Clerks Office                                    Feb 2, 2016

Cause No. 1361004R
CCA No AP-77,040

State of Texas                                    The District Court of
V.                                                Tarrant County, Texas
Cedric Ricks #999593                              371st Judicial District
Polunsky Unit 3872 FM
350 South Livingston TX 77351

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

FEB 09 2016

TIME _____ 11:30
BY _____ DEPUTY
CC: Defn, Counsel, Appel Atty,
State

Motion for Post-Conviction Relief
and for Ineffective Assistance of Trial Counsel
and Direct Appeal Counsel.

Now comes defendant Cedric Ricks pro-se (Ricks) respectfully moves
for the trial Judge Molee Westfall of the 371st Judicial District Court
to grant relief to defendant (Cedric Ricks) on Post-conviction Relief and also to
grant error in Ineffective Assistance of Trial Counsel.

1) Testimony by Nya Cardosa, of the Oklahoma Sheriff Dept, personally
committed perjure, when she testified, against defendant Cedric Ricks.
Quote in her statements about warrants coming out of Texas, which
she said, she received off of fax machine at her detention center.
Later during cross-examination, defendants Lawyer, Court Appointed
Counsel Steve Gordon, asked her about this under oath, and she
said she never received any warrants off of fax machine. The record
will reflect this, and the Ineffective Assistance of Trial Counsel,
because state witness Nya Cardosa, should have been impeached
and reprimanded in front of court and Jurors. This was very
prejudicial to the defendant, by demonstrating a reasonable
probability that, but for the counsels unprofessional errors, the result
of the proceedings would have been different. At least one juror would

SCANNED

Tarrant County Clerks office

State of Texas

V.

Cedric Ricks #999593
Polunsky Unit 3872 FM
350 South Livingston TX 77351

Helton for Post-conviction relief
and Ineffective Assistance of Trial Counsel
Cause No 1361004R
CCA Ap No 77,040

The District Court of
Tarrant County, Texas
371st Judicial District

cent-struck a different balance. It would have put the whole case in a different light as to undermine Confidence in the verdict. Jury was only offered-one sided evidence, and not the full story. of what happened, or what should have been presented, by defense counsel Sixth-and Fourteenth Amendments of the Constitution was not clear violations, because Steve Gordon and William Ray, participated in pre-trial proceedings in Feb-2014 and cross-examined this witness before trial. They had plenty enough time, to gather enough evidence to, impeach this witness. Video, audio and visual would have backed up this argument. Also the testimony of Det Gaugh of Bedford Police Dept, who said, under oath we (Bedford Police Dept) do not touch anything, until the Medical examiners office, does its investigation. This also, was a lie, because Det Gaugh of the Bedford Police Dept, went through defendants (Cedric Ricks) nightstand. to retrieved items, that were later, thrown out by Judge Molee Westfall. The record, will clearly show, what those items were. If officer lied under sworn testimony, that he doesn't touch anything, until Medical Examiner office, does investigation, what he did he touch. This also, was detrimental, in the light as to undermine confidence in verdict. Out of dere diligence all this should have been, raised in direct appeal. because of the egregious

Cause No. 1361004R
CCA No. AP - 77,040

State of Texas

V.

Cedric Ricks #999593
Polunsky Unit 3872
350 South Livingston TX 77351

The District Court of
Tarrant County, Texas
371st Judicial District

Motion for Post conviction Relief
and Ineffective Assistance of Trial Counsel
and Direct Appeal Counsel.

cont - acts of the Prosecutor and the Ineffective Assistance of Trial Counsel. Also the Missed opportunities to make aware of this to Mary B Thornton, because of not being able to visit with her. The arguments that I have, in recent cases, have been thrown out, because lawyers, have failed to raise these arguments, in a timely fashion. In one Case (Martinez v Ryan) is like the poster Child, for such misinterpretations of the law. Texas law, doesn't permit a defendant from raising post-conviction relief or Ineffective Assistance of Trial Counsel, in direct Appeal, but makes it very difficult. Copies of this will be mailed to the Attorney Generals Office of the United States, and also to death penalty activist, to show the egregious acts of the courts, to cover up their agenda.

Wherefore, Premises Considered. Defendant prays that this Honorable Court grant this motion and order a new-trial be conducted in the above entitled and numbered cause. Respectfully Submitted

Polunsky Unit 3672 #1
350 South Livingston TX 77351

Cedric Ricks #999593

1737



NORTH HOUSTON TX

04 FEB 2016 PM 2

RECEIVED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FT WORTH DIVISION

2016 FEB -8  AM II: 54

CLERK OF COURT.

Celvic Nicks #999593
Pohunsky Unit 3872 FM
350 South Livingston TX 77351

At Clerk of the Court.
U.S. District Court
501 West 10th St, 310,
Fort Worth TX, 76102 - 3673

7610236418S

Confidential Legal Mail

1738

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

FEB 11 2016
TIME_____ 9:38
BY_____ DEPUTY
CC  JSL, STATE

WRIT NO. _____

TRIAL COURT NO. 1361004

APPEAL NO. AP-77,040

| EX PARTE | * | IN THE 371ST JUDICIAL |
| | * | DISTRICT COURT |
| CEDRIC RICKS | * | TARRANT COUNTY, TEXAS |

## MOTION FOR EXTENSION OF TIME TO FILE ART. 11.071 WRIT APPLICATION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Cedric Ricks, Applicant in the above styled and numbered cause, by and through his attorney of record, Catherine Clare Bernhard, and files this Motion for Extension of Time to File Art. 11.071 Writ Application. In support of said motion, Applicant would show:

I.

On May 7, 2014, Applicant was convicted of Capital Murder. On May 16, 2014, Applicant was sentenced to death after the jury returned answers to the special issues submitted pursuant to Art. 37.071 of the Texas Code of Criminal Procedure.

II.

On May 19, 2014, this Court appointed the undersigned attorney to represent Applicant in his Art. 11.071 writ application.

SCANNED

1739

### III.

The State's brief in the direct appeal was filed with the Court of Criminal Appeals on January 28, 2016. Thus, pursuant to Tex. Code Crim. Proc. Ann. Art. 11.071 §4(a), Applicant's writ application is due on March 13, 2016.

### IV.

Counsel would now request an additional 90 days to complete this writ application pursuant to Art. 11.071 § 4 (b). Counsel would show this court the following good cause:

a. The trial record in this case contains over 46 volumes. Although much work has been done, there is still much that remains to be completed.

b. Counsel has retained various experts and investigators to assist in expeditiously investigating and developing various claims. These experts and investigators need additional time to complete their assigned tasks.

c. This is a death penalty case in state post-conviction proceedings. The state writ application is of upmost importance in raising claims that Applicant can pursue in his future appeals. The interests of justice require that counsel be allowed as much time as possible to pursue and develop any potential claims.

d. Counsel had a jury trial setting on February 8, 2016, for a capital murder charge in the State of Texas v. Tyler Wiley in the 194th Judicial District Court of Dallas County, Texas. Although the case ended up pleading, much time was spent in preparation for the trial.

1740

    e. Counsel has a murder case currently set for a jury trial on March 7, 2016, in the State of Texas v. Louis Logan pending in the Criminal District Court No. 7 of Dallas County, Texas.

    WHEREFORE, PREMISES CONSIDERED, Applicant respectfully requests that this Court grant a 90 day extension to file his Application for a Writ of Habeas Corpus pursuant to Art. 11.071.

                             Respectfully submitted,

                             _Catherine Clare Bernhard_

                             Catherine Clare Bernhard
                             P. O. Box 2817
                             Red Oak, Texas 75154
                             972-617-5548
                             fax – 972-421-1604
                             cbernhard@sbcglobal.net
                             State Bar No. 02216575

                             ATTORNEY FOR APPLICANT

# VERIFICATION

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this date personally appeared Catherine Clare Bernhard, attorney of record in the above-styled and numbered cause, who upon her oath does hereby swear and affirm upon her personal knowledge that all statements of fact contained in the foregoing Motion are in all respects true and correct.



Catherine Clare Bernhard

STATE OF TEXAS
COUNTY OF DALLAS

SUBSCRIBED AND SWORN BEFORE ME, the undersigned Notary Public, on this the 10th day of February, 2016.

CLINTON J. STAFFORD
MY COMMISSION EXPIRES
December 5, 2017

Notary Public in and for the
State of Texas.

## CERTIFICATE OF SERVICE

I hereby certify to the Court that a true and correct copy of the above and foregoing motion was delivered to Helena F. Faulkner with the Tarrant County District Attorney's Office by email to hfaulkner@tarrantcountytx.gov on February 10, 2016.

1742

## CERTIFICATE OF CONFERENCE

I hereby certify that on February 8, 2016, undersigned counsel conferred with counsel for the State, Helena Faulkner, concerning Applicant's Motion for Extension of Time to File 11.071 Writ Application. Counsel for the State indicated that she does not oppose this Motion.

WRIT NO. _____

TRIAL COURT NO. 1361004

APPEAL NO. AP-77,040

| | | |
|---|---|---|
| EX PARTE | * | IN THE 371ST JUDICIAL |
| | * | DISTRICT COURT |
| CEDRIC RICKS | * | TARRANT COUNTY, TEXAS |

ORDER ON APPLICANT'S MOTION FOR EXTENSION OF TIME TO

FILE ART. 11.071 WRIT APPLICATION

On the ___2 11 16___, the Court having considered the above and foregoing Motion finds the same is hereby **GRANTED / DENIED**.

_____
Judge Presiding

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

FEB 11 2016
TIME____9:28____
BY_____DEPUTY

1744

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

APR 04 2016

TIME _____9:27am_____
BY_____ DEPUTY
cc: JSC, State

WRIT NO. _____

TRIAL COURT NO. 1361004

| | |
|---|---|
| EX PARTE | IN THE 371st JUDICIAL |
| | DISTRICT COURT |
| CEDRIC RICKS | TARRANT COUNTY, TEXAS |

## SECOND EX PARTE
## FUNDING MOTION FOR EXPERT ASSISTANCE

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the indigent Applicant, by counsel, and pursuant to Tex. Code Crim. Proc. art. 11.071§3, the 5th, 6th, 8th and 14th Amendments to the United States Constitution and Sections 10, 13 & 19 of Article I of the Texas Constitution and other authority cited herein, moves this Court to enter a finding that there is a reasonable necessity for expert assistance and funding as requested in this motion. In support thereof, this Applicant would show:

I.

(a) Cedric Ricks was convicted of capital murder and sentenced to death. Undersigned counsel has been appointed to investigate expeditiously, the factual and

SCANNED

1745

legal grounds for the filing of an application for a writ of habeas corpus pursuant to Art. 11.071 of the Texas Code of Criminal Procedure.

(b) This Court has determined that the Applicant is indigent. His counsel is unable to retain any expert assistance due to Applicant's indigent status.

## II.

The funding that is requested will provide Counsel with essential tools necessary to investigate the legality of Applicant's confinement. Specifically, the claim to be investigated is that Applicant's trial counsel rendered ineffective assistance in failing to discover significant mitigating evidence. In order to investigate such a claim, counsel needs a psychologist to assess the significance of some of mitigation evidence that has been discovered post trial. Counsel has consulted Dr. Joanne Murphey, a psychologist with extensive forensic experience. This court previously authorized funds in the amount of $2500 for Dr. Murphey to review the evidence and provide an opinion in this case. However, those funds have now been exhausted and a final report has not yet been completed. Dr. Murphey estimates that an additional $2500 is necessary to complete her work in this case.

Applicant is entitled to such expert assistance upon a threshold showing that the assistance sought is relevant to a claim to be investigated and reasonable. Tex. Code Crim. Proc. Ann. art. 11.071 §3(b); cf. Ake v. Oklahoma, 470 U.S. 68 (1985).

1746

WHERFORE PREMISES CONSIDERED, the Applicant respectfully prays that this Court allow the Applicant funds in the amount of $2,500 to hire Dr. Murphey to assist in the preparation of his defense.

Respectfully submitted,

Catherine Clare Bernhard
P.O. Box 2817
Red Oak, Texas 75154
972-617-5548
fax 972-421-1604
cbernhard@sbcglobal.net
State Bar No. 02216575

ATTORNEY FOR APPLICANT

1747

## VERIFICATION

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this date personally appeared Catherine Clare Bernhard, attorney of record in the above-styled and numbered cause, who upon her oath does hereby swear and affirm upon her personal knowledge that all statements of fact contained in the foregoing Motion are in all respects true and correct.



_____
Catherine Clare Bernhard

STATE OF TEXAS

SUBSCRIBED AND SWORN BEFORE ME, the undersigned Notary Public, on this the 2ⁿ day of March, 2016.

CLINTON J. STAFFORD
MY COMMISSION EXPIRES
December 5, 2017

_____
Notary Public in and for the
State of Texas.

1748

WRIT NO. _____

TRIAL COURT NO. 1361004

EX PARTE

CEDRIC RICKS

IN THE 371ˢᵗ JUDICIAL

DISTRICT COURT

TARRANT COUNTY, TEXAS

ORDER ON APPLICANT'S SECOND EX PARTE FUNDING MOTION FOR
EXPERT ASSISTANCE

On _4/4/16_, the Court having considered the above and foregoing motion,
finds the same is hereby **GRANTED in an amount not to exceed** _$3500_ /
**DENIED** in which case Applicant requests that the Court designate in writing its reasons
for denying this request as required by Tex. Code Crim. Proc. Ann. art. 11.071 §3 (c).

_____
Judge Presiding

1749



THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

APR 04 2016

TIME _____ 9:27 am

BY _____ MM _____ DEPUTY

cc: JSC, State

WRIT NO. _____

TRIAL COURT NO. 1361004

EX PARTE

CEDRIC RICKS

IN THE 371ˢᵗ JUDICIAL

DISTRICT COURT

TARRANT, COUNTY, TEXAS

EX PARTE

FUNDING MOTION FOR RESEARCH ASSISTANCE

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the indigent Applicant, by counsel, and pursuant to Tex. Code Crim. Proc. art. 11.071§3, the 5ᵗʰ, 6ᵗʰ, 8ᵗʰ and 14ᵗʰ Amendments to the United States Constitution and Sections 10, 13 & 19 of Article I of the Texas Constitution and other authority cited herein, moves this Court to enter a finding that there is a reasonable necessity for expert assistance and funding as requested in this motion. In support thereof, this Applicant would show:

I.

(a) Cedric Ricks was convicted of capital murder and sentenced to death. Undersigned counsel has been appointed to investigate expeditiously, the factual and

SCANNED

1750

legal grounds for the filing of an application for a writ of habeas corpus pursuant to Art. 11.071 of the Texas Code of Criminal Procedure.

(b)  Part of that investigation must include conducting legal research. Applicant is requesting that this Court approve and provide funding for Applicant to retain the services of a research assistant.

(c) This Court has determined that the Applicant is indigent.  His counsel is unable to retain any expert assistance due to Applicant's indigent status.

## II.

The funding that is requested will provide Counsel with essential tools necessary to investigate the legality of Applicant's confinement. Specifically, the claim to be investigated is that trial counsel and appellate counsel were ineffective for failing to raise various legal claims in this case. Applicant is entitled to such expert assistance upon a threshold showing that the assistance sought is relevant to a claim to be investigated. Cf. Ake v. Oklahoma, 470 U.S. 68 (1985). A research assistant will also save the court money in the long run since the court will not have to pay the higher hourly rate of undersigned counsel to do this work.

## III.

1751

Counsel has spoken to a research assistant who can provide the assistance that counsel requests. Counsel is requesting $75 per hour for this assistance. Counsel estimates that this assistant will need to devote approximately 50 hours to this case. Counsel seeks funding in the amount of $3750 for research assistance in this case.

## VII.

This motion is made ex parte pursuant to Tex. Code Crim. Proc. Ann. art. 11.071 §3. It would be fundamentally unfair to require this indigent Applicant to divulge to the prosecution the nature of this motion for funding which will necessarily inform the State of defensive theories of mitigation. Williams v. State, 958 S.W.2d 186 (Tex. Crim. App. 1997). If the undersigned counsel were retained by the accused, there would be no requirement that the State be notified of the retention of expert assistance.

1752

WHERFORE PREMISES CONSIDERED, Movant prays that this Court:

(a) Find that a threshold showing has been made that a research assistant is an essential tool in the investigation of the factual and legal grounds for the filing of an application for a writ of habeas corpus pursuant to Art. 11.071 of the Texas Code of Criminal Procedure.

(b) approve funding in the amount of $3750.

(c) that the Movant have such other and further relief as he may show himself to be justly entitled.

Respectfully submitted,

Catherine Clare Bernhard
P.O. Box 2817
Red Oak, Texas 75154
972-617-5548
fax – 972-421-1604
State Bar No. 01226575
cbernhard@sbcglobal.net

**ATTORNEY FOR APPLICANT**

1753

## VERIFICATION

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this date personally appeared Catherine Clare Bernhard, attorney of record in the above-styled and numbered cause, who upon her oath does hereby swear and affirm upon her personal knowledge that all statements of fact contained in the foregoing Motion are in all respects true and correct.



Catherine Clare Bernhard

STATE OF TEXAS
COUNTY OF DALLAS

SUBSCRIBED AND SWORN BEFORE ME, the undersigned Notary Public, on this the _____ day of April, 2016.

CLINTON J. STAFFORD
MY COMMISSION EXPIRES
December 5, 2017

Notary Public in and for the
State of Texas.

1754

## ORDER

On ___4 4 16___, the Court having considered the above and foregoing motion, finds the same is hereby **GRANTED** and funding is approved in the amount of $___3750___ / **DENIED,** in which case Applicant requests that the court designate in writing the reasons for denying said motion, in whole or in part, as required by Tex. Code Crim. Proc. Ann. art. 11.071 § 3(c).

Judge Presiding

1755

WRIT NO. _____

TRIAL COURT NO. 1361004

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

APR 04 2016

TIME _____9:27am_____
BY _____MM_____ DEPUTY
cc  JSC/State

EX PARTE

CEDRIC RICKS

IN THE 371st JUDICIAL

DISTRICT COURT

TARRANT COUNTY, TEXAS

EX PARTE

FUNDING MOTION FOR EXPERT ASSISTANCE

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the indigent Applicant, by counsel, and pursuant to Tex. Code

Crim. Proc. art. 11.071§3, the 5th, 6th, 8th and 14th Amendments to the United States

Constitution and Sections 10, 13 & 19 of Article I of the Texas Constitution and

other authority cited herein, moves this Court to enter a finding that there is a

reasonable necessity for expert assistance and funding as requested in this motion.

In support thereof, this Applicant would show:

I.

(a) Cedric Ricks was convicted of capital murder and sentenced to death.

Undersigned counsel has been appointed to investigate expeditiously, the factual and

legal grounds for the filing of an application for a writ of habeas corpus pursuant to Art. 11.071 of the Texas Code of Criminal Procedure.

(b) This Court has determined that the Applicant is indigent. His counsel is unable to retain any expert assistance due to Applicant's indigent status.

## II.

The funding that is requested will provide Counsel with essential tools necessary to investigate the legality of Applicant's confinement. Specifically, the claim to be investigated is that Applicant's trial counsel rendered ineffective assistance in failing to discover significant mitigating evidence. In order to investigate such a claim, counsel needs an expert in risk assessment to assess the evidence in this case. To this end, Counsel has consulted Dr. Jonathan Sorensen, an experience expert in risk assessment in capital murder cases. Dr. Sorensen estimates that a review of the evidence in this case and preparation of a report could be done for $2,500. A copy of his curriculum vitae is attached and incorporated.

Applicant is entitled to such expert assistance upon a threshold showing that the assistance sought is relevant to a claim to be investigated and reasonable. Tex. Code Crim. Proc. Ann. art. 11.071 §3(b); cf. Ake v. Oklahoma, 470 U.S. 68 (1985).

1757

WHERFORE PREMISES CONSIDERED, the Applicant respectfully prays that this Court allow the Applicant funds in the amount of $2,500 to hire Dr. Sorensen to assist in the preparation of his defense.

Respectfully submitted,

Catherine Clare Bernhard
P.O. Box 2817
Red Oak, Texas 75154
972-617-5548
fax 972-421-1604
cbernhard@sbcglobal.net
State Bar No. 02216575

**ATTORNEY FOR APPLICANT**

1758

## VERIFICATION

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this date personally appeared Catherine Clare Bernhard, attorney of record in the above-styled and numbered cause, who upon her oath does hereby swear and affirm upon her personal knowledge that all statements of fact contained in the foregoing Motion are in all respects true and correct.

Catherine Clare Bernhard

STATE OF TEXAS

SUBSCRIBED AND SWORN BEFORE ME, the undersigned Notary Public, on this the 31 day of March, 2016.



CLINTON J. STAFFORD
MY COMMISSION EXPIRES
December 5, 2017

Notary Public in and for the
State of Texas.

1759

Vita                                                                    Spring 2016

# JON SORENSEN

Department of Criminal Justice
East Carolina University                    Phone:  (252) 328-2411
238 Rivers Building                         Fax:    (252) 737-1769
Greenville, NC 27858-4353                   E-mail:  sorensenj@ecu.edu

Education:
Ph.D., Criminal Justice, Sam Houston State University, Huntsville, TX 1990
M.A., Criminology & Corrections, Sam Houston State University, Huntsville, TX 1987
B.S., Criminal Justice, Pan American University, Edinburg, TX 1986

Employment:
Professor, Criminal Justice, East Carolina University, Greenville, NC 2012
Professor, Justice Studies, Prairie View A&M University, Prairie View, TX 2003
Senior Research Associate, State Sentencing and Corrections, Vera Institute of Justice, NYC 2000
Associate Professor, Criminal Justice, University of Texas – Pan American, Edinburg, TX 1994
Assistant Professor, Criminal Justice, Central Missouri State University, Warrensburg, MO 1990
Doctoral Fellow, Criminal Justice, Sam Houston State University, Huntsville, TX 1987
Tutor, History, Pan American University, Edinburg, TX 1984

Selected Publications:

Cihan, A., Davidson, M., & Sorensen. J. (Forthcoming). Analyzing the Heterogeneous Nature of Inmate
    Behavior: Trajectories of Prison Misconduct. Prison Journal.

Cunningham, M., Reidy, T. & Sorensen, J. (Forthcoming). Wasted Resources and Gratuitous Suffering:
    The Failure of a Security Rationale for Death Row.  Psychology, Public Policy, and the Law.

Reidy, T., Sorensen, J., & Davidson, M. (Forthcoming). Testing the predictive validity of the Personality
    Assessment Inventory (PAI) in relation to inmate misconduct and violence. Psychological
    Assessment.

Vartkessian, E., Sorensen, J., & Kelly, C. (Forthcoming). Tinkering with the machinery of death:
    An analysis of juror decision-making in Texas death penalty trials during two statutory eras.
    Justice Quarterly.

Espinosa, E. & Sorensen, J. (2016). The influence of gender and trauma on length of time served in
    juvenile justice settings. Criminal Justice and Behavior 43: 187-203.

Davidson, M., Reidy, T., & Sorensen, J. (2016) Gender-responsiveness in corrections: Estimating female
    inmate misconduct risk using the Personality Assessment Inventory (PAI). Law and Human
    Behavior 40: 72-81.

Sorensen, J., Vigen, M., Woods, S., & Williams, B. (2015). Assaults on inmates and staff by perpetrators
    of intimate partner homicide: An examination of competing hypotheses. Journal of Interpersonal
    Violence 30: 3367-3388.

Sorensen, J., Bonner, H., Visconte, S., Vigen, M., & Woods, S. (2015). Home invasion homicide offenders:
    An analysis of subsequent prison rule violations. Violence and Victims 30: 1082-1098.

Dawkins, M. & Sorensen, J. (2015). The impact of residential placement on aggregate delinquency: A state-level panel study, 1997-2011. Criminal Justice Policy Review 26: 85-100.

Cunningham, M. & Sorensen, J. (2014). Future dangerousness. In J.R. Acker, C. Lanier, & R. Bohm (eds.) America's Experiment with Capital Punishment: Reflections on the Past, Present and Future of the Ultimate Penal Sanction. 3rd edition. Durham, NC: Carolina Academic Press.

Brown, J. & Sorensen, J. (2014). Legal and extra-legal factors related to the imposition of blended sentences. Criminal Justice Policy Review 15: 227-241.

Espinosa, E., Sorensen, J., & Lopez, M. (2013). Youth pathways to placement: The influence of gender, mental health need and trauma on confinement in the juvenile justice system. Journal of Youth and Adolescence 42: 1824-1836.

Davis, J. & Sorensen, J. (2013). Disproportionate minority confinement of juveniles: A national examination of Black-White disparity in placements, 1997-2006. Crime & Delinquency 59: 115-139.

Brown, J. & Sorensen, J. (2013). Race, ethnicity, gender and waiver to adult court. Journal of Ethnicity in Criminal Justice 11:181-195.

Davis, J. & Sorensen, J. (2013). Disproportionate juvenile minority confinement: A state-level assessment of racial threat. Youth Violence and Juvenile Justice 11: 296-312.

Reidy, T.; Sorensen, J.; & Cunningham, M. (2013). Probability of criminal acts of violence: A test of jury predictive accuracy. Behavioral Sciences and the Law 31: 286-305.

Davis, J. & Sorensen, J. (2013). Violence propensity among capital murder defendants: Using base rates and correlational data to supplement clinical risk assessments. Journal of the American Academy of Psychiatry and the Law 41: 391-400.

Reidy, T.; Sorensen, J.; & Cunningham, M. (2012). Community violence to prison assault: A test of the behavioral continuity hypothesis. Law and Human Behavior 36: 356-363.

Sorensen, J.; Cunningham, M; Vigen, M.; & Woods, S. (2011). Serious assaults on prison staff: A descriptive analysis. Journal of Criminal Justice 39: 143-150.

Cunningham, M.; Sorensen, J.; Vigen, M.; & Woods, S. (2011). Life and death in the lone star state: Three decades of violence predictions by capital juries. Behavioral Sciences and the Law 29: 1-22.

Sorensen, J. & Davis, J. (2011). Violent criminals locked up: Examining the effect of incarceration on behavioral continuity. Journal of Criminal Justice 39: 151-158.

Cunningham, M.; Sorensen, J.; Vigen, M.; & Woods, S. (2011). Correlates and actuarial models of assaultive prison misconduct among violence-predicted capital offenders. Criminal Justice and Behavior 38: 5-25.

Cunningham, M.; Sorensen, J.; Vigen, M.; & Woods, S. (2010). Inmate homicides in Texas prisons: Killers, victims, motives, and circumstances. Journal of Criminal Justice 38: 348-358.

Davis, J. & Sorensen, J. (2010). Doctoral programs in criminal justice and criminology: A meta-analysis of program ranking. Southwest Journal of Criminal Justice 7: 6-23.

Sorensen, J. & Cunningham, M. (2010). Conviction offense and prison violence: A comparative study of murderers and other offenders. Crime & Delinquency 56: 103-125.

Cunningham, M. & Sorensen, J. (2010). Improbable predictions at capital sentencing: Contrasting prison violence outcomes. Journal of the American Academy of Psychiatry and the Law 38: 61-72.

Emeka, T. & Sorensen, J. (2009). Female juvenile risk: Is there a need for gendered assessment instruments? Youth Violence and Juvenile Justice 7: 313-330.

Sorensen, J. An assessment of the relative impact of criminal justice and criminology journals. (2009). Journal of Criminal Justice 37: 505-511.

Cunningham, M; Sorensen, J.; & Reidy, T. (2009). Capital jury decision-making: The limitations of Predictions of future violence. Psychology, Public Policy, and Law 15: 223-256.

Sorensen, J. & Cunningham, M. (2009). Once a killer, always a killer? Prison misconduct of former death-sentenced inmates in Arizona. Journal of Psychiatry and Law 37: 237-267.

Snell, C.; Sorensen, J.; Rodriguez, J.; & Kuanliang, A. (2009). Gender differences in research productivity among criminal justice and criminology scholars. Journal of Criminal Justice 37: 288-295.

Sorensen, J. (2009). Researching future dangerousness. In J.R. Acker, C. Lanier, W.J. Bowers (eds.) The Next Generation of Death Penalty Research: Priorities, Strategies, and an Agenda. Durham, NC: Carolina Academic Press.

Barfield-Cottledge, T.; Cintron, M.; & Sorensen, J. (2008). An examination of female youth gangs. Journal of Knowledge and Best Practices in Juvenile Justice & Psychology 2: 23-31.

Kuanliang, A.; Sorensen, J.; & Cunningham, M. (2008). Juvenile offenders in an adult prison system: A comparative examination of rates and correlates of misconduct. Criminal Justice and Behavior 35: 1186-1201.

Cunningham, M.; Reidy, T.; & Sorensen, J. (2008). Assertions of "future dangerousness" at federal capital sentencing: Rates and correlates of subsequent prison misconduct and violence Law and Human Behavior 32: 46-63.

Kuanliang, A. & Sorensen, J. (2008). Predictors of self-reported prison misconduct. Criminal Justice Studies 21: 27-35.

Cunningham, M. & Sorensen, J. (2007). Capital offenders in Texas prisons: Rates, correlates, and an actuarial analysis of violent misconduct. Law and Human Behavior 31: 553-571.

Sorensen, J. & Cunningham, M. (2007). Operationalizing risk: The influence of measurement choice on the prevalence and correlates of prison violence among incarcerated murderers. Journal of Criminal Justice 35: 546-555.

Cunningham, M. & Sorensen, J. (2007). Predictive factors for violent misconduct in close custody. Prison Journal 87: 241-253.

3

Kuanliang, A. & Sorensen, J. (2007). Trends in sentencing: Are we tough enough? In M.D. McShane and F.P. Williams III (eds.) Youth Violence and Delinquency Interventions: Monsters and Myths Volume 2. Westport, CT: Greenwood, pp. 17-27.

Sorensen, J. & Pilgrim, R. (2006) Lethal Injection: Capital Punishment in Texas During the Modern Era. Austin: University of Texas.

Sorensen, J.; Snell, C.; & Rodriguez, J. (2006). An assessment of criminal justice and criminology journal prestige. Journal of Criminal Justice Education 17: 297-322.

Cunningham, M. & Sorensen, J. (2006). Nothing to lose? A comparative examination of prison misconduct rates among life-without-parole and other long-term high-security inmates. Criminal Justice & Behavior 33: 683-705.

Cunningham, M. & Sorensen, J. (2006). Actuarial models for assessing prison violence risk: Revisions and extensions of the Risk Assessment Scale for Prison (RASP). Assessment 13: 253-265.

Cunningham, M.; Reidy, T.; & Sorensen, J.; (2005). Is death row obsolete? A decade of mainstreaming death-sentenced prisoners in Missouri. Behavioral Sciences and the Law 23: 307-320.

Cunningham, M.; Sorensen, J.; & Reidy, T. (2005). An actuarial model for assessment of prison violence risk among maximum security inmates. Assessment 12: 40-49.

Cunningham, M.; Sorensen, J.; & Reidy, T. (2004). Revisiting future dangerousness revisited: Response to DeLisi and Munoz. Criminal Justice Policy Review 15: 365-376.

Sorensen, J. & Marquart, J.W. (2003) Future dangerousness and incapacitation. In J.R. Acker, C. Lanier, & R. Bohm (eds.) America's Experiment with Capital Punishment: Reflections on the Past, Present and Future of the Ultimate Penal Sanction. 2nd edition. Durham, NC: Carolina Academic Press, pp. 283-300.

Sorensen, J; Hope, R.; & Stemen, D. (2003) Racial disproportionality in state prison admissions: Can regional variations be explained by differential arrest rates? Journal of Criminal Justice 31: 73-84.

Sorensen, J.; Patterson, A.; & Cohen, N. (2002) Ethnicity, nationality, and criminal case disposition on the border. Rio Bravo 1(new series): 71-78.

Sorensen, J. & Stemen, D. (2002) The effect of state sentencing policies on incarceration rates. Crime & Delinquency 48: 456-475.

Sorensen, J. & Pilgrim, R. (2002) Institutional affiliation of authors in the top criminal justice journals, 1995-1999. Journal of Criminal Justice 30: 11-18.

Sorensen, J.; Wallace, D.; & Pilgrim, R. (2001) Empirical studies on race and death sentencing: A decade after the GAO Report. Criminal Law Bulletin 37: 395-408.

Reidy, T.J.; Cunningham, M.D.; & Sorensen, J. (2001) From death to life: Prison behavior of former death row inmates in Indiana. Criminal Justice and Behavior 28: 62-82.

1763

Brock, D.; Cohen, N.; & Sorensen, J. (2000) Arbitrariness in the imposition of death sentences in Texas: an analysis of four counties by offense seriousness, race of victim, and race of offender. American Journal of Criminal Law 28: 43-71.

Sorensen, J. & Pilgrim, R. (2000) An actuarial risk assessment of violence posed by capital murder defendants. Journal of Criminal Law and Criminology 90: 1251-70.

Brock, D.; Sorensen, J.; & Marquart, J. (2000) Tinkering with the machinery of death: An analysis of the impact of legislative reform on the sentencing of capital murderers in Texas. Journal of Criminal Justice 28: 343-349.

Cohn, E.G.; Farrington, D.P.; & Sorensen, J. (2000) Journal publications of PhD graduates from American criminology and criminal justice programs, 1988-1997. Journal of Criminal Justice Education 11: 35-49.

Brock, D.; Sorensen, J.; & Marquart, J. (1999) Racial disparities in capital punishment in Texas after Penry. Justice Professional 12: 159-172.

Sorensen, J.; Wrinkle, R.; Brewer, V.; & Marquart, J. (1999) Capital punishment and deterrence: Examining the effect of executions on murder in Texas. Crime & Delinquency 45: 481-493.

Sorensen, J. & Wallace, D.H. (1999) Prosecutorial discretion in seeking death: An analysis of racial disparity in the pretrial stages of case processing in a midwestern county. Justice Quarterly 16: 559-578.

Sorensen, J. (1999) Boot camps for youthful offenders: Are they effective? NO. in C.B. Fields (ed.) Controversial Issues in Corrections. Boston: Allyn and Bacon, pp. 63-69.

Brock, D.E.; Sorensen, J.; & Marquart, J.W. (1998) The influence of race on prison sentences for murder in Twentieth Century Texas. In M.L. Dantzker, A.J. Lurigio, M.J. Seng, & J.M. Sinacore (eds.) Practical Applications for Criminal Justice. Boston: Butterworth-Heinemann, pp. 211-225.

Sorensen, J.; Wrinkle, R.; & Gutierrez, A. (1998) Patterns of rule-violating behaviors and adjustment to incarceration among murderers. Prison Journal 78: 222-231.

Wallace, D.H. & Sorensen, J. (1998) The Missouri Supreme Court's review of comparative proportionality: Explanations for three disproportionate executed death sentences. Thomas Jefferson Law Review 20: 207-276.

Marquart, J.W. & Sorensen, J. (1997) Correctional Contexts: Contemporary and Classical Readings. Los Angeles: Roxbury.

Wallace, D.H. & Sorensen, J. (1997) Comparative proportionality review: A nationwide examination of reversed death sentences. American Journal of Criminal Justice 22: 13-40.

Ethridge, P.A. & Sorensen, J. (1997) An analysis of attitudinal change and community adjustment among probationers in a county boot camp. Journal of Contemporary Criminal Justice 13: 139-154.

Sorensen, J.R. & Wrinkle, R.D. (1996) No hope for parole: Disciplinary infractions among death-sentenced and life-without-parole inmates. Criminal Justice and Behavior 23: 542-552.

5

Haghighi, B. & Sorensen, J. (1996) America's fear of crime. In T.J. Flanagan & D.R. Longmire (eds.) Americans View Crime and Justice: A National Public Opinion Survey. Thousand Oaks, CA: Sage Publications, pp. 16-30.

Brock, D.E.; Sorensen, J.R.; & Marquart, J.W. (1995) Social control in Twentieth Century Texas: The influence of ethnicity on prison terms for murder. Rio Bravo 4: 49-60.

Sorensen, J.R. & Wallace, D.H. (1995) Arbitrariness and discrimination in Missouri capital cases: An assessment using the Barnett scale. Journal of Crime and Justice 18: 21-58.

Sorensen, J.R. & Wallace, D.H. (1995) Capital punishment in Missouri: Examining the issue of racial disparity. Behavioral Sciences & the Law 11: 61-80.

Sorensen, J.R.; Burton, V.S.; Marquart, J.W.; & Alarid, L.F. (1995) Expectations and institutional support for research in criminal justice doctoral programs. Justice Professional 9: 31-43.

Marquart, J.W.; Ekland-Olson, S.; & Sorensen J.R. (1994) The Rope, the Chair, and the Needle: Capital Punishment in Texas—1924-1988. Austin: University of Texas.

Sorensen, J.R. (1994) Scholarly productivity in criminal justice: Institutional affiliation of authors in the top ten criminal justice journals. Journal of Criminal Justice 22: 535-547.

Sorensen, J.R.; Widmayer, A.; & Scarpitti, F. (1994) Examining the criminal justice and criminological paradigms: An analysis of ACJS and ASC members. Journal of Criminal Justice Education 5: 149-166.

Wallace, D.H. & Sorensen, J.R. (1994) Missouri proportionality review: An assessment of a state supreme court's procedures in capital cases. Notre Dame Journal of Law, Ethics & Public Policy 8: 281-315.

Sorensen, J.R.; Marquart, J.W.; & Brock, D.E. (1993) A comparison of factors related to the killings of felons by police and citizens. Journal of Police and Criminal Psychology 9: 20-33.

Sorensen, J.R.; Marquart, J.W.; & Brock, D.E. (1993) Factors related to killings of felons by police officers: A test of the community violence and conflict hypotheses. Justice Quarterly 10: 417-440.

Ethridge, P.A. & Sorensen, J.R. (1993) An evaluation of Citizens Against Auto Theft. Security Journal 4: 13-19.

Sorensen, J.R.; Patterson, A.L.; & Widmayer, A.L. (1993) Rejoinder: Measuring faculty productivity in a multidisciplinary field: A response to professor Marenin. Journal of Criminal Justice Education 4: 193-196.

Ralph, P.H.; Sorensen; J.R.; & Marquart, J.W. (1992) A comparison of death-sentenced and incarcerated murderers in pre-*Furman* Texas. Justice Quarterly 9: 185-209.

Sorensen, J.R.; Patterson, A.L.; & Widmayer, A.L. (1992) Publication productivity of faculty in criminology and criminal justice doctoral programs. Journal of Criminal Justice Education 3: 1-34.

Sorensen, J.R. & Marquart. J.W. (1991) Prosecutorial and jury decision making in post-*Furman* Texas capital cases. New York University Review of Law and Social Change 18: 743-76.

6

Sorensen, J.R.; Bodapati, M.; & Marquart, J.W. (1990) Research note: Two decades after *People v. Anderson*. Loyola of Los Angeles Law Review 24: 45-56.

Del Carmen, R.V. & Sorensen, J.R. (1989) Legal Issues in Drug Testing Probation and Parole Clients and Employees. National Institute of Corrections, U.S. Department of Justice. Washington: GPO.

Marquart, J.W.; Ekland-Olson, S.; & Sorensen, J.R. (1989) Gazing into the crystal ball: Can jurors accurately predict future dangerousness in capital cases? Law and Society Review 23: 449-468.

Marquart, J.W. & Sorensen, J.R. (1989) A national study of the *Furman*-commuted inmates: Assessing the threat to society from capital offenders. Loyola of Los Angeles Law Review 23: 5-28.

Sorensen, J.R. & Marquart, J.W. (1989) Working the dead. In M. Radelet (ed.) Facing the Death Penalty: Essays on Cruel and Unusual Punishment. Philadelphia, PA: Temple University Press, pp.169-177.

Sorensen, J.R. & Del Carmen, R.V. (1989) Legal aspects in drug testing offenders and criminal justice employees. In R. Weisheit (ed.) Drugs and the Criminal Justice System. Cincinnati: Anderson, pp. 329-359.

Marquart, J.W. & Sorensen, J.R. (1988) Institutional and postrelease behavior of *Furman*-commuted inmates in Texas. Criminology 26: 677-693.

Del Carmen, R.V. & Sorensen, J.R. (1988) Legal issues in drug testing probationers and parolees. Federal Probation 52: 19-27.

Grants:

Co-Principal Investigator, Domestic Violence Homicide Prevention Demonstration Initiative, Pitt County Site Team, Office of Violence Against Women, 2016-2018.

Consultant, Youth Pathways: Evaluating the Mitigating Effects of Gender, Trauma, and Mental Health Need in Juvenile Justice System Processing for System-Involved Girls. Office of Justice Programs. U.S. Department of Justice, 2015-2017.

Principal Investigator, Tobacco Project, Texas Department of State Health Services, 2005.

Senior Research Associate, National Associates Program on State Sentencing and Corrections, Clark Foundation, 2000-2001.

Courses:

Primary areas are research methods, policy, and corrections, but courses taught include a broad range at all levels: doctoral (research methods I & II, philosophy of punishment, juvenile corrections, juvenile processing by police and courts, correlates of crime & delinquency); masters (repeats of above, criminal justice principles-web, corrections-hybrid, courts-web, criminology-web, capital punishment, diversity issues in criminal justice, juvenile justice-web, policy analysis-web, management of juvenile justice organizations-web, professional paper, substance abuse-web); and, bachelors (repeats of above, race, gender, special populations & the criminal justice system; statistics, internship, correctional law, drugs & the criminal justice system).

7

Other Accomplishments:

College of Human Ecology Research Award, East Carolina University, 2012-13.

College of Juvenile Justice & Psychology Research Award, PVAMU, 2005-06; 2006-07.

Invited symposium presenter: "The Next Generation of Death Penalty Research: Priorities, Strategies, and an Agenda," sponsored by the University at Albany School of Criminal Justice, 2006; and, "The Law and Politics of the Death Penalty: Abolition, Moratorium, or Reform?," sponsored by the Wayne Morse Center for Law and Politics, University of Oregon, 2002.

Three research articles were cited by Justice Breyer in Ring v. Arizona, 536 U.S. 584 (2002). This body of work was also referenced by Justice Breyer in Glossip v. Gross, 135 S.Ct. 1885 (2015).

Several articles have been reprinted in edited collections, most notably in Hugo A. Bedau's, The Death Penalty in America, published by Oxford University Press, 1997.

The Rope, The Chair, and The Needle selected by the Association of College and Research Libraries for the American Library Association's *Choice list* of Outstanding Books for 1995.

Refereed for numerous journals, including Criminology, Justice Quarterly, Criminology and Public Policy, Crime & Delinquency, Journal of Research in Crime & Delinquency, Journal of Criminal Justice, Assessment, Journal of Quantitative Criminology, Youth Violence and Juvenile Justice, Journal of Criminal Justice Education, Prison Journal, Race and Justice, Journal of Interpersonal Violence, Criminal Justice Studies, Homicide Studies.

Editor of Southwest Journal of Criminal Justice, 2004-05; Associate editor, 2005-present.

References:
Available upon request.

WRIT NO. _____

TRIAL COURT NO. 1361004

EX PARTE                         IN THE 371ˢᵗ JUDICIAL

                                 DISTRICT COURT

CEDRIC RICKS                     TARRANT COUNTY, TEXAS

## ORDER ON APPLICANT'S EX PARTE FUNDING MOTION FOR EXPERT ASSISTANCE

On ___4 4 16___, the Court having considered the above and foregoing motion, finds the same is hereby **GRANTED in an amount not to exceed** $2600 / **DENIED** in which case Applicant requests that the Court designate in writing its reasons for denying this request as required by Tex. Code Crim. Proc. Ann. art. 11.071 §3 (c).

_____
Judge Presiding

1768

FILED
THOMAS A WILDER DIST CLERK
TARRANT COUNTY, TEXAS

APR 14 2016

TIME_____11:44am_____
BY_____ DEPUTY

WRIT NO. _____

TRIAL COURT NO. 1361004

EX PARTE

IN THE 371st JUDICIAL

DISTRICT COURT

CEDRIC RICKS

TARRANT COUNTY, TEXAS


EX PARTE

FUNDING MOTION FOR EXPERT ASSISTANCE

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the indigent Applicant, by counsel, and pursuant to Tex. Code Crim. Proc. art. 11.071§3, the 5th, 6th, 8th and 14th Amendments to the United States Constitution and Sections 10, 13 & 19 of Article I of the Texas Constitution and other authority cited herein, moves this Court to enter a finding that there is a reasonable necessity for expert assistance and funding as requested in this motion. In support thereof, this Applicant would show:

I.

(a) Cedric Ricks was convicted of capital murder and sentenced to death. Undersigned counsel has been appointed to investigate expeditiously, the factual and

SCANNED

legal grounds for the filing of an application for a writ of habeas corpus pursuant to Art. 11.071 of the Texas Code of Criminal Procedure.

(b) This Court has determined that the Applicant is indigent. His counsel is unable to retain any expert assistance due to Applicant's indigent status.

## II.

The funding that is requested will provide Counsel with essential tools necessary to investigate the legality of Applicant's confinement. Specifically, the claim to be investigated is that Applicant's trial counsel rendered ineffective assistance in failing to discover significant mitigating evidence. In order to investigate such a claim, counsel needs a psychologist to assess the significance of some of mitigation evidence that has been discovered post trial. To this end, Counsel has consulted Dr. John Fabian, a psychologist with extensive forensic experience. Dr. Fabian estimates that a review of the evidence in this case could be done for $5,000. A copy of his curriculum vitae is attached and incorporated.

Applicant is entitled to such expert assistance upon a threshold showing that the assistance sought is relevant to a claim to be investigated and reasonable. Tex. Code Crim. Proc. Ann. art. 11.071 §3(b); cf. Ake v. Oklahoma, 470 U.S. 68 (1985).

1770

WHERFORE PREMISES CONSIDERED, the Applicant respectfully prays that this Court allow the Applicant funds in the amount of $5,000 to hire Dr. Fabian to assist in the preparation of his defense.

Respectfully submitted,

Catherine Clare Bernhard
P.O. Box 2817
Red Oak, Texas 75154
972-617-5548
fax 972-421-1604
cbernhard@sbcglobal.net
State Bar No. 02216575

ATTORNEY FOR APPLICANT

1771

## VERIFICATION

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this date personally appeared Catherine Clare Bernhard, attorney of record in the above-styled and numbered cause, who upon her oath does hereby swear and affirm upon her personal knowledge that all statements of fact contained in the foregoing Motion are in all respects true and correct.



Catherine Clare Bernhard

STATE OF TEXAS

SUBSCRIBED AND SWORN BEFORE ME, the undersigned Notary Public, on this the 10th day of April, 2016.

CLINTON J. STAFFORD
MY COMMISSION EXPIRES
December 5, 2017

Notary Public in and for the
State of Texas.

1772

## JOHN MATTHEW FABIAN, PSY.D., J.D., ABPP
## BOARD CERTIFIED FORENSIC & CLINICAL PSYCHOLOGIST
## FORENSIC& CLINICAL NEUROPSYCHOLOGIST

Telephone: 512.487.7216/216.338.6462 ▪email/web:john@johnmatthewfabian.com

## CURRICULUM VITAE

| | |
|---|---|
| **Board Certifications** | American Board of Professional Psychology |
| | Board Certified Diplomate in Forensic Psychology |
| | Board Certified Diplomate in Clinical Psychology |
| | |
| **Fellowship Training** | Clinical Neuropsychology |
| | University of New Mexico School of Medicine |
| | Center for Neuropsychological Services & |
| | Neuropsychology Polytrauma Unit Raymond G. Murphy VA |
| | Medical Center New Mexico VA Health Care System |
| | |
| **Hospital Consulting Appointment** | North Dakota State Hospital Forensic Services Unit |
| | Consultant for the Forensic Evaluation Team |

**EDITORIAL BOARDS**
**JOURNAL REVIEWS**

Journal of Aggression and Violent Behavior
Journal of Forensic Psychology Practice
Psychological Injury and Law
Forensic Psychology Unbound Book Review and Legal Section Editor
Journal of Psychiatry and Behavioral Science
Reviewer Homicide Studies
Reviewer International Journal of Offender Therapy & Comparative Criminology
Reviewer Research in Developmental Disabilities
Reviewer Criminal Justice Review
Reviewer Journal of Sexual Medicine
Psychological Services
Journal of Sex and Marital Therapy
Justice Quarterly
Archives of Clinical Neuropsychology

2

1773

## PUBLICATIONS

**Book Chapter**

Fabian, J.M. Forensic Neuropsychology and Violence: Neuroscientific and Legal Implications. In *Handbook of Forensic Neuroscience* (in press). Eds., Anthony Beech, Adam J Carter, Ruth Mann and Pia Rotshtein. Oxford, England: Wiley Blackwell

**Peer Reviewed Journals**

Fabian, J.M. Assessing the sex offender with Asperger's Disorder: A forensic psychological and neuropsychological perspective. Sex Offender Law Report, Vol 12(5), 65-69.

Fabian, J.M. Diagnosing and litigating hebephilia in sexually violent predator civil commitment proceedings. American Academy of Psychiatry and Law (39), 496-505.

Fabian, J.M. (2011). Paraphilias and predators: The ethical application of psychiatric diagnoses in partisan sexually violent predator commitment proceedings. Journal of Forensic Psychology Practice, Vol. 11(1), 82-98.

Fabian, J.M. (2011). Applying *Roper v. Simmons* in juvenile transfer/waiver proceedings. International Journal of Offender Therapy and Comparative Criminology, 55(5).

Fabian, J.M. (2010). Neuroscience, volitional impairment and sexually violent predators: A review of the literature and its application to civil commitment proceedings. Journal of Aggression and Violent Behavior (17), 1-15.

Fabian, J.M. (2010). Neuropsychological and neurological correlates in violent and homicidal offenders: A legal and neuroscience perspective. Journal of Aggression and Violent Behavior, Vol. 15(3), 209-223.

Fabian, J.M. (2009). Mitigating murder at capital sentencing: An empirical and practical psycho-legal strategy. Journal of Forensic Psychology Practice Vol. 9(1), 1-34.

Fabian, J.M. (2008). Current standards and practices in violence risk assessment and communication at a maximum security forensic hospital following a high profile sexual homicide. Journal of Aggression and Violent Behavior, 13(5), 337-345.

Fabian, J.M. (2007). Methamphetamine motivated murder: Forensic psychological/psychiatric & legal applications in criminal contexts. Journal of Psychiatry and Law, 35(4), 443-474.

1774

Case 4:20-cv-01299-O   Document 8206   A literature review of the ...ity of selected violence 611619

and sexual violence risk assessment instruments. Journal of Psychiatry
and Law, 34(3), 307-350.

Fabian, J.M. (2006). State supreme court responses to *Atkins v. Virginia*:
Adaptive functioning assessment in light of purposeful planning,
premeditation, and the behavioral context of the homicide. Journal of
Forensic Psychology Practice, 6(4).

Fabian, J.M. (2005). Life, death, and IQ: it's much more than just a score:
The dilemma of the mentally retarded on death row. Journal of Forensic
Psychology Practice, 5(4).

**Law Review Journals**

Fabian, J.M., Thompson, W., & Lazarus, J. (2011). Life, Death, and IQ: It's
much more than just a score. Understanding and utilizing forensic
psychological and neuropsychological evaluations in *Atkins*
intellectual disability/mental retardation cases.
Cleveland State Law Review, 59(3).

Fabian, J.M. (2011). The Adam Walsh Child Protection and Safety Act: Legal
and psychological aspects of the new civil commitment law for
federal sex offenders. Cleveland State Law Review, 59(3).

Fabian, J.M. (2006). Rethinking "rational" in the *Dusky* standard:
Assessing a high profile delusional killer's functional abilities in the
Courtroom in the context of a capital murder trial.
Quinnipiac Law Review, 25(2).

Fabian, J.M. (2005). The risky business of conducting risk assessments for those
already civilly committed as sexually violent predators.
William Mitchell School of Law, 32(1).

Fabian, J.M. (2003). Examining our approaches to sex offenders & the law:
Kansas v. Hendricks, Crane and beyond: "mental abnormality," and
"sexual dangerousness,": volitional vs. emotional abnormality and the
debate between community safety and civil liberties. William Mitchell
School of Law, 29(4).

Fabian, J.M. (2003). Death penalty mitigation and the role of the forensic
psychologist. University of Alabama Law & Psychology Review, 27.

**Bar Journals**

Fabian, J.M. (2011). Evaluating Ohio's Life Tail Sexual Violent Predator
Indictment Specification: The Necessity of a Sexual Offender Risk
Assessment at Sentencing Phase. Vindicator (OACDL), 34-41.

Fabian, J.M. (2009). To catch a predator, and then commit him for life.
Part I: Analyzing the Adam Walsh Act's Civil Commitment Scheme
under 18 U.S.C. § 4248. Part II Sexual Offender
Risk Assessment. NACDL Champion Magazine.

4

Fabian, J.M. (2007). Adam Walsh Child Protection and Safety Act: Legal, psychological, aspects of the new civil commitment law for federal sex offenders. NLADA Cornerstone, 29(2).

Fabian, J.M. & Friedman, I. (2007). Get tough on sex offenders: The Adam Walsh Act & Ohio Senate Bill 10. Law & Fact, 83(2).

Fabian, J.M. (2007). How to deal with difficult clients from a mental health perspective. NACDL Champion Magazine.

Fabian, J.M. (2007). How to utilize forensic psychological evaluations within internet online solicitation and pornography sex crime cases. TCDLA, The Voice for the Defense.

Fabian, J.M., &, Gideon, A.F. (2007). The law and psychology in workers' compensation claims. Law & Fact, 83(3).

Fabian, J.M. & Lazarus, J. (2007). Considering *Roper v. Simmons* in waiver/bindover proceedings. Law & Fact, 83(2).

Fabian, J.M. (2007). Megan's law and sexual violence risk assessment. Law & Fact, 83(1).

Neller, D., & Fabian, J.M. (2007). Trauma and its link to violence. Center for Crime and Justice Studies-Criminal Justice Matters

Fabian, J.M. (2006). Forensic psychological/psychiatric evaluations in mortgage foreclosure cases: a clinical and legal perspective. Law & Fact, 82(4).

Fabian, J.M. (2004). Psychologists as expert witnesses in the courtroom: an overview of forensic psychology. Law & Fact.

**Book Reviews**

Fabian, J.M. (2011). Book review of C.D. Rostow & R.D. Davis. *A Handbook for Psychological Fitness-for-Duty Evaluations in Law Enforcement.*

Fabian, J.M. (2009). Book review of Ira Packer. *Evaluation of Criminal Responsibility.* In *Forensic Psychology Unbound.*

Fabian, J. M. (2015). Review of: Hynan, D. (2014). Child custody evaluation New theoretical applications and research. Illinois: Charles C. Thomas, Publisher, Ltd. 254 pages. ISBN-13: 978-0398080945. *Open Access Journal of Forensic Psychology, 7,* 56-63.

1776

# ACADEMIC APPOINTMENTS

| | |
|---|---|
| 2012- | Case Western Reserve University Department of Psychological Sciences<br>Adjunct Professor: ***"Cognitive and Neuropsychological Assessment"*** |
| 2006- | Cleveland State University-Department of Psychology<br>Adjunct Professor: ***"Forensic Psychology and the Law"***<br>***"Psychology of Violence"*** |

# EDUCATION

| | |
|---|---|
| 2007-2009 | Fielding Graduate Institute<br>*Bethesda, Maryland*<br>Completion of Postdoctoral Neuropsychology Certificate Program<br>Supervisor, Allan Mirsky, Ph.D., ABPP-CN<br>Board Certified Clinical Neuropsychologist<br>200 Hours of Direct Clinical Supervision including 70 personal cases and<br>approximately 300 additional postdoctoral student cases |
| 1999-2003 | Cleveland –Marshall College of Law<br>Cleveland, Ohio<br>J.D., Juris Doctor, conferred May 24, 2003<br><br>Landmark Case Seminar, American Psychiatry & Law Society, instructed by<br>Phillip Resnick, M.D., forensic psychiatrist, July, 2002-April, 2003 |
| 1995-1999 | Chicago School of Professional Psychology<br>*Chicago, Illinois*<br>APA Approved doctoral program in Clinical Psychology<br>Psy. D., Doctorate of Psychology, Conferred with Honors, August 31, 1999<br>Dissertation Title: "Adult Criminal Behavior and Morality: Analysis of Moral<br>Reasoning in Offenders and Non-Offenders" |
| 1995-1999 | Chicago School of Professional Psychology<br>*Chicago, Illinois*<br>Master of Arts, Clinical Psychology |
| 1993-1994 | University of Cincinnati<br>*Cincinnati, Ohio*<br>Master of Arts, Psychology<br>Thesis Title: "The Impact of Discipline and Supervision Practices and the<br>Etiology of Antisocial Personality Disorder" |
| 1988-1993 | University of Cincinnati<br>*Cincinnati, Ohio*<br>Bachelor of Arts, Political Science and Psychology |

6

1777

**Forensic Psychology &
Law Experiences**

| | |
|---|---|
| **Forensic Psychologist**<br>2006-Present | *Independent Practice- Forensic & Clinical Psychology (Multi-state practice)*<br>*Clinical/Forensic Neuropsychology*<br>***Pretrial Forensic Psychological Evaluations***: Competency to Waive Miranda Rights, Competency to Stand Trial, Sanity, Mens Rea, Diminished Capacity, Posttraumatic Stress Disorder (PTSD) and PTSD related self-defense, Battered Women's Syndrome<br>***Risk Assessment***: Sexual Violence (Megan's Law and Civil Commitment of Sexually Violent Predators, Violence Risk Assessment<br>***Capital Litigation***: Competency to Waive Appeals, Mitigation & Execution; Mitigation at Capital Sentencing; Mental Retardation Evaluations; Future Dangerousness<br>***Juvenile Forensic Psychological Evaluations***: Competency to Waive Miranda Rights, Competency to Stand Trial, Mens Rea, Waiver to Adult Court, Juvenile Sex Offender Evaluation, Juvenile Homicide<br>***Law Enforcement Evaluations***: Pre-employment screening and fitness for duty evaluations<br>***Civil Forensic Psychological Evaluations:*** Personal Injury Examinations in Torts for Emotional Distress, Assessing Employment Discrimination and Harassment Tort Claims, Disability and Workers' Compensation claims; Fitness for Duty Evaluations with Law Enforcement<br>***Forensic Neuropsychological Evaluations:*** Evaluate criminal trial defendants and civil claimants relevant to cognitive and neuropsychological functional abilities including language, memory, visuospatial construction, attention, and executive functioning. Integrate data to statutory and legal referral questions. |
| 2001-present | Cuyahoga County Court of Common Pleas Juvenile Court Division<br>County of Cuyahoga Juvenile Diagnostic Clinic<br>*Cleveland, Ohio*<br>Consulting neuropsychologist and psychologist performing delinquency-disposition/mitigation and treatment evaluations, competency to stand trial, violence/sexual violence risk assessments, bindover/waiver to adult court evaluations. Provide child custody evaluations and testimony as well as parenting rights and responsibilities examinations. |
| **Forensic Psychologist**<br>2004-2006 | State Operated Forensic Services at Minnesota Security Hospital<br>*St. Peter, Minnesota*<br>Provided specialized forensic evaluation services to the courts and comprehensive services to assigned Forensic Services patients. Forensic evaluations include: competency to stand trial, not guilty by reason of insanity, Commitment evaluations including Mentally Ill, Mentally Ill and Dangerous, Sexually Dangerous Persons, Sexual Psychopathic Personality. Provided expert consultation and testimony to courts and special review boards. Provided |

tech... consultation and direction to a bro... spectrum of other clinicians, the courts, and community care providers in the field of forensic psychology. Provided specialized consultation to treatment teams in multiple programs serving the mentally ill, chemically dependent, developmentally disabled, and sex offender populations throughout the State Operated Forensic Services network in Minnesota. Provided in depth evaluation and training relevant to violence and sexual violence risk assessments.

**Forensic Psychologist Consultant**
**2004-2005**

Federal Bureau of Prisons-Federal Correctional Institution
*Waseca, Minnesota*
Performed pre-trial forensic psychological evaluations and expert testimony for federal courts, including: competency to stand trial, not guilty by reason of insanity, and violence risk.

**Forensic Psychologist**
**Court Psychologist**
**1999-2004**

Forensic Psychiatric Clinic of Lake County Court of Common Pleas
& Adult Probation Department
*Lake County, Ohio*
Performed pre-trial forensic psychological evaluations including: competency to stand trial, not guilty by reason of insanity, competency to testify as a witness, and competency to waive Miranda rights. Conducted presentence and pre-parole Sex Offender Classification (HB180) evaluations for community registration and notification pursuant to Ohio's Megan's Law. Collaborated with the sex offender registration and notification deputy officer regarding sexual offenders released into the community. Consulted with detectives regarding internet pornography cases. Performed violence risk assessments of offenders and mentally ill offenders, conditional release evaluations, presentence mitigation evaluations including psychiatric factors in the crime, psychological status, and psychiatric recommendations regarding disposition, drug and alcohol dependency mitigation evaluations, and Treatment in Lieu of Conviction sentencing evaluations. Consulted with judges, prosecutors, defense attorneys, and probation/parole departments regarding special cases and sentencing recommendations. Provided expert testimony for the court.
Assessed inmate crises in the jail and occasional suicide risk assessments. Provided in-service training to probation staff, attorneys, and judges. Assessed patient psychiatric medication needs with jail psychiatrist.
*Post Doctoral Supervisors (1999):* Sandra McPherson, Ph.D., Dee Konick, Ph.D., Todd Gates, M.D

**Death Penalty Evaluations**

Ohio- Ohio Public Defender Commission, Ohio Attorney Generals Office common pleas court appointments, county common pleas, and court appointed defense counsel. Evaluated defendants for death penalty mitigation, post-conviction appeal evaluations, competency to be executed, competency to waive appeals, mental retardation claims pursuant to *State of Ohio v. Lott* and *Atkins v. Virginia.*

**Consultant to Forensic Psychiatric Clinic, Public Defenders Offices, Area Common Pleas Courts, Prosecutors' Offices,**

*Forensic Psychiatric Center of Northeast Ohio, Inc., Youngstown, Ohio*
*Cuyahoga County, Ashtabula County, Ohio Public Defenders Commission*
*Portage, Geauga, Muskingham County Common Pleas Courts*
*Cuyahoga and Summit County Prosecutor's Offices*
Performed evaluations including: not guilty by reason of insanity

Private Defense   competency to stand trial and waive Miranda rights, Sex Offender
2000-2004   Classification

**Consulting Psychologist**
**Juvenile Court**
2001-2004

Cuyahoga County Court of Common Pleas Juvenile Court Division
County of Cuyahoga Juvenile Diagnostic Clinic
*Cleveland, Ohio*
Consulting psychologist performing delinquency-disposition/mitigation and
treatment evaluations, competency to stand trial, violence/sexual violence risk
assessments, bindover/waiver to adult court evaluations.

**Forensic/Clinical**
**Psychology Intern**
**(Full APA Accreditation)**
1998-1999

*Northwest Ohio Consortium for Internship Training in Professional Psychology*
*Medical College of Ohio*
*Toledo, Ohio*

Performed forensic psychological evaluations for the courts. Provided expert
witness court testimony for sexual predator hearings. Evaluations included:
Sex Offender Classification (HB180), violence risk assessment, competency to
stand trial, not guilty by reason of insanity, presentence, presentence drug
dependency, observed juvenile bindover and child custody and visitation
evaluations. Conducted diagnostic assessments for sex offenders. Co-facilitated
sex offender treatment groups through the Sex Offender Treatment Program
(SOTP), and anger management treatment group. Conducted individual
psychotherapy, psychological testing, and diagnostic assessments with clients
from Division of Work Release, Lucas County Correctional Treatment Facility,
Lucas County Jail, Lucas County Adult Probation Department, United States
Probation/Parole, and two community mental health centers. Provided
consultation services to various community agencies. Presented didactics
concerning such topics as psychotherapy and sexual recidivism. Attended
clinical case and staff meetings. Observed court expert witness testimony.
*Supervisor:* Jon Pansky, Ph.D., Alice Holly, Ph.D.

**Other Rotations**
**Completed**

*Flower Rehabilitation Center*
Activities:
Conducted neuropsychological screens for neuropsychological deficits with
adults who have or are suspected of having neurological damage or disease
states. Identified atypical performance on neuropsychological assessment
instruments and referred patients for neuropsychological evaluations. Critically
reviewed neuropsychological reports and applied evaluation results in treatment
issues. Participated in forensic evaluations related to neurological damage as
well as consultations to the general hospital floors.

*University of Toledo Counseling Center and Student Medical Center*
Activities:
Conducted intake evaluations, individual therapy, and couples therapy.
Participated in staff and service meetings, case preparations, and crisis
stabilization counseling. Provided diagnostic and evaluation services. Provided
counseling for international psychotherapy. Provided preventative and
educational functions, including seminars and workshops on sexuality, rape
prevention, and consultation with various university offices.

9

1780

Supervisor:   Jean Haefner, Ph.D.

*Harbor Behavioral Healthcare*
Activities:
Co-facilitated juvenile sex offender treatment group based on cognitive/ behavioral relapse prevention model.
*Supervisor:*   Bob Cooley, Ph.D.

**Student Intern**
Summer, 1998

*Cuyahoga County Prosecutors Office*
*Cleveland, Ohio*
Shadowed assistant county prosecutors and public defenders in following assignments: Major Trial Division, Drug Unit, Child Protection Counsel (Child Sex Crimes Unit), Appeals Division, and General Legal Counsel Division. Exposed to Mentally Disordered Offenders Program and Juvenile Justice System.

**Therapy Practicum**
**Student**
1997-1998

*Metropolitan Correction Center*
*Federal Bureau of Prisons*
*United States Department of Justice*
*Chicago, Illinois*
Provided individual and group psychotherapy to inmates and individual treatment to sex offenders.   Performed psychological intake assessments, structured clinical interviews and assessments, substance abuse assessments for treatment, forensic screens, fitness for disciplinary hearing officers, and suicide risk assessment.   Wrote case notes, formulated treatment plans and wrote termination notes under supervision of licensed clinical psychologists.   Co-facilitated three group therapies, including:   anger management group, substance abuse group, and values group.   Attended medication clinics with staff psychologist and psychiatrist.   Attended department head staff meetings. Attended hostage negotiation training.   Participated in panel interviews of potential employees.   Facilitated communication skills training for officers.
*Completion of 900 clinical hours.*
*Supervisors:*   Daniel Greenstein, Psy.D., John Pindelski, Ph.D.

**Diagnostic Assessment**
**Practicum Student**
(Full APA Accreditation)
1998-1997

*Isaac Ray Center and Section on Psychiatry and Law*
*Cermak Health Services for Cook County Department of Corrections*
*Chicago, Illinois*
Activities:
Performed intelligence and personality assessments (selected, administered, scored, and interpreted psychological batteries) with male and female inmate population under supervision of licensed clinical psychologist.   Psychological evaluations included standard cognitive and personality tests in addition to forensic tests. Conducted psychological screenings in Intensive Treatment Unit. Provided individual therapy, facilitated and co-facilitated four structured group therapies, including: anger management group, victimization group, self-esteem group, and values group.   Facilitated bi-weekly substance abuse support groups for dual diagnosis unit.   Attended medication clinics with psychologist and psychiatrist.   Participated in case conferences and treatment team staffings. Attended didactics for mental health staff. Participated in court ordered forensic evaluation at Cook County Court Psychiatric Unit.

10

1781

*Completion of 788 clinical hours.*
*Supervisors: Carl Alaimo, Psy.D., Gary B. Kanuik, Psy.D.*

**Neuropsychology &**
**Law Experiences**

**Clinical Neuropsychology**

2011-                    Cuyahoga County Court of Common Pleas Juvenile Court Division
                         County of Cuyahoga Juvenile Diagnostic Clinic
                         *Cleveland, Ohio*
                         Consulting neuropsychologist performing delinquency-disposition/mitigation
                         and treatment evaluations, competency to stand trial, violence/sexual violence
                         risk assessments, bindover/waiver to adult court evaluations. Special emphasis
                         with providing neuropsychological assessment with juvenile delinquents with
                         histories of ADHD, learning disability, mental retardation, traumatic brain
                         injury, epilepsy, and neurodevelopmental risk factors.

2009- 2011

                         The Center for Neuropsychological Services (CNS) in the University of New
                         Mexico Hospital and Department of Psychiatry at the University of New
                         Mexico Health Sciences Center (UNM HSC) is the only Level One Trauma
                         Facility and medical school in the state. The CNS receives referrals for inpatient
                         and outpatient neuropsychological evaluations and/or consultation from a
                         variety of departments within the UNM HSC, including Family Practice and
                         Community Medicine, Neurology, Neurosurgery, Internal Medicine, Psychiatry,
                         and Pediatrics.

                         Evaluate of a variety of patients (children, adolescents, adults, and geriatrics)
                         with diverse neuropathology and psychopathology. Such conditions and
                         evaluations include traumatic brain injury, epilepsy, mental retardation,
                         cerebral-vascular disorders, brain tumor, ECT, multiple sclerosis, HIV/AIDS,
                         dementia, ADHD, chronic medical conditions, children, adolescents, and adults
                         with developmental disorders and mental retardation, and various psychiatric
                         disorders including schizophrenia, bipolar disorder, substance abuse, and
                         personality disorders. CNS provides pre and postoperative neuropsychological
                         evaluations and Wada testing for epilepsy surgery candidates. Evaluation of
                         forensic-legal issues including competency to consent to treatment, decisional
                         capacity, and guardianship. Evaluation of University athletes (men's and
                         women's soccer, and men's football) for neuropsychological pre and post
                         concussion study. Assisted behavioral neurologist at UNM Mind Institute with
                         evaluating clinical neurology patients. Provided regular consultations to both
                         neurology and psychiatry physicians and medical residents.

                         Participated in clinical neuropsychology rotation in the Neuropsychology
                         Polytrauma Unit at Raymond G. Murphy VA Medical Center New Mexico VA
                         Health Care System. Evaluated a variety of patients (adults and geriatrics) with
                         diverse neuropathology and psychopathology, including special emphasis of
                         traumatic brain injury, substance abuse, ADHD, and PTSD. Specific clinical
                         attention was provided in neurocognitive assessment of veterans with both

1782

PTSD and traumatic brain injury. Provided forensic evaluations regarding competency to consent to treatment and competency to make medical decisions. Attended clinical neuropsychology rounds at the Albuquerque Veteran's Administration Hospital as well as psychiatry, neuroradiology, and neurology rounds at the University of New Mexico School of Medicine. Supervision by John H. King, Ph.D., ABPP-CN and Rex Swanda, Ph.D., ABPP-CN

| | |
|---|---|
| 2008-2009 | Applewood Centers, Inc. <br> *Cleveland, Ohio* <br> Conduct neuropsychological and psychological evaluations for at risk children and adolescents. Consult with treating mental health professionals regarding cognitive, neuropsychological, psychiatric, and psychological functioning of children. |
| 2006-2007 | Neurology & Neuroscience Associates, Inc. <br> *Akron, Ohio* <br> Provide neuropsychological and clinical psychological assessments on brain injured patients, patients with dementia and seizure disorders |

**Specialized Training**

| | |
|---|---|
| February, 2006 | Hare Psychopathy Checklist Revised training (Hare PCL-R) with Robert Hare, *St. Paul, Minnesota* |
| March, 2000 | Hare Psychopathy Checklist Revised training with Robert Hare, Ph.D. <br> Sex Offender Evaluation Training, Dennis Doren, Ph.D., Douglas Epperson, Ph.D., Karl Hanson, Ph.D., Vernon Quinsey <br> *Madison, Wisconsin* |

**PRESENTATIONS**

| | |
|---|---|
| December 2, 2015 | Mental Health and Mitigation <br> Federal Public Defender for the Middle District of Alabama <br> *Montgomery, Alabama* |
| June 6, 2015 | The Neuroscience of Competency and Sanity <br> Arkansas Association of Criminal Defense Lawyers <br> Little Rock, Arkansas |
| March 13, 2015 | Mental Health, Neuropsychological Testing and Why it Matters: <br> The Role of the Forensic Psychologist and Neuropsychologist <br> in Capital Proceedings <br> Tennessee Association of Criminal Defense Lawyers <br> Chattanooga, TN |
| January 24, 2015 | The Forensic Psychological and Neuropsychological Evaluation in <br> Death Penalty Cases: Mitigating Murder at Capital Sentencing <br> Alabama Criminal Defense Lawyers' Association <br> Birmingham, AL |

12

1783

Case 4:20-cv-01299-O   Document 52-4   Filed 12/21/22   Page 285 of 502   PageID 11628

                        Ohio Association of Criminal Defense Lawyers
                        Columbus, OH

| | |
|---|---|
| November 20, 2014 | The Forensic Neuropsychological Evaluation in Death Penalty Cases<br>Texas Criminal Defense Lawyers Association<br>South Padre Island, TX |
| July 17, 2014 | Neuropsychological Evaluations in Sexually Dangerous Persons Cases<br>New York Mental Hygiene Legal Services<br>Utica, NY |
| December 8, 2013 | Substance Use and the Courts<br>Zukerman Daiker and Lear LPA and Cleveland Bar Association<br>Cleveland, OH |
| November 1, 2013 | Neuropsychological Assessment in Sexually Violent Predator Civil<br>Commitment Proceedings<br>ATSA Annual Conference<br>Chicago, IL |
| July 14, 2013 | Neuropsychology, neuroscience, volitional impairment and sexually violent<br>predators: A review of the literature and the law and their application to civil<br>commitment proceedings<br>33rd International Academy of Law & Mental Health<br>Amsterdam, Netherlands |
| May 16, 2013 | Case Presentation: Forensic Evaluation of Not Guilty by Reason of Insanity in a<br>School Shooter with Adolescent Schizophrenia<br>Case Western University and University of Cincinnati Schools of Medicine<br>Departments of Forensic Psychiatry<br>Northcoast Behavioral Healthcare Inc.<br>Sagamore Hills, OH |
| May 15, 2013 | Forensic Neuropsychology and Violence<br>American Academy of Forensic Psychology<br>Louisville, Kentucky |
| May 2, 2013 | Alabama/Georgia Criminal Defense Lawyer Associations<br>Forensic Neuropsychological Evaluations of Clients with Traumatic Brain<br>Injury (TBI)<br>Panama City, FL |
| March 1, 2013 | Attorney's Guide to Child Custody Evaluations<br>The Role of the Forensic Psychologist<br>National Business Institute<br>Independence, OH |
| November 16, 2012 | Veterans, PTSD, and Traumatic Brain Injuries<br>Death Penalty Seminar, Ohio Association of Criminal Defense Lawyers |

1784

| | |
|---|---|
| June 1, 2012 | Risk Assessment Issues for Sex Offenders with Neurodevelopmental and Intellectual Disabilities. Disabilities New Jersey Association for the Treatment of Sexual Abuseres, Inc. Newark, NJ |
| October 13, 2011 | Neuropsychological evaluations for the courts: A primer for criminal attorneys Cuyahoga Public Defender's Office & Cleveland Criminal Defense Lawyer's Association Cleveland, OH |
| October 15, 2011 | Miranda & Competency Issues in Death Penalty Litigation Arkansas Criminal Defense Lawyer's Association Fayetville, AR |
| September 30, 2011 | Utilizing forensic expert witnesses in sexual violence risk assessments & Utilizing an Expert in Sex Abuse Allegations Alabama Criminal Defense Lawyers' Association Huntsville, Alabama |
| July 17-23 2011 | Neuropsychological Correlates in Violent and Homicidal Offenders: A Legal and Neuroscience Perspective 32nd International Academy of Law and Mental Health Berlin, Germany |
| June 17, 2011 | Death Penalty Mitigation and the Roles of the Forensic Psychologist and Clinical Neuropsychologist Clark County Public Defender Las Vegas, Nevada |
| January 25, 2011 | Confirming Competencies in Death Penalty Proceedings Alabama Criminal Defense Lawyers Association Birmingham, Alabama |
| October 23, 2010 | God's Law, Man's Law, and the Meaning of M'Naughten Wrongfulness American Academy of Psychiatry and Law Tucson, Arizona |
| October 1, 2010 | Neurocognitive Development and Traumatic Brain Injury in Murder Defendants: The Role of the Neuropsychologist Virginia Indigent Defense Capital Defenders Norfolk, Virginia |
| July 16, 2010 | Neurobiological Aspects of Violence and Aggression: Neurocognitive Development & Traumatic Brain Injury Risk Factors in Sexual Homicide Cases The Mind and Criminal Defense |

1785

| | |
|---|---|
| April 15, 2010 | Assessing Competency to Waive Miranda Rights, Suggestibility, and Police-Induced Confessions<br>Cleveland Criminal Defense Lawyer's Association<br>Cleveland, Ohio |
| July 23, 2009 | Anatomy of a filicide: The Amber Hill case<br>Cuyahoga County Court Psychiatric Clinic<br>Cleveland, Ohio |
| July 16-17 2009 | Post-Traumatic Stress Disorder, Traumatic Brain Injury, Neuroscience and Violence<br>The Mind and Criminal Defense<br>Texas Defender Service<br>Plano, Texas |
| June 25, 2009 | Neuropsychological and Neurological Correlates in Violent and Homicidal Offenders: A Legal and Neuroscience Perspective<br>International Conference: Violence in Public Places and Institutions<br>University of Lancashire, Great Britain |
| June 20, 2009 | How to Utilize Forensic Psychological Evaluations within Internet Solicitation and Child Pornography Sex Cases<br>Sexually Violent Predator Risk Assessment and the Law<br>Alabama Criminal Defense Lawyers Association<br>Pensacola, Florida |
| November 21, 2008 | Examining Competency to Stand Trial<br>Ohio Association of Criminal Defense Lawyers<br>Columbus, Ohio |
| August 14, 2008 | Rethinking "Rational" in the Dusky Standard: Assessing the CWRU Killer's Functional Abilities<br>Cuyahoga County Court Psychiatric Clinic<br>Cleveland, Ohio |
| July 17-18 | The Mind and Criminal Defense<br>The Issue of Competency Throughout Your Proceedings<br>Freewill: What Is It and What Can We Do With It?<br>Insanity Evaluations and the Concept of Wrongfulness<br>The Center for American and International Law<br>Plano, Texas |
| April 25, 2008 | Indigent Criminal Defense: Advanced Skills for the Experienced Practitioner<br>Understanding and Defending the Mentally Impaired<br>Richmond, VA |

1786

| | |
|---|---|
| January 25, 2008 | The Alabama Criminal Defense Lawyers Association<br>Loosening the Death Belt XII: Back to Basics<br>Mental Health Evidence for Both Phases<br>Birmingham, Alabama |
| September 20, 2007 | Indiana Death Penalty Conference<br>Evaluating Atkins Mental Retardation Claims<br>Merrillville, IN |
| August 2, 2007 | Forensic Psychological/Psychiatric Evaluations in Competency<br>to Stand Trial Cases: Rethinking Rational in the *Dusky* Standard<br>NACDL<br>San Francisco, CA |
| June 2, 2007 | Forensic Psychological Evaluations for the Courts<br>Cuyahoga County Criminal Defense Lawyers Association<br>Mountaineer, West Virginia |
| May 5, 2007 | Evaluating Sexual Homicide At Capital Sentencing<br>American College of Forensic Psychology<br>23rd Annual Symposium, Santa Fe, New Mexico |
| April 20, 2007 | Forensic Mental Health and the Death Penalty<br>Mississippi College of Law |
| March 23, 2007 | A Survey of the Literature on Risk Factors for Juvenile Offenders<br>Capital Defense- Punishment Phase of a Capital Trial<br>The Center For American And International Law<br>Plano, Texas |
| March 13, 2007 | Megan's Law and Sex Offender Risk Assessment: The Role of the<br>Forensic Psychologist<br>Baldwin Wallace College, College of Arts and Sciences<br>Departments of Sociology/Criminology and Psychology |
| February 23, 2007 | Forensic Psychological Evaluations in Juvenile Competency Cases<br>Cuyahoga County Public Defenders Office (Juvenile Division) |
| June 30, 2006 | 2006 Office of the State Appellate Defender of Illinois<br>Center for Justice in Capital Proceedings<br>DePaul University College of Law<br>Mitigating Madness and Sexual Deviance: 2 Capital Case Examples |
| | Consultant to PESI Healthcare Inc. 2005-2006<br>Seminar: *Dangerous and Sexually Violent Clients*<br>Portland and Eugene, Oregon, March 9-10, 2006<br>Appleton and Brookfield, Wisconsin, November 3-4, 2005<br>Trumbull and Rocky Hill, Connecticut, Warwick, Rhode Island<br>October 5-7, 2005 |
| October 27, 2005 | Testimony to Vermont House Judiciary Committee on Civil Commitment |

| | |
|---|---|
| October 26, 2005 | State Operated Forensic Services of Minnesota<br>Violence and Sexual Violence Risk Assessment Training |
| June 29, 2005 | Hennepin County Bar Association, 7th Annual Civil Commitment Seminar<br>Risk Assessment of Sexual Dangerousness |
| May 17, 2003 | Ohio Department of Rehabilitation and Correction, Adult Parole Authority<br>Dynamic Risk Factors in Sexual Offending |
| August 11, 2003 | Court of Common Pleas, County of Lake<br>Violence Risk Assessment of Mentally Ill Offenders |
| July, 2001 | *Ohio Association of Criminal Defense Lawyers*<br>Treatment in Lieu of Conviction |
| December, 2000 | *Eastlake Police Department*<br>Stalking |
| **Professional<br>Memberships** | American Psychological Association Member<br>Division 41 American Psychology-Law Society Member<br>American Academy of Clinical Neuropsychology |

**References Provided Upon Request**

1788

WRIT NO. _____

TRIAL COURT NO. 1361004

EX PARTE

IN THE 371st JUDICIAL

DISTRICT COURT

CEDRIC RICKS

TARRANT COUNTY, TEXAS

### ORDER ON APPLICANT'S EX PARTE FUNDING MOTION FOR EXPERT ASSISTANCE

On ___4  11  16___, the Court having considered the above and foregoing motion, finds the same is hereby **GRANTED in an amount not to exceed** $6000 /
**DENIED** in which case Applicant requests that the Court designate in writing its reasons for denying this request as required by Tex. Code Crim. Proc. Ann. art. 11.071 §3 (c).

Judge Presiding

1789

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

APR 22 2016

TIME _____11:25am_____
BY _____ DEPUTY

WRIT NO. _____

TRIAL COURT NO. 1361004

EX PARTE

CEDRIC RICKS

IN THE 371st JUDICIAL

DISTRICT COURT

TARRANT COUNTY, TEXAS

EX PARTE

FUNDING MOTION FOR EXPERT ASSISTANCE

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the indigent Applicant, by counsel, and pursuant to Tex. Code Crim. Proc. art. 11.071§3, the 5th, 6th, 8th and 14th Amendments to the United States Constitution and Sections 10, 13 & 19 of Article I of the Texas Constitution and other authority cited herein, moves this Court to enter a finding that there is a reasonable necessity for expert assistance and funding as requested in this motion. In support thereof, this Applicant would show:

I.

(a) Cedric Ricks was convicted of capital murder and sentenced to death. Undersigned counsel has been appointed to investigate expeditiously, the factual and

SCANNED

1790

legal grounds for the filing of an application for a writ of habeas corpus pursuant to Art. 11.071 of the Texas Code of Criminal Procedure.

(b) This Court has determined that the Applicant is indigent. His counsel is unable to retain any expert assistance due to Applicant's indigent status.

## II.

The funding that is requested will provide Counsel with essential tools necessary to investigate the legality of Applicant's confinement. Specifically, the claim to be investigated is that Applicant's trial counsel rendered ineffective assistance in failing to discover significant mitigating evidence. In order to investigate such a claim, counsel needs an expert in the effects of lead exposure to assess the significance of some of mitigation evidence that has been discovered post trial. To this end, Counsel has consulted Dr. Felicia Rabito, an expert in effects of lead exposure. Dr. Rabito estimates that her assistance in this case would require approximately 6-8 hours at $350/hour. A copy of her curriculum vitae is attached and incorporated. Counsel is requesting that the court authorize funds up to $2800 for her assistance in this case.

Applicant is entitled to such expert assistance upon a threshold showing that the assistance sought is relevant to a claim to be investigated and reasonable. Tex. Code Crim. Proc. Ann. art. 11.071 §3(b); cf. Ake v. Oklahoma, 470 U.S. 68 (1985).

WHERFORE PREMISES CONSIDERED, the Applicant respectfully prays that

this Court allow the Applicant funds in the amount of $2,800 to hire Dr. Rabito to assist

in the preparation of his defense.

Respectfully submitted,

Catherine Clare Bernhard
P.O. Box 2817
Red Oak, Texas 75154
972-617-5548
fax 972-421-1604
cbernhard@sbcglobal.net
State Bar No. 02216575

ATTORNEY FOR APPLICANT

1792

# VERIFICATION

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this date personally appeared Catherine Clare Bernhard, attorney of record in the above-styled and numbered cause, who upon her oath does hereby swear and affirm upon her personal knowledge that all statements of fact contained in the foregoing Motion are in all respects true and correct.

_____
Catherine Clare Bernhard

STATE OF TEXAS

SUBSCRIBED AND SWORN BEFORE ME, the undersigned Notary Public, on this the 19th day of April, 2016.



CLINTON J. STAFFORD
MY COMMISSION EXPIRES
December 5, 2017

_____
Notary Public in and for the
State of Texas.

1793

**CURRICULUM VITAE**
**FELICIA A. RABITO, M.P.H., PhD.**

## PERSONAL

Home Address & Telephone:
1301 Octavia Street
New Orleans, LA 70115
504.891.6674

Office Address & Telephone:
Department of Epidemiology
School of Public Health & Tropical Medicine
1440 Canal Street, SL-18
New Orleans, LA 70112
504.988.3479 (phone), 504.988.1568 (fax)
E-mail: rabito@tulane.edu

## EDUCATON

| | |
|---|---|
| 1998 | Doctor of Philosophy (Epidemiology)<br>Tulane University School of Public Health & Tropical Medicine |
| 1989 | Master of Public Health (Biostatistics and Epidemiology)<br>Tulane University School of Public Health & Tropical Medicine |
| 1982 | B.B.A. University of Mississippi, Oxford Mississippi<br>Major: Business Administration, Minor: Economics, French |

## CERTIFICATION

Lead Clearance Testing Technician, State of New Hampshire, (Reciprocity with State of Louisiana) 2003-2007

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2008- | **Associate Professor**<br>Department of Epidemiology<br>Tulane University School of Public Health & Tropical Medicine |
| 2007-2015 | **Adjunct Associate Professor**<br>Department of Preventive Medicine<br>University of Tennessee Health Sciences Center |
| 1998-2007 | **Clinical Assistant Professor**<br>Department of Epidemiology<br>Tulane University School of Public Health & Tropical Medicine |

1

1794

| | |
|---|---|
| 2006 - | **Newcomb Fellow**<br>Newcomb College Institute<br>Tulane University |
| 2005 – 2006 | **Tulane University Graduate Faculty**<br>Tulane University (Graduate school closed in 2006) |
| 1996 - 2003 | **Epidemiologist and Senior Research Scientist,** New Orleans Childhood<br>Blood Lead Project<br>Center for Applied Environmental Public Health<br>Tulane University School of Public Health & Tropical Medicine |
| 1995 -1997 | **Senior Research Scientist,** HAMMER Project<br>Director, Occupational Health Component<br>Center for Applied Environmental Public Health<br>Tulane University School of Public Health & Tropical Medicine |
| 1993 -1995 | **Project Manager and Research Associate,** Consortium for Environmental<br>Risk Evaluation (CERE)<br>Entergy Spatial Analysis Research Laboratory<br>Department of Environmental Health Sciences<br>Tulane University School of Public Health & Tropical Medicine |
| 1993 -1995 | **Consulting Epidemiologist**<br>Centers for Disease Control and Prevention, Associated Schools of Public<br>Health |
| 1993 -1995 | **Research Scientist,** Entergy Spatial Analysis Research Laboratory<br>Department of Environmental Health Sciences<br>Tulane University School of Public Health & Tropical Medicine |
| 1989 - 1993 | **Research Assistant,** Childhood Blood Lead Project<br>Department of Environmental Health Sciences<br>Tulane University School of Public Health & Tropical Medicine |
| 1989 – 1993 | **Assistant to the Director,** Center for Bioenvironmental Research<br>Tulane University Health Sciences Center, School of Medicine<br>Section of Environmental Medicine |
| 1988 -1989 | **Research Scientist,** International Project on Acid Rain<br>Norwegian Ministry of Forestry<br>Oslo, Norway |
| 1985 – 1987 | **U.S. Peace Corps Volunteer,** Rusinga Island, Kenya |
| 1982 – 1985 | **Legislative Aide** to United States Senator J. Bennett Johnston<br>Washington, D.C. |

2

## HONORS AND AWARDS

- **Expert Consultant,** Environmental Protection Agency panel assessing outcomes from epidemiological studies that examined the prevalence or incidence of asthma, 2014
- Nominated for the Environmental Protection Agency's **Children's Health Protection Advisory Committee,** 2013
- **National Lead Star Award,** presented at the National Indoor Environmental Health and Technologies Conference in recognition of dedication and significant accomplishments to the lead poisoning prevention field, 2012
- **Editor's Choice Article, Rabito FA,** Iqbal S, Kiernan MP, Holt E, Chew GL. Children's Respiratory Health and Mold Levels in New Orleans Post-Katrina: A preliminary look. Journal of Asthma and Clinical Immunology. 2008;121(3):622-5 (impact factor 12.047)
- Selected as a **Lead and Antioxidant Expert Panel** member for the Centers for Disease Control and Prevention,2009
- Selected as a **National Healthy Homes Expert Panel** member, Centers for Disease Control and Prevention, 2007-2009
- Recipient of the **Award for Leadership in Research** Commending Outstanding Achievement in New Competitive Research Awards for the year 2005-2006, Tulane University, 2007
- Recipient of the Award for **Promise in Research** Commending Outstanding Progress in Competitive Research Awards for the year 2005-2006, Tulane University 2007
- Award for **Outstanding Achievement and Commitment to Excellence** in Competitive Research Awards for the year 2003-2004, Tulane University 2004
- Selected as one of the **Women of the Year,** City Business Magazine, 2004
- **Linkage Award.** Council on Linkages Between Academia and Public Health Practice. Awarded by ASTHO-NACCHO, 2003
- **Community-Based Lead Intervention Project** selected by CDC as one of three research projects (among over 50) to be featured before the U.S. Congress in highlighting the work of the Prevention Research Centers, 2003
- **Delta Omega** Public Health Honorary Society Inductee, Eta Chapter, 2002
- Selected as one of Gambit Weekly's **"40 Under 40"** for childhood lead poisoning research and development of the "Lead Buster" model for community-based research, 2000
- **National Performance Review: Hammer Award.** Presented by Vice-President Al Gore. Honored for work done on the development of the Occupational Health Surveillance Model for the Enhanced Work Planning Project, 1997
- Full tuition **scholarship** for doctoral studies, Department of Epidemiology, 1990
- **Research Fellowship** Award, Tulane University Graduate School, 1989

## PUBLIC POLICY ACTIVITY

- Louisiana Toxic Mold Task Force. A task force to study the public health impacts of toxic mold in the state of Louisiana. 2014 - 2015
- Mayor Elect's (Mitch Landrieu) Task Force for Sustainable Energy and the Environment; Building Healthy Communities Subcommittee, 2010
- Member of the Mayor's Committee on Environmental Lead, 2011-2012
- Presentation to the New Orleans City Council on the Lead Burden in New Orleans Children; this helped lead to the adoption of a law banning dry sanding of home in New Orleans, 2003
- Regularly interviewed by print (local, NYT, Huffington Post, NPR, AP), television (local and national), and radio on children's environmental health issues, particularly lead poisoning and residential based exposures leading to asthma disparities.

## PROFESSIONAL MEMBERSHIP

International Society for Environmental Epidemiology
Fellow, Newcomb College Institute
Fellow, Tulane University Center for Evidence-Based Global Health

## EDITORIAL BOARDS

Journal of Developmental Epidemiology, 2005 – 2008

## NATIONAL COMMITTEES

- Appointed a Global Burden of Disease 2013 Expert. Institute for Health Metrics and Evaluation, University of Washington. Asthma and lead specialty area. Appointed January 2014
- Science Advisory Council, National Center for Healthy Housing, 2006 – present
- Technical Advisory Panel; Gulf Coast Children's Health Study, Centers for Disease Control and Prevention, 2010 – 2013
- Lead and Antioxidant Expert Panel, Centers for Disease Control and Prevention, 2009
- National Healthy Homes Expert Panel, Centers for Disease Control and Prevention, 2007-2009
- Expert Panel Member: Consolidated Safety Services, Inc. Worker Health and Safety Training Development, 2006
- National Herculaneum Health Study Work Group, ATSDR, CDC, EPA, 2003.
- Florida Department of Health Environmental Public Health Tracking Network, Advisory Board, 2003-2005

## TEACHING

EPID 7120, Intermediate Epidemiology (3 credits):    Tulane University School of Public Health and Tropical Medicine, Department of Epidemiology

Advanced Statistical Methods in Epidemiology (3 credits): ): Taught as part of the Masters Bioinformatics and Biostatistics at Mekelle University, Mekelle, Ethiopia.

EPID 6030, Principles of Epidemiology (3 credits): Tulane University School of Public Health and Tropical Medicine, Department of Environmental Health Sciences, Center for Applied Environmental Public Health.

Environmental Health Surveillance. Continuing Education Unit credits given. Taught at the Hanford Nuclear Facility, Richland Washington. HAMMER Project, Tulane University School of Public Health and Tropical Medicine, Department of Environmental Health Sciences.

*Chair of Doctoral Student Committees*

4

1797



Whitney Arroyave, Tulane University School of Public Health and Tropical Medicine, "The effects of atopic, non-atopic, and obese asthma phenotypes on asthma outcomes in children, adolescents , and adults". 2014

Elizabeth Holt, Tulane University School of Public Health and Tropical Medicine, "Social and environmental determinants of asthma among U.S. urban children". (December 2009).

Elizabeth Wasilivich, Tulane University School of Public Health and Tropical Medicine. "The association between outdoor temperature change and hospital emergency department visits for asthma". (May 2008).

Shahed Iqbal,  Tulane University School of Public Health and Tropical Medicine  "Blood lead distribution, the association between blood lead levels and serum transferring saturation, and vitamin C intake" (December 2006).

*Member of Doctoral Student Committees*

Susanne Scott, PhD. Department of Epidemiology, Ohio State University. "Missing Values  the National Health and Nutrition Examination Survey, 1999-2002: A Heuristic Demonstration of Multiple Imputation Using ICE for Stata Software". 2010

Kimberly Gallo, PhD.  Tulane University School of Public Health and Tropical Medicine. Department of Environmental Health Sciences. " An Analysis of Environmental Justice:  Public Health and Environmental Policy Decision Making".  2004

Wen-Chao Ho, PhD. Tulane University School of Public Health and Tropical Medicine. Department of Environmental Health Sciences. " Influence of Body Mass Index and Air Pollution on Increased Morbidity from Asthma in Adolescents in Taiwan". 2003

*Current Doctoral Students* **(Primary Mentor)**

Fritha Morrison
Derek Werthmann

**PUBLICATIONS**
*Peer-Reviewed Publications*

Arroyave WD, **Rabito FA**, Carlson JC, Sever ML, Lefante J. Asthma severity, not asthma control, is worse in atopic compared with nonatopic adolescents with asthma. *Ann Allergy Asthma Immunol.* 2016 Jan: 116(1):18-25.

Ayele W, Mulugeta A, Destra A, **Rabito FA**. Treatment outcomes and their determinants in HIV patients on Anti-retroviral Treatment Program in selected health facilities of Kembata and Hadiya zones, Southern Nations, Nationalities and Peoples Region, Ethiopia.  BMC Public Health. 2015 Aug 27:15:826.

Burton H, **Rabito FA**, Danielson L, Takaro TK. Health effects of flooding in Canada – a 2015 review and description of gaps in research. *Canadian Water Resources Journal*, in press.

Li S, Zhao J, Want G, Zhu Y, **Rabito FA**, Krousel-Wood M, Chen W, Whelton, PK. Urinary triclosan concentrations are inversely associated with body mass index and waist circumference in the US

5

1798

general population: Experience in NHANES 2003-2010. *International Journal of Hygiene and Environmental Health. 2015 Jun;218(4):401-6.*

GBD 2013 Mortality and Causes of Death Collaborators. Global, regional, and national age-sex specific all-cause and cause specific mortality for 240 cuases of death. 1990-2013: a systematic analysis for the Global Bureden of Disease Study. *Lancet.* 2015 Jan 10;385(9963):117-71.

**Rabito FA**, Werthmann DW, Kocak M, Tylavsky FA, Palmer CD, Parsons PJ.  Changes in low level prenatal lead exposure over the course of pregnancy and the relation to birth outcomes. *Reproductive Toxicology.* 2014;50:138–144.

Arroyave WD, **Rabito FA**, Carlson JC, Freidman E, Stinebaugh, S. *Impermeable dust mite covers in the primary and tertiary prevention of allergic disease: a meta-analysis.* Annals of Asthma, Allergy and Immunology. 2014 Mar;112(3):237-48.

Arroyave WD, **Rabito FA,** Carlson JC. The relationship between specific IgE level and asthma outcomes: Results from the 2005-2006 National Health and Nutrition Examination Survey. *Journal of Allergy and Clinical Immunology: In Practice.* 2013;1(5):501-508.

**Rabito** FA, Horter L, Langlois EC, Carlson JC , White LE, Schwartz K, Osman P, Rice JC. Blood lead and pediatric asthma.  *Epidemiology.* 2013;24(3):474-476.

Holt E, Theall K, **Rabito FA**  Individual, Housing and neighborhood correlates of asthma  among young urban children. *Journal of Urban Health.* 2013;90(1):116-129.

Wasilivich E,  **Rabito FA,** Lefante J, Johnson  EJ. Short-term outdoor temperature change and emergency department visits for asthma among children - A Case-Crossover Study. *American Journal of Epidemiology.* 2012;176(Suppl):S123-130.

**Rabito** FA, Rice JC, Arroyave WD. 2012. Environmental Lead: Rabito et al. Respond. *Environmental Health Perspectives* 2012;120(5): 188-189.

**Rabito** FA, Iqbal S, Perry S, Rice J.  Environmental lead after Hurricane Katrina: Implications for future populations. *Environmental Health Perspectives.* 2012;120(2):180-184.

**Rabito** FA, Carlson J, Holt EW, Iqbal S, James MA. Cockroach exposure independent of sensitization status is associated with hospitalizations for asthma in inner-city children. *Annals of Allergy, Asthma, and Immunology.* 2011;106(2):103-109.

**Rabito** FA, Perry S, Salinas O, Hembling J, Schmidt N, Kissinger P. A longitudinal assessment of occupation, respiratory symptoms, and blood lead levels among Latino day laborers in a non-agricultural setting. *American Journal of Industrial Medicine.* 2011;54(3):366-374.

Krieger J, Jacobs DE, Ashley PH, Baeder A, Chew GL, Dearborn D, Hynes PH, Miller JD, Morley R, **Rabito** FA, Zeldin, DC.  Housing Interventions and Control of Asthma-Related Indoor Biologic Agents: A Review of the Evidence. *Journal of Public Health Management & Practice.* 2010;16(5):S11-S20.

**Rabito** FA, Perry S, Davis WE, Yau CL, Levetin E. The relationship between mold exposure and allergic response in post-Katrina New Orleans. *Journal of Allergy.*  2010; doi:10.1155/2010/510380.

6

Iqbal S, Muntner P, Bautuman V, **Rabito FA**. Estimated burden of blood lead levels ≥ 5μg/dl in 1999-2002 and declines from 1988-1994. *Environmental Research.* 2008;107(3):305-311.

**Rabito** FA, Iqbal S, Kiernan MP, Holt E, Chew GL. Children's respiratory health and mold levels in New Orleans post-Katrina: A preliminary look. *Journal of Asthma and Clinical Immunology.* 2008;121(3):622-625.

**Rabito** FA, Iqbal SI, Holt E, Grimsley LF, Islam T, Scott SK. Prevalence of indoor allergen exposures among New Orleans children with asthma. *Journal of Urban Health.* 2007;6:782-792.

Muntner P, Menke A, Batuman V, **Rabito** FA, He J, Todd AC. Association of tibia    lead and blood lead with end-stage renal disease: A pilot study of African–Americans. *Environmental Research.* 2007;104:396-401.

**Rabito** FA, Iqbal S, Shorter C, Osman P, Philips PE, Langlois E, White LE. The association between demolition activity and children's blood lead levels. *Environmental Research.* 2007;103:345-351.

Chew Ginger, Wilson Jonathan, **Rabito FA**, Grimsley F, Iqbal S, Reponen T, Muilenberg ML, Thorne PS, Dearborn DG, Morley RL. Mold and endotoxin levels in the aftermath of Hurricane Katrina: A pilot project of homes in New Orleans undergoing renovation. *Environmental Health Perspectives.* 2006;114(12):1883-1839.

Scott SK, **Rabito FA**, Price PD, Butler NN, Schwartzbaum JA, Jackson BM, Love RL, Harris RE. Comorbidity among the morbidly obese: A comparative study of 2002 US hospital patient discharges. *Surgery for Obesity and Related Diseases.* 2006;02:105-111.

Muntner P, Menke A, DeSalvo KB, **Rabito FA**, Batuman V. Continued Decline in Blood Lead Levels among Adults in the United States: The National Health and Nutrition Examination Surveys. *Archives of Internal Medicine.* 2005;165:2155-2161.

**Rabito** FA, White LE, Shorter C. From Research to Policy: Targeting the primary prevention of childhood lead poisoning. *Public Health Reports.* 2004;119:271-278.

**Rabito** FA, Sarpy S, Shorter C, Iqbal S. Lead prevention knowledge among urban residents: The Chicago Lead Knowledge Test revisited. *Journal of Children's Health.* 2004;2:11-20.

**Rabito** FA, Shorter C, White LE. Lead levels among children who live in public housing. *Epidemiology.* 2003;14(3):263-268.

Eroglu G, **Rabito FA**, Sudesh SK. Mortality from asthma in children and young adults in Louisiana. *Annals of Allergy Asthma and Immunology.* 2002;89:191-194

*Book Chapter*

Sarpy SA, **Rabito FA**, Goldstein N. "Sampling in Occupational Psychology: An Epidemiological Perspective." Research Methods in Occupational Health Psychology, Measurement, Design, and Data Analysis. Ed. Robert R Sinclair, Mo Wang, Lois E. Tetrick. Taylor and Francis, New York, 2013. 229-247.

*Proceedings of National/International Meetings*

**Rabito FA.** Emerging and Re-emerging Contaminants and Outbreaks. 2006 National Environmental Public Health Conference. Advancing Environmental Public Health: Science, Practice, New Frontiers National Center for Environmental Health, Centers for Disease Control and Prevention. December 2006. Available at:
http://www.cdc.gov/ncch/conference/2006_conference/abstracts/session_C5.html

*Published Abstracts*

Arroyave WD, Carlson JC, **Rabito FA.** The Relationship Between Immunoglobulin E And Asthma Outcomes: Findings From The National Health And Nutrition Examination Survey, 2005-2006. *American Journal of Respiratory and Critical Care Medicine,* Vol. 187, Meeting Abstracts, 2013

**Rabito FA,** Holt EW, Iqbal S, Lefante JL. Epidemiologic Challenges in Post-Disaster Populations. American Public Health Association (APHA) Meeting Abstracts, November , 2007

**Rabito FA,** Iqbal S, Hole E, Grimsley LF, Islam TMS, Scott SK. Regional Variation in Dust Allergen Levels in the Homes of Urban Children with Asthma. Annals of Epidemiology. 2007:17(9)746.

Iqbal S, Muntner P, Batuman V, **Rabito FA.** The Prevalence of Blood Lead Levels ≥5µg/dl among 1 to 21 Year Old U.S. Population and Trends from 1988–1994 through 1999–2002. Annals of Epidemiology. 2007:17(9)746.

**Rabito FA,** White LE. Lead Poisoning in High Risk Children in New Orleans: Responding to CDC's New Directives. *Epidemiology.* 1998;9(4):S138.

**Rabito FA,** White LA, Shorter C. Development of a Hazard Analysis Tool for use at the Department of Energy Nuclear Weapons Complex. *Epidemiology.* 1998;9(4):S159.

*Publications – Other: Technical Papers and Reports (abbreviated list)*

Sarpy SA, **Rabito FA.** Evaluating the Effectiveness of the Gulf Oil Spill Worker Health and Safety Training: examining Relative Effectiveness Among Worker Sub-Populations in the Gulf States. Final report prepared for the National Institute of Environmental Health Sciences. December 2013

Sarpy SA, **Rabito FA,** Goldstein NB. Assessing the Effectiveness of the Gulf Oil Spill Training: Preliminary Results of Pilot Testing of Workers Receiving Training. National Institute of Environmental Health Sciences (NIEHS) WETP Technical Report "Improving Safety and Health Training for Disaster Clean-up Workers: Lessons Learned from the 2010 Deepwater Horizon Oil Spill. " 2012

Sarpy SA, **Rabito FA,** Goldstein NB. Assessing the Effectiveness of the Gulf Oil Spill Training: A Systematic Comprehensive Training Evaluation Process Interim Report. Technical report prepared for the National Institute of Environmental Health Sciences. 2011

Rabito FA. Housing interventions and Health: A review of the Evidence. National Center for Healthy Housing. Report following a meeting of experts from across the country to weigh the strength of scientific evidence on a variety of housing interventions and their effects on health and the environment. 2009

Jeff Patridge, Robert H. Schneider, Roger Gibson, S. Pat Phillips, **Felicia Rabito**, Chuck Shorter. Missouri Department of Health and Senior Services, Division of Environmental Health and Communicable Disease Prevention. Office of Surveillance. Using Spatial Analyst to Determine Effects of Demolition on Blood Lead Levels in St. Louis City Children; A Preliminary Look. 2004

## PRESENTATIONS AT SCIENTIFIC/PROFESSIONAL MEETINGS

### *Investigator Initiated Presentations (abbreviated list)*

Carlson J, Rabito FA, Fox MS. Overland versus underground movement of American cockroaches (Periplaneta americana) in New Orleans, Louisiana: Results of the NICHE study. Entomological Society of America. Minneapolis, MN. 2015

Morrison FJR, Rabito FA, Smith SM, Carlson JC. Parental Perceptions of Pediatric Alternative Healthcare Venues in Greater New Orleans. Poster Presentation. Society for Pediatric and Perinatal Epidemiologic Research. Denver, Colorado. 2015.

Sarpy S, **Rabito FA**. Evaluating the Effectiveness of Worker Mental Health Training: Experiences from the Gulf Responder Resilience Project. American Public Health Association (APHA) Conference. New Orleans, Louisiana 2014

**Rabito FA**, Horter L, Langlois E, White LE. Pediatric lead exposure and the risk of asthma. International Society for Environmental Epidemiology (ISEE), Basel, Switzerland. 2013

Arroyave W, **Rabito FA**, Carlson J. The Relationship Between Immunoglobulin E And Asthma Outcomes: Findings From The National Health And Nutrition Examination Survey, 2005-2006. American Thoracic Society International Conference. Philadelphia, Pennsylvania, 2013

**Rabito FA**, Carlson J. Hospitalization for asthma is associated with cockroach exposure in the homes of children in New Orleans, LA. Entomological Society of America. San Diego, California 2010

**Rabito FA**, Perry S, Davis E, Levetin E. The Relationship Between Mold Exposure and Allergic Response in Post-Katrina New Orleans. American Thoracic Society International Conference. New Orleans, LA. 2010

Levetin E. Davis E, **Rabito FA**. Recovery from Hurricane Katrina: Aerobiology in Four New Orleans Neighborhoods. American Academy of Allergy Asthma and Immunology Conference. New Orleans, LA. 2010

**Rabito FA**, Holt E. Exploring the relationship between indoor allergen levels, allergen-specific IgE and exacerbation of asthma in an inner city cohort. American Academy of Allergy Asthma and Immunology. Philadelphia, PA. 2008

**Rabito FA**, Iqbal S, Lefante JJ. Epidemiologic challenges in post-disaster populations. American Public Health Association (APHA). Washington, D.C. 2007.

**Rabito FA**, Iqbal S. Regional variation in dust allergen levels in the homes of urban children with asthma. American College of Epidemiology. Ft. Lauderdale, FL. 2007

9

Iqbal S, **Rabito FA**, Muntner P. Association between vitamin C intake and blood lead levels among 1 to 5 year old U.S. Children. Tulane Health Sciences Annual Research Days Conference. New Orleans, LA. 2007

**Rabito FA**, Iqbal S, Shorter CF. Relationship between demolition activity and children's blood lead levels. 2005 National Environmental Public Health Conference. Centers for Disease Control and Prevention. Atlanta, GA. 2005

Scott SK, **Rabito FA**, Schwartzbaum JA, et al. Comorbid differences among a morbidly obese clinical population. American Public Health Association. Philadelphia, PA. 2005

Iqbal S, **Rabito FA**, Shorter CF. Community- Based Participatory Research Model Development: From an Epidemiologic Perspective. National Lead & Healthy Homes (HUD, CDC, EPA) Conference, Orlando, FL. 2004

**Rabito FA**, Iqbal S. Panel Presentation: Recruitment challenges in home based intervention projects: New Orleans Healthy Homes Initiative Project. U.S. Housing and Urban Development Healthy Homes and Lead Hazard Control Conference, Washington D.C. 2004

Iqbal F, **Rabito FA**, Shorter CF. Panel Presentation: Development of QA/QC measures in community-based intervention project. U.S. Housing and Urban Development Healthy Homes and Lead Hazard Control Grantee Conference, Washington D.C., 2004

**Rabito FA**, Shorter CF, White LE. Residence in Public Housing as a Risk Factor for Elevated Lead Levels in High Risk Children. International Society for Environmental Epidemiologist Conference. New York, NY. 2004

**Rabito FA**, Sarpy S. Factor analysis of the Chicago Lead Knowledge Questionnaire. Conference on Environmental Health. Unites States EPA. Research Triangle Park, NC. 2003

**Rabito FA**, Shorter C, White LA. Pediatric blood lead and environmental lead levels in inner-city New Orleans. National Lead-Safe Housing and Indoor Environmental Health Conference. New Orleans, LA. 2003

**Rabito FA**, Shorter C, White LAW. Dust control and blood lead levels in children: A community-based approach to research. National Conference on Chronic Disease Prevention and Control. Centers for Disease Control and Prevention. Washington, D.C. 2000

**Rabito FA**, White LW. Lead Poisoning in Inner City Children. American Public Health Association (APHA) Chicago, IL. 1999

**Rabito FA**, White LAW. Trends in pediatric lead levels. International Society for Environmental Epidemiology/ International Society for Exposure Assessment Conference. Athens, Greece. 1999

**Rabito FA**. Environmental Lead in the Mississippi Corridor. Governor's Lower Mississippi River Task Force. Baton Rouge, LA. 1998

*Invited Scientific Presentations (abbreviated list)*

1. **Rabito FA.** US Department of Housing and Urban Development Office of Lead Hazard Control land Healthy Homes. Developing a Healthy Home Research Agenda. Washington DC, 2015

2. **Rabito FA.** Society of Environmental Journalists 24th Annual Conference. Lead and Environmental Justice. New Orleans, LA 2014.

3. **Rabito FA.** Children's Environmental Health Threats in the Post Disaster Environment. New Jersey Environmental Health Conference. Atlantic City, NJ. March 2014.

4. Sarpy SA, **Rabito FA,** Goldstein, Muse I. The Gulf Oil Spill Training Evaluation: Use of Multiple Stakeholders in Examining Effectiveness and Impact. Invited presentation for the National Institute of Environmental Health Sciences at the WETP Awardee Workshop. Research Triangle Park, NC. 2013

5. **Rabito FA.** The role of cockroach exposure in asthma exacerbation. National Healthy Homes Conference. U.S. Department of Housing and Urban Development, U.S. Centers for Disease Control and Prevention, U.S. Environmental Protection Agency. Denver, Colorado. 2011

6. Sarpy SA, **Rabito FA,** Goldstein NB. Evaluation Plan for the Gulf Oil Spill Response Training: A Multiple Stakeholder Approach. Invited presentation at the National Institute of Environmental Health Sciences WETP Awardee Meeting and Technical Workshop "Deepwater Horizon Lessons Learned Workshop: Improving Safety and Health Training for Disaster Cleanup Workers" Mobile, AL. 2011

7. **Rabito FA.** Allergen exposure, allergic sensitization and asthma morbidity among inner-city asthmatic children. Fellowship Program Lecture Series. Department of Medicine, Section of Clinical Immunology, Allergy & Rheumatology. Ochsner Medical Clinic. New Orleans, LA. 2009

8. **Rabito FA,** Holt E. Effectiveness of an integrated environmental and educational intervention to reduce asthma exacerbations and blood lead levels in urban children. Building a Framework for Healthy Housing. 2008 National Healthy Homes Conference. U.S. Department of Housing and Urban Development, U.S. Centers for Disease Control and Prevention, U.S. Environmental Protection Agency. Baltimore, MD. 2008.

9. Holt E, **Rabito FA.** Housing Conditions and Health: An Evaluation of the Impact of Resident's Health and Knowledge. Building a Framework for Healthy Housing. 2008 National Healthy Homes Conference. U.S. Department of Housing and Urban Development, U.S. Centers for Disease Control and Prevention, U.S. Environmental Protection Agency. Baltimore, MD. 2008

10. **Rabito FA.** The health implications of airborne and soil borne contaminants. GeoHealth I - Building Bridges across the Geological and Health Sciences. The Geological Society of America and U.S. Geological Survey. Reston, VA. 2008

11. **Rabito FA.** Interior Biological Agent Asthma Control Interventions. National Center for Healthy Housing and Centers for Disease Control and Prevention. Health Homes Expert Panel Meeting. Atlanta, GA. 2007

12. **Rabito FA.** Indoor dust exposure, sources, transport, and characterization. The Society for Environmental Geochemistry and Health Urban Geochemistry and Health Conference. New Orleans, LA 2007

13. **Rabito FA.** Healthy Indoor Environments. Association of State and Territorial Health Officials (ASTHO) State Environmental Health Directors Meeting. New Orleans, LA. 2007

14. **Rabito, FA.** Toxic Exposure: Residential-Based Hazards and Children's Health. National Legal Aid and Defender Association. Dallas, TX. 2007

15. **Rabito FA.** Plenary speaker. Are we building upon inequity? Race, Place, and the environment after Katrina: Looking Back to Look Forward. A National Symposium. Deep South Center for Environmental Justice. Co-sponsored by Environmental Justice Resource Center at Clark Atlanta University, Lawyers Committee for Civil Rights Under Law, National Black Environmental Justice Network, Advocates for Environmental Human Rights, The National Alliance to Restore Opportunity to the Gulf Coast and Displaced Persons, Fannie Mae Foundation. New Orleans, LA. 2006

16. **Rabito FA,** Iqbal S. Demolition activity and children's blood lead levels. National Advisory Committee of the Centers for Disease Control and Prevention Childhood Lead Poisoning Prevention Program. St. Louis, MO. 2006

17. **Rabito FA.** Healthy rebuilding in hurricane-impacted areas. National Center for Healthy Housing. Columbia, MD. 2005

18. **Rabito FA,** Shorter C, Iqbal S. Translating Research to Policy: The lead example. University of Illinois Chicago Maternal and Child Health National Leadership Conference. Making Change Happen: Translating Research into MCH Public Health Practice. Oak Brook, IL. 2005.

19. **Rabito FA.** Lead in New Orleans' Environment: A mapping project. Mayor's Environmental Breakfast. University of New Orleans LA. 2004

20. **Rabito FA,** White LE. Exploring the relationship between demolition activity and children's blood lead levels. Advisory Committee on Childhood Lead Poisoning. St. Louis, MO, 2004

21. **Rabito FA,** Shorter CF. Community-Based Participatory Research Approach to Childhood Lead Poisoning Prevention Research. Housing and Urban Development Office of Health Homes and Lead Hazard Control Conference. Washington, D.C. 2003

22. **Rabito FA,** Shorter C, White LE Demographic and geographic distribution of childhood lead levels. New Orleans City Council. New Orleans, Louisiana 2001

23. **Rabito FA.** Pediatric lead poisoning. Lead Safe Awareness Day, Invited Speaker. Sponsored by the New Orleans Health Department and the State of Louisiana Department of Health and Human Services. New Orleans, LA. 2000

## GRANTS AND CONTRACTS

The Green Housing Study                                                    Rabito (PI)
Centers for Disease Control and Prevention (7/1/2014 – 12/31/2015)
Grant Amount: $600,000



Integrated Pest Management for the control of multiple cockroach species          Rabito (PI)
U.S. Department of Housing and Urban Development, Office of Healthy Homes and Lead Hazard
Control (12/1/2013 – 11/30/2016)
Grant Amount: $748,538, (30% effort)

Improving Asthma Outcomes Through Cockroach Control          Rabito (PI)
U.S. Department of Housing and Urban Development Office of Healthy Homes and Lead Hazard
Control (4/1/2011 – 3/31/2014)
Grant amount:  $942,465 (40% effort)

Technical Assistance to Ethiopia in Support of HIV Prevention, Care          Rabito (Investigator)
and Treatment
W. Lemma (PI)
Centers for Disease Control and Prevention  (2010-2014) (15% effort)

The Association Between Mold/Dampness Exposure and Atopic Status          Rabito (PI)
Pew Charitable Trust/ RAND Corporation (5/1/2007 – 10/31/2009 )
Grant amount:  $125,000

Maternal-Fetal Lead Exposure and Infant Neruocognitive Development.          Rabito (PI)
Tulane Research Enhancement Fund  (2007-2011)
Grant amount:  $50,000

Occupational Health of Latino Migrant Workers          Rabito (PI)
The Center for the Protection of Worker Rights, National Institute for
Occupational Safety and Health  (2008–2009)
Grant amount:  $30,000

New Orleans Home Health Hazard Assessment Initiative          Rabito (PI)
U.S. Department of Housing and Urban Development, Office of  Healthy
Homes and Lead Hazard Control (2006-2009 )
Grant amount:  $627,403

Environmental Public Health Tracking Project (L. White PI)          Rabito (Co-I)
PI of the sub-project, The Co-Morbidity of Asthma and Childhood Lead Poisoning.
Centers for Disease Control and Prevention  (9/2005 – 9/2010)
Grant amount:  $3,170,000

Randomized Control Trial of Asthma Reduction Strategies:  The New          Rabito (PI)
Orleans Healthy Homes Initiative.
U.S. Department of Housing and Urban Development, Office of Healthy Homes
and Lead Hazard control (10/2003-03/2007)
Grant amount:  $854,909

Healthy Rebuilding in Hurricane-Impact Areas          Rabito (Co-I)
Enterprise Foundation. (10/2006 – 5/2006)

Longitudinal Study of Mold Exposure and Respiratory Health          Rabito (PI)
Operation Assist. Columbia Mailman School of Public Health.  Columbia
University (1/2006 – 12/2006)

13

Environmental Public Health Tracking Project (L. White PI)                Rabito (Co-I)
PI of the sub-project, The Association Between Demolition Activity and
Children's Blood Lead Level
Centers for Disease Control and Prevention (8/2003 -8/2005)
Grant amount:  $2,128,225

Prevention Research Center (L. White PI)                                  Rabito (Co-I)
PI of the subproject, Intervention Trial of Childhood Lead Toxicity
Centers for Disease Control and Prevention (1998-2003)
Grant amount:  $3,662,898

Louisiana Childhood Lead Poisoning Prevention Program (L. White PI)       Rabito (Co-I)
State of Louisiana, Lead Poisoning Prevention Program (1998-2005)
Grant amount: $1,380,289

Development of the Employee Job Task Analysis (L. White PI)               Rabito (Co-I)
United States Department of Energy (1994-1998)
Grant amount: $12,700,000

### Service to the Professional Community

Scientific Reviewer:  National Institute of Health, Fogarty International, Brain Disorders. 2016

Scientific Reviewer:  National Institute of Health, National Institute of Environmental Health
Sciences.  Children's Environmental Health, 2015

Scientific Reviewer:  National Institute of Health, National Institute of Child Health and
Development. Asthma Cohort Support, 2013

Scientific Reviewer: Centers for Disease Control and Prevention, National Center for Environmental
Health. Indoor Environment of Low-Income Renovated Multifamily Housing in the Western Region
of the United States, 2013

Technical Advisory Board invited member, Children's Environmental Health Project. RTI,
International and LSU School of Public Health, 2011-2013

Special Emphasis Panel/Integrated Review Group scientific reviewer. Centers for Disease Control
and Prevention, National Center for Environmental Health. Green Housing Study, 2012

Technical Reviewer, Department of Housing and Urban Development, Office of Healthy Homes,
HUD Healthy Homes Technical Paper on Asthma,  2012

Louisiana Public Health Institute, Data Advisory Group, 2012

National Institutes of Environmental Health Sciences, Health Disparities Roundtable; Environmental
Justice Caucus, Facilitator, 2009

Journal Reviewer:
         International Journal of Environmental Health Research

14

Felicia A. Rabito, M.P.H., Ph.D.

Cochrane Injuries Group
Annals of Epidemiology
Environmental Health Perspectives
Annals of Asthma Allergy and Immunology
American Journal of Epidemiology
American Journal of Public Health
Journal of Allergy and Clinical Immunology
Allergy
Environmental Research
Science of the Total Environment
Indoor Air
Public Health Reports
Journal of Urban Health
Journal of Epidemiology (Japan)
Environmental Science & Technology
American Journal of Industrial Medicine
Zoonoses and Public Health
Journal of Immigrant and Minority Health

## Service to the General Community

Subject Matter Expert and featured on the documentary entitled MisLead: America's Secret Epidemic
Board of Directors of New Orleans Outreach, 2006-2013 (Board President 2011-2013)
Mayor Mitch Landrieu's Lead Advisory Workgroup, 2011 -2012
British-American Project, Host 2012
New Orleans Department of Health, Lead Prevention Program, grant writing assistance Kreisge
    Foundation 2012
Mayor-Elect Mitch Landrieu Transition Team, Energy and the Environment, 2010
Program Mentor, Don't Weight to Lose, 2008-2010
KaBOOM! 2007- 2009
New Orleans Area Health Disparities Initiative, 2005
State of Louisiana Asthma Coalition, 2004
City of New Orleans Martin Luther King Jr. Federal Holiday Planning Commission, 2003
City of New Orleans Lead Working Group , 2002
New Orleans Environmental Roundtable, 2002

15

WRIT NO. _____

TRIAL COURT NO. 1361004

EX PARTE                             IN THE 371st JUDICIAL

                                     DISTRICT COURT

CEDRIC RICKS                         TARRANT COUNTY, TEXAS

### ORDER ON APPLICANT'S EX PARTE FUNDING MOTION FOR EXPERT ASSISTANCE

On ___4  22 16___ , the Court having considered the above and foregoing motion, finds the same is hereby **GRANTED in an amount not to exceed** $2800 / **DENIED** in which case Applicant requests that the Court designate in writing its reasons for denying this request as required by Tex. Code Crim. Proc. Ann. art. 11.071 §3 (c).

Judge Presiding

1809

WRIT NO. _____

TRIAL COURT NO. 1361004

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS
MAY 23 2016
TIME_____9:00am___
BY_____DEPUTY

EX PARTE

CEDRIC RICKS

IN THE 371ˢᵗ JUDICIAL

DISTRICT COURT

TARRANT COUNTY, TEXAS

## EX PARTE MOTION REQUESTING DEFENSE PSCHOLOGIST TO TURN OVER RAW TEST DATA TO ANOTHER DEFENSE PSYCHOLOGIST

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the indigent Applicant, by counsel, and pursuant to Tex. Code Crim. Proc. art. 11.071§3, the 5th, 6th, 8th and 14th Amendments to the United States Constitution and Sections 10, 13 & 19 of Article I of the Texas Constitution and other authority cited herein, moves this Court to enter an order directing one defense psychologist to turn over raw test data to another defense psychologist. In support of said motion, Applicant would show:

I.

Defense expert, Dr. Joan Mayfield, a forensic neuropsychologist, is in possession of raw test data from psychological tests conducted on Applicant, Cedric Ricks. Undersigned attorney has requested that this test data be shared with another defense forensic neuropsychologist, Dr. John Fabian. However, the rules of the psychology profession prohibit turning over raw test data unless certain conditions are met. According to the Board Rule 465.22 (4) Test data are not part of a patient's or client's record. Test data are not subject to subpoena. Test data shall be made

SCANNED

1810

available only: (A) to another qualified mental health professional and only upon receipt of written release from the patient or client, or (B) pursuant of a court order.

## II.

Getting a release signed by the client who is housed in the Polunsky Unit in Livingston, Texas would take at least a week. TDCJ requires that attorneys schedule visits in advance. Polunsky is a four-hour drive for undersigned attorney and a visit consumes at least one entire day. The earliest undersigned attorney could visit Applicant to obtain a signed release would be May 27, 2016.

## III.

Applicant's writ is due June 11, 2016. Waiting until May 27, 2016, to obtain a signed release will not leave Dr. John Fabian with enough time to assess the data and formulate his opinion in Applicant's case. Therefore, Applicant requests that this court issue an order requiring the raw test data possessed by Dr. Mayfield be shared with Dr. Fabian.

1811

WHERFORE PREMISES CONSIDERED, the Applicant respectfully prays that this Court grant this motion.

Respectfully submitted,

Catherine Clare Bernhard
P.O. Box 2817
Red Oak, Texas 75154
972-617-5548
fax 972-421-1604
cbernhard@sbcglobal.net
State Bar No. 02216575

ATTORNEY FOR APPLICANT

1812

WRIT NO. _____

TRIAL COURT NO. 1361004

EX PARTE

CEDRIC RICKS

IN THE 371st JUDICIAL

DISTRICT COURT

TARRANT COUNTY, TEXAS

## ORDER

The Court having considered the request of Catherine Clare Bernhard, state habeas counsel for Applicant, for a court order directing habeas defense psychologist Dr. Joan Mayfield to turn over a copy of Applicant Cedric Ricks' raw test data to habeas defense psychologist Dr. John Fabian, finds the same is hereby **granted** and Dr. Mayfield is directed to turn over Cedric Ricks' raw test data to Dr. Fabian/ **denied.**

Signed this 5 23 16.

Judge Mollie Westfall
371st Judicial District Court
Tarrant County, Texas

1813



FILED
THOMAS A WILDER DIST CLERK
TARRANT COUNTY, TEXAS

JUN 1 7 2016

TIME_____ 11:18 am
BY_____ Mf DEPUTY

No. C-371-010796-1361004-A

| EX PARTE | § | IN THE 371ST JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| CEDRIC ALLEN RICKS | § | TARRANT COUNTY, TEXAS |

## STATE'S MOTION FOR AFFIDAVITS
## OF APPLICANT'S TRIAL AND APPELLATE COUNSEL

TO THE HONORABLE JUDGE OF SAID COURT:

The State of Texas, by and through the Criminal District Attorney of Tarrant County, Texas, requests this Court to order Applicant's counsel at trial and on direct appeal to provide the State with affidavits in the instant cause.

I.

A jury convicted Applicant of capital murder in cause number 1361004R, styled *The State of Texas v. Cedric Allen Ricks*, in the 371st Judicial District Court of Tarrant County, Texas, the Honorable Mollee Westfall presiding. The jury's answers to the special issues required the imposition of the death penalty.

II.

On June 13, 2016, Applicant filed his initial application for writ for habeas corpus in cause number C-371-010796-1361004-A. *See* TEX. CODE CRIM. PROC. art. 11.071.

III.

Applicant was represented at trial by William H. Ray and Steve Gordon. Applicant complains that his trial counsel were ineffective because they:

(a)    did not sufficiently develop and present significant mitigating evidence about: (i) Applicant's mother drinking and smoking

1

SCANNED

1814

during her pregnancy; (ii) people who babysat Applicant until the age of five; (iii) Applicant's behavior problems as a young child; (iv) whippings Applicant received from his parents and caregivers; (v) Applicant's problems in school; (vi) Applicant's behavior problems as a teenager; (vii) Applicant's family history of mental illness; (viii) Applicant's continued behavioral problems as an adult; (ix) the neighborhoods where Applicant lived before Calumet Park; (x) potential lead exposure in Applicant's neighborhoods; and (xi) the psychological significance of Applicant's life experiences;

(b)    did not object to Applicant's appearance in shackles in front of the jury;

(c)    presented inaccurate testimony about Applicant's future dangerousness risk;

(d)    did not raise the issue that the use of the term "probability" in the "future dangerousness" special issue dilutes the reasonable doubt standard; and

(e)    did not raise the issue that the definition of "mitigation" is unconstitutionally narrow.

IV.

Applicant was represented on direct appeal by Mary B. Thornton. Applicant complains that his appellate counsel was ineffective for not challenging the trial court's:

(a)    failure to charge the jury on the burden of proof for extraneous offenses at punishment;

(b)    exclusion of genetic evidence; and

(c)    denial of the defense's *Batson* motion.

2

1815

V.

In order to facilitate the resolution of Applicant's claims, it is necessary for Applicant's counsel at trial and on direct appeal to file affidavits addressing in detail Applicant's contentions in his application that he was denied his right to effective assistance of counsel.

IV.

WHEREFORE, PREMISES CONSIDERED, the State prays that this Court order Mr. Ray, Mr. Gordon, and Ms. Thornton to each file an affidavit detailing his or her representation of Applicant in order to resolve the issues raised in this habeas proceeding.

Respectfully submitted,

SHAREN WILSON
Criminal District Attorney
Tarrant County, Texas

DEBRA WINDSOR
Chief, Post-Conviction

HELENA F. FAULKNER
Assistant Criminal District Attorney
State Bar No. 06855600
401 W. Belknap
Fort Worth, Texas 76196-0201
(817) 884-1685
FAX (817) 884-1672

3

1816

## CERTIFICATE OF SERVICE

A true copy of the State's motion has been mailed to Applicant's habeas counsel,

Catherine Clare Bernhard, P.O. Box 2817, Red Oak, Texas, 75154, on June 17, 2016.

HELENA F. FAULKNER

4



FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

JUN 17 2015

TIME _4:38pm_
BY_____ _MGC_ _____ DEPUTY

RECEIVED IN
WRIT DIVISION

WRIT NO. _____

TRIAL COURT NO. 1361004

EX PARTE                             IN THE 371st JUDICIAL

                                     DISTRICT COURT

CEDRIC RICKS                         TARRANT, COUNTY, TEXAS

SECOND EX PARTE

FUNDING MOTION FOR RESEARCH ASSISTANCE

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the indigent Applicant, by counsel, and pursuant to Tex. Code
Crim. Proc. art. 11.071§3, the 5th, 6th, 8th and 14th Amendments to the United States
Constitution and Sections 10, 13 & 19 of Article I of the Texas Constitution and
other authority cited herein, moves this Court to enter a finding that there is a
reasonable necessity for expert assistance and funding as requested in this motion.
In support thereof, this Applicant would show:

I.

(a) Cedric Ricks was convicted of capital murder and sentenced to death.
Undersigned counsel has been appointed to investigate expeditiously, the factual and

SCANNED

1818

legal grounds for the filing of an application for a writ of habeas corpus pursuant to Art. 11.071 of the Texas Code of Criminal Procedure.

(b)  Part of that investigation must include conducting legal research. Applicant is requesting that this Court approve and provide funding for Applicant to retain the services of a research assistant.

(c) This Court has determined that the Applicant is indigent.  His counsel is unable to retain any expert assistance due to Applicant's indigent status.

## II.

The funding that is requested will provide Counsel with essential tools necessary to investigate the legality of Applicant's confinement. Specifically, the claim to be investigated is that trial counsel and appellate counsel were ineffective for failing to raise various legal claims in this case. Applicant is entitled to such expert assistance upon a threshold showing that the assistance sought is relevant to a claim to be investigated. Cf. Ake v. Oklahoma, 470 U.S. 68 (1985). A research assistant will also save the court money in the long run since the court will not have to pay the higher hourly rate of undersigned counsel to do this work.

## III.

This court had previously approved $3750 for research assistance in this case. However, those funds have now been exhausted and counsel is requesting another $4500 for additional research assistance.

## VII.

This motion is made ex parte pursuant to Tex. Code Crim. Proc. Ann. art. 11.071§3. It would be fundamentally unfair to require this indigent Applicant to divulge to the prosecution the nature of this motion for funding which will necessarily inform the State of defensive theories of mitigation. Williams v. State, 958 S.W.2d 186 (Tex. Crim. App. 1997). If the undersigned counsel were retained by the accused, there would be no requirement that the State be notified of the retention of expert assistance.

1820

WHERFORE PREMISES CONSIDERED, Movant prays that this Court:

(a) Find that a threshold showing has been made that a research assistant is an essential tool in the investigation of the factual and legal grounds for the filing of an application for a writ of habeas corpus pursuant to Art. 11.071 of the Texas Code of Criminal Procedure.

(b) approve funding in the amount of $4500.

(c) that the Movant have such other and further relief as he may show himself to be justly entitled.

Respectfully submitted,

Catherine Clare Bernhard
P.O. Box 2817
Red Oak, Texas 75154
972-617-5548
fax – 972-421-1604
State Bar No. 01226575
cbernhard@sbcglobal.net

**ATTORNEY FOR APPLICANT**

# VERIFICATION

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this date personally appeared Catherine Clare Bernhard, attorney of record in the above-styled and numbered cause, who upon her oath does hereby swear and affirm upon her personal knowledge that all statements of fact contained in the foregoing Motion are in all respects true and correct.

Catherine Clare Bernhard

STATE OF TEXAS
COUNTY OF DALLAS

SUBSCRIBED AND SWORN BEFORE ME, the undersigned Notary Public, on this the 12th day of June, 2016.

CLINTON J. STAFFORD
MY COMMISSION EXPIRE
December 5, 2017

Notary Public in and for the
State of Texas.

1822

## ORDER

On ___6 / 4 / 16___ , the Court having considered the above and foregoing motion, finds the same is hereby **GRANTED** and funding is approved in the amount of $ _____ **DENIED,** in which case Applicant requests that the court designate in writing the reasons for denying said motion, in whole or in part, as required by Tex. Code Crim. Proc. Ann. art. 11.071 § 3(c).

$4500 MW

_____
Judge Presiding

1823

FILE COPY



**COURT OF CRIMINAL APPEALS**
P.O. BOX 12308, CAPITOL STATION
AUSTIN, TEXAS 78711

SHARON KELLER
PRESIDING JUDGE

LAWRENCE E. MEYERS
CHERYL JOHNSON
MIKE KEASLER
BARBARA P. HERVEY
ELSA ALCALA
BERT RICHARDSON
KEVIN P. YEARY
DAVID NEWELL
JUDGES

ABEL ACOSTA
CLERK
(512) 463-1551

SIAN SCHILHAB
GENERAL COUNSEL
(512) 463-1597

Monday, June 20, 2016

Presiding Judge 371st District Court
401 W Belknap
Fort Worth, TX 76196-7118
* DELIVERED VIA E-MAIL *

Catherine Clare Bernhard
P.O. Box 2817
Red Oak, TX 75154
* DELIVERED VIA E-MAIL *

District Attorney Tarrant County
Sharen Wilson
401 West Belknap
Fort Worth, TX 76196
* DELIVERED VIA E-MAIL *

**FILED**
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

JUN 2 1 2016

TIME _____9:46am_____

BY_____ML_____ DEPUTY

Re: RICKS, CEDRIC ALLEN
CCA No. WR-85,278-01
Trial Court Case No. 1361004R

The Court has received documents from Mr. Ricks regarding his 11.071 application for writ of habeas corpus that are not properly before the Court at this time. Please find copies of these documents attached.

Sincerely,

Abel Acosta, Clerk

By: John Brown
Chief Deputy Clerk

cc:   District Clerk Tarrant County (DELIVERED VIA E-MAIL)

SCANNED

1824

Tarrant County Clerk of Appeals                    Feb 2, 2016

Cause No: 1361004R
CCA No AP-77,040

RECEIVED in
COURT OF CRIMINAL APPEALS

State of Texas                    The District Court of
V.                                Tarrant County, Texas
                                  371st Judicial District.
JUN 10 2016

Cedric Ricks #999593
Polunsky Unit 3872 FM
350 South Livingston TX 77351

Abel Acosta, Clerk

Amendment of State Habeas Writ under 11.071

Motion for Post-Conviction Relief
and for Ineffective Assistance of Trial Counsel
and Direct Appeal Counsel.

Now comes defendant Cedric Ricks pro-se (Ricks) respectfully moves for the trial Judge Molee Westfall of the 371st Judicial District Court to grant relief to defendant (Cedric Ricks) in Post-conviction Relief and the to grant error in Ineffective Assistance of Trial Counsel.

1) Testimony by Niya Cardosa, of the Oklahoma Sheriff Dept, personally committed perjure, when she testified, against defendant Cedric Ricks. Quote in her statements about warrants coming out of Texas, which she said she received off of fax machine at her detention center. Later during cross-examination, defendants Lawyer, Court Appointed Counsel Steve Gordon, asked her about this under oath, and she said she never received any warrants off of fax machine. The record will reflect this, and the Ineffective Assistance of Trial Counsel, because state witness Niya Cardosa, should have been impeached and reprimanded in front of court and jurors. This was very prejudicial to the defendant, by demonstrating a reasonable probability that, but for the counsels unprofessional errors, the result of the proceedings would have been different. At least one juror would.

1825

Tarrant County Clerks Office    Pg 2    Feb 2, 2016

State of Texas

Motion for Post-conviction relief
and Ineffective Assistance of Trial Counsel

V.

Cause No 1361004R
CCA Ap No 77,040

Cedric Ricks #999593
Polunsky Unit 3872 FM
350 South Livingston TX 77351

The District Court of
Tarrant County, Texas
371st Judicial District

Amendment of State Habeas writ
under 11.071

cont- Struck a different balance. It would have put the whole case in a different light as to undermine confidence in the verdict. Jury was only offered - one sided evidence, and not the full story of what happened, or what should have been presented, by defense counsel Sixth - and Fourteenth Amendments of the Constitution was in clear violatisas, because Steve Gordon and William Ray, participat in pre-trial proceedings in Feb-2014 and cross-examined this witness before trial. They had plenty enough time, to gather enough evidence to, impeach this witness. Video, audio and visual would have backed up this argument. Also the testimony of Det Gauge of Beeford Police Dept, who said, under oath, we Bedford Police Dept do not touch anything, until the Medical examiners office, does its investigation. This also, was a lie, because Det Gauge of the Bedford Police Dept, went through defendants (Cedric Ricks) nightstand he retrieved items, that were later, thrown out by Judge Molee Westfall. The record, will clearly show, what those items were. If officer lied under sworn testimony, that he doesn't touch everything, until Medical Examiner office, does investigation, what else did he touch. This also, was detrimental, in the light as to undermine confidence in verdict. Out of due diligence all this should have been, raised in direct appeal, because of the egregious

1826

Feb 2, 2016

Cause No. 136/004R
CCA No AP·77,040

State of Texas
V.

Cedric Ricks #999593

The District Court of
Tarrant County, Texas
371st Judicial District

Polunsky Unit 3872
350 South Livingston Tx 77351

Amendment of State Habeas Writ
under 11.071
Motion for Post conviction Relief
and Ineffective Assistance of Trial Counsel
and Direct Appeal Counsel.

Cont- acts of the Prosecutor and the Ineffective Assistance of Trial Counsel. Also the Missed opportunities to make aware of this to Mary B Thornton, because of not being able to visit with her. The arguments that I have, in recent cases, have been thrown out, because lawyers, have failed to raise these arguments, in a timely fashion. In one Case (Martinez v Ryan) is like the poster child, for such misinterpretations of the law. Texas law, doesn't permit a defendant from raising post-conviction relief, or Ineffective Assistance of Trial Counsel, in direct Appeal, but makes it very difficult. Copies of this will be mailed to the Attorney Generals Office of the United States, and also to death Penalty activist. To show the egregious acts of the courts, to cover up their agenda.

Wherefore Premises Considered. Defendant prays that this Honorable Court grant this motion and order a new-trial be conducted in the above entitled and numbered cause. Respectfully Submitted

Polunsky Unit 3872 3M
350 South Livingston Tx 77351

Cedric Ricks #999593

1827



NORTH HOUSTON TX 773

28 JUN 2025 PM 5 1

Cecilia Nick #999593
Polunsky Unit 3872 FH
350 South Swingston TX 77351

Court of Criminal Appeals of Texas
P.O. Box 12308
Capital Station
Austin, TX 78711

78711-230808

Confidential Legal Mail

1828

Tarrant County Clerk of

RECEIVED IN
COURT OF CRIMINAL APPEALS No 136700-12          June 1, 2016
                          CCA No AP-77,040       June 1, 2016

State of Texas

Cedric Ricks #999593    Motion to Amend State Habeas    The District Court of
                        Writ under 11.071             Tarrant County, Texas
                                                       371st Judicial District

JUN 10 2016

Comes now Cedric Ricks #999593 Pro se (Ricks #999593) respectfully moves the
court for leave to Amend Article 11.071 of the Texas Code Criminal Procedure
state application for writ of habeas corpus, and in support, would show

## Illegal Arrest.

1) U.S v Berry 670 F.2d 583,591 (5th 1982) Officers Laxton and Green of the
Oklahoma Highway patrol, blocked (Ricks #999593) from proceeding on highway
I35 without reasonable suspicion Laxton testified to this in court. Two officers
against one, drawing guns. Didn't state why or which I was being contained
U.S v Cole 444 F3d 688 (5th cir 2006) U.S v Simmons 390 U.S 377 88 s.ct 967 - never said
vehicle was stolen, or reported stolen. U.S v Lopez - Valdez 178 F.3d 282 (5th Cir 1999)
U.S. v Chavez - Villareal 3 F3d 124, 124, 127-28 (5th Cir 1993) Fishing Expedition to find more
evidence, after illegal stop. U.S v Cruz 581 F2d 535 (5th Cir 1978) The stop (Ricks) was
unreasonable not because the officer secretly hoped to find evidence of a greater offense,
but because it was clear that an officer would have been interested in pursuing the
lesser offense, absent the hope. U.S Martinez v Martinez 486 F3d 855 (5 2007)

## Illegal Search of Apt.

2) Arizona v Hicks 480 US 321, 322 (1987) Went through (Ricks #999593) drawer in bedroom
constituted illegal search of my apt. Knew I lived there, and exigent circumstances
were long gone. U.S v Menchaca-Castruita 587 F3d 283, 295-96 (5th 2009) Marcus
told officers on phone, I took his moms car, and he saw moms car was gone. Also, police
knew, I was in custody in Oklahoma at 10-11 am that night of the May 1, 2013.

## Ineffective Assistance of Counsel.

3) Trottie v Stephens 720. F3d 231, 242, 44 (5th Cir 2013) presumption of reasonableness
when my counsel William Ray, Steve Gordon did not call, certain known witnesses
+, argue self defense. Undersheriff, who set up beating of (Ricks) in Oklahoma
jail, not called to testify, even though Det William Mock, said in court. Jim Mullet
of the Garvin County jailer, put Mr Ricks into a cell, with all these gang members
Mr Ricks, was the only black person, in this holding cell, all the rest were "white"

1829

Tarrant County Clerk — Hue

State of Texas

Cedric Ricks # 999593

2022

Cause No 1361004R
CCA No AP- 77,040

June 1, 2022

The District Court of
Tarrant County, Texas
371st Judicial District

Motion to Amend State Habeas
Writ under 11.071

## Ineffective Assistance of Counsel

cont.

U.S v Fuchs 467 F.3d 889, 910 n.15 (5th Cir 2006)
Charles v Smith 894 F 2d 718, 725-724 (5th Cir 1990) invocation of right to silence
not scrupulously honored, when police asked 2 potentially incriminating
questions, minutes after invocation of right.

## Illegal Search of Home

Hogan v. Cunningham 722. F3d 725, 733 (5th Cir 2013) Warrantless home entry.

## Right to Counsel.

At both arraignments in Oklahoma, Judge Misah, failed to appoint counsel
to me, at both arraignments Rothgery v. Gillespie County, 554 U.S 191, 213
2008) Right to counsel attaches at criminal defendants initial appearance
before a Judicial officer, where he learns the charge against him, and his
liberty is subject to restriction. Brewer 430 US at 401 (right to counsel attaches
at interrogation after arraignment because adversarial proceeding had begun
Matteo v Superintendent, SCI Albion 171 F3d 877, 892-893 (3rd Cir 1999) Right
to counsel after preliminary arraignment, arrest, incarceration, and organized
police investigation, because (defendant Ricks #999593) faced procedural
and prosecutorial system.

## Verification

I have read the foregoing complaint and hereby verify that the matters alleged
therein are true, except as to matters alleged on "information and belief, and as
to those, I believe them to be true and correct.

Cedric Ricks # 999593
Polunsky Unit 3872 FM
350 South Livingston Tx 77351

1830

Calvin Nichols #999513
Polunsky Unit 3872A F4
350 South Livingston, TX 77351

Confidential Legal Mail

78711-230608



NORTH HOUSTON TX 773
03 JUN 2016 PM 5 1

Court of Criminal Appeals of Texas
P.O. Box 12308
Capitol Station
Austin, TX 78711

1831

Tarrant County Clerk Office

State of Texas

v.

Cedric Ricks #999593

Cause No. 1361004R
CCA No AP-77,040

The District Court of Tarrant County Texas 371st Judicial District

Motion to Amend State Habeas Writ under 11.071

Comes now Cedric Ricks #999593 (Pro-se)(Ricks#999593) Respectfully moves the court for leave to Amend Article 11.071 of the Texas Code Criminal Procedure state application for writ of habeas corpus, and in support, would show.

Ineffective of Assistance of Trial Counsel and State Habeas Counsel.

1) Det Gaugh of the Bedford Police Dept. Illegally searched Ricks apt, for twelve hours, without search warrant. While doing so, Det Gaugh, went through nightsland in bedroom, belonging to Ricks. 1 be retrieved items out of the nightsland, and knew Ricks, lived at Apt. My court appointed lawyer, William Ray, asked that all the items, in apt, be suppressed clue to illegal search. Judge of the Tarrant County courthouse, struck these items clown, and they were suppressed After the Bedford police, were done, investigating the Apt in Bedford they allowed relatives of victim, to go in and clean out the apt. Mother, Diana McGrew, retrieved items, out of same nightsland and turned them over to Bedford Police. They in turn, submitted them, as evidence in this case. Det Gaugh already tainted this crime scene, and nightsland, and judge tossed out, that evidence. Now my argument is, due to illegal search of the 4th Amendment, these items were used in my trial. Anything in that nightstand should have been suppressed as well. My

1832

Tarrant County Clerks File

State of Texas

Cedric Ricks #999593

Cause No 1361.004R

CC Appeal in 77,040

RECEIVED IN
COURT OF CRIMINAL APPEALS

JUN 10 2016

Abel Acosta, Clerk

In The District Court of
Tarrant County Texas
371 st Judicial Distri

Cont. Attorneys had a chance, at trial, to argue this fact. But they never ever, brought it up. Also testimony was used again. ra, concerning this evidence. I'm afraid my, state Habeas lawyer, wont bring this up either, because its not in the brief.

Also, I tried to raise, self defense with my trial counsel lawyers but they never, tried on my behalf. Even in testimony, one witness said he observed Ricks and Sanchez, hitting each other. My trial counsel, never made, light of this, in trial. The record will reflect they didn't even, repeat what witness said, in court.

3) I mentioned all this to my state Habeas
Lawyer Caetana Birland in a letter to our courts.

4) Tarrant County, never responded to my request for a new state Habeas Attorney. I still have the letter (copy)

Verification

I have read the foregoing complaint and hereby verify that the matter alleged therein are true, except as to matters alleged on information and belief and as to those, I believe them to be true and correct

Cedric Ricks #999593
Polunsky Unit 3872 FM
350 South Livingston TX 7735

1833

Culbie Nicholes #999593
Polunsky Unit 3872 FM
350 South Livingston, TX 77351

Court of Criminal Appeals of Texas
P.O. Box 12308
Capital Station
Austin, TX 78711

Confidential Legal Mail

NORTH HOUSTON TX
03 JAN 2016 PM 5 L

78711-230899 8005

1834

Tarrant County Clerks Office 1 of 6 (2 of 5)

RECEIVED IN
COURT OF CRIMINAL APPEAL

JUN 14 2016

Abel Acosta, Clerk

Catherine Bernhard
Attorney
P.O. Box 2817
Red Oak, Tx 75154
State of Texas
      v.
Cedric Ricks #999593

CAUSE No 1361004R
CCA No AP-77,040

The District Court of
Tarrant County, Texas
371st Judicial Distric

Motion to Amend
State Habeas Writ under
11.071 of the Texas Code of Criminal Procedure.

Comes now Cedric Ricks #999593, pro se (Ricks #999593) respectfully
moves the court for leave to amend Article 11.071 of the Texas
Code Criminal Procedure State Application for writ of habeas
Corpus, and in support, would show.

My counsel Catherine Bernhard, brought a draft copy of the
state Habeas brief, and gave it to me. I've read it, and it has
none of the issues, that I wanted raised in it. Only the ones
she wants raised. Due to this, out of due diligence I want
this added on to my State Habeas, under 11.071. My claims are
valid, and the court record, will clearly show it. My claims
are as follow (Followed CR). These issues weren't brought up in wording in Direct
Appeal
1) Never, was asked for license, when I was pulled over in Oklahoma.
Patrol Officer Laxton and Green, just told me, to exit car, when I was
pulled over. Laxton admitted in pre-trial testimony, he didn't
think they had the right person (Illegal detainment).
2) Laxton and Green, never read me, my miranda rights, and they
were the ones, who arrested me, without a charge.

1835

Tarrant County Clerk Fee   2 of 2   May 29, 2016

Catheren Bernhard
Attorney
P.O. Box 8817
Red Oak, TX 75154

Cause No 1361004R
CCA No AP-77,040

The District Court of
Tarrant County, Texas
371st Judicial District

cont-3) Nya Cardosa, testified, she was getting arrest warrants off, fax machine. This never happened, because Det William Mack was asked under sworn testimony in pre trial, what time, did you leave the Bedford Police Dept, on May 2, 2013, by Bob Gill Prosecutor of Tarrant County 6 US 193. My report, shows we left the police dept a 12:59 AM on the 2nd. William Mack, also stated they arrived in Pauls Valley at 3:06 AM. Bob Gill asked Det William Mack, did you have copies, of those "in hand, when you were in Pauls Valley? William Mack said 6 US 194. Eventually we did. At the time, they were, signed and upon our arrival, we had yet, to have the copies of them, but ultimately we did get copies 6 US 195. Now, My lawyer, said they were signed at 12:00 midnight, but if that's the case, Det William Mack, would have had them when he left Bedford Police Dept. at 12:59 AM. He couldn't have them then, or at Pauls Valley, when he arrived at 3:06 AM. Miss Nya Cardosa, said, she was reading them, off the fax machine, but wasn't even there, to produce them, for Mr Mack. Nobody in the Garvin County Sheriffs Office, had either. To further my claim, I never was arraigned on a murder charge in Oklahoma.   Nya Cardosa also lied, when asked by Bob Gill 6 US 30. Now you said you put him, in a quiet tank. Do you mean, a tank that houses several inmates

1836

Tarrant County Sheriff Office    3 of 3              May 29, 2016

Catherine Bernhard                Cause No 1361004R
Attorney                          CCA No AP-77,040
P.O. Box 2817
Red Oak, Texas 75154                        The District Court of
                                            Tarrant County, Texas
State of Texas                              371st Judicial District

Cedric Ricks #999593

Cont - 6 US 130 Niya Cardosa's answer to Bob Gills question is "ye,
6 US 139 Steve Gordon says, to Niya Cardosa, even though, you weren't on
duty May 2, 2013, Ricks was initially in a single cell, and then
requested to move over to population. After cross examination, from
Steve Gordon, 6 US 140, he asks her, about re, going to the hospital. She
said, she wasn't on shift, at the time. Bob Gill, had asked her earlier
in her testimony. 6 US 127. At some point in time, Ricks was transported
to the hospital, for treatment. Niya stated He was He was. This witness
is clearly lying, and my state Habeas lawyer, hasn't put this in
my state Habeas. 6 US 196 Det Mach, also, stated I was transferred
to hospital, about my hands. After I got back, from Hospital, detectives
tried to interview re. I haven't been housed in a cell yet, as Niya
Cardosa, said she did, when I returned from Hospital, relating to !
hands. I'm arraigned, at 10:00 am, I waive extradition and
my attorney asked Det William Mach 6 US 218 The sheriff says, I'm
going to send this guy, into general population, and we'll see
what happens, essentially kept? Mach answers "Yes sir,"
                                                            1837

Tarrant County Clerk Office  May 29, 2016

Catherine Bernhard

Attorney

P.O. Box 2817

Red Oak TX 75154

State of Texas

Cause No 1361004R

CCA No AP-77,040

The District Court of
Tarrant County, Texas
371st Judicial Court

CeDric Ricks #999593

cont—So not only, did Nqa Cardosa lie, The Undersheriff Jim Mullet, placed me, in a cell, with a bunch of white guys, me being the only black. I was beaten, and it almost, cost me, my life. Jim Mullet, was never subpoena to court, by my counsel, to answer to these criminal transactions. Ineffective Assistance of counsel, should have been, raised by my Direct Appeal lawyer and my State Habeas, but they have, failed to do so. 6 US 220 March, stated my eye, and blood was running from my mouth. After the video, surfaced of the fight, it showed the assault on me, which clearly, shows, I didn't start. Shows them, covering up the camera, and at another angle, somebody acting as a lookout. Mr. Rose, who testified in my trial, against me.

4) Law Section 18 - Article 18.02, Section 10, a subsequent evidentiary search, be authorized by a district judge, Court of Appeals, or Court of Criminal Appeals. 6 US 240. The warrants

1838

Tarrant County Clerk Office    5 of 5 (5 of 6)    May 24, 2018,

Catherine Beinhard
Attorney

Cause No 1361004I2
CCA No AP-77,040

P.O. Box 2817
Red Oak, Texas 75154

The District Court of
Tarrant County, Texas
371st Judicial District

State of Texas
v.
Cedric Ricks #999593

Cont- If the warrant, was to justify the search of apt, it was issued by someone who couldn't issue it. The rest of my claims, are to be preserved, with the court under my sworn statements, followed with my Affidavit. Also, is included with all the facts of this case.

5) Never read miranda rights, by state troopers. They're the ones who arrested me, on a later charge.

6) DNA testing of knives. Ineffective of Assistance of Counsel, because they had access to, all the evidence, and only tested two knives, instead of four.

7) Direct Appeal lawyer, using Laxtons testimony but he never testified in my trial, but my lawyer (Bill Ray) gave him (Green) Laxtons police report, to read in court.

8) DR testified about drugs, found in car, and jury heard, part of testimony, but the mis-trial was denied.

9) Jury not hearing, about officers in my Apt for 12 HRS, without a warrant. Also one of the crime scene investigators (Roho) entered Apt at 7pm on May 2 without a warrant. She testified to this, in my trial.

1839

Catherine Bernhard
Attorney
P.O. Box 2817
Red Oak TX 75154

State of Texas

Cedric Ricks #999593

Cause No 1361004R
CCA No Ap 77,040

The District Court of
Tarrant County, Texas
371st Judicial District

cont- Catherine Bernhard, works for a, Unit we cant get any of these issues in my state Habeas. Alot of this, can be re worded and things, will clearly add up, to the misconduct of these police, ~~xxxx~~ in Oklahoma, and lawyers.

Verification

I have read the foregoing complaint, and hereby verify that the matters alleged therein are true, except as to matters alleged on information and belief and, as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

Executed at Polunsky Unit, Livingston TX

Cedric Ricks #999593
Cedric Ricks
Polunsky Unit 3872 FM
350 South Livingston TX 77351

1840

Tarrant County Clerks Office                                    May 30, 2016

Catherine Bernhard          Mary B Thornton        Cause No 1361004R
    Attorney                Appellant Attorney      CCA No AP-77,040
P.O. Box 2817               3901 Race St                              The District Court of
Red Oak, TX 75154           Fort Worth, TX 76111                      Tarrant County, Texas
                                                                     371st Judicial District

State of Texas                    Motion to Amend
        v.                State Habeas Writ Under
Cedric Ricks #999593    11.071 Texas Code of Criminal Procedure
                            Ineffective Assistance of Counsel Claims.
                                        (Ricks #999593) respectfully move
Comes now Cedric Ricks #999593 pro se

the court for leave to Amend Article 11.071 of the Texas Code Criminal
Procedure State Application for writ of habeas corpus, and in support, would
show:

1) Mary Thornton filed my brief, back in Aug 2015. On page 33, she made a
reference to a objection, by defendant relating to evidence, seized
illegally by officers on the night of May 1, 2013 and May 2, 2013. The
Bedford police dept, was in my apt for 12 HRs, without a search
warrant. They didn't get a actual warrant, signed, until 10:13 A
on May, 2 2013. The Jury, never heard this, or is it, in the
transcripts of my trial. My trial counsel was ineffective, because
they never, raised the issue either, except at pre-trial. This
prejudiced me, at trial, because the outcome, probably, would have
been different because of this. The statement in my direct App
referring to this, is on pg 33. first paragraph.
2) I with all officers, who did the protective sweep, never seized
anything, as the state said in pre-trial, which the judge als
noted in the pre-trial hearing.

1841

Tarrant County Clerk Office    2 of 3    May 30, 2016

Catherine Bernhard    Mary B Thornton    Cause No 1361004R
Attorney     Appellant Attorney    CCA No AP-77,040
P.O. Box 2817    3901 Race St
Red Oak, TX 75154    Fort Worth, TX 76111     The District Court of
                                             Tarrant County, Texas
                                          371st Judicial District

State of Texas
    V
Cedric Ricks #999593

cont. Also the morning of May 2, 2013, a crime scene investigators, went into the apt between 6-7AM, and walked the crime scene. They stated they didn't have the warrant, because a police operative, call then, to exit premises. Clearly another violation of the fourth amendment. This wasn't, put in my direct appeal either. Out of due diligence I'm, making a claim, to strike, all evidence seized in Apt. Due to the time frame, and numerous people, walking in out of the Apt, only prejudiced me, in court. My state Habeas Lawyer, Catherine Bernhard gave me a draft copy of her brief, but its not "in there either. None of these infractions are there. I'm afraid she won't, put them, there either, so I'm doing it on my own, prose.

### Verification

I have read the foregoing complaint and hereby verify, that the matters alleged therein are true, except as to matters alleged on information and belief and, as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

Executed at Polunsky Unit, Livingston TX

Cedric Ricks    Cedric Ricks #999593
                     Polunsky Unit 3872 FM
                     350 South Livingston TX 77351

1842

Celvin Richo #999593
Polunsky Unit 3872 FM
350 South Livingston TX 77351

Confidential Legal Mail

Court of Criminal Appeals of Texas
P.O. Box 12308
Capitol Station
Austin, TX 78711

USA

1843

Case 4:20-cv-01999-O Document 52-4 Filed 12/21/22 Page 345 of 502 PageID 11688

RECEIVED
COURT OF CRIMINAL APPEALS
JUN 16 2016
Abel Acosta, Clerk

Tarrant County Clerks Office     1 of 1

June 12, 2016

State of Texas

Cause No. 1361004R
CCA No. AP-77,040

The District Court of
Tarrant County Texas
371st Judicial District

v.

Cedric Ricks #999593     Motion to Amend State Habeas
under 11.071 of the Texas Code
of Criminal Procedure.

Comes now Cedric Ricks #999593, pro se (Ricks #999593) respectfully moves the court for leave to amend Article 11.071 of the Texas Code Criminal Procedure state Application for writ of habeas Corpus, and in support will show:

I'm making these claims out of due diligence, because my direct Appeal Lawyer didn't elaborate on these claims thoroughly. My state Habeas, after much conversation, about these claims, hasn't proven to me, she will, bring them up either. I'm protecting myself on these issues.

Volumes and page numbers T) Illegal Search & Seizure and Ineffective of Assistance for reference.                    5) Counsel, on all claims.

1) 6 US 47 Officer Noel Scott said he got there at 2043 on May 1, 2013 and all officers were out of Apt at 734 Park Place Bedford Tx 76022 along with medical personel at 2055. He said door was secure. Bedford field case report No 201315605, would back this up. They should have gotten a warrant then, but hrs later went by, and people coming in and out of crime scene, without that warrant. 6 US 30 Scott was asked, did he have any knowledge while en-route that this person, Marcus Figueroa, was on the phone with dispatch. Scott answered "No." He answered, we had been advised he had left the scene, but we did not know for sure. Scott was asked again, by prosecutor, before you actually arrived at the apt, did you know that Marcus, was on the

1844

2 of 2

June 12, 2016

State of Texas

Cause No 1361004R
CCA No AP-77,040

The District Court of
Tarrant County Texas
371st Judicial District

Cedric Ricks #999593

Motion to Amend State Habeas
under 11.071 of the Texas Code
of Criminal Procedure

cont— with dispatch, while you were en-route. Scott answered "Yes" My counsel, during cross examination, should have struck his testimony, or made him, clarify his answers, under direct examination 6 US 49 My trial counsel William May asked Scott was there any other exigent circumstances to authorize the police, to enter the Apartment that you, are aware of 6 US 50 Scott said "No" (verbatim) 6 US 52 Prosecutor Bob Gill asked Clay Reagan did you listen to the calls that came into the Bedford Police Dept dispatch that evening, that being the call from Marcus Figueroa to Bedford 911 Reagan said "Yes I am (verbatim) Gill said, that call occured shortly after 9:00 PM on the evening of May 1, 2013, is that correct. Reagan, said approximately "Yes" sir. So this, disputes, what Scott said, door was secured, after the sweep and the door was secure at 2055. 6 US 66, would back, this claim, as well. 6 US 69 Reagan admitted, warrants were signed at midnight 3 HRS after the alleged offense. 6 US 69 Reagan admitted, I was arrested before warrants were signed 6 US 71 They didn't have, probable cause warrants, filled out, until a couple of days later on May 3, 2013 by Judge Murphy. Another violation of my illegal arrest in Oklahoma. 6 US 72 I was arrested at 11:18 but warrants weren't signed until midnight Again Reagan confirmed to be true. 6 US 73. Reagan

1845

Tarrant County Clerks office    3 of 3                    June 12, 2016

State of Texas            Cause No 1361004R        The District Court of
        V.                CCA No AP-77,040         Tarrant County, Texas
Cedric Ricks #999593  Motion to Amend State Habeas 371st Judicial District
                      under 11.071 of Texas Code of
                           Criminal Procedure.

Cont — was asked, about search warrants and why Judge Murphy for any
reason, could not have, reviewed a search warrant, for the apt, at
the same time, as the arrests warrants, if you'd had one. Reagan
answered "Yes sir." I don't see, why not. Another clear violation,
they had, all the time, to get a warrant for apt. Illegal Seizure.
6 US 188-229. He knew, undersheriff Jim Mullet, was going to place me,
in cell, with a bunch of white people (video will clearly show) and he
did nothing. A clear violation of the eighth Amendment.
6 US 253 Prosecutors made a statement, I was housed by Cardosa,
a jailor. But through testimony of Mach, it was the Undersheriff,
who set up, my housing. Cardosa, wasn't even at work, when this
happened, and she lied, in her testimony ( Clear Perjury )
6 US 258 Plain view doctrine, states a officer can pick up
items, observed in plain view. Officer Scott Critial, protective
Sweep officer, Never picked up anything. There were, two protective
Sweeps, by Maders and another officer, another clear violation
                         Verification
I have read the foregoing complaint and hereby verify that the matters, alleged
therein are true, except as to matters alleged on information and belief and
as to those I believe them to be true. I certify under penalty of perjury that
the foregoing is true and correct. Executed at Polunsky Unit. 3872FM
            Ced A 7th #999593        350 South Livingston
                                       TX 77351
                                         1846



NORTH HOUSTON TX 773

-14 JUN 2015 PM 1 L

Cedric Ricks #999593
Polunsky Unit 3872 FM
350 South Livingston TX 77351

Court of Criminal Appeals
P.O. Box 12308
Capital Station
Austin TX 78711

78711-230808

Confidential Legal Mail

1847

FILED
THOMAS A WILDER, DIST CLERK
TARRANT COUNTY TEXAS

JUN 3 0 2015

TIME _____ 9:30am

BY _____ DEPUTY

No. C-371-010796-1361004-A

EX PARTE                    §     IN THE 371ST JUDICIAL
                            §
                            §     DISTRICT COURT OF
                            §
CEDRIC ALLEN RICKS          §     TARRANT COUNTY, TEXAS

## MEMORANDUM

Applicant was convicted of capital murder and sentenced to death. Applicant has filed an application for writ of habeas corpus pursuant to TEX. CODE CRIM. PROC. art. 11.071 contending, among other grounds, that he was denied effective assistance of counsel at trial and on direct appeal.

## ORDER

1.     Applicant's trial counsel, William H. Ray and Steve Gordon, are ordered to each file an affidavit discussing his representation of Applicant in response to Applicant's allegations that counsel rendered ineffective assistance. Counsels' affidavits shall discuss in detail all relevant investigations, decision-making, and strategies. Counsel may attach documentary exhibits and any other relevant materials to the affidavits. Mr. Ray's and Mr. Gordon's affidavits shall fully address Applicant's claims in his first, third, fourth, sixth, and seventh grounds for relief that counsel were ineffective because they:

(a)     did not sufficiently develop and present significant mitigating evidence about:

(i) Applicant's mother drinking and smoking during her pregnancy;

(ii) people who babysat Applicant until the age of five;

1

SCANNED

(iii) Applicant's behavior problems as a young child;

(iv) whippings Applicant received from his parents and caregivers;

(v) Applicant's problems in school;

(vi) Applicant's behavior problems as a teenager;

(vii) Applicant's family history of mental illness;

(viii) Applicant's continued behavioral problems as an adult;

(ix) the neighborhoods where Applicant lived before Calumet Park;

(x) potential lead exposure in Applicant's neighborhoods; and

(xi) the psychological significance of Applicant's life experiences;

(b) did not object to Applicant's appearance in shackles in front of the jury;

(c) presented inaccurate testimony about Applicant's future dangerousness risk;

(d) did not raise the issue that the use of the term "probability" in the "future dangerousness" special issue dilutes the reasonable doubt standard; and

(e) did not raise the issue that the definition of "mitigation" is unconstitutionally narrow.

2. Applicant's counsel on direct appeal, Mary B. Thornton, is ordered to file an affidavit discussing her representation of Applicant on direct appeal to the Texas

2

Court of Criminal Appeals. Ms. Thornton's affidavit shall address <u>in detail</u> Applicant's allegations in his eighth, ninth, and tenth grounds for relief that counsel was ineffective for not challenging the trial court's:

> (a)   failure to charge the jury on the burden of proof for extraneous offenses at punishment;
>
> (b)   exclusion of genetic evidence; and
>
> (c)   denial of the defense's *Batson* motion.

3.   Mr. Ray, Mr. Gordon, and Ms. Thornton shall each submit an original and three copies of his or her affidavit and any supporting documentation to the post-conviction writ clerk **on or before August 15, 2016.**

4.   The Clerk of this Court is ordered to send a copy of this memorandum and order to: (A) Hon. William H. Ray at 512 Main St., Ste. 308, Fort Worth, TX, 76102, or at his most recent address; (B) Hon. Steve Gordon at 2101 Moneda St., Fort Worth, TX, 76117, or at his most recent address; (C) Hon. Mary B. Thornton at 3901 Race St., Fort Worth, TX, 76111, or at her most recent address; (D) Hon. Catherine Clare Bernhard, P.O. Box 2817, Red Oak, TX, 75154; and (E) the Post-Conviction Section of the Tarrant County District Attorney's Office.

SIGNED AND ENTERED on this 30th day of June , 2016.

_____
JUDGE PRESIDING



CHARLES P. REYNOLDS
TARRANT COUNTY
CRIMINAL MAGISTRATE

3

1850

FILE COPY



**COURT OF CRIMINAL APPEALS**
P.O. BOX 12308, CAPITOL STATION
AUSTIN, TEXAS 78711

SHARON KELLER
PRESIDING JUDGE

LAWRENCE E. MEYERS
CHERYL JOHNSON
MIKE KEASLER
BARBARA P. HERVEY
ELSA ALCALA
BERT RICHARDSON
KEVIN P. YEARY
DAVID NEWELL
JUDGES

ABEL ACOSTA
CLERK
(512) 463-1551

SIAN SCHILHAB
GENERAL COUNSEL
(512) 463-1597

Friday, July 01, 2016

District Attorney Tarrant County
Sharen Wilson
401 West Belknap
Fort Worth, TX 76196
* DELIVERED VIA E-MAIL *

Catherine Clare Bernhard
P.O. Box 2817
Red Oak, TX 75154
* DELIVERED VIA E-MAIL *

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

JUL 05 2016

TIME _____
BY _____ DEPUTY

**Re: RICKS, CEDRIC ALLEN**
**CCA No. WR-85,278-01**
**Trial Court Case No. 1361004R**

The Court has received a document form Mr. Ricks regarding his 11.071 application for writ of habeas corpus that is not properly before the Court at this time. Please find a copy of this document attached.

Sincerely,

Abel Acosta, Clerk
By: John Brown, Chief Deputy Clerk

cc:    Presiding Judge 371st District Court (DELIVERED VIA E-MAIL)
District Clerk Tarrant County (DELIVERED VIA E-MAIL)

1851

Tarrant County Clerks Office   1 of 1   June 16, 2016

State of Texas

RECEIVED IN
COURT OF CRIMINAL APPEALS

Cause No 1361004R
CCA No AP-77,040

The District Court of
Tarrant County, Texas
371st Judicial District

Cedric Ricks #999593

Motion to Amend State Habeas
Under 11.071 of the Texas Code
of Criminal Procedure

FILED
TARRANT COUNTY, TEXAS
JUL 05 2016

Abel Acosta, Clerk

TIME _____ 9:00am

Comes now Cedric Ricks #999593, pro se (Ricks #999593) Respectfully moves
the court, for leave to amend Article 11.071 of the Texas Code of Criminal
Procedure State Application for writ of habeas Corpus, and in support.
would show.

My counsel Catherine Bernhard (State Habeas) brought me, a draft copy of
the state Habeas writ and gave it to me on June 6, 2016. After
reading it, alot of key issues weren't in it. I wrote, her a letter, stating
my displeasure. She returned again, to visit me, and told me, I
wouldn't git to see, the final copy, once she submitted it. I was
told, it wouldn't be done, until. probably the day, it would be
filed. I recieved the final copy of the State Habeas writ, on
June 16, 2016. My V, and XIV amendments, have clearly, been violated
because the final writ, has more than 19 pages in it, I didn't
review. Key issues I had, in my possession, on June 6, 2016,
that was in the draft State Habeas writ, aren't in the
final writ. Due to the fact, Im submitting these key
issues and elaborating on some key points, pertaining to
some of the "issues". Ineffective Assistance of trial counsel.
Appelate Counsel, and now State Habeas Council.

Next Page—
1852

SCANNED

Tarrant County Clerks Office                    June 16, 2016

                        Cause No 1361004R        The District Court of
State of Texas          CCA No AP-77,040         Tarrant County, Texas
                                                 371st Judicial District
Cedric Ricks #999593

Cont- Grounds for relief- My (Ricks) Due process were violated when the medical Examiner (Dr Tasha Greenburg) presented false and misleading testimony about whether some of the victims wounds were defensive wounds. Dr Greenburg, testified the Rox cents wounds and Anthonys wounds, appeared to be defensive on their hands. ~~however~~ However, trial Counsel, Bill Ray, Steve Gordon, and Stanley Keaton, met with Dr Greenburg prior to trial to discuss the case. In pre-trial interview, and at her office, Greenburg said that she could not tell if the victims' wounds were defensive wounds or not. This can be verified with the notes taken by trial counsel (Exh- Notes of Bill Ray) Also Stanley Keaton (investigator) testified to this in trial. Her statement to the contrary at trial was false and misleading and served to violate Ricks right to a due process. U.S. Const Amends V, XIV. A conviction procured through the use of false testimony is a denial of due process guaranteed by the Federal Constitution. This would back up my claim, in the DNA process. State tested two knives and Defendant trial Counsel, only tested two other knives My (Ricks) trial counsel, had access to all knives, but only tested two knives. Clearly a violation of Due process under V, XIV Amends

                                                        over
                                                1853

Cause No 1361004l2
CCA No AP-77,040

The District Court of
Tarrant County, Texas
371st Judicial District

State of Texas

Cedric Ricks #999593

cont- Also, another key issue that I saw in my draft brief, but was left out, of my final State Habeas Writ. Trial Counsel was ineffective for failing to challenge the Constitutionality of the Texas Death Penalty Scheme, because it does not provide for meaningful Appellate Review. Under Article 37.071 is not subject to meaningful appellate review. Its unconstitutional under Amendments VI, VIII, XIV. Gregg v. Georgia 428 U.S. 153, 195 (1976)(meaningful appellate review provides a safeguard to insure that death sentences are not imposed capriciously or in a freakish manner. Because the mitigating issue contained in Article 37.071 § 2(e) is open-ended and unstructured-IE not enumerating a list of mitigating and aggravating factors and not requiring jurors to make "findings (specific) in this regard. - The Court of Criminal Appeals has no way to know, which aggravating and mitigating factors, that jurors considered. McFarland v State 928 S.W. 2d 482, 498 (Tex. Crim. App 1996) Competent Counsel should be concerned with meaningful Appellate review, in capital cases. Another Ineffective of Assistance of Counsel claim, on my behalf. ~~Failure~~ Failure to raise this issue in a pre-trial motion amounted to deficient

1854

Tarrant County Clerk's Office
State of Texas
v.
Cedric Ricks #999593

Cause No 1361004R
CCA No AP-77,040

June 16, 2016
The District Court of
Tarrant County, Texas
371st Judicial District

cont. performance. One more, key issue, that wasn't, brought up in my Direct Appeal, or State Habeas writ. The testimony of Robert Johnson, in my trial. His testimony, was damaging to me, because my counsel allowed him to testify, even though, he wasn't on record. He talked about my credibility, and it effected me. My counsel asked for a Mis-trial, but the judge of course, denied it. My counsel, seemed, ineffective Assistance of counsel, because they should have, struck him, before he, even said a word. Another failure of my trial counsel, and coflict of Interest, between Bill Ray, and Bob Gill. Vol 37 US 102 you will find this testimony. I sent all of this to the trial court, asking for post-conviction relief. To no-Avail, I have gotten no response. I retained copies, to show, that I showed due diligence.

Verification

I have read the foregoing complaint, and hereby verify that the matters alleged therein are true, except as to matters Alleged on information and belief, and, as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct. Cedric A.

Executed at Polunsky Unit
Cedric Ricks
Polunsky Unit 3872 FM
350 South Livingston TX 77351

1855

Collin Ukiba #999593
Polunsky Unit 3872 FM
350 South Livingston TX 77351

Confidential Legal Mail

NORTH HOUSTON TX 773

30 JUN 2016 PM 21

Court of Criminal Appeals
P.O. Box 12308
Capitol Station
Austin TX 78711

78711-230808

1856



**SHAREN WILSON**

Criminal District Attorney

Tarrant County

July 8, 2016

FILED
THOMAS A WILDER, DIST CLERK
TARRANT COUNTY, TEXAS

JUL - 6 2016

TIME 1:52
BY _____ AMS DEPUTY

Hon. Catherine Clare Bernhard
P.O. Box 2817
Red Oak, TX 75154

Re: Ricks, Cedric Allen; Cause Number 1361004R; 371st Judicial District Court
  Notification of Texas Forensic Science Commission DNA Mixture Review

The Texas Forensic Science Commission recently reviewed DNA mixture interpretation protocols relating to a common statistical method used by Texas laboratories for the interpretation of DNA test results known as Combined Probability of Inclusion/Exclusion (CPI/CPE). More information concerning this issue may be found on the Texas Forensic Science Commission's website.

The laboratory issuing the original DNA report in this case determined that this case is *not affected by the above mixture interpretation issue.*

In reaching this conclusion, however, the laboratory did determine that the above-referenced case *is affected* by the FBI's recent amendment of its population database (PopStats). As the listed attorney(s) of record, we are notifying you that we have *already requested that the issuing laboratory prepare an amended report* using the updated FBI population database. We will contact you once we have received that new report and forward a copy for your review. In the meantime please find enclosed the lab review request form which the lab completed in this cause.

Should you have any questions please contact ACDA Debra Windsor, Chief of Post-Conviction.

Sincerely,

Sharen Wilson
Criminal District Attorney

SCANNED

## Post-Conviction Case DNA Report Lab Review Form

**Defendant:** Ricks, Cedric

**Cause No.:** 1361004R

**Lab #(s):** 1305638 *any other reports regarding this defendant/cause*

**Date of Lab Report:** February 13, 2014

**Laboratory Name:** TCME

**Analyst Name:** Carolyn Van Winkle  (forms prepared by Constance Patton)

**Requesting Attorney:** Dawn Boswell

Is an amended report(s) needed in order to address the current mixture interpretation issue set forth by the Texas Forensic Commission in its *Notification of Texas Forensic Science Commission DNA Mixture Review*?

☐ Yes    ☑ No

Is an amended report(s) needed in light of the FBI database amendment notification?

☑ Yes    ☐ No

Which chemistry/kit was used by the lab in this analysis?
Identifiler

Are you able to issue an amended report? If not, please explain.
Yes

Which report(s) requires an amendment?  List all applicable reports by laboratory identifier(s) and add any additional notes or explanation regarding the above questions (if needed):

RMP's recalculation using FBI amended database; 1305638 / 1305637 report date February 13, 2014

Which item(s) on specific reports are affected?  Please list:
Report dated Feb 13, 2014: RMP's

24T, 25T, 38T1, 39T1, 39T3, 39T4, 41T1, 41T2, 41T3, 42T1, 42T4, 43, 44, 45.1, 46T1, 46T2, 46T3, 47, 48, 49T2, 49T4, 49T5, 51T, 52T1, 52T2, 52T3, 53T1, 53T2, 54.1, 54.2

1858

**Defendant:** Ricks, Cedric (page 1 of 2)

**Cause No.:** 1361004R

**Lab #(s):** 1305638 / 1305637

*Please list fractions on two separate lines using the same evidence number and description but noting that the item is either an epithelial or sperm fraction in the description.

| Evidence Description* | | Associated to Name/Item # | Evidence # | Data Type | Comparison Type | Stat Type |
|---|---|---|---|---|---|---|
| | Pants pocket | Cedric Ricks (57.1) | 38T1 | SS | I | RMP |
| | Socks | Cedric Ricks (57.1) | 39T1, 39T3, 39T4 | SS | I | RMP |
| | Gray shirt | Cedric Ricks (57.1) | 41T1, 41T2 | SS | I | RMP |
| Bathroom & kitchen drawers | | Cedric Ricks (57.1) | 43 & 44 | SS | I | RMP |
| | Cell phone | Cedric Ricks (57.1) | 45.1 | SS | I | RMP |
| Bathroom sink & wall | | Cedric Ricks (57.1) | 47 & 48 | SS | I | RMP |
| | Brown shirt | Cedric Ricks (57.1) | 49T5 | SS | I | RMP |
| | Knife blade | Cedric Ricks (57.1) | 52T1 | SS | I | RMP |
| | Knife handle | Cedric Ricks (57.1) | 52T3 (major) | MIX | I | RMP |
| | Towel | Cedric Ricks (57.1) | 53T1, 53T2 | SS | I | RMP |
| | Steering wheel | Cedric Ricks (57.1) | 54.1 | SS | I | RMP |
| Back shirt sleeve | | Cedric Ricks (57.1) | 41T3 (major) | MIX | I | RMP |
| | Knife handle | Cedric Ricks (57.1) | 46T3 (major) | MIX | I | RMP |
| | Trunk | Cedric Ricks (57.1) | 54.2 (partial) | SS | I | RMP |
| | Fingernails | Roxann Sanchez (10) | 24T & 25T | SS | I | RMP |
| | Knife blade | Marcus Figueroa (56.1) | 46T1 (major) | MIX | I | RMP |
| Knife blade/handle junction | | Marcus Figueroa (56.1) | 46T2 (major) | MIX | I | RMP |
| | Brown shirt | Marcus Figueroa (56.1) | 49T2 | SS | I | RMP |

Reviewed by: _Chotance Patton_ _JLL_

Approved by: _Lisoda Hales_

Date: _2/19/14_

1859

**Defendant:** Ricks, Cedric (page 2 of 2)

**Cause No.:** 1361004R

**Lab #(s):** 1305638 / 1305637

*Please list fractions on two separate lines using the same evidence number and description but noting that the item is either an epithelial or sperm fraction in the description.

| Evidence Description* | Associated to Name/Item # | Evidence # | Data Type | Comparison Type | Stat Type |
|---|---|---|---|---|---|
| Brown fabric piece | Anthony Figueroa 1305637-7 | 51T | SS | I | RMP |
| Knife blade | Anthony Figueroa 1305637-7 | 52T2 (major) | MIX | I | RMP |
| Brown shirt - back right shoulder | Anthony Figueroa 1305637-7 | 49T4 (partial) | SS | I | RMP |
| Knife blade/handle junction | N/A | 52T4 | INC / MIX | NCP | |
| Left hand fingernails | N/A | 25T (partial) | Y-STR / INC | NCP | |
| Right hand fingernails | N/A | 24T | Y-STR / NR | | |
| T-shirt | N/A | 40 | Sero | | |
| Shoes | Cedric Ricks (57.1) | 42T1, 42T4 | SS | I | RMP |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Reviewed by: _Constance Patton_ _pll_

Approved by: _Kirschsteise_

Date: _2/19/16_

1860

Please use the following key in summarizing your review of all items listed in the report(s) on the attached page(s):

## Data Type:

| | |
|---|---|
| **Sero** | Serology Testing Only |
| **NR** | No DNA Result |
| **INC** | Inconclusive DNA Result |
| **SS** | Single source DNA result |
| **MIX** | Mixed DNA result |
| **FP** | Forensic Paternity Test |
| **Y-STR** | Y Chromosome STR Result |
| **mtDNA** | Mitochondrial DNA Result |

## Comparison Type:

| | |
|---|---|
| **NCP** | No Comparison Performed |
| **I** | Inclusion (cannot be excluded as a contributor of the DNA result) |
| **E** | Exclusion (excluded as a contributor of the DNA result) |
| **INC** | Inconclusive comparison |
| **PI** | Paternity Inclusion (alleged father cannot be excluded as the biological father of the child in question) |
| **PE** | Paternity Exclusion (alleged father is excluded as the biological father of the child in question) |

## Statistic Type:

| | |
|---|---|
| **RMP** | Random Match Probability |
| **CPI** | Combined Probability of Inclusion |
| **CPE** | Combined Probability of Exclusion |
| **LR** | Likelihood Ratio |
| **PG** | Probabilistic Genotyping |
| **NSP** | No Statistic Provided (non-probative inclusion) |
| **CM** | Counting Method |

1861

COMPTROLLER JUDICIARY
ATTENTION: MARY HAND
PO BOX 13528
AUSTIN TX 78711-3528



U.S. POSTAL SERVICE
CERTIFIED MAIL RECEIPT

Postmark
Here

7015 1520 0003 4756 5207

CERTIFIED MAIL

Sent To COMPTROLLER JUDICIARY
PO. Box 13528
ATTEN MARY HAND
City AUSTIN TX 78711

---

TARRANT COUNTY
THOMAS A. WILDER
DISTRICT CLERK - CRIMINAL
401 W. BELKNAP
FORT WORTH, TEXAS 76196-0402

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete
item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
or on the front if space permits.

1. Article Addressed to:

COMPTROLLER JUDICIARY
ATTENTION: MARY HAND
PO BOX 13528
AUSTIN TX 78711-3528

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                                   ☐ Agent
                                    ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
SPECIAL HANDLING

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:          ☐ No

JUL 15 20

COMPTROLLER: JUDICIARY

3. Service Type
☑ Certified Mail®        ☐ Priority Mail Express™
☐ Registered            ☑ Return Receipt for Merchandise
☐ Insured Mail          ☐ Collect on Delivery

4. Restricted Delivery? (Extra Fee)         ☐ Yes

2. Article Number
(Transfer from service label)        7015 1520 0003 4756 5207

PS Form 3811, July 2013          Domestic Return Receipt

1862

C371-010796-1361004-A

| EX PARTE: | § | IN THE 371st JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| CEDRIC ALLEN RICKS | § | TARRANT COUNTY TEXAS |

## MOTION FOR EXTENSION OF TIME TO FILE AFFIDAVIT IN RESPONSE TO WRIT OF HABEAS CORPUS

**COMES NOW**, Attorney Stephen Gordon, and hereby moves the Court for an order extending the time to file his affidavit in response to the Writ of Habeas Corpus. The defense respectfully requests the extension for the following reasons:

1. On or about June 13, 2016, an Application for Writ of Habeas Corpus was filed in the above-referenced matter. It was delivered to Defendant Ricks' trial counsel sometime after that.

2. This is a *first* motion for extension of time.

3. A thorough response to the Writ will take substantial time.

4. Attorney Gordon was out of the country for the month of July, returning on August 2, 2016.

5. Attorney Gordon begins a trial in McClennan County on August 22, 2016. That trial is expected to take a week. Thereafter, Mr. Gordon will be preparing for a Death Penalty trial which is set to begin on September 6, 2016. He will need to prepare for both of those trials.

SCANNED                                                                 1863

5.     Mr. Gordon's file for the Defendant's case is in two bankers' boxes.  It will take a great deal of time to review the file to properly prepare the Affidavit.

7.     This request is not solely for the purpose of delay but so that justice may be done.  The reasons for the request do not include general congestion of the Court's calendar or lack of diligent preparation on the part of the parties involved.

Respectfully submitted,

Stephen Gordon
State Bar No. 00785918

STEVE GORDON & ASSOCIATES
2101 Moneda Street
Fort Worth, Texas 76117
Tel.  817.877.0610
Fax: 817.877.5610

1864

## CERTIFICATE OF SERVICE

This is to certify that on the date this motion was file stamped, a true and correct copy of the above and foregoing document was served on the District Attorney's Office, Tarrant County, by hand delivery.

STEPHEN GORDON

C371-010796-1361004-A

EX PARTE:                              §       IN THE 371st JUDICIAL
                                       §
                                       §       DISTRICT COURT OF
                                       §
CEDRIC ALLEN RICKS                     §       TARRANT COUNTY TEXAS

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

AUG 1 7 2016

TIME_____
BY_____  DEPUTY

## Order

Upon consideration of Counsel's Motion for Extension of Time to File Affidavit in

Response to Writ for Habeas Corpus, it is hereby:

ORDERED that Counsel's Motion for Extension of Time to File his Affidavit in

Response to the Writ for Habeas Corpus is GRANTED; and it is further

ORDERED that Plaintiff has until _____9 | 6 | 6_____ to file his Affidavit in

Response to the Writ for Habeas Corpus.

SO ORDERED.
DATED:

Judge Presiding




FILED
THOMAS A. WILDER DIST. CLERK
TARRANT COUNTY, TEXAS

AUG 2 4 2016

TIME_____11:32 am_____
BY_____ DEPUTY

CAUSE NO. C-371-010796-1361004-A

| | | |
|---|---|---|
| **EX PARTE** | * | **IN THE 371ST JUDICIAL** |
| | * | |
| | * | **DISTRICT COURT OF** |
| | * | |
| **CEDRIC ALLEN RICKS** | * | **TARRANT COUNTY, TEXAS** |

## MOTION FOR EXTENSION OF TIME
## TO FILE AFFIDAVIT

COMES NOW, **MARY B. THORNTON**, appointed counsel for Applicant, **CEDRIC ALLEN RICKS**, and files this Motion for Extension of Time to File Affidavit in the above styled and numbered cause requesting an additional forty-two (42) days and in support of his motion would show this Honorable Court as follows:

I.

Applicant was reindicted for the offense of capital murder in cause number 1361004R on February 28, 2014. His case was assigned to the 371st Judicial District Court in Tarrant County, Texas. He pleaded not guilty before a jury on May 5, 2014. On May 7, 2014, the jury found him guilty of the offense as charged in the State's indictment. On May 16, 2014, the jury answered Special Issue No. 1 "yes," and Special Issue No. 2 "no." As a result the trial court sentenced Applicant to Death as required by law.

1

SCANNED

II.

Counsel was appointed to represent Applicant on the appeal of his conviction and sentence of Death to the Texas Court of Criminal Appeals on May 19, 2014. Applicant's appellate brief containing twenty points of error was electronically filed in the Texas Court of Criminal Appeals on August 3, 2015, with requisite paper copies being tendered to the Court on August 5, 2015. The State of Texas electronically filed its reply brief on January 28, 2016. Applicant's application for writ of habeas corpus pursuant to *Tex. Crim. Proc. Code art. 11.071* was filed in this Honorable Court on or about June 13, 2016. On June 30, 2016, Counsel received an Order from this Honorable Court to prepare an affidavit addressing three separate claims of ineffective assistance of appellate counsel. The affidavit was originally due to be filed on August 15, 2016.

III.

Because of other cases counsel has not been able to complete the affidavit addressing Applicant's claims. During the first three weeks of July, 2016, counsel was in court on various cases six mornings. During the first three weeks of August, 2016, counsel was in court on various cases nine mornings. The last week in July counsel took a one week vacation to New Orleans, Louisiana. When counsel returned what she believed was a cold developed into bronchitis causing her to miss several days of work. After seeing the doctor and receiving antibiotics as well as steroids counsel slowly

2

1868



began to recover, but during this three week time frame she was not able to accomplish as much as she would have had she not gotten ill.

Counsel has also been working on and off on two capital murder cases. The State of Texas v Billy Ray Minkley, pending in this Honorable Court in cause number 1431092D, has an abundance of material, and counsel is still working her way through it. It is set to be tried in September of 2017, and at this juncture the State has indicated that it would seek the death penalty. In addition counsel was appointed to another capital murder case styled The State of Texas v Jamal Lee Washington on July 7, 2016. It is presently pending in Criminal District Court Number One in cause number 1463686. Counsel had to stop work on a brief that she was writing in order to review some material and visit the Defendant with co counsel the Hon. Fred Cummings.

Counsel is also writing the appellant's brief in Brent Troy Bartel v The State of Texas, trial cause number 1434748R, out of the 371st Judicial District Court. The appellate cause number is 02-16-00020-CR. This brief was due to be filed in the Second Court of Appeals for the Second District of Texas in Fort Worth on Monday, August 15, 2016. Counsel for Appellant requested an extension of time for an additional three weeks to complete the appellant's brief.

Counsel is leaving on vacation for two-and-a-half weeks beginning Saturday, September 3, 2016. She will be back in her office on Tuesday, September 20, 2016. The appellant's brief in Brent Troy Bartel has to be filed no later than Friday, September

1869

2, 2016. Counsel is presently writing the appellant's brief and anticipates that it will be completed by this date.

Because of counsel's illness, the two capital murder cases, and the appellate brief, counsel has been off of the wheel and has not been accepting new appointments since the middle of July.

Counsel is asking for an additional forty-two (42) days not for purposes of delay but because it is necessary in order to effectively and thoroughly answer Applicant's claims in his post conviction writ of habeas corpus.

WHEREFORE, PREMISES CONSIDERED, Appellant respectfully prays that this Honorable Court grant his Motion for Extension of Time to File Affidavit in the above styled and numbered cause for forty-two (42) days and extend the deadline for filing Appellant's brief to **Monday, September 26, 2016.**

4

1870

Respectfully submitted,


MARY B. THORNTON
Attorney for Appellant
3901 Race Street
Fort Worth, Texas 76111
Telephone No.: (817) 759-0400
Telecopier No.: (817) 831-3002
Email: marybrabson01@gmail.com
State Bar #19713700


## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of August, 2016, a true and correct copy of

the above motion was mailed via United States mail on the Hon. Helena Faulkner,

Assistant Criminal District Attorney assigned to the Post Conviction Unit, Tim Curry

Criminal Justice Center, Fourth Floor, 401 West Belknap, Fort Worth, Texas, 76196.


MARY B. THORNTON

5

1871

## CAUSE NO. C-371-010796-1361004-A

EX PARTE

**\*         IN THE 371ST JUDICIAL**
**\***
**\*         DISTRICT COURT OF**
**\***
CEDRIC ALLEN RICKS

**\*         TARRANT COUNTY, TEXAS**

### ORDER ON COUNSEL'S
### MOTION FOR EXTENSION OF TIME TO FILE AFFIDAVIT

On the 24th day of August, 2016, the Court having considered the above and

foregoing Motion finds the same is hereby **GRANTED/~~DENIED~~** and the time for

filing is extended to September 26, 2016.

The Hon. ~~Mollee Westfall~~, Presiding Judge
Judge of the 371st Judicial District Court
in Tarrant County, Texas

6

1872

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

SEP 2 6 2016

TIME _____ 1:00pm _____
BY _____ MM _____ DEPUTY

## CAUSE NO. C-371-010796-1361004-A

| | | |
|---|---|---|
| EX PARTE | * | IN THE 371ST JUDICIAL |
| | * | |
| | * | DISTRICT COURT OF |
| | * | |
| CEDRIC ALLEN RICKS | * | TARRANT COUNTY, TEXAS |

## SECOND MOTION FOR EXTENSION OF TIME
## TO FILE AFFIDAVIT

COMES NOW, **MARY B. THORNTON**, appointed counsel for Applicant, **CEDRIC ALLEN RICKS**, and files this Motion for Extension of Time to File Affidavit in the above styled and numbered cause requesting an additional two (2) days and in support of his motion would show this Honorable Court as follows:

**I.**

Applicant was reindicted for the offense of capital murder in cause number 1361004R on February 28, 2014. His case was assigned to the 371st Judicial District Court in Tarrant County, Texas. He pleaded not guilty before a jury on May 5, 2014. On May 7, 2014, the jury found him guilty of the offense as charged in the State's indictment. On May 16, 2014, the jury answered Special Issue No. 1 "yes," and Special Issue No. 2 "no." As a result the trial court sentenced Applicant to Death as required by law.

1

SCANNED

1873

## II.

Counsel was appointed to represent Applicant on the appeal of his conviction and sentence of Death to the Texas Court of Criminal Appeals on May 19, 2014. Applicant's appellate brief containing twenty points of error was electronically filed in the Texas Court of Criminal Appeals on August 3, 2015, with requisite paper copies being tendered to the Court on August 5, 2015. The State of Texas electronically filed its reply brief on January 28, 2016. Applicant's application for writ of habeas corpus pursuant to *Tex. Crim. Proc. Code art. 11.071* was filed in this Honorable Court on or about June 13, 2016. On June 30, 2016, Counsel received an Order from this Honorable Court to prepare an affidavit addressing three separate claims of ineffective assistance of appellate counsel. The affidavit was originally due to be filed on August 15, 2016.

## III.

Counsel requested one extension of time for filing for forty-two days which was granted rendering Applicant's affidavit due on September 26, 2016.

## IV.

From September 2, 2016, until September 20, 2016, counsel was on vacation out of the country. Prior to that time counsel was writing the appellant's brief in Brent Troy Bartel v The State of Texas, trial cause number 1434748R, out of the 371st Judicial District Court. The appellate cause number is 02-16-00020-CR. This brief was

2

1874

due before counsel's vacation; however, she received an extension on it until October 6, 2016.

In order to respond to Applicant's affidavit thoroughly counsel has briefed all three issues which Applicant has raised in his 11.071 post conviction writ of habeas corpus. Counsel has completed writing and adapting the first two grounds for review, eight and nine in Applicant's affidavit. The third ground for review has been written; however, it has not yet been adapted to the affidavit. Counsel estimates that it will take between one-and-a-half and two days to complete the affidavit.

Because counsel was ill prior to her vacation and because of other cases, including this one, counsel has been off of the wheel and has not been accepting new appointments since the middle of July, 2016.

Counsel is asking for an additional two (2) days not for purposes of delay but because it is necessary in order to effectively and thoroughly answer Applicant's claims in his post conviction writ of habeas corpus.

WHEREFORE, PREMISES CONSIDERED, Appellant respectfully prays that this Honorable Court grant his Second Motion for Extension of Time to File Affidavit in the above styled and numbered cause for two (2) days and extend the deadline for filing Appellant's brief to Wednesday, September 28, 2016.

3

1875

Respectfully submitted,

MARY B. THORNTON
Attorney for Appellant
3901 Race Street
Fort Worth, Texas 76111
Telephone No.: (817) 759-0400
Telecopier No.: (817) 831-3002
Email: marybrabson01@gmail.com
State Bar #19713700

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of September, 2016, a true and correct copy of the above motion was mailed via United States mail to the Hon. Helena Faulkner, Assistant Criminal District Attorney assigned to the Post Conviction Unit, Tim Curry Criminal Justice Center, Fourth Floor, 401 West Belknap, Fort Worth, Texas, 76196.

MARY B. THORNTON

4

1876

FILED
THOMAS A WILDER, DIST CLERK
TARRANT COUNTY TEXAS

SEP 2 6 2016

TIME _____ 1:00PM
BY _____ mjs _____ DEPUTY

## CAUSE NO. C-371-010796-1361004-A

| | | |
|---|---|---|
| **EX PARTE** | * | **IN THE 371ST JUDICIAL** |
| | * | |
| | * | **DISTRICT COURT OF** |
| | * | |
| **CEDRIC ALLEN RICKS** | * | **TARRANT COUNTY, TEXAS** |

## ORDER ON COUNSEL'S
## SECOND MOTION FOR EXTENSION OF TIME TO FILE AFFIDAVIT

On the $\underline{26}$ day of September, 2016, the Court having considered the above and

foregoing Motion finds the same is hereby **GRANTED/DENIED.**

_____

The Hon. Mollee Westfall, Presiding
Judge of the 371st Judicial District Court
in Tarrant County, Texas

5

SCANNED                                                    1877

No. C-371-010796-1361004-A

FILED
THOMAS A WILDER, DIST CLERK
TARRANT COUNTY, TEXAS

OCT 06 2016

TIME _10:01 am_
BY _____ DEPUTY

| EX PARTE | § | IN THE 371ST JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| CEDRIC ALLEN RICKS | § | TARRANT COUNTY, TEXAS |

## UNOPPOSED MOTION TO EXTEND TIME TO FILE THE STATE'S REPLY TO APPLICATION FOR WRIT OF HABEAS CORPUS

TO THE HONORABLE JUDGE OF SAID COURT:

Pursuant to TEX. CODE CRIM. PROC. art. 11.071, § 7(a), the State of Texas, by and through the Criminal District Attorney of Tarrant County, Texas, requests that the Court grant a sixty-day extension of time for the State to file its reply to Applicant's application for writ of habeas corpus. The following allegations are made in support of this motion:

I.

A Tarrant County jury convicted Applicant of capital murder in cause number 1361004R and answered the special issues in a way that required the imposition of the death penalty. Applicant's direct appeal is pending in the Texas Court of Criminal Appeals in cause number AP-77,040.

II.

The current application, which is Applicant's first, was filed pursuant to TEX. CODE CRIM. PROC. art. 11.071 on June 13, 2016. The State's reply to the application is currently due on October 11, 2016.

1

III.

The State requests that the deadline to file its reply to the application be extended sixty days to December 12, 2016.

IV.

Applicant raises eleven claims for relief. Pursuant to this Court's order, Applicant's trial counsel, William H. Ray and Steve Gordon, and Applicant's appellate counsel, Mary B. Thornton, have filed affidavits addressing Applicant's ineffective-assistance-of-counsel claims.

V.

The State is currently in the process of gathering materials necessary for the State to fully reply to Applicant's claims.

VI.

Counsel for the State cannot complete the State's reply by the current due date. Counsel needs additional time to gather materials, to complete its investigation of Applicant's claims, and to prepare the State's reply. In addition to working on the State's reply in the current habeas proceeding, counsel's duties have included preparing State's brief in opposition to an application for writ of certiorari to be filed with the United States Supreme Court in *Joey Darrell Faust & Ramon Marroquin v. Texas*, No. 16-203, by November 2, 2016; preparing and filing motions to set execution dates in *The State of Texas v. Tilon Lashon Carter*, No. 0949973D; *The State of Texas v. Christopher Wilkins*, No. 1002038D; and *The State of Texas v. James Eugene Bigby*, No. 0329813D;

2

1879

preparing and filing briefs for the State in *James Lemarc Byrd v. The State of Texas*, 02-02-15-00288-CR; and *Eliseo Hernandezgaleano v. The State of Texas*, No. 02-15-00423-02-15-00423-CR; assisting in reviewing materials related to discovery requests in the death-penalty case of *The State of Texas v. Steven Lawayne Nelson*, No. 1232507D; and attending continuing legal education courses the afternoons of August 26, September 9, and September 16, 2016.

### VII.

This motion is not brought for purposes of delay, but to ensure that justice is served and to allow the State the time necessary to research and address the issues raised in this habeas proceeding.

### VIII.

Applicant's counsel, Catherine Bernhard, has informed counsel for the State that she does not oppose this motion for extension.

WHEREFORE, PREMISES CONSIDERED, the State of Texas respectfully requests that the Court extend the time for the State to file its reply to December 12, 2016, as permitted by TEX. CODE CRIM. PROC. art. 11.071, § 7(a).

1880

Respectfully submitted,

SHAREN WILSON
Criminal District Attorney
Tarrant County, Texas

DEBRA WINDSOR
Assistant Criminal District Attorney
Chief, Post-Conviction

HELENA F. FAULKNER
Assistant Criminal District Attorney
State Bar Number 06855600
401 W. Belknap
Fort Worth, Texas  76196-0201
(817) 884-1687
FAX (817) 884-1672

## CERTIFICATE OF SERVICE

True copies of this motion were mailed to opposing counsel, Catherine Bernhard,

P.O. Box 2817, Red Oak, Texas, 75154, on October 6, 2016.

HELENA F. FAULKNER

4

1881

No. C-371-010796-1361004-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 371ST JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| CEDRIC ALLEN RICKS | § | TARRANT COUNTY, TEXAS |

## MEMORANDUM

The Court has considered the State's Unopposed Motion for Extension of Time to File the State's Reply to Application for Writ of Habeas Corpus and finds that the State has shown particularized need for the requested sixty-day extension of time to file its reply. *See* TEX. CODE CRIM. PROC. art. 11.071, § 7(a).

## ORDER

1.    The State's Motion for Extension of Time to File the State's Reply to Application for Writ of Habeas Corpus is GRANTED.  The State's reply is due on December 12, 2016.

2.    The Clerk of this Court is ordered to send a copy of this memorandum and order to:  (A) Catherine Bernhard, counsel for Applicant, at P.O. Box 2817, Red Oak, Texas, 75154, or at her most recent address; and (B) the Post-Conviction Section of the Criminal District Attorney's Office.

SIGNED AND ENTERED on the _____ day of October, 2016.


_____
JUDGE PRESIDING

1882

THOMAS A WILDER, DIST CLERK
TARRANT COUNTY, TEXAS

OCT 06 2016

TIME _____4:26pm_____

BY_____TNH_____ DEPUTY

No. C-371-010796-1361004-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 371ST JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| CEDRIC ALLEN RICKS | § | TARRANT COUNTY, TEXAS |

## MEMORANDUM

The Court has considered the State's Unopposed Motion for Extension of Time to File the State's Reply to Application for Writ of Habeas Corpus and finds that the State has shown particularized need for the requested sixty-day extension of time to file its reply. *See* TEX. CODE CRIM. PROC. art. 11.071, § 7(a).

## ORDER

1. The State's Motion for Extension of Time to File the State's Reply to Application for Writ of Habeas Corpus is GRANTED. The State's reply is due on December 12, 2016.

2. The Clerk of this Court is ordered to send a copy of this memorandum and order to: (A) Catherine Bernhard, counsel for Applicant, at P.O. Box 2817, Red Oak, Texas, 75154, or at her most recent address; and (B) the Post-Conviction Section of the Criminal District Attorney's Office.

SIGNED AND ENTERED on the ___6___ day of October, 2016.

_____
JUDGE PRESIDING

SCANNED

1883





CATHERINE CLARE BERNARD
ATTORNEY AT LAW
P. O. BOX 2817
RED OAK, TX 75154

---

M. Robbins - Writs - 3rd Floor



TARRANT COUNTY
THOMAS A. WILDER
DISTRICT CLERK - CRIMINAL
401 W. BELKNAP
FORT WORTH, TEXAS 76196-0402

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

CATHERNE CLARE BERNARD
ATTORNEY AT LAW
P. O. BOX 2817
RED OAK, TX 75154

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                        ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
   ☐ Certified Mail®        ☐ Priority Mail Express™
   ☐ Registered            ☑ Return Receipt for Merchandise
   ☐ Insured Mail          ☐ Collect on Delivery

4. Restricted Delivery? (Extra Fee)          ☐ Yes

2. Article Number
   (Transfer from service label)    7015 1520 0003 4756 5757

PS Form 3811, July 2013          Domestic Return Receipt

---

1884

FILED
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

DEC 13 2016

TIME _11:06am_
BY _____ DEPUTY

No. C-371-010796-1361004-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 371ST JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| CEDRIC ALLEN RICKS | § | TARRANT COUNTY, TEXAS |

## STATE'S MOTION FOR COURT TO ORDER PREPARATION OF PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the State of Texas, by and through the Criminal District Attorney of Tarrant County, Texas, and requests this Court to issue an order finding that there are no controverted, previously unresolved factual issues material to the legality of Applicant's confinement and directing the parties to file proposed findings of fact and conclusions of law. *See* TEX. CODE CRIM. PROC. art. 11.071, § 8(a)&(b). The following allegations are made in support of this motion:

I.

A Tarrant County jury convicted Applicant of capital murder in cause number 1361004D, styled *The State of Texas v. Cedric Allen Ricks*, in the 371st Judicial District Court of Tarrant County, Texas, the Honorable Mollee Westfall presiding. The jury's answers to the special issues required the imposition of the death penalty. Applicant's direct appeal is currently pending in the Court of Criminal Appeals of Texas as *Cedric Allen Ricks v. The State of Texas*, No. AP-77,040.

1

SCANNED

1885

## II.

The current application, which is Applicant's first, was filed pursuant to article 11.071 of the Texas Code of Criminal Procedure on June 13, 2016. *See* TEX. CODE CRIM. PROC. art. 11.071. Applicant raised eleven claims for relief. The Court granted the State an extension of time to respond to the application, and the State timely filed its reply on December 12, 2016.

## III.

The State asserts that there are no controverted, previously unresolved factual issues material to the legality of Applicant's confinement. *See* TEX. CODE CRIM. PROC. art. 11.071, § 8(a). Therefore, the next step in this habeas proceeding is for the Court to order the parties to file proposed findings of fact and conclusions of law. *See* TEX. CODE CRIM. PROC. art. 11.071, § 8(b).

WHEREFORE, PREMISES CONSIDERED, the State respectfully requests that the Court enter a written order finding that there are no controverted, previously unresolved factual issues material to the legality of Applicant's confinement and directing the parties to file proposed findings of fact and conclusions of law for the Court to consider. *See* TEX. CODE CRIM. PROC. art. 11.071, § 8(a)&(b).

2

1886

Respectfully submitted,

SHAREN WILSON
Criminal District Attorney
Tarrant County, Texas

DEBRA WINDSOR
Chief, Post-Conviction

*Helena J. Faulkner*

HELENA F. FAULKNER
Assistant Criminal District Attorney
State Bar No. 06855600
401 W. Belknap
Fort Worth, Texas  76196-0201
(817) 884-1685
FAX (817) 884-1672

## CERTIFICATE OF SERVICE

A true copy of the State's motion has been mailed to Applicant's habeas counsel, Catherine Clare Bernhard, P.O. Box 2817, Red Oak, Texas, 75154, on December 13, 2016.

*Helena J. Faulkner*

HELENA F. FAULKNER

3

1887

No. C-371-010796-1361004-A

| EX PARTE | § | IN THE 371ST JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| CEDRIC ALLEN RICKS | § | TARRANT COUNTY, TEXAS |

## MEMORANDUM AND ORDER

Having carefully reviewed Applicant's Application for Writ of Habeas Corpus and the State's Reply, the Court hereby determines pursuant to TEX. CODE CRIM. PROC. art. 11.071, § 8(a) that there exist no controverted, previously unresolved factual issues material to the legality of Applicant's confinement.

The Court orders counsel for Applicant and the State to file proposed findings of fact and conclusions of law no later than thirty days after the date of this order. *See* TEX. CODE CRIM. PROC. art. 11.071, § 8(b). The Court further orders the Clerk of this Court to furnish a copy of this Memorandum and Order to Applicant's counsel, Catherine Clare Bernhard, at P.O. Box 2817, Red Oak, Texas, 75154, or at her most recent address, by United States mail; and to the post-conviction section of the Tarrant County Criminal District Attorney's Office.

SIGNED AND ENTERED this the _____ day of _____, 20___.

_____

JUDGE PRESIDING

1888

D371-W010796-00

FILED
TARRANT COUNTY
6/15/2018 4:23 PM
THOMAS A. WILDER
DISTRICT CLERK

No. C-371-W010796-1361004-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 371ST JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| CEDRIC ALLEN RICKS | § | TARRANT COUNTY, TEXAS |

## STATE'S SECOND MOTION FOR COURT TO ORDER PREPARATION OF PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the State of Texas, by and through the Criminal District Attorney of Tarrant County, Texas, and files its second motion requesting this Court to issue an order finding that there are no controverted, previously unresolved factual issues material to the legality of Applicant's confinement and directing the parties to file proposed findings of fact and conclusions of law. *See* TEX. CODE CRIM. PROC. art. 11.071, § 8(a)&(b). The following allegations are made in support of this motion:

I.

A Tarrant County jury convicted Applicant of capital murder in cause number 1361004D, styled *The State of Texas v. Cedric Allen Ricks*, in the 371st Judicial District Court of Tarrant County, Texas. The Honorable Mollee Westfall presided. The jury's answers to the special issues required the imposition of the death penalty. The Court of Criminal Appeals of Texas affirmed Applicant's conviction and sentence on October 4, 2017, and the Supreme Court of the United States denied

1

1889

Applicant's petition for writ of certiorari on April 17, 2018. *Ricks v. State*, No. AP-77,040, 2017 WL 4401589 (Tex. Crim. App. October 4, 2017) (not designated for publication), *cert. denied*, 138 S. Ct. 1553 (2018).

## II.

The current application was filed on June 13, 2016. *See* TEX. CODE CRIM. PROC. art. 11.071. The Court granted the State an extension of time to respond to the application, and the State timely filed its answer on December 12, 2016.

## III.

Article 11.071 of the Texas Code of Criminal Procedure provides the convicting court twenty days from the date the State answers the application to issue an order stating whether controverted, previously unresolved factual issues material to the legality of the applicant's confinement exist. TEX. CODE CRIM. PROC. art. 11.071, §§ 8(a), 9(a). The Court should have entered an order making its determination on or before January 2, 2017.

## IV.

On December 13, 2016, the State filed a Motion for Court to Order Preparation of Proposed Findings of Fact and Conclusions of Law. The Court has yet to enter an order as required by article 11.071 either directing the parties to file proposed findings of fact and conclusions of law or designating issues of fact to be

2

1890

resolved and the manner in which they will be resolved. *See* TEX. CODE CRIM. PROC. art. 11.071, §§ 8(a)&(b), 9(a)&(b).

## V.

For the reasons argued in the State's answer to the application, and as shown by the habeas and trial records, there no controverted, previously unresolved factual issues material to the legality of Applicant's confinement. Therefore, the State requests that the Court order the parties to file proposed findings of fact and conclusions of law as provided in section 8(b) of article 11.071 so that justice can be served by concluding these proceedings. *See* TEX. CODE CRIM. PROC. art. 11.071, § 8(b).

## IV.

WHEREFORE, PREMISES CONSIDERED, the State respectfully requests that the Court enter a written order finding that there are no controverted, previously unresolved factual issues material to the legality of Applicant's confinement and directing the parties to file proposed findings of fact and conclusions of law for the Court to consider not later than the thirtieth day after the order is issued. *See* TEX. CODE CRIM. PROC. art. 11.071, § 8(a)&(b).

3

1891

Respectfully submitted,

SHAREN WILSON
Criminal District Attorney
Tarrant County, Texas

JOSEPH W. SPENCE
Assistant Criminal District Attorney
Chief, Post-Conviction

/s/ Helena F. Faulkner
HELENA F. FAULKNER
Assistant Criminal District Attorney
State Bar No. 06855600
401 W. Belknap
Fort Worth, Texas  76196-0201
(817) 884-1685
FAX (817) 884-1672
ccaappellatealerts@tarrantcountytx.gov

## CERTIFICATE OF SERVICE

A true copy of the State's Second Motion for Court to Order Preparation of

Proposed Findings of Fact and Conclusions of Law has been e-served on Applicant's

habeas counsel, Catherine Clare Bernhard, at cbernhard@sbcglobal.net, on June 15,

2018.

/s/ Helena F. Faulkner
HELENA F. FAULKNER

4

1892

No. C-371-W010796-1361004-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 371ST JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| CEDRIC ALLEN RICKS | § | TARRANT COUNTY, TEXAS |

## MEMORANDUM AND ORDER

Having reviewed Applicant's Application for Writ of Habeas Corpus, the State's Reply, and the habeas and trial records, the Court hereby determines pursuant to TEX. CODE CRIM. PROC. art. 11.071, § 8(a) that there exist no controverted, previously unresolved factual issues material to the legality of Applicant's confinement.

The Court orders counsel for Applicant and the State to file proposed findings of fact and conclusions of law no later than thirty days after the date of this order. *See* TEX. CODE CRIM. PROC. art. 11.071, § 8(b). The Court further orders the Clerk of this Court to furnish a copy of this Memorandum and Order to Applicant's counsel, Catherine Clare Bernhard, at cbernhard@sbcglobal.net, or at P.O. Box 2817, Red Oak, Texas, 75154, or her most recent address by United States mail; and to the post-conviction section of the Tarrant County Criminal District Attorney's Office.

SIGNED AND ENTERED this the _____ day of _____, 2018.

_____
JUDGE PRESIDING

1893



FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

JUN 25 2018

TIME 12:58
BY _____ AA _____ DEPUTY

No. C-371-W010796-1361004-A

EX PARTE                    §    IN THE 371ST JUDICIAL
                            §
                            §    DISTRICT COURT OF
                            §
CEDRIC ALLEN RICKS          §    TARRANT COUNTY, TEXAS

## MEMORANDUM AND ORDER

Having reviewed Applicant's Application for Writ of Habeas Corpus, the State's Reply, and the habeas and trial records, the Court hereby determines pursuant to TEX. CODE CRIM. PROC. art. 11.071, § 8(a) that there exist no controverted, previously unresolved factual issues material to the legality of Applicant's confinement.

The Court orders counsel for Applicant and the State to file proposed findings of fact and conclusions of law no later than thirty days after the date of this order. *See* TEX. CODE CRIM. PROC. art. 11.071, § 8(b). The Court further orders the Clerk of this Court to furnish a copy of this Memorandum and Order to Applicant's counsel, Catherine Clare Bernhard, at cbernhard@sbcglobal.net, or at P.O. Box 2817, Red Oak, Texas, 75154, or her most recent address by United States mail; and to the post-conviction section of the Tarrant County Criminal District Attorney's Office.

SIGNED AND ENTERED this the 25 day of June 2018.

_____
JUDGE PRESIDING

1894



STEVE GORDON
ATTORNEY AT LAW
2101 MONEDA STREET
FORT WORTH, TX 76117

7015 1520 0003 4756 5122

CERTIFIED MAIL

M. ROBBINS - 3RD Floor - Waits

TARRANT COUNTY
THOMAS A. WILDER
DISTRICT CLERK - CRIMINAL
401 W. BELKNAP
FORT WORTH, TEXAS 76196-0402

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

STEVE GORDON
ATTORNEY AT LAW
2101 MONEDA STREET
FORT WORTH, TX 76117

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _K Carroll_   ☐ Agent   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
☑ Certified Mail   ☐ Priority Mail Express
☐ Registered   ☑ Return Receipt for Merchandise
☐ Insured Mail   ☐ Collect on Delivery

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)    7015 1520 0003 4756 5122

PS Form 3811, July 2013    Domestic Return Receipt

1895



M Robbins - 3rd Floor Writs

MARY B. THORNTON
ATTORNEY AT LAW
3901 RACE STREET
FORT WORTH, TX 76111

U.S. Postal Service
CERTIFIED MAIL RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

Certified Mail Fee

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)
☐ Return Receipt (electronic)
☐ Certified Mail Restricted Delivery
☐ Adult Signature Required
☐ Adult Signature Restricted Delivery

Postage

Total Postage and Fees

MARY THORNTON
3901 RACE Street
FW, TX 76111

7015 1520 0003 4756 5139

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

MARY B. THORNTON
ATTORNEY AT LAW
3901 RACE STREET
FORT WORTH, TX 76111

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☑ Certified Mail®    ☐ Priority Mail Express™
☐ Registered    ☑ Return Receipt for Merchandise
☐ Insured Mail    ☐ Collect on Delivery

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)    7015 1520 0003 4756 5139

PS Form 3811, July 2013    Domestic Return Receipt

TARRANT COUNTY
THOMAS A. WILDER
DISTRICT CLERK - CRIMINAL
401 W. BELKNAP
FORT WORTH, TEXAS 76196-0402

1896

CATHERINE CLARE BERNHARD
ATTORNEY AT LAW
P. O. BOX 2817
RED OAK, TX 75154



**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

Certified Mail Fee
Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)
☐ Return Receipt (electronic)
☐ Certified Mail Restricted Delivery
☐ Adult Signature Required
☐ Adult Signature Restricted Delivery
Postage
Total Postage and Fees

CATHERINE C. BERNHARD
PO BOX 2817
RED OAK, TX 75154

7015 1520 0003 4756 5146

CERTIFIED MAIL

M. ROBBINS - 3RD Floor-Writs

**TARRANT COUNTY**
**THOMAS A. WILDER**
DISTRICT CLERK - CRIMINAL
401 W. BELKNAP
FORT WORTH, TEXAS 76196-0402

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

CATHERINE CLARE BERNHARD
ATTORNEY AT LAW
P. O. BOX 2817
RED OAK, TX 75154

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____   ☐ Agent   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Certified Mail®   ☐ Priority Mail Express™
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ Collect on Delivery

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)

7015 1520 0003 4756 5146

PS Form 3811, July 2013    Domestic Return Receipt

1897



WILLIAM H. RAY
ATTORNEY AT LAW
512 MAIN STREET, #308
FORT WORTH, TX 76102



7015 1520 0003 4756 5115
7015 1520 0003 4756 5115

CERTIFIED MAIL



M. ROBBINS - 3RD Floor - Exhibits

TARRANT COUNTY
THOMAS A. WILDER
DISTRICT CLERK - CRIMINAL
401 W. BELKNAP
FORT WORTH, TEXAS 76196-0402

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

WILLIAM H. RAY
ATTORNEY AT LAW
512 MAIN STREET, SUITE 308
FORT WORTH, TX 76102

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                    ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
☐ Certified Mail®      ☐ Priority Mail Express™
☐ Registered           ☑ Return Receipt for Merchandise
☐ Insured Mail         ☐ Collect on Delivery

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)    7015 1520 0003 4756 5115

PS Form 3811, July 2013        Domestic Return Receipt

1898

D371-W010796-00

FILED
TARRANT COUNTY
7/24/2018 3:13 PM
THOMAS A. WILDER
DISTRICT CLERK

No. C-371-W010796-1361004-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 371ST JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| CEDRIC ALLEN RICKS | § | TARRANT COUNTY, TEXAS |

## STATE'S PROPOSED MEMORANDUM, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

COMES NOW, The State of Texas, by and through the Criminal District Attorney of Tarrant County, Texas, and files its proposed memorandum, findings of fact, and conclusions of law.

## MEMORANDUM

A Tarrant County jury convicted Applicant of capital murder in the stabbing deaths of his girlfriend RS and her eight-year-old son AF in the same criminal transaction on May 1, 2013. [CR 1: 11; CR 2: 479; RR 33: 71.] The jury's answers to the special issues required imposition of the death penalty. [CR 2: 517-18; RR 40: 134-35.] The Court of Criminal Appeals of Texas affirmed this Court's judgment on October 4, 2017, and the Supreme Court of the United States denied the petition for writ of certiorari on April 16, 2018. *Ricks v. State*, No. AP-77,040, 2017 WL 4401589 (Tex. Crim. App. October 4, 2017), *cert. denied*, 138 S. Ct. 1553 (2018).

1

1899

On June 13, 2016, Applicant timely filed the current habeas application raising eleven claims for relief pursuant to TEX. CODE CRIM. PROC. 11.071. Applicant's trial counsel, William H. Ray and Stephen Gordon, and his appellate counsel, Mary B. Thornton, filed court-ordered affidavits addressing Applicant's claims. [*See* Affidavit of William H. "Bill" Ray ("Ray's affidavit"); Affidavit of Stephen Gordon in Response to Writ of Habeas Corpus ("Gordon's affidavit"); Affidavit of Mary B. Thornton ("Thornton's affidavit").] The Court granted the State an extension of time to respond to the application, and the State timely filed its reply on December 12, 2016.

The State filed a motion for the Court to order proposed findings of fact and conclusions of law on December 13, 2016, and a second motion on June 15, 2018. On June 25, 2018, this Court found that there exist no controverted, previously unresolved factual issues material to the legality of Applicant's confinement and ordered the parties to file proposed findings of fact and conclusions of law by July 25, 2018.

The Court has considered the Application for Writ of Habeas Corpus, the State's Reply to Application for Writ of Habeas Corpus, all of the exhibits and materials filed by each party, and the entire records of the trial and habeas proceedings. Where appropriate, the Court has used its personal recollection as

2

1900

permitted under TEX. CODE CRIM. PROC. art. 11.071, § 9(a).  Based on its review of the record, the Court makes the following findings of fact and conclusions of law regarding Applicant's claims and recommends that relief be denied:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.
### Claim One

Applicant alleges his trial counsel were ineffective under the Sixth Amendment because they failed to sufficiently develop and present mitigating evidence about:

- his mother's drinking while she was pregnant;

- his primary caretakers until the age of five;

- his behavioral problems as a young child;

- whippings he received;

- his problems in school;

- his behavioral problems as a teen;

- his continued behavioral problems as an adult;

- his family history of mental illness;

- the neighborhoods where he lived before Calumet Park, Illinois;

- the potential lead exposure in his neighborhoods; and

3

1901

- the psychological significance of his life experiences.

[Application at 26-80.]

**Findings of Fact**

1. The Court appointed William H. Ray and Stephen Gordon to represent Applicant at his capital-murder trial in cause number 1361004. [Ray's affidavit at 2; Gordon's affidavit at 1.]

2. Ray and Gordon are highly experienced attorneys who were well-qualified to represent Applicant in this capital-murder prosecution. [Ray's affidavit at 1-2; Gordon's affidavit at 1; *see* www.texasbar.com.]

3. Applicant's defense team knew from the initial case review that most of their time would be spent attempting to build a strong mitigation case. [Gordon's affidavit at 1.]

4. The defense team interviewed Applicant's family, which included his father Shederick Ricks, his mother Helen Ricks, and his brother Dwayne Ricks. [Ray's affidavit at 5.]

5. Trial counsel met with Applicant's family in person and by telephone many times, and they "were impressed by the cooperation and courtesy afforded by his family." [Gordon's affidavit at 2-3.]

6. Trial counsel and the entire mitigation team went to Chicago, Illinois, twice in order to locate and speak with witnesses and to obtain any relevant documents they could find. [Gordon's affidavit at 2; Ray's affidavit at 4-5.]

7. During their trips to Illinois, trial counsel made a point to locate juvenile records, adult criminal records, and medical records that would help them to formulate a strong mitigation case. [Gordon's affidavit at 2.]

8. Applicant's family was very helpful in arranging for people to meet with the defense team, and the team members interviewed everyone who came to meet with them. [Ray's affidavit at 5.]

4

1902

9. Members of the defense team told the people whom they interviewed that they wanted to know the "good and bad" about Applicant and his family in order to present Applicant's punishment case in the most effective way possible. [Ray's affidavit at 5.]

10. Members of the defense team provided their contact information to the people whom they interviewed. [Ray's affidavit at 5.]

11. Ray believed at the time that the people whom the defense team interviewed were forthcoming and provided helpful information. [Ray's affidavit at 5.]

12. Throughout the defense team's investigation, Applicant's family was "not totally forthcoming regarding family history and secrets." [Gordon's affidavit at 3.]

13. The defense's psychological team and retained medical doctor reviewed Applicant's medical records to look for any organic or other disabilities that Applicant's trial counsel did not know about or that had not been diagnosed. [Gordon's affidavit at 2.]

14. Applicant underwent neuropsychological testing with Antoinette McGarrahan, Ph.D., on January 14 and 22, 2014. [State's Exhibit 3: Affidavit of J. Randall Price, Ph.D. ("Dr. Price's affidavit") at 7-10.]

15. Trial counsel retained Dr. Lewine, a neuroscientist and research scientist, to conduct scientific tests to detect biological markers in Applicant's brain that are statistically significant in populations with an increased history of aggression and violence and to determine if anything in Applicant's biological, physiological, or behavioral profile was consistent with a diagnosis of psychopathy. [RR 38: 8, 95, 100-01.]

16. Trial counsel visited Applicant numerous times during the pendency of his case; they discussed their concerns and strategies, kept Applicant informed about developments in the case, and afforded Applicant every opportunity to assist in his defense. [Gordon's affidavit at 1-2.]

5

1903



17. Applicant was not always open with his trial counsel, and at times he refused to cooperate in the investigation. [Gordon's affidavit at 2; Applicant's Exhibits 3, 10.]

18. Even after Applicant informed trial counsel in March 2014 "that he wanted no further investigation on his behalf in order to develop the mitigation case," counsel continued their investigation with their retained experts. [Gordon's affidavit at 2.]

19. The State produced compelling evidence of the gruesome offenses committed against RS and her sons and Applicant's subsequent flight, as well as evidence of Applicant's lifelong history of explosive, violent, and aggressive behavior.

20. The testimony of the defense's lay witnesses at the punishment phase included the following:

    a. Applicant grew up as part of a close-knit, supportive, hard-working, church-going family in a nice house in a good neighborhood that one witness described as "a Utopia." [RR 38: 26-28, 38, 57, 73-74, 90-91, 107-09, 111, 115, 154, 181-82; RR 39: 188.]

    b. Applicant and his brother were very fortunate growing up, did not want for anything materially, and liked to spend time with their family. [RR 38: 179, 181.]

    c. Helen Ricks described family photographs and testified about the family time, vacations, and activities that the Ricks family engaged in during Applicant's childhood. [RR 39: 189, 217-20; RR 46: D-X 38.]

    d. From the time Applicant was a toddler, he was aggressive, mischievous, and hyperactive; he could not be still, follow instructions, or sit down. [RR 38: 116-18; RR 39: 193.]

    e. Applicant's family knew from the time he was young that something was wrong with him, and his problems worsened as he got older. [RR 38: 65; RR 39: 194-95.]

6



f.   Helen Ricks did not know the seriousness of Applicant's problems until he started school. [RR 39: 193.]

    i.   On the first day of daycare, Applicant's teacher told his parents not to bring him back because he would not listen and the teachers did not know what to do. [RR 38: 116; RR 39: 193.]

    ii.   Applicant's kindergarten teacher went to the Ricks' house and told his parents that she did not know what to do with Applicant because he acted out and would not behave or listen to directions. [RR 39: 193-94.]

    iii.   When Applicant attended Seven Holy Founders, the school informed Helen Ricks that Applicant was disruptive, and the school sent home numerous letters about his behavior and about wanting to figure out how to address the situation. [RR 39: 213-14.]

    iv.   Applicant got in trouble a lot at school, but his parents were always there to support him and his mother was hands-on with the school and with trying to help Applicant. [RR 38: 75; RR 39: 198-99.]

g.   Applicant always had anger issues, and therapy never uncovered answers for the problem. [RR 38: 188-89.]

h.   When Applicant was between six and eight years old, he set fires to his grandmother's curtains, behind the front bushes of his parents' house, and in a car. [RR 38: 63-64, 123; RR 39: 195.]

i.   Growing up, Applicant had a temper, could be mean and aggressive when playing football and basketball, and was known by his friends to have a "short fuse." [RR 38: 47-48, 58, 76, 103-04, 155-56, 158.]

j.   Applicant was spontaneous and impulsive, and there was a disconnect in his ability to connect a rationale to the things he did; he would tell his parents that "[s]omething in [his] head tell[s him] to do this." [RR 38: 92, 124, 131.]

7

1905




k.   Applicant would run away from home to avoid physical discipline – when he was ten or eleven years old, he ran out the back door when his father was going to discipline him, threw a brick through the kitchen picture window, and ran away. [RR 38: 130; RR 39: 202.]

l.   Applicant ran away for longer periods of time when he got older because he did not like his parents' rules. [RR 39: 220-21.]

m.   Applicant became aggressive as he got older; he was a different person when he was in a rage. [RR 38: 183, 186.]

n.   In high school, Applicant and his brother had a "drag out" fight at their aunt and uncle's house – Applicant entered the room where his brother and cousin were talking, jumped his brother, and started fighting him. [RR 38: 185-86.]

o.   A lot of the disciplining was left to Applicant's mother. [RR 39: 197.]

p.   When Applicant was younger, his parents sometimes whipped him, but later, when they could not physically discipline him all the time, they tried restricting things like television, going to the movies, or playing sports. [RR 38: 118, 121-22; RR 39: 196.]

q.   Applicant's parents did everything that they knew of to help him, and they were there to help him when he got into trouble, but it did no good. [RR 38: 116, 180, 186, 191; RR 39: 196.]

r.   By the time Applicant was an adolescent, his parents took him to doctors, counselors, and therapists to investigate what was going on with him, but no one ever suggested that they do anything more extensive, and an MRI showed nothing wrong with Applicant's brain. [RR 38: 124-26; RR 39: 196, 203, 214.]

s.   In high school, Applicant spent a month at Christ Hospital's psychiatric ward because he was doing certain things and running away and because he broke a car window with his fist when he saw his girlfriend in a car with another boy. [RR 38: 124; RR 39: 200-03.]

8

1906



i. Staff at Christ Hospital's psychiatric ward would tell Applicant's mother that they had to restrain him. [RR 39: 204.]

ii. Applicant refused to continue taking his prescribed medication after returning home from Christ Hospital's psychiatric ward. [RR 38: 143; RR 39: 204.]

t. Applicant got a high school diploma from a special school so that he could join the union. [RR 38: 143.]

u. Looking back, Shederick Ricks believed that he and Helen Ricks did everything they knew to do for Applicant, but they were not privy to what he really needed. [RR 38: 140.]

v. Applicant was protective of his mother; he did not like his father to argue with her, and he felt that his father did not love or respect her enough. [RR 39: 200.]

w. Applicant witnessed Shederick Ricks shove Helen Ricks and slap her one time, but Helen did not know whether it affected Applicant because it did not happen all the time and because he had behavior problems before that. [RR 39: 200, 204.]

x. Applicant's incidents became more severe as he got older. [RR 39: 228.]

y. Applicant testified that he had problems controlling his anger even in elementary school and that his problems started when he began dating in high school. [RR 40: 39, 47.]

z. Applicant testified that Dr. Lewine's testimony about his anger and aggression was accurate, that he loses control of his emotions, that his fights with girlfriends and his ex-wife started when he became unable to control himself during arguments, and that he was in a rage and unable to control himself when he stabbed RS and her sons. [RR 40: 39-45.]

9



    aa.    Applicant previously had choked RS to the point of unconsciousness and beat her head on the bathroom floor during an argument, and he lost his job as a result. [RR 40: 32-35, 73.]

    bb.    At the time of the murders, Applicant had a pending criminal case for the assault of RS, and they were in the process of splitting up when he murdered RS and her son. [RR 40: 35, 52-54.]

    cc.    Applicant testified that he felt stressed and depressed for about two-and-a-half years before the murders because he lost his job and his condominium, he had to move away from his family and friends, and he felt like a failure. [RR 40: 31-32, 38.]

    dd.    When Applicant talked to Helen Ricks about her letting his brother but not him stay at the family's house, she told him that it was "time to man up" because he had a baby whom he needed to take care of and love. [RR 39: 226-27.]

    ee.    Applicant's family was very private, and it was important for the family to be seen as perfect; things that happened in the home remained secret and were not discussed outside. [RR 38: 180, 192.]

21.    Trial counsel brought out information that included the following during cross-examination of the State's witnesses:

    a.    A person can have problems as an adult because his parents fought and were abusive when he was growing up. [RR 34: 73-75.]

    b.    Some people do not handle stress well; it can be because of their environment, the way their body is put together, or their genes. [RR 34: 75.]

    c.    Applicant's family were professional, articulate, mostly well-educated, church-going, loving people; but, as with any family, there was more going on with the Ricks than what they appeared outwardly. [RR 35: 137, 139].


     d.    Applicant had explosive and impulsive responses, even to little things. [RR 36: 46-51; RR 37: 42.]

22.    Dr. Lewine testified about biological markers in Applicant's brain that are associated with an increased history of aggression and violence. [RR 39: 101.]

     a.    Applicant's MRI did not show any gross structural lesions; there was no evidence of a tumor, multiple sclerosis, a stroke, or a major traumatic brain injury. [RR 40: 115, 123.]

     b.    The increased putamen volume in Applicant's brain is consistent with a history of violence and aggression. [RR 39: 118-19, 121-23.]

     c.    Applicant's brain structure is most likely associated with something he was born with or his developmental course during the first ten years of his life. [RR 40: 123-24.]

     d.    Applicant's brain scan does not show the brain biology expected in individuals with clear psychopathy, and his score on the Psychopathy Checklist Revised administered by Dr. McGarrahan was consistent with the imaging finding; however, Dr. Lewine acknowledged that some of Applicant's scores should possibly have been higher, which would place him in a rage that might be considered a psychopath. [RR 39: 121-25, 160-67.]

     e.    Applicant's score in the lowest one percent of the population on the Mayer-Salovey-Caruso Emotional Intelligence Test (MSCEIT) administered by Dr. McGarrahan shows impairments in his emotional intelligence, his ability to form and maintain interpersonal relationships, and his ability to extract information from non-verbal cues; these results are consistent with the facts of this case. [RR 39: 127-28.]

     f.    Applicant's EEG showed nothing indicating clinically massive pathophysiology. [RR 39: 130-31.]

     g.    Applicant's excessive amount of beta activity is often seen in individuals with impulse control and aggression problems and is

11



consistent with a biological predisposition toward violence and aggression. [RR 39: 130, 132.]

h.   There was no increased delta activity, which is commonly found with psychopathy. [RR 39: 132.]

i.   Because of Applicant's basic biology from birth, his system becomes overloaded and overwhelmed. [RR 39: 138-39.]

j.   Applicant goes into sensory overload at a lower level of sound intensity than neurotypical individuals, meaning that he cannot control his impulses in a heated argument; this is consistent with the facts in Applicant's case. [RR 39: 141-43.]

k.   Applicant's overall test results are consistent with the idea of a biological predisposition toward aggression and violence, but not within the psychopathy range, and his early environment probably contributed to it as well. [RR 39: 133, 145.]

l.   Having trouble from the beginning of school and being told not to return after the first day would be consistent with the biological observations of Applicant; it goes back to the fact that Applicant has an abnormal brain. [RR 39: 145-46.]

m.   The data is consistent with Applicant being impulsive and aggressive. [RR 39: 181.]

n.   Applicant's biological profile cannot explicitly be attributed to birth as opposed to his first few years of life, but he does not have a normal brain. [RR 39: 181.]

23.   During the punishment-phase closing arguments, trial counsel articulated the mitigation theme that Applicant "got a bad hand" and that his life should be spared because he had no control over being born with a biological predisposition toward impulsivity and aggression. [RR 40: 106-18.]

24.   Applicant submits habeas affidavits from his mother Helen Ricks, his father Shederick Ricks, his brother Dwayne Ricks, his grandmother Christine

12

1910

Sudduth, his cousin Tamara Butts, his uncle Joseph Sanders, and his aunt Deborah Sanders. [Applicant's Exhibits 3, 4, 5, 6, 9, 10, 13.]

a.  Each affiant talked to members of the defense team before trial, and, with the exception of Applicant's grandmother and aunt, the affiants testified at trial. [Applicant's Exhibits 3, 4, 5, 6, 9, 10, 13; RR 31: 58, 76; RR 38: 107, 176, 185.]

b.  Applicant's habeas affidavits from people who state that they did not meet with members of the defense team "were persons that the Ricks family and Applicant did not tell [the defense team] about." [Ray's affidavit at 6.]

c.  Applicant's habeas affidavits from people who claim that Applicant's trial counsel did not ask them the right questions "are overlooking the fact that when [the defense team] asked about Applicant's background, good and bad, [the team was] asking them everything they knew." [Ray's affidavit at 6.]

d.  The affiants' statements that they would have told trial counsel everything contained in their affidavits "if they had asked [the affiants] about it" demonstrates that these affiants were less than forthcoming with some or all of the information they now describe in an attempt to spare Applicant's life, which is consistent with evidence that Applicant was at times uncooperative and that his family had a history of keeping secret the events that happened behind closed doors. [RR 38: 180, 192; Gordon's affidavit at 2; Applicant's Exhibits 3, 4, 5, 6, 9, 10, 13.]

e.  Trial counsel covered many of the matters discussed in the habeas affidavits submitted by Applicant.

f.  As for the matters which these habeas affiants did not disclose before trial, they "had every opportunity to tell [the defense team] about Applicant, [but] they chose not to." [Ray's affidavit at 6.]

g.  As for these habeas affiants' claims that trial counsel or the defense team did not ask them the right questions, these affiants "are overlooking the fact that when [the defense team] asked about

13

1911



Applicant's background, good and bad, [the team was] asking them everything they knew." [Ray's affidavit at 6.]

25. Applicant complains that the jury never heard that his mother Helen Ricks drank heavily on a regular basis throughout her pregnancy with him. [Application at 27-28.]

    a. Applicant's "argument" simply quotes the habeas affidavits of his mother Helen Ricks, his uncle Joseph Sanders, and his aunt Deborah Sanders stating that Helen Ricks consumed alcohol every weekend while she was pregnant with Applicant. [Application at 27-28; Applicant's Exhibits 3, 4, 5.]

    b. Helen Ricks and the Sanders talked to members of the defense team before trial, and Applicant presents no evidence that they informed anyone about the extent of Helen Rick's alleged alcohol use now detailed in their habeas affidavits. [Applicant's Exhibits 3, 4, 5.]

    c. The defense's retained psychological team and medical doctor reviewed Applicant's medical records for any organic or other disability that trial counsel did not know about or that had not been diagnosed. [Gordon's affidavit at 2.]

    d. There is no evidence that the defense's retained experts told trial counsel that Helen Rick's alleged alcohol use during her pregnancy with Applicant should be pursued as an avenue of mitigating evidence.

    e. Applicant fails to prove that his trial counsel neglected to fully investigate or discover anything of mitigating value related to his alleged prenatal exposure to alcohol.

    f. Evidence that Applicant suffered from mitigating effects relating to prenatal alcohol exposure would have simply provided the jury with another explanation in addition to those offered by Dr. Lewine showing that Applicant's life-long problems stemmed from a prenatal source beyond his control.

14

1912



g.    Applicant fails to meet his burden to prove that the failure to discover and present the alleged alcohol-consumption facts stated in the habeas affidavits of Helen Ricks, Joseph Sanders, and Deborah Sanders resulted from a constitutionally inadequate mitigation investigation that fell below an objective standard of reasonableness under prevailing professional norms or was not the result of reasonable trial strategy.

h.    Applicant fails to meet his burden to affirmatively prove a reasonable probability that the addition of the alcohol-consumption facts in the affidavits of Helen Ricks, Joseph Sanders, and Deborah Sanders would have persuaded the jury to answer the mitigation special issue "yes" instead of "no," especially given the totality of the evidence presented by the parties at trial.

26.    Applicant complains that the jury never heard about Geraldine Sanders and her boyfriend Booker, whom he refers to as his "primary caretakers" until the age of five. [Application at 28-33.]

a.    Applicant's "argument" consists mainly of quotations from the habeas affidavits of his brother Dwayne Ricks and his distant cousin Stephanie Halverson regarding sexual abuse when Geraldine Sanders babysat them and from his distant cousin Tammy Hall recalling that Applicant's behavior caused Geraldine Sanders to frequently whip him with a white extension cord. [Application at 28-30; Applicant's Exhibits 6, 7, 8.]

b.    Applicant also quotes the affidavits of Dwayne Ricks, Halverson, and Hall recalling that another relative, Marie Sanders, was mean and cold, was cruel and verbally abusive to Halverson, and spanked Dwayne Ricks when she babysat him. [Application at 31-32; Applicant's Exhibits 6, 7, 8.]

c.    Neither Applicant nor his family told trial counsel about Hall or Halverson, and the defense team did not talk to them before trial. [Ray's affidavit at 6; Applicant's Exhibits 7, 8.]

d.    There is no evidence that Dwayne Ricks told trial counsel about the events now stated in his habeas affidavit, and his statement that he would have told them everything if they had asked him about it

15

1913

demonstrates that there are matters which he did not disclose despite having ample opportunity to do so.  [Applicant's Exhibit 6.]

e.  Trial counsel were "not aware of any information from anyone [they] spoke to in the family regarding Geraldine [Sanders] or her boyfriend." [Gordon's affidavit at 2.]

f.  Applicant cannot now fault his trial counsel for failing to present evidence or witnesses whom they knew nothing about despite their thorough mitigation investigation.

g.  Regarding the sexual abuse alleged in Dwayne Ricks' and Halverson's affidavits, Applicant provides no proof that he was aware of, witnessed, or suffered sexual abuse himself.  [Applicant's Exhibits 6, 7, 8.]

h.  The habeas affidavits of Dwayne Ricks, Halverson, and Hall do not set forth any ill treatment of Applicant when Marie Sanders babysat him. [Applicant's Exhibits 6, 7, 8.]

i.  Applicant fails to meet his burden to prove that the defense team's failure to discover Hall and Halverson or to learn and present the matters in their affidavits and Dwayne Ricks' affidavit resulted from a constitutionally inadequate mitigation investigation that fell below an objective standard of reasonableness under prevailing professional norms or was not a result of reasonable trial strategy.

j.  Applicant fails to meet his burden to affirmatively prove a reasonable probability that the allegations of sexual abuse (absent any evidence that it affected him), the fact that his behavior lead Geraldine Sanders to whip him frequently with an extension cord, or evidence that Marie Sanders was abusive to others and that she was cold and mean would have persuaded the jury to answer the mitigation special issue "yes" instead of "no."

16

1914

27.    Applicant complains that his trial counsel failed to make the jury aware of his behavioral problems from an early age. [Application at 33-36.]

a.    Applicant relies on the habeas affidavits of Joseph Sanders, Deborah Sanders, Butts, and Halverson. [Applicant's Exhibits 4, 5, 7, 10.]

b.    There is considerable overlap between the information contained in the habeas affidavits of Joseph Sanders, Deborah Sanders, Butts, and Halverson relied on by Applicant and the testimony presented at trial.

c.    Contrary to Applicant's allegations, the jury was aware that Applicant had behavioral problems from the time he was a toddler, that his parents knew from the time he was young that something was wrong with him, that Applicant's problems worsened as he got older, that he had behavioral problems in school from the first day of daycare, that he set fires on three occasions when he was between six and eight years old, that he could never explain why he did something bad, that his parents physically disciplined him, that he would run away from home to escape physical discipline, and that he witnessed his father abuse his mother. [See, e.g., RR 38: 63-65, 75, 92, 116-18, 121-24, 130-31; RR 39: 193-96, 198-99, 202, 213-14.]

d.    Applicant himself testified that, even in elementary school, he had trouble controlling his temper. [RR 40: 47.]

e.    While trial counsel did not know about and never talked to Halverson, the defense team talked to Butts and the Sanders before trial. [Applicant's Exhibits 4, 5, 7, 10; Ray's affidavit at 6.]

f.    There is no evidence that Butts or the Sanders shared the information contained in their habeas affidavits when they talked to members of the defense team before trial, and, according to their affidavits, they did not tell the defense team all of the information now disclosed. [Applicant's Exhibits 4, 5, 10.]

g.    Applicant makes no effort to meet his burden to prove that his trial counsel fell below an objective standard of reasonableness under prevailing professional norms in the manner in which they investigated

17

1915

and presented Applicant's mitigation case with regard to problems he had as a child.

h.    Applicant makes no effort to meet his burden to prove that, had trial counsel discovered and introduced the evidence he quotes, there is a reasonable probability that the jury would have answered the mitigation special issue "yes" instead of "no."

28.    Applicant asserts that his trial counsel were ineffective for failing to apprise the jury of evidence contained in the habeas affidavits of his mother Helen Ricks, his father Shederick Ricks, and his brother Dwayne Ricks about severe whippings Helen Ricks administered with belts and extension cords. [Application at 36-38; *see* Applicant's Exhibits 3, 6, 9.]

a.    Applicant's parents testified about the manner in which they chose to discipline Applicant:

   i.    Helen Ricks testified that Applicant "got a whipping sometimes" and that on other occasions she took things away from him. [RR 39: 196.]

   ii.    Shederick Ricks testified that: (a) when Applicant was younger, the thinking was that more discipline would solve his problems; (b) Applicant would run away from home to escape physical discipline; (c) there came a time when he could not physically discipline Applicant all the time; (d) when Applicant was older, hands-on discipline was not going to work, so he would take things away; and (e) on one occasion, Applicant ran out of the house to avoid being disciplined, threw a brick through a kitchen window, and ran away. [RR 38: 118, 121-22, 129-30.]

b.    There is no evidence that Applicant or his family members told trial counsel or other members of the defense team about the severity of the whippings now described in the habeas affidavits he submits, and the failure to disclose such evidence is wholly consistent with the Ricks family's history of wanting to appear perfect and of keeping secrets about what went on behind closed doors. [RR 38: 180, 192; *see* Gordon's affidavit at 3.]

18



    c.    Even if Applicant's trial counsel were aware of the severity of the whippings allegedly inflicted by Helen Ricks, the evidence would not have added any significant weight to the defense's dominant mitigation theme that Applicant was born with a bad brain, that he had exhibited behavioral signs and symptoms throughout his lifetime, and that his lack of control over being born with a biological predisposition to violence and aggression was sufficiently mitigating to spare his life.

    d.    The inferences made by Applicant's habeas mitigation specialist that two elementary photographs of Applicant showing alleged marks on his face demonstrate the alleged abuse are based on pure speculation without personal knowledge and are given no weight in this proceeding. [*See* Applicant's Exhibit 2.]

    e.    Applicant fails to meet his burden to establish that trial counsel acted outside the wide range of reasonable professional assistance under prevailing professional norms for failing to present evidence that neither Applicant nor his family disclosed despite ample opportunity to do so when they talked to the defense team before trial.

    f.    Applicant makes no attempt to meet his burden to show a reasonable probability that the addition of evidence that Helen Ricks allegedly severely whipped Applicant would have persuaded the jury to answer the special issues differently.

29.    Applicant complains that trial counsel should have done more to advise the jury about his school performance and his history of problems during his school career. [Application at 38-51.]

    a.    Applicant asserts that: (1) Helen Ricks should have testified about the extensive evidence contained in his habeas mitigation specialists' summary of his school records; and (2) trial counsel did not contact his teachers to provide first-hand reports about his behavior at school. [Application at 38-51; Applicant's Exhibit 2.]

    b.    Applicant submits affidavits from Sharon Speedwell, his eighth-grade teacher and the author of many school notes to his parents, and Donna


Ree, an employee of the McKinley Libra School where Applicant graduated. [Applicant's Exhibits 11, 12.]

c.    Ray told Applicant's family that it would be helpful to find a teacher or a coach to testify in Applicant's behalf. [Ray's affidavit at 5.]

d.    Trial counsel initiated attempts early on to find teachers and mentors who were aware of Applicant's childhood development. [Gordon's affidavit at 3.]

e.    The defense team's investigator and mitigation specialist made numerous attempts to locate teachers who could assist in Applicant's defense. [Gordon's affidavit at 3.]

f.    The defense team successfully located two of Applicant's former coaches who testified at the punishment phase of the trial. [Gordon's affidavit at 3; Ray's affidavit at 5-6; RR 40: 7-13, 15-22.]

g.    When trial counsel attempted to introduce excerpts of the school letters that Helen Ricks received, the Court sustained the State's hearsay objections to the evidence. [RR 39: 205-06, 210, 212; RR 46: D-X 38.]

h.    Applicant's jury was well aware of his lengthy history of problems in school, as well as his life-long behavioral problems in other areas of his life.

i.    Witness testimony during the punishment phase of the trial established that Applicant had trouble in school beginning with his first day in daycare, that his school constantly called Helen Ricks and sent letters home, and that the school tried to address Applicant's problems. [*See, e.g.*, RR 38: 116; RR 39: 193-94, 198-99, 213-14.]

j.    Applicant fails to meet his burden to demonstrate that his trial counsel acted outside the wide range of reasonable professional assistance under prevailing professional norms in the manner in which they attempted to locate his former teachers or by not introducing evidence contained in school letters that the Court excluded as hearsay during Helen Ricks' testimony.

<div align="center">20</div>

<div align="right">1918</div>



    k.    Applicant makes no attempt meet his burden to demonstrate a reasonable probability that the addition of testimony from Speedwell or Ree or the excluded school letters would have tipped the weight of the mitigating evidence in a manner that would have persuaded the jury to answer the mitigation special issue "yes" instead of "no."

30.    Applicant complains that the jury heard "only the barest details" of his behavioral problems as a teenager. [Application at 52-55.]

    a.    Applicant's entire "argument" consists of quotations from the habeas affidavits of Helen Ricks, Shederick Ricks, Dwayne Ricks, and Butts, as well as a letter that Helen Ricks wrote to Shederick Ricks in September 1991 recounting an episode where she called the police after Applicant became violent. [Application at 52-55; *see* Applicant's Exhibits 3, 6, 9, 10, 20.]

    b.    There is considerable overlap between the matters cited from the habeas affidavits and the evidence introduced at trial.

    c.    The jury was well aware of Applicant's behavioral problems during his teenage years.

    d.    Trial witnesses testified during the punishment phase that Applicant's problems worsened as he got older; that he was very intense and had a "short fuse"; that he had a "mean streak" as a football player and a "bit more anger" than the average football player; that he got into trouble a lot at school; that he ran away for longer periods of time when he got older; that he became aggressive when he got older; that, when he went into a rage, he was a different person until he was through it; that he was admitted to Christ Hospital's psychiatric ward for a month because he was doing certain things and running away and his mother did not know what else to do; that his problems became worse when he started dating; and that his parents kept saying there had to be something wrong with him. [*See, e.g.*, RR 38: 47-48, 58, 75-76, 103-05, 124-26, 155-56, 158, 183, 186, 188-89; RR 39: 196, 198-99, 213-14, 220-21.]

<div align="center">21</div>

<div align="right">1919</div>



e.  Applicant testified at the punishment phase of his trial that his problems controlling his anger began when he started dating in high school, and he discussed his run-ins with the law as a juvenile. [RR 40: 39-40, 57-58.]

f.  The jury heard evidence about the fight in high school between Applicant and Dwayne Ricks discussed in Dwayne Ricks' and Butts' affidavits. [Application at 52; Applicant's Exhibits 6, 10; RR 38: 185-86.]

g.  Applicant fails to meet his burden to prove that his trial counsel acted outside the wide range of reasonable professional assistance under prevailing professional norms in the manner that they investigated or presented evidence of Applicant's behavioral difficulties as a teenager.

h.  Applicant makes no attempt to meet his burden to prove a reasonable probability that introducing additional evidence about his behavioral problems as a teenager would have persuaded the jury to answer the mitigation special issue "yes" instead of "no."

31.  Applicant complains that the jury never heard from witnesses "who continued to notice signs of mental illness in [him], particularly his mood swings," as an adult. [Application at 55-56.]

a.  Applicant's "argument" relies on quotations from affidavits submitted by his uncle Joseph Sanders and his cousin Butts about Applicant's mood swings, depression, paranoia, and poor planning ability. [Application at 55-56; *see* Applicant's Exhibits 4, 10.]

b.  There is no evidence that Joseph Sanders or Butts told trial counsel the specific facts now stated in their habeas affidavits even though they had ample opportunity to do so when they spoke with members of the defense team before trial. [Applicant's Exhibits 4, 10.]

c.  Joseph Sanders' and Butts' statements in their habeas affidavits that they would have told members of the defense team the matters stated therein if they had been asked about them shows that they were not fully

22

1920

forthcoming with everything they knew when they talked to members of the defense team before trial. [Applicant's Exhibits 4, 10.]

d.    Trial counsel were not deficient for failing to introduce undisclosed testimony that their thorough mitigation investigation failed to uncover when they talked to the witnesses upon whom Applicant now relies.

e.    The jury was fully aware of Applicant's behavioral problems and other issues as an adult through the testimony of Dr. Lewine and lay witnesses for the State and the defense.

f.    Applicant testified at the punishment phase of the trial that Dr. Lewine's testimony about his anger and aggression was accurate, that he loses control of his emotions, that his fights with girlfriends and his ex-wife began with arguments that made him unable to control himself, that he was in a rage and unable to control himself when he stabbed RS and her sons, and that he had been stressed and depressed for about two and a half years before the murders because he lost his job and his condo and had to move away from his family and friends. [RR 40: 31-32, 39-45, 49.]

g.    Applicant testified that he had been arrested numerous times for domestic violence, violation of protective orders, resisting arrest, and resisting police officers. [RR 40: 58-59.]

h.    Applicant fails to meet his burden to prove that trial counsel acted below an objective standard of reasonableness under prevailing professional norms for not calling Joseph Sanders or Butts to testify about the information he quotes from their habeas affidavits.

i.    Applicant fails to meet his burden to prove that trial counsel acted outside the wide range of reasonable professional assistance under prevailing professional norms in the manner that they investigated or presented evidence of Applicant's mental state as an adult.

j.    Applicant makes no attempt to meet his burden to prove a reasonable probability that the addition of the facts he quotes from the habeas

23

1921



affidavits of Joseph Sanders and Butts would have persuaded the jury to answer the mitigation special issue "yes" instead of "no."

32.   Applicant complains that the jury never heard about his family history of mental illness. [Application at 56-58.]

    a.    Applicant relies on the following information contained in the habeas affidavits he submits:

        i.    Applicant's maternal grandmother Christine Sudduth states that her maternal grandfather "drank a lot, and sometimes fell off his horse because he was too drunk" and that one of her brothers "suffered from probable mental illness," had "problems with his nerves and had a breakdown," was not very talkative, and "used to pick at his ears and say something was in them" when nothing was there. [Application at 56-57; Applicant's Exhibit 13.]

        ii.    Applicant's brother Dwayne Ricks states that he has struggled with "mental health"; specifically, he "attempted suicide in 2012, got mental health care, and was diagnosed with bipolar disorder. [Applicant's Exhibit 6.]

        iii.    Applicant's mother Helen Ricks states that she was treated for depression. [Applicant's Exhibit 3.]

    b.    There is no evidence that Sudduth, Dwayne Ricks, or Helen Ricks told members of the defense team about the alleged family history of mental illness described in their affidavits even though they had ample opportunity to do so when they spoke to members of the defense team before trial. [Applicant's Exhibits at 3, 6, 13.]

    c.    Applicant submits no treatment records reflecting his family members' diagnoses or treatments for mental illness.

    d.    Applicant's medical records were reviewed by the defense's retained psychological team and medical doctor to assist in discovering any organic or other disabilities that trial counsel did not know about or that had not been diagnosed. [Gordon's affidavit at 2.]



e.  Applicant underwent neuropsychological testing with Dr. McGarrahan, before trial. [Dr. Price's affidavit at 7-10.]

f.  Trial counsel retained Dr. Lewine to conduct scientific tests on Applicant's brain. [RR 38: 8, 95, 100-01.]

g.  There is no evidence that the defense's retained professionals gave trial counsel any indication that Applicant's alleged family history of mental illness existed or that such history might affect him in any way, much less in a relevant mitigating way.

h.  "[I]t is unclear to what extent [Applicant's] emotional and behavior difficulties may be related to heredity of mental illness." [Dr. Price's affidavit at 22.]

i.  Applicant fails to prove that he has been or should have been diagnosed with a hereditary mental illness, much less one that would have convinced the jury to spare his life.

j.  Applicant fails to meet his burden to prove that his trial counsel acted outside the wide range of reasonable professional assistance under prevailing professional norms in the manner that they investigated or presented evidence relating to Applicant's mental health.

k.  Applicant makes no attempt to demonstrate how introducing the bare facts stated his family members' affidavits, especially absent any evidence that he inherited a related mental illness, would have been of sufficient mitigating value to persuade the jury to answer the mitigation special issue differently.

33.  Applicant alleges that the jury should have heard about risk factors in the neighborhoods where Applicant lived before moving to Calumet Park, Illinois. [Application at 58-61.]

a.  Applicant submits an affidavit from Amy Nguyen, a Geographic Information Systems Analyst specializing in capital sentencing mitigation maps, detailing the following information:

25

1923



i.    Using census and other data to map community risk factors identified by the United States Department of Justice for predicting violence, Nguyen analyzed the two neighborhoods where Applicant lived until he was two years old and the neighborhood where Geraldine Sanders babysat him until he entered kindergarten. [Applicant's Exhibit 16.]

ii.    Nguyen compares the neighborhoods' percentages of single-mother families, adults age twenty-five or older with less than a ninth-grade education, adults age twenty-five or older with no diploma or GED, and families living at or below poverty with the corresponding percentages for Cook County, Illinois, as a whole. [Applicant's Exhibit 16.]

iii.    Nguyen sets forth the homicide rates for the neighborhoods between 1965 and 1995. [Applicant's Exhibit 16.]

b.    Prevailing professional norms did not require trial counsel to retain a witness such as Nguyen to present the statistics and maps she offers in this habeas proceeding.

c.    Evidence at trial showed that Applicant grew up in a two-parent, two-income home [RR 38: 108-09, 111, 115; RR 39: 186-87]; Applicant spent the majority of his childhood as part of a close-knit, supportive, hard-working, church-going family in a nice house in a good neighborhood that one witness described as "a Utopia" [RR 38: 26-28, 38, 57, 73-74, 90, 107-09, 111, 115, 154, 181-82]; and poverty was never an issue for the Ricks' family. [RR 38: 179; RR 39: 214, 219.]

d.    Applicant refers to information in Hall's affidavit about the 1977 rape and murder of an eleven-year-old girl who lived above Geraldine Sanders and Booker, but there is no evidence that Applicant, who was about three years old at the time, was ever aware of the crime or that it had any impact whatsoever on him. [Application at 60-61; Applicant's Exhibits 18, 19.]

1924



  e. Any application of Nguyen's facts and statistics to Applicant would have been wholly speculative and irrelevant and would not have added anything of significant benefit to Applicant's case.

  f. Applicant fails to meet his burden to prove that his trial counsel acted below an objective standard of reasonableness under prevailing professional norms by not retaining an expert to present the type of evidence proffered by Nguyen in this habeas proceeding.

  g. Applicant makes no attempt to meet his burden to prove a reasonable probability that testimony about the matters contained in Nguyen's habeas affidavit would have persuaded the jury to answer the mitigation special issue "yes" instead of "no."

34. Applicant asserts that trial counsel should have informed the jury about his potential lead exposure in his neighborhoods. [Application at 61-68.]

  a. Applicant's "arguments" consist of quotes from findings contained in the habeas affidavits of Nguyen and Felicia A. Rabito, Ph.D., an epidemiologist with expertise in childhood lead exposure. [Application at 61-67; *see* Applicant's Exhibits 16, 17, 22.]

  b. Neither Nguyen nor Dr. Rabito met with Applicant.

  c. Applicant's assertions with regard to *potential* lead exposure are entirely speculative; there is no evidence that Applicant was exposed to lead or that he suffers the effects of childhood exposure to lead. [Application at 61-67; Dr. Price's affidavit at 21-22.]

  d. The defense's retained psychological team and medical doctor reviewed Applicant's medical records to assist in discovering any organic or other disabilities that trial counsel did not know about or that had not been diagnosed. [Gordon's affidavit at 2.]

  e. Trial counsel found no evidence during their investigations and evaluations that Applicant was exposed to lead paint or suffered from lead poisoning. [Gordon's affidavit at 3; Ray's affidavit at 6.]

<center>27</center>

f.   Applicant fails to show that an investigation into lead exposure would have uncovered potentially mitigating evidence.

g.   Applicant fails to meet his burden to prove that trial counsel acted outside the wide range of reasonable professional assistance under prevailing professional norms by not presenting the speculative evidence contained in Nguyen's or Dr. Rabito's affidavits.

h.   Applicant fails to meet his burden to prove that introduction of the speculative evidence contained in Nguyen's or Dr. Rabito's affidavits would have been relevant, much less that it would have had a reasonable probability of persuading the jury to answer the mitigation special issue differently.

35.   Applicant complains that his trial counsel did not present expert testimony explaining why the various aspects of his early life "were significant to [his] psychological makeup and development." [Application at 68-80.]

a.   Applicant relies on affidavits from Dr. Joann Murphey, a clinical psychologist, and Dr. John Fabian, a forensic and clinical psychologist and neuropsychologist, regarding various *potential* diagnoses or issues that allegedly could have pursued in light of Applicant's history. [Application at 68-80; Applicant's Exhibits 24, 33.]

b.   Neither Dr. Fabian nor Dr. Murphey met with Applicant or conducted a face-to-face evaluation of him. [Applicant's Exhibits 24, 33; Dr. Price's affidavit at 18-19.]

c.   Drs. Murphey and Fabian rely solely on their discussions with Applicant's habeas counsel and habeas mitigation specialist and a review of documents provided by habeas counsel. [Applicant's Exhibits 24, 33.]

d.   "The importance of a clinical interview is well recognized as paramount to the process of a complete and comprehensive psychological/neurpsychological evaluation." [Dr. Price's affidavit at 19.]

28

1926



e.   The ethical principles applicable to the practice or psychology require a licensed psychologist providing a professional opinion about an individual without conducting a face-to-face evaluation to document the limits this places on the reliability and validity of the conclusions. [Dr. Price's affidavit at 19.]

f.   Neither Dr. Fabian nor Dr. Murphey indicate how their opinions might be different had they conducted face-to-face evaluations of Applicant. [Applicant's Exhibits 24, 33.]

g.   The opinions of Drs. Fabian and Murphey are based, at least in part, on habeas affidavits of persons who were undiscovered by trial counsel and on facts which those who did speak to trial counsel failed to disclose [*see* Applicant's Exhibits 24, 33]; therefore, neither doctor's affidavit reflects the testimony or opinions that they or any other expert would have been able to provide at the time of Applicant's trial.

h.   Dr. Price, a highly qualified clinical and forensic psychologist and neuropsychologist, reviewed the extensive trial and habeas records and conducted a face-to-face evaluation of Applicant on May 14, 2014, at the State's request. [Dr. Price's Affidavit at 1-2.]

i.   Dr. Price's opinion – which is based on "a combination of all available data at the time of this report, including a review of the records, a 2.5-hour face-to-face examination of [Applicant] in the Tarrant County Jail on 5/14/14, [his] training and experience in clinical-forensic psychology and neuropsychology, and a reasonable degree of scientific psychological and neuropsychological certainty" – is more reliable and valid and carries greater weight than the opinions and conclusions of Drs. Fabian and Murphey, which are based on more limited data without the opportunity to interview Applicant. [Dr. Price's affidavit at 19-20.]

j.   Drs. Murphey and Fabian set forth aspects of Applicant's history which they claim are manifestations of his prenatal exposure to alcohol. [Applicant's Exhibits 24, 33.]

29

1927

k.   The only evidence of Applicant's prenatal exposure to alcohol is found in the habeas affidavits of Applicant's family members who failed to disclose Helen Ricks' alleged alcohol consumption during her pregnancy with Applicant when they talked to members of the defense team before trial. [Applicant's Exhibits 3, 4, 5.]

l.   Applicant's conduct issues throughout childhood, his history of behavioral outbursts, and his poor emotional regulation discussed by Dr. Fabian are not specific to Fetal Alcohol Spectrum Disorder (FASD), are unlikely related to FASD, and can be accounted for by other potential diagnoses or explanations. [Dr. Price's affidavit at 21; *see* Applicant's Exhibit 33.]

m.   "Taken altogether, there are other potential explanations for [Applicant's] behavioral/emotional symptoms and his neuropsychological testing results (which are largely low average to average) did not reveal any findings consistent with the pattern of neuropsychological deficits typically seen in the context of FASD." [Dr. Price's affidavit at 21.]

n.   The thirty-eight-point discrepancy between Applicant's verbal and nonverbal abilities on IQ testing conducted when he was twelve years old is not, as Dr. Murphey suggests, persuasive evidence for the possibility of Alcohol-Related Neurodevelopmental Disorder (ARND) and "is not likely to be representative of a discrepancy in his actual abilities due to prenatal alcohol exposure" because such discrepancy was not observed on Dr. McGarrahan's more recent and more reliable evaluation. [Dr. Price's affidavit at 20; *see* Applicant's Exhibit 24.]

o.   Although Dr. Murphey cites Applicant's academic challenges in math as being consistent with complications secondary to prenatal alcohol exposure, "subsequent evaluations failed to identify math as an area of weakness for [Applicant], as his math abilities were measured as average across several assessments," and his history of special education in math "appears to be due to his behavioral/emotional difficulties rather than a learning disability." [Dr. Price's affidavit at 20-21.]

30

1928

p.  Although Drs. Murphey and Fabian discuss Applicant's alleged *potential* childhood lead exposure, Dr. Price's evaluation of Applicant and the available records revealed no objective evidence confirming that Applicant was exposed to lead or that he suffers from the effects of childhood lead exposure. [Dr. Price's affidavit at 21-22.]

q.  Dr. Price is aware of no way to conclusively link Applicant's conduct, emotional, and academic difficulties to lead exposure. [Dr. Price's affidavit at 22.]

r.  While Applicant's alleged family history of mental illness would increase his risk of mental illness "to a degree, the mechanism of this increase is not currently understood and likely reflects a complex interplay of depositional, environmental, and genetic factors"; it is unclear to what extent Applicant's emotional and behavior difficulties may be related to heredity of mental illness. [Dr. Price's affidavit at 22.]

s.  Although Dr. Fabian proffers ADHD as a diagnostic consideration for Applicant, it is unclear whether Applicant's oppositional behavior, defiance, and hostility fully account for the behavioral symptoms discussed by Dr. Fabian; "thus, ADHD remains a diagnostic possibility but cannot be confirmed." [Dr. Price's affidavit at 22.]

t.  Although Dr. Fabian attributes symptoms of mood lability, paranoia, and grandiosity reported by others to a suspected diagnosis of bipolar disorder, "these symptoms also overlap with other conditions, including a personality disorder, which may have been emerging as [Applicant] was entering adulthood." [Dr. Price's affidavit at 22-23.]

u.  Dr. Sudhir Gokhale, a psychiatrist who treated Applicant during acute symptom presentation requiring psychiatric hospitalization and outpatient treatment, diagnosed Applicant with an adjustment disorder and documented symptoms consistent with a personality disorder; he never indicated that Applicant met the criteria for bipolar disorder. [Dr. Price's affidavit at 23.]

31

1929

v.  Although Applicant was prescribed lithium (a common mood stabilizer for treatment of bipolar disorder), the medication is sometimes used for symptoms related to aggression or irritability that can occur in a range of other psychiatric conditions. [Dr. Price's affidavit at 23.]

w.  Applicant's mood swings, poor emotional regulation, impulse control difficulties, manipulation, irritability, grandiosity, and mild transient paranoia are more likely reflective of a personality disorder, not bipolar disorder; this conclusion is supported by Applicant's PCL-R score in the range consistent with psychopathy and his personality testing results indicating a number of problematic personality traits. [Dr. Price's affidavit at 23.]

x.  Applicant does not appear to be experiencing symptoms of Post-Traumatic Stress Disorder (PTSD), which makes this diagnosis raised by Drs. Fabian and Murphey unlikely. [Dr. Price's affidavit at 23.]

y.  Applicant's history of running away and his irritability, which Dr. Murphey notes as symptoms of PTSD, are also compatible with conduct disorder. [Dr. Price's affidavit at 23.]

z.  Although Drs. Fabian and Murphey suggest that Applicant likely suffered from a learning disorder, there is no evidence that his special education was due to a history of learning disabilities or cognitive impairment; his school records suggest that his need for special education was due to his behavior disturbance, and his performance on achievement tests were within normal limits across academic areas. [Dr. Price's affidavit at 24; *see* Applicant's Exhibits 24, 33.]

aa.  Dr. Murphey notes that protracted family violence can have lasting neuro-cognitive effects, but, as Dr. Price points out, the "research on this issue has been mixed":

> While environmental factors certainly play a role in an individual's development, understanding the relationship between early life experience and actions later in life has proved challenging. Research into the impact of childhood maltreatment has found that adult antisocial acts

32

can be related to genetic influences interacting with environmental factors in some instances. Specifically, research has demonstrated increased rates of violence among adults who experienced maltreatment during youth and were also of the low MAOA genotype when this group was compared to adults who were maltreated as children but who had the high MAOA genotype as well as those who were not maltreated (regardless of MAOA genotype). While this research certainly is compelling and an important step in understanding violent behavior, the model is too simplistic and cannot account for the multitude of known and unknown factors that contribute to violent actions. For example, the limited variance that is explained by MAOA genotype and history of maltreatment (antisocial acts were committed by members of all groups in the above analyses) places significant restrictions on the utility of such a model to predict or understand violent behaviors in individual cases. Highlighting this complexity, DNA analysis performed during the initial trial found that [Applicant's] MAOA genotype was "high" which has been associated with lower rates of violent behavior, despite [Applicant's] longstanding history of repeated violent acts, although his serotonin transporter genotype (5HTT) has been associated with increased risk of violence (Reif et al., 2007) as well as depression and suicidality (Bernet et al., 2007).

... Animal studies have found that the experimental stress conditions can result in reduced hippocampal volumes in animal models, though causal implications [have] been more elusive in humans. In one study that aimed to address this issue, hippocampal size among twins discordant for history trauma and PTSD severity found decreased hippocampal size in both sets of twins with more severe PTSD, indicating that decreased hippocampal size was a risk factor for development of PTSD rather than a consequence of PTSD (Gilbertson et al., 2002).

33



> Therefore, while neurocognitive deficits may correlate with exposure to protracted family violence this relationship cannot be attributed to causation given the current state of the literature.

[Dr. Price's affidavit at 24-25.]

bb.  Applicant meets the DSM-5 criteria for antisocial personality disorder, and he periodically suffers from depression and possible alcohol/substance abuse, which are common comorbid conditions with antisocial personality disorder. [Dr. Price's affidavit at 23-24.]

cc.  Although the features of Applicant's history discussed by Drs. Fabian and Murphey are relevant to Applicant's psychological functioning (particularly his early experiences), "these aspects of [Applicant's] history cannot be causally linked with the instant offense." [Dr. Price's affidavit at 25.]

dd.  Applicant offers no evidence that he has been actually diagnosed with any of the conditions discussed in the affidavits of Drs. Fabian and Murphey.

ee.  Applicant fails to show how the defense team's inquiry into any of the matters speculated on by Drs. Fabian And Murphey would have yielded any evidence of mitigating value.

ff.  Applicant fails to meet his burden to prove that trial counsel acted outside the wide range of reasonable professional assistance under prevailing professional norms in investigating or presenting potential mitigating evidence and in making strategic decisions about what evidence or expert witnesses to present at trial.

gg.  Applicant makes no attempt to meet his burden to prove a reasonable probability that the presentation of expert witnesses such as Drs. Fabian and Murphey and the speculative matters discussed in their affidavits would have persuaded the jury to answer the mitigation special issue "yes" instead of "no."

34

1932



36.   Applicant's trial counsel acted well within the wide range of reasonable professional assistance in conducting a thorough mitigation investigation.

37.   Trial counsel made reasonable strategic decisions based on all of the relevant mitigating evidence they discovered during their thorough investigation to explain and demonstrate through Applicant's life-long history of behavioral problems and through state-of-the-art scientific testing that Applicant had a bad brain from birth, that his environment may have contributed to his problems, and that he had no control over his life-long impulsivity, violence, and aggression.

38.   Applicant's habeas allegations impermissibly second-guess what his trial counsel allegedly did not do while largely ignoring the scope of the investigation and mitigation case they developed, even when faced with a lack of full candor or cooperation from Applicant and his family members.

39.   The basis of Applicant's current claim – essentially that trial counsel should have investigated more, called more expert or lay witnesses to testify, or asked the called lay witnesses different questions in order to develop essentially the same defense theories already presented – is unpersuasive and does not support his claims of ineffective assistance.

40.   In many instances, facts and themes similar to those that Applicant faults his trial counsel for not presenting were developed at Applicant's trial.

41.   Any evidence that was not introduced at Applicant's trial or that is not cumulative of the evidence presented was not so powerful, compelling, or significant that it would have convinced the jury to answer the mitigation special issue differently.

42.   Simply setting forth facts and evidence under a broad allegation that trial counsel should have done something different, standing alone, falls far short of what is required for Applicant to meet his burden to prove either deficient performance or resulting prejudice as required to establish his claim of ineffective assistance of counsel.

35

1933

43.  Applicant fails to meet his burden to prove that trial counsel were in any way deficient in connection with their investigation and presentation of mitigating evidence at trial.

44.  Applicant makes no effort to meet his burden to prove a reasonable probability that he would have been sentenced to life without parole instead of death had his trial counsel done everything in the manner he now claims they should have.

45.  In light of the overwhelming weight of the extensive aggravating evidence presented at trial, Applicant cannot prove that the addition to his mitigation case of any, or even all, of the evidence he cites would have persuaded the jury to answer the mitigation special issue "yes" instead of "no."

## Conclusions of Law

1.  A defendant has a Sixth Amendment right to reasonably effective assistance of counsel. U.S. CONST. amend. VI; *see Strickland v. Washington*, 466 U.S. 668, 686 (1984).

2.  In order to prove a claim of ineffective assistance, an applicant must show by a preponderance of the evidence: (a) deficient performance of trial counsel; and (b) the deficiency prejudiced the defense. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Strickland*, 466 U.S. at 687; *Perez v. State*, 310 S.W.3d 890, 892-93 (Tex. Crim. App. 2010); *Ex parte Briggs*, 187 S.W.3d 458, 466 (Tex. Crim. App. 2005).

3.  To establish deficient performance under the first *Strickland* prong, an applicant must identify the acts or omissions of counsel that are alleged to constitute ineffective assistance and affirmatively prove that counsel's representation "fell below an objective standard of reasonableness" under prevailing professional norms. *Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466. He must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *State v. Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008); *Ex parte Ellis*, 233 S.W.3d 324, 330 (Tex. Crim. App. 2007).

1934

4.  An applicant who succeeds in proving deficient performance must then satisfy the second *Strickland* prong by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Flores*, 387 S.W.3d 626, 633 (Tex. Crim. App. 2012); *Ex parte Ramirez*, 280 S.W.3d 848, 852 (Tex. Crim. App. 2007). A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 694. An applicant must affirmatively prove prejudice, and it is not enough to show that the errors of counsel had some conceivable effect on the outcome of the proceedings. *Id.* at 693; *Ex parte Flores*, 387 S.W.3d at 633.

5.  An applicant bears the burden to prove that he received ineffective assistance of counsel. *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). Such a claim must be proven by a preponderance of the evidence. *See Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002).

6.  An applicant must meet his burden to prove ineffective assistance of counsel with more than unsubstantiated or conclusory statements. *United States v. Turcotte*, 405 F.3d 515, 537 (7th Cir. 2005). An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Ex parte Varelas*, 45 S.W.3d 627, 629 (Tex. Crim. App. 2001); *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

7.  Reviewing courts must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ex parte Ellis*, 233 S.W.3d at 330; *see Ex parte Flores*, 387 S.W.3d at 633-34 ("Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight").

8.  "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 690-91).

37

1935



9.   "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 521-22 (quoting *Strickland*, 466 U.S. at 691).

10.  Counsel is not required to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. *Wiggins*, 539 U.S. at 533. "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

11.  In evaluating an attorney's judgments about whether to pursue evidence, courts must consider "whether the known evidence would lead a reasonable attorney to investigate further" and apply a "heavy measure of deference to [an attorney's] judgments" about whether additional evidence might be adduced by further investigation. *Wiggins*, 539 U.S. at 527.

12.  To the extent an investigation revealed that further research would not have been profitable or would not have uncovered useful evidence, counsel's failure to pursue particular lines of investigation may not be deemed unreasonable. *Strickland*, 466 U.S. at 690-91.

13.  Though not dispositive, the level of cooperation of the accused with his counsel may be taken into account in assessing whether counsel's investigation was reasonable. *Ex parte Martinez*, 195 S.W.3d 713, 728-29 (Tex. Crim. App. 2006).

14.  The decision whether to call a particular witness is a trial strategy and a prerogative of trial counsel. *See Brown v. State*, 866 S.W.2d 675, 678 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd); *Weisinger v. State*, 775 S.W.2d 424, 427 (Tex. App.—Austin 1989, pet. ref'd).

15.  "The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel." *Waters v. Thomas*, 46

38



F.3d 1506, 1514 (11th Cir. 1995). "The test for ineffectiveness is not whether counsel could have done more; perfection is not required." *Id.* at 1518.

16. Trial counsel thoroughly investigated Applicant's background for mitigation purposes and called all of the available witnesses who could provide relevant, beneficial evidence, and their actions fall within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689; *Moore v. Johnson*, 194 F.3d 586, 591-92 (5th Cir. 1999).

17. Trial counsel made a well-reasoned strategic decision based on a thorough investigation, their professional judgment, the available witness testimony, and their reliance on well-qualified experts about how to best present Applicant's case to the jury. *See Miller v. Lynaugh*, 810 F.2d 1403, 1410 (5th Cir. 1987) ("the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain") (quoting *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)).

18. Trial counsel were not ineffective for failing to present evidence that was largely cumulative of the testimony presented at trial. *Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007); *see Beuke v. Houk*, 537 F.3d 618, 645 (6th Cir. 2008) (no prejudice in failing to present cumulative mitigation evidence; to establish prejudice, new evidence must differ in substantial way in strength and subject matter from evidence actually presented at sentencing).

19. Any evidence that was not introduced at Applicant's trial or that is not cumulative of the evidence presented was not so powerful, compelling, or significant that it would have convinced the jury to answer the mitigation special issue differently. *See Beuke*, 537 F.3d at 645 (to establish prejudice, new evidence presented in habeas proceeding must differ in substantial way in strength and subject matter from evidence actually presented at sentencing).

20. Applicant fails to prove that trial counsel's failure to locate any of the witnesses whom they did not find resulted from an inadequate investigation that fell outside the wide range of professionally competent assistance. *See Rompilla*, 545 U.S. at 383 (counsel not forced to "scour the globe on the off chance something will turn up"); *Payne v. Allen*, 539 F.3d 1297, 1317 (11th Cir. 2008) (test for reasonableness not whether counsel could have done



something more or different; an applicant must show counsel's performance fell outside wide range of professionally competent assistance).

21.  Applicant cannot fault trial counsel in hindsight for failing to uncover potential witnesses who were never mentioned by Applicant or his family members despite ample opportunity to do so. *See Ex parte Martinez*, 195 S.W.3d at 728 (failure to present alleged sexual abuse "is borne primarily by applicant, as he had ample opportunity to divulge this evidence to his lawyer and at least one of his agents before trial"); *Id.* at 737 (Hervey, J., concurring) (a defendant facing death penalty "has some obligation to assist his trial counsel in investigating his background information. When such a defendant is not forthcoming with this information, he risks that it will not be presented at trial"); *Perez v. State*, 5 S.W.3d 398, 400 (Tex. App.—Houston [14th Dist.] 1999, no pet.) ("[e]ven the most efficacious trial attorney must depend on the client to provide factual information that will aid in the defense").

22.  Simply setting forth facts and evidence under a broad allegation that trial counsel should have done something different, standing alone, falls far short of what is required for Applicant to meet his burden to prove either deficient performance or resulting prejudice. *See Miller v. Dretke*, 420 F.3d 356, 362 (5th Cir. 2005) (applicant must allege with specificity what investigation would have revealed and how outcome would change); *Turcotte*, 405 F.3d at 537 (applicant must meet burden with more than unsubstantiated or conclusory statements).

23.  Trial counsel's failure to investigate or discover potential diagnoses discussed in habeas affidavits submitted by Applicant was not ineffective because there is no evidence that the defense's retained highly-qualified professionals gave counsel any indication that such matters might exist or lead to relevant mitigating evidence. *See Campbell v. Coyle*, 260 F.3d 531, 555 (6th Cir. 2001) (failure to investigate and discover PTSD not ineffective when clinical psychologist failed to make such diagnosis).

24.  Applicant's habeas allegations impermissibly second-guess what his trial counsel allegedly did not do while largely ignoring the scope of the thorough investigation and mitigation case they developed, even when faced with a lack of full candor or cooperation from Applicant and his family members. *See Ex*

40

1938

*parte Flores*, 387 S.W.3d at 633-34 (counsel's performance judged by totality of circumstances, not through 20/20 hindsight).

25.    Many of Applicant's complaints constitute an impermissible second-guessing of the manner in which his experienced trial counsel chose to present Applicant's mitigation case at trial, but such arguments do not support an allegation of ineffective assistance. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight"); *Ex parte Flores*, 387 S.W.3d at 633-34 ("Both prongs of the *Strickland* test are judged by the totality of the circumstances as they existed at trial, not through 20/20 hindsight"); *Ex parte Ellis*, 233 S.W.3d at 330 (reviewing courts must be highly deferential to trial counsel and avoid deleterious effects of hindsight).

26.    The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance. *Scheanette v. State*, 144 S.W.3d 503, 510 (Tex. Crim. App. 2004).

27.    The basis of Applicant's current claims – essentially that trial counsel should have investigated more, called more expert or lay witnesses to testify, or asked the called lay witnesses different questions in order to develop essentially the same defense theories already presented – are unpersuasive and fail to establish his ineffective-assistance claims. *See Smith v. Cockrell*, 311 F.3d 661 (5th Cir. 2002) (courts "must be particularly wary of 'arguments that essentially come down to a matter of degrees'" involving questions of whether counsel investigated enough or presented enough mitigating evidence; "[t]hose questions are even less susceptible to judicial second-guessing").

28.    Applicant's "arguments" consist mainly of bare recitations of the facts contained in his various habeas exhibits without argument or explanation to demonstrate exactly how trial counsel acted outside the wide range of reasonable professional assistance under prevailing professional norms in conducting their mitigation investigation or in making their strategic decisions about how to most effectively investigate and present Applicant's mitigation case. *See Wiggins*, 539 U.S. at 521; *Ex parte Briggs*, 187 S.W.3d at 466.

29.    Applicant has not overcome the strong presumption that the conduct of his trial counsel fell within the wide range of reasonable professional assistance,

41



and his claims are not firmly founded in the record. *See Ex parte Varelas*, 45 S.W.3d at 629 (allegations of ineffectiveness must be firmly founded in the record).

30.    Applicant makes no effort to prove a reasonable probability that the jury would have answered the mitigation special issue differently had trial counsel done everything Applicant alleges they should have; therefore, he has failed to meet his burden to prove prejudice by a preponderance of the evidence. *See Ex parte Medina*, 361 S.W.3d 633, 644 (Tex. Crim. App. 2011) (proving prejudice "mandates a fact-intensive and exhaustive review of the proceedings as a whole"; because an applicant bears the burden, "the courts are not responsible for delving into the record, investigating the case, and then formulating a habeas applicant's claims").

31.    Applicant's claims that his trial counsel rendered ineffective assistance are not firmly founded in the record. *See Scheanette*, 144 S.W.3d at 510 (claim of ineffective assistance must be firmly founded in record).

32.    The Court recommends that Applicant's first claim for relief be denied.

<div align="center">

**II.**
**Claims Two and Three**

</div>

Applicant alleges that his appearance in shackles before the jury violated due process and that his trial counsel were ineffective for not objecting to his appearance in shackles in front of the jury. [Application at 81-88.]

**Findings of Fact**

1.    Applicant's trial counsel filed a pretrial Motion to Appear at All Phases of Pretrial and Trial in Civilian Clothes and Without Physical Restraints. [CR 1: 171.]

2.    The following pretrial discussion occurred regarding Applicant's motion to appear in civilian clothes and without physical restraints:

<div align="center">

42

</div>

<div align="right">

1940

</div>

[DEFENSE COUNSEL] Number 35, just that the Defendant – of course, when we're not in the presence of the jury, doesn't matter, but in any pretrial or trial matter, we'd ask that the Defendant be allowed to be present in street clothes.

We would also ask that he be – and the Court can certainly explore this. If the Court wants to put a curtain around the tables because the Court feels the Defendant should need to be leg ironed, that's fine, but I just don't want those things to be where the jury's going to see them. He doesn't necessarily have to – he's not handcuffed right now. He's not been a problem for me in this case, or anyone else, as far as I know, and I would just ask that we use the least restraint possible in that regard.

THE COURT: That's granted as to trial. At pretrial, he's here today, and he's not in civilian clothes.

[DEFENSE COUNSEL]: I'm not worried about pretrial, Judge.

THE COURT: Okay.

[RR 5: 74.]

3.    Applicant did not object to the use of shackles before or during the trial proceedings. [CR 1: 171; RR 5: 74.]

4.    Applicant did not request that the Court make specific findings on the record justifying the use of a physical restraint, ask to testify without a physical restraint, or object that the use of a physical restraint violated his due-process rights.

5.    Applicant never entered or exited the courtroom in the jury's presence while wearing shackles.

6.    Three-sided floor-length skirts were placed around the State's and the defense's tables throughout the trial to shield Applicant's shackles from the jury's view. [State's Exhibit 4: Witness Statement of James Hunter Van Zandt

43

1941

("Van Zandt's statement") at 1; State's Exhibit 5: Witness Statement of Randall G. Bannister ("Bannister's statement") at 1.]

7.    Applicant's case is unlike *Deck v. Missouri*, 544 U.S. 622 (2005), where Deck's leg irons, handcuffs, and belly chain were visible to the jury.

8.    Applicant "was well aware that he was not supposed to be seen in front of the jury with shackles on." [Ray's affidavit at 6-7.]

9.    When Applicant decided to testify at the punishment phase of the trial, he was seated at the witness stand outside the jury's presence so that jurors would not see him in shackles. [Ray's affidavit at 7; RR 40: 26-27.]

10.   When Applicant finished testifying, "he got up and paraded back to counsel table before anyone could stop him," which "was a complete surprise" to Ray. [Ray's affidavit at 6.]

11.   Applicant's actions in returning to the defense's counsel table in the jury's presence "were of his own volition" and "caught everyone by surprise." [Ray's affidavit at 6.]

12.   Any exposure of Applicant's shackles to the jury was solely the result of his own volitional conduct of getting up after he testified before anyone could stop him and walking back to the defense table in the jury's presence even though he knew that the jury was not supposed to see him wearing shackles. [Ray's affidavit at 6.]

13.   No one in the courtroom took any action as Applicant walked back to counsel table that would have indicated to the jury that Applicant posed a danger in the courtroom. [RR 40: 85.]

14.   Any potential viewing by the jury of Applicant's shackles as he returned to the defense table would have been brief as evidenced by the State's accurate diagram of the courtroom's measurements. [State's Exhibit 6: Courtroom Diagrams of 371st Judicial District Court.]

44

1942

15.   Neither Ray nor Gordon asked the Court to admonish the jury after Applicant walked from the witness stand to counsel table in the jury's presence before anyone could stop him. [RR 40: 85.]

16.   Ray, not knowing if anyone saw Applicant's shackles, made the sound strategic decision that the best way to handle the matter was not to call attention to the issue by objecting. [Ray's affidavit at 7.]

17.   Two bailiffs who were assigned to Applicant's trial do not recall Applicant walking back to the defense table in the jury's presence after he testified, and no breach-of-protocol report was written to document any such incident, demonstrating that nothing about the occurrence was particularly impactful or memorable. [Van Zandt's statement at 1; Bannister's statement at 1.]

18.   Juror Ladell Barnes' habeas affidavit submitted by Applicant is silent on the issue of Applicant's shackles. [Applicant's Exhibit 29.]

19.   At the time Applicant testified, defense witness Justin Crooks, a detention officer with the Tarrant County Sheriff's Office, had already testified at the punishment phase that he had not experienced any issues with Applicant in the Tarrant County jail during the pendency of this case and that he had not witnessed Applicant acting out or being aggressive, saying anything inappropriate, or acting inappropriately. [RR 38: 170, 172.]

20.   At the time Applicant testified, Crooks had already testified without objection that Applicant remained in his jail cell twenty-three hours a day, that Applicant was the only inmate out on the floor when he came out of his cell, and that Applicant was handcuffed and shackled when he was transported out of the area. [RR 38: 174-75.]

21.   Gordon addressed the issue of Applicant's future dangerousness during closing argument by referring to Crooks' testimony as follows:

> We – Mr. Ray and I, we brought you a jailer who said he saw him twice a week for a year. He reads. He's quiet. He's in his room. Any arguments with you? No, sir. Any fights? No, sir. And like Ray – Mr. Ray pointed out, had there been, had there been, you would have heard about it.

45

1943

[RR 40: 116.]

22.  The State responded without objection to Gordon's closing argument as follows:

> You saw him walk back to counsel table this morning with shackles on. Everywhere he goes in Tarrant County jail, he's shackled and handcuffed. He's not going to be like that in the penitentiary.

[RR 40: 128.]

23.  There is no evidence that the jury was aware of Applicant's shackles during the lengthy proceedings at any time other than when the State briefly referred to them in its punishment-phase closing argument.

24.  Trial counsel could have believed that not objecting to the State's brief jury argument referring to Applicant's shackles was preferable to calling the jury's attention to the matter.

25.  In its full context, the State's jury argument referring to Applicant's shackles was part of a larger argument based on unobjected-to trial testimony that Applicant was handcuffed and shackled whenever he left his housing area in the Tarrant County jail and a response to the defense's previous jury argument that Applicant was not a future danger because he had no disciplinary issues in the Tarrant County jail during the pendency of his trial. [RR 38: 174-75; RR 40: 116, 128.]

26.  The State's jury argument about Applicant walking back to the defense table in shackles was brief, isolated, and simply a reference to Applicant's own volitional conduct in the courtroom in the jury's presence. [RR 40: 128; *see* Ray's affidavit at 6.]

27.  The State's jury argument referring to Applicant's shackles was based on matters before the jury, was in response to the defense's prior jury argument, and was a plea for law enforcement. [RR 40: 116, 128.]

46

28. In light of the State's closing jury argument referring to Applicant's shackles [RR 40: 128], the direct-appeal record was sufficient for Applicant to raise his current due-process complaints rather than waiting to raise them for the first time in this habeas proceeding.

29. The Court did not create the circumstances that placed Applicant's shackles in potential view of the jury and lead to the complained-of State's jury argument.

30. The use of shackles did not prevent Applicant from choosing to testify in his own behalf at the punishment phase of his trial.

31. Applicant's shackles did not inhibit him in any way during his testimony.

32. Applicant's shackles did not undermine the dignity of the judicial process.

33. There is no evidence that Applicant's shackles impeded his ability to communicate with or assist his counsel during the trial.

34. The jury's knowledge through Applicant's own testimony that the State had offered him a life sentence helped to eliminate any potential impact of his shackles on the jury's determination of his character or future dangerousness. [Ray's affidavit at 7; RR 40: 45-46.]

35. The information in the habeas affidavit of Paula D. Cook, Applicant's private investigator, is unpersuasive.

    a. Statements in Cook's affidavit about her alleged conversation with an unnamed Court bailiff who was not in the courtroom during Applicant's trial are hearsay and not based on personal knowledge, and the Court will not consider them in this proceeding. [*See* Applicant's Exhibit 25.]

    b. Contrary to the speculation contained in Cook's affidavit, Applicant's feet were not visible when he sat at counsel table during the trial, and Applicant did not enter or exit the courtroom in shackles in the jury's presence. [*See* Applicant's Exhibit 25.]

c.  Cook's discussion of the distance Applicant would have walked in shackles to the witness stand to testify ignores the fact that Applicant was already seated on the witness stand to testify when the jury entered the courtroom. [*See* Applicant's Exhibit 25.]

36.  Applicant fails to meet his burden to prove that trial counsel acted outside the wide range of reasonable professional assistance under prevailing professional norms in making a strategic decision not to object and call the jury's attention to Applicant's shackles.

37.  Applicant fails to meet his burden to demonstrate a reasonable probability that, but for trial counsel's strategic decision not to object and call the jury's attention to Applicant's shackles, the jury would have answered the special issues differently.

38.  Applicant's shackles did not result in a due-process violation.

## Conclusions of Law

1.  The affidavit of Applicant's habeas investigator is stricken because it is based on hearsay, is speculative, and makes assertions that are not within her personal knowledge. *See* TEX. R. EVID. 602, 801(d), 802.

2.  Applicant's due-process claims, which could have been raised on direct appeal, are not cognizable in this habeas proceeding. *Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1996); *Ex parte Goodman*, 816 S.W.2d 383, 385 (Tex. Crim. App. 1991).

3.  Applicant cannot raise his current due-process complaints for the first time in this habeas proceeding. TEX. R. APP. P. 33.1(a) (contemporaneous-objection rule); *see Ex parte Jimenez*, 364 S.W.3d 866, 882 (Tex. Crim. App. 2012) (applying contemporaneous-objection rule to habeas proceedings); *Wright v. State*, 28 S.W.3d 526, 536 (Tex. Crim. App. 2000) (constitutional error waived by failing to timely object at trial); *see also Threadgill v. State*, 146 S.W.3d 654, 670 (Tex. Crim. App. 2004) (failure to object to jury argument forfeits right to raise issue on appeal); *Taylor v. State*, 279 S.W.3d 818, 821 (Tex. App.—Eastland 2008, pet. ref'd) (failure to object to use of shackles waives subsequent due-process complaint).

48

1946

4.   "[T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints *visible to the jury* absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Deck*, 544 U.S. at 629 (emphasis added).

5.   Applicant cannot benefit in this habeas proceeding from any potential exposure of his shackles to the jury because such exposure, if any, resulted solely from his own volitional conduct. *See Wynn v. State*, 219 S.W.3d 54, 61 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (defendant cannot invite error by choosing to reveal shackles to jury and then complain of it on appeal) (citing *Prystash v. State*, 3 S.W.3d 522, 532 (Tex. Crim. App. 1999) (defendant cannot invite error and then complain of it on appeal)).

6.   The record does not support Applicant's allegations of a due-process violation in light of the fact that the Court took measures to prevent Applicant's shackles from being visible to the jury and any potential exposure of the shackles was due to Applicant's own volitional conduct. *See Deck*, 544 U.S. at 629 (Fifth and Fourteenth Amendments prohibit use of physical restraints *visible to jury* absent trial court determination they are justified by state interest specific to particular trial); *contrast id.* at 625 (Deck shackled with leg irons, handcuffs, and belly chain, all of which were visible to jury throughout trial).

7.   Applicant cannot argue that he was harmed as a result of being shackled because his own volitional conduct caused the circumstances that lead to the jury becoming aware that he was shackled. *See Wynn*, 219 S.W.3d at 61.

8.   Any alleged due-process violation had no effect on the jury's punishment verdict.

9.   Ray's reasonable strategic decision not to object when Applicant returned to counsel table wearing shackles in the jury's presence was within the wide range of reasonable professionally competent assistance. *See Keiser v. State*, 880 S.W.2d 222, 225 (Tex. App.—Austin 1994, pet. ref'd) (failure to object to extraneous-offense evidence to avoid calling greater attention to jury constituted sound trial strategy); *see also Payne*, 539 F.3d at 1317 (test for reasonableness not whether counsel could have done something more or

49

1947



different; applicant must show performance fell outside wide range of professionally competent assistance).

10.   There was no valid objection that trial counsel could have made to the fact that jurors may have viewed Applicant in shackles when Applicant of his own volition walked back to the defense table after he testified and before the jury was removed from the courtroom. *See Parr v. Quarterman*, 472 F.3d 245, 256 (5th Cir. 2006) (counsel not deficient for failing to raise meritless argument); *Ex parte Chandler*, 182 S.W.3d 350, 356 (Tex. Crim. App. 2005) ("reasonably competent counsel need not perform a useless or futile act"); *Mooney v. State*, 817 S.W.2d 693, 698 (Tex. Crim. App. 1991) ("[c]ounsel is not required to engage in the filing of futile motions).

11.   There was no valid objection that trial counsel could have made to the State's jury argument referring to Applicant's shackles because the argument was based on matters before the jury, was in response to the defense's prior argument, and was a plea for law enforcement. *See Freeman v. State*, 340 S.W.3d 717, 727 (Tex. Crim. App. 2011) (proper areas of jury argument include summation of evidence, reasonable deduction from evidence, answer to opposing counsel's argument, and plea for law enforcement); *see also Parr*, 472 F.2d at 256 (counsel not deficient for failing to raise meritless argument).

12.   Applicant has not met his burden to overcome the presumption that the failure of his trial counsel to object to the jury potentially viewing his shackles or to the State's jury argument mentioning the restraint constituted reasonable trial strategy or that the performance of his trial counsel in this regard fell within the wide range of reasonable professional assistance under prevailing professional norms. *See Strickland*, 466 U.S. at 688; *Morales*, 253 S.W.3d at 696.

13.   Applicant has failed to meet his burden to affirmatively prove prejudice by showing a reasonable probability that the jury would have answered either special issue differently had it been unaware that Applicant was shackled during his testimony at the punishment phase of the trial. *See Strickland*, 466 U.S. at 687; *Ex parte Flores*, 387 S.W.3d at 633.

14.   Applicant's allegations that his trial counsel were ineffective for failing to object to his appearance in shackles in the jury's presence or to the State's

50

1948



jury argument at the punishment phase referring to Applicant's shackles are not firmly founded in the record. *See Scheanette*, 144 S.W.3d at 510 (claim of ineffective assistance must be firmly founded in record).

15.    The Court recommends that Applicant's second and third claims for relief be denied.

<div align="center">

**III.**
**Claim Four**

</div>

Applicant alleges that his trial counsel were ineffective for presenting inaccurate testimony about his risk of future dangerousness. [Application at 89-93.] Specifically, he complains that trial counsel should have retained an expert such as Jonathan R. Sorensen, Ph.D., to present actuarial data showing that Applicant's risk of future dangerousness was low instead of having Jeffrey Lewine, Ph.D., testify based on his review of actuarial data that Applicant's risk was "somewhere in the middle." [*Id.*]

**Findings of Fact**

1.    Defense expert Dr. Lewine testified at the punishment phase of trial about neurological and other testing performed on Applicant, the results of which showed Applicant's predisposition toward violence and aggression. [RR 39: 131-33, 145.]

2.    Trial counsel presented evidence at the punishment phase through Dr. Lewine and the State's classification expert that Applicant would pose only a moderate to low risk of future violence if he were sentenced to life without parole rather than death, and counsel reminded the jury of the testimony during closing arguments. [RR 37: 190-97; RR 39: 147-51; RR 40: 117.]

<div align="center">

51

</div>



3. Ray did not believe that showing percentages of low risk for violence would be particularly helpful in this case because Applicant showed no remorse. [Ray's affidavit at 9-10.]

4. In Ray's opinion, "an expert [such as Dr. Lewine] who can show hard facts of a disease or d[y]sfunction of the mind is much better testimony than offering an expert opinion that someone is not a future danger, which appears to be the opinion of Dr. Jon Sorensen." [Ray's affidavit at 9.]

5. The decision to present the testimony of Dr. Lewine, who reviewed actuarial data in the literature, instead of an actuarial expert like Dr. Sorensen, was a matter of sound trial strategy.

6. The fact that Applicant now proffers the testimony of a different expert with different qualifications who may have testified differently or more specifically about Applicant's actuarial risk of future dangerousness is insufficient to satisfy Applicant's burden to prove by a preponderance of the evidence that his trial counsel performed below an objective standard of reasonableness under prevailing professional norms.

7. Dr. Lewine's less complex testimony was likely more easily understood by jurors than the more complicated actuarial projections discussed in Dr. Sorensen's affidavit. [*See* Applicant's Exhibit 27.]

8. The persuasiveness of Dr. Sorensen's calculations of Applicant's future dangerousness would have been open to attack by the State because they do not appear to take into account such matters as Applicant's biological predisposition for aggression and violence, his history of violence, and the facts of his brutal offenses against RS and her young sons. [*See* Applicant's Exhibit 27.]

9. The State proved overwhelming aggravating facts to satisfy its burden to prove beyond a reasonable doubt that Applicant posed a future danger.

10. Prevailing professional norms did not require Applicant's trial counsel to present testimony from an actuary regarding Applicant's risk of future dangerousness if he received a sentence of life without parole instead of death.



11.   Trial counsel performed well within the wide range of reasonable professional assistance under prevailing professional norms in making strategic decisions about what witnesses to call and what evidence to present in their effort to convince the jury that Applicant posed a low risk of future dangerousness if he were sentenced to life without parole instead of death.

12.   Applicant makes no effort to meet his burden to establish a reasonable probability that the jury would have answered the future-dangerousness special issue "no" instead of "yes" had trial counsel called an expert such as Dr. Sorensen to testify. [Application at 89-93.]

13.   There is no reasonable probability that the jury would have answered the future-dangerousness special "no" instead of "yes" had it heard the actuarial calculations contained in Dr. Sorensen's habeas affidavit instead of Dr. Lewine's testimony about the published actuarial data that he had reviewed.

14.   Applicant's ineffective-assistance claims are not firmly founded in the record.

**Conclusions of Law**

1.   The strategic decision of trial counsel to present the testimony of Dr. Lewine, who reviewed actuarial data in the literature, instead of an actuarial expert like Dr. Sorensen was a prerogative of trial counsel. *See Miller*, 810 F.2d at 1410; *Brown*, 866 S.W.2d at 678; *Weisinger*, 775 S.W.2d at 427. This Court will not launch into an examination of the relative qualifications of experts hired and experts who might have been hired. *See Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014).

2.   The fact that Applicant now proffers the testimony of a different expert with different qualifications who may have testified differently or more specifically about Applicant's actuarial risk of future dangerousness is insufficient to satisfy Applicant's burden to prove by a preponderance of the evidence that his trial counsel performed below an objective standard of reasonableness under prevailing professional norms. *See Waters*, 46 F.3d at 1514 (mere fact other witnesses might have been available insufficient ground to prove ineffectiveness of counsel); *Scheanette*, 144 S.W.3d at 510 (fact another attorney may have pursued different tactic insufficient to prove ineffective-assistance claim).

53

1951



3.  Trial counsel performed well within the wide range of reasonable professional assistance under prevailing professional norms in making strategic decisions about what witnesses to call and what evidence to present in their effort to convince the jury that Applicant posed a low risk of future dangerousness if he were sentenced to life without parole instead of death; therefore, Applicant has failed to meet his burden to prove deficient performance of his trial counsel. *See Strickland*, 466 U.S. at 693; *Ex parte Flores*, 387 S.W.3d at 633.

4.  Applicant makes no effort to engage in the "fact-intensive and exhaustive review of the proceedings as a whole" required to prove *Strickland*'s prejudice prong, and this Court is "not responsible for delving into the record, investigating the case, and then formulating [Applicant's] claims." *See Ex parte Medina*, 361 S.W.3d at 644.

5.  Applicant has not met his burden to affirmatively demonstrate that he was prejudiced by the alleged deficient performance of his trial counsel because there is no reasonable probability that the jury would have answered the future-dangerousness special "no" instead of "yes" had it heard the actuarial calculations contained in Dr. Sorensen's habeas affidavit instead of Dr. Lewine's testimony about the published actuarial data that he had reviewed. *See Strickland*, 466 U.S. at 688; *Ex parte Flores*, 387 S.W.3d at 633.

6.  The Court recommends that Applicant's fourth claim for relief be denied.

54

1952

# IV.
## Claim Five

Applicant alleges that the Texas death-penalty statute is unconstitutional because jurors do not understand the penalty-phase instructions. [Application at 94-105.]

### Findings of Fact

1.  Applicant's fifth claim for relief relies in part on juror Ladell Barnes' habeas affidavit detailing his mental processes in reaching a verdict at Applicant's trial. [Application at 103-05; Applicant's Exhibit 29.]

2.  Applicant does not challenge Barnes' qualifications as a juror. [Application at 103-05.]

3.  Barnes' affidavit does not suggest the existence of any influence originating from a source outside of the jury room or other than from the jurors themselves. [Applicant's Exhibit 29.]

4.  Applicant relies heavily on findings by the Capital Jury Project (CJP), which are based on interviews about jurors' experiences and decision-making over the course of death-penalty trials in fourteen states, including Texas. [Application at 96-103.] *See* http://www.albany.edu/scj/13189.php.

5.  Applicant relies on a statistically insignificant sample of jurors from past Texas death-penalty cases. [Application at 100-01.]

6.  Applicant's assertions based on the CJP's findings are contrary to the assumption that the jurors followed the Court's instructions during the trial.

7.  The CJP's results are not persuasive.

8.  Applicant has not identified any court that has adopted or given precedential value to the CJP's findings. [Application at 94-105.]

1953

9.   Texas' death-penalty scheme is comprehensible to jurors.

10.  Texas' death-penalty scheme allows jurors to make a reasoned and informed decision whether to impose a sentence of life without parole or death.

11.  Applicant's arguments attacking Texas' statutory special issues are more suitable for consideration by the Texas Legislature.

12.  Jurors' ability to properly understand and apply the special-issue concepts can be adequately addressed during voir dire and jury argument.

13.  Applicant offers no valid basis to overturn Texas' current death-penalty scheme.

## Conclusions of Law

1.   Barnes' affidavit is inadmissible under TEX. R. EVID. 606(b); therefore, it is stricken from this habeas proceeding. *See* TEX. R. EVID. 606(b); *see also Ex parte Parra*, 420 S.W.3d 821, 827 (Tex. Crim. App. 2013) (refusing based on TEX. R. EVID. 606(b) to consider juror affidavit); *Bjorgaard v. State*, 220 S.W.3d 555, 558 (Tex. App.—Amarillo 2007) (TEX. R. EVID. 606(b) barred trial court from considering contents of juror affidavit describing jurors' collective thought process), *pet. dism'd, improv. granted*, 253 S.W.3d 661 (Tex. Crim. App. 2008).

2.   Applicant's complaints based on the CJP's finding are contrary to the well-established presumption that jurors will follow a trial court's instructions. *See Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983); *see also Jenkins v. State*, 493 S.W.3d 583, 619 (Tex. Crim. App. 2016).

3.   The CJP's results are unpersuasive. *See United States v. Sampson*, 2015 WL 7962394 at *24 (D. Mass. December 2, 2015) (unpublished mem. & order) (discussing flaws rendering CJP's results unpersuasive).

4.   The CJP's findings are not precedent, are not binding upon the courts, and provide no basis to declare Texas' death-penalty statute unconstitutional. *See United States v. Green*, 2008 WL 4000901 at *2 (W.D. Ky. August 26, 2008) (unpublished mem. op. & order) (rejecting request to declare Federal Death

Penalty Act unconstitutional based on CJP's findings); *United States v. Duncan*, 2008 WL 544847 at *1 (D. Idaho February 26, 2008) (unpublished mem. order) (same); *see also United States v. Regan*, 228 F. Supp. 2d 742, 746 (E.D. Va. 2002) (rejecting arguments that findings of death-penalty studies justified invalidating Federal Death Penalty Act).

5.   Texas' death-penalty scheme is constitutional. *See Sonnier v. Quarterman*, 476 F.3d 249, 366-67 (5th Cir. 2007).

6.   The Court recommends that Applicant's fifth claim for relief be denied.

## V.
## Claim Six

Applicant alleges that his trial counsel were ineffective for failing to assert that the term "probability" in the future-dangerousness special issue dilutes the beyond-a-reasonable-doubt standard, relieves the State of its constitutional burden of proof, and renders the beyond-a-reasonable doubt standard a nullity or (at best) a preponderance-of-the-evidence standard. [Application at 106-10.]

## Findings of Fact

1.   The Court's punishment-phase jury charge included the following statutory special issue: "Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?" [CR 1: 513.]

2.   The Court instructed the jury that the State has the burden to prove beyond a reasonable doubt that the answer to the future-dangerousness special issue should be "yes." [CR 1: 513.]

3.   Applicant's trial counsel filed a pretrial "Motion for Order 'In Limine' to Preserve the True and Correct Meaning of 'Probability' in the Future Dangerousness Instruction" and argued at the hearing on the motion that the

57



use of the term "probability" would reduce the State's burden to prove the future-dangerousness special issue beyond a reasonable doubt. [CR 1: 151-54; RR 5: 69-71; Ray's affidavit at 10.]

4. An objection that the use of the term "probability" unconstitutionally lowers the State's beyond-a-reasonable-doubt burden of proof for the future-dangerousness special issue would have been without merit and would have been overruled by the Court.

## Conclusions of Law

1. Applicant fails to establish deficient performance because his trial counsel raised essentially the same challenge to use of the term "probability" that Applicant alleges he should have made. *Strickland*, 466 U.S. at 687 (applicant must prove deficient performance in claim of ineffective assistance).

2. The Court of Criminal Appeals of Texas has repeatedly rejected arguments that the term "probability" unconstitutionally lowers the State's beyond-a-reasonable-doubt burden of proof with regard to the future-dangerousness special issue. *See, e.g., Estrada v. State*, 313 S.W.3d 274, 306 (Tex. Crim. App. 2010); *Rayford v. State*, 125 S.W.3d 521, 534 (Tex. Crim. App. 2003); *Robison v. State*, 888 S.W.2d 473, 481 (Tex. Crim. App. 1994).

3. Even if Applicant's trial counsel had not challenged the use of the term "probability" in the future-dangerousness special issue, Applicant cannot meet his burden to prove deficient performance in failing to raise an issue that clearly lacked merit. *See Ex parte Chandler*, 182 S.W.3d at 356 ("reasonably competent counsel need not perform a useless or futile act"); *Mooney*, 817 S.W.2d at 698 ("[c]ounsel is not required to engage in the filing of futile motions").

4. Even if Applicant could somehow meet his burden to prove deficient performance of trial counsel, he cannot meet his further burden to prove that prejudice resulted from the failure to raise an objection that lacked merit. *See Barrera v. State*, 978 S.W.3d 665, 668-69 (Tex. App.—Corpus Christi 1998, pet. ref'd) (no prejudice resulted from counsel's failure to raise objection that lacked merit).

58

5.   The Court recommends that Applicant's sixth claim for relief be denied.

## VI.
## Claim Seven

Applicant alleges that his trial counsel were ineffective for failing to raise the issue that the definition of "mitigation" is unconstitutionally narrow because it impermissibly instructs jurors to disregard mitigating evidence that is unrelated to a defendant's moral blameworthiness. [Application at 111-16.]

## Findings of Fact

1.   The Court's punishment-phase jury charge included the following statutory special issue:

> Taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, do you find from the evidence that there is a sufficient mitigating circumstance or circumstances to warrant that the sentence of life imprisonment without parole rather than a death sentence be imposed?

[CR 1: 514.]

2.   The Court further instructed the jury that it "shall consider mitigating evidence to be evidence that a juror might regard as reducing the Defendant's moral blameworthiness." [CR 1: 514.]

3.   There would have been no merit to an objection that the mitigation special issue unconstitutionally narrows the jury's discretion to factors concerning only moral blameworthiness.

59

1957

## Conclusions of Law

1.  The Court of Criminal Appeals of Texas has held that the mitigation special issue does not unconstitutionally narrow the jury's discretion to factors concerning only moral blameworthiness. *Roberts v. State*, 220 S.W.3d 521, 534 (Tex. Crim. App. 2007); *Perry v. State*, 158 S.W.3d 438, 449 (Tex. Crim. App. 2004); *Ladd v. State*, 3 S.W.3d 547, 574 (Tex. Crim. App. 1999).

2.  The United States Supreme Court's holding in *Tennard v. Dretke*, 542 U.S. 27 (2004), which was decided under another statutory scheme that did not include the mitigation special issue, does not hold otherwise. *Perry*, 158 S.W.3d at 449.

3.  Applicant's trial counsel were not deficient for failing to raise an issue that so clearly lacked merit. *See Ex parte Chandler*, 182 S.W.3d at 356 ("reasonably competent counsel need not perform a useless or futile act"); *Mooney*, 817 S.W.2d at 698 ("[c]ounsel is not required to engage in the filing of futile motions").

4.  Even if Applicant could establish that his trial counsel were deficient, he cannot meet his further burden to show resulting prejudice because there is no reasonable probability that the outcome of the punishment phase of his trial would have been different had his trial counsel advanced a meritless challenge to the definition of the term mitigation in the jury charge. *See Barrera*, 978 S.W.3d at 668-69 (no prejudice resulted from counsel's failure to raise objection that lacked merit).

5.  The Court recommends that Applicant's seventh claim for relief be denied.

## VII.
### Claims Eight, Nine, and Ten

Applicant alleges that his appellate counsel was ineffective for failing to raise

points of error on direct appeal challenging:

*   the Court's failure to charge the jury on the burden of proof for extraneous offenses at punishment;

1958

- the exclusion of Dr. Lewine's testimony about genetic testing; and

- the denial of his *Batson* motion.

## Findings of Fact

1. Mary B. Thornton was appointed to represent Applicant on direct appeal from his conviction and death sentence in cause number 1361004. [Thornton's affidavit at 1.]

2. Thornton, who is board certified in criminal law, was well qualified to represent Applicant on direct appeal from his conviction and death sentence. [*See* www.texasbar.com.]

3. During the charge conference at the punishment phase of the trial, the Court sustained the State's objection to the inclusion of an extraneous-offense charge requiring proof beyond a reasonable doubt because TEX. CODE CRIM. PROC. art. 37.071 does not require it. [RR 39: 270-72.]

4. In preparing Applicant's direct appeal, Thornton determined that the trial court was not required to instruct the jury on a burden of proof for extraneous offenses in a capital-murder case when the State seeks the death penalty. [Thornton's affidavit at 8-9; *see* CR 1: 513.]

5. The Court held a hearing outside the jury's presence to determine the admissibility of Dr. Lewine's testimony about the results of Applicant's MRI, EEG, genetic testing, evoked potentials testing, and questionnaire-based testing and interview. [RR 39: 9.]

   a. Dr. Lewine agreed that the vast majority of studies relating to the genetics testing used weak statistical samples and were based on patients with schizophrenia (which Applicant does not have) and that his method of extrapolating those studies to persons without schizophrenia is not universally accepted or agreed upon. [RR 39: 48-50, 54-55.]

61

1959



b.   Dr. Lewine was "not certain" if his proposed testimony about genetics testing "technically meet[s] Fry, Daubert criteria." [RR 39: 68-69.]

c.   Dr. Lewine acknowledged that the genetic-testing data was not currently mainstream data within the court system because "some of this work [is] not hard and well-defined as one would like." [RR 39: 51-52.]

d.   Dr. Lewine suggested that the genetic information at issue was not reliable enough to be presented to the jury, and Applicant's trial counsel acknowledged that the "genetic issue" might not be reliable and substantiated by research. [RR 39: 48-55, 68-70, 76.]

6.   The Court excluded Dr. Lewine's proposed testimony about genetics testing, but allowed all of his other proposed findings to be introduced before the jury. [RR 39: 76.]

7.   Dr. Lewine's unreliable genetic-testing evidence would not have assisted Applicant's jury.

8.   Thornton decided, based on her professional opinion after reviewing the trial record and the applicable case law, not to challenge the exclusion of Dr. Lewine's testimony regarding genetic testing because Applicant had failed at trial to establish its reliability and because the Court of Criminal Appeals would not find the error, if any, in excluding the testimony to be harmful. [Thornton's affidavit at 14-18, 22-23.]

9.   Review of the entire record shows that the exclusion of Dr. Lewine's unreliable genetic-testing evidence did not affect Applicant's substantial rights because the defense was not hampered in its ability to develop its argument that Applicant was born with a "bad brain" that made him biologically predisposed to aggression and violence beyond his control. [RR 39: 131-33, 142-45, 155, 157, 160, 170.]

10.   Applicant's trial counsel requested a *Batson* hearing alleging that Applicant was African-American and that the State exercised peremptory challenges on Alicia Stafford, an African-American female, Wanda Stafford, an African-

1960

American female, and Ray Flores, who had a Hispanic surname. [RR 30: 25-26.]

11.    The record reflects the following information regarding the parties' strikes:

    a.    Applicant, but not the State, struck Felicia Hernandez, a Hispanic female, Raymond Bean, an African-American male, and Justin Dawson, who was half Hispanic. [RR 30: 30-31.]

    b.    The State did not strike Ladell Barnes, an African-American male who served on Applicant's jury. [RR 30: 30-31.]

    c.    The State exercised a peremptory challenge on one person with a Hispanic surname and accepted two Hispanics. [RR 30: 34.]

    d.    The State exercised peremptory challenges on two African-Americans and accepted two. [RR 30: 34.]

12.    The Court found that Applicant failed to make a *prima facie* case of racial discrimination because, "just based on the numbers," the State did not strike "a disproportionate number of persons on the prospective jury panel of a cognizable race, minority." [RR 30: 35.]

13.    When Thornton applied the detailed analysis set forth in her habeas affidavit, she "did not believe that the statistics supported an inference of discriminatory intent." [Thornton's affidavit at 28-29, 33.]

14.    Because the defense's argument for discriminatory intent "was based exclusively on the numbers alone," and in light of *Hassan v. State*, 269 S.W.3d 872 (Tex. Crim. App. 2012), Thornton was "compelled" to agree with the Court's decision that Applicant had failed to make a *prima facie* case. [Thornton's affidavit at 33.]

15.    When Thornton looked for other relevant circumstances offered by the defense to demonstrate a *prima facie* case of discrimination, she did not believe the State's questioning of Alicia Stafford for one-and-a-half hours tilted the scales in favor of finding that a *prima facie* case had been made. [Thornton's affidavit at 33.]

16.    Robert Huseman, an experienced prosecutor who represented the State at Applicant's trial, is familiar with the *Batson* case. [State's Exhibit 8: Affidavit of Robert F. Huseman ("Huseman's affidavit") at 1.]

17.    Had the State been called upon at trial or on direct appeal to provide its explanations for striking Alicia Stafford, Wanda Stafford, and Ray Flores, the State would have articulated the reasons stated in Huseman's habeas affidavit. [Huseman's affidavit at 2.]

18.    Given the strong support in the record for the State's proffered facially race-neutral explanations, the Court would not have found that the State's explanations for exercising its peremptory challenges on Alicia Stafford, Wanda Stafford, or Ray Flores were a mere pretext for racial discrimination.

19.    The State did not exercise peremptory challenges on Alicia Stafford, Wanda Stafford, or Ray Flores for racial reasons. [Huseman's affidavit at 2-3.]

20.    Thornton made an objectively reasonable and strategic decision based on her review of the trial record and the applicable law not to raise the meritless claims that Applicant now asserts she should have on direct appeal.

21.    Applicant makes no attempt to conduct a fact-intensive and exhaustive review of the proceedings to demonstrate the prejudice required for an ineffective-assistance claim.

22.    Applicant fails to meet his burden to prove a reasonable probability that he would have prevailed on direct appeal had Thornton raised the claims he now asserts she should have on direct appeal.

## Conclusions of Law

1.    In order to show that appellate counsel was constitutionally ineffective for failing to assign a particular point of error on appeal, an applicant must prove that:    (a) counsel's decision not to raise a particular point of error was objectively unreasonable; and (b) there is a reasonable probability that, but for counsel's failure to raise that particular issue, he would have prevailed on appeal. *Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d 610,

1962

 

623 (Tex. Crim. App. 2009); *Ex parte Santana*, 227 S.W.3d 700, 704-05 (Tex. Crim. App. 2007).

2.     Appellate counsel need not advance every argument, regardless of its merit. *See Ex parte Flores*, 387 S.W.3d at 639; *Ex parte Miller*, 330 S.W.3d at 623-24.

3.     The Court of Criminal Appeals of Texas has long rejected claims that the trial court erred in not charging the jury that the State must prove extraneous offenses beyond a reasonable doubt at the penalty phase of a death-penalty trial. *See, e.g., Garcia v. State*, 57 S.W.3d 436, 442 (Tex. Crim. App. 2001); *Ladd*, 3 S.W.3d at 574-75; *Huizar v. State*, 12 S.W.3d 479, 482 n.3 (Tex. Crim. App. 2000); *Jackson v. State*, 992 S.W.2d 469, 477-78 (Tex. Crim. App. 1999).

4.     Thornton was not deficient for deciding not to raise a meritless point of error complaining that the Court's charge failed to require the State to prove extraneous offenses beyond a reasonable doubt at the punishment phase. *See Ex parte Miller*, 330 S.W.3d at 623-24 (appellate counsel "need not advance *every* argument, regardless of merit" (emphasis in original)); *see also Ex parte Chandler*, 182 S.W.3d at 356 ("reasonably competent counsel need not perform a useless or futile act"); *Mooney*, 817 S.W.2d at 698 ("[c]ounsel is not required to engage in the filing of futile motions").

5.     Applicant cannot meet his further burden to prove that he was prejudiced by Thornton's decision not to raise a meritless point of error complaining that the Court's charge failed to require the State to prove extraneous offenses beyond a reasonable doubt at the punishment phase. *See Barrera*, 978 S.W.3d at 668-69 (no prejudice resulted from counsel's failure to raise objection that lacked merit).

6.     "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702. In order to constitute scientific knowledge which will assist the trier of fact, the proposed testimony must be relevant and reliable. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 720 (Tex. 1998). The reliability

65

requirement focuses on the principles, research, and methodology underlying an expert's conclusions. *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002).

7. Scientific evidence which is not grounded "in the methods and procedures of science" is no more than "subjective belief or unsupported speculation." *Gammill*, 972 S.W.2d at 720. Unreliable evidence is of no assistance to the trier of fact and is therefore inadmissible under rule 702. *Id.*

8. Applicant has not met his burden to prove that Thornton's strategic decision, which was based on her review of the trial record and the applicable law, not to challenge the exclusion of the genetic-testing evidence at issue was objectively unreasonable. *See Ex parte Flores*, 387 S.W.3d at 630.

9. Even if Applicant could prove that Thornton rendered deficient performance by not challenging the exclusion of the genetic-testing evidence, he cannot meet his further burden to prove prejudice because there is no reasonable probability that Applicant would have prevailed on direct appeal if Thornton had raised the issue because exclusion of the evidence was harmless. *See Ex parte Flores*, 387 S.W.3d at 639.

10. The purposeful use of peremptory strikes in a racially discriminatory manner violates the Equal Protection Clause of the Fourteenth Amendment. *Batson v. Kentucky*, 476 U.S. 79, 88-89 (1986); *Guzman v. State*, 85 S.W.3d 242, 245 (Tex. Crim. App. 2002).

11. A three-step analysis guides the evaluation of a defendant's equal-protection challenges to a prosecutor's use of peremptory challenges: (a) the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race; (b) upon such a showing, the burden of proof shifts to the State to provide a race-neutral explanation for striking the veniremembers in question; and (c) the trial court must determine whether the defendant has established purposeful discrimination. *Hernandez v. New York*, 500 U.S. 352, 358 (1991); *Batson*, 476 U.S. at 94-98; *Hassan*, 369 S.W.3d at 875.

12. The ultimate burden of persuasion regarding improper motivation rests with, and never shifts from, the party challenging the peremptory strike. *Purkett v.*

66

1964



*Elem*, 514 U.S. 765, 768 (1995). Even if an error premised on *Batson* is shown, it does not warrant setting aside the judgment of a criminal proceeding on collateral attack if the error had no effect on the judgment. *See Young v. Bowersox*, 16 F.3d 1159, 1160-61 (8th Cir. 1998).

13.  To establish a *prima facie* case, a defendant must show: (a) the State exercised its strikes to exclude members of a cognizable minority group from the venire; and (b) this fact, along with any other relevant facts and circumstances, raises an inference that the State struck the veniremembers because of their race. *See Batson*, 476 U.S. at 96; *Hassan*, 369 S.W.3d at 875. The defendant bears the burden to establish a *prima facie* case of purposeful racial discrimination. *See Tompkins v. State*, 774 S.W.2d 195, 200 (Tex. Crim. App. 1987), *aff'd by an equally divided Court*, 490 U.S. 754 (1989).

14.  If a *prima facie* case is shown, the State must then provide facially race-neutral explanations for striking the veniremembers in question. *Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008) (citing *Purkett*, 514 U.S. at 767-68). A race-neutral explanation is based on something other than the veniremember's race. *See Hernandez*, 500 U.S. at 360. Unless discriminatory intent is inherent in the State's explanation, the offered reason is race-neutral. *Id.*

15.  The third step of the *Batson* inquiry involves evaluating the prosecutor's facially race-neutral explanations to determine if those explanations are genuine or merely a pretext for purposeful discrimination. *Whitsey v. State*, 796 S.W.2d 707, 713 (Tex. Crim. App. 1989). Whether the proponent of the strike intended to discriminate on the basis of race is a question of fact. *Hernandez*, 500 U.S. at 367. The focus of the inquiry is on the genuineness, not the reasonableness, of the asserted nonracial motive. *Nieto v. State*, 365 S.W.3d 673, 676 (Tex. Crim. App. 2012) (citing *Purkett*, 514 U.S. at 769).

16.  Thornton was not required to raise a *Batson* claim for which she saw no merit on direct appeal. *See Ex parte Chandler*, 182 S.W.3d at 356 ("reasonably competent counsel need not perform a useless or futile act").

17.  Applicant has failed to meet his burden to prove that Thornton's professional judgment not to advance a point of error on appeal based on *Batson* was objectively unreasonable. *See Ex parte Flores*, 387 S.W.3d at 639.



18.   Applicant's bare assertion that the appellate court would have found that he established a *prima facie* case and would have abated the appeal for a *Batson* hearing is insufficient to satisfy his burden to demonstrate the required prejudice prong of his ineffective-assistance claim. *See Ex parte Medina*, 361 S.W.3d at 644 (proving prejudice mandates "fact-intensive and exhaustive review" of proceedings as a whole).

19.   Applicant has not met his burden to prove that he suffered prejudice as a result of Thornton's failure to raise a point of error on direct appeal challenging the Court's finding that Applicant failed to establish a *prima facie* case of racial discrimination because there is no reasonable probability that he would have prevailed on direct appeal had Thornton raised such a complaint. *See Ex parte Flores*, 387 S.W.3d at 639.

20.   The Court recommends that Applicant's eighth, ninth, and tenth claims for relief be denied.

## VIII.
## Claim Eleven

Applicant alleges that his death sentence was imposed by an unconstitutionally arbitrary system because geographical and racial disparities have rendered Texas' death-penalty scheme unconstitutional. [Application at 145-54.]

## Findings of Fact

1.   The materials cited and relied on by Applicant do not establish his claim for relief. [Application at 145-54.]

2.   Applicant does not demonstrate that he was singled out for selective prosecution or that the death-penalty statute was applied against him in an unconstitutionally arbitrary or capricious manner. [Application at 145-54.]

68

1966



## Conclusions of Law

1.    Texas' death-penalty scheme satisfies constitutional requirements. *See Sonnier*, 476 F.3d at 366.

2.    Applicant's challenge to the constitutionality of Texas' death-penalty scheme based on the geographic and racial reasons he asserts is without merit. *See Threadgill*, 146 S.W.3d at 671-72 (varying decision-making between counties regarding seeking death penalty does not violate right to equal protection); *Allen v. State*, 108 S.W.3d 281, 285-86 (Tex. Crim. App. 2003) (rejecting disparate-application claim based on county's financial constraints or ability to seek death penalty); *Brooks v. State*, 990 S.W.2d 278, 289 (Tex. Crim. App. 1999) (rejecting claim based on statistical studies that Texas death sentences are disproportionately imposed in racially discriminatory manner).

3.    The materials cited and relied on by Applicant do not establish his claim for relief. *See Brooks*, 990 S.W.2d at 298 (citing *McClesky v. Kemp*, 481 U.S. 179, 296-97 (1987)).

4.    The Court recommends that Applicant's eleventh claim for relief be denied.

WHEREFORE, PREMISES CONSIDERED, the State prays that the Court adopt its proposed memorandum, findings of fact, and conclusions of law and that each of Applicant's claims for relief be denied.

69

1967

Respectfully submitted,

SHAREN WILSON
Criminal District Attorney
Tarrant County, Texas

JOSEPH W. SPENCE
Chief, Post-Conviction

/s/ Helena F. Faulkner
HELENA F. FAULKNER
Assistant Criminal District Attorney
State Bar Number 06855600
401 W. Belknap
Fort Worth, Texas 76196-0201
(817) 884-1687
FAX (817) 884-1672
ccaappellatealerts@tarrantcountytx.gov

## CERTIFICATE OF SERVICE

The State's Proposed Memorandum, Findings of Fact, and Conclusions of Law was e-served on Applicant's habeas counsel Catherine Clare Bernhard at cbernhard@sbcglobal.net on July 24, 2018.

/s/ Helena F. Faulkner
HELENA F. FAULKNER

70

1968

No. C-371-W010796-1361004-A

| EX PARTE | § | IN THE 371ST JUDICIAL |
|---|---|---|
| | § | |
| | § | DISTRICT COURT OF |
| | § | |
| CEDRIC ALLEN RICKS | § | TARRANT COUNTY, TEXAS |

## ORDER

Having carefully reviewed the State's Proposed Memorandum, Findings of Fact, and Conclusions of Law, and having further determined that the proposed findings are supported by the record and that the conclusions are legally sound, the Court hereby orders, adjudges, and decrees that these proposed findings of fact and conclusions of law are adopted as the Court's own. The Court further orders and directs the Clerk of this Court to:

1. File these findings and transmit them along with the Writ Transcript to the Clerk of the Court of Criminal Appeals pursuant to TEX. CODE CRIM. PROC. ANN. art. 11.071, § 9(f).

2. Furnish a copy of this Order to Applicant's attorney, Catherine Clare Bernhard, at cbernhard@sbcglobal.net, or at P.O. Box 2817, Red Oak, Texas, 75154, or at her most recent address by United States mail.

3. Furnish a copy of this Order to the post-conviction section of the Criminal District Attorney's Office.

SIGNED AND ENTERED on this the _____ day of _____, 2018.

_____
JUDGE PRESIDING

1969

D371-W010796-00

FILED
TARRANT COUNTY
7/24/2018 5:06 PM
THOMAS A. WILDER
DISTRICT CLERK

## NO. C-371-W010796-1361004-A

| | | |
|---|---|---|
| EX PARTE | * | IN THE 371ST JUDICIAL |
| | * | DISTRICT COURT |
| CEDRIC ALLEN RICKS | * | TARRANT COUNTY, TEXAS |

### APPLICANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the indigent Applicant, by counsel, and pursuant to Tex. Code Crim. Proc. art. 11.071 § 8(b), submits the following proposed findings of fact and conclusions of law:

### HISTORY OF THE CASE

Cedric Allen Ricks was charged with capital murder in cause no. 1361004 in the 371st Judicial District Court of Tarrant County, Texas. Mr. Ricks' indictment read, in pertinent part, that he did "then and there intentionally or knowingly cause the death of an individual, [A.F], by stabbing him with a knife and did then and there intentionally or knowingly cause the death of an individual, Roxann Sanchez, by stabbing her with a knife and by

1970

strangling her with his hand and hands, and both murders were committed during the same criminal transaction." The offense was alleged to have occurred on May 1, 2013. (I C.R. at 11). Mr. Ricks entered a plea of "not guilty", but was convicted by a jury and subsequently sentenced to death on May 16, 2014. (II C.R. at 526-29).

The Texas Court of Criminal Appeals affirmed Mr. Ricks' conviction and sentence on October 4, 2017, and the United States Supreme Court denied Mr. Ricks' petition for writ of certiorari on April 17, 2018. <u>Ricks v. State</u>, No. AP-77,040 (Tex. Crim. App. October 4, 2017)(not designated for publication), <u>cert. denied</u>, 138 S.Ct. 1553 (2018).

This is Mr. Ricks' first application for a writ of habeas corpus. Mr. Ricks' filed his application June 13, 2016. The State filed its response on December 12, 2016. On June 25, 2018, this Court entered an order pursuant to Tex. Code Crim. Proc. art. 11.071 § 8(a), determining that there exist no controverted, previously unresolved factual issues material to the legality of Mr. Ricks' confinement. Based on a review of the foregoing, the Court now makes the following findings:

Applicant's Proposed Findings of Fact and Conclusions of Law - Page **2** of **38**

1971

# FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I. APPLICANT'S FIRST GROUND FOR RELIEF: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO SUFFICIENTLY DEVELOP AND PRESENT SIGNIFICANT MITIGATING EVIDENCE IN VIOLATION OF CEDRIC RICKS' SIXTH AMENDMENT RIGHT TO COUNSEL.

1.   The Court finds that the testimony presented in the punishment phase of Mr. Ricks' trial described his childhood as largely idyllic. Numerous friends and family members testified that Cedric was raised in a loving and supportive family. Despite this "wonderful life", Cedric was constantly getting into trouble. The overriding theme of the defense at punishment was that "everyone always knew there was something wrong with Cedric." The defense presented the testimony of Dr. Jeffery Lewine in an attempt to show that Mr. Ricks' behavior was driven by biological factors beyond his control.

2.   In capital cases in which the state seeks the death penalty, it is a "well-defined norm" that defense mitigation investigations "should comprise

1972

efforts to discover all reasonably available mitigating evidence." <u>Wiggins</u> <u>v. State</u>, 539 U.S. 510, 524 (2003).

3.   The Court finds that the defense trial team made two trips to Chicago to speak with witnesses and search for documents. (State's Habeas Exhibit 2 - Affidavit of Stephen Gordon at 2; State's Habeas Exhibit 1 - Affidavit of William H. "Bill Ray at 4-5). On one occasion they met with witnesses at the home of Mr. Ricks' parents, Helen and Shedrick Ricks. On another occasion they rented a hotel conference room to meet with witnesses. The defense team asked these witnesses to tell them everything they knew about Cedric– the good and the bad. (State's Habeas Exhibit 1 – Affidavit of William H. "Bill" Ray at 5).

4.   However, the Court finds that these group meetings where witnesses were asked open-ended questions to tell everything they knew did not amount to a sufficiently reasonable mitigation investigation. As a result of this deficient investigation, the trial team missed numerous key aspects of Mr. Ricks' upbringing.

A. THE JURY NEVER HEARD ABOUT HELEN'S DRINKING WHEN SHE WAS PREGNANT WITH CEDRIC.

1973

5. The Court finds that Cedric's mother, Helen Ricks drank heavily on a regular basis when she was pregnant with Cedric. (Applicant's Exhibit 3 – Affidavit of Helen Ricks; Applicant's Exhibit 4 – Affidavit of Joseph Sanders; Applicant's Exhibit 5 – Affidavit of Deborah Sanders).

6. The Court finds that the jury never heard about Helen's drinking because the trial team failed to discover it.

## B. THE JURY NEVER HEARD ABOUT GERALDINE AND BOOKER, CEDRIC'S PRIMARY CARE-TAKERS UNTIL THE AGE OF FIVE.

7. Cedric spent the majority of his time before the age of five, in the care of his maternal aunt, Geraldine Sanders and her boyfriend Booker. Geraldine and Booker lived in an apartment at 6202 S. Vernon Ave and cared for a number of children. Booker drank heavily and sexually assaulted some of the girls in Geraldine's care. (Applicant's Exhibit 3; Applicant's Exhibit 6 – Affidavit of Dwayne Ricks; Applicant's Exhibit 7 – Affidavit of Stephanie Halverson). Cedric's brother Dwayne was also molested by an older girl in Geraldine's care. (Applicant's Exhibit 6).

8. When Cedric misbehaved while in the care of Geraldine, she would whip him with extension cords. (Applicant's Exhibit 8 – Affidavit of Tammy Hall).

9. The Court finds that the trial team did not discover the details of Cedric's early life while in the care of Geraldine because their mitigation investigation was deficient.

10. Shedrick Ricks testified at trial that Cedric was cared for by an aunt while his parents worked. (XXXVIII R.R. at 115). But the trial team made no effort to investigate this aunt or explore what Cedric was subjected to in her care.

11. The Court finds that the trial team's failure to investigate someone who was a primary caretaker of Cedric at a very early and impressionable age, amounted to a deficient mitigation investigation.

## C. THE JURY NEVER HEARD DETAILS ABOUT CEDRIC'S BEHAVIOR PROBLEMS AS A YOUNG CHILD.

12. At trial, the defense presented witnesses that testified about Cedric setting fires as a young boy and getting into trouble at school. (XXXVIII R.R. at 64, 66, 75, 91, 123, XXXIX R.R. at 192-93, 195).

13. However, Cedric's behavior problems started long before he began school. But, the jury never heard the details. His parents both testified that they did not realize the severity of Cedric's problems until he started school. (XXXVIII R.R. at 117; XXXIX R.R. at 192). However, numerous other

1975

friends and relatives realized that Cedric had behavior problems from the time he was a toddler. (Applicant's Exhibit 4 – Affidavit of Joseph Sanders; Applicant's Exhibit 5 – Affidavit of Deborah Sanders). Even other children recognized that Cedric's behavior as a young child was not normal. (Applicant's Exhibit 10 – Affidavit of Tamara Butts; Applicant's Exhibit 7 – Affidavit of Stephanie Halverson).

14. The Court finds that the trial team's failure to adequately investigate Cedric's early life, deprived the jury of significant mitigating evidence about Cedric's behavior as a very young child.

## D. THE JURY NEVER HEARD DETAILS ABOUT CEDRIC'S WHIPPINGS.

15. Although Cedric' mother testified that she occasionally "whipped" Cedric, the details of these "whippings" were never investigated by the trial team.

16. The jury never learned that Cedric was whipped by Helen with belts and extension cords. The beatings were so severe that Cedric's father sometimes had to intervene to stop Helen. (Applicant's Exhibit 6 – Affidavit of Dwayne Ricks; Applicant's Exhibit 3 – Affidavit of Helen Ricks; Applicant's Exhibit 9 – Affidavit of Shedrick Ricks). Cedric even took to

1976

running away from the severe discipline. While still in elementary school, on one occasion he jumped out a window and ran away wearing only his underwear. (Applicant's Exhibit 9 – Affidavit of Shedrick Ricks).

17. The Court finds that the failure of the trial team to adequately investigate the discipline that Cedric was subjected to amounted to deficient performance that deprived the jury of vital mitigating evidence.

E. THE JURY NEVER HEARD DETAILS ABOUT CEDRIC'S PROBLEMS IN SCHOOL.

18. Although the trial team had in their possession numerous letters and notes from teachers concerning Cedric's behavior in school, very little of this information was actually presented to the jury. Cedric's mother did testify that he was constantly getting into trouble at school, but few details were ever provided.

19. The trial team never located or spoke to any of Cedric's teachers who could have provided a detailed account of Cedric's behavior in school.

20. The jury was never told that Cedric spent much of his school years in special education or alternative schools because of his behavioral problems.

21. He constantly had problems following directions and obeying class rules. (Applicant's Exhibit 2 – Affidavit of Mairead Burke).

1977

22. His second grade teacher scheduled weekly phone calls to Cedric's mother to discuss his behavior. (Applicant's Exhibit 2).

23. In fourth grade, Cedric was placed in special education classes because of his behavior issues. (Applicant's Exhibit 2).

24. In fifth grade, Cedric's parents transferred him to a local Catholic school where he continued to have problems. He was suspended for disrupting class and showing disrespect. (Applicant's Exhibit 2).

25. Cedric had to attend summer school in order to be promoted to the 7th grade. The school also advised his parents that he would not be allowed to return to the school unless he received some professional counseling and treatment. Helen and Shedrick took Cedric to Mercy Hospital where he obtained a psychological evaluation and began counseling. However, after a few months his parents discontinued treatment. (Applicant's Exhibit 2).

26. In 7th grade, Cedric transferred back to public school, but continued to have problems. After 7th grade, the local public school determined that they could no longer meet Cedric's special education needs and he was transferred to an alternative school. (Applicant's Exhibit 2).

27. Sharon Speedwell was Cedric's 8th grade teacher at the alternative school. She was never contacted by the trial team but would have been

1978

available to testify. She had valuable first-hand information about Cedric

which the jury should have heard. She recalled:

> I remember Cedric's main problem was that he could not handle being
> in the classroom, and I had to send him to the intervention area to calm
> down to a point where he could return to the classroom. Cedric
> struggled in the classroom because he had a hard time ignoring other
> people and was easily pulled into situations. When I noticed Cedric was
> struggling, first, I tried to help him in the classroom with reminders
> about what he should be doing, a discussion, or some extra support. If
> he could not calm down and control his behavior, then he went to
> intervention. Intervention was a separate room outside the classroom
> where there were specially trained interventionists who worked one-on-
> one to help him calm down and get back in the classroom. Cedric's goal
> was to have a maximum of one intervention in the morning and one
> intervention in the afternoon…. I remember that part of Cedric's plan
> was sending a note home every day to his parents. The notes were brief
> because they were written at the end of the day before kids caught the
> bus. When a note said Cedric had a "good day" it meant that he met his
> goal of having one or less interventions in the morning and one or less
> interventions in the afternoon. If a note said that Cedric has a "difficult
> day" that meant he needed more time in intervention to get back in the
> classroom. There is one note that I wrote that Cedric had four
> interventions in one day; that would've been a difficult day for Cedric.

(Applicant's Exhibit 11 – Affidavit of Sharon Speedwell).

28. By 9th grade, Cedric had transferred back to public high school where he

was again placed in special education classes. He continued to have

discipline problems and was suspended for eleven days during this

school year. (Applicant's Exhibit 2).

1979

29. For 10th grade, Cedric was placed back in regular classes and his behavioral problems continued. One teacher even referred to him as "a hazard to the class". He was suspended for eight days during this school year. (Applicant's Exhibit 2).

30. In 11th grade, Cedric continued to struggle behaviorally, emotionally, and academically. He was suspended for eight days during this school year as well. Teachers continued to report serious concerns about Cedric's daily behavior. (Applicant's Exhibit 2).

31. After Cedric's continued behavioral problems, the school recommended that Cedric be transferred to a therapeutic day school, " a more restrictive environment for students with behavior/emotional disorders". However, Cedric's parents disagreed with this recommendation and Cedric remained in the same public school. (Applicant's Exhibit 2).

32. However, problems continued and Cedric was admitted to Christ Hospital for a month. He continued his schooling there. After that stay he was finally enrolled in the therapeutic day school that school officials had been recommending. (Applicant's Exhibit 2).

1980

33. The Court finds that the jury was not informed about the details of Cedric's schooling, other than to be told that he frequently got in trouble.

34. The Court finds that it is clear that the trial team thought this was important information for the jury to know because they tried to introduce some of the records and notes saved by Cedric's mother. However, because their mitigation investigation failed to uncover any of Cedric's teachers who could speak to his education from personal knowledge, this information was never conveyed to the jury.

35. The Court finds this to be a glaring omission from the mitigation investigation resulting in an incomplete picture presented at trial.

F. THE JURY NEVER HEARD DETAILS ABOUT CEDRIC'S BEHAVIOR PROBLEMS AS A TEEN.

36. Family and friends were prepared to testify about Cedric's paranoia and mood swings as a teenager. (Applicant's Exhibit 6 – Affidavit of Dwayne Ricks; Applicant's Exhibit 10 – Affidavit of Tamara Butts; Applicant's Exhibit 9 – Affidavit of Shedrick Ricks; Applicant's Exhibit 3 – Affidavit of Helen Ricks).

37. The Court finds that the trial team failed to develop this significant information or present it to the jury.

## G. THE JURY NEVER HEARD DETAILS OF CEDRIC'S CONTINUED BEHAVIORAL PROBLEMS AS AN ADULT.

38. Similarly, family and friends were available to testify that Cedric's mood swings and paranoia continued into adulthood. (Applicant's Exhibit 10 – Affidavit of Tamara Butts; Applicant's Exhibit 4 – Affidavit of Joseph Sanders).

39. The Court finds that the trial team failed to develop or present any of this testimony describing Cedric's obvious signs of mental illness.

## H. THE JURY NEVER HEARD ABOUT CEDRIC'S FAMLILY HISTORY OF MENTAL ILLNESS.

40. The jury also never heard about the Ricks' family history of mental illness. Cedric's mother Helen and his brother Dwayne had both been diagnosed with mental health issues. (Applicant's Exhibit 3 – Affidavit of Helen Ricks; Applicant's Exhibit 6 – Affidavit of Dwayne Ricks).

41. The Court finds that a family history of mental illness is a significant part of a complete mitigation investigation for a capital case. The failure of

1982

the trial team to develop this information and present it to the jury amounted to deficient performance.

## I. THE JURY HEARD NOTHING ABOUT THE NEIGHBORHOODS WHERE CEDRIC LIVED BEFORE CALUMET PARK.

42. Prior to moving to Calumet Park in 1976, the Ricks family lived in other areas of Chicago. (Applicant's Exhibit 3 – Affidavit of Helen Ricks).

43. The neighborhoods where Cedric lived before the age of five years had high levels of poverty and crime. This included the neighborhood of his baby-sitter Geraldine Sanders. (Applicant's Exhibit 16 – Affidavit of Amy Brown Nguyen).

44. The Court finds that the trial team failed to investigate these early neighborhoods so the jury never heard about this information.

## J. THE JURY NEVER HEARD ABOUT POTENTIAL LEAD EXPOSURE IN CEDRIC'S NEIGHBORHOODS.

45. Additionally, the jury never heard about high levels of lead exposure in the neighborhoods where young Cedric lived. (Applicant's Exhibit 16 – Affidavit of Amy Brown Nguyen; Applicant's Exhibit 17 – Chicago Department of Public Health lead poisoning data).

46. Nor was the jury educated about the dangers of lead exposure. Dr. Felicia Rabito, or a similar expert, could have explained that "lead is a known environmental toxin which can effect multiple organ systems and is a particular threat to the neurocognitive and behavioral health" of exposed children. The effects of lead exposure are irreversible. Not only does it have negative effects on intellectual and academic achievement, but it can also promote antisocial behavior. (Applicant's Exhibit 22 – Affidavit of Dr. Felicia Rabito).

47. The Court finds that the trial team's failure to uncover this significant environmental risk factor stemmed from the inadequate mitigation investigation that was conducted.

K. THE JURY NEVER HEARD ANYONE EXPLAIN THE PSYCHOLOGOICAL SIGNIFICANCE OF CEDRIC'S LIFE EXPERIENCES.

48. Not only did the jury not hear about many aspects of Cedric's early life, no one explained why these things were significant to Cedric's psychological makeup and development.

49. Dr. Joann Murphey, or another forensically trained psychologist, could have explained that Helen Ricks' heavy drinking during her pregnancy with

1984

Cedric could have resulted in a condition known as Alcohol Related Neuro-developmental Disorder (ARND). "Behavioral indicators for ARND may include behavior and/or cognitive abnormalities inconsistent with typical development, such as leaning difficulties, school problems, poor impulse control, social problems, deficits in higher-level language skills and cognitive / abstracting ability, specific deficits in math skills, and/or problems with memory, attention, or judgment." She noted that several such problems were reported in Cedric's school records, and believed it likely that ARND was a contributing factor to Cedric's early behavioral and academic problems. Dr. Murphey also thought it likely that Cedric suffered from Post-Traumatic Stress Disorder (PTSD) due to his exposure to physical abuse and family violence. She also found support in the records for a potential diagnosis of bi-polar disorder. (Applicant's Exhibit 24 – Affidavit of Dr. Joann Murphey).

50. Dr. John Fabian, a forensically trained neuropsychologist, also thought it likely that Cedric suffered from ADHD and / or a learning disorder. He noted that "the school records document issues with behavioral problems, self-control, and inability to follow rules or directions…and are often the product of both a combination of neurodevelopmental conditions such as

ADHD and learning disability as well as the effects of childhood trauma." He also found evidence to support a diagnosis of bi-polar disorder. (Applicant's Exhibit 33 – Affidavit of Dr. John Fabian).

51. The Court finds the trial team did have a neuropsychologist, Dr. Antoinette McGarrahan, evaluate Cedric. However, Dr. Fabian reviewed the testing that was done and concluded that it was not sufficient to evaluate for PTSD or bi-polar disorder. (Applicant's Exhibit 33 – Affidavit of Dr. John Fabian).

52. The Court finds that the sheer volume of significant mitigating information that was not discovered by the trial team clearly establishes that the trial mitigation investigation that was conducted in this case was substantially incomplete and inadequate.

53. The Court also finds that trail counsel were aware at the time that members of the Ricks family were "not totally forthcoming regarding family history and secrets." (State's Exhibit 2 – Affidavit of Stephen Gordon). This should have prompted the trial team to dig deeper and inquire further. The fact that so much new information was discovered post-conviction shows that this mitigating evidence was discoverable with sufficient effort.

54. "Trial counsel did not discover information about: multigenerational family history, prenatal and childhood exposure to high levels of lead, community violence, exposure to an alcoholic and sexually abusive environment, early childhood physical abuse, exposure to parental substance abuse, inconsistent caretakers, physical abuse at home by both parents, running away from home at an early age, emotional neglect, and a family history of mental illness. Having not discovered this information it was not possible for trial counsel to present this information to the jurors charged with determining Cedric's sentence." (Applicant's Exhibit 2 – Affidavit of Mairead Burke).

55. The Court finds that this inadequate investigation resulted in an inaccurate portrayal of Cedric's life. The jury in this case was told that Cedric had a "wonderful life" and lived in "utopia". Counsel argued that without the loving support of Cedric's family, he "would have been a train wreck a lot earlier." (XL R.R. at 114).

56. The Court finds that even when some mitigating evidence is presented at trial, prejudice is still possible if that evidence is substantially incomplete. The Court finds that Cedric's jury was presented with an incomplete and inaccurate picture of Cedric's life. The Court further finds that had this

1987

additional mitigating evidence been discovered and presented to the jury,

there is a reasonable probability that the result of the proceeding would have

been different.

57. The Court concludes that the failure of the trial team to conduct a

sufficient mitigation investigation and present this information to the jury

deprived Cedric Ricks of his Sixth Amendment right to effective assistance

of counsel.

## II. APPLICANT'S SECOND GROUND FOR RELIEF: THE APPEARANCE OF CEDRIC RICKS IN SHACKLES BEFORE THE JURY VIOLATED DUE PROCESS.

58. The Court finds that Cedric Ricks had his ankles chained during his trial.

There was a skirt on the front and sides of the defense table so that his

chains were not visible to the jury when he was sitting at counsel table.

59. Cedric Ricks testified in the punishment phase. His ankle chain was not

visible to the jury when he was seated on the witness stand. When Cedric

Ricks first approached the witness stand, the jury was not present in the

courtroom. However, when Cedric Ricks walked back to counsel table after

his testimony, the jury was present in the courtroom and his ankle chain was

in full view of all the jurors. (Applicant's Exhibit 6 – Affidavit of Dwayne Ricks; Applicant's Exhibit 25 – Affidavit of Paula Cook).

60. The Court never made any particularized findings about the need for shackles or ankle chains in Cedric Ricks' capital trial.

61. During closing arguments, the prosecutor used the fact that Mr. Ricks was shackled to argue to the jury that Mr. Ricks was a future danger. He stated: "You saw him walk back to counsel table this morning with shackles on. Everywhere he goes in the Tarrant County jail, he's shackled and handcuffed. He's not going to be like that in the penitentiary". (XL R.R. at 128).

62. The Court finds that the appearance of Cedric Ricks in ankle chains in front of the jury during his capital trial violated his due process rights to a fair trial.

## III. APPLICANT'S THIRD GROUND FOR RELIEF: TRIAL COUNSEL WAS INEFFECTIVE FOR NOT OBJECTING TO MR. RICKS' APPEARANCE IN SHACKLES IN FRONT OF THE JURY.

63. When Cedric Ricks walked in front of the jury during the penalty phase of his capital trial, defense counsel did not object or take any actions to prevent

Applicant's Proposed Findings of Fact and Conclusions of Law - Page 20 of 38

this. Nor did counsel object to the prosecutor's closing argument about Mr. Ricks' shackles.

64. Trial counsel explains that he did not object because Mr. Ricks' actions caught counsel by surprise. Mr. Ray stated that at the time, he thought an objection would only have called more attention to the shackles. (State's Exhibit 1 – Affidavit of William H. "Bill" Ray). No explanation was provided for trial counsel's failure to object to the state's closing argument.

65. However, the Court finds that trial counsel could have worded his objection in a way that did not call the jury's attentions to the shackles. Counsel could have asked that Mr. Ricks be instructed to remain on the witness stand while counsel approached the court to discuss a matter.

66. The Court finds that not wanting to draw more attention to the shackles is not a valid strategic reason for failing to object in this situation. And certainly by the time the prosecutor called the jury's attention to the shackles in closing arguments, this explanation holds little weight as an excuse for a failure to object.

67. The Court finds that reasonably competent trial counsel would have objected when Mr. Ricks walked in front of the jury in shackles.

68. The overwhelming evidence in this case established that most of Mr. Rick's

violence was attributable to problems he had in intimate relationships with

females. The defense's punishment argument was that Mr. Ricks would not

be a danger if sentenced to life in prison where it was unlikely that he would

have any intimate relationships with females. (XL R.R. at 115).

69. The appearance of Mr. Ricks in shackles in the courtroom conveyed to the

jury that Mr. Ricks could be a danger in settings outside of intimate

relationships.

70. The Court finds that if counsel had objected to Mr. Ricks' appearance in

shackles there is a reasonable probability that the result of the proceeding

would have been different.

## IV. APPLICANT'S FOURTH GROUND FOR RELIEF: TRIAL COUNSEL WAS INEFFECTIVE FOR PRESENTING INACCURATE TESTIMONY ABOUT MR. RICKS' FUTURE DANGEROUSNESS RISK.

71. Trial counsel presented only one expert witness in the penalty phase. Dr.

Jeffery Lewine, a neuroscientist at MINDSET. Dr. Lewine and his

colleagues conducted numerous tests on Mr. Ricks. Dr. Lewine testified

Applicant's Proposed Findings of Fact and Conclusions of Law - Page 22 of 38

1991

about magnetic resonance imaging date, electroencephalography and

evoked potentials, the results of some behavioral testing, and actuarial risk

factors for violence. Based on his testing, Dr. Lewine concluded that Mr.

Ricks had certain brain abnormalities that were associated with an increased

risk for violence and aggression. (XXXIX R.R. at 118).

72. Dr. Lewine told the jury that he looked at actuarial data on future

dangerousness and concluded that Mr. Ricks was "somewhere in the

middle". (XXXIX R.R. at 148-150). Dr. Lewine admitted that he was not an

actuary, nor had he studied prison populations. (XXXIX R.R. at 34).

73. The Court finds that Dr. Jon Sorensen, or another qualified actuarial expert,

could have told the jury that Mr. Ricks had several characteristics that

suggested he would have a positive adjustment in prison. Factors such as

Mr. Ricks' intellectual ability, educational attainment, employment history,

and the lack of any history of gang associations, all contribute to a higher

likelihood for positive prison adjustment. Using the "group statistical

method" and studies in the field, an actuarial expert could have told the jury

that Mr. Ricks' risk for future violent behavior in prison was actually low.

(Applicant's Exh. 27 – Affidavit of Dr. Jon Sorensen).

74. The Court finds that Dr. Lewine's testimony on Mr. Ricks' actuarial risk assessment was incorrect.

75. Counsel has a duty to seek out experts whose qualifications are specifically tailored to the needs of the case, "rather than relying on an "all-purpose" expert who may have insufficient knowledge or experience to testify persuasively". Commentary to Guideline 10.11 in the American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (2003), reprinted in 31 Hofstra L. Rev. 913, 1061.

76. The Court finds that trial counsel did not consult with an actuarial expert, but nevertheless, presented actuarial testimony from the one expert who testified.

77. Although trial counsel states that he does "not believe that percentages of low risk for violence are particularly helpful when the individual in question has no remorse", (State's Exh. 1), trial counsel, nevertheless, presented testimony about Mr. Rick's risk for violence. Only this testimony was incorrect.

78. The Court finds that when this incorrect testimony was combined with the rest of Dr. Lewine's testimony that Mr. Ricks had an increased risk for

violence, the jury was presented with virtually no reason to believe that Mr. Ricks would not be a future danger.

79. The Court finds that if trial counsel sought to present evidence of an actuarial risk assessment, reasonably effective trial counsel would have sought out a qualified expert. The failure to do so constitutes deficient performance.

80. The Court finds that if the jury had heard that Mr. Ricks' actual risk for violence in prison was low, there is a reasonable probability that the result of the proceeding would have been different.

## V. APPLICANT'S FIFTH GROUND FOR RELIEF: THE TEXAS DEATH PENALTY STATUTE IS UNCONSTITUTIONAL BECAUSE JURORS DO NOT UNDERSTAND THE PENALTY PHASE INSTRUCTIONS.

81. The United States Supreme Court has made it clear that death penalty juries must conduct an individualized determination of the appropriate sentence. They must be able to consider and give effect to relevant mitigating evidence. Lockett v. Ohio, 438 U.S. 586 (1978); Penry v. Lynaugh, 492 U.S. 302 (1989). A capital jury's sentencing discretion must be channeled

1994

by clear and objective standards which provide specific and detailed guidance for the jury and render the capital sentencing process one that can be rationally reviewed. Godfrey v. Georgia, 446 U.S. 420 (1980); Maynard v. Cartwight, 486 U.S. 356 (1988).

82. In order for the death penalty to be administered in a constitutional manner, jurors must be able to understand and apply the instructions they are given in regards to their sentencing decision.

83. The Capital Jury Project conducted research on the decision-making of actual capital jurors in fourteen states, including Texas. This research found that Texas capital jurors fail to understand that they are not only allowed to consider mitigation, but they are required to do so even if it does not excuse or lessen the capital defendants' culpability for the murder. Most jurors failed to understand that the jury did not have to be unanimous about individual mitigating factors before they were allowed to consider them. And over half of all Texas jurors believed mitigating factors had to have been proven beyond a reasonable doubt before they could be considered. (Applicant's Exhibit 28 – William J. Bowers & Wanda D. Foglia, Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing, 39 Crim. L. Bull. 51, 66-71 (2003).

1995

84. The Court finds that the jurors in Mr. Ricks' case were instructed on the statutory special issues in accordance with Tex. Code Crim. Proc. Art. 37.071 § 2. (II C.R. at 117-121). The Court finds that the jurors were voir dired extensively and individually on the meaning of these special issues.

85. During penalty phase deliberations, the jury sent out two notes specifically asking for clarification of these special issues. (II C.R. at 124, 127). The only answer provided by the court to these questions was to tell the jurors to refer to the instructions they already had. (II C.R. at 125, 128).

86. The Court finds that the jury that deliberated Mr. Ricks' fate did not adequately understand the special issues and jurors were operating under an unconstitutional belief that the law required a death sentence.

## VI. APPLICANT'S SIXTH GROUND FOR RELIEF: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THE ISSUE THAT THE USE OF THE TERM "PROBABILITY" IN THE "FUTURE DANGEROUSNESS" SPECIAL ISSUE DILUTES THE REASONABLE DOUBT STANDARD.

87. The Court finds that trial counsel did not file any objections to the use of the term "probability" in the second special issue.

1996

88. The Court finds that this objection should have been raised because the use of the term "probability" in this issue dilutes the reasonable doubt standard and confuses jurors.

89. The Court concludes that the failure to raise this deficiency in the capital murder statute amounted to ineffective assistance of counsel. U.S. Const. amends. VI, VIII, XIV; <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

## VII. APPLICANT'S SEVENTH GROUND FOR RELIEF: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THE ISSUE THAT THE DEFINITION OF "MITIGATION" IS UNCONSTITUTIONALLY NARROW.

90. The Court finds that trial counsel failed to raise a pretrial objection to the definition of mitigating evidence as being unconstitutionally narrow.

91. Art. 37.0711 § 3(f)(3) defines mitigating evidence to be "evidence that a juror might regard as reducing the defendant's moral blameworthiness".

92. The Court finds that this definition unconstitutionally narrows the jury's discretion in sentencing to factors that concern only moral blameworthiness.

Applicant's Proposed Findings of Fact and Conclusions of Law - Page 28 of 38

1997

93. The Court finds that this limited definition was particularly harmful in this case because it did not allow the jury to fairly consider Mr. Ricks' good behavior while in jail awaiting trial. (XXXVIII R.R. at 172).

94. The Court concludes that the failure to challenge this limited definition of mitigating evidence amounted to ineffective assistance of counsel. U.S. Const. amends. VI, VIII, XIV.

VIII. **APPLICANT'S EIGHTH GROUND FOR RELIEF:** APPELLATE COUNSEL WAS INEFFECTIVE FOR NOT RAISING THE TRIAL COURT'S FAILURE TO CHARGE THE JURY ON THE BURDEN OF PROOF FOR EXTRANEOUS OFFENSES AT PUNISHMENT.

95. The Court finds that defense counsel unsuccessfully requested that the jury be instructed that they must find extraneous offenses to be true beyond a reasonable doubt before they could be considered. (XXXIX R.R. at 270-272).

96. The Court finds that despite being properly preserved for review, appellate counsel did not raise this issue on appeal.

97. Although numerous cases have held that no burden of proof instruction is required in a capital case, see, e.g. Huizar v. State, 12 S.W.3d 479, 482 n.3

Applicant's Proposed Findings of Fact and Conclusions of Law - Page 29 of 38

1998

(Tex. Crim. App. 2000); Ladd v. State, 3 S.W.3d 547, 575 (Tex. Crim. App.

1999); Jackson v. State, 992 S.W.2d 469, 477-78 (Tex. Crim. App. 1999),

such an instruction is required in non-capital cases. See, e.g. Harrell v. State,

884 S.W.2d 154 (Tex. Crim. App. 1994).

98. The Court finds that the Eighth Amendment's requirement of heightened

reliability in capital cases should mandate that the burden of proof may not

be less in a capital case than in a non-capital case.

99. The Court finds that since trial counsel requested such an instruction, only a

showing of "some harm" would have been required to warrant reversal.

100. The Court finds that in Mr. Ricks' trial, there were numerous

unadjudicated extraneous offenses introduced by the State in punishment.

(XXXIV R.R. at 20-28; 36-37; XXXV 16-19, 113, 130, 133; XXXVI R.R.

at 11-15, 31-42, 58-59, 78-81; XXXVII R.R. at 13-40, 74-82, 90-95). In his

testimony, Mr. Ricks said that many of these offenses were exaggerated,

and some just did not happen. (XL R.R. at 55-56, 59, 62, 83-84).

101. The Court finds that had the jury been properly instructed about the

burden of proof required to consider the extraneous offenses, there is a

reasonable probability that at least one juror might have answered the

special issues in a different way.

Applicant's Proposed Findings of Fact and Conclusions of Law - Page 30 of 38

2000

2000