# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

| | |
|---|---|
| **CEDRIC ALLEN RICKS,** <br> Petitioner, <br><br> v. <br><br> **BOBBY LUMPKIN, Director,** <br> Texas Department of <br> Criminal Justice, <br> Correctional Institutions Division, <br> Respondent. | Case No. 4:20-CV-1299-O <br><br> U.S. District Judge Reed C. O'Connor |

## DR. ANTOINETTE MCGARRAHAN'S BRIEF OF AMICUS CURIAE

Proposed amicus Antoinette McGarrahan, PhD is a licensed psychologist practicing forensic psychology and neuropsychology from her office in Dallas, Texas. She has a nationwide practice that has been developed since 2000, when she opened her practice. Much of her practice involves working within the criminal justice system, particularly in the context of death penalty litigation. She obtained her PhD at the University of Texas Southwestern Medical Center in Dallas, Texas. Dr. McGarrahan submits this amicus curiae brief in support of the State of Texas as relates to Claim 6.C.2. in Cedric Ricks' Amended Petition for Writ of Habeas Corpus (Doc. #35). Dr. McGarrahan also submits this brief in support of the State of Texas as relates to Claim 6.C.5., to the extent that the claim is based upon the alleged prior testimony of Dr. McGarrahan tying future dangerousness of the defendant to that defendant's race.

No counsel for any party authored this brief in whole or in part, and no person or entity,

1

other than amicus, made a monetary contribution intended to fund the preparation or submission of this brief.

**Introduction**

In late March, 2023, Dr. McGarrahan learned from the head of a state-wide public defender's office that there was talk about her using race as a factor to determine future dangerousness in a capital trial. After being advised about this, Dr. McGarrahan investigated and learned that this information was emanating from a writ of habeas corpus[1] filed in the case of *Cedric Allen Ricks v. Bobby Lumpkin, Director, TDCJ*, 4:20-cv-01299-O (Doc. #35)(hereafter "*Ricks* Writ"), which was making its way through the tightly-knit capital defense community. Dr. McGarrahan, however, never actually testified in the trial of Cedric Ricks. The case in which she had allegedly correlated race with future dangerousness was *State of Texas v. Steven Lawayne Nelson*, Case No. 1232507D, Criminal District Court No. 4, Tarrant County, Texas; NDTX Writ of Habeas Corpus: *Steven Lawayne Nelson v. Lorie Davis, Director, TDCJ*, 4:16-CV-904-A (Doc. #25), *COA granted in part, denied in part*, 952 F.3d 651 (5th Cir. 2020). Further, the allegation that Dr. McGarrahan correlated race with future dangerousness was apparently never made at any stage in the *Nelson* case. *See Steven Lawayne Nelson v. Lorie Davis, Director, TDCJ*, 4:16-cv-904-A, Doc. ##12, 25, 41-1, 58, 65; 952 F.3d 651 (5th Cir. 2020). This is likely because Dr. McGarrahan never correlated Nelson's race with future dangerousness.[2]

---

[1] This document is actually entitled "AMENDED PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254" and is Document #35 in this case.

[2] Dr. McGarrahan's entire testimony in *Nelson* [hereafter "McGarrahan Testimony"] is contained in the Appendix to this brief.

2

**Dr. McGarrahan's Testimony in *Nelson***

> The precise testimony in *Nelson* about which the *Ricks* Writ complains is as follows:
>
> What we do know about Mr. Nelson is in addition to the ADHD, he has a number of risk factors. The mother who is working two jobs and absent father, verbal abuse, witnessing domestic violence, the minority status, below [SES] status, all of those things put an individual at greater risk. We can't pinpoint what it is that made Mr. Nelson go on and do what he did do. We just know that when you look at the risk factors that he had, I mean, it was a storm waiting to happen.

*Ricks* Writ (Doc.#35), Appendix p. 19.

Dr. McGarrahan was never called upon to define "minority status," nor was the term ever even used again after the single instance quoted above. On cross-examination, however, Dr. McGarrahan was asked to define "risk factor:"

> Q. And when you say "risk factor," what do you mean by that?
>
> A. Those are conditions, issues, factors that put an individual at a greater likelihood to develop a mental illness or condition.

McGarrahan Testimony, Appendix p. 31.

The *Ricks* Writ's claim regarding Dr. McGarrahan, simply put, is that although Dr. McGarrahan did not testify at all in the *Ricks* case, the mere fact that the defense had retained her as an expert at all was ineffective assistance of counsel because of her "history of espousing views that race is a risk factor for future dangerousness." *Ricks* Writ (Doc. #35) at p. 54. This is a mischaracterization of Dr. McGarrahan's actual testimony in *Nelson*.

