C-432-WO11509-1405275-A

**IN THE 432nd DISTRICT COURT**
**TARRANT COUNTY, TEXAS**

| | | |
|---|---|---|
| EX PARTE | ) | Trial Cause No. |
| AMOS WELLS, | ) | 1405275R |
| APPLICANT | ) | |
| | ) | |
| | ) | |

**FILED**
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

APR 18 2019

TIME 2:55
BY _____ DEPUTY

**INITIAL APPLICATION FOR WRIT OF HABEAS CORPUS**
**(FILED PURSUANT TO TEX. CODE CRIM. PROC. ART. 11.071)**

BEN WOLFF (No. 24091608)
Director, Office of Capital & Forensic Writs
(E-mail: Benjamin.Wolff@ocfw.texas.gov)
ASHLEY R. STEELE (No. 24089245)
(E-mail: Ashley.Steele@ocfw.texas.gov)
MICHELLE E. WARD (No. 24106550)
(E-mail: Michelle.Ward@ocfw.texas.gov)
Post-Conviction Attorneys
Office of Capital & Forensic Writs
1700 North Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

*Attorneys for Amos Wells*

17

State one of the two Texas special verdict sentencing questions and failed to appreciate and develop leads to the compelling mitigating evidence necessary to prevail on the other special issue. Indeed, this troubling pattern calls into question their fitness to effectively defend capital cases. A brief review of two capital cases preceding Mr. Wells's provides context for assessing trial counsel's performance here.

### a. Trial counsel ignored red flags indicating serious mental illness and inaccurately portrayed Steven Nelson as an incurably violent psychopath

Mr. Ray and Mr. Gordon were appointed to represent Steven Nelson in his October 2012 capital trial. Like in Mr. Wells's case, Mr. Ray and Mr. Gordon retained Dr. McGarrahan to evaluate their client before receiving background information about him and gave her no specific purpose or referral question. Amended Petition for a Writ of Habeas Corpus at 5, *Nelson v. Davis*, No. 16-cv-00904 (N.D. Texas), filed Dec. 22, 2016 (hereinafter "*Nelson* Petition"). Dr. McGarrahan informed defense counsel before trial that "[i]f asked on cross" she would "*agree that [Mr. Nelson] has several traits associated with psychopathy.*" *Id.* (emphasis added). Undeterred, trial counsel put Dr. McGarrahan on the stand and led her through an equally aggravating direct examination in which they sought to establish that their client was incurably violent.

On direct examination, Dr. McGarrahan explained that, because Mr. Nelson's caregivers were emotionally unresponsive from the time he was born, Mr. Nelson became aggressive and hostile, and engaged in harmful behaviors to others. Volume 43, page 244 of the reporter's record in *State of Texas v. Nelson*, No. AP-76,924 (Tex. Crim. App. 2015) (hereinafter "*Nelson* [volume number] RR [page number]"). Dr. McGarrahan testified that "[t]he brain is what controls our behavior and our emotions," and "there is something significantly wrong with Mr. Nelson's brain being wired in a different way, being predisposed to this severe aggression and violence from a very early age." Reporter's Record Volume 43, *Nelson v. State*, 1232507D at 247 (4th Dist. Ct., Tarrant County, Tex.). As a three-year-old, Mr. Nelson had started a fire. Dr. McGarrahan testified that "[t]hree years old is where we begin to see what we call violence to—he wasn't just setting a fire out of curiosity, he was setting a fire with the intent—with the intent to harm somebody else, to cry out, to engage in violence at the age of 3." *Id.* at 248.

Throughout his direct exam of Dr. McGarrahan, Mr. Ray made the case that his client would be a future danger. *See, e.g., Nelson* 43 RR 252 ("especially if you add that to the fire setting and the aggression and the stealing and lying. When you add those problems in addition to ADHD, you have a significantly increased risk for engaging in criminal offenses, juvenile delinquency, and violent behavior."). When

50

88

Mr. Ray asked why some people become criminals, Dr. McGarrahan responded that Mr. Nelson had a high number of risk factors, *including his race*:

Ray: What is it—and there may not be an answer to this, what is it that steers people towards committing crimes as opposed to yelling at the teacher, which is—maybe is a crime initially, but what is it in a person's psyche if they start developing these problems, what makes them go commit crime? Is there anything that you can put your finger on or does it just happen that way or is it unexplained, tell us about that.

McGarrahan: I think if we could figure that out, that would be very positive for our society. But I think there are individual differences from the individual who has ADHD and goes on to commit violent offenses and those who don't.

What we do know about Mr. Nelson is in addition to the ADHD, he has a number of risk factors. The mother who is working two jobs and absent father, verbal abuse, witnessing domestic violence, *the minority status*,[11] below SCS status, all of those things put an individual at greater risk. We can't pinpoint what it is that made Mr. Nelson go on and do what he did do. We just know that when you look at the risk factors that he had, I mean, it was a storm waiting to happen.

*Nelson* 43 RR 252-53 (emphasis added). Dr. McGarrahan's inclusion of Mr. Nelson's "minority status" as a risk factor for violence is redolent of the psychologist who testified that "the race factor, black" is one of several factors that he considered when assessing future dangerousness. *Buck v. Davis*, 137 S. Ct. 759, 769 (2017).

---

[11] Mr. Nelson is African American. *See* https://www.tdcj.texas.gov/death_row/dr_info/nelsonsteven.html.

51

As the Supreme Court observed, "[n]o competent defense attorney would introduce such evidence about his own client." *Id.* at 775. Repeatedly engaging a forensic psychologist who espouses such an opinion is likewise deficient.

