**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CEDRIC ALLEN RICKS,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | |
| | § | **Civil Action No. 4:20-CV-1299-O** |
| **BOBBY LUMPKIN, Director, Texas** | § | |
| **Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |

**MEMORANDUM OPINION & ORDER**

Before the Court are Petitioner Cedric Allen Ricks's Amended Petition for Federal Habeas Corpus Relief (ECF No. 35), Motion for Stay and Abeyance (ECF No. 38), and Motion for Discovery (ECF No. 67). For the reasons below, the Court **DENIES** Ricks's Amended Petition for Federal Habeas Corpus Relief, Motion for Stay and Abeyance, and Motion for Discovery.

**BACKGROUND**

**A.    The Offense**[1]

The domestic violence dispute between Ricks and Roxann Sanchez escalated into a nightmarish episode of brutality. Ricks and Sanchez lived together with their nine-month-old child Isaiah and Sanchez's two sons from a previous marriage—eight-year-old Anthony Figueroa and twelve-year-old Marcus Figueroa. In 2013, Ricks and Sanchez got into a verbal altercation at their residence. That altercation quickly turned physical as Ricks and Sanchez began hitting each other. Anthony and Marcus tried to get between them to break up the fight, but Ricks pushed Marcus down and continued hitting Sanchez with his fists. Ricks then got a knife from the kitchen and stabbed Sanchez multiple times while she tried to protect herself. Marcus quickly ran and tried to

---

[1] This section is a summary of the undisputed facts laid out in the Texas Court of Criminal Appeals' opinion of Ricks's conviction and sentence. *See Ricks v. Texas*, No. AP-77,040, 2017 WL 4401589, at *1 (Tex. Crim. App. Oct. 4, 2017).

call the police. But Ricks chased him down, pushed him to the ground, and stabbed him multiple times in the back of his neck. Ricks then pushed Anthony to the ground beside Marcus and stabbed him until he made a gargling noise. When Marcus tried to get up, Ricks got on top of him and began stabbing him again. Ricks finally stopped stabbing Marcus after Marcus played dead by imitating the gargling noise Anthony had made.

After the brutality, Ricks put the knife in the kitchen, washed his hands, and showered. He then made a phone call, packed his clothes, placed Isaiah in his crib, and left the apartment. Ricks then called his cousin, Tamara Butts, and said that he "did something bad" and asked to speak to her father, Joseph Sanders. Ricks told Sanders he "messed up" and "killed Sanchez and the boys" and asked him to get Isaiah from the residence. When he spoke with Butts again, Ricks told her that he killed Sanchez, Anthony, and Marcus. But he refused to tell Butts how he killed them or where he was. He insisted that Butts also go to the residence to get Isaiah. Butts urged Ricks to turn himself in. Ricks assured Butts that he would die before that happened.

After Ricks hung up, Butts called the police and informed them of what Ricks told her. Following that call, Marcus—alive but covered in blood—called the police and informed them that Ricks killed his mother and brother. He also informed them that he believed Ricks had left and that his mother's car was missing. The police arrived shortly after and discovered the bodies of Sanchez and Anthony. Marcus was immediately flown to the hospital and later recovered from his injuries. Isaiah was also taken to the hospital as a precautionary measure but was found to be unharmed. Based on the information from Butts and Marcus, Ricks was stopped in Oklahoma in Sanchez's car and arrested. After being placed in jail, Ricks got in a fight with his cellmates and was later extradited to Texas.

2

**B.      Capital Murder Proceedings**

Several days after the incident, a Tarrant County grand jury indicted Ricks on two counts of capital murder.[2] A jury later convicted Ricks of capital murder for killing Sanchez and Anthony during the same criminal transaction.[3] *See* TEX. PENAL CODE § 19.03(a)(7)(A). At the punishment stage, the jury answered the special issues submitted under Texas Code of Criminal Procedure Article 37.071, and the trial court, accordingly, set Ricks's punishment at death.[4] Ricks appealed his conviction and sentence, presenting twenty points of error.[5] The Texas Court of Criminal Appeals, however, affirmed Ricks's conviction and sentence. *Ricks*, 2017 WL 4401589. And the United States Supreme Court denied Ricks's certiorari petition. *Ricks v. Texas*, 138 S. Ct. 1553 (2018).

**C.      Habeas Corpus Proceedings**

Ricks filed a habeas corpus application in Texas state court, asserting eleven claims for relief.[6] After receiving a response from the State, the trial court entered findings of fact and conclusions of law recommending that relief be denied.[7] The Texas Court of Criminal Appeals denied Ricks's state habeas corpus application based on the trial court's findings and conclusions and its own review. *Ex parte Ricks*, No. WR-85,278-01, 2020 WL 6777958 (Tex. Crim. App. Nov. 18, 2020).

Ricks then initiated the instant proceeding and filed his initial petition for federal habeas corpus relief.[8] He later amended his petition, asserting ten claims for relief.[9] Ricks also filed two

---

[2] ECF No. 51-9.
[3] ECF No. 50-31.
[4] ECF No. 51-10 at 121–22.
[5] ECF No. 51-18.
[6] ECF No. 52-1.
[7] ECF No. 52-4 at 400–69.
[8] ECF No. 18.
[9] ECF No. 35.

motions related to his petition for federal habeas corpus relief. He filed a Motion for Stay and Abeyance to allow him to return to state court and litigate his unexhausted claims.[10] And he filed a Motion for Discovery, seeking evidence on whether his prosecutors allowed race-based or gender-based animus to impact their use of peremptory challenges during jury selection.[11]

## LEGAL STANDARD

"Federal habeas features an intricate procedural blend of statutory and caselaw authority." *Adekeye v. Davis*, 938 F.3d 678, 682 (5th Cir. 2019). This blend is largely made up of the Antiterrorism and Effective Death Penalty Act's ("AEDPA") two strict requirements. 28 U.S.C. § 2254. First, the AEDPA requires a petitioner to "exhaust[] the remedies available in the courts of the State" before seeking federal habeas relief. § 2254(b)(1)(A). Ordinarily, a petitioner satisfies this exhaustion requirement by raising his federal claim before the state courts, per state procedures. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). Second, the AEDPA requires a petitioner to show that the state court decision was (1) "contrary to, or involved an unreasonable application of" clearly established federal law; or (2) rested "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d); *Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022).