**The Mischaracterization of Dr. McGarrahan's *Nelson* Testimony in the *Ricks* Writ**

The statements in the *Ricks* Writ are in the context of a claim that two lawyers in Tarrant County tried three different death penalty cases using roughly the same strategy. *See Ricks* Writ (Doc. #35) at pp. 60-63. That strategy, according to the writ, was to essentially concede the future dangerousness of the defendant in an attempt to lessen the defendant's "moral

3

blameworthiness" in hopes of prevailing on the mitigation special issue.[3] During the direct examination, Dr. McGarrahan discussed Nelson's lack of attachment and his behavioral issues resulting from that lack of attachment as well as the infliction of childhood trauma.[4] *See*

---

[3] The Fifth Circuit Court of Appeals, in deciding *Nelson*, characterized the strategy as follows:

> Nelson's trial counsel … strategically framed this characterization: eliciting Dr. McGarrahan's testimony that the decisions that caused Nelson to reach the "point of no return" were "essentially his mother's and his father's," not his own choices. Though this would do nothing to convince a jury to answer in Nelson's favor on the first special question, whether he would "commit criminal acts of violence that would constitute a continuing threat to society," it arguably could have worked in Nelson's favor when the jury was evaluating the third special question, whether Nelson's "character and background, and [ ] personal moral culpability" provided mitigating circumstances to warrant a life instead of death sentence.

*Nelson v. Davis*, 952 F.3d 651, 665 (5th Cir. 2020).

[4] This is how the Fifth Circuit interpreted Dr. McGarrahan's testimony in *Nelson*:

> To the extent Nelson claims that counsel was ineffective for presenting testimony from McGarrahan at all, or for generally failing to present a persuasive picture of his mental health and background, we also do not believe reasonable jurists could debate that he has failed to demonstrate a substantial claim. … The record demonstrates that counsel presented a detailed and significant mitigation case, aided by McGarrahan's assessment of how childhood neglect and mistreatment likely left Nelson with significant psychological damage that set him on his violent path.
>
> Dr. McGarrahan testified that "research shows that ... emotional unavailability or emotional neglect of an infant is worse psychologically than physical abuse" and told the jury that she believed that Nelson was exposed to this type of harm from an early age. She emphasized that Nelson's childhood behavior indicated that he had to "cry out for help" through violence because he had important needs that "went unmet," and asserted that the degree of his psychological damage indicated that this mistreatment was severe. Specifically, McGarrahan cited a number of risk factors that she believed led to Nelson's "psychologically abnormal development," including an overworked mother, a father who was either abusive or absent throughout Nelson's life, and Nelson's exposure to violent domestic abuse. She concluded that there were "absolutely" choices made by other people in Nelson's formative years that shaped the direction of his life and that, by the time Nelson could make choices for himself, he was already "wired" to be "predisposed to severe aggression and violence" because of what he had experienced since infancy. Dr. McGarrahan's testimony tied together the descriptions of Nelson's absentee mother, abusive father, and other childhood struggles offered by his other

McGarrahan Testimony, Appendix, pp. 7-30. At no time did she discuss race or even "minority status" beyond the one mention discussed above. *See id*. Nonetheless, the argument that Dr. McGarrahan equated Nelson's race with his future danger consumes almost five pages in the *Ricks* Writ. *See id*, Doc. #35, at pp. 54-55, 60-63. In the following excerpts, the specific language in the *Ricks* Writ mischaracterizing Dr. McGarrahan's testimony in *Nelson* are as follows:

> **2. Trial counsel retained a neuropsychologist who has testified that "minority status" is a risk factor for future dangerousness.**
>
> **Despite knowing that Dr. Antoinette McGarrahan had a history of espousing views that race is a risk factor for future dangerousness … .**
>
> …
>
> **At Mr. Nelson's trial, Dr. McGarrahan testified that Mr. Nelson's "minority status" as a Black man was a risk factor for future dangerousness.**
>
> …
>
> **Hence, trial counsel were fully on notice of Dr. McGarrahan's belief that Mr. Ricks, a Black man, was dangerous because of his race at the time trial counsel retained her as a neuropsychologist in Mr. Ricks's case. Their decision to retain her in Mr. Ricks's case was unreasonable and constitutes deficient performance. *See Buck v. Davis*, 137 S. Ct. 756, 775 (2017) (holding that trial counsel were deficient by allowing an expert to testify despite knowing that the expert's report "reflected the view that Buck's race disproportionately predisposed him to violent conduct"); *see also Turner v. Murray*, 476 U.S. 28, 35 (1986) (plurality opinion)**

---

mitigation witnesses, including Nelson's mother, brother, sister, uncle, his mother's ex-boyfriend, and a behavioral health counselor who treated him when he was young.