Having established that his client was aggressive and prone to violence, Mr. Ray elicited testimony that his client was incurable and beyond help:

| | |
|---|---|
| McGarrahan: | There's no cure, there's only band-aids of treatment. |
| Ray: | So, I mean, really, the time that a guy gets to be 20 years old, they're essentially treating the symptoms and not the problem itself? |
| McGarrahan: | It's probably too late at that point. |

*Nelson* 43 RR 255. When Mr. Ray asked Dr. McGarrahan to explain Mr. Nelson's flat affect, she attributed it not to the mental illnesses or impairments of which it can be a symptom, but explained instead, "I believe in this case it's a lack of remorse, a lack of a sense of empathy, being able to understand other people's feelings, being able to put one's self in somebody else's shoes and experience somebody else's emotional pain." 43 RR 261.

As promised, on cross-examination, Dr. McGarrahan readily agreed that Mr. Nelson had all of the traits of a psychopath—which the prosecutor cataloged in detail—except for a dysfunctional marital history (Mr. Nelson never married). *Nelson*, 43 RR 272-75. After hearing Dr. McGarrahan's testimony, the State decided it was no longer necessary to present its own mental health expert, Dr. Randall Price,

52

90

even though Dr. Price had been retained by the State and was present in the courtroom ready to testify. *Nelson*, Petition at 12.

Trial counsel's closing argument attributed Mr. Nelson's behavior to immutable characteristics that as "Dr. McGarrahan told you about . . . put him on the track for permanent derailment." *Nelson*, 44 RR 23. As Mr. Ray argued, "That explains why he can't get along in the jail, why they got to have an army of sheriff's deputies to watch him everywhere he goes. And they ought to. He will never be any better. He was a train wreck waiting to happen. He didn't ask to be in that position."

A subsequent investigation by Mr. Nelson's post-conviction counsel determined that there were numerous "unexplored 'red flags' that defense counsel failed to pursue, including evidence of childhood trauma, severe abuse, neglect, mental illness, poverty, and issues relating to Mr. Nelson's sexual identity." *Nelson* Petition at 16. For example, trial counsel knew that Mr. Nelson had been diagnosed with PTSD by a Tarrant County facility, "with a PTSD score more than twice the facility average." *Id.*

Habeas counsel pursued the PTSD lead that trial counsel had ignored by retaining an expert in childhood and adolescent trauma. The expert concluded that Mr. Nelson suffered from "extreme childhood trauma and adversity, which has likely resulted in unrecognized and untreated trauma-related symptoms including symptoms of [PTSD]." *Id.* The expert noted that Mr. Nelson "exhibits characteristics

of dissociative behavior, bipolar and/or other mood disorders (such as major depression) that are present at increased rates among individuals who experienced childhood trauma." *Id.* at 17. The expert noted that the "failure to take into the account the influence of early trauma/adversity and PTSD is likely to have led to an inappropriate assessment of [Mr. Nelson] as having antisocial personality disorder." *Id.* In other words, trial counsel's failure to first adequately investigate their case *and then* make an informed strategic decision led to the presentation of a false and highly aggravated picture of their client. This *modus operandi* undermined trial counsel's next two capital trials.

### b. Trial counsel ignored red flags indicating serious mental illness and falsely portrayed their client Cedric Ricks as an incurably violent psychopath with a genetic predisposition to violence

Trial counsel applied the same strategy in the Cedric Ricks capital murder trial, again without first adequately investigating Mr. Ricks's social history. Mr. Ricks was sentenced to death on May 16, 2014, for the May 1, 2013, murder of his girlfriend and young son. Mr. Ray and Mr. Gordon represented Mr. Ricks at the same time they represented Mr. Wells, and they once again enlisted Dr. McGarrahan.[12] Dr. McGarrahan administered the Hare Psychopathy Checklist, an

---

[12] Mr. Ricks is also African American. Death Row Information, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, (last visited Apr. 16, 2019 1:57 P.M.), https://www.tdcj.texas.gov/death_row/dr_info/rickscedric.html. Trial counsel were on notice that Dr. McGarrahan considers "minority status" as a risk factor for future

54

## IV.
## PRAYER FOR RELIEF

Mr. Wells was convicted and sentenced to death in violation of his constitutional rights. He is therefore entitled to a new trial, or in the alternative, a new sentencing trial.

Respectfully submitted,

DATED:   *April 18, 2019*

By: *[signature]*
Ashley R. Steele

By: *[signature]*
Michelle E. Ward

STATE OF TEXAS     §
COUNTY OF TRAVIS   §

VERIFICATION

BEFORE ME, the undersigned authority, on this day personally appeared Ashley Steele, who upon being duly sworn by me testified as follows:

1. I am a member of the State Bar of Texas.

2. I am the duly authorized attorney for *Amos Wells*, having the authority to prepare and to verify *Amos Wells's* Initial Application for Post-Conviction Writ of Habeas Corpus.

3. I have prepared and have read the foregoing Application for Post-Conviction Writ of Habeas Corpus, and I believe all allegations in it to be true.

Ashley R. Steele

SUBSCRIBED AND SWORN TO BEFORE ME on this 18th day of April, 2019.

SANDRA B JUSTICE
NOTARY PUBLIC
ID# 13087099-4
State of Texas
Comm. Exp. 10-19-2020
NOTARY WITHOUT BOND

Sandra B. Justice
Notary Public, State of Texas

413

451

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Initial State Habeas Application upon:

Tarrant County District Clerk
Kelley Turner, Lead Appellate Clerk

Judge Ruben Gonzalez, Jr.
432nd Judicial District Court

Tarrant County Criminal District Attorney's Office
Helena Faulkner

This certification is executed on April 18, 2019, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Ashley R. Steele

414

452