As to the application of clearly established federal law, a state court decision is "contrary to" clearly established federal law if the state court (1) arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton*, 544 U.S. 133, 141 (2005). A state court "unreasonably applies" clearly established federal law to the facts of the

---

[10] ECF No. 38.
[11] ECF No. 67.

petitioner's case if such application is objectively unreasonable rather than merely incorrect or erroneous. *McDaniel v. Brown*, 558 U.S. 120, 132–33 (2010). Legal principles are "clearly established" when Supreme Court precedents, existing at the time of the state court decision, establish those principles. *Brown*, 142 S. Ct. at 1525. As to state-court factual findings, such findings are presumed reasonable unless the petitioner shows clear and convincing evidence that they are erroneous. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Nor is the factual determination unreasonable, even if reasonable minds reviewing the record might disagree about the factual finding or the implicit credibility determination underlying the factual finding. *Id.*

In addition to the two AEDPA requirements, the petitioner must also show that the state court's error during adjudicating the petitioner's criminal case was not harmless. *Brown*, 142 S. Ct. at 1517. To do so, the petitioner must show that the error had a "substantial and injurious effect or influence" on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 622 (1993). If, however, the state courts fail to adjudicate a claim on the merits that a petitioner presents to this Court, such a claim is reviewed de novo. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009).

## ANALYSIS

There are three issues before the Court: (1) Ricks's Amended Petition for Federal Habeas Corpus Relief; (2) Ricks's Motion for Stay and Abeyance; and (3) Ricks's Motion for Discovery. The Court first turns to Ricks's Petition for Federal Habeas Corpus Relief and then proceeds to his two motions.

## A.   Habeas Corpus

Ricks asserts ten claims for habeas corpus relief based on seven legal bases: (1) Texas's capital sentencing special issues are unconstitutionally vague; (2) Texas applies its death penalty arbitrarily; (3) the State failed to disclose favorable evidence that he was allowed pencils while in jail; (4) prosecutors use of false and misleading testimony; (5) prejudicial exposure of Ricks's shackles to the jury; (6) the prosecution's use of peremptory challenges in a racially discriminatory manner; and (7) ineffective assistance of counsel.[12] The Court addresses Ricks's claims based on those legal bases.

### 1.   Capital Sentencing Special Issues

For Ricks's first claim, he argues that the Texas capital sentencing special issues (Texas Code of Criminal Procedure Article 37.071) are unconstitutionally vague because they lack definitions of key terms, leaving juries unable to understand the meaning of the terms contained and giving the false impression that the full range of mitigating evidence cannot be considered.[13] This claim is without merit.

Ricks argues that the Texas capital sentencing special issues are unconstitutionally vague because they lack definitions of the following key terms: "probability," "criminal acts of violence," "personal moral culpability," and "continuing threat to society."[14] But the Fifth Circuit has repeatedly rejected vagueness challenges to these terms. *See, e.g.*, *Sprouse v. Stephens*, 748 F.3d at 622–23 (denying Certificate of Appealability on complaints about the lack of definitions of "probability," "criminal acts of violence," and "continuing threat to society" in a Texas capital sentencing jury charge); *Paredes v. Quarterman*, 574 F.3d 281, 294 (5th Cir. 2009) (holding that

---

[12] ECF No. 35.
[13] *Id.* at 110.
[14] ECF No. 35 at 110.

the terms "probability," "criminal acts of violence," and "continuing threat to society" were not unconstitutionally vague); *Turner v. Quarterman*, 481 F.3d 292, 299–300 (5th Cir. 2007) (rejecting claims that the terms "probability," "criminal acts of violence," and "continuing threat to society" were so vague as to preclude a capital sentencing jury's consideration of mitigating evidence). Ricks, in fact, agrees that Fifth Circuit precedent forecloses this claim and only presents it to preserve the issue for appellate review.[15]

Thus, Ricks's claim about the lack of definitions of key terms and alleged vagueness in the Texas capital sentencing special issues is meritless.

### 2. Arbitrary Application of Death Penalty

For Ricks's second claim, he argues that the death penalty is arbitrarily applied across Texas based on racial and geographical disparities.[16] The Texas Court of Criminal Appeals, noting Ricks's concession that the Texas Court of Criminal Appeals previously rejected similar arguments, declined to reconsider its prior holding and rejected the claim. *See Ricks*, 2017 WL 4401589, at *13. Supreme Court and Fifth Circuit precedent also foreclose this claim. *See, e.g.*, *Jurek v. Texas*, 428 U.S. 262, 279 (1976) (reviewing and upholding the Texas death-penalty statutory scheme); *Kelly v. Lynaugh*, 862 F.2d 1126, 1135 (5th Cir. 1988).

For federal habeas relief, complaints of racial discrimination in the imposition of the death penalty generally must be supported by a showing of racially invidious discrimination. *Kelly*, 862 F.2d at 1135 (citing *McCleskey v. Kemp*, 481 U.S. 279, 291–98 (1987)). Ricks has not shown this. He does not allege or present any evidence that his sentence stemmed from any intentional racial discrimination by his prosecutors. As a result, Ricks concedes that the Texas Court of Criminal

---

[15] *Id.*
[16] ECF No. 35 at 123–24.

Appeals' rejection of this claim on the merits was neither contrary to nor an unreasonable application of clearly established federal law and thus only asserted the claim to preserve it for appeal.[17] Therefore, Ricks's claim that the death penalty is arbitrarily applied across Texas is meritless and denied.