*Nelson v. Davis*, 952 F.3d 651, 664–65 (5th Cir. 2020). Dr. McGarrahan's testimony, as summarized above, is supported by the science of child development and trauma. *See, e.g.*, Bruce D. Perry, MD, PhD, *Bonding and Attachment in Maltreated Children - Consequences of Emotional Neglect in Childhood*, https://www.childtrauma.org/_files/ugd/aa51c7_a9e562d294864796bdd5b3096a8d8c86.pdf.

> **(noting dangers of appealing to racist stereotype of Black men as "violence prone").²¹**
>
> …
>
> **²¹ …**
>
> **Personal knowledge that an expert is known to espouse such views in a capital murder trial where the defendant is Black surely constitutes a red flag that renders trial counsel's reliance unreasonable.**

*Ricks* Writ (Doc. #35), Sect. 6.C.2, pp. 54-55.

> **When trial counsel asked Dr. McGarrahan why some people commit crimes, Dr. McGarrahan identified what she called "risk factors," which included Mr. Nelson's race … .**
>
> …
>
> **In a different case, the Supreme Court would later hold that "[n]o competent defense attorney would introduce such evidence about his own client"—i.e., evidence that the client's race increases his risk for future dangerousness. *Buck*, 137 S. Ct. at 775.**
>
> …
>
> **Trial counsel had heard Dr. McGarrahan testify at Mr. Nelson's trial that Mr. Nelson's race was a risk factor for his propensity for violence.**

*Ricks* Writ (Doc. #35), Sec. 6.C.5.a. and b., pp. 60-63 (end of first paragraph)(footnotes omitted).


**The Specious Comparison to Dr. Walter Quijano**

The "different case" referenced above is *Buck v. Davis*, 580 U.S. 100 (2017), in which the defense presented the testimony of forensic psychologist Walter Quijano, PhD that included Dr. Quijano's statistical theory in which he identifies being of either the Black or Hispanic race as a risk factor for "future dangerousness" in the context of the first special issue in a death penalty case. *See id.*, 580 U.S. at 107. At the time, Dr. Quijano had testified to this analysis in

6

multiple cases. The Texas Attorney General confessed error in every case in which Quijano testified for the state. In *Saldano v. Cockrell*, 267 F. Supp. 2d 635, 638 (E.D. Tex. 2003), *judgment entered*, 267 F. Supp. 2d 645 (E.D. Tex. 2003), *and aff'd in part, appeal dismissed in part sub nom*, *Saldano v. Roach*, 363 F.3d 545 (5th Cir. 2004), one of the cases in which the state had sponsored the testimony, the Court characterized the analysis in this way:

> Quijano testified that in his opinion, there was a probability that Saldano would be dangerous to society in the future. Asked to explain the basis of his opinion, Quijano said that his opinion was based on an analysis of 24 factors. One of the factors that Quijano used to predict future dangerousness was race and ethnicity. He testified that Saldano's Hispanic ethnicity increased the likelihood that he would be a danger in the future. Quijano explained that Hispanics were over-represented in the Texas prison system, and to him this fact suggested a correlation between ethnicity and future dangerousness.

*Id*. at 638.

Needless to say, Dr. McGarrahan's mentioning the term "minority status" in a list of risk factors which are defined as "conditions, issues, [and] factors that put an individual at a greater likelihood to develop a mental illness or condition" is a far cry from Dr. Quijano's express correlation of race with future dangerousness.[5] This distinction, however, may never be apparent to one who only reads the *Ricks* Amended Writ of Habeas Corpus (Doc. #35) without this additional context.

Ironically, in *Nelson*, the fact that the term "minority status" had been said was not mentioned in Nelson's writ, CIVIL NO. 4:16-CV-904-A, Doc. #25, TDCJ's response to Nelson's writ, *id*., Doc. #41-1, or any opinion from any court that considered the writ, *id.,* Doc. #58, Doc. #65). No allegation was ever made in *Nelson* that Dr. McGarrahan had used race as a

---

[5] "In determining whether Buck was likely to pose a danger in the future, Dr. Quijano considered seven "statistical factors." The fourth factor was "race." His report read, in relevant part: '4. Race. Black: Increased probability. There is an over-representation of Blacks among the violent offenders.'" *Buck v. Davis*, 580 U.S. 100, 107 (2017).

factor for anything.[6] Yet, *Nelson* provided the only support to this very argument in the *Ricks* Writ, in a case wherein Dr. McGarrahan did not even testify.