### 3. *Brady* Claim

During the punishment phase, detention officers discovered a pencil Ricks had snuck in his smock.[18] Ricks argues that the State failed to disclose favorable evidence that he was allowed pencils while in jail, which allowed the State to present a misleading narrative that Ricks posed a danger.[19] And as a result, he argues that the prosecutors violated his due process rights under the Supreme Court's holding in *Brady v. Maryland*, 373 U.S. 83, 97 (1963).[20]

This claim does not meet the three elements of a *Brady* claim which are: (1) the evidence must favor the accused because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the State willfully or inadvertently; and (3) the evidence must be "material"— prejudice results from its nondisclosure. *Banks v. Dretke*, 540 U.S. 668, 691 (2004).

First, evidence that Ricks could possess a pencil inside the jail under Tarrant County Detention Center rules is not exculpatory because what items an inmate in jail may possess is irrelevant to Ricks's punishment. The issue of concern at trial was that Ricks snuck a pencil in his smock to court, not whether he could have one in jail. Second, Ricks has failed to show that the jail's rules on possessing a pencil would not have been discoverable through the defendant's due diligence. *See United States v. Brown*, 650 F.3d 581, 588 (5th Cir. 2011) ("To have been

---

[17] ECF No 35 at 110.
[18] ECF No. 50-34.
[19] ECF No. 35 at 106–09.
[20] ECF No. 35 at 120–23.

suppressed, the evidence must not have been discoverable through the defendant's due diligence.").

Third, evidence that Ricks could have a pencil in jail is not material. Evidence is "material" only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley,* 473 U.S. 667, 682–85 (1985). A "reasonable probability" results when nondisclosure undermines confidence in the verdict by placing the case in a different light. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Here, whether Ricks could possess a pencil in jail does not undermine the verdict, or even the evidence that he improperly brought a pencil to court. But even if evidence that Ricks could possess a pencil inside the jail were somehow favorable to him, it pales in comparison to all the other aggravating evidence presented, including the brutality of the crime and his disturbing history of violence against women.[21] *See Miller v. Dretke*, 431 F.3d 241, 251 (5th Cir. 2005) ("If the evidence provides only incremental impeachment value, it does not rise to the level of *Brady* materiality.").

Thus, Ricks's *Brady* claim fails to meet the three requirements of a *Brady* violation and therefore fails.

### 4. False and Misleading Testimony

In Ricks's next claim, he contends that his due process rights were violated because the prosecution offered false and misleading testimony.[22] This claim is meritless.

A state denies a criminal defendant due process when it knowingly uses perjured testimony

---

[21] *See, e.g.*, ECF No. 50, 40 RR at 32–33, 37, 72–73 (In 2012, Ricks choked Sanchez to the point of unconsciousness and beat her head on the bathroom floor); 37 RR at 13–15 (Tashana Singleton, Ricks's ex-wife, testified that Ricks punched her in the jaw and on another occasion assaulted her by knocking her out of her chair, kicked her, punched her, and pushed her head into the wall); 35 RR at 131, 133 (Jennifer Clark, an ex-girlfriend of Ricks, testified that, during a fight between them, Ricks threatened to kill her when she went to call the police).

[22] ECF No. 35 at 98–105.

at trial or allows untrue testimony to go uncorrected. *Giglio v. United States*, 405 U.S. 150, 153–54 (1972); *Napue v. Illinois*, 360 U.S. 264, 269–70 (1959). To show a due process violation from the use of allegedly perjured testimony, a defendant has the burden of establishing that (1) the witness gave false testimony, (2) the falsity was material in that there was a reasonable likelihood that it affected the judgment of the jury, and (3) the prosecution used that testimony knowing that it was false. *Giglio*, 405 U.S. at 153–54.

Ricks argues that the prosecution offered false and misleading testimony that Ricks (1) improperly obtained a pencil in jail, (2) forced his high school girlfriend into his car against her will, and (3) was beaten in jail because he bragged about the murders.[23] The Court addresses each alleged piece of false testimony in turn.

### a.  Pencil Incident

At the punishment stage, the State called Deputy Moore, a sheriff's deputy whose duties included caring for Ricks and ensuring his safety during trial.[24] According to Moore, Ricks was in a holdover cell changing from his jail smock to civilian clothes when a deputy heard something drop and observed a pencil on the floor.[25] Moore explained that "because of [Ricks's] classification, he's not allowed to have any implements, such as a pencil, pen, things like that" because he was "on suicide watch" and that "obviously that can be something he can use to harm himself or someone else."[26] Moore agreed the pencil "can be a weapon."[27] When Moore asked Ricks about the pencil a few weeks later, Ricks said he concealed it in the straps of his smock when he left his cell to come to the courtroom.[28] Moore acknowledged that Ricks did nothing

---

[23] *Id.*
[24] ECF No. 50, 36 RR at 56.
[25] *Id.* at 55, 58.
[26] *Id.* at 59.
[27] *Id.*
[28] *Id.* at 59–60

dangerous with the pencil, threatened no one with it, and had no incidence of violence while dealing with him.[29] Moore also acknowledged that Ricks could have used the pencil against them but did not do so.[30]

Ricks argues that this testimony was false because the prosecutor knew that Ricks was allowed pencils and had not displayed violent behavior in jail.[31] But Moore testified about Ricks's behavior in the courthouse—not jail.[32] Moore actually returned the pencil to Ricks when he went back to jail.[33] Thus, Ricks fails to show that Deputy Moore's testimony was false.[34] *See Koch*, 907 F.2d at 531.