**"Minority Status" is a Recognized Risk Factor in a Childhood Trauma Analysis**

Anyone familiar with the treatment of childhood trauma is familiar with the concept of risk factors (a/k/a vulnerability factors) and protective factors (a/k/a resilience factors), which are used to predict relatively good or bad outcomes for victims of childhood trauma.[7] "Minority status" actually appears in the literature as one of these risk factors.[8] In the childhood trauma arena, race can be a risk factor for bad outcomes from childhood trauma for a number of

---

[6] The opinion in *Buck v. Davis* was handed down February 22, 2017. *See id.*, 580 U.S. at 100. The *Nelson* writ was pending at this time. In fact, the district court did not hand down its decision until March 29, 2017. During that time span, the writ lawyers, appeal lawyers, or the trial lawyers could have asserted a new claim based Dr. McGarrahan's use of the term "minority status." No new claim was presented. *Saldano v. Cockrell*, the previous case dealing with Dr. Walter Quijano wherein the State of Texas confessed error, was concluded in 2004. *See id.*, 267 F. Supp. 2d 635, 638 (E.D. Tex. 2003), *judgment entered*, 267 F. Supp. 2d 645 (E.D. Tex. 2003), *and aff'd in part, appeal dismissed in part sub nom*, *Saldano v. Roach*, 363 F.3d 545 (5th Cir. 2004). Thus, at the time *Nelson* was tried, Quijano's use of race as a predictor of future dangerousness had been exposed for years.

[7] "[C]onverging evidence from neurobiology and epidemiology suggests that early life stress such as abuse and related adverse experiences cause enduring brain dysfunction that, in turn, affects health and quality of life throughout the lifespan." Robert F. Anda, et al., *The enduring effects of abuse and related adverse experiences in childhood*, https://www.childtrauma.org/_files/ugd/aa51c7_788e6d5081fb4cf48515fefca1a6d536.pdf.

[8] *See, e.g.*, Eva Alisic, Marian J. Jongmans, Floryt van Wesel, Rolf J. Kleber, CLINICAL PSYCHOLOGY REVIEW (in press), Ch. 5, *Building child trauma theory from longitudinal studies: A meta-analysis*, pp. 61-102 (Table 5.4 at p. 81 specifically lists "minority status."), https://www.researchgate.net/profile/Eva-Alisic/publication/241881666_Children_and_trauma_a_broad_perspective_on_exposure_and_recovery/links/00b4952525e3dee031000000/Children-and-trauma-a-broad-perspective-on-exposure-and-recovery.pdf#page=61.

8

reasons,[9] many of which correlate with poverty and lack of support for families resulting from that condition,[10] or even the effects of racism.[11] In the literature, however, this term is never seen to indicate that the child will be a "future danger" in the context of a death penalty punishment phase.

**Conclusion**

It is Dr. McGarrahan's firm belief that her testimony in *Nelson* is in no way the equivalent of Dr. Walter Quijano's testimony in *Saldano* or *Buck v. Davis*. Because the *Ricks* Writ equates the two, Dr. McGarrahan wants the Court to have this additional information and context while considering Ricks' claims 6.C.2 and 6.C.5.

Respectfully submitted,

Westfall Sellers

By: /s/ Greg Westfall
Greg Westfall, Attorney at Law, PLLC
Texas Bar No. 00788646

1612 Summit Ave., Suite 200
Fort Worth, Texas 76102
P: 817.928.4222

---

[9] Judy H. Ng, et al., Explaining the Relationship Between Minority Group Status and Health Disparities: A Review of Selected Concepts, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6413828/(discussing stress and resilience in minority populations).

[10] *See, e.g.*, Leila Morsy and Richard Rothstein, *Toxic Stress and Children's Outcomes*, Economic Policy Institute, May 1, 2019, https://www.epi.org/publication/toxic-stress-and-childrens-outcomes-african-american-children-growing-up-poor-are-at-greater-risk-of-disrupted-physiological-functioning-and-depressed-academic-achievement/.

[11] *See, e.g.,* Donte L. Bernard, et al, *Making the "C-ACE" for a Culturally-Informed Adverse Childhood Experiences Framework to Understand the Pervasive Mental Health Impact of Racism on Black Youth,* Journal of Child & Adolescent Trauma (August 11, 2020), https://link.springer.com/article/10.1007/s40653-020-00319-9.

9

F: 817.385.6715
E: greg@westfallsellers.com

Attorneys for Dr. Antoinette McGarrahan

## CERTIFICATE OF SERVICE

I certify on May 3, 2023, I filed this motion with the Court's CM/ECF system and the system indicated the motion was served on all parties.

/s/Greg Westfall