### b. High School Incident

Ricks next contends that during the punishment stage, the State used false testimony of a high school security guard to contend that Ricks forced his former girlfriend into his car.[35] But the school security guard never testified that he witnessed Ricks dragging his girlfriend out of a building. The security guard testified that he had taken Ricks home after he was suspended from school.[36] And just after doing so, he received a call that Ricks had returned to the school and was "pulling his girlfriend out of the building."[37] Police reports and statements by the girl's father and mother that they did not believe Ricks had kidnapped her do not show that the high school security guard's testimony was false. In fact, Ricks's testimony—that he grabbed his former girlfriend

---

[29] *Id.* at 68–69.
[30] *Id.* at 72–73.
[31] ECF No. 35 at 100.
[32] ECF No. 50, 36 RR at 57–58.
[33] ECF No. 18-2 at 59–60.
[34] Because Ricks cannot meet his burden to show that the testimony was false, the State could not have knowingly presented false testimony.
[35] ECF No. 35 at 100–01.
[36] ECF No. 50, 36 RR at 12–13.
[37] *Id.*

against her will and placed her in his car—only supports the security guard's testimony.[38]

Thus, Ricks has failed to show that the security guard's testimony was false or that the prosecution knowingly presented false testimony. *See Spence v. Johnson,* 80 F.3d 989, 997 (5th Cir. 1996) (petitioner failed to show that the prosecution knowingly presented perjured testimony where witness's testimony was corroborated by other evidence).

### c.  Jail Incident

Finally, Ricks alleges that the prosecution offered false and misleading evidence from a jailer and former inmate that he was beaten in jail because he bragged about the murders.[39] The jailer testified that she advised Ricks not to reveal the nature of his offense to other inmates.[40] The inmate—who was in the general population cell where Ricks was placed and beaten—testified that Ricks told inmates that he committed the murders.[41] To show that the jailer and former inmate's testimony is false, Ricks provides a report that the attack may have been racially motivated.[42] This report may show that Ricks was beaten in jail because of his race rather than him bragging about the murders. But the report does not show that the jailer's testimony—that she advised Ricks not to reveal the nature of his offense to other inmates—or the inmate's testimony—that Ricks told the inmates that he committed the murders—was false or misleading. As such, Ricks cannot show that the jailer or inmate's testimony was false or that the prosecution knew it was false.

*        *        *

In sum, Ricks's false-and-misleading-testimony claim is meritless because Ricks has not shown the prosecution offered false or material testimony that Ricks (1) improperly obtained a

---

[38] *See* 40 RR at 55–56.
[39] ECF No. 35 at 103–05.
[40] ECF No. 50, 39 RR at 236–38.
[41] ECF No. 50, 39 RR at 255–57.
[42] ECF No. 18-2.

pencil in jail, (2) forced his high school girlfriend into his car against her will, or (3) was beaten in jail because he bragged about the murders. *Giglio*, 405 U.S. at 153–54. As a result, this claim is denied.

### 5. Shackling Claim

For his next claim, Ricks argues that his rights were violated when the jury saw him walk in shackles during the punishment phase.[43] Ricks also argues that his rights were violated by the trial court's failure to justify the shackling.[44] But these arguments fail.

The United States Supreme Court has held that the appearance of a defendant in shackles before a jury during a trial or the punishment phase may violate a defendant's Fifth and Fourteenth Amendment rights to due process because it "undermines the presumption of innocence and the related fairness of the factfinding process." *Deck v. Missouri*, 544 U.S. 622, 630 (2005). But brief and inadvertent exposure is not so inherently prejudicial as to require a mistrial. *See United States v. Hill*, 63 F.4th 335, 345–46 (5th Cir. 2023). A defendant must show that the shackles had "a substantial and injurious effect or influence in determining the jury's verdict." *Hatten v. Quarterman*, 570 F.3d 595, 604 (5th Cir. 2009).

The state trial court arranged for Ricks to be placed on the witness stand outside the jury's presence, with his leg shackles concealed from view while on the stand.[45] And while Ricks knew he was not supposed to be seen in front of the jury with shackles, he got up on his own volition after testifying and walked back to the defense table before anyone in the courtroom could object or intervene.[46] Thus, any exposure of Ricks's shackles to the jury was an invited error. That is, an

---

[43] ECF No. 35 at 45–52.
[44] *Id.*
[45] ECF No. 50-38, 40 R.R. at 26–27.
[46] ECF No. 52-4 at 74–75.

error attributable to his actions. *See United States v. Momoth*, 47 F.4th 394, 398 (5th Cir. 2022) (recognizing that, under the invited error rule, no reversal of a criminal conviction will result from an error that can be attributed to the actions of the defense). But even if this error were not attributable to Ricks's actions, he fails to show that the brief exposure of his shackles had "a substantial and injurious effect or influence in determining the jury's verdict." *Hatten*, 570 F.3d at 604.

As for Ricks's complaint that the trial court did not articulate any reasons for the shackling, the trial court had considered and granted Ricks's request at trial that the least amount of restraint be used and concealed from view.[47] Ricks did not, however, object to the use of shackles or request that the court make any specific findings on the record for the use of shackles. *See, e.g.*, *Ex parte Chavez*, 560 S.W.3d 191, 203 (Tex. Crim. App. 2018) (finding no trial court error in failing to enter explicit findings when trial court fashioned a remedy agreed to by defense). Nor does Ricks present any evidence that the trial court's failure to enter explicit findings prejudiced him or had "a substantial and injurious effect or influence in determining the jury's verdict." *Hatten*, 570 F.3d at 604; *see Brown*, 142 S. Ct. at 1517.

This claim is thus meritless.

### 6. **Race-Based *Batson* Claim**

For Ricks's next claim, he argues that the prosecution exercised race-based peremptory strikes in violation of *Batson v. Kentucky*, 476 U.S. 79, 89 (1986).[48] Ricks's Batson claims fail on the merits.

---

[47] ECF No. 50, 5 RR at 73–74.
[48] ECF No. 35 at 23–37.

### a.  Peremptory Challenges

Start with the prosecution's use of peremptory challenges. Ricks argues that his constitutional rights were violated because the prosecution exercised those challenges in a racially discriminatory manner by striking two black female members of the jury venire.[49]

"[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). *Batson* provides a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race. *Id.* at 96–98. First, the defendant must make out a *prima facie* case of discriminatory jury selection based on the totality of relevant facts. *Id.* Second, once the defendant makes the *prima facie* showing, the burden shifts to the State to come forward with a race-neutral explanation for challenging jurors within the targeted class. *Id.* Third, the trial court must determine whether the defendant established purposeful discrimination by the prosecution. *Id.* Ricks's *Batson* claim fails at each step.

First, Ricks fails to establish a *prima facie* case of discriminatory jury selection. The prosecution struck two black female members of the jury venire (Venire Member No. 13) and (Venire Member No. 28). But the prosecution also accepted two black venire members.[50] Thus, based on the numbers, the State did not strike a disproportionate number of persons on the relevant jury panel of a specific racial or ethnic minority. *See Williams v. Cain*, 359 F. App'x 462, 466 (5th Cir. 2009) (holding that a prisoner did not make a *prima facie* showing of racial discrimination in the prosecutor's use of peremptory challenges on black jurors because the state accepted and

---

[49] ECF No. 35 at 23–37.
[50] ECF No. 50, 30 RR at 30–35.

rejected black jurors).

Second, the prosecution offers several race-neutral reasons for striking the two venire members. For example, during *voir dire* examination Venire Member No. 13 revealed prior criminal jury service on a jury that voted to acquit a defendant. A venire member's prior jury service on a jury that voted to acquit a criminal defendant is a valid race-neutral basis for a prosecutorial exercise of a peremptory challenge against that venire member. *Broadnax v. Davis*, No. 3:15-CV-1758-N, 2019 WL 3302840, at *41–43 (N.D. Tex. July 23, 2019) (recognizing that prior jury service in a criminal trial that concluded with an acquittal is a legitimate race-neutral reason for a prosecutorial peremptory strike). The prosecutors struck Venire Member No. 28 because of concerns related to the venire member's views and beliefs regarding the death penalty. Such concerns are a valid race-neutral reason for exercising a peremptory strike. *See Davis v. Ayala*, 576 U.S. 257, 280 (2015) ("The prosecution's reluctance to take a chance that [a venire member] would ultimately be willing to consider the death penalty in accordance with state law did not compel the trial judge to find that the strike of [the venire member] was based on race.").

Third, considering the substantial evidence supporting the prosecutor's race-neutral justifications, Ricks has failed to meet his burden that the prosecution purposefully discriminated. The only evidence Ricks offers is the annotations on the prosecution's jury list of the venire members' races. But annotations of venire members' race, ethnicity, or gender on a prosecution's jury list do not give rise to an inference of purposeful prosecutorial discrimination. *See Broadnax*, 2019 WL 3302840, at *43 n.73 ("No sinister motive can be inferred rationally simply because the prosecution noted the race and gender of every remaining member of the jury venire or highlighted those for whom that office would need to be prepared to offer sound, race-neutral, reasons in the event the prosecution chose to exercise a peremptory strike against such an individual and the

16

defense raised a *Batson* objection.").[51] Rather, annotations on jury lists regarding race or ethnicity help prosecutors keep track of each venire member. *Id.* at *43.

### b. Disparate Questioning

Ricks's argument that the prosecutors engaged in disparate questioning of minority and non-minority venire members also fails. In support, he emphasizes that prosecutors questioned Venire Member No. 13—a black female—longer than any other venire member and then used a peremptory strike against her. "[D]isparate questioning or investigation alone does not constitute a *Batson* violation." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2248 (2019). "The disparate questioning or investigation of black and white prospective jurors may reflect ordinary race-neutral considerations." *Id.* Such considerations are present in this case. The juror questionnaire and *voir dire* examination of Venire Member No. 13 reveal that the prosecution needed to spend more time with her because her answers on the questionnaire regarding her feelings on the death penalty were highly ambiguous.[52] The prosecutors also questioned Venire Member No. 13 extensively about her brother's plea-bargained conviction for murder and her belief that her brother had been treated unfairly because no one else involved in that offense received prison time while her brother received a twenty-five-year sentence.[53]

Other than spending time on these subjects, the prosecution's *voir dire* examination tracked its routine pattern, covering the same topics with all other venire members regardless of their race or gender and asking questions about any ambiguities or pertinent issues in their questionnaire answers. While the *voir dire* questioning of venire members may not have been identical word-

---

[51] In fact, in *Broadnax,* the Court suggested that it would be professionally irresponsible for prosecutors to fail to document the ethnicity of venire members during jury selection in a capital murder trial. *Id.*
[52] ECF No. 53-2 at 383–402; ECF No. 50-13.
[53] ECF No. 50-13, 15 RR at 82–89.

for-word across the entire venire, there is no evidence of any systemic or consistent racially disparate questioning by the prosecutors. *See Miller-El*, 545 U.S. at 240–66; *Miller-El v. Cockrell*, 537 U.S. 322, 331–35 (2003) (describing the compelling evidence of systematic discriminatory practice and tactics used to strike black members of the venire).

Overall, because none of the three Batson requirements are met, Ricks's argument that his constitutional rights were violated by the prosecution's use of peremptory challenges fails.

\* \* \*

In sum, the prosecution's use of peremptory challenges on two black venire members and documentation of the race or ethnicity of the venire members do not show that prosecutors exercised peremptory challenges in a racially discriminatory manner. Nor did the prosecutors engage in racially disparate questioning of venire members by taking more time to question Venire Member No. 13. Thus, Ricks's race-based *Batson* claim does not warrant federal habeas relief and is denied.

### 7. Ineffective Assistance of Counsel

Ricks also brings several ineffective-assistance-of-counsel claims. To prevail on such a claim, a petitioner has the burden of showing (1) that his counsel's performance "fell below an objective standard of reasonableness" and (2) resulting prejudice. *Strickland v. Washington*, 466 U.S. 688, 694 (1984). To prove counsel's performance was objectively unreasonable, the petitioner must show that "no competent attorney" would have taken the action that counsel did. *Premo v. Moore*, 562 U.S. 115, 124 (2011). To show prejudice, the petitioner must show that the deficient performance prejudiced the defense. *Id.* This requires the petitioner to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Ricks argues that his trial counsel and appellate counsel's representation fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense.[54]

### a.   Trial Counsel

Ricks brings three ineffective assistance claims against his trial counsel: (1) failure to make *Batson* challenges to peremptory strikes against nine female venire members, (2) failure to object to Ricks's shackling, and (3) failure to adequately investigate Ricks's background and present all available mitigating evidence during the punishment phase of trial.[55] The Court addresses each claim in turn.[56]

### i.   *Batson* Challenge

Ricks first argues his trial counsel should have raised *Batson* objections to the prosecution using nine out of its thirteen peremptory strikes on female venire members.[57] As mentioned above, the Supreme Court in *Batson* provided a process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race. *Batson*, 476 U.S. at 96–98. That ruling has been extended to prohibit gender discrimination in exercising peremptory challenges. *J.E.B. v. Alabama*, 511 U.S. 127 (1994). Thus, the petitioner must first "present a prima facie case that the state discriminated on the basis of gender during the jury selection." *Hebert v. Rogers*, 890 F.3d 213, 221 (5th Cir. 2018). Ricks has not done so.

While the prosecution used nine out of its thirteen peremptory strikes on female venire members, eighteen women were among the thirty-six venire members in the strike zone.[58] And the

---

[54] ECF No. 35 at 41–45, 52–111.

[55] *Id.*

[56] Many of Ricks's ineffective assistance claims reference or hinge on his trial counsels' alleged failure to comply with the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. But those guidelines do not set forth the operative standard of judicial review for the performance of trial counsel. *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009).

[57] ECF No. 53-1 at 4–64.

[58] ECF No. 50-28, 30 RR at 14–25.

prosecution accepted the nine other women. That the prosecution struck roughly half of the female venire members in the strike zone does not establish a *prima facie Batson* violation. *See Williams*, 359 F. App'x at 466 (holding that a prisoner did not make a *prima facie* showing of discrimination in the prosecutor's use of peremptory challenges because the state had accepted jurors of the allegedly discriminated group).

But even if Ricks presented a *prima facie* case of gender discrimination, the State has provided a gender-neutral explanation for challenging the female jurors. The juror questionnaires and *voir dire* examination of the female venire members show that the prosecution consistently used peremptory strikes against female venire members who expressed general disapproval of the death penalty or a reluctance to impose it. Some opposed the death penalty or believed its use should be limited to certain crimes.[59] Others believed that imposing a death sentence was intimidating or worrisome.[60] Either way, antipathy toward or reluctance to impose the death penalty is a gender-neutral reason for exercising a peremptory challenge in a capital murder trial. *See Davis*, 576 U.S. at 280.

For those reasons, any gender-based *Batson* challenge is meritless. As a result, Ricks cannot show ineffective assistance of trial counsel for not raising a *Batson* objection based on gender. *See Hebert*, 890 F.3d at 220 (holding that if a petitioner fails to show a gender-based *Batson* violation, "then he also fails to show that [his] attorney's performance was deficient or that he was prejudiced thereby."). This ineffective assistance claim is thus denied.

---

[59] ECF No. 53-2 at 75 (Venire Member No. 5); *Id.* at 121 (Venire Member No. 6); *Id.* at 361 (Venire Member No. 12); *Id.* at 388 (Venire Member No. 13); *Id.* at 474 (Venire Member No. 15); *Id.* at 246 (Venire Member No. 23); *Id.* at 510 (Venire Member No. 30).
[60] *Id.* at 555 (Venire Member No. 17); *Id.* at 459 (Venire Member No. 28).

### ii.  Shackling

Ricks next argues that his trial counsel rendered ineffective assistance by failing to (1) object to the exposure of his shackles during the punishment phase or (2) require the state trial court to identify the reasons for Ricks's shackling during trial.[61] To show ineffective assistance of counsel, a petitioner must show that his trial counsel's representation was objectively unreasonable and prejudiced him. *Strickland*, 466 U.S. at 694. The state habeas court determined that the decision of Ricks's counsel not to object was reasonable and that Ricks failed to meet his burden under *Strickland*.[62] The Texas Court of Criminal Appeals agreed with that decision. *Ex parte Ricks*, 2020 WL 6777958, at *2. The state habeas court's denial of this claim was not unreasonable, and Ricks fails to rebut the presumption of correctness afforded to the state court's findings. § 2254(d), (e)(1).

To begin, the jury's view of the shackles was obscured by the curtain placed around the counsel table.[63] And as mentioned for Ricks's claim that his rights were violated when the jury saw him walk in shackles, any exposure was brief and of Ricks's own making. *See United States v. Green*, 272 F.3d 748, 754 (5th Cir. 2001) (The doctrine of invited error provides that "a defendant cannot complain on appeal of alleged errors which he invited or induced, especially where the defendant may not have been prejudiced by the error."). It is also unclear what objection Ricks's trial counsel could have made once Ricks chose to display his shackles in front of the jury. But even if an objection could be made, trial counsel made a reasonable decision not to object to avoid drawing the jury's attention to Ricks's shackles. *See Walker v. United States*, 433 F.2d 306, 307 (5th Cir. 1970) ("Since an objection may tend to emphasize a particular remark to an otherwise

---

[61] ECF No. 35 at 38–42.
[62] ECF No. 52-4 at 403–41.
[63] ECF No. 50-38.

oblivious jury, the effect of objection may be more prejudicial than the original remarks of opposing counsel.").

Ricks's complaint that trial counsel failed to have the state trial court identify the reasons for his shackling lacks merit. Ricks's counsel could have reasonably determined that once the trial court granted his request to obscure from the jury's view of the shackles, any objections to Ricks's shackling would have been pointless. *See Bell v. State*, 415 S.W.3d 278 (Tex. Crim. App. 2013) (explaining that the error in ordering the defendant to be shackled during the guilt phase of his trial was harmless because there was no reasonable probability that the jury was aware of the defendant's shackles.). A trial judge is also permitted, "in the exercise of his or her discretion, to take account of special circumstances, including security concerns, that may call for shackling." *Deck*, 544 U.S. at 633. The record here—Ricks fled the State to escape punishment, tried to sneak a pencil into court, was on suicide watch, and had a history of violence—supports the state trial judge's decision to place Ricks in shackles. Thus, any objection to Ricks's shackles was meritless.

For those reasons, Ricks's trial counsel did not render ineffective assistance of counsel by not objecting to the exposure of Ricks's shackles or requiring the state trial court to identify the reasons for shackling. This ineffective assistance claim is thus also denied.

### iii.  Mitigating Evidence

Ricks next argues that his trial counsel rendered ineffective assistance by failing to discover and present certain evidence of his childhood and mental health.[64] But Ricks fails to show that his counsel's illegal conduct in doing so fell below an objective level of reasonableness or prejudiced him under *Strickland*.

---

[64] ECF No. 35 at 57–111.

### 1. Ricks fails to show that his counsel's failure to present mitigating evidence of his childhood and mental health was unreasonable.

Counsel must "make a reasonable investigation of defendant's case or [] make a reasonable decision that a particular investigation is unnecessary." *Ransom v. Johnson*, 126 F.3d 716, 723 (5th Cir. 1997); *see Rompilla v. Beard*, 545 U.S. 374, 380–81 (2005). To meet this burden, a defendant must prove that the acts or omissions of counsel resulted from unreasonable professional judgment. *Strickland*, 466 U.S. at 690. He must also state with specificity what additional evidence would have resulted from further investigation and how such evidence would have altered the case's outcome. *Moawad v. Anderson*, 143 F.3d 942, 948 (5th Cir. 1998); *Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994). To do so, Ricks points to his counsel's failure to discover and present certain mitigating evidence of his childhood and mental health.[65]

First, the alleged failure to discover and present various mitigating evidence of his childhood. The state habeas court reasonably determined that Ricks's state trial counsel could not be faulted for failing to discover and present any new mitigating evidence showing Ricks was physically abused as a child because Ricks and his family disclosed no such evidence to counsel.[66] The reasonableness of counsel's strategic decisions, including what avenues to pursue in the search for mitigating evidence, is substantially influenced by the defendant's statements or silence. *Strickland*, 466 U.S. at 691; *Carter v. Johnson*, 131 F.3d 452, 465 (5th Cir. 1997) ("The duty of trial counsel to investigate is tempered by the information provided to counsel by the defendant."). Ricks's trial counsel was not required to identify avenues of investigation for mitigating evidence given Ricks's silence on aspects of his childhood and background that he chose not to discuss with them. *See Burger v. Kemp*, 483 U.S. 776, 795 (1987). Similarly, despite all the time spent with

---

[65] ECF No. 35 at 57–111.
[66] ECF No. 52-4 at 403–41.

family members and counsel's repeated requests for information about Ricks's life, they failed to provide the information that Ricks now presents. Thus, trial counsel cannot be faulted for making reasonable decisions on the information provided to them.

Next, the Court addresses the alleged failure to present evidence of Ricks's mental health. Defense expert Dr. Lewine testified during a hearing that he was prepared to offer his opinions on the origins of Ricks's tendency to engage in violent behavior, including his opinion that Ricks's propensity for violent outbursts had genetic origins.[67] But the state trial court excluded the genetics portion of Dr. Lewine's expert testimony due to a lack of scientific evidence in support.[68] When called to testify at the punishment phase, Dr. Lewine testified that Ricks's impulsivity and predisposition for violence could not be definitively linked to birth or early environmental factors but that it was clear Ricks did not have a normal brain.[69]

Ricks argues that rather than calling neuroscientist Dr. Lewine, his trial counsel should have called a more traditional mental health expert who could have testified that Ricks's predisposition for violent and aggressive behavior haled from an abusive childhood.[70] But evidence of mental illness can be a "double-edged sword" in that it could aggravate and mitigate. *See Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012) (mitigating evidence is "double-edged" when it might permit an inference that the defendant is not as morally culpable for his behavior but also might suggest that the defendant is likely to be dangerous in the future as a product of his environment). Thus, Ricks's trial counsel could reasonably have determined that calling an expert in neuroscience like Dr. Lewine was a preferable strategic choice to having Ricks evaluated by a

---

[67] ECF No. 50-36.
[68] *Id.* at 76.
[69] *Id.* at 176–81.
[70] ECF No. 35 at 76–93.

traditional mental health expert. Also, when a criminal defendant seeks to introduce mental health evidence through a psychological expert who has evaluated the defendant, the prosecution can have its own expert examine and evaluate the defendant. *See Kansas v. Cheever*, 571 U.S. 87, 94 (2013). So, calling a mental health expert would have also opened the door to an independent mental health evaluation from a prosecution expert—such as Dr. Price—who would testify at trial about Ricks's propensity for violence.

Because Ricks's counsel made a reasonable tactical decision to pursue their chosen mitigation strategy, his counsel was not ineffective by calling a neuroscientist rather than a traditional mental health expert.

### 2. Ricks fails to show that his counsel's failure to present certain mitigating evidence of his childhood and mental health prejudiced him.

In making the prejudice determination under *Strickland* in the context of a capital sentencing proceeding, the petitioner must show a "reasonable probability" that the result of the punishment phase of a trial would have been different if the new mitigating evidence had been presented. *Hinton v. Alabama*, 571 U.S. 263, 275 (2014). But "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (quoting *Strickland*, 466 U.S. at 693). To make this determination, courts examine all mitigating evidence introduced at trial and all new mitigating evidence presented in the habeas proceeding, re-weighing this mitigating evidence against the evidence in aggravation. *Sears v. Upton*, 561 U.S. 945, 956 (2010); *Williams v. Taylor*, 529 U.S. 362, 397 (2000)–98.

The state habeas court determined that Ricks had failed to show prejudice.[71] These findings are presumed correct, and Ricks fails to rebut that presumption "by clear and convincing

---

[71] ECF No. 52-4 at 403–41.

evidence." § 2254(e)(1). In any event, given that the State's case on punishment was substantial and the horrific facts of the crime, there is not a reasonable likelihood that any new evidence of Ricks's childhood or mental health would have persuaded the jury to return a life sentence. *United States v. Bernard*, 762 F.3d 467, 476 (5th Cir. 2014) ("[G]iven the horrific nature of the crime, reasonable jurists could not debate that the additional, cumulative evidence would in reasonable probability have influenced the jury's balancing of aggravating and mitigating factors."). Thus, Ricks's counsel's failure to discover and present certain mitigating evidence of Ricks's childhood or mental health did not prejudice Ricks under *Strickland*.

For those reasons, Ricks fails to show that his counsel's failure to present certain mitigating evidence of his childhood and mental health was unreasonable or prejudiced him.

\*     \*     \*

In sum, Ricks's trial counsel did not render ineffective assistance of counsel by not (1) making a *Batson* challenge to peremptory strikes used against female venire members, (2) objecting to Ricks's shackling, or (3) presenting certain mitigating evidence of Ricks's childhood and mental health.

### b.  Appellate Counsel

Ricks also brings an ineffective assistance claim against his state appellate counsel for failing to challenge the trial court's rejection of Ricks's trial counsel's *Batson* objection.[72] The same two-pronged standard for evaluating ineffective assistance claims against trial counsel applies to complaints about counsel's performance on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000). Appellate counsel does not render ineffective assistance by failing to assert a meritless claim on appeal. *Davila v. Davis*, 582 U.S. 521 (2017); *Broadnax v. Lumpkin*, 987 F.3d 400, 415

---

[72] ECF No. 35 at 37–41.

(5th Cir. 2021). As discussed above, Ricks's race-based and gender-based *Batson* claims lack merit. Thus, Ricks's appellate counsel's failure to present a *Batson* claim on direct appeal did not prejudice Ricks under *Strickland*. Nor does it show that Ricks's appellate counsel's conduct fell below an objective level of reasonableness.

For those reasons, Ricks's trial counsel and his appellate counsel did not render ineffective assistance of counsel.

\*   \*   \*

In the end, all ten of Ricks's claims fail on the merits.

## B.   Motion for Stay and Abeyance

For Ricks's Motion for Stay and Abeyance, he seeks to hold this case in abeyance to allow him to return to state court and litigate his unexhausted *Batson* claims.[73] A stay and abeyance to permit exhaustion of state-court remedies on unexhausted claims for relief is appropriate in the context of a pending federal habeas corpus proceeding only when a district court determines that (1) there is good cause for a petitioner's failure to exhaust his claims in state court; (2) the unexhausted claims are not meritless; and (3) the petitioner has not engaged in abusive litigation tactics or intentional delay. *Rhines v. Weber*, 544 U.S. 269, 277–78 (2005).

As discussed above, when viewed under a de novo standard of review, all of Ricks's unexhausted claims lack merit.  Furthermore, as explained below, all of his claims, including his unexhausted claims, lack sufficient arguable merit to justify the issuance of a Certificate of Appealability.  Thus, Ricks's unexhausted claims do not meet the standard for a stay set forth in *Rhines*.  Ricks's Motion for Stay and Abeyance is denied.

## C.   Motion for Discovery

---

[73] ECF No. 38.

For Ricks's Motion for Discovery, he seeks evidence on whether prosecutors allowed race-based or gender-based animus to impact their use of peremptory challenges during jury selection.[74] Discovery is permitted "for good cause." *Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997). But to show good cause, a "petitioner must demonstrate that 'a factual dispute, if resolved in the petitioner's favor, would entitle him to relief and the state has not afforded the petitioner a full and fair evidentiary hearing.'" *Lave v. Dretke*, 416 F.3d 372, 381 (5th Cir. 2005) (quoting *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994)). Ricks provides no good cause for discovery. There are sufficient facts before the Court to make an informed decision on the merits of Rick's *Batson*-related claims. *See McDonald v. Johnson*, 139 F.3d 1056, 1060 (5th Cir. 1998). And this Court will not allow fishing expeditions for possible evidence. *See Murphy v. Davis*, 901 F.3d 578, 590 (5th Cir. 2018). Ricks's Motion for Discovery—seeking evidence on whether prosecutors allowed race-based or gender-based animus to impact their use of peremptory challenges—would be just that. For those reasons, this Motion is denied.

## D.    Certificate of Appealability

Under AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under § 2254, the petitioner must obtain a Certificate of Appealability ("CoA"). *Miller-El*, 537 U.S. at 335–36; § 2253(c)(2). A CoA will be granted only if a petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004). To make such a showing, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Ricks has failed to show that reasonable minds could not disagree with

---

[74] ECF No. 67.

this Court's conclusion that Ricks's claims are meritless. Ricks is thus denied a CoA on all his claims.

## CONCLUSION

For those reasons, it is hereby **ORDERED** that all relief requested in Ricks's Amended Petition (ECF No. 35), Motion for Stay and Abeyance (ECF No. 38), Motion for Discovery (ECF No. 67), and Certificate of Appealability on all his claims are **DENIED**.

SIGNED September 26, 2023.

Reed O'Connor

**UNITED STATES DISTRICT JUDGE**